UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEXIA SA/NV, DEXIA HOLDINGS, INC.,
FSA ASSET MANAGEMENT LLC and
DEXIA CRÉDIT LOCAL SA,

               *Plaintiffs*,

       v.

BEAR STEARNS & CO. INC., THE BEAR
STEARNS COMPANIES, INC., BEAR
STEARNS ASSET BACKED SECURITIES I
LLC, EMC MORTGAGE LLC (f/k/a EMC
MORTGAGE CORPORATION),
STRUCTURED ASSET MORTGAGE
INVESTMENTS II INC., J.P. MORGAN
ACCEPTANCE CORPORATION I, J.P.
MORGAN MORTGAGE ACQUISITION
CORPORATION, J.P. MORGAN SECURITIES
LLC (f/k/a JPMORGAN SECURITIES INC.),
WAMU ASSET ACCEPTANCE CORP.,
WAMU CAPITAL CORP., WAMU
MORTGAGE SECURITIES CORP.,
JPMORGAN CHASE & CO. and JPMORGAN
CHASE BANK, N.A.,

               *Defendants*.

ECF Case

No. 12-cv-4761 (JSR)

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

July 27, 2012

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

EXPLANATION OF CITATION FORMS.......................................................... viii

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ................................................................................5

The Parties ......................................................................................................5

The Offerings ................................................................................................6

Plaintiffs' Allegations ...................................................................................8

Public Warnings Related to Issues in the Mortgage Industry............................9

ARGUMENT ...................................................................................................11

I.      PLAINTIFFS FAIL TO STATE A CLAIM FOR FRAUD..................11

      A.      Plaintiffs Fail to Plead Fraud With Requisite Particularity. .....................11

      B.      Plaintiffs Fail to Plead Any Actionable Misrepresentation. .....................13

            1.      Loan Origination and Underwriting Standards.............................13

            2.      Loan Selection and Due Diligence. ................................................15

            3.      Risk of Default.................................................................................16

            4.      Appraisals and Credit Ratings. ......................................................17

      C.      Plaintiffs Fail to Plead Justifiable Reliance. ............................................20

      D.      Plaintiffs Fail to Plead Scienter.................................................................22

      E.      Plaintiffs Fail to Plead Proximate Causation ............................................25

      F.      Plaintiffs Fail to Allege Damages ..............................................................26

II.     PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING AND
       ABETTING FRAUD .........................................................................27

III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENT
       MISREPRESENTATION...................................................................28

i

IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR SUCCESSOR
       LIABILITY ....................................................................................................30

V.     PLAINTIFFS DO NOT HAVE STANDING TO BRING THIS SUIT ................30

VI.    CONCLUSION .................................................................................................32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Acito v. IMCERA Grp., Inc., 47 F.3d 47 (2d Cir. 1995)...............................................22

AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC, 646 F. Supp. 2d 385
(S.D.N.Y. 2009)..........................................................................................................27

Ashcroft v. Iqbal, 556 U.S. 662 (2009).............................................................12, 26

ATSI Commcns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) ........................5

Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146 (2d Cir.
1995) ...........................................................................................................................31

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)..................................................22

Berman v. Morgan Keegan & Co., No. 10 Civ. 5866, 2011 WL 1002683 (S.D.N.Y. Mar.
14, 2011) .....................................................................................................................28

Brass v. American Film Tech., Inc., 987 F.2d 142 (2d Cir. 1993) ................................5

Cal. Pub. Emps. Ret. Sys. v. Shearman & Sterling, 95 N.Y.2d 427 (2000) ...............32

Chambers v. Time Warner, Inc., 282 F.3d 147 (2d Cir. 2002).....................................5

Citibank N.A. v. K-H Corp., 968 F.2d 1489 (2d Cir. 1992).........................................25

Defer LP v. Raymond James Fin., Inc., 654 F. Supp. 2d 204 (S.D.N.Y. 2009)...........25

Dexia SA/NV v. Deutsche Bank AG, Nos. 11-cv-5672(JSR), 11-cv-6141(JSR) (S.D.N.Y.
Feb. 6, 2012) ................................................................................................................5

DynCorp v. GTE Corp., 215 F. Supp. 2d 308 (S.D.N.Y. 2002)...................................29

EED Holdings v. Palmer Johnson Acquisition Corp., 387 F. Supp. 2d 265 (S.D.N.Y.
2004) ...........................................................................................................................29

Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189 (2d Cir. 2003) ..........20

Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168 (2d
Cir. 2004) ...................................................................................................................11

Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553 (2009)....................13

Fait v. Regions Fin. Corp., 655 F.3d 105 (2d Cir. 2011)............................................18

iii

Footbridge Ltd. v. Countrywide Home Loans, Inc., No. 09 Civ. 4050, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ................................................................................ passim

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC., 376 F. Supp. 2d 385 (S.D.N.Y. 2005) .......................................................................................................................28

Global Minerals & Metals Corp. v. Holme, 35 A.D.3d 93 (1st Dep't 2006) ...............................20

Gusmao v. GMT Group, Inc., No. 06 Civ. 5113, 2008 WL 2980039 (S.D.N.Y. Aug. 1, 2008) .........................................................................................................................30

In re AHT Corp., 292 B.R. 734 (S.D.N.Y. 2003) aff'd, 123 F. App'x 17 (2d Cir. 2005).............28

In re Am. Home Mortg. Holdings, Inc., No. 07-11047 (Bankr. D. Del. filed Aug. 6, 2007) ........10

In re Barclays Bank PLC Sec. Litig., No. 09 Civ. 1989, 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) ......................................................................................................................26

In re IndyMac Mortg.-Backed Sec. Litig., 718 F. Supp. 2d 495 (S.D.N.Y. 2010)................18, 19

In re Leslie Fay Cos., Inc. Sec. Litig., 918 F. Supp. 749 (S.D.N.Y. 1996) ..................................11

In re Merrill Lynch & Co., Inc., 273 F. Supp. 2d 351 (S.D.N.Y. 2003)..........................................5

In re Morgan Stanley Mortg. Pass-Through Certificates Litig., No. 09 Civ. 2137, 2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010)..............................................................21

In re New Century TRS Holdings, Inc., No. 07-10416 (Bankr. D. Del. filed Apr. 2, 2007).........10

In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621 (S.D.N.Y. 2008)................................................5

In re Sterling Foster & Co., Inc., Sec. Litig., 222 F. Supp. 2d 216 (E.D.N.Y. 2002)...................29

In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326 (S.D.N.Y. 2011)....................................12

J.A.O. Acquisition Corp. v. Stavitsky, 8 N.Y.3d 144 (2007) .......................................................28

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001)............................................................................22

Landesbank Baden-Württemberg v. Goldman Sachs & Co., 821 F. Supp. 2d 616 (S.D.N.Y. 2011) aff'd, No. 11-4443, 2012 WL 1352590 (2d Cir. Apr. 19, 2012).......... passim

LaSalle Nat'l Bank v. Ernst & Young LLP, 285 A.D.2d 101 (1st Dep't 2001)...........................26

Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531 (2d Cir. 1997) .........................20

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005).......................................................25

Lerner v. Fleet Bank, N.A., 459 F.3d 273 (2d Cir. 2006)................................................11, 22, 28

Lone Star Fund V (US), L.P. v. Barclays Bank PLC, 594 F.3d 383 (5th Cir. 2010) ...................15

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ....................................................30

Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co., 652 F. Supp. 2d 576 (E.D. Pa.
     2009) ...............................................................................................................27

MBIA Ins. Co. v. GMAC Mortg. LLC, 30 Misc. 3d 856 (Sup. Ct. N.Y. Cty. 2010).............29, 30

Miller v. Wells Fargo Bank Int'l Corp., 540 F.2d 548 (2d Cir. 1976)..........................................30

N. Fork Bank v. Cohen & Krassner, 44 A.D.3d 375 (2007) ............................................30

N.J. Carpenters Health Fund v. NovaStar Mortg., Inc., No. 08-cv-5310(DAB), 2011 WL
     1338195 (S.D.N.Y. Mar. 31, 2011) ...............................................................26

N.J. Carpenters Health Fund v. NovaStar Mortg., Inc., No. 1:08-cv-05310, ECF No. 135,
     slip op. (S.D.N.Y. Mar. 29, 2012)...............................................................12

N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC, 720 F. Supp. 2d 254
     (S.D.N.Y. 2010)...............................................................................................19

NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co., 743 F. Supp. 2d 288
     (S.D.N.Y. 2010)...............................................................................................27

NECA-IBEW Pension Trust Fund v. Bank of Am. Corp., No. 10-cv-0440, ECF No. 65,
     slip op. (S.D.N.Y. Mar. 16, 2012).............................................................18

Olkey v. Hyperion 1999 Term Trust, 98 F.3d 2 (2d Cir. 1996)........................................13

Peerless Mills, Inc. v. Am. Tel. & Tel. Co., 527 F.2d 445 (2d Cir. 1975) .....................................22

Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
     Commerce, 694 F. Supp. 2d 287 (S.D.N.Y. 2010) ...............................................23

Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc., 707 F. Supp. 2d 702 (W.D. Ky.
     2010), aff'd, 2012 WL 2330565 (6th Cir. June 20, 2012)......................................19

Republic Bank & Trust Co. v. Bear Stearns & Co., Inc., No. 10-5510, 2012 WL 2330565
     (6th Cir. June 20, 2012) ...............................................................................13, 14

Ret. Sys. of Miss. v. Merrill Lynch & Co., 714 F. Supp. 2d 475 (S.D.N.Y. 2010).......................28

Rodas v. Manitares, 159 A.D.2d 341 (1st Dep't 1990) ....................................................20

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)..............................................................11

Secs. Investor Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63 (2d Cir. 2000).........................22

Spencer Task Software & Info. Servs. LLC v. RPost Int'l Ltd., 383 F. Supp. 2d 428
(S.D.N.Y. 2003)................................................................................................26

