**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEXIA SA/NV; DEXIA HOLDINGS, INC.; FSA ASSET MANAGEMENT LLC; DEXIA CRÉDIT LOCAL SA,<br><br>              Plaintiffs,<br><br>      v.<br><br>BEAR, STEARNS & CO. INC., THE BEAR STEARNS COMPANIES, INC., BEAR STEARNS ASSET BACKED SECURITIES I LLC, EMC MORTGAGE LLC (f/k/a EMC MORTGAGE CORPORATION), STRUCTURED ASSET MORTGAGE INVESTMENTS II INC., J.P. MORGAN ACCEPTANCE CORPORATION I, J.P. MORGAN MORTGAGE ACQUISITION CORPORATION., J.P. MORGAN SECURITIES LLC (f/k/a JPMORGAN SECURITIES INC.), WAMU ASSET ACCEPTANCE CORP., WAMU CAPITAL CORP., WAMU MORTGAGE SECURITIES, JPMORGAN CHASE & CO., and JPMORGAN CHASE BANK, N.A.,<br><br>              Defendants. | 12-cv-4761 (JSR)<br><br>ECF CASE |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

GLOSSARY OF DEFINED TERMS ......................................................................... ix

I.    PRELIMINARY STATEMENT ............................................................................1

II.   STATEMENT OF FACTS ...................................................................................3

    A.   Defendants' Intimate Involvement With The RMBS Securitization Process, And With Their Sale To Dexia ...........................................................3

    B.   The Undisclosed Truth About Defendants' Securitization Practices ....................4

        1.   Bear Stearns .........................................................................................4

        2.   WaMu ...................................................................................................7

        3.   JPMorgan .............................................................................................10

    C.   Defendants Conceal Material Information From The CRAs ...............................11

    D.   Defendants' Culpability As Underwriters Of RMBS ..........................................12

    E.   The Certificates Suffer Massive Defaults In The Underlying Loan Pools And Are Downgraded To "Junk" ..........................................................................14

III.  ARGUMENT .......................................................................................................14

    A.   Legal Standard ....................................................................................................14

    B.   The Complaint Sufficiently Details Defendants' Fraud In The Offerings At Issue ....................................................................................................................15

    C.   Defendants Made Material Misrepresentations Regarding The Certificates .........17

        1.   Defendants Misrepresented The Loan Underwriting And Selection Practices That Were Used To Create The Certificates ..............................17

        2.   Defendants' Untrue Statements Regarding Credit Scores, Occupancy Rates and EPDs ...................................................................................18

        3.   Defendants' False Statements Regarding The Quality of the Collateral .............................................................................................20

i

        4.     The Certificates' Ratings Were Inflated ...................................................22

D.     The Complaint Adequately Pleads Reliance.........................................................24

E.     Defendants' Acted Knowingly Or Recklessly.....................................................26

        1.     Defendants' Motive and Opportunity To Sell RMBS Backed By Toxic Loans ..................................................................................27

        2.     Defendants' Knowledge Of The Abysmal Quality Of The Loans ...........27

        3.     The Magnitude of the Fraud Supports A Strong Inference Of Scienter ..................................................................................29

        4.     The Confidential Witness Statements Are Probative of Scienter .............29

F.     The Complaint Adequately Pleads Loss Causation ..............................................30

G.     The Complaint Adequately Pleads Injury.............................................................31

H.     Plaintiffs Adequately Plead Aiding And Abetting Fraud .....................................32

I.     Plaintiffs Adequately Plead Negligent Misrepresentation....................................33

J.     Plaintiffs Have Standing To Bring This Suit ........................................................34

IV.    CONCLUSION..................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
  651 F. Supp. 2d 155 (S.D.N.Y. 2009)..................................................................23, 26, 27

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*,
  No. 650027/11, 2012 WL 1450022 (N.Y. Sup. Ct. Apr. 23, 2012).......................24

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*,
  646 F. Supp. 2d 385 (S.D.N.Y. 2009)..................................................................32

*Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*,
  No. 03 Civ. 3748 (DAB), 2006 WL 278138 (S.D.N.Y. Feb. 2, 2006)..................25

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
  No. 2:11-CV-05236-MRP (MANx), 2011 WL 5067128 (C.D. Cal. Oct. 21, 2011)..............25

*Allstate v. Countrywide*,
  824 F. Supp. 2d 1164 (C.D. Cal. 2011) ............................................................15, 21, 23, 32

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d. Cir. 2007)..................................................................................14

*Barneli & Cie S.A. v. Dutch Book Funds, SPC, Ltd.*,
  No. 600871/08, 2010 N.Y. Misc. LEXIS 4270 (Sup. Ct. Aug. 9, 2010)................25

*Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass-Through Certificates*,
  748 F. Supp. 2d 1246 (W.D. Wash. 2010).........................................................18, 20

*Castellano v. Young & Rubican, Inc.*,
  257 F.3d 171 (2d. Cir. 2001).................................................................................31

*Chill v. General Elec. Co.*,
  101 F. 3d 263 (2d. Cir. 1996)................................................................................29

*China Dev. Indus. Bank v. Morgan Stanley*,
  No. 650957/2010, 2011 N.Y. Misc. LEXIS 1808 (N.Y. Sup. Ct. Feb. 25, 2011),
  *aff'd*, 86 A.D.3d 435 (1st Dept. 2011) ..............................................................24

*Cromer Fin. Ltd. v. Berger*,
  No. 00 CIV 2498, 2001 WL 1112548 (S.D.N.Y. Sept. 19, 2001).........................25

*Defer LP v. Raymond James Fin., Inc.*
  654 F. Supp. 2d 204 (S.D.N.Y. 2009).................................................................28

*DeMarco v. Robertson Stephens Inc.*,
    318 F. Supp. 2d 110 (S.D.N.Y. 2004)..................................................................................21

*Dexia, et al. v. Deutsche Bank, et al.*,
    No. 11 Civ. 5672 (JSR) (S.D.N.Y. Feb. 6, 2012) ...........................................................29, 35

*Dexia Holdings, Inc. v. Countrywide Fin. Corp.*,
    No. 2:11-cv-07165-MRP-MAN, 2012 WL 1798997 (C.D. Cal. Feb. 17, 2012)..............16, 31

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012).................................................................14, 15, 16, 31

*DynCorp. v. GTE Corp.*,
    215 F. Supp. 2d 308 (S.D.N.Y. 2002)..................................................................................35

*EED Hldgs v. Palmer Johnson Acquis. Corp.*,
    387 F. Supp. 2d 265 (S.D.N.Y. 2004)..................................................................................34

*Emergent Capital Inv. Mgmt., v. Stonepath Grp., Inc.*
    343 F.3d 189 (2d Cir. 2003).................................................................................................26

*Feinberg v. Katz*,
    No. 99 Civ. 0045 (CHS), 2005 WL 2990633 (S.D.N.Y. Nov. 7, 2005).........................26, 34

*FMC Corp., v. Varonos*,
    No. 87 C 9640, 1988 WL 116825 (N.D. Ill. Oct. 21, 1988).................................................35

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
    No. 09 Civ. 4050 (PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)........................18, 20

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
    No. 09-cv-04050 (PKC) (S.D.N.Y. Aug. 4, 2009) ....................................................16, 18, 20

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)..................................................................................30

*Gabriel Capital L.P. v. NatWest Fin., Inc.*,
    94 F. Supp. 2d 491 (S.D.N.Y. 2000)....................................................................................32

*Global Minerals & Metals Corp. v. Holme*,
    35 A.D.3d 93 (1st Dep't 2006) ............................................................................................26

*Gusmao v. GMT Grp., Inc.*,
    No. 06 Civ. 5113 (GEL), 2008 WL 2980039 (S.D.N.Y. Aug. 1, 2008)................................34

*Hunt v. Enzo Biochem*,
    530 F. Supp. 2d 580 (S.D.N.Y. 2008)..................................................................................25

iv

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010) .................................................................31

*In re Barclays Bank PLLC Sec. Litig.*,
  No. 09 Civ. 1989 (PAC), 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) .......................31

*In re Bear Stearns Cos., Inc. Sec. Deriv., and ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) .............................................................29, 31

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  No. 08 CIV. 8093 (LTS)(KNF), 2012 WL 1076216 (S.D.N.Y. March 30, 2012) ......... *passim*

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...............................................................15

*In re IndyMac Mortgage-Backed Sec. Litig.*,
  718 F. Supp. 2d 495 (S.D.N.Y. 2010) .................................................................23

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
  810 F. Supp. 2d 650 (S.D.N.Y. 2011) .................................................................17

*In re Novagold Res. Inc. Sec. Litig.*,
  629 F. Supp. 2d 272 (S.D.N.Y 2009) ..................................................................18

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ...................................................................21, 23

*In re Rezulin Prods. Liab. Litig.*,
  No. 00 Civ. 2843 (LAK), 2002 WL 31852826 (S.D.N.Y. Dec. 18, 2002) .............................36

*In re SLM Corp. Sec. Litig.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010) .................................................................19

*In re Top Tankers, Inc. Sec. Litig.*,
  528 F. Supp. 2d 408 (S.D.N.Y. 2007) .................................................................27

*Kimmell v. Schaefer*,
  89 N.Y.2d 257 (N.Y. 1996) ...............................................................................34

*King County, WA v. IKB Deutsche Industriebank*,
  751 F. Supp. 2d 652 (S.D.N.Y. 2010) ........................................................27, 31, 34

*Kottler v. Deutsche Bank AG*,
  607 F. Supp. 2d 447 (S.D.N.Y. 2009) .................................................................33

*Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*,
  No. 10-cv-7549 (WHP) (S.D.N.Y. Nov. 4, 2010) ..................................................16

v

*Lermer v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006)..................................................................27

*Lone Star Fund V (U.S.), L.P.* v. *Barclays Bank PLC*,
   594 F.3d 383 (5th Cir. 2010) .......................................................17, 18

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*,
   652 F. Supp. 2d 576 (E.D. Pa. 2009) ...................................................32

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
   87 A.D. 287 (1st Dept. 2011)................................................................16

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
   87 A.D.3d 287 (1st Dept. 2011)............................................................31

*MBIA Ins. Corp. v. Royal Bank of Can.*,
   No. 12238/09, 2010 WL 3294302 (N.Y. Sup. Aug. 19, 2010)...............26

*MBIA Ins. v. GMAC Mortg. LLC*,
   30 Misc. 3d 856 (Sup. Ct. N.Y. 2010) ..................................................35

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
   No. 08 Civ 5653 (PAC), 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ..........................19, 32

*N.J. Carpenters Health Fund v. NovaStar Mortgage., Inc.*,
   No. 08-cv-5310 (DAB) (S.D.N.Y. June 30, 2011) ...............................16

*N.J. Carpenters v. Residential Capital*,
   Nos. 08 CV 8781(HB), 08 CV 5093(HB), 2011 WL 2020260 (S.D.N.Y. May 19,
   2011) ....................................................................................................18

