C96MDEXC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
DEXIA SA/NV, DEXIA HOLDINGS,
INC.; FSA ASSET MANAGEMENT
LLC, and DEXIA CREDIT LOCAL
SA,

                    Plaintiffs,

           v.                              12 Civ. 4761 (JSR)

BEAR STEARNS & CO., INC.; THE
BEAR STEARNS COMPANIES, INC.;
BEAR STEARNS ASSET BACKED
SECURITIES I, LLC; EMC
MORTGAGE, LLC (f/k/a EMC
Mortgage Corporation);
STRUCTURED ASSET MORTGAGE
INVESTMENTS II, INC.; J.P.
MORGAN ACCEPTANCE CORPORATION
I; J.P. MORGAN MORTGAGE
ACQUISITION CORPORATION; J.P.
MORGAN SECURITIES, LLC (f/k/a
JPMorgan Securities, Inc.);
WAMU ASSET ACCEPTANCE CORP.;
WAMU CAPITAL CORP.; WAMU
MORTGAGE SECURITIES CORP.;
JPMORGAN CHASE & CO.; and
JPMORGAN CHASE BANK, N.A.,

                    Defendants.

------------------------------x
                                           New York, N.Y.
                                           September 6, 2012
                                           1:15 p.m.

Before:

                    HON. JED S. RAKOFF,

                                           District Judge

C96MDEXC

1                              APPEARANCES

2     BERNSTEIN LITOWITZ BERGER & GROSSMANN
           Attorneys for Plaintiffs
3     BY:   TIMOTHY A. DeLANGE
           JEROEN VAN KWAWEGEN
4
      CRAVATH SWAINE & MOORE
5          Attorneys for Defendants
      BY:   DANIEL SLIFKIN
6          YELENA KONANOVA

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C96MDEXC

1              (Case called)

2              THE COURT:  We have a lot of things to cover, but I

3     think I want to first hear on the motion to remand, and I'm

4     particularly interested in hearing anything anyone wants to say

5     on the Edge Act aspect.  Let me hear first from moving counsel.

6              MR. VAN KWAWEGEN:  Thank you, your Honor.

7              As your Honor is aware, the defendants have raised two

8     grounds to oppose remand.  They removed the case based on two

9     grounds.  They say that the case is related to 13 bankruptcies

10    and there is also a federal question of jurisdiction under the

11    Edge Act.

12             Plaintiffs' position is, we don't even have to reach

13    the 13 bankruptcies that the defendants put at issue, your

14    Honor, because of defendants' position with respect to the

15    mandatory abstention statute.  The defendants in their papers

16    on page 17 concede that all the elements of the abstention

17    statute, 1334(c)(2), are met except for one, and that one

18    exception is that there is also jurisdiction under the Edge Act

19    and, therefore, this Court should hear this case.

20             So if the Court finds that there is no Edge Act

21    jurisdiction, abstention is essentially mandatory under the

22    abstention statute.

23             THE COURT:  I know that's your argument.  That's why I

24    wanted to hear about the Edge Act.

25             MR. VAN KWAWEGEN:  The Edge Act, as your Honor is

C96MDEXC

1    aware, provides federal question of jurisdiction over actions

2    that arise out of international banking transactions.  And our

3    position is, there is no federal law at issue in this case,

4    there is no banking law at issue in this case, there is no

5    international transaction at issue in this case and that this

6    is plainly a common law action brought in state court against

7    New York defendants.

8            So the defendants say that this case is nevertheless

9    governed by the Edge Act because 18 of the 249,902 mortgages in

10   this case were originated in the Virgin Islands.  But this is

11   wrong, your Honor.

12           As your Honor is aware, there are two lines of cases

13   in this district, a line of cases that take a narrow reading of

14   the Edge Act and a line of cases that takes a broader reading

15   of the Edge Act.  The narrow reading of the Edge Act I think

16   ultimately can be traced back to the Lazard decision by Judge

17   Wood in 1991 and subsequently followed by Judge Kaplan in BLBNY

18   and Judge Sullivan in City Mortgage, that essentially requires

19   that there is a connection between the federally chartered bank

20   in the case and the underlying international banking

21   transaction.  That is clearly not the case here.

22           The broader reading of the Edge Act I think can be

23   traced back to Lemgruber, that Judge Batts decided, essentially

24   says no, there is no need for a perfect match between the

25   federally chartered bank in the case and the international

C96MDEXC

1   banking transaction.  But all those cases, Lemgruber, AIG,

2   Lloyd's by Judge Sweet, all find that one of the defendants,

3   whether or not that is a federally chartered bank, engaged in

4   an international banking transaction.  And that is not the case

5   here either, your Honor.  None of the defendants in this case

6   is alleged to have engaged in any international banking

7   transaction.  So even under the broader reading of the Edge

8   Act, we believe that this Court does not have jurisdiction

9   under the Edge Act.

10          THE COURT:  Let me hear from your adversary.

11          MR. SLIFKIN:  Thank you, your Honor.

12          I think the right place to start is with the wording

13   of the statute itself, 12 U.S.C. Section 632.  It says:  All

14   suits of a civil nature at common law or inequity to which any

15   corporation organized under the laws of the United States shall

16   be a party, arising out of transactions involving international

17   or foreign banking, and it continues.

18          So in this case I think you have to look at the two

19   elements of the statute.  The first element is, is there any

20   corporation organized under the law of the United States that's

21   a party?  The question is absolutely, no question, JP Morgan

22   Chase Bank, NA is a party.  Then it says:  Does the suit arise

23   out of transactions involving international or foreign banking?

24   We believe it does.  There are 18 mortgages originated in the

25   Virgin Islands.  That is banking dependency or interior

C96MDEXC

possession, which is part of the statute, lending practices key

to this suit.  So on a very simple reading both elements of the

statute are met.

