UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEXIA SA/NV; DEXIA HOLDINGS, INC.; FSA ASSET MANAGEMENT LLC; DEXIA CRÉDIT LOCAL SA, <br><br> *Plaintiffs*, <br><br> v. <br><br> BEAR STEARNS & CO. INC., THE BEAR STEARNS COMPANIES, INC., BEAR STEARNS ASSET BACKED SECURITIES I LLC, EMC MORTGAGE LLC (f/k/a EMC MORTGAGE CORPORATION), STRUCTURED ASSET MORTGAGE INVESTMENTS II INC., J.P. MORGAN ACCEPTANCE CORPORATION I, J.P. MORGAN MORTGAGE ACQUISITION CORPORATION, J.P. MORGAN SECURITIES LLC (f/k/a JPMORGAN SECURITIES INC.), WAMU ASSET ACCEPTANCE CORP., WAMU CAPITAL CORP., WAMU MORTGAGE SECURITIES CORP., JPMORGAN CHASE & CO., and JPMORGAN CHASE BANK, N.A., <br><br> *Defendants*. | ECF Case <br><br> No. 12-cv-4761 (JSR) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

January 21, 2013

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

EXPLANATION OF CITATION FORMS ............................................................ vi

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ..................................................................................................... 2

    The RMBS Purchases and Claims at Issue ...................................................... 2

    The Plaintiffs .................................................................................................... 2

ARGUMENT .......................................................................................................... 3

    I.     PLAINTIFFS LACK STANDING WITH RESPECT TO 63 OF THE 65
         SECURITIES AT ISSUE. ................................................................... 3

         A.     The Dexia Entities Lack Standing. ........................................... 3

              1.     FSAM Did Not Assign Purported Tort Claims to the Dexia
                    Entities. ....................................................................... 5

              2.     Even if "Delivery" of "All Right, Title and Interest" Were
                    Sufficient to Transfer Tort Claims, No Such "Delivery"
                    Occurred. ..................................................................... 8

         B.     FSAM Suffered No Injury with Respect to 63 of the 65 Certificates
             at Issue. ................................................................................. 10

    II.    PLAINTIFFS CANNOT ESTABLISH RELIANCE ON ANY
         PURPORTED MISSTATEMENTS OR OMISSIONS. ......................... 14

         A.     Legal Standard. ....................................................................... 14

         B.     Plaintiffs Cannot Establish Actual Reliance. ........................... 15

         C.     Plaintiffs Cannot Establish Justifiable Reliance. ..................... 21

    III.   PLAINTIFFS HAVE ADDUCED NO EVIDENCE OF LOSS
         CAUSATION. .................................................................................... 23

    IV.   SUMMARY JUDGMENT SHOULD BE GRANTED ON THE SIXTEEN
         OFFERINGS IN WHICH DEFENDANTS ACTED ONLY AS
         UNDERWRITERS. ........................................................................... 25

CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 2012 WL 3584278
(S.D.N.Y. Aug. 17, 2012) ..................................................................6, 19

Aimis Art Corp. v. N. Trust Secs., Inc., 641 F. Supp. 2d 314 (S.D.N.Y. 2009) .....................12, 14

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ...................................................3

Banque Arabe Et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146 (2d
Cir. 1995) ..........................................................................................4, 5

Cal. Pub. Emps.' Ret. Sys. ("CalPERS") v. Shearman & Sterling, 95 N.Y.2d 427 (N.Y.
2000) ..............................................................................................5, 6, 7

Carpe v. Aquila, Inc., 2005 WL 1138833 (W.D. Mo. Mar. 23, 2005) .........................................24

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................................3

Centro Empresarial Cempresa S.A. v. America Movil S.A.B. de C.V., 17 N.Y.3d 269
(2011) .................................................................................................14

Consol. Edison, Inc. v. Ne. Utils., 318 F. Supp. 2d 181 (S.D.N.Y. 2004), rev'd in part on
other grounds, 426 F.3d 524 (2d Cir. 2005) ..........................................................5, 6, 7

Crigger v. Fahnestock & Co., 443 F.3d 230 (2d Cir. 2006) ...............................................15

Dexia SA/NV v. Deutsche Bank AG
No. 11 Civ. 5672 (JSR), slip. op. (S.D.N.Y. Jan. 4, 2013) ....................................2, 15, 17, 25

Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189 (2d Cir. 2003) ..........15

Fed. Hous. Fin. Agency v. Deutsche Bank AG, 2012 WL 5471864 (S.D.N.Y. Nov. 12,
2012) .................................................................................................18

First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994) ...............................12

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349 (S.D.N.Y.
2007) ...................................................................................................6

Gabriel Capital, L.P. v. NatWest Fin., Inc., 177 F. Supp. 2d 169 (S.D.N.Y. 2001) ...........3, 14, 17

Global Minerals & Metals Corp. v. Holme, 35 A.D.3d 93 (1st Dep't 2006) .........................15, 21

Gordon Partners v. Blumenthal, 2007 WL 1438753 (S.D.N.Y. May 16, 2007) ....................23, 24

Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8 (2d Cir. 2000) ...................................14

In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig., 2012 U.S. Dist. LEXIS 87189
    (C.D. Cal. June 15, 2012) ...................................................................................................12

In re ICN/Viratek Sec. Litig., 1996 WL 164732, at *1-2 (S.D.N.Y. Apr. 9, 1996) ....................17

In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446 (S.D.N.Y. 2000) ....................................25

In re Omnicom Grp., Inc. Sec. Litig., 541 F. Supp. 2d 546 (S.D.N.Y. 2008) .........................23, 25

In re UBS Auction Rate Sec. Litig., 2009 U.S. Dist. Lexis 26385 (S.D.N.Y. Mar. 30,
    2009) ..............................................................................................................................11, 14

Kosovich v. Metro Homes, LLC, 2009 WL 5171737 (S.D.N.Y. Dec. 30, 2009) .........................23

Lama Holdings Co. v. Smith Barney, Inc., 88 N.Y.2d 413 (N.Y. 1996).......................................11

Laub v. Faessel, 745 N.Y.S.2d 534 (1st Dep't 2002) ..............................................................20, 23

Lentell v. Merrill Lynch & Co, 396 F.3d 161 (2d Cir. 2005)..................................................23, 24

Licht v. Donaldson, Lufkin and Jenrette Securities Corp., 1983 N.Y. Misc. LEXIS 4232
    (Sup. Ct., Sept. 6, 1983), aff'd, 474 N.Y.S.2d 1004 (App. Div. 1984) .................................6

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) .............................................................3, 11

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).......................................3

Mfrs. Hanover Trust Co. v. Drystdale Sec. Corp., 801 F.2d 13 (2d Cir. 1986)............................23

Nam Tai Elecs., Inc. v. UBS PaineWebber Inc., 850 N.Y.S.2d 11 (1st Dep't 2007)...................20

Orlando v. Kukielka, 836 N.Y.S.2d 252 (2d Dep't 2007)..............................................................22

Ostano Commerzanstalt v. Telewide Sys., Inc., 794 F.2d 763 (2d Cir. 1986) ..............................12

Republic Bank & Trust Co. v. Bear Stearns & Co., Inc., 683 F.3d 239 (6th Cir. June 20,
    2012) ..............................................................................................................................21, 22

Rodas v. Manitares, 159 A.D.2d 341 (1st Dep't 1990) ................................................................15

Sciallo v. Tyco Int'l Ltd., 2012 WL 2861340 (S.D.N.Y. July 9, 2012) ........................................24

Sec. Investor Protection Corp. v. BDO Seidman, 95 N.Y.2d 702 (2001) ...............................17, 19

Shanahan v. Vallat, 2008 WL 4525452 (S.D.N.Y. Oct. 3, 2008)..................................................23

iv

Singer Co. v. Stott & Davis Motor Express, 436 N.Y.S.2d 508 (4th Dep't 1981).........................17

Soc'y of Plastics Indus. v. Cnty. of Suffolk, 77 N.Y. 2d 761 (1991) ...............................................3

Steed Fin. LDC v. Nomura Sec. Int'l, Inc., 2004 WL 2072536 (S.D.N.Y. Sept. 14, 2004).........21

Toho Bussan Kaisha, Ltd. v. Am. Pres. Lines, Ltd., 265 F.2d 418 (2d Cir. 1959).......................12

Turtur v. Rothschild Registry, Int'l, Inc., 1993 U.S. Dist. LEXIS 11939 (S.D.N.Y. Aug. 26, 1993) ...............................................................................................................................14

VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP, 348 F. Supp. 2d 255 (S.D.N.Y. 2004) ...................................................................................................................................14

**Statutes & Rules**

Fed. R. Civ. P. 12(h)(3)........................................................................................................................3

Fed. R. Civ. P. 56(c) ..........................................................................................................................3

## EXPLANATION OF CITATION FORMS

The following citation forms are used in this memorandum:

- "Ex. [___]" for references to the exhibits to the Declaration of J. Wesley Earnhardt In Support of Defendants' Motion for Summary Judgment. For consistency and brevity, citations to specific pages within those exhibits will refer to the last three digits of the Bates number, if applicable, for the page(s) in question.

