## APPENDIX A TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### APPENDIX A.1[1]

**THE OFFERING DOCUMENTS DISCLOSED THAT BORROWER INCOME OR ASSETS MAY NOT BE VERIFIED AND/OR THAT UNDERWRITING GUIDELINES WERE LESS STRINGENT THAN AGENCY GUIDELINES, ALONG WITH THE ATTENDANT RISKS**

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| ARSI 2006-M2; <u>see also</u> similar disclosures at ARSI 2006-W4 at S-13, S-30, S-31. | **The Originators' Underwriting Standards Are Not as Stringent as Those of More Traditional Lenders, Which May Result in Losses Allocated to Certain Offered Certificates** . . . The Originators provide loans primarily to mortgagors who do not qualify for loans conforming to the underwriting standards of more traditional lenders but who generally have equity in their property and the apparent ability to repay. . . .  As a result of such underwriting standards, the <u>Mortgage Loans are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner</u>.  To the extent the credit enhancement features described in this prospectus supplement are insufficient to cover such losses, holders of the related Certificates may suffer a loss on their investment.  Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans than on mortgage loans originated in a more traditional manner.  (S-12)<br><br>The <u>Underwriting Guidelines are less stringent</u> than the standards generally acceptable to more traditional lenders with regard to:  (1) the applicant's credit standing and repayment ability and (2) the property offered as collateral.  Applicants who qualify under the Underwriting Guidelines generally have payment histories and |

---

[1] All underlined emphasis added.  This appendix is designed to provide representative examples of certain categories of disclosures from the Offering Documents and is not intended to be a comprehensive list of such disclosures or categories of disclosures.

[2] References to pages in the Prospectus Supplements are denoted with an "S-".  Page references without an "S-" are to Prospectuses.  CBASS 2007-CB6 is a Private Placement Memorandum and IMM 2007-A is an Offering Circular, each of which is the equivalent of a Prospectus Supplement for offerings not registered with the SEC.

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | debt ratios which would not satisfy the underwriting guidelines of more traditional lenders and may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies.  (S-29 to S-30)<br><br>Approximately . . . 33.55% of the Mortgage Loans were originated under the . . . Stated Income documentation program[] . . .  The Stated Income residential loan program requires the applicant's employment and income sources to be stated on the application.  The applicant's income as stated must be reasonable for the related occupation in the loan underwriter's discretion.  However, <u>the applicant's income as stated on the application is not independently verified</u>.  (S-30 to S-31) |
| BALTA 2006-4; <u>see also</u> similar disclosures at BALTA 2006-7 at S-25 to S-26, S-51 to S-52, 13, S-54, S-54, S-54, S-54, S-57, S-59, S-61, 18, 73. | **The Underwriting Standards of Some of the Mortgage Loans Do Not Conform to the Standards of Fannie Mae or Freddie Mac, And May Present a Greater Risk of Loss with Respect to those Mortgage Loans.**  Some of the mortgage loans were underwritten in accordance with underwriting standards which are primarily intended to provide for single family "non-conforming" mortgage loans.  A "nonconforming" mortgage loan means a mortgage loan that is ineligible for purchase by Fannie Mae or Freddie Mac due to . . . documentation standards . . .  These documentation standards may include <u>mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan</u>.  Accordingly, mortgage loans underwritten under the related originator's non-conforming credit underwriting standards are <u>likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines</u>.  Any resulting losses, to the extent not covered by credit enhancement, may affect the yield to maturity of the related offered certificates.  (S-34)<br><br>Approximately 58.98% of the mortgage loans in the aggregate have been acquired by the Sponsor from various sellers and were originated generally in accordance with the following underwriting guidelines established by the Sponsor. . . .  EMC has represented to the depositor that the mortgage loans were originated generally in accordance with such policies.  The mortgage loans originated by EMC, or EMC mortgage loans, are "conventional non-conforming mortgage loans" (i.e., loans that are not insured by the Federal Housing Authority, or FHA, or partially guaranteed by the veterans Administration or which do not qualify for sale to Fannie Mae or Freddie Mac) and are secured by first liens on one-to four-family residential properties.  These loans typically differ from those underwritten to the guidelines established by Fannie Mae and Freddie Mac |

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | primarily with respect to the original principal balances, loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property, property types and/or mortgage loans with loan-to-value ratios over 80% that do not have primary mortgage insurance.  (S-60) |
| | A mortgage pool may include mortgage loans that do not meet the purchase requirements of Fannie Mae and Freddie Mac.  These mortgage loans are known as nonconforming.  The mortgage loans may be nonconforming because they exceed the maximum principal balance of mortgage loans purchased by Fannie Mae and Freddie Mac, known as jumbo loans, because the mortgage loan may have been originated with limited or no documentation, because they are sub-prime mortgage loans, or because of some other failure to meet the purchase criteria of Fannie Mae and Freddie Mac.  (12) |
| | Under a stated income/verified asset documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower.  Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income.  Borrower's assets are verified.  (S-62) |
| | Under the no ratio documentation program the borrower's income is not stated and no ratios are calculated.  Although the income is not stated nor verified, lenders obtain a telephonic verification of the borrower's employment without reference to income.  Borrower's assets are verified.  (S-62) |
| | Under the stated income/stated asset documentation program, the borrower's income and assets are stated but not verified.  The underwriting of such mortgage loans may be based entirely on the adequacy of the mortgaged property as collateral and on the credit history of the borrower.  (S-62) |
| | Under the no income/no asset documentation program, the borrower's income and assets are neither stated nor verified.  The underwriting of such mortgage loans may be based entirely on the adequacy of the mortgaged property as collateral and on the credit history of the borrower.  (S-62) |

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | The nature of the information that a borrower is required to disclose and whether the information is verified depends, in part, on the documentation program used in the origination process. . . .  <u>A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both</u>.  Countrywide Home Loans offers the following documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program (the "*Alternative Documentation Program*"), a Reduced Documentation Loan Program (the "*Reduced Documentation Program*"), a CLUES Plus Documentation Loan Program (the "*CLUES Plus Documentation Program*"), a No Income/No Asset Documentation Loan Program (the "*No Income/No Asset Documentation Program*"), a Stated Income/Stated Asset Documentation Loan Program (the "*Stated Income/Stated Asset Documentation Program*") and a Streamlined Documentation Loan Program (the "*Streamlined Documentation Program*").  (S-65 to S-66)<br><br>The <u>Alternative Documentation Program</u> permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.  Under the <u>Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived</u>. . . .  Since <u>information relating to a prospective borrower's income and employment is not verified</u>, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application.  The maximum Loan-to-Value Ratio ranges up to 95%.  The CLUES Plus Documentation Program permits the <u>verification of employment by alternative means</u>, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application . . . .  Under the <u>Streamlined Documentation Program</u> . . . <u>a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted</u>.  The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.  (S-67 to S-68)<br><br><u>Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required</u> and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan |

-4-

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | file, they are not taken into account for purposes of the underwriting analysis.  (S-69) <br><br> The stated income/verified assets, stated income/stated assets, no documentation or no ratio programs <u>generally require less documentation and verification</u> than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories. . . .  Under a "stated income/stated assets" program, <u>no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied.</u>  Generally, under a "no documentation" program, <u>the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken</u> by the originator.  <u>The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.</u>  Generally, under a "no ratio" program, the mortgagor is not required to disclose their income although the nature of employment is disclosed.  Additionally, on a "no ratio" program assets are verified.  (17) <br><br> <u>The rate of default on single family loans which are . . . limited documentation mortgage loans . . . may be higher</u> than for other types of mortgage loans.  (73) |
| BSABS 2006-HE8; <u>see also</u> similar disclosures at BSABS 2006-EC2 at S-18; BSABS 2007-2 at S-20; BSABS 2006-IM1 at S-102 to S-103; MSST 2007-1 at S-19; NCMT 2007-1 at S- | **Certain mortgage loans were underwritten to nonconforming underwriting standards, which may result in losses or shortfalls to be incurred on the offered certificates . . .**  Certain mortgage loans were underwritten generally in accordance with underwriting standards which are primarily intended to provide for single family "non-conforming" mortgage loans.  A "non-conforming" mortgage loan means a mortgage loan which is ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor, i.e. borrowers on the mortgage loans may have an impaired or unsubstantiated credit history, or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines.  <u>These documentation standards may include mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan.  Accordingly, mortgage loans underwritten under such non-conforming credit underwriting standards are likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie</u> |

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| 73; SACO 2006-2 at S-20. | <u>Mac underwriting guidelines.</u> Any resulting losses, to the extent not covered by credit enhancement, may affect the yield to maturity of the offered certificates. (S-25 to S-26) |
| CARR 2006-NC3; <u>see also</u> similar disclosures at CARR 2006-NC5 at S-19 to S-20; CARR 2006-RFC1 at S-17 to S-18; CARR 2007-FRE1 at S-19 to S-20; JPMAC 2006-CW1 at S-10; JPMAC 2006-HE3 at S-11; JPMAC 2006-NC1 at S-11; JPMAC 2006-RM1 at S-11; JPMAC 2006-WMC2 at S-11; JPMAC 2006-WMC3 at S-11. | **The mortgage loans were underwritten to standards which do not conform to the credit standards of Fannie Mae or Freddie Mac which may result in losses on the mortgage loans.** . . . Each originator provides loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac credit guidelines . . . The mortgages include loans that:<br><br>• were made to mortgagors having imperfect credit histories; . . .<br>• were made to mortgagors who have debt-to-income ratios greater than 50% (i.e., the amount of debt the mortgagor owes represents a large portion of his or her income) . . .<br>• were made to mortgagors whose income is not required to be verified, which . . . may increase the risk that the mortgagor's income is less than represented<br>• were not originated pursuant to any particular secondary mortgage market program; as a result many of the mortgage loans have exceptions such as high loan-to-value ratios at origination . . .<br><br><u>As a result of the originators' underwriting standards, the mortgage loans in the mortgage pool are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner. Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the mortgage loans in the mortgage pool than on mortgage loans originated in a more traditional manner.</u> No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans. (S-19 to S-20) |
| NAA 2007-3 | **Mortgage Loans were underwritten to nonconforming underwriting standards, which may result in losses or shortfalls to be incurred on the Offered Certificates** . . . The underwriting standards applicable to the Mortgage Loans . . . may or may not conform to Fannie Mae and Freddie Mac guidelines. As a result, the Mortgage Loans may experience rates of delinquency, foreclosure and borrower bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in strict |

