# Exhibit 3

1

2          UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------X
     DEXIA SA/NV, DEXIA HOLDINGS, INC.,
5    FSA ASSET MANAGEMENT LLC and
     DEXIA CREDIT LOCAL SA,
6                                    ECF Case
                Plaintiffs,
7                    No. 12-cv-4761 (JSR)
          VS.
8
     BEAR STEARNS & CO. INC., THE
9    BEAR STEARNS COMPANIES, INC.,
     BEAR STEARNS ASSET BACKED
10   SECURITIES I LLC, EMC MORTGAGE
     LLC (f/k/a EMC MORTGAGE
11   CORPORATION), STRUCTURED ASSET
     MORTGAGE INVESTMENTS II INC.,
12   J.P. MORGAN MORTGAGE ACQUISITION
     CORPORATION, J.P. MORGAN
13   SECURITIES LLC (f/k/a JPMORGAN
     SECURITIES INC.), WAMU ASSET
14   ACCEPTANCE CORP., WAMU CAPITAL
     CORP., WAMU MORTGAGE SECURITIES
15   CORP., JPMORGAN CHASE & CO. and
     JPMORGAN CHASE BANK, N.A.,
16
                Defendants.
17   ------------------------------X

18

19        VIDEOTAPED DEPOSITION OF

20        JONATHAN M. PETERSON

21      Thursday, November 8, 2012

22        825 Eighth Avenue

23        New York, New York

24
     Reported by:  AYLETTE GONZALEZ, CLR
25   JOB NO. 55367

**Intentionally Left Blank**

```
 1                 J. PETERSON-11/8/12
 2   employees.
 3         Q.    So, FSA Asset Management LLC, how
 4   would you refer to that colloquially during
 5   your time?
 6         A.    FSAM.
 7         Q.    And I'll also try to use that
 8   terminology.  One thing just for the
 9   deposition is, just for the Court Reporter's
10   benefit, you have to make sure you let me
11   finish asking my question before you start
12   your answer.  And then I will do the same
13   before I start my next question.
14         A.    I will try to do that.
15         Q.    Okay.  What is your current job
16   title?
17         A.    Associate General Counsel.
18         Q.    And can you give me a brief
19   description of your educational background?
20         A.    BA from University of Virginia 1983
21   and a Juris Doctor from University of Virginia
22   Law School 1986.
23         Q.    And can you just briefly describe
24   for me your work history since college?
25         A.    Since college or since law school?
```

1                    J. PETERSON-11/8/12

2          Q.    Let's go from law school?

3          A.    From law school, I joined the law

4     firm in New York Richards & O'Neil in 1986.

5     That firm was essentially acquired by a law

6     firm then known as Bingham Dana in 2001.  I

7     stayed at Bingham Dana until 2003.  It had

8     already changed its name to Bingham McCutchen

9     and then in 2003 FSA, Inc., which is what you

10    referred to as Financial Security Assurance,

11    Inc.

12         Q.    Can you explain for me the various

13    positions you've held at FSA, Inc. since you

14    joined in 2003 and the basic responsibilities

15    you had in those positions?

16         A.    From 2003 to some point in 2005, I

17    was Assistant General Counsel and thereafter,

18    I was Associate General Counsel.  And in all

19    cases, my responsibilities were to provide

20    legal advice and services to the financial

21    products unit of the financial security

22    assurance holdings limited group.

23               I was dedicated to that group and

24    did not provide legal services to the other

25    businesses of Financial Security Assurance

1                    J. PETERSON-11/8/12

2     Holdings Limited.

3          Q.   So, your role was to support the

4     financial products division under FSAH; is

5     that right?

6          A.   Correct.

7          Q.   And you did not support the

8     insurance arm of FSAH; is that right?

9          A.   That's correct.

10          Q.   And you said that your primary

11     responsibility was to provide legal support to

12     the financial product division, right?

13          A.   Correct.

14          Q.   Did you perform any non-legal work

15     for that entity?

16          A.   I would say no.  I mean, it's a --

17     you're working on a business transaction with

18     parties who have business responsibilities.

19     I'm providing legal advice.  That's all in the

20     same transaction, but my role was to provide

21     legal support, legal advice.

22          Q.   Are you responsible for overseeing

23     this current litigation in your current role?

24          A.   Yes.  Among others, yes.

25          Q.   Okay.  Who else is involved for

1                    J. PETERSON-11/8/12

2    overseeing the prosecution of this case?

3         A.   I'm the primary legal person to

4    oversee it.  In addition, the General Counsel

5    of Dexia Credit Local, New York branch is

6    Francine Marks.  And the General Counsel of

7    the Dexia Group, which we refer to as Dexia SA

8    is Johan Bohets.

9              And so, collectively, we have

10   responsibilities for overseeing the

11   litigation, but I would characterize myself as

12   the primary person directly responsible.

13        Q.   You're the day-to-day responsible?

14        A.   Correct.

15        Q.   During your role at the various

16   Dexia entities, you've worked on fairly

17   complicated transactions; is that right?

18              MR. DeLANGE:  Object to the form.

19        You can answer.

20        A.   Certain transactions, yes, are

21   going to be more complicated than others.

22        Q.   Understood.  I want to get a sense

23   of, kind of, your investment expertise or your

24   financial expertise.

25              And just at a very basic level, do

**Intentionally Left Blank**

1            J. PETERSON-11/8/12

2            MR. DeLANGE:  Object to the form

3       of the question.  Maybe you could

4       explain or define what you mean by

5       Dexia.

6       A.   Dexia, in the U.S., did not analyze

7  investments for other parties.

8            If your question is did they

9  provide advice to third parties, that might

10  have happened in some of their -- their

11  businesses described in that earlier annual

12  report.

13       Q.   My question is actually exactly as

14  I put it to you, which is:  Dexia employed

15  people with expertise in making investments

16  and managing money?

17            MR. DeLANGE:  Object to the form

18       of the question.

19       Q.   That's correct right?

20       A.   Which Dexia entity.

21       Q.   Dexia SA, and all of the

22  subsidiaries?

23       A.   So, of the 36,000 employees it is

24  possible, and I believe probably, that there

25  were some employees in some jurisdictions, in

1                    J. PETERSON-11/8/12

2     some subsidiaries that would qualify as a

3     financial analyst as you've just described.

4          Q.   So, the best you can say is that

5     that's probable?

6               MR. DeLANGE:  Object to the form

7          of the question.  Argumentative.  He

8          answered the question.

9          Q.   They employed financial analysts,

10    right?

11         A.   As I just said, it depends on the

12    subsidiary.  You can't say "they" and say the

13    U.S. entities employed people who managed

14    money for other people because that's not

15    accurate, but based on the general statement,

16    yes.

17         Q.   Dexia SA, through its subsidiaries,

18    also employed individuals who had experts on

19    mortgage loans, correct?

20              MR. DeLANGE:  Object to the form

21         of the question.

22         A.   Which aspect of mortgage loans;

23    origination, securitization, insurance?

24         Q.   All of the above.

25         A.   I don't know if you would consider

1                    J. PETERSON-11/8/12

2    them experts in origination, but they did

3    provide insurance for mortgage loans, which

4    included assurance of securitizations,

5    transactions of certain tranches, and in the

6    U.S.

7         Q.   So, in the U.S. Dexia, through its

8    subsidiaries, actually provided hundreds of

9    billions of dollars of insurance or insurance

10   on hundreds of billions of dollars of assets;

11   is that right?

12        A.   It provided insurance, I believe

13   hundreds of billions is -- if you go based on

14   the par amount is probably accurate, but, yes.

15        Q.   And of that, billions of dollars of

16   residential mortgage-backed securities?

17        A.   I believe the billions is probably

18   correct.

19        Q.   What were Dexia's total assets as

20   of December 31, 2008; do you know?

21        A.   I do not know.

22        Q.   If you turn to the 2008 report at

23   page 4 and you go to the second page or -- I'm

24   sorry; not the second page, the second column

25   of page 4, and it says, "the retail and

1                    J. PETERSON-11/8/12

2    commercial banking".

3                    Do you see that?

4         A.   Yes.

5         Q.   And the second paragraph, the

6    second sentence, it says, "Dexia Asset

7    Management had 79 billion Euros of assets

8    under management as of December 31, 2008?

9         A.   Yes, I see that.

10         Q.   And then the very last sentence

11    says, "Total assets under custody amounted to

12    U.S. $1.9 trillion as of December 31, 2008"?

13         A.   Yes, I do see that.

14         Q.   Do you believe those statements to

15    be accurate?

16         A.   I have reason to believe they're

17    accurate as they appear in the Dexia annual

18    report.

19         Q.   So, in the 2006, 2007, 2008 time

20    period, would you consider Dexia, and its

21    subsidiaries, to be a sophisticated financial

22    institution?

23                    MR. DeLANGE:   Object to the form

24         of the question.

25         A.   I think it depends on the area of

1                    J. PETERSON-11/8/12

2    business in which it participates, whether

3    it's sophisticated and its sophistication

4    depends on receiving accurate information as

5    well and whether the information received is

6    accurate and they can apply their

7    sophistication.