Tsereteli v. Res. Asset Securitization Trust 2006-A8, 692 F. Supp. 2d 387 (S.D.N.Y.
2010) ..................................................................................................18, 19

Turtur v. Rothschild Registry Intern., Inc., 26 F.3d 304 (2d Cir. 1994)........................22

United States v. Partow, No. 3:06-CR-00104 (D. Alaska Dec. 15, 2006)....................10

Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P., 40 F. Supp. 2d 183 (S.D.N.Y.
1999) ..................................................................................................29

VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP, 348 F. Supp. 2d 255 (S.D.N.Y.
2004) ..................................................................................................28

Warth v. Seldin, 422 U.S. 490 (1975)..........................................................30

**Statutes & Rules**

Fed. R. Civ. P. 8 ...............................................................................12

Fed. R. Civ. P. 9(b) .................................................................... passim

Fed. R. Civ. P. 12(b)(6).........................................................................1

**Other Authorities**

Banks' Quarterly Results Show Signs of Credit Deterioration, DOW JONES
MARKETWATCH, Jan. 17, 2007.....................................................................10

Ellen Simon, Mortgage Pros Scramble to Modify Loans, AP GENERAL FINANCIAL /
BUSINESS NEWS, Apr. 4, 2007 ...................................................................10

Joseph N. DiStefano, Capital One Closes GreenPoint Mortgage, Idling 1,900,
BLOOMBERG, Aug. 20, 2007 ....................................................................10

Lingling Wei & James R. Hagerty, Weak Forecasts Mount in Housing Industry; IndyMac
Bancorp, Centex Are Hurt by Loan Losses, Writedowns in Land Value, WALL ST. J.,
Jan. 16, 2007 ..................................................................................10

Lingling Wei, Stated Income Home Mortgages Raise Red Flags, WALL ST. J., Aug. 22,
2006..............................................................................................9

Mark Whitehouse, As Home Owners Face Strains, Market Bets on Loan Defaults, WALL
ST. J., Oct. 20, 2006 .............................................................................9

Simon & Hagerty, <u>More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged as Housing Market Soared, Now, Delinquencies Mount</u>, Wall St. J., Dec. 5, 2006.................................................................................................................9

## EXPLANATION OF CITATION FORMS

The following citation forms are used in this memorandum:

- Exhibit [] to Declaration of Daniel Slifkin In Support of Motion to Dismiss ("Ex. []")

- Amended Complaint ("Compl.")

- Appendix to Defendants' Memorandum of Law in Support of Motion to Dismiss ("App'x")

- Residential mortgage-backed securities ("RMBS")

- FSA Asset Management LLC ("FSAM")

- Dexia Crédit Local SA ("DCL")

- Dexia Holdings, Inc. ("DHI")

- Bear Stearns & Co. Inc. (now known as J.P. Morgan Securities LLC) ("BSC"), the Bear Stearns Companies, Inc. (now known as The Bear Stearns Companies LLC), Bear Stearns Asset Backed Securities I LLC ("BSABS"), EMC Mortgage LLC (f/k/a EMC Mortgage Corporation) ("EMC") and Structured Asset Mortgage Investments II Inc. ("SAMI II") (together, the "Bear entities")

- J.P. Morgan Acceptance Corporation I ("JPM Acceptance"), J.P. Morgan Mortgage Acquisition Corporation ("JPM Acquisition"), J.P. Morgan Securities LLC (f/k/a JPMorgan Securities Inc.) ("JPMSI"), JPMorgan Chase & Co. ("JPMC"), and JPMorgan Chase Bank, N.A. ("JPMCBNA") (together, the "JPMorgan entities")

- WaMu Asset Acceptance Corp. ("WMAAC"), WaMu Capital Corp. ("WMCC") and WaMu Mortgage Securities Corp. ("WMMSC") (together, the "WaMu entities")

- JPM Acquisition, EMC and WMMSC (the "Sponsor Defendants")

- JPM Acceptance, BSABS, SAMI II and WMAAC (the "Depositor Defendants")

- JPMSI, BSC and WMCC (the "Underwriter Defendants")

## PRELIMINARY STATEMENT

At the height of the housing bubble, and with the benefit of extensive disclosures detailing the associated risks, Plaintiffs—highly sophisticated institutional investors—made an informed decision to invest over a billion dollars into the United States housing market.  This action is an attempt to shift onto others the consequences of that decision.

In 2006 and 2007, Plaintiff FSAM purchased over $1.6 billion in certificates (the "Certificates") issued in 51 RMBS offerings (the "Offerings").  Now, in an effort to rescind those investments in the wake of an historical collapse in the housing market, FSAM, together with its parent and affiliated companies Dexia SA/NV, DCL and DHI (collectively, "Plaintiffs" or "Dexia") bring claims of common law fraud, fraudulent inducement, aiding and abetting fraud and negligent misrepresentation against three separate sets of entities allegedly involved in structuring the Offerings and selling the Certificates—the Bear entities, the JPMorgan entities and the WaMu entities (collectively, "Defendants").  Defendants respectfully submit that Plaintiffs' claims should be dismissed pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.  Plaintiffs have failed to state a claim for which relief may be granted and certainly have failed to satisfy the heightened pleading standard required for claims sounding in fraud.

First, Plaintiffs' fraud claims fail because Plaintiffs have failed to plead any of the elements of fraud with the requisite particularity.  Although Plaintiffs claim to have been defrauded with respect to 51 separate Offerings as a result of misrepresentations made by Defendants about the loans backing those Offerings, Plaintiffs fail to offer a single allegation that relates specifically to those particular Offerings or the underlying loans.  Rather, Plaintiffs make generalizations about the failures of the mortgage industry and assertions about purportedly unsound origination and securitization practices at various Bear, WaMu, JPMorgan and other

non-party entities.  Critically, Plaintiffs fail to tie those alleged origination and securitization practices to any of the particular Offerings in which Plaintiffs invested.  As such, the allegations in the Amended Complaint fall well short of the particularized pleading required to state a claim for fraud under the heightened standard of Rule 9(b).  Plaintiffs are not relieved of their obligations to plead fraud with particularity merely because they have chosen to bring suit on a large number of Offerings.  (Part I.A.)

Not only are Plaintiffs' allegations of fraud inadequately pled, but so too are Plaintiffs' allegations regarding Defendants' knowledge of the alleged fraud.  In fact, with respect to the 16 Offerings for which Defendants served only as underwriter (see Compl. ¶ 141), Defendants are charged with knowledge of fraud merely on the basis of their "very close relationships" with the non-party sponsors of the Offerings (id. ¶ 142), and their alleged "access to critical, non-public information" about "due diligence areas" (id. ¶ 141).  Such allegations are insufficient to establish a strong inference of fraudulent intent.

Second, because Defendants informed Plaintiffs of the risks that form the basis of Plaintiffs' Complaint, Defendants cannot be liable for fraud.  As set forth in Appendix A, the Offering Documents disclosed the very risks about which Plaintiffs claim to have been misled, including that:

- Loans were underwritten pursuant to less stringent guidelines than traditional guidelines, and, as such, carried a heightened risk of delinquency, foreclosure and loss;

- Exceptions to stated underwriting guidelines may be made;

- Not every loan backing the Offerings would be subject to due diligence;

- Borrower information may not be verified—in particular, borrower credit quality and occupancy information may be based solely on the borrowers' representations;

- Credit ratings on the Certificates may be downgraded or withdrawn, which may, in turn, affect the liquidity of the Certificates; and

- Loan-to-Value ("LTV") ratios may not be a reliable indicator of rates of delinquency, foreclosure and loss in the event of a downturn in the residential real estate market.

Contemporaneous media reports also warned of mounting risks in the RMBS market, and raised alarm about the very practices forming the basis of Plaintiffs' claims—even as Plaintiffs continued to invest in RMBS. Plaintiffs cannot plausibly claim to have been unaware of the risks they undertook by investing in the Certificates. To the extent Plaintiffs failed to heed warnings in the Offering Documents and in the media, Defendants cannot be held liable. (Part I.B.1-3.) Moreover, certain of the statements alleged to be misleading are non-actionable statements of opinion which cannot form the basis of a fraud claim at all. (Part I.B.4.)

Third, Plaintiffs have failed to plead the other necessary elements of their fraud claim:

- Plaintiffs have failed to plead justifiable reliance. Plaintiffs are highly sophisticated financial institutions with significant experience in the mortgage market. The Offering Documents provided a wealth of information about the risks associated with the Offerings and directed Plaintiffs to invest only after conducting their own analysis of the risks. As sophisticated and experienced investors, Plaintiffs had the means to obtain and analyze additional information about the Offerings prior to investing. It was therefore not reasonable for Plaintiffs, as they now claim, to have relied solely on the Offering Documents in making their investment decisions. In any case, Plaintiffs have failed to identify, as they must, who actually read and relied on the allegedly false and misleading statements in the Offering Documents before deciding to invest. (Part I.C.)

- Plaintiffs have failed to plead scienter. With respect to the 35 Offerings in which Defendants acted as sponsor or depositor, Plaintiffs have failed to allege what "specific facts" Defendants knew about the Offerings and when they knew them. Contrary to Plaintiffs' allegations, the alleged fact that Defendants reached different conclusions than their third-party due diligence vendors regarding the quality of certain loans does not establish a strong inference of fraudulent intent with respect to the Offerings. Nor is Defendants' alleged pursuit of increased

3

output and profit sufficient to establish a motive to defraud.  With respect to the 16 Offerings in which Defendants served only as underwriter, Plaintiffs' allegations regarding Defendants' "experience" in the mortgage industry and alleged "close relationships" with non-party sponsors is insufficient to establish Defendants' knowledge of any particular facts rendering the statements in the Offering Documents false and misleading.  Plaintiffs' allegations are thus inadequate to support scienter.  (Part I.D.)