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*,
   720 F. Supp. 2d 254 (S.D.N.Y. 2010)...................................................23

*NECA-IBEW Heatlh & Welfare Fund v. Goldman, Sachs & Co.*,
   743 F. Supp. 2d 288 (S.D.N.Y. 2010)...................................................32

*North Fork Bank v. Cohen & Krassner*,
   843 N.Y.S. 2d 575 (1st Dep't 2007) .....................................................36

*Novak v. Kovaks*,
   216 F.3d 300 (2d Cir. 2000)..................................................................28

*Official Comm. of Unsecured Creditors of Worldcom, Inc. v. S.E.C.*,
   467 F.3d 73 (2d Cir. 2006)....................................................................34

*Ouaknine v. MacFarlane*,
   897 F.2d 75 (2d Cir. 1990)....................................................................15

*Peerless Mills, Inc. v. Am. Tel. & Tel. Co.*,
    527 F. 2d 445 (2d Cir. 1975).................................................................26

*Plumbers & Steamfitters Local 77 Pension Fund v. Canadian Imperial Bank of Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)...................................................27

*Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp., I*,
    No. 08 CV 1713 (ERK)(WDW), 2012 WL 601448 (E.D.N.Y. Feb. 23, 2012) ....................18

*Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*,
    No. 09-cv-287 (CRS) (W.D. Ky. Apr. 17, 2009)............................................ *passim*

*Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*,
    804 F. Supp. 2d 141 (S.D.N.Y. May 10, 2011) ........................................16, 18, 32

*Ret. Sys. of Miss. v. Goldman, Sachs Grp., Inc.*,
    No. 09 CV 1110 (HB), 2011 WL 135821 (S.D.N.Y. Jan. 12, 2012).....................17

*Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
    277 F.R.D. 97 (S.D.N.Y. 2011) ...............................................................32

*Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*,
    No. CV 08-1418, 2010 WL 6617866 (E.D.N.Y. Dec. 23, 2010) ..........................18

*Ret. Sys. v. Merrill Lynch & Co. Inc.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010)................................................... *passim*

*S.E.C. v. Mudd*,
    No. 11 CV 09202 (PAC), 2012 WL 3306961 (S.D.N.Y. Aug. 10, 2012)..............28

*Sec. Investor Prot. Corp. v. BDO Seidman, LLP*,
    222 F.3d 63 (2d Cir 2000).......................................................................26

*Suez Equity Investors, L.P. v. TD Bank*,
    250 F.3d 87 (2d Cir. 2001)..................................................................15, 34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................27

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    692 F. Supp. 2d 387 (S.D.N.Y. 2010).................................................16, 21, 22

*Turtur v. Rothschild Registry Int'l, Inc.*,
    26 F.3d 304 (2d Cir. 1994)......................................................................26

vii

*U.S. v. Cambio Exacto, S.A.,*
  166 F.3d 522 (2d Cir. 1999)..................................................................35

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991)..........................................................................22

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(a) ................................................................................14

Fed. R. Civ. P. 9(b) ....................................................................15, 20, 27

Fed. R. Civ. P. 17(a) ..............................................................................34

## GLOSSARY OF DEFINED TERMS

The following citation forms are used in this memorandum in opposition to Defendants'

motion to dismiss:

- "Bear Stearns" refers to the Bear Stearns Defendants, as defined in ¶24 of the Complaint.

- "BSCI" refers to Defendant The Bear Stearns Companies, Inc.

- "Certificates" refers to residential mortgage-backed securities at issue in this Action, as defined at ¶13 of the Complaint.

- Citations to "¶__" are to paragraphs of the Complaint.

- "Complaint" or "Comp." refers to the Amended Complaint dated May 18, 2012.

- "CRA" refers to a credit rating agency that provided a credit rating for the RMBS, including Moody's, Standard & Poor's and Fitch Ratings.

- "CW" refers to confidential witness; "CW __" refers to the corresponding confidential witness in the Complaint.

- "Defendants" consist of Bear, Stearns & Co. Inc. and certain of its affiliates (collectively, "Bear Stearns"), JPMorgan Chase & Co. and certain of its affiliates (collectively, "JP Morgan"), and WaMu Capital Corporation and certain of its affiliates (collectively, "Washington Mutual" or "WaMu"), as defined in ¶¶19-34 of the Complaint.

- "EPD" refers to early payment default.

- "FCIC" refers to the National Commission on the Causes of the Financial and Economic Crisis in the United States.

- "JPMorgan" refers to the JPMorgan Defendants, as defined in ¶30 of the Complaint.

- JPMC refers to Defendant JPMorgan Chase & Co.

- "LTV" refers to loan-to-value.

- "Long Beach Mortgage" refers to Long Beach Mortgage Company.

- "NYT" refers to *The New York Times*.

- "Plaintiffs" or "Dexia" consist of FSA Asset Management LLC ("FSAM"), Dexia Crédit Local SA ("DCL"), Dexia Holdings, Inc. ("DHI") and Dexia SA/NV, as defined at ¶¶13-18 of the Complaint.

- "RMBS" refers to residential mortgage-backed securities.

- "Sponsor and Depositor Defendants" refers to Defendants EMC Mortgage LLC, Structured Asset Mortgage Investments II, Inc., Bear Stearns Asset Backed Securities I, LLC, JPMorgan Chase Bank, NA, JPMorgan Acceptance Corp., JPMorgan Mortgage Acquisition Corp., WaMu Asset Acceptance Corp. and WaMu Mortgage Securities Corp., as defined at ¶¶355, 362, 369 of the Complaint.

- "WaMu" refers to the WaMu Capital Corp., WaMu Asset Acceptance Corp. and WaMu Mortgage Securities Corp. (collectively "WaMu Defendants") and to non-parties Washington Mutual Bank, Long Beach Securities Corp. and Long Beach Mortgage Co., as defined in ¶34 of the Complaint.

I.       **PRELIMINARY STATEMENT**

For at least three years, Defendants Bear Stearns, JPMorgan and WaMu created, issued, underwrote and sold RMBS from loans – many of which Defendants themselves originated – that they *knew* violated the underwriting guidelines represented in the offering documents. Aware of such blatant violations, Defendants "waived in" large swaths of risky loans for resale to Plaintiffs and other unsuspecting investors.   For example, Bear Stearns and JPMorgan "waived in" *50%* and *51%* respectively of the loans that their own due diligence had flagged as fatally defective, and WaMu deliberately reduced its investment in loan underwriting controls to the point that its chief credit officer warned that WaMu had lost the ability to "quantify the risk." ¶¶73, 86, 137.  In sum, Defendants *knew* that the Certificates were the product of a wholesale abandonment of prudent underwriting practices – but concealed their scheme from Plaintiffs and other investors.  ¶1.

RMBS give investors an interest in (a) the principal and interest payments from the underlying pools of mortgages, and (b) the collateral for those mortgages in case borrowers default.  Thus, the quality and value of RMBS depends largely on the quality of the underlying mortgages, which are measured by various metrics such as credit scores, LTV ratios, EPDs, extent of mortgage documentation, and borrower occupancy (the "occupancy rate").   The reliability of these metrics depends on the quality of the underwriting practices used to originate the loans, and strict adherence to underwriting standards is thus critical to investors.  ¶¶2-3.

Defendants, unlike Plaintiffs, had exclusive access to information about the quality of the mortgage pools, including (a) access to the underlying loan files, and (b) due diligence reports from the specialized due diligence vendors that Defendants hired.  This information uniformly showed that the underlying mortgages were of much poorer quality (*e.g.*, had worse borrower

credit scores, worse LTV ratios, worse EPD rates, worse occupancy rates, etc.), and that the default and loss risks were far greater than what Defendants represented to Plaintiffs. Plaintiffs reasonably relied on Defendants' false assurances as to the purported quality of the Certificates and purchased more than $1.5 billion in RMBS from Defendants. ¶6.

As part of the fraud, Defendants needed high ratings from S&P, Moody's and Fitch. To achieve such ratings, Defendants concealed the truth about the quality of the underlying loans from these CRAs, and then used the fraudulently procured ratings to induce investors, including Plaintiffs, to purchase the Certificates. As CRA executives later testified before the FCIC, RMBS sponsors such as Defendants "routinely" threatened to withdraw their business if they did not get their desired ratings, and those threats "absolutely tilted the balance away from [CRAs] being an independent arbiter of risk towards [being] a captive facilitator of risk transfer." ¶8.

Defendants reaped extraordinarily lucrative profits from their fraud (¶¶41-42), while Plaintiffs and other investors suffered staggering losses. ¶10. As a former JPMorgan executive told the *NYT,* in November 2011: "The bigwigs of the corporations knew this, but they figured we're going to make billions out of it, so who cares? The government is going to bail us out. And the problem loans will be out of here, maybe even overseas." ¶9.

Defendants' motion contends that Plaintiffs fail to allege fraud with the requisite particularity because their claims purportedly do not relate to the Certificates, and do not plead actionable misrepresentations, justifiable reliance, scienter, causation, or damages. Defendants are wrong. As the Complaint details, Defendants designed and implemented securitization machines focused solely on creating, structuring and selling as much as possible – including hundreds of millions of dollars of loans that Defendants knew to be defective. Plaintiffs also detail how Defendants had exclusive access to critical information regarding the quality of the

loans in the securitizations – information that clearly showed the underlying loans in the machine suffered from systemic violations of the underwriting standards. Defendants consciously disregarded this negative information and never disclosed it to Plaintiffs or the CRAs.

## II.   STATEMENT OF FACTS

### A.   Defendants' Intimate Involvement With The RMBS Securitization Process, And With Their Sale To Dexia

Defendants collectively securitized more than $325 billion in mortgages from 2005 to 2007, and were intimately involved in every aspect of the mortgage securitization process. ¶¶5, 19-34, 46.  In particular, as sponsors, depositors and underwriters of the Certificates, the Defendants (a) purchased mortgage pools from loan originators (which were often their own affiliates); (b) conducted due diligence on the mortgage pools and any third-party loan originators; (c) selected the loans to be securitized into Certificates; (d) "structured" the Certificates by segmenting the mortgage payments and default risks into separate tranches; and (e) managed the procuring of "AAA" ratings from the CRAs.  ¶¶35-46.

As the underwriters of all Certificates at issue (and as sponsor, depositor *and* underwriter of 35 of these 51 RMBS) Defendants also prepared the Offering Materials for each Certificate, and marketed and sold them to Dexia.  ¶¶35-44.  As detailed in the Complaint and at §III.C below, Defendants assured Dexia, *inter alia*:

- that the loans underlying the Certificates were originated pursuant to the stated loan underwriting standards, and were carefully selected for securitization because they met these quality standards.  ¶¶238-54 and Compl. Exs. B(1-3) & C(1-3);

- that the mortgage pools underlying the Certificates reflected specified borrower credit scores, occupancy rates, lack of EPDs and other metrics.  ¶¶257-71 and Exs. D-F;

- that the underlying loans were secured by properties that had been independently appraised in accordance with established industry standards, that the mortgage pools met stated LTV ratios based on such appraisals, and that loans that reflected an LTV value of worse than 80% ("High LTV Loans") – which provided little or no equity

3

cushion in the event of a borrower's default – were carefully restricted only to borrowers who were particularly creditworthy.  ¶¶272-78 and Compl. Ex. G; and

- that the Certificates' lofty "AAA" ratings were based on the CRAs' "independent evaluation" of the RMBS and "[took] into consideration the characteristics of the mortgage loans." ¶¶279-84 & Compl. Ex. H.