            Now, the question then arises, as counsel has put it,

does the nationally chartered bank, does it have to -- I am now

going to quote from Judge Sullivan in City Mortgage, if I may,

your Honor, where he said:  A nationally chartered bank must

have potential liability on claims arising out of the foreign

banking transactions.

            Now, with respect to Judge Sullivan, that connection

is not in the statute.

            As your Honor knows, Judge Jones has gone the other

way and the Second Circuit has that issue in front of them.

But I think we can avoid that issue here.  If you look at what

Judge Sullivan says, which is, does the nationally chartered

bank have potential liability?  We argue, well, it does on the

way this has been pleaded.  The territorial loans here are

within an offering called JP ALT 2006(a)(7).  In that case the

sponsor is JPM Mortgage Acquisition Corp.  That, according to

the pleadings, is a wholly-owned subsidiary of the NA, national

association.  And what the complaint says in paragraph 28 is:

All allegations against JP Morgan Mortgage are also made

against its controlling parent company.

            So here plaintiffs seek to hold the NA liable for the

actions of its subsidiary with respect to the offering.  JP ALT

C96MDEXC

1  the 2006(a)(7), that has the residential mortgages in it that

2  arise out of the Virgin Islands.  So even under, I think, Judge

3  Sullivan's articulation of the standard, and we understand the

4  Second Circuit may come up with something different, under that

5  articulation, his standard is met.  Certainly under Judge

6  Jones' standard of articulation of the standard, which is the

7  statute has no link, again, the elements of the statute are

8  met.  That's our submission on that point, your Honor.

9          THE COURT:  Let me hear from plaintiff's counsel in

10  rebuttal.

11          MR. VAN KWAWEGEN:  Your Honor, the difference between

12  Judge Jones' decision in AIG is that there the plaintiffs were

13  seeking defendants, including Countrywide, to hold them liable

14  as originators of mortgages.  There is no dispute that the

15  origination of a mortgage is a traditional banking transaction.

16          Here, that is absolutely not the case.  We have not

17  sued any loan originators other than EMC.  But as the complaint

18  makes clear, they were not originating their own loans, and

19  certainly there is no indication that they originated any loans

20  in the Virgin Islands.

21          In this case, unlike a very broad reading of Judge

22  Jones, there is simply no connection, no international banking

23  transaction connecting to any of our defendants, including

24  Chase.  If you would take the narrow reading, which we think is

25  the more appropriate reading in the procedural context that we

8

C96MDEXC

1    are now, on removal, for the reasons that Judge Sullivan stated

2    and Judge Briccetti in Weiss v. Hager stated.

3           But even you if you take the much broader reading of

4    Judge Jones, that is still not covering this case.  There is no

5    defendant in this case that is alleged to have engaged in any

6    international banking transaction, and the defendants have not

7    shown that the 18 mortgages that they are pointing to were

8    originated by any defendant in this case.  It is true that in

9    that specific offering a JP Morgan sponsored entity ultimately

10   acquired those mortgages, but they have not shown that that is

11   an international banking transaction in and of itself and

12   certainly have not argued that.

13          THE COURT:  I just want to set the stage for the rest

14   of the motions that we are going to hear about in a minute.

15          As I got into the motion to remand it did seem to me

16   that the whole issue was the Edge Act issue, but it also seemed

17   to me, as I think it's obvious to both sides here, that the

18   case law in this district is not a model of consistency.  So I

19   am going to have to sort that out, but I have put aside this

20   weekend to do that.  So I will get you on the motion to remand

21   a bottom-line decision by Monday or Tuesday of next week with

22   opinion to follow.  I won't have the opinion by then, but I

23   will have reached a conclusion.

24          The reason I'm mentioning that now, if I do decide to

25   remand I am not going to reach the motion to dismiss.  But if I

C96MDEXC

1    decide not to remand, then I will reach the motion to dismiss.

2    So I want to hear the oral argument on that now as well.

3         Why don't we turn to the motion to dismiss and here

4    the movant, of course, is the defendant.

5         MR. SLIFKIN:  Thank you, your Honor.

6         I am not going to repeat everything in our papers, but

7    there are maybe three points, with the Court's indulgence, that

8    I would like to touch on.

9         The first being the lack of allegations specific to

10   these offerings, the offerings that have been sued on.   The

11   second is the lack of attention in the complaint to the actual

12   disclosures in the documents relating to those specific

13   offerings.  And the third is, if I can put it this way, the

14   failure to recognize the very specific elements of a common law

15   fraud claim, as opposed to say a Section 11 claim, which hasn't

16   been brought here, particularly in reliance and causation.

17        If you look at the first point, the point is, the

18   relationship of the general allegations made in the complaint

19   to the specific offerings here.  As your Honor knows, this case

20   involves 51 offerings sold over all of 2006 and half of 2007,

21   approximately, from three separate banks, JP Morgan, Bear

22   Stearns, WAMU, and a bunch of related entities.  These are

23   claims for fraud.

24        So it's not the case the pleading is merely plausible,

25   but the pleading must be with particularity, including as to

C96MDEXC

1    why the statements in the 51 offering documents, why they are

2    fraudulent.  There are many allegations about problems, I'll

3    put it, of these various entities, about what certain people

4    said, what certain people did, what practices arose.  But there

5    is a single overriding flaw.  Those are never linked to the

6    specific deals in question.  If you look at pages 4 to 11 of

7    plaintiff's opposition to the motion to dismiss --

8             THE COURT:  Let me just pull that up.  We didn't bring

9    that up.  Go ahead.

10            MR. SLIFKIN:  That's their best shot, essentially, of

11   putting in one place all of the places in the complaint where

12   they say there are allegations supporting the assertion of

13   fraud.  And what they then say in argument, and I'll quote from

14   it, it says:  Defendants systematically securitized loans that

15   were originated in violation of the stated underwriting

16   guidelines and pointing back to that letter.  Now, we submit,

17   that doesn't work.  That doesn't work either factually or

18   legally.  I want to give you a few examples on the facts as

19   pleaded.