- "Stmt. ¶ ___" for references to Defendants' Local Rule 56.1 Statement.

- "Compl. ¶ ___" for references to the May 18, 2012 Amended Complaint in this matter.

- Residential mortgage-backed securities ("RMBS")

- The 65 RMBS certificates that are the subject of this litigation, as described in the Complaint (the "Certificates")

- The 51 RMBS offerings in which the Certificates were issued (the "Offerings")

**The Parties**

- Dexia SA/NV ("Dexia")

- Dexia Holdings, Inc. ("DHI")

- Dexia Credit Local SA ("DCL") (together with Dexia and DHI, the "Dexia Entities")

- FSA Asset Management LLC ("FSAM")

- Bear Stearns & Co. Inc. (now known as J.P. Morgan Securities LLC) ("BSC"), the Bear Stearns Companies, Inc. (now known as The Bear Stearns Companies LLC), Bear Stearns Asset Backed Securities I LLC ("BSABS"), EMC Mortgage LLC (f/k/a EMC Mortgage Corporation) ("EMC") and Structured Asset Mortgage Investments II Inc. ("SAMI II") (collectively, the "Bear entities")

- J.P. Morgan Acceptance Corporation I ("JPM Acceptance"), J.P. Morgan Mortgage Acquisition Corporation ("JPM Acquisition"), J.P. Morgan Securities LLC (f/k/a JPMorgan Securities Inc.) ("JPMSI"), JPMorgan Chase & Co. ("JPMC"), and JPMorgan Chase Bank, N.A. ("JPMCBNA") (collectively, the "JPMorgan entities")

- WaMu Asset Acceptance Corp. ("WMAAC"), WaMu Capital Corp. ("WMCC") and WaMu Mortgage Securities Corp. ("WMMSC") (collectively, the "WaMu entities")

**Deposition Transcripts**

- Deposition of Jonathan Peterson, FSAM 30(b)(6) representative, dated November 8, 2012 ) ("FSAM 30(b)(6) Peterson Tr.") (Ex. 3)

- Deposition of Jake Hendrickson, FSAM 30(b)(6) representative, dated December 21, 2012 ("FSAM 30(b)(6) Hendrickson Tr.") (Ex. 7)

- Deposition of Hongfei Zhang, dated November 27, 2012 ("Zhang Tr.") (Ex. 15)

- Deposition of Russell Brewer, dated January 8, 2013 ("Brewer Tr.") (Ex. 16)

- Deposition of Frank Albus, dated January 4, 2013 ("Albus Tr.") (Ex. 17)

- Deposition of Laurent Bouscharain, dated January 18, 2013 ("Bouscharain Tr.") (Ex. 113)

**Expert Reports**

- Expert Report for Plaintiffs of Joseph R. Mason, Ph.D., Dec. 16, 2012 ("Mason Report") (Ex. 19)

- Expert Report for Plaintiffs of Paul J. Seguin, Ph.D., Dec. 6, 2012 ("Seguin Report") (Ex. 14)

- Expert Report for Plaintiffs of Ilya Kolchinsky, December 6, 2012 ("Kolchinsky Report") (Ex. 18)

- Expert Report for Defendants of Dr. Christopher M. James, January 4, 2013 ("James Report") (Ex. 13)

## PRELIMINARY STATEMENT

In denying Defendants' motion to dismiss, this Court was required to accept as true the facts alleged by Plaintiffs in the Complaint.  The ensuing discovery process has revealed, however, that the undisputed facts contradict those pleaded by Plaintiffs with respect to at least two dispositive issues—standing and reliance.  Moreover, Plaintiffs have failed to adduce evidence sufficient to carry their burden to show loss causation.  Summary judgment for Defendants is therefore appropriate on all of Plaintiffs' claims.

First, Plaintiffs lack standing.  Plaintiffs alleged in the Complaint that FSA Asset Management LLC ("FSAM")—the Plaintiff that purchased each of the Certificates at issue—validly assigned its purported tort claims to the other Plaintiffs, Dexia SA/NV ("Dexia"), Dexia Holdings, Inc. ("DHI") and Dexia Credit Local SA ("DCL", collectively, the "Dexia Entities").  (See Compl. ¶¶ 17-18.)  Plaintiffs are wrong.  The Dexia Entities lack standing because FSAM did not expressly assign fraud and other tort claims related to the relevant assets to the Dexia Entities as New York law requires; in fact, it did not even validly "Deliver" such assets as defined in the operative contract.  Moreover, FSAM itself lacks standing with respect to 63 of the 65 Certificates because it has recovered its full purchase price for those securities and, thus, has suffered no cognizable injury.  (Infra Part I.)

Second, although the Complaint contains hundreds of pages of purported misstatements in the prospectuses and prospectus supplements for the Offerings at issue, which Plaintiffs allege form the basis of their claims (Compl. ¶¶ 236-84, Exs. B-H), it is undisputed that Plaintiffs did not read or rely on any of those materials when making their investment decisions.  Accordingly, Plaintiffs cannot satisfy their burden to show actual reliance on a purported misstatement.  Even assuming Plaintiffs could establish actual reliance on a particular misstatement, such reliance would be unreasonable and unjustifiable in light of Plaintiffs'

admitted failure to read any of the extensive risk disclosures in the prospectuses and prospectus supplements, and especially because Plaintiffs are sophisticated investors.  (Infra Part II.)

Third, there is no evidence of loss causation.  Despite the copious discovery record, Plaintiffs have failed to adduce any evidence that Defendants' allegedly fraudulent statements caused whatever losses they may have experienced.  (Infra Part III.)

Fourth, summary judgment is further warranted with respect to those sixteen Offerings in which Defendants played only a "limited and attenuated" role as underwriter of the Offering.  (Infra Part IV.)  See Dexia SA/NV v. Deutsche Bank AG, No. 11 Civ. 5672 (JSR), slip op. at 21 (S.D.N.Y. Jan. 4, 2013) ("Dexia v. DB Order").

## BACKGROUND

### The RMBS Purchases and Claims at Issue

Between January 2006 and August 2007, Plaintiff FSAM purchased 65 certificates (the "Certificates") issued in 51 RMBS offerings (the "Offerings").  (Stmt. ¶ 21; Compl. ¶ 2, 234; Ex. 11.)  FSAM, together with its parent and affiliated companies the Dexia Entities (collectively, "Plaintiffs") bring claims of common law fraud, fraudulent inducement, aiding and abetting fraud and negligent misrepresentation against three separate sets of Defendants—the Bear, JPMorgan and WaMu entities (collectively, "Defendants").  Plaintiffs allege that Defendants made fraudulent misrepresentations or omissions regarding the quality of the mortgage loans collateralizing the Certificates.  (Compl. ¶¶ 1-10.)

### The Plaintiffs

Plaintiffs are highly sophisticated financial institutions with significant experience in the mortgage market.  Dexia "is a European banking group" and a major player in European financial and mortgage markets, both as an originator of residential loans and as a securitizer of RMBS.  (Stmt. ¶¶ 7-8; Ex. 1; Ex. 2.)  As of December 31, 2008, Dexia had total assets under

2

custody of $1.9 trillion.  (Stmt. ¶ 9; FSAM 30(b)(6) Peterson Tr. 38:10-18 (Ex. 3); Ex. 4.)  Dexia

has significant experience with United States RMBS through the activities of its former

subsidiary Financial Security Assurance Holdings ("FSAH")—a leading provider of financial

guaranty insurance on United States RMBS and other asset-backed securities.  (Stmt. ¶ 10; Ex. 5

at 3.)  As of 2007, FSAH provided insurance on over $142 billion of RMBS and other asset-

backed securities, as part of a total portfolio of over $400 billion in insured assets.  (Stmt. ¶ 13;

Ex. 6 at 262.)  FSAH also actively invested in RMBS through Plaintiff FSAM, who purchased

RMBS pursuant to "detailed [investment] guidelines and criteria".  (Stmt. ¶¶ 14-15; Compl. ¶¶

286-87; see also Ex. 5 at 3-10, 12-15, 30-36.)  FSAM owned approximately $18 billion of

RMBS and other assets in 2006 and 2007.  (Stmt. ¶ 16; FSAM 30(b)(6) Hendrickson Tr. 36:22-

37:15 (Ex. 7).)  Dexia sold FSAH in 2009, but retained FSAH's financial products business,

including FSAM.  (Stmt. ¶¶ 25-27; Ex. 8; Dexia Plaintiffs' Rule 7.1 Stmt. ¶ (d) (Dkt No. 14).)