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | compliance with Fannie Mae or Freddie Mac guidelines.  (S-21) <br><br> The underwriting standards applicable to the Mortgage Loans typically differ from, and are, with respect to a substantial number of Mortgage Loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, credit score, required documentation, interest rates, borrower occupancy of the mortgaged property, and/or property types.  To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the Mortgage Loans thereunder may reflect higher delinquency rates and/or credit losses.  (S-49) |
| CBASS 2007-CB6; see also similar disclosures at INDX 2006-AR-29 at S-49. | **Other Levels of Documentation** <br> Other mortgage loans purchased by the Seller were originally underwritten pursuant to alternative documentation programs that require less documentation and verification than do traditional "Full Documentation" programs, including "No Documentation," "Limited Documentation," "Alternative Documentation," "Stated Documentation", "Stated/Stated Documentation" and "Streamlined Documentation" programs for certain qualifying mortgage loans.  <u>Under a "No Documentation" program, the originator does not undertake verification of a mortgagor's income or assets.</u>  Under a "Limited Documentation" program, certain underwriting documentation concerning income and employment verification is waived.  "Alternative Documentation" programs allow a mortgagor to provide W -2 forms instead of tax returns, permit bank statements in lieu of verification of deposits and permit alternative methods of employment Verification.  Under "Stated Documentation" programs, a mortgagor's income is deemed to be that stated on the mortgage application and is not independently verified by the originator.  <u>Under "Stated/Stated Documentation" programs, a mortgagor's income and assets are deemed to be those stated on the mortgage application and are not independently verified by the originator.</u>  These are underwriting programs designed to streamline the underwriting process by eliminating the requirement for income verification.  Depending on the facts and circumstances of a particular case, the originator of the mortgage loan may have accepted other information based on limited documentation that eliminated the need for either income verification and/or asset verification.  The objective use of limited documentation is to shift the emphasis of the underwriting process from the credit standing of the mortgagor to the value and adequacy of the mortgaged property as collateral.  "Streamlined Documentation" programs are used for mortgage loans which are being refinanced by the same |

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | originator.  The originator verifies current mortgage information, but does not undertake verification of the mortgagor's employment or assets and does not conduct a new appraisal of the property considered for refinancing.  The objective of Streamlined Documentation programs is to streamline the underwriting process in cases where the originator has the mortgagor's complete credit file from the original loan transaction.  (33) |
| IMSA 2006-2; see also similar disclosures at IMM 2007-A at S-13; IMSA 2007-3 at S-17; SAMI 2006-AR7 at S-21 to S-22; SAMI 2006-AR8 at S-23 to S-24. | **The Underwriting Standards of Some of the Mortgage Loans Do Not Conform to the Standards of Fannie Mae or Freddie Mac, And May Present a Greater Risk of Loss with Respect to those Mortgage Loans.**  Some of the mortgage loans were underwritten in accordance with underwriting standards which are primarily intended to provide for single family "non-conforming" mortgage loans.  A "nonconforming" mortgage loan means a mortgage loan that is ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines for "A" credit mortgagors.  These credit characteristics include mortgagors whose creditworthiness and repayment ability do not satisfy such Fannie Mae or Freddie Mac underwriting guidelines and mortgagors who may have a record of credit write-offs, outstanding judgments, prior bankruptcies and other credit items that do not satisfy such Fannie Mae or Freddie Mac underwriting guidelines.  These documentation standards may include mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan.  Accordingly, mortgage loans underwritten under the related originator's non-conforming credit underwriting standards are likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines.  Any resulting losses, to the extent not covered by credit enhancement, may affect the yield to maturity of the related offered certificates.  (S-18) |
| JPALT 2007-A2; see also similar disclosures at JPALT 2006-A2 at S-35 to S36, S-37, S-38, S-38; JPALT 2006-A3 at S-28, S-27 to S-28, | In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application. . . .  The "alternative," "reduced," "stated income/stated assets" and "no income/no asset" programs generally require either alternative or less documentation and verification than do full documentation programs . . .  Generally, under a "reduced documentation" program, either no verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator.  Reduced doc loans may also include loans having only one year of income verification and loans to mortgagors with acceptable payment histories and credit scores but no information or verification of the mortgagor's income.  Under a "stated income/stated assets" program, |

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| S-28, S-28, S-30; JPALT 2006-A5 at S-24 to S-25, S-26, S-26, S-27, S-30; JPALT 2006-A6 at S-24 to S-25, S-30 , S-29 to S-33; JPALT 2006-A7 at S-24 to S-25, S-32, S-33, S-33 ; JPALT 2007-A1 at S-36, S-38, S-38, S-38. | no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied.  Generally, under a "no income/no asset" program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator.  The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.  (S-39)

The Chase Originator Mortgage Loans were not originated in a manner generally consistent with Fannie Mae or Freddie Mac published underwriting guidelines and were originated using underwriting policies (the "**Alternative A Underwriting Policies**") that are different from and, in certain respects, less stringent than the general underwriting policies of JPMCB and its affiliates during the period of origination of the Mortgage Loans.  For example, such Mortgage Loans include mortgage loans secured by non-owner occupied properties, mortgage loans made to borrowers whose income is not required to be provided or verified, mortgage loans with higher loan-to-value ratios or mortgage loans made to borrowers whose ratios of debt service on the mortgage loans to income and total debt service on borrowings to income are higher than for such other programs, or mortgage loans made to international borrowers.  (S-41)

"Reduced Documentation" program Mortgage Loans were originated under the "no ratio" or "no income verification" guidelines.  Under the "no ratio" guidelines, no income is stated or verified but source(s) of income and employment are verified; under the "no income verification" guidelines, income is stated but not verified, however employment is verified; assets are verified in the case of both such guidelines.  For ChaseFlex Stated program Mortgage Loans (also known as Proactive "SISA" program Mortgage Loans or Stated Income/Stated Asset program Mortgage Loans), verification of the income and assets, as stated on the application, is not required.  The underwriting for such mortgage loans requires AUS approval and is based entirely on stronger credit profile and lower loan-to-value ratio requirements.  For "No Doc" program Mortgage Loans, no employment information, sources of income, income amount or assets are disclosed. Additionally, employment verification is not required.  The underwriting for such mortgage loans are based primarily or entirely on a stronger credit profile (evidenced by a higher minimum FICO credit risk score), a |

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | lower maximum product limit and additional due diligence performed on the collateral.  (S-41)<br><br>The Mortgage Loans originated using Alternative A Underwriting Policies described above <u>may experience greater rates of delinquency, foreclosure and loss than mortgage loans required to satisfy more stringent underwriting standards</u>.  (S-42)<br><br>American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring. . . . Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require.  Certain non-conforming Alt-A products also allow for <u>less verification documentation than Fannie Mae or Freddie Mac require</u>.  For these Alt-A products, the <u>borrower may not be required to verify employment income, assets required to close or both</u>.  For some other Alt-A products, the <u>borrower is not required to provide any information regarding employment income, assets required to close or both</u>.  Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.  (S-43) |
| LBMLT 2006-3; <u>see also</u> similar disclosures at LBMLT 2006-4 at S-11, S-11, S-35, S-37; LBMLT 2006-5 at S-11, S-11, S-32, S-36 | **Mortgage Loans Originated under the Sponsor's Underwriting Guidelines Carry a Risk of High Delinquencies** . . .  The sponsor's business primarily consists of originating, purchasing, selling and, through its parent Washington Mutual Bank ("WMB"), servicing mortgage loans secured by one- to four-family residences that <u>generally do not conform to the underwriting guidelines typically applied by banks and other primary lending institutions</u>, particularly with respect to a prospective borrower's credit history and debt-to-income ratio.  Borrowers who qualify under the sponsor's underwriting guidelines generally have equity in their property and repayment ability but <u>may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies</u>. . . .  The sponsor's <u>underwriting guidelines do not prohibit a mortgagor from obtaining secondary financing</u>, from the sponsor or from another source, at the time of origination of the sponsor's first lien, which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the sponsor's loan-to-value ratio determination.  (S-11)<br><br>As a result of such underwriting guidelines, <u>the mortgage loans in the mortgage pool are likely to experience</u> |