8         Q.    But to answer my question:  In the

9    areas of which Dexia operated, would you

10   consider Dexia and its subsidiaries to be a

11   sophisticated financial institution?

12             MR. DeLANGE:  Object to the form

13        of the question.  Asked and answered.

14        A.    Yes, in the areas that it operated

15   in.

16        Q.    It was a major bank, right?

17             MR. DeLANGE:  Object to the form

18        of the question.

19        A.    A major bank in its jurisdiction

20   that it operated as a bank.  It did not

21   operate as a bank in all jurisdictions, but

22   yes.

23        Q.    So, if you turn back to the

24   organizational chart, which I think is

25   Exhibit 2 --

1                    J. PETERSON-11/8/12

2        A.   This thing here?

3        Q.   Yes.  It should have a sticker that

4   says "Exhibit 2".

5        A.   Yes, not this.

6        Q.   Below Dexia SA, there is a Dexia

7   Credit Local entity?

8        A.   Correct.

9        Q.   What is that -- what was that

10  subsidiary?

11       A.   It is a banking institution

12  organized in France.

13       Q.   And does it -- did you refer to

14  that colloquially as DCL?

15       A.   Yes.

16       Q.   Does DCL have a New York branch?

17       A.   Yes.

18       Q.   Generally, can you explain to me

19  the types of activities that DCL would be

20  involved in in this New York branch?  What did

21  its New York branch do for its business?

22       A.   Currently or previously?

23       Q.   Let's focus on the 2006, 2007 time

24  period.

25       A.   I believe a large portion of its

```
 1                    J. PETERSON-11/8/12
 2    business was to provide Standby Bond Purchase
 3    Agreements in financing to project finance
 4    transactions.  It also provided related
 5    interest rate derivative or other derivative
 6    products.
 7         Q.   How many employees were generally
 8    employed by DCL N.Y.?
 9         A.   Again, in what period?
10         Q.   2006, 2007.
11         A.   I don't have the -- I don't know
12    the exact number.  I would say it would be
13    fewer than 200, but that's an approximation.
14         Q.   And in the next entity on the org
15    chart going down is Dexia Holdings, Inc.  You
16    see that?
17         A.   Yes.
18         Q.   What is Dexia Holdings, Inc.?
19         A.   It is a holding company.  It does
20    not have a business -- active business and
21    does not have employees.
22         Q.   It's organized in Delaware?
23         A.   Yes.
24         Q.   And it owns 99.74 percent of
25    financial security assurance holdings as of
```

1                   J. PETERSON-11/8/12

2    March 31, 2007; is that right?

3         A.   It did approximately own that

4    amount as of that date, yes.

5         Q.   Who owned the remaining percentage?

6         A.   I believe it was directors --

7    certain directors of Financial Security

8    Assurance Holdings, Ltd.

9         Q.   Now, FSAH, is that company still in

10   existence?

11        A.   Yes, under a different name.

12        Q.   And it's new name is?

13        A.   I believe, since it's not part of

14   the Dexia Group now, I believe it's Assured

15   Guarantee Municipal Holdings, Inc.

16        Q.   SO, FSAH was sold to a company

17   named Assured?

18        A.   It was sold to Assured Guarantee,

19   Ltd., correct?

20        Q.   But certain aspects of FSAH were

21   not transferred to Assured; is that right?

22        A.   Correct.

23        Q.   And certain of those subsidiaries

24   remain at Dexia, correct?

25        A.   Within the Dexia Group, yes,

1                J. PETERSON-11/8/12

2    correct.

3         Q.   And can you identify for me which

4    of the entities remain in the Dexia Group?

5         A.   From this chart?

6         Q.   Just generally, from your

7    knowledge.

8         A.   On this chart, it would be the

9    companies -- there were three companies on the

10   tier below FSA Holdings, Ltd.  Those companies

11   are told FSA Asset Management, LLC, which

12   we're referring to as FSAM.  FSA Capital

13   Management Services LLC and FSA Capital

14   Markets Services LLC, in addition to

15   subsidiary of FSAM called FSA Portfolio Asset

16   Limited.

17        Q.   In addition to those companies on

18   this chart, are there other subsidiaries that

19   remain with Dexia post the sale of FSAH to

20   Assured?

21        A.   I don't believe they are qualified

22   as a subsidiary.  They could be qualified

23   potentially as an affiliate, but there was a

24   company called FSA Global Funding Limited and

25   there's an interest in a funding -- a business

1                    J. PETERSON-11/8/12

2    called or a company called Cypress Point

3    Limited.

4         Q.    What are those entities?

5         A.    They are -- FSA Global Funding

6    Limited is based in the Cayman Islands and

7    provides or did provide a medium term note

8    business where it offered medium term notes to

9    investors, among other things.

10        Q.    And does it still conduct that

11   business today?

12        A.    It is essentially a runoff.  All of

13   these businesses that I just mentioned are

14   effectively in runoff.

15        Q.    What do you mean by runoff?

16        A.    They're not issuing new borrowings

17   or borrowing new funds; they are

18   administrating the existing liabilities,

19   paying the amounts as they come due, doing

20   relating hedging transactions that have to be

21   balanced from time to time.  Seeking to

22   terminate transactions when they can, either

23   in response to an investor or a customer's

24   request.  But it's no new business.

25        Q.    What is the ultimate intent for

**Intentionally Left Blank**

1                     J. PETERSON-11/8/12

2    to list as his contact information the Counsel

3    for the company, and he said yes.

4         Q.   So, you asked him whether you could

5    list Bernstein Litowitz as his contact

6    information and he said yes?

7         A.   Yes.

8         Q.   Does, to your knowledge, Bernstein

9    Litowitz represent him in connection with this

10   litigation?

11        A.   To my knowledge if, he is called to

12   testify Bernstein Litowitz would represent

13   him.

14        Q.   I'm sorry; I forgot ask with

15   Russell Brewer, have you spoken with Russell

16   Brewer recently?

17        A.   I believe the last time I spoke

18   with him personally was July 2011, maybe May,

19   June 2011.

20        Q.   What did you speak with him about

21   then?

22        A.   The divestment of the entire RMBS

23   portfolio of FSAM which could only be

24   accomplished in certain -- in certain --

25   compliance with certain documents that arose

1                    J. PETERSON-11/8/12

2    from the Assured transaction.  And so we had a

3    meeting at Assured that included Russell

4    Brewer.

5         Q.   So, let me unpack that a little

6    bit.  Why don't you explain what you mean by

7    that?  There was a meeting at Assured.  What

8    precipitated that meeting?

9         A.   The Dexia Group decided, in

10   approximately May 2011 to sell the RMBS

11   portfolio of FSAM.  FSAM could not simply just

12   transfer those assets to third parties.  Those

13   transfers were highly limited in a series of

14   documents arising from the separation of the

15   FP unit from FSA that closed on July 1st,

16   2009.

17             The way in which those transfers

18   would happen would be a call option would be

19   exercised by DCL New York, where DCL New York

20   would call the asset from FSAM.  FSAM would

21   deliver the asset, which was defined to be the

22   transfer of all right, title and interest in

23   the asset to DCL New York.

24        Q.   And then, I'm sorry, and you were

25   explaining how this meeting came about?

1                    J. PETERSON-11/8/12

2         A.    The meeting came about because

3    Dexia performed, having effectively billions

4    of dollars moving, wanted to alert Assured and

5    did not want Assured to object to what was

6    going to be happening.  And so, there was a

7    meeting held to discuss the -- how this series

8    of transfers that collectively would result in

9    the divestment of the RMBS portfolio would

10   function within the constraints of the

11   transaction documents between Dexia and

12   Assured.

13        Q.    If Assured had chosen to, could

14   they have prevented the transfer?

15        A.    They could not prevent the transfer

16   if the call settlement amount was the

17   outstanding principal amount of the RMBS

18   assets, plus accrued interest plus any

19   shortfalls that hadn't been paid.

20        Q.    So, in other words, Assured could

21   not prevents the transaction so long as FSAM

22   was made whole, correct?

23             MR. DeLANGE:  Object to the form

24        of the question.

25        A.    FSAM would not be made whole as

1                    J. PETERSON-11/8/12

2    long as the transfer was in compliance with

3    the Guaranteed Put Contract.  There was no

4    consent required from Assured under the

5    existing documents.

6         Q.    I'm not sure I understand that.

7         A.    FSAM was damaged because it bought

8    these RMBS securities and the amount it paid

9    on the purchase date was not the true value of

10   the certificates because information was not

11   provided to the purchaser as -- as it should

12   have been.  You said, "made whole".  I don't

13   know what you meant by "made whole".

14        Q.    Let me be more precise then.

15   Assured could not prevents the transaction

16   from happening so long as FSAM received the

17   par value of the instrument and any shortfall

18   in payments that had happened during the time

19   it held the instrument, correct?