- <u>Plaintiffs have failed to allege that they suffered any legally cognizable injury as a result of the alleged fraud.</u>  Plaintiffs do not—and cannot—claim that they have not received all regular payments, including interest substantially above current rates, to which they were entitled as Certificateholders.  Nor do they plead facts showing that they will not receive those payments in the future.  Plaintiffs claim <u>only</u> that the RMBS are worth less than what Plaintiffs paid for them.  That specific possibility—and the possibility that a secondary market for RMBS might not exist at all—was expressly disclosed in the Offering Documents.  Plaintiffs also fail to account for the impact of the financial crisis on their investments.  Defendants cannot be charged with responsibility for the decline in the value of housing investments, including RMBS, after the housing bubble burst in 2007.  (Parts I.E, F.)

Fourth, Plaintiffs' claims for aiding and abetting fraud and negligent misrepresentation, as well as their claims for successor liability, should be dismissed for similar reasons as their fraud claims.  (Parts II-IV.)

Fifth, Plaintiffs have not adequately alleged standing because the purchaser, FSAM, and the non-purchaser entities to which FSAM allegedly transferred the RMBS and its claims cannot both have standing to bring this lawsuit.  (Part V.)

This Court has already dismissed one similar RMBS complaint by Dexia, stating that Dexia's complaint, "despite [its] prolixity, fail[s] to meet the particularity requirements of

Federal Rule of Civil Procedure 9(b) in certain key respects".  Order, <u>Dexia SA/NV v. Deutsche Bank AG</u>, Nos. 11-cv-5672(JSR), 11-cv-6141(JSR) (S.D.N.Y. Feb. 6, 2012) ("<u>Dexia v. Deutsche Bank</u> Order").  The same is true here.  Dexia's Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS[1]

### The Parties

Dexia "is a European banking group" carrying out activities, inter alia, "in [the field of] asset management".[2]  It is a major player in European financial and mortgage markets, both as an originator of residential loans and as a securitizer of RMBS.[3]  Dexia has significant experience with U.S. RMBS through the activities of its former subsidiary Financial Security Assurance Holdings Ltd. ("FSA")—a leading provider of financial guaranty insurance on U.S. RMBS and other asset-backed securities—which it acquired in 2000 and sold in 2009.[4]  FSA developed extensive knowledge of mortgage originators through examinations, discussions, and site visits.[5]  In addition to insuring RMBS, FSA actively invested in RMBS through Plaintiff FSAM—which

---

[1] Allegations in the Complaint, if well pleaded, are assumed to be true only for the purpose of this motion to dismiss, and only to the extent that they are not inconsistent with judicially noticeable facts.

[2] <u>See</u> 2011 Annual Report, Dexia Group, at 4 (Ex. 1).  In ruling on a motion to dismiss, a court may take judicial notice of facts "not subject to reasonable dispute".  <u>In re Pfizer Inc. Sec. Litig.</u>, 584 F. Supp. 2d 621, 631-32 (S.D.N.Y. 2008).  A Court may also refer to documents referenced in the Complaints, as well as "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit".  <u>ATSI Commcns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007).  Additionally, the Court may consider matters as to which judicial notice may be taken, such as newspaper articles, to demonstrate widespread discussion of a particular topic.  <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002) (quoting <u>Brass v. American Film Tech., Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993)); <u>In re Merrill Lynch & Co., Inc.</u>, 273 F. Supp. 2d 351, 383 n.3 (S.D.N.Y. 2003).

[3] 2006 Annual Report, Dexia Group, at 86, 181 (Ex. 2).

[4] FSA 2006 10-K at 3 (Ex. 3).

[5] <u>Id.</u> at 20 ("Reviews of transactions typically include an examination of reports provided by, and (as circumstances warrant) discussions or site visits with, issuers, obligors, originators, servicers, collateral managers, trustees and other transaction participants.  Review of reports may include financial audits, servicer audits, evaluations by third-party appraisers, engineers, consultants or reports by other experts retained by the obligor or FSA.").

made the decision to invest in the Offerings (Compl. ¶ 13)—and other units in FSA's financial products business.[6]  Dexia retained FSA's financial products business and FSAM following the sale of FSA.[7]

Defendants are 13 legally independent entities that played various roles relating to the RMBS at issue.  JPM Acquisition, EMC and WMMSC served as sponsors.  (Compl. ¶¶ 20, 28, 33.)  JPM Acceptance, BSABS, SAMI II and WMAAC served as depositors.  (Id. ¶¶ 21, 22, 29, 32.)  JPMSI, BSC (whose successor-in-interest following their merger and conversion to a limited liability company is JPMSI) and WMCC served as underwriters.  (Id. at ¶¶ 19, 27, 31.)  The only connection alleged between Defendants Bear Stearns Companies, Inc., JPMC and JPMCBNA and Plaintiffs' claims is those Defendants' ownership interest in other Defendants.  (Id. ¶¶ 23, 25-26.)

**The Offerings**

Each Offering[8] was collateralized by thousands of mortgage loans organized into one or more loan pools.  The Offering Documents contained extensive disclosures about the underlying mortgage loans and the risks associated with the Offerings,[9] including that (i) under reduced documentation programs, borrower income, employment and/or asset information may not be

---

[6] Id. at 3-10 (objectives and business of Financial Guaranty and Financial Products Businesses), 12-15, 30-36 (insurance and investment portfolios, including RMBS).

[7] Dexia Press Release, July 1, 2009 (Ex. 4); Dexia Plaintiffs' Rule 7.1 Statement ¶ (d) (Dkt No. 14).

[8] Each Offering Document, cited herein by offering name (e.g., BALTA 2006-4), includes the Prospectus Supplement followed by the Prospectus for that Offering; Prospectus Supplement pages are designated by the prefix "S-".

[9] See, e.g., LBMLT 2006-3 at S-11 ("**Mortgage Loans Originated under the Originator's Underwriting Guidelines Carry a Risk of High Delinquencies**. . . .  As a result of such underwriting guidelines, the mortgage loans in the mortgage pool are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner.") (second emphasis added).

collected or verified;[10] (ii) exceptions to the underwriting guidelines could and would be made in

the ordinary course;[11] (iii) the loans were not subject to uniform levels of due diligence prior to

securitization;[12] (iv) borrower credit scores may fluctuate and, in any event, are not accurate

predictors of the likelihood of mortgage loan repayment;[13] (v) borrower occupancy statistics

were based on representations by the borrowers at the time of origination;[14] (vi) some of the

underlying loans were securitized prior to the expiration of the early payment default period;[15]

(vii) appraised residential property values fluctuate;[16] (viii) ratings could be lowered and should

not be treated as investment recommendations;[17] and (ix) credit enhancement measures might not

---

[10] See, e.g., BALTA 2006-4 at S-34 ("The Underwriting Standards of Some of the Mortgage Loans Do Not Conform to the Standards of Fannie Mae or Freddie Mac, And May Present a Greater Risk of Loss with Respect to those Mortgage Loans"); see also App'x A.1

[11] See, e.g., JPALT 2006-A2 at S-30 ("From time to time, exceptions to a lender's underwriting policies may be made.  Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter."); see also App'x A.2.

[12] See, e.g., WMABS 2007-HE2 at 42 ("The mortgage loan sellers will generally review only a limited portion of the mortgage loans in any delivery of such mortgage loans for conformity with the applicable credit, appraisal and underwriting standards."); see also App'x A.3.

[13] See, e.g., JPALT 2006-A2 at S-34 ("There can be no assurance that the credit scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the related mortgage loans or that any mortgagor's credit score would not be lower if obtained as of the date of the prospectus supplement."); see also App'x A.4.

[14] See, e.g., JPALT 2006-A2 at A6 ("Occupancy Status . . . *Based upon representation of the related mortgagors at the time of origination."); see also App'x A.4.

[15] See, e.g., LBMLT 2006-3 at S-17 ("The First Payment Date on Some Mortgage Loans Has Not Occurred Yet Meaning that those Borrowers Could Not be Delinquent on the Referenced Monthly Payment"); see also App'x A.4.

[16] See, e.g., BALTA 2006-4 at S-42 ("No assurance can be given that values of the mortgaged properties have remained or will remain at their levels on the dates of origination of the related mortgage loans."); see also App'x A.5.

[17] See, e.g., BALTA 2006-4 at S-42 ( [T]here can be no assurance that the ratings assigned to any offered certificate on the date on which the offered certificates are initially issued will not be lowered or withdrawn by a rating agency at any time thereafter. In the event any rating is revised or withdrawn, the liquidity or the market value of the related offered certificates may be adversely affected."); see also App'x A.6.

protect investors from losses.[18]  While the Offering Documents described the underlying loans generally, they also set forth mechanisms by which loans that did not comply with the representations made in the Offering Documents loans could be cured, repurchased or replaced.[19]

The Offering Documents stressed that prospective investors should "consider carefully" those and other disclosed risk factors, and that "only sophisticated investors with the resources to analyze the potential risks and rewards of an investment in the certificates should consider such an investment".[20]  Furthermore, as the housing market deteriorated in 2007, the Offering Documents contained additional warnings, including explicit disclosures about developing stresses in the mortgage market.[21]

**Plaintiffs' Allegations**

Plaintiffs allege that over a two-year period between January 19, 2006, and August 22, 2007, with respect to 51 separate Offerings, Defendants made fraudulent misrepresentations regarding the quality of the mortgage loans collateralized in the Offerings on which Plaintiffs relied to their detriment.  (Compl. ¶¶ 1-2.)[22]  Through their own due diligence—or simply through their relationship with non-party sponsors and originators—Defendants allegedly possessed special knowledge of problems with the mortgage loans.  (Id. ¶ 51.)  Plaintiffs contend

---

[18] See, e.g., WMALT 2007-HY1 at 5 ("Credit Support May Be Limited; The Failure of Credit Support to Cover Losses on the Trust Assets Will Result in Losses Allocated to the Related Securities").