Because of their roles in creating, underwriting and selling the Certificates, Defendants had exclusive access to non-public information about the quality of the underlying mortgage pools, including (a) access to the individual loan files, (b) familiarity with their own affiliates' loan origination practices, (c) knowledge of their own "due diligence" vendors' review of mortgage pools originated by third parties, and (d) knowledge regarding the true extent to which the CRAs' ratings were not "independent" and were based on information that was materially incomplete.  ¶46.  Accordingly, Dexia reasonably relied on the accuracy and completeness of Defendants' representations in those materials.  ¶¶6, 44, 285.

### B.     The Undisclosed Truth About Defendants' Securitization Practices

Unbeknownst to Dexia, however, Defendants had turned their securitization operations into machines that had substituted any semblance of due diligence with practices designed to reap maximum profits by knowingly transferring risks on toxic loans to unsuspecting investors.

#### 1.     Bear Stearns

From 2005 to 2007, Bear Stearns was one of the largest RMBS underwriters in the country, securitizing at least $162 billion in loans.  ¶5.  It achieved this massive volume largely as a result of its exceptionally aggressive efforts to push mortgage loans through its securitization process as quickly as possible, and irrespective of quality.

For example, one of Bear Stearns' biggest "due diligence" vendors, Clayton, later informed the FCIC that during the 18 months ended June 30, 2007, it had rated **only 54%** of all the loan samples that it had reviewed as meeting the stated underwriting guidelines.  As

Clayton's former President and COO testified to the FCIC: "That 54% to me says there [was] a quality control issue in the factory." ¶72. Nonetheless, Bear Stearns routinely over-ruled its due diligence vendors and "waived in" *50%* of the loans that Clayton had sampled and found to be in violation of stated underwriting standards (and Bear accepted 100% of all loans that had not been reviewed at all). As Clayton's COO also told the FCIC, of all RMBS issuers "***Bear Stearns was the worst on exceptions [to underwriting standards].***" ¶73.

Indeed, even these extraordinarily high defect rates were likely understated, as Bear Stearns took aggressive measures to suppress the scope of Clayton's and Bohan's due diligence of loan pools. For example, an April 5, 2007 email from a quality control and vendor relations manager of Bear Stearns' affiliate defendant EMC – which was the sponsor of each Bear Stearns securitization at issue here – advised its due diligence vendors that "effective immediately, *in addition to not ordering occupancy inspections and review appraisals,* DO NOT PERFORM RE-VERIFICATIONS OR RETRIEVE CREDIT REPORTS ON THE SECURITIZATION BREACH AUDITS." ¶68 (CAPS in original).[1] The same email directed Bear Stearns' due diligence vendors to stop making phone calls to verify borrower's purported employment. *Id.*

Bear Stearns had deliberately (and significantly) reduced the scope of its due diligence of subprime loans since not later than early 2005, before Dexia purchased the Bear Stearns Certificates. For example, in February 11, 2005, an EMC underwriting manager confirmed in an internal email to Bear Stearns analysts that it was reducing the amount of due diligence it would perform "in order to make us more competitive on bids with larger sub-prime [loan originators]," such as Countrywide, Greenpoint and Impac. ¶65. CW2, another EMC underwriting manager, described how this meant that EMC – which had previously conducted due diligence on samples

---

[1] Emphasis within quotation marks has been added unless otherwise stated.

equal to 10% to 20% of a given loan pool – began to review significantly fewer than 10%.  ¶66.
Worse still, to enable it to maximize RMBS volume, internal audit reports from 2006 describe
how Bear Stearns began to conduct its limited due diligence only *after* it had already bought and
processed the loans (a practice euphemistically referred to as "post-closing" due diligence).  *See,
e.g.,* ¶66 (EMC loan analyst Van Leeuwen confirming that Bear "***would go ahead and buy
[mortgages] and put them into a security before taking a look at them***").  As a result, Bear
ended up routinely buying and securitizing loans that were underwritten based on borrower
incomes and property values that were "way overinflated," and ***"as long as it was not totally
ridiculous, we took it.***"  ¶71.  In sum, despite its knowledge of underwriting violations on a
massive scale, by 2006 Bear Stearns was actually reducing, ***and in many cases eliminating
altogether***, its due diligence.  ¶¶64, 67.

Tellingly, Bear Stearns also changed its "early payment default" (or "EPD") policy to
facilitate its sales of RMBS at the expense of investors.  Until 2005, Bear Stearns' policy
prohibited it from securitizing loans before expiration of the EPD period (which was typically 30
to 90 days after Bear acquired the loan), with the result that Bear Stearns bore the risk of loss if a
loan defaulted during the EPD period.  ¶55.  In 2005, however, Bear Stearns changed its policy
to permit it to securitize loans as soon as it acquired them.  Thus, Bear Stearns transferred EPD
default and loss risks to investors, which in turn further increased Bear Stearns' incentives to
rush through the securitization process without conducting (and ignoring) due diligence.  ¶56.

Not surprisingly, Bear Stearns executives ensured that its securitization machine would
continue to increase volume.  For example, on April 4, 2006, an EMC executive informed the
company's staff that they were "responsible for making sure we fund at least 500 [loans] each
and every day … if we have 500+ loans in this office we MUST find a way to underwrite them

and buy them." ¶63.  During the same period, however, a June 13, 2006 email from Bear

Stearns' head of whole loan trading reminded Bear Stearns' personnel of the need "to be certain

we can securitize the loans with [a] 1 month epd before the epd period expires." ¶57.  Former

EMC loan analyst Van Leeuwen described Bear's resulting practice as follows:

> We would typically buy loans [for an RMBS deal] from a Wells Fargo or a
> Countrywide or [another] bank towards the end of the month, around the 28th or the
> 29th, and [the loans] would often be put into a security that would close on the 30th
> or 31st of the month, *so it was almost instantaneously that it would pass through*….
>
> *[T]here were people who knew that these loans were not the best*, but the whole
> focus was short term, *I mean they were only going to be on our books for a very
> short time anyway, so who cares?*  ¶58.

Perversely, Bear Stearns even devised a scheme to profit from loans it had already

securitized that later defaulted.  Loan purchasing agreements require loan originators to

repurchase or replace a loan that experiences an EPD.  Rather than demand the repurchase or

replacement of a loan to benefit investors, however, beginning in 2006, Bear Stearns used

information that it collected about EPDs to demand that loan originators refund to *Bear* a portion

of the purchase price (a "down bid") to reflect the decrease in the loan's value caused by the

EPD.  ¶¶77-78.  Between April 2006 and April 2007 alone, Bear Stearns resolved $1.9 billion in

EPD claims against loan originators, thereby pocketing *hundreds of millions of dollars* that

should have been used for the benefit of RMBS trusts holding the loans. Bear Stearns never

disclosed this fraudulent practice to Dexia or other investors.  ¶79.

### 2.   WaMu

WaMu was also one of the country's largest mortgage originators and securitizers before

its collapse in September 2008.  ¶5.  Like Bear Stearns, WaMu aggressively securitized new

loans as quickly as possible with minimal regard for quality.  In fact, WaMu launched a formal

"High Risk Lending Strategy" in January 2005 that required WaMu's subprime mortgage

subsidiary – Long Beach Mortgage – to increase its origination of subprime mortgages to $30 billion in 2005 and $36 billion in 2006.  ¶¶82-85.  To implement its new strategy, WaMu also strongly incentivized its employees to originate high risk loans regardless of quality.  As one former WaMu senior underwriter and credit quality manager (CW6) put it, "*[t]he more you slammed out, the more you made.*"  ¶88.  As a result, WaMu routinely steered high risk borrowers into high risk loans, accepted loan applications without verifying borrower income, and used low teaser rates to induce borrowers to take out large loans they could not afford.  ¶91.

At the same time, WaMu actually *reduced* its investment in loan underwriting and oversight.  As WaMu's CEO explained in a June 2004 internal memo, "we must significantly reduce the cost of originating mortgages by adopting automated underwriting and other loan fulfillment processes."  ¶85.  As a result, WaMu quickly lost its ability to properly originate and underwrite mortgages, *and WaMu's Chief Credit Officer warned his CEO in June 2005 that the WaMu's loan origination business was growing so fast that it could not "catch up and quantify the risk."*  ¶86.  Similarly, an internal September 2005 audit report identified serious problems in Long Beach's loan underwriting practices, including (1) failure to follow underwriting guidelines; (2) widespread use of unverified income and unsupported exclusion of debt items in calculating DTI ratios; (3) lax internal controls that allowed unauthorized employees to approve loans; and (4) failure to document approval of loan requirements in *60%* of loan files reviewed.  ¶86; *see also* ¶105 (results of November 2005 internal investigation into two WaMu offices in California which found that "*42% of the loans reviewed contained suspect activity or fraud*").  Two years later, a September 2007 internal audit confirmed that these problems continued, that WaMu's overall system of risk management and internal controls "has deficiencies related to multiple, critical origination and underwriting processes," and that

***"[a]ccurate reporting and tracking of exceptions to policy does not exist."*** ¶87.

In addition, WaMu pressured appraisers to inflate their property appraisals to facilitate loan approvals. For example, WaMu instituted a policy that required all appraisers be listed on the "WaMu appraiser list." Appraisers who submitted appraisals that were too low to get loans approved were told to "reconsider" their valuations or be excluded. As a former WaMu appraisal director (CW17) confirmed, "reconsiderations of value ["ROV's"] were done constantly," the number of ROVs doubled or tripled between 2005 and 2007, and when WaMu requested an ROV the appraisal value was increased roughly 80% of the time. ¶101. Moreover, senior WaMu management directly participated in illegally pressuring WaMu's appraisers. For example, top WaMu executives told the President of eAppraiseIT (a major supplier of appraisals to WaMu) that WaMu would retain – or exclude – eAppraiseIT appraisers based on how many came in at or above the values that WaMu wanted. ¶98; *see also* ¶¶93-107.

As the Senate Report also makes clear, WaMu's internal controls were so dismal that "***even loans marked with a red flag indicating fraud were being sold to investors***" (¶107), and the company knew it. *Id.* (citing internal WaMu Corporate Credit Review document, which described how "[t]he controls that are intended to prevent the sale of loans that [are known] to contain misrepresentations or fraud are not currently effective").