20            There is a great deal of discussion in the complaint

21   of something called the Clayton report.  It's cited repeatedly.

22   We actually attached it to my affidavit, so the Court has it.

23            It shows that 75 to 80 percent of the loans were

24   absolutely fine under anybody's standard.  That alone does not

25   say there is complete abandonment of underwriting guidelines.

C96MDEXC

1   That document says 80 percent of them are completely in

2   conformity.

3          The document continues to show that, depending on the

4   entity we are talking about here, because there are three,

5   between 7 and 14 percent of loans reviewed by Clayton, an

6   independent due diligence factor, were waived in.  There is no

7   explanation of what waived in means.  For all we know, based on

8   this pleading, they were waived in because whatever technical

9   defect there was in the loan file was remedied.  Maybe a HUD-1

10  statement was missing and it was found.  Maybe the borrower

11  hadn't signed some form and he got it signed and then they put

12  it in.

13         But most importantly, Clayton disavowed in their

14  testimony to Congress or to the government cited in the

15  complaint.  They disavowed any knowledge of whether the

16  waived-in loans were actually securitized at all, and the

17  complaint is devoid of any allegation that those waived-in

18  loans were securitized in the offerings that are being sued on.

19         With your indulgence, I'll give you another example of

20  a document that's featured very prominently in the complaint,

21  something called the Zippy Cheats & Tricks memo.  Let me remind

22  the Court essentially what that document says.  It concerns a

23  computerized system at JP Morgan for approving mortgages.

24  These are mortgages which have been referred to as stated

25  income, stated asset mortgages.  That's to say, all the

C96MDEXC

1   borrower needs to do is say, this is my income, these are my

2   assets, not verified.  That factor disclosed.

3          The memo says:  Put the numbers into the computerized

4   system, Zippy, and it will say accept or reject.  If it says

5   reject, why don't you just change the numbers and see if it

6   then accepts it.  That, understandably, is a problem, and if we

7   proceed into discovery, people will learn that the lady who

8   circulated that memo was fired and actions were taken.

9          What is important in the pleadings stage is that no

10  allegations that people did what the Zippy memo asserts, there

11  is no allegation of how often that was done or by whom, there

12  is no allegation that any such loans were issued because of

13  manipulation of Zippy, if any, were securitized at all, and

14  there is no allegation to suggest the product of the Zippy

15  Cheats & Tricks memo was securitized in these offerings.

16         I continue, your Honor.

17         THE COURT:  Let me ask you this.  Assuming for the

18  sake of argument that the pleadings were deficient in one or

19  another respect of the kind you are now describing, that would

20  be the kind of situation where I would dismiss without

21  prejudice to replead, right?

22         MR. SLIFKIN:  That's correct, your Honor.

23         That's what you did in the Dexia v. Deutsche Bank

24  case.

25         THE COURT:  I guess one question I have for your

C96MDEXC

1        adversary when he stands up, he doesn't agree that the

2        pleadings are deficient.  But assuming they are deficient in

3        one or another of these kinds of respects, does he have, based

4        on his investigation or offer that could be the basis for an

5        amended pleading?  For example, taking the waiver issue you

6        just mentioned.  So that, particularly given the memo, that's

7        suspicious, but in the pleading very little of the details as

8        to why there were waivers has been spelled out, but maybe he

9        has the basis to spell that out.  I don't know.  That's

10       something for him when he gets up.  But go ahead.

11              MR. SLIFKIN:  To finish up on the point about the

12       generality of the allegations and the lack of link, we do

13       recommend both Judge Batts' decision in NovaStar, too, and

14       Judge Castel's decision in Footbridge v. Countrywide which

15       dismissed for just this very reason.  And the cases that

16       plaintiffs cite contrary to that really do highlight the

17       distinction I've been making.  If you look at the MBIA

18       decision, your Honor, in the New York Appellate Division, there

19       is a specific listing of more than 4,000 loans.  The plaintiffs

20       say, we reviewed these loans that were securitized and we know

21       they are defective based upon the guideline.  Or in the Dodona

22       case, which was Judge Marrero's case, regarding a

23       securitization by Goldman Sachs, there was very specific

24       evidence that the Goldman Sachs regarded these offerings as

25       containing defective loans, e-mails from Goldman Sachs.

C96MDEXC

1    Nothing like that here, your Honor.

2            But even beyond that, even beyond that point, your

3    Honor, there is the point that plaintiffs seem to disregard the

4    disclosures that were made in the documents at issue.

5    Obviously, 51, the numerous tranches, even within those 51

6    offerings.  But to sort of summarize, since we can't possibly

7    go through all of them, when there is a discussion of the

8    underwriting guidelines, there is also discussion that

9    exceptions are made.  There is also a discussion that the

10   underwriting guidelines are less stringent than agency, the

11   federal agency guidelines.

12           There is also a discussion about that repurchase is

13   possible because some of the loans might be defective.  So it

14   is not the case that there was a representation that every

15   single loan met a stringent guideline, because these guidelines

16   aren't that stringent.  The guidelines are actually available

17   to the purchaser.  There are exceptions.  And we might be

18   repurchasing some of these precisely because they are

19   defective.

20           The same could be said about the due diligence

21   allegations.  There is a disclosure about due diligence.  It

22   says it's varied.  It says, there is a sampling basis.  So the

23   allegation, which it was misrepresented was due diligence

24   because you don't use a sample, it says that in the offering

25   documents.  I can go on to talk about occupancy, simply

C96MDEXC

information from borrowers, appraisals.  That's the information

from the appraiser.  There is no allegation that that's false.

Credit ratings.  There is no question that the credit

ratings of the underlying borrowers are disclosed, but there is

no allegation that they are false.  The allegation is, well, I

don't think they are really that useful.  That's not the

standard.  They have to be false, your Honor, and there is no

allegation that they are false.