## ARGUMENT[1]

## I.      PLAINTIFFS LACK STANDING WITH RESPECT TO 63 OF THE 65 SECURITIES AT ISSUE.

Standing is an "irreducible constitutional minimum".  Lujan v. Defenders of

Wildlife, 504 U.S. 555, 560 (1992); see also Fed. R. Civ. P. 12(h)(3); Soc'y of Plastics Indus. v.

Cnty. of Suffolk, 77 N.Y. 2d 761, 769 (1991).  To have standing, Plaintiffs must demonstrate an

"injury in fact"—an actual legal stake in the matter being adjudicated.  Lujan, 504 U.S. at 560.

### A.      The Dexia Entities Lack Standing.

It is undisputed that the Dexia Entities did not purchase the Certificates at issue.

Instead, the Complaint alleges those entities have standing because FSAM, the entity that did

---

[1] The legal standards for summary judgment are well-established.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Gabriel Capital, L.P. v. NatWest Fin., Inc., 177 F. Supp. 2d 169, 173-74 (S.D.N.Y. 2001).

purchase the Certificates, assigned the Certificates, "including all 'right, title and interest' in the RMBS assets (including all rights and remedies sought in this action), to [them] pursuant to certain intercompany agreements". (Compl. ¶ 18.)  That allegation is demonstrably false.

Plaintiffs contend the necessary assignment occurred pursuant to a June 30, 2009 agreement between Dexia, DCL and FSAM governing the sale of certain assets (the "Guaranteed Put Contract").[2]  (Stmt. ¶ 29.)  Pursuant to the Guaranteed Put Contract, FSAM could exercise a put option, or DCL could exercise a call option, with respect to certain assets held by FSAM (the "Put Settlement Assets"), which assets included all but one of the Certificates at issue here.[3]  (Stmt. ¶¶ 39, 48; Ex. 9 at 330, 342, 352-74; Ex. 11.)  Upon the exercise of the put or call option, the Guaranteed Put Contract required FSAM to take certain steps to "Deliver" the subject assets to DCL; that is, "to convey all right, title and interest in the Put Settlement Assets to Dexia or DCL".  (Stmt. ¶¶ 43-46; Ex. 9 at 337.)

Such "Delivery" is what Plaintiffs contend conferred standing on the Dexia Entities.[4]  (Stmt. ¶¶ 50-52; see Compl. ¶ 18; FSAM 30(b)(6) Peterson Tr. 111:17-23 (Ex. 3) ("The way in which those transfers would happen would be a call option would be exercised by DCL New York, where DCL New York would call the asset from FSAM.  FSAM would

---

[2] The Guaranteed Put Contract was entered into voluntarily as a result of Dexia's desire to sell its monoline insurance subsidiary, Financial Security Assurance, Inc. ("FSA, Inc."), to a third party who insisted that it not be saddled with certain obligations relating to FSAM's  asset portfolio that could otherwise fall on FSA, Inc.  (Stmt. ¶¶ 28-31; see FSAM 30(b)(6) Peterson Tr. 147:6-150:8 (Ex. 3).)

[3] The exception was BSABS 2006-EC2 A4, which was not subject to the Guaranteed Put Contract and apparently was sold directly by FSAM to Cantor Fitzgerald in November 2010 at a principal loss of less than $310,000.  (Ex. 10 at 215-16.)  As such, the Dexia Entities lack standing to assert any claims based on that security; only FSAM even arguably has standing with respect to that Certificate.

[4] The issue of whether the Guaranteed Put Contract conferred standing on the Dexia Entities to pursue the claims herein is a matter of law for the Court appropriate for resolution on summary judgment.  See Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146, 152 (2d Cir. 1995).

deliver the asset, which was defined to be the transfer of all right, title and interest in the asset to DCL New York.").)[5]  However, such "Delivery" is insufficient under established New York law to effectuate a valid assignment of FSAM's tort claims.  Moreover, as discussed below, even if it were sufficient, the undisputed facts demonstrate that the required "Delivery" never took place.

### 1. FSAM Did Not Assign Purported Tort Claims to the Dexia Entities.

Under New York law, an assignment of fraud and other tort claims must be explicit.  Banque Arabe, 57 F.3d at 151 ("[T]he assignment of the right to assert contract claims does not automatically entail the right to assert tort claims arising from that contract.").  "[I]n the absence of an explicit assignment of a cause of action based on fraud, 'only the . . . assignor may rescind or sue for damages for fraud and deceit; the representations were made to [the assignor] and [the assignor] alone had the right to rely upon them.'"  Id.

New York state and federal courts have interpreted the requirement that an assignment of tort claims be "explicit" to mean that, while assignment of all right, title and interest in a transaction may suffice to transfer tort claims, the assignment of all right, title and interest in an asset—like the "Delivery" at issue here—does not.  See id. at 152 (construing an "interest in the 'transaction' to be broader than an interest in the contract"); Cal. Pub. Emps.' Ret. Sys. ("CalPERS") v. Shearman & Sterling, 95 N.Y.2d 427, 432, 435 (2000) (holding that assignment of all "right, title and interest in, to and under the [loan] documents" did not "refer to the overall loan transaction" and hence was insufficient to transfer assignor's tort claim for malpractice in the preparation of the loan documents); Consol. Edison, Inc. v. Ne. Utils., 318 F. Supp. 2d 181, 188 (S.D.N.Y. 2004) (holding that transfer of "all rights in the security" did not encompass "all rights related to the security or accrued while possessing the security"), rev'd in

---

[5] Plaintiffs admit that the Guaranteed Put Contract and Exercise Notices discussed below were the sole mechanism by which that assignment purportedly took place.  (Stmt. ¶ 51; FSAM 30(b)(6) Peterson Tr. 214:23-215:9 (Ex. 3).)

part on other grounds, 426 F.3d 524 (2d Cir. 2005); Fraternity Fund Ltd. v. Beacon Hill Asset

Mgmt., LLC, 479 F. Supp. 2d 349, 373 (S.D.N.Y. 2007) (same); Licht v. Donaldson, Lufkin and

Jenrette Sec. Corp., 1983 N.Y. Misc. LEXIS 4232, at *3–4 (Sup. Ct. Sept. 1, 1983), aff'd, 474

N.Y.S.2d 1004 (App. Div. 1984) (holding that tort claims against underwriter of bond were not

encompassed in automatic transfer of all "rights in the security").

   Here, Plaintiffs admit that the transfer at issue conveyed only "all right, title and

interest in the Put Settlement Assets", and that FSAM did not even attempt explicitly to assign its

fraud or other tort claims to the Dexia Entities.  (Stmt. ¶¶ 46, 52; see FSAM 30(b)(6) Peterson

Tr. 111:17-23 (Ex. 3); Ex. 9 at 337.)  Such "Delivery" plainly is insufficient under New York

law to effectuate the transfer of tort claims.  See, e.g., CalPERS, 95 N.Y.2d at 431-32, 435.

   Had the parties to the Guaranteed Put Contract contemplated a transfer of tort

claims, one can imagine any number of ways in which they could have documented that intent,

including by mentioning those claims in the agreement itself.  See, e.g., Abu Dhabi Commercial

Bank v. Morgan Stanley & Co., 2012 WL 3584278, at *5 (S.D.N.Y. Aug. 17, 2012) (holding that

assignment of "all of [assignor's] rights, obligations and claims arising out of or related to the

MTNs [(medium term notes)]" was sufficient to transfer tort claims) (emphasis added).  Yet,

despite the Guaranteed Put Contract being entered into in mid-2009, after many of the

Certificates at issue had been downgraded (Compl. ¶ 234) and after waves of RMBS litigation

already had been filed, there is no mention of such claims in the transfer documents at all.