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
| --- | --- |
| | rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner.  Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the mortgage loans than on mortgage loans originated in a more traditional manner.  No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans.  (S-11)<br><br>The sponsor originates or acquires mortgage loans that generally do not conform to the underwriting guidelines typically applied by prime lending institutions, Fannie Mae or Freddie Mac, particularly with respect to a prospective borrower's credit history, credit score(s), LTV and debt-to-income ratio.  (S-36) .  Under the limited documentation and stated income documentation residential loan programs, the prospective borrower's employment and income sources must be stated on the prospective borrower's application.  The prospective borrower's income as stated must be reasonable for the related occupation and such determination as to reasonableness is subject to the loan underwriter's discretion.  However, the prospective borrower's income as stated on the application is not independently verified.  (S-38) |
| LBMLT 2006-6; see also similar disclosures at LBMLT 2006-7 at S-12, S-12, S-39; LBMLT  2006-8 at S-12, S-12, S-39; LBMLT 2006-11 at S-12, S-12, S-38; WMHE 2007-HE2 at S-10, S-10, S-31. | **Subprime Mortgage Loans are Subject to a Greater Risk of High Delinquencies** . . .  The mortgage loans were underwritten under the sub-prime mortgage loan underwriting guidelines of Long Beach Mortgage, a division of Washington Mutual Bank (the "**Long Beach underwriting guidelines**").  The Long Beach underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  The Long Beach underwriting guidelines are less stringent than the guidelines Washington Mutual Bank applies to  its borrowers who qualify for its prime or Alt-A mortgage loans and less stringent than the guidelines generally acceptable to Fannie Mae and Freddie Mac with regard to the borrower's credit history, credit score(s), loan-to-value ratio and debt-to-income ratio.  Borrowers who qualify under the Long Beach underwriting guidelines generally have payment histories, documentation or debt-to-income ratios that would not satisfy Fannie Mae and Freddie Mac underwriting guidelines and such borrowers may have a record of major derogatory credit items, such as outstanding judgments or prior bankruptcies.  The Long Beach underwriting guidelines do not prohibit a mortgagor from obtaining secondary financing, from the sponsor or from another source, at the time of origination of the sponsor's first lien, which secondary financing would reduce the |

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | equity the mortgagor would otherwise have in the related mortgaged property as indicated in the sponsor's loan-to-value ratio determination.  (S-11)<br><br>As a result, the rates of delinquency, bankruptcy and foreclosure for the mortgage loans could be higher, and may be substantially higher, than those of mortgage loans underwritten in accordance with Fannie Mae and Freddie Mac guidelines.  Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of sub-prime mortgage loans than on mortgage loans underwritten in accordance with Fannie Mae and Freddie Mac guidelines.  No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans.  (S-11)<br><br>Under the limited documentation residential loan program, salaried prospective borrowers or self-employed prospective borrowers are generally required to submit their most recent six months of personal bank statements or business bank statements.  Under the limited documentation and stated income documentation residential loan programs, the prospective borrower's employment and income sources must be stated on the prospective borrower's application.  The prospective borrower's income as stated must be reasonable for the related occupation and such determination as to reasonableness is subject to the loan underwriter's discretion.  However, the prospective borrower's income as stated on the application is not independently verified.  (S-37) |
| RASC 2006-KS7; see also similar disclosures at RASC 2007-KS2 at S-20 to S-21. | **Underwriting standards may affect the risk of loss on the mortgage loans.**  The mortgage loans have been originated using underwriting standards that are less restrictive than the underwriting requirements used as standards for other first lien and junior lien mortgage loan purchase programs, including other programs of Residential Funding Corporation, LLC and the programs of Fannie Mae and Freddie Mac.  Applying less restrictive underwriting standards creates additional risks that losses on the mortgage loans will be allocated to certificate holders.  Examples include . . . mortgage loans made to borrowers whose income is not verified, including borrowers who may not be required to state their income … that have an increased risk misstatements relating to borrower income.  (S-17 to S-18) |
| WAMU 2006-AR7 | The sponsor's low documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets.  It |

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | is available to borrowers with certain loan-to-value ratios, loan amounts and credit scores.  Under this program, the income as stated in the borrower's loan application is not verified, although the borrower's employment may be verified by telephone.  The borrower's stated income must be reasonable for the borrower's occupation and assets (as determined in the underwriter's discretion).  Assets may be verified for higher risk transactions and when exceptions are approved, such as when specific loan-to-value ratios or loan amount Emits are exceeded.  (S-40)<br><br>The sponsor has several "streamline" documentation programs under which the prospective borrower's income and assets either are not required to be obtained or are obtained but not verified.  Eligibility criteria vary but may include minimum credit scores, maximum loan amounts, maximum debt-to-income ratios and specified payment histories on an existing mortgage loan (generally, a history of timely mortgage payments for the past twelve months, or for the duration of the mortgage loan if less than twelve months old) or on other debt.  Purchase loans as well as refinance loans may be eligible under the streamline documentation programs.  For some mortgage loans that qualify under these programs, the borrower's income and assets are not required to be obtained.  For some other mortgage loans that qualify under these programs, the borrower's income and assets are obtained but not verified, the borrower's employment is verified with the employer by telephone, and the borrower's stated income must be reasonable for the borrower's occupation and assets (as determined in the underwriter's discretion).  (S-40) |
| WAMU 2006-AR7; see also similar disclosures at WMABS 2006-HE2 at 7; WMABS 2007-HE2 at 6 to 7. | **There May Be a Greater Likelihood of Losses on Mortgage Loans Originated Under Some Underwriting Standards** . . .  Each mortgage loan to be transferred to a trust will have been originated in accordance with the underwriting standards applied by the originator of that mortgage loan.  Underwriting standards may vary significantly among originators.  While the underwriting standards of each originator will have been approved by an affiliate of the depositor, the underwriting standards, including documentation requirements, of some originators may be less restrictive than those of other originators.  Moreover, some underwriting standards may result in a less accurate assessment of the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral.  As a result, there may be a greater likelihood of default on mortgage loans originated under some underwriting standards, and a greater likelihood that the related mortgaged properties will fail to provide adequate security in the event of such default.  In turn, there may be a greater likelihood that losses, to the extent not covered by credit support, |

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | will be allocated to the related securities.  (7) |
| WMABS 2006-HE2; see also similar disclosure at WMABS 2007-HE2 at S-40. | Under the stated income documentation residential loan program, prospective borrowers are required to state their income on the application but are not required to submit any documents in support.  Under the limited documentation residential loan program, salaried prospective borrowers or self-employed prospective borrowers are generally required to submit their most recent six months of personal bank statements or business bank statements.  Under the limited documentation and stated income documentation residential loan programs, the prospective borrower's employment and income sources must be stated on the prospective borrower's application.  The prospective borrower's income as stated must be reasonable for the related occupation and such determination as to reasonableness is subject to the loan underwriter's discretion. However, the prospective borrower's income as stated on the application is not independently verified. Verification of employment is required for salaried prospective borrowers.  (S-39) |
| WMALT 2007-HY1; see also similar disclosure at WMALT 2007-OC2 at S-28. | **Documentation Programs**  . . .  Generally, a reduced documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores.  A reduced documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets. . . . either (i) a borrower's employment and assets are verified, but no verification of a borrower's income is undertaken, (ii) a borrower's employment and income are verified, but no verification of a borrower's assets is undertaken, or (iii) in the case of some rate/term and cash-out refinance mortgage loans, only the borrower's employment is verified.  For mortgage loans underwritten under a reduced documentation program, less than 12 months of the borrower's income may be verified. . . .  In all cases, the borrower's employment is verified with the employer by telephone or by other independent means.

Generally, a no ratio program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores.  A no ratio program relies on the value and adequacy of the mortgaged property as collateral and the borrower's credit standing.  The borrower's income is not required to be obtained or verified. . . . Generally . . . the borrower's stated assets are also verified through receipt of the borrower's recent bank or brokerage statements or directly with the financial institution.  In all cases, the borrower's employment is verified with the employer by telephone or by other independent means. |

| PROSPECTUS OR PROSPECTUS SUPPLEMENT[2] | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | Generally, a no documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores.  A no documentation program <u>relies on the value and adequacy of the mortgaged property as collateral</u> and the borrower's credit standing.  Generally, the <u>borrower's employment, income and assets are neither obtained nor verified</u>.  In some cases, the <u>borrower's employment may be verified by telephone with the employer or by other independent means if the borrower's employment has been disclosed</u>. (S-27) |

**APPENDIX A.2**

**THE OFFERING DOCUMENTS DISCLOSED THAT EXCEPTIONS TO THE UNDERWRITING GUIDELINES WERE PERMITTED**

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| ARSI 2006-M2; see also similar disclosures at ARSI 2006-W4 at S-30; CARR 2006-NC3 at S-80–S-81; CARR 2006-NC5 at S-80, S-85; CARR 2006-RFC1 at S-94; CARR 2007-FRE1 at S-88; CBASS 2007-CB6 at 47, 50–51, 53; BSABS 2006-EC2 at S-36; BSABS 2006-HE8 at S-44, S-46; BSABS 2007-2 at S-59; LBMLT 2006-3 at S-37; LBMLT 2006-4 at S-36; LBMLT 2006-5 at S-35; LBMLT 2006-6 at S-36–S-37; LBMLT 2006-7 at S-38–S-39; LBMLT 2006-8 at S-38–S-39; | On a case-by-case basis, the applicable Originator may determine that, based upon compensating factors, a loan applicant, not strictly qualifying under one of the Risk Categories described below, warrants an exception to the requirements set forth in the Underwriting Guidelines.  Compensating factors may include, but are not limited to, loan-to-value ratio, debt-to-income ratio, good credit history, stable employment history, length at current employment and time in residence at the applicant's current address.  It is expected that a substantial number of the Mortgage Loans to be included in the mortgage pool will represent such underwriting exceptions. (S-29) |