20        A.    You also have to look at the entire

21   portfolio.  The entire portfolio could not be

22   transferred unless par amount had been put

23   into FSAM under the existing documents because

24   at some point, you would reach -- you would

25   reach a situation where you cannot transfer an

1                    J. PETERSON-11/8/12

2    asset out of FSAM if it would cause a

3    collateral posting to be acquired from Dexia.

4              And because the entire portfolio

5    was transferred, there was no way that you

6    could have the -- anything other than the --

7    the assets coming out at their outstanding

8    principal amount.  And because all of these

9    assets would be transferring, because Assured

10   was very aware of the collateral posting

11   obligation that was coming due on

12   September 29, 2011, Dexia wanted to disclose

13   the intent of this overall transaction with

14   Assured to make sure they didn't unexpectedly

15   seek to block it between potentially a trade

16   date and a settlement date.  Because they

17   would know -- they were obligated to receive

18   information about these transactions.  And in

19   theory, could have been confused, could have

20   tried to halt the transactions.

21        Q.   The transactions ultimately went

22   through, correct?

23        A.   Yes.

24        Q.   And -- and Dexia sold all of FSAM's

25   RMBS holdings, correct?

**Intentionally Left Blank**

1                J. PETERSON-11/8/12

2        Q.    How poorly?  Do you know

3    approximately the percentage of value that was

4    lost in 2008 portfolio wide?

5        A.    I do not know portfolio wide.

6              MR. DeLANGE:  Objection; beyond

7        the scope.

8              Go ahead, answer.

9        Q.    So, the third quarter of 2008,

10   Dexia received, essentially, a bailout from

11   Belgian and France, correct?

12             MR. DeLANGE:  Object to the form;

13       asked and answered.

14       A.    It received certain sovereign

15   guarantees on funding.  I believe it also

16   received a recapitalization, again, from

17   certain European governments.

18       Q.    Can you walk me through the actions

19   that were taken in the third quarter of 2008

20   insofar as Dexia's restructuring and infusion

21   of capital?

22       A.    I believe the French and Belgian

23   governments infused more than 6 billion of

24   capital into Dexia.  They also provided

25   certain guarantees that would allow Dexia to

1                    J. PETERSON-11/8/12

2    borrow funds in the market to then be able to

3    service liabilities as they were coming due.

4          Q.    And then what happened next?

5          A.    Next?

6          Q.    Next in line.  So, you get this

7    capital infusion.  In the story of Dexia, what

8    happened next?

9          A.    They made a decision to exit the

10   United States financial guaranteed and --

11   financial guaranteed business.  So, one of

12   their first decisions and actions was to sell

13   the FSA, Inc. insurance business.  I believe

14   that process must have begun October 2008

15   because the agreement was signed in

16   November 2008.

17         Q.    You said they made the decision.

18   Who is they?

19         A.    I would expect the Dexia management

20   board made the decision.

21         Q.    They decided to, essentially, get

22   out of the FSA, Inc. insurance business,

23   right?

24         A.    They decided to sell it, yes.

25         Q.    And they sold it to Assured?

1              J. PETERSON-11/8/12

2        A.    Assured Guaranteed Limited, yes.

3        Q.    And they did that because they

4    believed it was in the best interest of Dexia

5    SA and its other affiliates, correct?

6              MR. DeLANGE:  Object to the form

7        of the question.  Beyond the scope.

8        A.    I believe they considered it to be

9    in the best interest of Dexia to focus their

10   efforts on the European region?

11       Q.    And as a result they needed to sell

12   certain parts of the FSAH entity, correct?

13             MR. DeLANGE:  Object to the form

14       of the question.

15       A.    They sold the FSA, Inc. insurance

16   business.

17       Q.    Now, they didn't sell the FSAM

18   aspect of the business to Assured, correct?

19       A.    Correct.

20       Q.    Why was that?

21             MR. DeLANGE:  Object to the form

22       of the question.

23       A.    Assured would not buy it.

24       Q.    Why wouldn't they buy it?

25             MR. DeLANGE:  Object to the form

```
 1                  J. PETERSON-11/8/12

 2        of the question.  Beyond the scope.

 3        A.   Because of the massive existing and

 4   potential losses on the RMBS portfolio being

 5   insufficient to service the GIC liabilities.

 6        Q.   And so, instead of selling those

 7   liabilities to Assured, Dexia made the

 8   business decision to take them itself,

 9   correct?

10             MR. DeLANGE:  Object to the form

11        of the question.  Misstates the

12        testimony.

13        A.   If you're selling liabilities, you

14   essentially have to pay someone to take the

15   liability.  They weren't paying Assured and

16   Assured didn't want to obtain to take on the

17   GIC liabilities directly.

18             It was certainly aware that the

19   insurance company it was buying -- was

20   guaranteeing the GIC liabilities and because

21   you can't go to the hundreds of GIC holders

22   and take back the insurance policy, the

23   transaction for the purchase of the insurance

24   business included the separation of the

25   financial products business from FSA, Inc.
```

1                    J. PETERSON-11/8/12

2     from Assured through a number of fairly

3     complex agreements.

4          Q.   Right.  And the result of those

5     fairly complex agreements is that the FSAM

6     part of FSAH now resides with Dexia whereas

7     the insurance arm is with Assured, right?

8          A.   Essentially, yes.

9          Q.   Explain to me the sovereign

10    guarantee that Dexia received from France and

11    Belgian?

12               MR. DeLANGE:  Object to the form.

13          Beyond the scope.

14               You can answer.

15          A.   If you could be more specific about

16    which one.

17          Q.   Well, why don't you tell me the

18    number of sovereign guarantees they received

19    and then we'll go through them individually?

20          A.   The one which I'm most familiar is

21    the sovereign guarantee of Belgian and French

22    states that related to a portfolio of assets

23    at FSAM that included the RMBS portfolio.

24          Q.   And for the jury who is going to be

25    listening to this, how at that -- explain in a

1                  J. PETERSON-11/8/12

2    way that a jury can understand, how did those

3    sovereign guarantees work?

4                  MR. DeLANGE:  Object to the form

5         of the question.

6         A.   In the event there was a principal

7    shortfall, interest shortfall, breakdown on an

8    asset that was covered by that guarantee,

9    first there was something called the Guarantee

10   Put Contract.  FSAM would be obligated to

11   submit a put claim to Dexia SA and DCL New

12   York branch.

13                  Dexia SA and DCL New York branch

14   were obligated to then pay the put settlement

15   amount to FSAM.  However, they also had, and

16   did, exercise their right to make a deferred

17   settlement election.  And what that meant is,

18   as opposed to paying the entire purchase

19   amount, meaning, principal amount and interest

20   of the asset, they would pay shortfall amounts

21   as they came you due going forward.

22                  If Dexia SA did not perform on that

23   obligation to FSAM then FSAM would submit a

24   claim on the state guarantee for the Belgian

25   and French states.

**Intentionally Left Blank**

1                    J. PETERSON-11/8/12

2                    Marking as Exhibit 10, a document

3     bates stamped DEX_ JPM_00288327 through '391.

4                    (Plaintiff's Exhibit 10, document

5           Bearing Bates label DEX_JPM_00288327

6           through '391, marked for

7           identification, as of this date.)

8     Q.    Do you recognize Exhibit 10?

9     A.    Yes.

10    Q.    What is it?

11    A.    It is the put option confirmation

12    from the sovereign Guarantee Put Contract.

13    Q.    And it says at the top, "executed

14    version".

15                   Do you see that?

16    A.    It says, "execution version".

17    Q.    "Execution version," excuse me.

18                   Does this appear to you to be the

19    final version of this contract?

20    A.    It appears to be as of the closing.

21    I don't recall if there was an amendment also

22    at closing.  I recall, for example, an

23    amendment of this Purchase Agreement.  I don't

24    recall if they had to amend anything on the

25    Guarantee Contract at closing.

1                     J. PETERSON-11/8/12

2          Q.    Subject to any amendment, this is

3      the final execution version of the contract?

4          A.    It appears to be, yes.

5          Q.    Explain to be me the purpose of

6      this agreement.

7                     MR. DeLANGE:  Object to the form

8          of the question.

9          A.    It has several purposes.  This

10     particular confirmation set forth the

11     guarantee by Dexia SA and DCL, acting through

12     its New York branch, of assets held by FSAM

13     that were covered by this Guarantee Put

14     Contract in which in turn were also covered by

15     the sovereign guarantee from the Belgian and

16     French states.  There were four triggers,

17     which I can get into if you'd like, that would

18     result in put claims.

19                     If there were put claims asserted

20     by FSAM to Dexia SA and DCL New York, then

21     Dexia SA and DCL New York would be obligated

22     to pay a put settlement amount unless they

23     made a deferred settlement election, which

24     they always did.  Or substantially always did.

25     And at that point, what they would -- what

1                    J. PETERSON-11/8/12

2    Dexia SA and DCL New York branch would do

3    would pay principal shortfalls, interest

4    shortfalls and write down amounts as they came

5    due on the FSAM assets that were covered by

6    this guarantee.