[19] See, e.g., BALTA 2006-4 at S-143 ("In the case of a breach of any representation or warranty . . . which materially and adversely affects the value of the interests of certificateholders . . . the Sponsor will either (i) cure such breach . . ., (ii) provide the Trustee with a substitute mortgage loan . . . or (iii) purchase the related mortgage loan at the applicable Repurchase Price.).

[20] See, e.g., BALTA 2006-4 at Title Page, S-40; JPALT 2007-2 at Title Page.

[21] See, e.g., JPALT 2007-A2 at S-18 to S-19 ("Recent Developments in the Residential Mortgage Market May Adversely Affect the Yields of the Offered Certificates.  Recently, the residential mortgage market in the United States has experienced a variety of difficulties and changed economic conditions that may adversely affect the performance and market value of your securities".).

[22] Plaintiffs allege no purchases or Offerings in 2005 (see App'x A to Am. Compl.).

that some of the non-conforming loans underlying the Offerings are now in delinquency, default or foreclosure.  (Id. ¶¶ 80, 117, 140, 214.)  The Complaint does not allege, however, that Plaintiffs have failed to receive any payments owed to them as investors in the RMBS; rather, their only claim of damages is that the Certificates have lost value in the secondary market.  (Id. ¶¶ 302-03.)

**Public Warnings Related to Issues in the Mortgage Industry**

In addition to the explicit disclosures in the Offering Documents, extensive media coverage of problems in the housing industry and residential loan origination practices also disclosed the substance of Plaintiffs' allegations.  Indeed, throughout the period in which Plaintiffs' RMBS purchases were made—January 19, 2006 to August 22, 2007—claims now asserted by Plaintiffs were the subject of not only media and research analyst reports on the housing industry, but also various governmental commentaries on and inquiries into the mortgage business.

The media reported the deterioration in the credit quality and performance of subprime collateral over time[23] and the impact of these trends on RMBS.[24]  Moreover, in the wake of

---

[23] See, e.g., Lingling Wei, Stated Income Home Mortgages Raise Red Flags, WALL ST. J., Aug. 22, 2006 (discussing "a growing concern among consumer advocates and regulators over the home-lending industry's increasing reliance on reduced documentation, particularly unverified income . . . ."); Mark Whitehouse, As Home Owners Face Strains, Market Bets on Loan Defaults, WALL ST. J., Oct. 20, 2006 (citing estimate "that about $640 billion in subprime loans made in 2004 and 2005 will reset to higher rates over the next five years—a trend that . . . will lead to some 450,000 added defaults.").

[24] Simon & Hagerty, More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged as Housing Market Soared, Now, Delinquencies Mount, WALL ST. J., Dec. 5, 2006 ("The surge in mortgage delinquencies in the past few months is  . . . unsettling investors world-wide in the $10 trillion U.S. mortgage market. … An analysis by Merrill Lynch & Co. found that losses on recent subprime deals . . . could rise to the 'double digits' if home prices fall by 5%. Falling home prices could trigger losses not only for investors who bought riskier classes of mortgage-backed securities, but also for some holders of A-rated bonds, according to the report.").

rising delinquencies and defaults, news sources reported similar issues with Alt-A[25] mortgage

loans.  In fact, some media reports raised concerns specifically about the underwriting and

appraisal practices of certain Originators at issue here.[26]  Indeed, by August 2007—while

Plaintiffs continued to invest in Certificates (on which they now sue) (see Compl. Ex. A.), some

of the largest mortgage lenders, including several of the Originators at issue here (e.g., American

Home, New Century), had collapsed under the stress of mounting delinquencies and intense

public scrutiny.[27]

Thus, information available to Plaintiffs before and during the period in which they

purchased the Certificates, including explicit disclosures in the Offering Documents and public

reports from the news media and other sources, disclosed the very risks with respect to which

Plaintiffs now claim they were misled.

---

[25] "Alternative-A" or "Alt-A" underwriting guidelines are typically more stringent than subprime guidelines, but less so than Fannie Mae or Freddie Mac guidelines.  See, e.g., JPALT 2007-A2 at S-43.

[26] Ellen Simon, Mortgage Pros Scramble to Modify Loans, AP GENERAL FINANCIAL / BUSINESS NEWS, Apr. 4, 2007 (EMC); Banks' Quarterly Results Show Signs of Credit Deterioration, DOW JONES MARKETWATCH, Jan. 17, 2007 (IndyMac Bancorp Inc.); Joseph N. DiStefano, Capital One Closes GreenPoint Mortgage, Idling 1,900, BLOOMBERG, Aug. 20, 2007 (GreenPoint Mortgage); see also Lingling Wei & James R. Hagerty, Weak Forecasts Mount in Housing Industry; IndyMac Bancorp, Centex Are Hurt by Loan Losses, Writedowns in Land Value, WALL ST. J., Jan. 16, 2007; Indictment ¶ 5, United States v. Partow, No. 3:06-CR-00104 (D. Alaska Dec. 15, 2006) (Countrywide)

[27] See In re Am. Home Mortg. Holdings, Inc., No. 07-11047 (Bankr. D. Del. filed Aug. 6, 2007) (voluntary Ch. 11 bankruptcy filing); In re New Century TRS Holdings, Inc., No. 07-10416 (Bankr. D. Del. filed Apr. 2, 2007) (same).

**ARGUMENT**

I.     **PLAINTIFFS FAIL TO STATE A CLAIM FOR FRAUD.**

A.     **Plaintiffs Fail to Plead Fraud With Requisite Particularity.**

"A party [alleging fraud] must state with particularity the circumstances constituting fraud or mistake". Fed. R. Civ. P. 9(b).[28]  To satisfy that pleading standard, Plaintiffs must:  "(1) specify the statements that the plaintiff[s] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent".  Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).

Plaintiffs' fraud claim, in essence, is that Defendants misrepresented the quality of the loans backing the Offerings in which Plaintiffs invested.  None of Plaintiffs' allegations, however, relates to those particular Offerings or the specific loans backing them.  Rather, Plaintiffs make general allegations about allegedly unsound origination and securitization practices in the mortgage industry and at the Defendant entities.  Plaintiffs extrapolate that these practices must have resulted in the securitization of at least some loans—Plaintiffs do not allege how many—of lesser quality than was represented by Defendants in the specific offerings in which Plaintiffs invested.  That is insufficient:

- None of the general statements from confidential witnesses relied upon in the Complaint is linked to any of the particular loans or Offerings at issue.  (Compl. ¶¶ 294-96.)  Similarly, none of the anonymous appraisers purportedly quoted by Plaintiffs in the Amended Complaint is alleged to have provided valuations with respect to any of the hundreds of thousands of loans in the Offerings at issue.  (Id. ¶¶ 93-104.)

---

[28] Although Plaintiffs' claims arise under state law, the pleading standard articulated in Rule 9(b) applies because the action is proceeding in federal court.  See, e.g., Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 186-87 (2d Cir. 2004).  Rule 9(b) applies to all of Plaintiffs' claims because aiding and abetting fraud and negligent misrepresentation sound in fraud under New York law.  See In re Leslie Fay Cos., Inc. Sec. Litig., 918 F. Supp. 749, 767 (S.D.N.Y. 1996) (negligent misrepresentation); Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292-93 (2d Cir. 2006) (aiding and abetting fraud).

- None of the allegations based on third-party due diligence reports, such as the trending report by Clayton Holdings, Inc. ("Clayton Report"), is linked to any of the particular loans or Offerings at issue.  Specifically, Plaintiffs fail to allege that any of the loans "waived in" by Defendants were included in the Offerings in which Plaintiffs invested.  (Id. ¶¶ 49, 72-76, 137, 147, 150, 299.)

- None of the allegations regarding the so-called "Zippy memo"—a one-page flyer regarding origination written by a former Chase employee (id. ¶ 130)—suggests that any loans originated pursuant to instructions in the "Zippy memo" were included in the Offerings in which Plaintiffs invested.

- None of the allegations based on purported testimony elicited by the New York Attorney General in connection with its own investigations suggests that the testimony from that investigation relates to the Offerings at issue in this litigation. (Id. ¶¶ 93-104.)

- With respect to Offerings sponsored by non-Defendant entities, none of Plaintiffs' allegations regarding allegedly unsound origination and underwriting practices at those entities suggests that the loans included in the Offerings in which Plaintiffs invested were affected by those alleged practices.  (See id. ¶¶ 141-212.)

Such generalized allegations fall well short of the particularized pleading required by Rule 9(b)—and even the comparatively lenient standard of Rule 8[29]—and have been routinely rejected as inadequate by other courts in RMBS cases.  See N.J. Carpenters Health Fund v. NovaStar Mortg., Inc., No. 1:08-cv-05310, ECF No. 135, slip op. at 11 (S.D.N.Y. Mar. 29, 2012) ("NovaStar II") (Even under Rule 8, "general allegations and anecdotes of former [defendant] employees alone do not indicate there were material misstatements or omissions in the offering documents concerning the origination of the loans backing the [at-issue] Offering");[30] Footbridge Ltd. v. Countrywide Home Loans, Inc., No. 09 Civ. 4050, 2010 WL 3790810, at *13 (S.D.N.Y.

---

[29] "Rule 8 does not require 'detailed factual allegations', but 'it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation'." N.J. Carpenters Health Fund v. NovaStar Mortg., Inc., No. 1:08-cv-05310, ECF No. 135, slip op. at 7 (S.D.N.Y. Mar. 29, 2012) ("NovaStar II") (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

[30] Cf. In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (rejecting confidential witnesses' ("CW") allegations to establish recklessness for section 10(b) claim because "the majority of the CW allegations are either undated or pegged to an indefinite time period[, which] renders the task of matching CW allegations to contrary public statements all but impossible").