Indeed, by late 2006 serious concerns were raised at WaMu's highest levels about the extent to which mortgage loans held in WaMu's own "Held for Investment" ("HFI") portfolio threatened to inflict large losses on the bank. In response, WaMu's top executives – including WaMu's CEO (Killinger), the head of defendant WaMu Capital (David Beck), and the President of WaMu Home Loans (David Schneider) – devised a plan to transfer WaMu's risk on many of these loans by securitizing them and selling them to unsuspecting investors. *See, e.g.*, ¶108

9

(February 2007 email from Beck to Schneider urging that WaMu "address selling [this quarter] as soon as we can before we lose the oppty").  During later Senate hearings, no WaMu witness denied that the **$1.5 billion** in loans that were transferred from WaMu's HFI portfolio to RMBS investors under this scheme were selected based on their high default risk.  ¶¶108-16.

> **3.** **JPMorgan**

JPMorgan, to keep up with its competitors, also consciously decided to increase its origination of subprime mortgages – and its securitization and sale of RMBS – to improve its profits.  ¶¶120-25.  Accordingly, from 2006 to 2007, JPMorgan nearly doubled its securitizations of residential mortgages from $16.8 billion to $28.9 billion.  ¶126.

Publicly, JPMorgan's 2006 Annual Report assured investors that the bank had "materially tightened" its underwriting standards and would be "even more conservative" in originating mortgages.  ¶124.  In reality, however, the reverse was true.

For example, while JPMorgan's CEO Jamie Dimon privately expressed grave concerns that the subprime market "could go up in smoke" and warned his head of securitized products that JPMorgan needed to sharply reduce its own RMBS exposure (¶125), the bank was paying huge incentives to its home lending employees (such as commissions that were **seven** times higher for originating subprime loans compared to prime loans) to originate new subprime mortgages.  ¶127.  Given these incentives, JPMorgan's underwriting standards plummeted as its employees did everything they could to close new subprime loans for JPMorgan's securitization machine.  ¶126.  JPMorgan's home lending included, *inter alia,* pervasive efforts to (a) identify borrowers with limited education and no mortgage experience; (b) to steer these and other borrowers into subprime loans they could not afford, and (c) obtain approval for these loans by falsifying borrower's loan applications (e.g., inflating borrower incomes) and otherwise flagrantly circumventing basic mortgage lending standards (*e.g.,* by coercing appraisers into

providing inflated property values).  *See generally* ¶¶126-35 (citing multiple CWs).  Personnel at

the bank's Chase Home Finance affiliate circulated a JPMorgan memorandum that explained

how to get JPMorgan's automated loan underwriting system, known as "ZIPPY", to approve

high risk loans.  As an Oregon newspaper later noted:

> The memo's title says it all:  "Zippy Cheats and tricks."

> It is a primer on how to get risky mortgage loans approved by Zippy, Chase's in-house automated loan underwriting system.  ***The secret to approval?  Inflate the borrowers' income or otherwise falsify their loan application.*** ¶130.

Moreover, JPMorgan's loan underwriters, who were in theory meant to ensure that mortgage

loans complied with the bank's stated guidelines, were compensated based on the number of

mortgages they approved – not the quality of the loans.  ¶¶129-31.

JPMorgan officers at the highest level were well aware that the bank's loan underwriting

practices were being loosened, "not "tightened."  As its Chief Risk Officer testified in 2010,

"there was a tradeoff between certain financial covenants and protections versus a desire to

maintain market share," and CEO Dimon testified that the bank (like the other Defendants) had

been concerned it would lose business if it did not get "more aggressive on underwriting."  ¶133.

In addition, JPMorgan knowingly and routinely securitized mortgages of dismal quality

that it purchased from third-party loan originators.   ¶¶136-39.  For example, based on

information provided to the FCIC by Clayton, JPMorgan's due diligence provider for such

originators, JPMorgan "waived in" and securitized *51%* of the loans that Clayton had marked as

fatally defective between January 2006 and June 2007 – a higher rate than for any other financial

institution during the same period.  ¶137.

### C.    Defendants Conceal Material Information From The CRAs

Defendants knew that obtaining the highest possible "investment grade" ratings from the

CRAs was necessary to sell their RMBS.  As Defendants also knew, "in theory, the [CRAs] are

supposed to help investors make an informed decision about the amount of risk they're going to bear with these securities because [they] are so model based [and] there's no real market." ¶215.

Although Defendants touted the triple-A ratings on the Certificates in the relevant Offering Materials, they did **not** disclose that the CRAs had relied on them to provide all the critical information that the CRAs used in formulating their ratings, **and that Defendants had withheld the inside knowledge described above about the loan pools' and the Certificates' true quality from the CRAs**.  ¶¶215-23.  Defendants also did not disclose the extraordinary pressure that they put on CRAs to ensure their "cooperation" in providing the lofty credit ratings that Defendants desired.  For example, as senior Moody's executives later testified before the FCIC, RMBS sponsors such as Defendants "routinely" threatened to fire them if they did not get their desired ratings, and those threats "absolutely tilted the balance away from [CRAs] being an independent arbiter of risk towards [being] a captive facilitator of risk transfer."  ¶¶8; 224-32.

### D.    Defendants' Culpability As Underwriters Of RMBS

Bear Stearns and JPMorgan also underwrote – and sold to Dexia – Certificates in 16 offerings that were sponsored by other financial institutions.  As lead underwriters for these 16 offerings, these Defendants performed due diligence on the sponsors, the originators whose loans were included in the Certificates, and the non-public loan files, which gave them unique access to relevant information.  ¶141.  For these 16 offerings, Bear Stearns and JPMorgan also had (or recklessly ignored) other sources of inside information, including:

- **_Knowledge Concerning the Structuring of The Certificates_**.  In several instances, Defendants were retained by the sponsor to create or structure the Certificates, and/or to also act as the offering's "depositor."  *See* ¶143 (Bear Stearns' role in structuring all of the "Carrington-sponsored" RMBS that Dexia bought); ¶149 (Bear's role in creating the Morgan Stanley- and Newcastle-sponsored RMBS that Dexia bought); ¶154 (Bear's role in selecting the loans backing 2 of the Impac-sponsored offerings);

- **_Adverse Data From Their Due Diligence Vendors_**.  The due diligence vendors that Defendants hired to review the securitization practices of other RMBS "sponsors"

(such as Nomura and Morgan Stanley) found that those sponsors (like Defendants) routinely "waived in" and securitized large numbers of defective loans.   ¶147 (discussing Nomura's "waive in" rates); ¶150 (discussing Morgan Stanley's waive in rates).

Defendants also had close relationships with most of the third party sponsors for whom they acted as underwriters.  For example:

- o Bear Stearns acted as lead underwriter for Carrington (the sponsor of 4 RMBS at issue here), for a total of *over $8.7 billion* worth of Carrington-sponsored RMBS from 2005 to 2007 alone.  ¶144;

- o Bear Stearns (a) acted as lead underwriter for Impac-sponsored offerings totaling over *$12.7 billion* from 2005-2007 (including 3 of the RMBS at issue here); (b) purchased and sponsored the securitization of at least another $1.4 billion in Impac-originated loans; and (c) was one of Impac's biggest creditors, having provided Impac with $300 million in "*warehouse loans*" to allow it to originate new mortgages that Bear Stearns could securitize and sell.  ¶153;

- o JPMorgan acted as lead underwriter for GMAC (the sponsor of 2 RMBS at issue here), for a total of over $15.1 billion worth of GMAC-sponsored offerings from 2005-2007 alone.  ¶170;

- o JPMorgan not only acted as lead underwriter for Ameriquest-sponsored offerings totaling over *$8.7 billion* from 2005-2007 (including 2 of the RMBS at issue here), but also acted as financial adviser to Ameriquest's parent company (ACC Capital) in November 2006 in connection with efforts to sell Ameriquest.  ¶156;

- o JPMorgan acted as lead underwriter with IndyMac (the sponsor of 1 RMBS at issue here), for a total of over $800 million worth of IndyMac sponsored offerings from 2005-2007 alone.  ¶165.

Defendants also had close relationships with many of the largest loan originators who supplied the loan pools used to securitize the RMBS at issue, such as Countrywide, New Century, Fremont, Encore, ResMae, American Home, First NLC, Greenpoint and People's Choice.  For example, between 2005 and 2007, JPMorgan selected *$10 billion* of Countrywide loans for securitization, acted as lead underwriter for Countrywide bond issuances, and served as managing administrative agent for a $2.64 billion revolving credit facility to Countrywide.  ¶174. As detailed in the Complaint, these entities were also among the worst abusers of subprime

lending during the relevant period.  *See* ¶¶173-212.

In short, Bear Stearns' and JPMorgan's relationships with the third party RMBS sponsors and loan originators here went well beyond the confines of a narrow underwriting role.

### E.   The Certificates Suffer Massive Defaults In The Underlying Loan Pools And Are Downgraded To "Junk"

Defendants' fraudulent practices dramatically affected the quality of the Certificates.  At the time of purchase, the Certificates were all "prime" investment grade securities that carried AAA/Aaa ratings, which implied an expected cumulative loss rate of less than 0.5%.  ¶¶233-34. As of March 2012, however, ***more than 46%*** of the loans backing the Bear Stearns-sponsored Certificates were at least 60 days delinquent, in foreclosure, in bankruptcy or had been repossessed.  ¶80.   The same was true for more than ***48%*** (¶117) and ***41%*** (¶140) of the loans backing the WaMu-sponsored Certificates and JPMorgan-sponsored Certificates, respectively. For the loans backing the Certificates that Defendants did not directly sponsor, but which they underwrote and structured with other financial entities, the figure was more than ***35%***.  ¶214.  As a result, virtually every Certificate has since been downgraded to "junk" status.  ¶234.

## III.   ARGUMENT

### A.   Legal Standard

On a motion to dismiss under Rule 8(a), the Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiffs' favor, and a complaint survives dismissal if it contains "factual allegations sufficient to raise the right to relief above the speculative level," as shown by "any set of facts consistent with the allegations in the complaint."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F. 3d 87, 98 (2d. Cir. 2007).  Where, as here, the Complaint also asserts claims for fraud, such claims must also satisfy Rule 9(b), which simply requires Plaintiffs to "specify [which] statements … were false or misleading, give particulars as to the respect in

which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Suez Equity Investors, L.P. v. TD Bank*, 250 F.3d 87, 95 (2d Cir. 2001). "[R]eference to an offering memorandum satisfies [Rule] 9(b)'s requirement to identify time, place, speaker, and content of the representation where, as here, defendants are … affiliates participating in the offer of securities." *Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990). *See also Dodona I, LLC v. Goldman Sachs & Co.*, 847 F. Supp. 2d 624, 647, n. 13 (S.D.N.Y. 2012) (because complaint alleges '"tight weave of connections between' all the Defendants, '[a]t this stage of the litigation, any misstatements that could reasonably be found to have issued from one, essentially issued from all"').

To plead fraud under New York law, Plaintiffs must allege "a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury." *Suez*, 250 F.3d at 104. Here, the Complaint clearly pleads each element with particularity.