If I might then turn to the last two points --

THE COURT:  Yes.

MR. SLIFKIN:  -- that I wanted to talk about.  In the

context of a common law fraud suit, you have to look at every

single element.  And there are two I want to focus on.  The

first is reliance.  This is not fraud on the market reliance.

This is eyeball reliance.  The plaintiffs have to allege, with

respect to each of the statements they are seeking to sue on as

being false or misleading, as being fraudulent, that not only

did they look at that statement, they actually read that

statement, but they relied on that statement in making their

purchase decision.

Here, there is absolutely no allegations that that was

done, none.  Certainly there are no allegations about how

plaintiffs then did their own independent due diligence, which,

again, is an aspect of reasonable reliance.  But they fail even

at the threshold of actual reliance.

C96MDEXC

1            Finally, if I may say a word about causation and

2     damages, these securities are similar to bonds in that there is

3     a payment stream over time and of interest and principal and a

4     repayment to the end of a period because, as your Honor knows,

5     there are mortgages on the line.  That's how mortgages work.

6            Plaintiffs have not alleged that they missed any

7     principal or interest payments.  There is no allegation they

8     didn't get what they bargained for in purchasing these

9     securities.  The allegation, however, is that there was a

10    diminution in value of the bond.  If you look at the

11    prospectuses, it's explicit, there is no assurance that there

12    will be any second remarket for these securities.  So to say,

13    well, I didn't get the value I was promised, you weren't

14    promised any value in the sense there being a second remarket

15    value.  You were promised an income payment stream and you have

16    not alleged that you didn't get that, which we think is really

17    a complete failure to plead causation, again, a necessary

18    element of the underlying causes of action.

19            Thank you, your Honor.

20            THE COURT:  Thank you very much.  Let me hear from

21    plaintiff's counsel.

22            MR. DeLANGE:  Thank you, your Honor, Timothy DeLange,

23    Bernstein Litowitz Berger & Grossmann on behalf of the

24    plaintiffs.

25            I am going to respond to each one of the points that

C96MDEXC

Mr. Slifkin made, but I want to start with the specific
question that you had highlighted that would be addressed to
me.

         The short answer is, yes, if the Court found for
whatever reason that the pleadings were deficient, we could add
additional facts and additional allegations specifically with
respect to the waiver point that counsel was arguing and the
Court asked a question about.

         If you look at the Clayton report, defendants'
interpretation of it is wrong.  There is an initial rejection
rate.  Clayton reviews a sample of loans.  And based on that
review they determine, do these loans meet the guidelines or do
they not?  And there is numbers in there that reflect the
percentage that do not.  Defendants then have discussions with
Clayton.  In fact, they tried to get Clayton to reverse those
decisions that certain loans violated those guidelines.
Ultimately, there is a final rejection rate and that final
rejection rate is also reflected in the exhibit that was
provided to your Honor.

         There is then a waiver right.  That waiver rate is the
percentage of loans that defendants disregarded Clayton's
conclusions, disregarded them.  They were told they violated
the guidelines.  They had the opportunity to discuss that with
Clayton, and they decided they are going to ignore it and they
waived.

C96MDEXC

 1              Now, Clayton, it is correct in their testimony they

 2    disavowed knowledge as to whether or not the loans that were

 3    waived in ultimately ended up in a securitization.  Their job

 4    was finished at that point.  They provided the due diligence to

 5    these defendants and other defendants in this arena for their

 6    purchase of loans.  But, as we know, and as everyone knows,

 7    defendants were purchasing these loans not to hold for

 8    investment, they were purchasing them to sell.  And it is not a

 9    reasonable inference that loans that were waived in and the

10    defendants bought anyway did not end up in securitizations, and

11    that's an inference that the defendants would like the Court to

12    reach that is not reasonable.  That's the quick response to

13    your question.

14              I'll now address each of the three points that counsel

15    raised.  I'll start with what he characterizes as a lack of

16    allegations specific to the offerings.  That's just flatly

17    incorrect.  We have tables and charts showing that the

18    performance of each of these offerings was dismal.  As of the

19    filing of the complaint, 40 percent on average, 40 percent of

20    the loans in these offerings were delinquent.  That's a

21    terrible performance.

22              We also allege the downgrades.  When my client bought

23    these, every single one of these investments was a triple A

24    rated security, supposedly the safest investment you could

25    invest in.  Now, virtually every single one of them has been

C96MDEXC

1      downgraded, virtually every single one of them have been

2      downgraded to junk.

3           You take those allegations along with what this

4      complaint details.  And what that complaint details, and

5      defendants don't deny and they don't challenge, defendants

6      engaged in a systemic fraud of their mortgage securitization

7      system.  The entire system was fraudulent.  It was based on

8      volume and volume alone.  And they knowingly took steps to

9      disregard due diligence.  They knowingly waived in loans that

10     they were told violated the guidelines.  They knowingly

11     securitized loans that had been originated pursuant to fraud.

12          In the case of WAMU, there is a credit risk memo

13     identifying that they have no credit risk procedures to control

14     against selling fraudulent loans to investors.  That's what

15     their complaint details.  Defendants are attempting to focus on

16     one aspect.  You don't say that one loan in these 51 offerings

17     was pursuant to fraud or was pursuant to a waive in from the

18     Clayton report.  Their entire system was fraudulent, including

19     these 51 offerings.

20          These 51 offerings are in the complaint because that's

21     what my client purchased.  But the other offerings that the

22     defendants engaged in during this time period suffered from the

23     same problems that are detailed in this complaint and it's

24     detailed from the Clayton report showing that they were told

25     these loans violated your underwriting guidelines and they

C96MDEXC

1    chose to waive them in any way.  It's detailed from testimony

2    from government investigations of high-level employees and

3    defendants testifying that, yes, we were engaged in volume,

4    volume only.  We put pressure on people to get loans in.  We

5    reduced the due diligence.