   A number of the cases cited above are instructive.  In Consolidated Edison, the

court considered whether a New York statute providing for automatic transfer of all "rights in the

security" upon purchase—language substantively identical to that used in the Guaranteed Put

Contract—would encompass certain claims against a third party premised upon the assignee's

ownership of the shares at issue.  318 F. Supp. 2d at 187-93.  The Court held it did not, noting that the purported assignee's reading of the statute "transforms it to provide for the automatic transfer of all rights related to the security or accrued while possessing the security, instead of what the statute actually says, which is 'all rights in the security'".  Id. at 188.  Indeed, in Consolidated Edison, even the purported assignee conceded that "fraud claims . . . clearly do not run with the security".  Id. at 190.  So too here.

In CalPERS, the assignor had retained the services of a law firm to draft a promissory note in connection with a loan made by the assignor.  95 N.Y.2d at 431-32.  After the loan closed, the assignor transferred the asset (i.e., the promissory note) to CalPERS through an assignment of all "right, title and interest in, to and under the [loan] documents"—again, language substantively identical to that at issue here.  Id. at 432.  Later, CalPERS filed a malpractice action against the law firm premised on a claimed deficiency in its drafting of the promissory note.  Id.  The New York Court of Appeals held that the assignment did not grant CalPERS standing to bring that claim.  Id. at 435-36.  The Court noted that the assignment referred "only to rights and interests under the loan documents (including the promissory note) . . . and does not refer to the overall loan transaction" and therefore concluded, "[t]he assignment did not include a cause of action arising outside the loan documents themselves".  Id.

Here, likewise, the purported assignment of "all right, title and interest in the Put Settlement Assets" cannot transfer tort claims that arose outside of the Certificates.  In other words, even if FSAM transferred to the Dexia Entities the bundle of rights inextricably tied to ownership of the Certificates (e.g., the contractual right to a monthly payment stream, the right to make certain requests of the trustee, etc.), it indisputably did not transfer rights or claims that

accrued to FSAM from the act of <u>purchasing</u> the Certificates, including the ability to assert the

fraud and misrepresentation claims at issue here.  Accordingly, the Dexia Entities lack standing.

> ### 2.    Even if "Delivery" of "All Right, Title and Interest" Were Sufficient to Transfer Tort Claims, No Such "Delivery" Occurred.

Even if "Delivery" of "all right, title and interest in the Put Settlement Assets"

were sufficient under New York law to assign the tort claims at issue—and, as explained above,

it clearly is not—the record demonstrates that such "Delivery" never actually took place.[6]

The Guaranteed Put Contract provides that the party exercising the put or call

option was required to provide the counterparty an Exercise Notice in the form of a template

attached to the Guaranteed Put Contract.  (Stmt. ¶¶ 40-42; Ex. 9 at 332.)  Following transmission

of an Exercise Notice, FSAM (or the Collateral Agent, Bank of New York) was supposed to

"Deliver" the assets to the counterparty (Dexia or DCL).  (Stmt. ¶¶ 43-46; Ex. 9 at 336, 342.)

"Deliver" is defined as follows:

> [T]o deliver, novate, transfer, assign or sell, as appropriate, in the manner
> customary for the settlement of the applicable Put Settlement Assets (<u>which shall
> include executing all necessary documentation</u> and taking any other necessary
> actions) in order to convey all right, title and interest in the Put Settlement Assets
> to Dexia or DCL . . . .

(Stmt. ¶ 46; Ex. 9 at 337 (emphasis added).)  Plaintiffs contend that "Delivery" was effectuated

through a series of Put and Call Exercise Notices.  (Stmt. ¶ 49; <u>see</u> FSAM 30(b)(6) Peterson Tr.

201:19-202:5; 204:25-205:9 (Ex. 3).)  But the Put Exercise Notices at issue—all of which

followed the format of the template set forth in the Guaranteed Put Contract—make no reference

to "Delivery" of the Certificates or similar language at all.  (Stmt. ¶¶ 55-56; <u>see, e.g.</u>, Ex. 9 at

375-76; Exs. 55-112.)  Instead, the Put Exercise Notices were simply the mechanism by which

---

[6] To be clear, Defendants' argument is <u>not</u> that the assets were never effectively sold to DCL; it is that "Delivery", as expressly defined in the contract—which Plaintiffs imply means something <u>more</u> than a plain vanilla sale of the assets—never took place.

FSAM requested from DCL reimbursement for certain principal and interest shortfalls and write-down amounts "[p]ursuant to its rights under the Guaranteed Put Contract", and nothing more.[7] (Stmt. ¶ 57; see, e.g., Ex. 9 at 375-76; Exs. 55-112.)

      The Call Exercise Notices, pursuant to which all but five of the Put Settlement Assets at issue were purportedly assigned to DCL (Stmt. ¶¶ 75-77; see FSAM 30(b)(6) Peterson Tr. 188:10-18; 192:11-21 (Ex. 3); see also Ex. 11), also follow a template attached to the Guaranteed Put Contract (Stmt. ¶ 65; see, e.g., Ex. 9 at 379-82; Exs. 49-54), and they similarly fail to effectuate "Delivery". According to the Guaranteed Put Contract, for assets subject to a call exercise, "the Collateral Agent will Deliver" (as defined therein) the assets to DCL or Dexia. (Stmt. ¶ 69; Ex. 9 at 342 (emphasis added).) FSAM's 30(b)(6) representative identified the Pledge and Administration Agreement (the "PAA") as the mechanism that purportedly conveyed the assets from FSAM to the Collateral Agent in the first place (a necessary prerequisite to the Collateral Agent Delivering the assets to DCL). (Stmt. ¶ 70; FSAM 30(b)(6) Peterson Tr. 217:17-218:3 (Ex. 3).) However, that PAA merely granted the Collateral Agent a security interest in certain FSAM assets, and that security interest was "in trust" for the limited purpose of securing "the payment of all amounts due on all of the indebtedness, liabilities and obligations owed from time to time by FSAM". (Stmt. ¶ 71; Ex. 12 § 2.1(d) (emphasis added); see also FSAM 30(b)(6) Peterson Tr. 278:9-280:12 (Ex. 3).) Thus, the PAA involved no transfer or

---

[7] The Guaranteed Put Contract provided DCL the option to make a "Deferred Settlement Election" instead of purchasing the asset upon FSAM's exercise of the put option. (Stmt. ¶¶ 60-62; Ex. 9 at 339-40.) By making the Deferred Settlement Election, DCL could put off the obligation to purchase the put settlement asset and instead simply reimburse FSAM for the shortfalls and write-downs incurred in a given time period. (Stmt. ¶¶ 60-62; Ex. 9 at 339-40.) Mr. Peterson testified that DCL made that election with respect to every asset that was the subject of a put exercise (unless and until the asset was written down to zero) because the sovereign states who had provided Dexia a bailout insisted upon it. (Stmt. ¶¶ 63-64; FSAM 30(b)(6) Peterson Tr. 185:5-187:21 (Ex. 3).)

assignment of FSAM's rights, title and interest in the RMBS at issue to the Collateral Agent at all.  Indeed, because the call exercises at issue did not involve any indebtedness or other liability of FSAM secured by the RMBS—in fact, it involved a payment by Dexia or DCL to FSAM— the PAA could not possibly have empowered the Collateral Agent to Deliver the Certificates to DCL pursuant to the call exercise.

Moreover, although the Call Exercise Notices do state that DCL shall make payment to FSAM "against delivery [lowercase] of the Call Settlement Assets", they also specifically provide that only "[c]apitalized terms used but not defined herein shall have the meanings assigned to such terms in the Guaranteed Put Contract".  (Stmt. ¶¶ 66-67; Ex. 9 at 379-82; Exs. 49-54.)  The word "delivery" is not capitalized (in the template or in any of the call exercise notices).  (Stmt. ¶ 68; Ex. 9 at 379-82; Exs. 49-54.)

Plaintiffs' incorrect assertion that the Exercise Notices were sufficient to effectuate Delivery is also inconsistent with the plain meaning of the Guaranteed Put Contract because it would render certain of its provisions superfluous.  The Guaranteed Put Contract specifically contemplated that Delivery would take place after receipt of an Exercise Notice—the templates for which were attached to the Guaranteed Put Contract.  Had those notices themselves been intended to assign all right, title and interest to DCL, the contract's subsequent Delivery requirement would, in every instance, have been meaningless, as would the requirement that Delivery be effectuated through execution of "all necessary documentation".  (Stmt. ¶ 46; Ex. 9 at 336-37, 342.)  Thus, neither the Call Exercise Notices nor the Put Exercise Notices could have effectuated "Delivery"—even if such "Delivery" could have conferred standing upon the Dexia Entities (which, as a matter of law, it could not).