APPENDIX A.2

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| LBMLT 2006-11 at S-37–S-38; NCMT 2007-1 at S-45; RASC 2006-KS7 at S-48; RASC 2007-KS2 at S-60; WMHE 2007-HE2 at S-31 | |
| BALTA 2006-4 | Exceptions to the underwriting guidelines are permitted when the seller's performance supports such action and the variance request is approved by credit management. . . .  Such underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  These standards are applied in accordance with the applicable federal and state laws and regulations.  Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process.  (S-60–S-61) |
| BALTA 2006-7; see also similar disclosures at INDX 2006-AR29 at S-47; WMALT 2007-HY1 at S-27; WaMu 2006-AR7 at S-40; WMABS 2006-HE2 at S-42; WMABS 2007-HE2 at S-43; WMALT 2007-OC2 at S-29 | The underwriting standards described above are guidelines of general applicability.  On a case-by-case basis, it may be determined that an applicant warrants an exception to these guidelines.  An exception may be allowed by underwriting personnel with appropriate credit authority and only if the application reflects compensating factors, such as: a low loan-to-value ratio; stable ownership; low debt-to-income ratios; or excess cash reserves or similar mitigating circumstances.  (S-63) |
| BSABS 2006-EC2; see also similar disclosures at BSABS 2007-2 at S- | If an individual loan application does not meet the Originator's formal written underwriting guidelines, but the underwriter is confident both that the borrower has the ability and willingness to pay and that the property provides adequate collateral for the borrower's obligations, the Originator's underwriters can make underwriting exceptions up to certain limits within their formal exception policies and approval authorities. |

## APPENDIX A.2

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| 39 | All of the Originator's loan programs have tiered exception levels whereby approval of certain exceptions, such as LTV ratio exceptions, loan amount exceptions, and debt-to-income exceptions, are escalated to higher loan approval authority levels.  (S-33) |
| BSABS 2006-HE8 | <u>Exceptions to the BSRM Underwriting Guidelines are considered with reasonable compensating factors on a case-by-case basis and at the sole discretion of senior management.</u>  When exception loans are reviewed, all loan elements are examined as a whole to determine the level of risk associated with approving the loan including appraisal, credit report, employment, compensating factors and borrower's willingness and ability to repay the loan.  Compensating factors may include, but are not limited to, validated or sourced/seasoned liquid reserves in excess of the program requirements, borrower's demonstrated ability to accumulate savings or devote a greater portion of income to housing expense and borrower's potential for increased earnings based on education, job training, etc.  Loan characteristics such as refinance transactions where borrowers are reducing mortgage payments and lowering debt ratios may become compensating factors as well.  (S-46) |
| JPALT 2007-A2; <u>see also</u> similar disclosures at JPALT 2006-A2 at S-30; JPALT 2006-A3 at S-27; JPALT 2006-A5 at S-25; JPALT 2006-A6 at S-25, 23; JPALT 2006-A7 at S-25, 23; JPALT 2007-A1 at S-37, 23; JPMAC 2006-CW1 at 23; JPMAC 2006-HE3 at 23; JPMAC 2006-NC1 at 29; JPMAC 2006-RM1 at 23; JPALT 2006- | From time to time, <u>exceptions to a lender's underwriting policies may be made.</u>  Such exceptions may be made on a loan by loan basis at the discretion of the lender's underwriter.  Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.  (S-40) |

APPENDIX A.2

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| WMC3 at 23; JPALT 2007-A2 at S-42; JPALT 2006-A2 at S-38, 23; JPALT 2006-A3 at S-28–S-29; JPALT 2006-A5 at S-28; JPALT 2006-A6 at S-33; JPALT 2006-A7 at S-33; JPALT 2007-A1 at S-39 | |
| JPALT 2007-A2; see also similar disclosures at JPALT 2006-A3 at S-30, S-31; JPALT 2006-A5 at S-29–S-30, S-31; SACO 2006-2 at S-34, S-36 | American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.  These standards are applied in accordance with applicable federal and state laws and regulations.  Exceptions to the underwriting standards may be permitted where compensating factors are present.  (S-43) . . . American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. . . .  [N]o set of guidelines can contemplate every potential situation.  Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.  (S-44–S-45) |
| JPMAC 2006-CW1; see also similar disclosures at JPMAC 2006-HE3 at S-63; JPMAC 2006-WMC2 at S-55; JPMAC 2006- | Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability.  On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception.  Compensating factors may include low loan-to-value ratio or combined loan-to-value ratio, as applicable, low debt-to-income ratio, stable employment, time in the same residence or other factors.  It is expected that a significant number of the Mortgage Loans |

APPENDIX A.2

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| WMC3 at S-52–S-53 | will have been originated based on these types of underwriting exceptions.  (S-56–S-57) |
| JPMAC 2006-HE3; see also similar disclosures at BALTA 2006-4 at S-65; BALTA 2006-7 at S-56; NAA 2007-3 at S-49–S-50; SAMI 2006-AR7 at S-45; SAMI 2006-AR8 at S-48 | [C]ertain exceptions to the underwriting standards described herein may be made in the event that compensating factors are demonstrated by a prospective mortgagor.  (S-60) |
| LBMLT 2006-3; see also LBMLT 2006-4 at S-39; LBMLT 2006-5 at S-38; LBMLT 2006-6 at S-39–S-40; LBMLT 2006-7 at S-41–S-42; LBMLT 2006-8 at S-41–S-42;  LBMLT 2006-11 at S-40–S-41 | There can be no assurance that every mortgage loan owned by the trust was originated in conformity with the applicable underwriting guidelines in all material respects.  The sponsor's underwriting guidelines include a set of specific criteria pursuant to which the underwriting evaluation is made.  The application of the sponsor's underwriting guidelines does not imply that each specific criterion was satisfied with respect to every mortgage loan.  Rather, a mortgage loan will be considered to be originated in accordance with a given set of underwriting guidelines if, based on an overall qualitative evaluation, the mortgage loan is in substantial compliance with those underwriting guidelines.  For example, a mortgage loan may be considered to comply with a set of underwriting guidelines, even if one or more specific criteria included in those underwriting guidelines were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting guidelines.  The sponsor applies its underwriting guidelines in accordance with a procedure that complies with applicable federal and state laws and regulations.  (S-40) |
| MSST 2007-1 | **Exceptions**.  Accredited may allow exceptions to its underwriting guidelines in accordance with Accredited's established exception policy.  Exceptions may be allowed based upon the presence of compensating factors such as a low LTV, demonstrated pride of ownership and stability of employment.  (S-45) |

**APPENDIX A.3**

**THE OFFERING DOCUMENTS DISCLOSED THAT MORTGAGE LOANS WERE SUBJECT TO VARYING LEVELS OF DUE DILIGENCE, AND THAT DUE DILIGENCE WAS PERFORMED ONLY ON A SAMPLE OF MORTGAGE LOANS.**

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURE AND PAGE CITATIONS |
|---|---|
| ARSI 2006-M2; see also similar disclosures at ARSI 2006-W4 at S-26. | The Mortgage Loans were selected by the Seller and the Depositor using criteria established by the Seller and the Depositor in consultation with other parties.  (S-25) |
| BALTA 2006-4; see also similar disclosures at BALTA 2006-7 at S-40; BSABS 2006-EC2 at S-40; BSABS 2006-HE8 at S-52; BSABS 2006-IM1 at S-45; BSABS 2007-2 at S-62; MSST 2007-1 at 91; NCMT 2007-1 at 91; SACO 2006-2 at S-39; SAMI 2006-AR7 at S-37; SAMI 2006-AR8 at S-39. | Performing loans acquired by the Sponsor are subject to varying levels of due diligence prior to purchase.  (S-53) |

APPENDIX A.3

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURE AND PAGE CITATIONS |
| --- | --- |
| CARR 2007-FRE1; see also similar disclosures at JPMAC 2006-HE3 at S-64; JPMAC 2006-RM1 at S-54. | Fremont conducted a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the funding review, all loans were reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations was reviewed.  (S-89) |
| IMM 2007-A at Ex-C-1. | *Quality Control.*  The Seller performs a post-closing quality control review on a minimum of 25% of the mortgage loans originated or acquired under the programs described below for complete reverification of employment, income and liquid assets used to qualify for such mortgage loan.  Such review also includes procedures intended to detect evidence of fraudulent documentation and/or imprudent activity during the processing, funding, servicing or selling of the mortgage loan.  Verification of occupancy and applicable information is made by regular mail. |
| JPALT 2007-A2; see also similar disclosures at JPALT 2006-A2 at S-20; JPALT 2006-A3 at S-19; JPALT 2006-A5 at S-17; JPALT 2006-A6 at S-17; JPALT 2006-A7 at S-17 to S-18; JPALT 2007-A1 at S-25. | The Sponsor selected the Mortgage Loans for sale to the Depositor from among its portfolio of mortgage loans based on a variety of considerations, including type of mortgage loan, geographic concentration, range of mortgage interest rates, principal balance, credit scores and other characteristics.  In making this selection, the Sponsor took into account investor preferences and the Sponsor's objective of obtaining the most favorable combination of ratings on the Certificates.  (S-28) |
| LBMLT 2006-3; see also similar disclosures at LBMLT 2006-4 at S-37; LBMLT 2006-5 at S-36; LBMLT | As part of its quality control system, the sponsor re-verifies information that has been provided by the mortgage brokerage company prior to funding a loan and the sponsor conducts a post-funding audit of every origination file.  In addition, WMB, as servicer, periodically audits files based on a statistical sample of closed loans.  In the course of its pre-funding review, the sponsor re-verifies the income of each prospective borrower or, for a self-employed prospective borrower, reviews the income documentation obtained under the full documentation and limited documentation residential loan programs.  The sponsor generally requires evidence |