7                    In addition, this Put Contract

8    includes a call option provision which

9    governed the ability of Dexia SA or DCL New

10   York branch to call assets from FSAM.  And if

11   assets were called, those assets would be

12   delivered, which is a defined term in this

13   document, and it's defined to be the transfer

14   of all right, title and interest in the assets

15   from FSAM to the calling party.

16       Q.   And just so I understand how it

17   worked in practice, you said that the Dexia SA

18   and DCL parties always chose to -- not to

19   essentially buy the RMBS in response to the

20   put, but instead, paid the -- essentially the

21   shortages; is that right?

22                    MR. DeLANGE:  Object to the form

23       of the question.

24       A.   In the contract, they had the right

25   to make the deferred settlement election.  In

1                    J. PETERSON-11/8/12

2   the sovereign guarantee documentation, the

3   sovereigns -- Dexia made a covenant to the

4   sovereigns that they would, in fact, make the

5   deferred settlement election.

6                    There are going to be circumstances

7   where, for example, if an asset had been

8   written down to zero, there's no more deferral

9   and by the operation of this contract,

10  nevertheless it would be put and there could

11  be no deferred settlement election if the

12  asset was, in fact, then put and the put

13  settlement amount was paid.

14      Q.   But in the ordinary course, if the

15  asset had been written all the way down, they

16  would choose the deferred settlement option?

17      A.   Unless the asset had been

18  written --

19      Q.   Unless the asset had been written

20  all the way down?

21      A.   Yes.

22      Q.   And then ultimately, the Dexia SA

23  and DCL entities exercised -- in fact,

24  exercised call options related to the assets,

25  correct?

1                   J. PETERSON-11/8/12

2        A.    They exercised call options related

3    to the assets that they called which were, at

4    the time they exercised those call options,

5    beginning approximately June 2011, between

6    June and September 2011, they called all

7    remaining assets that were covered by the

8    Guaranteed Put Contract in the sovereign

9    guarantee.

10       Q.    With respect to the residential

11   mortgage-backed securities at issue in this

12   case, were each of them subject to a call by

13   Dexia SA and Dexia Credit Local?

14       A.    I don't believe each of them were.

15   I believe some were put because they were

16   effectively written down to zero.  I believe

17   there's a subset that were put and a larger

18   portion that were called.

19       Q.    Okay.  So, either whether through

20   the put or the call, every RMBS at issue in

21   this case was transferred pursuant to this

22   agreement from FSAM to Dexia SA/DCL?

23            MR. DeLANGE:  Object to the form

24       of the question.

25       A.    The assets were delivered, as

1                    J. PETERSON-11/8/12

2    defined, to DCL New York branch, which was the

3    entity that made the Call Exercise Notice.

4         Q.    When Dexia SA and DCL elected to do

5    the deferred settlement option, was there a

6    paperwork that evidenced that election?

7         A.    I don't recall.  I don't recall if

8    there was a separate deferred settlement

9    election for every put.

10        Q.    Were they -- were they told by FSAM

11   what the shortages were?

12        A.    When a put claim was submitted,

13   there would be a document that included

14   evidence of a shortfalls that were being

15   claimed at that particular time which

16   typically would include trustee reports or

17   service reports or something that shows the

18   underlying shortfalls that had been claimed.

19        Q.    Do you know if those documents have

20   been produced in this litigation?

21        A.    I don't know if they had been

22   produced to date, but --

23             MR. EARNHARDT:  I would just

24        request that we get those.

25    TO BE FURNISHED:_____

1                    J. PETERSON-11/8/12

2    _____

3         Q.    Another question; so you said you

4    believe some of the residential

5    mortgage-backed securities at issue in this

6    case were written down to zero?

7         A.    I believe they were.  Yes, I

8    believe they were -- I believe there were

9    some.  I don't know which ones, but I believe

10   there were some.

11        Q.    Do you know which ones?

12        A.    I believe it's been on a schedule

13   that has been produced to you.  If not, they

14   can be readily identified.

15        Q.    The question I was going to ask is;

16   how would we find that out?  What schedule

17   exists to tells which ones were called, which

18   ones were put, where they reside?

19        A.    I believe there's a document that

20   has been produced that shows purchase date,

21   purchase amount, sale date, sale amount.  And

22   I believe on that particular document, it will

23   -- it will have an indication as to whether it

24   was put as opposed to called.  I don't think

25   it says put versus called, but I believe you

```
 1              J. PETERSON-11/8/12

 2   can deduce if it wasn't sold in the June to

 3   September 2011 period, it would have been put

 4   earlier than that.

 5        Q.   Let me show you what I'm marking as

 6   Exhibit 11, which is a document titled,

 7   "Plaintiffs' Supplemental Response and

 8   Objections to Defendants' First Set of

 9   Interrogatories".

10              (Plaintiff's Exhibit 11, document

11              titled, "Plaintiffs' Supplemental

12              Response and Objections to Defendants'

13              First Set of Interrogatories," marked

14              for identification, as of this date.)

15        Q.   If you turn to Exhibit A to this

16   document, do you recognize this chart?

17        A.   Yes.

18        Q.   What is it?

19        A.   I believe it is a chart of the RMBS

20   positions that are at issue in this litigation

21   identifying their purchase trade date,

22   purchase price, certain additional

23   information, as well as sale trade date, sale

24   price.

25        Q.   Is this the document you were
```

1                    J. PETERSON-11/8/12

2    referring to in your earlier testimony where

3    you thought you could define whether a

4    document -- whether a particular RMBS was put

5    or called or were you thinking of something

6    different?

7         A.   It's either this specific document

8    or a further variation of this document, but

9    it is the information as provided on this

10   schedule that I was referring to.

11        Q.   Can you just walk me through how

12   you would tell whether one was put or called?

13        A.   Usually it would be, if not always

14   be, the column sale trade date where it says,

15   "certificate written down by issuer in" and

16   then there's a date?

17        Q.   Yes.

18        A.   Those are the certificates that

19   were put as opposed to sell because I believe

20   all the sale trade dates fall within the June

21   to September 2011 time period.

22        Q.   And why is it that all the sale

23   trade dates fall in that time period?

24        A.   Because that followed the May 2011

25   decision by Dexia to divest itself of the

1                    J. PETERSON-11/8/12

2    entire RMBS portfolio.

3         Q.    And why did it make that decision?

4              MR. DeLANGE:   Object to the form

5         of the question.   Asked and answered.

6         A.    Among other reasons, it was going

7    to have a multi-billion dollar collateral

8    posting obligation due to FSAM on

9    September 29, 2011.   It chose to sell these

10   positions, in part, to raise liquidity which

11   would be kept in FSAM following the sale --

12   following the calls as opposed to leaving the

13   assets in FSAM and still having to come up

14   with multi-billion dollars on the market to

15   satisfy the Dexia collateral posting

16   obligation due on September 29, 2011.

17        Q.    How significant was the collateral

18   posting that was due on September 29, 2011?

19             MR. DeLANGE:   Object to the form.

20        Q.    Do you remember the exact amount?

21        A.    There's a weekly calculation.   It

22   would have been the calculation immediately

23   prior to that date.   It was estimated to be in

24   excess of $3 billion.

25        Q.    Could Dexia have posted that

1              J. PETERSON-11/8/12

2    collateral without selling these assets?

3              MR. DeLANGE:  Object to the form

4         of the question.  Beyond the scope.

5         A.    It would have had to do another

6    different transaction to raise those funds.

7         Q.    It had to sell something in order

8    -- in order to post that collateral?

9         A.    It had to find the source of funds

10   from somewhere and it chose to -- it chose to

11   satisfy that collateral posting obligation by

12   retaining funds within FSAM from the

13   divestment of the RMBS portfolio.

14        Q.    Do you know which of these RMBS

15   that it decided to sell to satisfy this

16   collateral obligation had missed monthly

17   payments to the holder of the tranche of the

18   RMBS, if any?

19             MR. DeLANGE:  Object to the form

20        of the question; beyond the scope.

21             But you can answer.

22        A.    I don't know.

23        Q.    Do you know which of these RMBS are

24   projected to miss monthly payments provided to

25   the holder of the collateral?

1              J. PETERSON-11/8/12

2              MR. DeLANGE:  Object to the form

3         of the question; beyond the scope.

4              You can answer.

5         A.   I don't know which ones were

6    projected at the time of the sale, let alone

7    know, which they're no longer within the

8    portfolio.

9         Q.   Dexia made the decision not to keep

10   the mortgage-backed securities and receive

11   those monthly payments, but instead decided to

12   sell them in this six month window, three

13   month window so that it could make its

14   collateral posting obligations, right?

15             MR. DeLANGE:  Object to the form

16        of the question.

17        A.   That was a reason for the

18   divestment at that time and that is how the

19   proceeds were used.

20        Q.   And you said that Dexia was

21   required to post collateral.  What agreement

22   required it to post that collateral?