Sept. 28, 2010) (rejecting "conclusory allegation[s]" that the bank "regularly pressured appraisers to give inflated assessments" because the complaint "does not link th[ese] allegations to the Securitizations at issue"); Landesbank Baden-Württemberg v. Goldman Sachs & Co., 821 F. Supp. 2d 616, 622 (S.D.N.Y. 2011) ("Landesbank") aff'd, No. 11-4443, 2012 WL 1352590 (2d Cir. Apr. 19, 2012) ("[R]eferences [to] the Clayton Report without alleging . . . any connection between the mortgages reviewed in the Clayton Report and those collateralizing" the Offering at issue cannot support a claim of fraud); Republic Bank & Trust Co. v. Bear Stearns & Co., Inc. ("Republic Bank"), No. 10-5510, 2012 WL 2330565, at *14, 19 (6th Cir. June 20, 2012) (affirming dismissal in part because the plaintiff "[did] not connect the underwriters' alleged failure to follow their underwriting standards to the loans and securities involved in this case").

### B.     Plaintiffs Fail to Plead Any Actionable Misrepresentation.

To state a claim for fraud, a plaintiff must plead "a material misrepresentation of a fact". Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559 (2009).  "[T]he central issue . . . is not whether . . . particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mis[led] a reasonable investor about the nature of the [securities]".  Olkey v. Hyperion 1999 Term Trust, 98 F.3d 2, 5-6 (2d Cir. 1996) (emphasis added) (dismissing fraud claims where the "[RMBS] prospectuses warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed").

### 1.     Loan Origination and Underwriting Standards.

Plaintiffs allege that the Offering Documents were misleading because they stated that the loans backing the Offerings were generally originated or underwritten in accordance with specified guidelines, when in fact, the Offerings "routinely included mortgages . . . that deviated from the stated loan origination and underwriting standards".  (Compl. ¶ 245; see also

¶¶ 238-44.)  To support this claim, Plaintiffs selectively quote from the Offering Documents without reference to important qualifying and cautionary language therein.  (Id. ¶¶ 238-43.) When read as a whole, as they must be, the Offering Documents plainly disclose the facts about which Plaintiffs claim to have been misled.

First, the Offering Documents disclosed that, in many respects, the stated mortgage loans were underwritten pursuant to guidelines that were less stringent than agency, or "traditional", underwriting guidelines.  (See supra text accompanying n.10 and App'x A.1.)  Importantly, the Offering Documents disclosed that "[t]he inclusion of such Mortgage Loans may present certain risks that are not present in such other programs."  (Id.)  Accordingly, Plaintiffs' allegations regarding "loosened" underwriting standards (see, e.g., Compl. ¶¶ 126-28, 222, 296, 364) cannot support a claim for fraud.  See, e.g., Republic Bank, 2012 WL 2330565, at *14, 19 (affirming dismissal in part "because the [Bear Stearns] offering documents warned of the risks about which [plaintiff] claims ignorance").

Second, the Offering Documents for every single deal at issue contain, in substance, a disclaimer that "[f]rom time to time, exceptions to a lender's underwriting policies may be made" in light of compensating factors.  (See supra n.11.)  Accordingly, Plaintiffs' allegation that  loans "deviated from . . . stated loan origination and underwriting standards" (Compl. ¶ 245), without more, cannot support a claim for fraud.  See Footbridge, 2010 WL 3790810, at *12 (where the offering documents disclosed that exceptions would be made, plaintiff's claim that "defendants were too flexible in the underwriting decisions [is, w]ithout more, . . . insufficient to set forth a plausible claim of fraud based on the heightened pleading requirements of Rule 9(b)").

Third, the Offering Documents described specific mechanisms for dealing with loans that did not comply with the representations made in the Offering Documents.  Namely, the Offering Documents disclosed that the loan purchase contracts underlying each transaction included "repurchase or substitute" provisions pursuant to which originators would be obligated to repurchase loans that did not conform to contractual representations and warranties regarding appraisals, underwriting, and the like.  The existence of such repurchase obligations made clear to investors that there might be loans in the pools that did not conform to the representations made in the Offering Documents.  See Lone Star Fund V (US), L.P. v. Barclays Bank PLC, 594 F.3d 383, 389–90 (5th Cir. 2010) ("'repurchase or substitute' clauses" fundamentally "change the nature" of disclosures about underlying mortgages by making clear to all investors that the mortgage pools could contain noncompliant loans); Footbridge, 2010 WL 3790810, at *16 (same).

### 2.    Loan Selection and Due Diligence.

Plaintiffs have failed to allege any fact suggesting that the alleged misstatements relating to loan selection and due diligence identified in the Complaint are false or misleading.  In the alleged misstatements identified in the Complaint, Defendants represent, with respect to the Offerings, that:

- due diligence is conducted on a statistical samplings of loans (see Compl. ¶ 250);

- the level of due diligence varies (see id. ¶ 248); and

- the Sponsor selected loans based on a variety of considerations with the objective of obtaining the most favorable combinations of ratings on the certificates (id. ¶¶ 250, 252).

Plaintiffs allege that such statements were false and misleading because:  (i) Bear Stearns and JPMorgan "waived in" loans that third-party diligence vendor Clayton deemed, in its own opinion, to be defective (Compl. ¶ 261); (ii) WaMu allegedly securitized delinquency-prone or

fraudulently obtained loans (id.); and (iii) generally, "Defendants did not disclose that no due diligence was done on the vast majority of the loans included in the securitizations at issue" (id. ¶¶ 267, 277).  As an initial matter, as explained above (see supra Part I), Plaintiffs fail to allege any specific facts in support of these claims.  But even accepting Plaintiffs' allegations as true, none renders the disclosures in the Offering Documents regarding loan selection and due diligence misleading.  First, Plaintiffs' allegations regarding the Clayton report support a finding that Defendants did conduct due diligence.  Second, Plaintiffs allege that Defendants were driven in their loan selection practices by the objective of obtaining favorable ratings on the Certificates (Compl. ¶¶ 215-32), which is exactly what Defendants disclosed.  Third, Plaintiffs' allegations regarding Defendants' failure to disclose that "the vast majority" of loans were not subject to due diligence is flatly contradicted by the very "misstatements" identified by Plaintiffs, which made clear that only a "sampl[e]" of loans would be subject to due diligence.  (Id. ¶ 250; see also supra n.12.)

> 3.    Risk of Default.

Plaintiffs also allege that Defendants falsely represented the credit risk of the loans, including borrower credit, occupancy characteristics and the risk of early payment default. (Compl. ¶¶ 257-71.)  Those allegations too are contradicted by the Offering Documents themselves.

Plaintiffs allege that they were "misled into believing that the securitizations at issue were far less risky than they were" by statements in the Offering Documents regarding borrower credit quality.  (Compl. ¶¶ 258-262.)  The Offering Documents explicitly disclosed, however, that borrower credit quality may not be verified and that borrower credit scores were not a good predictor of borrower default on mortgage loans.  (See supra n.13.)  Most importantly, the

Offering Documents explicitly warned of the risk of loss associated with the Offerings and the underlying loans.  (See supra n.9.)

Plaintiffs allege that Defendants engaged in the practice of "quickly selling . . . mortgages into securitizations" before the early payment default period had expired, i.e., before any delinquency occurred.  (See, e.g., Compl. ¶¶ 55-60, 108-16.)  Again, the Offering Documents explicitly warned that certain loans were securitized before the first payment, meaning there was no indication whether the loan was delinquent.  (See supra n.15.)

Plaintiffs allege that "Defendants knew that their loan origination and securitization practices materially increased the risk that the mortgage pools backing the Certificates included many more mortgages that were not secured by an owner-occupied home than represented in the Offering Materials."  (Compl. ¶ 268.)  The Offering Documents make clear, however, that the occupancy status information therein is "[b]ased upon representations of the related borrowers at the time of origination".  (See supra n.14.)  Plaintiffs do not allege that Defendants inaccurately relayed the occupancy status information that the borrowers provided to the loan originators. See Footbridge, 2010 WL 3790810, at *9 ("The statements in the [offering documents] include additional limiting language that explains that the percentages reported are 'based upon representations of the related borrowers at the time of origination.' . . .  The [complaint] does not allege that the percentages reported in the [offering documents] are inaccurate representations of the data received from borrowers.").  Accordingly, Plaintiffs' allegations regarding occupancy rates cannot support a claim for fraud.