## B. The Complaint Sufficiently Details Defendants' Fraud In The Offerings At Issue

The Complaint details Defendants knowing misconduct and obsession with increasing volume and the number of securitizations, including deliberately securitizing billions of dollars in loans that Defendants knew to be toxic. Defendants securitized hundreds of millions of dollars of defective loans, knowing that this would put Plaintiffs, other investors and the entire financial system at risk of catastrophic losses. ¶¶4-5, 9-10, 44-46, 238-47, 291-93.

Defendants do not – and cannot – challenge the Complaint's detailed allegations that they systematically created, structured and sold Certificates that were backed by loans that Defendants **knew** to be much riskier than represented to investors. Instead, Defendants contend that Plaintiffs' allegations do not relate to those particular Offerings or specific underlying loans. Def. Br. at 11. Defendants are wrong. As Judge Marrero recently explained, plaintiffs' claims

"rest[] not on a single decisive action which manifestly demonstrates [defendants'] alleged wrongdoing, but on a series of interrelated events, which, viewed as a whole, represent the big picture of fraudulent conduct." *Dodona I*, 847 F. Supp. 2d at 640 (upholding fraud claims). *See also Allstate v. Countrywide*, 824 F. Supp. 2d 1164, 1185 n.23 (C.D. Cal. 2011) ("*Allstate I*") (finding "representations relating to Countrywide's underwriting practices are sufficiently pleaded as applying to Countrywide's entire operation and therefore to the specific Offerings purchased by Allstate"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1192 (C.D. Cal. 2008) ("*Countrywide I*") (upholding fraud claims, explaining that "[i]f the highly particularized allegations about Countrywide's core business operations give even a rough sketch of what Countrywide's business practices looked like during the class period, then many statements the Court has already discussed—and others raised in the CAC—may well have been fraudulent"). Numerous other MBS cases are in accord.[2] The same result should follow here.

Defendants' misconduct caused the loan pools backing the Certificates to suffer massive delinquencies, further confirming Plaintiffs' allegations. ¶¶80, 117, 140, 214. By contrast, Defendants' cited cases do not allege delinquencies in the loan pools backing the RMBS (*Footbridge, LBBW, Republic Bank*), and no internal documents or witness statements attributed to persons with access to the reported information to support the allegations (*NovaStar*).[3] *See*

---

[2] *See also Dexia Holdings, Inc. v. Countrywide Fin. Corp.*, 2012 WL 1798997, at *5 (C.D. Cal. Feb. 17, 2012) (upholding fraud claims), citing *Allstate I*; *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D. 287, 295 (1st Dept. 2011) (same); *Emps.' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 152 (S.D.N.Y. May 10, 2011) (plaintiff need not allege any particular loan was defective "so long as the complaint alleges widespread abandonment of underwriting guidelines"); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 392 (S.D.N.Y. 2010) (same).

[3] *See Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09-cv-04050 (PKC) (S.D.N.Y. Aug. 4, 2009), ECF No. 32; *Landesbank Baden-Württemberg v. Goldman Sachs & Co.*, No. 10-cv-7549 (WHP) (S.D.N.Y. Nov. 4, 2010), ECF No. 5; *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, No. 09-cv-287 (CRS) (W.D. Ky. Apr. 17, 2009), ECF No. 1-2, Ex. A; *N.J.*

*Dodona I*, 847 F. Supp. 2d at 643 (unlike *LBBW*, allegations "supported by quotes from Goldman-authored documents, complete with dates and names").

### C.   Defendants Made Material Misrepresentations Regarding The Certificates

#### 1.   Defendants Misrepresented The Loan Underwriting And Selection Practices That Were Used To Create The Certificates

The Complaint alleges in detail that Defendants systematically securitized loans that were originated ***in violation*** of the stated underwriting guidelines.  *See* §II.B above.  As this Court explained in *Pub. Emps.' Ret. Sys. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475 (S.D.N.Y. 2010) ("*Merrill I*"), the "alleged ***repeated deviation*** from established underwriting standards is enough to render misleading the assertion in the registration statements that underwriting guidelines were generally followed." *Id.* at 483.  Numerous additional authorities are in accord.[4]

Defendants concede – as they must – that the securitizations at issue contained mortgages that were not originated in compliance with the stated underwriting guidelines.  In their attempt to avoid liability for their fraud, Defendants contend (erroneously) that the Offering Materials (1) disclosed that the Certificates were backed by defective loans, and (2) contained "repurchase or substitute" provisions informing investors that the loans did not conform to the representations in the Offering Materials.  Def. Br. at 14-15

Numerous courts in this district have rejected these contentions.  As the court explained

---

*Carpenters Health Fund v. NovaStar Mortgage., Inc.*, No. 08-cv-5310 (DAB) (S.D.N.Y. June 30, 2011), ECF No. 120.

[4] *See also Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 2011 WL 135821, at *10 (S.D.N.Y. Jan. 12, 2012) (complaint "alleges not simply that the Offering Documents omitted the fact that originators could issue loans pursuant to 'exceptions,' but rather, alleges that the Offering Documents contained material misstatements as to whether the originators applied underwriting standards that took into account each loan applicant's ability to repay"); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig*, 810 F. Supp. 2d 650, 672 (S.D.N.Y. 2011) (rejecting "boilerplate disclaimers and disclosures in the relevant offering documents [] that, again do not disclose the risk of a systematic disregard for underwriting standards or an effort to maximize loan originations without regard to loan quality") (collecting cases).

in *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 2012 WL 1076216 (S.D.N.Y. March 30, 2012), while the repurchase clause "could be read as an acknowledgment of **occasional** underwriting violations, it cannot be read as an acknowledgment of the pandemic of violations that Plaintiffs allege." *Id.* at * 21 (collecting cases) (emphasis added.

Defendants' reliance on *Lone Star Fund V (U.S.), L.P.* v. *Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010) is misplaced.  There, the court held only that misrepresentations about the absence of delinquent loans are not actionable in light of the repurchase-or-substitute clause.  *Id.* at 387.  Unlike in *Lone Star,* Plaintiffs here allege that Defendants misrepresented not the absence of any delinquent loans, but rather the underwriting and appraisal standards, owner-occupancy and LVT ratios.  For the same reason, *Lone Star* has been distinguished by numerous of courts.[5]  *Footbridge* is similarly inapposite.[6]

## 2.    Defendants' Untrue Statements Regarding Credit Scores, Occupancy Rates and EPDs

Defendants do not dispute that the Complaint adequately alleges that the Offering Materials misrepresented the borrower credit scores and owner occupancy rates, and that the Bear Stearns Certificates were backed by loan pools that were already suffering from EPDs at

---

[5]  *See In re Bear Stearns*, 2012 WL 1076216, at *22 (unlike *Lone Star*, "plaintiffs point not only to seller representation as to the conformity of specific loans, but to representations in the [Offering Documents] concerning the underwriting and appraisal practices that were employed in constituting the pools"); *Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp., I*, 2012 WL 601448, at *19 ("Plaintiff's claim in *Lone Star* was that many loans underlying its securities were delinquent when the offering documents stated that there were no delinquencies. . . . The reasoning in *Lone Star* does not apply here because the Lead Plaintiff alleges . . . deviation from the underwriting guidelines purportedly used by the originators."); *Virgin Islands*, 804 F. Supp. 2d at 155 (*Lone Star* applies only to allegations of a limited number of defaulted loans, not to allegations of "widespread misrepresentations regarding the nature of the underwriting and appraisal practices.").

[6]  *See Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *16 (S.D.N.Y. Sept. 28, 2010) (analyzing repurchase or substitute clause in context of representation that "there ought not be any Mortgage Loans in default at the time of the Securitizations").

the time of securitization.  Rather, Defendants contend that the Offering Materials disclosed that the credit scores were not a good predictor of borrower default, that the occupancy rates were based on borrower representations, and that the RMBS included EPD loans.  Def. Br. at 16-17.  However, Defendants do not (and cannot) point to any language in the Offering Documents that *specifically disclosed* that credit scores were misrepresented, that the owner occupancy rates were wrong, or that there were EPD loans in the Bear Stearns Certificates.  *See In re Novagold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 291 (S.D.N.Y 2009) ("cautionary language must 'warn [] of the specific contingency that lies at the heart of the alleged misrepresentation'')

Instead, the Offering Materials represented that the stated credit scores were "indicative of a borrower's probability of default," would "help assess a mortgagor's creditworthiness," provided "a measurement of the relative degree of risk a borrower represents to a lender," and assessed "a prospective borrowers' ability to repay a mortgage loan."  ¶¶258-61, Ex. D.  Defendants' disclosure that there was "*no assurance* that [borrower] credit scores will be an accurate predictor of the likelihood of repayment" (Def. Br. at 7, n. 13) also misses the point: namely, Defendants never warned Plaintiffs that the credit scores were misrepresented.[7]

Defendants' assertion that the Offering Materials made "clear [] that the occupancy status information therein [was] based upon representations of the related borrowers" also fails.[8]  Courts uniformly hold that general disclaimers do not "protect[] a defendant from liability if a

---

[7] The purported disclosures did not disclose that Bear Stearns had instructed its due diligence vendor *not* to verify credit scores, or that Bear pressured its personnel to invent credit scores if loan originators did not provide this information quick enough to securitize the loan.  ¶261.  Similarly, it was not disclosed that WaMu's senior management was warned of an "extensive level of loan fraud," virtually all of it stemming from employees "circumventing bank policy surrounding loan verification and review."  ¶105.  Nor were Plaintiffs warned that JPMorgan waived in 51% of defective loans.  ¶261.

[8] This contention does not apply to the offerings where the Offering Materials did not include this disclosure: BALTA 2006-4, BALTA 2006-7, NAA 2007-3, SAMI 2006-AR7, SAMI-AR8.

statement was knowingly false when made." *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010) (rejecting defense where "Defendants knew the statements regarding the loan loss reserves were false when made"); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) (same).   And here, the Complaint squarely alleges that "Defendants ***knew*** that their loan origination and securitization practices materially increased the risk that the mortgage pools backing the [RMBS] included many more mortgages that were not secured by an owner-occupied home than represented in the Offering Materials." ¶¶246, 268.[9]

Finally, Plaintiffs allege that "*Bear Stearns'* Offering Materials represented that none of the mortgages supporting the Certificates were in default at the time of the securitization."   ¶269. Defendants have not identified any disclosure in any *Bear Stearns* Offering Materials that the Certificates included loans that were securitized before the EPD period expired.   Defendants' reliance on *WaMu* Offering Materials to support their contention is meritless.   Def. Br. at 17, 7 (fn. 15).

### 3.   Defendants' False Statements Regarding The Quality of the Collateral

The Complaint adequately alleges that the Offering Materials misrepresented the LTV ratios, falsely stated that loans with LTV ratios exceeding 80% ("high LTV loans") were restricted to borrowers who were particularly creditworthy and presented a low risk of default ("low-risk borrowers"), and misrepresent that the appraised property values were prepared by

---

[9] *Footbridge* is inapposite.   There, the court noted that the complaint alleged "in conclusory fashion that because [defendant] is a sophisticated loan originator, it was not blindsided and misled by speculators who allegedly lied on their loan applications," and held that "[s]uch an allegation is not sufficient to allege a misrepresentation under the heightened pleading requirements of Rule 9(b) and the PSRLA." 2010 WL 3790810, at *9.   Here, by contrast, the Complaint contains detailed allegations explaining the basis for Defendants' knowledge that their representations regarding the occupancy of the collateral were false.   ¶¶6, 48, 51, 141-51.