6          Bear Stearns told their due diligence vendor, in

7    addition to not doing due diligence on occupancy status, in

8    addition to not doing due diligence on appraisals, we don't

9    want you to go out and verify employment.  They were limiting

10   their due diligence.  In the case of WAMU, same situation.

11   There was a high-risk lending strategy internally that the bank

12   employed.  It was to go out and get as many loans as possible.

13         THE COURT:  Let me ask you this.  I am going to depart

14   from the facts of this case and put this into totally

15   hypothetical terms.

16         Supposing some financial institution engaged in

17   pervasive fraudulent tactics with respect to the securitization

18   and subsequent sale of particular securities, but the

19   particular ten securities that a hypothetical plaintiff bought

20   were not subject to those problems.  They were legitimate.

21   They were not misrepresented.  Everything was fine as to them,

22   even though there were frauds going on, but it didn't affect

23   them.  And it was the state, New York State fraud claim, not a

24   federal claim.  So there wouldn't be a claim in that situation,

25   right?  The fact that there was pervasive fraud affecting, in

C96MDEXC

| | |
|---|---|
| 1 | my hypothetical, thousands of other securities wouldn't matter |
| 2 | if there was no fraud with respect to the lucky ten that this |
| 3 | hypothetical plaintiff had purchased. |
| 4 | So what I'm getting at is, don't you still have to |
| 5 | show something much more specific about the particular |
| 6 | securities that are involved here in order to make out a state |
| 7 | law fraud claim? |
| 8 | MR. DeLANGE:  The answer is yes, and we have done |
| 9 | that.  Under your hypothetical, those ten securities that were |
| 10 | not infected with the systemwide fraud would perform as |
| 11 | expected and they would continue to have their triple A |
| 12 | ratings.  Maybe they would be downgraded to double A. |
| 13 | THE COURT:  They might be downgraded because of |
| 14 | changes in the economy, all sorts of extrinsic factors. |
| 15 | MR. DeLANGE:  That's certainly possible, and |
| 16 | potentially at trial defendants could offer evidence that |
| 17 | that's the case. |
| 18 | But looking at the pleading stage, and have |
| 19 | plaintiffs, under Rule 9(b), pled the who, what, when, where, |
| 20 | and how, and you have this systemic fraud that infects the |
| 21 | entire business.  This is how they did business and they |
| 22 | knowingly did the business this way.  Then you have 51 |
| 23 | offerings that suffered from dismal performance, dismal |
| 24 | delinquency rates, and they have all been downgraded, virtually |
| 25 | now all of them now junk.  That tells you the reasonable |

C96MDEXC

1    inference is, that systemic fraud included these 51 offerings.

2    They were not the ten offerings that, in the Court's

3    hypothetical, continued to perform well and were infected with

4    the fraud.

5         THE COURT:  You had other things you wanted to address

6    and I want to hear all those.  I am particularly interested in

7    hearing what you want to say on the issue of reliance, given

8    the relatively sophisticated nature of your claims.

9         MR. DeLANGE:  I will start with reliance, your Honor,

10   and I'll go back to the other points I was going to make.

11        Defendants mischaracterized the complaint.  They

12   allege that we don't have any allegations of reliance.  I feel

13   they are moving to dismiss another complaint in an RMBS case

14   because our complaint is replete with allegations of reliance

15   and it details that the purchaser here, which was FSAM, there

16   is an entire paragraph, two paragraphs, 287 to 288 in the

17   complaint, that focus on what FSAM reviewed and what they had

18   to do before they could purchase these types of securities.

19   They had underwriting guidelines that they had to follow.  And

20   pursuant to those guidelines, they had to analyze the credit

21   quality and credit characteristics of whatever security they

22   were buying and that's what they did here.  FSAM was the

23   purchaser and we specifically allege the detail of what they

24   did, the information they relied on.

25        In addition, after each one of the false statements

C96MDEXC

1    regarding -- again, the false statements all detail and relate

2    directly to key metrics in a mortgage-backed security.  A key

3    metric that shows the quality of the underlying collateral,

4    because that's what you are buying and that's what you look at,

5    is, is this underlying collateral the quality that they are

6    representing to me?  That's what is important.  And the key

7    metrics that were misrepresented, the plaintiff, who made the

8    purchases, FSAM, relied on that.  We make that specific

9    allegation.  The notion that we don't make any allegation in

10   that respect at all is contradicted by the details in the

11   complaint.

12          With respect to the argument that plaintiff is a

13   sophisticated investor, they are a sophisticated investor and

14   they did their due diligence.  They looked at these metrics

15   that were provided to them.  They analyzed these metrics in

16   accordance with their underwriting guidelines.

17          What they didn't have and couldn't have had that

18   defendants somehow want to argue that they should have went and

19   found is facts that defendants were waiving in half of the

20   loans that Clayton told them violated the guidelines.  There is

21   no way my client could have uncovered that.  There is no way my

22   client could have uncovered the fact that Bear Stearns gave

23   directives to limit due diligence.  There is no way my client

24   could have uncovered the fact that Washington Mutual's

25   subsidiary affiliate, Long Beach Mortgage, was engaged in

C96MDEXC

1    rampant fraud in 2005.  WAMU uncovered it and did nothing about

2    it and then admitted in a memo that they didn't have

3    appropriate procedures to keep fraudulent loans out of

4    securitizations to investors.  Those details, that information

5    was not available.  There is not a case defendants can cite to

6    that put the burden on even a sophisticated plaintiff to

7    uncover the details of the fraud here.