**B.    FSAM Suffered No Injury with Respect to 63 of the 65 Certificates at Issue.**

Because there was no assignment of the claims alleged herein to the Dexia

Entities, FSAM is the only Plaintiff that even potentially could have standing to assert those claims.  However, it too lacks standing because, with respect to all but two of the 65 Certificates at issue, it was made whole for any purported loss it claims to have suffered.[8]

       The existence of an "injury in fact" is the touchstone of the standing inquiry. Lujan, 504 U.S. at 560.  Under New York law, "'[t]he true measure of damage [in an action for fraud] is indemnity for the actual pecuniary loss sustained as the direct result of the wrong' or what is known as the 'out-of-pocket' rule".  Lama Holdings Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 421 (N.Y. 1996).  "Under this rule, the loss is computed by ascertaining the 'difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain.'"  Id.  Plaintiffs seek to recover the purported difference between the price paid and the "true value" of the Certificates at the time of purchase.  (Compl. ¶ 302; FSAM 30(b)(6) Peterson Tr. 113:6-13; 296:12-299:9 (Ex. 3).)

       Even assuming the purchase price FSAM paid was higher than it should have been as a result of alleged misrepresentations, New York law is clear that FSAM would lack standing to the extent it subsequently recovered in full the price it paid for the Certificates.  See In re UBS Auction Rate Sec. Litig., 2009 U.S. Dist. Lexis 26385, at *19 (S.D.N.Y. Mar. 30, 2009) (securities fraud plaintiffs who received full refund of purchase price on auction rate

---

[8] In fact, the allegation in the Complaint is that "Defendants' misconduct has caused Dexia SA/NV, DHI and DCL to suffer substantial losses on the RMBS Certificates", not FSAM. (Compl. ¶ 18 (emphasis added).)  The calculation described herein by which Defendants demonstrate that FSAM recovered its full purchase price for 63 of 65 Certificates was conservative in that it excluded all interest payments received by FSAM during the time it held the security and through the put and call options.  (James Report Ex. 30 (Ex. 13).)  Had Defendants included those interest payments (which Plaintiffs' own expert calculates as exceeding $163 million (Ex. 14, Appx. C), FSAM's total proceeds (in the aggregate and on 64 out of the 65 Certificates individually) would far exceed its purchase price—i.e., FSAM made a substantial profit on these investments.

securities pursuant to regulatory settlement lacked standing and cognizable damages); <u>Aimis Art Corp. v. N. Trust Sec., Inc.</u>, 641 F. Supp. 2d 314, 320 (S.D.N.Y. 2009) (same); <u>In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.</u>, 2012 U.S. Dist. LEXIS 87189, at *10 (C.D. Cal. June 15, 2012) (noting that if transaction through which special purpose vehicle ("SPV") purchasers of RMBS recovered their par value did <u>not</u> include assignments of causes of action, "then the Irish SPVs may have been made whole and injury in fact defeated, as Defendants argue"); <u>see also</u> <u>Ostano Commerzanstalt v. Telewide Sys. Inc.</u>, 794 F.2d 763, 766 (2d Cir. 1986) (plaintiff corporation suffered no "out-of-pocket loss" for purposes of fraud damages under New York law because, although it paid for an allegedly fraudulent licensing agreement, it subsequently sub-licensed the agreement for an even greater amount of money); <u>First Nationwide Bank v. Gelt Funding Corp.</u>, 27 F.3d 763, 768 (2d Cir. 1994) ("[A]ny amount recovered by the [plaintiff] necessarily reduces the damages that can be claimed as a result of the fraud."). Indeed, as the Second Circuit explained over half a century ago:  "Under the law of New York which governs this action, one who has been defrauded is entitled only to be indemnified for his injury and consequently may not recover if he has already recouped his actual pecuniary loss from others."  <u>Toho Bussan Kaisha, Ltd. v. Am. President Lines, Ltd.</u>, 265 F.2d 418, 420 (2d Cir. 1959).

Here, FSAM has no injury with respect to 63 of the 65 Certificates at issue because it recovered the price it paid for each of those Certificates.[9]  During the time that FSAM

---

[9] With respect to the two remaining Certificates, FSAM did suffer a principal loss for which it may have standing to sue.  As previously noted, one of the Certificates at issue, BSABS 2006-EC2 A4, was not subject to the Guaranteed Put Contract.  (Stmt. ¶ 275.)  FSAM appears to have sold that security directly into the market at a loss of less than $310,000.  (Stmt. ¶ 276; Ex. 10 at 215-16.)  However, if one includes the interest payments FSAM received on that security, it actually made a profit of over $720,000 on that Certificate.  (Stmt. ¶ 277; Ex. 14, Appx. C.)  The other Certificate, IMSA 2006-2 1A12, suffered a principal write-down of approximately

held the Certificates, it received monthly distributions of principal and interest.  (Stmt. ¶ 81.)

Subsequently, at the time of the put or call exercise, FSAM was paid—as provided for under the

Guaranteed Put Contract—an amount equal to "100% of the Outstanding Principal Amount" of

the Certificates, plus any "Interest Shortfall Amount, Principal Shortfall Amount or Writedown

Amount accrued but not yet paid" under the Guaranteed Put Contract, plus, without duplication,

accrued and unpaid interest through the settlement date.  (Stmt. ¶ 73; Ex. 9 at 338-39.)  FSAM's

30(b)(6) representative confirmed that the whole point of the Guaranteed Put Contract was to

ensure that FSAM would recover the full face value of its Certificates so that it could meet

certain obligations to its affiliates.  (Stmt. ¶ 83; see FSAM 30(b)(6) Peterson Tr. 112:13-114:20;

298:16-299:9 (Ex. 3); Bouscharain Tr. 39:7-42:25 (Ex.113).)

 Evidence showing the actual payments made to FSAM confirms it was made

whole.  The indisputable record demonstrates that for 63 out of the 65 Certificates at issue,

FSAM recovered at least its purchase price, and sometimes even earned a profit.[10]  (Stmt. ¶¶ 84-

274; see James Report at 66-70 & Ex. 30 (Ex. 13).)  Because damages in a fraud action are

---

$5,330,678 prior to the effective date of the Guaranteed Put Contract.  (Stmt. ¶ 278; James
Report at 68 n.182 & Ex. 30 (Ex. 13).)  As such, under the terms of that contract, that write-
down was not reimbursed to FSAM.  Notably, however, IMSA 2006-2 is an Offering for which
Defendants are only being sued in their capacity as underwriters of the securities, which requires
that summary judgment be granted for the reasons discussed infra in Part IV.

[10] For three out of the 63 Certificates, the available data shows that the sum of put and call
proceeds and principal repaid is lower than FSAM's price paid by a de minimis amount:  $3,906
for JPALT 2006-A6 1A5; $70 for JPALT 2007-A1 1A5; and $46,864 for SAMI 2006-AR7
A13B.  (Stmt. ¶¶ 265-74; see James Report Ex. 30 (Ex. 13).)  Because there was no write-down
associated with those securities prior to the effective date of the Guaranteed Put Contract, or any
other evidence in the record to explain the reason for the difference, those minor discrepancies
most likely represent data disparities, either in the public sources Defendants used to calculate
the payments or in the sometimes illegible information produced by Plaintiffs.  In any event,
even if FSAM had standing with respect to those three Certificates, its losses would be limited to
those de minimis amounts.  Moreover, if one considers the interest payments FSAM received on
those Certificates—which, to be conservative were excluded from Defendants' calculation—
FSAM's proceeds on those Certificates far exceed its purchase price.  (See id.; Ex. 14, Appx. C.)

purchase price minus actual value, and because FSAM recovered its purchase price (and more),

it has not suffered any cognizable injury and, thus, lacks standing with respect to those 63

Certificates.  See In re UBS, 2009 U.S. Dist. Lexis 26385 at *19; Aimis, 641 F. Supp. 2d at 320.