APPENDIX A.3

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURE AND PAGE CITATIONS |
|---|---|
| 2006-6 at S-37; LBMLT 2006-7 at S-39; LBMLT 2006-8 at S-39; LBMLT 2006-11 at S-38. | of funds to close on the mortgage loan.  (S-38) |
| RASC 2006-KS7; see also similar disclosures at RASC 2007-KS2 at 12. | The level of review by Residential Funding Corporation, if any, will vary depending on several factors.  Residential Funding Corporation, on behalf of the depositor, typically will review a sample of the mortgage loans purchased by Residential Funding Corporation for conformity with the applicable underwriting standards and to assess the likelihood of repayment of the mortgage loan from the various sources for such repayment, including the mortgagor, the mortgaged property, and primary mortgage insurance, if any.  Such underwriting reviews will generally not be conducted with respect to any individual mortgage pool related to a series of certificates.  (12) |
| WMABS 2006-HE2; see also similar disclosures at WMABS 2007-HE2 at S-41. | **Due Diligence and Quality Control Review.**  The sponsor's engages an approved third party due diligence vendor for a complete credit and compliance review of mortgage loans prior to purchase from unaffiliated mortgage loan sellers.  A third party vendor is engaged for an appraisal valuation process that includes the use of an automated valuation model to identify mortgage loans that are considered potential collateral risk.  This process is executed on all mortgage loans purchased from unaffiliated sellers.  For loans purchased from affiliated sellers, a sample of loans is reviewed.  (S-40) |
| WMHE 2007-HE2 | As part of its quality control system, the sponsor re-verifies information that has been provided by the mortgage brokerage company prior to funding a loan and the sponsor conducts a post-funding audit of every origination file.  In addition, Washington Mutual Bank periodically audits files based on a statistical sample of closed loans.  In the course of its pre-funding review, the sponsor re-verifies the income of each prospective borrower or, for a self-employed prospective borrower, reviews the income documentation obtained under the full documentation and limited documentation residential loan programs.  The sponsor generally requires evidence of funds to close on the mortgage loan.  (S-32) |
| WMALT 2007-HY1; see also similar disclosures at WMALT 2007-OC2 | **Due Diligence.**  The sponsor's credit risk oversight department conducts a credit, appraisal, and compliance review of adverse samplings (and, in some cases, statistical samplings) of mortgage loans prior to purchase from unaffiliated mortgage loan sellers.  Sample size is determined by due diligence results for prior purchased pools from that seller, performance of mortgage loans previously purchased and characteristics of |

**APPENDIX A.3**

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURE AND PAGE CITATIONS |
|---|---|
| at S-29. | the pool presented for purchase.  Automated valuation models are obtained on all mortgage loans purchased from unaffiliated sellers.  For mortgage loans originated by Washington Mutual Bank, Washington Mutual Bank's credit risk oversight department conducts a quality control review of statistical samplings of originated mortgage loans on a regular basis.  (S-28) |

APPENDIX A.4

**THE OFFERING DOCUMENTS DISCLOSED THAT OWNER OCCUPANCY STATUS OF A PROPERTY MAY BE BASED SOLELY ON THE BORROWER'S REPRESENTATIONS AND WOULD NOT BE VERIFIED.**

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURE AND PAGE CITATIONS |
|---|---|
| BSABS 2007-2; see also similar disclosures at BSABS 2006-HE8 at A-4; BSABS 2006-IM1 at A-4; BSABS 2006-EC2 at A-4; IMSA 2006-2 at S-38; IMSA 2007-3 at S-40; INDX 2006-AR29 at S-38; JPALT 2006-A2 at A-3; JPALT 2006-A3 at A-3; JPALT 2006-A5 at A-2; JPALT 2006-A6 at A-2;  JPALT 2006-A7 at A-2; JPALT 2007-A1 at A-1-2; JPALT 2007-A2 at A-1-2; LBMLT 2006-3 at S-145; LBMLT 2006-4 at S-138; LBMLT 2006-5 | Occupancy Status….*Based upon representation of the related mortgagors at the time of origination.  (A-4) |

APPENDIX A.4

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURE AND PAGE CITATIONS |
|---|---|
| at S-140; LBMLT 2006-6 at S-141; LBMLT 2006-7 at S-146; LBMLT 2006-8 at S-144; LBMLT 2006-11 at S-138; WMHE 2007-HE2 at S-120; ARSI 2006-M2 at III-7; ARSI 2006-W4 at III-7; LBMLT 2006-3 at S-17, S-143; IMSA 2006-2 at S-38; IMSA 2007-3 at S-40; JPALT 2006-A2 at A-3; JPALT 2006-A3 at A-3; JPALT 2006-A6 at A-2; JPALT 2006-A7 at A-2; JPALT 2007-A1 at A-1-2; JPALT 2007-A2 at A-1-2; LBMLT 2006-4 at S-16, S-138; LBMLT 2006-5 at S-16, S-140; LBMLT 2006-6 at S-16, S-141; LBMLT 2006-7 at S-17, S-146; LBMLT | |

APPENDIX A.4

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURE AND PAGE CITATIONS |
|---|---|
| 2006-8 at S-18, S-155; LBMLT 2006-11 at S-18, S-138; RASC 2007-KS2 at 9; WMHE 2007-HE2 at S-120. | |
| RASC 2007-KS2 | The basis for any statement that a given percentage of the mortgage loans is secured by mortgaged properties that are owner-occupied will be one or more of the following:  the making of a representation by the mortgagor at origination of a mortgage loan that the mortgagor intends to use the mortgaged property as a primary residence . . . (9) |
| JPMAC 2006-CW1; see also similar disclosures at JPMAC 2006-NC1 at 11; JPMAC 2006-RM1 at 9; JPMAC 2006-WMC2 at 9; JPMAC 2006-WMC3 at 9. | *Non-Owner Occupied Properties.*  The mortgaged properties in the trust fund may not be owner occupied. Rates of delinquencies, foreclosures and losses on mortgage loans secured by non-owner occupied properties may be higher than mortgage loans secured by a primary residence.  (9) |
| WMALT 2007-HY1; see also similar disclosures at WAMU 2006-AR7 at S-59; . | Appendix B contains important information about the mortgage loans including: . . . the stated owner occupancy status of the mortgaged properties when the mortgage loans were originated.  (S-46 to S-47) |

APPENDIX A.5

**THE OFFERING DOCUMENTS DISCLOSED THAT CREDIT RATINGS ARE SUBJECT TO CHANGE, WHICH MAY, IN TURN, AFFECT THE LIQUIDITY OF THE SECURITIES**

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| ARSI 2006-W4; <u>see also</u> similar disclosures at ARSI 2006-M2 at 3, S-22 | **The Ratings of Your Securities May Be Lowered or Withdrawn Which May Adversely Affect the Liquidity or Market Value of Your Security**. . . .  It is a condition to the issuance of the securities that each series of securities be rated in one of the four highest rating categories by a nationally recognized statistical rating agency.  A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time.  No person is obligated to maintain the rating on any security, and accordingly, there can be no assurance to you that the ratings assigned to any security on the date on which the security is originally issued will not be lowered or withdrawn by a rating agency at any time thereafter.  The rating(s) of any series of securities by any applicable rating agency may be lowered following the initial issuance of the securities as a result of the downgrading of the obligations of any applicable credit support provider, or as a result of losses on the related mortgage loans in excess of the levels contemplated by the rating agency at the time of its initial rating analysis.  Neither the depositor, the master servicer nor any of their respective affiliates will have any obligation to replace or supplement any credit support, or to take any other action to maintain any rating(s) of any series of securities.  If any rating is revised or withdrawn, the liquidity or the market value of your security may be adversely affected.  (3)

**The Ratings on the Certificates Could Be Reduced or Withdrawn**. . . .  <u>Each rating agency rating the Class A and Mezzanine Certificates may change or withdraw its initial ratings at any time in the future</u> if, in its sole judgment, circumstances warrant a change.  A reduction in the claims paying ability of the PMI Insurer would likely result in a reduction in the ratings of the Class A and Mezzanine Certificates.  No person is obligated to maintain the ratings at their initial levels.  <u>If a rating agency reduces or withdraws its rating on one or more classes of the Class A or Mezzanine Certificates, the liquidity and market value of the affected certificates is likely to be reduced.</u>  (S-23) |
| BALTA 2006-4; <u>see also</u> similar disclosures at | A rating is not a recommendation to buy, sell or hold securities and either rating agency can revise or withdraw such ratings at any time.  In general, ratings address credit risk and do not address the likelihood of prepayments.  (S-29) |

APPENDIX A.5

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| BALTA 2006-7 at S-21; BSABS 2006-IM1 at S-12; NAA 2007-3 at S-11; SACO 2006-2 at S-14; SAMI 2006-AR7 at S-18; SAMI 2006-AR8 at S-19; MSST 2007-1 at S-13; see also similar disclosures at NCMT 2007-1 at S-9; RASC 2006-KS7 at S-15; RASC 2006-KS2 at S-18; BALTA 2006-4 at 126; BALTA 2006-7 at 130; CARR 2006-NC3 at S-16; IMM 2007-A at S-11, S-106; IMSA 2006-2 at S-11, S-149 | |
| BALTA 2006-4; see also similar disclosures at BALTA 2006-7 at S-32; BALTA 2006-4 at 8; BALTA 2006-7 at 8; IMSA 2006-2 at | **The Ratings on the Offered Certificates are Not a Recommendation to Buy, Sell or Hold the Offered Certificates and are Subject to Withdrawal at Any Time, Which May Affect the Liquidity or the Market Value of the Offered Certificates** . . . .  A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time.  No person is obligated to maintain the rating on any offered certificate, and, accordingly, there can be no assurance that the ratings assigned to any offered certificate on the date on which the offered certificates are initially issued will not be lowered or withdrawn by a rating agency at any time thereafter.  In the event any rating is revised or withdrawn, the |