23        A.   The credit support annex to the

24   Guaranteed Put Contract.

25        Q.   Explain to me how that works.

1                    J. PETERSON-11/8/12

2          A.    It's another complicated document.

3     There is a collateral posting calculation from

4     July 1st, 2009 to September 29, 2011 that was

5     under the credit support annex for the

6     Guaranteed Put Contract.

7                    After September 29, 2011 and

8     onward, the calculation is under the credit

9     support annex for the non-Guaranteed Put

10    Contract.  The two calculations are the same

11    with one difference.  From the period July 1,

12    2009 to September 29, 2011, the assets that

13    were called the put portfolio assets and

14    subject to the Guaranteed Put Contract and,

15    thus, subject to the sovereign guarantee were

16    valued at their then par amount.

17                    Beginning on September 29, 2011,

18    those same assets would be valued at their

19    market value subject to their significant

20    haircuts which, in some cases, were

21    100 percent haircuts, meaning, they had zero

22    value.

23          Q.    So, just to be clear, that

24    requirement was part of contracts that allowed

25    Dexia to sell FSAI to Assured, correct?

1                  J. PETERSON-11/8/12

2        A.    It was.

3             MR. DeLANGE:  Object to the form

4        of the question.

5        A.    It was a term of the FP separation

6   documents.

7        Q.    Which were part of the numerous

8   transaction documents that were entered into

9   to allow Dexia to sell FSAI to Assured,

10  correct?

11            MR. DeLANGE:  Object to the form

12       of the question.

13       A.    They were connected with the sale

14  of the insurance company in that they happened

15  in the same transaction, the same closings.

16       Q.    So, the ultimate need by Dexia to

17  sell the mortgage-backed securities listed in

18  the schedule we just looked at was caused by

19  an obligation that Dexia undertook so it could

20  -- that it undertook voluntarily so that they

21  could sell FSAI to Assured?

22            MR. DeLANGE:  Object to the form

23       of the question.

24       A.    It is not the only reason why it

25  chose to sell the RMBS portfolio.  But one of

1                    J. PETERSON-11/8/12

2    the results of the decision to sell the RMBS

3    portfolio was that it could satisfy a

4    significant collateral posting obligation

5    coming due in a few months.

6          Q.   As a practical matter, it was

7    forced to sell the mortgage- backed

8    securities, right?

9                MR. DeLANGE:  Object to the form

10          of the question.  Asked and answered.

11          Beyond the scope.

12          Q.   What other options did it have?

13               MR. DeLANGE:  Objection to the

14          form of the question.  Beyond the

15          scope.

16          A.   It could have sold other assets.

17    It could have sought to raise funds in a

18    different avenue.  I'm not familiar with every

19    option it had.

20          Q.   What other major assets did it have

21    that it could sell to raise over $3 billion

22    dollars?

23               MR. DeLANGE:  Objection to the

24          form of the question.  Beyond the

25          scope.

1                    J. PETERSON-11/8/12

2          A.   I don't know the content of its

3     entire asset portfolio, but it had other

4     assets.  It chose to sell assets in a region

5     which it had elected to exit, initiated when

6     it decided to sell the FSA, Inc. insurance

7     business.

8          Q.   If you could turn back to the put

9     option confirmation, which I think we marked

10    as Exhibit 9?

11         A.   Yea.

12         Q.   If you could, turn to page 11.

13              MR. DeLANGE:  Wes, it's

14         Exhibit 10.

15              MR. EARNHARDT:  I'm sorry; Exhibit

16         10.

17         Q.   If you could turn to page 11 of

18    that exhibit --

19         A.   Yes.

20         Q.   -- you see on page 11, there's a

21    definition for the term, "deliver"?

22         A.   Yes.

23         Q.   Deliver is in all caps in bold and

24    in quotation marks?

25              MR. DeLANGE:  Object to the form

1                    J. PETERSON-11/8/12

2          of the question.

3          Q.    You see that?

4          A.    Yes, I see the word, "deliver" in

5    all caps and bold.

6          Q.    Initial caps and bold.  And can you

7    just read into the record that paragraph?

8          A.    "Deliver means to deliver,

9    motivate, transfer, assign or sell, as

10   appropriate, in the manner customary for the

11   settlement of the applicable put settlement

12   assets (which shall include executing all

13   necessary documentation and take any other

14   necessary actions), in order to convey all

15   right, title and interest in the put

16   settlement assets to Dexia or DCL, as

17   applicable, free and clear of any and all

18   liens, charges, claims or encumbrances:

19   Provided that, Dexia and DCL each hereby waive

20   any right to object to the Delivery of a put

21   settlement asset (i) as failing to be free and

22   clear of liens, charges, claims or

23   incumbrances or (ii) for breach of any implied

24   or expressed representation or warranty

25   hereunder, except in the case of a lien,

1                    J. PETERSON-11/8/12

2   charge, claim or encumbrance that is

3   predominantly attributable to actions of FSA

4   taken after the effective date."

5        Q.    I went to focus on the clause in

6   the parenthetical that you read, which says

7   "which shall include executing all necessary

8   documentation and taking any other necessary

9   actions".

10            Do you see that?

11       A.    Yes.

12       Q.    So, this definition, and because

13  this definition is in the contract, this

14  contract requires the execution of "necessary

15  documentation" to effectuate delivery of all

16  right, title and interest, correct?

17            MR. DeLANGE:  Object to the form

18       of the question.

19       A.    Could you repeat the question?

20       Q.    Maybe I will say it a little more

21  simply.  This definition of deliver requires

22  the execution of all necessary documentation

23  in order to convey all right, title and

24  interest to the put settlement assets, right?

25            MR. DeLANGE:  Object to the form

1                    J. PETERSON-11/8/12

2         of the question.

3         A.   It doesn't define what necessary

4    documentation is, but it requires

5    documentation.

6         Q.   And Dexia and DCL waived their

7    right to object to delivery of a put

8    settlement asset as failing to be free and

9    clear of liens, charges, claims or

10   incumbrances or for breach of any implied or

11   expressed representation or warranty except

12   for a few examples.  So, they waived -- Dexia

13   and DCL waived their right based on the asset

14   being free and clear of liens and not being in

15   breach of an implied or expressed

16   representation or warranty, correct?

17             MR. DeLANGE:  Object to the form

18        of the question.

19        A.   The purpose this definition related

20   to a financial obligation of Dexia and DCL to

21   the benefit of FSAM, and Assured did not want,

22   or allow, Dexia and DCL to block their

23   financial obligation by raising certain

24   objections.

25        Q.   But it retained the ability to make

1                  J. PETERSON-11/8/12

2    other objections, right?

3         A.   I don't know what other objections

4    you have in mind, but --

5         Q.   But there's nothing in the document

6    that eliminates any objections that Dexia and

7    DCL might have other than the two enumerated

8    here, right?

9              MR. DeLANGE:  Object to the form

10             of the question.

11        A.   I would have to see if the there

12   are other provisions in the Guaranteed Put

13   Contract where Dexia had waived their ability

14   to make other objections.

15        Q.   Fair enough.  But in this

16   definition of deliver, the only two objections

17   that Dexia and DCL waived were the two

18   enumerated there, correct?

19        A.   In this paragraph.

20        Q.   And presumably, if there were other

21   objections that Dexia or DCL might have had

22   with respect to the subjects covered by this

23   paragraph, they were not waived because they

24   were not enumerated as something that Dexia

25   and DCL were waiving, correct?

 1                    J. PETERSON-11/8/12

 2              MR. DeLANGE:  Object to the form

 3         of the question.

 4         A.   You can't make that presumption

 5    without understanding whether there had been

 6    waivers in other documents of that ability,

 7    yes.

 8         Q.   Sitting here today, do you know of

 9    other waivers in other documents relevant to

10    this?

11         A.   I could sit here today and check

12    the documents to see if there are them.

13         Q.   Absent doing that.

14         A.   Because typically, there wouldn't

15    be provisions that would not allow Dexia or

16    DCL to fulfill this guarantee obligation which

17    was conditioned on the delivery as defined.

18    And there would have been provisions made so

19    they would not have the ability to make other

20    types of waivers.

21         Q.   Sitting here today, without

22    reviewing all the numerous documents, can you

23    think of any?

24         A.   Not without further review.

25         Q.   Okay.  Now, the additional

```
1                    J. PETERSON-11/8/12

2      necessary documentation took the form of

3      either these put exercise notices or the call

4      exercise notices, correct?

5                    MR. DeLANGE:  Object to the form

6           of the question.

7           A.    The ones that were actually

8      transferred were through a Put Exercise Notice

9      or a Call Exercise Notice.

10          Q.    Let me show you an example of a

11     Call Exercise Notice.

12                    I'll show you what I'm marking as

13     Exhibit 12.

14                    (Plaintiff's Exhibit 12, Call

15          Exercise Notice dated June 20, 2011,

16          marked for identification, as of this

17          date.)

18          Q.    Do you recognize Exhibit 12?

19          A.    Yes.

20          Q.    What is it?

21          A.    It is a Call Exercise Notice dated

22     June 20, 2011 relating to a certain call of

23     assets by DCL New York from FSAM.

24          Q.    If you turn to the very last page

25     of this exhibit, there's something labeled
```

1                    J. PETERSON-11/8/12

2    Annex 2?

3         A.   Yes.

4         Q.   What is Annex 2?

5         A.   It would be the list of specific

6    assets that were called from FSAM pursuant to

7    this Call Exercise Notice.