### 4.   Appraisals and Credit Ratings.

Plaintiffs allege that Defendants "materially overstated the value of the collateral securing the mortgages backing the RMBS" because Defendants did not disclose that they pressured appraisers to inflate appraisals.  (Compl. ¶¶ 126, 132, 277.)  Separately, Plaintiffs

allege that Defendants provided them with "materially false and misleading" credit ratings because "Defendants pressured [the credit rating agencies] to provide them with AAA-ratings". (Id. ¶ 224-35, 284.)  Neither of those alleged categories of misstatements is actionable because appraisals and credit ratings are not objective facts but the subjective opinions of the appraisers and rating agencies, respectively.  See, e.g., Tsereteli v. Res. Asset Securitization Trust 2006-A8, 692 F. Supp. 2d 387, 393-94 (S.D.N.Y. 2010) ("neither an appraisal nor a judgment that a property's value supports a particular loan amount is a statement of fact[, rather, it is] a subjective opinion based on the particular methods and assumptions the appraiser uses."); id. (a credit rating is "a statement of opinion by each agency that it believed, based on the models it used and the factors it considered, [regarding] the credit quality of the mortgage pool"); see also Fait v. Regions Fin. Corp., 655 F.3d 105, 112 (2d Cir. 2011) (a claim that "defendants should have reached different conclusions" about an asset's value does not allege that they "did not believe the statements" when made).[31]

With respect to appraisals, Plaintiffs have failed to plead facts supporting a plausible inference that any "speaker did not truly have" their stated opinion as to the value of any specific mortgaged property at the time of the appraisal, nor have they alleged facts suggesting that Defendants did not accurately report the appraisals as given.  Tsereteli, 692 F. Supp. 2d at 393. Instead, Plaintiffs rely on vague accounts of appraisers who allegedly provided appraisals to some originators.  (Compl. ¶¶ 93-104.)  That does not call into question, however, the subjective beliefs of the appraisers of the underlying loans at the time of appraisal.  Indeed, Plaintiffs do not

---

[31] See also NECA-IBEW Pension Trust Fund v. Bank of Am. Corp., No. 10-cv-0440, ECF No. 65, slip op. at 1 (S.D.N.Y. Mar. 16, 2012) (dismissing RMBS claims and finding that "a statement of opinion or belief is not inherently true or false—it is true or false only to the extent that it misrepresents the speaker's state of mind"); In re IndyMac Mortg.-Backed Sec. Litig., 718 F. Supp. 2d 495, 510-11 (S.D.N.Y. 2010).

allege that:  (i) any individual appraisal of a mortgaged property was false; (ii) any appraiser of the mortgaged properties underlying the Offerings gave an opinion that they did not believe; or (iii) any appraiser of the mortgaged properties failed to follow the standards set forth in the Offering Documents.  See Tsereteli, 692 F. Supp. 2d at 393.[32]

Moreover, the Offering Documents expressly disclosed that the valuations of the underlying properties are susceptible to a range of influences and that the value of the properties likely would fluctuate and even decline over time.[33]  See Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc., 707 F. Supp. 2d 702, 712-13 (W.D. Ky. 2010), aff'd, 2012 WL 2330565 (dismissing claims of allegedly misstated appraisal values where offering documents disclosed that property values may fluctuate and warned that defendant "could offer no assurances that property values would remain where they were when the mortgages were originated").

With respect to the credit ratings, Plaintiffs' allegations are insufficient to support an inference that the Ratings Agencies did not actually believe that the ratings they had assigned were supported by the factors they said they had considered.  See In re IndyMac, 718 F. Supp. 2d at 512 (dismissing ratings-related claim for failure to allege that ratings agencies did not truly hold their opinions when made); N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC, 720 F. Supp. 2d 254, 271 (S.D.N.Y. 2010) ("The [issuing] Trusts actually received the ratings listed in the prospectus supplements, and Plaintiffs do not allege to the contrary, so there is no misstatement on the face of the documents.").

---

[32] Plaintiffs also cannot argue that Defendants misrepresented the appraisal practices.  See, e.g., Tsereteli, 692 F. Supp. 2d at 393 (holding that conclusory allegation that appraisals "were not in compliance with the Uniform Standards of Professional Appraisal Practice" was insufficient to state a claim).

[33] See, e.g., JPALT 2007-A2, at S-29 ("No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date."); see also supra n. 16.

C.      **Plaintiffs Fail to Plead Justifiable Reliance.**

To sustain a claim of fraud under New York law, "a party must establish, <u>inter alia</u>, justifiable reliance" on the alleged misrepresentations. <u>Lazard Freres & Co. v. Protective Life Ins. Co.</u>, 108 F.3d 1531, 1541 (2d Cir. 1997). In assessing allegations of justifiable reliance, courts "consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them". <u>Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.</u>, 343 F.3d 189, 195 (2d Cir. 2003). Under New York law, a sophisticated investor has an affirmative duty to conduct its own due diligence and verify the information it receives. <u>Global Minerals & Metals Corp. v. Holme</u>, 35 A.D.3d 93, 100 (1st Dep't 2006) ("New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transaction and the business they are acquiring."). To the extent that due diligence should have put the investor "on notice of the existence of material facts which have not been documented and [it] nevertheless proceeds with a transaction without securing the available documentation . . . [it] may truly be said to have willingly assumed the business risk that the facts may not be as represented". <u>Emergent Capital Inv. Mgmt. LLC</u>, 343 F.3d at 195 (quoting <u>Rodas v. Manitares</u>, 159 A.D.2d 341, 343 (1st Dep't 1990)).

Plaintiffs cannot dispute that they are highly sophisticated investors. As detailed above, Plaintiffs' public disclosures tout their substantial experience in multiple segments of the mortgage market. (<u>See</u> <u>supra</u> at 5-6.) As a result of their sophistication, Plaintiffs were fully capable of analyzing the risks associated with the Offerings.

Plaintiffs likewise had access to information about their investments and the risks associated with them. The Offering Documents explicitly warned Plaintiffs to analyze the default, market and other risks associated with the Offerings, and alerted plaintiffs to specific

risks relating to falling home prices, emergent market stresses and difficulties experienced by

loan originators.  (See supra n.21.)  Additionally, widespread media and governmental

reports issued before and throughout the period in which Plaintiffs were purchasing the

Certificates talked specifically about loosened underwriting standards, questionable

appraisal practices and borrower occupancy reports, and, in particular, discussed the rising

problems with the Originators at issue here, like American Home.  (See supra pp. 9-10.)

Furthermore, periodic "remittance reports" issued to Certificateholders, including Plaintiffs, in

connection with the distribution of regular pass-through payments provided Plaintiffs with the

opportunity to observe historical and ongoing trends in collateral performance.[34]  Most

significantly, Plaintiffs' own mortgage-related activities afforded them additional, special

information that was not available to other investors.  (See supra pp. 5-6.)

     As a separate matter, Plaintiffs Dexia SA/NV, DCL and DHI have failed to establish

reliance because Plaintiffs have failed to plead that those entities read and relied upon the

Offering Documents in making the purchase decision.  As Plaintiffs concede, "Plaintiff FSAM

made all of the investment purchase decisions concerning the Certificates" (Compl. ¶ 286),

"performed its investment and credit analyses as part of the investment decisions . . . based on

information provided by Defendants" (id. ¶ 287) and actually purchased the Offerings (id. ¶ 13).

FSAM then purportedly "assigned and transferred the RMBS . . . to the other Dexia Plaintiffs

pursuant to intercompany agreements".  (Id. ¶ 18.)  Nevertheless, Plaintiffs allege that all

"Plaintiffs relied on Defendants' false representations and omissions in the Offering Materials

---

[34] See, e.g., BALTA 2006-7 Remittance Report as of November 27, 2006, at 13 (Ex. 5) (0.60%
of loans underlying Group I are delinquent, in bankruptcy, foreclosure or real-estate owned
("REO")); BALTA 2006-7 Remittance Report as of March 26, 2007, at 12 (Ex. 6) (10.81% of
loans underlying Group I are delinquent, in bankruptcy, foreclosure or REO); In re Morgan
Stanley Mortg. Pass-Through Certificates Litig., No. 09 Civ. 2137, 2010 WL 3239430, at *8
(S.D.N.Y. Aug. 17, 2010) (taking judicial notice of remittance reports).

regarding the loan origination".  (Id. ¶ 285; see also id. ¶ 288.)  That allegation is completely unsupported by the facts alleged.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Plaintiffs must establish that they "actually relied" on the Offering Documents; because their "complaint[ is] devoid of any allegation that [Dexia SA/NV, DCL and DHI] ever received this information in any form, they cannot establish reliance".  Secs. Investor Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63, 73 (2d Cir. 2000).[35]

### D.   Plaintiffs Fail to Plead Scienter

To plead scienter, Plaintiffs must allege sufficient facts to raise a "strong inference of fraudulent intent".  Lerner, 459 F.3d at 290 (quoting Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995)).  Plaintiffs also must allege specific facts in support of the inference of scienter and cannot rely on "speculation and conclusory allegations".  Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001); see also Landesbank, 821 F. Supp. 2d at 623.  Plaintiffs fail to allege for each of the 51 Offerings what Defendants knew about any alleged misstatements and when they knew it.[36]  Instead, Plaintiffs' scienter allegations boil down to the assertion that, by virtue of Defendants' roles and experience in the securitization process, Defendants must have known that statements in the Offering Materials were false or misleading.  Such allegations do not raise a strong inference of fraudulent intent.

---

[35] Neither can Dexia SA/NV, DCL and DHI base their fraud claim on "indirect reliance" because Defendants did not make the representations in the Offering Documents "for the purpose of having [them] repeated in terms or communicated in substance to [those entities]".  Peerless Mills, Inc. v. Am. Tel. & Tel. Co., 527 F.2d 445, 451 (2d Cir. 1975); see also Turtur v. Rothschild Registry Intern., Inc., 26 F.3d 304, 312 (2d Cir. 1994) (holding that plaintiffs could not indirectly rely on defendants' opinion because defendants did not intend or had reason to anticipate that the at-issue opinion would be passed on to plaintiffs).

[36] As above, many of Plaintiffs' scienter allegations depend on confidential witnesses (e.g., Compl. ¶¶ 294-96) whose allegations are insufficiently particularized to plead a strong inference of Defendants' fraudulent intent.  (See supra Part I.A.)

First, Plaintiffs' allegations with respect to Defendants' "extensive professional securitization experience" and their "close relationships" with non-party sponsors do not establish knowledge of fraud.  (Compl. ¶¶ 42, 146, 173, 293.)  Rather, those allegations lack the requisite particularity as to Defendants' knowledge.  As with the complaint in <u>Dexia v. Deutsche Bank</u>, Plaintiffs' Complaint must be "dismissed with prejudice to the extent [it] rel[ies] on [Offerings] not sponsored by Defendant[s]".  Order, at 2; <u>see also</u> <u>Landesbank</u>, 821 F. Supp. 2d at 622 (allegations of defendant's "highly specialized, experienced, and dedicated group, that independently verified the value of [defendant's] mortgage inventory [does] not give defendants notice of the particulars:  the 'who, what, when, where and how' required to support a fraud claim") (alterations and internal quotation marks omitted).