20

independent appraisers based on industry standards.  ¶¶238-84.  Defendants do not dispute these

contentions.  Rather, Defendants claim that these misrepresentations are not "actionable because

appraisals [] are not objective facts but the subjective opinions of the appraisers" and because the

Complaint does not support "a plausible inference that any 'speaker did not truly have' their

stated opinion."  Def. Br. at 18.  Defendants are wrong.

The detailed allegations of the Complaint squarely support an inference that Defendants

did not truly believe the LTV ratios that they included in the Offering Materials.  *See In re Bear*

*Stearns*, 2012 WL 1076216, at *18 ("Because the appraisal 'opinions' were expressed by both

the originators and Bear Stearns (by incorporating the originators' representations into the

Offering Documents), Plaintiffs can state a claim by showing that either one disbelieved the

appraisal amounts").  Here, Defendants systematically pressured appraisers into increasing the

stated value of the collateral for the loans they securitized, and routinely waived in large numbers

of defective loans.  ¶¶71-75, 93-102, 132, 277.  Nothing more is required at the pleading stage.

*See Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1187 (C.D. Cal. 2011)

(sustaining allegations that defendants did not believe appraised values by alleging "facts which

call into question the factual bases for the appraisals").[10]

Representations that high LTV loans were restricted to low-risk borrowers are also false

---

[10] *See also DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 118 (S.D.N.Y. 2004)
(sustaining claims where complaint "allege[d] facts from which a factfinder could easily
conclude that the [reports] stated the opposite of defendants' true opinion"); *In re Oxford Health
Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (sustaining allegations where there was
"evidence that the defendants were aware of undisclosed facts that seriously undermined the
accuracy of their alleged opinions and beliefs").  None of Defendants' cases holds otherwise.  In
*Tsereteli*, the "only fact" alleged in support of an allegation that appraisals were not made in
accordance with appraisal standards was an OIG report which itself did "not even remotely
support the allegation."  *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp.
2d 387, 394 (S.D.N.Y. 2010).  In *Republic Bank & Trust Co v. Bear Stearns & Co., Inc.*, the
appraisal allegations were based on "news articles and general statements about typical practices
in the mid-2000s."  707 F. Supp. 2d 702, 712 (W.D. Ky. 2010).

or misleading statements of fact – *not* opinion – and plainly actionable. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991) (defining "statements of reasons, opinions, or belief" as "purport[ing] to express what is consciously on the speaker's mind").

Similarly, representations that the appraisals were conducted pursuant to the Uniform Standards of Appraisal Practice are statements of fact, *not* opinion.  As the *Bear Stearns* court explained in rejecting this same argument:

> Plaintiffs do not merely allege that the appraisal amounts were incorrect; they allege that the appraisals were not conducted in accordance with the industry standards identified in the Offering Documents. The former allegation differs from the latter in the same way the statement "the cook baked a delicious cake" differs from the statement "the cook followed the cake recipe on the box": the former is opinion, the latter an assertion of fact. Likewise, the conclusion that a house is worth $500,000 may be a statement of subjective opinion, but the assurance that the $500,000 figure was reached in accordance with a body of professional appraisal standards is a statement of verifiable fact.

*In re Bear Stearns*, 2012 WL 1076216, at *17 (distinguishing *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010)).

### 4.    The Certificates' Ratings Were Inflated

Plaintiffs purchased Certificates initially rated AAA, denoting the highest credit-quality. ¶234.  In truth, and unbeknownst to Plaintiffs, these AAA ratings were based on the faulty data detailed above that the Defendants provided to the rating agencies.  ¶¶216, 222.  Further, the Defendants improperly exerted pressure on the CRAs to ensure the most favorable ratings. ¶224-32.  As a result, virtually all of Plaintiffs' Certificates have now been downgraded to junk, a vast number of the underlying loans have been foreclosed upon, and the remaining loans are suffering from crippling deficiencies and face serious risks of default.  ¶¶233-34, 303.

As with appraisals, Defendants do not dispute that the ratings were inaccurate, but contend that they are inactionable "opinions" of the CRAs absent any allegations that the CRAs did not actually believe in their ratings.  Def. Br. at 18-19.  Again, opinions *are* actionable when

not genuinely or reasonably believed. *Abu Dhabi Commericial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 176 (S.D.N.Y. 2009) (ratings were actionable because "plaintiffs have sufficiently pled that the Rating Agencies did not genuinely or reasonably believe that the ratings they assigned . . . were accurate and had a basis in fact.").

Here, "there are two 'speakers': the agencies that rated the Certificates, and **Defendants** who presented those ratings to investors in the Offering Documents." *In re Bear Stearns*, 2012 WL 1076216, at *18. As in *In re Bear Stearns*, Plaintiffs adequately allege that (1) Defendants knew that loan information being sent to the rating agencies was inaccurate, and (2) Defendants knew that the ratings were a product of their improper influence over the CRAs and not accurate. ¶¶217-32. Defendants were thus "aware of undisclosed facts that seriously undermined the accuracy of their alleged opinions and beliefs." *In re Oxford Health*, 187 F.R.D. at 141-42 (opinions not based in fact are actionable).

Defendants selectively cite a few cases that dismissed bare allegations based on false ratings,[11] but conspicuously omit any reference to the RMBS cases that have sustained such claims. As the *Bear Stearns* court explained, if defendants "knowingly fed incomplete or inaccurate information to the Rating Agencies, or discovered after the Agencies rated the Certificates that they did so based on defective loan data, it follows that [Defendants] could not have reasonably believed that the ratings accurately reflected the Certificates' risk." 2012 WL 1076216, at *19. *See also Countrywide*, 824 F. Supp. 2d at 1185 (sustaining New York fraud claims based on "facts which call into question the factual bases for the … ratings"); *China Dev.*

---

[11] *See In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 511-12 (S.D.N.Y. 2010) (allegations that "ratings were based on outdated models, unverified loan information, and that the rating agencies failed to properly consider the credit quality of the mortgage loans"); *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720 F. Supp. 2d 254, 271 (S.D.N.Y. 2010) (allegations based on alleged failure to "disclose that the models relied on to rate the Certificates were outdated and unable to accurately assess their risk").

23

*Indus. Bank v. Morgan Stanley*, 2011 N.Y. Misc. LEXIS 1808, at *10 (N.Y. Sup. Ct. Feb. 25, 2011) (sustaining fraud claim based on alleged knowledge of "deeply flawed" ratings process making investment "appear to be safe"), *aff'd*, 86 A.D.3d 435 (1st Dept. 2011).

Indeed, in *Merrill I*, the plaintiffs alleged that the credit ratings assigned to 18 offerings by S&P, Moody's and Fitch were false and misleading.  714 F. Supp. 2d at 483.  Defendants contended, as Defendants do here, that plaintiffs had not properly pled the ratings as false statements and that the offering documents disclosed all risks associated with the ratings and the offerings.  This Court, however, disagreed and held that plaintiffs' claims that the offering materials misrepresented the RMBS ratings were actionable.  714 F. Supp. 2d at 486.

## D.     The Complaint Adequately Pleads Reliance

To adequately plead reliance, Plaintiffs must allege "plaintiff's reliance on the alleged misrepresentation and [resulting] injury."   *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 2012 WL 1450022, at *7 (N.Y. Sup. Ct. Apr. 23, 2012).   Here, Plaintiffs allege that:

> FSAM's investment and credit analyses were based on information provided by Defendants with respect to both the credit characteristics of the mortgage loan pool (including, for example, borrower characteristics, collateral value and owner occupancy rates), and the structure of the securitization with respect to the seniority and risk characteristics of the particular tranche of RMBS (including, for example, the credit rating of the Certificate, the level of subordination, and position in the payment "waterfall"). FSAM's focus throughout this review was on the quality characteristics of the underlying collateral, the originators of the underlying loans, and the credit ratings assigned to the Certificates. …

> If Plaintiffs had known these and other material facts regarding the Defendants' fraudulent misrepresentations … in the Offering Materials, Plaintiffs would not have purchased the RMBS.  ¶¶287-88.

Similar claims for fraud arising from RMBS investments have been sustained on substantially similar reliance allegations.  *See Allstate Ins. Co. v. Countrywide Fin. Corp.*, 2011 WL 5067128, at *18 (C.D. Cal. Oct. 21, 2011) (plaintiffs adequately pled reliance "by stating that it 'received, reviewed, and relied upon the Offering Materials' and that 'but for the

24

misrepresentations and omissions in the Offering Materials, [it] would not have [bought] the Certificates.'"); *Cromer Fin. Ltd. v. Berger*, 2001 WL 1112548, at *2 (S.D.N.Y. Sept. 19, 2001) (plaintiffs' allegations "that they 'would not have purchased the securities…if they had known [the truth], and that they 'relied on [defendants'] misrepresentations in deciding to purchase the shares'" adequately alleges reliance).

Defendants also contend that Plaintiffs are sophisticated investors who had a duty to conduct their own due diligence, and who had access to media and governmental reports discussing loosening underwriting standards and questionable appraisal practices, remittance reports showing collateral performance, and "special information not available to other investors." Def. Br. at 20-21.

Under New York law, however, even a sophisticated party may rely on the representations of another where the deceived party lacked "means of ascertaining the truth," *Hunt v. Enzo Biochem*, 530 F. Supp. 2d 580, 599 (S.D.N.Y. 2008), because the facts misrepresented were "peculiarly within the Defendants' knowledge." *Barneli & Cie S.A. v. Dutch Book Funds, SPC, Ltd.*, 2010 N.Y. Misc. LEXIS 4270, at *10 (Sup. Ct. Aug. 9, 2010). *See also Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, 2006 WL 278138, at *8 (S.D.N.Y. Feb. 2, 2006) (sophisticated investors may rely on information that is "peculiarly within defendant's knowledge [and] without prosecuting an investigation, as he has no independent means for ascertaining the truth"). The "peculiar knowledge" exception applies both where the facts allegedly misrepresented literally fall within the exclusive knowledge of the defendant, and "where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty." *MBIA Ins. Corp. v. Royal Bank of Can.*, 2010 WL 3294302, at *32 (N.Y. Sup. Aug. 19, 2010).

Here, while Defendants had direct access to borrower information and could test the loan files for deficiencies, it is undisputed that Plaintiffs had no such access.   ¶¶51, 291, 376.