8            I would like to take a quick step back to the second

9    point that defense counsel made, which was the disclosures in

10   the documents.  And this really falls from the argument that

11   I've been making thus far.  The documents disclose that there

12   may be exceptions when there is appropriate compensating

13   factors.  I have read through the documents.  I've read through

14   the prospectus supplements.  Nowhere does it say that

15   defendants are going to disregard and waive in half of the

16   loans that our due diligence vendor tells us violates the

17   guidelines.  That's not disclosed.  Nor is it disclosed that

18   they are going to include fraudulent loans.  The details of the

19   allegations of the systemic fraud were not disclosed, and we

20   won't find specific disclosures on any of that anywhere in the

21   offering documents.

22           The last point that counsel made -- I want to back up.

23   One point I want to correct that counsel made.  Counsel made

24   the statement that there is no dispute that 75 to 80 percent of

25   the loans in these pools were good or okay, I think was the

C96MDEXC

1    statement.  That's wrong.  Clayton only sampled and defendants

2    only sampled a certain percentage of the loans.  And they got

3    the information from Clayton and their other due diligence

4    vendors based on that sample.

5          What defendants never did, and this is not disputed,

6    is they never took the results of that sampling and

7    extrapolated it to the remaining 80 percent, 90 percent of the

8    pool that they never even looked at.  So you have a small set

9    of samples that they looked at, found violations, waived them

10   in any way, and then they disregarded those results, did

11   nothing with them, and took the remaining 90 percent of the

12   pool, put it together, and sold it to the investors.  That's

13   what happened.  A statement that 75 or 80 percent were okay is

14   inaccurate.

15         The last point --

16         THE COURT:  Is there any suggestion that the sampling

17   was anything other than a reasonable cross-section?

18         MR. DeLANGE:  We do not make an allegation that the

19   sampling was intentionally chosen for certain results.  That

20   allegation is not made in our complaint.  We don't even make an

21   allegation that counsel had mentioned we allege that they

22   didn't conduct enough due diligence, but they disclosed they

23   were only going to sample a certain amount.  We know that.  We

24   don't allege that their disclosure of the fact that they are

25   going to sample was false.  The problem was they got results.

C96MDEXC

1   Why would you sample if you are not going to use the results?

2   They sample and then take that small sample --

3           THE COURT:  I understand that.  But then why isn't it

4   fair for your adversary to extrapolate from the sample, even if

5   the sampler themselves do not?  If it's a reasonable

6   cross-section and a statistically sufficiently large sample

7   that one can infer that it's representative of the whole, then

8   you can reasonably infer about the whole from it, yes?

9           MR. DeLANGE:  The counter is true as well, which is I

10  can extrapolate from that sample and show that 25 to 30 percent

11  of the entire pool violated the underwriting --

12          THE COURT:  You, in effect, have been arguing that.

13          MR. DeLANGE:  Correct.

14          THE COURT:  I do think it cuts both ways is my point.

15          MR. DeLANGE:  I agree with that, your Honor.  The way

16  the RMBS are structured, that is critical.  If there is 20

17  percent of the pool that violates these guidelines and is

18  misrepresented to investors, that infects the overall

19  performance of the tranches and the waterfall.

20          Finally, with respect to damages and causation, again,

21  I think defendants are moving to dismiss another complaint.

22  They argue that we are alleging a diminution in value based on

23  delinquencies and downgrades.  That's not whether the complaint

24  alleges.  And the case law in New York State court is pretty

25  clear that the damages on these claims is the difference

C96MDEXC

1   between what you pay and the value of what you got at the time

2   of purchase, and that's what we allege.  We allege that what we

3   paid was more than what we got, more than the value of these

4   certificates measured at the time of purchase.  And the reason

5   for that is because, going back to the sample, 20 percent of

6   these loans violated guidelines.  There was a higher risk they

7   were going to default.  There is going to be less money coming

8   through the waterfall.  You are buying a junk bond, but you are

9   paying triple A prices for it.  That's the damages we allege

10   and we clearly allege the causation, which is based on all of

11   this systemic fraud, I'm buying something that's worth less

12   than what I am paying for it.

13          Unless the Court has additional questions, I have

14   nothing further.

15          THE COURT:  Very good.

16          I'll hear from your adversary in rebuttal.  Thank you.

17          MR. SLIFKIN:  I'll be brief.  Thank you, your Honor.

18          Let me hit on a couple of points.  The allegation,

19   principal allegation here is when it was represented that there

20   was -- the underwriting guidelines that were generally

21   followed, with exceptions, because that's stated, and with

22   repurchase rights, because that's stated, that was untrue.  So

23   the allegation is not that everything was perfect, because

24   there was disclosure that everything wasn't perfect.  Lots of

25   human intervention here.  The allegation, there was a wholesale

C96MDEXC

1   abandonment, systematic disregard of the underwriting

2   guidelines.

3           What has counsel presented?  He says, take a look at

4   the Clayton report.  Take a look at the Clayton report.

5   Slifkin affidavit, Exhibit 1, page 2.  It says there is 72,000

6   loans reviewed.  It says 60,000 of those loans were accepted as

7   being fine.  60,000 out of 72 were absolutely fine.  It says.

8   6,800 out of the 72 were rejected because they were defective.

9   And 4,923, 7 percent, 7 percent of the total, were waived in

10  with no explanation of what waiver means.

11          Your Honor, that is not abandonment of the guidelines.

12  That is application of the guidelines.  When something like

13  over 80 percent of the loans are found to be acceptable, I

14  don't see how that can be used as the basis of a pleading that

15  the guidelines were abandoned.  And 6,000, a little less than

16  10 percent, were rejected.  That's not abandonment of the

17  guidelines.  That's an application of the guidelines.

18          Counsel then said, we know, in addressing my point,

19  you have no idea if these loans constitute, these waivers

20  constitute, and you have no idea, I have not alleged it was

21  securitized here.  The performance has been dismal.  So what?

22  Remember, we are dealing with pleading with specificity, not

23  mere plausible inference.  How would a dismal performance in

24  the economy that we have just been through and housing market

25  we have been through show you that the underwriting guidelines

29

C96MDEXC

1    were abandoned?