*          *          *

In sum, the Dexia Entities lack standing with respect to all of the

Certificates because those entities did not purchase the Certificates and FSAM did not validly

assign any tort claims to those entities.  Thus, all of the Dexia Entities' claims should be

dismissed.  FSAM itself lacks standing with respect to 63 of the 65 Certificates because it

indisputably has been made whole with respect to those Certificates.  As a result, FSAM's claims

concerning 63 of the 65 Certificates should also be dismissed with prejudice.  With respect to the

remaining Certificates, IMSA 2006-2 1A12 and BSABS 2006-EC2 A4, FSAM has standing only

to the extent of the demonstrable out of pocket loss, if any, it suffered on those Certificates.

## II.   PLAINTIFFS CANNOT ESTABLISH RELIANCE ON ANY PURPORTED MISSTATEMENTS OR OMISSIONS.

### A.   Legal Standard.

Common law fraud claims in New York require a plaintiff to establish both

(i) actual, direct reliance on the alleged misrepresentations or omissions at issue and (ii) that such

reliance was justifiable.[11]  Gabriel Capital, 177 F. Supp. 2d at 174; Turtur v. Rothschild Registry,

Int'l, Inc., 1993 U.S. Dist. LEXIS 11939, at *17 (S.D.N.Y. Aug. 26, 1993).  To prove actual

reliance, a plaintiff must establish that it "in fact read and relied on" the alleged

misrepresentations or omissions.  Turtur, 1993 U.S. Dist. LEXIS 11939, at *17.

---

[11] Actual and justifiable reliance also are elements of Plaintiffs' negligent misrepresentation, see
Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000), fraudulent
inducement, see Centro Empresarial Cempresa S.A. v. America Movil S.A.B. de C.V., 17
N.Y.3d 269, 276 (2011), and aiding and abetting fraud claims, see VTech Holdings, Ltd. v.
Pricewaterhouse Coopers, LLP, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004).  Those claims, along
with the purported successor liability claim that derives therefrom, also should be dismissed for
lack of actual or justifiable reliance.

Moreover, under New York law, the requirement of reasonable or justifiable reliance imposes a duty on sophisticated investors (like Plaintiffs) to investigate business transactions and verify the information they receive.  "The law is indulgent of the simple or untutored; but the greater the sophistication of the investor, the more inquiry that is required. 'Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.'"  Crigger v. Fahnestock & Co., 443 F.3d 230, 235 (2d Cir. 2006); Global Minerals & Metals Corp. v. Holme, 35 A.D.3d 93, 100 (1st Dep't 2006) ("New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transaction and the business they are acquiring.").  To the extent Plaintiffs were "on notice of the existence of material facts which have not been documented and [Plaintiffs] nevertheless proceed[] with a transaction without securing the available documentation . . . [Plaintiffs] may truly be said to have willingly assumed the business risk that the facts may not be as represented".  Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003) (quoting Rodas v. Manitares, 159 A.D.2d 341, 343 (1st Dep't 1990)).

### B.   Plaintiffs Cannot Establish Actual Reliance.

Summary judgment is appropriate because Plaintiffs did not rely upon the alleged misrepresentations and omissions identified in the Complaint.  As this Court recently noted in a substantially similar case involving the same Plaintiffs, each of Plaintiffs' claims is subject to the requirements of Federal Rule of Civil Procedure 9(b).  Dexia v. DB Order at 11.  Therefore, Plaintiffs were required to specify in the Complaint, among other things, each statement or omission that Plaintiffs contend was fraudulent.  Id. (dismissing claims where "plaintiffs have not alleged . . . exactly what the misrepresentations were").  Plaintiffs devoted 47 paragraphs of

their Complaint and an additional 270 pages of exhibits purporting to do just that.  (See Compl.

¶¶ 238-84, Exs. B-H.)  Virtually every alleged misstatement specified therein comes from the

prospectus supplements for the offerings at issue; the remaining handful come from the

prospectuses for those offerings.[12]  None come from any other source.  See id.

        But the record is clear and undisputed:  Plaintiffs did not review prospectuses or

prospectus supplements in connection with their decision to purchase the Certificates.  In fact,

Jake Hendrickson, the Portfolio Manager and 30(b)(6) representative for FSAM on these topics,

testified unequivocally that FSAM's investment personnel did not review such documents:

> Q. In the process of reviewing a new issue deal, what, if any, role would
> reviewing the prospectus supplement or other offering documents play, if any, in
> your investment decision?
> A. It would -- they were not available.
> Q. Okay. You were making your investment decisions before the pro supps were
> available, correct?
> A. Correct.
> Q. And that's the case in general and also with respect to the deals at issue in this
> case, right?
> A. Correct.
> Q. So you didn't read or review the prospectus supplements, right?
> …
> A. Not prior to purchase.
> Q. Okay. And the analysts who worked for you, Mr. Albus and the others, they
> didn't do it either prior to purchase, right?
> A. Correct.
> …
> Q. Okay. And with respect to the specific deals at issue in this case, you don't
> recall anything different, in general, nobody would review the prospectus
> supplements for secondary market purchases, correct?
> A. In general, no.  (Stmt. ¶ 283; FSAM 30(b)(6) Hendrickson Tr. 71:24-75:17
> (Ex. 7); see also Stmt. ¶ 284; Zhang Tr. 69:11-70:22 (Ex. 15) ("Q. I just want to
> make sure, you've never read a prospectus in connection with the purchase of a
> residential mortgage-backed security?  A. No."); Stmt. ¶ 285; Brewer Tr. 145:23-
> 147:12 (Ex. 16) ("Did you ever read prospectuses in connection with FSAFP's

---

[12] For CBASS 2007-CB6 and IMM 2007-A, the alleged misstatements come from the private
placement memorandum or offering circular, respectively, which are the equivalent of
prospectus supplements for offerings not registered with the SEC.  There is also one reference to
an offering circular for ELAT 2007-1, but that offering is not even at issue in this case.

RMBS purchases in 2006 and 2007 that you recall?  A. I don't recall.").)

Accordingly, it is undisputed that Plaintiffs did not actually read or rely on <u>any</u> of the purported misstatements or omissions alleged in the Complaint, and summary judgment should be granted.  <u>See</u> <u>Sec. Investor Prot. Corp. v. BDO Seidman</u>, 95 N.Y.2d 702, 710 (2001) ("Plaintiff cannot sustain a cause of action for fraud if defendant's misrepresentation did not form the basis of reliance"); <u>Singer Co. v. Stott & Davis Motor Express, Inc.</u>, 436 N.Y.S.2d 508, 512 (4th Dep't 1981) (dismissing claims where "[t]here was no showing that [plaintiff] relied on the representation"); <u>see also</u> <u>Dexia v. DB Order</u> at 15 (Plaintiffs' failure to identify purchase dates was "especially important in this case because it appears that plaintiffs' investments in twenty-eight of the forty-three Offerings occurred before the ProSupps were even issued").  The court in <u>Gabriel Capital</u>, 177 F. Supp. 2d at 174, stated the point succinctly:  "[Plaintiff] was provided with the final Offering Memorandum after it decided to purchase the NSM Notes. Consequently, it could not have relied on the Offering Memorandum in making this investment decision.  As plaintiffs' Second Amended Complaint only refers to false and misleading statements made in the Offering Memorandum . . . there could be no reliance on the Offering Memorandum as a matter of law."

Plaintiffs' purported review of "term sheets" and "marketing materials" supplied by Defendants (the "Preliminary Materials") (<u>see</u> Albus Tr. 49:15-50:8 (Ex. 17)) cannot rescue their claims.  As noted above, Plaintiffs do not identify those Preliminary Materials as the source of even one of the specific purported misstatements or omissions in the Complaint.  Moreover, even if Plaintiffs could at this late date disavow the accuracy and completeness of their own pleading—and they cannot (<u>see, e.g.</u>, <u>In re ICN/Viratek Sec. Litig.</u>, 1996 WL 164732, at *1-2 (S.D.N.Y. Apr. 9, 1996))—they have adduced no evidence that the Preliminary Materials contained the same or even similar disclosures to those pleaded in the Complaint.