APPENDIX A.5

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| S-22; IMSA 2007-3 at S-22; see also similar disclosures at IMM 2007-A at S-23 | liquidity or the market value of the related offered certificates may be adversely affected.  (S-42) |
| BALTA 2006-4; see also similar disclosures at BALTA 2006-7 at S-22 | The ratings of the Rating Agencies do not address the possibility that, as a result of principal prepayments or recoveries certificateholders might suffer a lower than anticipated yield. . . .  The ratings assigned to the Offered Certificates should be evaluated independently from similar ratings on other types of securities.  A rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the Rating Agencies.  (S-160) |
| BSABS 2006-IM1; see also similar disclosures at BSABS 2006-EC2 at S-21; BSABS 2006-HE8 at S-28; BSABS 2007-2 at S-26; MSST 2007-1 at S-22; NAA 2007-3 at S-25; NCMT 2007-1 at S-20; SACO 2006-2 at S-23; see also similar disclosures at CARR 2006-NC3 at S-28; CARR 2006-NC5 at S-28; CARR 2006-RFC1 at S-25; CARR 2007-FRE1 at S-28; RASC 2006-KS7 at S-21; RASC | The ratings by each of the rating agencies of the offered certificates are not recommendations to purchase, hold or sell the offered certificates because such ratings do not address the market prices of the certificates or suitability for a particular investor. . . .  The rating agencies may suspend, reduce or withdraw the ratings on the offered certificates at any time.  Any reduction in, or suspension or withdrawal of, the rating assigned to a class of offered certificates would probably reduce the market value of such class of offered certificates and may affect your ability to sell them.  (S-21) |

APPENDIX A.5

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| 2007-KS2 at S-25 | |
| BSABS 2006-IM1; see also similar disclosures at BSABS 2006-EC2 at 12–13; BSABS 2006-HE8 at 14–15; BSABS 2007-2 at 14–15 | **Ratings of the securities do not address all investment risks and must be viewed with caution**. . . .  Any class of securities issued under this prospectus and the accompanying prospectus supplement will be rated in one of the four highest rating categories of a nationally recognized rating agency.  A rating is based on the adequacy of the value of the trust fund assets and any credit enhancement for that class and reflects the rating agency's assessment of the likelihood that holders of the class of securities will receive the payments to which they are entitled.  A rating is not an assessment of the likelihood that principal prepayments on the underlying loans will be made, the degree to which the rate of prepayments might differ from that originally anticipated or the likelihood of an early termination of the securities.  You should not view a rating as a recommendation to purchase, hold or sell securities because it does not address the market price or suitability of the securities for any particular investor.<br><br>There is no assurance that any rating will remain in effect for any given period or that the rating agency will not lower or withdraw the rating in the future.  The rating agency could lower or withdraw its rating due to: • any decrease in the adequacy of the value of the trust fund assets or any related credit enhancement, or • an adverse change in the financial or other condition of a credit enhancement provider.  (12–13) |
| CARR 2006-NC3; see also similar disclosures at CARR 2006-NC5 at S-158; CARR 2006-RFC1 at S-164; CARR 2007-FRE1 at S-161; see also similar disclosures at JPMAC 2006-CW1 at S-124; JPMAC 2006-HE3 at S-127–S-128; JPMAC | The rating does not address the possibility that certificateholders might suffer a lower than anticipated yield due to non-credit events.  A securities rating addresses the likelihood of the receipt by the holders of the offered certificates of distributions on the mortgage loans.  The rating takes into consideration the structural, legal and tax aspects associated with the offered certificates.  The ratings on the offered certificates do not constitute statements regarding the possibility that the holders of the offered certificates might realize a lower than anticipated yield.  In addition, the ratings do not address the likelihood of the receipt of any amounts in respect of Prepayment Interest Shortfalls, Relief Act Shortfalls or Net WAC Rate Carryover Amounts.  A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization.  Each security rating should be evaluated independently of any other security rating.  In the event that the ratings initially assigned to the offered certificates are subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to the offered certificates.  (S-151) |

APPENDIX A.5

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| 2006-NC1 at S-119 | |
| CBASS 2007-CB6 | **Possible Reduction or Withdrawal of Ratings on the Offered Certificates**. . . .  Each rating agency rating the Offered Certificates may change or withdraw its initial ratings at any time in the future if, in its judgment, circumstances warrant a change.  No person is obligated to maintain the ratings at their initial levels.  If a rating agency reduces or withdraws its rating on one or more Classes of the Offered Certificates, the liquidity and market value of the affected Certificates is likely to be reduced.  (24) |
| JPALT 2007-A2; see also similar disclosures at LBMLT 2006-3 at S-9; JPALT 2006-A2 at S-2; JPALT 2006-A3 at S-2; JPALT 2006-A5 at S-2; JPALT 2006-A6 at S-2; JPALT 2006-A7 at S-2; JPALT 2007-A1 at S-3; JPMAC 2006-CW1 at S-2; JPMAC 2006-HE3 at S-2; JPMAC 2006-NC1 at S-2; JPMAC 2006-RM1 at S-2; JPMAC 2006-WMC2 at S-2; JPMAC 2006-WMC3 at S-2 | The ratings are not recommendations to buy, sell or hold these certificates.  A rating may be changed or withdrawn at any time by the assigning rating agency.  (S-4) |
| LBMLT 2006-3; see also similar | Each rating agency rating the offered certificates may change or withdraw its initial ratings at any time in the future if, in its judgment, circumstances warrant a change.  No person is obligated to maintain the ratings at |

APPENDIX A.5

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| disclosures at LBMLT 2006-4 at S-30;  LBMLT 2006-5 at S-28; LBMLT 2006-6 at S-28; LBMLT 2006-7 at S-31; LBMLT 2006-8 at S-31; LBMLT 2006-11 at S-30 | their initial levels.  If a rating agency reduces or withdraws its rating on one or more classes of the offered certificates, the liquidity and market value of the affected certificates is likely to be reduced.  (S-31) |
| SAMI 2006-AR7; see also similar disclosures at SAMI 2006-AR8 at S-22 | The ratings of the offered certificates by the rating agencies may be lowered following the initial issuance thereof as a result of losses on the mortgage loans in excess of the levels contemplated by the rating agencies at the time of their initial rating analysis.  Neither the depositor, the master servicer, the servicer, the securities administrator, the trustee nor any of their respective affiliates will have any obligation to replace or supplement any credit enhancement, or to take any other action to maintain the ratings of the offered certificates.  (S-20) |
| WMALT 2007-HY1; see also similar disclosures at WaMu 2006-AR7 at S-122; WMABS 2006-HE2 at S-127; WMABS 2007-HE2 at S-128–S-129; WMALT 2007-OC2 at S-89; WMHE 2007-HE2 at S-116–S-117 | A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating agency.  The rating assigned to each class of offered certificates by each rating agency is based on that rating agency's independent evaluation of that class of certificates.  The rating assigned to a class of offered certificates by one rating agency may not correspond to any rating assigned to that class by any other rating agency. . . .  The ratings assigned to this issue do not constitute a recommendation to purchase or sell these securities. . . .  The ratings on the offered certificates address the likelihood of the receipt by certificateholders of all distributions with respect to the underlying mortgage loans to which they are entitled. . . .  The depositor has not requested a rating on the offered certificates by any rating agency other than S&P and Moody's.  However, there can be no assurance as to whether any other rating agency will rate the offered certificates, or, if it does, what rating would be assigned by any other rating agency.  A rating on the offered certificates by another rating agency, if assigned at all, may be lower than the rating assigned to the offered certificates by S&P or Moody's.  (S-88) |

APPENDIX A.6

**THE OFFERING DOCUMENTS DISCLOSED THAT LOAN-TO-VALUE ("LTV") RATIOS MAY NOT BE A RELIABLE INDICATOR OF RATES OF DELINQUENCY, FORECLOSURE AND LOSS IN THE EVENT OF A DOWNTURN IN THE RESIDENTIAL REAL ESTATE MARKET AND, IN ANY EVENT, THE APPRAISALS ON WHICH THE LTV RATIOS WERE BASED REPRESENTED AN OPINION OF THE APPRAISER, AND THERE WAS NO GUARANTEE THAT THE VALUE OF THE MORTGAGED PROPERTY WOULD REMAIN WHAT IT WAS AT THE TIME OF ORIGINATION**

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| ARSI 2006-M2; see also similar disclosures at ARSI 2006-W4 at S-13 | **Certain Mortgage Loans Have High Loan-to-Value Ratios (in the Case of First Liens) or Combined Loan-to-Value Ratios (in the Case of Second Liens) Which May Present a Greater Risk of Loss Relating to Such Mortgage Loans**. . . .   Mortgage loans with a loan-to-value ratio or combined loan-to-value ratio of greater than 80.00% may present a greater risk of loss than mortgage loans with loan-to-value ratios or combined loan-to-value ratios of 80.00% or below. . . [A]pproximately 27.31% of the Group II Mortgage Loans, in each case by aggregate scheduled principal balance of the related loan group as of the Cut-off Date, had a loan-to-value ratio or combined loan-to-value ratio at origination in excess of 80.00% and are not covered by any borrower-paid primary mortgage insurance. . . .   An overall decline in the residential real estate market, a rise in interest rates over a period of time and the general condition of a mortgaged property, as well as other factors, may have the effect of reducing the value of such mortgaged property from the appraised value at the time the Mortgage Loan was originated.  If there is a reduction in value of the mortgaged property, the loan-to-value ratio or combined loan-to-value ratio may increase over what it was at the time of origination.  Such an increase may reduce the likelihood of liquidation or other proceeds being sufficient to satisfy the Mortgage Loan.  There can be no assurance that the loan-to-value ratio or combined loan-to-value ratio of any Mortgage Loan determined at any time after origination is less than or equal to its original loan-to-value ratio or combined loan-to-value ratio.  Additionally, the Originators' determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios or combined loan-to-value ratios of the Mortgage Loans may differ from the appraised value of such mortgaged property or the actual value of such mortgaged property.  (S-12) |
| BALTA 2006-4; see also similar disclosures at | **The Value of the Mortgage Loans May Be Affected By, Among Other Things, a Decline in Real Estate Values, Which May Result in Losses on the Offered Certificates**. . . .   No assurance can be given that values of the mortgaged properties have remained or will remain at their levels on the dates of origination of |