8         Q.   And this Call Exercise Notice and

9    other Call Exercise Notices like it were the

10   mechanisms by which the residential

11   mortgage-backed securities in this case,

12   except for the few that were put that we've

13   talked about, were transferred from FSA Asset

14   Management to Dexia, correct?

15             MR. DeLANGE:  Object to the form

16        of the question.

17        A.   This is how they were delivered as

18   defined, but, yes, pursuant to this Call

19   Exercise Notice.

20        Q.   So, let's take a look at this.  In

21   the last sentence of the first paragraph --

22   actually, can you read into the record the

23   last sentence of the first paragraph?

24        A.   "Capitalized terms used but not

25   defined herein shall have the meanings

**Intentionally Left Blank**

1                J. PETERSON-11/8/12

2     document.

3          Q.    But we just went through and you

4     agreed that the deliver definition

5     contemplates the execution of all necessary

6     documentation, right?

7                MR. DeLANGE:  Object to the form

8          of the question.  He already told you

9          that the Call Exercise Notice was not

10         executed.

11               Go ahead, John, you can answer.

12         A.    The Call Exercise Notice was not

13    countersigned by FSAM.

14         Q.    So --

15         A.    This document is sufficient.  The

16    Put Contract is sufficient.

17         Q.    So, you're saying we should look to

18    the trade confirmation to see -- to see the

19    word, "deliver" in there, to see the

20    assignment of the right, title and interest?

21               MR. DeLANGE:  Object to the form

22         of the question.  Wes, he's told you

23         ten times to look to the --

24               MR. EARNHARDT:  Tim, you can't

25         testify, okay.

1             J. PETERSON-11/8/12

2             MR. DeLANGE:  I can make an

3        object.

4             MR. EARNHARDT:  You can object to

5        the form, but you cannot testify.

6             MR. DeLANGE:  You asked the same

7        question ten times.  He's told you

8        what documentation to look to.

9             MR. EARNHARDT:  That's fine;

10       object.

11            MR. DeLANGE:  You want to ask him

12       again which documentation to look to,

13       go ahead, he'll answer for the tenth

14       time.

15            MR. EARNHARDT:  Do not testify.

16       I've given you a lot of leeway.  Do

17       not coach the witness.

18            MR. DeLANGE:  You don't have

19       leeway to give or not give me.  Ask

20       the questions, he'll answer.  I'll

21       object, but you asked the same

22       question ten times.

23       Q.   So, are you saying that we have to

24   look at the trade confirmation to see the

25   delivery of right, title and interest?

1               J. PETERSON-11/8/12

2               MR. DeLANGE:  Object to the form

3          of the question.  It misstates his

4          testimony.

5          A.   No, you look to the Guaranteed Put

6     Contract, put option confirmation.  That is

7     the governing document.  This term, "deliver"

8     is required to happen and this effects that

9     for every transfer under the call option.

10         Q.   So, you said this is required to

11    happen.  Required by the contract, right?

12         A.   I don't know what you mean by

13    "this".

14         Q.   You said, quoting you, "this is the

15    governing document.  This term, 'deliver' is

16    required to happen."

17               That's your testimony, right?

18               MR. DeLANGE:  Object to the form

19          of the question.  It misstates his

20          testimony.

21         A.   Are you reading the entire

22    testimony, before and after?

23               MR. EARNHARDT:  Can you read back

24          his testimony, the question just

25          before the one I just asked?

1                    J. PETERSON-11/8/12

2              (Whereupon, the referred to

3         testimony was read back by the

4         Reporter.)

5         A.   And your question is?

6         Q.   The question is, you said deliver

7   is required to happen, right?  And my question

8   is, required to happen under the put option

9   confirmation contract.

10        A.   I don't believe I said deliver is

11   required to happen.  Deliver happens.  It

12   happens when the assets is transferred

13   pursuant to a call option.

14        Q.   Pursuant to the -- pursuant to the

15   put option confirmation is what you're saying?

16        A.   Correct.

17        Q.   Could you turn to page 16 of the

18   put option confirmation?  You see the

19   paragraph that says "call settlement"?

20        A.   Yes.

21        Q.   Do you see that it says,

22   "Settlement of the call option shall occur on

23   the second business day after delivery to

24   party B of the call notice."

25        A.   Yes.

1                    J. PETERSON-11/8/12

2         Q.   Such date, the call settlement

3    date.

4              "On the call settlement date, the

5    collateral agent will deliver to DCL or Dexia,

6    as applicable, the relevant call settlement

7    assets against payment of the call settlement

8    amount to party B by party A."

9              You see that?

10        A.   Yes.

11        Q.   "If party A fails to pay the call

12   settlement amount, the call option will fail

13   and the related call settlement assets will

14   not be delivered to party A."

15             Do you see that?

16        A.   Yes.

17        Q.   So, here, in caps, it says the

18   collateral agent will deliver to DCL or Dexia

19   as applicable the relevant call settlement

20   assets, right?

21        A.   Yes.

22        Q.   Where does it say that FSAM will

23   deliver, in capital letters, the collateral

24   settlement assets to the collateral agent?

25        A.   The collateral agent has a security

1                    J. PETERSON-11/8/12

2      interest of all of FSAM's assets under the

3      Pledge and Administration Agreement.  Because

4      FSAM has pledged all of its interests in all

5      of its assets to the collateral agent, this

6      sentence refers to the fact that the

7      collateral agent will deliver to DCL or Dexia

8      SA.

9          Q.   And where is the -- where would we

10     find the pledge by FSAM to the collateral

11     agent?

12         A.   Article 2 of the Pledge and

13     Administration Agreement.

14         Q.   Has that been produced in this

15     litigation?

16         A.   Yes.

17         Q.   Who is the collateral agent?

18         A.   The Bank of New York Trust Company.

19     I believe it's the Bank of New York Mellon

20     Trust Company.

21              MR. EARNHARDT:  Let's take a short

22         break.

23              THE VIDEOGRAPHER:  The time is

24         2:50 p.m.  We're off the record.

25              (Whereupon, a short break was

1           J. PETERSON-11/8/12

2      held.)

3           THE VIDEOGRAPHER:  The time is

4      3:08 p.m.  We're on the record.

5      Q.   Let me show you what I'm marking as

6  Exhibit 13.  That is a document Bates stamped

7  DEX_JPM_00613731 through '751.

8           (Plaintiff's Exhibit 13, document

9      bearing Bates label DEX_JPM_00613731

10     through '751, marked for

11     identification, as of this date.)

12          MR. DeLANGE:  Do you have a copy?

13          MR. EARNHARDT:  I don't actually

14     have a copy of this one.

15          MR. DeLANGE:  I'll read over his

16     shoulder.

17     Q.   Do you recognize this document?

18     A.   Yes.

19     Q.   What is this document?

20     A.   It is the Pledge and Intercreditor

21  Agreement that was, in essence, in effect for

22  about three months from the middle of November

23  until approximately, I believe, February of

24  2009.

25     Q.   I don't want to misstate your

Page 220

1                    J. PETERSON-11/8/12

2    earlier testimony, but to try to summarize it,

3    I believe you testified that the -- that FSAM

4    transferred its assets to the collateral agent

5    pursuant to a Pledge and Intercreditor

6    Agreement; is that right?

7                    MR. DeLANGE:  Object to the form

8         of the question.

9         A.    A transferred -- it pledged its

10   assets pursuant to the Pledge and

11   Administration Agreement dated as of June 30,

12   2009.

13        Q.    That's not this document?

14        A.    That's not this document.

15        Q.    The document you're referring to is

16   dated June 30, 2009?

17        A.    Correct.

18        Q.    What was the purpose of this

19   document?

20        A.    This was a reordering of the

21   priority of the liens on assets that

22   constituted the FP business.  It was executed

23   by the date immediately prior to the execution

24   of the Purchase Agreement with Assured.

25        Q.    Got it.  Okay.  You can set that

1                    J. PETERSON-11/8/12

2     aside.

3                    This is 14.  So, marking

4     Exhibit 14, the document Bates stamped

5     DEX_JPM_00288460 through DEX_JPM_00288477.

6                    (Plaintiff's Exhibit 14, document

7              bearing Bates label DEX_JPM_00288460

8              through '477, marked for

9              identification, as of this date.)

10         Q.    And I'm marking as Exhibit 15

11    DEX_JPM_00288489 through '506.

12                   (Plaintiff's Exhibit 15, document

13             bearing Bates label DEX_JPM_00288489

14             through '506, marked for

15             identification, as of this date.)

16         Q.    So, do you have Exhibit 14 and 15

17    in front of you?