Second, Plaintiffs' allegations regarding Defendants' purported desire to "increase the volume of [their] securitization business and overall profitability" do not establish a strong inference of fraudulent intent.  (Compl. ¶ 56, <u>see also</u>  ¶¶ 1; 55-76; 82-87; 290.)  "[A] general allegation that defendants wanted to [securitize] as many loans as possible in order to increase profits and market share" is insufficient to establish strong inference of scienter.  <u>Footbridge</u>, 2010 WL 3790810, at *20; <u>see also</u> <u>Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce</u>, 694 F. Supp. 2d 287, 298 (S.D.N.Y. 2010) ("it is not sufficient to allege goals that are possessed by virtually all corporate insiders" (internal quotation marks omitted)).[37]

---

[37] As part of the "motive" allegations, Plaintiffs also allege that WaMu reclassified certain loans that it originally held for investment and included them in the securitizations.  (Compl. ¶¶ 108-16.)  Plaintiffs fail to allege either that including such reclassified loans would render statements in the Offering Materials false or Defendants' knowledge of such effect.  Plaintiffs also allege that Bear Stearns noticed that "loans it purchased and securitized were experiencing early payment defaults" and received large amounts of compensation from the originators.  (<u>Id.</u> ¶¶ 77-79.)  As Plaintiffs acknowledge, Bear Stearns only noticed the early payment defaults and

Third, Plaintiffs' allegations regarding Defendants "waiving in" to securitizations loans that Clayton, in its opinion, deemed not to conform with applicable underwriting standards do not establish a strong inference of fraudulent intent.  (Compl. ¶¶ 72-73, 75, 137.)  In Landesbank, plaintiffs similarly alleged that defendant hired Clayton to perform due diligence, and nevertheless securitized most of the loans rejected by Clayton.  The court held that such an allegation was insufficient to plead scienter because plaintiffs "fai[l] to allege any connection between the mortgages reviewed in [Clayton's report to defendant noting the defective loans] and those collateralizing [the securitization at issue]".  821 F. Supp. 2d at 622.  Indeed, here, Plaintiffs' cited data from Clayton only shows the overall percentage of loans marked as defective by Clayton that had allegedly been "waived in" by Bear Stearns and JPMorgan.  (Compl. ¶¶ 73, 137.)  Such data does not demonstrate how many, if any, of such loans were securitized in the 51 Offerings.  Accordingly, Plaintiffs' allegations do not establish Defendants' knowledge of fraud.  See Landesbank, 821 F. Supp. 2d at 622.

Fourth, Plaintiffs' attempt to impute to Defendants the alleged knowledge of certain originators affiliated with Defendants by routinely conflating allegations with respect to each is insufficient to establish Defendants' knowledge of fraud.  (See, e.g., Compl. ¶ 47 ("Defendants and their affiliates also originated 30% or more of the loans").)[38]  Plaintiffs, however, do not allege with specificity that any of the Defendants actually originated loans underlying the 51 Offerings; indeed, Defendants are named only as sponsors, depositors and/or underwriters.  (See

---

received compensation after it securitized the loans.  (Id. ¶ 78.)  In any case, this allegation does not demonstrate what Defendants knew at the time the statements in the 51 Offerings were made.
[38] See also Compl. ¶¶ 126-35; 296 (attributing the alleged origination practices of Chase Home Finance, LLC ("CHF"), a non-party JPMorgan subsidiary, to JPMorgan Defendants); id. ¶ 9 (referring to Mr. James Theckston, a former regional vice president for CHF as "a former regional vice-president at JPMorgan"); id. ¶¶ 34, 85-107 (attributing the alleged origination practices of Long Beach Mortgage Company, a non-party WaMu subsidiary, to the WaMu Defendants).

Compl. ¶¶ 19-34, 45.)  Such allegations of Defendants' affiliates' knowledge are insufficient to plead a strong inference of Defendants' fraudulent intent.  To infer common knowledge between two corporate entities, plaintiffs must allege more than just a parent-subsidiary or affiliate relationship.  See Defer LP v. Raymond James Fin., Inc., 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009) (dismissing claims against parent company when allegations went no further than corporate relationship with fraudulent actor).  Plaintiffs here fail to plead any additional facts specifically showing that Defendants had knowledge of the alleged improper origination practices.[39]

### E.   Plaintiffs Fail to Plead Proximate Causation

When "plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors", plaintiff must allege specific facts "which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events".  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005) (internal quotation marks omitted); Citibank N.A. v. K-H Corp., 968 F.2d 1489, 1496-97 (2d Cir. 1992) (affirming dismissal of common law fraud claim because the plaintiff did not adequately allege that the damages suffered were proximately caused by the alleged misrepresentations of defendants).  Plaintiffs allege no specific facts showing that Plaintiffs' losses were caused by Defendants' alleged fraudulent conduct rather than by the global financial crisis and the decline of the housing market beginning in 2007.  Rather, Plaintiffs assert that the RMBS they purchased have since been downgraded by rating agencies (Compl. ¶ 302), like countless other RMBS in the wake of the

---

[39] Plaintiffs also cite an article that quotes a former CHF employee as saying that "[t]he bigwigs of the corporations knew this, but they figured we're going to make billions out of it, so who cares?".  (Compl. ¶¶ 9, 293.)  The article does not, nor do Plaintiffs, identify which "bigwigs" this references, what specifically they knew, or whether their alleged knowledge relates to the 51 Offerings.  Such speculative and general statements cannot sufficiently support allegations of scienter.  See Landesbank, 821 F. Supp. 2d at 623.

housing market collapse.  Plaintiffs have failed to plead specific facts tying their alleged losses during this collapse to Defendants' specific alleged misstatements.

Equally insufficient is Plaintiffs' allegation that "Defendants' misconduct dramatically affected the mortgage pools underlying the RMBS purchased by Plaintiffs [as demonstrated by the number of loans that are] delinquent, in foreclosure, bankruptcy, or repossession".  (Compl. ¶¶ 80, 117, 140, 214.)  Poor post-purchase performance of loans, however, does not plausibly suggest poor underwriting of loans.  Instead, such poor loan performance is "not only compatible with, but indeed . . . more likely explained by" other factors—in particular, inherently risky loan products going bad during the worst economic crisis since the Great Depression—than anything to do with underwriting.  Iqbal, 556 U.S. at 680; N.J. Carpenters Health Fund v. NovaStar Mortg., Inc., No. 08-cv-5310(DAB), 2011 WL 1338195, at *10-11 (S.D.N.Y. Mar. 31, 2011) ("NovaStar I") (allegations of poor loan performance amount to a claim that "the subprime market melted down and Defendants were market participants, so they must be liable for my losses in my risky investment") (internal quotation marks omitted); In re Barclays Bank PLC Sec. Litig., No. 09 Civ. 1989, 2011 WL 31548, at *5 (S.D.N.Y. Jan. 5, 2011) ("A backward-looking assessment of the infirmities of mortgage-related securities . . . cannot help plaintiffs' case.").

F.    **Plaintiffs Fail to Allege Damages**

To plead a prima facie case of fraud, a plaintiff must allege injury.  See LaSalle Nat'l Bank v. Ernst & Young LLP, 285 A.D.2d 101, 109 (1st Dep't 2001).  To plead injury adequately, Plaintiffs must, at minimum, make "factual allegations describing the pecuniary or out-of-pocket loss sustained as a result of the defendants' misrepresentations".  Spencer Task Software & Info. Servs. LLC v. RPost Int'l Ltd., 383 F. Supp. 2d 428, 455 (S.D.N.Y. 2003).  Unlike stock in which "shares are purchased for the purpose of investment and their true value to

26

the investor is the price which they may later be sold", asset-backed securities are securitized contract rights that provide investors "with the expectation that they would receive a stream of interest payments for the life of the securitization and, at the end of the securitization, the return of their principal".  AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC, 646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009).  Accordingly, RMBS investors suffer actionable damages when there is a failure to distribute the "pass-through" cash flows, not an alleged decline in the "value" of the certificates.  Id. (plaintiffs suffered losses on asset-backed securities "not [because of] a decrease in market price, but [because of] a decrease in the amount of money returned to them over the course of the securitization").

Plaintiffs do not—because they cannot—allege that they have received anything less than the full amount of "pass-through" payments to which they were entitled as Certificateholders. Rather, Plaintiffs allege merely that the "true value of the RMBS [they purchased] was much less than the amount Plaintiffs paid at the time of purchase".  (Compl. ¶ 302.)  Such vague allegation, standing alone, is insufficient to plead cognizable damages.  See NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co., 743 F. Supp. 2d 288, 291-92 (S.D.N.Y. 2010) (appeal pending, No. 11-2762 (2d Cir.)) (finding that allegations of a hypothetical price decline or increased financial risk were not cognizable injuries and that plaintiffs must show actual failure to receive payments to which they were entitled); Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co., 652 F. Supp. 2d 576, 590-92 (E.D. Pa. 2009) (finding that plaintiffs failed to plead damages where they failed to allege a diminished Certificate income stream).

## II.   PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING AND ABETTING FRAUD

Plaintiffs' aiding and abetting claims are premised solely on the fact that multiple entities were involved in sponsoring and underwriting each of the Offerings at issue.  (Compl. ¶¶ 355,

357-360, 362, 364-367, 369-372.)  That is insufficient.  Under New York law, plaintiffs must

allege (1) the existence of an underlying fraud, (2) knowledge of the fraud, and (3) substantial

assistance in the commission of the fraud.  See VTech Holdings, Ltd. v. Pricewaterhouse

Coopers, LLP, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004).  A claim of aiding and abetting must

show actual knowledge of the underlying fraud.  See Lerner, 459 F.3d at 292-93; Berman v.