Plaintiffs' reliance was thus "not so utterly unreasonable, foolish or knowingly blind as to compel the conclusion that whatever injury it suffered was its own responsibility." *Abu Dhabi*, 651 F. Supp. 2d at 172.[12]

Defendants' reference to news articles, remittance reports and "special information" outside the Complaint does not compel a different result.  Defendants do not – and cannot – point to any media reports, government reports, remittance reports, or other information showing that Plaintiffs could have discovered Defendants' fraudulent securitization practices.[13]  Defendants' cases do not involve an assignment and are clearly inapposite.[14]

## E.    Defendants' Acted Knowingly Or Recklessly

A complaint adequately pleads scienter either by alleging facts either (a) showing that defendants had both motive and opportunity to commit fraud, or (b) constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *Lermer v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006).  The Complaint here meets both standards.[15]

---

[12] Defendants' cases merely hold that reliance may be unreasonable if a plaintiff could have protected itself by insisting on a representation or contractual condition. *See Emergent Capital Inv. Mgmt., v. Stonepath Grp., Inc.* 343 F.3d 189, 189 (2d Cir. 2003) (plaintiff could have protected itself by insisting that defendants make a specific representation concerning the value of the investment); *Global Minerals & Metals Corp. v. Holme*, 35 A.D.3d 93, 101 (1st Dep't 2006) (plaintiff should have "condition[ed] the settlement on the truth of the representations").

[13] Defendants also claim that Dexia SA/NV, DCL and DHI fail to establish reliance because the Complaint does not plead that those entities read or relied on the Offering Documents.  As FSAM's assignees (*see infra* at §III.J), Dexia SA/NV, DCL and DHI "stand in [FSAM's] shoes, and the case must be analyzed from [FSAM's] perspective."  *Feinberg v. Katz*, 2005 WL 2990633, at *6 (S.D.N.Y. Nov. 7, 2005).  The Complaint clearly alleges FSAM's reliance.  ¶287.

[14] *See Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63 (2d Cir 2000) (absent an assignment, plaintiff that did not receive information directly from defendants did not establish reliance); *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304 (2d Cir. 1994) (same); *Peerless Mills, Inc. v. Am. Tel. & Tel. Co.*, 527 F. 2d 445 (2d Cir. 1975) (same).

[15] The Private Securities Litigation Reform Act – which does *not* apply to Plaintiffs' common law fraud claims – requires that plaintiffs raise an inference of intent that is "at least as compelling" as opposing inferences, a standard that the Supreme Court has held to have "raised

1.      **Defendants' Motive and Opportunity To Sell RMBS Backed By Toxic Loans**

The value of the Certificates depended directly on the quality of the loans backing them, and Defendants' remuneration was dependent on the sale of the Certificates.   ¶¶35-43. Defendants clearly "had a motive to maintain the appearance that the [loans backing the RMBS] were safe." *Abu Dhabi*, 651 F. Supp. 2d at 180 (finding scienter).  For example, "Defendants knew that, to sell the Certificates, they needed to obtain the highest possible 'investment grade' credit rating from the credit rating agencies" (¶215), and the Offering Materials made clear that the represented credit rating was a "condition to issuance" of the Certificates.  ¶¶279-80.  As in *Abu Dhabi*, Defendants' were therefore "motivated to ensure that the [Certificates] received high ratings, whether or not those ratings were justified." *Abu Dhabi*, 651 F. Supp. 2d at 180.[16]

Defendants acted on these motives by providing false information regarding the loans to the CRAs (¶¶217-23), exerting improper pressure on the CRAs to obtain favorable ratings (¶¶224-32), and distributing the resulting false ratings through the Offering Materials.  ¶¶237, 279-84.  Nothing more is required.  *See Abu Dhabi*, 651 F. Supp. 2d at 180; *King County, WA v. IKB Deutsche Industriebank*, 751 F. Supp. 2d 652, 663 (S.D.N.Y. 2010) (same).

2.      **Defendants' Knowledge Of The Abysmal Quality Of The Loans**

The Complaint also details how Defendants knew that the Certificates were backed by loans that were originated in violation of the stated underwriting guidelines, loans that were not supported by collateral that had been appraised in accordance with industry standards, and that had been given inaccurate credit ratings.  ¶¶55-76, 82-116, 118-39, 215-32, 279-84.  "Under

---

the bar" from the standards applicable Rule 9(b). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321, 324 (2007).  Even under this more stringent standard, "the tie goes to the plaintiff." *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 413-14 (S.D.N.Y. 2007).

[16] The particularized allegations in the Complaint are easily distinguished from the "perfunctory" allegation that "Defendants received information" in *Plumbers & Steamfitters Local 77 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010).

such circumstances, defendants knew, or more importantly, should have known that they were misrepresenting material facts related to the [securitizations]." *S.E.C. v. Mudd*, 2012 WL 3306961, at *11 (S.D.N.Y. Aug. 10, 2012). *See also Novak v. Kovaks*, 216 F.3d 300, 311 (2d Cir. 2000) (scienter adequately pled by alleging facts showing that defendants "knew facts or had access to information suggesting that their public statements were not accurate").

*Mudd* is instructive. There, the defendants made public statements about Fannie Mae's purportedly limited exposure to subprime and ALT-A loans, including loans with high LTV ratios and "loans made to borrowers with damaged credit." *Id.* at *2. The complaint alleged that defendants "knew that [certain subprime] loans had the highest credit risk on FNMA's book," "prepared presentations concerning FNMA's increased acquisition of [ALT-A] loans and the associated credit risk," and it was reported during a staff meeting that loans purchased from Countrywide "performed as poorly as some of the loans that were included in FNMA's ALT-A disclosures." The court concluded that "given what defendants knew about [subprime and ALT-A loans], they *must have known* that FNMA's disclosed subprime and ALT-A exposure calculations were materially misleading." *Id.* at *12.

The same is true here. *See* ¶¶35-51, 52-79, 81-116, 118-39, 141-212 (detailing Defendants' knowledge of the true quality of the loan pools backing the Certificates, including, *inter alia*, Defendants' role in purchasing the loans and structuring the Certificates, and access to internal individual asset summary reports, internal audit reports, internal credit reviews, and non-public information about the loan underwriting practices at key originators).[17] Moreover, unlike

---

[17] Defendants' reliance on *Defer LP v. Raymond James Fin., Inc.* 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009) is misplaced. There, the court expressly allowed for the possibility to plead scienter of the parent company based on "allegations demonstrating the parent company's familiarity with the subsidiaries operations and [] misconduct." Such familiarity is detailed throughout the Complaint. ¶¶56-61, 82-116, 120-35.

the complaint in *Dexia v. Deutsche Bank*, the Complaint here includes detailed allegations regarding Defendants' participation and knowledge of offerings where they acted as the underwriters.  Specifically, the Complaint details Defendants' involvement in structuring the Carrington, Nomura, Newcastle, and Morgan Stanley offerings (¶¶143-151), and Defendants' access to non-public information about the abysmal quality of the loans that were originated by key originators (¶¶152-214) in those offerings.

### 3.    The Magnitude of the Fraud Supports A Strong Inference Of Scienter

The fraud covered more than three years and was enormous, involving billions of dollars in loans.  ¶¶1, 5, 44.  Defendants reaped hundreds of millions of dollars in profits from their securitization machines.  ¶¶77-79, 108-16, 126-39.  Defendants' systematic misconduct was, at a minimum, "an extreme departure from the standards of ordinary care", *Chill v. General Elec. Co.*, 101 F. 3d 263, 269 (2d. Cir. 1996), and, as the Complaint alleges, the resulting risks to Plaintiffs, investors and the entire financial system was known to Defendants.  ¶4.  Nothing more is required.  *Id.  See also In re Bear Stearns Cos., Inc. Sec. Deriv., and ERISA Litig.*, 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) ("Although the size of the fraud alone does not create an inference of scienter, the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of the client's fraudulent accounting and the accountant's failure to conduct a thorough and objective audit created a strong inference that the auditor was reckless in not knowing that its audit opinions materially misrepresented the company's financial state").

### 4.    The Confidential Witness Statements Are Probative of Scienter

The CW statements further demonstrate that the Defendants knew the toxic quality of the loan pools that they securitized.  For instance, CW2, an assistant underwriting manager at EMC from June 2006 through May 2008, explained that Bear Stearns closely monitored EMC's loan selection process, noting that "EMC was basically a sub-company of Bear Stearns in New York,

and of course they had a day to day influence as to what was being purchased from the various sellers." ¶61. CW3 independently confirmed CW2's account. *Id.* Similarly, numerous witness statements show that WaMu pressured appraisers to inflate their appraisals, and that JPMorgan incentivized employees to steer high-risk borrowers to high-risk loans and to circumvent the loan underwriting requirements while senior JPMorgan executives were more likely to turn a blind eye to mortgage origination and underwriting shortcuts when mortgages were going to be securitized. ¶¶82-87, 91, 127, 129, 131.

Moreover, a strong inference of scienter is bolstered because the witnesses' accounts corroborate one another, as well as Defendants' internal documents. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 171, 197 (S.D.N.Y. 2010) ("Plaintiffs' numerous confidential witnesses support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards [and] the fact that this case involves corroboration from multiple sources also supports an inference of a scienter").

### F.    The Complaint Adequately Pleads Loss Causation

Loss causation requires a showing that it was "foreseeable that [plaintiff] would suffer losses as a result of relying on [defendants'] misrepresentations about the mortgage loans." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 296 (1st Dept. 2011). Plaintiffs need only allege that "defendants' misrepresentations induced a disparity between the transaction price and the 'true investment quality' of the securities at the time of the transaction." *Castellano v. Young & Rubican, Inc.*, 257 F.3d 171, 187 (2d. Cir. 2001). Here, Plaintiffs easily meet this standard. ¶¶311-12, 320-21, 326-27, 359-60, 366-67, 371-72.

Courts have overwhelming rejected Defendants' contention that Plaintiffs are required to allege facts showing that their losses were not caused by the global financial crisis. Def. Br. at 25. As the court explained in *IKB Deutsche*, "[n]either *Dura* nor *Lentell* [] imposes on plaintiffs

the heavy duty of pleading facts sufficient to *exclude* other non-fraud explanations." 708 F.

Supp. 2d at 343 (emphasis added).  Numerous authorities are in accord.[18]

Moreover, Defendants were active participants in the collapse of the housing market and

the resulting financial crisis.  ¶¶9-10, 134.  Thus, Defendants' loss causation arguments "are

premised on a convenient confusion of cause and effect" and should be rejected.  *See In re*

*Ambac Fin. Grp., Inc. Sec. Litig.,* 693 F. Supp. 2d 241, 270 (S.D.N.Y. 2010).

G.    **The Complaint Adequately Pleads Injury**

Common law "fraud damages represent the difference between the purchase price of the

asset and its true value, plus interest, generally measured as of the date of sale."  *Allstate,* 824 F.

Supp. 2d at 1188.  *See also Merrill Lynch & Co.,* 500 F.3d at 183 (same).  Here, the Complaint

asserts that "Defendants' fraudulent practices caused Plaintiffs' RMBS to be much riskier than

represented at the time of issuance" and that, "[a]s a result, the true value of the RMBS was

much less than the amount Plaintiffs paid at the time of purchase."  ¶302.  Nothing more is

required.  *See Allstate,* 824 F. Supp. 2d at 1188 ("New York follows the well-established

common law rule that fraud damages represent the difference between the purchase price of the

asset and its true value, plus interest, generally measured as of the date of sale").