2           Then he says, well, stuff got downgraded by the rating

3    agencies.  He said, well, if everything had been fine, okay, we

4    would expect a downgrade, there will still be an investment

5    grade.  Actually, one of the offerings is still investment

6    grade because of seniority of the tranche that they purchased.

7           Your Honor, that is a specific disclosure about

8    downgrades, about rating agencies and downgrades and it says:

9    We get these ratings from the agencies.  There is no allegation

10   that we inaccurately stated what the rating agencies gave us

11   and it says, this may be downgraded.  So what happened is what

12   they were warned of.

13          THE COURT:  I am not sure I follow that point.  Their

14   argument is not that the possibility of downgrade wasn't

15   disclosed.  Their argument is that the severe nature of the

16   downgrade here raises a plausible inference that it was because

17   they were really junk masquerading at triple A securities.

18          And your first argument is, well, downgrading can

19   occur, especially the kind we have been through for a hundred

20   different reasons, so it's not, in your view, plausible to

21   assume that the mere fact of downgrading shows that they were

22   junk.  I understand that argument.  But I don't think it's a

23   question of disclosure.  They are not arguing, at least the

24   argument they were making this morning was not that the

25   possibility of downgrading had not been disclosed.  Their

C96MDEXC

argument was that the severe nature of the downgrading was

circumstantial evidence supportive, corroborative of their

allegations of fraud.

          MR. SLIFKIN:  My only point, your Honor, was that if

you take the totality of the allegations and the statements,

there is no allegation that the original rating was

inaccurately conveyed to the investor.  And my only point is,

all that has happened here was they say there is powerful

evidence of fraud is what was actually identified as a

possibility in the document at the time of purchase.

          THE COURT:  I hear your point.  I actually think the

downgrade, I am not sure how I infer this, but it seems to me

that it arguably also is relevant to your argument about

reliance.  If the rating agencies, with at least this much

expertise as the plaintiffs here could be, according to

plaintiffs' allegations, inferentially, fooled, because there

are facts that they couldn't find out that no person could find

out through due diligence and, therefore, they gave it a much

higher rating than it deserved if they know all the facts,

isn't that circumstantial evidence supporting their argument

that the mere fact that their clients were highly sophisticated

people doesn't mean that they weren't defrauded or didn't have

reasonable reliance because there is only so much you can find

out through due diligence?  So what about that?

          MR. SLIFKIN:  I think there are two points there, your

C96MDEXC

Honor.  There is the actual reliance point and the reasonable

reliance point, and I think they have to be taken together.

The reason I say that is because, what they are saying is, here

is a statement, here is a representation about adherence to

underwriting guidelines.  They are saying that was false and I

reasonably relied upon that.  I don't think you can take what

the rating agencies did and use that in any way to support what

their allegation should be, which is, I actually eyeball relied

justifiably on this statement about underwriting guidelines

because we don't know that that factored at all into the rating

agency's decision.  That could be on completely different

grounds.  All we know is the rating agencies have their own

criteria and they did what they did and that was reported.

          THE COURT:  It doesn't go to actual reliance.  But

doesn't it go to your argument about reasonable reliance?  That

is to say, I thought your argument in part, not by any means

exclusively, but in part was that sophisticated plaintiffs like

the plaintiffs here could have, through due diligence, found

out everything relevant to these securities so they don't have

a basis to sue?  And the argument then I'm throwing out, and I

want to stress I'm just throwing it out without saying whether

it's a good argument or a bad argument, is that if the rating

agencies couldn't figure it out, why should these plaintiffs be

able to figure it out, assuming arguendo there is anything to

figure out?

C96MDEXC

1          MR. SLIFKIN:  The reason I said justifiability of

2     reliance has to be looked at in the context of the actual

3     reliance is because what your Honor just said, your Honor.  You

4     said, the rating agencies couldn't figure that out and the

5     question is, what is the it?  The it is the false statements.

6          So let's talk about underwriting guidelines.  As we

7     point out in our opening paper, pages 9 to 10, by the time

8     these plaintiffs are buying these securities, 2006 and as late

9     as August 2007, you look in the media.  There is all this

10     information in the public domain about underwriting guidelines,

11     the originators going bankrupt and all these problems.  That

12     goes directly to the statement about underwriting guidelines

13     and adherence to those guidelines, whereas the rating agency

14     goes to -- I don't know what they go to.  It's the rating

15     agency's criteria.  There is no allegation the underwriting

16     guidelines have anything to do with that.

17          THE COURT:  I hear what you are saying.  I understand.

18          MR. SLIFKIN:  Thank you, your Honor.

19          THE COURT:  Thank you very much.  Let me hear if there

20     is anything further on this issue with plaintiff.  I sort of

21     had the sense that you wanted a surrebuttal here.

22          MR. DeLANGE:  Thank you, your Honor.  I think my

23     facial expressions may have given that away.  I'll be very

24     brief.

25          The point the Court raises I think is a very valid

C96MDEXC

1    point.  As an investor in the market you have the rating

2    agencies, which are provided information directly from the

3    defendants and asked to provide their opinion, their rating on

4    the quality of the underlying collateral and the quality, the

5    credit quality of the security, and they are providing triple A

6    ratings.

7            In addition to the other information that is included

8    in the prospectus supplements, you have a triple A rating from

9    the rating agencies and there is news articles and testimony

10   that has now come out, the ratings, the triple A rating, that

11   was critical to defendants.  They admitted it in testimony.