17

The purported misstatements alleged in the Complaint broadly can be categorized in two groups:  (i) those that consist of textual disclosures (e.g., about underwriting guidelines and compliance therewith (Compl. Ex. B), loan selection and due diligence practices (Compl. Ex. C), loan delinquency status (Compl. Ex. F), appraisal procedures (Compl. Ex. G) and the credit ratings process (Compl. Ex. H)); and (ii) those that consist primarily or entirely of computational data that Plaintiffs allege is incorrect (e.g., credit score distributions (Compl. Ex. D), owner occupancy percentages (Compl. Ex. E), weighted average loan-to-value ("LTV") ratios (Compl. Ex. G) and credit ratings (Compl. Ex. H)).  With respect to the first category, Plaintiffs have adduced no evidence that any term sheet or marketing material they read (which typically focused on the structure of the deal and data about the collateral (see, e.g., Stmt. ¶¶ 286-88; Albus Tr. 61:22-62:9 (Ex. 17); Ex. 114) contained those types of textual disclosures. For example, the term sheet that was shown to one of FSAM's investment personnel at his deposition—which he testified was "far more detailed" than those he typically reviewed (see Stmt. ¶ 289; Albus Tr. 94:20-96:18 (Ex. 17))—contained no description at all about the underwriting guidelines used to originate the loans, or any of the other categories of textual disclosures alleged in the Complaint.[13]  (See Ex. 114.)  With respect to the alleged misstatements about computational data, Plaintiffs have adduced no evidence whatsoever that any such data was misstated, much less that it was materially and knowingly misstated.  Thus, Plaintiffs' purported review of terms sheets and marketing materials cannot establish actual reliance.

---

[13] Judge Cote's recent decision in Federal Housing Finance Agency v. Deutsche Bank AG, 2012 WL 5471864 (S.D.N.Y. Nov. 12, 2012) is inapposite.  That decision was rendered at the motion to dismiss stage, which required the court to accept as true plaintiff's allegation that "the data 'incorporated into the Prospectus Supplements' was the very same data included in the Preliminary Materials provided to [the plaintiff]".  Id. at *3.  Here, there is no evidence that was the case.  Moreover, the burden is now on Plaintiffs to bring forth evidence that they relied on particular misstatements or omissions.  There is no such evidence.

Apparently recognizing their inability to establish actual, direct reliance on any alleged misstatement or omission by Defendants, Plaintiffs' expert reports suggest they will argue they instead relied on the ratings assigned to the Certificates by the ratings agencies, which, they will in turn argue, were the product of Defendants committing a fraud on the ratings agencies. That theory fails.[14]

First, even if Plaintiffs could substitute the ratings agencies' purported reliance for their own, it would not relieve Plaintiffs of the obligation to adduce evidence of specific, intentional misstatements or omissions made by Defendants to the ratings agencies, upon which the ratings agencies themselves relied. There is no such evidence.[15] Plaintiffs have failed to identify a single piece of inaccurate information given by Defendants to the ratings agencies regarding any of the 51 Offerings at issue (let alone evidence that Defendants knowingly provided any such misinformation). Nor can Plaintiffs prove that any particular piece of material information was omitted from that which Defendants provided to the ratings agencies. Indeed, to do so would require Plaintiffs to catalogue every oral and written communication that ever occurred between any employee of Defendants and the ratings agencies—which clearly is not possible. See cf. BDO Seidman, 95 N.Y.2d at 710-11 ("Where [Defendant's] reports were filtered through the [third-party regulator's] own process of evaluation, [Plaintiff] cannot claim

---

[14] To be clear, the issue of the viability of this theory is distinct from the question whether the credit ratings themselves, as represented in the prospectus supplements that Plaintiffs did not read, can constitute actionable misstatements by Defendants. That latter claim, which Plaintiffs do assert in the Complaint, fails because credit ratings are statements of opinion (indeed the opinions of non-party ratings agencies), and, as such, are not actionable absent evidence that the opinion was not truly held. See Abu Dhabi, 2012 WL 3584278, at *8.

[15] The section of the Complaint titled "Defendants Knowingly Supplied False Information to the Ratings Agencies" contains a sum total of one paragraph that even attempts to discuss what Defendants actually said to the ratings agencies. (Compl. ¶ 222.) But even then, Plaintiffs do not identify any specific communication or any single affirmative misrepresentation they claim Defendants made to the ratings agencies.

19

justifiable reliance on the filtered statements, or the absence thereof, as representing either the

sum or substance of [Defendant's] representations.  The regulatory framework involved in this

case thus creates an insurmountable disconnect between [Defendant's] misrepresentations and

[Plaintiff's] purported reliance on those representations.").

        <u>Second</u>, Plaintiffs have not adduced any evidence that the rating for any particular

Certificate would have been different but-for the purportedly false information provided to the

ratings agencies, a necessary element (<u>i.e.</u>, transaction causation) of Plaintiffs' claims under their

"fraud on the ratings agencies" theory.  Transaction causation is demonstrated when a

defendant's misrepresentations induce a plaintiff to act, <u>Laub v. Faessel</u>, 745 N.Y.S.2d 534, 536

(1st Dep't 2002), and the plaintiff would not have acted without the defendant's

misrepresentation, <u>Nam Tai Elecs., Inc. v. UBS PaineWebber Inc.</u>, 850 N.Y.S.2d 11, 13 (1st

Dep't 2007).  Because Plaintiffs have adduced no evidence that any particular rating would have

changed if the purported "truth" had been communicated to the ratings agencies, or that any

particular purchase decision by Plaintiffs would have changed based on that rating, they cannot

establish transaction causation for any of the Certificates at issue.  In fact, Plaintiffs failed even

to depose the rating agencies prior to the deadline for discovery on issues relevant to summary

judgment (and still have not deposed them as of the date of this brief).

        Plaintiffs likely will respond by pointing to the report of their proffered expert,

Ilya Kolchinsky, who opines:  "If the credit rating agencies had been made aware of the material

deficiencies in either the origination process or the due diligence process—as described in the

Complaint—it is my opinion that they would not have awarded triple-A ratings to the Dexia

Bonds, and may not have been able to award any rating at all to some or all of these securities,

given the level of uncertainty around the quality of the mortgage loans securing them."  (Ex. 18

¶100.)  But Mr. Kolchinsky merely <u>assumed</u> that the ratings agencies received false information from the Defendants (<u>id.</u> ¶ 19), and he makes no attempt to specify which bonds would have been rated differently, how they would have been rated, or why.  That sort of generalized conjecture cannot establish transaction causation under Plaintiffs' theory of reliance on ratings. Summary judgment is therefore appropriate.

<b>C.      Plaintiffs Cannot Establish Justifiable Reliance.</b>

Even if Plaintiffs could show they actually read or relied on some alleged misstatement or omission by Defendants—and they cannot—summary judgment still would be appropriate because Plaintiffs cannot demonstrate that any such reliance was justifiable. Plaintiffs' failure to take one of the most elemental steps in analyzing an RMBS transaction, reading the prospectuses and prospectus supplements for the deals at issue, including the extensive risk disclosures contained in those offering documents, is fatal to their claims.

"[A]s a sophisticated institutional investor spending tens of millions of dollars, it had an obligation to protect itself, at least by reading the prospectus supplements, which contained descriptions of the risks involved in investing."  <u>Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.</u>, 683 F.3d 239, 250 (6th Cir. 2012).   Indeed, New York law imposes a heavy burden on sophisticated investors like Plaintiffs to inform themselves about the nature and risks of transactions in which they engage.  See <u>Global Minerals</u>, 35 A.D.3d at 100; <u>Steed Fin. LDC v. Nomura Sec. Int'l, Inc.</u>, 2004 WL 2072536, at *6 (S.D.N.Y. Sept. 14, 2004) ("[T]he more sophisticated the investor and the more resources available to the investor, the greater the burden on the investor to act to protect itself."); <u>see also</u> <u>Republic Bank</u>, 683 F.3d at 258 ("Were Republic a country bumpkin, not a financial institution, [its] argument might be colorable.  However, a large institutional investor, in its exercise of 'common sense,' should understand [the disclosure at issue in the offering documents].")  Even the term sheets Plaintiffs claim generally to have read (Stmt.

21

¶¶ 286-87; <u>see</u> Albus Tr. 48:4-25 (Ex. 17)), specifically warned investors that "[b]efore you invest, you should read the prospectus . . . and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering".  (Stmt. ¶ 290; Ex. 31 at 1.)  It is undisputed that Plaintiffs failed to follow that most basic instruction.