APPENDIX A.6

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| BALTA 2006-7 at S-31–S-32, S-55; SAMI 2006-AR7 at S-27, S-44, SAMI 2006-AR8 at S-29, S-47 | the related mortgage loans.  If the residential real estate market should experience an overall decline in property values so that the outstanding balances of the mortgage loans, and any secondary financing on the mortgaged properties, in the mortgage pool become equal to or greater than the value of the mortgaged properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry. . . .   In particular, mortgage loans with high principal balances or high loan-to-value ratios will be affected by any decline in real estate values.  Real estate values in any area of the country may be affected by several factors, including population trends, mortgage interest rates, and the economic well-being of that area.  Any decrease in the value of the mortgage loans may result in the allocation of losses which are not covered by credit enhancement to the offered certificates.  (S-42)

No assurance can be given that the value of any mortgaged property has remained or will remain at the level that existed on the appraisal or sales date.  If residential real estate values generally or in a particular geographic area decline, the Loan-to-Value Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to the mortgage loans.  (S-63) |
| BSABS 2006-EC2; see also similar disclosures at BSABS 2007-2 at S-22, S-33, 143; BSABS 2006-IM1 at S-19, 137; BSABS 2006-HE8 at S-39; 142 | With respect to a mortgage loan the proceeds of which were used to refinance an existing mortgage loan, the collateral value is the appraised value of the mortgaged property based upon the appraisal obtained at the time of refinancing.  No assurance can be given that the values of the mortgaged properties have remained or will remain at their levels as of the dates of origination of the mortgage loans.  (S-28–S29)

No assurance can be given that values of any properties have remained or will remain at their levels on the respective dates of origination of the related loans.  If residential real estate markets should experience an overall decline in property values such that the principal balances of the loans in a particular trust fund and any secondary financing on the related properties become equal to or greater than the value of those properties, the rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry.  In addition[], adverse economic conditions (which may or may not affect real property values) may affect the timely payment by borrowers of scheduled payments of principal of and interest on the loans and, accordingly, the rates of delinquencies, foreclosures and losses with respect to any trust fund.  (129–30) |
| BSABS 2006-HE8 | [T]here can be no assurance that the value of a mortgaged property estimated in an appraisal or review is equal |

APPENDIX A.6

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| see also similar disclosures at BSABS 2006-IM1 at S-30; BSABS 2007-2 at S-33 | to the actual value of that mortgaged property at the time of that appraisal or review.  (S-49) |
| CARR 2006-NC3; see also similar disclosures at CARR 2006-NC5 at S-19, S-21; CARR 2006-RFC1 at S-17, S-19–S-20; CARR 2007-FRE1 at S-19, S-21 | Losses on the mortgage loans may occur due to wide variety of causes including . . . a decline in real estate values and adverse changes in the borrower's financial condition.  A decline in real estate values or economic conditions nationally or in the regions where the mortgaged properties are located may increase the risk of realized losses on the mortgage loans.  (S-19)  **Mortgage loans with high loan-to-value ratios leave the related borrower with little or no equity in the related mortgaged property, which may result in losses with respect to these mortgage loans**. . . .  An overall decline in the residential real estate market rise in interest rates over period of time and the condition of mortgaged property, as well as other factors, may have the effect of reducing the value of the mortgaged property from the appraised value at the time the mortgage loan was originated and, therefore, increasing the loan-to-value ratio (or combined loan-to-value ratio in the ease of second lien mortgage loan) of the related mortgage loan.  An increase of this kind may reduce the likelihood of liquidation or other proceeds being sufficient to satisfy the mortgage loan, and any losses to the extent not covered by the credit enhancement may affect the yield to maturity of your certificates.  There can be no assurance that the value of mortgaged property estimated in any appraisal or review is equal to the actual value of that mortgaged property at the time of that appraisal or review.  In addition in determining loan-to-value ratios for certain mortgage loans, the value of the related mortgaged property may be based on an appraisal that is up to 36 months old if there is supporting brokers price opinion, automated valuation, drive-by appraisal or other certification of value.  If such an appraisal does not reflect current market values and such market values have declined, the likelihood that proceeds from sale of the mortgaged property may be insufficient to repay the mortgage loan is increased.  Investors should note that the values of the mortgaged properties may be insufficient to cover the outstanding principal balance of the mortgage loans.  There can be no assurance that the loan-to-value ratio (or combined loan-to-value ratio in the case of second lien mortgage loan) of any mortgage loan determined at any time after origination is less than or equal to its loan-to-value ratio (or combined loan-to-value ratio in the case of |

APPENDIX A.6

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | second lien mortgage loan) at origination.  (S-21) |
| CBASS 2007-CB6 | **There are Risks Relating to the Nature of the Mortgage Loans**. . . .Mortgagors may have obtained, either at the time of origination or subsequent thereto, additional financing which is subordinate to such Mortgage Loan, which subordinate financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the loan-to-value ratio set forth herein. . . .No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans.  (11)

**There are risks relating to high loan-to-value ratios**. . . .With respect to those Mortgage Loans with a loan-to-value ratio or combined loan-to-value ratio exceeding 100.00% at origination, either the Seller obtained prior to the Closing Date a current appraisal, broker's price opinion, automated valuation methodology price ("**AVM**") and/or drive-by or desk review of such property or any combination thereof or as a result of principal payments on the mortgage loan since origination, the Seller determined that no such Mortgage Loans had a loan-to-value ratio or combined loan-to-value ratio exceeding 100.00% as of the Cut-off Date. . . . <u>Mortgage loans with high combined loan-to-value ratios, in particular those Mortgage Loans with combined loan-to-value ratios in excess of 100.00%, will be more sensitive to declining property values than those Mortgage Loans with lower combined loan-to-value ratios and may present a greater risk of loss</u>.  In addition, these Mortgage Loans are more likely to be charged-off as bad debt if the borrower defaults.  The combined loan-to-value ratio of any Mortgage Loan that is a second lien Mortgage Loan is calculated based on the aggregate principal balance of such second lien Mortgage Loan and any senior lien Mortgage Loan.  An overall decline in the residential real estate market, a rise in interest rates over a period of time and the condition of a mortgaged property, as well as other factors, may have the effect of reducing the value of the mortgaged property from the appraised value at the time the Mortgage Loan was originated.  (12–13) |
| IMSA 2006-2; <u>see also</u> IMSA 2007-3 at S-17; <u>see also</u> similar disclosures at IMM 2007-A at S-18 | **The Value of the Mortgage Loans May Be Affected by, Among Other Things, a Decline in Real Estate Values and Changes in the Borrowers' Financial Condition, Which May Cause Losses or Shortfalls to be Incurred on the Offered Certificates**. . . .<u>No assurance can be given that values of the mortgaged properties have remained or will remain at their levels as of the dates of origination of the related mortgage loans.  If the residential real estate market should experience an overall decline in property values so that the outstanding balances of the mortgage loans, and any secondary financing on the mortgaged properties,</u> |

APPENDIX A.6

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | become equal to or greater than the value of the mortgaged properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry.  A decline in property values is more likely to result in losses on mortgage loans with high loan-to-value ratios.  Such losses will be allocated to the offered certificates to the extent not covered by credit enhancement.  (S-17–S-18) |
| INDX 2006-AR29 | To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession Appraisal Practice.  The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value using a Fannie Mae∕Freddie Mac appraisal report form, or other acceptable form.  (S-46) |
| JPALT 2007-A2; see also similar disclosures at JPALT 2006-A3 at S-20, S-31; JPALT 2006-A5 at S-18, S-31; JPALT 2006-A2 at S-22; JPALT 2006-A6 at S-18; JPALT 2006-A7 at S-18; JPALT 2007-A1 at S-26 | No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date.  If residential real estate values generally or in a particular geographic area decline, the Loan-to-Value Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to such Mortgage Loans.  (S-29)<br><br>Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.  The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms.  Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment.  In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter.  (S-44) |
| JPMAC 2006-CW1; see also similar disclosures at JPMAC 2006-HE3 at S-17–S-18, S-26, 22; JPMAC 2006-NC1 at S-17, S-24, 27; | There are several factors that could adversely affect the value of a mortgaged property and cause the outstanding balance of the related mortgage loan, together with any senior financing, to equal or exceed the value of that mortgaged property.  Among the factors that could adversely affect the value of a mortgaged property are:<br>• an overall decline in the residential real estate market in the areas in which the mortgaged properties are located. . . .  If a decline in the value of the mortgaged properties occurs, the actual rates of delinquencies, foreclosure and losses on the mortgage loans could be higher than those currently experienced in the mortgage |