18         A.    Yes.

19         Q.    Do you recognize these documents?

20         A.    They appear to be the ISDA Master

21    Agreements only, I'm assuming the Guaranteed

22    Put Contract and the Non-Guaranteed Put

23    Contract.

24         Q.    We'll start with Exhibit 14, the

25    one that ends in Bates stamp '489.

1                    J. PETERSON-11/8/12

2        A.   That's 15.

3        Q.   Sorry; yeah.  So, start with the

4   one that ends in '460.

5             Can you tell me how this document

6   relates to the Put Agreement we've been

7   discussing earlier?

8             MR. DeLANGE:  Object to the form

9        of the question.

10       A.   The Put Contract was documented

11  under an ISDA Master Agreement.  In addition

12  to this ISDA Master Agreement is a schedule to

13  the ISDA Master Agreement, a second document.

14  A third document is the Credit Support Annex

15  to the ISDA Master Agreement.  And the fourth

16  document the put option confirmation that we

17  previous looked at.  Collectively, the four

18  documents constitute the Guarantee Put

19  Contract.

20       Q.   So, let's just take those in order.

21  This is the overall Master Agreement.  We've

22  looked at the put confirmation.  And then you

23  mentioned the credit support annex?

24       A.   Correct.

25       Q.   What is that?

1                   J. PETERSON-11/8/12

2          A.    A credit support annex typically

3    for an ISDA Master Agreement will govern

4    collateralization obligations from one party

5    to another.   In this case, the credit support

6    annex, among other things, governed the Dexia

7    collateral posting calculation that was

8    required to be made -- is made every week and

9    as we discussed earlier, the calculation was

10   operative under the Guaranteed Put Contract

11   from July 1st, 2009 to September 29, 2011.

12   And under the Non-Guaranteed Put Contract from

13   September 29, 2011 and onward.

14         Q.    The Guaranteed Put Contract has

15   essentially run its course?

16              MR. DeLANGE:   Object to the form

17         of the question.

18         A.    The I don't know if every provision

19   has run its course.  The assets that were

20   subject to the guarantee put confirmation are

21   no longer at FSAM.

22         Q.    They've been either put or call --

23         A.    They are no longer eligible to be

24   put or called.  The credit support annex

25   calculation is now operative under the

**Intentionally Left Blank**

1                    J. PETERSON-11/8/12

2    the course of an insurance transaction?

3         A.   Because it is part of the

4    definition on page 2 the procedures where it

5    says, "Nonpublic information received in the

6    course of the proposed or actual financial

7    guarantee transaction is always assumed to be

8    confidential."

9         Q.   Were these information barrier

10   procedures audited?

11             MR. DeLANGE:  Object to the form

12        of the question.

13        A.   I don't know personally whether

14   they were audited.  I believe there were

15   internal audits conducted and whether internal

16   audits included an assessment of these

17   procedures, I don't have that knowledge.

18        Q.   Have you heard the term, "wall

19   crossers" before?

20        A.   Yes.

21        Q.   What does that refer to?

22        A.   It is referenced, for example, in

23   this document, it involves the circumstance

24   when an employee of one side of the FSA

25   business, for example, an insurance employee

Page 265

1                    J. PETERSON-11/8/12

2    crosses the firewall to talk to a trading

3    employee.  The consequence is if an insurance

4    employee crosses the wall to obtain

5    information from a trading employee, the

6    insurance employee cannot go back over the

7    wall and use that information in the insurance

8    transaction.

9              Similarly, as a trading employee

10   crossed the wall to talk to an insurance

11   employee, the trading employee could not take

12   that information back across the wall and use

13   it in a trading transaction.

14        Q.   Were there instances where

15   individuals "crossed the wall"?

16        A.   I do not -- I have no recollection

17   of a wall crossing ever happening.

18        Q.   You can put that document to the

19   side.

20              So, in this litigation, Dexia and

21   FSAM have sued various J.P. Morgan Bear

22   Stearns and WaMu entities, right?

23        A.   Yes.

24        Q.   Related to mortgage-backed

25   securities that FSAM purchased in 2006 and

Page 266

1                    J. PETERSON-11/8/12

2    2007?

3         A.   Yes.

4         Q.   Dexia has also brought lawsuits

5    against other investment banks involved in the

6    securitization of mortgage loans in the 2006,

7    2007 time period, correct?

8         A.   Yes.

9         Q.   And those lawsuits include

10   complaints filed against Deutsche Bank,

11   Merrill Lynch, Countrywide, Bank of America

12   and others; is that right?

13        A.   I believe the Complaint did not

14   identify separately Bank of America, but it

15   was included in the Complaint against its

16   affiliates.

17        Q.   And the securitizations at issue in

18   those lawsuits, and this one, involve

19   literally hundreds of originators of mortgage

20   loans, right?

21        A.   I don't have knowledge of whether

22   it's hundreds, but it is many originators,

23   yes.

24        Q.   So, are there any mortgage-backed

25   securities -- residential mortgage-backed

1                    J. PETERSON-11/8/12

2    securities that FSAM owned during the 2006,

3    2007 time period that never became the subject

4    of either a litigation for a tolling

5    agreement?

6              MR. DeLANGE:  I'm going to object

7         to the question to the extent it calls

8         for privileged information.

9              You can answer the question yes or

10        no.  I just don't want you to go into

11        more details with that question.

12        A.   To my knowledge, there are RMBS

13   securities that are not the subject of a

14   tolling agreement or litigation.

15        Q.   But was that FSAM purchased during

16   2006, 2007?

17        A.   To my knowledge, I believe there

18   are some, yes.

19        Q.   Roughly how many?

20        A.   That, I don't know.

21        Q.   You sued on the vast majority of

22   the mortgage-backed securities you purchased

23   in 2006 and 2007, right?

24              MR. DeLANGE:  Object to the form

25         of the question.

**Intentionally Left Blank**

1              J. PETERSON-11/8/12

2         discussion was held.)

3              (Plaintiff's Exhibit 22, document

4         bearing Bates label DEX_JPM_00618988

5         through '221, marked for

6         identification, as of this date.)

7              THE VIDEOGRAPHER:  The time is

8         4:38 p.m. we're on the record.

9         Q.   Mr. Peterson, I'm handing you a

10   document that has been marked as Exhibit 22

11   bearing Bates stamp DEX_JPM_00618988 through

12   '619221.

13              Do you recognize Exhibit 22?

14   A.   Yes.

15   Q.   What is Exhibit 22?

16   A.   Pledge and Administration

17   Agreement.  It governs the many aspects of the

18   administration of the financial products

19   business after the closing of the sale of the

20   FSA insurance business to Assured and the

21   separation of the FP business from FSA.

22   Q.   And you see on the upper right-hand

23   corner that it says "execution version"?

24   A.   Yes.

25   Q.   Do you believe this to be the final

1                    J. PETERSON-11/8/12

2    version of that agreement?

3         A.   It is the final version.  There was

4    a, I believe, minor amendment at closing, like

5    I referred to for other documents, very minor.

6    And then there was a second amendment in, I

7    believe, February 2010 of half a dozen

8    provisions.

9         Q.   Is this the document you referred

10   to earlier that you testified transferred

11   FSAM's assets to the collateral agent, as that

12   term is used in the Put Agreement?

13        A.   This document sets forth the grant,

14   among other things, the grant by both FSAM and

15   the GIC issuers of all of their assets to the

16   collateral agent as defined in this document.

17        Q.   Can you -- can you show me the

18   provision that does that?

19        A.   Section 2.1B is the grant by the

20   GIC issuers of security interest to the

21   collateral agent of all of their assets.

22             Section 2.1D is the grant by FSAM

23   of security interests to the collateral agent

24   and all of its assets.

25        Q.   And in your last answer, you use

1                    J. PETERSON-11/8/12

2     the phrase "grant of security interest,"

3     correct?

4          A.    Yes.

5          Q.    What's a security interest?

6          A.    Security interest is a right under

7     the uniform commercial code in certain assets

8     that is granted by a pledgor to a security

9     party.  In this instance, the collateral agent

10    was serving as the secured party for ultimate

11    beneficiaries of the pledge in that the

12    security interest required that assets cash

13    had to be applied in the confines of this

14    Pledge and Administration Agreement.

15         Q.    A grant of a security interest is

16    different from an assignment, correct?

17              MR. DeLANGE:  Object to the form

18         the question.  Calls for a legal

19         conclusion.  Beyond the scope.

20              You can answer.

21         A.    Under the uniform commercial code,

22    they're actually treated the same, which is

23    how many of these assets were pledged in order

24    to have the security interest obtain a certain

25    standard under Article 8 and Article 9 of the

1                    J. PETERSON-11/8/12

2    ECC.

3         Q.   Do you know whether the grant of a

4    security interest is the same as an assignment

5    under New York common law as it relates to

6    whether a claim of fraud can transfer from one

7    party to the other?

8              MR. DeLANGE:  Object to the form

9         of the question; calls for a legal

10        conclusion.  Beyond the scope.