Morgan Keegan & Co., No. 10 Civ. 5866, 2011 WL 1002683, at *10 (S.D.N.Y. Mar. 14, 2011)

(allegations of constructive knowledge or recklessness are insufficient).  As detailed above (see

Part I), Plaintiffs fail to plead an underlying fraud and thus, they also fail to plead aiding and

abetting liability.  See In re AHT Corp., 292 B.R. 734, 745-46 (S.D.N.Y. 2003) aff'd, 123 F.

App'x 17 (2d Cir. 2005).  On this basis alone, all claims of aiding and abetting against all

Defendants should be dismissed.[40]

## III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION

In order to sustain a claim of negligent misrepresentation, Plaintiffs must demonstrate

that they had a "special relationship" with Defendants that would give rise to a duty to provide

accurate information.  See J.A.O. Acquisition Corp. v. Stavitsky, 8 N.Y.3d 144, 148 (2007).  A

---

[40] Even if an underlying fraud were present, which it is not, Plaintiffs have failed to show knowledge and substantial participation on the part of the holding company Defendants—the Bear Stearns Companies, Inc. and JPMC.  Plaintiffs have failed to allege that those Defendants had actual knowledge of, or substantially participated in, any fraudulent conduct on the part of their subsidiaries, the Bear Stearns and the JPMorgan Sponsor and Depositor Defendants; rather, Plaintiffs assert only that the two holding company Defendants directed the activities of their subsidiaries and received their profits.  (Compl. ¶¶ 356, 363.)  The mere existence of a parent-subsidiary relationship, without specific allegations of conduct on the part of the parent, however, is insufficient to sustain a claim of aiding and abetting.  See Public Empls.' Ret. Sys. of Miss. v. Merrill Lynch & Co., 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) ("The parent/subsidiary relationship is an insufficient basis from which to infer control . . . [because] a parent corporation and its subsidiary are regarded as legally distinct entities." (internal quotation marks omitted)); see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC., 376 F. Supp. 2d 385, 412-13 (S.D.N.Y. 2005).  Plaintiffs offer no additional facts to show that either Defendant had any actual knowledge of fraudulent conduct on the part of its subsidiaries.

28

special relationship requires that defendants either "(1) possesse[d] 'unique or specialized expertise or (2) occupie[d] a special position of confidence and trust with the injured party". EED Holdings v. Palmer Johnson Acquisition Corp., 387 F. Supp. 2d 265, 281 (S.D.N.Y. 2004).

Plaintiffs have utterly failed to establish the existence of the requisite relationship with respect to Plaintiffs Dexia SA/NV, DCL and DHI because the Amended Complaint fails to allege that those Plaintiffs had any direct contact with Defendants. See In re Sterling Foster & Co., Inc., Sec. Litig., 222 F. Supp. 2d 216, 284 (E.D.N.Y. 2002) ("In light of the fact that the Second Amended Complaint does not refer to a single conversation between the [defendants] and the plaintiffs, the Court cannot find that a relationship so close as to approach that of privity existed between them."); Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P., 40 F. Supp. 2d 183, 189-92 (S.D.N.Y. 1999) (dismissing plaintiff's negligent misrepresentation claim because plaintiff conceded it "had no direct contact with defendants").

Nor do Plaintiffs allege any relationship of trust and confidence existed between the relevant Defendants and FSAM, which made the initial purchases. (Compl. ¶ 13.) When sophisticated parties engage in "arms-length business transactions", as here, courts find that a special relationship is not present. See DynCorp v. GTE Corp., 215 F. Supp. 2d 308, 329 (S.D.N.Y. 2002). Plaintiffs' assertion that they have relied on Defendants' "exclusive and non-public knowledge" regarding mortgage loans and underwriting for multiple investments over the course of two years is insufficient to establish this relationship. (Compl. ¶ 378.) "[T]he number of years of transactions undertaken by two business entities does not create a relationship of trust." MBIA Ins. Co. v. GMAC Mortg. LLC, 30 Misc. 3d 856, 864 (Sup. Ct. N.Y. Cty. 2010).

Additionally, Defendants' alleged "unique and special knowledge" regarding the RMBS allegedly acquired through the due diligence they performed does not give rise to a duty to

provide accurate information.  Plaintiffs allege that the Underwriter Defendants had access to non-public information concerning the mortgages, including loan files and due diligence results. (Compl. ¶ 375-377.)  Under New York law, however, "knowledge of the particulars of [a] company's business . . . does not constitute the type of 'specialized knowledge' that is required in order to impose a duty of care in the commercial context."  Gusmao v. GMT Group, Inc., No. 06 Civ. 5113, 2008 WL 2980039, at *15 (S.D.N.Y. Aug. 1, 2008); see also GMAC Mortg. LLC, 30 Misc.3d at 864-65 (RMBS issuer did not have superior knowledge of deviations from underwriting guidelines simply by virtue of its proximity to loan and servicing files).

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR SUCCESSOR LIABILITY

Plaintiffs allege successor liability against JPMC and JPMorgan Securities as successors-in-interest to the Bear Stearns entities.  (Compl. ¶¶ 384-91.)  Because Plaintiffs have failed to plead primary liability for fraud, aiding and abetting fraud or negligent misrepresentation, their claim for successor liability necessarily fails.

## V.     PLAINTIFFS DO NOT HAVE STANDING TO BRING THIS SUIT

Standing is an "irreducible constitutional minimum" that must exist for federal jurisdiction to attach, Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), and if, after the opportunity to amend the complaint, "standing does not adequately appear from all materials of record, the complaint must be dismissed", Warth v. Seldin, 422 U.S. 490, 501-02 (1975).  It is impossible for FSAM and Dexia SA/NV, DHI and DCL ("the non-purchaser  entities"), to have standing to pursue the same causes of action based on the same RMBS purchases.  If, like FSAM alleges (Compl. ¶ 18), it validly assigned the cause of action to the non-purchaser entities, FSAM itself does not have a cause of action.  See, e.g., N. Fork Bank v. Cohen & Krassner, 44 A.D.3d 375, 375 (2007) (in action brought by both the assignor and assignee, "the [fraud] claim is viable only insofar as asserted by" assignee); Miller v. Wells Fargo Bank Int'l Corp., 540 F.2d 548, 557

(2d Cir. 1976) (upon a valid assignment, "the assignor is divested of all control and right to cause of action and the assignee is entitled to control it and receive its fruits") (internal quotation marks and citations omitted).

In the alternative, if FSAM's claims were not validly assigned, the non-purchaser entities do not have standing to bring this lawsuit.  A transfer of "rights, title and interest in [an] Agreement'[, s]tanding alone, . . . may be deemed insufficient . . . to transfer claims for rescission or fraud in the inducement".  Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146, 152 (2d Cir. 1995) (finding the cause of action validly assigned where the agreement transferred "all of [the assignors'] rights and interest in the transaction described").[41]  Plaintiffs do not adequately plead the nature of the "intercompany agreements" pursuant to which FSAM allegedly "assigned and transferred the RMBS . . . to the other Dexia Plaintiffs".  (Compl. ¶ 18).  As evidenced by documents publicly filed with the SEC, Dexia SA and DCL entered into various agreements with FSAM,[42] which provided that FSAM will "convey all right, title and interest in the Put Settlement Assets to Dexia or DCL", which Put Settlement Assets appear to include RMBS, and which "will include the right to receive all accrued and unpaid interest".[43]  This plain language demonstrates that FSAM transferred only the Certificates themselves and the accompanying right to receive the periodic payments due on those Certificates and did not assign to Dexia or DCL rights or claims concerning the transaction

---

[41]Unlike in Banque Arabe, where assignor was "about to become defunct" and thus "ha[d] little incentive to reserve transactional rights when transferring its interests", 57 F.3d at 153, here, FSAM is clearly not defunct and is interested in pursuing its cause of action against Defendants.
[42] See Assured Guaranty, Ltd 8-K, dated as of July 8, 2009 ("Assured 8-K") (Ex. 7) at 2-3 (describing guaranty agreements among Plaintiffs in connection with Dexia's transaction with Assured Guaranty, Ltd.); id. at 6 ("Dexia and DCL have jointly and severally guaranteed the scheduled payments of interest and principal in relation to each FSAM asset", which includes "primarily residential mortgage backed securities"); see also Master Agreement, Ex. 10.3.1 to Assured 8-K (Ex. 8); Put Option Confirmation, Ex. 10.3.3 to Assured 8-K (Ex. 9).
[43] Ex. 9 at 11, 13.

by which FSAM acquired the Certificates.  See also Cal. Pub. Emps. Ret. Sys. v. Shearman & Sterling, 95 N.Y.2d 427, 432 (2000) (dismissing claims relating to a loan transaction that was brought by an entity that had been assigned only the "'right, title and interest in, to and under the [loan] documents'").

## VI.   CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Complaints should be granted, and the Complaints should be dismissed.

New York, New York

July 27, 2012

CRAVATH, SWAINE & MOORE LLP,

by

                s/ Daniel Slifkin
                Daniel Slifkin
                J. Wesley Earnhardt
                Members of the Firm

        Worldwide Plaza
        825 Eighth Avenue
        New York, NY 10019
        (212) 474-1000
            dslifkin@cravath.com
            wearnhardt@cravath.com

        *Attorneys for Defendants Bear Stearns & Co. Inc. (now known as J.P. Morgan Securities LLC), The Bear Stearns Companies, Inc. (now known as The Bear Stearns Companies LLC), Bear Stearns Asset Backed Securities I LLC, EMC Mortgage LLC (f/k/a EMC Mortgage Corporation), Structured Asset Mortgage Investments II Inc., J.P. Morgan Acceptance Corporation I, J.P. Morgan Mortgage Acquisition Corporation, J.P. Morgan Securities LLC (f/k/a JPMorgan Securities Inc.), WaMu Asset Acceptance Corp., WaMu Capital Corp., Washington Mutual Mortgage Securities Corp., JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.*

32