Nevertheless, Defendants assert that the Complaint fails to allege injury because

Plaintiffs purportedly received all principal and interest payments.  This Court, among other

courts, has rejected this contention.  *See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.,*

---

[18] *See also Dodona I*, 847 F. Supp. 2d at 649 ("the law does not require plaintiffs to plead facts sufficient to exclude other non-fraud explanations"); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 507 (S.D.N.Y. 2011) (same); *Dexia*, 2012 WL 1798997, at *6 (Untangling the effect of the alleged misrepresentations from the effects of the broader financial crisis will present a complicated issue of fact").  Defendants' citations to discussions of Section 11 Claims under the 1933 Securities Act do not address loss causation. *See In re Barclays Bank PLLC Sec. Litig.*, 2011 WL 31548, at *5 (S.D.N.Y. Jan. 5, 2011); *Novastar*, 2011 WL 1338195, at *10.

*Inc.*, 277 F.R.D. 97, 108 (S.D.N.Y. 2011) ("*Merrill II*") ("Defendants' argument that Plaintiffs must show that they failed to receive principal or interest payments…constitutes 'too cramped a reading of damages'"), citing *Countrywide I*, 588 F. Supp. 2d at 1169-70.[19]  Defendants' cases do not address the requirements for pleading injury under New York law.[20]

### H.    Plaintiffs Adequately Plead Aiding And Abetting Fraud

Aiding and abetting fraud requires (1) existence of an underlying fraud; (2) defendant's knowledge of the fraud; and (3) defendant's substantial assistance in committing the fraud. *Gabriel Capital L.P. v. NatWest Fin., Inc.*, 94 F. Supp. 2d 491, 511 (S.D.N.Y. 2000).  Plaintiffs assert aiding and abetting claims against the Sponsor and Depositor Defendants, and the Bear Stearns and JPMorgan parents (BSCI and JPMC) that used them to commit the fraud.  ¶¶354-72. Because Defendants do not dispute that these claims against the Sponsor and Depositor Defendants are well-pled if Plaintiffs have adequately pled an underlying fraud, and because the underlying fraud has been adequately pled for the reasons set forth in §II.A-G above, Plaintiffs' aiding and abetting claims against these defendants should also be sustained.[21]

---

[19] *See also Allstate*, 824 F. Supp. 2d at 1188 (rejecting argument that "Allstate has suffered no damages because most of the Certificates are not impaired"); *Virgin Islands*, 804 F. Supp. 2d at 155-156 (S.D.N.Y. 2011) (plaintiff's allegations that the value of the investment declined found sufficient); *New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 1473288, at *5 (S.D.N.Y. Mar. 29, 2010) (rejecting defendants' argument that plaintiffs have not sufficiently alleged an injury because majority of the certificates had made every payment).

[20] *See AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009) (discussing plaintiffs' burden of proof for showing loss causation at trial); *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 743 F. Supp. 2d 288 (S.D.N.Y. 2010) (no claim for damages under New York law); *Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.,* 652 F. Supp. 2d 576, 591 (E.D. Pa. 2009) (same).

[21] In a footnote, Defendants argue that the abetting claims against BSCI and JPMC are insufficient for failure to allege their knowledge of, or "substantial participation" in, their subsidiaries' fraud.  Def. Br. at 28, n.40.  Defendants, however, ignore the detailed allegations that describe how their fraudulent securitization practices were the result of conscious policy decisions taken at the highest corporate levels to grow profits by churning out RMBS without regard to quality, and by knowingly cutting back on underwriting controls while simultaneously

### I.  Plaintiffs Adequately Plead Negligent Misrepresentation

Negligent misrepresentation requires, *inter alia*, that defendant had a duty as a result of a special relationship to give correct information, that defendant made a misrepresentation to the plaintiff, and the plaintiff reasonably relied on it to its detriment. *See IKB Deutsche*, 2012 WL 1592193, at *6; *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263-64 (N.Y. 1996) ("duty to speak with care exists when the [parties'] relationship … is such that in morals and good conscience the one has the right to rely upon the other"); *EED Hldgs v. Palmer Johnson Acquis. Corp.*, 387 F. Supp. 2d 265, 281 (S.D.N.Y. 2004) (special relationship found where defendant possesses "unique or specialized expertise").

Defendants assert that Plaintiffs fail to allege any "special relationship" because the parties "engage[d] in arms-length business transactions." Def. Br. at 29.[22]  At best, however, this argument raises a factual dispute that cannot be resolved on the pleadings. *See, IKB Deutsche,* 2012 WL 1592193, at *10 ("Whether the nature and caliber of the relationship between the

_____

incentivizing their employees to originate, securitize and sell defective loans. For example, the Complaint alleges how JPMC's CEO was involved in expanding JPMorgan's RMBS business, but was privately so concerned about the subprime market "going up in smoke" that he caused JPMorgan to reduce its own RMBS exposure – and how JMPC's Chief Risk Officer understood the "tradeoff" between ensuring strict compliance with standards and "maintaining [JPMorgan's] market share" in the RMBS business. ¶¶125, 133. It also defies credulity to believe that the many steps that Bear Stearns took to increase its RMBS production – including its actions to limit its due diligence, to modify its EPD policies, and to provide massive amounts of financial support to rotten loan originators such as Impac and Encore Mortgage – occurred without the knowledge and coordination of BSCI management. *See, e.g.*, ¶¶55-79, 143-53, 198-199. *See, e.g., Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464-65 (S.D.N.Y. 2009) (sustaining claims because "Plaintiffs allege that [defendant] was the developer of the [fraudulent] strategy, so it only follows that it must have known of the fraud"). Defendants' cited authorities merely hold that the mere existence of parent/subsidiary relationship, ***without more***, is insufficient to establish parent's control or liability. *See, .e.g., Merrill I*, 714 F. Supp. at 485 (S.D.N.Y. 2010).

[22] Defendants' threshold argument -- that Plaintiffs fail to allege a special relationship between Defendants and Plaintiffs Dexia SA/NV, DCL and DHI because the Complaint "fails to allege that those Plaintiffs had any contact with Defendants" -- is a red herring. As assignees of FSAM (*see infra* at §III.J), Dexia SA/NV, DCL and DHI "stand in [FSAM's] shoes, and the case must be analyzed from [FSAM's] perspective." *Feinberg*, 2005 WL 2990633, at *6.

parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact").  Moreover, in this Circuit a complaint adequately pleads a "special relationship" by alleging that "defendants initiated contact with plaintiffs, induced them to forebear from performing their own due diligence, and repeatedly vouched for the veracity of the allegedly deceptive information."  *Suez,* 250 F.3d at 103.  Here, Defendants provided Plaintiffs with the Offering Materials knowing that Plaintiffs would rely on their misrepresentations and knowing that Plaintiffs lacked access to the relevant loan files and internal due diligence reports.  Having induced Dexia's reasonable reliance on their exclusive inside knowledge about the RMBS, the Complaint easily alleges negligent misrepresentation.[23]

## J.    Plaintiffs Have Standing To Bring This Suit

As Plaintiffs allege, FSAM purchased the Certificates in reliance on Defendant's representations and was a direct victim of Defendants' fraud.  ¶¶285-89.  Thus, until it is shown that the intra-company assignment of FSAM's claims to the other Dexia Plaintiffs was effective, FSAM remains "clearly a real party in interest within the meaning of Fed. R. Civ. P. 17(a)." *FMC Corp., v. Varonos,* 1988 WL 116825, at *5 (N.D. Ill. Oct. 21, 1988) ("The direct victim of a fraudulent scheme is clearly a real party in interest").  The Complaint also alleges that "Defendants' misconduct has caused Dexia SA/NV, DHI, and DCL to suffer substantial losses on the RMBS Certificates."  ¶18.  Thus, those Dexia Plaintiffs also have standing to bring claims. *See Official Comm. of Unsecured Creditors of Worldcom, Inc. v. S.E.C.,* 467 F.3d 73, 77 (2d Cir. 2006) (a party that "suffered economic injuries that are fairly traceable to [Defendants']

---

[23] Defendants' cases are readily distinguishable.  For example, in *Gusmao v. GMT Grp., Inc.*, 2008 WL 2980039, at *15 (S.D.N.Y. Aug. 1, 2008) ("The only duty [defendant] appears to allege is plaintiffs' duty to comply with the terms of the contract"); *DynCorp. v. GTE Corp.*, 215 F. Supp. 2d 308, 329 (S.D.N.Y. 2002) (plaintiff made no effort to allege special relationship); *MBIA Ins. v. GMAC Mortg. LLC*, 30 Misc. 3d 856, 864 (Sup. Ct. N.Y. 2010) (no allegation that defendants had *exclusive* access to due diligence results).

violations" and "seeks financial compensation to redress those losses" has Article III standing);
*U.S. v. Cambio Exacto, S.A.*, 166 F.3d 522, 528 (2d Cir. 1999) (same).

Defendants' claim that the intra-company assignments of all claims from FSAM to its corporate affiliate were not effective (Def. Br. at 31) relies on extraneous materials and is premature, and Plaintiffs are entitled to plead their claims in the alternative until the nature and validity of the assignments are finally determined on a full evidentiary record.  *See In re Rezulin Prods. Liab. Litig.*, 2002 WL 31852826, at *1 (S.D.N.Y. Dec. 18, 2002).[24]

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Dated: New York, New York
         August 20, 2012

                              **BERNSTEIN LITOWITZ BERGER
                                & GROSSMANN LLP**


                         By:    */s/ Jeroen van Kwawegen*_____

                                 William C. Fredericks
                                 Jeroen van Kwawegen
                                 Stephen L. Brodsky
                                 Katherine A. Stefanou
                                 1285 Avenue of the Americas, 38th Floor
                                 New York, NY 10019
                                 Tel: (212) 554-1400
                                 Fax: (212) 554-1444
                                 bill@blbglaw.com
                                 jeroen@blbglaw.com
                                 stephen.brodsky@blbglaw.com
                                 katherine.stefanou@blglaw.com

---

[24]   This Court has also previously rejected arguments that any of the Dexia Plaintiffs' claims should be dismissed for lack of standing at the pleading stage.  *See Dexia, et al. v. Deutsche Bank, et al.*, No. 11 Civ. 5672 (JSR) (S.D.N.Y. Feb. 6, 2012), ECF No. 49. *See also North Fork Bank v. Cohen & Krassner*, 843 N.Y.S. 2d 575, 577 (1st Dept. 2007) (assignment of "right, title and interest in and to [the] mortgage" assigned fraud claims).

- and -

Timothy A. DeLange (*pro hac vice*)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323
timothyd@blbglaw.com

*Counsel for Plaintiffs Dexia SA/NV, Dexia Holdings, Inc., FSA Asset Management LLC, Dexia Crédit Local SA*