12   They needed that to go out and market it to investors.

13           But I want to point out --

14           THE COURT:  To put it a different way, and I will let

15   defense counsel have the final word, this is one aspect.  I

16   don't want to dwell on it unnecessarily, but you can be reading

17   all the news articles you want.  But if you saw that the rating

18   agencies, with access well beyond what a newspaper reporter

19   might have, is still saying triple A, why isn't that a basis

20   for even a sophisticated investor to rely?  Say there is

21   nothing here that requires further -- we have seen these

22   articles that the underwriting guidelines may not be really

23   followed, but, gee, they are still getting a triple A rating

24   from the people who looked into it.  That's not the only thing

25   they have to do, but it certainly seems to me that even a

C96MDEXC

1    sophisticated investor, one could plausibly maintain, to put it

2    in pleading language, that even a sophisticated investor, under

3    those circumstances, could say, well, if the rating agencies,

4    notwithstanding those newspaper articles, are still giving it

5    triple A, that's something I can rely on.  But I will hear from

6    your adversary on that.

7              MR. DeLANGE:  That hypothetical I agree with, your

8    Honor.

9              THE COURT:  I thought you might.  When the Court gives

10   you a softball you know you should hit it out of the ballpark.

11             MR. DeLANGE:  You don't know when the next one is

12   going to come, so you have to take advantage of it.

13             THE COURT:  Is there anything further you wanted to

14   add?

15             MR. DeLANGE:  One additional point that I wanted to

16   make.  One is on this reliance point.  Defendants are sort of

17   caught in a catch 22 and their brief highlights this.  They

18   argue that the sophisticated plaintiff such as my client should

19   have gone out and done its due diligence and uncovered this

20   fraud before it invested.  And what do they refer to?  They

21   refer to monthly remittance reports, publicly-available

22   information regarding RMBS, publicly-available information

23   regarding the originators, data provided by third-party

24   vendors.  And then they turn around and they say, well, you

25   have all that in your complaint, but that's not sufficient to

C96MDEXC

1    allege fraud.  If it's not sufficient to allege fraud, and, by

2    the way, we have a lot more than what they highlight there, how

3    can they put a sophisticated investor and say you can't rely

4    because you should have figured this out?

5           The last point I want to leave the Court with is, you

6    asked Mr. Slifkin what the it was and his response was,

7    underwriting guidelines.  And that's too narrow of a reading of

8    the complaint in this case.  The it is the quality of the

9    underlying collateral.  That's what was misrepresented.  That's

10   what the case was about.  And it is what the complaint details.

11          Thank you, your Honor.

12          THE COURT:  Thank you very much.

13          Let me hear in still further rebuttal.

14          MR. SLIFKIN:  Let me address the triple A, your Honor.

15   I think your hypothetical was really very good.

16          Plaintiffs have to show reliance on the statements

17   they allege to be misleading.  If what they are saying is,

18   well, what we really did was rely on the triple A rating, that

19   doesn't tell you that they relied upon the statements alleged

20   to be misleading.  It tells you they relied on something else.

21          Now, you might say to yourself, well, but what do the

22   rating agencies base their triple A rating on?  We don't know.

23   That's not pleaded.  Having said, I relied on triple A rating,

24   that's why I really bought it, I don't know what that was based

25   on.  Hypothetically, one can assume it might be based on the

C96MDEXC

1    fact that the rating agencies, with their experience, said,

2    look at the structuring of this offering, look at the tranches

3    that I'm rating triple A.  That would have to be a 30, 40

4    percent decline in the housing prices for these to be anything

5    but golden.  That's unprecedented.  That's never going to

6    happen.

7          Because the chairman of the Federal Reserve,

8    Mr. Greenspan, said, the housing prices always go up.  If

9    that's the basis, they just happen to be wrong.  That doesn't

10   tell you anything about whether they were justifiably relying

11   upon the alleged misrepresentations.

12         If I may just respond to the last point that counsel

13   made, their pleading is, there was all this stuff in the public

14   domain and that's good enough to plead fraud.  We disagree.  We

15   think they fail at that threshold point.  If they get past it,

16   if they get past the pleading of falsity, then they also have

17   to plead justifiable reliance.  And given how all that stuff

18   was in the public domain, then they fail in the hurdle of

19   justifiable reliance, and I think that's the way logically

20   these arguments ought to be analyzed.  Thank you, your Honor.

21         THE COURT:  Thank you very much.

22         Just to continue with the schedule, if in the bottom

23   line that I give you no later than next Tuesday I do not

24   remand, I will give you a bottom line on the motion to dismiss

25   no later than the end of September.  Again, it may well be with

C96MDEXC

1    an opinion to follow, but at least you'll know what you need to

2    know in terms of moving forward.

3            That leaves us with one last thing which are the

4    discovery issues that you raised and I put off to today.  And I

5    think with apologies, in light of the hour and the fact that my

6    poor law clerk hasn't had her lunch yet, what I am going to do

7    is the following.  If I remand, then these I think are

8    appropriately handled by the state court.  If I do not remand,

9    then you should jointly call on Wednesday and I will hear you

10   on it at that time, and my apologies for not being able to

11   reach you today.  But I assume that between now and Wednesday

12   you can survive without rulings on those requests.

13           MR. DeLANGE:  Your Honor, just one question on

14   Wednesday.  Is there a particular time?

15           THE COURT:  Why don't we set a time.  Let's look at

16   our calendar.

17           THE DEPUTY CLERK:  Wednesday, the 12th.

18           THE COURT:  Why don't we say 3:30 on Wednesday.

19           MR. DeLANGE:  Thank you, your Honor.

20           THE COURT:  Very good.

21           MR. SLIFKIN:  May I add one additional point, your

22   Honor?

23           THE COURT:  Yes.

24           MR. SLIFKIN:  If we get to Wednesday, the question of

25   the discovery requests and the responses, you are being given

C96MDEXC

1     the written responses.  Since then there has been a lot of

2     discussion and JP Morgan has offered to provide documents that

3     it hadn't initially, that it initially objected to.  You don't

4     have that.  I don't know if you want that to make this

5     productive, were this to go ahead, or I can do it orally.

6              THE COURT:  Why don't we do it orally.  I'm very glad

7     to hear that, that they resolved large parts of it.  We will

8     just do it orally.

9                                o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25