Had Plaintiffs actually read the prospectus and prospectus supplements, they would have been warned of precisely the sort of risks associated with the Certificates that they now claim were misrepresented.  The prospectus supplements identified loan level characteristics for every deal and, as set forth more fully in Appendix A, both the prospectuses and prospectus supplements included robust risk disclosures, including, among others, that:

- Loans were underwritten pursuant to less stringent guidelines than traditional guidelines, and, thus, carried a heightened risk of delinquency, foreclosure and loss;

- Exceptions to stated underwriting guidelines may be made;

- The loans backing the Offerings could be subject to varying levels of due diligence;

- Borrower income and assets may be based solely on the borrowers' representations and not verified;

- The owner occupancy status of a property may be based solely on the borrowers' representation and would not be verified;

- Credit ratings on the Certificates may be downgraded or withdrawn, which may, in turn, affect the liquidity of the Certificates; and

- Loan-to-Value ("LTV") ratios may not be a reliable indicator of rates of delinquency, foreclosure and loss in the event of a downturn in the residential real estate market and, in any event, the appraisals on which the LTV ratios were based represented an opinion of the appraiser, and there was no guarantee that the value of the mortgaged property would remain what it was at the time of origination.

Because Plaintiffs failed to read disclosures that would have informed them of the very risks that form the basis of the Complaint, Plaintiffs cannot have justifiably relied on any purported misrepresentation from any source.  <u>See</u> <u>Republic Bank</u>, 683 F.3d at 254 ("[T]his allegation fails because language in the offering documents warned Republic—or would have warned Republic, had it read the documents—of the very risk at issue"); <u>Orlando v. Kukielka</u>,

836 N.Y.S.2d 252, 255 (2d Dep't 2007).

## III.    PLAINTIFFS HAVE ADDUCED NO EVIDENCE OF LOSS CAUSATION.

           Loss causation is a fundamental element of Plaintiffs' claims.  See Mfrs. Hanover

Trust Co. v. Drystdale Sec. Corp., 801 F.2d 13, 20 (2d Cir. 1986).  Plaintiffs must "show . . .

that the misrepresentations directly caused the loss about which [Plaintiffs] complain[]".  Laub,

745 N.Y.S.2d at 536; Kosovich v. Metro Homes, LLC, 2009 WL 5171737, at *6 (S.D.N.Y. Dec.

30, 2009) (Rakoff, J.) (Plaintiffs must allege that "the subject of the fraudulent statement or

omission was the cause of the actual loss suffered"); Shanahan v. Vallat, 2008 WL 4525452, at

*7 (S.D.N.Y. Oct. 3, 2008).  Where, as here, factors independent of the wrongdoing alleged in

the Complaint—namely the "biggest housing downturn we ever had" (Stmt. ¶ 297; FSAM

30(b)(6) Hendrickson Tr. 137:5-7 (Ex. 7))—may have caused Plaintiffs' purported loss, it is

Plaintiffs' burden to "eliminat[e] that portion of the price decline that is the result of forces

unrelated to the wrong."  Gordon Partners v. Blumenthal, 2007 WL 1438753, at *1 (S.D.N.Y.

May 16, 2007).  "[T]he law requires the disaggregation of confounding factors, [so]

disaggregating only some of them cannot suffice to establish that the alleged misrepresentations

actually caused Plaintiffs' loss."   In re Omnicom Grp., Inc. Sec. Litig., 541 F. Supp. 2d 546, 554

(S.D.N.Y. 2008).

           Plaintiffs have not even attempted to distinguish which of their purported losses

were due to Defendants' alleged misstatements as opposed to "other salient factors".  Lentell v.

Merrill Lynch & Co, 396 F.3d 161, 177 (2d Cir. 2005).  Indeed, Plaintiffs' purported damages

expert, Dr. Mason, simply asserts that:  "[S]ince widespread underwriting defects, including by

the Defendants in this case, are at the root of the financial crisis and economic downturn, there is

no known generally-accepted economic method that can distinguish investor losses caused by the

underwriting defects alleged here from those arising from the subsequent financial crisis and

economic downturn, nor would I argue that such a distinction is appropriate." (See Ex. 19 ¶ 24.)

Plaintiffs' and their expert's admission that they have not even attempted to disaggregate losses

requires summary judgment as a matter of law. See Sciallo v. Tyco Int'l Ltd., 2012 WL

2861340, at *2, 6 (S.D.N.Y. July 9, 2012) (granting summary judgment where plaintiffs'

damages expert's report addressed only the calculation of damages and not the issue of loss

causation); Gordon Partners, 2007 WL 1438753, at *2 (granting summary judgment where

plaintiffs "offered no event study or similar analysis to show whether any loss (and if so how

much) was caused by defendants' conduct as opposed to other market factors"); Carpe v. Aquila,

Inc., 2005 WL 1138833, at *8 (W.D. Mo. Mar. 23, 2005) (granting summary judgment where

"plaintiffs' expert does not take into account market forces related to the downfall of Enron and

the difficulties experienced industry-wide").

        Specifically, Plaintiffs have made no attempt to distinguish (i) Defendants'

conduct from that of other industry participants whom Dr. Mason asserts played a role in causing

Plaintiffs' losses (see Ex. 19 ¶ 24; Stmt. ¶ 293); or (ii) the conduct by Defendants that is at issue

here—i.e., alleged false statements in 51 RMBS Offerings—from other generalized conduct by

Defendants or their affiliates that he says contributed to the financial crisis.  With respect to the

first point, it is black letter law that Plaintiffs must disaggregate market-wide phenomena from

security-specific information.  See Lentell, 396 F.3d at 177.  They have not done so.  With

respect to the second, Plaintiffs and Dr. Mason presumably would admit that there is nothing

inherently wrongful or tortious about originating or securitizing subprime loans, yet they make

no attempt to distinguish "the decline in underwriting quality"—which is not at issue in this

case—from "failure to adhere to underwriting standards" or specific misstatements in the

Offering Documents—which are the subjects of Plaintiffs' claims.  (See Stmt. ¶¶ 294-96; Ex. 19

¶ 20.) That is insufficient. Plaintiffs must offer some "way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss". In re Omnicom, 541 F. Supp. 2d at 554. Because Plaintiffs fail to "disaggregat[e] [] confounding factors", they cannot meet their burden to establish loss causation. Id.; see also In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 460–61 (S.D.N.Y. 2000) (granting summary judgment where plaintiffs' loss causation analysis did not "remove the effects on stock price of market and industry information. . . .").

## IV.   SUMMARY JUDGMENT SHOULD BE GRANTED ON THE SIXTEEN OFFERINGS IN WHICH DEFENDANTS ACTED ONLY AS UNDERWRITERS.

For sixteen of the 51 Offerings, Plaintiffs concede that Defendants acted only as underwriters; Defendants were not otherwise involved in the loan origination or securitization process. (Compl. ¶ 141.) As this Court recently held, misrepresentation claims against underwriter-only RMBS defendants must be dismissed due to the underwriter's "limited and attenuated role" in such offerings, which nullify the scienter and reasonable reliance elements of Plaintiffs' claims. Dexia v. DB Order at 4, 20-22 (dismissing claims with prejudice "[f]or Offerings in which DBSP was not the sponsor [and] DBSI as underwriter was the only defendant directly involved in the Offering.") Summary judgment should thus be granted with regard to those sixteen Offerings.[16]

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion for summary judgment in its entirety.

---

[16] Those Offerings are:  CARR 2006-NC3; CARR 2006-NC5; CARR 2006-RFC1; CARR 2007-FRE1; IMM 2007-A; IMSA 2006-2; IMSA 2007-3; MSST 2007-1; NAA 2007-3; NCMT 2007-1; ARSI 2006-M2; ARSI 2006-W4; CBASS 2007-CB6; INDX 2006-AR29; RASC 2006-KS7; RASC 2007-KS2 (Compl. ¶ 141, Table 8.)

New York, New York

January 21, 2013

CRAVATH, SWAINE & MOORE LLP,

by

s/ Daniel Slifkin
Daniel Slifkin
Michael A. Paskin
J. Wesley Earnhardt
Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
dslifkin@cravath.com
wearnhardt@cravath.com

*Attorneys for Defendants Bear Stearns & Co. Inc. (now known as J.P. Morgan Securities LLC), The Bear Stearns Companies, Inc. (now known as The Bear Stearns Companies LLC), Bear Stearns Asset Backed Securities I LLC, EMC Mortgage LLC (f/k/a EMC Mortgage Corporation), Structured Asset Mortgage Investments II Inc., J.P. Morgan Acceptance Corporation I, J.P. Morgan Mortgage Acquisition Corporation, J.P. Morgan Securities LLC (f/k/a JPMorgan Securities Inc.), WaMu Asset Acceptance Corp., WaMu Capital Corp., Washington Mutual Mortgage Securities Corp., JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.*

26