APPENDIX A.6

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| JPMAC 2006-RM1 at S-17, S-24–S-25, 22; JPMAC 2006-WMC2 at S-17–S-18,  S-24–S-25, 18; JPMAC 2006-WMC3 at S-17–S-18, S-24–S-25, 22 | lending industry in general and you could suffer a loss.  (S-16)<br><br>No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date.  If residential real estate values overall or in a particular geographic area decline, the LTVs might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur on the Mortgage Loans.  (S-23)<br><br>No assurance can be given that values of the Properties have remained or will remain at their levels on the dates of origination of the related loans.  If the residential real estate market should experience anoverall decline in property values such that the outstanding principal balances of the loans, and any secondary financing on the Properties, in a particular pool become equal to or greater than the value of the Properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry.  In addition, adverse economic conditions and other factors (which may or may not affect real property values) may affect the timely payment by borrowers of scheduled payments of principal and interest on the loans and, accordingly, the actual rates of delinquencies, foreclosures and losses with respect to any pool.  To the extent that the losses are not covered by subordination provisions or lternative arrangements, the losses will be borne, at least in part, by the holders of the securities of the related series.  (22) |
| LBMLT 2006-3; see also similar disclosures at LBMLT 2006-4 at S-26, 26; LBMLT 2006-5 at S-25, 26; LBMLT 2006-6 at S-25, 28; LBMLT 2006-7 at S-27, 28; LBMLT 2006-8 at S-27, 28; LBMLT | Mortgage loans with higher loan-to-value ratios may present a greater risk of loss than mortgage loans with loan-to-value ratios of 80% or below.  Approximately 24.19% of the Group I mortgage loans and approximately 24.25% of the Group II mortgage loans (in each case by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the cut-off date) had loan-to-value ratios at origination (or combined loan-to-value ratio in the case of second lien mortgage loans) in excess of 80%, but no more than 100%.  Additionally, the originator's determination of the value of a mortgaged property used in the calculation of the loan-to-values ratios of the mortgage loans may differ from the appraised value of such mortgaged properties or the actual value of such mortgaged properties.  (S-27)<br><br>The underwriting standards are applied by the originators to primarily evaluate the mortgagor's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  As a result of this |

APPENDIX A.6

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| 2006-11 at S-26, 28 | underwriting criteria, changes in the values of mortgage properties may have a greater effect on the delinquency, foreclosure and loss experience on the mortgage loans in a trust fund than these changes would be expected to have on mortgage loans that are originated in a more traditional manner.  No assurance can be given by the depositor that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans.  (22) |
| MSST 2007-1 | **Recent developments in the residential mortgage market may adversely affect the market value of your securities.** . . .  Recently, the residential mortgage market in the United States has experienced a variety of difficulties and changed economic conditions that may adversely affect the performance and market value of your securities.  Delinquencies and losses with respect to residential mortgage loans generally have increased in recent months, and may continue to increase, particularly in the subprime sector.  In addition, in recent months housing prices and appraisal values in many states have declined or stopped appreciating, after extended periods of significant appreciation.  A continued decline or an extended flattening of those values may result in additional increases in delinquencies and losses on residential mortgage loans generally, particularly with respect to second homes and investor properties and with respect to any residential mortgage loans whose aggregate loan amounts (including any subordinate liens) are close to or greater than the related property values.  (S-28–S-29)<br><br>*Loan-to-Value Ratio or Combined Loan-to-Value Ratio.*  With respect to any mortgage loan secured by a first lien, the loan-to-value ratio of a mortgage loan is equal to the principal balance of such mortgage loan at the date of origination, divided by the collateral value of the related mortgaged property.  With respect to any mortgage loan secured by a second lien, the combined loan-to-value ratio is equal to the principal balance of the mortgage loan plus the principal balance of any related senior mortgage loan at the date of origination, divided by the collateral value of the related mortgaged property. . . .  With respect to a mortgage loan the proceeds of which were used to refinance an existing mortgage loan, the collateral value is the appraised value of the mortgaged property based upon the appraisal obtained at the time of refinancing.  No assurance can be given that the values of the mortgaged properties have remained or will remain at their levels as of the dates of origination of the mortgage loans.  (S-31–S-32) |
| NAA 2007-3 | **Developments in specified states could have a disproportionate effect on the Mortgage Loans due to geographic concentration of mortgaged properties**. . . . |

APPENDIX A.6

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| | • declines in the residential real estate market in the specified states may reduce the values of properties located in those states, which would result in an increase in the related loan-to-value ratios;<br>• any increase in the market value of properties located in the specified states would reduce the loan-to-value ratios and could, therefore, make alternative sources of financing available to the borrowers at lower interest rates, which could result in an increased rate of prepayment of the Mortgage Loans. (S-26–S-27)<br><br>**High loan-to-value ratios increase risk of loss**. . . .  The determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios of the Mortgage Loans may differ from the appraised value of such mortgaged properties for Mortgage Loans obtained for the purpose of acquiring the related mortgaged property because loan-to-value ratios for those Mortgage Loans are determined based upon the lesser of the selling price of the mortgaged property or its appraised value at the time of sale.  (S27–S-28) |
| NCMT 2007-1 | **The value of the mortgage loans may be affected by, among other things, a decline in real estate values, which may result in losses on the offered notes**. . . .No assurance can be given that values of the mortgaged properties have remained or will remain at their levels on the dates of origination of the related mortgage loans.  If the residential real estate market should experience an overall decline in property values so that the outstanding balances of the mortgage loans, and any secondary financing on the mortgaged properties, in the mortgage pool become equal to or greater than the value of the mortgaged properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry.  In some areas of the United States, real estate values have risen at a greater rate in recent years than in the past.  In particular, mortgage loans with high principal balances or high loan-to-value ratios will be affected by any decline in real estate values.  Real estate values in any area of the country may be affected by several factors, including population trends, mortgage interest rates, and the economic well-being of that area.  Any decrease in the value of the mortgage loans may result in the allocation of losses which are not covered by credit enhancement to the offered notes.  (S-27–S-28) |
| RASC 2006-KS7; see also similar disclosures at RASC 2007-KS2 at S-20, | **The return on your certificates may be affected by losses on the mortgage loans, which could occur due to a variety of causes**. . . .  Losses on the mortgage loans may occur due to a wide variety of causes, including a decline in real estate values and adverse changes in the borrowers financial condition.  A decline in real estate values or economic conditions nationally or in the regions where the mortgaged properties are located |

## APPENDIX A.6

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| 10 | may increase the risk of losses on the mortgage loans.  (S-17)<br><br>In the case of some mortgage loans seasoned for over twelve months, the LTV ratio may be determined at the time of purchase from the related seller based on the ratio of the current loan amount to the current value of the mortgaged property.  Appraised values may be determined by either:<br>• a statistical analysis;<br>• a broker's price opinion; or<br>• an automated valuation, drive-by appraisal or other certification of value.  (10) |
| SACO 2006-2 | *Combined Loan-to-Value Ratio.*  With respect to any mortgage loan secured by a second lien, the combined loan-to-value ratio is equal to the principal balance of the mortgage loan plus the principal balance of any related senior mortgage loan at the date of origination, divided by the collateral value of the related mortgaged property. . . .  With respect to a mortgage loan the proceeds of which were used to refinance an existing mortgage loan, the collateral value is the appraised value of the mortgaged property based upon the appraisal obtained at the time of refinancing.  No assurance can be given that the values of the mortgaged properties have remained or will remain at their levels as of the dates of origination of the related mortgage loans.  (S-29)<br><br>Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.  The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms.  Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment.  In addition, each appraisal is reviewed for accuracy and consistency by the Originator's vendor management company or an underwriter of the Originator or a mortgage insurance company contract underwriter.  (S-35–S-36) |
| SAMI 2006-AR7; see also similar disclosures at SAMI 2006-AR8 at 19 | Notwithstanding the foregoing, Loan-to-Value Ratios will not necessarily provide an accurate measure of the risk of liquidation loss in a pool of mortgage loans.  For example, the value of a mortgaged property as of the date of initial issuance of the related series of securities may be less than the Value determined at loan origination, and will likely continue to fluctuate from time to time based upon changes in economic conditions and the real estate market.  (19) |

APPENDIX A.6

| PROSPECTUS OR PROSPECTUS SUPPLEMENT | RELEVANT DISCLOSURES AND PAGE CITATIONS |
|---|---|
| WAMU 2006-AR7; <u>see also</u> similar disclosures at WMALT 2007-HY1 at S-26; WMALT 2007-OC2 at S-27–S-28 | Appraisers may be staff appraisers employed by the sponsor or independent appraisers selected in accordance with the pre-established appraisal guidelines.  Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed.  <u>However, in the case of mortgage loans underwritten through the sponsor's automated underwriting system, an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties</u>.  In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property.  (S-39 ) |
| WMABS 2006-HE2 | **Mortgages with High Loan-to-Value Ratios May have a Greater Risk of Loss**. . . .  Mortgage loans with higher loan-to-value ratios may present a greater risk of loss than mortgage loans with loan-to value ratios of 80% or below.  Approximately 30.4% of the mortgage loans (by aggregate scheduled principal balance as of the cut-off date) had loan-to-value ratios at origination (or combined loan-to-value ratio in the case of second lien mortgage loans) in excess of 80%, but no more than 100%.  Additionally, the originator's determination of the value of a mortgaged property used in the calculation of the loan-to-values ratios of the mortgage loans may differ from the appraised value of such mortgaged properties or the actual value of such mortgaged properties.  (S-26) |
| WMHE 2007-HE2 | Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of sub-prime mortgage loans than on mortgage loans underwritten in accordance with Fannie Mae and Freddie Mac standards.  No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans.  (S-10) |