11             You can answer.

12        A.   That, I don't know the answer to.

13        Q.   You can put that agreement to the

14   side.

15             The Complaint in this litigation

16   references a number of confidential witnesses.

17   You understand that?

18        A.   Yes, yes.

19        Q.   And topic 17 of the 30(b)(6)

20   deposition notice relates to those

21   confidential witnesses identified in the

22   Complaint?

23        A.   Yes.

24        Q.   Without revealing any privileged

25   communication or any work undertaken by

1                    J. PETERSON-11/8/12

2    Counsel, how did Dexia find the confidential

3    witnesses referred to in the Complaint?

4                    MR. DeLANGE:  I'm going to object

5             and just interpose the objection of

6             attorney/client privilege, attorney

7             work product and instruct him not to

8             answer anything that would reveal any

9             work product.  I know your question

10            said that, but I want the formal

11            objection.

12            A.   I am aware that the Complaint lists

13   confidential witnesses.  I'm aware that the

14   names of the confidential witnesses have been

15   identified to Defendants.  Dexia retained

16   Counsel to conduct an investigation.  And my

17   understanding is the confidential witnesses

18   were identified pursuant to that investigation

19   by Dexia's Counsel.

20            Q.   Yes or no, did Dexia engage a

21   private investigator?

22            A.   No.

23            Q.   Has any confidential witnesses

24   provided Dexia with a writing of any kind?

25                    MR. DeLANGE:  Object to the form

**Intentionally Left Blank**

1                    J. PETERSON-11/8/12

2    Holdings, Inc., Dexia Credit Local or Dexia

3    SA.

4          Q.   So let me just make sure I

5    understand.  You think Exhibit A refers to

6    Dexia's purchase price?

7          A.   FSAM's purchase price.

8          Q.   My question, and the question we're

9    talking about are the other entities, not

10   FSAM, the Dexia entities.  What damages are

11   they claiming?

12              MR. DeLANGE:  Object to the form

13         of the question.  Asked and halfway

14         answered before.  He was interrupted.

15         A.   FSAM's damages, as previously

16   stated, difference between purchase price paid

17   on the purchase date and the true value of the

18   certificates on the purchase date.

19              Other Plaintiffs suffered losses

20   pursuant to their reimbursement and guarantees

21   arising from the sales of certificates

22   identified on Exhibit A.

23         Q.   What losses related to

24   reimbursements and guarantees have they

25   suffered?

1                J. PETERSON-11/8/12

2          A.    The RMBS positions, when they were

3     called from FSAM, required that a certain call

4     settlement amount be paid by DCL New York to

5     FSAM, which was equivalent to the outstanding

6     principal amount of the position accrued

7     interest.  The principal interest and

8     write-down had not been paid.

9                In the reimbursement arrangements,

10    Dexia Holdings, Inc. was obligated to

11    reimburse DCL New York for the difference

12    between the call settlement amount and the

13    sale proceeds for a specific call option to

14    the extent that the net worth of Dexia

15    Holdings, Inc. would be become negative

16    pursuant to that reimbursement obligation then

17    the Dexia Holdings, Inc.'s, parents entities,

18    Dexia Credit Local or Dexia SA had agreed to

19    provide Dexia Holdings, Inc. with the funds

20    necessary for it to make the reimbursement to

21    DCL New York branch as describe3d in

22    difference between the cost settlement amount

23    and the sale proceeds.

24          Q.    Now, what determined the amount of

25    the call settlement amount?

1                    J. PETERSON-11/8/12

2          A.    The Guarantee Put Contract.

3          Q.    It was a contractual obligation to

4    purchase at that price, right?

5                MR. DeLANGE:  Objection to the

6          form of the question.

7          A.    It was a contractual obligation to

8    pay the call settlement amount upon the

9    exercise of a call option.

10         Q.    So, what you're saying is Dexia's

11   -- the Dexia entities claimed damages arise

12   from the fact that it paid an amount it

13   contractually agreed to pay?

14               MR. DeLANGE:  Object to the form

15         of the question.

16         A.    No, the Dexia Plaintiffs did not

17   pay the call settlement amount.  Dexia Credit

18   Local New York branch paid the settlement

19   amount.  The difference between the call

20   settlement amount and the sale proceeds was

21   then born by different affiliates with totally

22   other affiliates within the Dexia SA family

23   pursuant to a different intercompany

24   arrangement.

25         Q.    Pursuant to a different

1              J. PETERSON-11/8/12

2    intercompany arrangement that each of those

3    entities voluntarily agreed to, correct?

4              MR. DeLANGE:  Object to the form

5         of the question.

6         A.    They entered into that arrangement.

7    I don't believe they were compelled by any law

8    or other contractor to enter into that

9    arrangement.

10        Q.    No one held a gun to their head?

11        A.    Not to my knowledge.

12        Q.    Now, by virtue of the put and the

13   calls and the various monthly distributions

14   we've been talking about all day today, FSAM

15   received its purchase price back, correct?

16             MR. DeLANGE:  Objection to the

17        form of the question.  Misstates

18        testimony.

19        A.    It received the amounts to which it

20   was entitled pursuant to put claims.  The call

21   settlement amount.  It did not receive

22   something equivalent to the damages that were

23   the difference between the amount it paid on

24   the purchase date and the true value of the

25   positions on that original purchase date.

1                    J. PETERSON-11/8/12

2          Q.   No, I understand, but I just want

3    to make clear, though, that with respect to

4    the price it actually paid, not what

5    Plaintiffs think it should have paid, but what

6    it actually paid, it received that purchase

7    price back by virtue of its puts and calls and

8    the monthly distributions that we've been

9    talking about in the various agreements?

10              MR. DeLANGE:  Object to the form

11         of the question.  And misstates the

12         testimony.

13         A.   I would not say it received its

14   purchase price.  It received the put claim

15   amount and the call settlement amounts.

16         Q.   And those amounts equalled, in

17   every instance, the purchase price that FSAM

18   paid for the RMBS?

19              MR. DeLANGE:  Object to the form

20         of the question.

21         A.   No.

22         Q.   Why not?

23         A.   Put claims for intra shortfalls or

24   principal shortfalls are not equal to the

25   purchase price of the asset.

1                   J. PETERSON-11/8/12

2        Q.   But the calls that were executed

3   after those put claims were, correct?

4             MR. DeLANGE:   Object to the form.

5        A.   No.

6        Q.   Why not?

7        A.   There could have been interest

8   payments and principal payments that could

9   have changed the -- could have been a

10  reduction of the principal amount of the

11  position below the purchase price paid by FSAM

12  for that position on the purchase date.

13            So, the call settlement amount

14  would have been the then outstanding principal

15  amount, plus the other elements we discussed.

16       Q.   But FSAM would have received the

17  total purchase price either from Dexia or from

18  other sources, correct?  One way or the other,

19  it received its total purchase price back for

20  all of these assets?

21       A.   As required in the entire

22  structure, the purpose was to try to ensure

23  that FSAM had sufficient assets to discharge

24  to get liability for the GIC affiliates and

25  through the guaranteed arrangement from the

1                    J. PETERSON-11/8/12

2    assured transaction documented in the Put

3    Contracts and the sovereign guarantee, FSAM

4    ultimately received amounts that were equal to

5    the principal amounts of the assets from and

6    after the date of those contracts in July 1st,

7    2009.  It did not -- it was not compensated

8    for any losses it may have suffered prior to

9    that point.

10              MR. EARNHARDT:  Let's take a short

11        break.

12              THE VIDEOGRAPHER:  The time is

13        5:06 p.m.  We're off the record.

14              (Whereupon, a short break was

15        held.)

16              (Plaintiff's Exhibit 24, Master

17        Note issued by FSA Asset Management to

18        FSA Capital Management Services LLC

19        effective beginning October 29, 2001,

20        marked for identification, as of this

21        date.)

22              (Plaintiff's Exhibit 25, Master

23        Repurchase Agreement between FSA Asset

24        Management LLC and FSA Capital

25        Management Services LLC, marked for

1              J. PETERSON-11/8/12

2    identification, as of this date.)

3         (Plaintiff's Exhibit 26, document

4    bearing Bates label DEX_JPM_00618977

5    through '987, marked for

6    identification, as of this date.)

7         (Plaintiff's Exhibit 27, Insurance

8    and Indemnity Agreement dated

9    October 29, 2001 between FSA, Inc. and

10   FSA Capital Management Services LLC,

11   marked for identification, as of this

12   date.)

13        (Plaintiff's Exhibit 28, Amended

14   and Restated Insurance and Indemnity

15   Agreement as of October 21st, 2008

16   between FSA, Inc. and FSAM, marked for

17   identification, as of this date.)

18        (Plaintiff's Exhibit 29,

19   Reimbursement Agreement dated

20   December 31, 2007, marked for

21   identification, as of this date.)

22        (Plaintiff's Exhibit 30, first

23   iteration of an Intercompany Put and

24   Guarantee Fee Agreement, dated

25   September 30, 2009, marked for