# Exhibit 42

$1,036,250,000

(Approximate)

## NEWCASTLE MORTGAGE SECURITIES TRUST 2007-1

*Issuing Entity*

## NEWCASTLE INVESTMENT CORP.

*Sponsor*

## BEAR STEARNS ASSET BACKED SECURITIES I LLC

*Depositor*

## WELLS FARGO BANK, N.A.

*Master Servicer, Securities Administrator and Custodian*

## NATIONSTAR MORTGAGE LLC

*Servicer*

## FREMONT INVESTMENT & LOAN

*Originator*

### ASSET-BACKED NOTES, SERIES 2007-1

**You should consider carefully the risk factors beginning on page S-11 in this prospectus supplement.**

**The Issuing Entity**

The issuing entity will consist primarily of a pool of fixed and adjustable rate mortgage loans secured by first and second liens on one- to four-family residential properties, divided into two loan groups. The issuing entity will issue seventeen classes of notes, all of which are offered under this prospectus supplement.

| Class | Note Interest Rate | Initial Note Principal Balance[1] | Initial Rating (S&P/Moody's) | Designation |
|---|---|---|---|---|
| | | **Offered Notes** | | |
| 1-A-1 | Variable Rate | $ 370,224,000 | AAA/Aaa | Group 1 Senior |
| 2-A-1 | Variable Rate | $ 285,332,000 | AAA/Aaa | Group 2 Senior |
| 2-A-2 | Variable Rate | $ 27,683,000 | AAA/Aaa | Group 2 Senior |
| 2-A-3 | Variable Rate | $ 77,257,000 | AAA/Aaa | Group 2 Senior |
| 2-A-4 | Variable Rate | $ 39,130,000 | AAA/Aaa | Group 2 Senior |
| M-1 | Variable Rate | $ 42,429,000 | AA+/Aa1 | Crossed Subordinate |
| M-2 | Variable Rate | $ 41,341,000 | AA+/Aa2 | Crossed Subordinate |
| M-3 | Variable Rate | $ 25,022,000 | AA/Aa3 | Crossed Subordinate |
| M-4 | Variable Rate | $ 22,846,000 | AA/A1 | Crossed Subordinate |
| M-5 | Variable Rate | $ 21,215,000 | AA-/A2 | Crossed Subordinate |
| M-6 | Variable Rate | $ 18,495,000 | A+/A3 | Crossed Subordinate |
| M-7-A | Variable Rate | $ 5,000,000 | A/Baa1 | Crossed Subordinate |
| M-7-B | Variable Rate | $ 12,407,000 | A/Baa1 | Crossed Subordinate |
| M-8-A | Variable Rate | $ 3,500,000 | BBB+/Baa2 | Crossed Subordinate |
| M-8-B | Variable Rate | $ 12,275,000 | BBB+/Baa2 | Crossed Subordinate |
| M-9 | Variable Rate | $ 14,143,000 | BBB/Baa3 | Crossed Subordinate |
| M-10 | Variable Rate | $ 17,951,000 | BBB-/NR | Crossed Subordinate |
| Total Notes: | | $ 1,036,250,000 | | |

[1] Approximate. The initial note principal balance of each class is subject to a variance of plus or minus 10%.

**Other Information:**

The note interest rates on the offered notes are described in detail under the headings "*Summary— Description of the Notes — Note Interest Rates*" in this prospectus supplement.

**Credit Enhancement**

- the offered notes will have credit enhancement in the form of subordination, overcollateralization and excess interest.

**The holders of the notes will also have the benefit of an interest rate swap agreement and an interest rate cap agreement, each as described herein.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

**The Attorney General of the state of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.**

Bear, Stearns & Co. Inc., as underwriter, will purchase the offered notes (other than the Class M-7-B, Class M-8-B, Class M-9 and Class M-10 Notes) from the depositor. The Class M-7-B, Class M-8-B, Class M-9 and Class M-10 Notes will not be purchased by the underwriter but will be transferred to the seller or its designee on the closing date as partial consideration for the sale of the mortgage loans to the depositor. See "Method of Distribution" in this prospectus supplement.

## Bear, Stearns & Co. Inc.
## Underwriter

## Important Notice About Information Presented In This
## Prospectus Supplement And The Accompanying Prospectus

**You are encouraged to rely only on the information contained in this document. We have not authorized anyone to provide you with different information.**

We provide information to you about the offered notes in two separate documents that progressively provide more detail:

- the accompanying prospectus, which provides general information, some of which may not apply to this series of notes; and

- this prospectus supplement, which describes the specific terms of this series of notes and may be different from the information in the accompanying prospectus.

Annex I and Schedule A are incorporated into and are a part of this prospectus supplement as if fully set forth in this prospectus supplement

The description of your notes, as described in this prospectus supplement, is intended to supplement the related description in the accompanying prospectus.

Some of the statements contained in or incorporated by reference in this prospectus supplement and the accompanying prospectus consist of forward-looking statements relating to future economic performance or projections and other financial items. These statements can be identified by the use of forward-looking words such as "may," "will," "should," "expects," "believes," "anticipates," "estimates," or other comparable words. Forward-looking statements are subject to a variety of risks and uncertainties that could cause actual results to differ from the projected results. Those risks and uncertainties include, among others, general economic and business conditions, regulatory initiatives and compliance with governmental regulations, customer preferences and various other matters, many of which are beyond our control. Because we cannot predict the future, what actually happens may be very different from what we predict in our forward-looking statements.

The discussion contained in this prospectus supplement as to tax considerations is not intended or written to be used, and cannot be used, for the purpose of avoiding United States federal income tax penalties. Such discussion is written to support the promotion or marketing of the transactions or matters addressed in this prospectus supplement. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

The depositor's principal offices are located at 383 Madison Avenue, New York, New York 10179 and its phone number is (212) 272-2000.

## European Economic Area

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (referred to in this prospectus supplement as a Relevant Member State), the Underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (referred to in this prospectus supplement as a Relevant Implementation Date) it has not made and will not make an offer of notes to the public in that Relevant Member State prior to the publication of a prospectus in relation to the notes which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of notes to the public in that Relevant Member State at any time:

(a)     to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b)     to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(c)     in any other circumstances which do not require the publication by the Issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of notes to the public" in relation to any notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the notes to be offered so as to enable an investor to decide to purchase or subscribe the notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression referred to in this prospectus supplement as Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

## United Kingdom

The underwriter has represented and agreed that:

(a)     it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue or sale of the notes in circumstances in which Section 21(1) of the FSMA does not apply to the Issuer; and

(b)     it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the notes in, from or otherwise involving the United Kingdom.

# TABLE OF CONTENTS

**PROSPECTUS SUPPLEMENTS-**

SUMMARY OF PROSPECTUS
SUPPLEMENT ...................................... S-1
TRANSACTION STRUCTURE ....................... S-10
RISK FACTORS .................................... S-11
LEGAL PROCEEDINGS ................................ S-29
AFFILIATIONS, RELATIONSHIPS AND
RELATED TRANSACTIONS ........................ S-29
THE MORTGAGE POOL ................................ S-30
STATIC POOL INFORMATION ...................... S-34
THE DEPOSITOR ................................... S-34
THE SPONSOR ...................................... S-35
THE SELLER ....................................... S-35
THE MASTER SERVICER AND THE
SERVICER ........................................ S-35
MORTGAGE LOAN ORIGINATION .............. S-41
DESCRIPTION OF THE NOTES ...................... S-48
YIELD ON THE OFFERED NOTES ................. S-72
THE INDENTURE ................................... S-93
THE SALE AND SERVICING
AGREEMENT .................................... S-106
FEDERAL INCOME TAX
CONSEQUENCES ................................ S-112
SECONDARY MARKET ................................ S-114
LEGAL OPINIONS .................................. S-114
RATINGS .......................................... S-114
METHOD OF DISTRIBUTION ...................... S-115
LEGAL INVESTMENT ................................ S-116
AVAILABLE INFORMATION ...................... S-117
ERISA CONSIDERATIONS ........................... S-118
GLOSSARY ........................................ S-120
ANNEX I .......................................... AX-1
SCHEDULE A ...................................... A-1
SCHEDULE B ...................................... B-1
SCHEDULE C ...................................... C-1

**PROSPECTUS**

INTRODUCTION ........................................ 4
RISK FACTORS ........................................ 6
THE MORTGAGE POOLS .............................. 12
STATIC POOL INFORMATION ......................... 24
SERVICING OF MORTGAGE LOANS .................. 24
DESCRIPTION OF THE SECURITIES ................... 31
DESCRIPTION OF CREDIT ENHANCEMENT ...... 50
OTHER FINANCIAL OBLIGATIONS RELATED
TO THE SECURITIES ............................. 55
DESCRIPTION OF PRIMARY MORTGAGE
INSURANCE, HAZARD INSURANCE; CLAIMS
THEREUNDER ........................................ 57
THE SPONSOR ........................................ 60
THE DEPOSITOR ..................................... 61
THE AGREEMENTS .................................... 61
YIELD CONSIDERATIONS ............................. 72
MATURITY AND PREPAYMENT
CONSIDERATIONS .................................. 74
LEGAL ASPECTS OF MORTGAGE LOANS ........ 75
FEDERAL INCOME TAX CONSEQUENCES ........ 92
PENALTY AVOIDANCE .............................. 117
STATE AND OTHER TAX CONSEQUENCES .... 118
ERISA CONSIDERATIONS ........................... 118
LEGAL INVESTMENT MATTERS .................... 128
USE OF PROCEEDS ................................. 129
METHODS OF DISTRIBUTION ....................... 129
LEGAL MATTERS .................................... 130
FINANCIAL INFORMATION .......................... 130
RATINGS .......................................... 131
AVAILABLE INFORMATION .......................... 131
REPORTS TO SECURITYHOLDERS ................... 131
INCORPORATION OF INFORMATION BY
REFERENCE ........................................ 132
GLOSSARY ........................................ 133

## SUMMARY OF PROSPECTUS SUPPLEMENT

**The following summary is a very broad overview of the offered notes and does not contain all of the information that you should consider in making your investment decision. To understand all of the terms of the offered notes, read carefully this entire prospectus supplement and the entire prospectus. A glossary is included at the end of this prospectus supplement. Capitalized terms used but not defined in the glossary at the end of this prospectus supplement have the meanings assigned to them in the glossary at the end of the accompanying prospectus.**

Issuing Entity .............................  Newcastle Mortgage Securities Trust 2007-1, a Delaware statutory trust.

Title of Series.............................  Newcastle Mortgage Securities Trust, Mortgage-Backed Notes, Series 2007-1.

Cut-off Date ..............................  June 1, 2007.

Closing Date..............................  On or about July 12, 2007.

Depositor...................................  Bear Stearns Asset Backed Securities I LLC, a Delaware limited liability company and a limited purpose finance subsidiary of The Bear Stearns Companies Inc. and an affiliate of Bear, Stearns & Co. Inc. and Bear Stearns Financial Products Inc.

Sponsor .....................................  Newcastle Investment Corp.

Master Servicer, Securities
Administrator and Custodian .....  Wells Fargo Bank, N.A.

Servicer .....................................  Nationstar Mortgage LLC.

Originator...................................  Fremont Investment & Loan.

Seller .........................................  NIC WL II LLC, an indirect wholly owned subsidiary of the sponsor.

Indenture Trustee ......................  The Bank of New York.

Owner Trustee...........................  Wilmington Trust Company.

Derivatives Provider .................  Bear Stearns Financial Products Inc.

Payment Dates ..........................  Payments on the offered notes will be made on the 25th day of each month, or, if such day is not a business day, on the next succeeding business day, beginning in July 2007.

Offered Notes.............................  The classes of offered notes, their note interest rates and note principal balances are set forth on the front page to this prospectus supplement.

**The Issuing Entity**

The depositor will establish a Delaware statutory trust, the Newcastle Mortgage Securities Trust 2007-1, with respect to the Newcastle Mortgage Securities Trust, Asset-Backed Notes, Series 2007-1, pursuant to a short form trust agreement, among the sponsor, the depositor and the owner trustee, as amended by the amended and restated trust agreement, among the depositor, the owner trustee and Wells Fargo Bank, N.A., as securities administrator. The issuing entity is also referred to as the "trust" in this prospectus supplement. On the closing date, pursuant to an indenture, among the issuing entity, the indenture trustee and the securities administrator, the issuing entity will issue the notes. The beneficial ownership interest in the issuing entity will be represented by the owner trust certificates, which are not offered by this prospectus supplement.

Payments of interest and principal on the offered notes will be made from payments received from assets of the issuing entity as described in this prospectus supplement.

See "*Description of the Notes*" in this prospectus supplement.

**The Originator**

All of the mortgage loans to be included in the trust were originated or acquired by Fremont Investment & Loan, a California industrial bank. The originator will make representations and warranties with respect to the mortgage loans and will have obligations with respect to the repurchase and substitution of the mortgage loans. Fremont General Corporation, the parent of the originator, has guaranteed the obligations of the originator.

**The Mortgage Loans**

The issuing entity will contain 4,648 first and second lien, adjustable rate and fixed rate mortgage loans secured by one- to four-family residential real properties and individual condominium units. The mortgage loans have an aggregate principal balance of approximately $1,087,927,706 as of the cut-off date.

After an initial fixed-rate period of two, three or five years, as applicable, the interest rate on each adjustable rate mortgage loan will be adjusted semi-annually based on Six-Month LIBOR to equal the index plus a fixed percentage set forth in or computed in accordance with the related note subject to rounding and to certain other limitations, including an initial cap, a subsequent periodic cap on each adjustment date and a maximum lifetime mortgage rate, all as more fully described under "*The Mortgage Pool*" in this prospectus supplement. As to each mortgage loan, the servicer will be responsible for calculating and implementing interest rate adjustments.

The mortgage loans have been divided into two loan groups, each referred to in this prospectus supplement as a loan group and designated as loan group 1 and loan group 2 as more fully described below and in Schedule A to this prospectus supplement. The Class 1-A-1 Notes will be entitled to receive payments with respect to the mortgage loans in loan group 1, except under the limited circumstances described in this prospectus supplement. The Class 2-A-1 Notes, Class 2-A-2 Notes, Class 2-A-3 Notes and Class 2-A-4 Notes will be entitled to receive payments with respect to the mortgage loans in loan group 2, except under the limited circumstances described in this prospectus supplement. The Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7-A, Class M-7-B, Class M-8-A, Class M-8-B, Class M-9 and Class M-10 Notes will be entitled to receive payments from both loan groups, as more fully described in this prospectus supplement.

*Total Pool*

The following table summarizes the approximate characteristics of all of the mortgage loans as of the cut-off date:

| | |
|---|---|
| Number of mortgage loans: | 4,648 |
| Aggregate scheduled principal balance: | $1,087,927,706 |
| Range of scheduled principal balances: | $15,089 to $1,479,608 |
| Average scheduled principal balance: | $234,064 |
| Range of mortgage rates: | 5.250% to 13.850% |
| Weighted average mortgage rate: | 7.743% |

Range of remaining term to stated
maturity (months): ..................................114 to 357
Weighted average remaining term
to stated maturity (months): ...........................354
Weighted average combined loan-to-value
ratio at origination: ......................................83.10%
Weighted average gross margin: ...................5.276%
Weighted average rate cap at first
rate adjustment date: .....................................3.000%
Weighted average periodic rate cap: ............1.500%
Weighted average maximum lifetime
mortgage rate: ............................................13.741%
Weighted average months to first
rate adjustment date (months): ..........................24
First lien ........................................................94.65%
Second lien .......................................................5.35%
Interest only ....................................................4.54%
Balloon loans ................................................57.03%
State concentration above 5%:
California ........................................................29.07%
Florida..............................................................13.19%
New York .......................................................10.79%
Maryland...........................................................7.53%

### *The Group 1 Mortgage Loans*

The following table summarizes the approximate
characteristics of all of the mortgage loans in loan
group 1 as of the cut-off date:

Number of mortgage loans: ..........................2,337
Aggregate scheduled principal
balance:.................................................$503,707,244
Range of scheduled
principal balances: ...................... $49,895 to $735,830
Average scheduled
principal balance:..................................$215,536
Range of mortgage rates: ........................ 5.250% to 12.990%
Weighted average mortgage rate: .................7.704%
Range of remaining term to stated
maturity (months): ..................................174 to 357
Weighted average remaining term
to stated maturity (months): ...........................355
Weighted average combined loan-to-value
ratio at origination: ......................................81.56%
Weighted average gross margin: ...................5.457%
Weighted average rate cap at first
rate adjustment date: .....................................3.000%
Weighted average periodic rate cap: ............1.500%
Weighted average maximum lifetime
mortgage rate: ............................................13.959%
Weighted average months to first
rate adjustment date (months): ..........................23
First lien .......................................................100.00%
Interest only ....................................................2.30%
Balloon loans ................................................55.75%
State concentration above 5%:
Florida..............................................................15.78%
California ........................................................15.09%
Maryland...........................................................9.50%

New York.........................................................8.99%
Illinois .............................................................6.58%

### *The Group 2 Mortgage Loans*

The following table summarizes the approximate
characteristics of all of the mortgage loans in
loan group 2 as of the cut-off date:

Number of mortgage loans: ........................... 2,311
Aggregate scheduled principal
balance: ...............................................$584,220,463
Range of scheduled
principal balances:................................$15,089 to $1,479,608
Average scheduled
principal balance:.............................. $252,800
Range of mortgage rates:...........................5.250% to 13.850%
Weighted average mortgage rate: ................. 7.776%
Range of remaining term to stated
maturity (months):.................................... 114 to 357
Weighted average remaining term
to stated maturity (months): ........................... 354
Weighted average combined loan-to-value
ratio at origination: ...................................... 84.43%
Weighted average gross margin: ................... 5.118%
Weighted average rate cap at first
rate adjustment date:...................................... 3.000%
Weighted average periodic rate cap: ............. 1.500%
Weighted average maximum lifetime
mortgage rate:............................................ 13.551%
Weighted average months to first
rate adjustment date (months): .......................... 24
First lien .........................................................90.03%
Second lien........................................................9.97%
Interest only .....................................................6.47%
Balloon loans..................................................58.14%
State concentration above 5%:
California ........................................................41.13%
New York .......................................................12.34%
Florida..............................................................10.95%
Maryland ...........................................................5.84%

### **Removal and Substitution of a Mortgage Loan**

The indenture trustee will acknowledge the sale,
transfer and assignment to it by the depositor of
the mortgage loans, and receipt of, subject to
further review by the custodian, the mortgage
loan files and the exceptions to the mortgage
loan files. If the indenture trustee receives
written notice that any mortgage loan is
defective on its face or if a representation or
warranty with respect to any mortgage loan is
breached, the indenture trustee, or the custodian
on its behalf, will promptly notify the originator

of such defect or breach. If the originator cannot or does not cure such defect or breach within 30 days from the date of notice and, in each case such defect materially and adversely affects the interests of the noteholders in the mortgage loan, the originator, will, in accordance with the terms of the purchase agreement provide the Indenture Trustee with a substitute mortgage loan or repurchase the mortgage loan within 30 days of the date of notice.

**Description of the Notes**

*General*

The issuing entity will issue the notes in two loan groups. The Class 1-A-1 Notes will represent senior interests principally in loan group 1. The Class 2-A-1 Notes, Class 2-A-2 Notes, Class 2-A-3 Notes and Class 2-A-4 Notes will represent senior interests principally in loan group 2. The Class 1-A-1, Class 2-A-1, Class 2-A-2, Class 2-A-3 and Class 2-A-4 Notes are sometimes referred to in this prospectus supplement together as the senior notes or the Class A Notes.

The Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7-A, Class M-7-B, Class M-8-A, Class M-8-B, Class M-9 and Class M-10 Notes will each represent subordinated interests in both loan groups. The Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7-A, Class M-7-B, Class M-8-A, Class M-8-B, Class M-9 and Class M-10 Notes are sometimes referred to in this prospectus supplement collectively as the Class M Notes or the subordinate notes. The Class M-7-A and Class M-7-B Notes are sometimes referred to in this prospectus supplement collectively as the Class M-7 Notes. The Class M-8-A and Class M-8-B Notes are sometimes referred to in this prospectus supplement collectively as the Class M-8 Notes. The final maturity date for the offered notes is the payment date in April 2037.

*Record Date*

For each class of offered notes and any payment date, the business day immediately preceding such payment date so long as such class of notes is in book-entry form; and otherwise, the record date

will be the last business day of the month immediately preceding the applicable payment date.

*Denominations*

For each class of offered notes, $25,000 and multiples of $1.00 in excess thereof, except that one certificate of each class may be issued in the remainder of the class.

*Registration of Offered Notes*

The issuing entity will issue the offered notes initially in book-entry form. Persons acquiring interests in these offered notes will hold their beneficial interests through The Depository Trust Company, Clearstream Banking, société anonyme or the Euroclear System.

We refer you to "*Description of the Notes—Book-entry Notes*" and "*Annex I—Global Clearance, Settlement and Tax Documentation Procedures*" in this prospectus supplement.

*Note Interest Rates*

The note interest rates for the offered notes are variable rates that may change from payment date to payment date. The note interest rate will therefore be adjusted on a monthly basis. Investors will be notified of a note interest rate adjustment through the monthly payment reports as described under "*Reports to Noteholders*" in this prospectus supplement.

On any payment date, the note interest rate for each of the Class A Notes and the Class M Notes will be the least of (i) one-month LIBOR determined as described in this prospectus supplement plus the related margin listed below, (ii) 11.500% per annum and (iii) the related available funds rate.

| Class | Margin | |
| | (1) | (2) |
|---|---|---|
| 1-A-1 | 0.190% | 0.380% |
| 2-A-1 | 0.130% | 0.260% |
| 2-A-2 | 0.160% | 0.320% |
| 2-A-3 | 0.230% | 0.460% |
| 2-A-4 | 0.340% | 0.680% |
| M-1 | 0.500% | 0.750% |
| M-2 | 0.650% | 0.975% |
| M-3 | 0.750% | 1.125% |
| M-4 | 1.150% | 1.725% |
| M-5 | 1.250% | 1.875% |
| M-6 | 1.800% | 2.700% |
| M-7-A | 2.000% | 3.000% |
| M-7-B | 2.000% | 3.000% |
| M-8-A | 2.000% | 3.000% |
| M-8-B | 2.000% | 3.000% |
| M-9 | 2.000% | 3.000% |
| M-10 | 2.000% | 3.000% |

---

(1) For each payment date up to and including the Coupon Step-Up Date, as defined in this prospectus supplement under "Glossary."

(2) On each payment date after the Coupon Step-Up Date.

If on any payment date, the note interest rates for the notes are limited to the related available funds rate, the resulting basis risk shortfalls may be recovered by the holders of the notes on the same payment date or future payment dates on a subordinated basis to the extent that on such payment date there are available funds remaining after certain other distributions on the notes and the payment of certain fees and expenses of the issuing entity, and to the extent there are amounts available under the interest rate swap agreement and cap agreement to pay amounts as described in this prospectus supplement.

We refer you to "*Description of the Notes—Payments on the Notes,*" "*—The Interest Rate Swap Agreement*" and "*—The Cap Agreement*" in this prospectus supplement.

**Interest Payments**

On each payment date, holders of the offered notes will be entitled to receive:

- the interest that has accrued on the note principal balance of such notes at the related note interest rate during the related interest accrual period, and

- any interest due on a prior payment date that was not paid and basis risk shortfalls.

Any interest due on a prior payment date that was not paid on a prior payment date will be payable from interest funds, excess interest in the case of the Class A Notes and from excess interest in the case of the Class M Notes, in each case as and to the extent described in this prospectus supplement.

The offered notes may also receive interest payments in respect of interest that was due and not paid on a payment date from payments under the interest rate swap agreement and cap agreement as described below under "*Description of the Notes—The Interest Rate Swap Agreement*" and "*—The Cap Agreement.*"

The interest accrual period for the notes and any payment date will be the period from the previous payment date (or, in the case of the first accrual period, from the closing date) to the day prior to the current payment date. Interest will be calculated for the offered notes on the basis of the actual number of days in the accrual period, based on a 360-day year.

**Principal Payments**

On each payment date, holders of the notes will receive a distribution of principal on their notes if there is cash available on that date for the payment of principal. Monthly principal distributions will generally include:

- scheduled principal payments received or advanced and unscheduled payments of principal on the mortgage loans, and

- until a specified overcollateralization level has been reached, interest payments on the mortgage loans not needed to pay interest on the notes and monthly fees and expenses.

You are encouraged to review the priority of payments described under "*Description of the*

*Notes — Payments on the Notes"* in this prospectus supplement.

**Trigger Events**

The occurrence of a Trigger Event (as defined in the glossary of this prospectus supplement) following the stepdown date may have the effect of accelerating or decelerating the amortization of the notes and affecting the weighted average lives of the notes. The stepdown date will be the earlier to occur of (1) the first payment date following the payment date on which the aggregate note principal balance of the Class A notes has been reduced to zero and (2) the later of (x) the payment date occurring in July 2010 and (y) the first payment date on which the subordination available to the Class A notes is greater than or equal to 53.00%.

*See "Description of the Notes—Payments on the Notes," "Glossary" and "Yield on the Offered Notes—General Prepayment Considerations" in this prospectus supplement.*

**Credit Enhancement**

The credit enhancement provided for the benefit of the holders of the offered notes consists of overcollateralization, excess interest, subordination and limited cross-collateralization.

*Overcollateralization.* As of the Closing Date, the aggregate principal balance of the mortgage loans as of the cut-off date will exceed the aggregate note balance of the offered notes by approximately $51,677,706. Such amount represents approximately 4.75% of the aggregate principal balance of the mortgage loans as of the cut-off date, and is the approximate amount of overcollateralization that will be required to be provided under the indenture. The overcollateralization amount will be available to absorb realized losses on the mortgage loans. We cannot assure you that sufficient interest will be generated by the mortgage loans to maintain the required level of overcollateralization.

We refer you to *"Description of the Notes—Excess Interest and Overcollateralization Provisions"* in

this prospectus supplement for additional information.

*Excess Interest.* The mortgage loans bear interest each month that in the aggregate is expected to exceed the amount needed to pay monthly interest on the offered notes and to pay certain fees and expenses of the trust (including any net swap payment owed to the swap provider and any swap termination payment owed to the swap provider, other than any swap termination payment resulting from a swap provider trigger event). The excess interest from the mortgage loans each month will be available to absorb realized losses on the mortgage loans and to maintain overcollateralization at required levels.

*Subordination.* The senior notes will have a payment priority over the subordinate notes. Each class of Class M Notes with a lower numerical class designation will have payment priority over each class of Class M Notes with a higher numerical class designation. The Class M-7-A and the Class M-7-B Notes will have the same numerical class designation and, except as otherwise indicated, will receive payments and allocations to be made to the Class M-7 Notes, pro rata, based on their outstanding note balances. The Class M-8-A and the Class M-8-B Notes will have the same numerical class designation and, except as otherwise indicated, will receive payments and allocations to be made to the Class M-8 Notes, pro rata, based on their outstanding note balances.

Subordination provides the holders of notes having a higher payment priority with protection against losses realized when the remaining unpaid principal balance on a mortgage loan exceeds the amount of proceeds recovered upon the liquidation of that mortgage loan.

This loss protection is accomplished by allocating any realized losses on the mortgage loans in excess of the excess interest, net swap payments received from the swap provider and available therefor, cap payments received from the cap provider and available therefor and the amount of overcollateralization to the most subordinate notes beginning with the Class M-

10 Notes, until the note principal balance of that subordinate class has been reduced to zero.

The indenture will not permit the allocation of realized losses on the mortgage loans to the Class A Notes; however investors in the Class A Notes should realize that under certain loss scenarios there will not be enough interest and principal on the mortgage loans to pay to such notes all interest and principal amounts to which such notes are then entitled.

As of the closing date, the aggregate note principal balance of the Class M Notes will equal approximately 22.83% of the aggregate note principal balance of all classes of notes.

See "*Description of the Notes—Allocation of Losses*" in this prospectus supplement.

***Cross-Collateralization***. The payment rules will require that after the senior notes relating to a loan group receive certain payments on each payment date, available funds from that loan group otherwise allocable to such senior notes will be allocated to the senior notes relating to the other loan group or loan groups as described in this prospectus supplement. This feature is called "cross-collateralization."

**Interest Rate Swap Agreement**

The issuing entity will enter into an interest rate swap agreement with the derivatives provider, in such capacity, the swap provider. On or before each payment date commencing with the payment date in July 2007 and ending with the payment date in March 2013, the securities administrator, on behalf of the trust, will be obligated to make a fixed payment to the swap provider, and the swap provider will be obligated to make a floating payment to the trust, in each case as set forth in the interest rate swap agreement and as described in this prospectus supplement. To the extent that the fixed payment under the interest rate swap agreement exceeds the floating payment in respect of any payment date, amounts otherwise available to the noteholders will be applied to make a net payment to the swap provider. To the extent that the floating payment under the interest rate swap agreement exceeds the fixed payment in respect of

any payment date, the swap provider will make a net swap payment to the securities administrator who will remit to holders of the notes an amount necessary for certain distributions as described in this prospectus supplement. The Class M-7-B, Class M-8-B, Class M-9 and Class M-10 Notes will not be entitled to receive payments under the interest rate swap agreement under any circumstances.

Upon early termination of the interest rate swap agreement, the securities administrator, on behalf of the trust, or the swap provider may be liable to make a swap termination payment to the other party, regardless of which party has caused the termination. The swap termination payment will be computed in accordance with the procedures set forth in the interest rate swap agreement. In the event that the trust is required to make a swap termination payment to the swap provider, the securities administrator, on behalf of the trust, will be required to make a payment on the related payment date and on any subsequent payment dates until paid in full, prior to any distribution to noteholders, except in the case of certain swap termination payments resulting from an event of default or certain termination events with respect to the swap provider as described in this prospectus supplement, in which event payment of such amount by the trust will be subordinated to all distributions to the noteholders.

We refer you to "*The Interest Rate Swap Agreement*" in this prospectus supplement.

**Cap Agreement**

The issuing entity will enter into an interest rate cap agreement with the derivatives provider, in such capacity, the cap provider. On each payment date beginning in May 2009 and ending with the payment date in June 2014, the cap provider will be obligated to make payments to the securities administrator, on behalf of the trust, when one-month LIBOR as determined pursuant to the cap agreement exceeds the rate for the payment date as set forth in this prospectus supplement. Such payment will be distributed by the securities administrator as described in this prospectus supplement. Cap

payments received will be used to pay unpaid interest amounts, allocated realized losses and basis risk shortfalls and to restore overcollateralization, to the extent needed after distribution of the excess interest and net swap payments received from the swap provider for that payment date, as described in this prospectus supplement. The Class M-7-B, Class M-8-B, Class M-9 and Class M-10 Notes will not be entitled to receive payments under the interest rate cap agreement under any circumstances.

*See "Description of the Notes — The Cap Agreement" in this prospectus supplement.*

**Advances**

The servicer will be required to make cash advances with respect to delinquent payments of scheduled interest and principal on the mortgage loans, in general, to the extent that the servicer reasonably believes that such cash advances can be repaid from future payments on the related mortgage loans. If the servicer fails to make any required advances, the master servicer will be obligated to do so, and if the master servicer fails to make any required advances as successor servicer, the indenture trustee, as successor servicer, may be obligated to do so, each as described in this prospectus supplement. These cash advances are only intended to maintain a regular flow of scheduled interest and principal payments on the notes and are not intended to guarantee or insure against losses.

**Master Servicing Fee and Servicing Fee**

The master servicer will be entitled to receive a monthly fee as compensation for its activities under the sale and servicing agreement equal to $1/12^{th}$ of the related master servicing fee rate multiplied by the loan balance of each mortgage loan master serviced by it as of the due date in the month preceding the month in which such payment date occurs. The master servicing fee rate will be equal to 0.010% per annum. Each of the securities administrator, the indenture trustee and the custodian will be entitled to compensation for its services under the agreements which will be paid by the master servicer out of the master servicing fee.

The servicer will be entitled to $1/12^{th}$ of the related servicing fee rate multiplied by the loan balance of each mortgage loan serviced by it as of the due date in the month preceding the month in which such payment date occurs. The servicing fee rate will be equal to 0.500% per annum. Interest shortfalls on the mortgage loans resulting from prepayments during the related prepayment period that are being distributed to the noteholders on the related payment date will be offset by the servicer on the payment date in the following calendar month to the extent of compensating interest payments as described in this prospectus supplement.

**Indenture Trustee Fee**

The fees of the indenture trustee will be paid in accordance with a side letter agreement with the master servicer and at the expense of the master servicer.

**Optional Redemption**

At its option, the majority holder of the owner trust certificates may purchase from the issuing entity all of the mortgage loans and all other assets representing interests in such mortgage loans, together with any properties in respect thereof acquired on behalf of the issuing entity, and thereby effect termination and early retirement of the notes after the aggregate loan balance of the mortgage loans and properties acquired in respect thereof, remaining in the issuing entity has been reduced to less than or equal to 10% of the aggregate loan balance of the mortgage loans as of the cut-off date.

See "*The Indenture*" in this prospectus supplement.

**Federal Income Tax Consequences**

For federal income tax purposes the offered notes will be characterized as debt to the extent they are issued to parties unrelated to the owner of the owner trust certificates. Each noteholder that is unrelated to the owner of the owner trust certificates, by its acceptance of a note, will agree to treat the offered notes as debt.

The trust will be classified as a taxable mortgage pool. The trust will not, however, be subject to federal income tax as a corporation as long as the owner trust certificates are owned exclusively by a "real estate investment trust" ("REIT") or by a "qualified REIT subsidiary" or by an entity that is wholly-owned by a REIT or "qualified REIT subsidiary" and disregarded for federal income tax purposes. The sponsor will certify that it is a "real estate investment trust" and it will own the owner trust certificates through a "qualified REIT subsidiary" or an entity disregarded for federal income tax purposes. Moreover, the trust agreement sets forth restrictions on the transferability of the owner trust certificates to ensure that it will only be held by a "real estate investment trust," a "qualified REIT subsidiary" or an entity disregarded for federal income tax purposes.

See "*Risk Factor—Taxation of the Issuing Entity*", and "*Federal Income Tax Consequences*" in this prospectus supplement.

**Ratings**

It is a condition to the issuance of the offered notes that the offered notes receive the following ratings from Standard & Poor's, a division of The McGraw-Hill Companies, Inc., which is referred to in this prospectus supplement as S&P and Moody's Investors Service, Inc., which is referred to in this prospectus supplement as Moody's:

|  | S&P | Moody's |
|---|---|---|
| 1-A-1 .... | AAA | Aaa |
| 2-A-1 .... | AAA | Aaa |
| 2-A-2 .... | AAA | Aaa |
| 2-A-3 .... | AAA | Aaa |
| 2-A-4 .... | AAA | Aaa |
| M-1 ....... | AA+ | Aa1 |
| M-2 ....... | AA+ | Aa2 |
| M-3 ....... | AA | Aa3 |
| M-4 ....... | AA | A1 |
| M-5 ....... | AA- | A2 |
| M-6 ....... | A+ | A3 |
| M-7-A... | A | Baa1 |

|  | S&P | Moody's |
|---|---|---|
| M-7-B ... | A | Baa1 |
| M-8-A ... | BBB+ | Baa2 |
| M-8-B ... | BBB+ | Baa2 |
| M-9 ....... | BBB | Baa3 |
| M-10 ..... | BBB- | NR |

A rating is not a recommendation to buy, sell or hold securities and either rating agency can revise or withdraw such ratings at any time. Additionally, a rating does not address the frequency of prepayments on the mortgage loans, the corresponding effect on yield to investors or the likelihood of receipt of any payments under the interest rate cap agreement.

See "*Yield on the Offered Notes*" and "*Ratings*" in this prospectus supplement and "*Yield Considerations*" in the accompanying prospectus.

**Legal Investment**

The offered notes will constitute "mortgage related securities" for purposes of SMMEA.

See "*Legal Investment Matters*" in the accompanying prospectus.

**ERISA Considerations**

The offered notes may be eligible for purchase by persons investing assets of employee benefit plans or individual retirement accounts, subject to important considerations. Plans should consult with their legal advisors before investing in the notes. See "*ERISA Considerations*" in this prospectus supplement.

### TRANSACTION STRUCTURE



## RISK FACTORS

You are encouraged to carefully consider, among other things, the following factors in connection with the purchase of the offered notes:

**The offered notes will have limited liquidity, so you may be unable to sell your securities or may be forced to sell them at a discount from their fair market value.**

The underwriter intends to make a secondary market in the offered notes, however the underwriter will not be obligated to do so. There can be no assurance that a secondary market for the offered notes will develop or, if it does develop, that it will provide holders of the offered notes with liquidity of investment or that it will continue for the lives of the offered notes. As a result, any resale prices that may be available for any offered note in any market that may develop may be at a discount from the initial offering price or the fair market value thereof. The offered notes will not be listed on any securities exchange.

**Taxation of the issuing entity.**

It is anticipated that the trust will be characterized as one or more taxable mortgage pools ("TMP"), for federal income tax purposes.  In general, a TMP is treated as a separate corporation not includible with any other corporation in a consolidated income tax return, and is subject to corporate income taxation.  However, it is anticipated that the Trust will be entirely owned by the sponsor, which is a "real estate investment trust" ("REIT").  So long as the trust is owned directly or indirectly by a REIT, classification of the trust as a TMP will not cause it to be subject to corporate income tax.  Rather, the consequence of the classification of the trust as a TMP is that the shareholders of the sponsor may be required to treat a portion of the dividends they receive from the sponsor as though they were "excess inclusions" with respect to a residual interest in a "real estate mortgage investment conduit" ("REMIC"), within the meaning of Section 860D of the Code.

In the event that the trust is not wholly owned by a REIT or a "qualified REIT subsidiary," it would become subject to federal income taxation as a corporation and would not be permitted to be included in a consolidated income tax return of another corporate entity.  Any transfer of the owner trust certificates will require such transferee to represent that it is a REIT, a "qualified REIT subsidiary" or a wholly-owned entity of a REIT or "qualified REIT subsidiary" that is disregarded for federal income tax purposes.

In the event any offered notes are held by the sponsor or a "qualified REIT subsidiary" of the sponsor, such offered notes will not be characterized as debt or equity until any such notes are issued or sold to other parties.   If such classes of offered notes were not characterized as debt for federal income tax purposes at a time they were so issued or sold, the trust would no longer be treated as wholly-owned by the sponsor or as a "qualified REIT subsidiary", resulting in the adverse tax consequences discussed above.

In the event that federal income taxes are imposed on the trust, the cash flow available to make payments on the offered notes would be reduced.  In addition, the need for cash to pay such taxes could result in a liquidation of the trust, with a consequential redemption of the offered notes at a time earlier than anticipated.

**Less stringent underwriting guidelines and the resultant potential for delinquencies on the mortgage loans could lead to losses on your notes.**

Under a Cease and Desist Order dated March 7, 2007 by the Federal Deposit Insurance Corporation (the "Order"), the Federal Deposit Insurance Corporation is requiring that Fremont Investment & Loan cease and desist certain operations and practices, including originating residential subprime mortgage loans under the current underwriting guidelines as set forth in this prospectus supplement.  Substantially all of the mortgage loans included in the mortgage pool are mortgage loans that Fremont Investment & Loan originated prior to the Order and which Fremont has agreed not to originate in the future under the Order.  No assurance can be given that products offered and underwriting guidelines employed by Fremont Investment & Loan will not experience increased defaults and/or delinquencies that could lead to losses on your notes or otherwise have a material adverse effect on the value of the notes.

In connection with its purchase of the mortgage loans, the Seller, or an agent of the Seller, performed due diligence reviews of a sampling of the mortgage loans to be purchased.  Such reviews consisted of compliance reviews, credit  reviews and reviews of the appraisals generated by automated valuation models.  In furtherance of the compliance review, mortgage loans originated in high-cost states as well as mortgage loans in non-high-cost states were reviewed and a portion of such loans were rejected from the pool to be purchased due to compliance deficiencies.  In addition, a portion of the mortgage loans in the mortgage pool to be purchased were rejected due to credit quality deficiencies or appraisal deficiencies.  There can be no assurance that the mortgage loans in the mortgage pool do not have similar deficiencies that could result in  losses with respect to the mortgage loans.

In addition, certain mortgage loans were underwritten generally in accordance with underwriting standards which are primarily intended to provide for single family "non-conforming" mortgage loans. A "non-conforming" mortgage loan means a mortgage loan which is ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor, i.e. borrowers on the mortgage loans may have an impaired or unsubstantiated credit history, or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines. These documentation standards may include mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan. Accordingly, mortgage loans underwritten under such non-conforming credit underwriting standards are likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines. Any resulting losses, to the extent not covered by credit enhancement, may affect the yield to maturity of the offered notes.

*See "Mortgage Loan Origination—The Originator—Recent Events" in this prospectus supplement.*

**Recent Events with respect to Fremont Investment & Loan may limit the ability of Fremont to repurchase defective loans and may adversely effect the value of your notes.**

Fremont Investment & Loan recently announced its intention to exit the residential subprime mortgage origination business.  The issues that have led to the closing of the residential subprime mortgage origination platform of Fremont Investment & Loan and the decision to exit such business may have a material adverse effect on the value of your notes and on the performance of the mortgage loans. In addition, the resignation of Grant Thornton LLP as Fremont General Corporation's independent registered public accounting firm during the first quarter of this year resulted in the delay by Fremont General Corporation of the release of its audited financial information for the year ended December 31, 2006 and the unaudited information for the first quarter of 2007.  Such announcement, and the current and

future lack of audited and unaudited financial information, may have an adverse effect on the value of your notes.

In addition to the such recent events outlined above, Fremont Investment & Loan has announced that it has entered into an agreement to sell its commercial real estate operations and has entered into a letter of intent to sell its subprime residential servicing platform. No assurance can be given that the above-referenced transactions will be consummated or what impact, if any, such transactions will have on the ongoing operations of Fremont Investment & Loan.

Fremont Investment & Loan, as originator of the mortgage loans, has made various representations and warranties relating to the mortgage loans, which, if breached, may (in the event of such breach materially and adversely affects the interests of the noteholders in the related mortgage loan) require the subject mortgage loan to be repurchased by it. The inability of Fremont Investment & Loan to repurchase a defective mortgage loan may increase the losses allocated to your notes and/or otherwise adversely impact the notes. In addition, Fremont General Corporation, the parent of the Originator, has guaranteed the obligations of the Originator.

Each of these events, alone or together, could have a negative adverse effect on the performance of the mortgage loans or cause delays or losses in distributions on the notes. See "Mortgage Loan Origination—The Originator —Recent Events" in this prospectus supplement.

**Transfers of servicing may result in higher delinquencies and defaults which may adversely affect the yield on your notes.**

For the period from the cut-off date to, but not including, July 5, 2007, Fremont Investment & Loan will service the mortgage loans pursuant to an interim servicing agreement between Nationstar Mortgage LLC and Fremont Investment & Loan. As described under "Mortgage Loan Origination—The Originator —Recent Events—Servicer Rating Actions," Fremont Investment & Loan's residential primary servicer rating for subprime mortgage loans has been downgraded by Moody's Investors Service, Inc. and Fitch Ratings, Inc. As of July 5, 2007, this interim servicing agreement will terminate and all servicing functions will be performed by Nationstar Mortgage LLC in accordance with the servicing provisions set forth in the sale and servicing agreement.

The transfer of servicing from Fremont Investment & Loan to Nationstar Mortgage LLC may involve the risk of disruption in collections due to data input errors, misapplied or misdirected payments, system incompatibilities, the requirement to notify the mortgagors about the servicing transfer, delays caused by the transfer of the related servicing mortgage files and records to the new servicer, additional risks relating to the transfer of servicing as a result of the disclosure set forth in "Mortgage Loan Origination—The Originator —Recent Events," and other reasons. As a result of a servicing transfer and any delays associated with the transfer, the rate of delinquencies and defaults on the mortgage loans could increase at least for a period of time. We cannot assure you that there will be no disruptions associated with the transfer of servicing or that, if there are disruptions, they will not adversely affect the yield on your certificates.

**Fremont Investment & Loan's report of management related to assessment of compliance.**

Fremont Investment & Loan's report of management related to their assessment of compliance with applicable servicing criteria for the twelve months ended December 31, 2006, furnished pursuant to Item 1122 of Regulation AB, disclosed that it complied in all material respects with the specified minimum servicing standards, except as follows:

•       The specified minimum servicing standards require that payments received by borrowers be remitted to the appropriate accounts maintained pursuant to the transaction documents. During the year ended December 31, 2006, 709 payments were not remitted to the appropriate collection accounts in a timely manner.  Upon review of the 709 payments not remitted to the appropriate collection account and the total number of payments processed during 2006 of 1,377,091, the 709 payments represent .060% of the total number of loan payment received by Fremont Investment & Loan during 2006. Therefore, Fremont Investment & Loan's management concluded this error is immaterial and a non-reportable occurrence.

•       In addition, the specified minimum servicing standards require the proper adjustment of an adjustable rate mortgage loan pursuant to the terms of the related mortgage note. During the year ended December 31, 2006, one rate adjustment for a mortgage loan covered under the Servicemembers Civil Relief Act, as amended, was suppressed and the rate was not reset to the correct adjusted rate in a timely manner. Upon review of this exception, Fremont Investment & Loan's management noted that for the year ended December 31, 2006, a total of only 46 mortgage loans were subject to the Servicemembers Civil Relief Act, as amended, as compared to a total number of mortgage loans serviced by Fremont of approximately 1.3 million for the year ended December 31, 2006. Therefore, Fremont Investment & Loan's management concluded this error to be immaterial and a non-reportable occurrence.

Fremont Investment and Loan's management therefore concluded that the Fremont Investment & Loan complied with the specified minimum servicing standards in all material respects.

**Instances of material non-compliance in assessments of compliance with servicing criteria.**

Wells Fargo Bank, N.A.'s assessment of compliance with applicable servicing criteria relating to its provision of master servicing, trustee, securities administration and paying agent services for the twelve months ended December 31, 2006, furnished pursuant to Item 1122 of Regulation AB, discloses that it was not in compliance with the 1122(d)(3)(i) servicing criteria during that reporting period.  The assessment of compliance indicates that certain monthly investor or remittance reports included errors in the calculation and/or the reporting of delinquencies for the related pool assets, which errors may or may not have been material, and that all such errors were the result of data processing errors and/or the mistaken interpretation of data provided by other parties participating in the servicing function.  The assessment further states that all necessary adjustments to Wells Fargo Bank, N.A's data processing systems and/or interpretive clarifications have been made to correct those errors and to remedy related procedures.

**The subordinated notes have a greater risk of loss than the senior notes.**

When certain classes of notes provide credit enhancement for other classes of notes it is sometimes referred to as "subordination". For purposes of this prospectus supplement, "subordinated classes" means:

•       with respect to the senior notes: the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class M-10 Notes;

- with respect to the Class M-1 Notes: the Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class M-10 Notes;

- with respect to the Class M-2 Notes: the Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class M-10 Notes;

- with respect to the Class M-3 Notes: the Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class M-10 Notes;

- with respect to the Class M-4 Notes: the Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class M-10 Notes;

- with respect to the Class M-5 Notes: the Class M-6, Class M-7, Class M-8, Class M-9 and Class M-10 Notes;

- with respect to the Class M-6 Notes: the Class M-7, Class M-8, Class M-9 and Class M-10 Notes;

- with respect to the Class M-7 Notes: the Class M-8, Class M-9 and Class M-10 Notes;

- with respect to the Class M-8 Notes: the Class M-9 and Class M-10 Notes; and

- with respect to the Class M-9 Notes: the Class M-10 Notes.

Credit enhancement for the notes will be provided, first, by the right of the holders of the notes to receive certain payments of interest and principal prior to the more subordinated classes and, second, by the allocation of realized losses on the mortgage loans to the notes as described below. This form of credit enhancement uses collections on the mortgage loans otherwise payable to the holders of the subordinated classes to pay amounts due on the more senior classes. Such collections are the sole source of funds from which such credit enhancement is provided. Realized losses will first reduce the amount of excess interest and then reduce the overcollateralization amount.  If on any payment date, the aggregate principal balance of the notes (after all payments of principal have been made) exceeds the aggregate balance of the mortgage loans as of the last day of the due period and after giving effect to any prepayments received during the prepayment period, such excess will be allocated to the subordinated notes, beginning with the class of subordinated notes with the lowest payment priority, in each case until the note principal balance of that class has been reduced to zero. This means that with respect to the offered notes, realized losses would first be allocated to the Class M-10 Notes, and then to the other classes of Class M Notes in reverse order of numerical designation until the note principal balance of each such class of Class M Notes is reduced to zero. The indenture will not permit the allocation of realized losses on the mortgage loans to the Class A Notes; however investors in the Class A Notes should realize that under certain loss scenarios there will not be enough interest and principal on the mortgage loans to pay to such notes all interest and principal amounts to which such notes are then entitled.

Accordingly, if the note principal balance of a subordinated class were to be reduced to zero, delinquencies and defaults on the mortgage loans would reduce the amount of funds available for distributions to holders of the remaining subordinated class or classes and, if the aggregate note principal balance of all the subordinated classes were to be reduced to zero, delinquencies and defaults on the mortgage loans would reduce the amount of funds available for monthly distributions to holders of the senior notes.

You are encouraged to fully consider the risks of investing in a subordinated note, including the risk that you may not fully recover your initial investment as a result of realized losses on the mortgage loans.

*See "Description of the Notes" in this prospectus supplement.*

**Additional risks associated with the subordinated notes.**

The weighted average lives of, and the yields to maturity on, the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class M-10 Notes will be progressively more sensitive, in that order, to the rate and timing of mortgagor defaults and the severity of ensuing losses on the mortgage loans. If the actual rate and severity of losses on the mortgage loans are higher than those assumed by an investor in such notes, the actual yield to maturity of such notes may be lower than the yield anticipated by such holder based on such assumption. The timing of losses on the mortgage loans will also affect an investor's actual yield to maturity on the subordinated notes, even if the rate of defaults and severity of losses over the life of the mortgage loans are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the mortgage loans, to the extent they exceed the   overcollateralization amount following all distributions in respect of principal on the related payment date, will reduce the note principal balance of each of the subordinated notes, in reverse order of their numerical designation. As a result of such reductions, less interest will accrue on such class of subordinated notes than would otherwise be the case. Once a realized loss is allocated to a subordinated note, no interest will be distributable with respect to such written down amount.

It is not expected that the subordinated notes will be entitled to any principal distributions until at least July 2010 or during any period in which delinquencies or losses on the mortgage loans exceed certain levels. As a result, the weighted average lives of the subordinated notes will be longer than would otherwise be the case if distributions of principal were allocated among all of the notes at the same time. As a result of the longer weighted average lives of the subordinated notes, the holders of such notes have a greater risk of suffering a loss on their investments. Further, because such notes might not receive any principal if certain delinquency or loss levels occur, it is possible for such notes to receive no principal distributions even if no losses have occurred on the mortgage pool.

In addition, the multiple class structure of the subordinated notes causes the yield of such classes to be particularly sensitive to changes in the rates of prepayment of the mortgage loans. Because distributions of principal will be made to the holders of such notes according to the priorities described in this prospectus supplement, the yield to maturity on such classes of notes will be sensitive to the rates of prepayment on the mortgage loans experienced both before and after the commencement of principal distributions on such classes. The yield to maturity on such classes of notes will also be extremely sensitive to losses due to defaults on the mortgage loans and the timing thereof, to the extent such losses are not covered by excess interest, net swap payments received, cap payments received, overcollateralization, or a class of subordinated notes with a lower payment priority. Furthermore, the timing of receipt of principal and interest by the subordinated notes may be adversely affected by losses even if such classes of notes do not ultimately bear such loss.

Also, investors in the subordinate notes should be aware that in cases where principal distributions are made sequentially to the subordinate notes on or after the stepdown date, the most subordinate class of subordinate notes then outstanding may receive more than such class's pro rata share of principal for that payment date. As a result, the note principal balance of the most subordinate class or classes of subordinate notes may be reduced to zero prior to the more senior class or classes of subordinate notes.

**Excess interest may be inadequate to cover losses and/or to maintain overcollateralization.**

The mortgage loans are expected to generate more interest than is needed to pay interest on the notes and certain issuing entity expenses because we expect the weighted average interest rate on the mortgage loans, adjusted for any net swap payments and swap termination payments, to be higher than the weighted average note interest rate on the notes. If the mortgage loans generate more interest than is needed to pay interest on the notes and issuing entity expenses, adjusted for any net swap payments and swap termination payments, such "excess interest" will be used to make additional principal payments on the notes, which will reduce the total note principal balance of the notes below the aggregate principal balance of the mortgage loans, until the required level of overcollateralization has been met. In addition, amounts payable to the trust under the interest rate swap agreement and cap agreement may be used to restore and maintain the required level of overcollateralization. Overcollateralization is intended to provide limited protection to noteholders by absorbing the note's share of losses from liquidated mortgage loans. However, we cannot assure you that enough excess interest will be generated on the mortgage loans or that amounts payable under the interest rate swap agreement will be sufficient to maintain the required level of overcollateralization. As of the closing date it is expected that the required level of overcollateralization will be met.

The excess interest available on any payment date will be affected by the actual amount of interest received, advanced or recovered in respect of the mortgage loans during the preceding month. Such amount may be influenced by changes in the weighted average of the mortgage rates resulting from prepayments, defaults and liquidations of the mortgage loans.

If the protection afforded by overcollateralization is insufficient, then you could experience a loss on your investment.

**The available funds rate may reduce the yields on the offered notes.**

The note interest rates on the notes are each subject to an available funds rate as described in this prospectus supplement. If on any payment date the note interest rate for a class of offered notes is limited to the related interest rate cap, the holders of the applicable notes will receive a smaller amount of interest than they would have received on that payment date had the note interest rate for that class not been calculated based on the related interest rate cap. If the note interest rates on the offered notes are limited for any payment date, the resulting interest shortfalls may be recovered by the holders of these notes on the same payment date or on future payment dates on a subordinated basis to the extent that on such payment date or future payment dates there are available funds remaining after certain other distributions on the notes and the payment of certain fees and expenses of the issuing entity and to the extent there are amounts available under the interest rate swap agreement and cap agreement to pay such amounts as described in this prospectus supplement.

*See "Description of the Notes—Payments on the Notes" in this prospectus supplement.*

**Effect of mortgage rates on the offered notes.**

The offered notes accrue interest at note rates based on the one-month LIBOR index plus specified margins, limited by the available funds rate and a maximum note rate.  The available funds rate for the offered notes is based on the weighted average of the mortgage rates on the mortgage loans net of certain fees and expenses of the trust (including any net swap payment owed to the swap provider and any swap termination payment owed to the swap provider, other than a swap termination payment due to a swap provider trigger event).

The adjustable-rate mortgage loans have mortgage rates that adjust based on a six-month LIBOR index. The adjustable-rate mortgage loans have periodic and maximum limitations on adjustments to their mortgage rates, and substantially all of the adjustable-rate mortgage loans will have the first adjustment to their mortgage rates generally two years, three years or five years after the origination thereof. The fixed-rate mortgage loans have mortgage rates that will not adjust. As a result of the limit on the note rates on the offered notes, such notes may accrue less interest than they would accrue if their note rates were based solely on the one-month LIBOR index plus the specified margin (in the case of the offered notes).

A variety of factors could limit the note rates on the offered notes. Some of these factors are described below:

- The note rates for the offered notes adjust monthly while the mortgage rates on the adjustable-rate mortgage loans adjust less frequently and the mortgage rates on the fixed-rate mortgage loans do not adjust. Furthermore, substantially all of the adjustable-rate mortgage loans will have the first adjustment to their mortgage rates generally two years, three years or five years following their origination. Consequently, the limit on the note rates on the offered notes may prevent any increases in the note rates such Notes for extended periods in a rising interest rate environment.

- If prepayments, defaults, liquidations and repurchases occur more rapidly on the mortgage loans with relatively higher mortgage rates than on the mortgage loans with relatively lower mortgage rates, the note rates on the offered notes are more likely to be limited.

- The index used to determine the mortgage rates on the adjustable-rate mortgage loans may respond to different economic and market factors than does one-month LIBOR. It is possible that the mortgage rates on certain of the adjustable-rate mortgage loans may decline while the note rates on the offered notes are stable or rising. It is also possible that the mortgage rates on the adjustable-rate mortgage loans and the note rates on the offered notes that are subject to adjustment may both decline or increase during the same period, but that the note rates on such notes may decline more slowly or increase more rapidly.

If the note rates on the offered notes are limited for any payment date, the resulting basis risk shortfalls may be recovered by the holders of such notes on such payment date or future payment dates to the extent that on such payment date or future payment dates there are available funds remaining after certain other payments on the offered notes and the payment of certain fees and expenses of the trust (including any net swap payment owed to the swap provider and any swap termination payment owed to the swap provider, other than a swap termination payment due to a swap provider trigger event).

To the extent interest on the offered notes is limited to the related available funds rate, the difference between such interest rate cap and one-month LIBOR plus the related margin will create a shortfall. Some or all of this shortfall in respect of the offered notes will be funded to the extent of payments, if any, received from the swap provider under the interest rate swap agreement and cap payments, if any, received under the cap agreement. However, if payments under the interest rate swap agreement and cap agreement do not provide sufficient funds to cover such shortfalls, such shortfalls may remain unpaid on the final payment date, including the optional redemption date.

**Defaults could cause payment delays and losses.**

There could be substantial delays in the liquidation of defaulted mortgage loans and corresponding delays in receiving your portion of the proceeds of liquidation. These delays could last up

to several years. Furthermore, an action to obtain a deficiency judgment is regulated by statutes and rules, and the amount of a deficiency judgment may be limited by law. In the event of a default by a borrower, these restrictions may impede the ability of the servicer or master servicer to foreclose on or to sell the mortgaged property or to obtain a deficiency judgment. In addition, liquidation expenses such as legal and appraisal fees, real estate taxes and maintenance and preservation expenses, will reduce the amount of security for the mortgage loans and, in turn, reduce the proceeds payable to noteholders.

In the event that:

• the mortgaged properties fail to provide adequate security for the related mortgage loans, and

• the protection provided by the subordination of certain classes and the availability of overcollateralization, net swap payments and cap payments are insufficient to cover any shortfall,

You could lose all or a portion of the money you paid for your notes.

**Your yield could be adversely affected by the unpredictability of prepayments.**

No one can accurately predict the level of prepayments that the issuing entity will experience. The issuing entity's prepayment experience may be affected by many factors, including:

• general economic conditions,

• the level of prevailing interest rates,

• the availability of alternative financing, and

• homeowner mobility.

Certain of the mortgage loans contain due-on-sale provisions, and the servicer intends to enforce those provisions unless doing so is not permitted by applicable law or the servicer, in a manner consistent with reasonable commercial practice, permits the purchaser of the mortgaged property in question to assume the related mortgage loan. In addition, approximately 71.98% and 80.39% of the mortgage loans in loan group 1 and loan group 2, respectively, and approximately 76.50% of the mortgage loans in the aggregate by aggregate principal balance as of the cut-off date, impose a prepayment charge in connection with voluntary prepayments made within up to three years after origination, which prepayment charges may discourage prepayments during the applicable period. For a detailed description of the characteristics of the prepayment charges on the mortgage loans, and the standards under which the prepayment charges may be waived by the servicer, please see "The Mortgage Pool — Prepayment Charges on the Mortgage Loans" in this prospectus supplement. There can be no assurance that the prepayment charges will have any effect on the prepayment performance of the mortgage loans.

The weighted average lives of the notes will be sensitive to the rate and timing of principal payments, including prepayments, on the mortgage loans, which may fluctuate significantly from time to time.

You are encouraged to note that:

• if you purchase your notes at a discount and principal is repaid on the mortgage loans slower than you anticipate, then your yield may be lower than you anticipate;

•       if you purchase your notes at a premium and principal is repaid on the mortgage loans faster than you anticipate, then your yield may be lower than you anticipate;

•       if you purchase a note bearing interest at an adjustable rate, your yield will also be sensitive both to the level of one-month LIBOR and the related available funds rate;

•       since repurchases of mortgage loans as a result of breaches of representations and warranties or early payment defaults and liquidations of mortgage loans following default have the same effect as prepayments, your yield may be lower than you expect if the rate of such repurchases and liquidations is higher than you expect;

•       the overcollateralization provisions, whenever overcollateralization is at a level below the required level, are intended to result in an accelerated rate of principal distributions to holders of the related classes of notes then entitled to distributions of principal. An earlier return of principal to the holders of the offered notes as a result of the overcollateralization provisions will influence the yield on the offered notes in a manner similar to the manner in which principal prepayments on the mortgage loans will influence the yield on the related offered notes; and

•       you bear the reinvestment risks resulting from a faster or slower rate of principal payments than you expected.

We refer you to "The Mortgage Pool" and "Yield, Prepayment and Maturity Considerations" in this prospectus supplement and "Material Legal Aspects of the Loans—Due-on-Sale Clauses in Mortgage Loans" in the accompanying prospectus for a description of certain provisions of the mortgage loans that may affect the prepayment experience on the mortgage loans.

**Mortgage loan modifications may affect the available funds rates.**

Modifications of mortgage loans agreed to by the servicer in order to maximize ultimate proceeds of such mortgage loans may have the effect of, among other things, reducing the loan rate, forgiving payments of principal, interest or other amounts owed under the mortgage loan or contract, such as taxes or insurance premiums, extending the final maturity date of the loan, capitalizing delinquent interest and other amounts owed under the mortgage loan or contract, or any combination of these or other modifications. Any modified loan may remain in the trust, and the reduction in collections resulting from a modification may result in a lower available funds rate, reduced distributions of interest or principal on or result in a allocation of a realized loss to, one or more classes of the notes.

**A reduction in note rating could have an adverse effect on the value of your notes.**

The ratings of each class of offered notes will depend primarily on an assessment by the rating agencies of the mortgage loans, the amount of overcollateralization and the subordination afforded by certain classes of notes. The ratings by each of the rating agencies of the offered notes are not recommendations to purchase, hold or sell the offered notes because such ratings do not address the market prices of the notes or suitability for a particular investor.

The rating agencies may suspend, reduce or withdraw the ratings on the offered notes at any time. Any reduction in, or suspension or withdrawal of, the rating assigned to a class of offered notes would probably reduce the market value of such class of offered notes and may affect your ability to sell them.

**Your payments could be adversely affected by the bankruptcy or insolvency of certain parties.**

The originator and the seller will treat the transfer of the mortgage loans to the depositor as a sale of the mortgage loans. However, if the originator becomes bankrupt, the trustee in bankruptcy may argue that the mortgage loans were not sold but were only pledged to secure a loan to such entity. If that argument is made, you could experience delays or reductions in payments on the notes. If that argument is successful, the bankruptcy trustee could elect to sell the mortgage loans and pay down the notes early. Thus, you could lose the right to future payments of interest, and might suffer reinvestment loss in a lower interest rate environment.

In addition, if the servicer becomes bankrupt, a bankruptcy trustee or receiver may have the power to prevent the appointment of a successor servicer. Any related delays in servicing could result in increased delinquencies or losses on the mortgage loans.

**Developments in specified regions could have a disproportionate effect on the mortgage loans due to geographic concentration of mortgaged properties.**

Approximately 15.09% and 41.13% of the mortgage loans in loan group 1 and loan group 2, respectively, and approximately 29.07% of the mortgage loans in the aggregate by aggregate principal balance as of the cut-off date are secured by mortgaged properties that are located in the state of California. The tables entitled "Geographic Distribution" presented in Schedule A to this prospectus supplement list the states with the highest concentrations of mortgage loans in loan group 1 and loan group 2. Property in those states or in any other region having a significant concentration of properties underlying the mortgage loans, may be more susceptible than homes located in other parts of the country to certain types of uninsurable hazards, such as earthquakes, floods, mudslides and other natural disasters. In addition,

•       economic conditions in the specified regions, which may or may not affect real property values, may affect the ability of borrowers to repay their loans on time;

•       declines in the residential real estate market in the specified regions may reduce the values of properties located in those regions, which would result in an increase in the loan-to-value ratios; and

•       any increase in the market value of properties located in the specified regions would reduce the loan-to-value ratios and could, therefore, make alternative sources of financing available to the borrowers at lower interest rates, which could result in an increased rate of prepayment of the mortgage loans.

**Violation of consumer protection laws may result in losses on the mortgage loans and the offered notes.**

Applicable state laws generally regulate interest rates and other charges, require certain disclosure, and require licensing of the originators. In addition, other state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the mortgage loans.

The mortgage loans are also subject to federal laws, including:

•       the Federal Truth in Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the mortgagors regarding the terms of the mortgage loans;

•        the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

•        the Depository Institutions Deregulation and Monetary Control Act of 1980, which preempts certain state usury laws.

Violations of certain provisions of these federal and state laws may limit the ability of the servicer to collect all or part of the principal of or interest on the mortgage loans and in addition could subject the issuing entity to damages and administrative enforcement. In particular, the failure of the originators to comply with certain requirements of the Federal Truth in Lending Act, as implemented by Regulation Z, could subject the issuing entity to monetary penalties, and result in the mortgagors' rescinding the mortgage loans against the issuing entity. In addition to federal law, some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in mortgage loans that have interest rates or origination costs in excess of prescribed levels, that require mortgagors be given certain disclosures prior to the consummation of the mortgage loans and that restrict the ability of the servicer to foreclose in response to the mortgagor's default. The failure of the originators to comply with these laws could subject the issuing entity to significant monetary penalties, could result in the mortgagors rescinding the mortgage loans against the issuing entity and/or limit the servicer's ability to foreclose upon the related mortgaged property in the event of a mortgagor's default.

Under the anti-predatory lending laws of some states, the borrower is required to meet a net tangible benefits test in connection with the origination of the related mortgage loan. This test may be highly subjective and open to interpretation. As a result, a court may determine that a mortgage loan does not meet the test even if the originators reasonably believed that the test was satisfied. Any determination by a court that a mortgage loan does not meet the test will result in a violation of the state anti-predatory lending law, in which case the sponsor will be required to purchase that mortgage loan from the issuing entity.

The originator has represented that, as of the closing date, each mortgage loan is in compliance with applicable federal and state laws and regulations. In the event of a breach of such representation, the originator will be obligated to cure such breach or repurchase or replace the affected mortgage loan in the manner described in this prospectus supplement. If the originator is unable or otherwise fails to satisfy such obligations, the yield on the offered notes may be materially and adversely affected.

**Some of the mortgage loans have an initial interest only period, which may result in increased delinquencies and losses.**

As of the cut-off date, approximately 2.30% and 6.47% of the group 1 mortgage loans and group 2 mortgage loans, respectively, and approximately 4.54% of the mortgage loans in the aggregate, have an initial interest only period of three or five years. During this period, the payment made by the related mortgagor will be less than it would be if the mortgage loan amortized. In addition, the mortgage loan balance will not be reduced by the principal portion of scheduled payments during this period. As a result, no principal payments will be made to the notes from these mortgage loans during their interest only period except in the case of a prepayment.

After the initial interest only period, the scheduled monthly payment on these mortgage loans will increase, which may result in increased delinquencies by the related mortgagors, particularly if interest rates have increased and the mortgagor is unable to refinance. In addition, losses may be greater on these mortgage loans as a result of the mortgage loan not amortizing during the early years of these mortgage

loans. Although the amount of principal included in each scheduled monthly payment for a traditional mortgage loan is relatively small during the first few years after the origination of a mortgage loan, in the aggregate the amount can be significant. Any resulting delinquencies and losses, to the extent not covered by credit enhancement, will be allocated to the notes.

Mortgage loans with an initial interest only period are relatively new in the mortgage marketplace. The performance of these mortgage loans may differ significantly from the performance of mortgage loans that fully amortize. For instance, a mortgagor on a mortgage loan with an initial interest only period could seek to refinance at the end of the interest only period by paying off the mortgage loan with the proceeds of a new loan; such refinancing activity could result in higher prepayment speeds than would otherwise be the case with mortgage loans that do not have interest only periods. In addition, the failure to build equity in the property by the related mortgagor may affect the delinquency and prepayment of these mortgage loans.

**Some of the mortgage loans provide for balloon payments at maturity.**

Approximately 55.75% and 58.14% of the mortgage loans in loan group 1 and loan group 2, respectively, and approximately 57.03% of the mortgage loans in the aggregate by aggregate principal balance as of the cut-off date, are balloon loans. These mortgage loans will require a substantial payment of principal, or a balloon payment, at their stated maturity in addition to their scheduled monthly payment. The monthly payments due on the balloon mortgage loans included in the issuing entity may be based on original amortization terms of 40 or 50 years with the balloon principal payment due on a maturity date that is 30 years from the date of origination. Amortization terms of 40 or 50 years result in lower monthly payments than would be required by a traditional 30 year mortgage loan.  The lower monthly payments may allow the borrower to borrow a larger amount than would have been the case for a mortgage loan with a 30 year amortization term.

Mortgage loans with balloon payments involve a greater degree of risk because the ability of a mortgagor to make a balloon payment typically will depend upon the mortgagor's ability either to fully refinance the loan or to sell the related mortgaged property at a price sufficient to permit the mortgagor to make the balloon payment. The ability of a mortgagor to accomplish either of these goals will be affected by a number of factors, including the value of the related mortgaged property, the level of available mortgage rates at the time of sale or refinancing, the mortgagor's equity in the related mortgaged property, the financial condition of the mortgagor, tax laws and prevailing general economic conditions.

**Some of the mortgage loans are secured by second liens, which may result in increased losses with respect to these mortgage loans.**

Approximately 9.97% of the mortgage loans in loan group 2 and approximately 5.35% of the mortgage loans in the aggregate, by aggregate principal balance as of the cut-off date, are secured by second liens, rather than first liens. None of the mortgage loans in loan group 1 are secured by second liens.  The weighted average combined loan-to-value ratio at origination of such mortgage loans is approximately 99.61% with respect to such mortgage loans in loan group 2. The related first lien may or may not be included in this mortgage pool. In the case of second liens, there is a possibility that adequate funds will not be received in connection with a foreclosure of the related senior liens to satisfy fully both the senior liens and the mortgage loan secured by a junior lien. In that case, the issuing entity, as holder of the junior mortgage, could incur a loss.

**Some of the mortgage loans were originated simultaneously with second liens.**

Approximately 17.16% and 33.91% of the mortgage loans in loan group 1 and loan group 2, respectively, and approximately 26.16% of the mortgage loans in the aggregate, by aggregate principal balance as of the cut-off date, at the time of origination of the first lien mortgage loan, the related originator also originated a second lien mortgage loan which may or may not be included in the issuing entity. The weighted average loan-to-value ratio at origination of the first lien on such mortgage loans is approximately 80.71% and 81.03% of the mortgage loans in loan group 1 and loan group 2, respectively, and approximately 80.93% of the mortgage loans in the aggregate, and the weighted average combined loan-to-value ratio at origination of such mortgage loans (including the second lien) is approximately 99.14% and 98.85% of the mortgage loans in loan group 1 and loan group 2, respectively, and approximately 98.94% of the mortgage loans in the aggregate. With respect to these mortgage loans, the rate of delinquencies may be increased relative to mortgage loans that were originated without a simultaneous second lien because the mortgagors on such mortgage loans have less equity in the mortgaged property. Investors are encouraged to also note that any mortgagor may obtain secondary financing at any time subsequent to the date of origination of their mortgage loan from the originators or from any other lender. In addition, a title insurance policy may not have been obtained with respect to some of these simultaneous second lien mortgage loans (although a title search will have been done with respect to the related first lien mortgage loan), which may increase the risk that adequate funds will not be received in connection with a foreclosure of such mortgage loan.

**You may have difficulty selling your notes.**

The underwriter intends to make a secondary market in the offered notes, but the underwriter has no obligation to do so. We cannot assure you that a secondary market will develop or, if it develops, that it will continue. Consequently, you may not be able to sell your notes readily or at prices that will enable you to realize your desired yield. The market values of the notes are likely to fluctuate, and such fluctuations may be significant and could result in significant losses to you.

The secondary markets for asset backed securities have experienced periods of illiquidity and can be expected to do so in the future. Illiquidity can have a severely adverse effect on the prices of notes that are especially sensitive to prepayment, credit or interest rate risk, or that have been structured to meet the investment requirements of limited categories of investors.

**The return on your notes could be reduced by shortfalls due to prepayments and the application of the Servicemembers Civil Relief Act and similar state or local laws.**

When a mortgage loan is prepaid, the mortgagor is charged interest on the amount prepaid only up to the date on which the prepayment is made, rather than for an entire month.  This may result in a shortfall in interest collections available for payment on the next payment date.  The servicer will be required to cover a portion of the shortfall in interest collections that are attributable to voluntary prepayments in full, but only up to the amount of the servicer's servicing fee for that period.

The Servicemembers Civil Relief Act, or the Relief Act, and similar state or local laws provide relief to mortgagors who enter active military service and to mortgagors in reserve status who are called to active military service after the origination of their mortgage loans. Current or future military operations of the United States may increase the number of citizens in active military duty, including those citizens previously in reserve status. Under the Relief Act the interest rate applicable to a mortgage loan for which the related mortgagor is called to active military service will be reduced from the percentage stated in the related mortgage note to 6.00%. This interest rate reduction and any reduction provided under similar state or local laws will result in an interest shortfall because neither the servicer

nor the master servicer will be able to collect the amount of interest which otherwise would be payable with respect to such mortgage loan if the Relief Act or similar state or local law was not applicable thereto. This shortfall will not be paid by the mortgagor on future due dates or advanced by the servicer or master servicer and, therefore, will reduce the amount available to pay interest to the noteholders on subsequent payment dates.

Shortfalls in interest payments on the notes will be carried forward and may be paid on future payment dates out of excess interest and any net swap payments and cap payments received. See "Description of the Notes—Excess interest and Overcollateralization Provisions" in this prospectus supplement. We do not know how many mortgage loans in the mortgage pool have been or may be affected by the application of the Relief Act or similar state or local laws.

**The interest rate swap agreement and the swap provider.**

Net swap payments payable to the securities administrator by the swap provider under the interest rate swap agreement will be available as described in this prospectus supplement to make payments on the notes other than the Class M-7-B, Class M-8-B, Class M-9 or Class M-10 Notes in respect of interest previously accrued and unpaid, to reimburse for certain realized losses previously allocated to such notes and any basis risk shortfalls, and, to the extent not covered by excess interest, amounts necessary to restore and maintain the required level of overcollateralization, each as described in this prospectus supplement. However, no net amounts will be payable by the swap provider unless the floating amount owed by the swap provider on a payment date exceeds the fixed amount owed to the swap provider on such payment date. This will not occur with respect to the interest rate swap agreement except in periods when one-month LIBOR (as determined pursuant to the interest rate swap agreement) generally exceeds 5.074% per annum. No assurance can be made that any amounts will be received under the interest rate swap agreement, or that any amounts that are received will be sufficient to maintain required overcollateralization or to cover certain interest shortfalls, allocated realized losses or basis risk shortfalls. Any net swap payment payable to the swap provider under the terms of the interest rate swap agreement will reduce amounts available for distribution to noteholders, and may reduce the note interest rates of the notes. If the rate of prepayments on the mortgage loans is substantially faster than anticipated, the schedule on which payments due under the interest rate swap agreement are calculated may exceed the total principal balance of such mortgage loans, thereby increasing the relative proportion of interest collections on those mortgage loans that must be applied to make net swap payments to the swap provider. The combination of a rapid rate of prepayment and low prevailing interest rates could adversely affect the yields on the offered notes. In addition, any swap termination payment payable to the swap provider in the event of early termination of the interest rate swap agreement (other than certain swap termination payments resulting from an event of default or certain termination events with respect to the swap provider, as described in this prospectus supplement, and other than to the extent already paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the indenture trustee) will reduce amounts available for distribution to the offered noteholders.

Upon early termination of the interest rate swap agreement, the securities administrator, on behalf of the trust, or the swap provider may be liable to make a swap termination payment to the other party (regardless of which party caused the termination). The swap termination payment will be computed in accordance with the procedures set forth in the interest rate swap agreement. In the event that the issuing entity is required under the swap administration agreement to make a swap termination payment to the swap provider, the securities administrator, will withdraw amounts on deposit in the note account (other than to the extent already paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the indenture trustee), and make such payment on the related payment date, and on any subsequent payment dates until paid in full,

prior to distributions to the offered noteholders (other than certain swap termination payments resulting from an event of default or certain termination events with respect to the swap provider as described in this prospectus supplement, which swap termination payments will be subordinated to distributions to the offered noteholders). This feature may result in losses on the notes. Due to the priority of the applications of the available funds, the subordinated notes will bear the effects of any shortfalls resulting from a net swap payment or swap termination payment by the issuing entity before such effects are borne by the senior notes, and one or more classes of subordinated notes may suffer a loss as a result of such payment.

Net swap payments payable to the securities administrator by the swap provider under the interest rate swap agreement will be used to make payments on the notes other than the Class M-7-B, Class M-8-B, Class M-9 or Class M-10 Notes in respect of interest previously accrued and unpaid, to reimburse for certain realized losses previously allocated to such notes and any basis risk shortfalls and, to the extent not covered by the excess interest, to restore and maintain the required level of overcollateralization as described in this prospectus supplement. However, if the swap provider defaults on its obligations under the interest rate swap agreement, then there may be insufficient funds to cover such amounts, and the amount of excess interest may be reduced. To the extent that distributions on the notes depend in part on payments to be received by the securities administrator, on behalf of the trust, under the interest rate swap agreement, the ability of the securities administrator to make such distributions on such notes will be subject to the credit risk of the swap provider.

See "Description of the Notes—Interest Rate Swap Agreement" and "—Derivatives Provider" in this prospectus supplement.

**The cap agreement is subject to counterparty credit risk.**

The notes will have the benefit of a cap agreement, which will require the cap provider thereunder to make certain payments for the benefit of the notes other than the Class M-7-B, Class M-8-B, Class M-9 or Class M-10 Notes.  To the extent that distributions on the notes depend in part on payments to be received by the securities administrator on behalf of the trust under the cap agreement, the ability of the securities administrator to make such payments on such notes will be subject to the credit risk of the cap provider.  Although there will be a mechanism in place to facilitate replacement of the cap agreement upon the default or credit impairment of the cap provider, there can be no assurance that any such mechanism will result in the ability to obtain a suitable replacement cap agreement.

*See "Description of the Notes—Cap Agreement" and "—Derivatives Provider" in this prospectus supplement.*

**Credit scores are not an indicator of future performance of borrowers.**

Investors are encouraged to be aware that credit scores are based on past payment history of the borrower. Investors are encouraged not to rely on credit scores as an indicator of future borrower performance. See "*The Mortgage Pool*" in this prospectus supplement.

**Recent developments in the residential mortgage market may adversely affect the market value of your securities.**

Recently, the residential mortgage market in the United States has experienced a variety of difficulties and changed economic conditions that may adversely affect the performance and market value of your securities. Delinquencies and losses with respect to residential mortgage loans generally have increased in recent months, and may continue to increase, particularly in the subprime sector. In addition, in recent months housing prices and appraisal values in many states have declined or stopped

appreciating, after extended periods of significant appreciation. A continued decline or an extended flattening of those values may result in additional increases in delinquencies and losses on residential mortgage loans generally, particularly with respect to second homes and investor properties and with respect to any residential mortgage loans whose aggregate loan amounts (including any subordinate liens) are close to or greater than the related property values.

Another factor that may in the future contribute to higher delinquency rates is the potential increase in monthly payments on adjustable rate mortgage loans. Borrowers with adjustable payment mortgage loans may be exposed to increased monthly payments if the related mortgage interest rate adjusts upward from the initial fixed rate or a low introductory rate, as applicable, in effect during the initial period of the mortgage loan to the rate computed in accordance with the applicable index and margin. This increase in borrowers' monthly payments, together with any increase in prevailing market interest rates, after the initial fixed rate period, may result in significantly increased monthly payments for borrowers with adjustable rate mortgage loans.

Various federal, state and local regulatory authorities have taken or proposed actions that could hinder the ability of the servicer or the master servicer to foreclose promptly on defaulted mortgage loans. Any such actions may adversely affect the performance of the loans and the yield on and value of the securities.

You are encouraged to consider that the general market conditions discussed above may adversely affect the performance and market value of your securities.

**Statutory and judicial limitations on foreclosure procedures may delay recovery in respect of the mortgaged property and, in some instances, limit the amount that may be recovered by the foreclosing lender, resulting in losses on the mortgage loans that might be allocated to the offered notes.**

Foreclosure procedures may vary from state to state. Two primary methods of foreclosing a mortgage instrument are judicial foreclosure, involving court proceedings, and non-judicial foreclosure pursuant to a power of sale granted in the mortgage instrument. A foreclosure action is subject to most of the delays and expenses of other lawsuits if defenses are raised or counterclaims are asserted. Delays may also result from difficulties in locating necessary defendants. Non-judicial foreclosures may be subject to delays resulting from state laws mandating the recording of notice of default and notice of sale and, in some states, notice to any party having an interest of record in the real property, including junior lienholders. Some states have adopted "anti-deficiency" statutes that limit the ability of a lender to collect the full amount owed on a loan if the property sells at foreclosure for less than the full amount owed. In addition, United States courts have traditionally imposed general equitable principles to limit the remedies available to lenders in foreclosure actions that are perceived by the court as harsh or unfair. The effect of these statutes and judicial principles may be to delay and/or reduce payments in respect of the offered notes. See "*Legal Aspects of Mortgage Loans—Foreclosure on Mortgages and Some Contracts*" in the accompanying prospectus.

**The value of the mortgage loans may be affected by, among other things, a decline in real estate values, which may result in losses on the offered notes.**

No assurance can be given that values of the mortgaged properties have remained or will remain at their levels on the dates of origination of the related mortgage loans. If the residential real estate market should experience an overall decline in property values so that the outstanding balances of the mortgage loans, and any secondary financing on the mortgaged properties, in the mortgage pool become equal to or greater than the value of the mortgaged properties, the actual rates of delinquencies, foreclosures and

losses could be higher than those now generally experienced in the mortgage lending industry. In some areas of the United States, real estate values have risen at a greater rate in recent years than in the past. In particular, mortgage loans with high principal balances or high loan-to-value ratios will be affected by any decline in real estate values. Real estate values in any area of the country may be affected by several factors, including population trends, mortgage interest rates, and the economic well-being of that area. Any decrease in the value of the mortgage loans may result in the allocation of losses which are not covered by credit enhancement to the offered notes.

**The ratings on the offered notes are not a recommendation to buy, sell or hold the offered notes and are subject to withdrawal at any time, which may affect the liquidity or the market value of the offered notes.**

It is a condition to the issuance of the offered notes that each class of offered notes be rated in one of the four highest rating categories by a nationally recognized statistical rating agency. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time. No person is obligated to maintain the rating on any offered note, and, accordingly, there can be no assurance that the ratings assigned to any offered note on the date on which the offered notes are initially issued will not be lowered or withdrawn by a rating agency at any time thereafter. In the event any rating is revised or withdrawn, the liquidity or the market value of the related offered notes may be adversely affected. See "*Ratings*" in this prospectus supplement and "*Rating*" in the accompanying prospectus.

**The mortgage loans may have limited recourse to the related borrower, which may result in losses with respect to these mortgage loans.**

Some or all of the mortgage loans included in the issuing entity will be nonrecourse loans or loans for which recourse may be restricted or unenforceable. As to those mortgage loans, recourse in the event of mortgagor default will be limited to the specific real property and other assets, if any, that were pledged to secure the mortgage loan. However, even with respect to those mortgage loans that provide for recourse against the mortgagor and its assets generally, there can be no assurance that enforcement of the recourse provisions will be practicable, or that the other assets of the mortgagor will be sufficient to permit a recovery in respect of a defaulted mortgage loan in excess of the liquidation value of the related mortgaged property. Any risks associated with mortgage loans with no or limited recourse may affect the yields to maturity of the offered notes to the extent losses caused by these risks which are not covered by credit enhancement are allocated to the offered notes.

**The mortgage loans may have environmental risks, which may result in increased losses with respect to these mortgage loans.**

To the extent that the servicer or the master servicer, in its capacity as a successor servicer, for a mortgage loan acquires title to any related mortgaged property which is contaminated with or affected by hazardous wastes or hazardous substances, these mortgage loans may incur losses. See "*Servicing of Mortgage Loans—Realization Upon or Sale of Defaulted Mortgage Loans*" and "*Legal Aspects of Mortgage Loans—Environmental Legislation*" in the accompanying prospectus. To the extent these environmental risks result in losses on the mortgage loans, the yields to maturity of the offered notes, to the extent not covered by credit enhancement, may be affected.

**Some of the mortgage loans may be repurchased for early payment defaults.**

The originator will be obligated to repurchase any mortgage loan that experiences an early payment default (a default in the first three months following acquisition by the seller the last month of

which is July 2007).  Mortgage loans purchased with payment defaults in April, May or June 2007 that have been identified prior to the closing date will not be included in the trust.  Approximately 10.66% and 22.85% of the mortgage loans in loan group 1 and loan group 2, respectively, are subject to such repurchase for default of the payment due on July 1, 2007.  The price required to be paid by the originator for the repurchase will be less than the Repurchase Price (as defined in this prospectus supplement) for that mortgage loan.  In the event of a repurchase by the originator, the seller will remit to the securities administrator the difference between the price required to be paid by the originator and the Repurchase Price.  Any such repurchase will be distributed to the noteholders of the related loan group and will have the same effect as a principal prepayment of the related mortgage loan.  We cannot assure you of the magnitude of any such repurchases.

**A glossary is included at the end of this prospectus supplement. Capitalized terms used but not defined in the glossary at the end of this prospectus supplement have the meanings assigned to them in the glossary at the end of the accompanying prospectus.**

## LEGAL PROCEEDINGS

There are no material legal proceedings pending against the Sponsor, the Depositor, the Issuing Entity, the Servicer, the Master Servicer, the Securities Administrator, the Custodian, the Seller, the Indenture Trustee or the Owner Trustee, or with respect to which the property of any of the foregoing transaction parties is subject, that are material to the Noteholders. No legal proceedings against any of the foregoing transaction parties is known to be contemplated by governmental authorities, that are material to the Noteholders.

On March 7, 2007, Fremont General announced that it, Fremont and Fremont General's wholly owned subsidiary, Fremont General Credit Corporation, have consented to the terms of a cease and desist order issued by the Federal Deposit Insurance Corporation on March 7, 2007 without admitting to the allegations contained therein.  See "Mortgage Loan Origination—The Originator" in this prospectus supplement for additional information.

## AFFILIATIONS, RELATIONSHIPS AND RELATED TRANSACTIONS

Bear, Stearns & Co. Inc., the Depositor and the Derivatives Provider are affiliated parties. There are no affiliations among the Bear, Stearns & Co. Inc., the Depositor and the Derivatives Provider, and any of the Issuing Entity, Wells Fargo Bank, Nationstar Mortgage, the Originator, the Seller, the Sponsor or the Owner Trustee.

The Issuing Entity, the Sponsor, the Seller and the Servicer are affiliated parties. There are no affiliations among the Issuing Entity, the Sponsor, the Seller and the Servicer and any of Bear, Stearns & Co. Inc., the Depositor, the Originator, Wells Fargo Bank, the Derivatives Provider or the Owner Trustee.

Wells Fargo Bank is the Master Servicer, the Securities Administrator and a Custodian. Other than as indicated in the foregoing sentence, there are no affiliations among the Indenture Trustee, Wells Fargo Bank, the Originator, the Derivatives Provider or the Owner Trustee.

Except as otherwise described in this prospectus supplement, there are currently no business relationships, agreements, arrangements, transactions or understandings among (a) the Sponsor, the Depositor or the Issuing Entity and (b) any of the parties referred to in the preceding sentence, or any of their respective affiliates, that were entered into outside the normal course of business or that contain terms other than would be obtained in an arm's length transaction with an unrelated third party and that are material to the investor's understanding of the certificates, or that relate to the certificates or the

pooled assets. Except as otherwise described in this prospectus supplement, no such business relationship, agreement, arrangement, transaction or understanding has existed during the past two years.

An affiliate of the Underwriter provides warehouse financing to the Seller that may be secured by some or all of the mortgage loans.  Such affiliate of the Underwriter will release any and all of its liens on or security interests in the mortgage loans prior to the Closing Date.

## THE MORTGAGE POOL

### General

We have provided below and in Schedule A to this prospectus supplement information with respect to the mortgage loans that we expect to include in the pool of mortgage loans in the issuing entity. Prior to the Closing Date, we may remove mortgage loans from the mortgage pool and we may substitute other mortgage loans for the mortgage loans we remove. The Sponsor believes that the information set forth in this prospectus supplement with respect to the mortgage pool as presently constituted is representative of the characteristics of the mortgage pool although certain characteristics of the mortgage loans in the mortgage pool may vary. If, as of the Closing Date, any material pool characteristics differs by 10% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement to this prospectus supplement, or in a current report on Form 8-K. Unless we have otherwise indicated, the information we present below and in Schedule A is expressed as of the Cut-off Date, which is June 1, 2007. References to percentages of the mortgage loans unless otherwise noted are calculated based on the aggregate unpaid principal balance of the mortgage loans, including the subsequent mortgage loans, as of the Cut-off Date.

The mortgage loans will be selected for inclusion in the mortgage pool based on rating agency criteria, compliance with representations and warranties, and conformity to criteria relating to the characterization of securities for tax, ERISA, SMMEA, Form S-3 eligibility and other legal purposes.

All of the mortgage loans will be acquired by the Depositor on the date of issuance of the Offered Notes from the Seller pursuant to the Assignment Agreement. The Seller acquired the mortgage loans directly in privately negotiated transactions from the Originator. See "*Mortgage Loan Origination— General*" in this prospectus supplement.  Bear Stearns Mortgage Capital Corporation, an affiliate of the Depositor, the Underwriter and the Derivatives Provider provided financing for the purchase of the Mortgage Loans by the Seller.

The mortgage pool will consist of approximately 4,648 first and second lien, fixed and adjustable-rate mortgages secured by one- to four-family residences and individual condominium units, having an aggregate unpaid principal balance as of the Cut-off Date of approximately $1,087,927,706, after application of scheduled payments due on or before the Cut-off Date whether or not received. The mortgage loans have original terms to maturity of not greater than 30 years.

No mortgage loan included in the trust has ever been delinquent 30 or more days.  The current and historical delinquency disclosure included in this prospectus supplement regarding the mortgage loans, the representation of the Originator with respect to the delinquency status of the mortgage loans and the delinquency status of the static pool information of the originator utilizes the OTS Method. In addition, delinquency information included in reports to noteholders and delinquencies for purposes of the trigger tests described in this prospectus supplement will use the OTS Method. See "*The Mortgage Pools – Methods of Delinquency Calculation*" in the accompanying prospectus.

As of the cut-off date, no scheduled payment on any mortgage loan is more than 30 days past due and no scheduled payment on any mortgage loan has been more than 30 days past due since origination.

The mortgage pool has been divided into two loan groups, designated as "Loan Group 1" and "Loan Group 2" as more fully described below and in Schedule A to this prospectus supplement. The mortgage loans in Loan Group 1 are referred to in this prospectus supplement as the group 1 mortgage loans. The mortgage loans in Loan Group 2 are referred to in this prospectus supplement as the group 2 mortgage loans. Each group of mortgage loans is referred to in this prospectus supplement as a "Loan Group". The mortgage loans in Loan Group 1 are comprised of mortgage loans that conform to Freddie Mac and Fannie Mae loan limits and the mortgage loans in Loan Group 2 are comprised of mortgage loans that may or may not conform to Freddie Mac and Fannie Mae loan limits. All of the mortgage loans we will include in the issuing entity will be fully amortizing or have a balloon payment.

Approximately 70.33% of the mortgage loans are adjustable rate mortgage loans. After an initial fixed-rate period of two, three or five years, as applicable, the interest rate on each adjustable-rate mortgage loan will be adjusted semi-annually based on Six-Month LIBOR, referred to in this prospectus supplement as an Index, computed in accordance with the related note, plus (or minus) the related gross margin, generally subject to rounding and to certain other limitations, including generally a maximum lifetime mortgage rate and in certain cases a minimum lifetime mortgage rate and in certain cases a maximum upward or downward adjustment on each interest adjustment date. The maximum change in the interest rate of any adjustable rate mortgage loan on any single interest adjustment date (other than the initial interest adjustment date) is known as its "Periodic Rate Cap". The Servicer will be responsible for calculating and implementing interest rate adjustments with respect to the mortgage loans.

*Six-Month LIBOR*. "Six-Month LIBOR" will be a per annum rate equal to the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market based on quotations of major banks as published in *The Wall Street Journal* and are most recently available as of the time specified in the related mortgage note.

| | Six-Month LIBOR | | | | | |
|---|---|---|---|---|---|---|
| Adjustment Date | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| January 1 .............................. | 2.03% | 1.38% | 1.22% | 2.79% | 4.71% | 5.37% |
| February 1 ............................. | 2.08 | 1.35 | 1.21 | 2.97 | 4.82 | 5.40 |
| March 1 ................................. | 2.04 | 1.34 | 1.17 | 3.19 | 4.98 | 5.33 |
| April 1 .................................. | 2.36 | 1.23 | 1.16 | 3.39 | 5.14 | 5.33 |
| May 1.................................... | 2.12 | 1.29 | 1.38 | 3.41 | 5.22 | 5.35 |
| June 1.................................... | 2.08 | 1.21 | 1.60 | 3.54 | 5.39 | 5.39 |
| July 1 .................................... | 1.95 | 1.12 | 1.89 | 3.73 | 5.59 | 5.38 |
| August 1 ............................... | 1.87 | 1.21 | 1.93 | 3.95 | 5.51 | |
| September 1 ........................... | 1.80 | 1.20 | 1.98 | 4.00 | 5.42 | |
| October 1 .............................. | 1.71 | 1.14 | 2.20 | 4.27 | 5.38 | |
| November 1 ........................... | 1.60 | 1.23 | 2.32 | 4.47 | 5.37 | |
| December 1............................ | 1.47 | 1.27 | 2.63 | 4.63 | 5.33 | |

*Loan-to-Value Ratio or Combined Loan-to-Value Ratio*. With respect to any mortgage loan secured by a first lien, the loan-to-value ratio of a mortgage loan is equal to the principal balance of such mortgage loan at the date of origination, divided by the collateral value of the related mortgaged property. With respect to any mortgage loan secured by a second lien, the combined loan-to-value ratio is equal to the principal balance of the mortgage loan plus the principal balance of any related senior mortgage loan at the date of origination, divided by the collateral value of the related mortgaged property.

The "collateral value" of a mortgaged property is the lesser of

- the appraised value based on an appraisal made by an independent fee appraiser at the time of the origination of the related mortgage loan, and

- the sales price of that mortgaged property at the time of origination.

With respect to a mortgage loan the proceeds of which were used to refinance an existing mortgage loan, the collateral value is the appraised value of the mortgaged property based upon the appraisal obtained at the time of refinancing. No assurance can be given that the values of the mortgaged properties have remained or will remain at their levels as of the dates of origination of the mortgage loans.

*Credit scores*. Many lenders obtain credit scores in connection with mortgage loan applications to help them assess a borrower's creditworthiness. They obtain credit scores from credit reports provided by various credit reporting organizations, each of which may employ differing computer models and methodologies. The credit score is designed to assess a borrower's credit history at a single point, using objective information currently on file for the borrower at a particular credit reporting organization. Information utilized to create a credit score may include, among other things, payment history, delinquencies on accounts, level of outstanding indebtedness, length of credit history, types of credit, and bankruptcy experience. Credit scores range from approximately 350 to approximately 840, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. However, a credit score purports only to be a measurement of the relative degree of risk a borrower represents to a lender, that is, a borrower with a higher score is statistically expected to be less likely to default in payment than a borrower with a lower score. In addition, it should be noted that credit scores were developed to indicate a level of default probability over a two-year period, which does not correspond to the life of a mortgage loan. Furthermore, credit scores were not developed specifically for use in connection with mortgage loans, but for consumer loans in general, and assess only the borrower's past credit history. Therefore, a credit score does not take into consideration the differences between mortgage loans and consumer loans generally or the specific characteristics of the related mortgage loan including, for example, the loan-to-value ratio, the collateral for the mortgage loan, or the debt-to-income ratio. We cannot assure you that the credit scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the mortgage loans.

The mortgage loans will be serviced as described below under "*The Master Servicer and the Servicer*". The mortgage loans were originated generally in accordance with the guidelines described in "*Mortgage Loan Origination — The Originator.*"

All of the mortgage loans have scheduled monthly payments due on the Due Date. Certain mortgage loans contain due-on-sale clauses. Certain other mortgage loans are assumable under some circumstances if, in the sole judgment of the Servicer, the prospective purchaser of a mortgaged property is creditworthy and the security for the mortgage loan is not impaired by the assumption.

**Mortgage Loan Statistics**

The following paragraphs and the tables included in Schedule A set forth additional information with respect to the mortgage pool.

**Prepayment Charges on the Mortgage Loans**

Approximately 76.50% of the mortgage loans in the aggregate, provide for payment by the mortgagor of a prepayment charge in limited circumstances on prepayments, which prepayment charge will discourage prepayments during the applicable period. A prepayment charge may not apply with

respect to a sale of the related mortgaged property, and in some circumstances, such as illegality, may be unenforceable. Generally, these mortgage loans provide for payment of a prepayment charge on partial or full prepayments made within one a stated number of months that is between 12 and 36 months, as provided in the related mortgage note, from the date of origination of the mortgage loan. The holders of the Owner Trust Certificates will be entitled to all prepayment charges received on the mortgage loans, and these amounts will not be available for payment on the Offered Notes.

As of July 1, 2003, the Alternative Mortgage Parity Act of 1982, which regulates the ability of the originator to impose prepayment charges, was amended, and as a result, the originator will be required to comply with state and local laws in originating mortgage loans with prepayment charge provisions with respect to loans originated on or after July 1, 2003. The Depositor makes no representations as to the effect that the prepayment charges and the recent amendment of the Parity Act, may have on the prepayment performance of the mortgage loans. However, the recent amendment of the Parity Act does not retroactively affect loans originated before July 1, 2003. See *"Legal Aspects of Mortgage Loans— Enforceability of Certain Provisions"* in the accompanying prospectus.

In addition, the Servicer may waive the collection of any otherwise applicable prepayment charge or reduce the amount thereof actually collected, but only if: (i) the enforceability thereof will have been limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally, (ii) the enforcement thereof is illegal, or any local, state or federal agency has threatened legal action if the prepayment charge is enforced, (iii) the mortgage debt has been accelerated in connection with a foreclosure or other involuntary payment or (iv) such waiver is standard and customary in servicing similar mortgage loans and relates to a default or a reasonably foreseeable default and would, in the reasonable judgment of the Servicer, maximize recovery of total proceeds taking into account the value of such prepayment charge and the related mortgage loan. In any event, no waiver of a prepayment premium, late payment charge or other charge in connection with any mortgage loan will effect the potential cash flow to the Offered Notes from the related pool assets.

Certain prepayment charges are classified as "hard" prepayment charges, meaning that the borrower has to cover the prepayment charge regardless of the reason for prepayment, while others are classified as "soft," meaning that the borrower has to cover the prepayment charge unless the borrower has conveyed the related mortgaged property to a third party. The Sponsor does not have information with respect to the percentage of each type of prepayment charge included in the pool of mortgage loans.

**Special Characteristics of the Mortgage Loans**

*Interest Only Loans*. Approximately 2.30% and 6.47% of the group 1 mortgage loans and group 2 mortgage loans, respectively, and approximately 4.54% of the mortgage loans in the aggregate, will receive interest only for the initial period of three or five years following origination as set forth in the related mortgage note. At the end of the interest only period, the monthly payments on each such mortgage loan will be recalculated to provide for amortization of the principal balance by the maturity date and payment of interest at the then-current mortgage rate.

*Second Lien Loans*. None of the group 1 mortgage loans and approximately 9.97% of the group 2 mortgage loans, and approximately 5.35% of the mortgage loans in the aggregate are secured by a second lien on the related mortgages property.

*Balloon Loans*. Approximately 55.75% and 58.14% of the group 1 mortgage loans and group 2 mortgage loans, respectively, and approximately 57.03% of the mortgage loans in the aggregate balloon loans that provide for equal monthly payments, consisting of principal and interest, based on a stated

amortization schedule, which may be 40 or 50 years, and a single payment of the remaining principal balance of the loan on a maturity date that is 30 years from the date of origination.

## STATIC POOL INFORMATION

Information concerning static pool performance data of previous term securitizations of the Originator is available on the Originator's website at http://fremont-regab.com/. At this website, static pool performance data of the Originator's previous term securitizations is presented in the form of published charts. Notwithstanding the foregoing, the information contained on such websites is modified as follows: (i) page II-2 of Schedule C attached hereto replaces in its entirety the page found on such websites under the Deal ID "Fremont Home Loan Trust 2006-A," the Description "2006-10 Static Pool Report for FIL 2006-A" and the Date "10/31/2006"; (ii) page II-3 of Schedule C attached hereto replaces in its entirety the page found on such websites under the Deal ID "Fremont Home Loan Trust 2006-A," the Description "2006-9 Static Pool Report for FIL 2006-A" and the Date "09/30/2006"; (iii) page II-4 of Schedule C attached hereto replaces in its entirety the page found on such websites under the Deal ID "Fremont Home Loan Trust 2006-B P1," the Description "2006-9 Static Pool Report for FIL 2006-B (Pool 1)" and the Date "09/30/2006" and (iv) page II-5 of Schedule C attached hereto replaces in its entirety the page found on such websites under the Deal ID "Fremont Home Loan Trust 2006-B P2," the Description "2006-9 Static Pool Report for FIL 2006-B (Pool 2)" and the Date "09/30/2006". We caution you that the mortgage loans to be transferred to the issuing entity may not perform in a similar manner to the mortgage loans in other trusts.

Information provided through the internet address above is not deemed to be a part of this prospectus supplement, the accompanying prospectus or a part of the registration statement filed with the SEC to which this prospectus supplement relates:

(i)     with respect to information regarding the Originator's prior securitized pools, information regarding prior securitized pools that were established before January 1, 2006; and

(ii)    with respect to information regarding the mortgage loans to be transferred to the issuing entity, information about the mortgage loans for periods prior to January 1, 2006.

## THE DEPOSITOR

The Depositor, Bear Stearns Asset Backed Securities I LLC, was formed in the state of Delaware in January 2004, and is a wholly-owned subsidiary of The Bear Stearns Companies Inc. The Depositor was organized for the sole purpose of serving as a private secondary mortgage market conduit. The Depositor does not have, nor is it expected in the future to have, any significant assets.

The Depositor is an affiliate of the Underwriter and the Derivatives Provider.

The Depositor has been serving as a private secondary mortgage market conduit for residential mortgage loans since 2004. As of March 31, 2007, the Depositor has been involved in the issuance of securities backed by residential mortgage loans in excess of $77,949,316,285. The Depositor will execute an assignment and recognition agreement through which the mortgage loans will be transferred to itself by the seller. These mortgage loans are subsequently deposited into the Trust, described in this prospectus supplement, which will then issue the notes.

After issuance and registration of the securities contemplated in this prospectus supplement and any supplement hereto, the Depositor will have no duties or responsibilities with respect to the pool assets

or the securities other than any obligations with respect to the filing of any reports under the Exchange Act as set forth in the Indenture.

The Depositor's principal executive offices are located at 383 Madison Avenue, New York, New York 10179. Its telephone number is (212) 272-2000.

## THE SPONSOR

Newcastle Investment Corp. will be the sponsor of the transaction (the "Sponsor"). The Sponsor is a Maryland corporation which was incorporated in June 2002.  Its common stock is traded on the New York Stock Exchange under the trading symbol "NCT".

The Sponsor has elected to be taxed as a Real Estate Investment Trust, or REIT, under the Internal Revenue Code of 1986, as amended, and its principal objective is to acquire a highly diversified portfolio of real estate related debt investments that has moderate credit risk and sufficient liquidity.  The Sponsor generally utilizes a match funded financing strategy in order to minimize refinancing and interest rate risks.  The Sponsor is externally managed and advised by its manager, an affiliate of Fortress Investment Group LLC.  The Sponsor is an affiliate of the Servicer, the Seller and the Issuing Entity.

The Sponsor has been engaged in the securitization of assets since its inception in 2002.  The purpose of the Sponsor's securitization transactions is to use securitization as a means of permanently financing assets in which the Sponsor invests.  The assets securitized by the Sponsor have included, among other things, commercial mortgage backed securities, unsecured REIT debt, real estate loans, asset backed securities and residential mortgage loans.  The Sponsor participates in the structuring of its securitization transactions and typically pools the assets to be securitized (either directly or indirectly through major investment banks).  In addition, the Sponsor typically receives and holds, directly or indirectly through its affiliates, the entire interest in one or more of the most subordinated classes of securities issued in its securitization transactions.  The Sponsor is not aware of any prior securitization initiated by it which has defaulted or experienced an early amortization triggering event.

The Sponsor has only limited experience securitizing residential mortgage loans.  The Sponsor securitized a portfolio of prime residential mortgage loans in 2004 and a portfolio of subprime residential mortgage loans 2006.  The 2004 portfolio contained 1,795 loans and had a balance as of the related cut-off date of approximately $646,356,820.  The 2006 portfolio contained 11,272 loans and had a balance as of the related cut-off date of approximately $1,502,867,687.  The Sponsor does not originate or service any of the residential mortgage loans that it securitizes.

## THE SELLER

NIC WL II LLC (the "Seller") is a wholly-owned subsidiary of the Sponsor.  The Seller is a Delaware limited liability company which was formed in March 2007.  The Seller purchased the Mortgage Loans from the Originator pursuant to the Purchase Agreement.  The Seller currently has no material assets other than the Mortgage Loans.

## THE MASTER SERVICER AND THE SERVICER

### Wells Fargo Bank

Wells Fargo Bank, N.A. ("Wells Fargo Bank") will act as Custodian, the Securities Administrator and the Master Servicer under the Agreements.  Wells Fargo Bank is a national banking association and a wholly-owned subsidiary of Wells Fargo & Company.  A diversified financial services company with

approximately $482 billion in assets, 23+ million customers and 158,000+ employees as of December 31, 2006, Wells Fargo & Company is a U.S. bank holding company, providing banking, insurance, trust, mortgage and consumer finance services throughout the United States and internationally.  Wells Fargo Bank provides retail and commercial banking services and corporate trust, custody, securities lending, securities transfer, cash management, investment management and other financial and fiduciary services. The Depositor and the Sponsor may maintain banking and other commercial relationships with Wells Fargo Bank and its affiliates.  Wells Fargo Bank maintains principal corporate trust offices located at 9062 Old Annapolis Road, Columbia, Maryland 21045-1951 (among other locations) and its office for certificate transfer services is located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479.

Wells Fargo Bank's assessment of compliance with applicable servicing criteria relating to its provision of master servicing, trustee, securities administration and paying agent services for the twelve months ended December 31, 2006, furnished pursuant to Item 1122 of Regulation AB, discloses that it was not in compliance with the 1122(d)(3)(i) servicing criteria during that reporting period.  The assessment of compliance indicates that certain monthly investor or remittance reports included errors in the calculation and/or the reporting of delinquencies for the related pool assets, which errors may or may not have been material, and that all such errors were the result of data processing errors and/or the mistaken interpretation of data provided by other parties participating in the servicing function.  The assessment further states that all necessary adjustments to Wells Fargo Bank's data processing systems and/or interpretive clarifications have been made to correct those errors and to remedy related procedures

Wells Fargo Bank serves or has served within the past two years as loan file custodian for various mortgage loans owned by the Sponsor or an affiliate of the Sponsor and anticipates that one or more of those mortgage loans may be included in the Trust.  The terms of any custodial agreement under which those services are provided by Wells Fargo Bank are customary for the mortgage-backed securitization industry and provide for the delivery, receipt, review and safekeeping of mortgage loan files.

**The Master Servicer**

Wells Fargo Bank will act as Master Servicer pursuant to the Sale and Servicing Agreement.  The Master Servicer will be responsible for the aggregation of monthly servicer reports and remittances and for the oversight of the performance of the Servicer under the terms of the Sale and Servicing Agreement. In particular, the Master Servicer will independently calculate monthly loan balances based on servicer data, compare its results to servicer loan-level reports and reconciles any discrepancies with the Servicer. The Master Servicer will also review the servicing of defaulted loans for compliance with the terms of the Sale and Servicing Agreement. In addition, upon the occurrence of certain servicer events of default under the Sale and Servicing Agreement, the Master Servicer may be required to enforce certain remedies on behalf of the Trust against the Servicer.

Wells Fargo Bank has been engaged in the business of master servicing since June 30, 1995.  As of December 31, 2006, Wells Fargo Bank was acting as master servicer for approximately 1,427 series of residential mortgage-backed securities with an aggregate outstanding principal balance of approximately $748,854,000,000.

Wells Fargo Bank serves or has served within the past two years as warehouse master servicer for various mortgage loans owned by affiliates of the Depositor.  The terms of the warehouse master servicing agreement under which those services are provided by Wells Fargo Bank are customary for the mortgage-backed securitization industry.

**The Servicer**

Primary servicing of the mortgage loans will be provided for by Nationstar Mortgage LLC in accordance with the Sale and Servicing Agreement. The Servicer will be responsible for the primary servicing of the mortgage loans and the Master Servicer will be required to monitor its performance. In the event of a default by the Servicer under the Sale and Servicing Agreement, the Master Servicer will be required to enforce any remedies against the Servicer and shall either find a successor servicer or shall assume primary servicing obligations for the mortgage loans itself.

*General*

The Servicer, Nationstar Mortgage LLC, a Delaware limited liability company, which we sometimes refer to as "Nationstar Mortgage", is a sub prime mortgage lender formed in 1994 that engages in originating primarily non-conforming home equity loans, through five major origination sources. The Nationstar Mortgage was originally named Nova Credit Corporation and was headquartered in Denver, Colorado. In the first calendar quarter of 1997, Nationstar Mortgage's operations were moved to Dallas, Texas and Nationstar Mortgage underwent a reorganization and the hiring of a new management team. In April 1997, Nationstar Mortgage's name was changed to Centex Credit Corporation. In September of 2001, Nationstar Mortgage merged into its wholly-owned subsidiary, Centex Home Equity Company, LLC, a Delaware limited liability company, with Centex Home Equity Company, LLC becoming the surviving entity.  On July 11, 2006, Centex Financial Services, LLC sold Centex Home Equity Company, LLC to FIF HE Holdings LLC, an affiliate of Fortress Investment Group LLC.  Pursuant to such sale, FIF HE Holdings LLC became the sole equityholder of Centex Home Equity Company, LLC and Centex Home Equity Company, LLC's name was changed to Nationstar Mortgage LLC.  In addition, the name of CHEC Funding, LLC was changed to Nationstar Funding LLC. Fortress Investment Group LLC is a global alternative investment and asset management firm.  In addition, the Servicer is an affiliate of the Sponsor, the Seller and the Issuing Entity.

Nationstar Mortgage's executive offices are located at 350 Highland Drive, Lewisville, TX 75067. Its telephone number is (469) 549-2000.  Nationstar Mortgage has centralized its underwriting, servicing and quality control functions in its Lewisville office. The Lewisville office is located at 350 Highland Drive, Lewisville, Texas, 75067.

*Servicing*

*General*. Nationstar Mortgage has been servicing loans since March 1997, when it assumed the default management cycle of loans previously handled by CTX Mortgage Company, LLC, a seller/servicer of primarily conforming mortgage loans. Servicing encompasses, among other activities, the following processes: billing and collection of payments when due, movement and reporting of cash to the payment clearing bank accounts, customer help, reconveyance, recovery of delinquent installments, instituting foreclosure and liquidation of the underlying collateral. Nationstar Mortgage's most current rating as a residential subprime loan servicer is "RPS2" by Fitch Ratings, dated November 14, 2006. Nationstar Mortgage was ranked "above average" as a residential subprime loan servicer by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. in December 2004.

Nationstar Mortgage services all loans in its Lewisville, Texas servicing facility using a mid-range AS-400 based servicing platform, known as LSAMS, for which it purchased a separate user license in August of 1997. The LSAMS system is also employed by other large servicers in the subprime and prime mortgage loan industries. Nationstar Mortgage has purchased an additional servicing system from London Bridge Corporation, known as FORTRACS. This event-tracking system, working in tandem with LSAMS, can separately track (i) mortgaged properties in foreclosure, (ii) borrower bankruptcies and (iii)

mortgaged properties acquired by foreclosure or otherwise in connection with defaulted home equity loans (commonly referred to as REO property). FORTRACS has generally increased Nationstar Mortgage's ability to track and monitor loans in the default process.

Nationstar Mortgage's operating and compliance policies and procedures are published on its intranet system and updated to comply with state and federal legal and regulatory requirements.

Nationstar Mortgage's default management policy has been designed to identify collection problems so as to facilitate a prompt response to the delinquent borrower's situation. Early identification of a significant collection problem is especially critical in the subprime mortgage environment.

Borrowers are mailed a monthly billing statement approximately two weeks prior to their payment's scheduled due date. Collection activity on an account begins as soon as five days after the scheduled due date if a payment is not made. Nationstar Mortgage uses a custom behavioral risk scoring model to prioritize the calling of customers in the early stages of delinquency and utilizes a Davox predictive power dialer to assist with productivity of calls. New loans that do not perform in accordance with their loan terms are specifically identified for collection work performed by managers and, if necessary, the originating operation. Notices and special collection letters are used in the normal collection process.

The collection strategy is to determine the facts surrounding the delinquency, obtain customer agreement for the solution and attempt to preclude future delinquency on the part of the borrower. Generally, when a promise for payment is obtained from the borrower by the collector, LSAMS will target the loan in the "queue" for the date of the promised payment. If the payment is made, the account is removed from the collection queue. If the arrangement for payment was not kept, the loan is placed back in the call route for the collector to contact and follow up on the previous arrangements for payment. If the payment is received per the arrangements and no future promise or target dates are noted on LSAMS, the loan will be removed from the collection cycle unless the account becomes delinquent in the future.

Generally, when a loan appears in the LSAMS default management system, the collector will telephone the borrower to discuss the past due payment situation. Standard collection form letters, approved by Nationstar Mortgage's legal department, are generally utilized in conjunction with telephone calling, in order to reach the delinquent borrower. Documentation of collection activity is critically important in the default management process. Collectors have access on LSAMS to borrower demographics, telephone numbers, loan payment history and all previous collection notes, to assist in the collection of a past due account. Nationstar Mortgage's policy requires that managers in the collection department monitor the collectors' work on LSAMS and offer them appropriate guidance and training.

Nationstar Mortgage's policy is to send out a notice of demand when an account is classified as a 60-day delinquent account. This may be done sooner if the circumstances of a particular account indicate that legal action appears likely. This letter will give the customer 30 days' notice of Nationstar Mortgage's intent to initiate foreclosure action on the loan. If an alternative to foreclosure is appropriate, a recommended course of action will be prescribed by senior servicing management. Servicing and collection practices regarding the liquidation of properties (e.g., foreclosure) and the rights of the borrower vary from state to state.

Prior to bidding at a foreclosure sale, Nationstar Mortgage performs an in-depth market value analysis of the mortgaged property on all defaulted loans. This analysis which is performed by the appraisal review department, includes a current appraisal or broker price opinion of the mortgaged property conducted by an independent vendor from Nationstar Mortgage's approved network of

appraisers or real estate brokers. Nationstar Mortgage uses the market value analysis to develop its strategy for bidding, repairs, and sale of the property.

If Nationstar Mortgage acquires title to a property at a foreclosure sale or through other means, the REO property department immediately begins working on the file by obtaining at least two local real estate brokers to inspect the property and provide an estimate of repairs needed and a recommended list price. Repairs are performed if it is determined that they will increase the net liquidation proceeds and speed of disposal.

If the property is not vacated when it is acquired, a local attorney will be hired to commence eviction proceedings or small cash incentives may be offered the customer to vacate the property in marketable condition. Once it has listed a foreclosed property, the REO property department will follow up closely with the listing agent to ensure that the collateral is secure and that it is being aggressively marketed.

The REO sales team markets properties through a network of over 2,000 approved real estate brokers. Nationstar Mortgage utilizes an online purchase offer management system to track and respond promptly to offers submitted by the real estate brokers. The REO closing department handles all paperwork required to transfer the property in the final sale. Nationstar Mortgage's REO policies and procedures support expeditious disposition of REO property to maximize recovery.

If a loan is liquidated for less than its unpaid principal balance plus accrued interest, reimbursement of liquidation expenses and servicer advances, or if Nationstar Mortgage determines that a delinquent loan is nonrecoverable, a realized loss will be incurred. A separate loss recovery unit is responsible for pursuing deficiency balances after completion of the foreclosure action. This unit evaluates relevant information on loans that resulted in a realized loss, searches for recovery opportunities and attempts recovery of funds through various collection methods.

Nationstar Mortgage will exercise its discretion consistent with customary servicing procedures and its rights under the relevant servicing agreements, with respect to the enforcement and servicing of loans in such manner as will maximize the receipt of principal and interest, including but not limited to the waiver of ancillary fees, such as late charges and prepayment penalties, and the modification of the loans.

Nationstar Mortgage will not agree to any modification, waiver or amendment of any provision of any loan unless, in its good faith judgment, the modification, waiver or amendment will minimize the loss that might otherwise be experienced with respect to the loan, but only in the event of a payment default with respect to the loan or in the event that a payment default with respect to the loan is reasonably foreseeable by Nationstar Mortgage. However, with respect to loans held in Nationstar Mortgage -sponsored term securitizations, no such modification, waiver or amendment may extend the maturity date of the loan beyond the date that is six months after the latest final scheduled payment date of the classes of offered securities of the related issuing entity that remain outstanding. In addition, Nationstar Mortgage may modify, waive or amend any provision of a loan if required to do so by statute or a court of competent jurisdiction.

Nationstar Mortgage outsources the tracking and follow-up on homeowners and flood insurance for loans without escrows. Nationstar Mortgage follows an established process of sending Nationstar Mortgage -approved letters notifying the customer of non-receipt of proof of insurance renewal. This three-letter process is supplemented with phone calls made to the homeowner's insurance agent. If proof of insurance has still not been received following this process, Nationstar Mortgage will obtain a collateral protection insurance policy on the borrower's behalf and at the borrower's expense. Nationstar

Mortgage has a master policy with the collateral protection insurance provider, which protects against errors and omissions with a blanket policy covering Nationstar Mortgage's balance on the loan. For property taxes on loans without escrows, Nationstar Mortgage obtains tax service contracts on the loans from a major vendor, which tracks all properties for the payment of property taxes by the homeowner.

Nationstar Mortgage offers full tax and insurance escrow services to its new customers. These escrow services involve collecting monthly pro-rated tax and insurance amounts from borrowers and controlling the payments to taxing authorities and insurers.

Nationstar Mortgage, as servicer, reports borrower information monthly to the major credit reporting agencies.

As of May 18, 2007, Nationstar Mortgage was exceeding certain "servicer termination test" performance triggers on a "wrapped" transaction. In connection with the sale of Centex Home Equity Company, LLC to FIF HE Holdings LLC, the insurers agreed, subject to certain conditions, to waive any servicer termination events arising from the change of control of Centex Home Equity Company, LLC or certain performance triggers.  These waivers do not limit the rights of the insurers to remove Nationstar Mortgage as servicer upon the occurrence of any servicer termination event, other than the ones described above.

Although Nationstar Mortgage has received no notification of any intent to remove or replace it as servicer on that transaction, there can be no assurance that an insurer will not act to remove or replace Nationstar Mortgage as servicer with respect to any "wrapped" transaction as to which Nationstar Mortgage is exceeding "servicer termination test" triggers.

Nationstar Mortgage has never been terminated as a servicer on any securitization transaction it has serviced.

*Borrower Bankruptcy*. Under the Federal Bankruptcy Code (Title 11 of the United States Code), as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, as well as the Bankruptcy Abuse Prevention and Consumer Protection Act, a borrower may be entitled to protection from both the immediate foreclosure by Nationstar Mortgage upon the mortgaged property and the collection by Nationstar Mortgage of past due payments. In addition, a borrower's bankruptcy filing could limit the ability of Nationstar Mortgage to seek and secure a deficiency judgment against the borrower where such judgment may be allowed by state law.

In the case of a Chapter 7 bankruptcy filing by a borrower, unless and until Nationstar Mortgage secures a reaffirmation agreement from the borrower, the process of collecting payments on the loan or foreclosing on the mortgaged property may be delayed by the filing. If a reaffirmation agreement is executed by the borrower and approved by the bankruptcy court, and is not otherwise rejected in the bankruptcy proceedings, the borrower may retain the mortgaged property and will be obligated to continue to make loan payments. If the borrower elects not to reaffirm the loan, the borrower is deemed to have surrendered the mortgaged property.

In addition to filings under Chapter 7 of the Bankruptcy Code, borrowers may seek protection from enforcement of loan obligations pursuant to Chapter 13 of the Bankruptcy Code. Courts have broad discretion in the administration of bankruptcies pursuant to Chapter 13, including the discretion to restructure the loan by reducing the amount of each monthly payment, changing the rate of interest, altering the repayment schedule, forgiving all or a portion of the loan and reducing the lender's security interest, including classifying the lender as an unsecured lender, or making other modifications to the loan the court deems appropriate.

Upon receipt of notice of the filing of a bankruptcy by a borrower, Nationstar Mortgage will verify the validity of the filing by the use of its PACER bankruptcy reporting system. In the case of a Chapter 7 bankruptcy filing, a reaffirmation agreement will be provided by Nationstar Mortgage to counsel for the borrower. If the borrower fails to execute a reaffirmation agreement, the mortgaged property is deemed surrendered and Nationstar Mortgage may begin the process to recover the property.

In the case of a Chapter 13 bankruptcy filing, Nationstar Mortgage will file a proof of claim to protect the loan amount and secured nature of the claim. If a borrower fails to make post-petition mortgage payments, or plan payments of arrearages, during the pendency of a Chapter 13 bankruptcy, Nationstar Mortgage will seek relief from the automatic stay and proceed to recover the mortgaged property.

*Material Changes in Servicing Procedures*. There have been no material changes to Nationstar Mortgage's servicing policies and procedures during the past three years.

## MORTGAGE LOAN ORIGINATION

### General

All of the mortgage loans were originated or acquired by Fremont Investment & Loan.

### The Originator

The information set forth in the following paragraphs with regard to Fremont Investment & Loan ("Fremont") and its underwriting standards has been provided by Fremont.

Fremont is a California industrial bank headquartered in Brea, California and is an indirect subsidiary of Fremont General Corporation ("Fremont General"), a financial services holding company listed on the New York Stock Exchange.

#### *Recent Events*

*Cease and Desist Order*.  On March 7, 2007, Fremont General announced that it, Fremont and Fremont General's wholly owned subsidiary, Fremont General Credit Corporation, have consented to the terms of a cease and desist order issued by the Federal Deposit Insurance Corporation on March 7, 2007 without admitting to the allegations contained therein.  The cease and desist order requires, among other things, Fremont to cease and desist from the following:

- Operating with management whose policies and practices are detrimental to Fremont;

- Operating Fremont without effective risk management policies and procedures in place in relation to Fremont's brokered subprime mortgage lending and commercial real estate construction lending businesses;

- Operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by Fremont;

- Operating without an accurate, rigorous and properly documented methodology concerning its allowance for loan and lease losses;

- Operating with a large volume of poor quality loans;

- Engaging in unsatisfactory lending practices;

- Operating with inadequate capital in relation to the kind and quality of assets held by Fremont;

- Operating with inadequate provisions for liquidity in relation to the volatility of Fremont's business lines and the kind and quality of assets held by Fremont;

- Marketing and extending adjustable-rate mortgage products to subprime borrowers in an unsafe and unsound manner that greatly increases the risk that borrowers will default on the loans or otherwise cause losses to Fremont, including (1) adjustable-rate mortgage products that qualify borrowers for loans with low initial payments based on an introductory rate that will expire after an initial period, without adequate analysis of the borrower's ability to repay at the fully indexed rate, (2) adjustable-rate mortgage products containing features likely to require frequent refinancing to maintain affordable monthly payment or to avoid foreclosure, and (3) loans or loan arrangements with loan-to-value ratios approaching or exceeding 100 percent of the value of the collateral;

- Making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms; and

- Operating inconsistently with the Federal Deposit Insurance Corporation's Interagency Advisory on Mortgage Banking and Interagency Expanded Guidance for Subprime Lending Programs.

*Limited Financial Information relating to Fremont*.  Pursuant to a Form 12b-25 filed on March 2, 2007, Fremont General, announced that it was delaying the filing of its Annual Report on Form 10-K for the fiscal year ended December 31, 2006.  Pursuant to a Form 8-K filed on March 16, 2007, Fremont General announced that it would not file its Annual Report on Form 10-K for the fiscal year ended December 31, 2006 before its extended deadline of March 16, 2007.  On April 2, 2007, Fremont General announced in a Form 8-K filed with the Securities Exchange Commission that, Grant Thornton LLP ("Grant Thornton") resigned from its position as Fremont General's independent registered public accounting firm on March 27, 2007.  On April 24, 2007, the audit committee of the board of directors of Fremont General announced that it has engaged Squar, Milner, Peterson, Miranda & Williamson as its independent accounting firm, engaged to complete the audit of the financial statements of Fremont General (and its subsidiaries, including Fremont) for the year ended December 31, 2006.  As of the date hereof, Fremont has not finalized the reports of its financial operations for the year ended 2006 and consequently, current financial information relating to Fremont is unavailable at this time.

*Exit from Subprime Residential Lending Business, Sale of Residential Servicing Platform and Sale of Commercial Loan Operations*.  On March 2, 2007, Fremont General also announced that, in light of the current operating environment for subprime mortgage lenders and recent legislative and regulatory events, Fremont intends to exit its subprime residential real estate lending business.  Pursuant to Form 8-K's filed on March 21, 2007 and April 16, 2007, Fremont General announced that Fremont had entered into whole loan sale agreements with respect to the sale of the majority of its subprime residential mortgage loans in an aggregate amount of approximately $6.9 billion to various buyers, resulting in an expected pre-tax loss of $240 million.  In addition, on April 16, 2007, Fremont General announced that it had entered into a letter of intent to sell Fremont's subprime residential servicing platform, as well as a portion of Fremont's subprime loan origination platform.  There can be no assurance that Fremont General or its affiliates will complete the above-referenced transactions, or if completed, that any previously disclosed terms will not be changed or materially altered.  Fremont also announced on May 21,

2007 that it had entered into definitive agreements to sell the commercial real estate lending business of Fremont and announced the completion of such sale on July 2, 2007.

*Sale of Minority Interest and Appointment of New Management*.   On May 21, 2007, Fremont General announced that it had entered into an agreement for the sale of a minority stake in Fremont General to an investor group led by Gerald J. Ford and that, he, Carl B. Webb and J. Randy Staff were to become Chairman, CEO and CFO, respectively, of Fremont General and Fremont.   The sale of the minority interest is subject to regulatory approval.   Fremont General announced that effective June 29, 2007, Alan W. Faigin, the Secretary, General Counsel and Chief Legal Officer of Fremont General, was appointed interim President and Chief Executive Officer of Fremont, replacing Kyle R. Walker. It is expected that Mr. Faigin will serve in this position until he is succeeded by Carl B. Webb.

*Servicer Rating Actions*.   In addition, on March 5, 2007, Moody's Investors Service, Inc. downgraded Fremont's residential primary servicer rating for subprime mortgage loans to "SQ4+" from "SQ3+" and placed such rating on review for possible further downgrade and on March 6, 2007, Fitch Ratings, Inc. downgraded Fremont's residential primary servicer rating for subprime mortgage loans to "RPS4" from "RPS3+" and placed such rating on "Watch Negative", indicating that further downgrades of such rating are possible.

*See "Risk Factors—Recent Developments" in this prospectus supplement.*

### Originations

Prior to the date of the Order, Fremont operated wholesale residential real estate loan production offices located in Anaheim, California; Concord, California; Downers Grove, Illinois; Westchester County, New York; and Tampa, Florida.   Fremont conducted business in 45 states and the District of Columbia and its primary source of originations was through licensed mortgage brokers.   As part of its residential subprime mortgage loan origination program, Fremont either sold its mortgage loans to third parties in whole loan sales transactions, transferred such loans in connection with a securitization, or retained the loans for long term investment.   Fremont no longer originates subprime residential real estate loans.

Fremont began originating subprime residential mortgage loans in May 1994 and prior to the date of the Order, substantially all of its residential mortgage loan originations consisted of subprime mortgage loans.   Fremont's subprime residential originations totaled approximately $6.94 billion, $13.74 billion, $23.91 billion and $36.24 billion for the years ended 2002, 2003, 2004 and 2005, respectively, and approximately $25.84 billion for the first nine months ended September 30, 2006.   Since March 2007, Fremont has only originated a limited number of mortgage loans, and as disclosed above, has announced that it is exiting the subprime mortgage origination business and has entered into a letter of intent to sell certain portions of its origination platform.

### Underwriting Guidelines

All of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria described in this section. This summary does not purport to be a complete description of the underwriting guidelines used by Fremont to originate the mortgage loans.

During the second quarter of 2006, Fremont made several changes to its loan origination guidelines with the objective of improving the performance of its mortgage loans. The mortgage loans originated under the guidelines previously in effect began to experience increased levels of delinquencies, foreclosures and forbearances.   Such performance resulted in certain of the subordinated classes of certificates backed by mortgage loans originated under the guidelines previously in effect to be placed on

certain rating agency watch lists with negative implications. For example, subprime mortgage loans originated and serviced (including interim serviced solely for the period of interim servicing) by Fremont Investment & Loan experienced delinquencies, foreclosures and forbearances of 2.77% (by scheduled principal balance) as of December 31, 2005, which increased to 6.39% (by scheduled principal balance) as of September 30, 2006.

Substantially all of the mortgage loans were based on loan application packages submitted through licensed mortgage brokers. These brokers must have meet minimum standards set by Fremont based on an analysis of the following information submitted with an application for approval: applicable state lending license (in good standing), signed broker application and agreement, and signed broker authorization. Once approved, licensed mortgage brokers were eligible to submit loan application packages in compliance with the terms of a signed broker agreement.

Mortgage loans were underwritten in accordance with Fremont's underwriting programs, referred to as the Scored Programs ("Scored Programs"), subject to various exceptions as described in this section. Fremont began originating mortgage loans pursuant to Scored Programs in 2001 and the Scored Programs were the exclusive type of origination programs beginning in 2004. Fremont's underwriting guidelines were primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The Scored Programs assessed the risk of default by using credit scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment. All of the mortgage loans in the mortgage loan pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market.

The Scored Programs were developed to simplify the origination process. In contrast to assignment of credit grades according to traditional non-agency credit assessment methods, i.e., mortgage and other credit delinquencies, the Scored Programs rely upon a borrower's credit score, mortgage payment history and seasoning on any bankruptcy/foreclosure initially to determine a borrower's likely future credit performance. Licensed mortgage brokers are able to access credit scores at the initial phases of the loan application process and use the credit score to determine the interest rates a borrower may have qualified for based upon Fremont's Scored Programs risk-based pricing matrices. Final loan terms were subject to approval by Fremont.

Under the Scored Programs, Fremont required credit reports for each borrower, in most instances using the credit score of the primary borrower (the borrower with the highest percentage of total income) to determine program eligibility. However, under certain programs, the borrower with the highest credit score was used to determine program eligibility. Credit scores were requested from each national credit repository. For the purpose of determining program eligibility,

- if credit scores were available from all three credit repositories, the middle of the three credit scores was used,

- if credit scores were available from only two of the repositories, the lower of the two credit scores was used, and

- if a single credit score was available, the single credit score was used; however, potential borrowers with a single credit score did not qualify for loan amounts in excess of $800,000, loans with loan-to-value ratios in excess of 90% or 80% (depending on type of program) and second mortgage loans with loan-to-value ratios in excess of 5%.

Generally, the minimum applicable credit score allowed was 500, however borrowers with no credit scores are not automatically rejected and may have been eligible for certain loan programs in appropriate circumstances.

All of the mortgage loans were underwritten by Fremont's underwriters having the appropriate approval authority. Each underwriter was granted a level of authority commensurate with their proven judgment, experience and credit skills. On a case by case basis, Fremont may have determined that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below was nonetheless qualified to receive a loan, i.e., an underwriting exception. Compensating factors may have included, but were not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. It is expected that a substantial portion of the mortgage loans may represent such underwriting exceptions.

There were three documentation types, Full Documentation ("Full Documentation"), Easy Documentation ("Easy Documentation") and Stated Income ("Stated Income"). Fremont's underwriters verified the income of each applicant under various documentation types as follows: under Full Documentation, applicants were generally required to submit verification of stable income for the periods of one to two years preceding the application dependent on credit profile; under Easy Documentation, the borrower was qualified based on verification of adequate cash flow by means of personal or business bank statements; under Stated Income, applicants were qualified based on monthly income as stated on the mortgage application. The income was not verified under the Stated Income program; however, the income stated must have been reasonable and customary for the applicant's line of work.

Fremont originated loans secured by 1-4 unit residential properties made to eligible borrowers with a vested fee simple (or in some cases a leasehold) interest in the property. Fremont's underwriting guidelines were applied in accordance with a procedure which complies with applicable federal and state laws and regulations and required an appraisal of the mortgaged property, and if appropriate, a review appraisal. Generally, initial appraisals were provided by qualified independent appraisers licensed in their respective states. Review appraisals may have only been provided by appraisers approved by Fremont. In some cases, Fremont relied on a statistical appraisal methodology provided by a third-party. Qualified independent appraisers must have met minimum standards of licensing and provide errors and omissions insurance in states where it was required to become approved to do business with Fremont. Each uniform residential appraisal report included a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may have been a desk review, field review or an automated valuation report that confirmed or supported the original appraiser's value of the mortgaged premises.

Fremont required title insurance on all first mortgage loans, which were secured by liens on real property. Fremont also required that fire and extended coverage casualty insurance be maintained on the secured property in an amount at least equal to the principal balance of the related loan or the replacement cost of the property, whichever was less.

Fremont conducted a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the funding review, all loans were reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations was reviewed. The loan review confirmed the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing review findings and level of error was sent

S-45

monthly to each loan production office for response. The review findings and branch responses were then reviewed by Fremont's senior management. Adverse findings were tracked monthly.

*Balloon Loans*. Beginning in September 2005, Fremont began originating certain mortgage loans that did not provide for full amortization prior to maturity, where the payment of any remaining unamortized principal balance was due in a single or balloon payment at maturity. Initially, these balloon loans were originated by Fremont provide for amortization of principal based on a 40 year period with a term to maturity of 30 years ("40/30 Loans"). Starting in August 2006, Fremont began originating balloon loans that provide for amortization of principal based on a 50 year period with a term to maturity of 30 years ("50/30 Loans").

*Second Lien Mortgage Loans*. Fremont had two programs for the origination of second lien mortgage loans. The programs were limited to loans that were originated contemporaneously with the origination of a loan secured by a first lien. Fremont announced that it had discontinued both programs in January 2007; however the mortgage loan pool includes second lien loans originated prior to such date.

The first program allowed for loans with up to 5% loan to value and maximum combined loan to values of 95%. This program was limited to borrowers with minimum credit scores of 600, credit grades of at least "C" and debt to income ratios not greater than 50%. Permissible loan balances for this program were from $15,000 to $44,444. The maximum term on these loans was 10 to 30 years; provided, that a 15 year amortization term was available only for Full Documentation or Easy Documentation loans with an original loan balance of $15,000 or greater. Terms over 15 years were available only for Full Documentation or Easy Documentation loans with an original loan balance of $25,000 or greater. Loans under this program were available for "owner occupied" or "non-owner occupied" properties.

The second program was for borrowers with minimum credit scores of 600. This program allowed for loans of up to 20% loan to value and 100% maximum combined loan to values and was limited to borrowers in credit grades of "A+" and "A" and debt ratios not greater than 50%. Permissible loan balances for this program were from $15,000 to $200,000. Combined loan balances (first and second lien mortgage loans) of up to $1,000,000 were allowed to borrowers under Full Documentation that had credit scores of 600 and greater or Stated Documentation loans that had credit scores of 640 and greater. In addition, permissible loan balances from $15,000 to $250,000 were allowed for Full Documentation borrowers with credit scores of 640 or greater. Combined loan balances (first and second lien mortgage loans) of up to $1,250,000 were allowed. The loans were available with amortization terms of 10, 15, 20 and 30 years, however loan balances must have been at least $25,000 to qualify for an amortization term of 20 years or longer. Rural properties and properties in Alaska were not allowed under this program.

### Risk Categories

Fremont's underwriting guidelines under the Scored Programs with respect to each rating category generally required:

- debt to income ratios of 55% or less on mortgage loans with loan-to-value ratios of 95% or less, however, debt to income ratios of 50% or less are required on loan-to-value ratios greater than 95%;

- applicants had a credit score of at least 500;

- that no liens or judgments affecting title may remain open after the funding of the loan, other than liens in favor of the internal revenue service that were subordinated to the loan; and

- that any collection, charge-off, or judgment not affecting title that was less than 1 year old must have been paid in connection with closing if either its balance was greater than $1,000 or the aggregate balances of all such collections, charge-offs or judgments were greater than $2,500.

In addition, the various risk categories generally had the following criteria for borrower eligibility:

"AA."  Under the "AA" category, an applicant must have had no 30-day late mortgage payments within the last 12 months and it must have been at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure.  The maximum loan-to-value ratio was 95%.  The maximum permitted loan-to-value ratio was reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics.  The minimum Credit Score was 620 for Full Documentation and Easy Documentation and 640 for Stated documentation loans.

"A+."  Under the "A+" category, an applicant must have had no 30-day late mortgage payments within the last 12 months and it must have been at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure.  The maximum loan-to-value ratio was 100% with a minimum credit score of 600.  The maximum permitted loan-to-value ratio was reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics, or credit scores below 600.

"A."  Under the "A" category, an applicant must have had not more than one 30-day late mortgage payment within the last 12 months and it must have been at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure.  The maximum loan-to-value ratio was 100% with a minimum credit score of 600.  The maximum permitted loan-to-value ratio was reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics, or credit scores below 600.

"A-."  Under the "A-" category, an applicant must have had not more than three 30-day late mortgage payments within the last 12 months and it must have been at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure.  The maximum loan-to-value ratio was 90% with a minimum credit score of 550.  The maximum permitted loan-to-value ratio was reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics, or credit scores below 550.

"B."  Under the "B" category, an applicant must have had not more than one 60-day late mortgage payment within the last 12 months and it must have been at least 18 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure.  The maximum loan-to-value ratio was 90% with a credit score of 550.  The maximum permitted loan-to-value ratio was reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics, or credit scores below 550.

"C."  Under the "C" category, an applicant must not have been more than 90 days delinquent with respect to its current mortgage payment and it must have been at least 12 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure.  The maximum permitted loan-to-value ratio was 85% with a minimum credit score of 580.  The maximum permitted loan-to-value ratio was reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"C-."  Under the "C-" category, an applicant must not have been more than 150 days delinquent with respect to its current mortgage payment and it must not have been subject of a Chapter 7 or Chapter 13 bankruptcy and/or foreclosure.  The maximum permitted loan-to-value ratio was 70% with a minimum credit score of 500.  The maximum permitted loan-to-value ratio was reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"D."  Under the "D" category, an applicant must not have been more than 180 days delinquent with respect to its current mortgage payment.  Any Chapter 7 or Chapter 13 bankruptcy proceedings and/or foreclosure actions must have been paid in connection with closing.  The maximum permitted loan-to-value ratio was 65% with a minimum credit score of 500.  The maximum permitted loan-to-value ratio was reduced to 60% if the property was currently subject to foreclosure proceedings.

## DESCRIPTION OF THE NOTES

### General

The Newcastle Mortgage Securities Trust, Mortgage-Backed Notes, Series 2007-1 will consist of seventeen classes of Notes. The Class 1-A-1, Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7-A, Class M-7-B, Class M-8-A, Class M-8-B, Class M-9 and Class M-10 Notes, referred to in this prospectus supplement collectively as the "Offered Notes", are offered by this prospectus supplement. The Class 1-A-1, Class 2-A-1, Class 2-A-2, Class 2-A-3 and Class 2-A-4 Notes are also referred to in this prospectus supplement collectively as the "Senior Notes" or the "Class A Notes." The Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7-A, Class M-7-B, Class M-8-A, Class M-8-B, Class M-9 and Class M-10 Notes are referred to in this prospectus supplement collectively as the "Class M Notes" or the "Subordinate Notes." The Class M-7-A and Class M-7-B Notes are sometimes referred to in this prospectus supplement collectively as the "Class M-7 Notes." The Class M-8-A and Class M-8-B Notes are sometimes referred to in this prospectus supplement collectively as the "Class M-8 Notes."  The Issuing Entity will also issue trust certificates referred to in this prospectus supplement as the Owner Trust Certificates, which are not offered by this prospectus supplement.

The Class 1-A-1, Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7-A, Class M-7-B, Class M-8-A, Class M-8-B, Class M-9 and Class M-10 Notes, referred to collectively as the "Notes", will be issued pursuant to the Indenture. Set forth below are summaries of the material terms and provisions pursuant to which the Offered Notes will be issued. The following summaries are subject to, and are qualified in their entirety by reference to, the provisions of the Indenture. When particular provisions or terms used in the Indenture are referred to, the actual provisions (including definitions of terms) are incorporated by reference.

The Notes will be issued by the Issuing Entity, the assets of which on the Closing Date will consist of the following:

- all of the Depositor's right, title and interest in and to the mortgage loans, the related mortgage notes, mortgages and other related documents, including all interest and principal due with respect to the mortgage loans after the Cut-off Date, but excluding any payments of principal or interest due on or prior to the Cut-off Date,

- any mortgaged properties acquired on behalf of the Issuing Entity by foreclosure or by deed in lieu of foreclosure, and any revenues received thereon,

- the rights of the Depositor under the Assignment Agreement among the Depositor, the Seller and the Originator,

- such assets relating to the mortgage loans as from time to time may be held in the Collection Accounts and the Note Account, and

- any proceeds of the foregoing.

Each class of Notes will have the approximate initial Note Principal Balance as set forth on the cover hereof and will have the Note Interest Rate determined as provided under "*Summary of prospectus supplement—Description of the Notes—Note Interest Rates*" and "*Description of Notes—Interest Payments*" in this prospectus supplement.

Payments on the Offered Notes will be made on the 25th day of each month, or, if such day is not a business day, on the next succeeding business day, beginning in July 2007, and referred to in this prospectus supplement as a Payment Date.

For each class of Offered Notes, $25,000 and multiples of $1.00 in excess thereof, except that one certificate of each class may be issued in the remainder of the class.

**Book-Entry Notes**

The Offered Notes will initially be issued in book-entry form and are referred to in this prospectus supplement as the Book-entry Notes. Holders of the Book-entry Notes may elect to hold their Notes through the Depository Trust Company, referred to in this prospectus supplement as DTC, in the United States, or Clearstream Banking, société anonyme, formerly known as Cedelbank SA, or Clearstream, or Euroclear, in Europe if they are participants of their systems, or indirectly through organizations which are participants in their systems. The Book-entry Notes will be issued in one or more securities which equal the aggregate principal balance of the Notes and will initially be registered in the name of Cede & Co., the nominee of DTC. Clearstream and Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream's and Euroclear's names on the books of their respective depositaries which in turn will hold the positions in customers' securities accounts in the depositaries' names on the books of DTC. Investors may hold the beneficial interests in the Book-entry Notes in minimum denominations of $25,000 and integral multiples of $1.00 in excess thereof provided that one Note of each of these classes may be issued in a different Note Principal Balance to accommodate the remainder of the Note Principal Balance of the Notes of such class. Except as described below, no beneficial owner of the Book-entry Notes will be entitled to receive a physical note, or definitive note, representing the security. Unless and until definitive notes are issued, it is anticipated that the only holder of the Book-entry Notes will be Cede & Co., as nominee of DTC. Note Owners will not be holders as that term is used in the Agreements.

The Note Owner's ownership of a Book-entry Note will be recorded on the records of the brokerage firm, bank, thrift institution or other financial intermediary that maintains the Note Owner's account for that purpose. In turn, the financial intermediary's ownership of the Book-entry Notes will be recorded on the records of DTC, or of a participating firm that acts as agent for the financial intermediary, whose interest will in turn be recorded on the records of DTC, if the Note Owner's financial intermediary is not a DTC participant and on the records of Clearstream or Euroclear, as appropriate.

Note Owners will receive all payments of principal and interest on the Book-entry Notes from the Securities Administrator through DTC and DTC participants. While the Book-entry Notes are outstanding, except under the circumstances described below, under the DTC rules, regulations and procedures, DTC is required to make book-entry transfers among participants on whose behalf it acts in

connection with the Book-entry Notes and is required to receive and transmit payments of principal and interest on the Book-entry Notes.

Participants and indirect participants with whom Note Owners have accounts for notes are similarly required to make book-entry transfers and receive and transmit the payments on behalf of their respective Note Owners. Accordingly, although Note Owners will not possess definitive notes, the DTC rules provide a mechanism by which Note Owners will receive payments and will be able to transfer their interest.

Note Owners will not receive or be entitled to receive definitive notes representing their respective interests in the Book-entry Notes, except under the limited circumstances described below. Unless and until definitive notes are issued, Note Owners who are not participants may transfer ownership of Book-entry Notes only through participants and indirect participants by instructing the participants and indirect participants to transfer the Book-entry Notes, by book-entry transfer, through DTC for the account of the purchasers of the Book-entry Notes, which account is maintained with their respective participants. Under the DTC rules and in accordance with DTC's normal procedures, transfers of ownership of notes will be executed through DTC and the accounts of the respective participants at DTC will be debited and credited. Similarly, the participants and indirect participants will make debits or credits, as the case may be, on their records on behalf of the selling and purchasing Note Owners.

Under a book-entry format, Note Owners may experience delays in their receipt of payments, since the payments will be made by the Securities Administrator to Cede & Co., as nominee for DTC. Payments on Book-entry Notes held through Clearstream or Euroclear will be credited to the cash accounts of Clearstream participants or Euroclear participants in accordance with the relevant system's rules and procedures, to the extent received by the relevant depository. The payments will be subject to tax reporting in accordance with relevant United States tax laws and regulations. Because DTC can only act on behalf of financial intermediaries, the ability of a Note Owner to pledge Book-entry Notes to persons or entities that do not participate in the depository system, or otherwise take actions relating to the Book-entry Notes, may be limited due to the lack of physical notes for the Book-entry Notes. In addition, issuance of the Book-entry Notes in book-entry form may reduce the liquidity of the Book-entry Notes in the secondary market since some potential investors may be unwilling to purchase securities for which they cannot obtain physical notes.

DTC has advised the Depositor and the Securities Administrator that, unless and until definitive notes are issued, DTC will take any action permitted to be taken by a Noteholder under the Indenture and other Agreements only at the direction of one or more financial intermediaries to whose DTC accounts the Book-entry Notes are credited, to the extent that the actions are taken on behalf of financial intermediaries whose holdings include the Book-entry Notes. Clearstream or the Euroclear operator, as the case may be, will take any other action permitted to be taken by Noteholders under the Indenture and other Agreements on behalf of a Clearstream participant or Euroclear participant only in accordance with its relevant rules and procedures and subject to the ability of the relevant depository to effect the actions on its behalf through DTC. DTC may take actions, at the direction of the related participants, with respect to some notes which conflict with actions taken relating to other notes.

Definitive notes will be issued to Note Owners or their nominees, respectively, rather than to DTC or its nominee, only if (1) the Issuing Entity advises the Indenture Trustee and the Securities Administrator in writing that DTC is no longer willing or able to properly discharge its responsibilities as clearing agency with respect to the Book-entry Notes and the Issuing Entity is unable to locate a qualified successor within 30 days; or (2) the Issuing Entity, at its option, elects to terminate the book-entry system through DTC. Additionally, after the occurrence of an Event of Default under the Indenture, any Note Owner materially and adversely affected thereby may, at its option, request and, subject to the procedures

set forth in the Indenture and other Agreements, receive a definitive note evidencing such Note Owner's fractional undivided interest in the class of notes.

Upon its receipt of notice of the occurrence of any event described in the immediately preceding paragraph, the Securities Administrator is required to request that DTC notify all Note Owners through its participants of the availability of definitive notes. Upon surrender by DTC of the global note or definitive notes representing the Book-entry Notes and receipt of instructions for re-registration, the Securities Administrator will reissue the Book-entry Notes as definitive notes issued in the respective principal balances owned by individual Note Owners, and thereafter the Indenture Trustee will recognize the holders of definitive notes as Noteholders under the Indenture and other Agreements.

Although DTC, Clearstream and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of notes among participants of DTC, Clearstream and Euroclear, they are under no obligation to perform or continue to perform the procedures and the procedures may be discontinued at any time. See Annex I to this prospectus supplement.

The Depositor, the Sponsor, the Seller, the Master Servicer, the Securities Administrator, the Servicer and the Indenture Trustee will have no liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in the Book-entry Notes held by Cede & Co., as nominee for DTC, or for maintaining, supervising or reviewing any records relating to beneficial ownership interests or transfers thereof.

For additional information regarding DTC, Clearstream, Euroclear and the Notes, see "*Description of the Securities—Form of Securities*" and "*—Global Securities*" in the accompanying prospectus.

**Payments on the Notes**

On each Payment Date, the Available Funds for such Payment Date, will be distributed by the Securities Administrator as follows:

(A)    On each Payment Date, the Group 1 Interest Remittance Amount for such Payment Date will be distributed as follows:

*first*, to the Class 1-A-1 Notes, the Class Monthly Interest Amount and any Class Interest Carryover Shortfall for such class and such Payment Date;

*second*, to the extent not paid pursuant to priority (B) below, to the Class 2-A-1 Notes, the Class 2-A-2 Notes, the Class 2-A-3 Notes and the Class 2-A-4 Notes, the related Class Monthly Interest Amount and any related Class Interest Carryover Shortfall for each such class and that Payment Date, allocated among each such class of notes on a pro rata basis based on each note's Class Monthly Interest Amount and Class Interest Carryover Shortfall;

(B)    On each Payment Date, the Group 2 Interest Remittance Amount for such Payment Date will be distributed as follows:

*first*, to the Class 2-A-1 Notes, the Class 2-A-2 Notes, the Class 2-A-3 Notes and the Class 2-A-4 Notes, the related Class Monthly Interest Amount and any related Class Interest Carryover Shortfall for each such class and that Payment Date, allocated among each such class of notes on a pro rata basis based on each note's Class Monthly Interest Amount and Class Interest Carryover Shortfall;

*second*, to the extent not paid pursuant to priority (A) above, to the Class 1-A-1 Notes, the Class Monthly Interest Amount and any Class Interest Carryover Shortfall for such class and such Payment Date;

(C)   On each Payment Date, the Interest Remittance Amount remaining for such Payment Date will be distributed as follows:

*first*, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 (allocated among the Class M-7 Notes, *pro rata* based on their respective Note Balances), Class M-8 (allocated among the Class M-8 Notes, *pro rata* based on their respective Note Balances), Class M-9 and M-10 Notes, in that order, the Class Monthly Interest Amount for each such class and that Payment Date;

(D)   On each Payment Date, (i) prior to the Stepdown Date or (ii) on which a Trigger Event is in effect, concurrently as follows:

(i)   from the Group 1 Principal Remittance Amount,

*first,* to the Class 1-A-1 Notes, the Group 1 Principal Distribution Amount for that Payment Date (excluding any Overcollateralization Increase Amount included therein), until the Note Principal Balance thereof has been reduced to zero;

*second and following the payments pursuant to priority (D)(ii) below,* sequentially to the Class 2-A-1 Notes, the  Class 2-A-2 Notes, the Class 2-A-3 Notes and the Class 2-A-4 Notes, in that order, the remaining Group 1 Principal Distribution Amount (excluding any Overcollateralization Increase Amount included therein) in reduction of the Note Principal Balances, until the Note Principal Balances thereof have been reduced to zero; provided, that notwithstanding the foregoing order of priority, if on any Payment Date, the aggregate Note Principal Balance of the Subordinate Notes as of the day prior to such Payment Date is equal to zero and the Overcollateralization Amount for the prior Payment Date is equal to zero, then such amount shall be paid to the Group 2 Notes, pro rata, based on their respective note principal balances;

(ii)   from the Group 2 Principal Remittance Amount,

*first,* sequentially to the Class 2-A-1 Notes, the  Class 2-A-2 Notes, the Class 2-A-3 Notes and the Class 2-A-4 Notes, in that order, the Group 2 Principal Distribution Amount (excluding any Overcollateralization Increase Amount included therein) in reduction of the Note Principal Balances, until the Note Principal Balances thereof have been reduced to zero; provided, that notwithstanding the foregoing order of priority, if on any Payment Date, the aggregate Note Principal Balance of the Subordinate Notes as of the day prior to such Payment Date is equal to zero and the Overcollateralization Amount for the prior Payment Date is equal to zero, then such amount shall be paid to the Group 2 Notes, pro rata, based on their respective note principal balances;

*second and following the payments pursuant to priority (D)(i) above,* to the Class 1-A-1 Notes, the remaining Group 2 Principal Distribution Amount (excluding any Overcollateralization Increase Amount included therein) for that Payment Date, until the Note Principal Balance thereof has been reduced to zero;

(iii)        from the Principal Remittance Amount remaining, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 (allocated among the Class M-7 Notes, *pro rata* based on their respective Note Balances), Class M-8 (allocated among the Class M-8 Notes, *pro rata* based on their respective Note Balances), Class M-9 and M-10 Notes, in that order, the Principal Distribution Amount remaining (excluding any Overcollateralization Increase Amount included therein) in reduction of the Note Principal Balances, until the Note Principal Balances thereof have been reduced to zero;

(E)        On each Payment Date, (i) on or after the Stepdown Date or (ii) on which a Trigger Event is not in effect, concurrently as follows:

(i)        from the Group 1 Principal Remittance Amount,

*first,* to the Class 1-A-1 Notes, the Group 1 Senior Principal Distribution Amount for that Payment Date, until the Note Principal Balance thereof has been reduced to zero;

*second and following the payments pursuant to priority (E)(ii) below,* sequentially to the Class 2-A-1 Notes, the Class 2-A-2 Notes, the Class 2-A-3 Notes and the Class 2-A-4 Notes, in that order, the Group 2 Senior Principal Distribution Amount remaining unpaid in reduction of the Note Principal Balances, until the Note Principal Balances thereof have been reduced to zero; provided, that notwithstanding the foregoing order of priority, if on any Payment Date, the aggregate Note Principal Balance of the Subordinate Notes as of the day prior to such Payment Date is equal to zero and the Overcollateralization Amount for the prior Payment Date is equal to zero, then such amount shall be paid to the Group 2 Notes, pro rata, based on their respective note principal balances;

(ii)        from the Group 2 Principal Remittance Amount,

*first,* sequentially to the Class 2-A-1 Notes, the Class 2-A-2 Notes, the Class 2-A-3 Notes and the Class 2-A-4 Notes, in that order, the Group 2 Senior Principal Distribution Amount in reduction of the Note Principal Balances, until the Note Principal Balances thereof have been reduced to zero; provided, that notwithstanding the foregoing order of priority, if on any Payment Date, the aggregate Note Principal Balance of the Subordinate Notes as of the day prior to such Payment Date is equal to zero and the Overcollateralization Amount for the prior Payment Date is equal to zero, then such amount shall be paid to the Group 2 Notes, pro rata, based on their respective note principal balances;

*second and following the payments pursuant to priority (E)(i) above,* to the Class 1-A-1 Notes, the Group 1 Senior Principal Distribution Amount remaining unpaid for that Payment Date, until the Note Principal Balance thereof has been reduced to zero;

(iii)        from the Principal Remittance Amount remaining, as follows

*first,* to the Class M-1 Notes, the Class M-1 Principal Distribution Amount for such Payment Date, until the Note Principal Balance thereof has been reduced to zero;

*second,* to the Class M-2 Notes, the Class M-2 Principal Distribution Amount for such Payment Date, until the Note Principal Balance thereof has been reduced to zero;

*third,* to the Class M-3 Notes, the Class M-3 Principal Distribution Amount for such Payment Date, until the Note Principal Balance thereof has been reduced to zero;

*fourth,* to the Class M-4 Notes, the Class M-4 Principal Distribution Amount for such Payment Date, until the Note Principal Balance thereof has been reduced to zero;

*fifth,* to the Class M-5 Notes, the Class M-5 Principal Distribution Amount for such Payment Date, until the Note Principal Balance thereof has been reduced to zero;

*sixth,* to the Class M-6 Notes, the Class M-6 Principal Distribution Amount for such Payment Date, until the Note Principal Balance thereof has been reduced to zero;

*seventh,* to the Class M-7 Notes, the Class M-7 Principal Distribution Amount for such Payment Date (allocated among the Class M-7 Notes, *pro rata* based on their respective Note Balances), until the Note Principal Balance thereof has been reduced to zero;

*eighth,* to the Class M-8 Notes, the Class M-8 Principal Distribution Amount for such Payment Date (allocated among the Class M-8 Notes, *pro rata* based on their respective Note Balances), until the Note Principal Balance thereof has been reduced to zero;

*ninth,* to the Class M-9 Notes, the Class M-9 Principal Distribution Amount for such Payment Date, until the Note Principal Balance thereof has been reduced to zero; and

*tenth,* to the Class M-10 Notes, the Class M-10 Principal Distribution Amount for such Payment Date, until the Note Principal Balance thereof has been reduced to zero;

(F)     From the Available Funds remaining for such Payment Date as follows:

*first,* to the Notes, the Overcollateralization Increase Amount for such Payment Date, in the following order of priority:

(i) the Group 1 Allocation Percentage of the Overcollateralization Increase Amount to the Group 1 Notes in reduction of the Note Principal Balance, until the Note principal Balance thereof has been reduced to zero;

(ii)  the Group 2 Allocation Percentage of the Overcollateralization Increase Amount to the Group 2 Notes (allocated among such notes in the order of priority set forth in clause (D) above) in reduction of the Note Principal Balance, until the Note Principal Balances thereof have been reduced to zero;

(iii)   any remaining Overcollateralization Increase Amount, pro rata, to the Group 1 Notes and Group 2 Notes then entitled to principal in reduction of the Note Principal Balance, until the Note Principal Balances thereof have been reduced to zero;

(iv)  any remaining Overcollateralization Increase Amount sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 (allocated among the Class M-7 Notes, *pro rata* based on their respective Note Balances), Class M-8 (allocated among the Class M-8 Notes, *pro rata* based on their respective Note Balances), Class M-9 and M-10 Notes, in that order, in each case in reduction of the Note Principal Balance thereof, until the Note Principal Balance thereof has been reduced to zero;

*second*, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 (allocated among the Class M-7 Notes, *pro rata* based on their respective Note Balances), Class M-8 (allocated among the Class M-8 Notes, *pro rata* based on their respective Note Balances), Class M-9 and M-10 Notes, in that order, in each case, first (a) any related Class Interest Carryover Shortfall and then (b) any related Allocated Realized Loss Amount;

*third,* concurrently and pro rata based on the related Basis Risk Shortfall Amount due to each group, (i) to the Class 1-A-1 Notes, the related Basis Risk Shortfall Amount and (ii) to the Group 2 Notes, pro rata among the Group 2 Notes, the related Basis Risk Shortfall Amount

*fourth,* sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 (allocated among the Class M-7 Notes, *pro rata* based on their respective Note Balances), Class M-8 (allocated among the Class M-8 Notes, *pro rata* based on their respective Note Balances), Class M-9 and M-10 Notes, in that order, the related Basis Risk Shortfall Amount;

*fifth,* to the swap provider, any swap termination payments resulting from a swap provider trigger event; and

*sixth,* to the holders of the owner trust certificates, the remainder as provided in the indenture.

**Interest Payments**

Holders of each class of notes will be entitled to receive interest payments in the amounts and order of priority described above under "*—Payments on the Notes.*"

No Class Monthly Interest Amount will be payable with respect to any class or classes of Notes after the Payment Date on which the Note Principal Balance of such class has been reduced to zero and no interest will accrue on the Notes on or after the final scheduled Payment Date or any such other final Payment Date.

When a Principal Prepayment in full is made on a mortgage loan, the mortgagor is charged interest only for the period from the Due Date of the preceding monthly payment up to the date of the Principal Prepayment, instead of for a full month. When a partial Principal Prepayment is made on a mortgage loan, the mortgagor is not charged interest on the amount of the prepayment for the month in which the prepayment is made. Interest shortfalls resulting from Principal Prepayments in full or in part are referred to herein as Prepayment Interest Shortfalls.

Any Prepayment Interest Shortfalls resulting from prepayments in full or prepayments in part made during the preceding calendar month that are being distributed to the Noteholders on that Payment Date will be offset by the servicer; provided, however, that only Prepayment Interest Shortfalls that do not exceed the aggregate of the related Servicing Fee for the applicable Payment Date will be offset. Any Prepayment Interest Shortfalls required to be funded but not funded by the Servicer are required to be paid by the Master Servicer, but only to the extent that such amount does not exceed the aggregate Master Servicer compensation for the applicable Payment Date. No assurance can be given that the Master Servicing compensation available to cover Prepayment Interest Shortfalls will be sufficient therefor. Any Prepayment Interest Shortfalls which are not covered by the Servicer or the Master Servicer on any Payment Date will have the effect of reducing the aggregate amount of interest collected that is available for payment to Noteholders and will not be reimbursed on any future Payment Date. See "*The Sale and*

*Servicing Agreement—Servicing and Other Compensation and Payment of Expenses*" in this prospectus supplement.

The aggregate amount of interest collected that is available for payment to Noteholders may be further reduced on each Payment Date by application of the Relief Act or similar state laws. Neither the Servicer nor the Master Servicer are obligated to fund interest shortfalls resulting from the Relief Act or similar state laws.

Realized Losses on the mortgage loans will further reduce the aggregate amount of interest collected that is available for payment to Noteholders.

The "Note Interest Rate" with respect to at a per annum rate that adjusts monthly, equal to the lesser of (i) one-month LIBOR plus the applicable Margin, (ii) the related Available Funds Rate and (iii) 11.500% per annum.  The Interest Accrual Period for the notes for a given Payment Date will be the last Payment Date (or, with respect to the first Payment Date, the Closing Date) through the day immediately preceding the then-current Payment Date, on an actual/360 basis.

**Calculation of One-Month LIBOR**

On the second LIBOR business day preceding the commencement of each interest accrual period, for the notes, which date we refer to as an interest determination date, the Securities Administrator will determine "One-Month LIBOR" for such interest accrual period on the basis of such rate as it appears on Reuters Screen LIBOR01 Page, which is the display page currently so designated on the Reuters Monitor Money Rates Service (or such other page as may replace that page on that service for the purpose of displaying comparable rates or prices), as of 11:00 a.m. London time on such interest determination date. If such rate does not appear on such page, or such other page as may replace that page on that service, or if such service is no longer offered, such other service for displaying LIBOR or comparable rates as may be reasonably selected by the Securities Administrator, One-Month LIBOR for the applicable accrual period will be the Reference Bank Rate. If no such quotations can be obtained and no Reference Bank Rate is available, One-Month LIBOR will be the One-Month LIBOR applicable to the preceding accrual period.

The Reference Bank Rate with respect to any accrual period, means the arithmetic mean, rounded upwards, if necessary, to the nearest whole multiple of 0.03125%, of the offered rates for United States dollar deposits for one month that are quoted by the Reference Banks, as described below, as of 11:00 a.m., New York City time, on the related interest determination date to prime banks in the London interbank market for a period of one month in amounts approximately equal to the aggregate Note Principal Balance of all classes of notes for such interest accrual period, provided that at least two such Reference Banks provide such rate. If fewer than two offered rates appear, the Reference Bank Rate will be the arithmetic mean, rounded upwards, if necessary, to the nearest whole multiple of 0.03125%, of the rates quoted by one or more major banks in New York City, selected by the trustee, as of 11:00 a.m., New York City time, on such date for loans in U.S. dollars to leading European banks for a period of one month in amounts approximately equal to the aggregate Note Principal Balance of all classes of notes for such interest accrual period. As used in this section, "LIBOR Business Day" means a day on which banks are open for dealing in foreign currency and exchange in London and New York City; and "Reference Banks" means leading banks selected by the trustee and engaged in transactions in Eurodollar deposits in the international Eurocurrency market:

- with an established place of business in London,

- which have been designated as such by the trustee and

- which are not controlling, controlled by, or under common control with, the Depositor, the Sponsor or the Master Servicer.

The establishment of One-Month LIBOR on each interest determination date by the Securities Administrator and the Securities Administrator's calculation of the rate of interest applicable to the classes of offered certificates bearing interest at an adjustable rate for the related accrual period will, in the absence of manifest error, be final and binding.

### Principal Payments on the Notes

Payments in reduction of the Note Principal Balance of the Senior Notes will be made on each Payment Date pursuant to the priorities set forth in paragraphs (D), (E) and (F), as applicable, under "—*Payments on the Notes*." In accordance with such priority, the Principal Remittance Amount for each Loan Group will be allocated to the notes.

The principal payment of each Offered Note will be due and payable in full on the final scheduled Payment Date for such Offered Note as provided on such Note. All principal payments on the Offered Notes will be made to the offered Noteholders entitled thereto in accordance with the percentage interests represented by such Offered Notes. Upon notice to the Securities Administrator by the Issuing Entity, the Securities Administrator will notify the person in whose name an Offered Note is registered at the close of business on the Record Date preceding the final scheduled Payment Date or other final Payment Date (including any final Payment Date resulting from any redemption pursuant to the Indenture). Such notice will to the extent practicable be mailed no later than five Business Days prior to such final scheduled payment date or other final Payment Date and will specify that payment of the principal balance and any interest due with respect to such Offered Note at the final scheduled payment date or other final Payment Date will be payable only upon presentation and surrender of such Note and will specify the place where such Note may be presented and surrendered for such final payment.

### Excess Interest and Overcollateralization Provisions

Excess Interest on each Payment Date will be required to be applied up to the Overcollateralization Increase Amount as described above under clause *first* of paragraph (F) under "—*Payments on the Notes*" with respect to the notes whenever the Overcollateralization Amount is less than the Required Overcollateralization Amount. Any remaining Excess Interest, together with any Excess Overcollateralization Amount, will be distributed in the manner and order of priority described above under clauses *second* through *sixth* of paragraph (F) under "—*Payments on the Notes.*"

In addition, notwithstanding the foregoing, on any Payment Date after the Payment Date on which the Note Principal Balance of a class of notes has been reduced to zero, that class of notes will be retired and will no longer be entitled to payments, including distributions in respect of Basis Risk Shortfalls Amounts.

### Table of Fees and Expenses

The following table indicates the fees and expenses to be paid from the cash flows from the mortgage loans and other assets of the Issuing Entity, while the Offered Notes are outstanding.

All fee rates are expressed in percentages, at an annualized rate, applied to the outstanding aggregate principal balance of the mortgage loans.

| Item | Recipient | Amount | Source | Frequency |
|------|-----------|--------|--------|-----------|
| Servicing Fee [1] | Servicer | 0.500% per annum | mortgage loan interest collections | monthly |
| Master Servicing Fee [1] | Master Servicer | 0.010% per annum | mortgage loan interest | monthly |
| Additional Servicing Compensation [1] | Servicer | All assumption fees and other similar charges (excluding prepayment charges) and income earned on investments in the collection account | payments made by obligors with respect to the mortgage loans excluding prepayment charges or late payment fees | From time to time |
| Servicing Transfer Costs and Other Expenses [1] | Master Servicer and Indenture Trustee | The amount of costs incurred to the extent not paid by the predecessor servicer and other amounts permitted under the sale and servicing agreement. | amounts on deposit in the Note Account | From time to time |
| Net Swap Payments [1] | Swap Provider | The amount by which the fixed swap payment exceeds the floating swap payment | aggregate interest and principal collected or advanced on the mortgage loans | monthly |

| Item | Recipient | Amount | Source | Frequency |
|------|-----------|--------|--------|-----------|
| Indemnification expenses [1] | Seller, Servicer, Master Servicer, Sponsor, Depositor, Indenture Trustee, Owner Trustee, Securities Administrator, Custodian | Amounts for which the seller, the servicer, the depositor, the sponsor, the master servicer, the indenture trustee, the owner trustee, the securities administrator and the custodian are entitled to indemnification as described in this prospectus supplement | amounts on deposit in the Note Account | From time to time |

[1] Each of these fees and expenses are paid on a first priority basis prior to payments to Noteholders.

### Monthly Advances

If the scheduled payment on a mortgage loan which was due on a related Due Date is delinquent other than as a result of application of the Relief Act or similar state law, the Servicer will remit to the Securities Administrator on the date specified in the Sale and Servicing Agreement an amount equal to such delinquency, net of the servicing fee rate except to the extent the Servicer determines any such advance to be nonrecoverable from Liquidation Proceeds, Insurance Proceeds or from future payments on the mortgage loan for which such advance was made. Subject to the foregoing, such advances will be made by the Servicer through final disposition or liquidation of the related mortgaged property, or until such time as specified in the Sale and Servicing Agreement. Failure by the Servicer to remit any required advance, which failure goes unremedied for the number of days specified in the Sale and Servicing Agreement, will constitute an event of termination under the Sale and Servicing Agreement. Such event of termination will then obligate the Master Servicer, as successor servicer, to advance such amounts to the Note Account to the extent provided in the Sale and Servicing Agreement. In the event that the Master Servicer fails to make a required advance, the Indenture Trustee as successor servicer will be required to advance such amounts to the Note Account to the extent provided in the Indenture. Any failure of the Master Servicer to make such required advances would constitute an event of termination as discussed under "*The Sale and Servicing Agreement—Events of Default and Removal of Servicer and Master Servicer*" in the accompanying prospectus.

All Monthly Advances will be reimbursable to the party making such Monthly Advance from late collections, Insurance Proceeds and Liquidation Proceeds from the mortgage loan as to which the unreimbursed Monthly Advance was made. In addition, any Monthly Advances previously made in respect of any mortgage loan that are deemed by the Servicer or Master Servicer to be nonrecoverable from related late collections, Insurance Proceeds or Liquidation Proceeds may be reimbursed to such party out of any funds in the Note Account prior to the payments on the Notes.

**Allocation of Losses**

Any Realized Losses on the mortgage loans will have the effect of first reducing the Excess Interest for the related Payment Date and second, reducing the Overcollateralization Amount.  If on any Payment Date the aggregate Note Principal Balance of the Notes (after all payments of principal on such Payment Date have been made) exceed the aggregate Principal Balance of the Mortgage Loans (as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period) such excess will be allocated first, to the Class M-10 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero, second, to the Class M-9 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero, third, to the Class M-8 Notes (allocated among the Class M-8 Notes, *pro rata* based on their respective Note Balances), in reduction of the Note Principal Balance thereof, until reduced to zero, fourth, to the Class M-7 Notes (allocated among the Class M-7 Notes, *pro rata* based on their respective Note Balances), in reduction of the Note Principal Balance thereof, until reduced to zero, fifth, to the Class M-6 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero, sixth, to the Class M-5 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero, seventh, to the Class M-4 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero, eighth, to the Class M-3 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero, ninth, to the Class M-2 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero and tenth, to the Class M-1 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero. Any reduction to the Note Principal Balance of a note is an "Allocated Realized Loss Amount".  The indenture will not permit the allocation of realized losses on the mortgage loans to the Class A Notes; however investors in the Class A Notes should realize that under certain loss scenarios there will not be enough interest and principal on the mortgage loans to pay to such notes all interest and principal amounts to which such notes are then entitled.

Once Realized Losses have been allocated to a class of notes, such amounts with respect to such notes will no longer accrue interest nor will such amounts in respect of interest be reinstated thereafter. However, Allocated Realized Loss Amounts may be repaid to the holders of the notes from Excess Interest, according to the priorities set forth in paragraph (F) under *"Description of the Notes — Payments on the Notes"* above.

No reduction of the Note Principal Balance of any class of offered notes will be made on any Payment Date on account of Realized Losses to the extent that such reduction would have the effect of reducing the aggregate Note Principal Balance of all of the classes of offered notes as of such payment date to an amount less than the Loan Balances of the mortgage loans as of the related due date.

In the event that the Servicer or Master Servicer receives any Subsequent Recoveries, such Subsequent Recoveries will be distributed in accordance with the priorities described under *"Description of the Notes — Payments on the Notes"* in this prospectus supplement, and the Note Principal Balance of each class of notes that has been reduced by the allocation of a Realized Loss to such class will be increased, in order of seniority, by the amount of such Subsequent Recoveries. Holders of such classes of notes will not be entitled to any payment in respect of Class Monthly Interest Amount on the amount of such increases for any accrual period preceding the payment date on which such increase occurs. Any Subsequent Recoveries that are received during a Prepayment Period will be included as a part of Available Funds for the related Payment Date.

**The Interest Rate Swap Agreement**

The Issuing Entity will enter into an interest rate swap agreement (the "Interest Rate Swap Agreement") with Bear Stearns Financial Products Inc. (the "Swap Provider") for the benefit of the holders of the notes. The Securities Administrator will be appointed to receive and distribute funds with

regards to the Interest Rate Swap Agreement on behalf of the Trust. On or before each payment date, the Securities Administrator will deposit into an account held in the Trust (the "Swap Account") certain amounts, if any, received from the Swap Provider. The Securities Administrator will withdraw from the Swap Account and distribute to holders of the notes certain amounts as described below under "The Swap Account" in this prospectus supplement.  The Class M-7-B, Class M-8-B, Class M-9 and Class M-10 Notes will not be entitled to receive payments under the Interest Rate Swap Agreement under any circumstances.

Under the Interest Rate Swap Agreement, on or before each payment date commencing with the payment date in July 2007 and ending with the payment date in March 2013, the Securities Administrator, on behalf of the Trust and from amounts on deposit in the Note Account, will be obligated to pay to the Swap Provider a fixed amount for that payment date, or the "Fixed Swap Payment," equal to the product of (x) a fixed rate equal to 5.074% per annum, (y) the product of (i) the notional amount as set forth below for that Payment Date and (ii) 250, and (z) a fraction, the numerator of which is 30 (or, in the case of the first payment date, the number of days from and including the effective date (as defined in the Interest Rate Swap Agreement) to but excluding such payment date, determined on a 30/360 basis) and the denominator of which is 360, and the Swap Provider will be obligated to pay to the Securities Administrator, on behalf of the Trust, a floating amount, or the "Floating Swap Payment," equal to the product of (x) One-Month LIBOR as determined pursuant to the Interest Rate Swap Agreement, for the related calculation period (as defined in the Interest Rate Swap Agreement) (y) the product of (i) the notional amount as set forth below for that Payment Date and (ii) 250, and (z) a fraction, the numerator of which is equal to the actual number of days in the related calculation period and the denominator of which is 360. A net payment, referred to as a "Net Swap Payment", will be required to be made on or before each applicable payment date (a) by the Securities Administrator, on behalf of the Trust, to the Swap Provider, to the extent that the Fixed Swap Payment for such payment date exceeds the Floating Swap Payment for such payment date, or (b) by the Swap Provider to the Securities Administrator, on behalf of the Trust, to the extent that the Floating Swap Payment exceeds the Fixed Swap Payment for such payment date. For each payment date in respect of which a Net Swap Payment is required to be made to the Swap Provider, the Trust will be required to make a payment to the Swap Account in the amount of such Net Swap Payment, prior to distributions to the noteholders. The Securities Administrator, on behalf of the Trust, will only be required to make a Net Swap Payment to the Swap Provider to the extent of funds paid by the Trust to the Swap Account.

The notional amount with respect to the Interest Rate Swap Agreement and each payment date set forth below will be approximately the related notional amount set forth below; provided, however, that the notional amount set forth below may be reduced even further if all of the Offered Notes are not sold to purchasers unaffiliated with the Sponsor:

**SCHEDULED NOTIONAL AMOUNTS**
**FOR THE SWAP AGREEMENT**

| Payment Date | Notional Amount($) | Rate (%) | Payment Date | Notional Amount($) | Rate (%) |
|---|---|---|---|---|---|
| 07/25/07 | 3,917,896 | 5.074 | 08/25/10 | 578,388 | 5.074 |
| 08/25/07 | 3,865,100 | 5.074 | 09/25/10 | 561,632 | 5.074 |
| 09/25/07 | 3,821,548 | 5.074 | 10/25/10 | 546,048 | 5.074 |
| 10/25/07 | 3,771,720 | 5.074 | 11/25/10 | 531,000 | 5.074 |
| 11/25/07 | 3,717,232 | 5.074 | 12/25/10 | 517,652 | 5.074 |
| 12/25/07 | 3,657,696 | 5.074 | 01/25/11 | 504,708 | 5.074 |
| 01/25/08 | 3,591,412 | 5.074 | 02/25/11 | 492,416 | 5.074 |
| 02/25/08 | 3,517,848 | 5.074 | 03/25/11 | 480,200 | 5.074 |
| 03/25/08 | 3,434,968 | 5.074 | 04/25/11 | 469,816 | 5.074 |
| 04/25/08 | 3,344,504 | 5.074 | 05/25/11 | 459,136 | 5.074 |
| 05/25/08 | 3,241,840 | 5.074 | 06/25/11 | 447,200 | 5.074 |
| 06/25/08 | 3,132,264 | 5.074 | 07/25/11 | 435,944 | 5.074 |
| 07/25/08 | 3,028,420 | 5.074 | 08/25/11 | 424,968 | 5.074 |
| 08/25/08 | 2,931,272 | 5.074 | 09/25/11 | 414,140 | 5.074 |
| 09/25/08 | 2,839,624 | 5.074 | 10/25/11 | 403,816 | 5.074 |
| 10/25/08 | 2,753,696 | 5.074 | 11/25/11 | 393,352 | 5.074 |
| 11/25/08 | 2,669,796 | 5.074 | 12/25/11 | 383,960 | 5.074 |
| 12/25/08 | 2,588,264 | 5.074 | 01/25/12 | 374,824 | 5.074 |
| 01/25/09 | 2,503,764 | 5.074 | 02/25/12 | 365,880 | 5.074 |
| 02/25/09 | 2,409,984 | 5.074 | 03/25/12 | 355,768 | 5.074 |
| 03/25/09 | 2,286,284 | 5.074 | 04/25/12 | 344,936 | 5.074 |
| 04/25/09 | 2,034,520 | 5.074 | 05/25/12 | 335,160 | 5.074 |
| 05/25/09 | 1,523,264 | 5.074 | 06/25/12 | 325,120 | 5.074 |
| 06/25/09 | 1,287,472 | 5.074 | 07/25/12 | 316,912 | 5.074 |
| 07/25/09 | 1,248,396 | 5.074 | 08/25/12 | 308,796 | 5.074 |
| 08/25/09 | 1,212,276 | 5.074 | 09/25/12 | 300,728 | 5.074 |
| 09/25/09 | 1,178,344 | 5.074 | 10/25/12 | 293,012 | 5.074 |
| 10/25/09 | 1,146,624 | 5.074 | 11/25/12 | 285,208 | 5.074 |
| 11/25/09 | 1,115,884 | 5.074 | 12/25/12 | 278,208 | 5.074 |
| 12/25/09 | 1,087,576 | 5.074 | 01/25/13 | 271,352 | 5.074 |
| 01/25/10 | 1,059,416 | 5.074 | 02/25/13 | 264,800 | 5.074 |
| 02/25/10 | 1,011,980 | 5.074 | 03/25/13 | 258,224 | 5.074 |
| 03/25/10 | 936,316 | 5.074 | | | |
| 04/25/10 | 835,272 | 5.074 | | | |
| 05/25/10 | 685,924 | 5.074 | | | |
| 06/25/10 | 614,292 | 5.074 | | | |
| 07/25/10 | 595,756 | 5.074 | | | |

The Interest Rate Swap Agreement will terminate following the last payment date specified above, unless the Interest Rate Swap Agreement is terminated earlier upon the occurrence of a Swap Event of Default, an Early Termination Event or a Swap Additional Termination Event, each as defined below.

The respective obligations of the Swap Provider and the Securities Administrator, on behalf of the Trust, to pay specified amounts due under the Interest Rate Swap Agreement (other than any Swap Termination Payment, as defined below) generally will be subject to the following conditions precedent: (1) no Swap Event of Default (as defined below) or event that with the giving of notice or lapse of time or both would become a Swap Event of Default will have occurred and be continuing with respect to the

S-62

other party and (2) no "early termination date" (as defined in the Interest Rate Swap Agreement) has occurred or been effectively designated.

Events of default under the Interest Rate Swap Agreement (each a "<u>Swap Event of Default</u>") include the following:

- failure to make a payment as required under the terms of the Interest Rate Swap Agreement,

- failure by the Swap Provider to comply with or perform certain agreements or obligations as required under the terms of the Interest Rate Swap Agreement,

- failure by the Swap Provider to comply with or perform certain agreements or obligations in connection with any credit support document as required under the terms of the Interest Rate Swap Agreement,

- certain representations by the Swap Provider or any credit support provider prove to have been incorrect or misleading in any material respect,

- repudiation or certain defaults by the Swap Provider or any credit support provider in respect of any derivative or similar transactions entered into between the Securities Administrator and the Swap Provider and specified for this purpose in the Interest Rate Swap Agreement,

- cross-default by the Swap Provider or any credit support provider relating generally to its obligations in respect of borrowed money in excess of a threshold specified in the Interest Rate Swap Agreement,

- certain insolvency or bankruptcy events, and

- certain mergers, consolidations or asset transfers without an assumption of related obligations under the Interest Rate Swap Agreement,

each as further described in the Interest Rate Swap Agreement.

Termination Events under the Interest Rate Swap Agreement (each a "<u>Swap Termination Event</u>") include the following:

- illegality (which generally relates to changes in law causing it to become unlawful for either party to perform its obligations under the Interest Rate Swap Agreement),

- tax event (which generally relates to the application of certain withholding taxes to amounts payable under the Interest Rate Swap Agreement, as a result of a change in tax law or certain similar events), and

- tax event upon merger (which generally relates to the application of certain withholding taxes to amounts payable under the Interest Rate Swap Agreement as a result of a merger or similar transaction),

each as further described in the Interest Rate Swap Agreement.

Additional termination events under the Interest Rate Swap Agreement (each a "Swap Additional Termination Event"), include the following:

- failure of the Swap Provider to maintain certain credit ratings or otherwise comply with the downgrade provisions of the Interest Rate Swap Agreement (including certain collateral posting requirements), in each case in certain circumstances as specified in the Interest Rate Swap Agreement,

- failure of the Swap Provider to comply with the Regulation AB provisions of the Interest Rate Swap Agreement (including, if applicable, the provisions of any additional agreement incorporated by reference into the Interest Rate Swap Agreement),

- occurrence of an optional redemption pursuant to the terms of the Indenture,

- amendment of the Indenture in a manner contrary to the requirements of the Interest Rate Swap Agreement,

- liquidation following an event of default under the Indenture, and

- failure of the Securities Administrator to pay certain amounts to the holders of the Class A Notes as required under the Indenture,

each as further described in the Interest Rate Swap Agreement.

If the Swap Provider's credit ratings are withdrawn or reduced below certain ratings thresholds specified in the Interest Rate Swap Agreement, the Swap Provider may be required, at its own expense and in accordance with the requirements of the Interest Rate Swap Agreement, to do one or more of the following: (1) obtain a substitute swap provider, or (2) establish any other arrangement as may be specified for such purpose in the Interest Rate Swap Agreement.

After the Closing Date, to the extent provided for in the Interest Rate Swap Agreement, the Swap Provider may transfer its rights and obligations under the Interest Rate Swap Agreement without the consent of the other party, if certain conditions specified in the Interest Rate Swap Agreement are satisfied.

Upon the occurrence of a Swap Event of Default, the non-defaulting party will have the right to designate an early termination date (an "Early Termination Date"). Upon the occurrence of a Swap Termination Event or a Swap Additional Termination Event, an Early Termination Date may be designated by one of the parties as specified in the Interest Rate Swap Agreement, and will occur only upon notice (including, in some circumstances, notice to the rating agencies) and, in some circumstances, upon satisfaction of certain additional requirements, all as set forth in the Interest Rate Swap Agreement. The occurrence of an Early Termination Date under the Interest Rate Swap Agreement will constitute a "Swap Early Termination."

Upon a Swap Early Termination, the Securities Administrator, on behalf of the Trust, or the Swap Provider may be liable to make a swap termination payment (the "Swap Termination Payment") to the other, regardless, if applicable, of which of the parties has caused the termination. The Swap Termination Payment will be computed in accordance with the procedures set forth in the Interest Rate Swap Agreement. In the event that the Securities Administrator is required to make a Swap Termination Payment to the Swap Provider, the trust will be required to make a payment to the Securities Administrator in the same amount (to the extent such Swap Termination Payment has not been paid by

the Securities Administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Indenture Trustee). In the case of a Swap Termination Payment not triggered by a Swap Provider Trigger Event (as defined in this prospectus supplement), the trust will be required to pay such amount on the related payment date, and on any subsequent payment date, until paid in full, prior to distributions to the Noteholders, and in the case of a Swap Termination Payment triggered by a Swap Provider Trigger Event, the trust's obligation to make such payment generally will be subordinated to certain distributions to the holders of the offered certificates to the extent described in the Indenture.

Upon a Swap Early Termination other than in connection with the optional redemption of the notes, the Securities Administrator will use reasonable efforts to appoint a successor swap provider to enter into a new interest rate swap agreement on terms substantially similar to the Interest Rate Swap Agreement, with a successor swap provider meeting all applicable eligibility requirements. If the Securities Administrator receives a Swap Termination Payment from the Swap Provider in connection with such Swap Early Termination, the Securities Administrator will apply such Swap Termination Payment to any upfront payment required to appoint the successor swap provider. If the Securities Administrator is required to pay a Swap Termination Payment to the Swap Provider in connection with such Swap Early Termination, the Securities Administrator will apply any upfront payment received from the successor swap provider to pay such Swap Termination Payment. If the Securities Administrator is unable to appoint a successor swap provider within 30 days of the Swap Early Termination, then the Securities Administrator will deposit any Swap Termination Payment received from the original Swap Provider into a separate, non-interest bearing reserve account and will, on each subsequent payment date, withdraw from the amount then remaining on deposit in such reserve account an amount equal to the Net Swap Payment, if any, that would have been paid to the Securities Administrator by the original Swap Provider calculated in accordance with the terms of the original Interest Rate Swap Agreement, and distribute such amount in accordance with the terms of the Indenture.

Upon a Swap Early Termination in connection with the optional redemption of the notes, if the Securities Administrator is required to make a Swap Termination Payment to the Swap Provider, the party exercising such optional redemption of the notes will be required to include in its payment an amount equal to such Swap Termination Payment, as described in this prospectus supplement. In connection with such Swap Early Termination, the Issuing Entity will not receive a Swap Termination Payment from the Swap Provider except under certain limited circumstances set forth in the Interest Rate Swap Agreement.

A "Swap Provider Trigger Event" will mean: (i) a Swap Event of Default under the Interest Rate Swap Agreement with respect to which the Swap Provider is a Defaulting Party (as defined in the Interest Rate Swap Agreement), (ii) a Termination Event under the Interest Rate Swap Agreement with respect to which the Swap Provider is the sole Affected Party (as defined in the Interest Rate Swap Agreement) or (iii) an Additional Termination Event under the Interest Rate Swap Agreement with respect to which the Swap Provider is the sole Affected Party.

The aggregate "significance percentage" of the Interest Rate Swap Agreement and the Interest Rate Cap Agreement, as calculated in accordance with Regulation AB Item 1115, is less than 10%. As provided in the Interest Rate Swap Agreement and the Interest Rate Cap Agreement, Bear Stearns Financial Products Inc. may be replaced in certain circumstances, including if the aggregate significance percentage of the Interest Rate Swap Agreement and the Interest Rate Cap Agreement is equal to or greater than 10%.

### The Swap Account

Any Net Swap Payments made by the Swap Provider will be paid in accordance with the Indenture. The Securities Administrator will be required to deposit into the Swap Account all amounts received from the Swap Provider. Any amounts received from the Swap Provider and not paid to the Offered Notes will be paid to the holders of the Owner Trust Certificates or its designee.

Net Swap Payments and Swap Termination Payments (other than any Swap Termination Payment resulting from a Swap Provider Trigger Event) payable by the Trust will be deducted from Available Funds before payments to Noteholders and will first be deposited into the Swap Account for payment to the Swap Provider.

On each Payment Date, to the extent required, following the payment on the notes described in "Description of the Notes—Payment on the Notes" above, the Securities Administrator will withdraw from amounts in the Swap Account to pay to the Offered Notes other than the Class M-7-B, Class M-8-B, Class M-9 or Class M-10 Notes the following amounts in the following order of priority:

*first,* concurrently, to the Senior Notes, any related Class Monthly Interest Amount and Class Interest Carryover Shortfall, pro rata, to the extent remaining unpaid after the distributions pursuant to "Description of the Notes—Payment on the Notes" above;

*second,* sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7-A and Class M-8-A Notes, in that order, any related Class Monthly Interest Amount and Class Interest Carryover Shortfall, to the extent remaining unpaid after the distributions pursuant to "Description of the Notes—Payment on the Notes";

*third,* to the Senior Notes and Subordinate Notes (other than the Class M-7-B, Class M-8-B, Class M-9 or Class M-10 Notes), the Overcollateralization Deficiency Amount for such Payment Date, to the extent remaining after the distributions pursuant to "Description of the Notes—Payment on the Notes" and allocated in the order of priority set forth in clause (E) under "Description of the Notes—Payment on the Notes" above;

*fourth,* sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7-A and Class M-8-A Notes, in that order, any related Allocated Realized Loss Amount, to the extent remaining unpaid after the distributions pursuant to "Description of the Notes—Payment on the Notes";

*fifth,* to the Senior Notes and Subordinate Notes (other than the Class M-7-B, Class M-8-B, Class M-9 or Class M-10 Notes), any related Basis Risk Shortfall Amount to the extent remaining unpaid after the distributions pursuant to "Description of the Notes—Payment on the Notes", allocated in the order of priority set forth in subclauses *third* and *fourth* of paragraph F, under "Description of the Notes—Payment on the Notes"; and

*sixth,* any remaining amounts to the Owner Trust Certificates.

Payments by the Trust in respect of any Swap Termination Payment triggered by a Swap Provider Trigger Event owed to the Swap Provider pursuant to the Interest Rate Swap Agreement (other than to the extent already paid by the Securities Administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Indenture Trustee) will be subordinated to distributions to the holders of the offered notes and will be paid by the Trust as set forth in the Indenture.

**The Cap Agreement**

The Issuing Entity will enter into a cap agreement (the "Cap Agreement") with Bear Stearns Financial Products Inc. (the "Cap Provider") for the benefit of the holders of the notes. The Securities Administrator will be appointed to receive and distribute funds with regards to the Cap Agreement on behalf of the Trust. Pursuant to the Cap Agreement the Cap Provider will agree to pay to the Securities Administrator on behalf of the Trust, on or before each Payment Date commencing with the Payment Date in May 2009 and ending with the Payment Date in June 2014, an amount, or the "Cap Payment", equal to the product of (x) a per-annum rate equal to the excess, if any, of  (i) One-Month LIBOR, as determined pursuant to the Cap Agreement over (ii) the Rate for such Payment Date as set forth below and (y) the product of (i) the Cap Notional Amount (as defined below) for that payment date and (ii) 250, and (z) a fraction, the numerator of which is equal to the actual number of days in the related calculation period as provided in the Cap Agreement and the denominator of which is 360.  The Class M-7-B, Class M-8-B, Class M-9 and Class M-10 Notes will not be entitled to receive payments under the Interest Rate Cap Agreement under any circumstances.

The notional amount with respect to the Cap Agreement and each payment date will be approximately the calculation amount specified in the table below for such payment date (the "Cap Notional Amount"); provided, however, that the notional amount set forth below may be reduced even further if all of the Offered Notes are not sold to purchasers unaffiliated with the Sponsor. The Cap Agreement will terminate immediately following the Payment Date in June 2014, unless terminated earlier upon the occurrence of a Cap Default, an Early Termination Event or an Additional Termination Event, each as defined below.

## SCHEDULED NOTIONAL AMOUNTS
## FOR THE CAP AGREEMENT

| Payment Date | Notional Amount($) | Rate (%) | Payment Date | Notional Amount($) | Rate (%) |
|---|---|---|---|---|---|
| 07/25/07 | - | - | 01/25/11 | 542,126.61 | 10.10 |
| 08/25/07 | - | - | 02/25/11 | 526,560.68 | 10.21 |
| 09/25/07 | - | - | 03/25/11 | 511,669.71 | 10.31 |
| 10/25/07 | - | - | 04/25/11 | 495,677.19 | 10.30 |
| 11/25/07 | - | - | 05/25/11 | 480,691.15 | 10.29 |
| 12/25/07 | - | - | 06/25/11 | 467,652.19 | 10.28 |
| 01/25/08 | - | - | 07/25/11 | 454,605.45 | 10.27 |
| 02/25/08 | - | - | 08/25/11 | 441,932.57 | 10.26 |
| 03/25/08 | - | - | 09/25/11 | 429,747.73 | 10.25 |
| 04/25/08 | - | - | 10/25/11 | 417,677.57 | 10.24 |
| 05/25/08 | - | - | 11/25/11 | 406,349.23 | 10.23 |
| 06/25/08 | - | - | 12/25/11 | 394,534.31 | 10.22 |
| 07/25/08 | - | - | 01/25/12 | 383,032.86 | 10.21 |
| 08/25/08 | - | - | 02/25/12 | 371,891.26 | 10.22 |
| 09/25/08 | - | - | 03/25/12 | 362,447.80 | 10.23 |
| 10/25/08 | - | - | 04/25/12 | 354,245.17 | 10.22 |
| 11/25/08 | - | - | 05/25/12 | 345,496.97 | 10.21 |
| 12/25/08 | - | - | 06/25/12 | 337,509.59 | 10.20 |
| 01/25/09 | - | - | 07/25/12 | 328,173.50 | 10.19 |
| 02/25/09 | - | - | 08/25/12 | 319,215.58 | 10.19 |
| 03/25/09 | - | - | 09/25/12 | 310,667.09 | 10.19 |
| 04/25/09 | - | - | 10/25/12 | 302,211.55 | 10.18 |
| 05/25/09 | 342,908.99 | 8.17 | 11/25/12 | 294,276.90 | 10.17 |
| 06/25/09 | 479,062.63 | 8.16 | 12/25/12 | 285,959.38 | 10.16 |
| 07/25/09 | 446,769.81 | 8.18 | 01/25/13 | 277,907.57 | 10.15 |
| 08/25/09 | 425,563.05 | 8.63 | 02/25/13 | 269,950.36 | 10.15 |
| 09/25/09 | 403,970.56 | 8.80 | 03/25/13 | 262,404.94 | 10.15 |
| 10/25/09 | 381,674.14 | 8.79 | 04/25/13 | 506,884.80 | 10.14 |
| 11/25/09 | 359,864.27 | 8.79 | 05/25/13 | 493,507.72 | 10.13 |
| 12/25/09 | 337,048.64 | 8.79 | 06/25/13 | 480,487.77 | 10.12 |
| 01/25/10 | 315,472.50 | 8.83 | 07/25/13 | 467,815.27 | 10.11 |
| 02/25/10 | 314,521.53 | 9.53 | 08/25/13 | 455,480.83 | 10.10 |
| 03/25/10 | 343,126.03 | 9.91 | 09/25/13 | 443,475.30 | 10.09 |
| 04/25/10 | 398,414.05 | 9.91 | 10/25/13 | 431,789.79 | 10.08 |
| 05/25/10 | 503,243.49 | 9.91 | 11/25/13 | 420,415.65 | 10.06 |
| 06/25/10 | 531,561.17 | 9.90 | 12/25/13 | 409,344.47 | 10.05 |
| 07/25/10 | 507,954.08 | 9.90 | 01/25/14 | 398,568.06 | 10.04 |
| 08/25/10 | 525,322.08 | 10.02 | 02/25/14 | 388,078.48 | 10.03 |
| 09/25/10 | 542,078.08 | 10.12 | 03/25/14 | 377,867.98 | 10.02 |
| 10/25/10 | 557,001.37 | 10.11 | 04/25/14 | 367,929.04 | 10.01 |
| 11/25/10 | 564,184.98 | 10.10 | 05/25/14 | 358,254.33 | 10.00 |
| 12/25/10 | 557,812.63 | 10.10 | 06/25/14 | 348,836.73 | 9.99 |

The Cap Agreement will terminate following the last payment date specified above, unless the Cap Agreement is terminated earlier upon the occurrence of a Cap Event of Default, an Early Termination Event or a Swap Additional Termination Event, each as defined below.

The obligations of the Cap Provider to pay specified amounts due under the Cap Agreement (other than any Cap Termination Payment, as defined below) generally will be subject to the following conditions precedent: (1) no Cap Default (as defined below) or event that with the giving of notice or lapse of time or both would become a Cap Default shall have occurred and be continuing with respect to the Cap Agreement and (2) no "Early Termination Date" (as defined in the Cap Agreement) has occurred or been effectively designated with respect to the Cap Agreement.

"Events of Default" under the Cap Agreement (each a "Cap Default") include the following:

•     failure to make a payment due under the Cap Agreement after notice of such failure is received and expiration of a specified grace period,

•     failure by the Cap Provider to comply with or perform certain agreements or obligations required under the Cap Agreement after notice of such failure is received and expiration of a specified grace period,

•     failure to comply with or perform certain agreements or obligations in connection with any credit support document as required under the terms of the Cap Agreement,

•     certain representations by the Cap Provider or its credit support provider prove to have been incorrect or misleading in any material respect,

•     repudiation or certain defaults by the Cap Provider or its credit support provider in respect of any derivative or similar transactions entered into between the Indenture Trustee and the Cap Provider and specified for this purpose in the Cap Agreement,

•     cross-default by the Cap Provider or its credit support provider relating generally to its obligations in respect of borrowed money in excess of a threshold specified in the Cap Agreement,

•     certain insolvency or bankruptcy events, and

•     certain mergers, consolidations or asset transfers without an assumption of the related obligations under the Cap Agreement,

each as further described in the Cap Agreement.

Termination events under the Cap Agreement (each a "Cap Termination Event") include the following:

•     illegality (which generally relates to changes in law causing it to become unlawful for either party to perform its obligations under the Cap Agreement),

•     tax event (which generally relates to the application of certain withholding taxes to amounts payable under the Cap Agreement, as a result of a change in tax law or certain similar events), and

•     tax event upon merger (which generally relates to the application of certain withholding taxes to amounts payable under the Cap Agreement as a result of a merger or similar transaction),

each as further described in the Cap Agreement.

Additional termination events under the Cap Agreement (each a "Cap Additional Termination Event") , include the following:

- failure of the Cap Provider to maintain certain credit ratings or otherwise comply with the downgrade provisions of the Cap Agreement (including certain collateral posting requirements), in each case in certain circumstances as specified in the Cap Agreement,

- failure of the Cap Provider to comply with the Regulation AB provisions of the Cap Agreement (including, if applicable, the provisions of any additional agreement incorporated by reference into the Cap Agreement),

- amendment to the Indenture contrary to the requirements of the Interest Rate Cap Agreement, and

- occurrence of an optional redemption of the notes pursuant to the terms of the Indenture,

each as further described in the Cap Agreement.

If the Cap Provider's credit ratings are withdrawn or reduced below certain ratings thresholds specified in the Cap Agreement, the Cap Provider may be required, at its own expense and in accordance with the requirements of the Cap Agreement, to do one or more of the following: (1) obtain a substitute cap provider, or (2) establish any other arrangement as may be specified for such purpose in the Cap Agreement.

After the Closing Date, to the extent provided for in the Cap Agreement, the Cap Provider may transfer its rights and obligations under the Cap Agreement without the consent of the other party, if certain conditions specified in the Cap Agreement are satisfied.

Upon the occurrence of any Cap Default under the Cap Agreement, the non-defaulting party will have the right to designate a "Cap Early Termination Date". With respect to Termination Events (including Cap Additional Termination Events), a Cap Early Termination Date may be designated by one of the parties (as specified in the Cap Agreement) and will occur only upon notice (including in some circumstances, to the rating agencies) and, in some circumstances, after any affected party has used reasonable efforts to transfer its rights and obligations under the Cap Agreement to a related entity within a specified period after notice has been given of the Termination Event, all as set forth in the Cap Agreement. The occurrence of a Cap Early Termination Date under the Cap Agreement will constitute a "Cap Early Termination."

Upon a Cap Early Termination, the Cap Provider may be liable to make a termination payment (the "Cap Termination Payment") to the Securities Administrator (regardless, if applicable, of which of the parties has caused the termination). The Cap Termination Payment will be based on the value of the Cap Agreement computed in accordance with the procedures set forth in the Cap Agreement.

Upon a Cap Early Termination, other than in connection with the optional redemption of the notes, the Indenture Trustee, pursuant to the Indenture, will use reasonable efforts to replace the Cap Provider as a party under the Cap Agreement, or, if such a replacement is unavailable, to enter a new Cap Agreement on terms substantially similar to the Cap Agreement, with a successor cap provider meeting all rating agency requirements and any third party consent requirements. In connection with such appointment, if the Securities Administrator receives a Cap Termination Payment from the original Cap Provider, the Securities Administrator will apply such Cap Termination Payment to appoint the successor cap provider. If the Securities Administrator receives a Cap Termination Payment from the Cap Provider and a replacement cap agreement or similar agreement cannot be obtained within 30 days thereafter, then

the Securities Administrator will deposit such Cap Termination Payment into a separate, non-interest bearing account and will, on each subsequent Payment Date, withdraw from the amount then remaining on deposit in such reserve account, an amount equal to the Cap Payment, if any, that would have been paid to the Securities Administrator by the original Cap Provider calculated in accordance with the terms of the original Cap Agreement, and distribute such amount in accordance with the terms of the Indenture.

Upon a Cap Early Termination in connection with the optional redemption of the notes, to the extent that the Securities Administrator receives a Cap Termination Payment from the Cap Provider, such Cap Early Termination Payment generally will not be available to noteholders and the Securities Administrator will distribute such Cap Termination Payment in accordance with the terms of the Interest Rate Cap Agreement, and the Indenture.

The aggregate "significance percentage" of the Interest Rate Swap Agreement and the Interest Rate Cap Agreement, as calculated in accordance with Regulation AB Item 1115, is less than 10%. As provided in the Interest Rate Swap Agreement and the Interest Rate Cap Agreement, Bear Stearns Financial Products Inc. may be replaced in certain circumstances, including if the aggregate significance percentage of the Interest Rate Swap Agreement and the Interest Rate Cap Agreement is equal to or greater than 10%.

### *The Cap Account*

On or before each payment date, the Securities Administrator will deposit into an account held in the Trust (the "Cap Account") certain amounts, if any, received from the Cap Provider. On each Payment Date, to the extent required, following the payment on the notes described in "Description of the Notes—Payment on the Notes" and payments from the Swap Account above, the Securities Administrator will withdraw from amounts in the Cap Account to pay to the Offered Notes other than the Class M-7-B, Class M-8-B, Class M-9 or Class M-10 Notes the following amounts in the following order of priority:

*first,* concurrently, to the Senior Notes, any related Class Monthly Interest Amount and Class Interest Carryover Shortfall, pro rata, to the extent remaining unpaid after the distributions pursuant to "Description of the Notes—Payment on the Notes" above and distributions from the Swap Account;

*second,* sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7-A and Class M-8-A Notes, in that order, any related Class Monthly Interest Amount and Class Interest Carryover Shortfall, to the extent remaining unpaid after the distributions pursuant to "Description of the Notes—Payment on the Notes" and distributions from the Swap Account;

*third,* to the Senior Notes and Subordinate Notes (other than the Class M-7-B, Class M-8-B, Class M-9 or Class M-10 Notes), the Overcollateralization Deficiency Amount for such Payment Date, to the extent remaining after the distributions pursuant to "Description of the Notes—Payment on the Notes" and distributions from the Swap Account and allocated in the order of priority set forth in clause (E) under "Description of the Notes—Payment on the Notes" above;

*fourth,* sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7-A and Class M-8-A Notes, in that order, any related Allocated Realized Loss Amount, to the extent remaining unpaid after the distributions pursuant to "Description of the Notes—Payment on the Notes" and distributions from the Swap Account;

*fifth,* to the Senior Notes and Subordinate Notes (other than the Class M-7-B, Class M-8-B, Class M-9 or Class M-10 Notes), any related Basis Risk Shortfall Amounts, as applicable, to the extent remaining unpaid after the distributions pursuant to "Description of the Notes—Payment on the

Notes", allocated in the order of priority set forth in subclauses *third* and *fourth* of paragraph (F), under "Description of the Notes—Payment on the Notes" and distributions from the Swap Account; and

*sixth*, any remaining amounts to the Owner Trust Certificates.

**The Derivatives Provider**

Bear Stearns Financial Products Inc. ("BSFP") will be the interest rate swap provider and the interest rate cap provider.  BSFP, a Delaware corporation, is a bankruptcy remote derivatives product company based in New York, New York that has been established as a wholly owned subsidiary of The Bear Stearns Companies, Inc.  BSFP engages in a wide array of over-the-counter interest rate, currency, and equity derivatives, typically with counterparties who require a highly rated derivative provider.  As of the dates of this Prospectus, BSFP has a ratings classification of "AAA" from Standard & Poor's and "Aaa" from Moody's Investors Service.  BSFP will provide upon request, without charge, to each person to whom this prospectus supplement is delivered, a copy of (i) the ratings analysis from each of Standard & Poor's and Moody's Investors Service evidencing those respective ratings or (ii) the most recent audited annual financial statements of BSFP.  Request for information should be directed to the DPC Manager of Bear Stearns Financial Products Inc. at (212) 272-4009 or in writing at 383 Madison Avenue, 36th Floor, New York, New York 10179. BSFP is an affiliate of Bear, Stearns & Co. Inc. and the Depositor.

The information contained in the preceding paragraph has been provided by BSFP for use in this prospectus supplement. BSFP has not been involved in the preparation of, and does not accept responsibility for, this prospectus supplement as a whole or the accompanying prospectus.

## YIELD ON THE OFFERED NOTES

### General

The weighted average life of, and the yield to maturity on, each class of Offered Notes generally will be directly related to the rate of payment of principal, including prepayments, of the mortgage loans. The actual rate of principal prepayments on pools of mortgage loans is influenced by a variety of economic, tax, geographic, demographic, social, legal and other factors and has fluctuated considerably in recent years. In addition, the rate of principal prepayments may differ among pools of mortgage loans at any time because of specific factors relating to the mortgage loans in the particular pool, including, among other things, the age of the mortgage loans, the geographic locations of the properties securing the loans, the extent of the mortgagors' equity in such properties, and changes in the mortgagors' housing needs, job transfers and employment status. The rate of principal prepayments may also be affected by whether the mortgage loans impose prepayment penalties. In addition, approximately 71.98% and 80.39% of the mortgage loans in Loan Group 1 and Loan Group 2, respectively, and approximately 76.50% of the mortgage loans in the aggregate by aggregate principal balance as of the cut-off date, imposed a prepayment charge in connection with voluntary prepayments made within up to three years after origination, which prepayment charges may discourage prepayments during the applicable period. For a detailed description of the characteristics of the prepayment charges on the mortgage loans, and the standards under which the prepayment charges may be waived by the Master Servicer, please see "*The Mortgage Pool—Prepayment Charges on the Mortgage Loans*" in this prospectus supplement. There can be no assurance that the prepayment charges will have any effect on the prepayment performance of the mortgage loans.

These penalties, if still applicable and if enforced by the Master Servicer would typically discourage prepayments on the mortgage loans. The holders of the Owner Trust Certificates will be

entitled to all prepayment charges received on the mortgage loans and these amounts will not be available for distribution on the other classes of notes. However, there can be no assurance that the prepayment charges will have any effect on the prepayment performance of the mortgage loans. Investors are encouraged to conduct their own analysis of the effect, if any, that the prepayment charges may have on the prepayment performance of the mortgage loans.

The timing of changes in the rate of prepayments may significantly affect the actual yield to investors who purchase the offered notes at prices other than par, even if the average rate of principal prepayments is consistent with the expectations of investors. In general, the earlier the payment of principal of the mortgage loans the greater the effect on an investor's yield to maturity. As a result, the effect on an investor's yield of principal prepayments occurring at a rate higher or lower than the rate anticipated by the investor during the period immediately following the issuance of the offered notes may not be offset by a subsequent like reduction or increase in the rate of principal prepayments.

Certain of the mortgage loans were underwritten generally in accordance with underwriting standards which are primarily intended to provide for single family "non-conforming" mortgage loans. A "non-conforming" mortgage loan means a mortgage loan which is ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor, i.e., borrowers on the mortgage loans may have an impaired or unsubstantiated credit history, or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines. These documentation standards may include mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan. Accordingly, mortgage loans underwritten under the originator's non-conforming credit underwriting standards are likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines. Any resulting losses, to the extent not covered by credit enhancement, may affect the yield to maturity of the offered notes.

The weighted average life and yield to maturity of each class of offered notes will also be influenced by the amount of Excess Interest generated by the mortgage loans and applied in reduction of the Note Principal Balances of such notes. The level of Excess Interest available on any payment date to be applied in reduction of the Note Principal Balances of the offered notes will be influenced by, among other factors,

- the overcollateralization level of the assets in the related loan group at such time, i.e., the extent to which interest on the mortgage loans is accruing on a higher Loan Balance than the Note Principal Balance of offered notes;

- with respect to the offered notes, the final Required Overcollateralization Amount, Stepdown Date and the final Trigger Event;

- the delinquency and default experience of the mortgage loans; and

- the provisions of the Indenture that permit principal collections to be distributed to the Owner Trust Certificates when required overcollateralization levels have been met.

To the extent that greater amounts of Excess Interest are distributed in reduction of the Note Principal Balance of a class of offered notes, the weighted average life thereof can be expected to shorten. No assurance, however, can be given as to the amount of Excess Interest to be distributed at any time or in the aggregate.

We refer you to "*Description of the Notes — Payments on the Notes*" and " *— Excess Interest and Overcollateralization Provisions*" in this prospectus supplement.

The yields to maturity of the offered notes and, in particular the subordinated notes, in the order of payment priority, will be progressively more sensitive to the rate, timing and severity of Realized Losses on the mortgage loans. If an Allocated Realized Loss Amount is allocated to a class of the offered notes, that class will thereafter accrue interest on a reduced Note Principal Balance.

**Prepayments and Yields of Offered Notes**

The extent to which the yield to maturity of the offered notes may vary from the anticipated yield will depend upon the degree to which it is purchased at a discount or premium and, correspondingly, the degree to which the timing of payments thereon is sensitive to prepayments, liquidations and purchases of the mortgage loans. In particular, in the case of the offered notes purchased at a discount, an investor is encouraged to consider the risk that a slower than anticipated rate of principal payments, liquidations and purchases of the mortgage loans could result in an actual yield to such investor that is lower than the anticipated yield and, in the case of an offered note purchased at a premium, the risk that a faster than anticipated rate of principal payments, liquidations and purchases of such mortgage loans could result in an actual yield to such investor that is lower than the anticipated yield.

Mortgage loans with higher mortgage rates may prepay faster than mortgage loans with relatively lower mortgage rates in response to a given change in market interest rates. Any such disproportionate prepayment of mortgage loans may reduce the Available Funds Rate applicable to a class or classes of notes. If the Note Interest Rate on a class of notes is limited by its Available Funds Rate no amounts will be distributable on the applicable payment date or on any future payment date in respect of the foregone interest amounts, except to the extent that amounts under the Interest Rate Swap Agreement, Cap Agreement and any Excess Interest is available on future payment dates to pay Basis Risk Shortfall Amounts. See *"Description of the Notes — Payments on the Notes"* and *" — Excess Interest and Overcollateralization Provisions"* and *"The Interest Rate Swap Agreement".*

To the extent that the Net Interest Rate on the offered notes is limited by the applicable Available Funds Rate, the difference between (x) the interest amount payable to such class at the applicable Net Interest Rate without regard to the related Available Funds Rate, and (y) the Class Monthly Interest Amount payable to such class on an applicable payment date will create a basis risk shortfall. Excess Interest may be used to provide some protection against such basis risk shortfalls. However, there can be no assurance that the Excess Interest will be sufficient to cover these basis risk shortfalls, particularly because on any payment date where the Net Interest Rate is limited to the related Available Funds Rate, there will be little or no excess interest. To the extent that Excess Interest is insufficient to cover all such basis risk shortfalls, the Interest Rate Swap Agreement and Cap Agreement may provide some protection against such basis risk shortfalls. However, the Interest Rate Swap Agreement and Cap Agreement may not provide sufficient funds to cover all such basis risk shortfalls. In addition, payments under the Interest Rate Swap Agreement and Cap Agreement are limited to a specified rate in effect from time to time. In the case of the Interest Rate Swap Agreement, in the event of a decrease in One-Month LIBOR, the amount of Excess Interest available to the offered notes will be reduced by any Net Swap Payments and Swap Termination Payments (to the extent not due to a Swap Provider Trigger Event and other than to the extent already paid by the Swap Administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Trust) paid to the Swap Provider as described in this prospectus supplement. In the case of the Cap Agreement, the Cap Provider will only be required to make Cap Payments if One-Month LIBOR exceeds the Rate for that Payment Date set forth in this prospectus supplement. In addition, the related Available Funds Rate and therefore the Net Interest Rate on offered notes may be reduced by the requirement of the issuing entity to pay any Net Swap Payments and Swap Termination Payments (to the extent not due to a Swap Provider Trigger Event and other than to the extent already paid by the Swap Administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Trust) to the

Swap Provider as described in this prospectus supplement. Moreover, Net Swap Payments and Swap Termination Payments paid by the Swap Provider (to the extent that the Indenture Trustee has not applied such Swap Termination Payments to appoint a successor swap provider) and Cap Payments will first be applied to cover interest shortfalls and to make accelerated payments of principal on the offered notes and may be insufficient to pay basis risk shortfalls.

The "final maturity date" for each class of offered notes is the payment date in April 2037, which is the Payment Date in the month following the latest maturing mortgage loan. The actual final Payment Date with respect to each class of offered notes could occur significantly earlier than its last scheduled payment date because

- prepayments on the related mortgage loans are likely to occur which will be applied to the payment of the Note Principal Balances thereof,

- Excess Interest to the extent available will be applied as an accelerated payment of principal on the offered notes to the extent described in this prospectus supplement, and

- the majority holder of the Owner Trust Certificates may purchase all the mortgage loans when the outstanding Stated Principal Balances thereof and REO properties have declined to 10% or less of the cut-off date principal balance of the mortgage loans and may purchase mortgage loans in certain other circumstances as described in this prospectus supplement.

The Servicer may from time to time implement programs designed to encourage refinancing. These programs may include, without limitation, modifications of existing loans, general or targeted solicitations, the offering of pre-approved applications, reduced origination fees or closing costs, or other financial incentives. Targeted solicitations may be based on a variety of factors, including the credit of the borrower or the location of the mortgaged property. In addition, the Sponsor may encourage assumptions of mortgage loans, including defaulted mortgage loans, under which creditworthy borrowers assume the outstanding indebtedness of the mortgage loans which may be removed from the mortgage pool. As a result of these programs, with respect to the mortgage pool underlying any issuing entity, the rate of principal prepayments of the mortgage loans in the mortgage pool may be higher than would otherwise be the case, and in some cases, the average credit or collateral quality of the mortgage loans remaining in the mortgage pool may decline.

Prepayments on mortgage loans are commonly measured relative to a prepayment standard or model. The model used in this prospectus supplement, which we refer to as the prepayment model, is a prepayment assumption which represents an assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of mortgage loans similar to the mortgage loans for the life of such mortgage loans. A 100% prepayment assumption assumes that the outstanding principal balance of a pool of mortgage loans prepays at a constant prepayment rate ("CPR") of (a) in the case of the fixed-rate mortgage loans, 4.6% in the first month of the life of such pool, such rate increasing by an additional approximate 18.4%/11 CPR (precisely 1.673%) until the 12th month and such rate thereafter remaining constant at 23% CPR (the "Fixed-Rate Prepayment Vector"), and (b) in the case of the adjustable-rate mortgage loans, 2% in the first month of the life of such pool, such rate increasing by an additional approximate 28%/11 CPR (precisely 2.545%) until the 12th month, beginning in the 12th month and in each month thereafter until the 22nd month, a CPR of 30% per annum, beginning in the 23rd month and in each month thereafter until the 28th month, a CPR of 50% per annum and beginning in the 29th month and in each month thereafter during the life of such Mortgage Loans, a CPR of 30% per annum (the "Adjustable-Rate Prepayment Vector"); provided however, the Adjustable-Rate Prepayment Vector will not exceed 90% CPR in any period.

There is no assurance, however, that prepayments on the mortgage loans will conform to any level of the prepayment model, and no representation is made that the mortgage loans will prepay at the prepayment rates shown or any other prepayment rate. The rate of principal payments on pools of mortgage loans is influenced by a variety of economic, geographic, social and other factors, including the level of interest rates. Other factors affecting prepayment of mortgage loans include changes in obligors, housing needs, job transfers and unemployment. In the case of mortgage loans in general, if prevailing interest rates fall significantly below the interest rates on such mortgage loans, the mortgage loans are likely to be subject to higher prepayment rates than if prevailing interest rates remain at or above the rates borne by such mortgage loans. Conversely, if prevailing interest rates rise above the interest rates on such mortgage loans, the rate of prepayment would be expected to decrease.

The following tables have been prepared on the basis of the following assumptions, which we refer to, collectively, as modeling assumptions:

- the mortgage loans in the respective loan groups prepay at the indicated percentages of the prepayment assumption;

- distributions on the offered notes are received, in cash, on the 25th day of each month, commencing in July 2007, in accordance with the payment priorities defined in this prospectus supplement;

- no defaults or delinquencies in, or modifications, waivers or amendments respecting, the payment by the mortgagors of principal and interest on the mortgage loans occur;

- scheduled payments are assumed to be received on the first day of each month commencing in July 2007, there are no shortfalls in the payment of interest to noteholders, and prepayments represent payment in full of individual mortgage loans and are assumed to be received on the last day of each month, commencing in June 2007, and include 30 days interest thereon;

- the level of Six-Month LIBOR and One-Month LIBOR remains constant at 5.360% and 5.320% per annum, respectively;

- the mortgage rate on each adjustable rate mortgage loan will be adjusted on each interest adjustment date (as necessary) to a rate equal to Six-Month LIBOR, plus the applicable gross margin, subject to maximum lifetime mortgage rates, minimum lifetime mortgage rates and periodic caps (as applicable);

- scheduled payments of principal and interest on the mortgage loans are calculated on their respective principal balances (prior to giving effect to prepayments received thereon during the preceding calendar month), mortgage rate and remaining amortization terms to maturity such that the mortgage loans will fully amortize by their remaining amortization terms (taking into account any remaining interest only periods or balloon periods);

- scheduled payments of principal and interest on each mortgage loan will be adjusted in the month immediately following each interest adjustment date (as necessary) for such mortgage loan to equal the fully amortizing payment described in the bullet point above;

- the closing date for the notes is July 12, 2007;

- the Required Overcollateralization Amount, the Stepdown Date and the Trigger Event are described in this prospectus supplement (without variance);

- except as indicated with respect to the weighted average lives, the majority holder of the Owner Trust Certificates does not exercise its right to purchase the assets of the issuing entity on the optional redemption date; and

- each loan group consists of the mortgage loans having the approximate characteristics described in Schedule B hereto.

There will be discrepancies between the characteristics of the actual mortgage loans and the characteristics assumed in preparing the table below. Any discrepancy may have an effect upon the percentages of the initial Note Principal Balances outstanding (and the weighted average lives) of the classes of Offered Notes set forth in the table. In addition, to the extent that the actual mortgage loans included in the mortgage pool have characteristics that differ from those assumed in preparing the table below, the classes of Offered Notes set forth below may mature earlier or later than indicated by the table below. Based on the foregoing assumptions, the tables below indicate the weighted average life of each class of Offered Notes and sets forth the percentage of the initial Note Principal Balances of each such class that would be outstanding after each of the Payment Dates shown, at specified percentages of CPR. Neither the prepayment model used in this prospectus supplement nor any other prepayment model or assumption purports to be a historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of mortgage loans, including the mortgage loans included in the Issuing Entity. Variations in the prepayment experience and the balance of the mortgage loans that prepay may increase or decrease the percentages of the initial principal balances (and weighted average lives) shown in the following table. Variations may occur even if the average prepayment experience of all of the mortgage loans equals any of the specified percentages of CPR. The timing of changes in the rate of prepayment may significantly affect the actual yield to maturity to investors, even if the average rate of Principal Prepayments is consistent with the expectations of investors.

### Prepayment Scenarios[1]

|  | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Adjustable-Rate Mortgage Loans: | 50% | 75% | 100% | 150% | 200% |
| Fixed-Rate Mortgage Loans: | 50% | 75% | 100% | 150% | 200% |

_____
[1]   Percentage of the Fixed-Rate Prepayment Vector or the Adjustable-Rate Prepayment Vector, as applicable.

Based on the foregoing assumptions, the following tables indicate the projected weighted average lives of the Offered Notes, and set forth the percentages of the Original Note Balance of such Offered Note that would be outstanding after each of the dates shown, at various percentages of the Prepayment Vector.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class 1-A-1 Notes | | | | |
|---|---|---|---|---|---|
| **Payment Date** | **Scenario I** | **Scenario II** | **Scenario III** | **Scenario IV** | **Scenario V** |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 84 | 76 | 68 | 52 | 35 |
| June 25, 2009 | 62 | 46 | 31 | 4 | 0 |
| June 25, 2010 | 48 | 28 | 12 | 0 | 0 |
| June 25, 2011 | 36 | 24 | 12 | 0 | 0 |
| June 25, 2012 | 29 | 19 | 12 | 0 | 0 |
| June 25, 2013 | 25 | 15 | 9 | 0 | 0 |
| June 25, 2014 | 21 | 12 | 6 | 0 | 0 |
| June 25, 2015 | 18 | 9 | 5 | 0 | 0 |
| June 25, 2016 | 16 | 7 | 3 | 0 | 0 |
| June 25, 2017 | 13 | 6 | 2 | 0 | 0 |
| June 25, 2018 | 11 | 5 | 2 | 0 | 0 |
| June 25, 2019 | 10 | 4 | 1 | 0 | 0 |
| June 25, 2020 | 8 | 3 | 1 | 0 | 0 |
| June 25, 2021 | 7 | 2 | 1 | 0 | 0 |
| June 25, 2022 | 6 | 2 | * | 0 | 0 |
| June 25, 2023 | 5 | 1 | * | 0 | 0 |
| June 25, 2024 | 4 | 1 | 0 | 0 | 0 |
| June 25, 2025 | 4 | 1 | 0 | 0 | 0 |
| June 25, 2026 | 3 | 1 | 0 | 0 | 0 |
| June 25, 2027 | 3 | * | 0 | 0 | 0 |
| June 25, 2028 | 2 | * | 0 | 0 | 0 |
| June 25, 2029 | 2 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 1 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 1 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 1 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 1 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 1 | 0 | 0 | 0 | 0 |
| June 25, 2035 | * | 0 | 0 | 0 | 0 |
| June 25, 2036 | * | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 4.71 | 3.12 | 2.15 | 1.05 | 0.81 |
| Weighted Average Life (years) to Optional Termination[1][2] | 4.38 | 2.88 | 1.97 | 1.05 | 0.81 |

---

(*)      If applicable, indicates a number that is greater than zero but less than 0.5%.

(1)      The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

(2)      Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted.

### Percent of Initial Note Principal Balance Outstanding at the Following CPR Percentages

| Payment Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| | | | Class 2-A-1 Notes | | |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 75 | 63 | 50 | 26 | * |
| June 25, 2009 | 43 | 18 | 0 | 0 | 0 |
| June 25, 2010 | 22 | 0 | 0 | 0 | 0 |
| June 25, 2011 | 4 | 0 | 0 | 0 | 0 |
| June 25, 2012 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2013 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2014 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2015 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2016 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2017 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2018 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2019 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2020 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2021 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2022 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2023 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2024 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2025 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2026 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2027 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2028 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 1.92 | 1.29 | 1.00 | 0.69 | 0.52 |
| Weighted Average Life (years) to Optional Termination[1][2] | 1.92 | 1.29 | 1.00 | 0.69 | 0.52 |

(*)    If applicable, indicates a number that is greater than zero but less than 0.5%.

(1)    The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

(2)    Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class 2-A-2 Notes | | | | |
|---|---|---|---|---|---|
| | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
| **Payment Date** | | | | | |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2009 | 100 | 100 | 51 | 0 | 0 |
| June 25, 2010 | 100 | 20 | 0 | 0 | 0 |
| June 25, 2011 | 100 | 0 | 0 | 0 | 0 |
| June 25, 2012 | 30 | 0 | 0 | 0 | 0 |
| June 25, 2013 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2014 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2015 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2016 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2017 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2018 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2019 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2020 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2021 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2022 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2023 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2024 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2025 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2026 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2027 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2028 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 4.75 | 2.93 | 2.00 | 1.45 | 1.06 |
| Weighted Average Life (years) to Optional Termination[1][2] | 4.75 | 2.93 | 2.00 | 1.45 | 1.06 |

---

(*)   If applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

(2)   Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class 2-A-3 Notes | | | | |
|---|---|---|---|---|---|
| **Payment Date** | **Scenario I** | **Scenario II** | **Scenario III** | **Scenario IV** | **Scenario V** |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2009 | 100 | 100 | 100 | 0 | 0 |
| June 25, 2010 | 100 | 100 | 16 | 0 | 0 |
| June 25, 2011 | 100 | 82 | 16 | 0 | 0 |
| June 25, 2012 | 100 | 54 | 15 | 0 | 0 |
| June 25, 2013 | 88 | 32 | 0 | 0 | 0 |
| June 25, 2014 | 68 | 15 | 0 | 0 | 0 |
| June 25, 2015 | 51 | 1 | 0 | 0 | 0 |
| June 25, 2016 | 36 | 0 | 0 | 0 | 0 |
| June 25, 2017 | 24 | 0 | 0 | 0 | 0 |
| June 25, 2018 | 13 | 0 | 0 | 0 | 0 |
| June 25, 2019 | 4 | 0 | 0 | 0 | 0 |
| June 25, 2020 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2021 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2022 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2023 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2024 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2025 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2026 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2027 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2028 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 8.33 | 5.37 | 3.00 | 1.65 | 1.30 |
| Weighted Average Life (years) to Optional Termination[1][2] | 8.33 | 5.37 | 3.00 | 1.65 | 1.30 |

| | |
|---|---|
| (*) | If applicable, indicates a number that is greater than zero but less than 0.5%. |
| (1) | The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above. |
| (2) | Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted. |

S-81

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class 2-A-4 Notes | | | | |
|---|---|---|---|---|---|
| **Payment Date** | **Scenario I** | **Scenario II** | **Scenario III** | **Scenario IV** | **Scenario V** |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2009 | 100 | 100 | 100 | 43 | 0 |
| June 25, 2010 | 100 | 100 | 100 | 0 | 0 |
| June 25, 2011 | 100 | 100 | 100 | 0 | 0 |
| June 25, 2012 | 100 | 100 | 100 | 0 | 0 |
| June 25, 2013 | 100 | 100 | 94 | 0 | 0 |
| June 25, 2014 | 100 | 100 | 69 | 0 | 0 |
| June 25, 2015 | 100 | 100 | 50 | 0 | 0 |
| June 25, 2016 | 100 | 81 | 36 | 0 | 0 |
| June 25, 2017 | 100 | 64 | 26 | 0 | 0 |
| June 25, 2018 | 100 | 51 | 19 | 0 | 0 |
| June 25, 2019 | 100 | 40 | 14 | 0 | 0 |
| June 25, 2020 | 91 | 32 | 10 | 0 | 0 |
| June 25, 2021 | 78 | 25 | 8 | 0 | 0 |
| June 25, 2022 | 66 | 20 | 4 | 0 | 0 |
| June 25, 2023 | 56 | 15 | 1 | 0 | 0 |
| June 25, 2024 | 48 | 12 | 0 | 0 | 0 |
| June 25, 2025 | 40 | 10 | 0 | 0 | 0 |
| June 25, 2026 | 34 | 7 | 0 | 0 | 0 |
| June 25, 2027 | 29 | 5 | 0 | 0 | 0 |
| June 25, 2028 | 24 | 2 | 0 | 0 | 0 |
| June 25, 2029 | 20 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 17 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 14 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 11 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 9 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 7 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 5 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 2 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 18.02 | 12.12 | 8.81 | 1.99 | 1.54 |
| Weighted Average Life (years) to Optional Termination[1][2] | 14.28 | 9.38 | 6.77 | 1.99 | 1.54 |

---

(*)   If applicable, indicates a number that is greater than zero but less than 0.5%.
(1)   The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.
(2)   Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| Payment Date | Class M-1 Notes | | | | |
|---|---|---|---|---|---|
| | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2009 | 100 | 100 | 100 | 100 | 67 |
| June 25, 2010 | 100 | 100 | 100 | 83 | 67 |
| June 25, 2011 | 100 | 75 | 100 | 83 | 53 |
| June 25, 2012 | 91 | 59 | 37 | 83 | 27 |
| June 25, 2013 | 78 | 47 | 27 | 54 | 12 |
| June 25, 2014 | 67 | 37 | 19 | 33 | 0 |
| June 25, 2015 | 57 | 29 | 14 | 20 | 0 |
| June 25, 2016 | 49 | 23 | 10 | 10 | 0 |
| June 25, 2017 | 42 | 18 | 8 | 1 | 0 |
| June 25, 2018 | 36 | 14 | 5 | 0 | 0 |
| June 25, 2019 | 30 | 11 | 4 | 0 | 0 |
| June 25, 2020 | 26 | 9 | 3 | 0 | 0 |
| June 25, 2021 | 22 | 7 | 2 | 0 | 0 |
| June 25, 2022 | 19 | 6 | 0 | 0 | 0 |
| June 25, 2023 | 16 | 4 | 0 | 0 | 0 |
| June 25, 2024 | 14 | 3 | 0 | 0 | 0 |
| June 25, 2025 | 11 | 3 | 0 | 0 | 0 |
| June 25, 2026 | 10 | 1 | 0 | 0 | 0 |
| June 25, 2027 | 8 | 0 | 0 | 0 | 0 |
| June 25, 2028 | 7 | 0 | 0 | 0 | 0 |
| June 25, 2029 | 6 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 5 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 4 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 3 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 3 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 1 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 10.52 | 6.94 | 5.85 | 6.12 | 3.82 |
| Weighted Average Life (years) to Optional Termination[1][2] | 9.49 | 6.19 | 5.29 | 3.80 | 2.29 |

---

| | |
|---|---|
| (*) | If applicable, indicates a number that is greater than zero but less than 0.5%. |
| (1) | The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above. |
| (2) | Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted. |

## Percent of Initial Note Principal Balance Outstanding at the Following CPR Percentages

| | Class M-2 Notes | | | | |
|---|---|---|---|---|---|
| | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
| **Payment Date** | | | | | |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2009 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2010 | 100 | 100 | 100 | 100 | 59 |
| June 25, 2011 | 100 | 75 | 85 | 87 | 8 |
| June 25, 2012 | 91 | 59 | 37 | 18 | 4 |
| June 25, 2013 | 78 | 47 | 27 | 8 | 0 |
| June 25, 2014 | 67 | 37 | 19 | 5 | 0 |
| June 25, 2015 | 57 | 29 | 14 | 3 | 0 |
| June 25, 2016 | 49 | 23 | 10 | 0 | 0 |
| June 25, 2017 | 42 | 18 | 8 | 0 | 0 |
| June 25, 2018 | 36 | 14 | 5 | 0 | 0 |
| June 25, 2019 | 30 | 11 | 4 | 0 | 0 |
| June 25, 2020 | 26 | 9 | 3 | 0 | 0 |
| June 25, 2021 | 22 | 7 | 0 | 0 | 0 |
| June 25, 2022 | 19 | 6 | 0 | 0 | 0 |
| June 25, 2023 | 16 | 4 | 0 | 0 | 0 |
| June 25, 2024 | 14 | 3 | 0 | 0 | 0 |
| June 25, 2025 | 11 | 3 | 0 | 0 | 0 |
| June 25, 2026 | 10 | 0 | 0 | 0 | 0 |
| June 25, 2027 | 8 | 0 | 0 | 0 | 0 |
| June 25, 2028 | 7 | 0 | 0 | 0 | 0 |
| June 25, 2029 | 6 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 5 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 4 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 3 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 2 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 10.50 | 6.91 | 5.56 | 4.69 | 3.23 |
| Weighted Average Life (years) to Optional Termination[1][2] | 9.49 | 6.18 | 5.01 | 4.09 | 2.62 |

(*)     If applicable, indicates a number that is greater than zero but less than 0.5%.
(1)     The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.
(2)     Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted.

## Percent of Initial Note Principal Balance Outstanding at the Following CPR Percentages

| | Class M-3 Notes | | | | |
|---|---|---|---|---|---|
| Payment Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2009 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2010 | 100 | 100 | 100 | 100 | 16 |
| June 25, 2011 | 100 | 75 | 51 | 21 | 8 |
| June 25, 2012 | 91 | 59 | 37 | 13 | 4 |
| June 25, 2013 | 78 | 47 | 27 | 8 | 0 |
| June 25, 2014 | 67 | 37 | 19 | 5 | 0 |
| June 25, 2015 | 57 | 29 | 14 | 2 | 0 |
| June 25, 2016 | 49 | 23 | 10 | 0 | 0 |
| June 25, 2017 | 42 | 18 | 8 | 0 | 0 |
| June 25, 2018 | 36 | 14 | 5 | 0 | 0 |
| June 25, 2019 | 30 | 11 | 4 | 0 | 0 |
| June 25, 2020 | 26 | 9 | 2 | 0 | 0 |
| June 25, 2021 | 22 | 7 | 0 | 0 | 0 |
| June 25, 2022 | 19 | 6 | 0 | 0 | 0 |
| June 25, 2023 | 16 | 4 | 0 | 0 | 0 |
| June 25, 2024 | 14 | 3 | 0 | 0 | 0 |
| June 25, 2025 | 11 | * | 0 | 0 | 0 |
| June 25, 2026 | 10 | 0 | 0 | 0 | 0 |
| June 25, 2027 | 8 | 0 | 0 | 0 | 0 |
| June 25, 2028 | 7 | 0 | 0 | 0 | 0 |
| June 25, 2029 | 6 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 5 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 4 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 3 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 10.48 | 6.89 | 5.41 | 4.08 | 2.73 |
| Weighted Average Life (years) to Optional Termination[1][2] | 9.49 | 6.18 | 4.87 | 3.74 | 2.49 |

---

(*)   If applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

(2)   Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class M-4 Notes | | | | |
|---|---|---|---|---|---|
| **Payment Date** | **Scenario I** | **Scenario II** | **Scenario III** | **Scenario IV** | **Scenario V** |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2009 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2010 | 100 | 100 | 100 | 100 | 16 |
| June 25, 2011 | 100 | 75 | 51 | 21 | 8 |
| June 25, 2012 | 91 | 59 | 37 | 13 | 4 |
| June 25, 2013 | 78 | 47 | 27 | 8 | 0 |
| June 25, 2014 | 67 | 37 | 19 | 5 | 0 |
| June 25, 2015 | 57 | 29 | 14 | 0 | 0 |
| June 25, 2016 | 49 | 23 | 10 | 0 | 0 |
| June 25, 2017 | 42 | 18 | 8 | 0 | 0 |
| June 25, 2018 | 36 | 14 | 5 | 0 | 0 |
| June 25, 2019 | 30 | 11 | 4 | 0 | 0 |
| June 25, 2020 | 26 | 9 | 0 | 0 | 0 |
| June 25, 2021 | 22 | 7 | 0 | 0 | 0 |
| June 25, 2022 | 19 | 6 | 0 | 0 | 0 |
| June 25, 2023 | 16 | 4 | 0 | 0 | 0 |
| June 25, 2024 | 14 | 3 | 0 | 0 | 0 |
| June 25, 2025 | 11 | 0 | 0 | 0 | 0 |
| June 25, 2026 | 10 | 0 | 0 | 0 | 0 |
| June 25, 2027 | 8 | 0 | 0 | 0 | 0 |
| June 25, 2028 | 7 | 0 | 0 | 0 | 0 |
| June 25, 2029 | 6 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 5 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 4 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 1 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 10.46 | 6.88 | 5.32 | 3.82 | 2.54 |
| Weighted Average Life (years) to Optional Termination[1][2] | 9.49 | 6.18 | 4.80 | 3.50 | 2.29 |

_____

(*)    If applicable, indicates a number that is greater than zero but less than 0.5%.

(1)    The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

(2)    Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class M-5 Notes | | | | |
|---|---|---|---|---|---|
| **Payment Date** | **Scenario I** | **Scenario II** | **Scenario III** | **Scenario IV** | **Scenario V** |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2009 | 100 | 100 | 100 | 100 | 73 |
| June 25, 2010 | 100 | 100 | 100 | 87 | 16 |
| June 25, 2011 | 100 | 75 | 51 | 21 | 8 |
| June 25, 2012 | 91 | 59 | 37 | 13 | 2 |
| June 25, 2013 | 78 | 47 | 27 | 8 | 0 |
| June 25, 2014 | 67 | 37 | 19 | 5 | 0 |
| June 25, 2015 | 57 | 29 | 14 | 0 | 0 |
| June 25, 2016 | 49 | 23 | 10 | 0 | 0 |
| June 25, 2017 | 42 | 18 | 8 | 0 | 0 |
| June 25, 2018 | 36 | 14 | 5 | 0 | 0 |
| June 25, 2019 | 30 | 11 | 4 | 0 | 0 |
| June 25, 2020 | 26 | 9 | 0 | 0 | 0 |
| June 25, 2021 | 22 | 7 | 0 | 0 | 0 |
| June 25, 2022 | 19 | 6 | 0 | 0 | 0 |
| June 25, 2023 | 16 | 4 | 0 | 0 | 0 |
| June 25, 2024 | 14 | 0 | 0 | 0 | 0 |
| June 25, 2025 | 11 | 0 | 0 | 0 | 0 |
| June 25, 2026 | 10 | 0 | 0 | 0 | 0 |
| June 25, 2027 | 8 | 0 | 0 | 0 | 0 |
| June 25, 2028 | 7 | 0 | 0 | 0 | 0 |
| June 25, 2029 | 6 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 5 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 3 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 10.44 | 6.86 | 5.25 | 3.65 | 2.40 |
| Weighted Average Life (years) to Optional Termination[1][2] | 9.49 | 6.18 | 4.75 | 3.33 | 2.17 |

_____

(*)   If applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

(2)   Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class M-6 Notes | | | | |
|---|---|---|---|---|---|
| | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
| **Payment Date** | | | | | |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2009 | 100 | 100 | 100 | 100 | 33 |
| June 25, 2010 | 100 | 100 | 100 | 35 | 16 |
| June 25, 2011 | 100 | 75 | 51 | 21 | 8 |
| June 25, 2012 | 91 | 59 | 37 | 13 | 0 |
| June 25, 2013 | 78 | 47 | 27 | 8 | 0 |
| June 25, 2014 | 67 | 37 | 19 | 5 | 0 |
| June 25, 2015 | 57 | 29 | 14 | 0 | 0 |
| June 25, 2016 | 49 | 23 | 10 | 0 | 0 |
| June 25, 2017 | 42 | 18 | 8 | 0 | 0 |
| June 25, 2018 | 36 | 14 | 5 | 0 | 0 |
| June 25, 2019 | 30 | 11 | 0 | 0 | 0 |
| June 25, 2020 | 26 | 9 | 0 | 0 | 0 |
| June 25, 2021 | 22 | 7 | 0 | 0 | 0 |
| June 25, 2022 | 19 | 6 | 0 | 0 | 0 |
| June 25, 2023 | 16 | 3 | 0 | 0 | 0 |
| June 25, 2024 | 14 | 0 | 0 | 0 | 0 |
| June 25, 2025 | 11 | 0 | 0 | 0 | 0 |
| June 25, 2026 | 10 | 0 | 0 | 0 | 0 |
| June 25, 2027 | 8 | 0 | 0 | 0 | 0 |
| June 25, 2028 | 7 | 0 | 0 | 0 | 0 |
| June 25, 2029 | 6 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 5 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 10.41 | 6.83 | 5.20 | 3.53 | 2.32 |
| Weighted Average Life (years) to Optional Termination[1][2] | 9.49 | 6.17 | 4.71 | 3.22 | 2.10 |

---

(*)    If applicable, indicates a number that is greater than zero but less than 0.5%.

(1)    The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

(2)    Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class M-7 Notes | | | | |
|---|---|---|---|---|---|
| | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
| **Payment Date** | | | | | |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2009 | 100 | 100 | 100 | 100 | 33 |
| June 25, 2010 | 100 | 100 | 100 | 35 | 16 |
| June 25, 2011 | 100 | 75 | 51 | 21 | 8 |
| June 25, 2012 | 91 | 59 | 37 | 13 | 0 |
| June 25, 2013 | 78 | 47 | 27 | 8 | 0 |
| June 25, 2014 | 67 | 37 | 19 | * | 0 |
| June 25, 2015 | 57 | 29 | 14 | 0 | 0 |
| June 25, 2016 | 49 | 23 | 10 | 0 | 0 |
| June 25, 2017 | 42 | 18 | 8 | 0 | 0 |
| June 25, 2018 | 36 | 14 | 5 | 0 | 0 |
| June 25, 2019 | 30 | 11 | 0 | 0 | 0 |
| June 25, 2020 | 26 | 9 | 0 | 0 | 0 |
| June 25, 2021 | 22 | 7 | 0 | 0 | 0 |
| June 25, 2022 | 19 | 6 | 0 | 0 | 0 |
| June 25, 2023 | 16 | 0 | 0 | 0 | 0 |
| June 25, 2024 | 14 | 0 | 0 | 0 | 0 |
| June 25, 2025 | 11 | 0 | 0 | 0 | 0 |
| June 25, 2026 | 10 | 0 | 0 | 0 | 0 |
| June 25, 2027 | 8 | 0 | 0 | 0 | 0 |
| June 25, 2028 | 7 | 0 | 0 | 0 | 0 |
| June 25, 2029 | 6 | 0 | 0 | 0 | 0 |
| June 25, 2030 | * | 0 | 0 | 0 | 0 |
| June 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 10.37 | 6.80 | 5.15 | 3.43 | 2.29 |
| Weighted Average Life (years) to Optional Termination[1][2] | 9.49 | 6.17 | 4.68 | 3.14 | 2.08 |

---

| (*) | If applicable, indicates a number that is greater than zero but less than 0.5%. |
|---|---|
| (1) | The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above. |
| (2) | Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted. |

## Percent of Initial Note Principal Balance Outstanding at the
## Following CPR Percentages

| | Class M-8 Notes | | | | |
|---|---|---|---|---|---|
| Payment Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2009 | 100 | 100 | 100 | 100 | 33 |
| June 25, 2010 | 100 | 100 | 100 | 35 | 16 |
| June 25, 2011 | 100 | 75 | 51 | 21 | 8 |
| June 25, 2012 | 91 | 59 | 37 | 13 | 0 |
| June 25, 2013 | 78 | 47 | 27 | 8 | 0 |
| June 25, 2014 | 67 | 37 | 19 | 0 | 0 |
| June 25, 2015 | 57 | 29 | 14 | 0 | 0 |
| June 25, 2016 | 49 | 23 | 10 | 0 | 0 |
| June 25, 2017 | 42 | 18 | 8 | 0 | 0 |
| June 25, 2018 | 36 | 14 | * | 0 | 0 |
| June 25, 2019 | 30 | 11 | 0 | 0 | 0 |
| June 25, 2020 | 26 | 9 | 0 | 0 | 0 |
| June 25, 2021 | 22 | 7 | 0 | 0 | 0 |
| June 25, 2022 | 19 | 1 | 0 | 0 | 0 |
| June 25, 2023 | 16 | 0 | 0 | 0 | 0 |
| June 25, 2024 | 14 | 0 | 0 | 0 | 0 |
| June 25, 2025 | 11 | 0 | 0 | 0 | 0 |
| June 25, 2026 | 10 | 0 | 0 | 0 | 0 |
| June 25, 2027 | 8 | 0 | 0 | 0 | 0 |
| June 25, 2028 | 7 | 0 | 0 | 0 | 0 |
| June 25, 2029 | 1 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 10.32 | 6.76 | 5.10 | 3.35 | 2.23 |
| Weighted Average Life (years) to Optional Termination[1][2] | 9.49 | 6.17 | 4.66 | 3.08 | 2.03 |

(*)     If applicable, indicates a number that is greater than zero but less than 0.5%.

(1)     The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

(2)     Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class M-9 Notes | | | | |
|---|---|---|---|---|---|
| | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
| **Payment Date** | | | | | |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2009 | 100 | 100 | 100 | 100 | 33 |
| June 25, 2010 | 100 | 100 | 100 | 35 | 16 |
| June 25, 2011 | 100 | 75 | 51 | 21 | 7 |
| June 25, 2012 | 91 | 59 | 37 | 13 | 0 |
| June 25, 2013 | 78 | 47 | 27 | 7 | 0 |
| June 25, 2014 | 67 | 37 | 19 | 0 | 0 |
| June 25, 2015 | 57 | 29 | 14 | 0 | 0 |
| June 25, 2016 | 49 | 23 | 10 | 0 | 0 |
| June 25, 2017 | 42 | 18 | 6 | 0 | 0 |
| June 25, 2018 | 36 | 14 | 0 | 0 | 0 |
| June 25, 2019 | 30 | 11 | 0 | 0 | 0 |
| June 25, 2020 | 26 | 9 | 0 | 0 | 0 |
| June 25, 2021 | 22 | 3 | 0 | 0 | 0 |
| June 25, 2022 | 19 | 0 | 0 | 0 | 0 |
| June 25, 2023 | 16 | 0 | 0 | 0 | 0 |
| June 25, 2024 | 14 | 0 | 0 | 0 | 0 |
| June 25, 2025 | 11 | 0 | 0 | 0 | 0 |
| June 25, 2026 | 10 | 0 | 0 | 0 | 0 |
| June 25, 2027 | 8 | 0 | 0 | 0 | 0 |
| June 25, 2028 | 2 | 0 | 0 | 0 | 0 |
| June 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 10.26 | 6.71 | 5.04 | 3.28 | 2.21 |
| Weighted Average Life (years) to Optional Termination[1][2] | 9.49 | 6.17 | 4.64 | 3.03 | 2.03 |

---

(*)     If applicable, indicates a number that is greater than zero but less than 0.5%.

(1)     The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

(2)     Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class M-10 Notes | | | | |
| Payment Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| June 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| June 25, 2009 | 100 | 100 | 100 | 100 | 33 |
| June 25, 2010 | 100 | 100 | 100 | 35 | 16 |
| June 25, 2011 | 100 | 75 | 51 | 21 | 0 |
| June 25, 2012 | 91 | 59 | 37 | 13 | 0 |
| June 25, 2013 | 78 | 47 | 27 | 0 | 0 |
| June 25, 2014 | 67 | 37 | 19 | 0 | 0 |
| June 25, 2015 | 57 | 29 | 14 | 0 | 0 |
| June 25, 2016 | 49 | 23 | 10 | 0 | 0 |
| June 25, 2017 | 42 | 18 | 0 | 0 | 0 |
| June 25, 2018 | 36 | 14 | 0 | 0 | 0 |
| June 25, 2019 | 30 | 11 | 0 | 0 | 0 |
| June 25, 2020 | 26 | 4 | 0 | 0 | 0 |
| June 25, 2021 | 22 | 0 | 0 | 0 | 0 |
| June 25, 2022 | 19 | 0 | 0 | 0 | 0 |
| June 25, 2023 | 16 | 0 | 0 | 0 | 0 |
| June 25, 2024 | 14 | 0 | 0 | 0 | 0 |
| June 25, 2025 | 11 | 0 | 0 | 0 | 0 |
| June 25, 2026 | 7 | 0 | 0 | 0 | 0 |
| June 25, 2027 | 1 | 0 | 0 | 0 | 0 |
| June 25, 2028 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| June 25, 2037 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)[1] | 10.15 | 6.63 | 4.96 | 3.20 | 2.17 |
| Weighted Average Life (years) to Optional Termination[1][2] | 9.49 | 6.17 | 4.62 | 2.99 | 2.01 |

(*)      If applicable, indicates a number that is greater than zero but less than 0.5%.

(1)      The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related Payment Date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

(2)      Assumes an optional purchase of the Mortgage Loans on the earliest Payment Date on which it is permitted.

## THE INDENTURE

The following summary describes some of the terms of the Indenture. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Trust Agreement and Indenture. Whenever particular defined terms of the Indenture are referred to, those defined terms are incorporated in this prospectus supplement by reference. The Issuing Entity will provide to a prospective or actual Noteholder without charge, on written request, a copy (without exhibits) of the Indenture and the Trust Agreement. Requests should be addressed to Newcastle Mortgage Securities Trust 2007-1, 1345 Avenue of the Americas, New York, New York 10105. See "*The Agreements*" in the accompanying prospectus.

### General

The Notes will be issued pursuant to the Indenture, a form of which has been filed as an exhibit to the registration statement. A current report on Form 8-K relating to the Notes containing a copy of the Indenture, the Trust Agreement and the Sale and Servicing Agreement as executed will be filed by the Depositor with the Securities and Exchange Commission within fifteen days of the initial issuance of the Notes, except if the fifteenth day falls on a Saturday, a Sunday or a holiday, it can be filed on the following business day. Reference is made to the accompanying prospectus for important information in addition to that presented in this prospectus supplement regarding the Issuing Entity, the terms and conditions of the Indenture, the Trust Agreement and the Notes. The Notes will be transferable and exchangeable at the designated office of the Securities Administrator located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479.

### The Issuing Entity

Newcastle Mortgage Securities Trust 2007-1 is a statutory trust to be formed under the laws of the State of Delaware pursuant to the short form trust agreement (the "Short Form Trust Agreement"), among the Depositor, the Sponsor and the Owner Trustee, as amended and restated by the amended and restated trust agreement (the "Amended Trust Agreement," and, together with the Short Form Trust Agreement, the "Trust Agreement") dated as of the Closing Date, among the Depositor, the Owner Trustee, and the Securities Administrator. The Trust Agreement constitutes the "governing instrument" under the laws of the State of Delaware relating to statutory trusts. After its formation, the Issuing Entity will not engage in any activity other than (i) acquiring and holding the assets of the Issuing Entity and proceeds therefrom, (ii) issuing the Notes and owner trust certificates, (iii) making payments on the Notes and (iv) engaging in other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

The Issuing Entity is not expected to have any significant assets other than the mortgage loans and certain related assets. In accordance with the Sale and Servicing Agreement, certain duties of the Issuing Entity under the Agreements will be performed by the Securities Administrator and certain other duties will be performed by the Sponsor or an affiliate thereof.

The Issuing Entity's fiscal year end is December 31.

### The Owner Trustee

Wilmington Trust Company is the Owner Trustee under the Trust Agreement. Wilmington Trust Company is a Delaware banking corporation with trust powers incorporated in 1903. Wilmington Trust Company's principle place of business is located at 1100 North Market Street, Wilmington, Delaware,

19890. Wilmington Trust Company has served as Owner Trustee in numerous asset-backed securities transactions involving mortgage and mortgage-related receivables.

Wilmington Trust Company is subject to various legal proceedings that arise from time to time in the ordinary course of business. Wilmington Trust Company does not believe that the ultimate resolution of any of these proceedings will have a materially adverse effect on its services as Owner Trustee.

Wilmington Trust Company has provided the above information for purposes of complying with Regulation AB. Other than the above two paragraphs, Wilmington Trust has not participated in the preparation of, and is not responsible for, any other information contained in this prospectus supplement.

Neither the Owner Trustee nor any director, officer or employee of the Owner Trustee will be under any liability to the Issuing Entity or the Noteholders under the Trust Agreement under any circumstances, except for the owner trustee's own misconduct, gross negligence, bad faith or grossly negligent failure to act or in the case of the inaccuracy of some representations made by the owner trustee in the Trust Agreement. All persons into which the owner trustee may be merged or with which it may be consolidated or any person resulting from that merger or consolidation shall be the successor of the owner trustee under the Trust Agreement.

The principal compensation to be paid to the Owner Trustee in respect of its obligations under the Trust Agreement will have been paid by or on behalf of the Issuing Entity on or prior to the Closing Date.

**The Indenture Trustee**

The Indenture Trustee is The Bank of New York, a banking corporation organized under the laws of the State of New York.  The Bank of New York's operations include a full range of securities services, treasury management, investment management and private banking services.

Asset classes for which The Bank of New York serves as trustee include residential and commercial mortgages, credit cards, auto loans, equipment loans and leases, trade receivables, commercial leases, franchise loans, and student loans.

The Indenture Trustee will not be under any obligation to exercise any of the trusts or powers vested in it by the Indenture or to make any investigation of matters arising under the Indenture or to institute, conduct or defend any litigation under the Indenture or in relation to the Indenture at the request, order or direction of any of the Noteholders, unless the Noteholders have offered to the Indenture Trustee indemnity satisfactory to it against the cost, expenses and liabilities which may be incurred.  The Issuing Entity will reimburse the Indenture Trustee for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to compensation for its services.  Such expenses include reasonable compensation and expenses, disbursements and advances of the Indenture Trustee's agents, counsel, accountants and experts.  The Issuing Entity will indemnify the Indenture Trustee and hold it harmless against any and all claims, taxes, penalties, losses, liabilities or expenses (including attorneys' fees and expenses) of any kind whatsoever incurred by either of them in connection with the administration of the Trust and the performance of their respective duties under any of the agreements to which it is a party other than by reason of its own negligent action, its own negligent failure to perform its obligation in compliance with the Indenture or any liability imposed by reason of its willful misfeasance or bad faith.

**The Securities Administrator**

Under the terms of the Indenture, Wells Fargo Bank will also be responsible for securities administration, which includes pool performance calculations, distribution calculations and the preparation of monthly distribution reports.  As Securities Administrator, Wells Fargo Bank is responsible for the preparation of monthly reports on Form 10-D, certain current reports on Form 8-K and annual reports on Form 10-K that are required to be filed with the Securities and Exchange Commission on behalf of the issuing Trust.

Wells Fargo Bank has been engaged in the business of securities administration since June 30, 1995.  As of December 31, 2006, Wells Fargo Bank was acting as Securities Administrator with respect to more than $1,006,418,000,000 of outstanding residential mortgage-backed securities.

Using information set forth in this prospectus supplement, the Securities Administrator will recreate the cashflow model for the trust based solely on the information received from the Issuing Entity. Based on the monthly loan information provided by the Servicer or the Master Servicer, the Securities Administrator will calculate the amount of principal and interest to be paid to each class of notes on each Payment Date.  In accordance with the cashflow model and based on the monthly loan information provided by the Master Servicer, the Securities Administrator will perform distribution calculations, remit payments on the Payment Date to Noteholders and prepare a monthly statement to Noteholders detailing the payments received and the activity on the mortgage loans during the Due Period as described under "*Description of the Notes*" and "*Reports to Noteholders*" in this prospectus supplement. In performing these obligations, the Securities Administrator will be able to conclusively rely on the information provided to it by the Master Servicer, and the Securities Administrator will not be required to recompute, recalculate or verify the information provided to it by the Master Servicer.

The Securities Administrator may resign at any time, in which event the Issuing Entity will be obligated to appoint a successor securities administrator. The Issuing Entity may also remove the Securities Administrator if the Securities Administrator ceases to be eligible to continue as such under the Agreements or if the Securities Administrator becomes incapable of acting, bankrupt, insolvent or if a receiver or public officer takes charge of the Securities Administrator or its property. Upon such resignation or removal of the Securities Administrator or the Issuing Entity will be entitled to appoint a successor securities administrator.

The Securities Administrator undertakes to perform such duties and only such duties as are specifically set forth in the Agreements as duties of the Securities Administrator, including:

Upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments which are specifically required to be furnished to the Securities Administrator pursuant to the Agreements, the Securities Administrator will examine them to determine whether they are in the required form; provided, however, the Securities Administrator will not be responsible for the accuracy or content of any resolution, certificate, statement, opinion, report, document, order or other instrument furnished hereunder; provided, further, that the Securities Administrator will not be responsible for the accuracy or verification of any calculation provided to it pursuant to the Agreements.

1.      On each Payment Date, the Securities Administrator will make monthly payments and the final payment to the Noteholders from funds in the Note Account as provided in the Indenture.

2.      Except for those actions that the Securities Administrator is required to take under the Agreements, the Securities Administrator will not have any obligation or liability to take any action or to refrain from taking any action in the absence of written direction as provided in the Agreements.

The Securities Administrator will not in any way be liable by reason of any insufficiency in any account held by or in the name of the Securities Administrator unless it is determined by a court of competent jurisdiction that the Securities Administrator's negligence or willful misconduct was the primary cause of such insufficiency (except to the extent that the Securities Administrator is obligor and has defaulted thereon). In no event will the Securities Administrator be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Securities Administrator has been advised of the likelihood of such loss or damage and regardless of the form of action. Furthermore, the Securities Administrator will not be responsible for the acts or omissions of the other transaction parties, it being understood that the Agreements will not be construed to render them partners, joint venturers or agents of one another. None of the foregoing will be construed, however, to relieve the Securities Administrator from liability for its own negligent action, its own negligent failure to act or its own willful misconduct. The Securities Administrator will be entitled to reimbursement and indemnification by the trust for any loss, liability or expense arising out of or in connection with the Agreements as set forth in the Agreements except any such loss, liability or expense as may arise from its negligence or intentional misconduct.

**The Paying Agent and Note Registrar**

Wells Fargo Bank in its capacity as Securities Administrator, will act as the initial paying agent and note registrar under the Agreements. Each of the paying agent and note registrar may resign upon thirty (30) days' prior written notice to the Issuing Entity; provided that no such resignation will be effective until acceptance of the appointment of a successor paying agent or certificate registrar. In the event the paying agent and/or the note registrar resigns or is removed by the Issuing Entity for cause, the Issuing Entity may appoint a successor paying agent or certificate registrar, as applicable. The Issuing Entity will cause such successor paying agent, if other than the Indenture Trustee, the Master Servicer or the Securities Administrator, to execute and deliver to the Issuing Entity an instrument in which such paying agent will agree with the Issuing Entity that such paying agent will hold all sums held by it for the payment to related Noteholders in trust for the benefit of the related Noteholders entitled thereto until such sums have been paid to the related Noteholders.

**The Custodian**

Wells Fargo Bank will act as Custodian of the mortgage loan files pursuant to the Sale and Servicing Agreement. In that capacity, Wells Fargo Bank is responsible for holding and safeguarding the related mortgage notes and other contents of the mortgage files on behalf of the Indenture Trustee and the Noteholders. Wells Fargo Bank maintains each such mortgage loan file in a separate file folder marked with a unique bar code to assure loan-level file integrity and to assist in inventory management. Files are segregated by transaction or investor.

Wells Fargo Bank has been engaged in the mortgage document custody business for more than 25 years. Wells Fargo Bank maintains document custody facilities in its Minneapolis, Minnesota headquarters and in three regional offices located in Richfield, Minnesota, Irvine, California and Salt Lake City, Utah. As of December 31, 2006, Wells Fargo Bank maintains mortgage custody vaults in each of those locations with an aggregate capacity of over eleven million files.

**The Note Account**

The Securities Administrator will establish and maintain in the name of the Indenture Trustee, for the benefit of the Noteholders, an account (the "Note Account"). The Securities Administrator will deposit in the Note Account, as received, the following amounts:

(i)      Any amounts withdrawn from the Collection Account or other permitted account;

(ii)      Any advance and compensating interest payments;

(iii)      Any Insurance Proceeds or Liquidation Proceeds received by the Master Servicer which were not deposited in the Collection Accounts or other permitted account;

(iv)      The repurchase price with respect to any mortgage loans repurchased and all proceeds of any mortgage loans or property acquired in connection with the optional redemption;

(v)      Any amounts required to be deposited with respect to losses on permitted investments; and

(vi)      Any other amounts received by or on behalf of the Master Servicer or the Indenture Trustee and required to be deposited in the Note Account pursuant to the Sale and Servicing Agreement and the Indenture.

All amounts deposited to the Note Account will be held in the name of the Indenture Trustee, in trust for the benefit of the Noteholders in accordance with the terms and provisions of the Indenture. The amount at any time credited to the Note Account may be held as cash or invested in the name of the Indenture Trustee, in trust for the benefit of the Noteholders, in such permitted investments selected by the Servicer as set forth in the Sale and Servicing Agreement. Any one or more of the following obligations or securities held in the name of the Indenture Trustee, in trust for the benefit of the Noteholders will be considered a permitted investment:

(i)      direct obligations of, and obligations the timely payment of which are fully guaranteed by the United States of America or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America;

(ii)      (a) demand and time deposits in, notes of deposit of, bankers' acceptances issued by or federal funds sold by any depository institution or trust company (including the Indenture Trustee or its agent acting in their respective commercial capacities) incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state authorities, so long as, at the time of such investment or contractual commitment providing for such investment, such depository institution or trust company or its ultimate parent has a short-term uninsured debt rating generally in one of the two highest available rating categories of each Rating Agency and provided that each such investment has an original maturity of no more than 365 days and (b) any other demand or time deposit or certificate of deposit that is fully insured by the Federal Deposit Insurance Corporation;

(iii)      repurchase obligations with a term not to exceed 30 days with respect to any security described in clause (i) above and entered into with a depository institution or trust company (acting as principal) rated A (or its equivalent) or higher by each Rating Agency; provided, that, such

repurchase obligations are accounted for by the Trust as secured loans to the repurchase counterparty in accordance with Financial Accounting Standard 140;

(iv)    securities bearing interest or sold at a discount that are issued by any corporation incorporated under the laws of the United States of America or any State thereof and that are rated by each Rating Agency in its highest long-term unsecured rating category at the time of such investment or contractual commitment providing for such investment;

(v) commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than 30 days after the date of acquisition thereof) that is rated by each Rating Agency in its highest short-term unsecured debt rating available at the time of such investment;

(vi)    units of money market funds, including those money market funds managed or advised by the Indenture Trustee, the Securities Administrator or their Affiliates, that have the highest applicable rating from the Rating Agencies; and

(vii)    any other demand, money market or time deposit, obligation, security or investment as may be acceptable to the Rating Agencies as evidenced in writing by the Rating Agencies to the Securities Administrator.

In addition, no instrument described hereunder may evidence either the right to receive (a) only interest with respect to the obligations underlying such instrument or (b) both principal and interest payments derived from obligations underlying such instrument and the interest and principal payments with respect to such instrument provide a yield to maturity at par greater than 120% of the yield to maturity at par of the underlying obligations

On each Payment Date, the Securities Administrator will withdraw Available Funds from the Note Account and make payments to the related Noteholders in accordance with the provisions set forth under "*Description of the Notes—Payments on the Notes*" in this prospectus supplement. Each of the Indenture Trustee, the Securities Administrator and the Custodian will be entitled to compensation for its services under the Agreements which will be paid by the Master Servicer. The Indenture Trustee, the Securities Administrator, the Master Servicer and the Custodian will also be entitled to be reimbursed from amounts on deposit in the Note Account for their expenses, costs and liabilities incurred by or reimbursable to them pursuant to the Agreements prior to the payment of the Available Funds.

### Events of Default

Events of default under the Indenture will include:

(i)    a failure by the Issuing Entity to pay Class Monthly Interest Amount on the Offered Notes on any Payment Date and such default shall continue for a period of five days; or

(ii)    the failure by the Issuing Entity on the Final Scheduled Payment Date to pay all Class Monthly Interest Amount of the Offered Notes, all remaining Basis Risk Shortfall Amounts to the Offered Notes and to reduce the Note Principal Balances of any Offered Notes to zero; or

(iii)    there occurs a default in the observance or performance of any covenant or agreement of the Issuing Entity made in the Indenture, or any representation or warranty of the Issuing Entity made in the Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith proving to have been incorrect in any material respect as of the time when the same shall have been made,

and such default shall continue or not be cured, or the circumstance or condition in respect of which such representation or warranty was incorrect shall not have been eliminated or otherwise cured, for a period of 30 days after there shall have been given, by registered or certified mail, to the Issuing Entity by the Indenture Trustee or to the Issuing Entity and the Indenture Trustee by the Holders of at least 25% of the aggregate Note Principal Balance of the Outstanding Notes, a written notice specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a notice of default hereunder; or

(iv)    there occurs the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of the Issuing Entity or any substantial part of the trust fund in an involuntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Issuing Entity or for any substantial part of the trust fund, or ordering the winding up or liquidation of the Issuing Entity's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or

(v)    there occurs the commencement by the Issuing Entity of a voluntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Issuing Entity to the entry of an order for relief in an involuntary case under any such law, or the consent by the Issuing Entity to the appointment or taking possession by a receiver, liquidator, assignee, custodian, Indenture Trustee, sequestrator or similar official of the Issuing Entity or for any substantial part of the assets of the trust fund, or the making by the Issuing Entity of any general assignment for the benefit of creditors, or the failure by the Issuing Entity generally to pay its debts as such debts become due, or the taking of any action by the Issuing Entity in furtherance of any of the foregoing; or

(vi)    the Issuing Entity becoming an entity subject to federal tax.

**Rights Upon Event of Default**

If an Event of Default should occur and be continuing with respect to the Notes, the Securities Administrator at the written direction of the Noteholders representing more than 50% of the aggregate Note Principal Balance of the Notes then outstanding, may declare the principal of the Notes, together with accrued and unpaid interest thereon through the date of acceleration, to be due and payable immediately. Such declaration may, under certain circumstances, be rescinded and annulled by the Noteholders representing more than 50% of the aggregate Note Principal Balance of the Notes then outstanding.

If, following an Event of Default, any Notes have been declared to be due and payable, the Indenture Trustee may, if directed by the Noteholders representing more than 50% of the aggregate Note Principal Balance of the Notes, refrain from selling such assets and continue to apply all amounts received on such assets to payments due on the Notes in accordance with their terms, notwithstanding the acceleration of the maturity of the Notes.  The Indenture Trustee, however, must sell or cause to be sold (in accordance with the direction of the Noteholders representing more than 50% of the aggregate Note Balance of the Notes) the assets included in the Trust if collections in respect of such assets are determined (by an independent appraiser payable by the Trust) to be insufficient to pay certain expenses payable under the Indenture and to make all scheduled payments on the Notes.  In the event the assets of the Trust are sold, any collection on, or the proceeds from the sale of, the assets will be applied in accordance with the provisions of the Indenture.

Subject to the provisions of the Indenture relating to the duties of the Indenture Trustee, in case an Event of Default has occurred and is continuing, the Indenture Trustee will be under no obligation to exercise any of the rights and powers under the Indenture at the request or direction of any of the Noteholders, unless such Noteholders have offered to the Indenture Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.  Subject to such provisions for indemnification and certain limitations contained in the Indenture, the Noteholders representing more than 50% of the aggregate Note Balance of the Notes will have the right to direct the time, method, and place of conducting any proceeding or any remedy available to the Indenture Trustee or exercising any trust or power conferred on the Indenture Trustee with respect to the Notes; and the Noteholders representing more than 50% of the aggregate Note Balance of the Notes may, in certain cases, waive any default with respect thereto.

**Limitation on Suits**

To the extent set forth in the Indenture, no Noteholder will have any right to institute any proceedings with respect to the Indenture unless (1) such Noteholder has previously given written notice to the Indenture Trustee of a continuing Event of Default; (2) Noteholders representing not less than 25% of the aggregate Note Principal Balance of the Notes then outstanding have made written request to the Indenture Trustee to institute proceedings in respect of such Event of Default in its own name as Indenture Trustee, on behalf of the Noteholder; (3) such Noteholders have offered to the Indenture Trustee indemnity satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request; (4) for 60 days after its receipt of such notice, request and offer of indemnity the Indenture Trustee has failed to institute any such proceedings; and (5) no direction inconsistent with such written request has been given to the Indenture Trustee during such 60-day period by the Noteholders representing more than 50% of the aggregate Note Principal Balance of the Notes then outstanding.

**Supplemental Indentures**

Without the consent of the holders of any Offered Notes, the Issuing Entity and the Indenture Trustee, at any time and from time to time, may enter into one or more supplemental Indentures for any of the following purposes: (a) to correct or amplify the description of any property at any time subject to the lien of the Indenture, (b) to evidence the succession of another person to the Issuing Entity; (c) to add to the covenants of the Issuing Entity; (d) to convey, transfer, assign, mortgage or pledge any property to or with the Indenture Trustee; (e) to cure any ambiguity, to correct or supplement any provision in the Indenture; (f) to make any other provisions with respect to matters or questions arising under the Indenture; (g) to evidence and provide for the acceptance of the appointment of a successor indenture trustee; or (h) to modify, eliminate or add to the provisions of the Indenture; provided, that, with respect to any supplemental indenture under (f) and (h) above, such action (as evidenced by either (i) an opinion of counsel delivered to the Depositor, the Issuing Entity and the Indenture Trustee to the effect that such amendment will not materially and adversely affect the interests of the holders of the Offered Notes or (ii) confirmation from the Rating Agencies that such amendment will not result in the reduction or withdrawal of the rating of any class of Offered Notes) will not materially and adversely affect the interests of the holders of the Offered Notes and will not (as evidenced by an officer's certificate of the Sponsor) cause the Trust to fail to qualify as a "qualified special purpose entity" under Financial Accounting Standard 140.

The Issuing Entity and the Indenture Trustee also may, with the consent of the holders of not less than a majority of the Note Balance of each class of Offered Notes affected thereby, enter into a supplemental indenture for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture or of modifying in any manner the rights of the holders of the Offered Notes under the Indenture; provided that no such supplemental indenture will, without the

consent of the holder of each Offered Note affected thereby: (a) change the date of payment of any installment of principal of or interest on any Offered Note, or reduce the principal amount thereof or the Note Rate thereon, change the provisions of the Indenture relating to the application of collections on, or the proceeds of the sale of, the Trust to payment of principal of or interest on the Offered Notes, or change any place of payment where, or the coin or currency in which, any Offered Note or the interest thereon is payable; (b) reduce the percentage of the Note Balances of the Offered Notes, the consent of the holders of which is required for any such supplemental indenture; (c) reduce the percentage of the Note Balances of the Offered Notes required to direct the Indenture Trustee to direct the Issuing Entity to sell or liquidate the Trust; (d) modify any of the provisions of the Indenture in such manner as to affect the calculation of the amount of any payment of interest or principal due on any Offered Note; or (e) permit the creation of any lien ranking prior to or on a parity with the lien of the Indenture with respect to any part of the Trust or terminate the lien of the Indenture.

### Optional Redemption

The majority holder of the Owner Trust Certificates may purchase all of the mortgage loans, together with any properties in respect thereof acquired on behalf of the trust, on or after the Payment Date on which the sum of the aggregate Loan Balance of the mortgage loans is 10% or less of the Cut-off Date Loan Balance of the mortgage loans. In the event that the option is exercised, the purchase will be made at a price (the "Redemption Price") generally equal to the greater of (A) the sum of (x) the aggregate outstanding Loan Balance of the mortgage loans (other than those referred to in clause (y) below), including accrued interest thereon, and (y) in the case of any REO property and any mortgage loans with respect to which foreclosure proceedings have been initiated or are otherwise 120 days or more delinquent, the fair market value of such REO property and mortgage loans (disregarding accrued interest thereon) and (B) the sum of the aggregate unpaid principal balance of the Notes (other than any Allocated Realized Loss Amounts), all accrued and unpaid interest thereon (other than any Basis Risk Shortfall Amounts), any unreimbursed Monthly Advances, Servicing Advances and any Monthly Advances the Servicer has failed to remit and any Swap Termination Payment payable to the Swap Provider then remaining unpaid or which is due to the exercise of such option.

### Voting Rights

Voting rights of the trust in general will be allocated among the classes of notes based upon their respective Note Principal Balances.

### Assignment of the Mortgage Loans; Repurchase

At the time of issuance of the Notes, the Depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the Cut-off Date, to be sold to the trust. The mortgage loans in each of the Loan Groups will be identified in a schedule appearing as an exhibit to the Indenture with each Loan Group separately identified. Such schedule will include information as to the principal balance of each mortgage loan as of the Cut-off Date, as well as information including, among other things, the mortgage rate, the Net Mortgage Rate, the Monthly Payment, the maturity date of each mortgage note, the Loan-to-Value Ratio and Combined Loan-to-Value Ratio.

In addition, the Depositor will deposit with the Custodian, on behalf of the Indenture Trustee, for the benefit of the Noteholders, if any, the following documents with respect to each mortgage loan:

(a)    the original mortgage note, endorsed without recourse in blank or in the following form: "Pay to the order of The Bank of New York., as Indenture

Trustee for Noteholders of Newcastle Mortgage securities Trust Asset-Backed Notes, Series 2007-1 without recourse," with all intervening endorsements that show a complete chain of endorsement from the originator to the Sponsor or, if the original mortgage note is unavailable to the Depositor, a photocopy thereof, if available, together with a lost note affidavit;

> (b)    the original recorded mortgage or a photocopy thereof, to the extent provided in the Sale Servicing Agreement;

> (c)    a duly executed assignment of the mortgage in blank or to "The Bank of New York., as Indenture Trustee for Noteholders of Newcastle Mortgage Securities Trust Asset-Backed Notes, Series 2007-1, without recourse" or in blank; in recordable form or, for each mortgage loan subject to the Mortgage Electronic Registration Systems, Inc. (the "MERS® System"), evidence that the mortgage is held for the trustee as described in the Sale and Servicing Agreement;

> (d)    all interim recorded assignments of such mortgage, if any and if available to the Depositor; and

> (e)    the original or duplicate original lender's title policy or, in the event such original title policy has not been received from the insurer, such original or duplicate original lender's title policy will be delivered within one year of the closing date or, in the event such original lender's title policy is unavailable, a photocopy of such title policy or, in lieu thereof, a current lien search on the related property.

With respect to each mortgage loan subject to the MERS® System, in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. ("MERS"), the assignment of the mortgage related to each such mortgage loan shall be registered electronically through the MERS® System and MERS shall serve as mortgagee of record solely as nominee in an administrative capacity on behalf of the trustee and shall not have any interest in such mortgage loans.

Assignments of the mortgage loans provided to the Custodian on behalf of the Indenture Trustee will not be required to be submitted for recording (except with respect to any mortgage loan located in Maryland) unless (i) the Indenture Trustee and the Depositor receive written notice that such failure to record would result in a withdrawal or a downgrading by any Rating Agency of the rating on any class of Notes, (ii) such mortgage loan is electronically registered through the MERS® System; or (iii) the earliest to occur of: (a) reasonable direction by the holders of 25% of the aggregate note balance of the Notes, (b) the occurrence of a servicer event of termination, (iii) the occurrence of a bankruptcy, insolvency or foreclosure relating to the originator and (iv) the occurrence of a servicing transfer as described in Sale and Servicing Agreement.

The Custodian on behalf of the Indenture Trustee will perform a review of the mortgage loan documents on or prior to the closing date or in the case of any document permitted to be delivered after the closing date, promptly after the Custodian's receipt of such documents and will hold such documents in trust for the benefit of the holders of the related notes, if any.

**Representations and Warranties**

In the Assignment Agreement, the Originator will make certain representations and warranties as of the Closing Date. All of the Depositor's right, title and interest to the mortgage loans and all rights of the Depositor under the Assignment Agreement will be assigned to the Indenture Trustee pursuant to the

Sale and Servicing Agreement. The Depositor will file the Agreements along with the exhibits to the Agreements with the Securities and Exchange Commission in a report on Form 8-K.

The representations and warranties of the Originator with respect to the related mortgage loans include the following, among others:

(a)    The mortgage loan is covered by an American Land Title Association ("ALTA") lender's title insurance policy or a comparable form in the States of California or Texas (which, in the case of an adjustable rate mortgage loan has an adjustable rate mortgage endorsement in the form of ALTA 6.0 or 6.1), issued by a title insurer acceptable to Fannie Mae and Freddie Mac and qualified to do business in the jurisdiction where the mortgaged property is located, insuring (subject to the exceptions contained in (x)(a) and (b), and with respect to any second lien mortgage loan (c), above) the Seller or the Servicer, its successors and assigns as to the first or second priority lien (as indicated on the mortgage loan schedule) of the mortgage in the original principal amount of the mortgage loan (including, if the mortgage loan provides for negative amortization, the maximum amount of negative amortization in accordance with the mortgage) and, with respect to any adjustable rate mortgage loan, against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the mortgage providing for adjustment in the mortgage interest rate and monthly payment and negative amortization provisions of the mortgage note. Additionally, such lender's title insurance policy affirmatively insures ingress and egress to and from the mortgaged property, and against encroachments by or upon the mortgaged property or any interest therein.  The Seller is the sole insured of such lender's title insurance policy, and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this agreement.  No claims have been made under such lender's title insurance policy, and no prior holder of the related mortgage, including the Seller, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy;

(b)    The terms of the mortgage note and the mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments, recorded in the applicable public recording office if necessary to maintain the lien priority of the mortgage, and which have been delivered to the Custodian; the substance of any such waiver, alteration or modification has been approved by the title insurer, to the extent required by the related policy, and is reflected on the related mortgage loan schedule. No instrument of waiver, alteration or modification has been executed, and no mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the title insurer, to the extent required by the policy, and which assumption agreement has been delivered to the custodian and the terms of which are reflected in the related mortgage loan schedule;

(c)    The mortgage file contains an appraisal of the related mortgaged property which satisfied the standards of Fannie Mae and Freddie Mac, was on appraisal form 1004, form 1025 and form 1073 with an interior inspection and was made and signed, prior to the approval of the mortgage loan application, by a qualified appraiser, duly appointed by the Servicer, who had no interest, direct or indirect in the mortgaged property or in any loan made on the security thereof, whose compensation is not affected by the approval or disapproval of the mortgage loan and who met the minimum qualifications of Fannie Mae and Freddie Mac.  Each appraisal of the mortgage loan was made in accordance with the relevant provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989;

(d)    No mortgage loan (a)(1) is subject to the provisions of the Homeownership and Equity Protection Act of 1994 as amended ("HOEPA"), (2) that is secured by the borrower's principal residence has an APR or total points and fees that exceed the thresholds set by HOEPA and its implementing regulations, including 12 CFR 226.32 (a)(1)(i) and (ii)) and such requirement applies to other second mortgage loans or (3)  has an "annual percentage rate" or "total points and fees" payable by the borrower

(as each such term is defined under HOEPA) that equal or exceed the applicable thresholds defined under HOEPA (Section 32 of Regulation Z, 12 C.F.R. Section 226.32(a)(1)(i) and (ii)), (b) is a "high cost" mortgage loan, "covered" mortgage loan (excluding home loans defined as "covered home loans" pursuant to clause (1) of the definition of that term in the New Jersey Home Ownership Security Act that were originated between November 26, 2003 and July 7, 2004), "high risk home" mortgage loan, or "predatory" mortgage loan or any other comparable term, no matter how defined under any federal, state or local law, (c) is subject to any comparable federal, state or local statutes or regulations, or any other statute or regulation providing for heightened regulatory scrutiny or assignee liability to holders of such mortgage loans, or (d) is a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the current Standard & Poor's LEVELS® Glossary which is now Version 5.7 Revised, Appendix E).

After the Closing Date, if in compliance with review procedures any document is found to be missing or defective in any material respect, the Indenture Trustee or the Custodian, as agent for the Indenture Trustee, will be required to notify the Originator and the Seller in writing. If the Originator cannot or does not cure such omission or defect with respect to a missing or defective document, within 30 days of its receipt of notice, the Originator will be required to repurchase the related mortgage loan from the Issuing Entity within 30 days from the date of notice.  Under the Sale and Servicing Agreement, the price at which a mortgage loan will be required to be repurchased ( the "Repurchase Price") will be equal to 100% of the Outstanding Principal Balance thereof as of the date of repurchase plus accrued and unpaid interest thereon at the mortgage rate to the first day of the month following the month of repurchase, plus any costs and damages incurred by the trust in connection with any violation of such mortgage loan of any anti-predatory lending laws, and reduced by any portion of the servicing fee or advances payable to the purchaser of the mortgage loan. To the extent that the Originator is obligated pursuant to the Assignment Agreement to repurchase a mortgage loan at a price less than the Repurchase Price, then the Seller will be obligated to remit to the Depositor the difference between the Repurchase Price and the amount required to be paid by the Originator.  Rather than repurchase the mortgage loan as provided above, the Originator may remove such mortgage loan from the Issuing Entity and substitute in its place another mortgage loan of like characteristics.

After the Closing Date, if in compliance with review procedures a representation or warranty with respect to any mortgage loan is breached and such breach materially and adversely affects the interests of the holders of the Notes in such mortgage loan, the Indenture Trustee or the Custodian, as agent for the Indenture Trustee, will be required to notify the Originator and the Seller in writing. If the Originator cannot or does not cure such omission or defect with respect to a missing or defective document, or if the Originator does not cure such breach with respect to a breach of a representation or warranty, in each case within 30 days of its receipt of notice, the Originator will be required to repurchase the related mortgage loan from the Issuing Entity within 30 days from the date of notice at the Repurchase Price. To the extent that the Originator is obligated pursuant to the Assignment Agreement to repurchase a mortgage loan at a price less than the Repurchase Price, then the Seller will be obligated to remit to the Depositor the difference between the Repurchase Price and the amount required to be paid by the Originator.  Rather than repurchase the mortgage loan as provided above the Originator may remove such mortgage loan from the Issuing Entity and substitute in its place another mortgage loan of like characteristics.

Fremont General Corporation, the parent of the Originator, has guaranteed the obligations of the Originator to cure, repurchase or substitute the mortgage loans.

The obligation to cure, repurchase or substitute as described above constitutes the sole remedy available to the Noteholders, the Indenture Trustee or the Depositor for omission of, or a material defect in, a mortgage loan document or for a breach of representation or warranty by the Originator with respect to a mortgage loan.

**Reports to Noteholders**

On each Payment Date, the Securities Administrator will make available to each Noteholder, the Master Servicer and the Depositor a statement generally setting forth, among other information:

1.      the applicable record dates, interest accrual periods and determination dates for calculating payments and general Payment Dates;

2.      with respect to each Loan Group, the total cash flows received;

3.      the amount, if any, of fees or expenses accrued and paid and to whom such fees and expenses were paid;

4.      the amount of the related distribution to holders of the Offered Notes (by class) allocable to interest and to principal, separately identifying (A) the aggregate amount of any Principal Prepayments included therein and (B) the aggregate of all scheduled payments of principal included therein;

5.      the Excess Interest, the Overcollateralized Amount, the Overcollateralization Increase Amount, the Required Overcollateralization Amount, the Excess Overcollateralization Amount, the Overcollateralization Deficiency and the Senior Enhancement Percentage for such Payment Date;

6.      the Class Monthly Interest Amount in respect of the Notes for such Payment Date and the Class Interest Carryover Shortfall, if any, with respect to the Notes on such Payment Date;

7.      the aggregate amount of any Prepayment Interest Shortfall for such Payment Date, to the extent not covered by payments of Compensating Interest by the Servicer;

8.      the Basis Risk Shortfall Amounts for the Offered Notes, if any, for such Payment Date and the amount remaining undistributed after reimbursements therefor on such Payment Date;

9.      whether a Stepdown Date or a Trigger Event is in effect on such Payment Date;

10.     the Note Principal Balance of the Offered Notes before and after giving effect to the distribution of principal and allocation of Realized Losses on such Payment Date;

11.     with respect to each Loan Group, the number and Loan Balance of all the mortgage loans for the following Payment Date;

12.     the Note Interest Rates for each class of Offered Notes for such Payment Date;

13.     with respect to any mortgage loan that was liquidated during the preceding calendar month, the loan number and Loan Balance of, and Realized Loss on, such mortgage loan as of the end of the prior calendar month;

14.     with respect to each Loan Group, the total number and principal balance of any real estate owned, or REO, properties as of the end of the prior calendar month;

15.     with respect to each Loan Group, the cumulative Realized Losses through the end of the preceding month;

16.     with respect to each Loan Group, the number and aggregate outstanding Loan Balance of the mortgage loans, using the OTS method of calculation, that are, (1) 30 days delinquent, (2) 60 days

S-105

delinquent and (3) 90 days or more delinquent, in each case as of the close of business on the last day of the calendar month preceding such Payment Date;

17.    with respect to each Loan Group and if applicable, material modifications, extensions or waivers to pool asset terms, fees, penalties or payments during the payment period or that have become material over time;

18.    with respect to each Loan Group and if applicable, the special hazard amount, fraud loss amount and bankruptcy amount, if applicable, as of the close of business on the applicable Payment Date.

The Securities Administrator will make the monthly statement and, at its option, any additional files containing the same information in an alternative format, available each month to Noteholders via the Securities Administrator's internet website referenced below under "Available Information". Assistance in using the Securities Administrator's website service can be obtained by calling the Securities Administrator's customer service desk at (866) 846-4526. Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the Securities Administrator's customer service desk and indicating such. The Securities Administrator may change the way monthly statements are distributed in order to make such distributions more convenient or more accessible to the above parties.

So long as the Issuing Entity is required to file reports under the Exchange Act, these monthly statements will be made available as described below under "Available Information" in this prospectus supplement.

Annual reports of assessment of compliance with the AB Servicing Criteria, attestation reports, and statements of compliance will be provided to registered holders of the related notes, if not available at the Securities Administrator's website, upon request free of charge. See "—Evidence as to Compliance".

The annual reports on Form 10-K, the distribution reports on Form 10-D, certain current reports on Form 8-K and amendments to those reports, in each case, prepared and filed by the Securities Administrator with respect to the Issuing Entity pursuant to section 13(a) or 15(d) of the Exchange Act will be made available on the website of the Securities Administrator as soon as reasonably practicable after such material is electronically filed with, or furnished to, the SEC.

In addition, within a reasonable period of time after the end of each calendar year, the Securities Administrator will prepare and deliver to each Noteholder of record during the previous calendar year a statement containing information necessary to enable Noteholders to prepare their tax returns. Such statements will not have been examined and reported upon by an independent public accountant.

### THE SALE AND SERVICING AGREEMENT

The following summary describes a number of terms of the Sale and Servicing Agreement. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Sale and Servicing Agreement. The Sponsor will provide to a prospective or actual Noteholder without charge, on written request, a copy (without exhibits) of the Sale and Servicing Agreement. Requests should be addressed to Newcastle Investment Corp., 1345 Avenue of the Americas, New York, New York 10105. See "*The Agreements*" in the accompanying prospectus.

**Servicing and Other Compensation and Payment of Expenses**

The Master Servicer will be entitled to receive a fee as compensation for its activities under the Sale and Servicing Agreement which will be equal to $1/12^{th}$ of the master servicing fee rate, set forth below, multiplied by the Loan Balance of each mortgage loan outstanding. The master servicing fee rate for each mortgage loan will be 0.010% per annum.  Each of the Indenture Trustee, the Securities Administrator and the Custodian will be entitled to compensation for its services under the Agreements which will be paid by the Master Servicer.  The Agreements also will provide that the Master Servicer will be entitled to reimbursement from the Note Account for advances and certain expenses. The Servicer will be entitled to receive a fee as compensation for its activities under the Sale and Servicing Agreement equal to $1/12^{th}$ of the servicing fee rate, set forth below, multiplied by the Loan Balance of each mortgage loan outstanding. The servicing fee rate for each mortgage loan will be 0.500% per annum.

In addition to the primary compensation described above, the Servicer will be entitled to retain all assumption fees, tax service fees and late payment charges, all to the extent collected from mortgagors and as provided in the Sale and Servicing Agreement other than prepayment charges and penalties, if any, collected.

The Servicer will pay all related expenses incurred in connection with its servicing responsibilities (subject to limited reimbursement as described in the Sale and Servicing Agreement).

**Collection and Other Servicing Procedures**

The Servicer will use reasonable efforts to ensure that all payments required under the terms and provisions of the mortgage loans are collected, and will follow collection procedures comparable to the collection procedures of prudent mortgage lenders servicing mortgage loans for their own account, to the extent such procedures will be consistent with the Sale and Servicing Agreement.

In instances in which a loan is in default, or if default is reasonably foreseeable, and if determined by the Servicer to be in the best interests of the related Noteholders, the Servicer may engage, either directly or through subservicers, in a wide variety of loss mitigation practices including waivers, modifications, payment forbearances, partial forgiveness, entering into repayment schedule arrangements, and capitalization of arrearages rather than proceeding with foreclosure or repossession, if applicable. In making that determination, the Servicer will take into account whether such loss mitigation practice will not be materially adverse to the interests of the Noteholders in the aggregate on a present value basis using reasonable assumptions (including taking into account any estimated Realized Losses that might result absent such action). Modifications may have the effect of, among other things, reducing the loan rate, forgiving payments of principal, interest or other amounts owed under the mortgage loan or contract, such as taxes or insurance premiums, extending the final maturity date of the loan, capitalizing delinquent interest and other amounts owed under the mortgage loan or contract, or any combination of these or other modifications. In addition, if the loan is not in default or if default is not reasonably foreseeable, the Servicer may modify the loan only to the extent set forth in the Sale and Servicing Agreement. Any modified loan may remain in the related trust, and the reduction in collections resulting from a modification may result in a lower available funds rate, reduced distributions of interest or principal on, may extend the final maturity of, or result in a allocation of a Realized Loss to, one or more classes of the related Notes.

In connection with any such servicing modification and subject to the Sale and Servicing Agreement and the Sale and Servicing Agreement, the Servicer or Master Servicer may reimburse itself from the issuing entity for any outstanding advances and servicing advances at the time of the modification to the extent that such related advances or servicing advances are reimbursable to that

Servicer or Master Servicer and to the extent of the principal portion of related Available Funds for the related Payment Date. Any such reimbursement will occur during the same calendar month as the servicing modification, and any such reimbursement will be treated as a Realized Loss which will be incurred on the Payment Date related to the calendar month during which the servicing modification occurred.

### Realization Upon Defaulted Mortgage Loans

The Servicer will take such action either as the Servicer deems to be in the best interest of the Issuing Entity, or as is consistent with accepted servicing practices or in accordance with established practices for other mortgage loans serviced by the Servicer with respect to defaulted mortgage loans and foreclose upon or otherwise comparably convert the ownership of properties securing defaulted mortgage loans as to which no satisfactory collection arrangements can be made. To the extent set forth in the Sale and Servicing Agreement, the Servicer will service the property acquired by the Issuing Entity through foreclosure or deed-in-lieu of foreclosure in accordance with procedures that the Servicer employs and exercises in servicing and administering mortgage loans for its own account and which are in accordance with accepted mortgage servicing practices of prudent lending institutions and to the extent set forth in the Sale and Servicing Agreement. The Servicer will not be required to expend its own moneys with respect to the restoration or to make servicing advances with respect to such mortgaged properties unless such entity has determined that (i) such amounts would be recovered and (ii) it believes such restoration will increase proceeds to the Issuing Entity following the mortgaged property's eventual liquidation. The Servicer may also in its discretion, as an alternative to foreclosure, sell a defaulted mortgage loan at fair market value to third parties, if the Servicer reasonably believes that such sale would maximize proceeds to the trust in the aggregate (on a present value basis) with respect to such mortgage loan.

Since Insurance Proceeds cannot exceed deficiency claims and certain expenses incurred by the Servicer, no insurance payments will result in a recovery to Noteholders which exceeds the principal balance of the defaulted mortgage loan together with accrued interest thereon at its Net Rate.

### The Collection Account

The Servicer will establish and maintain one or more accounts, referred to in this prospectus supplement as the Collection Account, into which it will deposit daily all collections of principal and interest on any mortgage loans, including but not limited to Principal Prepayments, Insurance Proceeds, Liquidation Proceeds (less amounts reimbursable to the Servicer out of Liquidation Proceeds in accordance with the Sale and Servicing Agreement), the Repurchase Price for any mortgage loans repurchased, and advances made from the Servicer's own funds (less the related Servicing Fee). The Collection Account and amounts at any time credited thereto shall comply with the requirements of the Sale and Servicing Agreement.

On the date specified in the Sale and Servicing Agreement, the Servicer will withdraw or cause to be withdrawn from the Collection Accounts and any other permitted accounts and will remit to the Securities Administrator the Available Funds (calculated for this purpose without reduction of any payments or reimbursements owed to the Derivatives Provider, Master Servicer, Securities Administrator, Indenture Trustee or Custodian) for deposit in the Note Account for such Payment Date.

To the extent provided in the Sale and Servicing Agreement, amounts on deposit in a Collection Account may be invested in permitted investments in the name of the Indenture Trustee for the benefit of the Noteholders and, except as provided in the Sale and Servicing Agreement, not commingled with any other funds. Such permitted investments shall mature, or shall be subject to redemption or withdrawal, no later than the date on which such funds are required to be withdrawn for deposit in the Note Account, and

shall be held until required for such deposit. The income earned from permitted investments shall be paid to the Servicer under the Sale and Servicing Agreement, and the risk of loss of monies required to be paid to the Noteholders resulting from such investments shall be borne by and be the risk of the Servicer. The Servicer (to the extent provided in the Sale and Servicing Agreement) shall deposit the amount of any such loss in the Collection Account within two business days of receipt of notification of such loss but not later than the date in such month on which funds are required to be remitted by the Servicer to the Securities Administrator.

### Evidence as to Compliance

The Sale and Servicing Agreement will provide that on or before a specified date in March of each year, beginning with the first year after the year in which the Cut-off Date occurs, each party responsible for the servicing function will provide to the Depositor, the Servicer, the Securities Administrator and the Master Servicer a report on an assessment of compliance with the minimum servicing criteria established in Item 1122(a) of Regulation AB (the "AB Servicing Criteria"). The AB Servicing Criteria include specific criteria relating to the following areas: general servicing considerations, cash collection and administration, investor remittances and reporting, and pool asset administration. Such report will indicate that the AB Servicing Criteria were used to test compliance on a platform level basis and will set out any material instances of noncompliance.

The Sale and Servicing Agreement will also provide that the each party responsible for the servicing function will deliver along with its report on assessment of compliance, an attestation report from a firm of independent public accountants on the assessment of compliance with the AB Servicing Criteria.

The Sale and Servicing Agreement will also provide for delivery to the Depositor, the Servicer, the Securities Administrator and the Master Servicer, on or before a specified date in March of each year, of a separate annual statement of compliance from each entity responsible for the servicing function to the effect that, to the best knowledge of the signing officer, such entity has fulfilled in all material respects its obligations under the Sale and Servicing Agreement throughout the preceding year or, if there has been a material failure in the fulfillment of any obligation, the statement shall specify such failure and the nature and status thereof. This statement may be provided as a single form making the required statements as to more than one servicing agreement.

Copies of the annual reports of assessment of compliance, attestation reports, and statements of compliance may be obtained by Noteholders, if not otherwise available at the Securities Administrator's website, without charge upon written request to the Securities Administrator. These items will be filed with the Issuing Entity's annual report on Form 10-K, to the extent required under Regulation AB.

### Events of Default and Removal of the Servicer and Master Servicer

The circumstances under which the Servicer may be removed are generally upon the occurrence of any of the following ( a "Servicer Event of Termination"):

(i) (A) the failure by the Servicer to make any Monthly Advance; or (B) any other failure by the Servicer to deposit in the Collection Account or the Note Account any deposit required to be made under the terms of this Agreement which continues unremedied for a period of one business day after the date upon which written notice of such failure shall have been given to the Servicer by the Master Servicer or to the Master Servicer and the Indenture Trustee by any holders of not less than 25% of the aggregate Note Principal Balances of the Notes; or

(ii) the failure by the Servicer to make any required servicing advance which failure continues unremedied for a period of 30 days, or the failure by the Servicer duly to observe or perform, in any material respect, any other covenants, obligations or agreements of the Servicer as set forth in the Sale and Servicing Agreement, which failure continues unremedied for a period of 30 days (or if such failure or breach cannot be remedied within 30 days, then such remedy shall have been commenced within 30 days and diligently pursued thereafter; provided, however, that in no event shall such failure or breach be allowed to exist for a period of greater than 90 days), after the date (A) on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Master Servicer or to the Master Servicer by any holders of not less than 25% of the aggregate Note Principal Balance of the Notes or (B) of actual knowledge of such failure by a servicing officer of the Servicer; or

(iii) the entry against the Servicer of a decree or order by a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a trustee, conservator, receiver or liquidator in any insolvency, conservatorship, receivership, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 days; or

(iv) the Servicer shall voluntarily go into liquidation, consent to the appointment of a conservator or receiver or liquidator or similar person in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Servicer or of or relating to all or substantially all of its property; or a decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator, receiver, liquidator or similar person in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Servicer and such decree or order shall have remained in force undischarged, unbonded or unstayed for a period of 60 days; or the Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors or voluntarily suspend payment of its obligations.

In the event of a Servicer Event of Termination, the Master Servicer (or such other successor servicer as is approved in accordance with the Sale and Servicing Agreement) will be the successor in all respects to the Servicer under the Sale and Servicing Agreement within 90 days of the time the Servicer receives a notice of termination.  The Master Servicer, in its capacity as successor servicer, immediately will assume all of the obligations of the Servicer to make Advances. As compensation therefor, the Master Servicer (or such other successor servicer) will be entitled to such compensation as the Servicer would have been entitled to under the Sale and Servicing Agreement if no such notice of termination had been given.  In the event of a default by the Master Servicer, as successor servicer, the Indenture Trustee (or such other successor servicer as is approved in accordance with the Sale and Servicing Agreement) will be the successor in all respects to the Master Servicer, as successor servicer, under the Sale and Servicing Agreement within 90 days of the time the Master Servicer receives a notice of termination.

A "Master Servicer Event of Termination" under the Sale and Servicing Agreement, will generally include:

(i) the Master Servicer fails to cause to be deposited in the Note Account any amount so required to be deposited pursuant to the Sale and Servicing Agreement (other than an advance), and such failure continues unremedied for a period of three Business Days after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer; or

(ii) the Master Servicer fails to observe or perform in any material respect any other material covenants and agreements set forth the Sale and Servicing Agreement to be performed by it, which

covenants and agreements materially affect the rights of Noteholders, and such failure continues unremedied for a period of 60 days after the date on which written notice of such failure, properly requiring the same to be remedied, shall have been given to the Master Servicer by the Indenture Trustee, or to the Master Servicer and the Indenture Trustee by the holders of not less than 25% of the aggregate Note Principal Balance of the Notes; or

(iii) there is entered against the Master Servicer a decree or order by a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator, receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding up or liquidation of its affairs, and the continuance of any such decree or order is unstayed and in effect for a period of 60 consecutive days, or an involuntary case is commenced against the Master Servicer under any applicable insolvency or reorganization statute and the petition is not dismissed within 60 days after the commencement of the case; or

(iv) the Master Servicer consents to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Master Servicer or substantially all of its property; or the Master Servicer admits in writing its inability to pay its debts generally as they become due, files a petition to take advantage of any applicable insolvency or reorganization statute, makes an assignment for the benefit of its creditors, or voluntarily suspends payment of its obligations; or

(v) the Master Servicer assigns or delegates its duties or rights under the Sale and Servicing Agreement in contravention of the provisions permitting such assignment or delegation under the Sale and Servicing Agreement; or

(vi) any failure of the Master Servicer to make any compensating interest payment (to the extent the Servicer fails to pay such compensating interest payment) required to be made from its own funds on the business day prior to the applicable Payment Date.

In the event of a Master Servicing Event of Termination, the Indenture Trustee (or such other successor master servicer as is approved in accordance with the Sale and Servicing Agreement) will be the successor in all respects to the Servicer or Master Servicer, as applicable, under the Sale and Servicing Agreement within 90 days of the time the Master Servicer receives a notice of termination.

 The Indenture Trustee, in its capacity as successor servicer or successor master servicer, immediately will assume all of the obligations of the Servicer or Master Servicer, as applicable, to make Advances. As compensation therefor, the Indenture Trustee (or such other successor servicer) will be entitled to such compensation as the Servicer or Master Servicer, as applicable, would have been entitled to under the Sale and Servicing Agreement if no such notice of termination had been given.

Notwithstanding the above, (i) if the Indenture Trustee is unwilling to act as successor servicer or master servicer or (ii) if the Indenture Trustee is legally unable so to act, the Indenture Trustee may appoint or petition a court of competent jurisdiction to appoint, any established housing and home finance institution, bank or other mortgage loan or home equity loan servicer having a net worth of not less than $50,000,000, acceptable to the holder of the Owner Trust Certificates and meeting such other standards for a successor servicer or master servicer as are set forth in the Sale and Servicing Agreement.  Pending appointment of a successor to the Servicer or Master Servicer, unless the Indenture Trustee is prohibited by law from so acting, the Indenture Trustee will act in such capacity as described in the prior paragraph.

Upon any termination or appointment of a successor to the Servicer pursuant to the Sale and Servicing Agreement, the Securities Administrator will give prompt written notice thereof to the

Noteholders and each Rating Agency.  No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicer Event of Termination for five business days after a responsible officer of the Securities Administrator becomes aware of the occurrence of such an event, the Securities Administrator will transmit by mail to all Noteholders notice of such occurrence unless such Servicer Event of Termination by the Servicer has been waived or cured.

All reasonable costs and expenses incurred by the Master Servicer or the Indenture Trustee in connection with the transfer of servicing shall be paid by the predecessor servicer upon presentation of reasonable documentation of such costs, and if such predecessor servicer defaults in its obligation to pay such costs, such costs will be paid by the successor servicer (reimbursable from the Trust) or, in the case of the Master Servicer or the Indenture Trustee, from the assets of the Trust prior to any payments to the Noteholders.

### Servicing of Delinquent Mortgage Loans

The Servicer will be required to act with respect to delinquent Mortgage Loans in accordance with procedures set forth in the Sale and Servicing Agreement.  These procedures, as followed with respect to any delinquent Mortgage Loan, may, among other things, result in (i) foreclosing on such Mortgage Loan, (ii) accepting the deed to the related Mortgaged Property in lieu of foreclosure, (iii) granting the borrower under such Mortgage Loan a modification or forbearance or (iv) accepting payment from the borrower under such Mortgage Loan of an amount less than the Principal Balance of such Mortgage Loan in final satisfaction of such Mortgage Loan.  These procedures are intended to lead to the alternative that would result in the recovery of the highest net present value of proceeds on such Mortgage Loan.  However, there can be no assurance that following such procedures will have that result or that following such procedures will lead to the alternative that is in the best interests of the Noteholders.  If the Servicer extends the payment period or accepts a lesser amount than stated in the mortgage note in satisfaction of the mortgage note, your yield may be affected.

## FEDERAL INCOME TAX CONSEQUENCES

In the opinion of Orrick, Herrington & Sutcliffe LLP, based on the application of existing law and assuming compliance with the Indenture, the Trust Agreement and other related documents, and based in part on the facts set forth in this prospectus supplement and additional information and representations, for federal income tax purposes the Offered Notes will be characterized as indebtedness to a Noteholder to the extent they are issued to parties unrelated to the owner of the owner trust certificates.  Under the Indenture, the Issuing Entity, the Indenture Trustee and the Noteholders will agree to treat the Offered Notes as indebtedness for federal, state and local income and franchise tax purposes (assuming such Offered Notes are issued to parties unrelated to the owner of the owner trust certificates).

In the opinion of Orrick, Herrington & Sutcliffe LLP, assuming compliance with the agreements, for U.S. federal income tax purposes, despite the fact that the Trust will be classified as a TMP, the Trust will not be subject to federal income tax as long as an entity that qualifies as a REIT under the Code holds, directly or indirectly, through one or more qualified REIT subsidiaries, or wholly-owned entities treated as "disregarded entities" under the Code, a 100% ownership interest in the Owner Trust Certificates.

The Sponsor will hold, through a wholly-owned qualified REIT subsidiary or wholly-owned entity disregarded for federal income tax purposes, a 100% ownership interest in the Owner Trust Certificates.  The Sponsor filed with its federal income tax return for its taxable year ended December 31, 2006 an election to be a REIT, and that at the time of such filing it was organized in conformity with the

requirements for REIT qualification set forth in the Code, and will continue to operate in a manner that enables it to qualify as a REIT and that it will not undertake any action that would cause the Trust to be subject to federal income tax.  In rendering its opinion, Orrick, Herrington & Sutcliffe LLP has not independently verified the Sponsor's qualification as a REIT, but instead has relied solely upon representations made by the Sponsor concerning its REIT status.  If the Sponsor were to fail to qualify as a REIT while it or its subsidiary owns the Owner Trust Certificates, the Trust could become subject to federal income tax as a corporation and would not be allowed to file a consolidated federal income tax return with any other corporation.  A tax imposed upon the Trust could reduce cash flow that would otherwise be available to make payments on the Offered Notes.  The Trust Agreement sets forth restrictions on the transferability of the Owner Trust Certificates to ensure that it will only be held by a REIT or a qualified REIT subsidiary.  As an entity that is disregarded as separate from its owner for federal income tax purposes, the Trust is effectively treated as a part of the Sponsor for federal income tax purposes.  Therefore, Offered Notes held by the Sponsor or a "qualified REIT subsidiary" of the Sponsor are not treated as having been issued or as being outstanding for federal income tax purposes so long as they continue to be so held.  In the event any Offered Notes are held by the Sponsor or a "qualified REIT subsidiary" of the Sponsor, such Offered Notes will not be characterized as debt or equity until any such Notes are issued or sold to other parties.  If such classes of Offered Notes were not characterized as debt for federal income tax purposes at a time they were so issued or sold (for example, as a result of the credit quality of any such Offered Notes having deteriorated to the point that they were properly characterized as representing equity interests in the Trust at the time when they were issued or sold), the Trust would no longer be treated as wholly-owned by the Sponsor or as a "qualified REIT subsidiary", resulting in the adverse tax consequences discussed above.  The remainder of this discussion assumes that the Offered Notes are properly characterized as debt instruments for federal income tax purposes.

The Offered Notes may be treated as having been issued with "original issue discount" ("OID"). See "*Material Federal Income Tax Considerations*" in the accompanying prospectus.

The Internal Revenue Service (the "IRS") has issued regulations (the "OID Regulations") under Sections 1271 to 1275 of the Code generally addressing the treatment of debt instruments issued with original issue discount. Purchasers of the Offered Notes should be aware that the OID Regulations do not adequately address certain issues relevant to, or are not applicable to, prepayable securities such as the Offered Notes. Because of the uncertainty concerning the application of Section 1272(a)(6) of the Code to such notes and because the rules of the OID Regulations relating to debt instruments having an adjustable rate of interest are limited in their application in ways that could preclude their application to such notes even in the absence of Section 1272(a)(6) of the Code, the IRS could assert that the Offered Notes should be treated as issued with, or issued with a different amount of, original issue discount, as applicable, or should be governed by the rules applicable to debt instruments having contingent payments or by some other method not yet set forth in regulations. Until the Treasury issues guidance to the contrary, the trustee intends to base its computation of original issue discount on Section 1272(a)(6) of the Code and the OID Regulations as described in the accompanying prospectus. See "*Material Federal Income Tax Considerations*" in the accompanying prospectus.  Prospective purchasers of the Offered Notes are advised to consult their tax advisors concerning the tax treatment of the Offered Notes.

The Offered Notes will not be treated as assets described in Section 7701(a)(19)(C) of the Code or "real estate assets" under Section 856(c)(4)(A) of the Code. In addition, interest on the Offered Notes will not be treated as "interest on obligations secured by mortgages on real property" under Section 856(c)(3)(B) of the Code. The Offered Notes also will not be treated as "qualified mortgages" under Section 860G(a)(3)(C) of the Code.

Prospective investors in the Offered Notes should see "*Material Federal Income Tax Considerations*" and "*State and Local Tax Considerations*" in the accompanying prospectus for a

discussion of the application of federal income and state and local tax laws to the Issuing Entity and purchasers of the Offered Notes.

## SECONDARY MARKET

There can be no assurance that a secondary market for the Offered Notes will develop or, if it does develop, that it will continue. The primary source of information available to investors concerning the Offered Notes will be the monthly statements discussed in the accompanying prospectus under "*Description of the Securities—Reports to Securityholders*" in the accompanying prospectus, which will include information as to the Note Principal Balance of the Offered Notes and the status of the applicable form of credit enhancement. There can be no assurance that any additional information regarding the Offered Notes will be available through any other source. In addition, the Depositor is not aware of any source through which price information about the Offered Notes will be generally available on an ongoing basis. The limited nature of information regarding the Offered Notes may adversely affect the liquidity of the Offered Notes, even if a secondary market for the Offered Notes becomes available.

## LEGAL OPINIONS

Legal matters relating to the Offered Notes will be passed upon for the Depositor and the Underwriter by Orrick, Herrington & Sutcliffe LLP, Los Angeles, California and for the Sponsor and the Seller by Thacher Proffitt & Wood LLP, New York, New York.

## RATINGS

It is a condition to the issuance of each class of Offered Notes that it receives at least the ratings set forth below from S&P and Moody's.

|          | Rating |           |
|----------|:------:|:---------:|
|          | **S&P** | **Moody's** |
| 1-A-1 ..... | AAA | Aaa |
| 2-A-1 ..... | AAA | Aaa |
| 2-A-2 ..... | AAA | Aaa |
| 2-A-3 ..... | AAA | Aaa |
| 2-A-4 ..... | AAA | Aaa |
| M-1 ........ | AA+ | Aa1 |
| M-2 ........ | AA+ | Aa2 |
| M-3 ........ | AA | Aa3 |
| M-4 ........ | AA | A1 |
| M-5 ........ | AA- | A2 |
| M-6 ........ | A+ | A3 |
| M-7-A ... | A | Baa1 |
| M-7-B .... | A | Baa1 |
| M-8-A ... | BBB+ | Baa2 |
| M-8-B .... | BBB+ | Baa2 |
| M-9 ........ | BBB | Baa3 |
| M-10 ...... | BBB- | NR |

The ratings of S&P and Moody's assigned to asset-backed notes address the likelihood of the receipt by Noteholders of all payments to which the Noteholders are entitled. The rating process addresses structural and legal aspects associated with the Offered Notes, including the nature of the underlying mortgage loans. The ratings assigned to asset-backed notes do not represent any assessment of the

likelihood that Principal Prepayments will be made by the mortgagors or the degree to which the rate and timing Principal Prepayments will differ from that originally anticipated, the payment of any Basis Risk Shortfall Amount or the anticipated yields in light of prepayments. The ratings do not address the possibility that Noteholders might suffer a lower than anticipated yield due to non-credit events or the likelihood of receipt of any payments under the interest rate cap agreement.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each security rating should be evaluated independently of any other security rating. In the event that the ratings initially assigned to the Offered Notes are subsequently lowered for any reason, no person or entity is obligated to provide any additional credit support or credit enhancement with respect to the Offered Notes.

The Depositor has not requested that any rating agency rate any class of the Offered Notes other than as stated above. However, there can be no assurance as to whether any other rating agency will rate any class of the Offered Notes, or, if it does, what rating would be assigned by any other rating agency. A rating on any class of the Offered Notes by another rating agency, if assigned at all, may be lower than the ratings assigned to the Offered Notes as stated above.

The Rating Agencies have stated that it is their standard policy to monitor ratings on publicly offered securities for which a rating has been provided, as to each rating agency rating each class of Offered Notes in accordance with the Rating Agencies' particular surveillance policies, unless the Issuing Entity requests a rating without surveillance. A rating agency will monitor the rating it issues on an ongoing basis and may update the rating after conducting its regular review of the Issuing Entity's creditworthiness or after conducting a review of the status of the rating upon becoming aware of any information that might reasonably be expected to result in a change of rating. The Depositor has not requested that any rating agency not monitor their ratings of the Offered Notes, and the Depositor has not requested that any rating agency use any monitoring procedures other than their standard monitoring procedures.

## METHOD OF DISTRIBUTION

Subject to the terms and conditions set forth in the underwriting agreement, the Depositor has agreed to sell, and the Underwriter has agreed to purchase the Offered Notes (other than the Class M-7-B, Class M-8-B, Class M-9 and Class M-10 Notes) (collectively, the "Underwritten Notes"). The Class M-7-B, Class M-8-B, Class M-9 and Class M-10 Notes will not be purchased by the Underwriter but will be transferred to the Seller on the Closing Date as partial consideration for the sale of the mortgage loans to the Depositor. The Underwriter is obligated to purchase all Underwritten Notes of the respective classes offered by this prospectus supplement if it purchases any. The Underwriter is an affiliate of the Depositor and the Derivatives Provider.

Distribution of the Offered Notes will be made from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale. Proceeds to the Depositor from the sale of the Underwritten Notes, before deducting expenses payable by the Depositor, will be approximately 99.66% of the aggregate initial Note Principal Balance of the Underwritten Notes but before deducting expenses payable by the Depositor in connection Underwritten Notes which are estimated to be $800,000.00. In connection with the purchase and sale of the Underwritten Notes, the Underwriter may be deemed to have received compensation from the Depositor in the form of underwriting discounts.

The Underwritten Notes are offered subject to receipt and acceptance by the Underwriter, to prior sale and to the Underwriter's right to reject any order in whole or in part and to withdraw, cancel

or modify the offer without notice. It is expected that delivery of the Underwritten Certificates will be made through the facilities of DTC, Clearstream, Luxembourg and the Euroclear System and that delivery of each other class of Underwritten Notes will be made at the offices of the Underwriter, in each case, on or about the Closing Date.

The underwriting agreement provides that the Depositor will indemnify the Underwriter against certain civil liabilities, including liabilities under the Securities Act of 1933, as amended.

## LEGAL INVESTMENT

The Offered Notes will not constitute "mortgage related securities" for purposes of SMMEA.

Institutions whose investment activities are subject to review by certain regulatory authorities hereafter may be or may become subject to restrictions on investment in the Offered Notes, and such restrictions may be retroactively imposed. The Federal Financial Institutions Examination Council, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Office of Thrift Supervision, or OTS, and the National Credit Union Administration, or NCUA, have adopted guidelines, and have proposed policies, regarding the suitability of investments in various types of derivative mortgage-backed securities, including securities such as the Offered Notes.

For example, on April 23, 1998, the Federal Financial Institutions Examination Council issued a revised supervisory policy statement, referred to as the 1998 Policy Statement, applicable to all depository institutions, setting forth guidelines for investments in "high-risk mortgage securities." The 1998 Policy Statement has been adopted by the Federal Reserve Board, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the NCUA and the OTS. The 1998 Policy Statement rescinds a 1992 policy statement that had required, prior to purchase, a depository institution to determine whether a mortgage derivative product that it is considering acquiring is high-risk, and, if so, that the proposed acquisition would reduce the institution's overall interest rate risk. In addition, The 1998 Policy Statement eliminates former constraints on investing in certain "high-risk" mortgage derivative products and substitutes broader guidelines for evaluating and monitoring investment risk. In addition, the NCUA has issued regulations governing federal credit union investments which prohibit investment in certain specified types of securities, which may include the Offered Notes. The NCUA has indicated that its regulations will take precedence over the Policy Statement. Similar policy statements and regulations have been issued by other regulators having jurisdiction over other types of depository institutions.

The OTS has issued Thrift Bulletin 73a, or TB 73a, entitled "Investing in Complex Securities", effective December 18, 2001 and applies to savings associations regulated by the OTS, and Thrift Bulletin 13a, or TB 13a, entitled "Management of Interest Rate Risk, Investment Securities, and Derivatives Activities", effective December 1, 1998, which is applicable to thrift institutions regulated by the OTS.

TB 73a requires savings associations, prior to taking any investment position, to determine that the investment position meets applicable regulatory and policy requirements and internal guidelines, is suitable for the institution, and is safe and sound. The OTS recommends, with respect to purchases of specific securities, additional analysis, including, among others, analysis of repayment terms, legal structure, expected performance of the Issuing Entity and any underlying assets as well as analysis of the effects of payment priority, with respect to a security which is divided into separate tranches with unequal payments, and collateral investment parameters, with respect to a security that is prefunded or involves a revolving period. TB 73a reiterates the OTS's due diligence requirements for investing in all securities and warns that if a savings association makes an investment that does not meet the applicable regulatory

requirements, the savings association's investment practices will be subject to criticism, and the OTS may require divestiture of such securities. The OTS also recommends, with respect to an investment in any "complex securities," that savings associations should take into account quality and suitability, interest rate risk, and classification factors. For the purposes of each of TB 73a and TB 13a, "complex security" includes, among other things, any collateralized mortgage obligation or real estate mortgage investment conduit security, other than any "plain vanilla" mortgage note interest security (that is, securities that are part of a single class of securities in the related pool that are non-callable and do not have any special features). Accordingly, all classes of Offered Notes would likely be viewed as "complex securities." With respect to quality and suitability factors, TB 73a warns (i) that a savings association's sole reliance on outside ratings for material purchases of complex securities is an unsafe and unsound practice, (ii) that a savings association should only use ratings and analyses from nationally recognized rating agencies in conjunction with, and in validation of, its own underwriting processes, and (iii) that it should not use ratings as a substitute for its own thorough underwriting analyses. With respect the interest rate risk factor, TB 73a recommends that savings associations should follow the guidance set forth in TB 13a.

TB 13a requires thrift institutions, prior to taking any investment position, to (i) conduct a pre-purchase portfolio sensitivity analysis for any "significant transaction" involving securities or financial derivatives, and (ii) conduct a pre-purchase price sensitivity analysis of any "complex security" or financial derivative. The OTS recommends that while a thrift institution should conduct its own in-house pre-acquisition analysis, it may rely on an analysis conducted by an independent third-party as long as management understands the analysis and its key assumptions. Further, TB 13a recommends that the use of "complex securities with high price sensitivity" be limited to transactions and strategies that lower a thrift institution's portfolio interest rate risk. TB 13a warns that investment in complex securities by thrift institutions that do not have adequate risk measurement, monitoring and control systems may be viewed by OTS examiners as an unsafe and unsound practice.

The Depositor makes no representations as to the proper characterization of any class of Offered Notes for legal investment or other purposes, or as to the ability of particular investors to purchase any class of Offered Notes under applicable legal investment restrictions. These uncertainties may adversely affect the liquidity of any class of Offered Notes. Accordingly, all institutions whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their legal advisors in determining whether and to what extent any class of Offered Notes constitutes a legal investment or is subject to investment, capital or other restrictions.

See "*Legal Investment Matters*" in the accompanying prospectus.

## AVAILABLE INFORMATION

The Depositor is subject to the informational requirements of the Exchange Act and in accordance therewith files reports and other information with the Commission. Reports and other information filed by the Depositor can be inspected and copied at the Public Reference Room maintained by the Commission at 100 F Street NE, Washington, DC 20549, and its Regional Offices located as follows: Chicago Regional Office, 500 West Madison, 14th Floor, Chicago, Illinois 60661; New York Regional Office, 233 Broadway, New York, New York 10279. Copies of the material can also be obtained from the Public Reference Section of the Commission, 100 F Street NE, Washington, DC 20549, at prescribed rates and electronically through the Commission's Electronic Data Gathering, Analysis and Retrieval system at the Commission's Website (http://www.sec.gov). Information about the operation of the Public Reference Room may be obtained by calling the Securities and Exchange Commission at (800) SEC-0330. Exchange Act reports as to any series filed with the Commission will be filed under the Issuing Entity's name. The Depositor does not intend to send any financial reports to Noteholders.

The Issuing Entity's annual reports on Form 10-K (including reports of assessment of compliance with the AB Servicing Criteria, attestation reports, and statements of compliance, discussed under "*Description of the Notes*", "*Indenture—Reports to Noteholders*" "*—Evidence as to Compliance*" in this prospectus supplement, required to be filed under Regulation AB), periodic distribution reports on Form 10-D, certain current reports on Form 8-K and amendments to those reports prepared by the Securities Administrator and filed by it with the Commission will be posted on the Securities Administrator's internet website as soon as reasonably practicable after it has been electronically filed with, or furnished to, the Commission. The address of the website is: www.ctslink.com.

## ERISA CONSIDERATIONS

ERISA and Section 4975 of the Code impose certain requirements on Plans and on persons who are fiduciaries with respect to such Plans. Any Plan fiduciary which proposes to cause a Plan to acquire any of the Offered Notes would be required to determine whether such an investment is permitted under the governing Plan instruments and is prudent and appropriate for the Plan in view of its overall investment policy and the composition and diversification of its portfolio. The DOL (as defined in the accompanying prospectus) has promulgated the DOL Regulations defining the term "Plan Assets" for purposes of applying the general fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of ERISA and Section 4975 of the Code. Under the DOL Regulations, generally, when a Plan acquires an "equity interest" in another entity (such as the Issuing Entity), the underlying assets of that entity may be considered to be Plan Assets. The DOL Regulations provide that the term "equity interest" means any interest in an entity other than an instrument which is treated as indebtedness under applicable local law and which has no "substantial equity features".

As of the date hereof, it is anticipated that the ratings of the Offered Notes and the traditional debt features of the Offered Notes should cause such notes to be treated as debt with no "substantial equity features" under the DOL Regulations. There can be no assurance given, however, that the Offered Notes are or will be treated as debt and not "equity interests" under the DOL Regulations. Moreover, the debt treatment of the Offered Notes for ERISA purposes could change subsequent to their issuance; that is, they could be treated as equity interests, if, for example, the ratings of the Offered Notes change. If the Offered Notes were to be treated as equity interests, the mortgage loans and other assets of the Issuing Entity may be considered to be Plan Assets. Because of the factual nature of certain of the above-described provisions of ERISA, the Code and the DOL Regulations, Plans or persons investing Plan Assets should carefully consider whether such an investment might constitute or give rise to a prohibited transaction under ERISA or the Code.

In addition, ERISA and the Code prohibit certain transactions involving the assets of a Plan and Parties in Interest (as defined in the accompanying prospectus) who have certain specified relationships to the Plan. Accordingly, even if the Offered Notes are treated as indebtedness under the DOL Regulations, prior to making an investment in the Offered Notes, investing Plans should determine whether the Issuing Entity, the Sponsor, the Depositor, the Underwriter, the Owner Trustee, the Indenture Trustee, the Master Servicer, the Securities Administrator, the Servicer, any other servicer, any administrator, any provider of credit support, any owner of the Offered Notes, which could be transferred subsequent to the purchase of an Offered Note by a Plan, any equity holder or any of their affiliates is a Party in Interest with respect to such Plan and, if so, whether such transaction is subject to one or more statutory, regulatory or administrative exemptions. Additionally, an investment of the assets of a Plan in certain securities may cause the assets of the issuer of those securities to be deemed "Plan Assets" of such Plan, and any person with certain specified relationships to such issuer to be deemed a Party in Interest with respect to the investing Plan.

By acquiring an Offered Note, each purchaser will be deemed to represent that either (1) it is not acquiring such note with the assets of a Plan; or (2) (A) the acquisition, holding and transfer of such note will not give rise to a nonexempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code and (B) such notes are rated investment grade or better and such person believes that the Offered Notes are properly treated as indebtedness without substantial equity features for purposes of the DOL Regulations, and agrees to so treat such notes. Alternatively, regardless of the rating of the Offered Notes, such person may provide the Securities Administrator and the Owner Trustee with an opinion of counsel, which opinion of counsel will not be at the expense of the Issuing Entity, the Sponsor, the Depositor, the Underwriter, the Owner Trustee, the Indenture Trustee, the Master Servicer, the Securities Administrator, the Servicer or any successor servicer which opines that the acquisition, holding and transfer of such Note or interest therein is permissible under applicable law, will not constitute or result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Issuing Entity, the Sponsor, the Depositor, the Underwriter, the Owner Trustee, the Indenture Trustee, the Master Servicer, the Securities Administrator, the Servicer or any successor servicer to any obligation in addition to those undertaken in the Indenture.

**ANY PLAN FIDUCIARY WHICH PROPOSES TO CAUSE A PLAN TO ACQUIRE ANY OF THE OFFERED NOTES SHOULD CONSULT WITH ITS COUNSEL WITH RESPECT TO THE POTENTIAL CONSEQUENCES UNDER ERISA AND THE CODE OF THE PLAN'S ACQUISITION AND OWNERSHIP OF SUCH NOTES.**

# GLOSSARY

**Agreements** — The Sale and Servicing Agreement, the Indenture, the Trust Agreement and the Assignment Agreement.

**Allocated Realized Loss Amount** — With respect to any class of Subordinate Notes and any Payment Date, the excess, if any, of (1) the sum of (x) the amount of the reduction in the note principal balance of that class of Subordinate Notes on the applicable Payment Date attributable to the allocation of realized losses as described under "Description of the Notes – Allocation of Realized Losses" and (y) the amount of any such reductions on prior Payment Dates over (2) the sum of (x) the amount distributed in respect of the related Allocated Realized Loss Amount to such class on prior Payment Dates and (y) the amount of any increases in the note principal balance of such class of Subordinate Notes resulting from subsequent recoveries.

**Assignment Agreement** — The Assignment and Recognition Agreement, among the Originator, the Seller and the Depositor relating to the sale of the Mortgage Loans from the Seller to the Depositor.

**Available Funds** — For any Payment Date, the sum of (1) Interest Remittance Amount for that Payment Date and (2) the Principal Remittance Amount for that Payment Date.

**Available Funds Rate** — With respect to any Payment Date and the Group 1 Notes, a per annum rate equal to the product of (i) the excess, if any, of (a) the weighted average of the Net Rates on the mortgage loans included in Loan Group 1 (weighted on the basis of the related Loan Balance as of the first day of the related Due Period, adjusted to reflect unscheduled payments of principal received thereon after such date and included in the Principal Distribution Amount on the immediately preceding Payment Date) over (b) the Swap Expense Fee Rate and (ii) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related interest period and (iii) a fraction the numerator of which is the aggregate Loan Balance of the Mortgage Loans as of the first day of the related Due Period adjusted to reflect unscheduled payments of principal received thereon after such date and included in the Principal Distribution Amount on the immediately preceding Payment Date and the denominator of which is the aggregate note principal balance of the Notes immediately prior to such Payment Date.

With respect to any Payment Date and the Group 2 Notes, a per annum rate equal to the product of (i) the excess, if any, of (a) the weighted average of the Net Rates on the mortgage loans included in Loan Group 2 (weighted on the basis of the related Loan Balance as of the first day of the related Due Period, adjusted to reflect unscheduled payments of principal received thereon after such date and included in the Principal Distribution Amount on the immediately preceding Payment Date) over (b) the Swap Expense Fee Rate and (ii) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related interest period and (iii) a fraction the numerator of which is the aggregate Loan Balance of the mortgage loans as of the first day of the related Due Period adjusted to reflect unscheduled payments of principal received thereon after such date and included in the Principal Distribution Amount on the immediately preceding Payment Date and the denominator of which is the aggregate note principal balance of the Notes immediately prior to such Payment Date.

With respect to any Payment Date and the Subordinate Notes, a per annum rate equal to the product of (i) the excess, if any, of (a) the weighted average of the Net Rates on the mortgage loans (weighted on the basis of the related Loan Balance as of the first day of the related Due Period, adjusted to reflect unscheduled payments of principal received thereon after such date and included in the Principal Distribution Amount on the immediately preceding Payment Date) over (b) the Swap Expense Fee Rate and (ii) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related interest period and (iii) a fraction the numerator of which is the aggregate Loan

Balance of the mortgage loans as of the first day of the related Due Period after giving effect to principal prepayments received during the Prepayment Period ending during that Due Period and the denominator of which is the aggregate note principal balance of the Notes immediately prior to such Payment Date.

**Bankruptcy Loss** — Any loss resulting from a bankruptcy court, in connection with a personal bankruptcy of a mortgagor, (1) establishing the value of a mortgaged property at an amount less than the Loan Balance of the mortgage loan secured by such mortgaged property or (2) reducing the amount of the monthly payment on the related mortgage loan.

**Basis Risk Shortfall Amount** — On any Payment Date, and with respect to any class of Offered Note, an amount equal to the sum of (A) excess of the (i) interest accrued at the related Note Interest Rate (without giving effect to the related Available Funds Rate) over (ii) the amount of interest received on such Note based on the related Available Funds Rate, and (B) the unpaid portion of any Basis Risk Shortfall Amount from previous Payment Dates (and any interest thereon at the then applicable Note Interest Rate without giving effect to the related Available Funds Rate).

**Book-entry Notes** — The Offered Notes issued, maintained and transferred at the DTC, Clearstream, Luxembourg or the Euroclear System.

**Class Interest Carryover Shortfall** — With respect to any class of Notes and any Payment Date, an amount equal to the sum of (1) the excess of the Class Monthly Interest Amount with respect to that class for the preceding Payment Date and any outstanding Class Interest Carryover Shortfall with respect to that class from any preceding Payment Date, over the amount in respect of interest that is actually distributed to the holders of the Notes of that class on the preceding Payment Date plus (2) one month's interest on the excess, to the extent permitted by law, at the Note Rate for that class.

**Class M-1 Principal Distribution Amount**— With respect to any Payment Date, the excess of: (1) the sum of: (A) the aggregate note principal balance of the Senior Notes, after taking into account distribution of the Senior Principal Distribution Amount for that Payment Date, and (B) the Note Principal Balance of the Class M-1 Notes immediately prior to such Payment Date, over (2) the lesser of: (A) approximately 54.80% of the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period, and (B) the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period minus the OC Floor.

**Class M-2 Principal Distribution Amount**— With respect to any Payment Date, the excess of: (1) the sum of: (A) the aggregate note principal balance of the Senior Notes, after taking into account distribution of the Senior Principal Distribution Amount for the applicable Payment Date, (B) the note principal balance of the Class M-1 Notes, after taking into account distribution of the Class M-1 Principal Distribution Amount for the applicable Payment Date, and (C) the note principal balance of the Class M-2 Notes immediately prior to such Payment Date, over (2) the lesser of: (A) approximately 62.40% of the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period, and (B) the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period minus the OC Floor.

**Class M-3 Principal Distribution Amount** — With respect to any Payment Date, the excess of: (1) the sum of: (A) the aggregate note principal balance of the Senior Notes, after taking into account distribution of the Senior Principal Distribution Amount for the applicable Payment Date, (B) the note principal balance of the Class M-1 Notes, after taking into account distribution of the Class M-1 Principal

Distribution Amount for the applicable Payment Date, (C) the note principal balance of the Class M-2 Notes, after taking into account distribution of the Class M-2 Principal Distribution Amount for the applicable Payment Date, and (D) the note principal balance of the Class M-3 Notes immediately prior to such Payment Date, over (2) the lesser of:  (A) approximately 67.00% of the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period, and (B) the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period minus the OC Floor.

**Class M-4 Principal Distribution Amount** — With respect to any Payment Date, the excess of:  (1) the sum of:  (A) the aggregate note principal balance of the Senior Notes, after taking into account distribution of the Senior Principal Distribution Amount for the applicable Payment Date, (B) the note principal balance of the Class M-1 Notes, after taking into account distribution of the Class M-1 Principal Distribution Amount for the applicable Payment Date, (C) the note principal balance of the Class M-2 Notes, after taking into account distribution of the Class M-2 Principal Distribution Amount for the applicable Payment Date, (D) the note principal balance of the Class M-3 Notes, after taking into account distribution of the Class M-3 Principal Distribution Amount for the applicable Payment Date and (E) the note principal balance of the Class M-4 Notes immediately prior to such Payment Date, over (2) the lesser of:  (A) approximately 71.20% of the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period, and (B) the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period minus the OC Floor.

**Class M-5 Principal Distribution Amount** — With respect to any Payment Date, the excess of: (1) the sum of: (A) the aggregate note principal balance of the Senior Notes, after taking into account distribution of the Senior Principal Distribution Amount for the applicable Payment Date, (B) the note principal balance of the Class M-1 Notes, after taking into account distribution of the Class M-1 Principal Distribution Amount for the applicable Payment Date, (C) the note principal balance of the Class M-2 Notes, after taking into account distribution of the Class M-2 Principal Distribution Amount for the applicable Payment Date, (D) the note principal balance of the Class M-3 Notes, after taking into account distribution of the Class M-3 Principal Distribution Amount for the applicable Payment Date, (E) the note principal balance of the Class M-4 Notes, after taking into account distribution of the Class M-4 Principal Distribution Amount for the applicable Payment Date, and (F) the note principal balance of the Class M-5 Notes immediately prior to such Payment Date, over (2) the lesser of: (A) approximately 75.10% of the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period, and (B) the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period minus the OC Floor.

**Class M-6 Principal Distribution Amount** — With respect to any Payment Date, the excess of: (1) the sum of: (A) the aggregate note principal balance of the Senior Notes, after taking into account distribution of the Senior Principal Distribution Amount for the applicable Payment Date, (B) the note principal balance of the Class M-1 Notes, after taking into account distribution of the Class M-1 Principal Distribution Amount for the applicable Payment Date, (C) the note principal balance of the Class M-2 Notes, after taking into account distribution of the Class M-2 Principal Distribution Amount for the applicable Payment Date, (D) the note principal balance of the Class M-3 Notes, after taking into account distribution of the Class M-3 Principal Distribution Amount for the applicable Payment Date, (E) the note principal balance of the Class M-4 Notes, after taking into account distribution of the Class M-4 Principal Distribution Amount for the applicable Payment Date, (F) the note principal balance of the Class M-5

Notes, after taking into account distribution of the Class M-5 Principal Distribution Amount for the applicable Payment Date, and (G) the note principal balance of the Class M-6 Notes immediately prior to such Payment Date, over (2) the lesser of: (A) approximately 78.50% of the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period, and (B) the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period minus the OC Floor.

**Class M-7 Principal Distribution Amount** — With respect to any Payment Date, the excess of: (1) the sum of: (A) the aggregate note principal balance of the Senior Notes, after taking into account distribution of the Senior Principal Distribution Amount for the applicable Payment Date, (B) the note principal balance of the Class M-1 Notes, after taking into account distribution of the Class M-1 Principal Distribution Amount for the applicable Payment Date, (C) the note principal balance of the Class M-2 Notes, after taking into account distribution of the Class M-2 Principal Distribution Amount for the applicable Payment Date, (D) the note principal balance of the Class M-3 Notes, after taking into account distribution of the Class M-3 Principal Distribution Amount for the applicable Payment Date, (E) the note principal balance of the Class M-4 Notes, after taking into account distribution of the Class M-4 Principal Distribution Amount for the applicable Payment Date, (F) the note principal balance of the Class M-5 Notes, after taking into account distribution of the Class M-5 Principal Distribution Amount for the applicable Payment Date, (G) the note principal balance of the Class M-6 Notes, after taking into account distribution of the Class M-6 Principal Distribution Amount for the applicable Payment Date, and (H) the note principal balance of the Class M-7 Notes immediately prior to such Payment Date, over (2) the lesser of: (A) approximately 81.70% of the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period, and (B) the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period minus the OC Floor.

**Class M-8 Principal Distribution Amount** — With respect to any Payment Date, the excess of: (1) the sum of: (A) the aggregate note principal balance of the Senior Notes, after taking into account distribution of the Senior Principal Distribution Amount for the applicable Payment Date, (B) the note principal balance of the Class M-1 Notes, after taking into account distribution of the Class M-1 Principal Distribution Amount for the applicable Payment Date, (C) the note principal balance of the Class M-2 Notes, after taking into account distribution of the Class M-2 Principal Distribution Amount for the applicable Payment Date, (D) the note principal balance of the Class M-3 Notes, after taking into account distribution of the Class M-3 Principal Distribution Amount for the applicable Payment Date, (E) the note principal balance of the Class M-4 Notes, after taking into account distribution of the Class M-4 Principal Distribution Amount for the applicable Payment Date, (F) the note principal balance of the Class M-5 Notes, after taking into account distribution of the Class M-5 Principal Distribution Amount for the applicable Payment Date, (G) the note principal balance of the Class M-6 Notes, after taking into account distribution of the Class M-6 Principal Distribution Amount for the applicable Payment Date, (H) the note principal balance of the Class M-7 Notes, after taking into account distribution of the Class M-7 Principal Distribution Amount for the applicable Payment Date, and (I) the note principal balance of the Class M-8 Notes immediately prior to such Payment Date, over (2) the lesser of: (A) approximately 84.60% of the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period, and (B) the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period minus the OC Floor.

**Class M-9 Principal Distribution Amount** — With respect to any Payment Date, the excess of: (1) the sum of: (A) the aggregate note principal balance of the Senior Notes, after taking into account distribution of the Senior Principal Distribution Amount for the applicable Payment Date, (B) the note principal balance of the Class M-1 Notes, after taking into account distribution of the Class M-1 Principal Distribution Amount for the applicable Payment Date, (C) the note principal balance of the Class M-2 Notes, after taking into account distribution of the Class M-2 Principal Distribution Amount for the applicable Payment Date, (D) the note principal balance of the Class M-3 Notes, after taking into account distribution of the Class M-3 Principal Distribution Amount for the applicable Payment Date, (E) the note principal balance of the Class M-4 Notes, after taking into account distribution of the Class M-4 Principal Distribution Amount for the applicable Payment Date, (F) the note principal balance of the Class M-5 Notes, after taking into account distribution of the Class M-5 Principal Distribution Amount for the applicable Payment Date, (G) the note principal balance of the Class M-6 Notes, after taking into account distribution of the Class M-6 Principal Distribution Amount for the applicable Payment Date, (H) the note principal balance of the Class M-7 Notes, after taking into account distribution of the Class M-7 Principal Distribution Amount for the applicable Payment Date, (I) the note principal balance of the Class M-8 Notes, after taking into account distribution of the Class M-8 Principal Distribution Amount for the applicable Payment Date, and (J) the note principal balance of the Class M-9 Notes immediately prior to such Payment Date, over (2) the lesser of: (A) approximately 87.20% of the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period, and (B) the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period minus the OC Floor.

**Class M-10 Principal Distribution Amount** — With respect to any Payment Date, the excess of: (1) the sum of: (A) the aggregate note principal balance of the Senior Notes, after taking into account distribution of the Senior Principal Distribution Amount for the applicable Payment Date, (B) the note principal balance of the Class M-1 Notes, after taking into account distribution of the Class M-1 Principal Distribution Amount for the applicable Payment Date, (C) the note principal balance of the Class M-2 Notes, after taking into account distribution of the Class M-2 Principal Distribution Amount for the applicable Payment Date, (D) the note principal balance of the Class M-3 Notes, after taking into account distribution of the Class M-3 Principal Distribution Amount for the applicable Payment Date, (E) the note principal balance of the Class M-4 Notes, after taking into account distribution of the Class M-4 Principal Distribution Amount for the applicable Payment Date, (F) the note principal balance of the Class M-5 Notes, after taking into account distribution of the Class M-5 Principal Distribution Amount for the applicable Payment Date, (G) the note principal balance of the Class M-6 Notes, after taking into account distribution of the Class M-6 Principal Distribution Amount for the applicable Payment Date, (H) the note principal balance of the Class M-7 Notes, after taking into account distribution of the Class M-7 Principal Distribution Amount for the applicable Payment Date, (I) the note principal balance of the Class M-8 Notes, after taking into account distribution of the Class M-8 Principal Distribution Amount for the applicable Payment Date, (J) the note principal balance of the Class M-9 Notes, after taking into account distribution of the Class M-9 Principal Distribution Amount for the applicable Payment Date, and (K) the note principal balance of the Class M-10 Notes immediately prior to such Payment Date, over (2) the lesser of: (A) approximately 90.50% of the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period, and (B) the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period minus the OC Floor.

**Class Monthly Interest Amount** — With respect to any class of Offered Notes and any Payment Date, the amount of interest accrued during the related Interest Accrual Period at the applicable Note Interest Rate on the Note Principal Balance of such Note immediately prior to such Payment Date. Class Monthly

Interest Amount on the Notes will be calculated on the basis of the actual number of days in the related Interest Accrual Period and a 360-day year.

**Compensating Interest Payments** — Any payments made by the Master Servicer or the Servicer from its own funds to cover Prepayment Interest Shortfalls.

**Coupon Step-Up Date** — Each Payment Date on which the aggregate Loan Balance of the Mortgage Loans and REO Properties is equal to or less than 10% of the aggregate Loan Balance of the Mortgage Loans as of the Cut-off Date.

**CPR** — A constant rate of prepayment on the mortgage loans.

**Cumulative Loss Trigger Event** — Shall have occurred with respect to any Payment Date, if the fraction, expressed as a percentage, obtained by dividing (x) the aggregate amount of realized losses incurred on the Mortgage Loans from the Cut-Off Date through the last day of the related Due Period (less the aggregate amount of subsequent recoveries with respect to the Mortgage Loans during such period) by (y) the aggregate Loan Balance of the Mortgage Loans as of the Cut-Off Date, exceeds the applicable percentages described below with respect to such Payment Date:

| Payment Date | Loss Percentage |
|---|---|
| July 2009 to June 2010 | 1.85% for the first month, plus an additional 1/12th of 2.25% for each month thereafter. |
| July 2010 to June 2011 | 4.10% for the first month, plus an additional 1/12th of 2.35% for each month thereafter. |
| July 2011 to June 2012 | 6.45% for the first month, plus an additional 1/12th of 1.90% for each month thereafter. |
| July 2012 to June 2013 | 8.35% for the first month, plus an additional 1/12th of 0.90% for each month thereafter. |
| July 2013 and thereafter | 9.25% |

**Custodian** — Wells Fargo Bank, N.A. and its successors and assigns or any successor Custodian appointed pursuant to the terms of the Sale and Servicing Agreement.

**Cut-off Date** — June 1, 2007.

**Delinquency Amount** — With respect to any Due Period, the sum, without duplication, of the aggregate principal balance of the Mortgage Loans that are (1) 60 or more days delinquent, (2) 60 or more days delinquent and in bankruptcy, (3) in foreclosure and (4) REO properties, each as of the last day of such Due Period.

**Delinquency Event** — Shall have occurred and be continuing if on any Payment Date, the 60+ Delinquency Percentage (Rolling Three Month) for that Payment Date exceeds 29.52% of the Senior Enhancement Percentage for the prior Payment Date.

**Depositor** — Bear Stearns Asset Backed Securities I LLC.

**Determination Date** — With respect to any Payment Date and the mortgage loans the date specified in the Indenture.

**Due Date** — With respect to each mortgage loan, the date in each month on which its Monthly Payment is due if such due date is the first day of a month and otherwise is deemed to be the first day of the following month or such other date specified in the Sale and Servicing Agreement.

**Due Period** — With respect to any Payment Date, the period commencing on the second day of the month immediately preceding the month in which such Payment Date occurs and ending on the first day of the month in which such Payment Date occurs.

**Event of Default** — Any one of the following: (a) the failure by the Issuing Entity to pay Class Monthly Interest Amount on any class of Class A Notes (or if the Note Principal Balance of the Class A Notes has been reduced to zero, the most senior class of Notes outstanding) on any Payment Date and such default continues for the time period specified in the Indenture; (b) the failure by the Issuing Entity on the final scheduled Payment Date to pay all Class Monthly Interest Amount of any class of Notes, all remaining Basis Risk Shortfall Amount of the Class A Notes and reduce the Note Principal Balances of any class of Notes to zero; (c) a default by the Issuing Entity in the observance of certain negative covenants or covenant in the Indenture or any representation or warranty made by the Issuing Entity in the Indenture or in any Note or other writing delivered pursuant thereto having been incorrect in a material respect as of the time made, and the continuation of any such default for a period of thirty days after notice to the Issuing Entity by the Indenture Trustee or by the Holders of at least 25% of the aggregate Note Principal Balance of the Notes, as applicable; or (d) certain events of bankruptcy, insolvency, receivership or reorganization of the Issuing Entity.

**Excess Interest** — With respect to any Payment Date, the amounts remaining, if any, after the application of payments pursuant to clauses A through E under "Description of the Notes – Payments on the Notes" above.

**Excess Overcollateralization Amount** — With respect to any Payment Date, the lesser of (1) the Principal Remittance Amount for the Payment Date and (2) the excess, if any, of (x) the Overcollateralization Amount, assuming 100% of the Principal Remittance Amount is distributed on the Notes, over (y) the Required Overcollateralization Amount.

**Group 1 Allocation Percentage** — With respect to any Payment Date, a fraction expressed as a percentage, the numerator of which is the Group 1 Principal Remittance Amount for that Payment Date and the denominator of which is the Principal Remittance Amount for that Payment Date.

**Group 1 Interest Remittance Amount** — With respect to a Payment Date and Loan Group 1 will generally be equal to (A) the sum, without duplication, of (i) all scheduled interest received on the mortgage loans in Loan Group 1 during the related Due Period, less the Servicing Fee and Master Servicing Fee for such mortgage loans, (ii) the interest portion of all Monthly Advances for such Payment Date on the Group 1 Mortgage Loans, (iii) all Compensating Interest for such Payment Date related to the Group 1 Mortgage Loans, (iv) Liquidation Proceeds and Subsequent Recoveries received during the related Prepayment Period, to the extent such Liquidation Proceeds and Subsequent Recoveries related to interest on the Group 1 Mortgage Loans and less all non-recoverable advances relating to interest and certain expenses on the Group 1 Mortgage Loans reimbursed during the related Prepayment Period, (v) the interest portion of proceeds of the repurchase of any Group 1 Mortgage Loans during the related Due Period, and (vi) such Loan Group's pro rata share (based on the aggregate Loan Balance) of the interest portion of the purchase price of the assets of the Issuing Entity upon exercise on such Payment Date by the majority holder of the owner trust certificates of its optional redemption right, minus (B) the sum of (i) amounts payable or reimbursable to the Servicer, the Master Servicer, the Securities Administrator, the Indenture Trustee and the Custodian during the related Due Period as provided in the Indenture to the extent related to such Loan Group and (ii) the product of (1) the sum of (x) such reimbursement or

payments to the Servicer, the Master Servicer, the Securities Administrator, the Indenture Trustee and the Custodian during the related Due Period as provided in the Indenture and not related to a Loan Group and (y) any Net Swap Payment or Swap Termination Payment owed to the Swap Provider (other than any swap termination payment resulting from a swap provider trigger event) on such Payment Date and (2) a fraction, the numerator of which is the amount of interest collected or advanced in respect of the Group 1 Mortgage Loans for such Payment Date and the denominator of which is the amount of interest collected or advanced in respect of the Group 1 Mortgage Loans and Group 2 Mortgage Loans for such Payment Date.

**Group 1 Mortgage Loans** — The mortgage loans included in Loan Group 1.

**Group 1 Notes** — The Class 1-A-1 Notes.

**Group 1 Principal Remittance Amount** — With respect to a Payment Date and Loan Group 1, will generally be equal to (A) the sum, without duplication, of (i) the scheduled principal collected on the mortgage loans in the related Loan Group during the related Due Period or advanced by the Servicer or Master Servicer, (ii) prepayments of principal in respect of the Group 1 Mortgage Loans, exclusive of any prepayment charges, collected in the related Prepayment Period, (iii) the Outstanding Principal Balance received with respect to each Group 1 Mortgage Loan that was repurchased by the Originator and the amount, if any, by which the aggregate unpaid principal balance of any replacement mortgage loans in the Loan Group 1 is less than the aggregate unpaid principal balance of any deleted mortgage loans in the Loan Group 1 delivered by the Originator in connection with a substitution of a mortgage loan in the related Loan Group, (iv) all Liquidation Proceeds and Subsequent Recoveries collected during the related Prepayment Period on the Group 1 Mortgage Loans, to the extent such Liquidation Proceeds and Subsequent Recoveries relate to principal, less all non-recoverable advances relating to principal reimbursed during the related Due Period, and (v) such Loan Group's pro rata share (based on the aggregate Loan Balance) of the principal portion of the purchase price of the assets of the Issuing Entity upon the exercise by the majority holder of the owner trust certificates of its optional redemption right; minus (B) the amount by which the sum of (i) amounts payable or reimbursable to the Servicer, the Master Servicer, the Securities Administrator, the Indenture Trustee and the Custodian during the related Due Period as provided in the Indenture to the extent related to such Loan Group including all non-recoverable advances relating to interest and certain expenses reimbursed during the related Prepayment Period and (ii) the product of (1) the sum of (x) such reimbursement or payments to the Servicer, the Master Servicer, the Securities Administrator, the Indenture Trustee and the Custodian during the related Due Period as provided in the Indenture and not related to a Loan Group and (y) any Net Swap Payment or Swap Termination Payment owed to the Swap Provider (other than any swap termination payment resulting from a swap provider trigger event) on such Payment Date and (2) a fraction, the numerator of which is the amount of interest collected or advanced in respect of the Group 1 Mortgage Loans for such Payment Date and the denominator of which is the amount of interest collected or advanced in respect of the Group 1 Mortgage Loans and Group 2 Mortgage Loans for such Payment Date exceed the Group 1 Interest Remittance Amount for such Payment Date.

**Group 1 Principal Distribution Amount** – The product of (i) the Principal Distribution Amount for that Payment Date and (ii) the Group 1 Allocation Percentage.

**Group 1 Senior Principal Distribution Amount** — With respect to any Payment Date, the excess, if any, of (1) the aggregate note principal balances of the Group 1 Notes immediately prior to that Payment Date over (i) the lesser of (a) approximately 47.00% of the aggregate Loan Balance of the Group 1 Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period and (b) the aggregate Loan Balance of the Group 1 Mortgage Loans as of the last date of the related Due Period and after giving effect to principal

prepayments received during the related Prepayment Period minus 0.50% of the aggregate Loan Balance of the Group 1 Mortgage Loans as of the Cut-Off Date.

**Group 2 Allocation Percentage** — With respect to any Payment Date, a fraction expressed as a percentage, the numerator of which is the Group 2 Principal Remittance Amount for that Payment Date and the denominator of which is the  Principal Remittance Amount for that Payment Date.

**Group 2 Interest Remittance Amount** — With respect to a Payment Date and Loan Group 2 will generally be equal to (A) the sum, without duplication, of (i) all scheduled interest received on the mortgage loans in Loan Group 2 during the related Due Period, less the Servicing Fee and Master Servicing Fee for such mortgage loans, (ii) the interest portion of all Monthly Advances for such Payment Date on the Group 2 Mortgage Loans, (iii) all Compensating Interest for such Payment Date related to the Group 2 Mortgage Loans, (iv) Liquidation Proceeds and Subsequent Recoveries received during the related Prepayment Period, to the extent such Liquidation Proceeds and Subsequent Recoveries related to interest on the Group 2 Mortgage Loans and less all non-recoverable advances relating to interest and certain expenses on the Group 1 Mortgage Loans reimbursed during the related Prepayment Period, (v) the interest portion of proceeds of the repurchase of any Group 2 Mortgage Loans during the related Due Period, and (vi) such Loan Group's pro rata share (based on the aggregate Loan Balance) of the interest portion of the purchase price of the assets of the Issuing Entity upon exercise on such Payment Date by the majority holder of the owner trust certificates of its optional redemption right, minus (B) the sum of (i) amounts payable or reimbursable to the Servicer, the Master Servicer, the Securities Administrator, the Indenture Trustee and the Custodian during the related Due Period as provided in the Indenture to the extent related to such Loan Group and (ii) the product of (1) the sum of (x) such reimbursement or payments to the Servicer, the Master Servicer, the Securities Administrator, the Indenture Trustee and the Custodian during the related Due Period as provided in the Indenture and not related to a Loan Group and (y) any Net Swap Payment or Swap Termination Payment owed to the Swap Provider (other than any swap termination payment resulting from a swap provider trigger event) on such Payment Date and (2) a fraction, the numerator of which is the amount of interest collected or advanced in respect of the Group 2 Mortgage Loans for such Payment Date and the denominator of which is the amount of interest collected or advanced in respect of the Group 1 Mortgage Loans and Group 2 Mortgage Loans for such Payment Date.

**Group 2 Mortgage Loans** — The mortgage loans included in Loan Group 2.

**Group 2 Notes** — The Class 2-A-1, Class 2-A-2, Class 2-A-3 and Class 2-A-4 Notes.

**Group 2 Principal Distribution Amount** – The product of (i) the Principal Distribution Amount for that Payment Date and (ii) the Group 2 Allocation Percentage.

**Group 2 Principal Remittance Amount** — With respect to a Payment Date and Loan Group 2, will generally be equal to (A) the sum, without duplication, of (i) the scheduled principal collected on the mortgage loans in the related Loan Group during the related Due Period or advanced by the Servicer or Master Servicer, (ii) prepayments of principal in respect of the Group 2 Mortgage Loans, exclusive of any prepayment charges, collected in the related Prepayment Period, (iii) the Outstanding Principal Balance received with respect to each Group 2 Mortgage Loan that was repurchased by the Originator and the amount, if any, by which the aggregate unpaid principal balance of any replacement mortgage loans in the Loan Group 2 is less than the aggregate unpaid principal balance of any deleted mortgage loans in the Loan Group 2 delivered by the Originator in connection with a substitution of a mortgage loan in the related Loan Group, (iv) all Liquidation Proceeds and Subsequent Recoveries collected during the related Prepayment Period on the Group 2 Mortgage Loans, to the extent such Liquidation Proceeds and Subsequent Recoveries relate to principal, less all non-recoverable advances relating to principal

reimbursed during the related Due Period, and (v) such Loan Group's pro rata share (based on the aggregate Loan Balance) of the principal portion of the purchase price of the assets of the Issuing Entity upon the exercise by the majority holder of the owner trust certificates of its optional redemption right; minus (B) the amount by which the sum of (i) amounts payable or reimbursable to the Servicer, the Master Servicer, the Securities Administrator, the Indenture Trustee and the Custodian during the related Due Period as provided in the Indenture to the extent related to such Loan Group including all non-recoverable advances relating to interest and certain expenses reimbursed during the related Prepayment Period and (ii) the product of (1) the sum of (x) such reimbursement or payments to the Servicer, the Master Servicer, the Securities Administrator, the Indenture Trustee and the Custodian during the related Due Period as provided in the Indenture and not related to a Loan Group and (y) any Net Swap Payment or Swap Termination Payment owed to the Swap Provider (other than any swap termination payment resulting from a swap provider trigger event) on such Payment Date and (2) a fraction, the numerator of which is the amount of interest collected or advanced in respect of the Group 2 Mortgage Loans for such Payment Date and the denominator of which is the amount of interest collected or advanced in respect of the Group 1 Mortgage Loans and Group 2 Mortgage Loans for such Payment Date exceed the Group 2 Interest Remittance Amount for such Payment Date.

**Group 2 Senior Principal Distribution Amount** — With respect to any Payment Date, the excess, if any, of (1) the aggregate note principal balances of the Group 2 Notes immediately prior to that Payment Date over (i) the lesser of (a) approximately 47.00% of the aggregate Loan Balance of the Group 2 Mortgage Loans as of the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period and (b) the aggregate Loan Balance of the Group 2 Mortgage Loans as of the last date of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period minus 0.50% of the aggregate Loan Balance of the Group 2 Mortgage Loans as of the Cut-Off Date.

**Indenture** — The Indenture, among the Issuing Entity, the Indenture Trustee and the Securities Administrator relating to the Offered Notes.

**Indenture Trustee** — The Bank of New York, a New York banking corporation organized under the laws of the State of New York and its successors and assigns or any successor Indenture Trustee appointed pursuant to the terms of the Indenture.

**Insurance Proceeds** — Amounts paid by an insurer under any primary mortgage insurance policy, standard hazard insurance policy, flood insurance policy or title insurance policy covering any mortgage loan or mortgaged property other than amounts required to be paid over to the mortgagor pursuant to law or the related mortgage note and other than amounts used to repair or restore the mortgaged property or to reimburse certain expenses.

**Interest Accrual Period** — For each class of Notes and for any Payment Date, the period commencing on the immediately preceding Payment Date (or, with respect to the first Payment Date, the Closing Date) and ending on the day immediately preceding such Payment Date.

**Interest Remittance Amount** — With respect to a Payment Date, the sum of the Group 1 Interest Remittance Amount and the Group 2 Interest Remittance Amount for such Payment Date.

**Issuing Entity**— Newcastle Mortgage Securities Trust 2007-1, a Delaware statutory trust, or its successor in interest.

**Liquidated Mortgage Loan** — Any defaulted mortgage loan as to which the Servicer has determined that all amounts which it expects to recover from or on account of such mortgage loan have been recovered.

**Liquidation Proceeds** — Amounts received by the Servicer in connection with the liquidation of a defaulted mortgage loan whether through a Indenture Trustee's sale, foreclosure sale, proceeds of insurance policies, condemnation proceeds or otherwise and any Subsequent Recoveries.

**Loan Balance** — With respect to any mortgage loan and any date of determination, the actual outstanding principal balance thereof on the Cut-Off Date less any principal payments made or advanced by the Servicer or the Master Servicer on such Mortgage Loan through such date of determination; provided that the Loan Balance of any Liquidated Mortgage Loan is zero.

**Loan-to-Value Ratio** — The fraction, expressed as a percentage, the numerator of which is the principal balance at origination and the denominator of which is the lesser of the sales price at the time of origination of the mortgage loan and the appraised value of the mortgaged property at origination.

**Margin**— With respect to each class of Notes:

| Class | Margin (1) | Margin (2) |
|-------|-----|-----|
| 1-A-1 | 0.190% | 0.380% |
| 2-A-1 | 0.130% | 0.260% |
| 2-A-2 | 0.160% | 0.320% |
| 2-A-3 | 0.230% | 0.460% |
| 2-A-4 | 0.340% | 0.680% |
| M-1 | 0.500% | 0.750% |
| M-2 | 0.650% | 0.975% |
| M-3 | 0.750% | 1.125% |
| M-4 | 1.150% | 1.725% |
| M-5 | 1.250% | 1.875% |
| M-6 | 1.800% | 2.700% |
| M-7-A | 2.000% | 3.000% |
| M-7-B | 2.000% | 3.000% |
| M-8-A | 2.000% | 3.000% |
| M-8-B | 2.000% | 3.000% |
| M-9 | 2.000% | 3.000% |
| M-10 | 2.000% | 3.000% |

(1)   For each payment date up to and including the Coupon Step-Up Date, as defined in this prospectus supplement under "Glossary."
(2)   On each payment date after the Coupon Step-Up Date.

**Master Servicer** — Wells Fargo Bank, N.A. and its successors and assigns or any successor Master Servicer appointed pursuant to the terms of the Sale and Servicing Agreement.

**Master Servicer Event of Termination** — As defined under "*The Sale and Servicing Agreement – Events of Default and Removal of the Servicer and Master Servicer*" herein.

**Master Servicing Fee** — With respect to each mortgage loan, accrued interest at 1/12[th] of the related Mater Servicing Fee Rate on the same principal balance on which interest on the mortgage loan accrues for the calendar month.

**Master Servicing Fee Rate** — An amount equal to 0.010% per annum.

**Monthly Advance** — The aggregate of all payments of principal and interest, net of the Servicing Fee, that were due during the related Due Period on the mortgage loans and that were delinquent on the related Due Date (other than shortfalls in interest due to the application of the Relief Act or similar state law).

**Monthly Payments** — For any mortgage loan and any month, the scheduled payment or payments of principal and interest due during such month on such mortgage loan which either is payable by a mortgagor in such month under the related mortgage note, or in the case of any mortgaged property acquired through foreclosure or deed-in-lieu of foreclosure, would otherwise have been payable under the related mortgage note.

**Net Liquidation Proceeds** — Are Liquidation Proceeds net of unreimbursed advances by the Servicer, Monthly Advances, expenses incurred by the Servicer in connection with the liquidation of such mortgage loan and the related mortgaged property, and any other amounts payable to the Servicer under the Sale and Servicing Agreement.

**Net Rate** — For any mortgage loan, the then applicable mortgage rate thereon less the Servicing Fee Rate and Master Servicing Fee Rate.

**Noteholder** — A holder of an Offered Note.

**Note Interest Rate** — With respect to a Payment Date and a class of Notes, a per annum rate equal to the lesser of (i) One-month LIBOR plus the applicable Margin, (ii) the related Available Funds Rate and (iii) 11.500% per annum.

**Note Owner** — Any person who is the beneficial owner of a Book-entry Note.

**Note Principal Balance** — With respect to any Note as of any Payment Date, such Note's initial principal balance on the Closing Date, as reduced by (1) all amounts allocable to principal previously distributed with respect to such Note and (2) the principal portion of all Realized Losses previously allocated to such Note; provided that, the Note Principal Balance of any class of Notes with the highest payment priority to which Realized Losses have been allocated shall be increased by the amount of any Subsequent Recoveries on the mortgage loans not previously allocated, but not by more than the amount of Realized Losses previously allocated to reduce the Note Principal Balance of that Note.

**Notes** — The Class 1-A-1, Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7-A, Class M-7-B, Class M-8-A, Class M-8-B, Class M-9 and Class M-10 Notes.

**OC Floor** — For any Payment Date, an amount equal to 0.50% of the aggregate Loan Balance of the mortgage loans as of the Cut-Off Date.

**Offered Notes** — The Class 1-A-1, Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7-A, Class M-7-B, Class M-8-A, Class M-8-B, Class M-9 and Class M-10 Notes.

**One-Month LIBOR**— Has the meaning set forth under *"Description of the Notes—Calculation of One-Month LIBOR"* in this prospectus supplement.

**Original Subordinate Principal Balance** — The aggregate Note Principal Balance of the Subordinate Notes as of the Closing Date.

**Outstanding Principal Balance** — With respect to a mortgage loan, the principal balance of such mortgage loan remaining to be paid by the mortgagor or, in the case of an REO Property, the principal balance of the related mortgage loan remaining to be paid by the mortgagor at the time such property was acquired by the Issuing Entity.

**Overcollateralization Amount** — With respect to each Payment Date, the excess, if any, of (1) the aggregate Loan Balance of the Mortgage Loans as of the close of business on the last day of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period over (2) the aggregate note principal balance of the Notes as of that Payment Date (after taking into account the payment of the Principal Distribution Amount on that Payment Date).

**Overcollateralization Deficiency** — With respect to any Payment Date, the excess, if any, of (1) the Required Overcollateralization Amount for that Payment Date over (2) the Overcollateralization Amount for that Payment Date assuming 100% of the Principal Remittance Amount is distributed on the Notes.

**Overcollateralization Increase Amount** — With respect to any Payment Date, the lesser of (1) the Overcollateralization Deficiency for that Payment Date and (2) the Excess Interest for that Payment Date.

**Owner Trust Certificates** —Trust certificates issuing by the Issuing Entity pursuant to the Trust Agreement.

**Owner Trustee** — Wilmington Trust Company and its successors and assigns or any successor Owner Trustee appointed pursuant to the terms of the Trust Agreement.

**Payment Date** — In each month, the 25th day of the month, or, if such day is not a business day, on the next succeeding business day, beginning in July 2007.

**Prepayment Period** — With respect to any mortgage loan and any Payment Date, the period beginning on the 16th day of the calendar month immediately preceding the month in which such Payment Date occurs (or with respect to the first Payment Date, the period commencing on the Cut-Off Date) and ending on the 15th day of the then current calendar month.

**Principal Distribution Amount** — With respect to any Payment Date, the sum of (x) the sum of the Group 1 Principal Remittance Amount for that Payment Date and the Group 2 Principal Remittance Amount for that Payment Date, minus the Excess Overcollateralization Amount, if any, for that Payment Date and (y) the Overcollateralization Increase Amount, if any, for that Payment Date.

**Principal Prepayment** — With respect to each Loan Group any payment or other recovery of principal on a mortgage loan in the related Loan Group which is received in advance of its scheduled Due Date to the extent that it is not accompanied by an amount as to interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment, including Insurance Proceeds and Repurchase Proceeds, but excluding the principal portion of Net Liquidation Proceeds received at the time a mortgage loan becomes a Liquidated Mortgage Loan.

**Principal Remittance Amount** — With respect to a Payment Date, the sum of the Group 1 Principal Remittance Amount and the Group 2 Principal Remittance Amount for such Payment Date.

**Rating Agencies** — Standard and Poor's, a division of The McGraw-Hill Companies, Inc. and Moody's Investors Service, Inc.

**Realized Loss** — With respect to a mortgage loan (1) a Bankruptcy Loss or (2) as to any Liquidated Mortgage Loan, the unpaid principal balance thereof plus accrued and unpaid interest thereon payable to the Issuing Entity at the mortgage rate through the last day of the month of liquidation less the Net Liquidation Proceeds with respect to such mortgage loan and the related mortgaged property. In addition, to the extent the Master Servicer receives Subsequent Recoveries with respect to any mortgage loan, the amount of the Realized Loss with respect to that mortgage loan will be reduced to the extent such recoveries are applied to reduce the Note Principal Balance of any class of Notes on any Payment Date.

**Record Date** — For each class of Offered Notes and each Payment Date, the business day immediately preceding such Payment Date so long as such class of notes is in book-entry form; and otherwise, the record date will be the last business day of the month immediately preceding the applicable Payment Date.

**REO Property** — A mortgage property acquired by the Issuing Entity through foreclosure or deed-in-lieu of foreclosure.

**Repurchase Price** — With respect to any mortgage loan required to be repurchased, an amount equal to the sum of (1) 100% of the Outstanding Principal Balance of such mortgage loan plus accrued but unpaid interest on the Outstanding Principal Balance at the related mortgage rate through and including the last day of the month of repurchase, (2) any unreimbursed Monthly Advances and servicing advances payable to the Servicer of the mortgage loan and (3) any costs and damages incurred by the Issuing Entity in connection with any violation of such mortgage loan of any anti-predatory lending laws.

**Repurchase Proceeds** — The Repurchase Price in connection with any repurchase of a mortgage loan by the originator or the Seller, as applicable, and any cash deposit in connection with the substitution of a mortgage loan. See "*Description of the Securities—Assignment of Trust Fund Assets*" in the accompanying prospectus and "*Trust Agreement—Representations and Warranties*" in this prospectus supplement.

**Required Overcollateralization Amount** — With respect to any Payment Date (1) prior to the Stepdown Date, the product of (x) 4.75% and (y) the aggregate Loan Balance of the Mortgage Loans as of the Cut-Off Date; and (2) on and after the Stepdown Date, the greater of (i) the lesser of (x) the product of 4.75% and the aggregate Loan Balance of the Mortgage Loans as of the Cut-Off Date and (y) the product of 9.50% and the aggregate Loan Balance of the Mortgage Loans as of the end of the related Due Period and after giving effect to principal prepayments received during the related Prepayment Period and (ii) the OC Floor; provided, however, that on each Payment Date during the continuance of a Trigger Event, the Required Overcollateralization Amount will equal the Required Overcollateralization Amount in effect as of the Payment Date immediately preceding the date on which such Trigger Event first occurred.

**Reserve Interest Rate** — With respect to any Interest Determination Date for the Offered Notes, the rate per annum that the Securities Administrator determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 0.0625%) of the one-year United States dollar lending rates which New York City banks selected by the Securities Administrator are quoting on the relevant Interest Determination Date to the principal London offices of leading banks in the London interbank market or (ii) in the event that the Securities Administrator can determine no such arithmetic mean, the lowest one-month United States dollar lending rate which New York City banks selected by the Securities Administrator are quoting on such Interest Determination Date to leading European banks.

**Sale and Servicing Agreement** — The Sale and Servicing Agreement, among the Issuing Entity, the Sponsor, the Indenture Trustee, the Servicer, the Master Servicer, the Securities Administrator and the Depositor relating the Mortgage Loans.

**Securities Administrator** — Wells Fargo Bank, N.A. and its successors and assigns or any successor Securities Administrator appointed pursuant to the terms of the Sale and Servicing Agreement.

**Seller** — NIC WL II LLC and its successors and assigns.

**Senior Enhancement Percentage** — With respect to any Payment Date, the percentage equivalent of a fraction, the numerator of which is the sum of (1) the aggregate note principal balance of the Subordinate Notes and (2) the Overcollateralization Amount, in each case, after taking into account the distribution of the Principal Distribution Amount on that Payment Date, and the denominator of which is the aggregate Loan Balance of the Mortgage Loans as of the last day of the related Due Period and after giving effect to unscheduled payments of principal received during the related Prepayment Period.

**Senior Notes** — The Class 1-A-1, Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4 Notes.

**Senior Principal Distribution Amount** — With respect to any Payment Date, the sum of the Group 1 Senior Principal Distribution Amount and the Group 2 Senior Principal Distribution Amount**.**

**Servicer** — Nationstar Mortgage LLC and its successors and assigns.

**Servicer Event of Termination** — As defined under "*The Sale and Servicing Agreement – Events of Default and Removal of the Servicer and Master Servicer*" herein.

**Servicing Fee** — With respect to each mortgage loan, accrued interest at $1/12^{th}$ of the related Servicing Fee Rate on the same principal balance on which interest on the mortgage loan accrues for the calendar month.

**Servicing Fee Rate** — An amount equal to 0.500% per annum.

**60+ Delinquency Percentage (Rolling Three Month)** — With respect to any Payment Date, the average of the percentage equivalents of the fractions determined for each of the three immediately preceding Due Periods, the numerator of each of which is equal to the Delinquency Amount for such Due Period, and the denominator of each of which is the aggregate Loan Balance of all of the Mortgage Loans as of the end of such Due Period.

**Sponsor** — Newcastle Investment Corp., its successors and assigns.

**Stepdown Date** — The earlier to occur of (1) the Payment Date immediately following the Payment Date on which the aggregate note principal balances of the Senior Notes are reduced to zero, and (2) the later to occur of (A) the July 2010 Payment Date, and (B) the first Payment Date on which the Senior Enhancement Percentage, calculated for this purpose, before giving effect to any distribution of principal on the Notes on that Payment Date but after giving effect to the distribution of the Principal Remittance Amount on the Mortgage Loans, is at least equal to approximately 53.00%.

**Subordinate Notes** — The Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7-A, Class M-7-B, Class M-8-A, Class M-8-B, Class M-9 and Class M-10 Notes.

**Subsequent Recoveries** — Any amount recovered by the Servicer or the Master Servicer (net of reimbursable expenses) with respect to a Liquidated Mortgage Loan with respect to which a Realized Loss was incurred after the liquidation or disposition of such mortgage loan.

**Swap Expense Fee Rate** — With respect to each Payment Date, a per annum rate, equal to the product of (x) the sum of (i) any Net Swap Payment owed to the Swap Provider for that Payment Date and (ii) any Swap Termination Payment for that Payment Date (other than any Swap Termination Payment resulting from a Swap Provider Trigger Event) payable by the Securities Administrator on behalf of the trust, and (y) 12 divided by the aggregate Loan Balance of the Mortgage Loans as of the first day of the related Due Period, adjusted to reflect unscheduled payments of principal received thereon after such date and included in the Principal Distribution Amount on the immediately preceding Payment Date.

**Trigger Event** — With respect to any payment Date, the existence of a Delinquency Event or a Cumulative Loss Trigger Event on such Payment Date

**Trust Agreement** — The Amended and Restated Trust Agreement, among the Owner Trustee, the Depositor and the Securities Administrator.

**Underwriter** — Bear, Stearns & Co. Inc.

**Wells Fargo Bank** — Wells Fargo Bank, N.A.

ANNEX I

**GLOBAL CLEARANCE, SETTLEMENT AND TAX DOCUMENTATION PROCEDURES**

Except in certain limited circumstances, the Offered Notes, which are referred to as the global securities, will be available only in book-entry form. Investors in the global securities may hold interests in these global securities through any of DTC, Clearstream or Euroclear. Initial settlement and all secondary trades will settle in same-day funds.

Secondary market trading between investors holding interests in global securities through Clearstream and Euroclear will be conducted in accordance with their normal rules and operating procedures and in accordance with conventional eurobond practice. Secondary market trading between investors holding interests in global securities through DTC will be conducted according to the rules and procedures applicable to U.S. corporate debt obligations.

Secondary cross-market trading between investors holding interests in global securities through Clearstream or Euroclear and investors holding interests in global securities through DTC participants will be effected on a delivery-against-payment basis through the respective depositories of Clearstream and Euroclear, in such capacity, and other DTC participants.

Although DTC, Euroclear and Clearstream are expected to follow the procedures described below in order to facilitate transfers of interests in the global securities among participants of DTC, Euroclear and Clearstream, they are under no obligation to perform or continue to perform those procedures, and those procedures may be discontinued at any time. Neither the Depositor, the Master Servicer, the Securities Administrator nor the Indenture Trustee will have any responsibility for the performance by DTC, Euroclear and Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their obligations.

Non-U.S. holders of global securities will be subject to U.S. withholding taxes unless those holders meet certain requirements and deliver appropriate U.S. tax documents to the securities clearing organizations or their participants.

**Initial Settlement**

The global securities will be registered in the name of Cede & Co. as nominee of DTC. Investors' interests in the global securities will be represented through financial institutions acting on their behalf as direct and indirect participants in DTC. Clearstream and Euroclear will hold positions on behalf of their participants through their respective depositories, which in turn will hold such positions in accounts as DTC participants.

Investors electing to hold interests in global securities through DTC participants, rather than through Clearstream or Euroclear accounts, will be subject to the settlement practices applicable to similar issues of mortgage-backed notes. Investors' securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold interests in global securities through Clearstream or Euroclear accounts will follow the settlement procedures applicable to conventional eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period. Interests in global securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

AX-1

**Secondary Market Trading**

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

Transfers between DTC Participants. Secondary market trading between DTC participants will be settled using the DTC procedures applicable to similar issues of note interest certificates in same-day funds.

Transfers between Clearstream and/or Euroclear Participants. Secondary market trading between Clearstream participants or Euroclear participants and/or investors holding interests in global securities through them will be settled using the procedures applicable to conventional eurobonds in same-day funds.

Transfers between DTC Seller and Clearstream or Euroclear Purchaser. When interests in global securities are to be transferred on behalf of a seller from the account of a DTC participant to the account of a Clearstream participant or a Euroclear participant for a purchaser, the purchaser will send instructions to Clearstream or Euroclear through a Clearstream participant or Euroclear participant at least one business day prior to settlement. Clearstream or the Euroclear operator will instruct its respective depository to receive an interest in the global securities against payment. Payment will include interest accrued on the global securities from and including the last Payment Date to but excluding the settlement date. Payment will then be made by the respective depository to the DTC participant's account against delivery of an interest in the global securities. After this settlement has been completed, the interest will be credited to the respective clearing system, and by the clearing system, in accordance with its usual procedures, to the Clearstream participant's or Euroclear participant's account. The credit of this interest will appear on the next business day and the cash debit will be back-valued to, and the interest on the global securities will accrue from, the value date, which would be the preceding day when settlement occurred in New York. If settlement is not completed through DTC on the intended value date, i.e., the trade fails, the Clearstream or Euroclear cash debit will be valued instead as of the actual settlement date.

Clearstream participants and Euroclear participants will need to make available to the respective clearing system the funds necessary to process same-day funds settlement. The most direct means of doing so is to pre-position funds for settlement from cash on hand, in which case the Clearstream participants or Euroclear participants will take on credit exposure to Clearstream or the Euroclear operator until interests in the global securities are credited to their accounts one day later.

As an alternative, if Clearstream or the Euroclear operator has extended a line of credit to them, Clearstream participants or Euroclear participants can elect not to pre-position funds and allow that credit line to be drawn upon. Under this procedure, Clearstream participants or Euroclear participants receiving interests in global securities for purchasers would incur overdraft charges for one day, to the extent they cleared the overdraft when interests in the global securities were credited to their accounts. However, interest on the global securities would accrue from the value date. Therefore, the investment income on the interest in the global securities earned during that one-day period would tend to offset the amount of these overdraft charges, although this result will depend on each Clearstream participant's or Euroclear participant's particular cost of funds.

Since the settlement through DTC will take place during New York business hours, DTC participants are subject to DTC procedures for transferring interests in global securities to the respective depository of Clearstream or Euroclear for the benefit of Clearstream participants or Euroclear participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the seller settling the

sale through a DTC participant, a cross-market transaction will settle no differently than a sale to a purchaser settling through a DTC participant.

Finally, intra-day traders that use Clearstream participants or Euroclear participants to purchase interests in global securities from DTC participants or sellers settling through them for delivery to Clearstream participants or Euroclear participants should note that these trades will automatically fail on the sale side unless affirmative action is taken. At least three techniques should be available to eliminate this potential condition:

- borrowing interests in global securities through Clearstream or Euroclear for one day, until the purchase side of the intra-day trade is reflected in the relevant Clearstream or Euroclear accounts, in accordance with the clearing system's customary procedures;

- borrowing interests in global securities in the United States from a DTC participant no later than one day prior to settlement, which would give sufficient time for such interests to be reflected in the relevant Clearstream or Euroclear accounts in order to settle the sale side of the trade; or

- staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the DTC participant is at least one day prior to the value date for the sale to the Clearstream participant or Euroclear participant.

*Transfers between Clearstream or Euroclear Seller and DTC Purchaser.* Due to time zone differences in their favor, Clearstream participants and Euroclear participants may employ their customary procedures for transactions in which interests in global securities are to be transferred by the respective clearing system, through the respective depository, to a DTC participant. The seller will send instructions to Clearstream or the Euroclear operator through a Clearstream participant or Euroclear participant at least one business day prior to settlement. Clearstream or Euroclear will instruct its respective depository, to credit an interest in the global securities to the DTC participant's account against payment. Payment will include interest accrued on the global securities from and including the last Payment Date to but excluding the settlement date. The payment will then be reflected in the account of the Clearstream participant or Euroclear participant the following business day, and receipt of the cash proceeds in the Clearstream participant's or Euroclear participant's account would be back-valued to the value date, which would be the preceding day, when settlement occurred through DTC in New York. If settlement is not completed on the intended value date, i.e., the trade fails, receipt of the cash proceeds in the Clearstream participant's or Euroclear participant's account would instead be valued as of the actual settlement date.

**Certain U.S. Federal Income Tax Documentation Requirements**

A beneficial owner who is an individual or corporation holding the global security on its own behalf of global securities holding securities through Clearstream or Euroclear, or through DTC if the holder has an address outside the U.S., will be subject to the 30% U.S. withholding tax that typically applies to payments of interest, including original issue discount, on registered debt issued by U.S. persons, unless:

- each clearing system, bank or other institution that holds customers' securities in the ordinary course of its trade or business in the chain of intermediaries between the beneficial owner or a foreign corporation or foreign trust and the U.S. entity required to withhold tax complies with applicable certification requirements; and

- the beneficial owner takes one of the following steps to obtain an exemption or reduced tax rate:

AX-3

- Exemption for Non-U.S. Persons—Form W-8BEN. Beneficial holders of global securities that are Non-U.S. persons generally can obtain a complete exemption from the withholding tax by filing a signed Form W-8BEN, or Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding. Non-U.S. persons residing in a country that has a tax treaty with the United States can obtain an exemption or reduced tax rate, depending on the treaty terms, by filing Form W-8BEN. If the information shown on Form W-8BEN changes, a new Form W-8BEN must be filed within 30 days of the change.

- Exemption for Non-U.S. persons with effectively connected income—Form W-8ECI. A Non-U.S. person, including a non-U.S. corporation or bank with a U.S. branch, for which the interest income is effectively connected with its conduct of a trade or business in the United States, can obtain an exemption from the withholding tax by filing Form W-8ECI, or Certificate of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with the Conduct of a Trade or Business in the United States.

- Exemption for U.S. Persons—Form W-9. U.S. persons can obtain a complete exemption from the withholding tax by filing Form W-9, or Payer's Request for Taxpayer Identification Number and Certification.

*U.S. Federal Income Tax Reporting Procedure*. The holder of a global security or, in the case of a Form W-8BEN or Form W-8ECI filer, his agent, files by submitting the appropriate form to the person through whom it holds the security—the clearing agency, in the case of persons holding directly on the books of the clearing agency. Form W-8BEN and Form W-8ECI generally are effective until the third succeeding calendar year from the date the form is signed. However, the W-8BEN and W-8ECI with a taxpayer identification number will remain effective until a change in circumstances makes any information on the form incorrect, provided that the withholding agent reports at least annually to the beneficial owner on Form 1042-S. The term "U.S. person" means:

- a citizen or resident of the United States;

- a corporation, partnership or other entity treated as a corporation or a partnership for United States federal income tax purposes, organized in or under the laws of the United States or any state thereof, including for this purpose the District of Columbia, unless, in the case of a partnership, future Treasury regulations provide otherwise;

- an estate that is subject to U.S. federal income tax regardless of the source of its income; or

- a trust if a court within the United States is able to exercise primary supervision of the administration of the Issuing Entity and one or more United States persons have the authority to control all substantial decisions of the Issuing Entity.

If the information shown on Form W-8BEN or Form W-8ECI changes, a new Form W-8BEN or Form W-8ECI, as applicable, must be filed within 30 days of the change. Certain issuing entities not described in the final bullet of the preceding sentence in existence on August 20, 1996 that elect to be treated as a United States Person will also be a U.S. person. The term "Non-U.S. person" means any person who is not a U.S. person. This summary does not deal with all aspects of U.S. federal income tax withholding that may be relevant to foreign holders of the global securities. Investors are advised to consult their own tax advisors for specific tax advice concerning their holding and disposing of the global securities.

AX-4

**SCHEDULE A**

## Aggregate Statistical Mortgage Loan Statistics
### As of the Cut-off Date

### Cut-off Date Principal Balance of the Mortgage Loans

| Cut-off Date Principal Balance | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 0.01 - 50,000.00 ... | 361 | $ 13,041,739.31 | 1.20% | 11.162% | 337 | 98.21% | 654 |
| 50,000.01 - 100,000.00 ... | 700 | 52,781,156.97 | 4.85 | 10.119 | 352 | 89.79 | 640 |
| 100,000.01 - 150,000.00 ... | 672 | 84,546,881.34 | 7.77 | 8.674 | 354 | 81.46 | 630 |
| 150,000.01 - 200,000.00 ... | 706 | 123,497,717.97 | 11.35 | 8.058 | 354 | 81.45 | 632 |
| 200,000.01 - 250,000.00 ... | 520 | 116,566,476.99 | 10.71 | 7.711 | 355 | 81.92 | 635 |
| 250,000.01 - 300,000.00 ... | 402 | 110,304,821.61 | 10.14 | 7.648 | 355 | 82.20 | 646 |
| 300,000.01 - 350,000.00 ... | 332 | 107,603,024.31 | 9.89 | 7.466 | 355 | 82.52 | 645 |
| 350,000.01 - 400,000.00 ... | 246 | 91,935,782.01 | 8.45 | 7.310 | 355 | 83.82 | 660 |
| 400,000.01 - 450,000.00 ... | 189 | 80,589,603.30 | 7.41 | 7.315 | 355 | 82.74 | 655 |
| 450,000.01 - 500,000.00 ... | 139 | 66,204,530.81 | 6.09 | 7.216 | 355 | 82.82 | 660 |
| 500,000.01 - 550,000.00 ... | 115 | 59,850,248.30 | 5.50 | 7.352 | 355 | 84.53 | 653 |
| 550,000.01 - 600,000.00 ... | 74 | 42,437,983.70 | 3.90 | 6.954 | 355 | 83.38 | 662 |
| 600,000.01 - 650,000.00 ... | 63 | 39,392,915.48 | 3.62 | 7.225 | 355 | 84.57 | 660 |
| 650,000.01 - 700,000.00 ... | 36 | 24,400,232.24 | 2.24 | 7.240 | 355 | 83.51 | 643 |
| 700,000.01 - 750,000.00 ... | 35 | 25,378,956.01 | 2.33 | 7.164 | 355 | 84.62 | 668 |
| 750,000.01 - 800,000.00 ... | 35 | 27,523,782.12 | 2.53 | 7.505 | 350 | 81.92 | 663 |
| 800,000.01 - 850,000.00 ... | 7 | 5,849,010.56 | 0.54 | 7.019 | 355 | 84.92 | 654 |
| 850,000.01 - 900,000.00 ... | 4 | 3,479,807.03 | 0.32 | 6.366 | 356 | 81.60 | 682 |
| 900,000.01 - 950,000.00 ... | 2 | 1,892,361.13 | 0.17 | 5.926 | 353 | 74.77 | 663 |
| 950,000.01 - 1,000,000.00 ... | 8 | 7,951,197.00 | 0.73 | 6.364 | 354 | 74.54 | 707 |
| 1,000,000.01+ ............................. | 2 | 2,699,478.20 | 0.25 | 7.531 | 352 | 75.96 | 653 |
| Total ....................................... | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

### Cut-off Date Mortgage Rates of the Mortgage Loans

| Cut-off Date Mortgage Rates | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 5.0000 - 5.4999 ...................... | 26 | $ 11,144,654.23 | 1.02% | 5.330% | 356 | 79.96% | 697 |
| 5.5000 - 5.9999 ...................... | 177 | 70,172,467.02 | 6.45 | 5.841 | 355 | 77.74 | 689 |
| 6.0000 - 6.4999 ...................... | 360 | 123,683,504.79 | 11.37 | 6.262 | 355 | 78.64 | 683 |
| 6.5000 - 6.9999 ...................... | 596 | 187,349,506.97 | 17.22 | 6.750 | 354 | 81.76 | 667 |
| 7.0000 - 7.4999 ...................... | 451 | 131,376,808.97 | 12.08 | 7.265 | 355 | 82.54 | 656 |
| 7.5000 - 7.9999 ...................... | 656 | 173,966,354.82 | 15.99 | 7.742 | 355 | 84.00 | 648 |
| 8.0000 - 8.4999 ...................... | 415 | 104,180,804.73 | 9.58 | 8.237 | 355 | 83.96 | 628 |
| 8.5000 - 8.9999 ...................... | 435 | 106,440,145.03 | 9.78 | 8.724 | 354 | 84.41 | 613 |
| 9.0000 - 9.4999 ...................... | 252 | 50,074,506.63 | 4.60 | 9.256 | 355 | 84.61 | 593 |
| 9.5000 - 9.9999 ...................... | 295 | 49,159,200.81 | 4.52 | 9.759 | 355 | 85.49 | 592 |
| 10.0000 - 10.4999 ...................... | 302 | 28,839,465.09 | 2.65 | 10.217 | 353 | 91.61 | 629 |
| 10.5000 - 10.9999 ...................... | 125 | 11,670,041.98 | 1.07 | 10.724 | 352 | 88.20 | 614 |
| 11.0000 - 11.4999 ...................... | 251 | 19,803,574.78 | 1.82 | 11.254 | 349 | 94.44 | 651 |
| 11.5000 - 11.9999 ...................... | 137 | 10,745,911.50 | 0.99 | 11.687 | 352 | 90.76 | 621 |
| 12.0000 - 12.4999 ...................... | 119 | 6,591,508.48 | 0.61 | 12.274 | 345 | 95.12 | 614 |
| 12.5000 - 12.9999 ...................... | 41 | 2,507,665.69 | 0.23 | 12.639 | 343 | 89.20 | 607 |
| 13.0000 - 13.4999 ...................... | 6 | 122,306.68 | 0.01 | 13.155 | 258 | 96.23 | 682 |
| 13.5000 - 13.9999 ...................... | 4 | 99,278.19 | 0.01 | 13.785 | 288 | 95.00 | 668 |
| Total ....................................... | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

A-1

### Credit Score of the Mortgage Loans

| FICO | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 500 - 524 ........................... | 92 | $ 18,960,710.29 | 1.74% | 9.563% | 354 | 72.48% | 513 |
| 525 - 549 ........................... | 152 | 28,921,414.66 | 2.66 | 9.355 | 355 | 74.09 | 535 |
| 550 - 574 ........................... | 270 | 63,108,281.64 | 5.80 | 8.909 | 355 | 78.88 | 561 |
| 575 - 599 ........................... | 301 | 68,325,225.95 | 6.28 | 8.561 | 355 | 83.28 | 588 |
| 600 - 624 ........................... | 829 | 169,707,849.67 | 15.60 | 8.140 | 354 | 85.13 | 612 |
| 625 - 649 ........................... | 1,004 | 227,791,872.50 | 20.94 | 7.641 | 355 | 83.97 | 638 |
| 650 - 674 ........................... | 843 | 200,849,711.60 | 18.46 | 7.467 | 354 | 84.03 | 661 |
| 675 - 699 ........................... | 496 | 125,942,260.73 | 11.58 | 7.294 | 355 | 84.20 | 686 |
| 700+................................... | 661 | 184,320,379.35 | 16.94 | 6.966 | 354 | 82.29 | 734 |
| Total ........................... | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

### Combined Original LTV of the Mortgage Loans

| Combined Original LTV | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 0.00 - 49.99 ...................... | 97 | $ 15,655,565.58 | 1.44% | 7.799% | 355 | 40.46% | 631 |
| 50.00 - 54.99 ...................... | 42 | 8,899,284.30 | 0.82 | 7.139 | 350 | 51.96 | 651 |
| 55.00 - 59.99 ...................... | 78 | 19,178,614.04 | 1.76 | 7.318 | 353 | 57.65 | 634 |
| 60.00 - 64.99 ...................... | 110 | 26,274,781.61 | 2.42 | 7.426 | 355 | 62.35 | 634 |
| 65.00 - 69.99 ...................... | 127 | 30,422,728.71 | 2.80 | 7.612 | 354 | 66.84 | 628 |
| 70.00 - 74.99 ...................... | 176 | 46,587,389.59 | 4.28 | 7.518 | 352 | 72.17 | 636 |
| 75.00 - 79.99 ...................... | 248 | 70,422,904.63 | 6.47 | 7.375 | 354 | 77.27 | 638 |
| 80.00 - 80.00 ...................... | 1,146 | 310,133,795.74 | 28.51 | 7.450 | 355 | 80.00 | 656 |
| 80.01 - 84.99 ...................... | 196 | 59,032,325.14 | 5.43 | 7.159 | 355 | 83.39 | 644 |
| 85.00 - 89.99 ...................... | 504 | 147,205,990.75 | 13.53 | 7.409 | 355 | 86.29 | 639 |
| 90.00 - 94.99 ...................... | 624 | 183,389,748.00 | 16.86 | 7.698 | 355 | 90.37 | 649 |
| 95.00 - 99.99 ...................... | 315 | 74,200,735.55 | 6.82 | 8.238 | 354 | 95.29 | 643 |
| 100.00 - 100.00 ...................... | 985 | 96,523,842.75 | 8.87 | 9.886 | 352 | 100.00 | 661 |
| Total ........................... | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

### Original Term of the Mortgage Loans

| Original Term (months) | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 120................................... | 20 | $ 964,951.58 | 0.09% | 11.188% | 116 | 100.00% | 663 |
| 180................................... | 47 | 2,937,268.24 | 0.27 | 8.168 | 175 | 77.17 | 681 |
| 240................................... | 11 | 1,376,407.91 | 0.13 | 8.165 | 236 | 83.73 | 626 |
| 360................................... | 4,570 | 1,082,649,078.66 | 99.51 | 7.738 | 355 | 83.10 | 647 |
| Total ........................... | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

A-2

### Stated Remaining Term of the Mortgage Loans

| Stated Remaining Term (months) | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 60 - 119 ................................. | 20 | $    964,951.58 | 0.09% | 11.188% | 116 | 100.00% | 663 |
| 120 - 179 ................................. | 47 | 2,937,268.24 | 0.27 | 8.168 | 175 | 77.17 | 681 |
| 180 - 239 ................................. | 11 | 1,376,407.91 | 0.13 | 8.165 | 236 | 83.73 | 626 |
| 300 - 359 ................................. | 4,570 | 1,082,649,078.66 | 99.51 | 7.738 | 355 | 83.10 | 647 |
| Total ......................... | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

### Debt Ratio of the Mortgage Loans

| Debt Ratio | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 0.01 - 20.00 .................... | 530 | $   75,199,620.93 | 6.91% | 8.646% | 353 | 86.93% | 654 |
| 20.01 - 25.00 .................... | 196 | 31,247,482.08 | 2.87 | 8.071 | 353 | 83.42 | 645 |
| 25.01 - 30.00 .................... | 267 | 57,125,484.82 | 5.25 | 7.655 | 354 | 82.87 | 652 |
| 30.01 - 35.00 .................... | 387 | 92,221,394.92 | 8.48 | 7.478 | 353 | 81.87 | 658 |
| 35.01 - 40.00 .................... | 640 | 154,989,442.58 | 14.25 | 7.579 | 355 | 81.94 | 656 |
| 40.01 - 45.00 .................... | 749 | 179,764,195.80 | 16.52 | 7.585 | 355 | 83.33 | 655 |
| 45.01 - 50.00 .................... | 965 | 247,864,455.18 | 22.78 | 7.704 | 355 | 85.43 | 654 |
| 50.01 - 55.00 .................... | 914 | 249,515,630.08 | 22.93 | 7.800 | 355 | 80.65 | 624 |
| Total ......................... | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

### Type of Mortgage Loans

| Type of Interest Rate | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Adjustable Rate ........................... | 2,791 | $ 765,092,171.09 | 70.33% | 7.741% | 355 | 82.95% | 640 |
| Fixed Rate .................................... | 1,857 | 322,835,535.30 | 29.67 | 7.746 | 353 | 83.46 | 666 |
| Total ........................................ | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

A-3

### Product Type of the Mortgage Loans

| Product | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 10 YR FIXED ............................ | 20 | $ 964,951.58 | 0.09% | 11.188% | 116 | 100.00% | 663 |
| 15 YR FIXED ............................ | 47 | 2,937,268.24 | 0.27 | 8.168 | 175 | 77.17 | 681 |
| 2/6 LIBOR................................. | 798 | 160,997,727.05 | 14.80 | 8.463 | 355 | 80.96 | 615 |
| 2/6 LIBOR 40/30 BAL ............... | 232 | 59,259,116.53 | 5.45 | 8.099 | 355 | 82.33 | 622 |
| 2/6 LIBOR 50/30 BAL ............... | 930 | 287,834,782.75 | 26.46 | 7.677 | 355 | 83.96 | 643 |
| 2/6 LIBOR IO ............................ | 67 | 25,435,301.00 | 2.34 | 6.989 | 355 | 83.52 | 647 |
| 20 YR FIXED ............................ | 11 | 1,376,407.91 | 0.13 | 8.165 | 236 | 83.73 | 626 |
| 3/6 LIBOR................................. | 209 | 46,125,688.22 | 4.24 | 7.847 | 356 | 82.20 | 639 |
| 3/6 LIBOR 40/30 BAL ............... | 69 | 19,948,749.95 | 1.83 | 7.323 | 355 | 82.87 | 656 |
| 3/6 LIBOR 50/30 BAL ............... | 396 | 128,747,176.64 | 11.83 | 7.346 | 355 | 84.06 | 653 |
| 3/6 LIBOR IO ............................ | 40 | 17,272,713.22 | 1.59 | 6.538 | 355 | 84.36 | 675 |
| 30 YR FIXED ............................ | 1,407 | 202,651,573.43 | 18.63 | 8.178 | 356 | 84.36 | 661 |
| 40/30 FIXED BAL....................... | 70 | 17,658,054.76 | 1.62 | 6.856 | 356 | 80.45 | 666 |
| 5/6 LIBOR................................. | 9 | 3,039,539.44 | 0.28 | 6.481 | 356 | 76.99 | 695 |
| 5/6 LIBOR 40/30 BAL ............... | 5 | 1,559,284.69 | 0.14 | 7.159 | 355 | 83.84 | 681 |
| 5/6 LIBOR 50/30 BAL ............... | 22 | 8,234,999.49 | 0.76 | 6.621 | 355 | 81.16 | 687 |
| 5/6 LIBOR IO ............................ | 14 | 6,637,092.11 | 0.61 | 6.140 | 356 | 75.69 | 722 |
| 50/30 FIXED BAL....................... | 302 | 97,247,279.38 | 8.94 | 6.952 | 355 | 82.17 | 676 |
| Total ........................................ | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

### Interest Only Term of the Mortgage Loans

| Interest Only | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Interest Only.............................. | 121 | $ 49,345,106.33 | 4.54% | 6.717% | 355 | 82.76% | 667 |
| Not Interest Only....................... | 4,527 | 1,038,582,600.06 | 95.46 | 7.791 | 354 | 83.12 | 647 |
| Total ........................................ | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

### Prepayment Penalty Original Term of the Mortgage Loans

| Prepayment Penalty Original Term (months) | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Prepay Penalty: N/A................... | 1,246 | $ 255,706,684.89 | 23.50% | 8.077% | 354 | 84.43% | 643 |
| Prepay Penalty: 12 months.......... | 617 | 180,016,829.48 | 16.55 | 7.726 | 354 | 82.76 | 653 |
| Prepay Penalty: 24 months.......... | 1,734 | 391,304,393.54 | 35.97 | 7.921 | 355 | 83.46 | 635 |
| Prepay Penalty: 30 months.......... | 7 | 1,315,803.95 | 0.12 | 8.361 | 356 | 89.95 | 617 |
| Prepay Penalty: 36 months.......... | 1,044 | 259,583,994.53 | 23.86 | 7.153 | 354 | 81.45 | 667 |
| Total ........................................ | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

### Lien Type of the Mortgage Loans

| Lien Type | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| First Lien.................................. | 3,761 | $1,029,683,502.04 | 94.65% | 7.557% | 355 | 82.17% | 647 |
| Second Lien................................ | 887 | 58,244,204.35 | 5.35 | 11.031 | 349 | 99.61 | 664 |
| Total ........................................ | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

A-4

### Documentation Type of the Mortgage Loans

| Documentation Type | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Full/Alternative Documentation . | 3,413 | $  788,795,293.53 | 72.50% | 7.533% | 354 | 83.86% | 644 |
| Easy Documentation ................. | 77 | 17,749,374.06 | 1.63 | 7.936 | 355 | 83.57 | 638 |
| Stated Income Verification ......... | 1,158 | 281,383,038.80 | 25.86 | 8.317 | 355 | 80.95 | 658 |
| Total ........................................ | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

### Loan Purpose of the Mortgage Loans

| Loan Purpose | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Cash Out Refinance ................... | 3,007 | $  771,435,964.01 | 70.91% | 7.611% | 355 | 82.03% | 642 |
| Purchase ................................... | 1,577 | 305,352,272.93 | 28.07 | 8.072 | 354 | 85.63 | 661 |
| Rate/Term Refinance ................. | 64 | 11,139,469.45 | 1.02 | 7.866 | 352 | 88.03 | 643 |
| Total ........................................ | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

### Property Type of the Mortgage Loans

| Property Type | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 2 Family ...................................... | 221 | $  62,925,270.69 | 5.78% | 7.640% | 355 | 83.68% | 667 |
| 3 Family ...................................... | 28 | 10,860,976.60 | 1.00 | 7.548 | 354 | 81.05 | 682 |
| 4 Family ...................................... | 9 | 3,750,600.55 | 0.34 | 8.197 | 356 | 79.63 | 625 |
| Condominium ............................. | 324 | 61,809,364.37 | 5.68 | 8.090 | 355 | 83.58 | 654 |
| Single Family ............................. | 4,066 | 948,581,494.18 | 87.19 | 7.727 | 354 | 83.07 | 645 |
| Total ........................................ | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

### Occupancy Status of the Mortgage Loans

| Occupancy Status | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Investor ....................................... | 321 | $  64,823,874.93 | 5.96% | 8.085% | 355 | 80.62% | 663 |
| Owner Occupied.......................... | 4,297 | 1,014,021,205.17 | 93.21 | 7.725 | 354 | 83.29 | 646 |
| Second Home ............................. | 30 | 9,082,626.29 | 0.83 | 7.291 | 352 | 80.03 | 646 |
| Total ........................................ | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

A-5

## Geographic Distribution of the Mortgage Loans

| State | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Alabama | 4 | $ 695,554.50 | 0.06% | 9.405% | 356 | 94.30% | 601 |
| Alaska | 2 | 384,486.09 | 0.04 | 7.974 | 355 | 80.00 | 584 |
| Arizona | 122 | 23,219,444.08 | 2.13 | 7.901 | 355 | 82.41 | 643 |
| Arkansas | 4 | 426,985.29 | 0.04 | 9.310 | 355 | 92.00 | 593 |
| California | 959 | 316,300,084.44 | 29.07 | 7.342 | 355 | 82.26 | 659 |
| Colorado | 93 | 16,283,499.55 | 1.50 | 7.780 | 355 | 85.17 | 645 |
| Connecticut | 77 | 15,676,963.66 | 1.44 | 7.727 | 355 | 84.55 | 643 |
| Delaware | 30 | 4,343,933.84 | 0.40 | 8.257 | 355 | 86.11 | 637 |
| District of Columbia | 43 | 9,257,362.21 | 0.85 | 7.467 | 355 | 75.52 | 641 |
| Florida | 745 | 143,468,022.64 | 13.19 | 8.058 | 354 | 81.94 | 635 |
| Georgia | 165 | 20,879,713.64 | 1.92 | 8.469 | 352 | 87.53 | 629 |
| Hawaii | 59 | 20,508,602.29 | 1.89 | 7.517 | 353 | 80.95 | 659 |
| Idaho | 16 | 2,162,658.62 | 0.20 | 8.020 | 356 | 81.99 | 623 |
| Illinois | 263 | 51,912,620.73 | 4.77 | 8.214 | 354 | 85.60 | 642 |
| Indiana | 26 | 2,828,256.06 | 0.26 | 8.112 | 354 | 87.03 | 638 |
| Iowa | 4 | 308,942.93 | 0.03 | 8.929 | 343 | 87.70 | 596 |
| Kansas | 13 | 1,150,132.73 | 0.11 | 8.938 | 355 | 84.38 | 626 |
| Kentucky | 8 | 1,088,954.98 | 0.10 | 7.833 | 356 | 76.45 | 634 |
| Maine | 9 | 1,159,497.17 | 0.11 | 8.058 | 356 | 86.20 | 655 |
| Maryland | 342 | 81,959,677.83 | 7.53 | 7.842 | 355 | 83.65 | 634 |
| Massachusetts | 126 | 31,780,808.76 | 2.92 | 7.702 | 355 | 84.47 | 657 |
| Michigan | 20 | 2,808,840.31 | 0.26 | 9.030 | 355 | 83.47 | 644 |
| Minnesota | 68 | 11,389,241.90 | 1.05 | 8.010 | 355 | 85.55 | 646 |
| Missouri | 31 | 3,547,164.62 | 0.33 | 8.600 | 353 | 89.22 | 639 |
| Montana | 1 | 189,246.99 | 0.02 | 8.200 | 354 | 95.00 | 611 |
| Nebraska | 4 | 311,412.00 | 0.03 | 8.697 | 355 | 83.02 | 646 |
| Nevada | 69 | 14,645,017.73 | 1.35 | 7.699 | 355 | 83.82 | 653 |
| New Hampshire | 14 | 3,054,454.46 | 0.28 | 7.744 | 356 | 83.69 | 645 |
| New Jersey | 175 | 49,727,524.12 | 4.57 | 8.055 | 355 | 84.29 | 648 |
| New Mexico | 11 | 1,684,621.88 | 0.15 | 7.757 | 355 | 87.12 | 654 |
| New York | 357 | 117,406,963.68 | 10.79 | 7.468 | 354 | 82.01 | 664 |
| North Carolina | 61 | 8,813,651.68 | 0.81 | 8.586 | 355 | 86.09 | 616 |
| Ohio | 44 | 5,819,154.62 | 0.53 | 8.420 | 354 | 87.04 | 634 |
| Oklahoma | 8 | 787,812.24 | 0.07 | 8.508 | 322 | 84.24 | 605 |
| Oregon | 30 | 6,061,624.26 | 0.56 | 8.187 | 355 | 84.27 | 624 |
| Pennsylvania | 114 | 17,202,847.26 | 1.58 | 8.403 | 354 | 84.99 | 617 |
| Rhode Island | 11 | 2,839,103.12 | 0.26 | 7.604 | 355 | 85.95 | 651 |
| South Carolina | 23 | 3,381,561.80 | 0.31 | 8.432 | 346 | 82.30 | 616 |
| Tennessee | 21 | 3,287,915.75 | 0.30 | 8.764 | 347 | 86.81 | 610 |
| Texas | 121 | 17,630,405.30 | 1.62 | 7.553 | 351 | 82.65 | 653 |
| Utah | 27 | 5,635,632.16 | 0.52 | 7.704 | 356 | 84.14 | 644 |
| Vermont | 2 | 328,330.86 | 0.03 | 8.871 | 356 | 87.03 | 607 |
| Virginia | 154 | 35,037,850.65 | 3.22 | 7.762 | 355 | 83.44 | 637 |
| Washington | 92 | 19,372,526.73 | 1.78 | 7.725 | 355 | 83.43 | 634 |
| West Virginia | 11 | 1,865,906.61 | 0.17 | 9.362 | 356 | 85.15 | 591 |
| Wisconsin | 69 | 9,302,693.62 | 0.86 | 8.394 | 355 | 86.61 | 627 |
| Total | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

**Gross Margin of the Mortgage Loans**

| Gross Margin | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED ..................... | 1,857 | $ 322,835,535.30 | 29.67% | 7.746% | 353 | 83.46% | 666 |
| 2.5000 - 2.9999 ..................... | 17 | 6,892,798.83 | 0.63 | 5.274 | 356 | 77.77 | 689 |
| 3.0000 - 3.4999 | 80 | 35,414,421.11 | 3.26 | 5.652 | 356 | 81.00 | 693 |
| 3.5000 - 3.9999 | 147 | 58,379,551.44 | 5.37 | 6.163 | 356 | 80.45 | 686 |
| 4.0000 - 4.4999 | 284 | 93,094,074.28 | 8.56 | 6.635 | 355 | 82.03 | 670 |
| 4.5000 - 4.9999 | 357 | 106,202,322.04 | 9.76 | 7.139 | 355 | 83.18 | 654 |
| 5.0000 - 5.4999 | 463 | 129,610,746.72 | 11.91 | 7.681 | 355 | 83.41 | 648 |
| 5.5000 - 5.9999 | 484 | 123,708,869.76 | 11.37 | 8.199 | 355 | 83.78 | 627 |
| 6.0000 - 6.4999 | 366 | 92,711,522.57 | 8.52 | 8.661 | 355 | 84.37 | 614 |
| 6.5000 - 6.9999 | 593 | 119,077,864.34 | 10.95 | 9.557 | 355 | 83.08 | 585 |
| Total ..................... | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

**Minimum Interest Rate of the Mortgage Loans**

| Minimum Interest Rate | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED ..................... | 1,857 | $ 322,835,535.30 | 29.67% | 7.746% | 353 | 83.46% | 666 |
| 5.0000 - 5.4999 | 26 | 11,144,654.23 | 1.02 | 5.330 | 356 | 79.96 | 697 |
| 5.5000 - 5.9999 | 95 | 41,404,660.87 | 3.81 | 5.738 | 356 | 80.75 | 692 |
| 6.0000 - 6.4999 | 172 | 63,375,621.08 | 5.83 | 6.255 | 355 | 80.82 | 683 |
| 6.5000 - 6.9999 | 350 | 112,772,569.46 | 10.37 | 6.764 | 355 | 82.60 | 664 |
| 7.0000 - 7.4999 | 319 | 95,518,997.42 | 8.78 | 7.268 | 355 | 82.82 | 653 |
| 7.5000 - 7.9999 | 525 | 142,824,939.49 | 13.13 | 7.742 | 355 | 83.86 | 645 |
| 8.0000 - 8.4999 | 357 | 92,274,579.99 | 8.48 | 8.238 | 355 | 83.82 | 625 |
| 8.5000 - 8.9999 | 386 | 97,800,957.87 | 8.99 | 8.723 | 355 | 84.51 | 611 |
| 9.0000 - 9.4999 | 221 | 45,119,844.82 | 4.15 | 9.254 | 355 | 84.61 | 591 |
| 9.5000 - 9.9999 | 192 | 38,882,527.30 | 3.57 | 9.739 | 355 | 83.78 | 580 |
| 10.0000 - 10.4999 | 71 | 12,477,465.37 | 1.15 | 10.227 | 355 | 82.55 | 577 |
| 10.5000 - 10.9999 | 31 | 4,724,451.47 | 0.43 | 10.670 | 355 | 76.64 | 549 |
| 11.0000 - 11.4999 | 15 | 2,710,749.47 | 0.25 | 11.138 | 355 | 66.83 | 539 |
| 11.5000 - 11.9999 | 21 | 2,798,870.13 | 0.26 | 11.765 | 355 | 65.34 | 552 |
| 12.0000 - 12.4999 | 6 | 702,268.81 | 0.06 | 12.182 | 356 | 56.45 | 558 |
| 12.5000 - 12.9999 | 4 | 559,013.31 | 0.05 | 12.621 | 354 | 57.87 | 547 |
| Total ..................... | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

A-7

**Maximum Interest Rate of the Mortgage Loans**

| Maximum Interest Rate | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED ......................... | 1,857 | $ 322,835,535.30 | 29.67% | 7.746% | 353 | 83.46% | 666 |
| 11.0000 - 11.4999 ...................... | 26 | 11,144,654.23 | 1.02 | 5.330 | 356 | 79.96 | 697 |
| 11.5000 - 11.9999 ...................... | 95 | 41,404,660.87 | 3.81 | 5.738 | 356 | 80.75 | 692 |
| 12.0000 - 12.4999 ...................... | 172 | 63,375,621.08 | 5.83 | 6.255 | 355 | 80.82 | 683 |
| 12.5000 - 12.9999 ...................... | 350 | 112,772,569.46 | 10.37 | 6.764 | 355 | 82.60 | 664 |
| 13.0000 - 13.4999 ...................... | 319 | 95,518,997.42 | 8.78 | 7.268 | 355 | 82.82 | 653 |
| 13.5000 - 13.9999 ...................... | 525 | 142,824,939.49 | 13.13 | 7.742 | 355 | 83.86 | 645 |
| 14.0000 - 14.4999 ...................... | 357 | 92,274,579.99 | 8.48 | 8.238 | 355 | 83.82 | 625 |
| 14.5000 - 14.9999 ...................... | 386 | 97,800,957.87 | 8.99 | 8.723 | 355 | 84.51 | 611 |
| 15.0000 - 15.4999 ...................... | 221 | 45,119,844.82 | 4.15 | 9.254 | 355 | 84.61 | 591 |
| 15.5000 - 15.9999 ...................... | 192 | 38,882,527.30 | 3.57 | 9.739 | 355 | 83.78 | 580 |
| 16.0000 - 16.4999 ...................... | 71 | 12,477,466.37 | 1.15 | 10.227 | 355 | 82.55 | 577 |
| 16.5000 - 16.9999 ...................... | 31 | 4,724,451.47 | 0.43 | 10.670 | 355 | 76.64 | 549 |
| 17.0000 - 17.4999 ...................... | 15 | 2,710,749.47 | 0.25 | 11.318 | 355 | 66.83 | 539 |
| 17.5000 - 17.9999 ...................... | 21 | 2,798,870.13 | 0.26 | 11.765 | 355 | 65.34 | 552 |
| 18.0000 - 18.4999 ...................... | 6 | 702,268.81 | 0.06 | 12.182 | 356 | 56.45 | 558 |
| 18.5000 - 18.9999 ...................... | 4 | 559,013.31 | 0.05 | 12.621 | 354 | 57.87 | 547 |
| Total ......................... | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

**Initial Periodic Rate Cap of the Mortgage Loans**

| Initial Periodic Rate Cap | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED ......................... | 1,857 | $ 322,835,535.30 | 29.67% | 7.746% | 353 | 83.46% | 666 |
| 3.000 ......................... | 2,791 | 765,092,171.09 | 70.33 | 7.741 | 355 | 82.95 | 640 |
| Total ......................... | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

**Subsequent Period Cap of the Mortgage Loans**

| Subsequent Periodic Cap | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED ......................... | 1,857 | $ 322,835,535.30 | 29.67% | 7.746% | 353 | 83.46% | 666 |
| 1.000 ......................... | 1 | 250,000.00 | 0.02 | 5.500 | 355 | 44.64 | 609 |
| 1.500 ......................... | 2,790 | 764,842,171.09 | 70.30 | 7.742 | 355 | 82.96 | 640 |
| Total ......................... | 4,648 | $1,087,927,706.39 | 100.00% | 7.743% | 354 | 83.10% | 647 |

A-8

# Group 1 Statistical Mortgage Loan Statistics

### As of the Cut-off Date

### Current Principal Balance of the Group 1 Mortgage Loans

| Current Principal Balance | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 0.01 - 50,000.00 ... | 3 | $ 149,717.82 | 0.03% | 10.197% | 356 | 50.70% | 583 |
| 50,000.01 - 100,000.00 ... | 219 | 18,203,638.46 | 3.61 | 8.911 | 353 | 77.17 | 605 |
| 100,000.01 - 150,000.00 ... | 451 | 57,088,335.32 | 11.33 | 8.302 | 354 | 78.46 | 619 |
| 150,000.01 - 200,000.00 ... | 530 | 92,735,009.23 | 18.41 | 7.941 | 354 | 80.31 | 626 |
| 200,000.01 - 250,000.00 ... | 383 | 85,792,194.02 | 17.03 | 7.645 | 355 | 81.63 | 629 |
| 250,000.01 - 300,000.00 ... | 270 | 74,030,109.38 | 14.70 | 7.604 | 356 | 81.96 | 641 |
| 300,000.01 - 350,000.00 ... | 224 | 72,768,714.95 | 14.45 | 7.415 | 355 | 83.02 | 640 |
| 350,000.01 - 400,000.00 ... | 174 | 65,228,520.80 | 12.95 | 7.251 | 356 | 84.08 | 653 |
| 400,000.01 - 450,000.00 ... | 50 | 20,632,201.16 | 4.10 | 7.274 | 356 | 82.00 | 639 |
| 450,000.01 - 500,000.00 ... | 15 | 7,059,091.07 | 1.40 | 7.219 | 356 | 85.46 | 660 |
| 500,000.01 - 550,000.00 ... | 10 | 5,185,422.87 | 1.03 | 7.124 | 355 | 86.02 | 658 |
| 550,000.01 - 600,000.00 ... | 6 | 3,475,026.68 | 0.69 | 7.334 | 354 | 85.61 | 613 |
| 600,000.01 - 650,000.00 ... | 1 | 623,431.38 | 0.12 | 7.550 | 354 | 80.00 | 655 |
| 700,000.01 - 750,000.00 ... | 1 | 735,830.49 | 0.15 | 9.300 | 357 | 80.00 | 570 |
| Total ........................................ | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

### Current Gross Rate of the Group 1 Mortgage Loans

| Current Gross Rate | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 5.0000 - 5.4999 ...................... | 11 | $ 3,423,081.16 | 0.68% | 5.328% | 356 | 76.28% | 698 |
| 5.5000 - 5.9999 ...................... | 100 | 28,590,261.20 | 5.68 | 5.896 | 355 | 76.95 | 681 |
| 6.0000 - 6.4999 ...................... | 212 | 52,819,045.04 | 10.49 | 6.271 | 354 | 77.36 | 677 |
| 6.5000 - 6.9999 ...................... | 362 | 89,940,776.74 | 17.86 | 6.759 | 355 | 81.39 | 662 |
| 7.0000 - 7.4999 ...................... | 267 | 61,985,041.05 | 12.31 | 7.263 | 355 | 82.26 | 646 |
| 7.5000 - 7.9999 ...................... | 395 | 84,889,489.42 | 16.85 | 7.754 | 355 | 83.79 | 634 |
| 8.0000 - 8.4999 ...................... | 251 | 51,260,144.75 | 10.18 | 8.254 | 355 | 83.14 | 616 |
| 8.5000 - 8.9999 ...................... | 278 | 54,179,641.90 | 10.76 | 8.735 | 354 | 84.05 | 603 |
| 9.0000 - 9.4999 ...................... | 180 | 32,101,327.44 | 6.37 | 9.262 | 356 | 84.01 | 587 |
| 9.5000 - 9.9999 ...................... | 163 | 26,485,011.30 | 5.26 | 9.736 | 355 | 81.92 | 574 |
| 10.0000 - 10.4999 ...................... | 55 | 8,620,354.00 | 1.71 | 10.220 | 356 | 79.50 | 567 |
| 10.5000 - 10.9999 ...................... | 25 | 3,545,447.18 | 0.70 | 10.671 | 355 | 73.97 | 547 |
| 11.0000 - 11.4999 ...................... | 13 | 2,364,516.75 | 0.47 | 11.302 | 356 | 67.49 | 552 |
| 11.5000 - 11.9999 ...................... | 17 | 2,441,127.53 | 0.48 | 11.785 | 356 | 64.29 | 553 |
| 12.0000 - 12.4999 ...................... | 5 | 552,941.05 | 0.11 | 12.217 | 356 | 54.14 | 559 |
| 12.5000 - 12.9999 ...................... | 3 | 509,037.12 | 0.10 | 12.633 | 354 | 57.17 | 549 |
| Total ........................................ | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

A-9

### Credit Score of the Group 1 Mortgage Loans

| FICO | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 500 - 524 | 75 | $ 12,134,215.45 | 2.41% | 9.601% | 354 | 69.90% | 515 |
| 525 - 549 | 129 | 22,138,183.83 | 4.40 | 9.331 | 355 | 73.24 | 536 |
| 550 - 574 | 207 | 42,313,118.87 | 8.40 | 8.945 | 355 | 78.65 | 561 |
| 575 - 599 | 236 | 47,412,471.10 | 9.41 | 8.536 | 356 | 81.73 | 588 |
| 600 - 624 | 433 | 87,739,469.31 | 17.42 | 7.860 | 355 | 83.65 | 612 |
| 625 - 649 | 484 | 107,621,516.72 | 21.37 | 7.388 | 355 | 82.09 | 637 |
| 650 - 674 | 346 | 79,893,031.72 | 15.86 | 7.213 | 355 | 83.68 | 660 |
| 675 - 699 | 174 | 41,993,059.91 | 8.34 | 6.972 | 355 | 81.67 | 686 |
| 700+ | 253 | 62,462,176.72 | 12.40 | 6.732 | 355 | 81.98 | 732 |
| Total | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

### Combined Original LTV of the Group 1 Mortgage Loans

| Combined Original LTV | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 0.00 - 49.99 | 81 | $ 12,199,999.80 | 2.42% | 8.074% | 354 | 40.95% | 613 |
| 50.00 - 54.99 | 34 | 6,337,000.45 | 1.26 | 7.393 | 350 | 52.47 | 626 |
| 55.00 - 59.99 | 63 | 12,411,858.50 | 2.46 | 7.736 | 352 | 57.60 | 614 |
| 60.00 - 64.99 | 82 | 16,164,821.00 | 3.21 | 7.659 | 355 | 62.44 | 621 |
| 65.00 - 69.99 | 99 | 17,868,375.97 | 3.55 | 7.814 | 355 | 66.91 | 620 |
| 70.00 - 74.99 | 121 | 26,325,428.72 | 5.23 | 7.697 | 355 | 72.04 | 623 |
| 75.00 - 79.99 | 184 | 40,945,408.43 | 8.13 | 7.557 | 354 | 77.24 | 625 |
| 80.00 - 80.00 | 527 | 109,824,415.74 | 21.80 | 7.565 | 355 | 80.00 | 644 |
| 80.01 - 84.99 | 145 | 36,067,106.01 | 7.16 | 7.230 | 355 | 83.33 | 634 |
| 85.00 - 89.99 | 341 | 80,110,092.64 | 15.90 | 7.559 | 355 | 86.20 | 631 |
| 90.00 - 94.99 | 355 | 81,528,407.32 | 16.19 | 7.901 | 355 | 90.45 | 634 |
| 95.00 - 99.99 | 174 | 39,773,131.21 | 7.90 | 7.965 | 355 | 95.19 | 641 |
| 100.00 - 100.00 | 131 | 24,151,197.84 | 4.79 | 8.511 | 354 | 100.00 | 655 |
| Total | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

### Original Term of the Group 1 Mortgage Loans

| Original Term (months) | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 180 | 8 | $ 1,198,775.48 | 0.24% | 7.090% | 176 | 69.94% | 653 |
| 240 | 8 | 1,118,112.10 | 0.22 | 7.520 | 236 | 81.60 | 623 |
| 360 | 2,321 | 501,390,356.05 | 99.54 | 7.706 | 356 | 81.59 | 634 |
| Total | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

### Stated Remaining Term of the Group 1 Mortgage Loans

| Stated Remaining Term (months) | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 120 - 179 | 8 | $ 1,198,775.48 | 0.24% | 7.090% | 176 | 69.94% | 653 |
| 180 - 239 | 8 | 1,118,112.10 | 0.22 | 7.520 | 236 | 81.60 | 623 |
| 300 - 359 | 2,321 | 501,390,356.05 | 99.54 | 7.706 | 356 | 81.59 | 634 |
| Total | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

A-10

### Debt Ratio of the Group 1 Mortgage Loans

| Debt Ratio | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 0.01 - 20.00 | 77 | $ 15,540,309.89 | 3.09% | 7.675% | 355 | 79.10% | 628 |
| 20.01 - 25.00 | 72 | 13,503,130.02 | 2.68 | 7.769 | 353 | 80.54 | 640 |
| 25.01 - 30.00 | 140 | 25,870,921.16 | 5.14 | 7.579 | 354 | 81.42 | 645 |
| 30.01 - 35.00 | 206 | 42,164,917.99 | 8.37 | 7.532 | 355 | 80.57 | 643 |
| 35.01 - 40.00 | 349 | 73,358,680.93 | 14.56 | 7.537 | 355 | 81.07 | 644 |
| 40.01 - 45.00 | 399 | 85,384,893.20 | 16.95 | 7.640 | 355 | 82.26 | 641 |
| 45.01 - 50.00 | 472 | 105,290,691.21 | 20.90 | 7.762 | 355 | 85.04 | 642 |
| 50.01 - 55.00 | 622 | 142,593,699.23 | 28.31 | 7.856 | 355 | 79.51 | 614 |
| Total | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

### Interest Rate Types of Group 1 Mortgage Loans

| Type of Mortgage Rate | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Adjustable Rate | 1,665 | $ 356,998,356.28 | 70.87% | 7.959% | 355 | 82.21% | 625 |
| Fixed Rate | 672 | 146,708,887.35 | 29.13 | 7.083 | 353 | 79.99 | 657 |
| Total | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

### Product Type of the Group 1 Mortgage Loans

| Product | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 15 YR FIXED | 8 | $ 1,198,775.48 | 0.24% | 7.090% | 176 | 69.94% | 653 |
| 2/6 LIBOR | 544 | 96,252,229.06 | 19.11 | 8.566 | 355 | 79.79 | 604 |
| 2/6 LIBOR 40/30 BAL | 156 | 34,126,308.15 | 6.78 | 8.171 | 355 | 80.69 | 609 |
| 2/6 LIBOR 50/30 BAL | 489 | 116,005,869.18 | 23.03 | 7.825 | 355 | 84.37 | 632 |
| 2/6 LIBOR IO | 25 | 6,368,384.35 | 1.26 | 7.178 | 355 | 82.64 | 641 |
| 20 YR FIXED | 8 | 1,118,112.10 | 0.22 | 7.520 | 236 | 81.60 | 623 |
| 3/6 LIBOR | 140 | 25,968,623.65 | 5.16 | 7.973 | 356 | 81.28 | 627 |
| 3/6 LIBOR 40/30 BAL | 45 | 9,716,261.75 | 1.93 | 7.757 | 355 | 82.93 | 625 |
| 3/6 LIBOR 50/30 BAL | 224 | 57,278,395.26 | 11.37 | 7.447 | 356 | 83.28 | 639 |
| 3/6 LIBOR IO | 17 | 4,333,449.49 | 0.86 | 6.800 | 355 | 83.19 | 667 |
| 30 YR FIXED | 414 | 85,644,216.86 | 17.00 | 7.104 | 356 | 79.19 | 652 |
| 40/30 FIXED BAL | 58 | 13,119,268.77 | 2.60 | 6.894 | 356 | 79.21 | 658 |
| 5/6 LIBOR | 6 | 1,156,632.14 | 0.23 | 6.948 | 356 | 72.16 | 683 |
| 5/6 LIBOR 40/30 BAL | 2 | 312,027.01 | 0.06 | 6.900 | 356 | 73.55 | 696 |
| 5/6 LIBOR 50/30 BAL | 14 | 4,620,826.24 | 0.92 | 6.532 | 356 | 81.97 | 692 |
| 5/6 LIBOR IO | 3 | 859,350.00 | 0.17 | 6.664 | 356 | 79.59 | 696 |
| 50/30 FIXED BAL | 184 | 45,628,514.14 | 9.06 | 7.088 | 356 | 81.95 | 666 |
| Total | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

A-11

**Interest Only Term of the Group 1 Mortgage Loans**

| Interest Only | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Interest Only.............................. | 45 | $ 11,561,183.84 | 2.30% | 6.998% | 355 | 82.62% | 655 |
| Not Interest Only........................ | 2,292 | 492,146,059.79 | 97.70 | 7.720 | 355 | 81.54 | 633 |
| Total ............................ | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

**Prepayment Penalty Original Term of the Group 1 Mortgage Loans**

| Prepayment Penalty Original Term (months) | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Prepay Penalty:  N/A................... | 681 | $ 141,132,518.14 | 28.02% | 7.889% | 355 | 82.91% | 634 |
| Prepay Penalty: 12 months........... | 282 | 75,389,713.87 | 14.97 | 7.625 | 356 | 80.69 | 634 |
| Prepay Penalty: 24 months........... | 809 | 165,379,644.08 | 32.83 | 7.998 | 355 | 81.41 | 617 |
| Prepay Penalty: 30 months........... | 5 | 904,878.01 | 0.18 | 8.096 | 356 | 89.10 | 626 |
| Prepay Penalty: 36 months........... | 560 | 120,900,489.53 | 24.00 | 7.131 | 354 | 80.68 | 657 |
| Total ............................ | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

**Lien Type of the Group 1 Mortgage Loans**

| Lien Type | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| First Lien ..................................... | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |
| Total ........................................ | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

**Documentation Type of the Group 1 Mortgage Loans**

| Documentation Type | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Full/Alternative Documentation . | 1,831 | $ 388,414,850.24 | 77.11% | 7.541% | 355 | 82.61% | 633 |
| Easy Documentation ................... | 29 | 6,130,810.70 | 1.22 | 8.318 | 356 | 84.05 | 611 |
| Stated Income Verification ......... | 477 | 109,161,582.69 | 21.67 | 8.249 | 355 | 77.69 | 640 |
| Total ........................................ | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

**Loan Purpose of the Group 1 Mortgage Loans**

| Loan Purpose | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Cash Out Refinance ................... | 2,037 | $ 455,140,743.03 | 90.36% | 7.670% | 355 | 81.03% | 633 |
| Purchase .................................. | 261 | 40,619,728.58 | 8.06 | 8.070 | 355 | 86.15 | 641 |
| Rate/Term Refinance ................. | 39 | 7,946,772.02 | 1.58 | 7.803 | 352 | 88.58 | 633 |
| Total ........................................ | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

A-12

## Property Type of the Group 1 Mortgage Loans

| Property Type | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 2 Family.......................................... | 90 | $ 25,424,051.21 | 5.05% | 7.335% | 356 | 81.11% | 653 |
| 3 Family.......................................... | 14 | 5,266,414.24 | 1.05 | 7.786 | 355 | 83.66 | 648 |
| 4 Family.......................................... | 6 | 2,883,960.90 | 0.57 | 7.949 | 356 | 83.12 | 622 |
| Condominium.................................. | 147 | 28,793,443.33 | 5.72 | 7.905 | 355 | 82.28 | 639 |
| Single Family ............................... | 2,080 | 441,339,373.95 | 87.62 | 7.709 | 355 | 81.51 | 632 |
| Total .................................... | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

## Occupancy Status of the Group 1 Mortgage Loans

| Occupancy Status | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Owner Occupied.......................... | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |
| Total .................................... | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

A-13

## Geographic Distribution of the Group 1 Mortgage Loans

| State | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Alabama | 3 | $ 471,886.85 | 0.09% | 9.289% | 356 | 96.33% | 625 |
| Alaska | 2 | 384,486.09 | 0.08 | 7.974 | 355 | 80.00 | 584 |
| Arizona | 72 | 13,932,314.53 | 2.77 | 7.936 | 355 | 81.78 | 631 |
| Arkansas | 4 | 426,985.29 | 0.08 | 9.310 | 355 | 92.00 | 593 |
| California | 262 | 75,995,339.11 | 15.09 | 7.178 | 355 | 78.14 | 646 |
| Colorado | 44 | 8,126,897.78 | 1.61 | 7.520 | 356 | 82.66 | 644 |
| Connecticut | 50 | 10,689,814.69 | 2.12 | 7.598 | 356 | 84.05 | 635 |
| Delaware | 20 | 3,381,056.93 | 0.67 | 7.936 | 355 | 84.73 | 636 |
| District of Columbia | 23 | 5,304,722.84 | 1.05 | 7.309 | 355 | 71.43 | 622 |
| Florida | 409 | 79,501,062.33 | 15.78 | 7.958 | 355 | 79.76 | 624 |
| Georgia | 88 | 13,136,185.61 | 2.61 | 8.313 | 354 | 88.06 | 625 |
| Hawaii | 26 | 10,763,768.34 | 2.14 | 7.020 | 351 | 80.36 | 653 |
| Idaho | 10 | 1,294,520.77 | 0.26 | 8.040 | 356 | 81.00 | 611 |
| Illinois | 167 | 33,123,490.10 | 6.58 | 8.015 | 354 | 85.47 | 640 |
| Indiana | 10 | 1,055,942.99 | 0.21 | 7.983 | 355 | 84.09 | 632 |
| Iowa | 3 | 288,130.40 | 0.06 | 8.780 | 355 | 86.81 | 594 |
| Kansas | 7 | 832,861.97 | 0.17 | 8.487 | 355 | 82.74 | 627 |
| Kentucky | 4 | 437,240.66 | 0.09 | 9.028 | 356 | 89.12 | 609 |
| Maine | 4 | 600,332.33 | 0.12 | 7.981 | 356 | 86.41 | 660 |
| Maryland | 209 | 47,868,193.39 | 9.50 | 7.652 | 355 | 82.39 | 628 |
| Massachusetts | 75 | 19,972,595.09 | 3.97 | 7.506 | 355 | 83.44 | 646 |
| Michigan | 8 | 1,035,683.93 | 0.21 | 8.815 | 356 | 89.20 | 593 |
| Minnesota | 46 | 8,795,891.56 | 1.75 | 7.714 | 356 | 84.31 | 654 |
| Missouri | 16 | 1,973,094.90 | 0.39 | 8.446 | 355 | 88.70 | 627 |
| Nebraska | 3 | 277,167.87 | 0.06 | 8.351 | 355 | 80.92 | 646 |
| Nevada | 31 | 7,530,271.96 | 1.49 | 7.384 | 355 | 83.34 | 655 |
| New Hampshire | 10 | 2,108,742.19 | 0.42 | 7.772 | 356 | 83.23 | 632 |
| New Jersey | 87 | 22,771,653.76 | 4.52 | 8.051 | 356 | 82.10 | 632 |
| New Mexico | 7 | 1,248,267.41 | 0.25 | 7.596 | 355 | 87.95 | 658 |
| New York | 152 | 45,288,777.77 | 8.99 | 7.313 | 356 | 78.39 | 639 |
| North Carolina | 36 | 5,106,398.92 | 1.01 | 8.363 | 355 | 85.94 | 624 |
| Ohio | 30 | 3,857,447.79 | 0.77 | 8.207 | 355 | 87.59 | 641 |
| Oklahoma | 6 | 681,205.85 | 0.14 | 8.591 | 323 | 83.38 | 598 |
| Oregon | 20 | 4,307,541.81 | 0.86 | 8.040 | 356 | 83.33 | 614 |
| Pennsylvania | 81 | 13,100,934.95 | 2.60 | 8.234 | 355 | 84.45 | 608 |
| Rhode Island | 4 | 1,028,180.09 | 0.20 | 7.611 | 355 | 82.69 | 623 |
| South Carolina | 19 | 2,939,317.01 | 0.58 | 8.260 | 345 | 82.64 | 619 |
| Tennessee | 15 | 2,275,344.33 | 0.45 | 8.346 | 346 | 86.15 | 617 |
| Texas | 61 | 9,156,870.78 | 1.82 | 7.602 | 349 | 81.04 | 645 |
| Utah | 15 | 3,150,155.62 | 0.63 | 7.343 | 356 | 81.84 | 655 |
| Vermont | 2 | 328,330.86 | 0.07 | 8.871 | 356 | 87.03 | 607 |
| Virginia | 94 | 19,558,995.59 | 3.88 | 7.901 | 355 | 81.64 | 621 |
| Washington | 52 | 12,532,648.38 | 2.49 | 7.541 | 355 | 83.23 | 631 |
| West Virginia | 9 | 1,321,111.45 | 0.26 | 8.663 | 356 | 86.73 | 620 |
| Wisconsin | 41 | 5,745,380.76 | 1.14 | 8.153 | 355 | 87.22 | 625 |
| Total | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

**Gross Margin of the Group 1 Mortgage Loans**

| Gross Margin | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED .............................. | 672 | $ 146,708,887.35 | 29.13% | 7.083% | 353 | 79.99% | 657 |
| 2.5000 - 2.9999 ................ | 8 | 2,314,960.34 | 0.46 | 5.270 | 356 | 74.18 | 690 |
| 3.0000 - 3.4999 ................ | 30 | 9,318,730.87 | 1.85 | 5.699 | 355 | 78.19 | 687 |
| 3.5000 - 3.9999 ................ | 74 | 20,416,107.29 | 4.05 | 6.180 | 356 | 79.33 | 679 |
| 4.0000 - 4.4999 ................ | 149 | 37,097,645.86 | 7.36 | 6.648 | 355 | 82.18 | 666 |
| 4.5000 - 4.9999 ................ | 202 | 49,466,572.60 | 9.82 | 7.144 | 355 | 83.28 | 647 |
| 5.0000 - 5.4999 ................ | 257 | 57,072,506.10 | 11.33 | 7.737 | 355 | 82.38 | 631 |
| 5.5000 - 5.9999 ................ | 312 | 65,451,595.28 | 12.99 | 8.241 | 355 | 83.36 | 617 |
| 6.0000 - 6.4999 ................ | 225 | 43,719,821.10 | 8.68 | 8.672 | 355 | 83.42 | 602 |
| 6.5000 - 6.9999 ................ | 408 | 72,140,416.84 | 14.32 | 9.561 | 356 | 81.16 | 577 |
| Total ........................... | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

**Minimum Interest Rate of the Group 1 Mortgage Loans**

| Minimum Interest Rate | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED .............................. | 672 | $ 146,708,887.35 | 29.13% | 7.083% | 353 | 79.99% | 657 |
| 5.0000 - 5.4999 ................ | 11 | 3,423,081.16 | 0.68 | 5.328 | 356 | 76.28 | 698 |
| 5.5000 - 5.9999 ................ | 39 | 11,687,875.83 | 2.32 | 5.761 | 355 | 78.59 | 683 |
| 6.0000 - 6.4999 ................ | 87 | 22,706,797.27 | 4.51 | 6.264 | 355 | 80.02 | 679 |
| 6.5000 - 6.9999 ................ | 190 | 48,478,926.57 | 9.62 | 6.781 | 356 | 82.73 | 660 |
| 7.0000 - 7.4999 ................ | 178 | 43,174,128.60 | 8.57 | 7.268 | 355 | 82.88 | 643 |
| 7.5000 - 7.9999 ................ | 307 | 68,093,836.45 | 13.52 | 7.758 | 355 | 83.41 | 631 |
| 8.0000 - 8.4999 ................ | 211 | 44,051,228.17 | 8.75 | 8.254 | 355 | 82.87 | 613 |
| 8.5000 - 8.9999 ................ | 243 | 48,305,167.20 | 9.59 | 8.735 | 355 | 83.82 | 601 |
| 9.0000 - 9.4999 ................ | 156 | 28,158,204.59 | 5.59 | 9.258 | 355 | 83.79 | 585 |
| 9.5000 - 9.9999 ................ | 138 | 22,390,145.95 | 4.45 | 9.733 | 355 | 81.04 | 570 |
| 10.0000 - 10.4999 .............. | 50 | 8,209,500.12 | 1.63 | 10.221 | 356 | 79.20 | 566 |
| 10.5000 - 10.9999 .............. | 20 | 2,810,084.93 | 0.56 | 10.673 | 355 | 76.46 | 546 |
| 11.0000 - 11.4999 .............. | 10 | 2,006,273.74 | 0.40 | 11.305 | 356 | 63.83 | 544 |
| 11.5000 - 11.9999 .............. | 17 | 2,441,127.53 | 0.48 | 11.785 | 356 | 64.29 | 553 |
| 12.0000 - 12.4999 .............. | 5 | 552,941.05 | 0.11 | 12.217 | 356 | 54.14 | 559 |
| 12.5000 - 12.9999 .............. | 3 | 509,037.12 | 0.10 | 12.633 | 354 | 57.17 | 549 |
| Total ........................... | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

A-15

**Maximum Interest Rate of the Group 1 Mortgage Loans**

| Maximum Interest Rate | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED .............................. | 672 | $ 146,708,887.35 | 29.13% | 7.083% | 353 | 79.99% | 657 |
| 11.0000 - 11.4999 ...................... | 11 | 3,423,081.16 | 0.68 | 5.328 | 356 | 76.28 | 698 |
| 11.5000 - 11.9999 ...................... | 39 | 11,687,875.83 | 2.32 | 5.761 | 355 | 78.59 | 683 |
| 12.0000 - 12.4999 ...................... | 87 | 22,706,797.27 | 4.51 | 6.264 | 355 | 80.02 | 679 |
| 12.5000 - 12.9999 ...................... | 190 | 48,478,926.57 | 9.62 | 6.781 | 356 | 82.73 | 660 |
| 13.0000 - 13.4999 ...................... | 178 | 43,174,128.60 | 8.57 | 7.268 | 355 | 82.88 | 643 |
| 13.5000 - 13.9999 ...................... | 307 | 68,093,836.45 | 13.52 | 7.758 | 355 | 83.41 | 631 |
| 14.0000 - 14.4999 ...................... | 211 | 44,051,228.17 | 8.75 | 8.254 | 355 | 82.87 | 613 |
| 14.5000 - 14.9999 ...................... | 243 | 48,305,167.20 | 9.59 | 8.735 | 355 | 83.82 | 601 |
| 15.0000 - 15.4999 ...................... | 156 | 28,158,204.59 | 5.59 | 9.258 | 355 | 83.79 | 585 |
| 15.5000 - 15.9999 ...................... | 138 | 22,390,145.95 | 4.45 | 9.733 | 355 | 81.04 | 570 |
| 16.0000 - 16.4999 ...................... | 50 | 8,209,500.12 | 1.63 | 10.221 | 356 | 79.20 | 566 |
| 16.5000 - 16.9999 ...................... | 20 | 2,810,084.93 | 0.56 | 10.673 | 355 | 76.46 | 546 |
| 17.0000 - 17.4999 ...................... | 10 | 2,006,273.74 | 0.40 | 11.305 | 356 | 63.83 | 544 |
| 17.5000 - 17.9999 ...................... | 17 | 2,441,127.53 | 0.48 | 11.785 | 356 | 64.29 | 553 |
| 18.0000 - 18.4999 ...................... | 5 | 552,941.05 | 0.11 | 12.217 | 356 | 54.14 | 559 |
| 18.5000 - 18.9999 ...................... | 3 | 509,037.12 | 0.10 | 12.633 | 354 | 57.17 | 549 |
| Total .............................. | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

**Initial Periodic Rate Cap of the Group 1 Mortgage Loans**

| Initial Periodic Rate Cap | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED .............................. | 672 | $ 146,708,887.35 | 29.13% | 7.083% | 353 | 79.99% | 657 |
| 3.000 .............................. | 1,665 | 356,998,356.28 | 70.87 | 7.959 | 355 | 82.21 | 625 |
| Total .............................. | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

**Subsequent Period Cap of the Group 1 Mortgage Loans**

| Subsequent Periodic Cap | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED .............................. | 672 | $ 146,708,887.35 | 29.13% | 7.083% | 353 | 79.99% | 657 |
| 1.000 .............................. | 1 | 250,000.00 | 0.05 | 5.500 | 355 | 44.64 | 609 |
| 1.500 .............................. | 1,664 | 356,748,356.28 | 70.82 | 7.961 | 355 | 82.23 | 625 |
| Total .............................. | 2,337 | $ 503,707,243.63 | 100.00% | 7.704% | 355 | 81.56% | 634 |

# Group 2 Statistical Mortgage Loan Statistics

## As of the Cut-off Date

### Current Principal Balance of the Group 2 Mortgage Loans

| Current Principal Balance | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 0.01 - 50,000.00 ... | 358 | $ 12,892,021.49 | 2.21% | 11.173% | 337 | 98.76% | 655 |
| 50,000.01 - 100,000.00 ... | 481 | 34,577,518.51 | 5.92 | 10.755 | 351 | 96.44 | 659 |
| 100,000.01 - 150,000.00 ... | 221 | 27,458,546.02 | 4.70 | 9.449 | 355 | 87.67 | 654 |
| 150,000.01 - 200,000.00 ... | 176 | 30,762,708.74 | 5.27 | 8.410 | 354 | 84.89 | 651 |
| 200,000.01 - 250,000.00 ... | 137 | 30,774,282.97 | 5.27 | 7.896 | 355 | 82.73 | 649 |
| 250,000.01 - 300,000.00 ... | 132 | 36,274,712.23 | 6.21 | 7.738 | 355 | 82.69 | 657 |
| 300,000.01 - 350,000.00 ... | 108 | 34,834,309.36 | 5.96 | 7.571 | 355 | 81.48 | 655 |
| 350,000.01 - 400,000.00 ... | 72 | 26,707,261.21 | 4.57 | 7.454 | 355 | 83.17 | 677 |
| 400,000.01 - 450,000.00 ... | 139 | 59,957,402.14 | 10.26 | 7.330 | 355 | 83.00 | 660 |
| 450,000.01 - 500,000.00 ... | 124 | 59,145,439.74 | 10.12 | 7.216 | 355 | 82.50 | 660 |
| 500,000.01 - 550,000.00 ... | 105 | 54,664,825.43 | 9.36 | 7.374 | 355 | 84.39 | 653 |
| 550,000.01 - 600,000.00 ... | 68 | 38,962,957.02 | 6.67 | 6.920 | 355 | 83.18 | 667 |
| 600,000.01 - 650,000.00 ... | 62 | 38,769,484.10 | 6.64 | 7.219 | 355 | 84.64 | 660 |
| 650,000.01 - 700,000.00 ... | 36 | 24,400,232.24 | 4.18 | 7.240 | 355 | 83.51 | 643 |
| 700,000.01 - 750,000.00 ... | 34 | 24,643,125.52 | 4.22 | 7.100 | 355 | 84.76 | 671 |
| 750,000.01 - 800,000.00 ... | 35 | 27,523,782.12 | 4.71 | 7.505 | 350 | 81.92 | 663 |
| 800,000.01 - 850,000.00 ... | 7 | 5,849,010.56 | 1.00 | 7.019 | 355 | 84.92 | 654 |
| 850,000.01 - 900,000.00 ... | 4 | 3,479,807.03 | 0.60 | 6.366 | 356 | 81.60 | 682 |
| 900,000.01 - 950,000.00 ... | 2 | 1,892,361.13 | 0.32 | 5.926 | 353 | 74.77 | 663 |
| 950,000.01 - 1,000,000.00 ... | 8 | 7,951,197.00 | 1.36 | 6.364 | 354 | 74.54 | 707 |
| 1,000,000.01+ ... | 2 | 2,699,478.20 | 0.46 | 7.531 | 352 | 75.96 | 653 |
| Total ................ | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

### Current Gross Rate of the Group 2 Mortgage Loans

| Current Gross Rate | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 5.0000 - 5.4999 ............ | 15 | $ 7,721,573.07 | 1.32% | 5.331% | 356 | 81.58% | 696 |
| 5.5000 - 5.9999 ............ | 77 | 41,582,205.82 | 7.12 | 5.803 | 356 | 78.28 | 695 |
| 6.0000 - 6.4999 ............ | 148 | 70,864,459.75 | 12.13 | 6.256 | 355 | 79.59 | 687 |
| 6.5000 - 6.9999 ............ | 234 | 97,408,730.23 | 16.67 | 6.742 | 353 | 82.11 | 672 |
| 7.0000 - 7.4999 ............ | 184 | 69,391,767.92 | 11.88 | 7.266 | 355 | 82.79 | 664 |
| 7.5000 - 7.9999 ............ | 261 | 89,076,865.40 | 15.25 | 7.731 | 355 | 84.21 | 661 |
| 8.0000 - 8.4999 ............ | 164 | 52,920,659.98 | 9.06 | 8.220 | 355 | 84.76 | 639 |
| 8.5000 - 8.9999 ............ | 157 | 52,260,503.13 | 8.95 | 8.713 | 355 | 84.79 | 623 |
| 9.0000 - 9.4999 ............ | 72 | 17,973,179.19 | 3.08 | 9.244 | 355 | 85.68 | 604 |
| 9.5000 - 9.9999 ............ | 132 | 22,674,189.51 | 3.88 | 9.786 | 354 | 89.65 | 613 |
| 10.0000 - 10.4999 ............ | 247 | 20,219,111.09 | 3.46 | 10.215 | 352 | 96.77 | 656 |
| 10.5000 - 10.9999 ............ | 100 | 8,124,594.80 | 1.39 | 10.748 | 351 | 94.40 | 643 |
| 11.0000 - 11.4999 ............ | 238 | 17,439,058.03 | 2.99 | 11.247 | 348 | 98.10 | 664 |
| 11.5000 - 11.9999 ............ | 120 | 8,304,783.97 | 1.42 | 11.659 | 351 | 98.54 | 641 |
| 12.0000 - 12.4999 ............ | 114 | 6,038,567.43 | 1.03 | 12.279 | 344 | 98.87 | 619 |
| 12.5000 - 12.9999 ............ | 38 | 1,998,628.57 | 0.34 | 12.641 | 341 | 97.36 | 622 |
| 13.0000 - 13.4999 ............ | 6 | 122,306.68 | 0.02 | 13.155 | 258 | 96.23 | 682 |
| 13.5000 - 13.9999 ............ | 4 | 99,278.19 | 0.02 | 13.785 | 288 | 95.00 | 668 |
| Total ................ | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

A-17

### Credit Score of the Group 2 Mortgage Loans

| FICO | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 500 - 524 | 17 | $ 6,826,494.84 | 1.17% | 9.496% | 354 | 77.05% | 512 |
| 525 - 549 | 23 | 6,783,230.83 | 1.16 | 9.434 | 355 | 76.85 | 535 |
| 550 - 574 | 63 | 20,795,162.77 | 3.56 | 8.835 | 355 | 79.35 | 561 |
| 575 - 599 | 65 | 20,912,754.85 | 3.58 | 8.616 | 355 | 86.80 | 588 |
| 600 - 624 | 396 | 81,968,380.36 | 14.03 | 8.439 | 354 | 86.70 | 612 |
| 625 - 649 | 520 | 120,170,355.78 | 20.57 | 7.869 | 354 | 85.65 | 638 |
| 650 - 674 | 497 | 120,956,679.88 | 20.70 | 7.635 | 354 | 84.26 | 661 |
| 675 - 699 | 322 | 83,949,200.82 | 14.37 | 7.456 | 355 | 85.46 | 686 |
| 700+ | 408 | 121,858,202.63 | 20.86 | 7.086 | 353 | 82.44 | 735 |
| Total | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

### Combined Original LTV of the Group 2 Mortgage Loans

| Combined Original LTV | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 0 - 49.99 | 16 | $ 3,455,565.78 | 0.59% | 6.826% | 355 | 38.74% | 694 |
| 50.00 - 54.99 | 8 | 2,562,283.85 | 0.44 | 6.509 | 349 | 50.72 | 713 |
| 55.00 - 59.99 | 15 | 6,766,755.54 | 1.16 | 6.552 | 354 | 57.74 | 670 |
| 60.00 - 64.99 | 28 | 10,109,960.61 | 1.73 | 7.053 | 354 | 62.22 | 656 |
| 65.00 - 69.99 | 28 | 12,554,352.74 | 2.15 | 7.326 | 352 | 66.74 | 638 |
| 70.00 - 74.99 | 55 | 20,261,960.87 | 3.47 | 7.285 | 348 | 72.34 | 653 |
| 75.00 - 79.99 | 64 | 29,477,496.20 | 5.05 | 7.123 | 355 | 77.31 | 656 |
| 80.00 - 80.00 | 619 | 200,309,380.00 | 34.29 | 7.387 | 355 | 80.00 | 663 |
| 80.01 - 84.99 | 51 | 22,965,219.13 | 3.93 | 7.048 | 355 | 83.48 | 661 |
| 85.00 - 89.99 | 163 | 67,095,898.11 | 11.48 | 7.230 | 355 | 86.39 | 648 |
| 90.00 - 94.99 | 269 | 101,861,340.68 | 17.44 | 7.536 | 355 | 90.30 | 661 |
| 95.00 - 99.99 | 141 | 34,427,604.34 | 5.89 | 8.553 | 354 | 95.40 | 645 |
| 100.00 - 100.00 | 854 | 72,372,644.91 | 12.39 | 10.345 | 351 | 100.00 | 663 |
| Total | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

### Original Term of the Group 2 Mortgage Loans

| Original Term (months) | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 120 | 20 | $ 964,951.58 | 0.17% | 11.188% | 116 | 100.00% | 663 |
| 180 | 39 | 1,738,492.76 | 0.30 | 8.911 | 174 | 82.16 | 699 |
| 240 | 3 | 258,295.81 | 0.04 | 10.958 | 235 | 92.95 | 640 |
| 360 | 2,249 | 581,258,722.61 | 99.49 | 7.766 | 355 | 84.41 | 659 |
| Total | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

A-18

## Stated Remaining Term of the Group 2 Mortgage Loans

| Stated Remaining Term (months) | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 60 - 119 ...................................... | 20 | $ 964,951.58 | 0.17% | 11.188% | 116 | 100.00% | 663 |
| 120 - 179 ...................................... | 39 | 1,738,492.76 | 0.30 | 8.911 | 174 | 82.16 | 699 |
| 180 - 239 ...................................... | 3 | 258,295.81 | 0.04 | 10.958 | 235 | 92.95 | 640 |
| 300 - 359 ...................................... | 2,249 | 581,258,722.61 | 99.49 | 7.766 | 355 | 84.41 | 659 |
| Total ................................ | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

## Debt Ratio of the Group 2 Mortgage Loans

| Debt Ratio | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 0.01 - 20.00 .................... | 453 | $ 59,659,311.04 | 10.21% | 8.900% | 353 | 88.97% | 660 |
| 20.01 - 25.00 .................... | 124 | 17,744,352.06 | 3.04 | 8.302 | 353 | 85.61 | 648 |
| 25.01 - 30.00 .................... | 127 | 31,254,563.66 | 5.35 | 7.717 | 353 | 84.06 | 658 |
| 30.01 - 35.00 .................... | 181 | 50,056,476.93 | 8.57 | 7.432 | 352 | 82.97 | 671 |
| 35.01 - 40.00 .................... | 291 | 81,630,761.65 | 13.97 | 7.617 | 355 | 82.73 | 667 |
| 40.01 - 45.00 .................... | 350 | 94,379,302.60 | 16.15 | 7.535 | 355 | 84.31 | 667 |
| 45.01 - 50.00 .................... | 493 | 142,573,763.97 | 24.40 | 7.662 | 354 | 85.71 | 663 |
| 50.01 - 55.00 .................... | 292 | 106,921,930.85 | 18.30 | 7.726 | 355 | 82.18 | 637 |
| Total ................................ | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

## Interest Rate Type of the Group 2 Mortgage Loans

| Type of Mortgage Rate | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Adjustable Rate ............................ | 1,126 | $ 408,093,814.81 | 69.85% | 7.551% | 355 | 83.60% | 653 |
| Fixed Rate ..................................... | 1,185 | 176,126,647.95 | 30.15 | 8.297 | 352 | 86.35 | 674 |
| Total ........................................ | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

A-19

## Product Type of the Group 2 Mortgage Loans

| Product | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 10 YR FIXED ............................ | 20 | $ 964,951.58 | 0.17% | 11.188% | 116 | 100.00% | 663 |
| 15 YR FIXED ............................ | 39 | 1,738,492.76 | 0.30 | 8.911 | 174 | 82.16 | 699 |
| 2/6 LIBOR.................................. | 254 | 64,745,497.99 | 11.08 | 8.311 | 355 | 82.70 | 631 |
| 2/6 LIBOR 40/30 BAL ............. | 76 | 25,132,808.38 | 4.30 | 8.001 | 355 | 84.56 | 640 |
| 2/6 LIBOR 50/30 BAL ............. | 441 | 171,828,913.57 | 29.41 | 7.578 | 355 | 83.68 | 651 |
| 2/6 LIBOR IO .......................... | 42 | 19,066,916.65 | 3.26 | 6.925 | 355 | 83.81 | 648 |
| 20 YR FIXED ............................ | 3 | 258,295.81 | 0.04 | 10.958 | 235 | 92.95 | 640 |
| 3/6 LIBOR.................................. | 69 | 20,157,064.57 | 3.45 | 7.683 | 356 | 83.37 | 655 |
| 3/6 LIBOR 40/30 BAL ............. | 24 | 10,232,488.20 | 1.75 | 6.911 | 355 | 82.82 | 686 |
| 3/6 LIBOR 50/30 BAL ............. | 172 | 71,468,781.38 | 12.23 | 7.264 | 355 | 84.68 | 664 |
| 3/6 LIBOR IO .......................... | 23 | 12,939,263.73 | 2.21 | 6.450 | 355 | 84.75 | 678 |
| 30 YR FIXED ............................ | 993 | 117,007,356.57 | 20.03 | 8.964 | 355 | 88.14 | 668 |
| 40/30 FIXED BAL..................... | 12 | 4,538,785.99 | 0.78 | 6.746 | 356 | 84.03 | 691 |
| 5/6 LIBOR.................................. | 3 | 1,882,907.30 | 0.32 | 6.194 | 356 | 79.95 | 702 |
| 5/6 LIBOR 40/30 BAL ............. | 3 | 1,247,257.68 | 0.21 | 7.224 | 355 | 86.42 | 678 |
| 5/6 LIBOR 50/30 BAL ............. | 8 | 3,614,173.25 | 0.62 | 6.736 | 355 | 80.12 | 681 |
| 5/6 LIBOR IO .......................... | 11 | 5,777,742.11 | 0.99 | 6.063 | 356 | 75.11 | 726 |
| 50/30 FIXED BAL..................... | 118 | 51,618,765.24 | 8.84 | 6.833 | 355 | 82.36 | 685 |
| Total ......................................... | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

## Interest Only Term of the Group 2 Mortgage Loans

| Interest Only | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Interest Only.............................. | 76 | $ 37,783,922.49 | 6.47% | 6.631% | 355 | 82.80% | 670 |
| Not Interest Only....................... | 2,235 | 546,436,540.27 | 93.53 | 7.855 | 354 | 84.54 | 658 |
| Total ......................................... | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

## Prepayment Penalty Original Term of the Group 2 Mortgage Loans

| Prepayment Penalty Original Term (months) | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Prepay Penalty:  N/A................... | 565 | $ 114,574,166.75 | 19.61% | 8.310% | 354 | 86.30% | 655 |
| Prepay Penalty: 12 months.......... | 335 | 104,627,115.61 | 17.91 | 7.799 | 353 | 84.25 | 666 |
| Prepay Penalty: 24 months.......... | 925 | 225,924,749.46 | 38.67 | 7.864 | 355 | 84.96 | 648 |
| Prepay Penalty: 30 months.......... | 2 | 410,925.94 | 0.07 | 8.947 | 356 | 91.83 | 596 |
| Prepay Penalty: 36 months.......... | 484 | 138,683,505.00 | 23.74 | 7.171 | 354 | 82.12 | 675 |
| Total ......................................... | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

## Lien Type of the Group 2 Mortgage Loans

| Lien Type | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| First Lien ................................. | 1,424 | $ 525,976,258.41 | 90.03% | 7.416% | 355 | 82.75% | 659 |
| Second Lien ............................... | 887 | 58,244,204.35 | 9.97 | 11.031 | 349 | 99.61 | 664 |
| Total ......................................... | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

A-20

### Documentation Type of the Group 2 Mortgage Loans

| Documentation Type | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Full/Alternative  Documentation | 1,582 | $ 400,380,443.29 | 68.53% | 7.526% | 354 | 85.07% | 655 |
| Easy Documentation | 48 | 11,618,563.36 | 1.99 | 7.734 | 355 | 83.31 | 653 |
| Stated Income Verification | 681 | 172,221,456.11 | 29.48 | 8.361 | 354 | 83.01 | 669 |
| Total | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

### Loan Purpose of the Group 2 Mortgage Loans

| Loan Purpose | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Cash Out Refinance | 970 | $ 316,295,220.98 | 54.14% | 7.526% | 354 | 83.46% | 655 |
| Purchase | 1,316 | 264,732,544.35 | 45.31 | 8.072 | 354 | 85.55 | 664 |
| Rate/Term Refinance | 25 | 3,192,697.43 | 0.55 | 8.023 | 354 | 86.64 | 670 |
| Total | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

### Property Type of the Group 2 Mortgage Loans

| Property Type | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| 2 Family | 131 | $ 37,501,219.48 | 6.42% | 7.847% | 355 | 85.43% | 677 |
| 3 Family | 14 | 5,594,562.36 | 0.96 | 7.323 | 354 | 78.58 | 713 |
| 4 Family | 3 | 866,639.65 | 0.15 | 9.022 | 355 | 68.00 | 635 |
| Condominium | 177 | 33,015,921.04 | 5.65 | 8.252 | 354 | 84.72 | 667 |
| Single Family | 1,986 | 507,242,120.23 | 86.82 | 7.743 | 354 | 84.43 | 657 |
| Total | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

### Occupancy Status of the Group 2 Mortgage Loans

| Occupancy Status | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Investor | 321 | $ 64,823,874.93 | 11.10% | 8.085% | 355 | 80.62% | 663 |
| Owner Occupied | 1,960 | 510,313,961.54 | 87.35 | 7.746 | 354 | 84.99 | 659 |
| Second Home | 30 | 9,082,626.29 | 1.55 | 7.291 | 352 | 80.03 | 646 |
| Total | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

A-21

## Geographic Distribution of the Group 2 Mortgage Loans

| State | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| Alabama | 1 | $ 223,667.65 | 0.04% | 9.650% | 356 | 90.00% | 551 |
| Arizona | 50 | 9,287,129.55 | 1.59 | 7.849 | 355 | 83.35 | 660 |
| California | 697 | 240,304,745.33 | 41.13 | 7.393 | 355 | 83.56 | 663 |
| Colorado | 49 | 8,156,601.77 | 1.40 | 8.039 | 354 | 87.68 | 647 |
| Connecticut | 27 | 4,987,148.97 | 0.85 | 8.003 | 355 | 85.63 | 662 |
| Delaware | 10 | 962,876.91 | 0.16 | 9.385 | 353 | 90.95 | 640 |
| District of Columbia | 20 | 3,952,639.37 | 0.68 | 7.679 | 356 | 81.01 | 665 |
| Florida | 336 | 63,966,960.31 | 10.95 | 8.182 | 353 | 84.65 | 649 |
| Georgia | 77 | 7,743,528.03 | 1.33 | 8.733 | 349 | 86.63 | 636 |
| Hawaii | 33 | 9,744,833.95 | 1.67 | 8.065 | 355 | 81.60 | 665 |
| Idaho | 6 | 868,137.85 | 0.15 | 7.989 | 355 | 83.46 | 641 |
| Illinois | 96 | 18,789,130.63 | 3.22 | 8.565 | 353 | 85.82 | 647 |
| Indiana | 16 | 1,772,313.07 | 0.30 | 8.188 | 354 | 88.79 | 641 |
| Iowa | 1 | 20,812.53 | 0.00 | 10.990 | 176 | 100.00 | 624 |
| Kansas | 6 | 317,270.76 | 0.05 | 10.122 | 356 | 88.67 | 624 |
| Kentucky | 4 | 651,714.32 | 0.11 | 7.031 | 356 | 67.95 | 650 |
| Maine | 5 | 559,164.84 | 0.10 | 8.140 | 356 | 85.98 | 650 |
| Maryland | 133 | 34,091,484.44 | 5.84 | 8.110 | 354 | 85.42 | 643 |
| Massachusetts | 51 | 11,808,213.67 | 2.02 | 8.033 | 354 | 86.20 | 675 |
| Michigan | 12 | 1,773,156.38 | 0.30 | 9.157 | 354 | 80.13 | 674 |
| Minnesota | 22 | 2,593,350.34 | 0.44 | 9.014 | 354 | 89.76 | 617 |
| Missouri | 15 | 1,574,069.72 | 0.27 | 8.794 | 350 | 89.86 | 654 |
| Montana | 1 | 189,246.99 | 0.03 | 8.200 | 354 | 95.00 | 611 |
| Nebraska | 1 | 34,244.13 | 0.01 | 11.500 | 355 | 100.00 | 648 |
| Nevada | 38 | 7,114,745.77 | 1.22 | 8.033 | 355 | 84.33 | 651 |
| New Hampshire | 4 | 945,712.27 | 0.16 | 7.682 | 356 | 84.70 | 673 |
| New Jersey | 88 | 26,955,870.36 | 4.61 | 8.058 | 354 | 86.14 | 661 |
| New Mexico | 4 | 436,354.47 | 0.07 | 8.217 | 356 | 84.73 | 644 |
| New York | 205 | 72,118,185.91 | 12.34 | 7.566 | 353 | 84.28 | 680 |
| North Carolina | 25 | 3,707,252.76 | 0.63 | 8.894 | 354 | 86.30 | 605 |
| Ohio | 14 | 1,961,706.83 | 0.34 | 8.838 | 351 | 85.95 | 618 |
| Oklahoma | 2 | 106,606.39 | 0.02 | 7.983 | 317 | 89.74 | 655 |
| Oregon | 10 | 1,754,082.45 | 0.30 | 8.550 | 355 | 86.57 | 648 |
| Pennsylvania | 33 | 4,101,912.31 | 0.70 | 8.942 | 350 | 86.73 | 646 |
| Rhode Island | 7 | 1,810,923.03 | 0.31 | 7.600 | 356 | 87.80 | 668 |
| South Carolina | 4 | 442,244.79 | 0.08 | 9.580 | 356 | 80.05 | 596 |
| Tennessee | 6 | 1,012,571.42 | 0.17 | 9.702 | 352 | 88.30 | 595 |
| Texas | 60 | 8,473,534.52 | 1.45 | 7.499 | 354 | 84.38 | 661 |
| Utah | 12 | 2,485,476.54 | 0.43 | 8.163 | 356 | 87.05 | 630 |
| Virginia | 60 | 15,478,855.06 | 2.65 | 7.586 | 355 | 85.72 | 657 |
| Washington | 40 | 6,839,878.35 | 1.17 | 8.062 | 354 | 83.80 | 640 |
| West Virginia | 2 | 544,795.16 | 0.09 | 11.058 | 356 | 81.32 | 519 |
| Wisconsin | 28 | 3,557,312.86 | 0.61 | 8.783 | 355 | 85.62 | 630 |
| Total | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

A-22

**Gross Margin of the Group 2 Mortgage Loans**

| Gross Margin | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED ...................... | 1,185 | $ 176,126,647.95 | 30.15% | 8.297% | 352 | 86.35% | 674 |
| 2.5000 - 2.9999 ...................... | 9 | 4,577,838.49 | 0.78 | 5.275 | 356 | 79.58 | 688 |
| 3.0000 - 3.4999 ...................... | 50 | 26,095,690.24 | 4.47 | 5.635 | 356 | 82.00 | 696 |
| 3.5000 - 3.9999 ...................... | 73 | 37,963,444.15 | 6.50 | 6.155 | 356 | 81.06 | 690 |
| 4.0000 - 4.4999 ...................... | 135 | 55,996,428.42 | 9.58 | 6.627 | 355 | 81.93 | 673 |
| 4.5000 - 4.9999 ...................... | 155 | 56,735,749.44 | 9.71 | 7.134 | 355 | 83.10 | 660 |
| 5.0000 - 5.4999 ...................... | 206 | 72,538,240.62 | 12.42 | 7.636 | 355 | 84.23 | 662 |
| 5.5000 - 5.9999 ...................... | 172 | 58,257,274.48 | 9.97 | 8.152 | 355 | 84.25 | 639 |
| 6.0000 - 6.4999 ...................... | 141 | 48,991,701.47 | 8.39 | 8.651 | 355 | 85.22 | 624 |
| 6.5000 - 6.9999 ...................... | 185 | 46,937,447.50 | 8.03 | 9.552 | 355 | 86.03 | 597 |
| Total ...................... | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

**Minimum Interest Rate of the Group 2 Mortgage Loans**

| Minimum Interest Rate | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED ...................... | 1,185 | $ 176,126,647.95 | 30.15% | 8.297% | 352 | 86.35% | 674 |
| 5.0000 - 5.4999 ...................... | 15 | 7,721,573.07 | 1.32 | 5.331 | 356 | 81.58 | 696 |
| 5.5000 - 5.9999 ...................... | 56 | 29,716,785.04 | 5.09 | 5.729 | 356 | 81.60 | 695 |
| 6.0000 - 6.4999 ...................... | 85 | 40,668,823.81 | 6.96 | 6.251 | 356 | 81.27 | 686 |
| 6.5000 - 6.9999 ...................... | 160 | 64,293,642.89 | 11.01 | 6.751 | 355 | 82.51 | 668 |
| 7.0000 - 7.4999 ...................... | 141 | 52,344,868.82 | 8.96 | 7.267 | 355 | 82.77 | 662 |
| 7.5000 - 7.9999 ...................... | 218 | 74,731,103.04 | 12.79 | 7.728 | 355 | 84.27 | 658 |
| 8.0000 - 8.4999 ...................... | 146 | 48,223,351.82 | 8.25 | 8.224 | 355 | 84.69 | 637 |
| 8.5000 - 8.9999 ...................... | 143 | 49,495,790.67 | 8.47 | 8.712 | 355 | 85.17 | 621 |
| 9.0000 - 9.4999 ...................... | 65 | 16,961,640.23 | 2.90 | 9.247 | 355 | 85.97 | 600 |
| 9.5000 - 9.9999 ...................... | 54 | 16,492,381.35 | 2.82 | 9.746 | 355 | 87.51 | 594 |
| 10.0000 - 10.4999 ...................... | 21 | 4,267,965.25 | 0.73 | 10.240 | 355 | 88.98 | 600 |
| 10.5000 - 10.9999 ...................... | 11 | 1,914,366.54 | 0.33 | 10.667 | 355 | 76.90 | 552 |
| 11.0000 - 11.4999 ...................... | 5 | 704,475.73 | 0.12 | 11.354 | 354 | 75.39 | 525 |
| 11.5000 - 11.9999 ...................... | 4 | 357,742.60 | 0.06 | 11.628 | 354 | 72.56 | 544 |
| 12.0000 - 12.4999 ...................... | 1 | 149,327.76 | 0.03 | 12.050 | 356 | 65.00 | 555 |
| 12.5000 - 12.9999 ...................... | 1 | 49,976.19 | 0.01 | 12.500 | 355 | 65.00 | 527 |
| Total ...................... | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

A-23

**Maximum Interest Rate of the Group 2 Mortgage Loans**

| Maximum Interest Rate | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED ....................... | 1,185 | $ 176,126,647.95 | 30.15% | 8.297% | 352 | 86.35% | 674 |
| 11.0000 - 11.4999 ...................... | 15 | 7,721,573.07 | 1.32 | 5.331 | 356 | 81.58 | 696 |
| 11.5000 - 11.9999 ...................... | 56 | 29,716,785.04 | 5.09 | 5.729 | 356 | 81.60 | 695 |
| 12.0000 - 12.4999 ...................... | 85 | 40,668,823.81 | 6.96 | 6.251 | 356 | 81.27 | 686 |
| 12.5000 - 12.9999 ...................... | 160 | 64,293,642.89 | 11.01 | 6.751 | 355 | 82.51 | 668 |
| 13.0000 - 13.4999 ...................... | 141 | 52,344,868.82 | 8.96 | 7.267 | 355 | 82.77 | 662 |
| 13.5000 - 13.9999 ...................... | 218 | 74,731,103.04 | 12.79 | 7.728 | 355 | 84.27 | 658 |
| 14.0000 - 14.4999 ...................... | 146 | 48,223,351.82 | 8.25 | 8.224 | 355 | 84.69 | 637 |
| 14.5000 - 14.9999 ...................... | 143 | 49,495,790.67 | 8.47 | 8.712 | 355 | 85.17 | 621 |
| 15.0000 - 15.4999 ...................... | 65 | 16,961,640.23 | 2.90 | 9.247 | 355 | 85.97 | 600 |
| 15.5000 - 15.9999 ...................... | 54 | 16,492,381.35 | 2.82 | 9.746 | 355 | 87.51 | 594 |
| 16.0000 - 16.4999 ...................... | 21 | 4,267,965.25 | 0.73 | 10.240 | 355 | 88.98 | 600 |
| 16.5000 - 16.9999 ...................... | 11 | 1,914,366.54 | 0.33 | 10.667 | 355 | 76.90 | 552 |
| 17.0000 - 17.4999 ...................... | 5 | 704,475.73 | 0.12 | 11.354 | 354 | 75.39 | 525 |
| 17.5000 - 17.9999 ...................... | 4 | 357,742.60 | 0.06 | 11.628 | 354 | 72.56 | 544 |
| 18.0000 - 18.4999 ...................... | 1 | 149,327.76 | 0.03 | 12.050 | 356 | 65.00 | 555 |
| 18.5000 - 18.9999 ...................... | 1 | 49,976.19 | 0.01 | 12.500 | 355 | 65.00 | 527 |
| Total ...................... | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

**Initial Periodic Rate Cap of the Group 2 Mortgage Loans**

| Initial Periodic Rate Cap | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED ........................... | 1,185 | $ 176,126,647.95 | 30.15% | 8.297% | 352 | 86.35% | 674 |
| 3.000 ........................... | 1,126 | 408,093,814.81 | 69.85 | 7.551 | 355 | 83.60 | 653 |
| Total ........................... | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

**Subsequent Period Cap of the Group 2 Mortgage Loans**

| Subsequent Periodic Cap | Number of Mortgage Loans | Cut-off Date Principal Balance | Percent by Cut-off Date Principal Balance | Weighted Average Mortgage Rate | Weighted Average Remaining Term to Maturity | Weighted Average Combined Loan-to-Value Ratio | Weighted Average FICO Score |
|---|---|---|---|---|---|---|---|
| FIXED ........................... | 1,185 | $ 176,126,647.95 | 30.15% | 8.297% | 352 | 86.35% | 674 |
| 1.500 ........................... | 1,126 | 408,093,814.81 | 69.85 | 7.551 | 355 | 83.60 | 653 |
| Total ........................... | 2,311 | $ 584,220,462.76 | 100.00% | 7.776% | 354 | 84.43% | 659 |

A-24

**SCHEDULE B**

## Schedule B

| Loan | Group | Current Balance ($) | Current Mortgage Rate (%) | Current Net Mortgage Rate (%) | Original Amort Term (in months) | Remaining Amort Term (in months) | Remaining Term to Maturity (months) | Gross Margin (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Maximum Lifetime Gross Mortgage Rate (%) | Minimum Lifetime Gross Mortgage Rate (%) | Number of Months Until First Rate Adjustment | Rate Adjustment Frequency (in months) | Remaining Interest Only Period (in months) | Index |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | G-2 | 781,666.36 | 6.7300000000 | 6.2600000000 | 180 | 173 | 173 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | G-2 | 166,596.20 | 6.9700000000 | 6.4600000000 | 180 | 176 | 176 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | G-2 | 61,721.24 | 7.2500000000 | 6.7400000000 | 180 | 176 | 176 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 4 | G-1 | 159,775.54 | 8.7500000000 | 8.2400000000 | 180 | 175 | 175 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 5 | G-1 | 96,974.68 | 8.8500000000 | 8.3400000000 | 180 | 176 | 176 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 6 | G-1 | 480,679.85 | 7.0324800490 | 6.5224800490 | 180 | 175 | 175 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 7 | G-2 | 461,342.41 | 6.2056518925 | 5.6956518925 | 180 | 176 | 176 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 8 | G-2 | 3,117,377.70 | 7.3178847930 | 6.8078847930 | 360 | 355 | 355 | 4.9350937769 | 3.0000000000 | 1.5000000000 | 13.3178847930 | 7.3178847930 | 19 | 6 | N/A | 6-Month LIBOR |
| 9 | G-2 | 8,394,400.93 | 6.6187174748 | 6.1087174748 | 360 | 355 | 355 | 6.0131594413 | 3.0000000000 | 1.5000000000 | 14.6187174748 | 8.6187174748 | 19 | 6 | N/A | 6-Month LIBOR |
| 10 | G-2 | 315,311.11 | 8.7810057353 | 8.2710057353 | 360 | 354 | 354 | 6.3626522164 | 3.0000000000 | 1.5000000000 | 14.7810057353 | 8.7810057353 | 18 | 6 | N/A | 6-Month LIBOR |
| 11 | G-1 | 1,670,676.44 | 9.5316544125 | 9.0216544125 | 360 | 354 | 354 | 6.6848635661 | 3.0000000000 | 1.5000000000 | 15.5316544125 | 9.5316544125 | 18 | 6 | N/A | 6-Month LIBOR |
| 12 | G-1 | 696,415.93 | 5.9900000000 | 5.4800000000 | 360 | 355 | 355 | 3.6010000000 | 3.0000000000 | 1.5000000000 | 11.9900000000 | 5.9900000000 | 20 | 6 | N/A | 6-Month LIBOR |
| 13 | G-2 | 853,318.73 | 7.6240989509 | 7.1140989509 | 360 | 356 | 356 | 5.1917819522 | 3.0000000000 | 1.5000000000 | 13.6240989509 | 7.6240989509 | 18 | 6 | N/A | 6-Month LIBOR |
| 14 | G-2 | 385,041.48 | 7.5023639895 | 6.9923639895 | 360 | 355 | 355 | 5.1153639895 | 3.0000000000 | 1.5000000000 | 13.5023639895 | 7.5023639895 | 20 | 6 | N/A | 6-Month LIBOR |
| 15 | G-2 | 112,662.34 | 7.5000000000 | 6.9900000000 | 360 | 356 | 356 | 5.1280000000 | 3.0000000000 | 1.5000000000 | 13.5000000000 | 7.5000000000 | 20 | 6 | N/A | 6-Month LIBOR |
| 16 | G-1 | 119,368.89 | 7.9000000000 | 7.3900000000 | 360 | 355 | 355 | 5.5130000000 | 3.0000000000 | 1.5000000000 | 13.9000000000 | 7.9000000000 | 20 | 6 | N/A | 6-Month LIBOR |
| 17 | G-2 | 181,998.54 | 9.4208254016 | 8.9108254016 | 360 | 355 | 355 | 5.3282544125 | 3.0000000000 | 1.5000000000 | 15.4208254016 | 9.4208254016 | 20 | 6 | N/A | 6-Month LIBOR |
| 18 | G-2 | 6,759,187.08 | 7.5595866956 | 7.0405866956 | 360 | 355 | 355 | 5.1549678651 | 3.0000000000 | 1.5000000000 | 13.5595866956 | 7.5595866956 | 19 | 6 | N/A | 6-Month LIBOR |
| 19 | G-2 | 26,647,886.79 | 8.4044755816 | 7.8944755816 | 360 | 355 | 355 | 5.8714347838 | 3.0000000000 | 1.5000000000 | 14.4044755816 | 8.4044755816 | 19 | 6 | N/A | 6-Month LIBOR |
| 20 | G-1 | 4,985,217.43 | 8.4589506713 | 7.9489506713 | 360 | 355 | 355 | 5.9696893682 | 3.0000000000 | 1.5000000000 | 14.4589506713 | 8.4589506713 | 19 | 6 | N/A | 6-Month LIBOR |
| 21 | G-1 | 10,506,634.60 | 8.6550809000 | 8.0550809000 | 360 | 354 | 354 | 5.9520210402 | 3.0000000000 | 1.5000000000 | 14.5650809000 | 8.6550809000 | 18 | 6 | N/A | 6-Month LIBOR |
| 22 | G-1 | 3,608,510.33 | 7.3217127369 | 6.8117127369 | 360 | 355 | 355 | 4.8738452193 | 3.0000000000 | 1.5000000000 | 13.3217127369 | 7.3217127369 | 19 | 6 | N/A | 6-Month LIBOR |
| 23 | G-1 | 11,300,376.70 | 8.5140640037 | 8.0040640037 | 360 | 355 | 355 | 5.5997403492 | 3.0000000000 | 1.5000000000 | 14.5140640037 | 8.5140640037 | 19 | 6 | N/A | 6-Month LIBOR |
| 24 | G-2 | 209,313.85 | 7.6500000000 | 7.1400000000 | 360 | 355 | 355 | 5.2500000000 | 3.0000000000 | 1.5000000000 | 13.6500000000 | 7.6500000000 | 19 | 6 | N/A | 6-Month LIBOR |
| 25 | G-1 | 2,075,770.41 | 8.7613226582 | 8.2513226582 | 360 | 355 | 355 | 6.1580363591 | 3.0000000000 | 1.5000000000 | 14.7613226582 | 8.7613226582 | 19 | 6 | N/A | 6-Month LIBOR |
| 26 | G-1 | 335,714.61 | 7.1012961277 | 6.5912961277 | 360 | 355 | 355 | 4.7187067632 | 3.0000000000 | 1.5000000000 | 13.1012961277 | 7.1012961277 | 19 | 6 | N/A | 6-Month LIBOR |
| 27 | G-2 | 4,347,939.88 | 9.8875507017 | 9.4775507017 | 360 | 356 | 356 | 6.1032425330 | 3.0000000000 | 1.5000000000 | 14.9875507017 | 9.8875507017 | 21 | 6 | N/A | 6-Month LIBOR |
| 28 | G-1 | 107,716.73 | 6.7000000000 | 6.1900000000 | 360 | 357 | 357 | 4.3260000000 | 3.0000000000 | 1.5000000000 | 12.7000000000 | 6.7000000000 | 20 | 6 | N/A | 6-Month LIBOR |
| 29 | G-2 | 2,200,398.82 | 8.5622041427 | 8.0522041427 | 360 | 356 | 356 | 5.9596318004 | 3.0000000000 | 1.5000000000 | 14.5622041427 | 8.5622041427 | 20 | 6 | N/A | 6-Month LIBOR |
| 30 | G-1 | 1,533,527.97 | 8.2474696679 | 7.7374696679 | 360 | 355 | 355 | 5.5463527152 | 3.0000000000 | 1.5000000000 | 14.2474696679 | 8.2474696679 | 20 | 6 | N/A | 6-Month LIBOR |
| 31 | G-1 | 238,271.18 | 9.5494444020 | 9.0394444020 | 360 | 354 | 354 | 6.9900000000 | 3.0000000000 | 1.5000000000 | 15.5494444020 | 9.5494444020 | 18 | 6 | N/A | 6-Month LIBOR |
| 32 | G-2 | 5,248,721.44 | 7.1068576077 | 6.5968576077 | 360 | 356 | 356 | 5.1796063176 | 3.0000000000 | 1.5000000000 | 13.1068576077 | 7.1068576077 | 20 | 6 | N/A | 6-Month LIBOR |
| 33 | G-1 | 37,311,324.51 | 7.7493887143 | 7.2393887143 | 360 | 356 | 356 | 6.1557692811 | 3.0000000000 | 1.5000000000 | 13.7493887143 | 7.7493887143 | 20 | 6 | N/A | 6-Month LIBOR |
| 34 | G-1 | 4,335,436.21 | 7.3460689014 | 6.8360689014 | 360 | 355 | 355 | 5.5035792611 | 3.0000000000 | 1.5000000000 | 13.3460689014 | 7.3460689014 | 19 | 6 | N/A | 6-Month LIBOR |
| 35 | G-2 | 23,400,817.41 | 8.3061683520 | 7.7961683520 | 480 | 476 | 476 | 5.7734746774 | 3.0000000000 | 1.5000000000 | 14.3061683520 | 8.3061683520 | 18 | 6 | N/A | 6-Month LIBOR |
| 36 | G-2 | 234,707.64 | 8.6900000000 | 8.1800000000 | 480 | 475 | 475 | 6.8230000000 | 3.0000000000 | 1.5000000000 | 15.2000000000 | 9.2000000000 | 20 | 6 | N/A | 6-Month LIBOR |
| 37 | G-1 | 1,308,474.23 | 7.3679966360 | 7.3579966360 | 480 | 474 | 474 | 4.2608673560 | 3.0000000000 | 1.5000000000 | 13.8779966360 | 7.8779966360 | 18 | 6 | N/A | 6-Month LIBOR |
| 38 | G-1 | 3,091,633.51 | 8.5251200565 | 8.0151200565 | 480 | 475 | 475 | 5.8181232287 | 3.0000000000 | 1.5000000000 | 14.5251200565 | 8.5251200565 | 20 | 6 | N/A | 6-Month LIBOR |
| 39 | G-1 | 114,164.63 | 8.7000000000 | 8.1900000000 | 480 | 476 | 476 | 6.3130000000 | 3.0000000000 | 1.5000000000 | 14.7000000000 | 8.7000000000 | 20 | 6 | N/A | 6-Month LIBOR |
| 40 | G-1 | 434,760.74 | 9.9900000000 | 9.0394444020 | 480 | 476 | 476 | 6.9900000000 | 3.0000000000 | 1.5000000000 | 16.5000000000 | 10.5000000000 | 20 | 6 | N/A | 6-Month LIBOR |
| 41 | G-1 | 351,529.97 | 7.5000000000 | 6.9900000000 | 480 | 474 | 474 | 5.1280000000 | 3.0000000000 | 1.5000000000 | 13.5000000000 | 7.5000000000 | 18 | 6 | N/A | 6-Month LIBOR |
| 42 | G-1 | 4,163,201.19 | 9.1216694427 | 8.6116694427 | 480 | 475 | 475 | 6.8171125532 | 3.0000000000 | 1.5000000000 | 13.1216694427 | 7.1216694427 | 20 | 6 | N/A | 6-Month LIBOR |
| 43 | G-1 | 10,382,376.20 | 7.4525681392 | 7.4352681392 | 480 | 475 | 475 | 4.4929452894 | 3.0000000000 | 1.5000000000 | 13.9452681392 | 7.9452681392 | 20 | 6 | N/A | 6-Month LIBOR |
| 44 | G-2 | 3,123,401.12 | 8.1737685351 | 7.6637685351 | 480 | 474 | 474 | 5.7734746774 | 3.0000000000 | 1.5000000000 | 14.1737685351 | 8.1737685351 | 18 | 6 | N/A | 6-Month LIBOR |
| 45 | G-2 | 1,928,469.15 | 8.5063012249 | 7.9963012249 | 480 | 474 | 474 | 6.0365446021 | 3.0000000000 | 1.5000000000 | 14.5063012249 | 8.5063012249 | 18 | 6 | N/A | 6-Month LIBOR |
| 46 | G-1 | 628,395.57 | 6.6815357045 | 6.1715357045 | 480 | 474 | 474 | 4.2608673560 | 3.0000000000 | 1.5000000000 | 12.6815357045 | 6.6815357045 | 18 | 6 | N/A | 6-Month LIBOR |
| 47 | G-1 | 5,973,351.26 | 8.5515798687 | 8.0415798687 | 480 | 475 | 475 | 5.8181232287 | 3.0000000000 | 1.5000000000 | 14.5515798687 | 8.5515798687 | 19 | 6 | N/A | 6-Month LIBOR |
| 48 | G-1 | 383,663.86 | 7.9878823340 | 7.4778823340 | 480 | 476 | 476 | 5.9264022077 | 3.0000000000 | 1.5000000000 | 13.9878823340 | 7.9878823340 | 19 | 6 | N/A | 6-Month LIBOR |
| 49 | G-1 | 951,394.00 | 8.9148565983 | 8.4048565983 | 480 | 476 | 476 | 6.5004448069 | 3.0000000000 | 1.5000000000 | 14.9148565983 | 8.9148565983 | 19 | 6 | N/A | 6-Month LIBOR |
| 50 | G-1 | 169,077.28 | 10.3500000000 | 9.8400000000 | 480 | 477 | 477 | 6.1630000000 | 3.0000000000 | 1.5000000000 | 16.3500000000 | 10.3500000000 | 21 | 6 | N/A | 6-Month LIBOR |
| 51 | G-2 | 305,147.71 | 5.6500000000 | 5.1400000000 | 480 | 475 | 475 | 3.2630000000 | 3.0000000000 | 1.5000000000 | 11.6500000000 | 5.6500000000 | 18 | 6 | N/A | 6-Month LIBOR |
| 52 | G-2 | 5,017,679.74 | 7.1257904427 | 6.6157904427 | 600 | 595 | 595 | 4.7235694462 | 3.0000000000 | 1.5000000000 | 13.1257904427 | 7.1257904427 | 19 | 6 | N/A | 6-Month LIBOR |
| 53 | G-2 | 12,953,770.72 | 8.3031996106 | 7.7931996106 | 600 | 596 | 596 | 5.7909147522 | 3.0000000000 | 1.5000000000 | 14.3031996106 | 8.3031996106 | 18 | 6 | N/A | 6-Month LIBOR |
| 54 | G-1 | 1,312,741.56 | 7.3275966311 | 6.8175966311 | 600 | 594 | 594 | 4.2934528894 | 3.0000000000 | 1.5000000000 | 13.3275966311 | 7.3275966311 | 18 | 6 | N/A | 6-Month LIBOR |
| 55 | G-1 | 6,431,086.45 | 8.6486131587 | 8.1386131587 | 600 | 595 | 595 | 5.7125161442 | 3.0000000000 | 1.5000000000 | 14.6486131587 | 8.6486131587 | 19 | 6 | N/A | 6-Month LIBOR |
| 56 | G-1 | 167,115.75 | 9.1000000000 | 8.5900000000 | 600 | 595 | 595 | 6.6770000000 | 3.0000000000 | 1.5000000000 | 15.1000000000 | 9.1000000000 | 19 | 6 | N/A | 6-Month LIBOR |
| 57 | G-1 | 335,861.33 | 8.5500000000 | 8.0400000000 | 600 | 596 | 596 | 6.1630000000 | 3.0000000000 | 1.5000000000 | 14.5500000000 | 8.5500000000 | 18 | 6 | N/A | 6-Month LIBOR |
| 58 | G-2 | 63,424,162.72 | 6.3785825251 | 5.8685825251 | 600 | 595 | 595 | 5.2256523898 | 3.0000000000 | 1.5000000000 | 13.3785825251 | 6.8785825251 | 18 | 6 | N/A | 6-Month LIBOR |
| 59 | G-1 | 12,457,443.89 | 8.4672212626 | 7.9672212626 | 600 | 593 | 593 | 5.6751363851 | 3.0000000000 | 1.5000000000 | 14.4672212626 | 8.4672212626 | 17 | 6 | N/A | 6-Month LIBOR |
| 60 | G-1 | 681,173.45 | 8.1249900286 | 7.6149900286 | 600 | 593 | 593 | 5.6374326554 | 3.0000000000 | 1.5000000000 | 14.1249900286 | 8.1249900286 | 17 | 6 | N/A | 6-Month LIBOR |
| 61 | G-2 | 2,612,616.14 | 6.2556496673 | 6.2456496673 | 600 | 595 | 595 | 3.4645193107 | 3.0000000000 | 1.5000000000 | 12.2556496673 | 6.2556496673 | 19 | 6 | N/A | 6-Month LIBOR |

# Schedule B

| Loan | Group | Current Balance ($) | Current Mortgage Rate (%) | Current Net Mortgage Rate (%) | Original Amort Term (in months) | Remaining Amort Term (in months) | Remaining Term to Maturity (months) | Gross Margin (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Maximum Lifetime Gross Mortgage Rate (%) | Minimum Lifetime Gross Mortgage Rate (%) | Number of Months Until First Rate Adjustment | Rate Adjustment Frequency (in months) | Remaining Interest Only Period (in months) | Index |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 62 | G-2 | 3,300,241.27 | 7.3836589564 | 6.8736589564 | 600 | 595 | 355 | 4.9823382936 | 3.0000000000 | 1.5000000000 | 13.3836589564 | 7.3836589564 | 19 | 6 | N/A | 6-Month LIBOR |
| 63 | G-2 | 1,648,367.12 | 9.1446088484 | 8.6346088484 | 600 | 594 | 354 | 6.5258461320 | 3.0000000000 | 1.5000000000 | 15.1446088484 | 9.1446088484 | 18 | 6 | N/A | 6-Month LIBOR |
| 64 | G-2 | 467,979.01 | 9.0309899551 | 8.5209899551 | 600 | 595 | 355 | 6.4439899551 | 3.0000000000 | 1.5000000000 | 13.0309899551 | 9.0309899551 | 19 | 6 | N/A | 6-Month LIBOR |
| 65 | G-2 | 592,372.08 | 7.4602838878 | 6.9502838878 | 600 | 596 | 356 | 5.0882838878 | 3.0000000000 | 1.5000000000 | 13.4602838878 | 7.4602838878 | 20 | 6 | N/A | 6-Month LIBOR |
| 66 | G-2 | 49,824.13 | 7.7500000000 | 7.2400000000 | 600 | 595 | 355 | 5.5000000000 | 3.0000000000 | 1.5000000000 | 13.7500000000 | 7.7500000000 | 19 | 6 | N/A | 6-Month LIBOR |
| 67 | G-2 | 48,690,389.79 | 8.8997406668 | 8.3897406668 | 600 | 595 | 355 | 4.5195810788 | 3.0000000000 | 1.5000000000 | 12.8997406668 | 8.8997406668 | 19 | 6 | N/A | 6-Month LIBOR |
| 68 | G-2 | 68,212,945.03 | 7.6872075107 | 7.1772075107 | 600 | 595 | 355 | 5.2859073729 | 3.0000000000 | 1.5000000000 | 13.6872075107 | 7.6872075107 | 19 | 6 | N/A | 6-Month LIBOR |
| 69 | G-2 | 10,567,857.39 | 7.9596915188 | 7.4486915188 | 600 | 595 | 355 | 5.4923679332 | 3.0000000000 | 1.5000000000 | 13.9596915188 | 7.9596915188 | 19 | 6 | N/A | 6-Month LIBOR |
| 70 | G-1 | 5,375,360.47 | 8.2832076842 | 7.7732076842 | 600 | 594 | 354 | 5.8274483935 | 3.0000000000 | 1.5000000000 | 14.2832076842 | 8.2832076842 | 18 | 6 | N/A | 6-Month LIBOR |
| 71 | G-1 | 120,533.33 | 8.9080000000 | 8.3980000000 | 600 | 597 | 357 | 6.5170000000 | 3.0000000000 | 1.5000000000 | 14.9080000000 | 8.9080000000 | 21 | 6 | N/A | 6-Month LIBOR |
| 72 | G-1 | 373,888.11 | 9.6000000000 | 9.0900000000 | 600 | 596 | 356 | 6.9900000000 | 3.0000000000 | 1.5000000000 | 15.6000000000 | 9.6000000000 | 20 | 6 | N/A | 6-Month LIBOR |
| 73 | G-1 | 3,295,322.55 | 7.3420973074 | 6.8320973074 | 600 | 595 | 355 | 4.8125297570 | 3.0000000000 | 1.5000000000 | 13.3420973074 | 7.3420973074 | 19 | 6 | N/A | 6-Month LIBOR |
| 74 | G-2 | 9,357,153.90 | 8.4121962915 | 7.9021962915 | 600 | 595 | 355 | 5.8278433529 | 3.0000000000 | 1.5000000000 | 14.4121962915 | 8.4121962915 | 19 | 6 | N/A | 6-Month LIBOR |
| 75 | G-1 | 173,302.70 | 8.5000000000 | 7.9900000000 | 600 | 594 | 354 | 6.1000000000 | 3.0000000000 | 1.5000000000 | 14.5000000000 | 8.5000000000 | 18 | 6 | N/A | 6-Month LIBOR |
| 76 | G-1 | 678,179.74 | 7.8846643207 | 7.3846643207 | 600 | 595 | 355 | 5.5028907883 | 3.0000000000 | 1.5000000000 | 13.8846643207 | 7.8846643207 | 19 | 6 | N/A | 6-Month LIBOR |
| 77 | G-1 | 549,922.82 | 6.6635878791 | 6.1535878791 | 600 | 595 | 355 | 4.2915878791 | 3.0000000000 | 1.5000000000 | 12.6635878791 | 6.6635878791 | 19 | 6 | N/A | 6-Month LIBOR |
| 78 | G-2 | 2,662,631.41 | 8.0142426231 | 7.5042426231 | 600 | 595 | 355 | 5.6011352529 | 3.0000000000 | 1.5000000000 | 14.0142426231 | 8.0142426231 | 19 | 6 | N/A | 6-Month LIBOR |
| 79 | G-1 | 805,767.55 | 7.6111083109 | 7.1011083109 | 600 | 595 | 355 | 5.1007265946 | 3.0000000000 | 1.5000000000 | 13.6111083109 | 7.6111083109 | 19 | 6 | N/A | 6-Month LIBOR |
| 80 | G-1 | 1,434,944.78 | 8.5257403226 | 8.0157403226 | 600 | 596 | 356 | 6.0643600174 | 3.0000000000 | 1.5000000000 | 14.5257403226 | 8.5257403226 | 20 | 6 | N/A | 6-Month LIBOR |
| 81 | G-2 | 421,017.47 | 6.5371255616 | 6.0271255616 | 600 | 595 | 355 | 4.1418980279 | 3.0000000000 | 1.5000000000 | 12.5371255616 | 6.5371255616 | 19 | 6 | N/A | 6-Month LIBOR |
| 82 | G-1 | 1,513,785.44 | 6.7084770653 | 6.1984770653 | 600 | 595 | 355 | 4.3261863963 | 3.0000000000 | 1.5000000000 | 12.7084770653 | 6.7084770653 | 19 | 6 | N/A | 6-Month LIBOR |
| 83 | G-1 | 13,118,065.92 | 7.0941991418 | 6.5841991418 | 600 | 595 | 355 | 4.7006877525 | 3.0000000000 | 1.5000000000 | 13.0941991418 | 7.0941991418 | 19 | 6 | N/A | 6-Month LIBOR |
| 84 | G-1 | 55,813,020.07 | 7.8633996697 | 7.3533996697 | 600 | 595 | 355 | 5.4332053254 | 3.0000000000 | 1.5000000000 | 13.8633996697 | 7.8633996697 | 19 | 6 | N/A | 6-Month LIBOR |
| 85 | G-2 | 8,327,629.84 | 7.7720054926 | 7.2620054926 | 600 | 595 | 355 | 5.2608574541 | 3.0000000000 | 1.5000000000 | 13.7720054926 | 7.7720054926 | 19 | 6 | N/A | 6-Month LIBOR |
| 86 | G-1 | 17,328,033.55 | 8.0830827010 | 7.5730827010 | 600 | 594 | 354 | 5.6310087370 | 3.0000000000 | 1.5000000000 | 14.0830827010 | 8.0830827010 | 18 | 6 | N/A | 6-Month LIBOR |
| 87 | G-1 | 1,000,000.00 | 6.5500000000 | 6.0400000000 | 360 | 356 | 356 | 4.1600000000 | 3.0000000000 | 1.5000000000 | 12.5500000000 | 6.5500000000 | 20 | 6 | N/A | 6-Month LIBOR |
| 88 | G-2 | 1,976,410.01 | 7.1744893523 | 6.6644893523 | 360 | 354 | 354 | 4.7688521464 | 3.0000000000 | 1.5000000000 | 13.1744893523 | 7.1744893523 | 18 | 6 | 54 | 6-Month LIBOR |
| 89 | G-2 | 252,000.00 | 7.7500000000 | 7.2400000000 | 360 | 355 | 355 | 5.5500000000 | 3.0000000000 | 1.5000000000 | 13.7500000000 | 7.7500000000 | 19 | 6 | 55 | 6-Month LIBOR |
| 90 | G-1 | 4,662,170.00 | 6.3536306055 | 5.8436306055 | 360 | 355 | 355 | 3.9604847464 | 3.0000000000 | 1.5000000000 | 12.3536306055 | 6.3536306055 | 19 | 6 | 55 | 6-Month LIBOR |
| 91 | G-2 | 9,685,672.59 | 7.2005682439 | 6.6905682439 | 360 | 354 | 354 | 4.8046989453 | 3.0000000000 | 1.5000000000 | 13.2005682439 | 7.2005682439 | 18 | 6 | 54 | 6-Month LIBOR |
| 92 | G-2 | 451,801.63 | 6.6500000000 | 6.1400000000 | 360 | 354 | 354 | 4.2270000000 | 3.0000000000 | 1.5000000000 | 12.6500000000 | 6.6500000000 | 18 | 6 | 54 | 6-Month LIBOR |
| 93 | G-2 | 1,038,862.42 | 6.7300112078 | 6.2200112078 | 360 | 355 | 355 | 4.3383218955 | 3.0000000000 | 1.5000000000 | 12.7300112078 | 6.7300112078 | 19 | 6 | 55 | 6-Month LIBOR |
| 94 | G-2 | 351,303.73 | 6.8500000000 | 6.3400000000 | 360 | 356 | 356 | 4.4630000000 | 3.0000000000 | 1.5000000000 | 12.8500000000 | 6.8500000000 | 20 | 6 | 56 | 6-Month LIBOR |
| 95 | G-2 | 718,247.57 | 7.2712320642 | 6.7612320642 | 360 | 355 | 355 | 4.5959957907 | 3.0000000000 | 1.5000000000 | 13.2712320642 | 7.2712320642 | 19 | 6 | 55 | 6-Month LIBOR |
| 96 | G-1 | 360,000.00 | 7.3000000000 | 6.7900000000 | 360 | 356 | 356 | 4.9000000000 | 3.0000000000 | 1.5000000000 | 13.3000000000 | 7.3000000000 | 20 | 6 | 56 | 6-Month LIBOR |
| 97 | G-2 | 328,000.00 | 5.4000000000 | 4.8900000000 | 360 | 354 | 354 | 3.0280000000 | 3.0000000000 | 1.5000000000 | 11.4000000000 | 5.4000000000 | 18 | 6 | 54 | 6-Month LIBOR |
| 98 | G-1 | 202,335.10 | 7.6900000000 | 7.1800000000 | 360 | 356 | 356 | 5.2900000000 | 3.0000000000 | 1.5000000000 | 13.6900000000 | 7.6900000000 | 20 | 6 | 56 | 6-Month LIBOR |
| 99 | G-2 | 154,700.00 | 8.1500000000 | 7.6400000000 | 360 | 354 | 354 | 5.7630000000 | 3.0000000000 | 1.5000000000 | 14.1500000000 | 8.1500000000 | 18 | 6 | 54 | 6-Month LIBOR |
| 100 | G-1 | 1,374,548.03 | 6.8714913512 | 6.3614913512 | 360 | 355 | 355 | 4.4698162438 | 3.0000000000 | 1.5000000000 | 12.8714913512 | 6.8714913512 | 19 | 6 | 55 | 6-Month LIBOR |
| 101 | G-2 | 1,952,076.02 | 6.9829060991 | 6.4729060991 | 360 | 354 | 354 | 4.5832118565 | 3.0000000000 | 1.5000000000 | 12.9829060991 | 6.9829060991 | 18 | 6 | 54 | 6-Month LIBOR |
| 102 | G-2 | 200,000.00 | 8.3500000000 | 7.8400000000 | 360 | 356 | 356 | 5.9630000000 | 3.0000000000 | 1.5000000000 | 14.3500000000 | 8.3500000000 | 20 | 6 | 56 | 6-Month LIBOR |
| 103 | G-2 | 397,000.00 | 8.5700000000 | 8.0600000000 | 360 | 355 | 355 | 6.7040326531 | 3.0000000000 | 1.5000000000 | 14.5700000000 | 8.5700000000 | 19 | 6 | 55 | 6-Month LIBOR |
| 104 | G-2 | 90,277.56 | 8.1400000000 | 7.6300000000 | 240 | 235 | 235 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 6-Month LIBOR |
| 105 | G-2 | 86,980.81 | 6.8000000000 | 6.2900000000 | 240 | 237 | 237 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 6-Month LIBOR |
| 106 | G-2 | 208,472.10 | 7.6500000000 | 7.1400000000 | 240 | 237 | 237 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 6-Month LIBOR |
| 107 | G-2 | 654,023.44 | 7.7721205650 | 7.2621205650 | 240 | 236 | 236 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 6-Month LIBOR |
| 108 | G-2 | 168,635.75 | 6.7500000000 | 6.2400000000 | 240 | 236 | 236 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 6-Month LIBOR |
| 109 | G-2 | 1,500,634.03 | 7.2053207624 | 6.6953207624 | 360 | 356 | 356 | 4.8239296154 | 3.0000000000 | 1.5000000000 | 13.2053207624 | 7.2053207624 | 32 | 6 | N/A | 6-Month LIBOR |
| 110 | G-1 | 3,525,281.31 | 8.0413483879 | 7.5313483879 | 360 | 356 | 356 | 5.5128239748 | 3.0000000000 | 1.5000000000 | 14.0413483879 | 8.0413483879 | 32 | 6 | N/A | 6-Month LIBOR |
| 111 | G-1 | 419,925.94 | 8.9468384281 | 8.4368384281 | 360 | 353 | 353 | 6.4183722646 | 3.0000000000 | 1.5000000000 | 14.9468384281 | 8.9468384281 | 29 | 6 | N/A | 6-Month LIBOR |
| 112 | G-1 | 418,969.29 | 8.4900000000 | 7.9800000000 | 360 | 356 | 356 | 6.1030000000 | 3.0000000000 | 1.5000000000 | 14.4900000000 | 8.4900000000 | 32 | 6 | N/A | 6-Month LIBOR |
| 113 | G-1 | 791,453.22 | 8.6828193699 | 8.1728193699 | 360 | 356 | 356 | 6.2009503976 | 3.0000000000 | 1.5000000000 | 14.6828193699 | 8.6828193699 | 32 | 6 | N/A | 6-Month LIBOR |
| 114 | G-2 | 215,932.86 | 9.0347712386 | 8.5247712386 | 360 | 355 | 355 | 5.7947562078 | 3.0000000000 | 1.5000000000 | 15.0347712386 | 9.0347712386 | 31 | 6 | N/A | 6-Month LIBOR |
| 115 | G-1 | 453,658.45 | 5.5000000000 | 4.9900000000 | 360 | 354 | 354 | 3.1130000000 | 3.0000000000 | 1.5000000000 | 11.5000000000 | 5.5000000000 | 30 | 6 | N/A | 6-Month LIBOR |
| 116 | G-2 | 124,620.73 | 9.1000000000 | 8.5900000000 | 360 | 356 | 356 | 6.6770000000 | 3.0000000000 | 1.5000000000 | 15.1000000000 | 9.1000000000 | 32 | 6 | N/A | 6-Month LIBOR |
| 117 | G-1 | 316,431.91 | 6.4500000000 | 5.9400000000 | 360 | 356 | 356 | 4.0630000000 | 3.0000000000 | 1.5000000000 | 12.4500000000 | 6.4500000000 | 32 | 6 | N/A | 6-Month LIBOR |
| 118 | G-2 | 89,742.95 | 8.9000000000 | 8.3900000000 | 360 | 356 | 356 | 6.5060000000 | 3.0000000000 | 1.5000000000 | 14.9000000000 | 8.9000000000 | 32 | 6 | N/A | 6-Month LIBOR |
| 119 | G-1 | 2,411,575.23 | 7.2986420706 | 6.7886420706 | 360 | 356 | 356 | 4.7893639454 | 3.0000000000 | 1.5000000000 | 13.2986420706 | 7.2986420706 | 32 | 6 | N/A | 6-Month LIBOR |
| 120 | G-1 | 2,025,998.30 | 8.2064421933 | 7.6964421933 | 360 | 355 | 355 | 5.7502363664 | 3.0000000000 | 1.5000000000 | 14.2064421933 | 8.2064421933 | 31 | 6 | N/A | 6-Month LIBOR |
| 122 | G-2 | 3,603,422.20 | 6.5187686595 | 6.0087686595 | 360 | 356 | 356 | 4.1348368925 | 3.0000000000 | 1.5000000000 | 12.5187686595 | 6.5187686595 | 32 | 6 | N/A | 6-Month LIBOR |

## Schedule B

| Loan | Group | Current Balance ($) | Current Net Mortgage Rate (%) | Current Mortgage Rate (%) | Original Amort Term (in months) | Remaining Amort Term (in months) | Remaining Term to Maturity (months) | Gross Margin (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Maximum Lifetime Gross Mortgage Rate (%) | Minimum Lifetime Gross Mortgage Rate (%) | Number of Months Until First Rate Adjustment | Rate Adjustment Frequency (in months) | Remaining Interest Only Period (in months) | Index |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 123 | G-2 | 4,017,417.46 | 8.3823420822 | 8.3823420822 | 360 | 355 | 355 | 5.8610423713 | 3.000000000 | 1.500000000 | 14.3823420822 | 8.3823420822 | 31 | 6 | N/A | 6-Month LIBOR |
| 124 | G-1 | 559,130.17 | 7.7912059440 | 7.7912059440 | 360 | 357 | 357 | 5.4058215280 | 3.000000000 | 1.500000000 | 13.7912059440 | 7.7912059440 | 33 | 6 | N/A | 6-Month LIBOR |
| 125 | G-1 | 2,112,657.37 | 8.4071801861 | 8.4071801861 | 360 | 356 | 356 | 5.9776047045 | 3.000000000 | 1.500000000 | 14.4071801861 | 8.4071801861 | 32 | 6 | N/A | 6-Month LIBOR |
| 126 | G-1 | 155,555.31 | 7.2400000000 | 7.7500000000 | 360 | 356 | 356 | 5.3610000000 | 3.000000000 | 1.500000000 | 13.7500000000 | 7.7500000000 | 32 | 6 | N/A | 6-Month LIBOR |
| 127 | G-1 | 490,815.16 | 5.7629652584 | 6.2729652584 | 360 | 355 | 355 | 3.8978381759 | 3.000000000 | 1.500000000 | 12.2729652584 | 6.2729652584 | 32 | 6 | N/A | 6-Month LIBOR |
| 128 | G-1 | 737,728.90 | 7.6930685177 | 8.2030685177 | 360 | 356 | 356 | 5.7582404376 | 3.000000000 | 1.500000000 | 14.2030685177 | 8.2030685177 | 31 | 6 | N/A | 6-Month LIBOR |
| 129 | G-1 | 119,634.98 | 8.9400000000 | 9.4500000000 | 360 | 354 | 354 | 6.9900000000 | 3.000000000 | 1.500000000 | 15.4500000000 | 9.4500000000 | 30 | 6 | N/A | 6-Month LIBOR |
| 130 | G-1 | 90,886.31 | 6.2900000000 | 6.8000000000 | 360 | 356 | 356 | 4.4280000000 | 3.000000000 | 1.500000000 | 12.8000000000 | 6.8000000000 | 32 | 6 | N/A | 6-Month LIBOR |
| 131 | G-1 | 572,474.41 | 7.7302385257 | 8.2402385257 | 360 | 356 | 356 | 5.7711952790 | 3.000000000 | 1.500000000 | 14.2402385257 | 8.2402385257 | 32 | 6 | N/A | 6-Month LIBOR |
| 132 | G-1 | 124,574.25 | 8.3400000000 | 8.8500000000 | 360 | 355 | 355 | 4.4500000000 | 3.000000000 | 1.500000000 | 14.8500000000 | 8.8500000000 | 31 | 6 | N/A | 6-Month LIBOR |
| 133 | G-1 | 54,849.09 | 8.5400000000 | 9.0500000000 | 360 | 355 | 355 | 6.6500000000 | 3.000000000 | 1.500000000 | 15.0500000000 | 9.0500000000 | 31 | 6 | N/A | 6-Month LIBOR |
| 134 | G-1 | 1,872,686.16 | 6.0126894440 | 6.5226894440 | 360 | 354 | 354 | 4.1234233084 | 3.000000000 | 1.500000000 | 12.5226894440 | 6.5226894440 | 30 | 6 | N/A | 6-Month LIBOR |
| 135 | G-1 | 2,899,785.78 | 8.0240005527 | 8.5340005527 | 360 | 355 | 355 | 6.0251717566 | 3.000000000 | 1.500000000 | 14.5340005527 | 8.5340005527 | 32 | 6 | N/A | 6-Month LIBOR |
| 136 | G-1 | 2,917,931.76 | 6.5681441224 | 7.0781441224 | 360 | 356 | 356 | 4.6945078817 | 3.000000000 | 1.500000000 | 13.0781441224 | 7.0781441224 | 32 | 6 | N/A | 6-Month LIBOR |
| 137 | G-1 | 13,259,990.00 | 7.7228319286 | 8.2328319286 | 480 | 476 | 476 | 5.7352051547 | 3.000000000 | 1.500000000 | 14.2328319286 | 8.2328319286 | 32 | 6 | N/A | 6-Month LIBOR |
| 138 | G-2 | 3,364,447.22 | 6.1764712266 | 7.0784412266 | 480 | 475 | 475 | 4.2854822273 | 3.000000000 | 1.500000000 | 13.0784412266 | 7.0784412266 | 32 | 6 | N/A | 6-Month LIBOR |
| 139 | G-2 | 121,358.18 | 8.2400000000 | 8.7500000000 | 480 | 419 | 419 | 6.3500000000 | 3.000000000 | 1.500000000 | 14.7500000000 | 8.7500000000 | 32 | 6 | N/A | 6-Month LIBOR |
| 140 | G-1 | 419,947.79 | 6.6141292565 | 7.1241292565 | 480 | 474 | 474 | 4.7106526125 | 3.000000000 | 1.500000000 | 13.1241292565 | 7.1241292565 | 30 | 6 | N/A | 6-Month LIBOR |
| 141 | G-1 | 2,637,222.47 | 6.1259984137 | 6.3599984137 | 480 | 475 | 475 | 4.2520794459 | 3.000000000 | 1.500000000 | 12.6359984137 | 6.3599984137 | 31 | 6 | N/A | 6-Month LIBOR |
| 142 | G-2 | 2,235,919.44 | 6.3599984137 | 6.3599984137 | 480 | 476 | 476 | 4.4598222719 | 3.000000000 | 1.500000000 | 12.6359984137 | 6.3599984137 | 31 | 6 | N/A | 6-Month LIBOR |
| 143 | G-2 | 1,063,895.75 | 6.3376750161 | 6.3376750161 | 480 | 477 | 477 | 6.3147051133 | 3.000000000 | 1.500000000 | 12.3476750161 | 6.3376750161 | 33 | 6 | N/A | 6-Month LIBOR |
| 144 | G-2 | 390,287.36 | 7.6655877464 | 7.6655877464 | 480 | 477 | 357 | 5.2962640704 | 3.000000000 | 1.500000000 | 13.6755877464 | 7.6755877464 | 33 | 6 | N/A | 6-Month LIBOR |
| 145 | G-2 | 483,694.90 | 6.9571029568 | 6.9571029568 | 480 | 475 | 475 | 4.9669839686 | 3.000000000 | 1.500000000 | 13.4671029568 | 7.4671029568 | 32 | 6 | N/A | 6-Month LIBOR |
| 146 | G-1 | 1,308,114.52 | 6.7766791908 | 6.7766791908 | 480 | 476 | 476 | 4.7667131417 | 3.000000000 | 1.500000000 | 13.2866791908 | 7.2866791908 | 32 | 6 | N/A | 6-Month LIBOR |
| 147 | G-2 | 164,638.06 | 5.1900000000 | 5.7000000000 | 480 | 476 | 476 | 3.3280000000 | 3.000000000 | 1.500000000 | 11.7000000000 | 5.7000000000 | 32 | 6 | N/A | 6-Month LIBOR |
| 148 | G-1 | 161,447.64 | 5.9600000000 | 5.9600000000 | 480 | 475 | 475 | 4.4700000000 | 3.000000000 | 1.500000000 | 12.4700000000 | 6.4700000000 | 31 | 6 | N/A | 6-Month LIBOR |
| 149 | G-1 | 969,742.52 | 7.2931406423 | 7.2931406423 | 480 | 475 | 355 | 5.4096780849 | 3.000000000 | 1.500000000 | 13.8031406423 | 7.8031406423 | 31 | 6 | N/A | 6-Month LIBOR |
| 150 | G-1 | 162,140.49 | 8.3400000000 | 8.8500000000 | 480 | 477 | 357 | 6.4670000000 | 3.000000000 | 1.500000000 | 14.8500000000 | 8.8500000000 | 33 | 6 | N/A | 6-Month LIBOR |
| 151 | G-2 | 414,841.14 | 6.3500000000 | 6.3500000000 | 480 | 475 | 475 | 3.9500000000 | 3.000000000 | 1.500000000 | 12.3500000000 | 6.3500000000 | 31 | 6 | N/A | 6-Month LIBOR |
| 152 | G-1 | 1,010,530.33 | 8.3069811123 | 8.3069811123 | 480 | 476 | 476 | 6.3147051133 | 3.000000000 | 1.500000000 | 14.8169811123 | 8.8169811123 | 31 | 6 | N/A | 6-Month LIBOR |
| 153 | G-1 | 1,095,273.64 | 6.9965484921 | 6.9965484921 | 480 | 477 | 477 | 5.1046071960 | 3.000000000 | 1.500000000 | 13.5065484921 | 7.5065484921 | 33 | 6 | N/A | 6-Month LIBOR |
| 154 | G-1 | 3,945,838.51 | 7.4658503196 | 7.4658503196 | 480 | 476 | 476 | 5.5586775438 | 3.000000000 | 1.500000000 | 13.9758503196 | 7.9758503196 | 32 | 6 | N/A | 6-Month LIBOR |
| 155 | G-1 | 95,979.98 | 8.8400000000 | 8.8400000000 | 480 | 476 | 476 | 6.9788000000 | 3.000000000 | 1.500000000 | 15.3500000000 | 9.3500000000 | 32 | 6 | N/A | 6-Month LIBOR |
| 156 | G-1 | 10,631,174.39 | 8.0031489786 | 8.0031489786 | 600 | 596 | 596 | 4.2732155345 | 3.000000000 | 1.500000000 | 12.7900626311 | 6.6555384126 | 32 | 6 | N/A | 6-Month LIBOR |
| 157 | G-1 | 8,087,910.85 | 6.8279572161 | 6.8279572161 | 600 | 595 | 595 | 4.9134423209 | 3.000000000 | 1.500000000 | 13.3795372161 | 7.3379572161 | 31 | 6 | N/A | 6-Month LIBOR |
| 158 | G-2 | 2,440,966.25 | 6.6764921196 | 6.6764921196 | 600 | 595 | 595 | 4.6334560266 | 3.000000000 | 1.500000000 | 13.0084616774 | 7.0084616774 | 31 | 6 | N/A | 6-Month LIBOR |
| 159 | G-2 | 211,771.66 | 6.5900000000 | 6.5900000000 | 600 | 594 | 594 | 4.7000000000 | 3.000000000 | 1.500000000 | 13.1000000000 | 7.1000000000 | 32 | 6 | N/A | 6-Month LIBOR |
| 160 | G-2 | 220,303.20 | 7.5400000000 | 7.5400000000 | 600 | 593 | 593 | 5.6270000000 | 3.000000000 | 1.500000000 | 14.0500000000 | 8.0500000000 | 29 | 6 | N/A | 6-Month LIBOR |
| 161 | G-1 | 2,043,451.64 | 5.6941967981 | 5.6941967981 | 600 | 595 | 595 | 3.8630000000 | 3.000000000 | 1.500000000 | 12.2041967981 | 6.2041967981 | 31 | 6 | N/A | 6-Month LIBOR |
| 162 | G-1 | 297,770.14 | 9.2400000000 | 9.7500000000 | 600 | 593 | 593 | 6.9900000000 | 3.000000000 | 1.500000000 | 15.7500000000 | 9.7500000000 | 31 | 6 | N/A | 6-Month LIBOR |
| 163 | G-1 | 607,189.24 | 6.2772431912 | 6.7872431912 | 600 | 596 | 596 | 4.5480707767 | 3.000000000 | 1.500000000 | 12.7872431912 | 6.7872431912 | 32 | 6 | N/A | 6-Month LIBOR |
| 164 | G-1 | 15,258,578.70 | 7.2494082731 | 7.5594082731 | 600 | 597 | 597 | 5.3620786831 | 3.000000000 | 1.500000000 | 13.7594082731 | 7.7594082731 | 33 | 6 | N/A | 6-Month LIBOR |
| 165 | G-1 | 476,753.46 | 10.2000000000 | 10.2000000000 | 600 | 595 | 595 | 6.9900000000 | 3.000000000 | 1.500000000 | 16.2000000000 | 10.2000000000 | 31 | 6 | N/A | 6-Month LIBOR |
| 166 | G-1 | 9,100,503.52 | 5.1400000000 | 5.6500000000 | 600 | 596 | 596 | 4.9954432209 | 3.000000000 | 1.500000000 | 13.3500000000 | 6.6200000000 | 32 | 6 | N/A | 6-Month LIBOR |
| 167 | G-1 | 13,517,887.94 | 7.8900000000 | 5.1400000000 | 600 | 595 | 595 | 3.2780000000 | 3.000000000 | 1.500000000 | 11.6500000000 | 5.6500000000 | 28 | 6 | N/A | 6-Month LIBOR |
| 168 | G-2 | 143,022.73 | 8.0900000000 | 8.4000000000 | 600 | 592 | 592 | 5.8200000000 | 3.000000000 | 1.500000000 | 14.4000000000 | 8.4000000000 | 31 | 6 | N/A | 6-Month LIBOR |
| 169 | G-2 | 268,976.90 | 8.0000000000 | 8.6000000000 | 600 | 593 | 593 | 4.6579077187 | 3.000000000 | 1.500000000 | 13.0893555983 | 7.0893555983 | 31 | 6 | N/A | 6-Month LIBOR |
| 170 | G-2 | 2,651,611.99 | 8.6000000000 | 8.6000000000 | 600 | 593 | 593 | 6.9900000000 | 3.000000000 | 1.500000000 | 14.6000000000 | 8.6000000000 | 29 | 6 | N/A | 6-Month LIBOR |
| 171 | G-2 | 8,184,300.41 | 6.1283231656 | 6.1283231656 | 600 | 593 | 593 | 6.2454859702 | 3.000000000 | 1.500000000 | 14.6358231656 | 8.6358231656 | 33 | 6 | N/A | 6-Month LIBOR |
| 172 | G-1 | 170,973.43 | 5.3445447858 | 5.3445447858 | 600 | 596 | 596 | 4.4698173258 | 3.000000000 | 1.500000000 | 12.8545447858 | 6.8545447858 | 32 | 6 | N/A | 6-Month LIBOR |
| 173 | G-1 | 343,732.51 | 7.0646749412 | 7.5746749412 | 600 | 597 | 597 | 5.2341688812 | 3.000000000 | 1.500000000 | 13.5746749412 | 7.5746749412 | 33 | 6 | N/A | 6-Month LIBOR |
| 174 | G-1 | 233,718.22 | 4.9200000000 | 5.4300000000 | 600 | 596 | 596 | 3.9162203585 | 3.000000000 | 1.500000000 | 13.0162203585 | 5.4300000000 | 32 | 6 | N/A | 6-Month LIBOR |
| 175 | G-2 | 309,725.02 | 7.8900000000 | 7.9003436657 | 600 | 595 | 595 | 4.7893386657 | 3.000000000 | 1.500000000 | 13.5993436657 | 7.5993436657 | 29 | 6 | N/A | 6-Month LIBOR |
| 176 | G-1 | 499,881.76 | 5.5889355983 | 6.5889355983 | 600 | 595 | 595 | 4.6579077187 | 3.000000000 | 1.500000000 | 13.0893555983 | 7.0893555983 | 31 | 6 | N/A | 6-Month LIBOR |
| 177 | G-1 | 168,214.54 | 8.6000000000 | 8.6000000000 | 600 | 594 | 594 | 6.2130000000 | 3.000000000 | 1.500000000 | 14.6000000000 | 8.6000000000 | 32 | 6 | N/A | 6-Month LIBOR |
| 178 | G-1 | 355,038.04 | 6.1283231656 | 6.1283231656 | 600 | 595 | 595 | 6.2454859702 | 3.000000000 | 1.500000000 | 14.6358231656 | 8.6358231656 | 31 | 6 | N/A | 6-Month LIBOR |
| 179 | G-1 | 709,879.44 | 6.8545447858 | 6.8545447858 | 600 | 596 | 596 | 4.4698173258 | 3.000000000 | 1.500000000 | 12.8545447858 | 6.8545447858 | 32 | 6 | N/A | 6-Month LIBOR |
| 180 | G-1 | 1,469,161.82 | 7.0646749412 | 7.5746749412 | 600 | 597 | 597 | 5.2341688812 | 3.000000000 | 1.500000000 | 13.5746749412 | 7.5746749412 | 33 | 6 | N/A | 6-Month LIBOR |
| 181 | G-1 | 343,732.51 | 6.7629682385 | 10.2062083385 | 600 | 597 | 597 | 4.8709681718 | 3.000000000 | 1.500000000 | 13.0162083385 | 7.0162083385 | 33 | 6 | N/A | 6-Month LIBOR |
| 182 | G-1 | 348,298.87 | 7.2593263221 | 7.2593263221 | 600 | 595 | 595 | 5.2593263221 | 3.000000000 | 1.500000000 | 13.2593263221 | 7.2593263221 | 29 | 6 | N/A | 6-Month LIBOR |
| 183 | G-1 | 5,657,496.12 | 5.9052088004 | 6.4152088004 | 600 | 595 | 595 | 4.0201438222 | 3.000000000 | 1.500000000 | 12.4152088004 | 6.4152088004 | 31 | 6 | N/A | 6-Month LIBOR |

## Schedule B

| Loan | Group | Current Balance ($) | Current Mortgage Rate (%) | Current Net Mortgage Rate (%) | Original Amort Term (in months) | Remaining Amort Term (in months) | Remaining Term to Maturity (months) | Gross Margin (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Maximum Lifetime Gross Mortgage Rate (%) | Minimum Lifetime Gross Mortgage Rate (%) | Number of Months Until First Rate Adjustment | Rate Adjustment Frequency (in months) | Remaining Interest Only Period (in months) | Index |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 184 | G-1 | 11,923,951.62 | 7.575343485 | 7.065343485 | 600 | 596 | 356 | 5.217092460 | 3.000000000 | 1.500000000 | 13.575343485 | 6.903364340 | 32 | 6 | N/A | 6-Month LIBOR |
| 185 | G-1 | 6,811,044.89 | 6.903364340 | 6.393364340 | 600 | 596 | 356 | 4.561163771 | 3.000000000 | 1.500000000 | 12.903364340 | 6.903364340 | 32 | 6 | N/A | 6-Month LIBOR |
| 186 | G-1 | 16,400,060.12 | 7.848638434 | 7.338638434 | 600 | 595 | 355 | 5.397366180 | 3.000000000 | 1.500000000 | 13.848638434 | 7.848638434 | 31 | 6 | 33 | 6-Month LIBOR |
| 187 | G-2 | 858,000.00 | 5.990000000 | 5.480000000 | 360 | 357 | 357 | 3.618000000 | 3.000000000 | 1.500000000 | 11.990000000 | 5.990000000 | 33 | 6 | 33 | 6-Month LIBOR |
| 188 | G-1 | 517,298.92 | 6.500000000 | 5.990000000 | 360 | 357 | 357 | 4.128000000 | 3.000000000 | 1.500000000 | 12.500000000 | 6.500000000 | 33 | 6 | 33 | 6-Month LIBOR |
| 189 | G-2 | 1,065,000.00 | 6.353098915 | 5.843098915 | 360 | 354 | 354 | 3.945056338 | 3.000000000 | 1.500000000 | 12.353098915 | 6.353098915 | 30 | 6 | 30 | 6-Month LIBOR |
| 190 | G-2 | 3,253,238.48 | 6.771101605 | 6.261101605 | 360 | 354 | 354 | 4.466276748 | 3.000000000 | 1.500000000 | 12.771101605 | 6.771101605 | 31 | 6 | 31 | 6-Month LIBOR |
| 191 | G-2 | 1,710,326.64 | 7.242786851 | 6.732786851 | 360 | 355 | 355 | 4.851834897 | 3.000000000 | 1.500000000 | 13.242786851 | 7.242786851 | 31 | 6 | 31 | 6-Month LIBOR |
| 192 | G-1 | 169,900.00 | 6.100000000 | 5.590000000 | 360 | 355 | 355 | 3.728000000 | 3.000000000 | 1.500000000 | 12.100000000 | 6.100000000 | 32 | 6 | 32 | 6-Month LIBOR |
| 193 | G-1 | 948,500.00 | 6.494133146 | 5.984133146 | 360 | 355 | 355 | 4.097450733 | 3.000000000 | 1.500000000 | 12.494133146 | 6.494133146 | 31 | 6 | 31 | 6-Month LIBOR |
| 194 | G-1 | 1,218,750.00 | 8.0416307692 | 7.5316307692 | 360 | 354 | 354 | 6.2490342564 | 3.000000000 | 1.500000000 | 14.0416307692 | 8.0416307692 | 30 | 6 | 30 | 6-Month LIBOR |
| 195 | G-1 | 244,000.00 | 6.250000000 | 5.740000000 | 360 | 355 | 355 | 3.863000000 | 3.000000000 | 1.500000000 | 12.250000000 | 6.250000000 | 31 | 6 | 31 | 6-Month LIBOR |
| 196 | G-2 | 132,000.00 | 8.000000000 | 7.490000000 | 360 | 355 | 355 | 5.600000000 | 3.000000000 | 1.500000000 | 14.000000000 | 8.000000000 | 31 | 6 | 31 | 6-Month LIBOR |
| 197 | G-2 | 1,571,499.99 | 5.818167581 | 5.308167581 | 360 | 356 | 356 | 3.418167581 | 3.000000000 | 1.500000000 | 11.818167581 | 5.818167581 | 31 | 6 | 55 | 6-Month LIBOR |
| 198 | G-2 | 648,000.00 | 6.750000000 | 6.240000000 | 360 | 355 | 355 | 4.363000000 | 3.000000000 | 1.500000000 | 12.750000000 | 6.750000000 | 31 | 6 | 55 | 6-Month LIBOR |
| 199 | G-2 | 620,000.00 | 5.350000000 | 4.840000000 | 360 | 356 | 356 | 2.978000000 | 3.000000000 | 1.500000000 | 11.350000000 | 5.350000000 | 56 | 6 | 56 | 6-Month LIBOR |
| 200 | G-2 | 399,500.00 | 8.300000000 | 7.790000000 | 360 | 356 | 356 | 5.900000000 | 3.000000000 | 1.500000000 | 14.300000000 | 8.300000000 | 56 | 6 | 56 | 6-Month LIBOR |
| 201 | G-1 | 546,599.59 | 6.801011533 | 6.291011533 | 360 | 355 | 355 | 4.479361678 | 3.000000000 | 1.500000000 | 12.801011533 | 6.801011533 | 31 | 6 | 54 | 6-Month LIBOR |
| 202 | G-1 | 1,110,000.00 | 5.492792793 | 4.972792793 | 360 | 356 | 356 | 3.1112522523 | 3.000000000 | 1.500000000 | 11.492792793 | 5.492792793 | 32 | 6 | 56 | 6-Month LIBOR |
| 203 | G-2 | 640,000.00 | 5.900000000 | 5.390000000 | 360 | 356 | 356 | 3.5280000000 | 3.000000000 | 1.500000000 | 11.900000000 | 5.900000000 | 32 | 6 | 56 | 6-Month LIBOR |
| 204 | G-1 | 809,919.90 | 5.741964251 | 5.231964251 | 360 | 354 | 354 | 3.5824562573 | 3.000000000 | 1.500000000 | 11.741964251 | 5.741964251 | 30 | 6 | 54 | 6-Month LIBOR |
| 205 | G-1 | 101,129.59 | 8.040000000 | 7.530000000 | 360 | 354 | 354 | 5.617000000 | 3.000000000 | 1.500000000 | 14.040000000 | 8.040000000 | 30 | 6 | 54 | 6-Month LIBOR |
| 206 | G-1 | 274,500.00 | 6.400000000 | 5.890000000 | 360 | 356 | 356 | 4.000000000 | 3.000000000 | 1.500000000 | 12.400000000 | 6.400000000 | 32 | 6 | 56 | 6-Month LIBOR |
| 207 | G-1 | 150,000.00 | 6.720000000 | 6.210000000 | 360 | 356 | 356 | 4.348000000 | 3.000000000 | 1.500000000 | 12.720000000 | 6.720000000 | 32 | 6 | 56 | 6-Month LIBOR |
| 208 | G-2 | 259,250.00 | 5.800000000 | 5.290000000 | 360 | 357 | 357 | 3.428000000 | 3.000000000 | 1.500000000 | 11.800000000 | 5.800000000 | 33 | 6 | 57 | 6-Month LIBOR |
| 209 | G-1 | 219,335.13 | 7.620000000 | 7.110000000 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 210 | G-1 | 5,838,453.42 | 8.8959863287 | 8.3859863287 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 211 | G-2 | 5,274,471.40 | 6.970869559 | 6.460869559 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 212 | G-1 | 421,329.64 | 7.550000000 | 7.040000000 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 213 | G-1 | 764,433.39 | 6.7970312992 | 6.2870312992 | 360 | 357 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 214 | G-2 | 790,034.48 | 7.5310137651 | 7.0210137651 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 215 | G-2 | 188,393.02 | 7.150000000 | 6.640000000 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 216 | G-2 | 19,247,483.05 | 6.6890783794 | 6.1790783794 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 217 | G-1 | 15,193,082.78 | 6.8559881541 | 6.3459881541 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 218 | G-1 | 5,417,677.54 | 7.2027047713 | 6.6927047713 | 360 | 354 | 354 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 219 | G-1 | 6,623,015.16 | 7.4099392511 | 6.8909392511 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 220 | G-1 | 123,333.18 | 8.800000000 | 8.290000000 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 221 | G-2 | 192,801.32 | 7.700000000 | 7.190000000 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 222 | G-2 | 4,516,325.72 | 6.6500912233 | 6.1400912233 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 223 | G-1 | 6,941,270.62 | 8.8358557333 | 8.3258557333 | 360 | 357 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 224 | G-1 | 416,629.69 | 7.6340695233 | 7.1240695233 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 225 | G-2 | 298,371.71 | 6.450000000 | 5.940000000 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 226 | G-1 | 477,390.98 | 7.2839277773 | 6.7739277773 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 227 | G-1 | 2,207,187.04 | 7.9396073229 | 7.4296073229 | 480 | 474 | 474 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 228 | G-1 | 322,206.16 | 7.3499679553 | 6.8399679553 | 480 | 476 | 476 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 229 | G-1 | 727,764.01 | 7.8431693826 | 7.3331693826 | 480 | 476 | 476 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 230 | G-2 | 1,201,804.26 | 7.1648641488 | 6.6548641488 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 231 | G-1 | 1,296,942.70 | 8.3002655055 | 7.7902655055 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 232 | G-1 | 383,940.47 | 7.6665597873 | 7.1565597873 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 233 | G-1 | 1,603,677.31 | 8.1825449896 | 7.6725449896 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 234 | G-1 | 338,179.67 | 8.2759155566 | 7.7659155566 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 235 | G-2 | 149,548.92 | 5.990000000 | 5.480000000 | 360 | 357 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 236 | G-1 | 421,154.54 | 8.7299876667 | 8.2109876667 | 480 | 476 | 476 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 237 | G-1 | 133,865.02 | 8.990000000 | 8.480000000 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 238 | G-1 | 16,969,885.28 | 6.6046728498 | 6.0946728498 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 239 | G-2 | 23,249,742.09 | 7.2159631955 | 7.0596381955 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 240 | G-1 | 6,637,669.51 | 6.6917071327 | 6.1817071327 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 241 | G-1 | 15,819,857.63 | 7.3962926164 | 6.8862926164 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 242 | G-1 | 674,641.74 | 6.690000000 | 6.180000000 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 243 | G-2 | 2,626,892.46 | 6.3358294116 | 5.8258294116 | 480 | 476 | 476 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 244 | G-2 | 229,667.56 | 7.2806206240 | 6.7706206240 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

## Schedule B

| Loan | Group | Current Balance ($) | Current Mortgage Rate (%) | Current Net Mortgage Rate (%) | Original Amort Term (months) | Remaining Amort Term (months) | Remaining Term to Maturity (months) | Gross Margin (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Maximum Lifetime Gross Mortgage Rate (%) | Minimum Lifetime Gross Mortgage Rate (%) | Number of Months Until First Rate Adjustment | Rate Adjustment Frequency (months) | Remaining Interest Only Period (months) | Index |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 245 | G-2 | 636,164.28 | 6.800000000 | 6.290000000 | 480 | 476 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 246 | G-2 | 375,420.01 | 7.850000000 | 7.340000000 | 480 | 477 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 247 | G-1 | 544,143.92 | 6.770393178 | 6.260393178 | 480 | 476 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 248 | G-1 | 1,229,083.12 | 7.049076183 | 6.539076183 | 480 | 476 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 249 | G-1 | 161,720.18 | 7.390000000 | 6.880000000 | 480 | 475 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 250 | G-1 | 399,173.61 | 6.750000000 | 6.240000000 | 480 | 476 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 251 | G-1 | 602,430.46 | 6.464359873 | 5.954359873 | 480 | 476 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 252 | G-1 | 83,896.60 | 10.850000000 | 10.340000000 | 480 | 477 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 253 | G-1 | 174,807.12 | 7.150000000 | 6.640000000 | 480 | 477 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 254 | G-1 | 531,722.35 | 7.384508699 | 6.874508699 | 480 | 476 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 255 | G-1 | 341,007.73 | 6.850000000 | 6.340000000 | 480 | 474 | 354 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 256 | G-1 | 2,509,132.27 | 6.513432547 | 6.003432547 | 480 | 476 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 257 | G-1 | 3,576,382.49 | 6.983465992 | 6.473465992 | 480 | 474 | 354 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 258 | G-1 | 1,246,882.98 | 6.434686218 | 5.924686218 | 480 | 476 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 259 | G-1 | 1,718,885.94 | 7.2970770872 | 6.7870770872 | 480 | 476 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 260 | G-2 | 551,780.00 | 5.250000000 | 4.740000000 | 360 | 355 | 355 | 2.863000000 | 3.000000000 | 1.500000000 | 11.250000000 | 5.250000000 | 55 | 6 | N/A | 6-Month LIBOR |
| 261 | G-2 | 1,311,118.30 | 6.585909173 | 6.075909173 | 360 | 356 | 356 | 4.2053547253 | 3.000000000 | 1.500000000 | 12.585909173 | 6.585909173 | 56 | 6 | N/A | 6-Month LIBOR |
| 262 | G-1 | 403,450.94 | 5.250000000 | 4.740000000 | 360 | 356 | 356 | 3.829000000 | 3.000000000 | 1.500000000 | 11.250000000 | 5.250000000 | 56 | 6 | N/A | 6-Month LIBOR |
| 263 | G-1 | 175,187.17 | 5.250000000 | 4.740000000 | 360 | 356 | 356 | 2.875000000 | 3.000000000 | 1.500000000 | 11.250000000 | 5.250000000 | 56 | 6 | N/A | 6-Month LIBOR |
| 264 | G-1 | 332,876.57 | 5.5536267873 | 5.0436267873 | 360 | 356 | 356 | 5.1766993230 | 3.000000000 | 1.500000000 | 13.5536267873 | 5.5536267873 | 56 | 6 | N/A | 6-Month LIBOR |
| 265 | G-1 | 109,376.15 | 6.800000000 | 6.290000000 | 360 | 356 | 356 | 4.411000000 | 3.000000000 | 1.500000000 | 12.800000000 | 6.800000000 | 56 | 6 | N/A | 6-Month LIBOR |
| 266 | G-1 | 135,756.31 | 9.490000000 | 8.980000000 | 360 | 356 | 356 | 6.050000000 | 3.000000000 | 1.500000000 | 16.000000000 | 10.000000000 | 56 | 6 | N/A | 6-Month LIBOR |
| 267 | G-2 | 229,301.09 | 8.990000000 | 8.480000000 | 360 | 356 | 356 | 6.618000000 | 3.000000000 | 1.500000000 | 14.990000000 | 8.990000000 | 56 | 6 | N/A | 6-Month LIBOR |
| 268 | G-2 | 571,262.42 | 7.550000000 | 7.040000000 | 480 | 474 | 354 | 5.150000000 | 3.000000000 | 1.500000000 | 13.550000000 | 7.550000000 | 54 | 6 | N/A | 6-Month LIBOR |
| 269 | G-2 | 383,539.99 | 6.300000000 | 5.790000000 | 480 | 475 | 355 | 3.500000000 | 3.000000000 | 1.500000000 | 11.900000000 | 6.300000000 | 55 | 6 | N/A | 6-Month LIBOR |
| 270 | G-2 | 210,101.98 | 7.350000000 | 6.840000000 | 480 | 476 | 356 | 2.870000000 | 3.000000000 | 1.500000000 | 11.250000000 | 5.250000000 | 55 | 6 | N/A | 6-Month LIBOR |
| 271 | G-1 | 101,925.13 | 10.300000000 | 9.790000000 | 480 | 475 | 355 | 6.990000000 | 3.000000000 | 1.500000000 | 16.300000000 | 10.300000000 | 55 | 6 | N/A | 6-Month LIBOR |
| 272 | G-2 | 888,992.34 | 6.640934398 | 6.130934398 | 600 | 597 | 357 | 4.214794238 | 3.000000000 | 1.500000000 | 12.640934398 | 6.640934398 | 57 | 6 | N/A | 6-Month LIBOR |
| 273 | G-2 | 475,869.29 | 8.850000000 | 8.340000000 | 600 | 597 | 357 | 6.467000000 | 3.000000000 | 1.500000000 | 14.850000000 | 8.850000000 | 57 | 6 | N/A | 6-Month LIBOR |
| 274 | G-2 | 319,779.86 | 7.200000000 | 6.690000000 | 600 | 596 | 356 | 4.813000000 | 3.000000000 | 1.500000000 | 13.200000000 | 7.200000000 | 56 | 6 | N/A | 6-Month LIBOR |
| 275 | G-1 | 1,565,991.77 | 6.172657764 | 5.662657764 | 600 | 595 | 355 | 3.7875712589 | 3.000000000 | 1.500000000 | 12.172657764 | 6.172657764 | 55 | 6 | N/A | 6-Month LIBOR |
| 276 | G-1 | 639,109.34 | 8.700396297 | 8.190396297 | 600 | 595 | 355 | 6.3188948393 | 3.000000000 | 1.500000000 | 14.700396297 | 8.700396297 | 55 | 6 | N/A | 6-Month LIBOR |
| 277 | G-1 | 397,772.91 | 7.650000000 | 7.140000000 | 600 | 596 | 356 | 5.328000000 | 3.000000000 | 1.500000000 | 13.700000000 | 7.700000000 | 56 | 6 | N/A | 6-Month LIBOR |
| 278 | G-1 | 404,580.00 | 6.990000000 | 6.480000000 | 600 | 596 | 356 | 3.636000000 | 3.000000000 | 1.500000000 | 12.690000000 | 6.690000000 | 56 | 6 | N/A | 6-Month LIBOR |
| 279 | G-1 | 335,738.97 | 6.870000000 | 6.360000000 | 360 | 356 | 356 | 4.490000000 | 3.000000000 | 1.500000000 | 12.870000000 | 6.870000000 | 56 | 6 | N/A | 6-Month LIBOR |
| 280 | G-1 | 237,703.15 | 5.540000000 | 5.030000000 | 600 | 596 | 356 | 3.178000000 | 3.000000000 | 1.550000000 | 11.550000000 | 5.550000000 | 56 | 6 | N/A | 6-Month LIBOR |
| 281 | G-1 | 199,367.92 | 5.690000000 | 5.180000000 | 600 | 596 | 356 | 3.290000000 | 3.000000000 | 1.500000000 | 11.690000000 | 5.690000000 | 56 | 6 | N/A | 6-Month LIBOR |
| 282 | G-2 | 2,320,687.55 | 9.597577187 | 9.087577187 | 600 | 595 | 355 | 4.307592668 | 3.000000000 | 1.500000000 | 11.997577187 | 9.597577187 | 55 | 6 | N/A | 6-Month LIBOR |
| 283 | G-1 | 85,960.40 | 8.650000000 | 8.140000000 | 600 | 596 | 356 | 6.278000000 | 3.000000000 | 1.500000000 | 14.650000000 | 8.650000000 | 56 | 6 | N/A | 6-Month LIBOR |
| 284 | G-2 | 477,000.00 | 6.690000000 | 6.180000000 | 600 | 596 | 356 | 4.318000000 | 3.000000000 | 1.500000000 | 12.690000000 | 6.690000000 | 56 | 6 | N/A | 6-Month LIBOR |
| 285 | G-1 | 16,854,493.65 | 6.579497452 | 6.069497452 | 360 | 356 | 356 | 3.644152869 | 3.000000000 | 1.500000000 | 11.994950844 | 5.994950844 | 56 | 6 | 56 | 6-Month LIBOR |
| 286 | G-2 | 12,884,972.37 | 6.435101401 | 5.925101401 | 360 | 356 | 356 | 3.723000000 | 3.000000000 | 1.500000000 | 12.435101401 | 6.435101401 | 56 | 6 | 56 | 6-Month LIBOR |
| 287 | G-2 | 2,925,051.16 | 6.826575351 | 6.316575351 | 600 | 595 | 355 | 4.0545395373 | 3.000000000 | 1.500000000 | 12.432395373 | 6.432395373 | 55 | 6 | 56 | 6-Month LIBOR |
| 288 | G-1 | 1,262,324.63 | 6.779412383 | 6.269412383 | 360 | 356 | 356 | 3.272997677 | 3.000000000 | 1.500000000 | 12.950000000 | 6.950000000 | 56 | 6 | 56 | 6-Month LIBOR |
| 289 | G-2 | 4,373,413.74 | 6.932997677 | 6.422997677 | 600 | 596 | 356 | 4.578000000 | 3.000000000 | 1.500000000 | 12.932997677 | 6.932997677 | 57 | 6 | 57 | 6-Month LIBOR |
| 290 | G-1 | 3,627,292.44 | 6.594119430 | 6.084119430 | 600 | 596 | 356 | N/A | 3.000000000 | 1.500000000 | N/A | N/A | N/A | N/A | N/A | N/A |
| 291 | G-2 | 8,752,308.89 | 6.954108583 | 6.444108583 | 600 | 595 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 292 | G-2 | 4,094,437.03 | 7.164370656 | 6.654370656 | 600 | 596 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 293 | G-2 | 1,683,697.71 | 7.384442648 | 6.874442648 | 600 | 597 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 294 | G-1 | 1,161,479.80 | 6.9093144848 | 6.3993144848 | 600 | 596 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 295 | G-2 | 561,592.11 | 6.579497452 | 6.069497452 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 296 | G-1 | 2,925,051.16 | 6.826575351 | 6.316575351 | 600 | 595 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 297 | G-1 | 1,262,324.63 | 6.779412383 | 6.269412383 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 298 | G-1 | 4,373,413.74 | 6.329967677 | 5.819967677 | 600 | 596 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 299 | G-2 | 3,627,292.44 | 6.594119430 | 6.084119430 | 600 | 596 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 300 | G-1 | 398,011.29 | 7.102482708 | 6.592482708 | 600 | 595 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 301 | G-2 | 1,447,707.05 | 7.614574021 | 7.104574021 | 600 | 595 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 302 | G-1 | 300,004.67 | 10.350000000 | 10.740211? | 597 | 593 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 303 | G-1 | 142,369.56 | 9.740000000 | 9.230000000 | 600 | 596 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 304 | G-1 | 865,443.43 | 6.788582655 | 6.278582655 | 600 | 596 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 305 | G-1 | 570,580.14 | 7.097748650 | 6.587748650 | 600 | 596 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

## Schedule B

| Loan | Group | Current Balance ($) | Current Mortgage Rate (%) | Current Net Mortgage Rate (%) | Original Amort Term (in months) | Remaining Amort Term (in months) | Remaining Term to Maturity (months) | Gross Margin (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Maximum Lifetime Gross Mortgage Rate (%) | Minimum Lifetime Gross Mortgage Rate (%) | Number of Months Until First Rate Adjustment | Rate Adjustment Frequency (in months) | Remaining Interest Only Period (in months) | Index |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 306 | G-1 | 539,159.75 | 6.7976630043 | 6.2876630043 | 600 | 596 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 307 | G-1 | 151,897.23 | 8.8500000000 | 7.3400000000 | 600 | 595 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 308 | G-1 | 169,874.09 | 7.0000000000 | 6.4900000000 | 600 | 596 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 309 | G-1 | 156,424.34 | 6.9900000000 | 6.4800000000 | 600 | 594 | 354 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 310 | G-1 | 13,937,218.47 | 6.7219974351 | 6.2119974351 | 600 | 595 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 311 | G-1 | 11,266,963.66 | 7.3481527491 | 6.8381527491 | 600 | 596 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 312 | G-1 | 3,678,793.24 | 7.1387393841 | 6.6287393841 | 600 | 596 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 313 | G-1 | 4,003,361.04 | 7.9723402978 | 7.4623402978 | 600 | 596 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 314 | G-2 | 83,418.23 | 11.0750000000 | 10.5650000000 | 120 | 116 | 116 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 315 | G-2 | 73,321.64 | 11.0650000000 | 10.5650000000 | 120 | 116 | 116 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 316 | G-2 | 215,816.22 | 11.1793510133 | 10.6693510133 | 120 | 116 | 116 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 317 | G-2 | 202,409.28 | 10.7577739519 | 10.2477739519 | 120 | 115 | 115 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 318 | G-2 | 51,099.17 | 12.3250000000 | 11.8150000000 | 120 | 116 | 116 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 319 | G-2 | 149,883.47 | 10.9956235151 | 10.4856235151 | 120 | 115 | 115 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 320 | G-2 | 189,003.57 | 11.7614647715 | 11.2514647715 | 120 | 116 | 116 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 321 | G-2 | 21,463.98 | 13.1000000000 | 12.5900000000 | 180 | 176 | 176 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 322 | G-2 | 42,504.04 | 12.1644626722 | 11.6544626722 | 180 | 176 | 176 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 323 | G-2 | 21,386.04 | 12.3250000000 | 11.8150000000 | 180 | 175 | 175 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 324 | G-2 | 55,088.42 | 12.2804459574 | 11.7704459574 | 180 | 175 | 175 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 325 | G-2 | 84,307.09 | 11.7248639142 | 11.2148639142 | 180 | 175 | 175 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 326 | G-2 | 22,527.62 | 12.3250000000 | 11.8150000000 | 180 | 174 | 174 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 327 | G-2 | 22,577.70 | 10.0250000000 | 9.5150000000 | 180 | 174 | 174 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 328 | G-2 | 17,603.16 | 10.7400000000 | 10.2300000000 | 180 | 176 | 176 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 329 | G-2 | 41,371.72 | 11.4823846855 | 10.9723846855 | 180 | 177 | 177 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 330 | G-2 | 153,345.70 | 12.0472209133 | 11.5372209133 | 180 | 176 | 176 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 331 | G-2 | 246,331.49 | 11.5631714628 | 11.0531714628 | 180 | 175 | 175 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 332 | G-2 | 46,488.11 | 11.4750000000 | 10.9650000000 | 240 | 234 | 234 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 333 | G-2 | 121,530.14 | 12.4750000000 | 11.9650000000 | 240 | 236 | 236 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 334 | G-2 | 61,920.53 | 11.9750000000 | 11.4650000000 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 335 | G-2 | 41,731.49 | 12.3250000000 | 11.8150000000 | 180 | 174 | 174 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 336 | G-2 | 146,589.65 | 11.0613006426 | 10.5513006426 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 337 | G-2 | 4,440,980.56 | 10.7904758450 | 10.2804758450 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 338 | G-2 | 4,272,262.62 | 11.3563716210 | 10.8463716210 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 339 | G-2 | 178,077.54 | 11.9101304690 | 11.4001304690 | 360 | 354 | 354 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 340 | G-2 | 510,365.99 | 10.9708851158 | 10.4608851158 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 341 | G-2 | 543,342.04 | 11.6041287623 | 11.0941287623 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 342 | G-2 | 127,365.27 | 10.5683001830 | 10.0583001830 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 343 | G-2 | 361,855.89 | 11.2995624819 | 10.7895624819 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 344 | G-2 | 207,042.62 | 10.4603496411 | 9.9503496411 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 345 | G-2 | 54,780.83 | 10.6157792470 | 10.1057792470 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 346 | G-2 | 79,981.02 | 10.9565197593 | 10.4465197593 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 347 | G-2 | 9,494,098.14 | 10.6223153366 | 10.1123153366 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 348 | G-2 | 10,529,453.29 | 11.3470309171 | 10.8370309171 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 349 | G-2 | 110,845.16 | 10.9708851158 | 10.4608851158 | 360 | 352 | 352 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 350 | G-2 | 167,515.28 | 10.0012258016 | 9.4912258016 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 351 | G-2 | 188,208.16 | 11.8834146298 | 11.3734146298 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 352 | G-2 | 167,629.33 | 10.0896495786 | 9.5796495786 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 353 | G-2 | 203,168.72 | 10.4990452480 | 9.9890452480 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 354 | G-2 | 306,808.34 | 10.3318489607 | 9.8218489607 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 355 | G-2 | 60,266.09 | 10.5722710616 | 10.0622710616 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 356 | G-2 | 58,386.53 | 10.8728005586 | 10.3628005586 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 357 | G-2 | 4,846,148.93 | 10.4014124431 | 9.8914124431 | 360 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 358 | G-2 | 4,540,209.89 | 11.1144354637 | 10.6044354637 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 359 | G-2 | 7,227,125.96 | 10.8615971659 | 10.3515971659 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 360 | G-2 | 7,456,727.69 | 11.5265418692 | 11.0165418692 | 360 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

**SCHEDULE C**

# Regulation AB Static Pool Data
## Fremont Home Loan Trust Series 2006-A

| Original Pool Profile: | Original Count | Original Amount |
|---|---|---|
| Number of Mortgage Loans | 4,268 | |
| Original Pool Balance | | 982,532,607 |
| Weighted Average Interest Rate | | 8.502 |
| Weighted Average Remaining Term | | 396.9 |
| Weighted Average CLTV | | 87.73 |
| Weighted Average FICO | | 621 |
| Minimum FICO | | 500 |
| Maximum FICO | | 813 |
| **Product Type:** | | |
| Fixed | 834 | 83,698,556 |
| 2/6, 2/1 FIRM w IO | 287 | 92,939,518 |
| 2/6, 2/1 FIRM wo IO | 2,044 | 471,596,271 |
| 3/6, 3/1 FIRM w IO | 10 | 3,791,460 |
| 3/6, 3/1 FIRM wo IO | 21 | 3,385,073 |
| 5/6, 5/1 FIRM wo IO | 4 | 1,091,990 |
| Fixed 40/30 | 43 | 12,676,340 |
| 2/6 FIRM 40/30 | 1,006 | 307,002,532 |
| 3/6 FIRM 40/30 | 12 | 4,031,425 |
| 5/6 FIRM 40/30 | 7 | 2,319,443 |
| **Loan Purpose:** | | |
| Purchase | 2,178 | 470,070,672 |
| Refi Cash-Out | 2,051 | 503,571,427 |
| Refi No Cash-Out | 39 | 8,890,508 |
| **Property Type:** | | |
| Single Family | 3,558 | 806,099,045 |
| Two to Four Family | 423 | 119,673,157 |
| Condominium | 287 | 56,760,405 |
| **Occupancy Status:** | | |
| Primary | 3,926 | 914,535,286 |
| Non-owner | 294 | 57,051,015 |
| Second Home | 48 | 10,946,307 |
| **Distribution of Assets by Current:** | | |
| 5.00%+ - 6.00% | 8 | 3,086,758 |
| 6.00%+ - 7.00% | 253 | 73,569,812 |
| 7.00%+ - 8.00% | 1,025 | 298,863,686 |
| 8.00%+ - 9.00% | 1,370 | 369,933,631 |
| 9.00%+ - 10.00% | 789 | 151,287,613 |
| 10.00%+ - 11.00% | 358 | 43,864,783 |
| 11.00%+ - 12.00% | 338 | 33,594,518 |
| 12.00%+ - 13.00% | 119 | 7,897,269 |
| 13.00%+ - 14.00% | 8 | 414,539 |
| **Documentation Level:** | | |
| Full Documentation | 2,470 | 521,436,330 |
| Low Documentation | 1,798 | 461,096,278 |
| **Geographic Concentration:** | | |
| California | 789 | 249,976,496 |
| Colorado | 70 | 11,953,049 |
| Florida | 705 | 137,188,295 |
| Georgia | 189 | 26,236,463 |
| Illinois | 224 | 43,396,258 |
| Massachusetts | 148 | 37,158,377 |
| Maryland | 333 | 73,904,890 |
| Minnesota | 34 | 5,481,204 |
| New Jersey | 236 | 62,581,564 |
| Nevada | 73 | 16,025,403 |
| New York | 372 | 120,557,859 |
| Virginia | 141 | 33,955,774 |
| Other (less than 2% concentration) | 954 | 164,216,975 |

| | October 2006 Remittances | | |
|---|---|---|---|
| **Delinquency Data:** | # of Active Accts | Active Balance | % of Balance |
| 0 - 30 Days (BK, FC, REO) | 6 | 962,827 | 0.97% |
| 31-60 Days | 142 | 32,701,376 | 33.08% |
| 61 -90 Days | 67 | 17,196,636 | 17.39% |
| 91 - 120 Days | 61 | 13,758,838 | 13.92% |
| 121 - 150 Days | 68 | 18,792,310 | 19.01% |
| 151 - 180 Days | 52 | 12,589,711 | 12.73% |
| 181 - 210 Days | 10 | 2,864,589 | 2.90% |
| 211 - 240 Days | 0 | 0 | 0.00% |
| 241 - 270 Days | 0 | 0 | 0.00% |
| 271 - 360 Days | 0 | 0 | 0.00% |
| 1 to 2 Years | 0 | 0 | 0.00% |
| 2 to 3 Years | 0 | 0 | 0.00% |
| Total | 406 | 98,866,287 | 100.00% |
| Total as a % Original | 9.51% | 10.06% | |

| | Loss $ |
|---|---|
| Gross Losses To Date | 0 |
| Recoveries | 0 |
| Net Losses To Date | 0 |
| Net Loss TD % of Original | 0.000% |

| | CPR 1 Month | CPR 3 Month | CPR 6 Month |
|---|---|---|---|
| Current Prepayment Rate | 31.45% | 30.28% | 0.00% |

26.63 %

## Regulation AB Static Pool Data
## Fremont Home Loan Trust Series 2006-A

| Original Pool Profile: | Original Count | Original Amount |
|---|---|---|
| Number of Mortgage Loans | 4,268 | |
| Original Pool Balance | | 982,532,607 |
| Weighted Average Interest Rate | | 8.502 |
| Weighted Average Remaining Term | | 396.9 |
| Weighted Average CLTV | | 87.73 |
| Weighted Average FICO | | 621 |
| Minimum FICO | | 500 |
| Maximum FICO | | 813 |
| Product Type: | | |
| Fixed | 834 | 83,698,556 |
| 2/6, 2/1 FIRM w IO | 287 | 92,939,518 |
| 2/6, 2/1 FIRM wo IO | 2,044 | 471,596,271 |
| 3/6, 3/1 FIRM w IO | 10 | 3,791,460 |
| 3/6, 3/1 FIRM wo IO | 21 | 3,385,073 |
| 5/6, 5/1 FIRM wo IO | 4 | 1,091,990 |
| Fixed 40/30 | 43 | 12,676,340 |
| 2/6 FIRM 40/30 | 1,006 | 307,002,532 |
| 3/6 FIRM 40/30 | 12 | 4,031,425 |
| 5/6 FIRM 40/30 | 7 | 2,319,443 |
| Loan Purpose: | | |
| Purchase | 2,178 | 470,070,672 |
| Refi Cash-Out | 2,051 | 503,571,427 |
| Refi No Cash-Out | 39 | 8,890,508 |
| Property Type: | | |
| Single Family | 3,558 | 806,099,045 |
| Two to Four Family | 423 | 119,673,157 |
| Condominium | 287 | 56,760,405 |
| Occupancy Status: | | |
| Primary | 3,926 | 914,535,286 |
| Non-owner | 294 | 57,051,015 |
| Second Home | 48 | 10,946,307 |
| Distribution of Assets by Current: | | |
| 5.00%+ - 6.00% | 8 | 3,086,758 |
| 6.00%+ - 7.00% | 253 | 73,569,812 |
| 7.00%+ - 8.00% | 1,025 | 298,863,686 |
| 8.00%+ - 9.00% | 1,370 | 369,933,631 |
| 9.00%+ - 10.00% | 789 | 151,287,613 |
| 10.00%+ - 11.00% | 353 | 43,884,783 |
| 11.00%+ - 12.00% | 338 | 33,594,518 |
| 12.00%+ - 13.00% | 119 | 7,897,269 |
| 13.00%+ - 14.00% | 8 | 414,539 |
| Documentation Level: | | |
| Full Documentation | 2,470 | 521,436,330 |
| Low Documentation | 1,798 | 461,096,278 |
| Geographic Concentration: | | |
| California | 789 | 249,976,496 |
| Colorado | 70 | 11,953,049 |
| Florida | 705 | 137,188,295 |
| Georgia | 139 | 26,236,463 |
| Illinois | 224 | 43,266,258 |
| Massachusetts | 148 | 37,158,377 |
| Maryland | 333 | 73,904,850 |
| Minnesota | 34 | 5,481,204 |
| New Jersey | 236 | 62,581,564 |
| Nevada | 73 | 16,025,403 |
| New York | 572 | 120,557,859 |
| Virginia | 141 | 33,955,774 |
| Other (less than 2% concentration) | 954 | 164,216,975 |

| Delinquency Data: | # of Active Accts | Active Balance | % of Balance |
|---|---|---|---|
| | | September 2006 Remittances | |
| 0 - 30 Days (BK, FC, REO) | 5 | 912,453 | 1.04% |
| 31-60 Days | 148 | 35,754,608 | 40.59% |
| 61 -90 Days | 71 | 15,990,097 | 18.15% |
| 91 - 120 Days | 70 | 19,185,151 | 21.78% |
| 121 - 150 Days | 56 | 13,384,497 | 15.19% |
| 151 - 180 Days | 10 | 2,864,589 | 3.25% |
| 181 - 210 Days | 0 | 0 | 0.00% |
| 211 - 240 Days | 0 | 0 | 0.00% |
| 241 - 270 Days | 0 | 0 | 0.00% |
| 271 - 360 Days | 0 | 0 | 0.00% |
| 1 to 2 Years | 0 | 0 | 0.00% |
| 2 to 3 Years | 0 | 0 | 0.00% |
| Total | 360 | 88,091,395 | 100.00% |
| Total as a % Original) | 8.43% | 8.97% | |

| | Loss $ |
|---|---|
| Gross Losses To Date | 0 |
| Recoveries | 0 |
| Net Losses To Date | 0 |
| Net Loss TD % of Original | 0.000% |

| | CPR 1 Month | CPR 3 Month | CPR 6 Month |
|---|---|---|---|
| Current Prepayment Rate | 34.25% | 28.82% | 26.74% |

NA

## Regulation AB Static Pool Data
### Fremont Home Loan Trust Series 2006-B (Pool 1)

| Original Pool Profile: | Original Count | Original Amount |
|---|---|---|
| Number of Mortgage Loans | 4,725 | |
| Original Pool Balance | | 1,002,548,679 |
| Weighted Average Interest Rate | | 8.592 |
| Weighted Average Remaining Term | | 403.0 |
| Weighted Average CLTV | | 88.87 |
| Weighted Average FICO | | 627 |
| Minimum FICO | | 500 |
| Maximum FICO | | 816 |
| **Product Type:** | | |
| Fixed | 1,499 | 161,107,866 |
| 2/6, 2/1 FIRM w IO | 270 | 93,683,846 |
| 2/6, 2/1 FIRM wo IO | 1,664 | 562,026,457 |
| 3/6, 3/1 FIRM w IO | 3 | 773,600 |
| 3/6, 3/1 FIRM wo IO | 21 | 4,574,547 |
| 5/6, 5/1 FIRM wo IO | 3 | 295,623 |
| Fixed 40/30 | 101 | 31,742,795 |
| 2/6 FIRM 40/30 | 1,148 | 344,351,639 |
| 3/6 FIRM 40/30 | 11 | 2,223,035 |
| 5/6 FIRM 40/30 | 5 | 1,769,271 |
| **Loan Purpose:** | | |
| Purchase | 2,736 | 496,506,692 |
| Refi Cash-Out | 1,947 | 497,719,170 |
| Refi No Cash-Out | 42 | 8,322,812 |
| **Property Type:** | | |
| Single Family | 3,940 | 826,892,163 |
| Two to Four Family | 415 | 108,026,126 |
| Condominium | 370 | 67,630,390 |
| **Occupancy Status:** | | |
| Primary | 4,495 | 957,472,052 |
| Non-owner | 190 | 36,010,126 |
| Second Home | 40 | 9,066,500 |
| **Distribution of Assets by Current:** | | |
| 5.00%+ - 6.00% | 16 | 6,142,078 |
| 6.00%+ - 7.00% | 328 | 114,795,823 |
| 7.00%+ - 8.00% | 903 | 280,950,106 |
| 8.00%+ - 9.00% | 1,195 | 322,465,916 |
| 9.00%+ - 10.00% | 821 | 159,251,602 |
| 10.00%+ - 11.00% | 572 | 67,047,181 |
| 11.00%+ - 12.00% | 563 | 50,176,445 |
| 12.00%+ - 13.00% | 309 | 20,715,674 |
| 13.00%+ - 14.00% | 17 | 981,428 |
| | 1 | 22,427 |
| **Documentation Level:** | | |
| Full Documentation | 2,865 | 570,846,255 |
| Low Documentation | 1,860 | 431,702,424 |
| **Geographic Concentration:** | | |
| California | 831 | 261,627,668 |
| Colorado | 53 | 8,355,051 |
| Florida | 810 | 147,929,920 |
| Georgia | 201 | 28,705,707 |
| Illinois | 338 | 60,639,110 |
| Massachusetts | 126 | 33,835,162 |
| Maryland | 315 | 72,617,668 |
| Minnesota | 67 | 10,010,346 |
| New Jersey | 196 | 49,460,600 |
| Nevada | 59 | 11,232,717 |
| New York | 359 | 105,162,142 |
| Virginia | 120 | 26,787,471 |
| Other (less than 2% concentration) | 1,250 | 186,185,117 |

### September 2006 Remittances

| Delinquency Data: | # of Active Accts | Active Balance | % of Balance |
|---|---|---|---|
| 0 - 30 Days (BK, FC, REO) | 2 | 274,745 | 0.49% |
| 31-60 Days | 152 | 33,359,911 | 59.25% |
| 61 -90 Days | 60 | 13,384,824 | 23.77% |
| 91 - 120 Days | 44 | 9,288,190 | 16.50% |
| 121 - 150 Days | 0 | 0 | 0.00% |
| 151 - 180 Days | 0 | 0 | 0.00% |
| 181 - 210 Days | 0 | 0 | 0.00% |
| 211 - 240 Days | 0 | 0 | 0.00% |
| 241 - 270 Days | 0 | 0 | 0.00% |
| 271 - 360 Days | 0 | 0 | 0.00% |
| 1 to 2 Years | 0 | 0 | 0.00% |
| 2 to 3 Years | 0 | 0 | 0.00% |
| Total | 258 | 56,307,668 | 100.00% |
| Total as a % Original | 5.46% | 5.62% | |

| | Loss $ |
|---|---|
| Gross Losses To Date | 45,992 |
| Recoveries | 0 |
| Net Losses To Date | 45,992 |
| Net Loss TD % of Original | 0.005% |

| | CPR 1 Month | CPR 3 Month | CPR 6 Month |
|---|---|---|---|
| Current Prepayment Rate | 13.31% | 19.72% ~~NA~~ | 0.00% ~~NA~~ |

## Regulation AB Static Pool Data
### Fremont Home Loan Trust Series 2006-B (Pool 2)

| Original Pool Profile: | Original Count | Original Amount |
|---|---|---|
| Number of Mortgage Loans | 4,407 | |
| Original Pool Balance | | 283,066,575 |
| Weighted Average Interest Rate | | 11.493 |
| Weighted Average Remaining Term | | 351.1 |
| Weighted Average CLTV | | 99.50 |
| Weighted Average FICO | | 647 |
| Minimum FICO | | 550 |
| Maximum FICO | | 807 |
| Product Type: | | |
| Fixed | 4,407 | 283,066,575 |

| | September 2006 Remittances | | |
|---|---|---|---|
| Delinquency Data: | # of Active Accts | Active Balance | % of Balance |
| 0 - 30 Days (BK, FC, REO) | 1 | 60,523 | 0.32% |
| 31-60 Days | 153 | 10,925,841 | 57.97% |
| 61 -90 Days | 56 | 4,695,224 | 24.91% |
| 91 - 120 Days | 38 | 3,167,178 | 16.80% |
| 121 - 150 Days | 0 | 0 | 0.00% |
| 151 - 180 Days | 0 | 0 | 0.00% |
| 181 - 210 Days | 0 | 0 | 0.00% |
| 211 - 240 Days | 0 | 0 | 0.00% |
| 241 - 270 Days | 0 | 0 | 0.00% |
| 271 - 360 Days | 0 | 0 | 0.00% |
| 1 to 2 Years | 0 | 0 | 0.00% |
| 2 to 3 Years | 0 | 0 | 0.00% |
| Total | 248 | 18,848,766 | 100.00% |
| Total as a % Original | 5.63% | 6.66% | |

| Loan Purpose: | | |
|---|---|---|
| Purchase | 3,591 | 227,052,262 |
| Refi Cash-Out | 798 | 54,687,707 |
| Refi No Cash-Out | 18 | 1,326,546 |
| Property Type: | | |
| Single Family | 3,592 | 227,948,648 |
| Two to Four Family | 445 | 35,380,636 |
| Condominium | 370 | 19,737,292 |
| Occupancy Status: | | |
| Primary | 4,333 | 281,365,903 |
| Non-owner | 67 | 1,513,406 |
| Second Home | 7 | 187,267 |
| Distribution of Assets by Current: | | |
| 9.00%+ - 10.00% | 445 | 31,603,782 |
| 10.00%+ - 11.00% | 871 | 68,181,037 |
| 11.00%+ - 12.00% | 1,156 | 79,284,075 |
| 12.00%+ - 13.00% | 1,718 | 90,554,391 |
| 13.00%+ - 14.00% | 217 | 13,443,290 |
| Documentation Level: | | |
| Full Documentation | 2,641 | 152,290,478 |
| Low Documentation | 1,766 | 130,776,097 |
| Geographic Concentration: | | |
| California | 770 | 75,939,807 |
| Colorado | 66 | 3,012,285 |
| Florida | 766 | 42,626,154 |
| Georgia | 246 | 9,420,323 |
| Illinois | 337 | 15,638,466 |
| Massachusetts | 136 | 8,984,136 |
| Maryland | 243 | 15,964,881 |
| Minnesota | 72 | 3,369,170 |
| New Jersey | 233 | 16,365,538 |
| Nevada | 66 | 4,232,032 |
| New York | 368 | 33,656,181 |
| Virginia | 164 | 11,735,796 |
| Other (less than 2% concentration) | 940 | 42,121,806 |

| | Loss $ |
|---|---|
| Gross Losses To Date | 0 |
| Recoveries | 0 |
| Net Losses To Date | 0 |
| Net Loss TD % of Original | 0.000% |

| | CPR 1 Month | CPR 3 Month | CPR 6 Month |
|---|---|---|---|
| Current Prepayment Rate | 11.13% | ~~12.40%~~ | ~~0.00%~~ |
| | | N/A | N/A |

**PROSPECTUS**

**Mortgage-Backed/Asset-Backed Securities (Issuable in Series)**
**Bear Stearns Asset Backed Securities I LLC**
*Depositor*

**The Securities**

---

**Consider carefully the risk factors beginning on page 6 of this prospectus.**

The securities represent obligations of the issuing entity only and do not represent an interest in or obligation of the depositor, the sponsor, the master servicer or any of their affiliates.

This prospectus may be used to offer and sell the securities only if accompanied by a prospectus supplement.

---

Each issue of securities will have its own series designation and will evidence either the ownership of assets in the related trust fund or debt obligations secured by assets of the related trust fund.

- Each series of securities will consist of one or more classes of mortgage-backed or asset-backed certificates or notes.

- Each class of securities will represent the entitlement to a specified portion of interest payments and a specified portion of principal payments on the trust assets.

- A series may include classes of securities that are senior in right of payment to other classes. Classes of securities may be entitled to receive distributions of principal, interest or both prior to other classes or before or after specified events.

- No market will exist for the securities of any series before they are issued. In addition, even after the securities of a series have been issued and sold, there can be no assurance that a resale market for them will develop.

Offers of the securities will be made through Bear, Stearns & Co. Inc. and the other underwriters listed in the related prospectus supplement.

**The Trust Fund and Its Assets**

As specified in the related prospectus supplement, each trust fund will consist primarily of assets from one of the following categories:

- mortgage loans secured by senior or junior liens on one- to four-family residential properties;

- closed-end and/or revolving home equity loans secured by senior or junior liens on one- to four-family residential or mixed-use properties;

- home improvement installment sales contracts and loan agreements that are either unsecured or secured by senior or junior liens on one- to four-family residential or mixed-use properties or by purchase money security interests in the related home improvements;

- installment sales contracts and installment loan agreements secured by senior or junior liens on manufactured homes or by mortgages on the related real estate;

- mortgage-backed securities issued or guaranteed by Ginnie Mae, Freddie Mac or Fannie Mae; and

- private label mortgage-backed or asset-backed securities.

**Neither the Securities and Exchange Commission nor any state securities commission has approved these securities or determined that this prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

**Bear, Stearns & Co. Inc.**
**June 26, 2007**

**TABLE OF CONTENTS**

| Caption | Page |
|---|---|
| RISK FACTORS | 6 |
| DESCRIPTION OF THE SECURITIES | 15 |
| General | 15 |
| The Primary Assets and Their Valuation | 19 |
| Exchangeable Securities | 20 |
| Exchanges | 20 |
| Procedures | 22 |
| Payments of Interest | 22 |
| Payments of Principal | 23 |
| Final Scheduled Distribution Date | 23 |
| Special Redemption | 23 |
| Optional Redemption, Purchase or Termination | 24 |
| Weighted Average Lives of the Securities | 24 |
| THE TRUST FUNDS | 26 |
| General | 26 |
| The Loans | 27 |
| Methods of Delinquency Calculation | 35 |
| FICO Scores | 36 |
| Private Label Securities | 37 |
| Agency Securities | 39 |
| Collection and Distribution Accounts | 46 |
| CREDIT ENHANCEMENT | 48 |
| Subordinated Securities | 48 |
| Insurance Policies, Surety Bonds and Guaranties | 48 |
| Overcollateralization | 49 |
| Other Insurance Policies | 49 |
| Reserve Funds | 50 |
| Cross-Collateralization | 51 |
| Minimum Principal Payment Agreement | 51 |
| Deposit Agreement | 52 |
| Financial Instruments | 52 |
| STATIC POOL INFORMATION | 54 |
| SERVICING OF LOANS | 54 |
| General | 54 |
| Collection Procedures; Escrow Accounts | 54 |
| Deposits to and Withdrawals from the Collection Account | 55 |
| Advances and Limitations on Advances | 57 |
| Maintenance of Insurance Policies and Other Servicing Procedures | 57 |
| Realization upon Defaulted Loans | 59 |
| Enforcement of Due-on-Sale Clauses | 59 |
| Servicing Compensation and Payment of Expenses | 60 |
| Certain Matters Regarding the Servicer | 61 |
| THE AGREEMENTS | 62 |
| Assignment of Primary Assets | 62 |
| Reports to Holders | 66 |
| Events of Default; Rights upon Event of Default | 67 |
| The Trustees | 70 |
| Duties of Trustees | 71 |
| Resignation of Trustees | 74 |

| Caption | Page |
|---|---|
| Amendment of Agreement | 74 |
| Voting Rights | 75 |
| List of Holders | 75 |
| Book-Entry Securities | 75 |
| REMIC Administrator | 75 |
| Termination | 76 |
| MATERIAL LEGAL ASPECTS OF THE LOANS | 76 |
| Mortgages | 76 |
| Foreclosure on Mortgages | 77 |
| Environmental Risks | 79 |
| Rights of Redemption | 81 |
| Junior Mortgages; Rights of Senior Mortgages | 81 |
| Anti-Deficiency Legislation and Other Limitations on Lenders | 82 |
| Due-on-Sale Clauses in Mortgage Loans | 83 |
| Enforceability of Prepayment and Late Payment Fees | 84 |
| Equitable Limitations on Remedies | 84 |
| Applicability of Usury Laws | 85 |
| The Home Improvement Contracts and the Manufactured Housing Contracts | 85 |
| Installment Sales Contracts | 88 |
| Civil Relief Act | 89 |
| Forfeitures in Drug and RICO Proceedings | 90 |
| THE SPONSOR | 90 |
| THE DEPOSITOR | 91 |
| USE OF PROCEEDS | 92 |
| MATERIAL FEDERAL INCOME TAX CONSIDERATIONS | 92 |
| General | 92 |
| Taxation of Debt Securities | 93 |
| Taxation of the REMIC and its Holders | 100 |
| REMIC Expenses; Single Class REMICs | 100 |
| Taxation of the REMIC | 102 |
| Taxation of Holders of Residual Interest Securities | 103 |
| Administrative Matters | 108 |
| Inducement Fees | 108 |
| Tax Status as a Grantor Trust | 109 |
| Sale or Exchange | 112 |
| Miscellaneous Tax Aspects | 113 |
| Taxation of Classes of Exchangeable Securities | 114 |
| Tax Treatment of Foreign Investors | 117 |
| Tax Characterization of the Trust Fund as a Partnership | 118 |
| Tax Consequences to Holders of the Notes | 118 |
| Tax Consequences to Holders of the Certificates | 121 |
| REPORTABLE TRANSACTIONS | 126 |
| STATE AND LOCAL TAX CONSIDERATIONS | 126 |
| ERISA CONSIDERATIONS | 126 |

Class and Statutory Exemptions ........................128
Class exemptions for purchases and sales of
securities. ..........................................................128
Underwriter Exemption ......................................131
Insurance company general accounts.................137
Revolving pool features. ....................................137
ERISA Considerations Relating to Notes ...........138
Exchangeable Securities ....................................139
Tax Exempt Investors .........................................140
Consultation with Counsel.................................140
METHOD OF DISTRIBUTION ..........................140

LEGAL MATTERS ...............................................142
FINANCIAL INFORMATION.............................142
AVAILABLE INFORMATION ...........................142
INCORPORATION OF CERTAIN INFORMATION
BY REFERENCE.................................................143
RATINGS..............................................................143
LEGAL INVESTMENT CONSIDERATIONS ....144
PLAN OF DISTRIBUTION..................................146
GLOSSARY OF TERMS......................................146

**Important Notice About Information in This Prospectus**
**and Each Accompanying Prospectus Supplement**

Information about each series of securities is contained in two separate documents:

- this prospectus, which provides general information, some of which may not apply to a particular series; and

- the accompanying prospectus supplement for a particular series, which describes the specific terms of the securities of that series.

Although the accompanying prospectus supplement cannot contradict the information contained in this prospectus, insofar as the prospectus supplement contains specific information about a particular series of securities that expands on the more general information contained in this prospectus, you are encouraged to rely on the information in the prospectus supplement.

You are encouraged to rely only on the information contained in this prospectus and the accompanying prospectus supplement.  We have not authorized anyone to provide you with information that is different from that contained in this prospectus and the accompanying prospectus supplement.

Each prospectus supplement generally will include the following information with respect to the related series of securities:

- the principal amount, interest rate and authorized denominations of each class of securities;

- information concerning the mortgage loans, home equity loans, home improvement contracts, manufactured housing contracts, mortgage backed securities and/or private securities in the related trust fund;

- information concerning the sponsor or any other seller of the mortgage loans, home equity loans, home improvement contracts, manufactured housing contracts, mortgage backed securities and/or private securities and information concerning any servicer;

- the terms of any credit enhancement with respect to particular classes of the securities;

- information concerning other trust fund assets, including any reserve fund;

- the final scheduled distribution date for each class of securities;

- the method for calculating the amount of principal to be paid to each class of securities, and the timing and order of priority of principal payments;

- information about any REMIC tax elections for some or all of the trust fund assets; and

- particulars of the plan of distribution for the securities.

4

We include cross-references in this prospectus and the accompanying prospectus supplement to captions in these materials where you can find further related discussions. The Table of Contents included in the accompanying prospectus supplement lists the pages on which these captions are located.

There is also a Glossary of Terms where you will find definitions of certain capitalized terms used in this prospectus.

If you require additional information, the mailing address of our principal executive offices is Bear Stearns Asset Backed Securities I LLC, 383 Madison Avenue, New York, New York, 10179 and our telephone number is (212) 272-2000.  For other means of acquiring additional information about us or a series of securities, see "Incorporation of Certain Information by Reference" in this prospectus.

## Risk Factors

You should consider carefully the following information, together with the information set forth under "Risk Factors" in the accompanying prospectus supplement, since it identifies the principal risk factors associated with an investment in the securities.

**You may have difficulty selling your securities or obtaining your desired price ....**

No market will exist for the securities before they are issued. In addition, we cannot give you any assurance that a resale market will develop following the issuance and sale of any series of the securities. Even if a resale market does develop, you may not be able to sell your securities when you wish or at the price you want.

**Only the assets of the related trust fund are available to pay your securities ....................**

The securities of each series will be payable solely from the assets of the related trust fund, including any applicable credit enhancement, and will not have a claim against the assets of any other trust. In the case of securities that are in the form of notes, the related indenture will require that noteholders proceed only against the assets of the related trust fund. We cannot give you any assurance that the market value of the assets in any trust fund will be equal to or greater than the total principal amount of the related securities then outstanding, plus accrued interest. Moreover, if the assets of a trust fund are ever sold, the sale proceeds will be applied first to reimburse any related trustee, servicer and credit enhancement provider for their unpaid fees and expenses before any remaining amounts are distributed to securityholders.

In addition, at the times specified in the related prospectus supplement, assets of the trust fund and the related security accounts may be released to the depositor, the servicer, the credit enhancement provider or other persons, if

- all payments then due on the related securities have been made, and

- any other payments specified in the related prospectus supplement have been made.

Once released, such assets will no longer be available to make payments to securityholders.

You will have no recourse against the depositor or any other person if any required distribution on the securities is not

6

made or for any other default.  The only obligations of the depositor with respect to a trust fund or the related securities would result from a breach of the representations and warranties that the depositor may make concerning the trust assets.  However, because of the depositor's very limited assets, even if the depositor should be required to repurchase a loan from a particular trust fund because of the breach of a representation or warranty, its sole source of funds for the repurchase would be:

- funds obtained from enforcing any similar obligation of the originator of the loan, or

- monies from any reserve fund established to pay for loan repurchases.

**Credit enhancement may be insufficient to provide against particular risks.............**
Although credit enhancement is intended to reduce the effect of delinquent payments or loan losses on particular classes of securities, the amount of any credit enhancement is subject to the limits described in the related prospectus supplement.  In addition, the amount of credit enhancement may decline or be depleted before the related securities are paid in full.  As a result, securityholders may suffer losses.

**Principal payments on the loans may adversely affect the average life of, and rate of return on, your securities.....**
You may be unable to reinvest the principal payments on your securities at a rate of return equal to the rate on your securities. The timing of principal payments on the securities of a series will be affected by a number of factors, including the following:

- the extent of prepayments on the underlying loans in the trust fund or, if the trust fund contains underlying securities, on the loans backing the underlying securities;

- how payments of principal are allocated among the classes of securities of that series as specified in the related prospectus supplement;

- if any party has an option to terminate the related trust early, the effect of the exercise of the option;

- the rate and timing of defaults and losses on the assets in the related trust fund;

7

- repurchases of assets in the related trust fund as a result of material breaches of representations and warranties made by the depositor, the sponsor or any other seller; and

- in the case of a trust fund that contains revolving credit line loans, any provisions for non-amortization, early amortization or scheduled amortization periods described in the related prospectus supplement.

All the above factors may affect the yield to maturity of the securities.

**The interest accrual period may reduce the effective yield on your securities** .............

Interest payable on the securities on any given distribution date will include all interest accrued during the related interest accrual period. Each prospectus supplement will specify the interest accrual period for the related securities. If interest accrues during the calendar month before the related distribution date, your effective yield will be less than it would be if the interest accrual period ended the day before the distribution date. As a result, your effective yield at par may be less than the indicated coupon rate.

**Loans with balloon payments may increase your risk of loss** ...................................

Certain underlying loans may not be fully amortizing over their terms to maturity and may require a substantial principal payment (a "balloon" payment) at their stated maturity. Loans of this type involve greater risk than fully amortizing loans since the borrower generally must be able to refinance the loan or sell the related property prior to the loan's maturity date. The borrower's ability to do so will depend on such factors as the level of available mortgage rates at the time of sale or refinancing, the relative strength of the local housing market, the borrower's equity in the property, the borrower's general financial condition and tax laws.

**Adjustable rate or interest only loans may be underwritten to less stringent standards than fixed rate loans** ..........................

A trust fund may include adjustable rate or interest-only loans that were underwritten on the assumption that the borrowers would be able to make higher monthly payments in a relatively short period of time. In fact, however, the

borrowers' income may not be sufficient to meet their loan payments as payment amounts increase, thus increasing the risk of default.

**Junior lien loans generally are riskier than senior lien loans**.............................

If the mortgage or home equity loans in a trust fund are primarily in a junior lien position, any proceeds from liquidations, insurance recoveries or condemnations must be used first to satisfy the claims of the related senior lien loans (and related foreclosure expenses) before being available to satisfy the junior lien loans.  In addition, a junior mortgage lender may only foreclose subject to the related senior mortgage.  As a result, the junior mortgage lender must either pay the related senior mortgage lender in full, at or before the foreclosure sale, or agree to make the regular payments on the senior mortgage.  The trust will not have a source of funds to satisfy any senior mortgages or to continue making payments on them.  As a result, the trust's ability, as a practical matter, to foreclose on any junior mortgage loan will be quite limited.

**A decline in property values could reduce the amount and delay the timing of recoveries on defaulted mortgage loans** .........................

The following factors, among others, could adversely affect property values in such a way that the outstanding balance of the related loans, together with any senior financing on the same properties, would equal or exceed those values:

- an overall decline in the residential real estate markets where the properties are located;

- failure of borrowers to maintain their properties adequately; and

- natural disasters that may not be covered by hazard insurance, such as earthquakes and floods.

If property values decline, actual rates of delinquencies, foreclosures and losses on the underlying loans could be higher than those currently experienced by the mortgage lending industry in general.

**Some mortgaged properties may not be owner occupied**......

The mortgaged properties in the trust fund may not be owner occupied.  Rates of delinquencies, foreclosures and losses on

9

mortgage loans secured by non-owner occupied properties may be higher than those on mortgage loans secured by the borrower's primary residence.

**Home improvement contracts and other loans may not have sufficient security** ....................................... A trust fund may include home improvement contracts that are not secured by an interest in real estate or otherwise. A trust fund may also include mortgage or home equity loans with original loan-to-value ratios (or combined loan-to-value ratios in the case of junior loans) greater than 100%. In these cases, the trust fund could be treated as a general unsecured creditor for the unsecured portion of these loans.

If a loan of this type goes into default, the trust fund will have recourse only against the borrower's assets generally for the unsecured portion of the loan, along with the borrower's other general unsecured creditors. In a bankruptcy proceeding, the unsecured portion of the loan may be discharged, even if the value of the borrower's assets available to the trust fund would be insufficient to pay the remaining amounts owing on the loan.

**Home improvement contracts will not be stamped** ................... The depositor will ensure that a UCC-1 financing statement is filed that identifies as collateral the home improvement contracts included in a trust fund. However, typically the home improvement contracts themselves will not be stamped or marked to reflect their assignment to the trust fund. Thus, if as a result of negligence, fraud or otherwise, a subsequent purchaser were able to take physical possession of the contracts without notice of the assignment to the trust fund, the interests of the related securityholders in those contracts could be defeated.

**If amounts in any pre-funding account are not used to purchase trust assets, you will receive a prepayment on the related securities** ................. The related prospectus supplement may provide that the depositor or sponsor will deposit a specified amount in a pre-funding account on the date the securities are issued. In this case, the deposited funds may be used only to acquire additional assets for the trust during a specified period after the initial issuance of the securities. Any amounts remaining in the account at the end of that period will be distributed as a prepayment of principal to the holders of the related

securities.  The resulting prepayment could adversely affect the yield to maturity on those securities.

**Bankruptcy laws may result in adverse claims against trust fund assets.........................**

The federal bankruptcy code and state debtor relief laws may adversely affect the ability of the trust fund, as a secured lender, to realize upon its security. For example, in a federal bankruptcy proceeding, a lender may not foreclose on mortgaged property without the bankruptcy court's permission.  Similarly, the debtor may propose a rehabilitation plan, in the case of mortgaged property that is not his principal residence, that would reduce the amount of the lender's secured indebtedness to the value of the property as of the commencement of the bankruptcy.  As a result, the lender would be treated as a general unsecured creditor for the reduced amount, the amount of the monthly payments due on the loan could be reduced, and the interest rate and loan payment schedule could be changed.

Any such actions could result in delays in receiving payments on the loans underlying the securities and result in the reduction of total payments.

**Environmental risks may adversely affect trust fund assets...........................................**

Federal, state and local laws and regulations impose a wide range of requirements on activities that may affect the environment, health and safety.  In certain circumstances, these laws and regulations impose obligations on owners or operators of residential properties such as those that secure the loans. Failure to comply with these laws and regulations can result in fines and penalties that could be assessed against the trust fund as owner of the related property.

In some states, a lien on the property due to contamination has priority over the lien of an existing mortgage.  Further, a mortgage lender may be held liable as an "owner" or "operator" for costs associated with the release of petroleum from an underground storage tank under certain circumstances.  If the trust fund is considered the owner or operator of a property, it will suffer losses as a result of any liability imposed for environmental hazards on the property.

**Consumer protection laws may adversely affect trust fund assets...................................** The loans and contracts in each trust fund also may be subject to federal laws relating to loan origination and underwriting.  These laws

- require certain disclosures to the borrowers regarding the terms of the loans;

- prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the consumer credit protection act, in the extension of credit;

- regulate the use and reporting of information related to the borrower's credit experience; and

- require additional application disclosures, limit changes that may be made to the loan documents without the borrower's consent and restrict a lender's ability to declare a default or to suspend or reduce a borrower's credit limit to certain enumerated events.

Loans may also be subject to federal, state or local laws that impose additional disclosure requirements and other restrictions on creditors with respect to mortgage loans with high interest rates or high up-front fees and charges.  These laws can impose specific liabilities upon creditors that fail to comply and may affect the enforceability of the related loans.  In addition, the trust fund, as assignee of the creditor, would generally be subject to all claims and defenses that the borrower could assert against the creditor, including the right to rescind the loan.

Home improvement contracts may be subject to federal or state laws that protect the borrower from defective or incomplete work by a contractor.  These laws permit the borrower to withhold payment if the work does not meet the quality and durability standards agreed to between the borrower and the contractor.  These laws have the effect of subjecting the trust fund, as assignee of the creditor, to all claims and defenses which the borrower in a sale transaction could assert against the seller of defective goods.

If certain provisions of these laws are violated, the servicer may be unable to collect all or part of the principal or interest on the loans.  The trust fund also could be subject to damages and administrative enforcement.

**Subordinate securities are subject to additional risk** .......... If you invest in any class of subordinate securities, your rights as an investor to receive payments otherwise due you will be subordinate to the rights of the servicer and the holders of the related senior securities. As a result, before investing in any subordinate securities, you must be prepared to bear the risk that payments on your securities may be delayed and that you might not recover all of your initial investment.

**Any credit support provided by financial instruments may be insufficient to protect against particular risks** ............................................ As described under "Credit Enhancement—Financial Instruments" in this prospectus, a trust fund may include financial instruments to protect against certain risks or to provide certain cash flow characteristics for particular classes of the securities of a series.  If you invest in one of these classes and the issuing entity of the financial instruments fails to perform its obligations, the yield to maturity, market price and liquidity of your securities could be materially adversely affected.  In addition, if the issuing entity of the related financial instruments experiences a credit rating downgrade, the market price and liquidity of your securities could be reduced.  Finally, if the financial instruments are intended to provide an approximate or partial hedge for certain risks or cashflow characteristics, the yield to maturity, market price and liquidity of your securities could be adversely affected to the extent that the financial instrument does not provide a perfect hedge.

**REMIC residual securities are subject to additional risk** ... If you invest in any class of securities that represent the "residual interest" in a real estate mortgage investment conduit (REMIC), you will be required to report as ordinary income your pro rata share of the REMIC's taxable income, whether or not you actually received any cash. Thus, as the holder of a REMIC residual interest security, you could have taxable income and tax liabilities in a year that are in excess of your ability to deduct servicing fees and any other REMIC expenses. In addition, because of their special tax treatment, your after-tax yield on a REMIC residual interest security

may be significantly less than that of a corporate bond with similar cash-flow characteristics and pre-tax yield. Transfers of REMIC residual interest securities are also restricted.

**Book-entry registration may limit your ability to sell securities and delay your receipt of payments** ..................

*Limit on Liquidity of Securities*. Securities issued in book-entry form may have only limited liquidity in the resale market, since investors may be unwilling to purchase securities for which they cannot obtain physical instruments.

*Limit on Ability to Transfer or Pledge*. Transactions in book-entry securities can be effected only through The Depository Trust Company (DTC), its participating organizations, its indirect participants and certain banks. As a result, your ability to transfer or pledge securities issued in book-entry form may be limited.

*Delays in Distributions*. You may experience some delay in the receipt of distributions on book-entry securities since the distributions will be forwarded by the trustee to DTC for DTC to credit to the accounts of its participants. In turn, these participants will credit the distributions to your account either directly or indirectly through indirect participants.

**Ratings of the securities do not address all investment risks and must be viewed with caution** ...............................

Any class of securities issued under this prospectus and the accompanying prospectus supplement will be rated in one of the four highest rating categories of a nationally recognized rating agency. A rating is based on the adequacy of the value of the trust fund assets and any credit enhancement for that class and reflects the rating agency's assessment of the likelihood that holders of the class of securities will receive the payments to which they are entitled. A rating is not an assessment of the likelihood that principal prepayments on the underlying loans will be made, the degree to which the rate of prepayments might differ from that originally anticipated or the likelihood of an early termination of the securities. You should not view a rating as a recommendation to purchase, hold or sell securities because it does not address the market price or suitability of the securities for any particular investor.

There is no assurance that any rating will remain in effect for any given period or that the rating agency will not lower or withdraw the rating in the future. The rating agency could lower or withdraw its rating due to:

- any decrease in the adequacy of the value of the trust fund assets or any related credit enhancement, or

- an adverse change in the financial or other condition of a credit enhancement provider.

## Description of the Securities

### General

Bear Stearns Asset Backed Securities I LLC, as depositor, will establish a trust fund for each series of its securities. A particular series of securities will consist of mortgage-backed or asset-backed certificates or notes or both certificates and notes.

Each series of certificates will be issued under a pooling and servicing agreement or a trust agreement among the depositor, the trustee and, if the trust fund includes loans, the master servicer. A form of pooling and servicing agreement has been filed as an exhibit to the registration statement of which this prospectus forms a part.

Each series of notes will be issued under an indenture between the related trust fund and the trustee named in the prospectus supplement for that series. A form of indenture has been filed as an exhibit to the registration statement of which this prospectus forms a part. If the trust fund includes loans, the trust fund and the master servicer of the loans will also enter into a servicing agreement.

The sponsor and any other seller named in the related prospectus supplement, from which the depositor will have purchased assets to be included in the trust fund, may agree to reimburse the depositor for certain fees and expenses that the depositor incurs in connection with the offering of the securities.

The following summaries describe the material provisions which may appear in each pooling and servicing agreement or trust agreement, in the case of a series of certificates, and in each indenture and servicing agreement, in the case of a series of notes. The summaries do not purport to be complete and are subject to, and are qualified in their entirety by reference to, all of the provisions of the prospectus supplement and the governing agreements for that series.

Each series of securities will consist of one or more classes of the following types of classes:

Accretion Directed

A class of securities designated to receive principal payments primarily from the interest that accrues on specified Accrual Classes.

| | |
|---|---|
| Accrual | A class of securities where the accrued interest otherwise payable to such certificates is allocated to specified classes of certificates as principal payments in reduction of their certificate principal balance.  The certificate principal balance of the Accrual Class will be increased to the extent such accrued interest is so allocated. |
| Companion | A class that receives principal payments on any distribution date only if scheduled payments have been made on specified planned amortization classes, targeted amortization classes or scheduled principal classes. |
| Component | A class consisting of "components." The components of a class of component securities may have different principal and/or interest payment characteristics but together constitute a single class. Each component of a class of component securities may be identified as falling into one or more of the categories in this list. |
| Fixed Rate | A class with an interest rate that is fixed throughout the life of the class. |
| Floating Rate | A class that receives interest payments based on an interest rate that fluctuates each payment period based on a designated index plus a specified margin. |
| Interest Only or IO | A class of securities with no principal balance and which is not entitled to principal payments.  Interest usually accrues based on a specified notional amount. |
| Inverse Floating Rate | A class of securities where the pass-through rate adjusts based on the excess between a specified rate and LIBOR or another index. |
| Lock Out | A class of securities which is "locked out" of certain payments, usually principal, for a specified period of time. |
| Partial Accrual | A class that accretes a portion of the amount of accrued interest thereon, which amount will be |

16

added to the principal balance of such class on each applicable distribution date, with the remainder of such accrued interest to be distributed currently as interest on such class. Such accretion may continue until a specified event has occurred or until such Partial Accrual class is retired.

Principal Only | A class of securities which is not entitled to interest payments.

Planned Amortization Class or PAC | A class of securities with a principal balance that is reduced based on a schedule of principal balances, assuming a certain range of prepayment rates on the underlying assets.

Scheduled Principal | A class that is designed to receive principal payments using a predetermined principal balance schedule but is not designated as a Planned Amortization Class or Targeted Amortization Class. In many cases, the schedule is derived by assuming two constant prepayment rates for the underlying assets. These two rates are the endpoints for the "structuring range" for the scheduled principal class.

Senior Support | A class that absorbs the realized losses other than excess losses that would otherwise be allocated to a Super Senior Class after the related classes of subordinated securities are no longer outstanding.

Sequential Pay | Classes that receive principal payments in a prescribed sequence, that do not have predetermined principal balance schedules and that under all circumstances receive payments of principal continuously from the first distribution date on which they receive principal until they are retired. A single class that receives principal payments before or after all other classes in the same series of securities may be identified as a sequential pay class.

| | |
|---|---|
| Super Senior | A class that will not bear its proportionate share of realized losses (other than excess losses) as its share is directed to another class, referred to as the "support class" until the class principal balance of the support class is reduced to zero. |
| Target Amortization Class or TAC | A class of securities with a principal balance that is reduced based on a scheduled of principal balances, assuming a certain targeted rate of prepayments on the related collateral. |
| Variable Rate | A class with an interest rate that resets periodically and is calculated by reference to the rate or rates of interest applicable to specified assets or instruments (e.g., the mortgage rates borne by the underlying loans). |

A series may also include one or more classes of subordinated securities. Upon satisfaction of any conditions applicable to a particular class as described in the related prospectus supplement, the transfer of the securities may be registered, and the securities may be exchanged, at the office of the trustee without the payment of any service charge, other than any tax or governmental charge payable in connection with the registration of transfer or exchange. If specified in the related prospectus supplement, one or more classes of a series may be available in book-entry form only.

Unless otherwise provided in the related prospectus supplement, payments of principal of and interest on a series of securities will be made on each distribution date specified in the prospectus supplement by check mailed to holders of that series, registered as such at the close of business on the record date specified in the prospectus supplement that is applicable to that distribution date, at their addresses appearing on the security register. However, payments may be made by wire transfer (at the expense of the holder requesting payment by wire transfer) in circumstances described in the prospectus supplement. However, final payments of principal in retirement of each security will be made only upon presentation and surrender of the security at the office of the related trustee. Notice of the final payment on a security will be mailed to each holder before the distribution date on which the final principal payment is expected to be made.

Payments of principal and interest on the securities will be made by the trustee or the securities administrator, as applicable. Unless otherwise provided in the related prospectus supplement, the following amounts will be deposited directly into the collection account established for a particular series of securities with the trustee (or with the master servicer in the name of the trustee).:

- all payments with respect to the primary assets for that series (see, "—The Primary Assets and Their Valuation" below), together with reinvestment income thereon;

18

- amounts withdrawn from any cash, letters of credit, short-term investments or other instruments acceptable to the rating agencies identified in the prospectus supplement as rating that series and deposited in each reserve fund for the series established in the name of the trustee; and

- amounts available pursuant to any other credit enhancement for the series.

If provided in the related prospectus supplement, the deposits may be net of certain amounts payable to the servicer and any other person specified in the prospectus supplement. These amounts thereafter will be deposited into the separate distribution account established for the series and will be available to make payments on the related securities on the next distribution date.   See "The Trust Funds—Collection and Distribution Accounts" in this prospectus.

## The Primary Assets and Their Valuation

The primary assets of each trust fund may include one or more pools of the following:

- Residential Loans,

- Home Equity Loans,

- Home Improvement Contracts,

- Manufactured Housing Contracts,

- Agency Securities, and

- Private Label Securities.

When we use the term "loans" in this prospectus, we include Residential Loans, Home Equity Loans, Home Improvement Contracts and Manufactured Housing Contracts.   The residential or mixed-use properties that secure the loans are collectively referred to in this prospectus as the "mortgaged properties."

If specified in the related prospectus supplement for a series of notes, each primary asset included in the related trust fund will be assigned an initial Asset Value.   The initial Asset Value of the primary assets of the trust fund will be at least equal to the principal amount of the related notes on the date of issuance.

As to each series of securities, the mortgage loans will be selected for inclusion in the mortgage pool based on rating agency criteria, compliance with representations and warranties, and conformity to criteria relating to the characterization of securities for tax, ERISA, SMMEA, Form S-3 eligibility and other legal purposes.

## Exchangeable Securities

*General*

As the related prospectus supplement will discuss, some series will include one or more classes of exchangeable securities.  In any of these series, the holders specified in the related prospectus supplement, will be entitled, after notice and payment to the trustee of an administrative fee, to exchange all or a portion of those classes for proportionate interests in one or more of the other classes of exchangeable securities.

If the related prospectus supplement describes the issuance of exchangeable securities, all of these classes of exchangeable securities will be listed on the cover of the prospectus supplement.  The classes of securities that are exchangeable for one another will be referred to in the related prospectus supplement as "related" to each other, and each related grouping of exchangeable securities will be referred to as a "combination."  Each combination of exchangeable securities will be issued by the related trust fund and, in the aggregate, will represent a distinct combination of interests in the trust fund.  At any time after their initial issuance, any class of exchangeable securities may be exchanged for the related class or classes of exchangeable securities.  In some cases, multiple classes of exchangeable securities may be exchanged for one or more classes of related exchangeable securities.

Descriptions in the related prospectus supplement about the securities of that series, including descriptions of principal and interest distributions, registration and denomination of securities, credit enhancement, yield and prepayment considerations and tax, ERISA and legal investment considerations, will also apply to each class of exchangeable securities.  The related prospectus supplement will separately describe the yield and prepayment considerations applicable to, and the risks of investment in, each class of exchangeable securities in a combination.  For example, separate decrement tables and yield tables, if applicable, will be included for each class of a combination of exchangeable securities.

## Exchanges

If a holder elects to exchange its exchangeable securities for related exchangeable securities the following three conditions must be satisfied:

- the aggregate principal balance of the exchangeable securities received in the exchange, immediately after the exchange, must equal the aggregate principal balance, immediately prior to the exchange, of the exchanged securities—for purposes of this condition, an interest only class will have a principal balance of zero;

- the annual interest amount payable with respect to the exchangeable securities received in the exchange must equal the aggregate annual interest amount of the exchanged securities; and

- the class or classes of exchangeable securities must be exchanged in the applicable proportions, if any, described in the related prospectus supplement.

There are different types of combinations that can exist.  Any individual series of securities may have multiple types of combinations.  Some examples of combinations include:

•        A class of exchangeable securities with an interest rate that varies directly with changes in an index and a class of exchangeable securities with an interest rate that varies indirectly with changes in an index may be exchangeable for a class of exchangeable securities with a fixed interest rate.  In this case, the classes that vary with an index would produce, in the aggregate, an annual interest amount equal to that generated by the class with a fixed interest rate.  In addition, the aggregate principal balance of the two classes that vary with an index would equal the principal balance of the class with the fixed interest rate.

•        An interest only class and principal only class of exchangeable securities may be exchangeable, together, for a class that is entitled to both principal and interest payments.  The principal balance of the principal and interest class would be equal to the principal balance of the exchangeable principal only class, and the interest rate on the principal and interest class would be a fixed rate that when applied to the principal balance of this class would generate an annual interest amount equal to the annual interest amount of the exchangeable interest only class.

•        Two classes of principal and interest classes with different fixed interest rates may be exchangeable, together, for a class that is entitled to both principal and interest payments, with a principal balance equal to the aggregate principal balance of the two exchanged classes, and a fixed interest rate that when applied to the principal balance of the exchanged for class, would generate an annual interest amount equal to the aggregate annual interest amount of the two exchanged classes.

These examples of combinations of exchangeable securities describe combinations of exchangeable securities which differ in their interest characteristics.  In some series, a securityholder may be able to exchange its exchangeable securities for other exchangeable securities that have different principal payment characteristics.  Examples of these types of combinations include:

•        A class of exchangeable securities that accretes all of its interest for a specified period, with the accreted amount added to the principal balance of the accreting class, and a class of exchangeable securities that receives principal payments from these accretions may be exchangeable, together, for a single class of exchangeable securities that receives payments of principal continuously from the first distribution date on which it receives interest until it is retired.

•        A class of exchangeable securities that is designed to receive principal payments in accordance with a predetermined schedule, or a planned amortization class, and a class of exchangeable securities that only receives principal payments on a distribution date if scheduled payments have been made on the planned

amortization class, may be exchangeable, together, for a class of exchangeable securities that receives principal payments without regard to the schedule from the first distribution date on which it receives principal until it is retired.

A number of factors may limit the ability of an exchangeable securityholder to effect an exchange. For example, the securityholder must own, at the time of the proposed exchange, the class or classes necessary to make the exchange in the necessary proportions. If a securityholder does not own the necessary classes or does not own the necessary classes in the proper proportions, the securityholder may not be able to obtain the desired class of exchangeable securities. The securityholder desiring to make the exchange may not be able to purchase the necessary class from the then-current owner at a reasonable price or the necessary proportion of the needed class may no longer be available due to principal payments or prepayments that have been applied to that class.

## Procedures

The related prospectus supplement will describe the procedures that must be followed to make an exchange. A securityholder will be required to provide notice to the trustee five business days prior to the proposed exchange date or as otherwise specified in the related prospectus supplement. The notice must include the outstanding principal or notional amount of the securities to be exchanged and to be received, and the proposed exchange date. When the trustee receives this notice, it will provide instructions to the securityholder regarding delivery of the securities and payment of the administrative fee. A securityholder's notice to the trustee will become irrevocable on the second business day prior to the proposed exchange date. Any exchangeable securities in book-entry form will be subject to the rules, regulations and procedures applicable to DTC's book-entry securities.

If the related prospectus supplement describes exchange proportions for a combination of classes of exchangeable securities, these proportions will be based on the original, rather than the outstanding, principal or notional amounts of these classes.

The first payment on an exchangeable security received in an exchange will be made on the distribution date in the month following the month of the exchange or as otherwise described in the related prospectus supplement. This payment will be made to the securityholder of record as of the applicable record date.

## Payments of Interest

The securities of each class that by their terms are entitled to receive interest will bear interest (calculated on the basis of a 360-day year consisting of twelve 30-day months or on the basis of a 360-day year and the actual number of days elapsed during the related accrual period, as specified in the related prospectus supplement) from the date and at the rate specified in the prospectus supplement, or will be entitled to receive interest payment amounts calculated in the method described in the prospectus supplement. Interest on the interest-bearing securities of a series will be payable on the distribution date specified in the related prospectus supplement. The rate of interest on securities of a series may be variable or may change with changes in the annual interest rates of the loans (or underlying loans) included in the related trust fund and/or as

prepayments occur with respect to the loans (or underlying loans). All indices that apply to pool assets with adjustable rates will be indices "that are of a type that are customarily used in the debt and fixed income markets to measure the cost of borrowed funds. Principal only securities may not be entitled to receive any interest distributions or may be entitled to receive only nominal interest distributions. Any interest on zero coupon securities that is not paid on the related distribution date will accrue and be added to principal on that date.

Interest payable on the securities on a distribution date will include all interest accrued during the period specified in the related prospectus supplement. In the event interest accrues during the calendar month preceding a distribution date, the effective yield to holders will be reduced from the yield that would otherwise be obtainable if interest payable on the securities were to accrue through the day immediately preceding that distribution date.

## Payments of Principal

On each distribution date for a series, principal payments will be made to the holders of the securities on which principal is then payable, to the extent set forth in the prospectus supplement. The payments will be made in a total amount determined as specified in the prospectus supplement and will be allocated among the respective classes of the series in the manner, at the times and in the priority (which may include allocation by random lot) set forth in the prospectus supplement.

## Final Scheduled Distribution Date

The final scheduled distribution date with respect to each class of a series of notes is the date no later the date on which the total principal balance of the class will be fully paid, and the final scheduled distribution date with respect to each class of a series of certificates is the date on which the principal balance of the class is expected to be reduced to zero, in each case calculated on the basis of the assumptions applicable to that series described in the related prospectus supplement. The final scheduled distribution date for each class of a series will be specified in the related prospectus supplement.

Since payments on the primary assets of each trust fund will be used to make distributions that reduce the outstanding principal amount of the related securities, it is likely that the actual final distribution date of any class will occur earlier, and may occur substantially earlier, than its final scheduled distribution date. Furthermore, with respect to a series of certificates, the actual final distribution date of any certificate may occur later than its final scheduled distribution date as a result of delinquencies, defaults and liquidations of the primary assets of the related trust fund. No assurance can be given as to the actual prepayment experience with respect to any series. See "—Weighted Average Lives of the Securities" below.

## Special Redemption

If so specified in the prospectus supplement relating to a series of securities having other than monthly distribution dates, one or more classes of the securities may be subject to special redemption, in whole or in part, on the special redemption date specified in the related prospectus supplement if, as a consequence of prepayments on the loans (or underlying loans) or

low yields then available for reinvestment, the entity specified in the prospectus supplement determines, based on assumptions set forth in the applicable agreement, that the available interest amount that will have accrued on the securities through the designated interest accrual date specified in the related prospectus supplement is less than the amount of interest that will have accrued on the securities to that date.  In this event and as further described in the related prospectus supplement, the trustee will redeem a principal amount of outstanding securities of the series sufficient to cause the available interest amount to equal the amount of interest that will have accrued through the designated interest accrual date for the securities outstanding immediately after the redemption.

## Optional Redemption, Purchase or Termination

The depositor or the servicer or any other entity that may be designated in the related prospectus supplement will have the option, on any distribution date, to purchase one or more classes of certificates of any series or redeem, in whole or in part, one or more classes of notes of any series under the circumstances, if any, specified in the related prospectus supplement. Alternatively, if the prospectus supplement for a series of certificates so provides, the depositor, the servicer or another entity designated in the prospectus supplement will have the option to cause an early termination of the related trust fund by repurchasing all of the primary assets from the trust fund on or after a date specified in the prospectus supplement, or on or after such time as the total outstanding principal amount of the certificates or primary assets (as specified in the prospectus supplement) is equal to or less than the amount or percentage specified in the prospectus supplement.  Notice of the redemption, purchase or termination must be given by the depositor, the trustee or the securities administrator, as applicable, prior to the related date.  The redemption, purchase or repurchase price will be set forth in the prospectus supplement.  In the event that a REMIC election has been made, the pooling and servicing agreement may require that the trustee or the securities administrator, as applicable, receive a satisfactory opinion of counsel that the optional redemption, purchase or termination will be conducted so as to constitute a "qualified liquidation" under Section 860F of the Internal Revenue Code of 1986, as amended, or the Code.

In addition, the prospectus supplement may provide other circumstances under which holders of securities of a series could be fully paid significantly earlier than would otherwise be the case if payments or distributions were solely based on the activity of the related primary assets.

## Weighted Average Lives of the Securities

Weighted average life refers to the average amount of time that will elapse from the date of issue of a security until each dollar of principal of the security will be repaid to the investor. The weighted average life of the securities of a class will be influenced by the rate at which the amount financed under the loans (or underlying loans relating to the Agency Securities or Private Label Securities, as applicable), included in the trust fund for a series is paid, whether in the form of scheduled amortization or prepayments.

Prepayments on loans and other receivables can be measured relative to a prepayment standard or model. The prospectus supplement for each series of securities will describe the prepayment standard or model, if any, that is used and may contain tables setting forth the projected weighted average life of each class of securities of the series and the percentage of the original principal amount of each class of securities of the series that would be outstanding on specified distribution dates based on the assumptions stated in the prospectus supplement, including assumptions that prepayments on the loans (or underlying loans relating to the Agency Securities or Private Label Securities, as applicable) included in the related trust fund are made at rates corresponding to various percentages of the prepayment standard or model specified in the prospectus supplement.

There is, however, no assurance that prepayment of the loans (or underlying loans relating to the Agency Securities or Private Label Securities, as applicable) included in the related trust fund will conform to any level of any prepayment standard or model specified in the related prospectus supplement. The rate of principal prepayments on pools of loans may be influenced by a variety of factors, including job-related factors such as transfers, layoffs or promotions and personal factors such as divorce, disability or prolonged illness. Economic conditions, either generally or within a particular geographic area or industry, also may affect the rate of principal prepayments. Demographic and social factors may influence the rate of principal prepayments in that some borrowers have greater financial flexibility to move or refinance than do others. The deductibility of mortgage interest payments, servicing decisions and other factors also can affect the rate of principal prepayments. As a result, there can be no assurance as to the rate or timing of principal prepayments of the loans (or underlying loans) either from time to time or over the lives of the loans (or underlying loans).

The rate of prepayments of conventional housing loans and other receivables has fluctuated significantly in recent years. In general, however, if prevailing interest rates fall significantly below the interest rates on the loans (or underlying loans) for a series, the loans are likely to prepay at rates higher than if prevailing interest rates remain at or above the interest rates borne by the loans. In this regard, it should be noted that the loans (or underlying loans) for a series may have different interest rates. In addition, the weighted average life of a class of securities may be affected by the varying maturities of the loans (or underlying loans). If any loans (or underlying loans) for a series have actual terms to stated maturity that are less than those that were assumed in calculating the final scheduled distribution date of the related securities, one or more classes of the series may be fully paid prior to their respective final scheduled distribution date, even in the absence of prepayments and a reinvestment return higher than the Assumed Reinvestment Rate established by the rating agencies named in the related prospectus supplement.

The sponsor may, from time to time, implement programs designed to encourage refinancing. These programs may include, without limitation, modifications of existing loans, general or targeted solicitations, the offering of pre-approved applications, reduced origination fees or closing costs, or other financial incentives. Targeted solicitations may be based on a variety of factors, including the credit of the borrower or the location of the mortgaged property. In addition, the sponsor may encourage assumptions of mortgage loans, including defaulted mortgage loans, under which creditworthy borrowers assume the outstanding indebtedness of the mortgage loans which may be removed from the related mortgage pool. As a result of these

programs, with respect to the mortgage pool underlying any trust, the rate of principal prepayments of the mortgage loans in the mortgage pool may be higher than would otherwise be the case, and in some cases, the average credit or collateral quality of the mortgage loans remaining in the mortgage pool may decline.

## The Trust Funds

### General

The notes of each series will be secured by the pledge of the assets of the related trust fund, and the certificates of each series will represent interests in the assets of the related trust fund. The trust fund of each series will include assets purchased by the depositor from the sponsor and any other seller composed of:

- the primary assets of the trust fund;

- amounts available from the reinvestment of payments on the primary assets at any Assumed Reinvestment Rate that may be established by the rating agencies specified in the related prospectus supplement;

- any credit enhancement in the form of an irrevocable letter of credit, surety bond, insurance policy or other form of credit support;

- REO property consisting of any mortgaged property or home improvement that secured a loan but which is acquired by foreclosure or deed in lieu of foreclosure or repossession; and

- the amount, if any, initially deposited into the collection account or distribution account(s) for the series as specified in the related prospectus supplement.

The securities will be non-recourse obligations of the related trust fund. Holders of a series of notes may only proceed against the collateral securing that series in the case of a default with respect to the notes and may not proceed against any assets of the depositor or the related trust fund not pledged to secure the notes.

The primary assets for a series will be sold by the sponsor and any other seller to the depositor or purchased by the depositor in the open market or in privately negotiated transactions (which may include transactions with affiliates) and will be transferred by the depositor to the related trust fund. Loans relating to a series will be serviced by the servicer (which may be the sponsor or any other seller) that is specified in the related prospectus supplement. The servicer will service the loans pursuant to a pooling and servicing agreement with respect to a series of certificates, or a servicing agreement between the trust fund and servicer with respect to a series of notes.

If the prospectus supplement so provides, a trust fund relating to a series of securities may be a business trust formed under the laws of the state specified in the prospectus supplement pursuant to a trust agreement between the depositor and the trustee.

Each trust fund, prior to the initial offering of the related series of securities, will have no assets or liabilities.  No trust fund is expected to engage in any activities other than:

- to acquire, manage and hold the related primary assets and other assets contemplated in this prospectus and in the related prospectus supplement, and the proceeds thereof,

- to issue the related securities,

- to make payments and distributions on the securities, and

- to perform certain related activities.

No trust fund is expected to have any source of capital other than its assets and any related credit enhancement.

Primary assets included in the trust fund for a series may consist of any combination of loans, Agency Securities and Private Label Securities, as and to the extent the related prospectus supplement specifies.

## The Loans

*General*.  Loans in each trust fund may consist of Residential Loans, Home Equity Loans, Home Improvement Contracts or Manufactured Housing Contracts.  If specified in the related prospectus supplement, the loans in the related trust fund may include cooperative apartment loans secured by security interests in shares issued by private, non-profit, cooperative housing corporations and in the related proprietary leases or occupancy agreements granting exclusive rights to occupy specific dwelling units in the cooperatives' buildings. As more fully described in the related prospectus supplement, the loans may be either "conventional" loans or loans that are insured or guaranteed by a governmental agency like the FHA or VA. The loans will have been originated in accordance with the underwriting criteria specified in the related prospectus supplement.

In general, the loans in a pool will have monthly payments due on the first day of each month. However, as described in the related prospectus supplement, the loans in a pool may have payments due more or less frequently than monthly.  In addition, payments may be due on any day during a month.  The payment terms of the loans to be included in a trust fund will be described in the related prospectus supplement and may include any of the following features, all as described in this prospectus or in the related prospectus supplement and expanded upon in the related prospectus supplement:

- Interest may be payable at

    – a fixed rate,

    – a rate that adjusts from time to time in relation to an index that will be specified in the related prospectus supplement,

- a rate that is fixed for a period of time or under certain circumstances and is followed by an adjustable rate,

- a rate that otherwise varies from time to time, or

- a rate that is convertible from an adjustable rate to a fixed rate.

Changes to an adjustable rate may be subject to periodic limitations, maximum rates, minimum rates or a combination of these limitations. As specified in the related prospectus supplement, the loans may provide for payments in level monthly installments, for balloon payments, or for payments that are allocated to principal and interest according to the "sum of the digits" or "Rule of 78s" methods. Accrued interest may be deferred and added to the principal of a loan for the periods and under the circumstances as may be specified in the related prospectus supplement. Loans may provide for the payment of interest at a rate lower than the specified loan rate for a period of time or for the life of the loan, and the amount of any difference may be contributed from funds supplied by the sponsor or any other seller of the property or another source.

- Principal may be

    - payable on a level debt service basis to fully amortize the loan over its term,

    - calculated on the basis of an assumed amortization schedule that is significantly longer than the original term to maturity or on an interest rate that is different from the loan rate, or

    - nonamortizing during all or a portion of the original term.

Payment of all or a substantial portion of the principal may be due on maturity in the form of a balloon payment. Principal may include interest that has been deferred and added to the principal balance of the loan.

- Monthly payments of principal and interest may

    - be fixed for the life of the loan,

    - increase over a specified period of time or

    - change from period to period.

Loans may include limits on periodic increases or decreases in the amount of monthly payments and may include maximum or minimum amounts of monthly payments.

Prepayments of principal may be conditioned on payment of a prepayment fee, which may be fixed for the life of the loan or may decline over time, and may be prohibited for the life of the loan or for particular lockout periods. Some loans may permit prepayments after expiration of the applicable lockout period and may require the payment of a prepayment fee in connection with any subsequent prepayment. Other loans may permit prepayments without

payment of a fee unless the prepayment occurs during specified time periods. The loans may include "due on sale" clauses which permit the mortgagee to demand payment of the entire loan in connection with the sale or transfers of the related property. Other loans may be assumable by persons meeting the then applicable underwriting standards of the related seller.

A trust fund may contain buydown loans that include provisions for a third party to subsidize partially the monthly payments of the borrowers on those loans during the early years of those loans, the difference to be made up from a buydown fund contributed by that third party at the time of origination of the loan. A buydown fund will be in an amount equal either to the discounted value or full aggregate amount of future payment subsidies. The underlying assumption of buydown plans is that the income of the borrower will increase during the buydown period as a result of normal increases in compensation and inflation, so that the borrower will be able to meet the full loan payments at the end of the buydown period.  If assumption of increased income is not fulfilled, the possibility of defaults on buydown loans is increased. The related prospectus supplement will contain information with respect to any buydown loan concerning limitations on the interest rate paid by the borrower initially, on annual increases in the interest rate and on the length of the buydown period.

When we use the term "mortgaged property" in this prospectus, we mean the real property which secures repayment of the related loan.  Home Improvement Contracts and Manufactured Housing Contracts may, and the other loans will, be secured by mortgages or deeds of trust or other similar security instruments creating a lien on a mortgaged property.  In the case of Home Equity Loans, the related liens may be subordinated to one or more senior liens on the related mortgaged properties as further described in the prospectus supplement. As specified in the related prospectus supplement, home improvement contracts and manufactured housing contracts may be unsecured or secured by purchase money security interests in the financed home improvements and the financed manufactured homes. When we use the term "properties" in this prospectus supplement, we mean the related mortgaged properties, home improvements and manufactured homes.  The properties relating to the loans will consist primarily of single-family properties, meaning detached or semi-detached one- to four-family dwelling units, townhouses, rowhouses, individual condominium units, individual units in planned unit developments and other dwelling units, or mixed-use properties.  Any mixed-use property will not exceed three stories and its primary use will be for one- to four-family residential occupancy, with the remainder of its space for retail, professional or other commercial uses.  Any non-residential use will be in compliance with local zoning laws and regulations. Properties may include vacation and second homes, investment properties and leasehold interests. In the case of leasehold interests, the term of the leasehold will exceed the scheduled maturity of the related loan by a time period specified in the related prospectus supplement. The properties may be located in any one of the fifty states, the District of Columbia, Guam, Puerto Rico or any other territory of the United States.

Loans with specified loan-to-value ratios and/or principal balances may be covered wholly or partially by primary mortgage guaranty insurance policies. The existence, extent and duration of any coverage provided by primary mortgage guaranty insurance policies will be described in the related prospectus supplement.

*Home Equity Loans.*  The primary assets for a series may consist, in whole or in part, of, closed-end home equity loans, revolving credit line home equity loans or certain balances forming a part of the revolving credit line loans, secured by mortgages creating senior or junior liens primarily on one- to four-family residential or mixed-use properties.  The full principal amount of a closed-end loan is advanced at origination of the loan and generally is repayable in equal (or substantially equal) installments of an amount sufficient to fully amortize the loan at its stated maturity.  Unless otherwise described in the related prospectus supplement, the original terms to stated maturity of closed-end loans will not exceed 360 months.  Principal amounts of a revolving credit line loan may be drawn down (up to the maximum amount set forth in the related prospectus supplement) or repaid from time to time, but may be subject to a minimum periodic payment.  Except to the extent provided in the related prospectus supplement, the trust fund will not include any amounts borrowed under a revolving credit line loan after the cut-off date designated in the prospectus supplement.  As more fully described in the related prospectus supplement, interest on each revolving credit line loan, excluding introductory rates offered from time to time during promotional periods, is computed and payable monthly on the average daily principal balance of that loan.  Under certain circumstances, a borrower under either a revolving credit line loan or a closed-end loan may choose an interest-only payment option.  In this case only the amount of interest that accrues on the loan during the billing cycle must be paid.  An interest-only payment option may be available for a specified period before the borrower must begin making at least the minimum monthly payment of a specified percentage of the average outstanding balance of the loan.

The rate of prepayment on Home Equity Loans cannot be predicted.  Home Equity Loans have been originated in significant volume only during the past few years and the depositor is not aware of any publicly available studies or statistics on the rate of their prepayment.  The prepayment experience of the related trust fund may be affected by a wide variety of factors, including general economic conditions, prevailing interest rate levels, the availability of alternative financing and homeowner mobility and the frequency and amount of any future draws on any revolving credit line loans.  Other factors that might be expected to affect the prepayment rate of a pool of Home Equity Loans include the amounts of, and interest rates on, the underlying first mortgage loans, and the use of first mortgage loans as long-term financing for home purchase and junior mortgage loans as shorter-term financing for a variety of purposes, including home improvement, education expenses and purchases of consumer durables such as automobiles.  Accordingly, Home Equity Loans may experience a higher rate of prepayment than traditional fixed-rate first mortgage loans. On the other hand, because Home Equity Loans such as the revolving credit line loans generally are not fully amortizing, the absence of voluntary borrower prepayments could cause rates of principal payments to be lower than, or similar to, those of traditional fully-amortizing first mortgage loans.  Any future limitations on the right of borrowers to deduct interest payments on Home Equity Loans for federal income tax purposes may further increase the rate of prepayments of the Home Equity Loans.  Moreover, the enforcement of a "due-on-sale" provision (as described below) will have the same effect as a prepayment of the related Home Equity Loans.  See "Material Legal Aspects of the Loans— Due-on-Sale Clauses in Mortgage Loans" in this prospectus.

Collections on revolving credit line loans may vary for a number of reasons, including those listed below.

- A borrower may make a payment during a month in an amount that is as little as the minimum monthly payment for that month or, during the interest-only period for certain revolving credit line loans (and, in more limited circumstances, closed-end loans with respect to which an interest-only payment option has been selected), the interest, fees and charges for that month.

- A borrower may make a payment that is as much as the entire principal balance plus accrued interest and related fees and charges during a month.

- A borrower may fail to make the required periodic payment.

- Collections on the mortgage loans may vary due to seasonal purchasing and the payment habits of borrowers.

Each single family property will be located on land owned in fee simple by the borrower or on land leased by the borrower for a term at least ten years (unless otherwise provided in the related prospectus supplement) greater than the term of the related loan.  Attached dwellings may include owner-occupied structures where each borrower owns the land upon which the unit is built, with the remaining adjacent land owned in common or dwelling units subject to a proprietary lease or occupancy agreement in a cooperatively owned apartment building.  Mortgages on cooperative dwelling units consist of a lien on the shares issued by the cooperative dwelling corporation and the proprietary lease or occupancy agreement relating to the cooperative dwelling.

The aggregate principal balance of loans secured by single family properties that are owner-occupied will be disclosed in the related prospectus supplement.  The sole basis for a representation that a given percentage of the loans are secured by single family property that is owner-occupied will be either

- a representation by the borrower at origination of the loan either that the underlying mortgaged property will be used by the borrower for a period of at least six months every year or that the borrower intends to use the mortgaged property as a primary residence, or

- a finding that the address of the underlying mortgaged property is the borrower's mailing address as reflected in the servicer's records.

To the extent specified in the related prospectus supplement, single family properties may include non-owner occupied investment properties and vacation and second homes.

*Home Improvement Contracts*.  The primary assets for a series may consist, in whole or in part, of home improvement installment sales contracts and installment loan agreements originated by home improvement contractors in the ordinary course of business.  As specified in the related prospectus supplement, the Home Improvement Contracts will be either unsecured or secured by senior or junior mortgages primarily on single family properties, or by purchase

money security interests in the related home improvements. The Home Improvement Contracts will be fully amortizing and may have fixed interest rates or adjustable interest rates and may provide for other payment characteristics as described below and in the related prospectus supplement.

The home improvements securing the Home Improvement Contracts include, but are not limited to, replacement windows, house siding, new roofs, swimming pools, satellite dishes, kitchen and bathroom remodeling goods and solar heating panels.

*Manufactured Housing Contracts*. The trust fund assets for a series may consist, in whole or part, of conventional manufactured housing installment sales contracts and installment loan agreements originated by a manufactured housing dealer in the ordinary course of business. As specified in the related prospectus supplement, the Manufactured Housing Contracts will be secured by manufactured homes, located in any of the fifty states or the District of Columbia or by mortgages on the real estate on which the manufactured homes are located.

The manufactured homes securing the Manufactured Housing Contracts will consist of manufactured homes within the meaning of 42 United States Code, Section 5402(6), or manufactured homes meeting those other standards as shall be described in the related prospectus supplement. Section 5402(6) defines a "manufactured home" as "a structure, transportable in one or more sections, which, in the traveling mode, is eight body feet or more in width or forty body feet or more in length, or, when erected on site, is three hundred twenty or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air conditioning and electrical systems contained therein; except that the term shall include any structure which meets all the requirements of [this] paragraph except the size requirements and with respect to which the manufacturer voluntarily files a certification required by the Secretary of Housing and Urban Development and complies with the standards established under [this] chapter."

Manufactured homes, unlike mortgaged properties, generally depreciate in value. Consequently, at any time after origination it is possible, especially in the case of contracts with high loan-to-value ratios at origination, that the market value of a manufactured home or home improvement may be lower than the principal amount outstanding under the related contract.

*Additional Information*. The selection criteria applicable to the loans will be specified in the related prospectus supplement. These include, but are not limited to, the combined loan-to-value ratios or loan-to-value ratios, as applicable, original terms to maturity and delinquency information.

The loans for a series of securities may include loans that do not amortize their entire principal balance by their stated maturity in accordance with their terms but require a balloon payment of the remaining principal balance at maturity, as specified in the related prospectus supplement. As further described in the related prospectus supplement, the loans for a series of securities may include loans that do not have a specified stated maturity.

The loans will be either conventional contracts or contracts insured by the Federal Housing Administration (FHA) or partially guaranteed by the Veterans Administration (VA). Loans designated in the related prospectus supplement as insured by the FHA will be insured under various FHA programs as authorized under the United States Housing Act of 1937, as amended.   These programs generally limit the principal amount and interest rates of the mortgage loans insured.  Loans insured by the FHA generally require a minimum down payment of approximately 5% of the original principal amount of the loan.  No FHA-insured loans relating to a series of securities may have an interest rate or original principal amount exceeding the applicable FHA limits at the time or origination of such loan.

The insurance premiums for loans insured by the FHA are collected by lenders approved by the Department of Housing and Urban Development (HUD) and are paid to the FHA.  The regulations governing FHA single-family mortgage insurance programs provide that insurance benefits are payable either upon foreclosure (or other acquisition of possession) and conveyance of the mortgaged premises to HUD or upon assignment of the defaulted loan to HUD.  With respect to a defaulted FHA-insured loan, the servicer is limited in its ability to initiate foreclosure proceedings.  When it is determined, either by the servicer or HUD, that default was caused by circumstances beyond the borrower's control, the servicer is expected to make an effort to avoid foreclosure by entering, if feasible, into one of a number of available forms of forbearance plans with the borrower.  Such plans may involve the reduction or suspension of regular mortgage payments for a specified period, with such payments to be made upon or before the maturity date of the mortgage, or the recasting of payments due under the mortgage up to or beyond the maturity date.  In addition, when a default caused by such circumstances is accompanied by certain other criteria, HUD may provide relief by making payments to the servicer in partial or full satisfaction of amounts due under the loan (which payments are to be repaid by the borrower to HUD) or by accepting assignment of the loan from the servicer.  With certain exceptions, at least three full monthly installments must be due and unpaid under the loan and HUD must have rejected any request for relief from the borrower before the servicer may initiate foreclosure proceedings.

HUD has the option, in most cases, to pay insurance claims in cash or in debentures issued by HUD.  Currently, claims are being paid in cash, and claims have not been paid in debentures since 1965.  HUD debentures issued in satisfaction of FHA insurance claims bear interest at the applicable HUD debenture interest rate.  The servicer of each FHA-insured loan will be obligated to purchase any such debenture issued in satisfaction of a loan upon default for an amount equal to the principal amount of the debenture.

The amount of insurance benefits generally paid by the FHA is equal to the entire unpaid principal amount of the defaulted loan adjusted to reimburse the servicer for certain costs and expenses and to deduct certain amounts received or retained by the servicer after default.  When entitlement to insurance benefits results from foreclosure (or other acquisition of possession) and conveyance to HUD, the servicer is compensated for no more than two-thirds of its foreclosure costs, and is compensated for interest accrued and unpaid prior to the date of foreclosure but in general only to the extent it was allowed pursuant to a forbearance plan approved by HUD. When entitlement to insurance benefits results from assignment of the loan to HUD, the insurance payment includes full compensation for interest accrued and unpaid to the assignment date.  The insurance payment itself, upon foreclosure of an FHA-insured loan, bears interest

from a date 30 days after the borrower's first uncorrected failure to perform any obligation to make any payment due under the loan and, upon assignment, from the date of assignment to the date of payment of the claim, in each case at the same interest rate as the applicable HUD debenture interest rate as described above.

Loans designated in the related prospectus supplement as guaranteed by the VA will be partially guaranteed by the VA under the Serviceman's Readjustment Act of 1944, as amended. The Serviceman's Readjustment Act permits a veteran (or in certain instances, the spouse of a veteran) to obtain a mortgage loan guaranty by the VA covering mortgage financing of the purchase of a one- to four-family dwelling unit at interest rates permitted by the VA. The program has no mortgage loan limits, requires no down payment from the purchaser and permits the guarantee of mortgage loans of up to 30 years' duration.

The maximum guaranty that may be issued by the VA under a VA-guaranteed mortgage loan depends upon the original principal amount of the mortgage loan, as further described in 38 United States Code Section 1803(a), as amended. The liability on the guaranty is reduced or increased pro rata with any reduction or increase in the amount of indebtedness, but in no event will the amount payable on the guaranty exceed the amount of the original guaranty. The VA may, at its option and without regard to its guaranty, make full payment to a mortgage holder of unsatisfied indebtedness on a mortgage upon its assignment to the VA.

With respect to a defaulted VA-guaranteed loan, the servicer is, absent exceptional circumstances, authorized to announce its intention to foreclose only when the default has continued for three months. Generally, a claim for the guaranteed amount is submitted to the VA after liquidation of the related mortgaged property.

The amount payable under a VA guaranty will be the percentage of the VA-insured loan originally guaranteed by the VA applied to the indebtedness outstanding as of the applicable date of computation specified in the VA regulations. Payments under the guaranty will be equal to the unpaid principal amount of the loan, interest accrued on the unpaid balance of the loan to the appropriate date of computation and limited expenses of the mortgagee, but in each case only to the extent that such amounts have not been recovered through liquidation of the mortgaged property. The amount payable under the guaranty may in no event exceed the amount of the original guaranty.

The prospectus supplement for each series will provide information with respect to the loans that are primary assets of the related trust fund as of the cut-off date, including, among other things, and to the extent relevant:

- the aggregate unpaid principal balance of the loans;

- the range and weighted average interest rates on the loans and, in the case of adjustable rate loans, the range and weighted average of the current interest rates and the lifetime interest rate caps, if any;

- the range and average principal balance of the loans;

- the weighted average original and remaining terms to stated maturity of the loans and the range of original and remaining terms to stated maturity, if applicable;

- the range and weighted average of combined loan-to-value ratios or loan-to-value ratios for the loans, as applicable;

- the percentage (by principal balance as of the cut-off date) of loans that accrue interest at adjustable or fixed interest rates;

- any special hazard insurance policy or bankruptcy bond or other enhancement relating to the loans;

- the percentage (by principal balance as of the cut-off date) of loans that are secured by mortgaged properties or home improvements or that are unsecured;

- the geographic distribution of any mortgaged properties securing the loans;

- for loans that are secured by single family properties, the percentage (by principal balance as of the cut-off date) secured by shares relating to cooperative dwelling units, condominium units, investment property and vacation or second homes;

- the lien priority of the loans;

- the delinquency status and year of origination of the loans;

- whether the loans are closed-end loans and/or revolving credit line loans; and

- in the case of revolving credit line loans, the general payments and credit line terms of those loans and other pertinent features.

The prospectus supplement will also specify any other limitations on the types or characteristics of the loans in the trust fund for the related series of securities.

A Current Report on Form 8-K will be sent, upon request, to holders of the related series of securities and will be filed, together with the related pooling and servicing agreement, with respect to each series of certificates, or the related servicing agreement, owner trust agreement and indenture, with respect to each series of notes, with the Commission after the initial issuance of the securities. In the event that mortgage loans are added to or deleted from the trust fund after the date of the related prospectus supplement but on or before the date of issuance of the securities or if any material pool characteristic differs by 5% or more from the description in the prospectus supplement, revised disclosure will be provided either in a supplement or in a Current Report on Form 8-K which will be available to investors on the SEC website.

## Methods of Delinquency Calculation

Each prospectus supplement will describe the delinquency method used for calculations with respect to the related mortgage loans, which will either be the MBA Method or the OTS Method. Under either method, except with respect to Home Equity Loans, the determination as

to whether a mortgage loan falls into a delinquency category is made as of the close of business on the last day of each month prior to the date of determining the delinquency: for example, if a cut-off date is August 1, or a distribution date is August 25, delinquencies are calculated as of July 31.

Under the MBA Method, a mortgage loan is considered "30 days delinquent" if the borrower fails to make a scheduled payment prior to the close of business on the day prior to the mortgage loan's first succeeding due date. For example, if a securitization had a closing date occurring in August and a cut-off date of August 1, a mortgage loan with a payment due on July 1 that remained unpaid as of the close of business on July 31 would be described as 30 days delinquent as of the cut-off date in the prospectus supplement. A mortgage loan would be considered "60 days delinquent" with respect to such scheduled payment if such scheduled payment were not made prior to the close of business on the day prior to the mortgage loan's second succeeding due date (or, in the preceding example, if the mortgage loan with a payment due on June 1 remained unpaid as of the close of business on July 31).

Under the OTS Method, a mortgage loan is considered "30 days delinquent" if the borrower fails to make a scheduled payment prior to the close of business on the mortgage loan's first succeeding due date. For example, if a securitization had a closing date occurring in August and a cut-off date of August 1, a mortgage loan with a payment due on July 1 that remained unpaid as of the close of business on July 31 would not be described as 30 days delinquent as of the cut-off date in the prospectus supplement. Such mortgage loan with a payment due on June 1 that remained unpaid as of the close of business on July 31 would be described as 30 days delinquent as of the cut-off date in the prospectus supplement. A mortgage loan would be considered "60 days delinquent" with respect to such scheduled payment if such scheduled payment were not made prior to the close of business on the mortgage loan's second succeeding due date (or, in the preceding example, if the mortgage loan with a payment due on May 1 remained unpaid as of the close of business on July 31).

Generally, because of the way delinquencies are calculated as described above, delinquencies calculated under the MBA Method are a month greater than as calculated under the OTS Method, and mortgage loans which are 30 days delinquent under the MBA Method are not delinquent under the OTS Method. Investors should carefully note the method used with respect to the related securitization as described in the prospectus supplement.

Investors should note that calculations of delinquency are made as of the end of the prior month. Changes in borrower delinquency status after that time will not be disclosed until the following month. In addition, under both methods, bankruptcy, foreclosure and REO property status is determined as of the last day of the prior month. Such mortgage loans are removed from the delinquency buckets, although they will count in connection with delinquency triggers or for total delinquency information.

## FICO Scores

The FICO Score is a statistical ranking of likely future credit performance developed by Fair, Isaac & Company and the three national credit repositories-Equifax, Trans Union and First American (formerly Experian which was formerly TRW). The FICO Scores available from the

three national credit repositories are calculated by the assignment of weightings to the most predictive data collected by the credit repositories and range from the 300's to the 900's. Although the FICO Scores are based solely on the information at the particular credit repository, such FICO Scores have been calibrated to indicate the same level of credit risk regardless of which credit repository is used.   The FICO Scores is used along with, but not limited to, mortgage payment history, seasoning on bankruptcy and/or foreclosure, and is not a substitute for the underwriter's judgment.

**Private Label Securities**

*General*.  Primary assets for a series may consist, in whole or in part, of Private Label Securities or PLS (*i.e.*, private mortgage-backed asset-backed securities) that include:

- pass-through certificates representing beneficial interests in underlying loans of a type that would otherwise be eligible to be loans held directly by the trust fund, or

- collateralized obligations secured by underlying loans of a type that would otherwise be eligible to be loans held directly by the trust fund.

    The Private Label Securities will previously have been

- offered and distributed to the public pursuant to an effective registration statement, or

- purchased in a transaction not involving any public offering from a person that is not an affiliate of the Private Label Securities at the time of sale (nor its affiliate at any time during the three preceding months) and a period of two years has elapsed since the date the Private Label Securities were acquired from the issuing entity or its affiliate, whichever is later.

    Although individual underlying loans may be insured or guaranteed by the United States or one of its agencies or instrumentalities, they need not be, and the Private Label Securities themselves may be, but need not be, insured or guaranteed.

    The Private Label Securities will have been issued pursuant to a pooling and servicing agreement, a trust agreement or similar agreement.  The seller/servicer of the underlying loans will have entered into a PLS agreement with the PLS trustee.  The PLS trustee, its agent or a custodian will take possession of the underlying loans.  The underlying loans will be serviced by the PLS servicer directly or by one or more sub-servicers subject to the supervision of the PLS servicer.

    The issuer of Private Label Securities will be

- a financial institution or other entity engaged generally in the business of lending,

- a public agency or instrumentality of a state, local or federal government, or

- a limited purpose corporation organized for the purpose of, among other things, establishing trusts and acquiring and selling loans to such trusts, and selling beneficial interests in trusts.

If specified in the prospectus supplement, the PLS issuer may be an affiliate of the depositor. The obligations of the PLS issuer generally will be limited to certain representations and warranties that it makes with respect to the assets it conveys to the related trust. The PLS issuer will not have guaranteed any of the assets conveyed to the related trust or any of the Private Label Securities issued under the PLS agreement.

Distributions of principal and interest will be made on the Private Label Securities on the dates specified in the related prospectus supplement. The Private Label Securities may be entitled to receive nominal or no principal distributions or nominal or no interest distributions. Principal and interest distributions will be made on the Private Label Securities by the PLS trustee or the PLS servicer. The PLS issuer or the PLS servicer may have the right to repurchase the underlying loans after a certain date or under other circumstances specified in the related prospectus supplement.

The loans underlying the Private Label Securities may be fixed rate, level payment, fully amortizing loans or adjustable rate loans or loans having balloon or other irregular payment features. The underlying loans will be secured by mortgages on mortgaged properties.

*Credit Support Relating to Private Label Securities*. Credit support in the form of reserve funds, subordination of other private securities issued under the PLS agreement, guarantees, cash collateral accounts, security policies or other types of credit support may be provided with respect to the underlying loans or with respect to the Private Label Securities themselves. The type, characteristics and amount of credit support will be a function of the characteristics of the underlying loans and other factors and will be based on the requirements of the nationally recognized statistical rating organization that rated the Private Label Securities.

*Additional Information*. If the primary assets of a trust fund include Private Label Securities, the related prospectus supplement will specify the items listed below, to the extent relevant and to the extent information is reasonably available to the depositor and the depositor reasonably believes the information to be reliable below:

- the total approximate principal amount and type of the Private Label Securities to be included in the trust fund,

- the maximum original term to stated maturity of the Private Label Securities,

- the weighted average term to stated maturity of the Private Label Securities,

- the pass-through or certificate rate or range of rates of the Private Label Securities,

- the PLS issuer, the PLS servicer (if other than the PLS issuer) and the PLS trustee,

- certain characteristics of any credit support such as reserve funds, security policies or guarantees relating to the underlying loans or to the Private Label Securities themselves;

- the terms on which underlying loans may, or are required to, be purchased prior to their stated maturity or the stated maturity of the Private Label Securities, and

- the terms on which underlying loans may be substituted for those originally underlying the Private Label Securities.

In addition, the related prospectus supplement will provide information about the loans underlying the Private Label Securities, including

- the payment features of the underlying loans (*i.e.*, whether closed-end loans or revolving credit line loans, whether fixed rate or adjustable rate, whether level payment or balloon payment loans),

- the approximate aggregate principal balance, if known, of the underlying loans insured guaranteed by a governmental entity,

- the servicing fee or range of servicing fees with respect to the underlying loans,

- the minimum and maximum stated maturities of the underlying loans at origination,

- the lien priority of the underlying loans, and

- the delinquency status (disclosed in 30/31 day buckets) and year of origination of the underlying loans.

The above disclosure may be on an approximate basis and will be as of the date specified in the related prospectus supplement.

## Agency Securities

*Ginnie Mae*.  The Government National Mortgage Association (Ginnie Mae) is a wholly-owned corporate instrumentality of HUD. Section 306(g) of Title II of the National Housing Act of 1934, as amended, authorizes Ginnie Mae to, among other things, guarantee the timely payment of principal of and interest on certificates which represent an interest in a pool of mortgage loans insured by the FHA under the National Housing Act of 1934 or Title V of the National Housing Act of 1949, or partially guaranteed by the VA under the Servicemen's Readjustment Act of 1944, as amended, or Chapter 37 of Title 38 of the United States Code.

Section 306 (g) of the National Housing Act of 1934 provides that "the full faith and credit of the United States is pledged to the payment of all amounts which may be required to be paid under any guarantee under this subsection." In order to meet its obligations under any guarantee under Section 306 (g) of the National Housing Act, Ginnie Mae may, under Section 306(d) of the National Housing Act, borrow from the United States Treasury in an amount which is at any time sufficient to enable Ginnie Mae, with no limitations as to amount, to perform its obligations under its guarantee.

*Ginnie Mae Certificates*.  Each Ginnie Mae certificate held in a trust fund for a series of securities will be a "fully modified pass-through" mortgaged-backed certificate issued and serviced by a mortgage banking company or other financial concern approved by Ginnie Mae or approved by Fannie Mae as a seller-servicer of FHA loans and/or VA loans.  Each Ginnie Mae certificate may be a GNMA I certificate or a GNMA II certificate.  The mortgage loans

underlying the Ginnie Mae certificates will consist of FHA loans and/or VA loans. Each mortgage loan of this type is secured by a one- to four-family residential property or a manufactured home. Ginnie Mae will approve the issuance of each Ginnie Mae certificate in accordance with a guaranty agreement between Ginnie Mae and the issuer and servicer of the Ginnie Mae certificate. Pursuant to its guaranty agreement, a Ginnie Mae servicer will be required to advance its own funds in order to make timely payments of all amounts due on each of the related Ginnie Mae certificates, even if the payments received by the Ginnie Mae servicer on the FHA loans or VA loans underlying each of those Ginnie Mae certificates are less than the amounts due on those Ginnie Mae certificates.

The full and timely payment of principal of and interest on each Ginnie Mae certificate will be guaranteed by Ginnie Mae, which obligation is backed by the full faith and credit of the United States. Each Ginnie Mae certificate will have an original maturity of not more than 40 years (but may have original maturities of substantially less than 40 years). Each Ginnie Mae certificate will provide for the payment by or on behalf of the Ginnie Mae servicer to the registered holder of the Ginnie Mae certificate of scheduled monthly payments of principal and interest equal to the registered holder's proportionate interest in the aggregate amount of the monthly principal and interest payment on each FHA loan or VA loan underlying the Ginnie Mae certificate, less the applicable servicing and guarantee fee which together equal the difference between the interest on the FHA loans or VA loans and the pass-through rate on the Ginnie Mae certificate. In addition, each payment will include proportionate pass-through payments of any prepayments of principal on the FHA loans or VA loans underlying the Ginnie Mae certificate and liquidation proceeds in the event of a foreclosure or other disposition of any the related FHA loans or VA loans.

If a Ginnie Mae servicer is unable to make the payments on a Ginnie Mae certificate as it becomes due, it must promptly notify Ginnie Mae and request Ginnie Mae to make the payment. Upon notification and request, Ginnie Mae will make payments directly to the registered holder of a Ginnie Mae certificate. In the event no payment is made by a Ginnie Mae servicer and the Ginnie Mae servicer fails to notify and request Ginnie Mae to make the payment, the holder of the related Ginnie Mae certificate will have recourse only against Ginnie Mae to obtain the payment. The trustee or its nominee, as registered holder of the Ginnie Mae certificates held in a trust fund, will have the right to proceed directly against Ginnie Mae under the terms of the guaranty agreements relating to the Ginnie Mae certificates for any amounts that are not paid when due.

Except for pools of mortgage loans secured by manufactured homes, all mortgage loans underlying a particular Ginnie Mae certificate must have the same interest rate over the term of the loan.  The interest rate on a GNMA I certificate will equal the interest rate on the mortgage loans included in the pool of mortgage loans underlying the GNMA I certificate, less one-half percentage point per year of the unpaid principal balance of the mortgage loans.

Mortgage loans underlying a particular GNMA II certificate may have annual interest rates that vary from each other by up to one percentage point. The interest rate on each GNMA II certificate will be between one-half percentage point and one and one-half percentage points lower than the highest interest rate on the mortgage loans included in the pool of mortgage loans

underlying the GNMA II certificate (except for pools of mortgage loans secured by manufactured homes).

Regular monthly installment payments on each Ginnie Mae certificate will be comprised of interest due as specified on a Ginnie Mae certificate plus the scheduled principal payments on the FHA loans or VA loans underlying the Ginnie Mae certificate due on the first day of the month in which the scheduled monthly installments on the Ginnie Mae certificate is due. Regular monthly installments on each Ginnie Mae certificate, are required to be paid to the trustee identified in the related prospectus supplement as registered holder by the 15th day of each month in the case of a GNMA I certificate, and are required to be mailed to the trustee by the 20th day of each month in the case of a GNMA II certificate. Any principal prepayments on any FHA loans or VA loans underlying a Ginnie Mae certificate held in a trust fund or any other early recovery of principal on a loan will be passed through to the trustee identified in the related prospectus supplement as the registered holder of the Ginnie Mae certificate.

Ginnie Mae certificates may be backed by graduated payment mortgage loans or by "buydown" mortgage loans for which funds will have been provided, and deposited into escrow accounts, for application to the payment of a portion of the borrowers' monthly payments during the early years of those mortgage loans. Payments due the registered holders of Ginnie Mae certificates backed by pools containing "buydown" mortgage loans will be computed in the same manner as payments derived from other Ginnie Mae certificates and will include amounts to be collected from both the borrower and the related escrow account. The graduated payment mortgage loans will provide for graduated interest payments that, during the early years of the mortgage loans, will be less than the amount of stated interest on the mortgage loans. The interest not so paid will be added to the principal of the graduated payment mortgage loans and, together with interest on that interest, will be paid in subsequent years. The obligations of Ginnie Mae and of a Ginnie Mae issuer/servicer will be the same irrespective of whether the Ginnie Mae certificates are backed by graduated payment mortgage loans or "buydown" mortgage loans. No statistics comparable to the FHA's prepayment experience on level payment, non-buydown loans are available in inspect of graduated payment or buydown mortgages. Ginnie Mae certificates related to a series of certificates may be held in book-entry form.

*Fannie Mae*.   The Federal National Mortgage Association (Fannie Mae) is a federally chartered and privately owned corporation organized and existing under the Federal National Mortgage Association Charter Act.  Fannie Mae was originally established in 1938 as a United States government agency to provide supplemental liquidity to the mortgage market and was transformed into a stockholder-owned and privately managed corporation by legislation enacted in 1968.

Fannie Mae provides funds to the mortgage market primarily by purchasing mortgage loans from lenders. Fannie Mae acquires funds to purchase mortgage loans from many capital market investors that may not ordinarily invest in mortgages.  In so doing, it expands the total amount of funds available for housing. Operating nationwide, Fannie Mae helps to redistribute mortgage funds from capital-surplus to capital-short areas.

*Fannie Mae Certificates*.   Fannie Mae certificates are either guaranteed mortgage pass-through certificates or stripped mortgage-backed securities. The following discussion of Fannie

Mae certificates applies equally to both types of Fannie Mae certificates, except as otherwise indicated. Each Fannie Mae certificate to be included in the trust fund for a series of securities will represent a fractional undivided interest in a pool of mortgage loans formed by Fannie Mae. Each pool formed by Fannie Mae will consist of mortgage loans of one of the following types:

- fixed-rate level installment conventional mortgage loans,

- fixed-rate level installment mortgage loans that are insured by FHA or partially guaranteed by the VA,

- adjustable rate conventional mortgage loans, or

- adjustable rate mortgage loans that are insured by the FHA or partially guaranteed by the VA.

Each mortgage loan must meet the applicable standards set forth under the Fannie Mae purchase program and will be secured by a first lien on a one- to four-family residential property.

Each Fannie Mae certificate will be issued pursuant to a trust indenture. Original maturities of substantially all of the conventional, level payment mortgage loans underlying a Fannie Mae certificate are expected to be between either eight to 15 years or 20 to 40 years. The original maturities of substantially all of the fixed rate level payment FHA loans or VA loans are expected to be 30 years.

Mortgage loans underlying a Fannie Mae certificate may have annual interest rates that vary by as much as two percentage points from one another. The rate of interest payable on a Fannie Mae guaranteed mortgage-backed certificate and the series pass-through rate payable with respect to a Fannie Mae stripped mortgage-backed security is equal to the lowest interest rate of any mortgage loan in the related pool, less a specified minimum annual percentage representing servicing compensation and Fannie Mae's guaranty fee. Under a regular servicing option pursuant to which the mortgagee or other servicer assumes the entire risk of foreclosure losses, the annual interest rates on the mortgage loans underlying a Fannie Mae certificate will be between 50 basis points and 250 basis points greater than the annual pass-through rate, in the case of a Fannie Mae guaranteed mortgage-backed certificate, or the series pass-through rate in the case of a Fannie Mae stripped mortgage-backed security.  Under a special servicing option pursuant to which Fannie Mae assumes the entire risk for foreclosure losses, the annual interest rates on the mortgage loans underlying a Fannie Mae certificate will generally be between 55 basis points and 255 basis points greater than the annual pass-through rate, in the case of a Fannie Mae guaranteed mortgage-backed certificate, or the series pass-through rate in the case of a Fannie Mae stripped mortgage-backed security.

Fannie Mae guarantees to each registered holder of a Fannie Mae certificate that it will distribute on a timely basis amounts representing the holder's proportionate share of scheduled principal and interest payments at the applicable pass-through rate provided for by the Fannie Mae certificate on the underlying mortgage loans, whether or not received, and the holder's proportionate share of the full principal amount of any foreclosed or other finally liquidated mortgage loan, whether or not the principal amount is actually recovered. The obligations of

Fannie Mae under its guarantees are obligations solely of Fannie Mae and are not backed by, or entitled to, the full faith and credit of the United States. If Fannie Mae were unable to satisfy its obligations, distributions to holders of Fannie Mae certificates would consist solely of payments and other recoveries on the underlying mortgage loans and, accordingly, monthly distributions to holders of Fannie Mae certificates would be affected by delinquent payments and defaults on those mortgage loans.

Fannie Mae stripped mortgage-backed securities are issued in series of two or more classes, with each class representing a specified undivided fractional interest in principal distributions and interest distributions, adjusted to the series pass-through rate, on the underlying pool of mortgage loans. The fractional interests of each class in principal and interest distributions are not identical, but the classes in the aggregate represent 100% of the principal distributions and interest distributions, adjusted to the series pass-through rate, on the respective pool. Because of the difference between the fractional interests in principal and interest of each class, the effective rate of interest on the principal of each class of Fannie Mae stripped mortgage-backed securities may be significantly higher or lower than the series pass-through rate and/or the weighted average interest rate of the underlying mortgage loans.

Unless otherwise specified by Fannie Mae, Fannie Mae certificates evidencing interests in pools of mortgages formed on or after May 1, 1985 will be available in book-entry form only. Distributions of principal and interest on each Fannie Mae certificate will be made by Fannie Mae on the 25th day of each month to the persons in whose name the Fannie Mae certificate is entered in the books of the Federal Reserve Banks, or registered on the Fannie Mae certificate register in the case of fully registered Fannie Mae certificates as of the close of business on the last day of the preceding month. With respect to Fannie Mae certificates issued in book-entry form, distributions on the Fannie Mae certificates will be made by wire, and with respect to fully registered Fannie Mae certificates, distributions on the Fannie Mae certificates will be made by check.

*Freddie Mac*.   The Federal Home Loan Mortgage Corporation (Freddie Mac) is a shareholder-owned, United States government-sponsored enterprise created pursuant to the Federal Home loan Mortgage Corporation Act, Title III of the Emergency Home Finance Act of 1970, as amended. The common stock of Freddie Mac is owned by the Federal Home loan Banks. Freddie Mac was established primarily for the purpose of increasing the availability of mortgage credit for the financing of urgently needed housing. It seeks to provide an enhanced degree of liquidity for residential mortgage investments primarily by assisting in the development of secondary markets for conventional mortgages. The principal activity of Freddie Mac currently consists of the purchase of first lien conventional mortgage loans FHA loans, VA loans or participation interests in those mortgage loans and the sale of the loans or participations so purchased in the form of mortgage securities, primarily Freddie Mac certificates. Freddie Mac is confined to purchasing, so far as practicable, mortgage loans that it deems to be of the quality, type and class which meet generally the purchase standards imposed by private institutional mortgage investors.

*Freddie Mac Certificates*.   Each Freddie Mac certificate included in a trust fund for a series will represent an undivided interest in a pool of mortgage loans that may consist of first lien conventional loans, FHA loans or VA loans. Freddie Mac certificates are sold under the

terms of a mortgage participation certificate agreement. A Freddie Mac certificate may be issued under either Freddie Mac's Cash Program or Guarantor Program.  Typically, mortgage loans underlying the Freddie Mac certificates held by a trust fund will consist of mortgage loans with original terms to maturity of from ten to 40 years. Each of those mortgage loans must meet the applicable standards set forth in the law governing Freddie Mac. A Freddie Mac certificate group may include whole loans, participation interests in whole loans and undivided interests in whole loans and/or participations comprising another Freddie Mac certificate group. Under the guarantor program, any Freddie Mac certificate group may include only whole loans or participation interests in whole loans.

Freddie Mac guarantees to each registered holder of a Freddie Mac certificate the timely payment of interest on the underlying mortgage loans to the extent of the applicable certificate rate on the registered holder's pro rata share of the unpaid principal balance outstanding on the underlying mortgage loans in the Freddie Mac certificate group represented by a Freddie Mac certificate, whether or not received. Freddie Mac also guarantees to each registered holder of a Freddie Mac certificate ultimate receipt by a holder of all principal on the underlying mortgage loans, without any offset or deduction, to the extent of that holder's pro rata share.  However, Freddie Mac does not guarantee, except if and to the extent specified in the prospectus supplement for a series, the timely payment of scheduled principal. Under Freddie Mac's Gold PC Program, Freddie Mac guarantees the timely payment of principal based on the difference between the pool factor published in the month preceding the month of distribution and the pool factor published in the related month of distribution. Pursuant to its guarantees, Freddie Mac indemnifies holders of Freddie Mac certificates against any diminution in principal by reason of charges for property repairs, maintenance and foreclosure. Freddie Mac may remit the amount due on account of its guarantee of collection of principal at any time after default on an underlying mortgage loan, but not later than (x) 30 days following foreclosure sale, (y) 30 days following payment of the claim by any mortgage insurer, or (z) 30 days following the expiration of any right of redemption, whichever occurs later, but in any event no later than one year after demand has been made upon the mortgagor for accelerated payment of principal. In taking actions regarding the collection of principal after default on the mortgage loans underlying Freddie Mac certificates, including the timing of demand for acceleration, Freddie Mac reserves the right to exercise its judgment with respect to the mortgage loans in the same manner as for mortgage loans which it has purchased but not sold. The length of time necessary for Freddie Mac to determine that a mortgage loan should be accelerated varies with the particular circumstances of each borrower, and Freddie Mac has not adopted standards which require that the demand be made within any specified period.

Freddie Mac certificates are not guaranteed by the United States or by any Federal Home loan Bank and do not constitute debts or obligations of the United States or any Federal Home loan Bank. The obligations of Freddie Mac under its guarantee are obligations solely of Freddie Mac and are not backed by, nor entitled to, the full faith and credit of the United States. If Freddie Mac were unable to satisfy its obligations, distributions to holders of Freddie Mac certificates would consist solely of payments and other recoveries on the underlying mortgage loans and, accordingly, monthly distributions to holders of Freddie Mac certificates would be affected by delinquent payments and defaults on those mortgage loans.

Registered holders of Freddie Mac certificates are entitled to receive their monthly pro rata share of all principal payments on the underlying mortgage loans received by Freddie Mac, including any scheduled principal payments, full and partial prepayments of principal and principal received by Freddie Mac by virtue of condemnation, insurance, liquidation or foreclosure, and repurchases of the mortgage loans by Freddie Mac or by the party that sold the related mortgage loans to Freddie Mac. Freddie Mac is required to remit each registered Freddie Mac certificateholder's pro rata share of principal payments on the underlying mortgage loans, interest at the Freddie Mac pass-through rate and any other sums like prepayment fees, within 60 days of the date on which those payments are deemed to have been received by Freddie Mac.

Under Freddie Mac's Cash Program, with respect to pools formed prior to June 1, 1987, there is no limitation on be amount by which interest rates on the mortgage loans underlying a Freddie Mac certificate may exceed the pass-through rate on the Freddie Mac certificate. With respect to Freddie Mac certificates issued on or after June 1, 1987, the maximum interest rate on the mortgage loans underlying the Freddie Mac certificates may exceed the pass-through rate of the Freddie Mac certificates by 50 to 100 basis points. Under that program, Freddie Mac purchases group of whole mortgage loans from sellers at specified percentages of their unpaid principal balances, adjusted for accrued or prepaid interest, which when applied to the interest rate of the mortgage loans and participations purchased, results in the yield expressed as a percentage required by Freddie Mac. The required yield, which includes a minimum servicing fee retained by the servicer, is calculated using the outstanding principal balance. The range of interest rates on the mortgage loans and participations in a Freddie Mac certificate group under the Cash Program will vary since mortgage loans and participations are purchased and assigned to a Freddie Mac certificate group based upon their yield to Freddie Mac rather than on the interest rate on the underlying mortgage loans.

Under Freddie Mac's Guarantor Program, the pass-through rate on a Freddie Mac certificate is established based upon the lowest interest rate on the underlying mortgage loans, minus a minimum servicing fee and the amount of Freddie Mac's management and guaranty income as agreed upon between the sponsor and Freddie Mac. For Freddie Mac certificate group formed under the Guarantor Program with certificate numbers beginning with 18-012, the range between the lowest and the highest annual interest rates on the mortgage loans in a Freddie Mac certificate group may not exceed two percentage points.

Freddie Mac certificates duly presented for registration of ownership on or before the last business day of a month are registered effective as of the first day of the month. The first remittance to a registered holder of a Freddie Mac certificate will be distributed so as to be received normally by the 15th day of the second month following the month in which the purchaser became a registered holder of the Freddie Mac certificates. Subsequent remittances will be distributed monthly to the registered holder so as to be received normally by the 15th day of each month. The Federal Reserve Bank of New York maintains book-entry accounts with respect to Freddie Mac certificates sold by Freddie Mac on or after January 2, 1985, and makes payments of principal and interest each month to the registered holders of Freddie Mac certificates in accordance with the holders' instructions.

*Stripped Mortgage-Backed Securities*. Agency Securities may consist of one or more stripped mortgage-backed securities, each as described in this prospectus and in the related

prospectus supplement. Each Agency Security of this type will represent an undivided interest in all or part of either the principal distributions or the interest distributions, or in some specified portion of the principal and interest distributions, on particular Freddie Mac, Fannie Mae, Ginnie Mae or other government agency or government-sponsored agency certificates. The underlying securities will be held under a trust agreement by Freddie Mac, Fannie Mae, Ginnie Mae or another government agency or government-sponsored agency, each as trustee, or by another trustee named in the related prospectus supplement. Freddie Mac, Fannie Mae, Ginnie Mae or another government agency or government-sponsored agency will guarantee each stripped agency security to the same extent as the applicable entity guarantees the underlying securities backing the stripped Agency Security.

*Other Agency Securities*.  If specified in the related prospectus supplement, a trust fund may include other mortgage pass-through certificates issued or guaranteed by Ginnie Mae, Fannie Mae, Freddie Mac or other government agencies or government-sponsored agencies. The characteristics of any other mortgage pass-through certificates issued or guaranteed by Ginnie Mae, Fannie Mae, Freddie Mac or other government agencies or government-sponsored agencies will be described in that prospectus supplement. If so specified, a combination of different types of Agency Securities may be held in a trust fund.

## Collection and Distribution Accounts

A separate collection account, which shall be an Eligible Account, will be established by the trustee or the servicer, as applicable, in the name of the trustee, for each series of securities for receipt of

- the amount of any cash specified in the related prospectus supplement to be initially deposited by the depositor in the collection account,

- all amounts received with respect to the primary assets of the related trust fund, and

- income earned on the foregoing amounts.

As provided in the related prospectus supplement, certain amounts on deposit in the collection account and certain amounts available under any credit enhancement for the securities of that series will be deposited into the applicable distribution account for distribution to the holders of the related securities.  The trustee or the securities administrator, as applicable, will establish a separate distribution account, which shall be an Eligible Account, for each series of securities. The trustee or the securities administrator, as applicable, will invest the funds in the collection account and the distribution account in eligible investments including, among other investments, obligations of the United States and certain of its agencies, federal funds, certificates of deposit, commercial paper, demand and time deposits and banker's acceptances, certain repurchase agreements of United States government securities and certain guaranteed investment contracts, in each case acceptable to the rating agencies named in the prospectus supplement.  The trustee or the party designated in the prospectus supplement will have sole discretion to determine the particular investments made so long as it complies with the investment terms of the related pooling and servicing agreement or the related servicing agreement and indenture. With certain exceptions, all such eligible investments must mature, in the case of funds in the collection

46

account, not later than the day preceding the date when the funds are due to be deposited into the distribution account or otherwise distributed and, in the case of funds in the distribution account, not later than the day preceding the next distribution date for the related series of securities.

Notwithstanding any of the foregoing, amounts may be deposited and withdrawn pursuant to any deposit agreement or minimum principal payment agreement that may be specified in the related prospectus supplement.

If specified in the related prospectus supplement, a trust fund will include one or more pre-funding accounts, which shall be Eligible Accounts, that are segregated trust accounts established and maintained with the trustee for the related series.  If specified in the prospectus supplement, a portion of the proceeds of the sale of the securities equal to the pre-funded amount will be deposited into the pre-funding account on the closing date and may be used to purchase additional primary assets during the pre-funding period specified in the prospectus supplement. In no case will the pre-funded amount exceed 50% of the proceeds of the offering of the related securities, and in no case will the pre-funding period exceed one year.  Additional restrictions may be imposed on pre-funding by ERISA or the REMIC provisions under the Code, which require, among other things, that the pre-funding period end no later than 90 days after the closing date.  See "Material Federal Income Tax Considerations—Taxation of the REMIC" and "ERISA Considerations" in this prospectus.  The primary assets to be purchased generally will be selected on the basis of the same criteria as those used to select the initial primary assets of the trust fund, and the same representations and warranties will be made with respect to them.  If any pre-funded amount remains on deposit in the pre-funding account at the end of the pre-funding period, the remaining amount will be applied in the manner specified in the related prospectus supplement to prepay the notes and/or the certificates of that series.

If a pre-funding account is established, one or more capitalized interest accounts that are segregated trust accounts may be established and maintained with the trustee for the related series.  On the closing date for the series, a portion of the proceeds of the sale of the related securities will be deposited into the capitalized interest account, which shall be an Eligible Account, and used to fund the excess, if any, of

- the sum of

    - the amount of interest accrued on the securities of the series, and

    - if specified in the related prospectus supplement, certain fees or expenses during the pre-funding period,

over

- the amount of interest available from the primary assets in the trust fund.

Any amounts on deposit in the capitalized interest account at the end of the pre-funding period that are not necessary for these purposes will be distributed to the person specified in the related prospectus supplement.

## Credit Enhancement

If so provided in the prospectus supplement relating to a series of securities, simultaneously with the depositor's assignment of the primary assets to the trustee, the depositor will obtain from an institution or by other means acceptable to the rating agencies named in the prospectus supplement one or more types of credit enhancement in favor of the trustee on behalf of the holders of the related series or designated classes of the series.  The credit enhancement will support the payment of principal of and interest on the securities, and may be applied for certain other purposes to the extent and under the conditions set forth in the prospectus supplement.  Credit enhancement for a series may include one or more of the forms described below.  If so specified in the related prospectus supplement, the credit enhancement may be structured so as to protect against losses relating to more than one trust fund.

## Subordinated Securities

If specified in the related prospectus supplement, credit enhancement for a series may consist of one or more classes of subordinated securities.  The rights of the holders of subordinated securities to receive distributions on any distribution date will be subordinate in right and priority to the rights of holders of senior securities of the same series, but only to the extent described in the related prospectus supplement.

## Insurance Policies, Surety Bonds and Guaranties

If so provided in the prospectus supplement for a series of securities, deficiencies in amounts otherwise payable on the securities or on specified classes will be covered by insurance policies and/or surety bonds provided by one or more insurance companies or sureties. Those instruments may cover, with respect to one or more classes of securities of the related series, timely distributions of interest and/or full distributions of principal on the basis of a schedule of principal distributions set forth in or determined in the manner specified in the related prospectus supplement. In addition, if specified in the related prospectus supplement, a trust fund may also include bankruptcy bonds, special hazard insurance policies, other insurance or guaranties for the purpose of:

- maintaining timely payments or providing additional protection against losses on the trust fund assets;

- paying administrative expenses; or

- establishing a minimum reinvestment rate on the payments made in respect of those assets or principal payment rate on those assets.

Arrangements may include agreements under which securityholders are entitled to receive amounts deposited in various accounts held by the trustee upon the terms specified in the related prospectus supplement. A copy of any arrangement instrument for a series will be filed with the SEC as an exhibit to a Current Report on Form 8-K to be filed with the SEC following issuance of the securities of the related series.

## Overcollateralization

If so provided in the prospectus supplement for a series of securities, a portion of the interest payment on each loan included in the trust fund may be applied as an additional distribution in respect of principal to reduce the principal balance of a class or classes of securities and, thus, accelerate the rate of payment of principal on that class or those classes of securities.

## Other Insurance Policies

If specified in the related prospectus supplement, credit enhancement for a series may consist of pool insurance policies, special hazard insurance policies, bankruptcy bonds and other types of insurance relating to the primary assets, as described below and in the related prospectus supplement.

*Pool Insurance Policy*.  If so specified in the related prospectus supplement, the depositor will obtain a pool insurance policy for the loans in the related trust fund.  The pool insurance policy will cover any loss (subject to the limitations described in the prospectus supplement) by reason of default, but will not cover the portion of the principal balance of any loan that is required to be covered by any primary mortgage insurance policy.  The amount and terms of any pool insurance coverage will be set forth in the related prospectus supplement.

*Special Hazard Insurance Policy*.  Although the terms of such policies vary to some degree, a special hazard insurance policy typically provides that, where there has been damage to property securing a defaulted or foreclosed loan (title to which has been acquired by the insured) and to the extent the damage is not covered by a standard hazard insurance policy (or any flood insurance policy, if applicable) required to be maintained with respect to the property, or in connection with partial loss resulting from the application of the coinsurance clause in a standard hazard insurance policy, the special hazard insurer will pay the lesser of

- the cost of repair or replacement of the property, and

- upon transfer of the property to the special hazard insurer, the unpaid principal balance of the loan at the time of acquisition of the property by foreclosure or deed in lieu of foreclosure, plus accrued interest to the date of claim settlement and certain expenses incurred by the servicer with respect to the property.

If the unpaid principal balance of the loan plus accrued interest and certain expenses is paid by the special hazard insurer, the amount of further coverage under the special hazard insurance policy will be reduced by that amount less any net proceeds from the sale of the related property.  Any amount paid as the cost of repair of the property will reduce coverage by that amount.  Special hazard insurance policies typically do not cover losses occasioned by war, civil insurrection, certain governmental actions, errors in design, faulty workmanship or materials (except under certain circumstances), nuclear reaction, flood (if the mortgaged property is in a federally designated flood area), chemical contamination and certain other risks.

Restoration of the property with the proceeds described in the first bullet of the second previous paragraph is expected to satisfy the condition under any pool insurance policy that the property be restored before a claim under the pool insurance policy may be validly presented with respect to the defaulted loan secured by the property.  The payment described in the second bullet of the second previous paragraph will render unnecessary presentation of a claim in respect of the loan under any pool insurance policy.  Therefore, so long as a pool insurance policy remains in effect, the payment by the special hazard insurer of the cost of repair or of the unpaid principal balance of the related loan plus accrued interest and certain expenses will not affect the total amount in respect of insurance proceeds paid to holders of the securities, but will affect the relative amounts of coverage remaining under the special hazard insurance policy and pool insurance policy.

*Bankruptcy Bond.*  In the event of a bankruptcy of a borrower, the bankruptcy court may establish the value of the property securing the related loan at an amount less than the then-outstanding principal balance of the loan.  The amount of the secured debt could be reduced to that value, and the holder of the loan thus would become an unsecured creditor to the extent the principal balance of the loan exceeds the value assigned to the property by the bankruptcy court.  In addition, certain other modifications of the terms of a loan can result from a bankruptcy proceeding.  See "Material Legal Aspects of the Loans" in this prospectus.  If the related prospectus supplement so provides, the depositor or other entity specified in the prospectus supplement will obtain a bankruptcy bond or similar insurance contract covering losses resulting from proceedings with respect to borrowers under the Federal Bankruptcy Code.  The bankruptcy bond will cover certain losses resulting from a reduction by a bankruptcy court of scheduled payments of principal of and interest on a loan or a reduction by the court of the principal amount of a loan and will cover certain unpaid interest on the amount of any principal reduction from the date of the filing of a bankruptcy petition.

The bankruptcy bond will provide coverage in the aggregate amount specified in the prospectus supplement for all loans in the trust fund for the related series.  The amount will be reduced by payments made under the bankruptcy bond in respect of the loans and will not be restored.

## Reserve Funds

If the prospectus supplement relating to a series of securities so specifies, the depositor will deposit into one or more reserve funds cash, a letter or letters of credit, cash collateral accounts, eligible investments, or other instruments meeting the criteria of the rating agencies in the amount specified in the prospectus supplement.  Each reserve fund will be established by the trustee or the securities administrator, as applicable, as part of the trust fund for that series or for the benefit of the credit enhancement provider for that series.  In the alternative or in addition to the initial deposit by the depositor, a reserve fund for a series may be funded over time through application of all or a portion of the excess cash flow from the primary assets for the series, to the extent described in the related prospectus supplement.  If applicable, the initial amount of the reserve fund and the reserve fund maintenance requirements for a series of securities will be described in the related prospectus supplement.

Amounts withdrawn from any reserve fund will be applied by the trustee or the securities administrator, as applicable, to make payments on the securities of the related series, to pay expenses, to reimburse any credit enhancement provider for the series or for any other purpose, in the manner and to the extent specified in the related prospectus supplement.

Amounts deposited into a reserve fund will be invested by the trustee or the securities administrator, as applicable, in eligible investments maturing no later than the day specified in the related prospectus supplement.

## Cross-Collateralization

If specified in the related prospectus supplement, the beneficial ownership of separate groups of assets included in a trust fund may be evidenced by separate classes of the related series of securities. In that case, credit support may be provided by a cross-collateralization feature which requires that distributions be made with respect to securities evidencing a beneficial ownership interest in, or secured by, one or more asset groups within the same trust fund prior to distributions to subordinated securities evidencing a beneficial ownership interest in, or secured by, one or more other asset groups within that trust fund. Cross-collateralization may be provided by

- the allocation of a portion of excess amounts generated by one or more asset groups within the same trust fund to one or more other asset groups within the same trust fund, or

- the allocation of losses with respect to one or more asset groups to one or more other asset groups within the same trust fund.

Excess amounts will be applied and/or losses will be allocated to the class or classes of subordinated securities of the related series then outstanding having the lowest rating assigned by any rating agency or the lowest payment priority, in each case to the extent and in the manner more specifically described in the related prospectus supplement. The prospectus supplement for a series which includes a cross-collateralization feature will describe the manner and conditions for applying the cross-collateralization feature.

If specified in the related prospectus supplement, the coverage provided by one or more forms of credit support may apply concurrently to two or more related trust funds. If applicable, the related prospectus supplement will identify the trust funds to which credit support relates and the manner of determining the amount of coverage the credit support provides to the identified trust funds.

## Minimum Principal Payment Agreement

If provided in the prospectus supplement relating to a series of securities, the depositor will enter into a minimum principal payment agreement with an entity meeting the criteria of the rating agencies named in the prospectus supplement under which the entity will provide certain payments on the securities of the series in the event that aggregate scheduled principal payments and/or prepayments on the primary assets for the series are not sufficient to make payments on the securities of the series as provided in the prospectus supplement.

**Deposit Agreement**

If specified in a prospectus supplement, the depositor and the trustee for a series of securities will enter into a deposit agreement with the entity specified in the prospectus supplement on or before the sale of the related series of securities.  The deposit agreement is intended to accumulate available cash for investment so that the cash, together with income thereon, can be applied to future distributions on one or more classes of securities.  The related prospectus supplement will describe the terms of any deposit agreement.

**Financial Instruments**

If provided in the related prospectus supplement, the trust fund may include one or more financial instruments that are intended to meet the following goals:

- to convert the payments on some or all of the loans and Private Label Securities from fixed to floating payments, or from floating to fixed, or from floating based on a particular index to floating based on another index;

- to provide payments if any index rises above or falls below specified levels (all indices that apply to pool assets with adjustable rates will be indices "that are of a type that are customarily used in the debt and fixed income markets to measure the cost of borrowed funds); or

- to provide protection against interest rate changes, certain types of losses or other payment shortfalls to one or more classes of the related series.

If a trust fund includes financial instruments of this type, the instruments may be structured to be exempt from the registration requirements of the Securities Act of 1933, as amended.

The trust fund may include one or more derivative instruments, as described in this section.  All derivative instruments included in any trust fund will be used only in a manner that reduces or alters risk resulting from the mortgage loans or other assets in the pool, and only in a manner such that the return on the offered securities will be based primarily on the performance of the mortgage loans or other assets in the pool.  Derivative instruments may include 1) interest rate swaps (or caps, floors and collars) and yield supplement agreements as described below, 2) currency swaps and 3) market value swaps that are referenced to the value of one or more of the mortgage loans or other assets included in the trust fund or to a class of offered securities.

An interest rate swap is an agreement between two parties to exchange a stream of interest payments on an agreed hypothetical or "notional" principal amount. No principal amount is exchanged between the counterparties to an interest rate swap. In a typical swap, one party agrees to pay a fixed rate on a notional principal amount, while the counterparty pays a floating rate based on one or more reference interest rates including the London Interbank Offered Rate, or LIBOR, a specified bank's prime rate or U.S. Treasury Bill rates. Interest rate swaps also permit counterparties to exchange a floating rate obligation based upon one reference interest rate, such as LIBOR, for a floating rate obligation based upon another referenced interest rate, such as U.S. Treasury Bill rates.  An interest rate cap, collar or floor is an agreement where the

counterparty agrees to make payments representing interest on a notional principal amount when a specified reference interest rate is above a strike rate, outside of a range of strike rates, or below a strike rate as specified in the agreement, generally in exchange for a fixed amount paid to the counterparty at the time the agreement is entered into. A yield supplement agreement is a type of cap agreement, and is substantially similar to a cap agreement as described above.

The trustee, supplemental interest trustee or securities administrator, as applicable, on behalf of a trust fund may enter into interest rate swaps, caps, floors and collars, or yield supplement agreements, to minimize the risk to securityholders from adverse changes in interest rates or to provide supplemental credit support. Cap agreements and yield supplement agreements may be entered into to supplement the interest rate or other rates available to make interest payments on one or more classes of the securities of any series.

A market value swap might be used in a structure where the pooled assets are hybrid ARMs, or mortgage loans that provide for a fixed rate period and then convert by their terms to adjustable rate loans. Such a structure will only provide that at a specified date near the end of the fixed rate period, the investors must tender their securities to the trustee who will then transfer the securities to other investors in a mandatory auction procedure. A market value swap will only be used in conjunction with a mandatory auction procedure. The market value swap would ensure that the original investors would receive at least par at the time of tender, by covering any shortfall between par and the then current market value of their securities.

Any derivative contracts will be documented based upon the standard forms provided by the International Swaps and Derivatives Association, or ISDA. These forms generally consist of an ISDA master agreement, a schedule to the master agreement, and a confirmation, although in some cases the schedule and confirmation will be combined in a single document and the standard ISDA master agreement will be incorporated therein by reference. Standard ISDA definitions also will be incorporated by reference. Each confirmation will provide for payments to be made by the derivative counterparty to the trust, and in some cases by the trust to the derivative counterparty, generally based upon specified notional amounts and upon differences between specified interest rates or values. For example, the confirmation for an interest rate cap agreement will contain a schedule of fixed interest rates, generally referred to as strike rates, and a schedule of notional amounts, for each distribution date during the term of the interest rate cap agreement. The confirmation also will specify a reference rate, generally a floating or adjustable interest rate, and will provide that payments will be made by the derivative counterparty to the trust on each distribution date, based on the notional amount for that distribution date and the excess, if any, of the specified reference rate over the strike rate for that distribution date.

In the event of the withdrawal of the credit rating of a derivative counterparty or the downgrade of such credit rating below levels specified in the derivative contract (where the derivative contract is relevant to the ratings of the offered securities, such levels generally are set by the rating agencies rating the offered securities), the derivative counterparty may be required to post collateral for the performance of its obligations under the derivative contract, or to take certain other measures intended to assure performance of those obligations. Posting of collateral will be documented using the ISDA Credit Support Annex.

53

There can be no assurance that the trustee will be able to enter into derivatives at any specific time or at prices or on other terms that are advantageous. In addition, although the terms of the derivatives may provide for termination under various circumstances, there can be no assurance that the trustee will be able to terminate a derivative when it would be economically advantageous to the trust fund to do so.

## Static Pool Information

For each mortgage pool discussed above, the depositor will provide static pool information with respect to the experience of the sponsor, or other appropriate entity, in securitizing asset pools of the same type to the extent material.

With respect to each series of securities, the information referred to in this section will be provided through an internet web site at the address disclosed in the related prospectus supplement.

## Servicing of Loans

### General

Under the pooling and servicing agreement or the servicing agreement for a series of securities, the servicer will provide customary servicing functions with respect to the loans comprising the primary assets of the related trust fund.

### Collection Procedures; Escrow Accounts

The servicer will make reasonable efforts to collect all payments required to be made under the loans and will, consistent with the terms of the related governing agreement for a series and any applicable credit enhancement, follow such collection procedures as it follows with respect to comparable loans held in its own portfolio.  Consistent with the above, the servicer has the discretion to

- waive any assumption fee, late payment charge, or other charge in connection with a loan, and

- to the extent provided in the related agreement, arrange with a borrower a schedule for the liquidation of delinquencies by extending the due dates for scheduled payments on the loan.

If the related prospectus supplement so provides, the servicer, to the extent permitted by law, will establish and maintain escrow or impound accounts, which shall be Eligible Accounts, with respect to loans in which borrower payments for taxes, assessments, mortgage and hazard insurance policy premiums and other comparable items will be deposited.  In the case of loans that do not require such payments under the related loan documents, the servicer will not be required to establish any escrow or impound account for those loans.  The servicer will make withdrawals from the escrow accounts to effect timely payment of taxes, assessments and mortgage and hazard insurance, to refund to borrowers amounts determined to be overages, to pay interest to borrowers on balances in the escrow accounts to the extent required by law, to

repair or otherwise protect the related property and to clear and terminate the escrow accounts. The servicer will be responsible for the administration of the escrow accounts and generally will make advances to the escrow accounts when a deficiency exists.

## Deposits to and Withdrawals from the Collection Account

- Unless the related prospectus supplement specifies otherwise, the trustee or the servicer will establish a separate collection account, which shall be an Eligible Account, in the name of the trustee.  Unless the related prospectus supplement provides otherwise.

The funds held in the collection account may be invested in eligible investments.  If so specified in the related prospectus supplement, the servicer will be entitled to receive as additional compensation any interest or other income earned on funds in the collection account.

The servicer, the depositor, the trustee, the sponsor or any additional seller, as applicable, will deposit into the collection account for each series, on the business day following the closing date, all scheduled payments of principal and interest on the primary assets due after the related cut-off date but received by the servicer on or before the closing date, and thereafter, within two business days after the date of receipt thereof, the following payments and collections received or made by the servicer (other than, unless otherwise provided in the related prospectus supplement, in respect of principal of and interest on the related primary assets due on or before the cut-off date):

- all payments in respect of principal, including prepayments, on the primary assets;

- all payments in respect of interest on the primary assets after deducting, at the discretion of the servicer (but only to the extent of the amount permitted to be withdrawn or withheld from the collection account in accordance with the related agreement), related servicing fees payable to the servicer;

- all Liquidation Proceeds after deducting, at the discretion of the servicer (but only to the extent of the amount permitted to be withdrawn from the collection account in accordance with the related agreement), the servicing fee, if any, in respect of the related primary asset;

- all Insurance Proceeds;

- all amounts required to be deposited into the collection account from any reserve fund for the series pursuant to the related agreement;

- all advances of cash made by the servicer in respect of delinquent scheduled payments on a loan and for any other purpose as required pursuant to the related agreement; and

- all repurchase prices of any primary assets repurchased by the depositor, the servicer, the sponsor or any additional seller pursuant to the related agreement.

The servicer is permitted, from time to time, to make withdrawals from the collection account for each series for the following purposes:

- to reimburse itself for advances that it made in connection with that series under the related agreement; provided that the servicer's right to reimburse itself is limited to amounts received on or in respect of particular loans (including, for this purpose, Liquidation Proceeds and proceeds of insurance policies covering the related loans and Mortgaged Properties ("Insurance Proceeds")) that represent late recoveries of scheduled payments with respect to which the Advance was made;

- to the extent provided in the related agreement, to reimburse itself for any advances that it made in connection with the series which the servicer determines in good faith to be nonrecoverable from amounts representing late recoveries of scheduled payments respecting which the advance was made or from Liquidation Proceeds or Insurance Proceeds;

- to reimburse itself from Liquidation Proceeds for liquidation expenses and for amounts expended by it in good faith in connection with the restoration of damaged property and, in the event deposited into the collection account and not previously withheld, and to the extent that Liquidation Proceeds after such reimbursement exceed the principal balance of the related loan, together with accrued and unpaid interest thereon to the due date for the loan next succeeding the date of its receipt of the Liquidation Proceeds, to pay to itself out of the excess the amount of any unpaid servicing fee and any assumption fees, late payment charges, or other charges on the related loan;

- in the event the servicer has elected not to pay itself the servicing fee out of the interest component of any scheduled payment, late payment or other recovery with respect to a particular loan prior to the deposit of the scheduled payment, late payment or recovery into the collection account, to pay to itself the servicing fee, as adjusted pursuant to the related agreement, from any scheduled payment, late payment or other recovery to the extent permitted by the related agreement;

- to reimburse itself for expenses incurred by and recoverable by or reimbursable to it pursuant to the related agreement;

- to pay to the applicable person with respect to each primary asset or related real property that has been repurchased or removed from the trust fund by the depositor, the servicer, the sponsor or any additional seller pursuant to the related agreement, all amounts received thereon and not distributed as of the date on which the related repurchase price was determined;

- to make payments to the trustee or the securities administrator, as applicable, of the series for deposit into the related distribution account or for remittance to the holders of the series in the amounts and in the manner provided for in the related agreement; and

- to clear and terminate the collection account pursuant to the related agreement

In addition, if the servicer deposits into the collection account for a series any amount not required to be deposited therein, the servicer may, at any time, withdraw the amount from the collection account.

## Advances and Limitations on Advances

The related prospectus supplement will describe the circumstances, if any, under which the servicer will make advances with respect to delinquent payments on loans. If specified in the related prospectus supplement, the servicer will be obligated to make advances. Its obligation to make advances may be limited in amount, or may not be activated until a certain portion of a specified reserve fund is depleted. Advances are intended to provide liquidity and, except to the extent specified in the related prospectus supplement, not to guarantee or insure against losses. Accordingly, any funds advanced are recoverable by the servicer out of amounts received on particular loans that represent late recoveries of scheduled payments, Insurance Proceeds or Liquidation Proceeds respecting which an advance was made. If an advance is made and subsequently determined to be nonrecoverable from late collections, Insurance Proceeds or Liquidation Proceeds from the related loan, the servicer may be entitled to reimbursement from other funds in the collection account or distribution account(s), as the case may be, or from a specified reserve fund, as applicable, to the extent specified in the related prospectus supplement.

## Maintenance of Insurance Policies and Other Servicing Procedures

*Standard Hazard Insurance; Flood Insurance*. The servicer will be required to maintain (or to cause the borrower under each loan to maintain) a standard hazard insurance policy providing the standard form of fire insurance coverage with extended coverage for certain other hazards as is customary in the state in which the related property is located. The standard hazard insurance policies will provide for coverage at least equal to the applicable state standard form of fire insurance policy with extended coverage for property of the type securing the related loans. In general, the standard form of fire and extended coverage policy will cover physical damage to, or destruction of, the related property caused by fire, lightning, explosion, smoke, windstorm, hail, riot, strike and civil commotion, subject to the conditions and exclusions in each policy. Because the standard hazard insurance policies relating to the loans will be underwritten by different hazard insurers and will cover properties located in various states, the policies will not contain identical terms and conditions. The basic terms, however, generally will be determined by state law and generally will be similar. Most such policies typically will not cover any

physical damage resulting from war, revolution, governmental actions, floods and other water-related causes, earth movement (including earthquakes, landslides and mudflows), nuclear reaction, wet or dry rot, vermin, rodents, insects or domestic animals, theft and, in certain cases, vandalism.  The foregoing list is merely indicative of certain kinds of uninsured risks and is not intended to be all inclusive.  Uninsured risks not covered by a special hazard insurance policy or other form of credit enhancement will adversely affect distributions to holders.  When a property securing a loan is located in a flood area identified by HUD pursuant to the Flood Disaster Protection Act of 1973, as amended, the servicer will be required to cause flood insurance to be maintained with respect to the property, to the extent available.

The standard hazard insurance policies covering properties typically will contain a "coinsurance" clause, which in effect will require that the insured at all times carry hazard insurance of a specified percentage (generally 80% to 90%) of the full replacement value of the property, including any improvements on the property, in order to recover the full amount of any partial loss.  If the insured's coverage falls below this specified percentage, the coinsurance clause will provide that the hazard insurer's liability in the event of partial loss will not exceed the greater of

- the actual cash value (*i.e.*, replacement cost less physical depreciation) of the property, including the improvements, if any, damaged or destroyed, and

- such proportion of the loss, without deduction for depreciation, as the amount of insurance carried bears to the specified percentage of the full replacement cost of the property and improvements.

Since the amount of hazard insurance to be maintained on the improvements securing the loans declines as their principal balances decrease, and since the value of the properties will fluctuate over time, the effect of this requirement in the event of partial loss may be that hazard insurance proceeds will be insufficient to restore fully the damage to the affected property.

Coverage will be in an amount at least equal to the greater of

- the amount necessary to avoid the enforcement of any co-insurance clause contained in the policy, and

- the outstanding principal balance of the related loan.

The servicer will also typically maintain on REO property a standard hazard insurance policy in an amount that is at least equal to the maximum insurable value of the REO property.  No earthquake or other additional insurance will be required of any borrower or will be maintained on REO property other than pursuant to such applicable laws and regulations as shall at any time be in force and shall require the additional insurance.

Any amounts collected by the servicer under insurance policies (other than amounts to be applied to the restoration or repair of the property, released to the borrower in accordance with normal servicing procedures or used to reimburse the servicer for amounts to which it is entitled to reimbursement) will be deposited into the collection account.  In the event that the servicer

obtains and maintains a blanket policy insuring against hazard losses on all of the loans, written by an insurer then acceptable to each rating agency named in the prospectus supplement, it will conclusively be deemed to have satisfied its obligations to cause to be maintained a standard hazard insurance policy for each loan or related REO property. This blanket policy may contain a deductible clause, in which case the servicer will be required, in the event that there has been a loss that would have been covered by the policy absent the deductible clause, to deposit into the collection account the amount not otherwise payable under the blanket policy because of the application of the deductible clause.

## Realization upon Defaulted Loans

The servicer will use its reasonable best efforts to foreclose upon, repossess or otherwise comparably convert the ownership of the properties securing the related loans that come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments. In this connection, the servicer will follow such practices and procedures as it deems necessary or advisable and as are normal and usual in its servicing activities with respect to comparable loans that it services. However, the servicer will not be required to expend its own funds in connection with any foreclosure or towards the restoration of the property unless it determines that

- the restoration or foreclosure will increase the Liquidation Proceeds of the related loan available to the holders after reimbursement to itself for its expenses, and

- its expenses will be recoverable either through Liquidation Proceeds or Insurance Proceeds.

However, in the case of a trust fund for which a REMIC election has been made, the servicer will be required to liquidate any REO property by the end of the third calendar year after the trust fund acquires beneficial ownership of the REO property. While the holder of an REO property can often maximize its recovery by providing financing to a new purchaser, the trust fund will have no ability to do so and neither the servicer nor the depositor will be required to do so.

The servicer may arrange with the borrower on a defaulted loan a change in the terms of the loan to the extent provided in the related prospectus supplement. This type of modification may only be entered into if it meets the underwriting policies and procedures employed by the servicer in servicing receivables for its own account and meets the other conditions set forth in the related prospectus supplement.

## Enforcement of Due-on-Sale Clauses

When any property is about to be conveyed by the borrower, the servicer will typically, to the extent it has knowledge of the prospective conveyance and prior to the time of the consummation of the conveyance, exercise its rights to accelerate the maturity of the related loan under any applicable "due-on-sale" clause, unless it reasonably believes that the clause is not enforceable under applicable law or if enforcement of the clause would result in loss of coverage under any primary mortgage insurance policy. In that event, the servicer is authorized to accept from or enter into an assumption agreement with the person to whom the property has been or is about to be conveyed. Under the assumption, the transferee of the property becomes liable under

the loan and the original borrower is released from liability and the transferee is substituted as the borrower and becomes liable under the loan. Any fee collected in connection with an assumption will be retained by the servicer as additional servicing compensation. The terms of a loan may not be changed in connection with an assumption.

## Servicing Compensation and Payment of Expenses

The servicer will be entitled to a periodic servicing fee in an amount to be determined as specified in the related prospectus supplement. The servicing fee may be fixed or variable, as specified in the related prospectus supplement. In addition, the servicer may also be entitled to additional servicing compensation in the form of assumption fees, late payment charges and similar items, and excess proceeds following disposition of property in connection with defaulted loans.

The servicer may also pay certain expenses incurred in connection with the servicing of the loans, including, without limitation, the payment of the fees and expenses of each trustee and independent accountants, payment of security policy and insurance policy premiums, if applicable, and the cost of any credit enhancement, and payment of expenses incurred in preparation of reports to holders.

When a borrower makes a principal prepayment in full between due dates on the related loan, the borrower generally will be required to pay interest on the amount prepaid only to the date of prepayment. If and to the extent provided in the related prospectus supplement, in order that one or more classes of the securities of a series will not be adversely affected by any resulting shortfall in interest, the amount of the servicing fee may be reduced to the extent necessary to include in the servicer's remittance to the applicable trustee for deposit into the related distribution account an amount equal to one month's interest on the related loan (less the servicing fee). If the total amount of these shortfalls in a month exceeds the servicing fee for that month, a shortfall to holders may occur.

The servicer will be entitled to reimbursement for certain expenses that it incurs in connection with the liquidation of defaulted loans. The related holders will suffer no loss by reason of the servicer's expenses to the extent the expenses are covered under related insurance policies or from excess Liquidation Proceeds. If claims are either not made or paid under the applicable insurance policies or if coverage under the policies has been exhausted, the related holders will suffer a loss to the extent that Liquidation Proceeds, after reimbursement of the servicer's expenses, are less than the principal balance of and unpaid interest on the related loan that would be distributable to holders. In addition, the servicer will be entitled to reimbursement of its expenses in connection with the restoration of REO property. This right of reimbursement is prior to the rights of the holders to receive any related Insurance Proceeds, Liquidation Proceeds or amounts derived from other credit enhancement. The servicer generally is also entitled to reimbursement from the collection account for advances.

The rights of the servicer to receive funds from the collection account for a series, whether as the servicing fee or other compensation, or for the reimbursement of advances, expenses or otherwise, are not subordinate to the rights of holders of securities of the series.

## Certain Matters Regarding the Servicer

The servicer for each series will be identified in the related prospectus supplement.  The servicer may be an affiliate of the depositor and may have other business relationships with the depositor and its affiliates.

If an event of default occurs under either a servicing agreement or a pooling and servicing agreement, the servicer may be replaced by the trustee or a successor servicer.  The events of default and the rights of a trustee upon a default under the agreement for the related series will be substantially similar to those described under "The Agreements—Events of Default; Rights upon Event of Default—Pooling and Servicing Agreement; Servicing Agreement" in this prospectus.

The servicer does not have the right to assign its rights and delegate its duties and obligations under the related agreement unless the successor servicer accepting such assignment or delegation

- services similar loans in the ordinary course of its business;

- is reasonably satisfactory to the trustee;

- has a net worth of not less than the amount specified in the prospectus supplement;

- would not cause the rating of the related securities by a rating agency named in the prospectus supplement, as such rating is in effect immediately prior to the assignment, sale or transfer, to be qualified, downgraded or withdrawn as a result of the assignment, sale or transfer; and

- executes and delivers to the trustee an agreement, in form and substance reasonably satisfactory to the trustee, that contains an assumption by the successor servicer of the due and punctual performance and observance of each covenant and condition required to be performed or observed by the servicer under the agreement from and after the date of the agreement.

No assignment will become effective until the trustee or a successor servicer has assumed the servicer's obligations and duties under the related agreement.  To the extent that the servicer transfers its obligations to a wholly-owned subsidiary or affiliate, the subsidiary or affiliate need not satisfy the criteria set forth above.  In this instance, however, the assigning servicer will remain liable for the servicing obligations under the agreement.  Any entity into which the servicer is merged or consolidated or any successor corporation resulting from any merger, conversion or consolidation will succeed to the servicer's obligations under the agreement provided that the successor or surviving entity meets the requirements for a successor servicer set forth above.

Except to the extent otherwise provided in the related prospectus supplement or pooling and servicing agreement, each agreement will provide that neither the servicer nor any director, officer, employee or agent of the servicer will be under any liability to the related trust fund, the

depositor or the holders for any action taken or for failing to take any action in good faith pursuant to the related agreement, or for errors in judgment. However, neither the servicer nor any such person will be protected against any breach of warranty or representations made under the agreement, or the failure to perform its obligations in compliance with any standard of care set forth in the agreement, or liability that would otherwise be imposed by reason of willful misfeasance, bad faith or negligence in the performance of their duties or by reason of reckless disregard of their obligations and duties under the agreement. Each agreement will further provide that the servicer and any director, officer, employee or agent of the servicer is entitled to indemnification from the related trust fund and will be held harmless against any loss, liability or expense incurred in connection with any legal action relating to the agreement or the securities, other than any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of duties under the agreement or by reason of reckless disregard of those obligations and duties. In addition, the agreement will provide that the servicer is not under any obligation to appear in, prosecute or defend any legal action that is not incidental to its servicing responsibilities under the agreement that, in its opinion, may involve it in any expense or liability. The servicer may, in its discretion, undertake any such action that it may deem necessary or desirable with respect to the agreement and the rights and duties of the parties thereto and the interests of the holders thereunder. In that event, the legal expenses and costs of the action and any resulting liability may be expenses, costs, and liabilities of the trust fund and the servicer may be entitled to be reimbursed therefor out of the collection account.

## The Agreements

The following summaries describe the material provisions of the pooling and servicing agreement or trust agreement, in the case of a series of certificates, and the indenture and servicing agreement, in the case of a series of notes. The summaries do not purport to be complete and are subject to, and qualified in their entirety by reference to, the provisions of the agreements applicable to the particular series of securities. Where particular provisions or terms used in the agreements are referred to, the provisions or terms are as specified in the agreements.

## Assignment of Primary Assets

*General*. At the time of issuance of the securities of a series, the depositor will transfer, convey and assign to the related trust fund all right, title and interest of the depositor in the primary assets and other property to be transferred to the trust fund. This assignment will include all principal and interest due on or with respect to the primary assets after the cut-off date. The trustee will, concurrently with the assignment, execute and deliver the securities.

*Assignment of Mortgage Loans*. The depositor will deliver to the trustee (or, if specified in the prospectus supplement, a custodian on behalf of the trustee), as to each Residential Loan and Home Equity Loan, the related note endorsed without recourse to the order of the trustee or in blank, the original mortgage, deed of trust or other security instrument with evidence of recording indicated thereon (except for any mortgage not returned from the public recording office, in which case a copy of the mortgage will be delivered, together with a certificate that the original of the mortgage was delivered to such recording office), and an assignment of the mortgage in recordable form. The trustee or, if so specified in the related prospectus supplement, the custodian will hold these documents in trust for the benefit of the holders.

62

If so specified in the related prospectus supplement, at the time of issuance of the securities, the depositor will cause assignments to the trustee of the mortgages relating to the loans to be recorded in the appropriate public office for real property records, except in states where, in the opinion of counsel acceptable to the trustee, recording is not required to protect the trustee's interest in the related loans.  If specified in the prospectus supplement, the depositor will cause the assignments to be recorded within the time after issuance of the securities as is specified in the related prospectus supplement.  In this event, the prospectus supplement will specify whether the agreement requires the depositor to repurchase from the trustee any loan the related mortgage of which is not recorded within that time, at the price described below with respect to repurchases by reason of defective documentation.  Unless otherwise provided in the prospectus supplement, the enforcement of the repurchase obligation would constitute the sole remedy available to the holders or the trustee for the failure of a mortgage to be recorded.

*Assignment of Home Improvement Contracts*.  The depositor will deliver to the trustee or the custodian each original Home Improvement Contract and copies of related documents and instruments and, except in the case of unsecured Home Improvement Contracts, the security interest in the related home improvements.  In order to give notice of the right, title and interest of holders to the Home Improvement Contracts, the depositor will cause a UCC-1 financing statement to be executed by the depositor or the sponsor identifying the trustee as the secured party and identifying all Home Improvement Contracts as collateral.  The Home Improvement Contracts will not be stamped or otherwise marked to reflect their assignment to the trust fund.  Therefore, if, through negligence, fraud or otherwise, a subsequent purchaser were able to take physical possession of the Home Improvement Contracts without notice of the assignment, the interest of holders in the Home Improvement Contracts could be defeated.  See "Material Legal Aspects of the Loans—The Home Improvement Contracts and the Manufactured Housing Contracts" in this prospectus.

*Assignment of Manufactured Housing Contracts*.  If specified in the related prospectus supplement, the depositor, the sponsor or any additional seller will deliver to the trustee the original contract as to each Manufactured Housing Contract and copies of documents and instruments related to each contract and, other than in the case of unsecured contracts, the security interest in the property securing that contract.  In order to give notice of the right, title and interest of securityholders to the contracts, if specified in the related prospectus supplement, the depositor, the sponsor or any additional seller will cause a UCC-1 financing statement to be executed by depositor, the sponsor or any additional seller identifying the trustee as the secured party and identifying all contracts as collateral.  If so specified in the related prospectus supplement, the contracts will not be stamped or otherwise marked to reflect their assignment to the trustee.  Therefore, if, through negligence, fraud or otherwise, a subsequent purchaser were able to take physical possession of the contracts without notice of the assignment, the interest of securityholders in the contracts could be defeated.  See "Material Legal Aspects of the Loans—The Home Improvement Contracts and the Manufactured Housing Contracts" in this prospectus.

*Loan Schedule*.  Each loan will be identified in a schedule appearing as an exhibit to the related agreement and will specify with respect to each loan:

- the original principal amount,

- its unpaid principal balance as of the cut-off date,

- the current interest rate,

- the current scheduled payment of principal and interest,

- the maturity date, if any, of the related note, and

- if the loan is an adjustable rate loan, the lifetime rate cap, if any, and the current index.

*Assignment of Agency and Private Label Securities*.  The depositor will cause the Agency and Private Label Securities to be registered in the name of the trustee (or its nominee or correspondent).  The trustee (or its nominee or correspondent) will take possession of any certificated Agency or Private Label Securities.  The trustee will not typically be in possession of, or be assignee of record of, any loans underlying the Agency or Private Label Securities.  See "The Trust Funds—Private Label Securities" in this prospectus.  Each Agency and Private Label Security will be identified in a schedule appearing as an exhibit to the related agreement, which will specify the original principal amount, principal balance as of the cut-off date, annual pass-through rate or interest rate and maturity date for each Agency and Private Label Security conveyed to the related trust fund.  In the agreement, the depositor will represent and warrant to the trustee that:

- the information contained in the Agency or Private Label Securities schedule is true and correct in all material respects,

- immediately prior to the conveyance of the Agency or Private Label Securities, the depositor had good title and was the sole owner of the Agency or Private Label Securities,

- there has been no other sale of the Agency or Private Label Securities, and

- there is no existing lien, charge, security interest or other encumbrance on the Agency or Private Label Securities.

*Repurchase and Substitution of Non-Conforming Primary Assets*.  If any document in the file relating to the primary assets delivered by the depositor to the trustee (or custodian) is found by the trustee, within 90 days of the execution of the related agreement (or promptly after the trustee's receipt of any document permitted to be delivered after the closing date), to be defective in any material respect and the depositor, the sponsor or any additional seller does not cure such defect within 90 days after the discovery of such defect (or within any other period specified in the related prospectus supplement) the depositor, the sponsor or any additional seller will, not later than 90 days after the discovery of such defect (or within such any period specified in the related prospectus supplement), repurchase from the trustee the related primary asset or any

property acquired in respect of the asset. The repurchase shall be effected at a price equal to the *sum* of:

- the *lesser* of

    - the principal balance of the primary asset, and

    - the trust fund's federal income tax basis in the primary asset;

plus

- accrued and unpaid interest to the date of the next scheduled payment on the primary asset at the rate set forth in the related agreement.

However, the purchase price shall not be limited to the trust fund's federal income tax basis in the asset, if the repurchase at a price equal to the principal balance of the repurchased primary asset will not result in any prohibited transaction tax under Section 860F(a) of the Code.

If provided in the related prospectus supplement, the depositor, the sponsor or any additional seller, as the case may be, may, rather than repurchase the primary asset as described above, remove the non-conforming primary asset from the trust fund and substitute in its place one or more other qualifying substitute primary assets.  If no REMIC election is made with respect to the trust fund, the substitution must be effected within 120 days of the date of initial issuance of the securities.  If a REMIC election is made with respect to the trust fund, the trustee must have received a satisfactory opinion of counsel that the substitution will not cause the trust fund to lose its status as a REMIC or otherwise subject the trust fund to a prohibited transaction tax.

Any qualifying substitute primary asset will, on the date of substitution, meet the following criteria:

- it has a principal balance, after deduction of all scheduled payments due in the month of substitution, not in excess of the principal balance of the deleted primary asset (the amount of any shortfall to be deposited to the collection account in the month of substitution for distribution to holders),

- it has an interest rate not less than (and not more than 2% greater than) the interest rate of the deleted primary asset,

- it has a remaining term-to-stated maturity not greater than (and not more than two years less than) that of the deleted primary asset,

- it complies with all of the representations and warranties set forth in the applicable agreement as of the date of substitution, and

- if a REMIC election is made with respect to the trust fund, the qualifying substitute primary asset is a qualified replacement mortgage under Section 860G(a) of the Code.

The above-described cure, repurchase or substitution obligations constitute the sole remedies available to the holders or the trustee for a material defect in the documentation for a primary asset.

The sponsor or another entity will make representations and warranties with respect to primary assets for each series.  If the sponsor or the other entity cannot cure a breach of any such representations and warranties in all material respects within the time period specified in the related pooling and servicing agreement after notification by the trustee of such breach, and if the breach is of a nature that materially and adversely affects the value of the primary asset, the sponsor or the other entity will be obligated to repurchase the affected primary asset or, if provided in the related pooling and servicing agreement, provide a qualifying substitute primary asset, subject to the same conditions and limitations on purchases and substitutions as described above.

The sponsor's only source of funds to effect any cure, repurchase or substitution will be through the enforcement of the corresponding obligations, if any, of the responsible originator or sponsor of the non-conforming primary assets.  See "Risk Factors—Only the assets of the related trust fund are available to pay your certificates" in this prospectus.

No holder of securities of a series, solely by virtue of the holder's status as a holder, will have any right under the applicable agreement to institute any proceeding with respect to agreement, unless holder previously has given to the trustee for the series written notice of default and unless the holders of securities evidencing not less than percentage specified in the related prospectus supplement of the aggregate voting rights of the securities of the series have made written request upon the trustee to institute the proceeding in its own name as trustee thereunder and have offered to the trustee reasonable indemnity, and the trustee for 60 days has neglected or refused to institute the proceeding.

## Reports to Holders

- The applicable trustee or the securities administrator, as applicable, will prepare and forward to each holder on each distribution date, or as soon thereafter as is practicable, a monthly statement setting forth, the items specified in the related prospectus supplement and in the related pooling and servicing agreement or indenture.

In addition, within a reasonable period of time after the end of each calendar year the trustee or securities administrator, as applicable, will furnish to each holder of record at any time during the calendar year:

- the total of the amounts reported pursuant to clauses under the first and second bullets above and under the last clause of the fourth bullet above for the calendar year, and

- the information specified in the related agreement to enable holders to prepare their tax returns including, without limitation, the amount of any original issue discount accrued on the securities.

Reports, whether monthly or annual, will be transmitted in paper format to the holder of record of the class of securities contemporaneously with the distribution on that particular class. In addition, the monthly reports will be posted on a website as described below under "Available Information" and "Reports to Holders."

As to each issuing entity, so long as it is required to file reports under the Exchange Act, those reports will be made available as described above under "Available Information."

As to each issuing entity that is no longer required to file reports under the Exchange Act, periodic distribution reports will be posted on the trustee's or the securities administrator's website referenced under "Available Information" in this prospectus as soon as practicable. Annual reports of assessment of compliance with the AB Servicing Criteria, attestation reports, and statements of compliance will be provided to registered holders of the related securities upon request free of charge.  See "Servicing of Loans-Evidence as to Compliance" in the related prospectus supplement.

Information in the distribution date statements and annual statements provided to the holders will not have been examined and reported upon by an independent public accountant. However, the servicer will provide to the trustee a report by independent public accountants with respect to its servicing of the loans.  See "Servicing of Loans-Evidence as to Compliance" in the related prospectus supplement.

If so specified in the prospectus supplement, the related series of securities (or one or more classes of the series) will be issued in book-entry form.  In that event, owners of beneficial interests in those securities will not be considered holders and will not receive such reports directly from the trustee or the securities administrator, as applicable.  The trustee or the securities administrator, as applicable, will forward reports only to the entity or its nominee that is the registered holder of the global certificate that evidences the book-entry securities. Beneficial owners will receive reports from the participants and indirect participants of the applicable book-entry system in accordance with the policies and procedures of the participants and indirect participants.

## Events of Default; Rights upon Event of Default

*Pooling and Servicing Agreement; Servicing Agreement*.  "Events of default under the pooling and servicing agreement for each series of certificates include, but are not limited to:

- any failure by the servicer to deposit amounts in the collection account and distribution account(s) to enable the trustee to distribute to holders of securities of the series any required payment, provided that this failure continues unremedied for the number of days specified in

  the related prospectus supplement after the giving of written notice to the servicer by the trustee, or to the servicer and the trustee by holders having not less than 25% of the total voting rights of the series;

- any failure by the servicer duly to observe or perform in any material respect any other of its covenants or agreements in the agreement provided that this failure continues unremedied for

67

the number of days specified in the related prospectus supplement after the giving of written to the servicer by the trustee, or to the servicer and the trustee by the holders having not less than 25% of the total voting rights of the of the series; and

- certain events of insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings and certain actions by the servicer indicating its insolvency, reorganization or inability to pay its obligations.

So long as an event of default remains unremedied under the applicable agreement for a series of securities relating to the servicing of loans, unless otherwise specified in the a percentage specified in the related prospectus supplement of the total voting rights of the series may terminate all of the rights and obligations of the servicer as servicer under the applicable agreement (other than its right to recovery of other expenses and amounts advanced pursuant to the terms of the agreement, which rights the servicer will retain under all circumstances), whereupon the trustee will succeed to all the responsibilities, duties and liabilities of the servicer under the agreement and will be entitled to reasonable servicing compensation not to exceed the applicable servicing fee, together with other servicing compensation in the form of assumption fees, late payment charges or otherwise as provided in the agreement.

In the event that the trustee is unwilling or unable so to act, it may select (or petition a court of competent jurisdiction to appoint) a finance institution, bank or loan servicing institution with a net worth specified in the related prospectus supplement to act as successor servicer under the provisions of the agreement.   The successor servicer would be entitled to reasonable servicing compensation in an amount not to exceed the servicing fee as set forth in the related prospectus supplement, together with other servicing compensation in the form of assumption fees, late payment charges or otherwise, as provided in the agreement.

During the continuance of any event of default of a servicer under an agreement for a series of securities, the trustee will have the right to take action to enforce its rights and remedies and to protect and enforce the rights and remedies of the holders of securities of the series, and, unless otherwise specified in the related prospectus supplement, holders of securities having not less than a percentage specified in the related prospectus supplement of the total voting rights of the series may direct the time, method and place of conducting any proceeding for any remedy available to the trustee or exercising any trust or power conferred upon the trustee.   However, the trustee will not be under any obligation to pursue any such remedy or to exercise any of such trusts or powers unless the holders have offered the trustee reasonable security or indemnity against the cost, expenses and liabilities that may be incurred by the trustee as a result.   The trustee may decline to follow any such direction if it determines that the action or proceeding so directed may not lawfully be taken or would involve it in personal liability or be unjustly prejudicial to the non-assenting holders.

*Indenture*.  "Events of default" under the indenture for each series of notes include, but are not limited to:

- a default for thirty (30) days (or other time period specified in the related prospectus supplement) in the payment of any principal of or interest on any note of the series;

- failure to perform any other covenant of the depositor or the trust fund in the indenture, provided that the failure continues for a period of sixty (60) days after notice is given in accordance with the procedures described in the related prospectus supplement;

- any representation or warranty made by the depositor or the trust fund in the indenture or in any certificate or other writing delivered pursuant to it or in connection with it with respect to or affecting such series having been incorrect in a material respect as of the time made, provided that the breach is not cured within sixty (60) days after notice is given in accordance with the procedures described in the related prospectus supplement;

- certain events of bankruptcy, insolvency, receivership or liquidation of the depositor or the trust fund; and

- any other event of default specified with respect to notes of that series.

If an event of default with respect to the then-outstanding notes of any series occurs and is continuing, either the indenture trustee or the holders of a majority of the total amount of those notes may declare the principal amount of all the notes of the series (or, if the notes of that series are zero coupon securities, such portion of the principal amount as may be specified in the related prospectus supplement) to be due and payable immediately.  Under certain circumstances of this type the declaration may be rescinded and annulled by the holders of a majority of the total amount of those notes.

If, following an event of default with respect to any series of notes, the related notes have been declared to be due and payable, the indenture trustee may, in its discretion, and notwithstanding such acceleration, elect to maintain possession of the collateral securing the notes and to continue to apply distributions on the collateral as if there had been no declaration of acceleration, provided that the collateral continues to provide sufficient funds for the payment of principal of and interest on the notes as they would have become due if there had not been a declaration.  In addition, the indenture trustee may not sell or otherwise liquidate the collateral securing the notes of a series following an event of default (other than a default in the payment of any principal of or interest on any note of the series for thirty (30) days or other period specified in the related prospectus supplement), unless:

- the holders of 100% of the total amount of the then-outstanding notes of the series consent to the sale; or

- the proceeds of the sale or liquidation are sufficient to pay in full the principal of and accrued interest due and unpaid on the outstanding notes of the series at the date of sale; or

- the indenture trustee determines that the collateral would not be sufficient on an ongoing basis to make all payments on the notes as such payments would have become due if the notes had not been declared due and payable, and the indenture trustee obtains the consent of the holders of a percentage specified in the related prospectus supplement of the total amount of the then-outstanding notes of the series.

In the event that the indenture trustee liquidates the collateral in connection with an event of default involving a default for thirty (30) days or other period specified in the related prospectus supplement) in the payment of principal of or interest on the notes of a series, the indenture provides that the indenture trustee will have a prior lien on the proceeds of any liquidation for its unpaid fees and expenses. As a result, upon the occurrence of an event of default of this type, the amount available for distribution to the noteholders may be less than would otherwise be the case. However, the indenture trustee may not institute a proceeding for the enforcement of its lien except in connection with a proceeding for the enforcement of the lien of the indenture for the benefit of the noteholders after the occurrence of the event of default.

In the event that the principal of the notes of a series is declared due and payable as described above, holders of the notes issued at a discount from par may be entitled to receive no more than an amount equal to the unpaid principal amount of those notes less the amount of the discount that remains unamortized.

Subject to the provisions of the indenture relating to the duties of the indenture trustee, in case an event of default shall occur and be continuing with respect to a series of notes, the indenture trustee will be under no obligation to exercise any of its rights or powers under the indenture at the request or direction of any of the holders of notes of the series, unless the holders offer security or indemnity satisfactory to the indenture trustee against the costs, expenses and liabilities it might incur in complying with their request or direction. Subject to the provisions for indemnification and certain limitations contained in the indenture, the holders of a majority of amount of the then-outstanding notes of the series shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the indenture trustee or exercising any trust or power conferred on the indenture trustee with respect to those notes, and the holders of a majority of the amount of the amount of the then- outstanding notes of the series may, in certain cases, waive any default with respect to the notes, except a default in the payment of principal or interest or a default in respect of a covenant or provision of the indenture that cannot be modified without the waiver or consent of all affected holders of the outstanding notes.

## The Trustees

The identity of the commercial bank, savings and loan association or trust company named as the trustee or indenture trustee, as the case may be, for each series of securities will be set forth in the related prospectus supplement. Entities serving as trustee may have normal banking relationships with the depositor or the servicer. In addition, for the purpose of meeting the legal requirements of certain local jurisdictions, each trustee will have the power to appoint co-trustees or separate trustees. In the event of an appointment, all rights, powers, duties and obligations conferred or imposed upon the trustee by the related agreement will be conferred or imposed upon that trustee and each separate trustee or co-trustee jointly, or, in any jurisdiction in which the trustee shall be incompetent or unqualified to perform certain acts, singly upon the separate trustee or co-trustee who will exercise and perform such rights, powers, duties and obligations solely at the direction of the trustee. The trustee may also appoint agents to perform any of its responsibilities, which agents will have any or all of the rights, powers, duties and obligations of the trustee conferred on them by their appointment; provided, however, that the trustee will continue to be responsible for its duties and obligations under the agreement.

70

## Duties of Trustees

No trustee will make any representations as to the validity or sufficiency of the related agreement, the securities or of any primary asset or related documents.  If no event of default (as defined in the related agreement) has occurred, the applicable trustee will be required to perform only those duties specifically required of it under the agreement.  Upon receipt of the various certificates, statements, reports or other instruments required to be furnished to it, the trustee will be required to examine them to determine whether they are in the form required by the related agreement.  However, the trustee will not be responsible for the accuracy or content of any documents furnished to it by the holders or the servicer under the agreement.

Each trustee may be held liable for its own negligent action or failure to act, or for its own misconduct; provided, however, that no trustee will be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the related holders in an event of default.  No trustee will be required to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under the related agreement, or in the exercise of any of its rights or powers, if it has reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

If an event of default will occur, the trustee will, by notice in writing to the master servicer, which may be delivered by telecopy, immediately terminate all of the rights and obligations of the master servicer thereafter arising under the Agreements, but without prejudice to any rights it may have as a certificateholder or to reimbursement of advances and other advances of its own funds, and the trustee shall act as provided in the Agreements to carry out the duties of the master servicer, including the obligation to make any advance the nonpayment of which was an event of default described in the Agreements. Any such action taken by the trustee must be prior to the distribution on the relevant distribution date.

On and after the time the master servicer receives a notice of termination pursuant to the Agreements, the trustee shall automatically become the successor to the master servicer with respect to the transactions set forth or provided for in the Agreements and after a transition period (not to exceed 90 days), shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the master servicer by the terms and provisions in the Agreements; provided, however, pursuant to the Agreements, the trustee in its capacity as successor master servicer shall be responsible for making any advances required to be made by the master servicer immediately upon the termination of the master servicer and any such advance shall be made on the distribution date on which such advance was required to be made by the predecessor master servicer. Effective on the date of such notice of termination, as compensation therefor, the trustee shall be entitled to all compensation, reimbursement of expenses and indemnification that the master servicer would have been entitled to if it had continued to act hereunder, provided, however, that the trustee shall not be (i) liable for any acts or omissions of the master servicer, (ii) obligated to make advances if it is prohibited from doing so under applicable law, (iii) responsible for expenses of the master servicer or (iv) obligated to deposit losses on any permitted investment directed by the master servicer.  Notwithstanding the foregoing, the trustee may, if it shall be unwilling to so act, or shall, if it is prohibited by applicable law from making advances or if it is otherwise unable to so act, appoint, or petition a court of competent

jurisdiction to appoint, any established mortgage loan servicing institution the appointment of which does not adversely affect the then current rating of the certificates by each rating agency as the successor to the master servicer pursuant to the Agreements in the assumption of all or any part of the responsibilities, duties or liabilities of the master servicer pursuant to the Agreements. Any successor master servicer shall (i) be an institution that is a Fannie Mae and Freddie Mac approved seller/servicer in good standing, that has a net worth of at least the amount specified in the related prospectus supplement, (ii) be acceptable to the trustee (which consent shall not be unreasonably withheld) and (iii) be willing to act as successor servicer of any mortgage loans under the Agreements, and shall have executed and delivered to the depositor and the trustee an agreement accepting such delegation and assignment, that contains an assumption by such person of the rights, powers, duties, responsibilities, obligations and liabilities of the master servicer (other than any liabilities of the master servicer hereof incurred prior to termination of the master servicer as set forth in the Agreements), with like effect as if originally named as a party to the Agreements, provided that each rating agency shall have acknowledged in writing that its rating of the certificates in effect immediately prior to such assignment and delegation will not be qualified or reduced as a result of such assignment and delegation. If the trustee assumes the duties and responsibilities of the master servicer, the trustee shall not resign as master servicer until a successor master servicer has been appointed and has accepted such appointment. Pending appointment of a successor to the master servicer hereunder, the trustee, unless the trustee is prohibited by law from so acting, shall act in such capacity as provided in the Agreements. In connection with such appointment and assumption, the trustee may make such arrangements for the compensation of such successor out of payments on mortgage loans or otherwise as it and such successor shall agree; provided that no such compensation unless agreed to by the certificateholders shall be in excess of that permitted the master servicer hereunder. The trustee and such successor shall take such action, consistent with the Agreements, as shall be necessary to effectuate any such succession. Neither the trustee nor any other successor master servicer shall be deemed to be in default hereunder by reason of any failure to make, or any delay in making, any distribution hereunder or any portion thereof or any failure to perform, or any delay in performing, any duties or responsibilities hereunder, in either case caused by the failure of the master servicer to deliver or provide, or any delay in delivering or providing, any cash, information, documents or records to it.

The costs and expenses of the trustee in connection with the termination of the master servicer, appointment of a successor master servicer and, if applicable, any transfer of servicing, including, without limitation, all costs and expenses associated with the complete transfer of all servicing data and the completion, correction or manipulation of such servicing data as may be required by the trustee to correct any errors or insufficiencies in the servicing data or otherwise to enable the trustee or the successor master servicer to service the mortgage loans properly and effectively, to the extent not paid by the terminated master servicer, will be payable to the trustee pursuant to the Agreements. Any successor to the master servicer as successor servicer under any subservicing agreement shall give notice to the applicable mortgagors of such change of servicer and will, during the term of its service as successor servicer maintain in force the policy or policies that the master servicer is required to maintain pursuant to the Agreements.

If the trustee will succeed to any duties of the master servicer respecting the mortgage loans as provided herein, it will do so in a separate capacity and not in its capacity as trustee and, accordingly, the provisions of the Agreements concerning the trustee's duties will be

inapplicable to the trustee in its duties as the successor to the master servicer in the servicing of the mortgage loans (although such provisions will continue to apply to the trustee in its capacity as trustee); the provisions of the Agreements relating to the master servicer, however, will apply to it in its capacity as successor master servicer.

Upon any termination or appointment of a successor to the master servicer, the trustee will give prompt written notice thereof to certificateholders of record pursuant to the Agreements and to the rating agencies.

The trustee will transmit by mail to all certificateholders, within 60 days after the occurrence of any event of default, the trustee shall transmit by mail to all certificateholders notice of each such event of default hereunder actually known to a responsible officer of the trustee, unless such event of default shall have been cured or waived.

The trustee will not in any way be liable by reason of any insufficiency in any account held by or in the name of the trustee unless it is determined by a court of competent jurisdiction that the trustee's gross negligence or willful misconduct was the primary cause of such insufficiency (except to the extent that the trustee is obligor and has defaulted thereon).  In no event will the trustee be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the trustee has been advised of the likelihood of such loss or damage and regardless of the form of action. Furthermore, the trustee will not be responsible for the acts or omissions of the other transaction parties, it being understood that the Agreements will not be construed to render them partners, joint venturers or agents of one another.  None of the foregoing will be construed, however, to relieve the trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct. The trustee will be entitled to reimbursement and indemnification by the trust for any loss, liability or expense arising out of or in connection with the Agreements as set forth in the Agreements except any such loss, liability or expense as may arise from its negligence or intentional misconduct.

In addition to having express duties under the Agreements, the trustee, as a fiduciary, also has certain duties unique to fiduciaries under applicable law.  In general, the trustee will be subject to certain federal laws and, because the Agreements is governed by New York law, certain New York state laws.  As a national bank acting in a fiduciary capacity, the trustee will, in the administration of its duties under the Agreements, be subject to certain regulations promulgated by the Office of the Comptroller of the Currency, specifically those set forth in Chapter 12, Part 9 of the Code of Federal Regulations.  New York common law has required fiduciaries of common law trusts formed in New York to perform their duties in accordance with the "prudent person" standard, which, in this transaction, would require the trustee to exercise such diligence and care in the administration of the trust as a person of ordinary prudence would employ in managing his own property.  However, under New York common law, the application of this standard of care can be restricted contractually to apply only after the occurrence of a default.  The Agreements provides that the trustee is subject to the prudent person standard only for so long as an event of default has occurred and remains uncured.

## Resignation of Trustees

Each trustee may, upon written notice to the depositor, resign at any time, in which event the depositor will be obligated to use its best efforts to appoint a successor trustee.  If no successor trustee has been appointed and has accepted such appointment within 30 days after the giving of such notice of resignation, the resigning trustee may petition any court of competent jurisdiction for appointment of a successor trustee.  Each trustee may also be removed at any time

- if the trustee ceases to be eligible to continue as such under the related agreement, or

- if the trustee becomes insolvent, or

- the holders of securities having more than over 50% of the total voting rights of the securities in the trust fund give written notice to the trustee and to the depositor.

Any resignation or removal of a trustee and appointment of a successor trustee will not become effective until the successor trustee accepts its appointment.

## Amendment of Agreement

The Agreement for each series of securities may be amended by the depositor, the servicer (with respect to a series relating to loans), and the trustee, without notice to or consent of the holders, for the following purposes:

- to cure any ambiguity,

- to correct any defective provisions or to correct or supplement any provision in the agreement,

- to add to the duties of the depositor, the applicable trustee or the servicer,

- to add any other provisions with respect to matters or questions arising under the agreement or related credit enhancement,

- to add or amend any provisions of the agreement as required by any rating agency named in the prospectus supplement in order to maintain or improve the rating of the securities (it being understood that none of the depositor, the sponsor, any other seller, the servicer or any trustee is obligated to maintain or improve the rating), or

- to comply with any requirements imposed by the Code.

In no event, however, shall any amendment (other than an amendment to comply with Code requirements) adversely affect in any material respect the interests of any holders of the series, as evidenced by an opinion of counsel delivered to the trustee.  An amendment shall be deemed not to adversely affect in any material respect the interests of any holder if the trustee receives written confirmation from each rating agency named in the prospectus supplement that the amendment will not cause the rating agency to reduce its then-current rating.

Each agreement for a series may also be amended by the applicable trustee, the servicer, if applicable, and the depositor with the consent of the holders possessing not less than the percentage specified in the related prospectus supplement of the total outstanding principal amount of the securities of the series (or, if only certain classes are affected by the amendment, a percentage specified in the related prospectus supplement of the total outstanding principal amount of each affected class), for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the agreement, or modifying in any manner the rights of holders of the series.  In no event, however, shall any amendment

- reduce the amount or delay the timing of payments on any security without the consent of the holder of the security, or

- reduce the percentage of the total outstanding principal amount of securities of each class, the holders of which are required to consent to any such amendment, without the consent of the holders of 100% of the total outstanding principal amount of each affected class.

**Voting Rights**

The prospectus supplement will set forth the method of determining allocation of voting rights with respect to the related series of securities.

**List of Holders**

Upon written request of three or more holders of record of a series for purposes of communicating with other holders with respect to their rights under the agreement (which request is accompanied by a copy of the communication such holders propose to transmit), the trustee will afford them access during business hours to the most recent list of holders of that series held by the trustee.

No agreement will provide for the holding of any annual or other meeting of holders.

**Book-Entry Securities**

If specified in the related prospectus supplement for a series of securities, the securities (or one or more of the securities) may be issued in book-entry form.  In that event, beneficial owners of those securities will not be considered "Holders" under the agreements and may exercise the rights of holders only indirectly through the participants in the applicable book-entry system.

**REMIC Administrator**

For any series with respect to which a REMIC election is made, preparation of certain reports and certain other administrative duties with respect to the trust fund may be performed by a REMIC administrator, which may be an affiliate of the depositor.

## Termination

*Pooling and Servicing Agreement; Trust Agreement*.  The obligations created by the pooling and servicing agreement or trust agreement for a series will terminate upon the distribution to holders of all amounts distributable to them under the agreement in the circumstances described in the related prospectus supplement.  See "Description of the Securities—Optional Redemption, Purchase or Termination" in this prospectus.

*Indenture*.  The indenture will be discharged with respect to a series of notes (except with respect to certain continuing rights specified in the indenture) upon the delivery to the indenture trustee for cancellation of all the notes of that series or, with certain limitations, upon deposit with the indenture trustee of funds sufficient for the payment in full of all of the notes of the series.

In addition to such discharge with certain limitations, if so specified with respect to the notes of any series, the indenture will provide that the related trust fund will be discharged from any and all obligations in respect of the notes of that series (except for certain obligations relating to temporary notes and exchange of notes, registration of the transfer or exchange of those notes, replacing stolen, lost or mutilated notes, maintaining paying agencies and holding monies for payment in trust) upon the deposit with the indenture trustee, in trust, of money and/or direct obligations of or obligations guaranteed by the United States of America that, through the payment of interest and principal in accordance with their terms, will provide money in an amount sufficient to pay the principal of and each installment of interest on the notes on the final scheduled distribution date for the notes and any installment of interest on the notes in accordance with the terms of the indenture and the notes.  In the event of any such defeasance and discharge of notes of a series, holders of notes of that series would be able to look only to such money and/or direct obligations for payment of principal of and interest on, if any, their notes until maturity.

## Material Legal Aspects of the Loans

The following discussion contains general summaries of material legal matters mortgage loans, home improvement installment sales contracts and home improvement installment loan agreements that are general in nature.  Because the legal matters are determined primarily by applicable state law and because state laws may differ substantially, the summaries do not purport to be complete, to reflect the laws of any particular state, or to encompass the laws of all states in which the properties securing the loans may be situated.

## Mortgages

The Residential Loans and Home Equity Loans for a series will, and the Home Improvement Contracts for a series may, be secured by mortgages or deeds of trust or deeds to secure debt, depending upon the prevailing practice in the state in which the property subject to a mortgage loan is located.  We refer to Residential Loans, Home Equity Loans and Home Improvement Contracts that are secured by mortgages as "mortgage loans."  The filing of a mortgage, deed of trust or deed to secure debt creates a lien or title interest upon the real property covered by that instrument and represents the security for the repayment of an obligation that is

customarily evidenced by a promissory note. It is not prior to the lien for real estate taxes and assessments or other charges imposed under governmental police powers and may also be subject to other liens pursuant to the laws of the jurisdiction in which the mortgaged property is located. Priority with respect to the instruments depends on their terms, the knowledge of the parties to the mortgage and generally on the order of recording with the applicable state, county or municipal office. There are two parties to a mortgage: the mortgagor, who is the borrower/property owner or the land trustee (as described below), and the mortgagee, who is the lender. Under the mortgage instrument, the mortgagor delivers to the mortgagee a note or bond and the mortgage. In the case of a land trust, there are three parties because title to the property is held by a land trustee under a land trust agreement of which the borrower/property owner is the beneficiary; at origination of a mortgage loan, the borrower executes a separate undertaking to make payments on the mortgage note. A deed of trust transaction normally has three parties: the trustor, who is the borrower/property owner; the beneficiary, who is the lender; and the trustee, a third-party grantee. Under a deed of trust, the trustor grants the property, irrevocably until the debt is paid, in trust, generally with a power of sale, to the trustee to secure payment of the obligation. The mortgagee's authority under a mortgage and the trustee's authority under a deed of trust are governed by the law of the state in which the real property is located, the express provisions of the mortgage or deed of trust, and, in some cases, in deed of trust transactions, the directions of the beneficiary.

## Foreclosure on Mortgages

Foreclosure of a mortgage is generally accomplished by judicial action. Generally, the action is initiated by the service of legal pleadings upon all parties having an interest of record in the real property. Delays in completion of the foreclosure occasionally may result from difficulties in locating necessary parties defendant. When the mortgagee's right to foreclosure is contested, the legal proceedings necessary to resolve the issue can be time-consuming and expensive. After the completion of a judicial foreclosure proceeding, the court may issue a judgment of foreclosure and appoint a receiver or other officer to conduct the sale of the property. In some states, mortgages may also be foreclosed by advertisement, pursuant to a power of sale provided in the mortgage. Foreclosure of a mortgage by advertisement is essentially similar to foreclosure of a deed of trust by nonjudicial power of sale.

Foreclosure of a deed of trust generally is accomplished by a nonjudicial trustee's sale under a specific provision in the deed of trust that authorizes the trustee to sell the property upon any default by the borrower under the terms of the note or deed of trust. In certain states, foreclosure also may be accomplished by judicial action in the manner provided for foreclosure of mortgages. In some states, the trustee must record a notice of default and send a copy to the borrower-trustor and to any person who has recorded a request for a copy of a notice of default and notice of sale. In addition, the trustee in some states must provide notice to any other individual having an interest in the real property, including any junior lienholders. If the deed of trust is not reinstated within any applicable cure period, a notice of sale must be posted in a public place and, in most states, published for a specified period of time in one or more newspapers. In addition, some state laws require that a copy of the notice of sale be posted on the property and sent to all parties having an interest of record in the property. The trustor, borrower or any person having a junior encumbrance on the real estate may, during a reinstatement period, cure the default by paying the entire amount in arrears plus the costs and

expenses incurred in enforcing the obligation. Generally, state law controls the amount of foreclosure expenses and costs, including attorney's fees, which may be recovered by a lender.

An action to foreclose a mortgage is an action to recover the mortgage debt by enforcing the mortgagee's rights under the mortgage. It is regulated by statutes and rules and subject throughout to the court's equitable powers. Generally, a mortgagor is bound by the terms of the related mortgage note and the mortgage as made and cannot be relieved from his default if the mortgagee has exercised its rights in a commercially reasonable manner. However, since a foreclosure action historically was equitable in nature, the court may exercise equitable powers to relieve a mortgagor of a default and deny the mortgagee foreclosure on proof that either the mortgagor's default was neither willful nor in bad faith or the mortgagee's action established a waiver, fraud, bad faith, or oppressive or unconscionable conduct such as to warrant a court of equity to refuse affirmative relief to the mortgagee. Under certain circumstances, a court of equity may relieve the mortgagor from an entirely technical default where the default was not willful.

A foreclosure action is subject to most of the delays and expenses of other lawsuits if defenses or counterclaims are interposed, and sometimes requires up to several years to complete. Moreover, a non-collusive, regularly conducted foreclosure sale may be challenged as a fraudulent conveyance, regardless of the parties' intent, if a court determines that the sale was for less than fair consideration and the sale occurred while the mortgagor was insolvent and within one year (or within the state statute of limitations if the trustee in bankruptcy elects to proceed under state fraudulent conveyance law) of the filing of bankruptcy. Similarly, a suit against the debtor on the related mortgage note may take several years and, generally, is a remedy alternative to foreclosure, the mortgagee being precluded from pursuing both at the same time.

In the case of foreclosure under either a mortgage or a deed of trust, a public sale is conducted by the referee or other designated officer or by the trustee. However, because of the difficulty potential third party purchasers at the sale have in determining the exact status of title and because the physical condition of the property may have deteriorated during the foreclosure proceedings, it is uncommon for a third party to purchase the property at a foreclosure sale. Rather, it is common for the lender to purchase the property from the trustee or referee for an amount that may be equal to the unpaid principal amount of the mortgage note secured by the mortgage or deed of trust plus accrued and unpaid interest and the expenses of foreclosure, in which event the mortgagor's debt will be extinguished. The lender may purchase the property for a lesser amount in order to preserve its right against the borrower to seek a deficiency judgment in states where such a judgment is available. Thereafter, subject to the right of the borrower in some states to remain in possession during the redemption period, the lender will assume the burdens of ownership, including obtaining hazard insurance, paying taxes and making such repairs at its own expense as are necessary to render the property suitable for sale. The lender will commonly obtain the services of a real estate broker and pay the broker's commission in connection with the sale of the property. Depending upon market conditions, the ultimate proceeds of the sale of the property may not equal the lender's investment in the property. Any loss may be reduced by the receipt of any mortgage guaranty insurance proceeds.

## Environmental Risks

Federal, state and local laws and regulations impose a wide range of requirements on activities that may affect the environment, health and safety. These include laws and regulations governing air pollutant emissions, hazardous and toxic substances, impacts to wetlands, leaks from underground storage tanks and the management, removal and disposal of lead- and asbestos-containing materials. In certain circumstances, these laws and regulations impose obligations on the owners or operators of residential properties such as those subject to the loans. The failure to comply with these laws and regulations may result in fines and penalties.

Moreover, under various federal, state and local laws and regulations, an owner or operator of real estate may be liable for the costs of addressing hazardous substances on, in or beneath such property and related costs. Liability may be imposed without regard to whether the owner or operator knew of, or was responsible for, the presence of hazardous substances, and could exceed the value of the property and the aggregate assets of the owner or operator. In addition, persons who transport or dispose of hazardous substances, or arrange for the transportation, disposal or treatment of hazardous substances, at off-site locations may also be held liable if there are releases or threatened releases of hazardous substances at such off-site locations.

In addition, under the laws of some states and under the Federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), contamination of property may give rise to a lien on the property to assure the payment of the costs of clean-up. In several states, such a lien has priority over the lien of an existing mortgage against the property. Under CERCLA, the clean-up lien is subordinate to pre-existing, perfected security interests.

Under the laws of some states, and under CERCLA, there is a possibility that a lender may be held liable as an "owner or operator" for costs of addressing releases or threatened releases of hazardous substances at a property, regardless of whether or not the environmental damage or threat was caused by the current or prior owner or operator. CERCLA and some state laws provide an exemption from the definition of "owner or operator" for a secured creditor who, without "participating in the management" of a facility, holds indicia of ownership primarily to protect its security interest in the facility. The Solid Waste Disposal Act (SWDA) provides similar protection to secured creditors in connection with liability for releases of petroleum from certain underground storage tanks. However, if a lender "participates in the management" of the facility in question or is found not to have held its interest primarily to protect a security interest, the lender may forfeit its secured creditor exemption status.

A regulation promulgated by the U.S. Environmental Protection Agency (EPA) in April 1992 attempted to clarify the activities in which lenders could engage both prior to and subsequent to foreclosure of a security interest without forfeiting the secured creditor exemption under CERCLA. The rule was struck down in 1994 by the United States Court of Appeals for the District of Columbia Circuit in *Kelley ex rel State of Michigan v. Environmental Protection Agency*, 15 F.3d 1100 (D.C. Cir. 1994), *reh'g denied*, 25 F.3d 1088, *cert. denied sub nom. Am. Bankers Ass'n v. Kelley*, 115 S.Ct. 900 (1995). Another EPA regulation promulgated in 1995 clarifies the activities in which lenders may engage without forfeiting the secured creditor

exemption under the underground storage tank provisions of SWDA.  That regulation has not been struck down.

On September 30, 1996, Congress enacted the Asset Conservation, Limited Liability and Deposit Insurance Protection Act (ACA) which amended both CERCLA and SWDA to provide additional clarification regarding the scope of the lender liability exemptions under the two statutes.  Among other things, ACA specifies the circumstances under which a lender will be protected by the CERCLA and SWDA exemptions, both while the borrower is still in possession of the secured property and following foreclosure on the secured property.

Generally, ACA states that a lender who holds indicia of ownership primarily to protect a security interest in a facility will be considered to participate in management only if, while the borrower is still in possession of the facility encumbered by the security interest, the lender

- exercises decision-making control over environmental compliance related to the facility such that the lender has undertaken responsibility for hazardous substance handling or disposal practices related to the facility or

- exercises control at a level comparable to that of a manager of the facility such that the lender has assumed or manifested responsibility for (a) overall management of the facility encompassing daily decision-making with respect to environmental compliance or (b) overall or substantially all of the operational functions (as distinguished from financial or administrative functions) of the facility other than the function of environmental compliance.

ACA also specifies certain activities that are not considered to be "participation in management," including monitoring or enforcing the terms of the extension of credit or security interest, inspecting the facility, and requiring a lawful means of addressing the release or threatened release of a hazardous substance.

ACA also specifies that a lender who did not participate in management of a facility prior to foreclosure will not be considered an "owner or operator," even if the lender forecloses on the facility and after foreclosure sells or liquidates the facility, maintains business activities, winds up operations, undertakes an appropriate response action, or takes any other measure to preserve, protect, or prepare the facility prior to sale or disposition, if the lender seeks to sell or otherwise divest the facility at the earliest practicable, commercially reasonable time, on commercially reasonable terms, taking into account market conditions and legal and regulatory requirements.

ACA specifically addresses the potential liability of lenders who hold mortgages or similar conventional security interests in real property, such as the trust fund does in connection with the mortgage loans and the Home Improvement Contracts.

If a lender is or becomes liable under CERCLA, it may be authorized to bring a statutory action for contribution against any other "responsible parties," including a previous owner or operator.  However, these persons or entities may be bankrupt or otherwise judgment proof, and the costs associated with environmental cleanup and related actions may be substantial. Moreover, some state laws imposing liability for addressing hazardous substances do not contain exemptions from liability for lenders.  Whether the costs of addressing a release or threatened

80

release at a property pledged as collateral for one of the loans would be imposed on the related trust fund, and thus occasion a loss to the holders, therefore depends on the specific factual and legal circumstances at issue.

## Rights of Redemption

In some states, after sale pursuant to a deed of trust or foreclosure of a mortgage, the trustor or mortgagor and foreclosed junior lienors are given a statutory period in which to redeem the property from the foreclosure sale. The right of redemption should be distinguished from the equity of redemption, which is a non-statutory right that must be exercised prior to the foreclosure sale. In some states, redemption may occur only upon payment of the entire principal balance of the loan, accrued interest and expenses of foreclosure. In other states, redemption may be authorized if the former borrower pays only a portion of the sums due. The effect of a statutory right of redemption is to diminish the ability of the lender to sell the foreclosed property. The exercise of a right of redemption would defeat the title of any purchaser at a foreclosure sale, or of any purchaser from the lender subsequent to foreclosure or sale under a deed of trust. Consequently, the practical effect of a right of redemption is to force the lender to retain the property and pay the expenses of ownership until the redemption period has run. In some states, there is no right to redeem property after a trustee's sale under a deed of trust.

## Junior Mortgages; Rights of Senior Mortgages

The mortgage loans comprising or underlying the primary assets included in the trust fund for a series will be secured by mortgages or deeds of trust, which may be second or more junior mortgages to other mortgages held by other lenders or institutional investors. The rights of the related trust fund (and therefore of the securityholders), as mortgagee under a junior mortgage, are subordinate to those of the mortgagee under the senior mortgage, including the prior rights of the senior mortgagee to receive hazard insurance and condemnation proceeds and to cause the property securing the mortgage loan to be sold upon default of the mortgagor, thereby extinguishing the junior mortgagee's lien unless the junior mortgagee asserts its subordinate interest in the property in foreclosure litigation and, possibly, satisfies the defaulted senior mortgage. A junior mortgagee may satisfy a defaulted senior loan in full and, in some states, may cure the default and bring the senior loan current, in either event adding the amounts expended to the balance due on the junior loan. In most states, absent a provision in the mortgage or deed of trust, no notice of default is required to be given to a junior mortgagee.

The standard form of the mortgage used by most institutional lenders confers on the mortgagee the right both to receive all proceeds collected under any hazard insurance policy and all awards made in connection with condemnation proceedings, and to apply the proceeds and awards to any indebtedness secured by the mortgage, in such order as the mortgagee may determine. Thus, in the event improvements on the property are damaged or destroyed by fire or other casualty, or in the event the property is taken by condemnation, the mortgagee or beneficiary under underlying senior mortgages will have the prior right to collect any insurance proceeds payable under a hazard insurance policy and any award of damages in connection with the condemnation and to apply the same to the indebtedness secured by the senior mortgages.

Proceeds in excess of the amount of senior mortgage indebtedness, in most cases, may be applied to the indebtedness of a junior mortgage.

Another provision sometimes found in the form of the mortgage or deed of trust used by institutional lenders obligates the mortgagor to pay before delinquency all taxes and assessments on the property and, when due, all encumbrances, charges and liens on the property that appear prior to the mortgage or deed of trust, to provide and maintain fire insurance on the property, to maintain and repair the property and not to commit or permit any waste thereof, and to appear in and defend any action or proceeding purporting to affect the property or the rights of the mortgagee under the mortgage. Upon a failure of the mortgagor to perform any of these obligations, the mortgagee is given the right under certain mortgages to perform the obligation itself, at its election, with the mortgagor agreeing to reimburse the mortgagee for any sums expended by the mortgagee on behalf of the mortgagor. All sums so expended by the mortgagee become part of the indebtedness secured by the mortgage.

## Anti-Deficiency Legislation and Other Limitations on Lenders

Certain states have imposed statutory prohibitions that limit the remedies of a beneficiary under a deed of trust or a mortgagee under a mortgage. In some states, statutes limit the right of the beneficiary or mortgagee to obtain a deficiency judgment against the borrower following foreclosure or sale under a deed of trust. A deficiency judgment is a personal judgment against the former borrower equal in most cases to the difference between the net amount realized upon the public sale of the real property and the amount due to the lender. Other statutes require the beneficiary or mortgagee to exhaust the security afforded under a deed of trust or mortgage by foreclosure in an attempt to satisfy the full debt before bringing a personal action against the borrower. In other states, the lender has the option of bringing a personal action against the borrower on the debt without first exhausting the security. However, in some of these states, the lender, following judgment on the personal action, may be deemed to have elected a remedy and may be precluded from exercising remedies with respect to the security. Consequently, the practical effect of the election requirement, when applicable, is that lenders will usually proceed first against the security rather than bringing a personal action against the borrower. Finally, other statutory provisions limit any deficiency judgment against the former borrower following a foreclosure sale to the excess of the outstanding debt over the fair market value of the property at the time of the public sale. The purpose of these statutes is generally to prevent a beneficiary or a mortgagee from obtaining a large deficiency judgment against the former borrower as a result of low or no bids at the foreclosure sale.

In addition to laws limiting or prohibiting deficiency judgments, numerous other statutory provisions, including the Federal Bankruptcy Code, the Relief Act and state laws affording relief to debtors, may interfere with or affect the ability of the secured lender to realize upon collateral and/or enforce a deficiency judgment. For example, with respect to Federal Bankruptcy Code, the filing of a petition acts as a stay against the enforcement of remedies for collection of a debt. Moreover, a court with federal bankruptcy jurisdiction may permit a debtor through a rehabilitation plan under chapter 13 of the Federal Bankruptcy Code to cure a monetary default with respect to a loan on his residence by paying arrearages within a reasonable time period and reinstating the original loan payment schedule even though the lender accelerated the loan and the lender has taken all steps to realize upon its security (provided no sale of the property has yet

occurred) prior to the filing of the debtor's chapter 13 petition.  Some courts with federal bankruptcy jurisdiction have approved plans, based on the particular facts of the reorganization case, that effected the curing of a loan default by permitting the obligor to pay arrearages over a number of years.

Courts with federal bankruptcy jurisdiction have also indicated that the terms of a mortgage loan may be modified if the borrower has filed a petition under chapter 13.  These courts have suggested that such modifications may include reducing the amount of each monthly payment, changing the rate of interest, altering the repayment schedule and reducing the lender's security interest to the value of the residence, thus leaving the lender a general unsecured creditor for the difference between the value of the residence and the outstanding balance of the loan.  Federal bankruptcy law and limited case law indicate that the foregoing modifications could not be applied to the terms of a loan secured by property that is the principal residence of the debtor.  In all cases, the secured creditor is entitled to the value of its security plus post-petition interest, attorney's fees and costs to the extent the value of the security exceeds the debt.

In a chapter 11 case under the Federal Bankruptcy Code, the lender is precluded from foreclosing without authorization from the bankruptcy court.  The lender's lien may be transferred to other collateral and/or be limited in amount to the value of the lender's interest in the collateral as of the date of the bankruptcy.  The loan term may be extended, the interest rate may be adjusted to market rates and the priority of the loan may be subordinated to bankruptcy court-approved financing.  The bankruptcy court can, in effect, invalidate due-on-sale clauses through confirmed Chapter 11 plans of reorganization.

The Federal Bankruptcy Code provides priority to certain tax liens over the lender's security.  This may delay or interfere with the enforcement of rights in respect of a defaulted mortgage loan.  In addition, substantive requirements are imposed upon lenders in connection with the origination and the servicing of mortgage loans by numerous federal and some state consumer protection laws.  The laws include the Federal Truth in Lending Act, Real Estate Settlement Procedures Act, Equal Credit Opportunity Act, Fair Credit Billing Act, Fair Credit Reporting Act and related statutes and regulations.  These federal laws impose specific statutory liabilities upon lenders that originate loans and that fail to comply with the provisions of the law.  In some cases, this liability may affect assignees of the loans.

**Due-on-Sale Clauses in Mortgage Loans**

Due-on-sale clauses permit the lender to accelerate the maturity of the loan if the borrower sells or transfers, whether voluntarily or involuntarily, all or part of the real property securing the loan without the lender's prior written consent.  The enforceability of these clauses has been the subject of legislation or litigation in many states, and in some cases, typically involving single family residential mortgage transactions, their enforceability has been limited or denied.  In any event, the Garn-St. Germain Depository Institutions Act of 1982 preempts state constitutional, statutory and case law that prohibits the enforcement of due-on-sale clauses and permits lenders to enforce these clauses in accordance with their terms, subject to certain exceptions.  As a result, due-on-sale clauses have become generally enforceable except in those states whose legislatures exercised their authority to regulate the enforceability of such clauses with respect to mortgage loans that were (i) originated or assumed during the "window period"

under the Garn-St. Germain Act, which ended in all cases not later than October 15, 1982, and (ii) originated by lenders other than national banks, federal savings institutions and federal credit unions.  Freddie Mac has taken the position in its published mortgage servicing standards that, out of a total of eleven "window period states," five states (Arizona, Michigan, Minnesota, New Mexico and Utah) have enacted statutes extending, on various terms and for varying periods, the prohibition on enforcement of due-on-sale clauses with respect to certain categories of window period loans.  Also, the Garn-St. Germain Act does "encourage" lenders to permit assumption of loans at the original rate of interest or at some other rate less than the average of the original rate and the market rate.

In addition, under the Federal Bankruptcy Code, due-on-sale clauses may not be enforceable in bankruptcy proceedings and may, under certain circumstances, be eliminated in any modified mortgage resulting from bankruptcy proceedings.

## Enforceability of Prepayment and Late Payment Fees

Forms of notes, mortgages and deeds of trust used by lenders may contain provisions obligating the borrower to pay a late charge if payments are not timely made, and in some circumstances may provide for prepayment fees or penalties if the obligation is paid prior to maturity.  In certain states, there are or may be specific limitations upon the late charges a lender may collect from a borrower for delinquent payments.  Certain states also limit the amounts that a lender may collect from a borrower as an additional charge if the loan is prepaid.  Late charges and prepayment fees are typically retained by servicers as additional servicing compensation.  Although the Parity Act permits the collection of prepayment charges and late fees in connection with some types of eligible loans preempting any contrary state law prohibitions, some states may not recognize the preemptive authority of the Parity Act or have formally opted out of the Parity Act.  As a result, it is possible that prepayment charges and late fees may not be collected even on loans that provide for the payment of those charges.  The master servicer or another entity identified in the accompanying prospectus supplement will be entitled to all prepayment charges and late payment charges received on the loans and those amounts will not be available for payment on the bonds.  The Office of Thrift Supervision (OTS), the agency that administers the Parity Act for unregulated housing creditors, withdrew its favorable Parity Act regulations and Chief Counsel Opinions that previously authorized lenders to charge prepayment charges and late fees in certain circumstances notwithstanding contrary state law, effective with respect to loans originated on or after July 1, 2003.  However, the OTS's ruling does not retroactively affect loans originated before July 1, 2003.

## Equitable Limitations on Remedies

In connection with lenders' attempts to realize upon their security, courts have invoked general equitable principles.  The equitable principles are generally designed to relieve the borrower from the legal effect of his default under the loan documents.  Examples of judicial remedies that have been fashioned include judicial requirements that the lender undertake affirmative and expensive actions to determine the causes of the borrower's default and the likelihood that the borrower will be able to reinstate the loan.  In some cases, courts have substituted their judgment for the lender's judgment and have required that lenders reinstate loans or recast payment schedules in order to accommodate borrowers who are suffering from

temporary financial disability. In other cases, courts have limited the right of a lender to realize upon its security if the default under the security agreement is not monetary, such as the borrower's failure to adequately maintain the property or the borrower's execution of secondary financing affecting the property. Finally, some courts have been faced with the issue of whether or not federal or state constitutional provisions reflecting due process concerns for adequate notice require that borrowers under security agreements receive notices in addition to the statutorily-prescribed minimums. For the most part, these cases have upheld the notice provisions as being reasonable or have found that, in cases involving the sale by a trustee under a deed of trust or by a mortgagee under a mortgage having a power of sale, there is insufficient state action to afford constitutional protections to the borrower.

Most conventional single-family mortgage loans may be prepaid in full or in part without penalty. The regulations of the Office of Thrift Supervision prohibit the imposition of a prepayment penalty or equivalent fee for or in connection with the acceleration of a loan by exercise of a due-on-sale clause. A mortgagee to whom a prepayment in full has been tendered may be compelled to give either a release of the mortgage or an instrument assigning the existing mortgage. The absence of a restraint on prepayment, particularly with respect to mortgage loans having higher mortgage rates, may increase the likelihood of refinancing or other early retirements of such mortgage loans.

## Applicability of Usury Laws

Title V of the Depository Institutions Deregulation and Monetary Control Act of 1980 provides that state usury limitations shall not apply to certain types of residential first mortgage loans originated by certain lenders after March 31, 1980. Similar federal statutes were in effect with respect to mortgage loans made during the first three months of 1980. The Office of Thrift Supervision, as successor to the Federal Home Loan Bank Board, is authorized to issue rules and regulations and to publish interpretations governing implementation of Title V.

Title V authorizes any state to reimpose interest rate limits by adopting a state law before April 1, 1983 or by certifying that the voters of such state have voted in favor of any provision, constitutional or otherwise, which expressly rejects an application of the federal law. Fifteen states adopted such a law prior to the April 1, 1983 deadline. In addition, even where Title V is not rejected, any state is authorized by the law to adopt a provision limiting discount points or other charges on mortgage loans covered by Title V.

## The Home Improvement Contracts and the Manufactured Housing Contracts

### General

The Home Improvement Contracts and Manufactured Housing Contracts, other than those that are unsecured or secured by mortgages on real estate, generally are "chattel paper" or constitute "purchase money security interests," each as defined in the Uniform Commercial Code (UCC) in effect in the applicable jurisdiction. Pursuant to the UCC, the sale of chattel paper is treated in a manner similar to perfection of a security interest in chattel paper. Under the related agreement, the depositor will transfer physical possession of the contracts to the trustee or a custodian or may retain possession of the contracts as custodian for the trustee. In addition, the

depositor will make an appropriate filing of a UCC-1 financing statement in the appropriate states to give notice of the trustee's ownership of the contracts.  The contracts will typically not be stamped or otherwise marked to reflect their assignment from the depositor to the trustee.

Therefore, if through negligence, fraud or otherwise, a subsequent purchaser were able to take physical possession of the contracts without notice of such assignment, the trustee's interest in the contracts could be defeated.

*Security Interests in Home Improvements*

A Home Improvement Contract that is secured by the related home improvements grants to the originator of the contract a purchase money security interest in the related home improvements to secure all or part of the purchase price of the home improvements and related services.  A financing statement generally is not required to be filed to perfect a purchase money security interest in consumer goods. Purchase money security interests of this type are assignable.  In general, a purchase money security interest grants to the holder a security interest that has priority over a conflicting security interest in the same collateral and the proceeds of the collateral.  However, to the extent that the collateral subject to a purchase money security interest becomes a fixture, in order for the related purchase money security interest to take priority over a conflicting interest in the fixture, the holder's interest in the home improvement must generally be perfected by a timely fixture filing.  In general, under the UCC, a security interest does not exist under the UCC in ordinary building material incorporated into an improvement on land. Home Improvement Contracts that finance lumber, bricks, other types of ordinary building material or other goods that are deemed to lose their characterization, upon incorporation of the materials into the related property, will not be secured by a purchase money security interest in the home improvement being financed.

*Enforcement of Security Interest in Home Improvements*

So long as the home improvement has not become subject to real estate law, a creditor can repossess a home improvement securing a Home Improvement Contract by voluntary surrender, by "self-help" repossession that is "peaceful" (*i.e.*, without breach of the peace) or, in the absence of voluntary surrender and the ability to repossess without breach of the peace, by judicial process.  The holder of a Home Improvement Contract must give the debtor a number of days' notice, which varies from ten to 30 days depending on the state, prior to commencement of any repossession.  The UCC and consumer protection laws in most states place restrictions on repossession sales, including requiring prior notice to the debtor and commercial reasonableness in effecting the sale.  The law in most states also requires that the debtor be given notice of any sale prior to resale of the unit that the debtor may redeem it at or before resale.

Under the laws applicable in most states, a creditor is entitled to obtain a deficiency judgment from a debtor for any deficiency on repossession and resale of the property securing the debtor's loan.  However, some states impose prohibitions or limitations on deficiency judgments, and in many cases the defaulting borrower will have no assets from which to pay a judgment.

86

Certain other statutory provisions, including federal and state bankruptcy and insolvency laws and general equitable principles, may limit or delay the ability of a lender to repossess and resell collateral or enforce a deficiency judgment.

*Security Interests in the Manufactured Homes*

The manufactured homes securing the Manufactured Housing Contracts may be located in all 50 states and the District of Columbia.  Security interests in manufactured homes may be perfected either by notation of the secured party's lien on the certificate of title or by delivery of the required documents and payment of a fee to the state motor vehicle authority, depending on state law.  The security interests of the trustee in the manufactured homes will not be noted on the certificates of title or by delivery of the required documents and payment of fees to the applicable state motor vehicle authorities unless the related prospectus supplement so requires. With respect to each transaction, a decision will be made as to whether or not the security interests of the trustee in the manufactured homes will be noted on the certificates of title and the required documents and fees will be delivered to the applicable state motor vehicle authorities based upon, among other things, the practices and procedures of the related originator and servicer and after consultation with the applicable rating agency or rating agencies. In some nontitle states, perfection pursuant to the provisions of the UCC is required.  As manufactured homes have become large and often have been attached to their sites without any apparent intention to move them, courts in many states have held that manufactured homes, under particular circumstances, may become governed by real estate title and recording laws.  As a result, a security interest in a manufactured home could be rendered subordinate to the interests of other parties claiming an interest in the manufactured home under applicable state real estate law.  In order to perfect a security interest in a manufactured home under real estate laws, the secured party must file either a "fixture filing" under the provisions of the UCC or a real estate mortgage under the real estate laws of the state where the home is located.  These filings must be made in the real estate records office of the county where the manufactured home is located.  If so specified in the related prospectus supplement, the Manufactured Housing Contracts may contain provisions prohibiting the borrower from permanently attaching the manufactured home to its site.  So long as the borrower does not violate this agreement, a security interest in the manufactured home will be governed by the certificate of title laws or the UCC, and the notation of the security interest on the certificate of title or the filing of a UCC financing statement will be effective to maintain the priority of the security interest in the manufactured home.  If, however, a manufactured home is permanently attached to its site, the related lender may be required to perfect a security interest in the manufactured home under applicable real estate laws.

In the event that the owner of a manufactured home moves it to a state other than the state in which the manufactured home initially is registered, under the laws of most states the perfected security interest in the manufactured home would continue for four months after relocation and, after expiration of the four months, only if and after the owner re-registers the manufactured home in the new state.  If the owner were to relocate a manufactured home to another state and not re-register a security interest in that state, the security interest in the manufactured home would cease to be perfected.  A majority of states generally require surrender of a certificate of title to re-register a manufactured home.  Accordingly, the secured party must surrender possession if it holds the certificate of title to the manufactured home or, in the case of manufactured homes registered in states which provide for notation of lien on the

certificate of title, notice of surrender would be given to the secured party noted on the certificate of title.  In states which do not require a certificate of title for registration of a manufactured home, re-registration could defeat perfection.

Under the laws of most states, liens for repairs performed on a manufactured home and liens for personal property taxes take priority over a perfected security interest in the manufactured home.

### *Consumer Protection Laws*

The so-called "Holder-in-Due-Course" rule of the Federal Trade Commission is intended to defeat the ability of the transferor of a consumer credit contract that is the seller of goods that gave rise to the transaction (and certain related lenders and assignees) to transfer the contract free of notice of claims by the related debtor.  The effect of this rule is to subject the assignee of the contract to all claims and defenses the debtor could assert against the seller of goods.  Liability under this rule is limited to amounts paid under a contract; however, the obligor also may be able to assert the rule to set off remaining amounts due as a defense against a claim brought by the trustee against such obligor.  Numerous other federal and state consumer protection laws impose requirements applicable to the origination and lending pursuant to the contracts, including the Federal Truth in Lending Act, the Federal Trade Commission Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act and the Uniform Consumer Credit Code.  In the case of some of these laws, the failure to comply with their provisions may affect the enforceability of the related contract.

### *Applicability of Usury Laws*

Title V of the Depository Institutions Deregulation and Monetary Control Act of 1980 provides that, subject to the following conditions, state usury limitations shall not apply to any contract that is secured by a first lien on certain kinds of consumer goods.  The Home Improvement Contracts or Manufactured Housing Contracts would be covered if they satisfy certain conditions, among other things, governing the terms of any prepayments, late charges and deferral fees and requiring a 30-day notice period prior to instituting any action leading to repossession of the related unit.

Title V authorized any state to reimpose limitations on interest rates and finance charges by adopting before April 1, 1983 a law or constitutional provision that expressly rejects application of the federal law.  Fifteen states adopted such a law prior to the April 1, 1983 deadline.  In addition, even where Title V was not rejected, any state is authorized by the law to adopt a provision limiting discount points or other charges on loans covered by Title V.

## Installment Sales Contracts

The loans may also consist of installment sales contracts.  Under an installment sales contract the seller/lender retains legal title to the property and enters into an agreement with the purchaser/borrower for the payment of the purchase price, plus interest, over the term of the contract.  Only after full performance by the purchaser/borrower of the contract is the seller/lender obligated to convey title to the property to the borrower.  As with mortgage or deed

of trust financing, during the effective period of the installment sales contract, the borrower is generally responsible for maintaining the property in good condition and for paying real estate taxes, assessments and hazard insurance policy premiums associated with the property.

The method of enforcing the rights of the seller/lender under an installment sales contract varies on a state-by-state basis depending upon the extent to which state courts are willing, or able pursuant to state statute, to enforce the contract strictly according to the terms.  The terms of installment sales contracts generally provide that upon a default by the borrower, the borrower loses his right to occupy the property, the entire indebtedness is accelerated, and the borrower's equitable interest in the property is forfeited.  The seller/lender in such a situation does not have to foreclose in order to obtain title to the property, although in some cases a quiet title action is in order if the borrower has filed the installment sales contract in local land records and an ejectment action may be necessary to recover possession.  In a few states, particularly in cases of borrower default during the early years of an installment sales contract, the courts will permit ejectment of the buyer and a forfeiture of his interest in the property.  However, most state legislatures have enacted provisions by analogy to mortgage law protecting borrowers under installment sales contracts from the harsh consequences of forfeiture.  Under these statutes, a judicial or nonjudicial foreclosure may be required, the lender may be required to give notice of default and the borrower may be granted some grace period during which the installment sales contract may be reinstated upon full payment of the default amount and the borrower may have a post-foreclosure statutory redemption right.  In other states, courts in equity may permit a borrower with significant investment in the property under an installment sales contract for the sale of real estate to share in the proceeds of sale of the property after the indebtedness is repaid or may otherwise refuse to enforce the forfeiture clause.  Nevertheless, generally speaking, the lender's procedures for obtaining possession and clear title under an installment sales contract in a given state are simpler and less time-consuming and costly than are the procedures for foreclosing and obtaining clear title to a property subject to one or more liens.

## Civil Relief Act

Under the Servicemembers Civil Relief Act, or the Relief Act, members of all branches of the military on active duty, including draftees and reservists in military service,

- are entitled to have their interest rates reduced and capped at 6% per year, on obligations (including loans) incurred prior to the commencement of military service for the duration of military service, and

- may be entitled to a stay of proceedings on any kind of foreclosure or repossession action in the case of defaults on such obligations entered into prior to military service for the duration of military service, and

- may have the maturity of their obligations incurred prior to military service extended, the payments lowered and the payment schedule readjusted for a period of time after the completion of military service.

However, these benefits are subject to challenge by creditors and if, in the opinion of the court, the ability of a person to comply with his obligations is not materially impaired by military

service, the court may apply equitable principles accordingly.  Please note that various state laws may provide borrower protections similar, but not identical, to the Relief Act.

If a borrower's obligation to repay amounts otherwise due on a loan included in a trust fund for a series is relieved pursuant to the Relief Act or similar state statute, none of the trust fund, the servicer, the depositor or the trustee will be required to advance such amounts, and any related loss may reduce the amounts available to be paid to the holders of the related securities. Any shortfalls in interest collections on loans (or underlying loans), included in a trust fund for a series resulting from application of the Relief Act will be allocated to each class of securities of the series that is entitled to receive interest in respect of the loans (or underlying loans) in proportion to the interest that each class of securities would have otherwise been entitled to receive in respect of the loans (or underlying loans) had the interest shortfall not occurred.

## Forfeitures in Drug and RICO Proceedings

Federal law provides that property owned by persons convicted of drug-related crimes or of criminal violations of RICO can be seized by the government if the property was used in, or purchased with the proceeds of, these crimes. Under procedures contained in the Crime Control Act, the government may seize the property even before conviction. The government must publish notice of the forfeiture proceeding and may give notice to all parties "known to have an alleged interest in the property", including the holders of mortgage loans.

A lender may avoid forfeiture of its interest in the property if it establishes that: (1) its mortgage was executed and recorded before commission of the crime upon which the forfeiture is based, or (2) the lender was, at the time of execution of the mortgage, "reasonably without cause to believe" that the property was used in, or purchased with the proceeds of, illegal drug or RICO activities.

## The Sponsor

The sponsor will be EMC Mortgage Corporation ("EMC") for each series of securities unless otherwise indicated in the related prospectus supplement.  The sponsor was incorporated in the State of Delaware on September 26, 1990, as a wholly owned subsidiary corporation of The Bear Stearns Companies Inc., and is an affiliate of the depositor and the underwriter.  The sponsor was established as a mortgage banking company to facilitate the purchase and servicing of whole loan portfolios containing various levels of quality from "investment quality" to varying degrees of "non-investment quality" up to and including real estate owned assets ("REO"). The sponsor commenced operation in Texas on October 9, 1990.

Since its inception in 1990, the sponsor has purchased over $100 billion in residential whole loans and servicing rights, which include the purchase of newly originated alternative A, jumbo (prime) and sub-prime loans.  Loans are purchased on a bulk and flow basis.  The sponsor is one of the United States' largest purchasers of scratch and dent, sub-performing and non-performing residential mortgages and REO from various institutions, including banks, mortgage companies, thrifts and the U.S. government.  Loans are generally purchased with the ultimate strategy of securitization into an array of Bear Stearns' securitizations based upon product type and credit parameters, including those where the loan has become re-performing or cash-flowing.

Performing loans include first lien fixed rate and ARMs, as well as closed end fixed rate second liens and lines of credit ("HELOCs").  Performing loans acquired by the sponsor are subject to varying levels of due diligence prior to purchase.  Portfolios may be reviewed for credit, data integrity, appraisal valuation, documentation, as well as compliance with certain laws.  Performing loans purchased will have been originated pursuant to the sponsor's underwriting guidelines or the originator's underwriting guidelines that are acceptable to the sponsor.

Subsequent to purchase by the sponsor, performing loans are pooled together by product type and credit parameters and structured into RMBS, with the assistance of Bear Stearns' Financial Analytics and Structured Transactions Group, for distribution into the primary market.

The sponsor has been securitizing residential mortgage loans since 1999.

### The Depositor

The depositor, Bear Stearns Asset Backed Securities I LLC, was formed in the state of Delaware in January 2004, and is a wholly-owned subsidiary of The Bear Stearns Companies Inc.

The depositor will not engage in any activities other than to authorize, issue, sell, deliver, purchase and invest in (and enter into agreements in connection with), and/or to engage in the establishment of one or more trusts, which will issue and sell, bonds, notes, debt or equity securities, obligations and other securities and instruments.  The depositor's securities must be collateralized or otherwise secured by, or otherwise represent an interest in, among other things, receivables or pass-through certificates or participations or certificates of participation or beneficial ownership in one or more pools of receivables, and the proceeds of the foregoing, that arise in connection with loans secured by senior or junior mortgages on real estate or manufactured housing and any and all other commercial transactions and commercial, sovereign, student or consumer loans or indebtedness.  The depositor may purchase, acquire, own, hold, transfer, convey, service, sell, pledge, assign, finance and otherwise deal with such receivables, pass-through certificates, or participations or certificates of participation or beneficial ownership.  Article Three of the depositor's Limited Liability Company Agreement limits the depositor's activities to the above activities and certain related activities, such as credit enhancement with respect to depositor securities, and to any activities incidental to and necessary or convenient for the accomplishment of those purposes.

91

The depositor has been serving as a private secondary mortgage market conduit for residential mortgage loans since 2004. In conjunction with EMC's acquisition of mortgage loans, the depositor will execute a mortgage loan purchase agreement through which the loans will be transferred to itself. These loans are subsequently deposited in a common law or statutory trust, described in this prospectus, which will then issue the certificates.

After issuance and registration of the securities contemplated in this prospectus, in the related prospectus supplement and any supplement hereto, the depositor will have substantially no duties or responsibilities with respect to the pool assets or the securities, other than certain administrative duties as described in the related prospectus supplement.

## Use of Proceeds

The depositor will apply all or substantially all of the net proceeds from the sale of each of the related trust fund series of securities for one or more of the following purposes:

- to purchase the primary assets of the related trust fund,

- to repay indebtedness incurred to obtain funds to acquire the primary assets of the related trust fund,

- to establish any reserve funds described in the related prospectus supplement, and

- to pay costs of structuring and issuing the securities, including the costs of obtaining any credit enhancement.

If specified in the related prospectus supplement, the purchase of the primary assets for a series may be effected by delivering the securities to the sponsor or any other seller in exchange for the primary assets.

## Material Federal Income Tax Considerations

### General

The following summary of the material federal income tax consequences of the purchase, ownership, and disposition of the securities is based on the opinion of any one of Thacher Proffitt & Wood LLP, Orrick, Herrington & Sutcliffe LLP, Greenberg Traurig, LLP or other tax counsel designated in the prospectus supplement as tax counsel to the depositor or the trust. This summary is based upon the provisions of the Code, the regulations promulgated thereunder, including, where applicable, proposed regulations, and the judicial and administrative rulings and decisions now in effect, all of which are subject to change or possible differing interpretations. The statutory provisions, regulations, and interpretations on which this interpretation is based are subject to change either prospectively or retroactively.

The summary does not purport to deal with all aspects of federal income taxation that may affect particular investors in light of their individual circumstances. This summary focuses primarily upon investors who will hold securities as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Code. If penalties were asserted against

purchasers of the Securities offered hereunder in respect of their treatment of the Securities for tax purposes, the summary of tax considerations contained, and the opinions stated herein or in the prospectus supplement may not meet the conditions necessary for purchasers' reliance on that summary and those opinions to exculpate them from the asserted penalties. Prospective investors are encouraged to consult their own tax advisers concerning the federal, state, local and any other tax consequences as relates specifically to such investors in connection with the purchase, ownership and disposition of the securities.

The federal income tax consequences to securityholders will vary depending on whether:

- the securities of a series are classified as indebtedness;

- an election is made to treat the trust fund relating to a particular series of securities as one or more real estate mortgage investment conduits or REMICs under the Code;

- the securities represent an ownership interest in some or all of the assets included in the trust fund for a series; or

- an election is made to treat the trust fund relating to a particular series of certificates as a partnership.

The prospectus supplement for each series of securities will specify how the securities will be treated for federal income tax purposes and will discuss whether one or more REMIC elections, if any, will be made with respect to the series.

*Status as Real Property Loans*.   Except to the extent otherwise provided in the related prospectus supplement, if the securities are regular interests in a REMIC or represent interests in a grantor trust, in the opinion of tax counsel:

- securities held by a domestic building and loan association will constitute "loans... secured by an interest in real property" within the meaning of Section 7701(a)(19)(C)(v) of the Code; and

- securities held by a real estate investment trust will constitute "real estate assets" within the meaning of Section 856(c)(4)(A) of the Code and interest on securities will be considered "interest on obligations secured by mortgages on real property or on interests in real property" within the meaning of Section 856(c)(3)(B) of the Code.

- To the extent that the securities are neither regular interests in a REMIC nor interests in a grantor trust, they may not have the character described in the preceding sentence.

## Taxation of Debt Securities

*Interest and Acquisition Discount*.   Securities that are REMIC regular interests are generally taxable to holders in the same manner as evidences of indebtedness issued by the REMIC.  Stated interest on the securities that are REMIC regular interests will be taxable as ordinary income and taken into account using the accrual method of accounting, regardless of the holder's regular method of accounting.  Interest (other than original issue discount) on securities

(other than securities that are REMIC regular interests) which are characterized as indebtedness for federal income tax purposes will be includible in income by holders thereof in accordance with their usual methods of accounting. When we refer to "debt securities" in this section, we mean securities characterized as debt for federal income tax purposes, including securities that are REMIC regular interests.

Debt securities that permit interest to accrue for more than one year before the payments of that interest and certain of the other debt securities issued at a discount may be issued with "original issue discount" or OID. The following discussion is based in part on the regulations issued under Sections 1271 through 1273 and 1275 of the Code, or OID Regulations. Holders are encouraged to be aware, however, that the OID Regulations do not adequately address certain issues relevant to prepayable securities, such as the debt securities.

In general, OID is the difference between the stated redemption price at maturity of a debt security and its issue price. A holder of a debt security must include OID in gross income as ordinary interest income as it accrues under a method taking into account an economic accrual of the discount. In general, OID must be included in income in advance of the receipt of the cash representing that income. The amount of OID on a debt security will be considered to be zero if it is less than a *de minimis* amount determined under the Code.

The issue price of a debt security is the first price at which a substantial amount of debt securities of that class are sold to the public (excluding bond houses, brokers, underwriters or wholesalers). If less than a substantial amount of a particular class of debt securities is sold for cash on or prior to the closing date, the issue price for that class will be treated as the fair market value of that class on the closing date. The issue price of a debt security also includes the amount paid by an initial debt securityholder for accrued interest that relates to a period prior to the issue date of the debt security.

The stated redemption price at maturity of a debt security is the sum of all payments provided by the security other than "qualified stated interest" payments. Under the OID Regulations, qualified stated interest generally means interest payable at a single fixed rate or qualified variable rate (as described below), provided that the interest payments are unconditionally payable at intervals of one year or less during the entire term of the debt security. The OID Regulations state that interest payments are unconditionally payable only if a late payment or nonpayment is expected to be penalized or reasonable remedies exist to compel payment or the terms of the debt instrument otherwise make late payment or non-payment remote. Debt securities may provide for default remedies in the event of late payment or nonpayment of interest. Although the matter is not free from doubt, the trustee intends to treat interest on such debt securities as unconditionally payable and as constituting qualified stated interest. Interest is payable at a single fixed rate only if the rate appropriately takes into account the length of the interval between payments. Distributions of interest on debt securities with respect to which deferred interest will accrue will not constitute qualified stated interest payments, in which case the stated redemption price at maturity of such debt securities includes all distributions of interest thereon. Where the interval between the issue date and the first distribution date on a debt security is longer than the interval between subsequent distribution dates, the greater of (i) the interest foregone and (ii) the excess of the stated principal amount over the issue price will be included in the stated redemption price at maturity and tested under

the *de minimis* rule described below.  Where the interval between the issue date and the first distribution date on a debt security is shorter than the interval between subsequent distribution dates, all of the additional interest will be included in the stated redemption price at maturity and tested under the *de minimis* rule described below.  In the case of a debt security with a long first period that has non-*de minimis* OID, all stated interest in excess of interest payable at the effective interest rate for the long first period will be included in the stated redemption price at maturity and the debt security will generally have OID.  Holders of debt securities are encouraged to consult their own tax advisors to determine the issue price and stated redemption price at maturity of a debt security.

Under the *de minimis* rule, OID on a debt security will generally be considered to be zero if the OID is less than 0.25% of the stated redemption price at maturity of the debt security multiplied by the weighted average maturity of the debt security.  For this purpose, the weighted average maturity of the debt security is computed as the sum of the amounts determined by multiplying the number of full years (*i.e.*, rounding down partial years) from the issue date until each distribution in reduction of stated redemption price at maturity is scheduled to be made by a fraction, the numerator of which is the amount of each distribution included in the stated redemption price at maturity of the debt security and the denominator of which is the stated redemption price at maturity of the debt security.  Holders generally must report *de minimis* OID pro rata as principal payments are received, and such income will be capital gain if the debt security is held as a capital asset.  However, holders may elect to accrue all *de minimis* OID as well as market discount under a constant yield method.  See "—Election to Treat All Interest as Original Issue Discount" below.

In addition, under the OID Regulations, there is a special method for determining whether the OID for a debt security that bears interest for one or more accrual periods at a rate below the rate applicable for the remaining term of such debt security (*e.g.*, a debt security with teaser rates or interest holidays) is *de minimis*.  In that case, the OID will be caused to be more than *de minimis* only if the greater of (x) the foregone interest on such debt security resulting from the teaser rate or interest holiday and (y) any "true" discount on such debt security (*i.e.*, the excess of the debt security's stated principal amount over its issue price) exceeds the *de minimis* amount, in which case the stated interest on the debt security will be treated as OID rather than qualified stated interest.

Debt securities may provide for interest based on a qualified variable rate.  Under the OID Regulations, interest is generally treated as payable at a qualified variable rate and not as contingent interest if

- the interest is unconditionally payable at least annually,

- the issue price of the debt instrument does not exceed the total noncontingent principal payments, and

- interest is based on a "qualified floating rate," an "objective rate," or a combination of "qualified floating rates" that do not operate in a manner that significantly accelerates or defers interest payments on the debt security.

In the case of certain of the debt securities, none of the payments under the instrument will be considered qualified stated interest, and thus the aggregate amount of all payments will be included in the stated redemption price at maturity.

The Internal Revenue Service, or IRS, issued contingent payment regulations governing the calculation of OID on instruments having contingent interest payments.  These contingent payment regulations represent the only guidance regarding the views of the IRS with respect to contingent interest instruments and specifically do not apply for purposes of calculating OID on debt instruments subject to Section 1272(a)(6) of the Code, such as the debt securities.  Additionally, the OID Regulations do not contain provisions specifically interpreting Section 1272(a)(6) of the Code.  Until the Treasury issues guidance to the contrary, the trustee intends to base its computation of OID on Section 1272(a)(6) of the Code and the OID Regulations as described in this prospectus.  However, because no regulatory guidance currently exists under Section 1272(a)(6) of the Code, there can be no assurance that such methodology represents the correct manner of calculating OID.

The holder of a debt security issued with OID must include in gross income, for all days during its taxable year on which it holds the debt security, the sum of the "daily portions" of OID.  The amount of OID includible in income by a holder will be computed by allocating to each day during an accrual period a pro rata portion of the OID that accrued during the accrual period.  In the case of a debt security that is not a REMIC regular interest security and the principal payments on which are not subject to acceleration resulting from prepayments on the loans, the amount of OID includible in income of a holder for an accrual period (generally the period over which interest accrues on the debt instrument) will equal the product of the yield to maturity of the debt security and the adjusted issue price of the debt security, reduced by any payments of qualified stated interest.  The adjusted issue price is the sum of the debt security's issue price plus prior accruals of OID, reduced by the total payments made with respect to the debt security in all prior periods other than qualified stated interest payments.

Certain classes of the debt securities may be "pay-through securities," which are debt instruments that are subject to acceleration due to prepayments on other debt obligations securing those instruments.  The amount of OID to be included in the income of a holder of a pay-through security is computed by taking into account the prepayment rate assumed in pricing the debt instrument.  The amount of OID that will accrue during an accrual period on a pay-through security is the *excess*, if any, of the

- sum of

    (a)  the present value of all payments remaining to be made on the pay-through security as of the close of the accrual period and

    (b)  the payments during the accrual period of amounts included in the stated redemption price of the pay-through security,

*over*

- the adjusted issue price of the pay-through security at the beginning of the accrual period.

The present value of the remaining payments is to be determined on the basis of three factors:

- the original yield to maturity of the pay-through security (determined on the basis of compounding at the end of each accrual period and properly adjusted for the length of the accrual period),

- events that have occurred before the end of the accrual period and

- the assumption that the remaining payments will be made in accordance with the original prepayment assumption.

The effect of this method is to increase the portions of OID required to be included in income by a holder of a pay-through security to take into account prepayments with respect to the loans at a rate that exceeds the prepayment assumption, and to decrease (but not below zero for any period) the portions of OID required to be included in income by a holder of a pay-through security to take into account prepayments with respect to the loans at a rate that is slower than the prepayment assumption.  Although OID will be reported to holders of pay-through securities based on the prepayment assumption, no representation is made to holders that loans will be prepaid at that rate or at any other rate.

The depositor may adjust the accrual of OID on a class of securities that are REMIC regular interests in a manner that it believes to be appropriate, to take account of realized losses on the loans, although the OID Regulations do not provide for such adjustments.  If the IRS were to require that OID be accrued without such adjustments, the rate of accrual of OID for a class of securities that are REMIC regular interests could increase.

Certain classes of securities may represent more than one class of REMIC regular interests.  Unless otherwise provided in the related prospectus supplement, the applicable trustee intends, based on the OID Regulations, to calculate OID on such securities as if, solely for the purposes of computing OID, the separate regular interests were a single debt instrument.

A subsequent holder of a debt security will also be required to include OID in gross income, but a holder who purchases the debt security for an amount that exceeds its adjusted issue price will be entitled (as will an initial holder who pays more than a debt security's issue price) to offset such OID by comparable economic accruals of portions of the excess.

*Effects of Defaults and Delinquencies*.  Holders will be required to accrue interest and OID income with respect to the related securities without giving effect to delays and reductions in distributions attributable to a default or delinquency on the loans, except possibly to the extent that it can be established that such amounts are uncollectible.  As a result, the amount of income (including OID) reported by a holder of a security in any period could significantly exceed the amount of cash distributed to the holder in that period.  The holder will eventually be allowed a loss (or will be allowed to report a lesser amount of income) to the extent that the aggregate amount of distributions on the securities is reduced as a result of a loan default.  However, the timing and character of losses or reductions in income are uncertain and, accordingly, holders of securities are encouraged to consult their own tax advisors on this point.

97

*Interest Weighted Securities*.  An "interest weighted security" is a security that is a REMIC regular interest or a "stripped" security (as discussed under "—Tax Status as a Grantor Trust; General" below) the payments on which consist solely or primarily of a specified portion of the interest payments on qualified mortgages held by the REMIC or on loans underlying pass-through securities.  It is not clear how income should be accrued with respect to interest weighted securities.  The trustee intends to take the position that all of the income derived from an interest weighted security should be treated as OID and that the amount and rate of accrual of such OID should be calculated using the rules described above as applicable to debt instruments issued with OID and by treating none of the payments on the interest weighted security as qualified stated interest.  However, in the case of interest weighted securities that are entitled to some payments of principal and are REMIC regular interests, the IRS could assert that income derived from the interest weighted security should be calculated as if the security were a security purchased at a premium equal to the excess of the price paid by the holder for the security over its stated principal amount, if any.  Under this approach, a holder would be entitled to amortize such premium only if it has in effect an election under Section 171 of the Code with respect to all taxable debt instruments held by such holder, as described below.  Alternatively, the IRS could assert that an interest weighted security should be taxable under the rules governing bonds issued with contingent payments.  This treatment may be more likely in the case of interest weighted securities that are stripped securities as described below.  See "—Tax Status as a Grantor Trust— *Discount or Premium on Pass-Through Securities*" below.

*Variable Rate Debt Securities*.  In the case of debt securities bearing interest at a rate that varies directly, according to a fixed formula, with an objective index, it appears that the yield to maturity of the debt securities and, in the case of pay-through securities, the present value of all payments remaining to be made on the debt securities, should be calculated as if the interest index remained at its value as of the issue date of the securities.  Because the proper method of adjusting accruals of OID on a variable rate debt security is uncertain, holders of variable rate debt securities are encouraged to consult their own tax advisers regarding the appropriate treatment of such securities for federal income tax purposes.

*Market Discount*.  A purchaser of a security may be subject to the market discount rules of sections 1276 through 1278 of the Code.  A holder that acquires a debt security with more than a prescribed *de minimis* amount of "market discount" (generally, the excess of the principal amount of the debt security over the purchaser's purchase price) will be required to include accrued market discount in income as ordinary income in each month, but limited to an amount not exceeding the principal payments on the debt security received in that month and, if the securities are sold, the gain realized.  This market discount would accrue in a manner to be provided in Treasury regulations but, until such regulations are issued, market discount would in general accrue either

- on the basis of a constant yield (in the case of a pay-through security, taking into account a prepayment assumption) or

- in the ratio of (a) in the case of securities (or, in the case of a pass-through security, as set forth below, the loans underlying the security) not originally issued with OID, stated interest payable in the relevant period to total stated interest remaining to be paid at the beginning of the period or (b) in the case of securities (or, in the case of a pass-through security, as

described below, the loans underlying the security) originally issued at a discount, OID in the relevant period to total OID remaining to be paid.

Section 1277 of the Code provides that, regardless of the origination date of the debt security (or, in the case of a pass-through security, the underlying loans), the excess of interest paid or accrued to purchase or carry a security (or, in the case of a pass-through security, as described below, the underlying loans) with market discount over interest received on the security is allowed as a current deduction only to the extent such excess is greater than the market discount that accrued during the taxable year in which such interest expense was incurred.  In general, the deferred portion of any interest expense will be deductible when such market discount is included in income, including upon the sale, disposition, or repayment of the security (or, in the case of a pass-through security, an underlying loan).  A holder may elect to include market discount in income currently as it accrues on all market discount obligations acquired by such holder during the taxable year such election is made and thereafter, in which case the interest deferral rule will not apply.

*Premium*.  A holder who purchases a debt security (other than an interest weighted security to the extent described above) at a cost greater than its stated redemption price at maturity, generally will be considered to have purchased the security at a premium, which it may elect to amortize as an offset to interest income on the security (and not as a separate deduction item) on a constant yield method.  Although no regulations addressing the computation of premium accrual on comparable securities have been issued, the legislative history of The Tax Reform Act of 1986 indicates that premium is to be accrued in the same manner as market discount.  Accordingly, it appears that the accrual of premium on a class of pay-through securities will be calculated using the prepayment assumption used in pricing the class.  If a holder makes an election to amortize premium on a debt security, the election will apply to all taxable debt instruments (including all REMIC regular interests and all pass-through certificates representing ownership interests in a trust holding debt obligations) held by the holder at the beginning of the taxable year in which the election is made, and to all taxable debt instruments acquired thereafter by the holder, and will be irrevocable without the consent of the IRS.  Purchasers who pay a premium for the securities are encouraged to consult their tax advisers regarding the election to amortize premium and the method to be employed.

On December 30, 1997, the IRS issued final amortizable bond premium regulations dealing with amortizable bond premium.  The regulations specifically do not apply to prepayable debt instruments subject to Section 1272(a)(6) of the Code.  Absent further guidance from the IRS, the trustee intends to account for amortizable bond premium in the manner described above.  Prospective purchasers of the debt securities are encouraged to consult their tax advisors regarding the possible application of the amortizable bond premium regulations.

*Election to Treat All Interest as Original Issue Discount*.  The OID Regulations permit the holder of a debt security to elect to accrue all interest, discount (including *de minimis* market discount or OID) and premium, based on a constant yield method for debt securities acquired on or after April 4, 1994.  If such an election were to be made with respect to a debt security with market discount, the holder of the debt security would be deemed to have made an election to include in income currently market discount with respect to all other debt instruments having market discount that such holder of the debt security acquires during the year of the election or

thereafter.  Similarly, the holder of a debt security that makes this election for a debt security that is acquired at a premium will be deemed to have made an election to amortize bond premium with respect to all debt instruments having amortizable bond premium that the holder owns or acquires.  The election to accrue interest, discount and premium on a constant yield method with respect to a debt security is irrevocable.

## Taxation of the REMIC and its Holders

*General*.  In the opinion of tax counsel, if one or more REMIC elections, as applicable, are made with respect to a series of securities, then the arrangement by which the securities of that series are issued will be treated as one or more REMICs, as long as all of the provisions of the applicable governing agreement are complied with and the statutory and regulatory requirements are satisfied.  Securities will be designated as "regular interests" or "residual interests" in a REMIC, as specified in the related prospectus supplement.

Except to the extent specified otherwise in a prospectus supplement, if a REMIC election is made with respect to a series of securities:

- securities held by a domestic building and loan association will constitute "a regular or a residual interest in a REMIC" within the meaning of Section 7701(a)(19)(C)(xi) of the Code (assuming that at least 95% of the REMIC's assets consist of cash, government securities, "loans secured by an interest in real property," and other types of assets described in Section 7701(a)(19)(C) of the Code); and

- securities held by a real estate investment trust will constitute "real estate assets" within the meaning of Section 856(c)(4)(A) of the Code, and income with respect to the securities will be considered "interest on obligations secured by mortgages on real property or on interests in real property" within the meaning of Section 856(c)(3)(B) of the Code (assuming, for both purposes, that at least 95% of the REMIC's assets are qualifying assets).

If less than 95% of the REMIC's assets consists of assets described in the immediately preceding bullets, then a security will qualify for the tax treatment described in the previous sentence in the proportion that such REMIC's assets are qualifying assets.

## REMIC Expenses; Single Class REMICs

As a general rule, all of the expenses of a REMIC will be taken into account by holders of the residual interest securities.  In the case of a "single class REMIC," however, the expenses will be allocated under Treasury regulations among the holders of the REMIC regular interest securities and the holders of the REMIC residual interest securities on a daily basis in proportion to the relative amounts of income accruing to each holder on that day.  A "single class REMIC" refers to any REMIC that would be classified as a grantor trust in the absence of a REMIC election, including a REMIC with more than one class of interests that would, nevertheless, be classified as a grantor trust pursuant to Section 301.7701-4(c) of the Treasury regulations, absent such an election.  In the case of a holder of a REMIC regular interest security who is an individual or a "pass-through interest holder" (including certain pass-through entities but not including real estate investment trusts), the expenses will be deductible only to the extent that the

100

expenses, plus other "miscellaneous itemized deductions" of the holder, exceed 2% of the holder's adjusted gross income and not deductible for purposes of calculating an individual holder's alternative minimum tax liability.  In addition, the amount of itemized deductions otherwise allowable for the taxable year for an individual whose adjusted gross income exceeds the applicable amount will be reduced.

This reduction is scheduled to be phased-out over a five-year period beginning in 2006.  The reduction or disallowance of this deduction may have a significant impact on the yield of the REMIC regular interest security to the holder.  In general terms, a single class REMIC is one that either

- would qualify, under existing Treasury regulations, as a grantor trust if it were not a REMIC (treating all interests as ownership interests, even if they would be classified as debt for federal income tax purposes), or

- is similar to such a trust and is structured with the principal purpose of avoiding the single class REMIC rules.

The expenses of the REMIC will typically be allocated to holders of the related REMIC residual interest securities.

## Taxation of the REMIC

*General*.  Although a REMIC is a separate entity for federal income tax purposes, a REMIC is not generally subject to entity-level tax.  Rather, the taxable income or net loss of a REMIC is taken into account by the holders of the REMIC residual interests.  As described above, the REMIC regular interests are generally taxable as debt of the REMIC.  Qualification as a REMIC requires ongoing compliance with certain conditions.  Although a REMIC is not generally subject to federal income tax, the Code provides that failure to comply with one or more of the ongoing requirements of the Code for REMIC status during any taxable year, including the implementation of restrictions on the purchase and transfer of the residual interests in a REMIC as described below under "—Taxation of Owners of Residual Interest Securities", would cause the trust not to be treated as a REMIC for that year and thereafter.  In this event, the entity may be taxable as a separate corporation and the related certificates may not be accorded the status or given the tax treatment described below.

*Calculation of REMIC Income*.  The taxable income or net loss of a REMIC is determined under an accrual method of accounting and in the same manner as in the case of an individual, with certain adjustments.  In general, the taxable income or net loss will be the difference between

- the gross income produced by the REMIC's assets, including stated interest and any OID or market discount on loans and other assets, and

- deductions, including stated interest and OID accrued on the REMIC regular interest securities, amortization of any premium with respect to loans, and servicing fees and other expenses of the REMIC.

A holder of a REMIC residual interest security that is an individual or a "pass-through interest holder" (including certain pass-through entities, but not including real estate investment trusts) will be unable to deduct servicing fees payable on the loans or other administrative expenses of the REMIC for a given taxable year, to the extent that these expenses, when aggregated with the holder's other miscellaneous itemized deductions for that year, do not exceed 2% of the holder's adjusted gross income.

For purposes of computing its taxable income or net loss, a REMIC should have an initial aggregate tax basis in its assets equal to the aggregate fair market value of the regular interests and the residual interests on the startup day (generally, the day that the interests are issued).  That aggregate basis will be allocated among the assets of the REMIC in proportion to their respective fair market values.

The OID provisions of the Code apply to loans of individuals originated on or after March 2, 1984, and the market discount provisions apply to loans originated after July 18, 1984. Subject to possible application of the *de minimis* rules, the method of accrual by a REMIC of OID income on such loans will be equivalent to the method under which holders of pay-through securities accrue OID (*i.e.*, under the constant yield method taking into account the prepayment assumption). A REMIC will deduct OID on the regular interest securities in the same manner that the holders of the regular interest securities include such discount in income, but without regard to the *de minimis* rules. See "—Taxation of Debt Securities" above. However, a REMIC that acquires loans at a market discount must include such market discount in income currently, as it accrues, on a constant interest basis.

To the extent that a REMIC's basis allocable to loans that it holds exceeds their principal amounts, the resulting premium, if attributable to mortgages originated after September 27, 1985, will be amortized over the life of the loans (taking into account the prepayment assumption) on a constant yield method. Although the law is somewhat unclear regarding recovery of premium attributable to loans originated on or before that date, it is possible that the premium may be recovered in proportion to payments of loan principal.

*Prohibited Transactions and Contributions Tax*. A REMIC will be subject to a 100% tax on any net income derived from a "prohibited transaction." For this purpose, net income will be calculated without taking into account any losses from prohibited transactions or any deductions attributable to any prohibited transaction that resulted in a loss. In general, prohibited transactions include:

- subject to limited exceptions, the sale or other disposition of any qualified mortgage transferred to the REMIC;

- subject to a limited exception, the sale or other disposition of a cash flow investment;

- the receipt of any income from assets not permitted to be held by the REMIC pursuant to the Code; or

- the receipt of any fees or other compensation for services rendered by the REMIC.

It is anticipated that a REMIC will not engage in any prohibited transactions in which it would recognize a material amount of net income. In addition, subject to a number of exceptions, a tax is imposed at the rate of 100% on amounts contributed to a REMIC after the close of the three-month period beginning on the startup day. The holders of REMIC residual interest securities will generally be responsible for the payment of any taxes imposed on the REMIC. However, to the extent not paid by the holders of the REMIC residual interest securities or otherwise, taxes will be paid out of the trust fund and will be allocated pro rata to all outstanding classes of securities of the REMIC.

## Taxation of Holders of Residual Interest Securities

The holder of a certificate representing a REMIC residual interest will take into account the "daily portion" of the taxable income or net loss of the REMIC for each day during the

taxable year on which the holder held the residual interest security. The daily portion is determined by allocating to each day in any calendar quarter its ratable portion of the taxable income or net loss of the REMIC for that quarter, and by allocating that amount among the holders (on that day) of the residual interest securities in proportion to their respective holdings on that day.

The holder of a residual interest security must report its proportionate share of the taxable income of the REMIC whether or not it receives cash distributions from the REMIC attributable to income or loss. The reporting of taxable income without corresponding distributions could occur, for example, if the loans held by the REMIC were issued or acquired at a discount, since mortgage prepayments cause recognition of discount income, while the corresponding portion of the prepayment could be used in whole or in part to make principal payments on REMIC regular interests securities issued without any discount or at an insubstantial discount. (If this occurs, it is likely that cash distributions will exceed taxable income in later years.) The taxable income of a REMIC may also be greater in earlier years than later years as a result of the fact that interest expense deductions, as a percentage of outstanding principal on the REMIC regular interest securities, will typically increase over time as lower yielding securities are paid, whereas interest income with respect to loans will generally remain constant over time as a percentage of loan principal.

In any event, because the holder of a REMIC residual interest security is taxed on the net income of the REMIC, the taxable income derived from the residual interest security in a given taxable year will not be equal to the taxable income associated with investment in a corporate bond or stripped instrument having similar cash flow characteristics and pretax yield. Therefore, the after-tax yield on a residual interest security may be less than that of a corporate bond or stripped instrument, or may be negative in the case of a REMIC residual interest security that is expected to receive little or no cash flow.

*Limitation on Losses*. The amount of the REMIC's net loss that a holder may take into account currently is limited to the holder's adjusted basis at the end of the calendar quarter in which the loss arises. A holder's basis in a REMIC residual interest security will initially equal the holder's purchase price, and will subsequently be increased by the amount of the REMIC's taxable income allocated to the holder, and decreased (but not below zero) by the amount of distributions made and the amount of the REMIC's net loss allocated to the holder. Any disallowed loss may be carried forward indefinitely, but may be used only to offset income generated by the same REMIC. The ability of holders of residual interest securities to deduct net losses may be subject to additional limitations under the Code. Holders are encouraged to consult their tax advisers with respect to such additional limitations.

*Distributions*. Distributions on a REMIC residual interest security (whether at their scheduled times or as a result of prepayments) will generally not result in any additional taxable income or loss to a holder of the residual interest security. If the amount of the payment exceeds the holder's adjusted basis in the residual interest security, however, the holder will recognize gain (treated as gain from the sale of the residual interest security) to the extent of the excess.

*Sale or Exchange.* The holder of a REMIC residual interest security will recognize gain or loss on the sale or exchange of the residual interest security equal to the difference, if any, between the amount realized and the holder's adjusted basis in the residual interest security at the time of sale or exchange. A holder's adjusted basis in a residual interest security generally equals the cost of the residual interest security increased by the taxable income of the REMIC that was included in the income of the holder and decreased by distributions received thereon by the holder and amounts of the REMIC net loss allocated to the holder. Except to the extent provided in Treasury regulations which have not yet been issued, any loss upon disposition of a residual interest security will be disallowed if the selling holder disposing of such residual interest security acquires any other residual interest in a REMIC or similar mortgage pool within six months before or after disposition. In that event, the loss will be used to increase the residual interest securityholder's adjusted basis in the newly acquired residual interest or similar security.

*Excess Inclusions.* The portion of the REMIC taxable income of a holder of a residual interest security consisting of "excess inclusion" income may not be offset by other deductions or losses, including net operating losses, on the holder's federal income tax return. Further, if the holder of a residual interest security is an organization subject to the tax on unrelated business income imposed by Section 511 of the Code, the holder's excess inclusion income will be treated as unrelated business taxable income of the holder. In addition, under Treasury regulations yet to be issued, if a real estate investment trust, a regulated investment company, a common trust fund, or certain cooperatives were to own a residual interest security, a portion of dividends (or other distributions) paid by the real estate investment trust (or other entity) would be treated as excess inclusion income. If a residual interest security is owned by a foreign person, excess inclusion income is subject to tax and withholding at a rate of 30%, which may not be reduced by treaty, is not eligible for treatment as "portfolio interest" and is subject to certain additional limitations. See "—Tax Treatment of Foreign Investors" below.

In addition, the Code provides three rules for determining the effect of excess inclusions on the alternative minimum taxable income of a residual interest securityholder.

- *First*, alternative minimum taxable income for the residual holder is determined without regard to the special rule that taxable income cannot be less than excess inclusions.

- *Second*, the residual holder's alternative minimum taxable income for a tax year cannot be less than excess inclusions for the year.

- *Third*, the amount of any alternative minimum tax net operating loss deductions must be computed without regard to any excess inclusions.

The excess inclusion portion of a REMIC's income is generally equal to the *excess*, if any, of

- REMIC taxable income for the quarterly period allocable to a residual interest security,

over

- the daily accruals for such quarterly period of (i) 120% of the long term applicable federal rate on the startup day multiplied by (ii) the adjusted issue price of the residual interest security at the beginning of the quarterly period.

The adjusted issue price of a residual interest security at the beginning of each calendar quarter will equal its issue price (calculated in a manner analogous to the determination of the issue price of a regular interest security), increased by the aggregate of the daily accruals for prior calendar quarters, and decreased (but not below zero) by the amount of loss allocated to a holder and the amount of distributions made on the residual interest security before the beginning of the quarter. The long-term federal rate, which is announced monthly by the Treasury Department, is an interest rate that is based on the average market yield of outstanding marketable obligations of the United States government having remaining maturities in excess of nine years.

Under the REMIC regulations, transfers of residual interest securities may be disregarded in certain circumstances.  See "—*Restrictions on Ownership and Transfer of Residual Interest Securities*" and "—Tax Treatment of Foreign Investors" below.

*Restrictions on Ownership and Transfer of Residual Interest Securities*.  As a condition to qualification as a REMIC, reasonable arrangements must be made to prevent the ownership of a REMIC residual interest by any "disqualified organization" including the United States, any State or political subdivision thereof, any foreign government, any international organization, or any agency or instrumentality of any of the foregoing, a rural electric or telephone cooperative described in Section 1381(a)(2)(C) of the Code, any entity exempt from the tax imposed by sections 1 through 1399 of the Code, if the entity is not subject to tax on its unrelated business income, or an electing large partnership within the meaning of Section 775 of the Code. Accordingly, the applicable pooling and servicing agreement will prohibit disqualified organizations from owning a residual interest security.  In addition, no transfer of a residual interest security will be permitted unless the proposed transferee shall have furnished to the trustee an affidavit representing and warranting that it is neither a disqualified organization nor an agent or nominee acting on behalf of a disqualified organization.

If a residual interest security is transferred to a disqualified organization (in violation of the restrictions set forth above), a substantial tax will be imposed on the transferor of the residual interest security at the time of the transfer.  In addition, if a disqualified organization holds an interest in a pass-through entity (including, among others, a partnership, trust, real estate investment trust, regulated investment company, or any person holding as nominee an interest in a pass-through entity) that owns a residual interest security, the pass-through entity will be required to pay an annual tax on its allocable share of the excess inclusion income of the REMIC.

The REMIC regulations disregard certain transfers of REMIC residual interests, in which case the transferor continues to be treated as the owner of the REMIC residual interests and thus continues to be subject to tax on its allocable portion of the net income of the REMIC.  Under the REMIC Regulations, a transfer of a "noneconomic residual interest" (as defined below) to a holder of a residual interest (other than a holder who is not a U.S. Person, as defined in "Tax Treatment of Foreign Investors" below) is disregarded for all federal income tax purposes if a significant purpose of the transfer was to enable the transferor to impede the assessment or

106

collection of tax.  A residual interest in a REMIC (including a residual interest with a positive value at issuance) is a "noneconomic residual interest" unless, at the time of the transfer, (i) the present value of the expected future distributions on the residual interest at least equals the product of the present value of the anticipated excess inclusions and the highest corporate income tax rate in effect for the year in which the transfer occurs, and (ii) the transferor reasonably expects that the transferee will receive distributions from the REMIC at or after the time at which taxes accrue on the anticipated excess inclusions in an amount sufficient to satisfy the accrued taxes on each excess inclusion.  The present value of the anticipated excess inclusions and the present value of the expected futures distributions are determined in the same manner as determined in connection with the transfer of a residual interest to a disqualified organization. The REMIC regulations explain that a significant purpose to impede the assessment or collection of tax exists if the transferor, at the time of the transfer, either knew or should have known that the transferee would be unwilling or unable to pay taxes due on its share of the taxable income of the REMIC.  A safe harbor is provided if (i) the transferor conducted, at the time of the transfer, a reasonable investigation of the financial condition of the transferee and found that the transferee historically had paid its debts as they became due and found no significant evidence to indicate that the transferee would not continue to pay its debts as they came due in the future, (ii) the transferee represents to the transferor that it understands that, as the holder of the noneconomic residual interest, the transferee may incur tax liabilities in excess of any cash flows generated by the interest and that the transferee intends to pay taxes associated with holding the residual interest as they become due, (iii) the transferee represents to the transferor that it will not cause income from the noneconomic residual interest to be attributable to a foreign permanent establishment or fixed base (within the meaning of an applicable income tax treaty) of the transferee or any other person, and (iv) one of the two following tests is satisfied:

(a)     the "formula test":

the present value of the anticipated tax liabilities associated with the holding of the noneconomic residual interest will not exceed the sum of:

(1)     the present value of any consideration given to the transferee to acquire the residual interest;

(2)     the present value of the expected future distributions on the residual interest; and

(3)     the present value of the anticipated tax savings associated with holding the residual interest as the REMIC generates losses; or

(b)     the "asset test":

(1)     at the time of the transfer, and at the close of each of the transferee's two fiscal years preceding the transferee's fiscal year of the transfer, the transferee's gross assets for financial reporting purposes exceed $100 million and its net assets for financial reporting purposes exceed $10 million, excluding obligations of any related persons or any other

107

asset if a principal purpose for holding or acquiring the other asset is to permit the transferee to satisfy the asset test.

(2)     the transferee must be a domestic "C" corporation (other than a corporation exempt from taxation, a regulated investment company or real estate investment trust); the transferee must agree in writing that any subsequent transfer of the residual interest would be to an eligible "C" corporation and would meet the requirements for a safe harbor transfer, and the facts and circumstances known to the transferor on or before the date of the transfer must not reasonably indicate that the taxes associated with ownership of the residual interest will not be paid by the transferee; and

(3)     a reasonable person would not conclude, based on the facts and circumstances known to the transferor on or before the date of the transfer (including the consideration given to the transferee to acquire the noncomonic residual interest in the REMIC), that the taxes associated with the residual interest will not be paid.

For purposes of the computation in clause (a), the transferee is assumed to pay tax at the highest corporate rate of tax specified in the Code or, in certain circumstances, the alternative minimum tax rate. Further, present values generally are computed using a discount rate equal to the short-term applicable federal rate set forth in Section 1274(d) of the Code for the month of the transfer and the compounding period used by the transferee.

*Mark-to-Market Rules*.  A REMIC residual interest security cannot be marked-to-market.

## Administrative Matters

The REMIC's books must be maintained on a calendar year basis and the REMIC must file an annual federal income tax return. The REMIC will also be subject to the procedural and administrative rules of the Code applicable to partnerships, including the determination of any adjustments to, among other things, items of REMIC income, gain, loss, deduction, or credit, by the IRS in a unified administrative proceeding.

## Inducement Fees

Final regulations addressing the federal income tax treatment of "inducement fees" received by transferees of noneconomic REMIC residual interests require inducement fees to be included in income over a period reasonably related to the period during which the applicable REMIC is expected to generate taxable income or net loss allocable to the holder of the noneconomic residual interest. Under two safe harbor methods currently set forth in the regulations, inducement fees would be permitted to be included in income:

(i)     in the same amounts and over the same period that the taxpayer uses for financial reporting purposes, provided that such period is not shorter than the period the applicable REMIC is expected to generate taxable income, or

(ii)     ratably over the remaining anticipated weighted average life of the applicable REMIC, determined based on actual distributions projected as remaining to be made on all the regular and residual interests issued by the REMIC under the prepayment assumption.

If the holder of a residual interest sells or otherwise disposes of the residual interest, any unrecognized portion of the inducement fee would be required to be taken into account at the time of the sale or disposition.

Prospective purchasers of the noneconomic REMIC residual interests are encouraged to consult with their tax advisors regarding the effect of these final regulations.

## Tax Status as a Grantor Trust

*General*.  As further specified in the related prospectus supplement, if a REMIC election is not made and the trust fund is not structured as a partnership, then the trust fund relating to a series of securities may be classified for federal income tax purposes as a grantor trust under Subpart E, Part 1 of Subchapter J of the Code and not as an association taxable as a corporation. We refer to the securities of a series of this type as "pass-through securities."  In some series there will be no separation of the principal and interest payments on the loans.  In these circumstances, a holder will be considered to have purchased a pro rata undivided interest in each of the loans.  In the case of "stripped securities", sale of the securities will produce a separation in the ownership of all or a portion of the principal payments from all or a portion of the interest payments on the loans.

Each holder must report on its federal income tax return its share of the gross income derived from the loans (not reduced by the amount payable as trust expense fees to the applicable trustee and the servicer and similar fees), at the same time and in the same manner as the items would have been reported under the holder's tax accounting method had it held its interest in the loans directly, received directly its share of the amounts received with respect to the loans, and paid directly its share of the trust expense fees.  In the case of pass-through securities other than stripped securities, income will consist of a pro rata share of all of the income derived from all of the loans and, in the case of stripped securities, income will consist of a pro rata share of the income derived from each stripped bond or stripped coupon in which the holder owns an interest. The holder of a security will generally be entitled to deduct trust expense fees under Section 162 or Section 212 of the Code to the extent that such fees represent "reasonable" compensation for the services rendered by the applicable trustee and the servicer (or third parties that are compensated for the performance of services).  In the case of a noncorporate holder, however, trust expense fees (to the extent not otherwise disallowed, *e.g.*, because they exceed reasonable compensation) will be deductible in computing the holder's regular tax liability only to the extent that the fees, when added to other miscellaneous itemized deductions, exceed 2% of adjusted gross income and may not be deductible to any extent in computing the holder's alternative minimum tax liability.  In addition, the amount of itemized deductions otherwise allowable for the taxable year for an individual whose adjusted gross income exceeds the applicable amount will be reduced.

This reduction is scheduled to be phased-out over a five-year period beginning in 2006.

*Discount or Premium on Pass-Through Securities*.  The holder's purchase price of a pass-through security is to be allocated among the loans in proportion to their fair market values, determined as of the time of purchase of the securities.  In the typical case, the trustee (to the extent necessary to fulfill its reporting obligations) will treat each loan as having a fair market value proportional to the share of the aggregate principal balances of all of the loans that it represents, since the securities, will have a relatively uniform interest rate and other common characteristics.  To the extent that the portion of the purchase price of a pass-through security allocated to a loan (other than to a right to receive any accrued interest thereon and any undistributed principal payments) is less than or greater than the portion of the principal balance of the loan allocable to the security, the interest in the loan allocable to the pass-through security will be deemed to have been acquired at a discount or premium, respectively.

The treatment of any discount will depend on whether the discount represents OID or market discount.  In the case of a loan with OID in excess of a prescribed *de minimis* amount or a stripped security, a holder of the security will be required to report as interest income in each taxable year its share of the amount of OID that accrues during that year in the manner described above.  OID with respect to a loan could arise, for example, by virtue of the financing of points by the originator of the loan, or by virtue of the charging of points by the originator of the loan in an amount greater than a statutory *de minimis* exception, in circumstances under which the points are not currently deductible pursuant to applicable Code provisions.  Any market discount or premium on a loan will be includible in income, generally in the manner described above, except that in the case of pass-through securities, market discount is calculated with respect to the loans underlying the security, rather than with respect to the security itself.  A holder that acquires an interest in a loan originated after July 18, 1984 with more than a *de minimis* amount of market discount (generally, the excess of the principal amount of the loan over the purchaser's allocable purchase price) will be required to include accrued market discount in income in the manner set forth above.  See "—Taxation of Debt Securities —*Market Discount*" and "—*Premium*" above.

In the case of market discount on a pass-through security attributable to loans originated on or before July 18, 1984, the holder generally will be required to allocate the portion of the discount that is allocable to a loan among the principal payments on the loan and to include the discount allocable to each principal payment in ordinary income at the time the principal payment is made.  This treatment would generally result in discount being included in income at a slower rate than discount would be required to be included in income using the method described in the preceding paragraph.

*Stripped Securities*.  A stripped security may represent a right to receive only a portion of the interest payments on the loans, a right to receive only principal payments on the loans, or a right to receive certain payments of both interest and principal.  Ratio stripped securities may represent a right to receive differing percentages of both the interest and principal on each loan.  Pursuant to Section 1286 of the Code, the separation of ownership of the right to receive some or all of the interest payments on an obligation from ownership of the right to receive some or all of the principal payments results in the creation of "stripped bonds" with respect to principal payments and "stripped coupons" with respect to interest payments.  Section 1286 of the Code applies the OID rules to stripped bonds and stripped coupons.  For purposes of computing OID, a

stripped bond or a stripped coupon is treated as a debt instrument issued on the date that such stripped interest is purchased with an issue price equal to its purchase price or, if more than one stripped interest is purchased, the ratable share of the purchase price allocable to the stripped interest.

Servicing fees in excess of reasonable servicing fees will be treated under the stripped bond rules.  If the excess servicing fee is less than 100 basis points (*i.e.*, 1% interest on the loan's principal balance) or the securities are initially sold with a *de minimis* discount (assuming no prepayment assumption is required), any non-*de minimis* discount arising from a subsequent transfer of the securities should be treated as market discount.  The IRS appears to require that reasonable servicing fees be calculated on a loan by loan basis, which could result in some loans being treated as having more than 100 basis points of interest stripped off.

Section 1272(a)(6) of the Code requires that a prepayment assumption be used in computing the accrual of original issue discount with respect to some categories of debt instruments, and that adjustments be made in the amount and rate of accrual of the discount when prepayments do not conform to the prepayment assumption. To the extent the stripped securities represent an interest in any pool of debt instruments the yield on which may be affected by reason of prepayments, those provisions will apply to the stripped securities. It is unclear whether those provisions would be applicable to stripped securities that do not represent an interest in any such pool, or whether use of a prepayment assumption may be required or permitted in the absence of these provisions. It is also uncertain, if a prepayment assumption is used, whether the assumed prepayment rate would be determined based on conditions at the time of the first sale of the stripped securities or, with respect to any subsequent holder, at the time of purchase of the stripped securities by that holder.

The accrual of income on the stripped securities will be significantly slower if a prepayment assumption is permitted to be made than if yield is computed assuming no prepayments. It currently is intended to base information returns or reports to the IRS and holders on the prepayment assumption disclosed in the related prospectus supplement and on a constant yield computed using a representative initial offering price for each class of securities. However, none of the company, the master servicer or the trustee will make any representation that the mortgage loans will in fact prepay at a rate conforming to the prepayment assumption or at any other rate, and holders are encouraged to bear in mind that the use of a representative initial offering price will mean that the information returns or reports, even if otherwise accepted as accurate by the IRS, will in any event be accurate only as to the initial holders of each series who bought at that price. Prospective purchasers of the stripped securities are encouraged to consult their own tax advisors regarding the use of the prepayment assumption.

It is unclear under what circumstances, if any, the prepayment of a mortgage loan will give rise to a loss to the holder of a stripped security. If a stripped security is treated as a single instrument (rather than an interest in discrete mortgage loans) and the effect of prepayments is taken into account in computing yield with respect to the stripped security, it appears that no loss may be available as a result of any particular prepayment unless prepayments occur at a rate faster than the prepayment assumption. However, if a stripped security is treated as an interest in discrete mortgage loans, or if the prepayment assumption is not used, then when a mortgage loan

is prepaid, the holder of a stripped security should be able to recognize a loss equal to the portion of the adjusted issue price of the stripped security that is allocable to the mortgage loan.

In the case of a stripped security that is an interest weighted security, the applicable trustee intends, absent contrary authority, to report income to holders as OID, in the manner described above for interest weighted securities.

*Possible Alternative Characterizations*.  The characterizations of the stripped securities described above are not the only possible interpretations of the applicable Code provisions. Among other possibilities, the IRS could contend that:

- in certain series, each non-interest weighted security is composed of an unstripped undivided ownership interest in loans and an installment obligation consisting of stripped principal payments;

- the non-interest weighted securities are subject to the contingent payment provisions of the regulations; or

- each interest weighted stripped security is composed of an unstripped undivided ownership interest in loans and an installment obligation consisting of stripped interest payments.

Given the variety of alternatives for treatment of the stripped securities and the different federal income tax consequences that result from each alternative, potential purchasers are urged to consult their own tax advisers regarding the proper treatment of the securities for federal income tax purposes.

*Character as Qualifying Loans*.  In the case of stripped securities, there is no specific legal authority existing regarding whether the character of the securities, for federal income tax purposes, will be the same as the underlying loans.  The IRS could take the position that the loans' character is not carried over to the securities in such circumstances.  Pass-through securities will be, and, although the matter is not free from doubt, stripped securities should be considered to represent:

- "real estate assets" within the meaning of section 856(c)(4)(A) of the Code; and

- "loans secured by an interest in real property" within the meaning of section 7701(a)(19)(C)(v) of the Code.

Interest income attributable to pass-through securities will be and to stripped securities should be considered to represent "interest on obligations secured by mortgages on real property or on interests in real property" within the meaning of section 856(c)(3)(B) of the Code.  Reserves or funds underlying the securities may cause a proportionate reduction in the above-described qualifying status categories of securities and the interest income thereon.

## Sale or Exchange

Subject to the discussion below with respect to any trust fund as to which a partnership election is made (or which otherwise is classified as a partnership for federal income tax

purposes), a holder's tax basis in a security is the price the holder pays for the security, appropriately adjusted to take into account amortization of OID, market discount and premium, if any, and any payments received with respect to the security (other than qualified stated interest payments).  Gain or loss recognized on a sale, exchange, or redemption of a security, measured by the difference between the amount realized and the security's basis as so adjusted, will generally be capital gain or loss, assuming that the security is held as a capital asset and will generally be long-term capital gain or loss if the holding period of the security is more than one year and short-term capital gain or loss if the holding period of the security is one year or less. Non-corporate taxpayers are subject to reduced maximum rates on long-term capital gains and are generally subject to tax at ordinary income rates on short-term capital gains.  The deductibility of capital losses is subject to certain limitations.  Prospective investors are encouraged to consult their own tax advisors concerning these tax law provisions.

In the case of a security held by a bank, thrift, or similar institution described in Section 582 of the Code, however, gain or loss realized on the sale or exchange of a REMIC regular interest security or other debt instrument will be taxable as ordinary income or loss.  In addition, gain from the disposition of a regular interest security that might otherwise be capital gain will be treated as ordinary income to the extent of the *excess*, if any, of:

- the amount that would have been includible in the holder's income if the yield on the regular interest security had equaled 110% of the applicable federal rate as of the beginning of such holder's holding period,

*over*

- the amount of ordinary income actually recognized by the holder with respect to the regular interest security.

## Miscellaneous Tax Aspects

*Backup Withholding*.  Subject to the discussion below with respect to any trust fund as to which a partnership election is made (or which otherwise is classified as a partnership for federal income tax purposes), a holder, other than a holder of a REMIC residual interest security, may, under certain circumstances, be subject to "backup withholding" with respect to distributions on the securities or the proceeds of a sale of the securities to or through brokers.  This withholding generally applies if the holder of a security:

- fails to furnish the applicable trustee with its taxpayer identification number;

- furnishes the applicable trustee with an incorrect taxpayer identification number;

- fails to report properly interest, dividends or other "reportable payments" as defined in the Code; or

- under certain circumstances, fails to provide the applicable trustee or such holder's securities broker with a certified statement, signed under penalty of perjury, that the taxpayer

113

identification number provided is its correct number and that the holder is not subject to backup withholding.

Backup withholding will not apply, however, with respect to certain payments made to holders, including payments to certain exempt recipients (such as exempt organizations and corporations) and to certain nonresident alien individuals, foreign partnerships or foreign corporations. Holders are encouraged to consult their tax advisers as to their qualification for exemption from backup withholding and the procedure for obtaining the exemption.

The trustee or securities administrator, as applicable, will report to the holders and to the servicer for each calendar year the amount of any "reportable payments" during such year and the amount of tax withheld, if any, with respect to payments on the securities.

## Taxation of Classes of Exchangeable Securities

### General

Except as disclosed in the applicable prospectus supplement, the arrangement pursuant to which the exchangeable securities of a series are created, sold and administered will be classified as a grantor trust under subpart E, part I of subchapter J of the Code. The exchangeable securities will represent beneficial ownership of interests in the classes of securities in the related trust fund.

### Tax Status

The exchangeable securities will represent "real estate assets" within the meaning of Section 856(c)(4)(A) of the Code and assets described in Section 7701(a)(19)(C) of the Code, and OID and interest accruing on exchangeable securities will represent "interest on obligations secured by mortgages on real property" within the meaning of Section 856(c)(3)(B) of the Code, in each case, to the extent the securities or income on the securities would be qualifying if held directly (although the matter is not entirely clear for Strips, defined below). Exchangeable securities will be "qualified mortgages" under Section 860G(a)(3) of the Code for a REMIC to the extent the securities the interest in which is represented by such classes would be qualifying if held directly.

### Tax Accounting for Exchangeable Securities

An exchangeable security represents beneficial ownership of an interest in one or more classes of securities on deposit in the related trust fund, as specified in the applicable prospectus supplement. If it represents an interest in more than one class of securities, a purchaser must allocate its basis in the exchangeable security among the interests in the classes of securities in accordance with their relative fair market values as of the time of acquisition. Similarly, on the sale of such an exchangeable security, the holder must allocate the amount received on the sale among the interests in the classes of securities in accordance with their relative fair market values as of the time of sale.

The holder of an exchangeable security must account separately for each interest in a class of securities (there may be only one such interest). Where the interest represents a pro rata

114

portion of a class of securities that are REMIC regular interests, the holder of the exchangeable security should account for such interest as described for REMIC regular interests under "Taxation of Debt Securities" above. Where the interest represents beneficial ownership of a disproportionate part of the principal and interest payments on a class of securities (a "Strip"), the holder is treated as owning, pursuant to Section 1286 of the Code, "stripped bonds" to the extent of its share of principal payments and "stripped coupons" to the extent of its share of interest payments on such class of securities. We intend to treat each Strip as a single debt instrument for purposes of information reporting. The IRS, however, could take a different position. For example, the IRS could contend that a Strip should be treated as a pro rata part of the class of securities to the extent that the Strip represents a pro rata portion thereof, and "stripped bonds" or "stripped coupons" with respect to the remainder. A prospective investor is encouraged to consult its tax advisor regarding this matter.

A holder of an exchangeable security should calculate OID with respect to each Strip and include it in ordinary income as it accrues, which may be before the receipt of cash attributable to such income, in accordance with a constant interest method that takes into account the compounding of interest. The holder should determine its yield to maturity based on its purchase price allocated to the Strip and on a schedule of payments projected using a prepayment assumption, and then make periodic adjustments to take into account actual prepayment experience. With respect to a particular holder, Treasury regulations do not address whether the prepayment assumption used to calculate OID would be determined at the time of purchase of the Strip or would be the original prepayment assumption with respect to the related class of securities. Further, if the related class of securities is subject to redemption as further described in the applicable prospectus supplement, Treasury regulations do not address the extent to which such prepayment assumption should take into account the possibility of the retirement of the Strip concurrently with the redemption of such class of securities. A prospective investor is encouraged to consult its tax advisor regarding these matters. For purposes of information reporting relating to OID, the original yield to maturity of the Strip, determined as of the date of issuance of the series, will be calculated based on the original prepayment assumption.

If OID accruing with respect to a Strip, computed as described above, is negative for any period, the holder may be entitled to offset such amount only against future positive original issue discount accruing from such Strip (or possibly also against OID from prior periods). We intend to report by offsetting negative OID accruals only against future positive accruals of OID. Although not entirely free from doubt, such a holder may be entitled to deduct a loss to the extent that its remaining basis would exceed the maximum amount of future payments to which the holder is entitled with respect to such Strip, assuming no further prepayments of the underlying loans (or, perhaps, assuming prepayments at a rate equal to the prepayment assumption). Although the issue is not free from doubt, all or a portion of such loss may be treated as a capital loss if the Strip is a capital asset in the hands of the holder.

A holder realizes gain or loss on the sale of a Strip in an amount equal to the difference between the amount realized and its adjusted basis in such Strip. The holder's adjusted basis generally is equal to the holder's allocated cost of the Strip, increased by income previously included, and reduced (but not below zero) by distributions previously received. Except as described below, any gain or loss on such sale generally is capital gain or loss if the holder has held its interest as a capital asset and is long-term if the interest has been held for the long-term

115

capital gain holding period (more than one year). Such gain or loss will be ordinary income or loss (1) for a bank or thrift institution or (2) if the securities are REMIC regular interests, to the extent income recognized by the holder is less than the income that would have been recognized if the yield on such interests were 110% of the applicable federal rate under Section 1274(d) of the Code.

If a holder exchanges a single class of exchangeable securities for several classes of related exchangeable securities, and then sells one of the related exchangeable securities, the sale may subject the investor to the coupon stripping rules of Section 1286 of the Code. The holder must allocate its basis in the single class of exchangeable securities between the part of such class underlying the related exchangeable security that was sold and the part of such class underlying the related exchangeable securities that were retained, in proportion to their relative fair market values as of the date of such sale. The holder is treated as purchasing the part retained for the amount of basis allocated to such part. The holder must calculate OID with respect to the retained part as described above.

Although the matter is not free from doubt, a holder that acquires in one transaction a combination of exchangeable securities that may be exchanged for a single class of related exchangeable securities that is identical to a class of securities that is on deposit in the related trust fund should be treated as owning the relevant class of securities.

*Exchanges of Exchangeable Securities*

An exchange of an interest in one or more classes of exchangeable securities for an interest in one or more other classes of related exchangeable securities that are part of the same combination, or vice versa, will not be a taxable exchange. After the exchange, the holder is treated as continuing to own the interests in the class or classes of exchangeable securities that it owned immediately before the exchange.

*Tax Treatment of Foreign Investors*

A foreign holder of an exchangeable security is subject to taxation in the same manner as foreign holders of debt securities. Such manner of taxation is discussed below under the heading " —Tax Treatment of Foreign Investors."

*Backup Withholding*

A holder of an exchangeable security is subject to backup withholding rules similar to those applicable to debt securities. Such manner of taxation is discussed under the heading "—Miscellaneous Tax Aspects—Backup Withholding" in this prospectus.

*Reporting and Administrative Matters*

Reports will be made to the IRS and to holders of record of exchangeable securities that are not excepted from the reporting requirements.

116

## Tax Treatment of Foreign Investors

Subject to the discussion below with respect to any trust fund as to which a partnership election is made (or which otherwise is classified as a partnership for federal income tax purposes), under the Code, unless interest (including OID) paid on a security (other than a residual interest security) is considered to be "effectively connected" with a trade or business conducted in the United States by a nonresident alien individual, foreign partnership or foreign corporation, interest will normally qualify as portfolio interest and will be exempt from federal income tax or withholding tax.  However, interest will not qualify as portfolio interest where:

- the recipient is a holder, directly or by attribution, of 10% or more of the capital or profits interest in the issuing entity, or

- the recipient is a controlled foreign corporation to which the issuing entity is a related person.

For interest to qualify for the portfolio interest exemption from United States withholding tax, the holder must generally complete a Form W-8BEN indicating that the holder is a non-U.S. Person entitled to such exemption.  The Form W-8BEN, or in certain circumstances other documentation, must be provided to the person otherwise required to withhold United States tax.  If a foreign holder is a partnership or other type of pass-through entity that is not treated for United States withholding tax purposes as the beneficial owner of the income with respect to the security, the holder generally must receive the Form W-8BEN as described in the previous sentence from the holder's partners or other beneficial owners of the income with respect to the security and may be required to provide the forms, and certain additional information, to the person through whom the holder holds the security.  The forms provided by the holder or its interestholders regarding status as a non-U.S. Person must generally be passed through the ownership chain to the person otherwise required to withhold tax in order for the exemption to apply.  These provisions supersede the generally applicable provisions of United States law that would otherwise require the issuing entity to withhold at a 30% rate (unless such rate were reduced or eliminated by an applicable tax treaty) on, among other things, interest and other fixed or determinable, annual or periodic income paid to nonresident alien individuals, foreign partnerships or foreign corporations.  Holders of pass-through securities and stripped securities, including ratio strip securities, however, may be subject to withholding to the extent that the loans were originated on or before July 18, 1984.

Interest and OID of holders who are foreign persons are not subject to withholding if they are effectively connected with a United States business conducted by the holder and appropriate documentation is provided to the person otherwise required to withhold.  They will, however, generally be subject to the regular United States income tax.

Payments to holders of REMIC residual interest securities who are foreign persons will generally be treated as interest for purposes of the 30% (or lower treaty rate) United States withholding tax.  Holders should assume that such income does not qualify for exemption from United States withholding tax as "portfolio interest."  It is clear that, to the extent that a payment represents a portion of REMIC taxable income that constitutes excess inclusion income, the holder of a residual interest security will not be entitled to an exemption from or reduction of the 30% withholding tax rule.  If the payments are subject to United States withholding tax, they

generally will be taken into account for withholding tax purposes only when paid or distributed (or when the residual interest security is disposed of). The Treasury has statutory authority, however, to promulgate regulations that would require such amounts to be taken into account at an earlier time in order to prevent the avoidance of tax. Regulations could, for example, require withholding prior to the distribution of cash in the case of residual interest securities that do not have significant value. Under the REMIC regulations, if a residual interest security has tax avoidance potential, a transfer of a residual interest security to a nonresident alien individual, foreign partnership or foreign corporation will be disregarded for all federal tax purposes. A residual interest security has tax avoidance potential unless, at the time of the transfer, the transferor reasonably expects that the REMIC will distribute to the transferee residual interest holder amounts that will equal at least 30% of each excess inclusion, and that such amounts will be distributed at or after the time at which the excess inclusions accrue and not later than the calendar year following the calendar year of accrual. If a nonresident alien individual, foreign partnership or foreign corporation transfers a residual interest security to a U.S. Person, and if the transfer has the effect of allowing the transferor to avoid tax on accrued excess inclusions, then the transfer is disregarded and the transferor continues to be treated as the owner of the residual interest security for purposes of the withholding tax provisions of the Code. See "—Excess Inclusions" above.

## Tax Characterization of the Trust Fund as a Partnership

Tax counsel is of the opinion that a trust fund structured to be classified, for federal income tax purposes, as a partnership will not be an association (or publicly traded partnership) taxable as a corporation for such purposes. This opinion is based on the assumption that the terms of the trust agreement and related documents will be complied with, and on counsel's conclusions that the nature of the income of the trust fund will exempt it from the rule that certain publicly traded partnerships are taxable as corporations or the issuance of the certificates has been structured as a private placement under an IRS safe harbor, so that the trust fund will not be characterized as a publicly traded partnership taxable as a corporation.

If the trust fund were taxable as a corporation for federal income tax purposes, the trust fund would be subject to corporate income tax on its taxable income. The trust fund's taxable income would include all its income, possibly reduced by its interest expense on the notes or certificates. Any such corporate income tax could materially reduce cash available to make payments on the notes and distributions on the certificates, and holders of certificates could be liable for any such tax that is unpaid by the trust fund.

## Tax Consequences to Holders of the Notes

*Treatment of the Notes as Indebtedness*. The trust fund will agree, and the noteholders will agree by their purchase of notes, to treat the notes as debt for federal income tax purposes. As a result, tax counsel is of the opinion that the notes will be classified as debt for federal income tax purposes. The discussion below assumes this characterization of the notes is correct.

*OID, Indexed Securities, etc.* The discussion below assumes that all payments on the notes are denominated in U.S. dollars, and that the notes are not "indexed securities" or "strip notes." Moreover, the discussion assumes that the interest formula for the notes meets the

requirements for "qualified stated interest" under the OID Regulations, and that any OID on the notes (*i.e.*, any excess of the principal amount of the notes over their issue price) does not exceed a *de minimis* amount (*i.e.*, 0.25% of their principal amount multiplied by the number of full years included in their term), all within the meaning of the OID Regulations. If these conditions are not satisfied with respect to any given series of notes, additional tax considerations with respect to the notes will be disclosed in the applicable prospectus supplement.

*Interest Income on the Notes*. Based on the above assumptions, except as discussed in the following paragraph, the notes will not be considered issued with OID. The stated interest on the notes will be taxable to a noteholder as ordinary interest income when received or accrued in accordance with the noteholder's method of tax accounting. Under the OID Regulations, a holder of a note issued with a *de minimis* amount of OID must include the OID in income, on a pro rata basis, as principal payments are made on the note, unless an election is made by such holder to treat all interest as OID, as discussed above. See "Taxation of Debt Securities—Election to Treat All Interest as Original Issue Discount" in this prospectus. It is believed that any prepayment premium paid as a result of a mandatory redemption will be taxable as contingent interest when it becomes fixed and unconditionally payable. A purchaser who buys a note for more or less than its principal amount will generally be subject, respectively, to the premium amortization or market discount rules of the Code.

A holder of a note that is a "short-term note" (*i.e.*, it has a fixed maturity date of not more than one year from the issue date) may be subject to special rules. An accrual basis holder of a short-term note (and certain cash method holders, including regulated investment companies, as set forth in Section 1281 of the Code) generally would be required to report interest income as interest accrues on a straight-line basis over the term of each interest period. Other cash basis holders of a short-term note would, in general, be required to report interest income as interest is paid (or, if earlier, upon the taxable disposition of the short-term note). However, a cash basis holder of a short-term note reporting interest income as it is paid may be required to defer a portion of any interest expense otherwise deductible on indebtedness incurred to purchase or carry the short-term note until the taxable disposition of the short-term note. A cash basis taxpayer may elect under Section 1281 of the Code to accrue interest income on all nongovernment debt obligations with a term of one year or less, in which case the taxpayer would include interest on the short-term note in income as it accrues, but would not be subject to the interest expense deferral rule referred to in the preceding sentence. Certain special rules apply if a short-term note is purchased for more or less than its principal amount.

*Sale or Other Disposition*. If a noteholder sells a note, the holder will recognize gain or loss in an amount equal to the difference between the amount realized on the sale (excluding any amount attributable to accrued but unpaid qualified stated interest, which will be treated as such) and the holder's adjusted tax basis in the note. The adjusted tax basis of a note to a particular noteholder will equal the holder's cost for the note, appropriately adjusted to take into account amortization of OID, market discount and premium, if any, and any payments previously received by the noteholder with respect to the note (other than payments of qualified stated interest). Any such gain or loss will be capital gain or loss if the note was held as a capital asset, except for gain representing accrued interest and accrued market discount not previously included in income. Capital losses generally may be used only to offset capital gains.

*Foreign Holders*.  Interest payments made (or accrued) to a noteholder who is a "foreign person" (*i.e.*, nonresident alien, foreign corporation or other non-U.S. Person) generally will be considered "portfolio interest," and generally will not be subject to United States federal income tax or withholding tax, if the interest is not effectively connected with the conduct of a trade or business within the United States by the foreign person and the foreign person:

- is not actually or constructively a "10 percent shareholder" of the trust fund or the sponsor (including a holder of 10% of the outstanding certificates) or a "controlled foreign corporation" with respect to which the trust fund or the sponsor is a "related person" within the meaning of the Code; and

- provides the trustee or other person who is otherwise required to withhold U.S. tax with respect to the notes with an appropriate statement (on Form W-8BEN), signed under penalties of perjury, certifying that the beneficial owner of the note is a foreign person entitled to exemption from such tax and providing the foreign person's name and address.

If a foreign holder is a partnership or other type of pass-through entity that is not treated for U.S. withholding tax purposes as the beneficial owner of the income with respect to the note, the holder generally must receive the Form W-8BEN as described in the previous sentence from the holder's partners or other beneficial owners of the income with respect to the note and may be required to provide the forms, and certain additional information, to the person through whom the holder holds the note.  The forms provided by the holder or its interestholders regarding status as a non-U.S. Person must generally be passed through the ownership chain to the person otherwise required to withhold tax in order for the exemption to apply.  If a note is held through a securities clearing organization or certain other financial institutions, the foreign person that owns the note should furnish such organization or institution with a Form W-8BEN or a similar form.  The organization or institution may then be required to forward the Form W-8BEN to the withholding agent.  If interest is not portfolio interest and is not effectively connected with the conduct of a U.S. trade or business, then it will be subject to U.S. federal income and withholding tax at a rate of 30%, unless reduced or eliminated pursuant to an applicable tax treaty.

Any capital gain realized on the sale, redemption, retirement or other taxable disposition of a note by a foreign person will be exempt from U.S. federal income and withholding tax; provided, that (i) such gain is not effectively connected with the conduct of a trade or business in the United States by the foreign person and (ii) in the case of an individual foreign person, the foreign person is not present in the United States for 183 days or more in the taxable year of the disposition.

*Backup Withholding*.  Each holder of a note (other than an exempt holder such as a corporation, tax-exempt organization, qualified pension and profit-sharing trust, individual retirement account or nonresident alien who provides certification as to status as a nonresident) will be required to provide, under penalties of perjury, a certificate containing the holder's name, address, correct federal taxpayer identification number and a statement that the holder is a U.S. Person and not subject to backup withholding.  Should a nonexempt noteholder fail to provide the required certification, the trust fund will be required to backup withhold from the amount

120

otherwise payable to the holder and remit the withheld amount to the IRS as a credit against the holder's federal income tax liability.

*Possible Alternative Treatments of the Notes.* If, contrary to the opinion of tax counsel, the IRS successfully asserted that one or more of the notes did not represent debt for federal income tax purposes, the notes might be treated as equity interests in the trust fund. If so treated, the trust fund might be taxable as a corporation with the adverse consequences described above under "— Tax Characterization of the Trust Fund as a Partnership," and the taxable corporation would not be able to reduce its taxable income by deductions for interest expense on notes recharacterized as equity. Alternatively, and most likely in the view of tax counsel, the trust fund might be treated as a publicly traded partnership that would not be taxable as a corporation because it would meet certain qualifying income tests. Nonetheless, treatment of the notes as equity interests in such a publicly traded partnership could have adverse tax consequences to certain holders. For example, income to certain tax-exempt entities (including pension funds) may be "unrelated business taxable income," income to foreign holders generally would be subject to United States tax and United States tax return filing and withholding requirements, and individual holders might be subject to certain limitations on their ability to deduct their share of the trust fund's expenses.

## Tax Consequences to Holders of the Certificates

*Treatment of the Trust Fund as a Partnership.* The trust fund and the servicer will agree, and the certificateholders will agree by their purchase of certificates, to treat the trust fund as a partnership for purposes of federal and state income tax, franchise tax and any other tax measured in whole or in part by income, with the assets of the partnership being the assets held by the trust fund, the partners of the partnership being the certificateholders, and the notes being debt of the partnership. However, the proper characterization of the arrangement involving the trust fund, the certificates, the notes, the trust fund and the servicer is not clear because there is no authority on transactions closely comparable to that contemplated herein.

A variety of alternative characterizations is possible. For example, because the certificates have certain features characteristic of debt, the certificates might be considered debt of the trust fund. Any such characterization would not result in materially adverse tax consequences to certificateholders as compared to the consequences from treatment of the certificates as equity in a partnership described below. The following discussion assumes that the certificates represent equity interests in a partnership.

*Indexed Securities, etc.* The following discussion assumes that all payments on the certificates are denominated in U.S. dollars, none of the certificates is an indexed security or a stripped certificate, and that a series of securities includes a single class of certificates. If these conditions are not satisfied with respect to any given series of certificates, additional tax considerations with respect to such certificates will be disclosed in the applicable prospectus supplement.

*Partnership Taxation.* If the trust fund is a partnership, the trust fund will not be subject to federal income tax. Rather, each certificateholder will be required to separately take into account the holder's allocated share of income, gains, losses, deductions and credits of the trust

fund.  The trust fund's income will consist primarily of interest and finance charges earned on the underlying loans (including appropriate adjustments for market discount, OID and bond premium, if any) and any gain upon collection or disposition of loans.  The trust fund's deductions will consist primarily of interest accruing with respect to the notes, servicing and other fees, and losses or deductions upon collection or disposition of loans.

The tax items of a partnership are allocable to the partners in accordance with the Code, Treasury regulations and the partnership agreement (here, the trust agreement and related documents).  Cash basis holders will in effect be required to report income from the certificates on the accrual basis, and certificateholders may become liable for taxes on trust fund income even if they have not received cash from the trust fund to pay taxes.  In addition, because tax allocations and tax reporting will be done on a uniform basis for all certificateholders but certificateholders may be purchasing certificates at different times and at different prices, certificateholders may be required to report on their tax returns taxable income that is greater or less than the amount reported to them by the trust fund.

All of the taxable income allocated to a certificateholder that is a pension, profit-sharing or employee benefit plan or other tax-exempt entity (including an individual retirement account) may constitute "unrelated business taxable income" generally taxable to the holder under the Code.

An individual taxpayer's share of expenses of the trust fund (including fees to the servicer but not interest expense) would be miscellaneous itemized deductions.  Such deductions might be disallowed to the individual in whole or in part and might result in such holder being taxed on an amount of income that exceeds the amount of cash actually distributed to the holder over the life of the trust fund.

The trust fund intends to make all tax calculations relating to income and allocations to certificateholders on an aggregate basis.  If the IRS were to require that such calculations be made separately for each loan, the trust fund might be required to incur additional expense but it is believed that there would not be a material adverse effect on certificateholders.

*Discount and Premium*.  It is believed that the underlying loans will not be issued with OID, and, therefore, the trust fund should not have OID income.  However, the purchase price paid by the trust fund for the loans may be greater or less than the remaining principal balance of the loans at the time of purchase.  If so, the loan will have been acquired at a premium or discount, as the case may be.  (As indicated above, the trust fund will make this calculation on an aggregate basis, but might be required to recompute it on a loan-by-loan basis.)

If the trust fund acquires the underlying loans at a market discount or premium, the trust fund will elect to include any discount in income currently as it accrues over the life of the loans or to offset any premium against interest income on the loans.  As indicated above, a portion of market discount income or premium deduction may be allocated to certificateholders.

*Section 708 Termination*.  Under section 708 of the Code, the trust fund will be deemed to terminate for federal income tax purposes if 50% or more of the capital and profits interests in the trust fund are sold or exchanged within a 12-month period.  Pursuant to Treasury regulations

issued under section 708 of the Code, if such a termination occurs, the trust fund would be deemed to contribute its assets to a new partnership in exchange for interests in the new partnership.  Such interests would be deemed distributed to the partners of the original trust fund in liquidation thereof, which would not constitute a sale or exchange.

*Disposition of Certificates*.  Generally capital gain or loss will be recognized on a sale of certificates in an amount equal to the difference between the amount realized and the seller's tax basis in the certificates sold.  A certificateholder's tax basis in a certificate will generally equal the holder's cost increased by the holder's share of trust fund income (includible in income) and decreased by any distributions received with respect to the certificate.  In addition, both the tax basis in the certificates and the amount realized on a sale of a certificate would include the holder's share of the notes and other liabilities of the trust fund.  A holder acquiring certificates at different prices may be required to maintain a single aggregate adjusted tax basis in the certificates, and, upon sale or other disposition of some of the certificates, allocate a portion of the aggregate tax basis to the certificates sold (rather than maintaining a separate tax basis in each certificate for purposes of computing gain or loss on a sale of that certificate).

Any gain on the sale of a certificate attributable to the holder's share of unrecognized accrued market discount on the loans would generally be treated as ordinary income to the holder and would give rise to special tax reporting requirements.  The trust fund does not expect to have any other assets that would give rise to such special reporting requirements.  Thus, to avoid those special reporting requirements, the trust fund will elect to include market discount in income as it accrues.

If a certificateholder is required to recognize an aggregate amount of income (not including income attributable to disallowed itemized deductions described above) over the life of the certificates that exceeds the aggregate cash distributions with respect thereto, this excess will generally give rise to a capital loss upon the retirement of the certificates.

*Allocations Between Transferors and Transferees*.  In general, the trust fund's taxable income and losses will be determined monthly, and the tax items for a particular calendar month will be apportioned among the certificateholders in proportion to the principal amount of certificates owned by them as of the close of the last day of such month.  As a result, a holder purchasing certificates may be allocated tax items (which will affect its tax liability and tax basis) attributable to periods before the actual transaction.

The use of such a monthly convention may not be permitted by existing regulations.  If a monthly convention is not allowed (or only applies to transfers of less than all of the partner's interest), taxable income or losses of the trust fund might be reallocated among the certificateholders.  The trust fund's method of allocation between transferors and transferees may be revised to conform to a method permitted by future regulations.

*Section 754 Election*.  In the event that a certificateholder sells its certificates at a profit (loss), the purchasing certificateholder will have a higher (lower) basis in the certificates than the selling certificateholder had. Although recent legislation requires a partnership with a substantial built in loss in its assets to make certain basis adjustments affecting the acquiring partners, those adjustments are not required for securitization partnerships. The trust expects to qualify as a

123

securitization partnership and, thus, the tax basis of the trust fund's assets will not be adjusted to reflect that higher (or lower) basis unless the trust fund were to file an election under Section 754 of the Code.  In order to avoid the administrative complexities that would be involved in keeping accurate accounting records, as well as potentially onerous information reporting requirements, the trust fund will not make such election, unless such an election is required by law.  As a result, certificateholders might be allocated a greater or lesser amount of trust fund income than would be appropriate based on their own purchase price for certificates.

*Administrative Matters*.  The trustee is required to keep or have kept complete and accurate books of the trust fund.  Books will be maintained for financial reporting and tax purposes on an accrual basis, and the fiscal year of the trust fund will be the calendar year unless otherwise required by law.  The trustee will file a partnership information return (IRS Form 1065) with the IRS for each taxable year of the trust fund and will report each certificateholder's allocable share of items of trust fund income and expense to holders and the IRS on Schedule K-1.  The trust fund will provide the Schedule K-l information to nominees that fail to provide the trust fund with the information statement described below, and such nominees will be required to forward such information to the beneficial owners of the certificates.  Generally, holders must file tax returns that are consistent with the information return filed by the trust fund or be subject to penalties unless the holder notifies the IRS of all such inconsistencies.

Under Section 6031 of the Code, any person that holds certificates as a nominee at any time during a calendar year is required to furnish the trust fund with a statement containing certain information on the nominee, the beneficial owners and the certificates so held.  Such information includes:

- the name, address and taxpayer identification number of the nominee; and

- as to each beneficial owner (a) the name, address and identification number of such person, (b)  whether such person is a U.S. Person, a tax-exempt entity or a foreign government, an international organization or any wholly owned agency or instrumentality of either of the foregoing, and (c) certain information on certificates that were held, bought or sold on behalf of such person throughout the year.

In addition, brokers and financial institutions that hold certificates through a nominee are required to furnish directly to the trust fund information as to themselves and their ownership of certificates.  A clearing agency registered under Section 17A of the Securities Exchange Act of 1934 is not required to furnish any such information statement to the trust fund.  The information referred to above for any calendar year must be furnished to the trust fund on or before the following January 31.  Nominees, brokers and financial institutions that fail to provide the trust fund with the information described above may be subject to penalties.

The depositor will be designated as the tax matters partner in the related trust agreement and, as such, will be responsible for representing the certificateholders in any dispute with the IRS.  The Code provides for administrative examination of a partnership as if the partnership were a separate and distinct taxpayer.  Generally, the statute of limitations for partnership items does not expire before three years after the date on which the partnership information return is filed.  Any adverse determination following an audit of the return of the trust fund by the

appropriate taxing authorities could result in an adjustment of the returns of the certificateholders, and, under certain circumstances, a certificateholder may be precluded from separately litigating a proposed adjustment to the items of the trust fund. An adjustment could also result in an audit of a certificateholder's returns and adjustments of items not related to the income and losses of the trust fund.

*Tax Consequences to Foreign Certificateholders*. It is not clear whether the trust fund would be considered to be engaged in a trade or business in the United States for purposes of federal withholding taxes with respect to non-U.S. Persons because there is no clear authority dealing with that issue under facts substantially similar to those described herein. Although it is not expected that the trust fund would be engaged in a trade or business in the United States for such purposes, the trust fund will withhold as if it were so engaged in order to protect the trust fund from possible adverse consequences of a failure to withhold. The trust fund expects to withhold on the portion of its taxable income that is allocable to foreign certificateholders pursuant to Section 1446 of the Code, as if such income were effectively connected with a United States trade or business, at a rate of 35% for foreign holders that are taxable as corporations and the highest rate of tax specified in Section 1 of the Code for all other foreign holders. Subsequent adoption of Treasury regulations or the issuance of other administrative pronouncements may require the trust fund to change its withholding procedures. In determining a holder's withholding status, the trust fund may rely on IRS Form W-8BEN or a similar form, IRS Form W-9 or the holder's certification of non-foreign status signed under penalties of perjury.

Each foreign holder might be required to file a United States individual or corporate income tax return (including, in the case of a corporation, the branch profits tax) on its share of the trust fund's income. Each foreign holder must obtain a taxpayer identification number from the IRS and submit that number to the trust fund on Form W-8BEN in order to assure appropriate crediting of the taxes withheld. A foreign holder generally would be entitled to file with the IRS a claim for refund with respect to taxes withheld by the trust fund taking the position that no taxes were due because the trust fund was not engaged in a United States trade or business. However, interest payments made (or accrued) to a certificateholder who is a foreign person generally will be considered guaranteed payments to the extent such payments are determined without regard to the income of the trust fund. If these interest payments are properly characterized as guaranteed payments, then the interest will not be considered "portfolio interest." As a result, certificateholders will be subject to United States federal income tax and withholding tax at a rate of 30%, unless reduced or eliminated pursuant to an applicable treaty. In such case, a foreign holder would only be entitled to claim a refund for that portion of the taxes in excess of the taxes that should be withheld with respect to the guaranteed payments.

*Backup Withholding*. Distributions made on the certificates and proceeds from the sale of the certificates will be subject to "backup" withholding tax if, in general, the certificateholder fails to comply with certain identification procedures, unless the holder is an exempt recipient under applicable provisions of the Code.

## Reportable Transactions

Recent Treasury pronouncements directed at potentially abusive tax shelter activity appear to apply to transactions not conventionally regarded as tax shelters. Treasury regulations require taxpayers to report certain disclosures on IRS Form 8886 if they participate in a "reportable transaction." Organizers and sellers of the transaction are required to maintain records including investor lists containing identifying information and to furnish those records to the IRS upon demand. A transaction may be a "reportable transaction" based upon several indicia, one or more of which may be present with respect to your investment in the securities. Recently enacted legislation imposes significant penalties for failing to comply with these disclosure requirements. Investors are encouraged to consult their own tax advisers concerning any possible disclosure obligation with respect to their investment, and should be aware that Bear Stearns and other participants in the transaction intend to comply with such disclosure and investor list maintenance requirements as they determine apply to them with respect to a transaction.

## State and Local Tax Considerations

In addition to the United States federal income tax considerations described in this prospectus under "Material Federal Income Tax Considerations," potential investors are encouraged to consider the state and local income tax consequences of the acquisition, ownership, and disposition of the securities. State and local income tax law may differ substantially from the corresponding federal law, and this discussion does not purport to describe any aspect of the income tax laws of any state or locality. Therefore, potential investors are encouraged to consult their own tax advisors with respect to the various state and local tax consequences of an investment in the securities.

## ERISA Considerations

Sections 404 and 406 of ERISA impose fiduciary and prohibited transaction restrictions on ERISA Plans and on various other retirement plans and arrangements, including bank collective investment funds and insurance company general and separate accounts in which ERISA Plans are invested. Section 4975 of the Code imposes essentially the same prohibited transaction restrictions on Tax Favored Plans. ERISA and the Code prohibit a broad range of transactions involving assets of Plans and persons having obtained certain relationships to a Plan, called "Parties in Interest", unless a statutory or administrative exemption is available with respect to any such transaction.

Some employee benefit plans, including governmental plans (as defined in Section 3(32) of ERISA), and, if no election has been made under Section 410(d) of the Code, church plans (as defined in Section 3(33) of ERISA) are not subject to the ERISA requirements. Accordingly, assets of these plans may be invested in the securities without regard to the ERISA considerations described below, subject to the provisions of other applicable federal, state and local law. Any such plan which is qualified and exempt from taxation under Sections 401(a) and 501(a) of the Code, however, is subject to the prohibited transaction rules set forth in Section 503 of the Code.

ERISA generally imposes on Plan fiduciaries general fiduciary requirements, including those of investment prudence and diversification and the requirement that a Plan's investments be made for the exclusive benefit of Plan participants and their beneficiaries and in accordance with the documents governing the Plan. Any person who has discretionary authority or control with respect to the management or disposition of Plan Assets and any person who provides investment advice with respect to a Plan's assets, or Plan Assets, for a fee is a fiduciary of the investing Plan. If the mortgage loans and other assets included in the trust fund were to constitute Plan Assets, then any party exercising management or discretionary control with respect to those Plan Assets may be deemed to be a Plan "fiduciary," and thus subject to the fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of ERISA and Section 4975 of the Code with respect to any investing Plan. In addition, the acquisition or holding of securities by or on behalf of a Plan or with Plan Assets, as well as the operation of the trust fund, may constitute or involve a prohibited transaction under ERISA and the Code unless a statutory or administrative exemption is available. Further, ERISA and the Code prohibit a broad range of transactions involving Plan Assets and persons, called Parties in Interest unless a statutory or administrative exemption is available. Some Parties in Interest that participate in a prohibited transaction may be subject to a penalty (or an excise tax) imposed under Section 502(i) of ERISA or Section 4975 of the Code, unless a statutory or administrative exemption is available with respect to any transaction of this sort.

Some transactions involving the trust fund might be deemed to constitute prohibited transactions under ERISA and the Code with respect to a Plan that purchases the securities, if the mortgage loans and other assets included in a trust fund are deemed to be assets of the Plan. The DOL has promulgated the DOL Regulations concerning whether or not Plan Assets of a Plan would be deemed to include an interest in the underlying assets of an entity, including a trust fund, for purposes of applying the general fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of ERISA and the Code. Under the DOL Regulations, generally, when a Plan acquires an "equity interest" in another entity (such as the trust fund), the underlying assets of that entity may be considered to be Plan Assets unless an exception applies. Exceptions contained in the DOL Regulations provide that a Plan's assets will not include an undivided interest in each asset of an entity in which the Plan makes an equity investment if: (1) the entity is an operating company; (2) the equity investment made by the Plan is either a "publicly-offered security" that is "widely held," both as defined in the DOL Regulations, or a security issued by an investment company registered under the Investment Company Act of 1940, as amended; or (3) Benefit Plan Investors do not own 25% or more in value of any class of equity securities issued by the entity. In addition, the DOL Regulations provide that the term "equity interest" means any interest in an entity other than an instrument which is treated as indebtedness under applicable local law and which has no "substantial equity features." Under the DOL Regulations, Plan Assets will be deemed to include an interest in the instrument evidencing the equity interest of a Plan (such as a security with "substantial equity features"), and, because of the factual nature of some of the rules set forth in the DOL Regulations, Plan Assets may be deemed to include an interest in the underlying assets of the entity in which a Plan acquires an interest (such as the trust fund). Without regard to whether the securities are characterized as equity interests, the purchase, sale and holding of securities by or on behalf of a Plan could be considered to give rise to a prohibited transaction if the Issuing Entity, the trustee or any of their respective affiliates is or becomes a Party in Interest with respect to the Plan. The depositor, Bear, Stearns & Co. Inc., the master servicer or other servicer, any pool insurer, any

127

special hazard insurer, the trustee, and certain of their affiliates might be considered Parties in Interest with respect to a Plan.  If so, the acquisition, holding or disposition of securities by or on behalf of such Plan could be considered to give rise to a "prohibited transaction" within the meaning of ERISA and the Code unless an exemption is available. Neither Plans nor persons investing Plan Assets should acquire or hold securities in reliance upon the availability of any exception under the DOL Regulations.

## Class and Statutory Exemptions

The DOL has issued Prohibited Transaction Class Exemptions ("PTCEs") which provide exemptive relief to parties to any transaction which satisfies the conditions of the exemption.  A partial listing of the PTCEs which may be available for investments in securities follows.  In addition, the Pension Protection Act of 2006 provides a statutory exemption under Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code from certain prohibited transactions between an ERISA plan, Keogh plan, IRA or related investment vehicle and a person or entity that is a Party in Interest to such Plan solely by reason of providing services to such plan or entity (other than a Party in Interest that is a fiduciary, or its affiliate, that has or exercises discretionary authority or control or renders investment advice with respect to the assets of the plan or entity involved in the transaction), provided that there is adequate consideration for the transaction.  Each of these exemptions is available only if specified conditions are satisfied and may provide relief for some, but not all, of the prohibited transactions that a particular transaction may cause.  The prospectus supplement for a particular offering of securities may tell you whether the securities themselves satisfy the conditions of these exemptions.  You are encouraged to consult with your advisors regarding the specific scope, terms and conditions of an exemption as it applies to you, as an investor, before relying on that exemption's availability.

## Class exemptions for purchases and sales of securities.

The following exemptions may apply to a purchase or sale of securities between a Plan, on the one hand, and a Party in Interest, on the other hand:

- PTCE 84-14, which exempts certain transactions approved on behalf of the Plan by independent qualified professional asset managers.

- PTCE 86-128, which exempts certain transactions between a Plan and certain broker-dealers.

- PTCE 90-1, which exempts certain transactions entered into by insurance company pooled separate accounts in which Plans have made investments.

- PTCE 91-38, which exempts certain transactions entered into by bank collective investment funds in which Plans have made investments.

- PTCE 96-23, which exempts certain transactions approved on behalf of a Plan by certain in-house investment managers.

These exemptions do not expressly address prohibited transactions that might result from transactions incidental to the operation of a trust.  The issuing entity cannot assure you that a purchase or sale of securities in reliance on one of these exemptions will not give rise to indirect, non-exempt prohibited transactions.

*Class exemptions for purchases and sales of securities and transactions incidental to the operation of the Issuing Entity.*

The following exemptions may apply to a purchase or sale of securities between a Plan, on the one hand, and a Party in Interest, on the other hand, and may also apply to prohibited transactions that may result from transactions incident to the operation of the Issuing Entity:

- PTCE 95-60, which exempts certain transactions involving insurance company general accounts.

- PTCE 83-1, which exempts certain transactions involving the purchase of pass-through certificates in mortgage pool investment trusts from, and the sale of such certificates to, the pool sponsor, as well as transactions in connection with the servicing and operation of the pool.

*Prohibited Transaction Class Exemption 83-1*. The U.S. Department of Labor has issued an administrative exemption, Prohibited Transaction Class Exemption 83-1 ("PTCE 83-1"), which, under certain conditions, exempts from the application of the prohibited transaction rules of ERISA and the excise tax provisions of Section 4975 of the Code transactions involving a Plan in connection with the operation of a "mortgage pool" and the purchase, sale and holding of "mortgage pool pass-through certificates." A "mortgage pool" is defined as an investment pool, consisting solely of interest bearing obligations secured by first or second mortgages or deeds of trust on single-family residential property, property acquired in foreclosure and undistributed cash. A "mortgage pool pass-through certificate" is defined as a certificate which represents a beneficial undivided interest in a mortgage pool which entitles the holder to pass-through payments of principal and interest from the mortgage loans.

For the exemption to apply, PTCE 83-1 requires that:

- the depositor and the trustee maintain a system of insurance or other protection for the mortgage loans and the property securing such mortgage loans, and for indemnifying holders of certificates against reductions in pass-through payments due to defaults in loan payments or property damage in an amount at least equal to the greater of 1% of the aggregate principal balance of the mortgage loans, or 1% of the principal balance of the largest covered pooled mortgage loan;

- the trustee may not be an affiliate of the depositor;

- and the payments made and retained by the depositor in connection with the trust fund, together with all funds inuring to the depositor's benefit for administering the trust fund, represent no more than "adequate consideration" for selling the mortgage loans, plus reasonable compensation for services provided to the trust fund.

In addition, if it is applicable, PTCE 83-1 exempts the initial sale of certificates to a Plan with respect to which the depositor, the special hazard insurer, the pool insurer, the master servicer, or other servicer, or the trustee are or is a party in interest if the Plan does not pay more than fair market value for such certificate and the rights and interests evidenced by such certificate are not subordinated to the rights and interests evidenced by other certificates of the same pool. PTCE 83-1 also exempts from the prohibited transaction rules any transactions in connection with the servicing and operation of the mortgage pool, provided that any payments made to the master servicer in connection with the servicing of the trust fund are made in accordance with a binding agreement, copies of which must be made available to prospective investors.

In the case of any Plan with respect to which the depositor, the master servicer, the special hazard insurer, the pool insurer, or the trustee is a fiduciary, PTCE 83-1 will only apply if, in addition to the other requirements:

- the initial sale, exchange or transfer of certificates is expressly approved by an independent fiduciary who has authority to manage and control those plan assets being invested in certificates;

- the Plan pays no more for the certificates than would be paid in an arm's length transaction;

- no investment management, advisory or underwriting fee, sale commission, or similar compensation is paid to the depositor with regard to the sale, exchange or transfer of certificates to the Plan;

- the total value of the certificates purchased by such Plan does not exceed 25% of the amount issued; and

- at least 50% of the aggregate amount of certificates is acquired by persons independent of the depositor, the trustee, the master servicer, and the special hazard insurer or pool insurer.

Before purchasing certificates, a fiduciary of a Plan should confirm that the trust fund is a "mortgage pool," that the certificates constitute "mortgage pool pass-through certificates," and that the conditions set forth in PTCE 83-1 would be satisfied. In addition to making its own determination as to the availability of the exemptive relief provided in PTCE 83-1, the Plan fiduciary should consider the availability of any other prohibited transaction exemptions. The Plan fiduciary also should consider its general fiduciary obligations under ERISA in determining whether to purchase any certificates on behalf of a Plan.

**Underwriter Exemption**

The DOL has issued Exemptions to some underwriters, which generally exempt from the application of the prohibited transaction provisions of Section 406 of ERISA, and the excise taxes imposed on those prohibited transactions pursuant to Section 4975(a) and (b) of the Code, some transactions, among others, relating to the servicing and operation of mortgage pools and the initial purchase, holding and subsequent resale of mortgage-backed securities or other "securities" underwritten by an Underwriter, as defined below, provided that the conditions set forth in the Exemption are satisfied. For purposes of this section "ERISA Considerations", the term "Underwriter" shall include (1) the underwriter, (2) any person directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with the underwriter and (3) any member of the underwriting syndicate or selling group of which a person described in (1) or (2) is a manager or co-manager with respect to a class of securities.

The Exemption sets forth seven general conditions which must be satisfied for the Exemption to apply.

First, the acquisition of securities by a Plan or with Plan Assets must be on terms that are at least as favorable to the Plan as they would be in an arm's-length transaction with an unrelated party.

Second, the Exemption only applies to securities evidencing rights and interests that are not subordinated to the rights and interests evidenced by other securities of the same trust, unless none of the mortgage loans has a loan-to- value ratio or combined loan-to-value ratio at the date of issuance of the securities that exceeds 100%.

Third, the securities at the time of acquisition by a Plan or with Plan Assets must be rated in one of the four highest generic rating categories by an Exemption Rating Agency. However, the securities must be rated in one of the two highest generic categories by an Exemption Rating Agency if the loan-to-value ratio or combined loan-to-value ratio of any one- to four-family residential mortgage loan or home equity loan held in the trust exceeds 100% but does not exceed 125% at the date of issuance of the securities, and in that case the Exemption will not apply: (1) to any of the securities if any mortgage loan or other asset held in the trust (other than a one- to four-family residential mortgage loan or home equity loan) has a loan-to-value ratio or combined loan-to-value ratio that exceeds 100% at the Closing Date or (2) to any subordinate securities.

Fourth, the trustee cannot be an affiliate of any member of the "Restricted Group", other than the Underwriter.  The Restricted Group consists of any Underwriter, the master servicer, any servicer, any insurer, the depositor, any counterparty to an "eligible swap" (as described below) and any obligor with respect to assets included in the trust fund consisting of more than 5% of the aggregate unamortized principal balance of the assets in the trust fund as of the date of initial issuance of the securities other than the underwriter.

Fifth, the sum of all payments made to and retained by the Underwriter(s) must represent not more than reasonable compensation for underwriting the securities; the sum of all payments made to and retained by the depositor pursuant to the assignment of the assets to the related trust

131

fund must represent not more than the fair market value of the obligations; and the sum of all payments made to and retained by the master servicer, the servicer, the special servicer and any subservicer must represent not more than reasonable compensation for the person's services under the related Agreement and reimbursement of the person's reasonable expenses in connection therewith.

Sixth, the investing Plan or Plan Asset investor must be an accredited investor as defined in Rule 501(a)(1) of Regulation D of the Commission under the Securities Act.

Seventh, for Issuing Entities other than certain trusts, the documents establishing the Issuing Entity and governing the transaction must contain certain provisions as described in the Exemption intended to protect the assets of the Issuing Entity from creditors of the Depositor.

Permitted trust funds include owner-trusts, as well as grantor-trusts and REMICs. Owner-trusts are subject to certain restrictions in their governing documents to ensure that their assets may not be reached by creditors of the depositor in the event of bankruptcy or other insolvency and must provide certain legal opinions.

The Exemption permits interest rate swaps, interest rate caps and yield supplement agreements to be assets of a trust fund if certain conditions are satisfied.

An interest-rate swap or (if purchased by or on behalf of the Issuing Entity) an interest-rate cap contract (collectively, a "swap" or "swap agreement") is a permitted trust fund asset if it: (a) is an "eligible swap;" (b) is with an "eligible counterparty;" (c) meets certain additional specific conditions which depend on whether the swap is a "ratings dependent swap" or a "non-ratings dependent swap" and (d) permits the Issuing Entity to make termination payments to the swap counterparty (other than currently scheduled payments) solely from excess spread or amounts otherwise payable to the servicer, depositor, sponsor or any other seller.  Securities to which one or more swap agreements apply may be acquired or held by only "qualified plan investors."

An "eligible swap" is one which:  (a) is denominated in U.S. dollars; (b) pursuant to which the Issuing Entity pays or receives, on or immediately prior to the respective payment or distribution date for the class of securities to which the swap relates, a fixed rate of interest or a floating rate of interest based on a publicly available index (e.g., LIBOR or the U.S. Federal Reserve's Cost of Funds Index (COFI)), with the Issuing Entity receiving such payments on at least a quarterly basis and obligated to make separate payments no more frequently than the counterparty, with all simultaneous payments being netted ("allowable interest rate"); (c) has a notional amount that does not exceed either:  (i) the principal balance of the class of securities to which the swap relates, or (ii) the portion of the principal balance of such class represented by obligations ("allowable notional amount"); (d) is not leveraged (i.e., payments are based on the applicable notional amount, the day count fractions, the fixed or floating rates permitted above, and the difference between the products thereof, calculated on a one-to-one ratio and not on a multiplier of such difference) ("leveraged"); (e) has a final termination date that is either the earlier of the date on which the issuer terminates or the related class of securities are fully repaid and (f) does not incorporate any provision which could cause a unilateral alteration in the requirements described in (a) through (d) above.

132

An "eligible counterparty" means a bank or other financial institution which has a rating at the date of issuance of the securities, which is in one of the three highest long term credit rating categories or one of the two highest short term credit rating categories, utilized by at least one of the exemption rating agencies rating the securities; provided that, if a counterparty is relying on its short term rating to establish eligibility under the Exemption, such counterparty must either have a long term rating in one of the three highest long term rating categories or not have a long term rating from the applicable exemption rating agency.

A "qualified plan investor" is a plan where the decision to buy a class of securities is made on behalf of the plan by an independent fiduciary qualified to understand the swap transaction and the effect the swap would have on the rating of the securities and such fiduciary is either (a) a "qualified professional asset manager" ("QPAM") under PTCE 84-14, (b) an "in-house asset manager" under PTCE 96-23 or (c) has total assets (both plan and non-plan) under management of at least $100 million at the time the securities are acquired by the plan.

In "ratings dependent swaps" (where the rating of a class of securities is dependent on the terms and conditions of the swap), the swap agreement must provide that if the credit rating of the counterparty is withdrawn or reduced by any exemption rating agency below a level specified by the exemption rating agency, the servicer must, within the period specified under the Pooling and Servicing Agreement:   (a) obtain a replacement swap agreement with an eligible counterparty which is acceptable to the exemption rating agency and the terms of which are substantially the same as the current swap agreement (at which time the earlier swap agreement must terminate); or (b) cause the swap counterparty to establish any collateralization or other arrangement satisfactory to the exemption rating agency such that the then current rating by the exemption rating agency of the particular class of securities will not be withdrawn or reduced (and the terms of the swap agreement must specifically obligate the counterparty to perform these duties for any class of securities with a term of more than one year).   In the event that the servicer fails to meet these obligations, holders of the securities that are employee benefit plans or other retirement arrangements must be notified in the immediately following periodic report which is provided to the holders of the securities but in no event later than the end of the second month beginning after the date of such failure.   Sixty days after the receipt of such report, the exemptive relief provided under the Exemption will prospectively cease to be applicable to any class of securities held by an employee benefit plan or other retirement arrangement which involves such ratings dependent swap.

"Non-ratings dependent swaps" (those where the rating of the securities does not depend on the terms and conditions of the swap) are subject to the following conditions. If the credit rating of the counterparty is withdrawn or reduced below the lowest level permitted above, the servicer will, within a specified period after such rating withdrawal or reduction: (a) obtain a replacement swap agreement with an eligible counterparty, the terms of which are substantially the same as the current swap agreement (at which time the earlier swap agreement must terminate); (b) cause the counterparty to post collateral with the Issuing Entity in an amount equal to all payments owed by the counterparty if the swap transaction were terminated; or (c) terminate the swap agreement in accordance with its terms.

An "eligible yield supplement agreement" is any yield supplement agreement or similar arrangement or (if purchased by or on behalf of the Issuing Entity) an interest rate cap contract to

supplement the interest rates otherwise payable on obligations held by the trust fund ("EYS Agreement").  If the EYS Agreement has a notional principal amount and/or is written on an International Swaps and Derivatives Association, Inc. (ISDA) form, the EYS Agreement may only be held as an asset of the trust fund if it meets the following conditions:  (a) it is denominated in U.S. dollars; (b) it pays an allowable interest rate; (c) it is not leveraged; (d) it does not allow any of these three preceding requirements to be unilaterally altered without the consent of the trustee; (e) it is entered into between the Issuing Entity and an eligible counterparty and (f) it has an allowable notional amount.

The Exemption also requires that the trust fund meet the following requirements: (1) the trust fund must consist solely of assets of the type that have been included in other investment pools; (2) securities evidencing interests in the other investment pools must have been rated in one of the four highest generic categories of one of the Exemption Rating Agencies for at least one year prior to the acquisition of securities by or on behalf of a Plan or with Plan Assets; and (3) securities evidencing interests in the other investment pools must have been purchased by investors other than Plans for at least one year prior to any acquisition of securities by or on behalf of a Plan or with Plan Assets.

A fiduciary of a Plan or any person investing Plan Assets to purchase a security must make its own determination that the conditions set forth above will be satisfied with respect to the security.

If the general conditions of the Exemption are satisfied, the Exemption may provide an exemption from the restrictions imposed by Sections 406(a) and 407(a) of ERISA, and the excise taxes imposed by Sections 4975(a) and (b) of the Code by reason of Sections 4975(c)(1)(A) through (D) of the Code, in connection with the direct or indirect sale, exchange or transfer of securities in the initial issuance of the securities or the direct or indirect acquisition or disposition in the secondary market of securities by a Plan or with Plan Assets or the continued holding of securities acquired by a Plan or with Plan Assets pursuant to either of the foregoing. However, no exemption is provided from the restrictions of Sections 406(a)(1)(E), 406(a)(2) and 407 of ERISA for the acquisition or holding of a security on behalf of an "Excluded Plan" by any person who has discretionary authority or renders investment advice with respect to the assets of an Excluded Plan. For purposes of the securities, an Excluded Plan is a Plan sponsored by any member of the Restricted Group.

If the specific conditions of the Exemption are also satisfied, the Exemption may provide an exemption from the restrictions imposed by Sections 406(b)(1) and (b)(2) of ERISA, and the excise taxes imposed by Sections 4975(a) and (b) of the Code by reason of Section 4975(c)(1)(E) of the Code, in connection with:

1.    The direct or indirect sale, exchange or transfer of securities in the initial issuance of securities between the depositor or an Underwriter and a Plan when the person who has discretionary authority or renders investment advice with respect to the investment of Plan Assets in the securities is (a) a mortgagor with respect to 5% or less of the fair market value of the trust fund assets or (b) an affiliate of such a person, provided that:

i.  The Plan is not an Excluded Plan,

ii.  Each Plan's investment in each class of securities does not exceed 25% of the outstanding securities in the class,

iii.  After the Plan's acquisition of the securities, no more than 25% of the assets over which the fiduciary has investment authority are invested in securities of a trust fund containing assets which are sold or serviced by the same entity, and

iv.  In the case of initial issuance (but not secondary market transactions), at least 50% of each class of securities and at least 50% of the aggregate interests in the trust fund are acquired by persons independent of the Restricted Group;

2.  The direct or indirect acquisition or disposition in the secondary market of securities by a Plan or with Plan assets provided that the conditions in (i), (iii) and (iv) of 1 above are met; and

3.  The continued holding of securities acquired by a Plan or with Plan Assets pursuant to sections 1 or 2 above.

Further, if the specific conditions of the Exemption are satisfied, the Exemption may provide an exemption from the restrictions imposed by Sections 406(a), 406(b) and 407 of ERISA, and the excise taxes imposed by Sections 4975(a) and (b) of the Code by reason of Section 4975(c) of the Code for transactions in connection with the servicing, management and operation of the trust fund. The depositor expects that the specific conditions of the Exemption required for this purpose will be satisfied with respect to the securities so that the Exemption would provide an exemption from the restrictions imposed by Sections 406(a) and (b) of ERISA (as well as the excise taxes imposed by Sections 4975(a) and (b) of the Code by reason of Section 4975(c) of the Code) for transactions in connection with the servicing, management and operation of the trust fund, provided that the general conditions of the Exemption are satisfied.

The Exemption also may provide an exemption from the application of the prohibited transaction provisions of Sections 406(a) and 407(a) of ERISA, and the excise taxes imposed by Section 4975(a) and (b) of the Code by reason of Sections 4975(c)(1)(A) through (D) of the Code if the restrictions are deemed to otherwise apply merely because a person is deemed to be a Party in Interest with respect to an investing Plan by virtue of providing services to the Plan (or by virtue of having a specified relationship to such a person) solely as a result of the Plan's ownership of securities.

The Exemption generally extends exemptive relief to mortgage-backed and asset-backed securities transactions using pre-funding accounts for trusts issuing securities. With respect to the securities, the Exemption will generally allow mortgage loans supporting payments to securityholders, and having a value equal to no more than 25% of the total principal amount of the securities being offered by the trust fund, to be transferred to the trust fund within the pre-funding period instead of requiring that all the mortgage loans be either identified or transferred

135

on or before the Closing Date. In general, the relief applies to the purchase, sale and holding of securities which otherwise qualify for the Exemption, provided that the following general conditions are met:

- the ratio of the amount allocated to the pre-funding account to the total principal amount of the securities being offered must be less than or equal to 25%;

- all additional mortgage loans transferred to the related trust fund after the Closing Date must meet the same terms and conditions for eligibility as the original mortgage loans used to create the trust fund, which terms and conditions have been approved by one of the Exemption Rating Agencies;

- the transfer of the additional mortgage loans to the trust fund during the pre-funding period must not result in the securities to be covered by the Exemption receiving a lower credit rating from an Exemption Rating Agency upon termination of the pre-funding period than the rating that was obtained at the time of the initial issuance of the securities by the trust fund;

- solely as a result of the use of pre-funding, the weighted average annual percentage interest rate for the mortgage loans included in the related trust fund on the Closing Date and all additional mortgage loans transferred to the related trust fund after the Closing Date at the end of the Pre- Funding Period must not be more than 100 basis points lower than the rate for the mortgage loans which were transferred to the trust fund on the Closing Date;

- either:

  (1) the characteristics of the additional mortgage loans transferred to the related trust fund after the Closing Date must be monitored by an insurer or other credit support provider which is independent of the depositor; or

  (2) an independent accountant retained by the depositor must provide the depositor with a letter (with copies provided to the Exemption Rating Agency rating the securities, the Underwriter and the trustee) stating whether or not the characteristics of the additional mortgage loans transferred to the related trust fund after the Closing Date conform to the characteristics described in the prospectus or prospectus supplement and/or agreement. In preparing the letter, the independent accountant must use the same type of procedures as were applicable to the mortgage loans which were transferred to the trust fund as of the Closing Date;

- the pre-funding period must end no later than three months or 90 days after the Closing Date or earlier in some circumstances if the pre-funding accounts falls below the minimum level specified in the Agreement or an event of default occurs;

- amounts transferred to any pre-funding accounts and/or capitalized interest account used in connection with the pre-funding may be invested only in investments which are permitted by the Exemption Rating Agencies rating the securities and must:

  (1) be direct obligations of, or obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency or instrumentality thereof (provided that the obligations are backed by the full faith and credit of the United States); or

  (2) have been rated (or the obligor has been rated) in one of the three highest generic rating categories by one of the Exemption Rating Agencies ("ERISA Permitted Investments");

- the prospectus or prospectus supplement must describe the duration of the pre-funding period;

- the trustee (or any agent with which the trustee contracts to provide trust services) must be a substantial financial institution or trust company experienced in trust activities and familiar with its duties, responsibilities and liabilities with ERISA. The trustee, as legal owner of the trust fund, must enforce all the rights created in favor of securityholders of the trust fund, including employee benefit plans subject to ERISA.

## Insurance company general accounts.

- In the event that securities which are certificates do not meet the requirements of the Exemption solely because they are subordinate certificates or fail to meet a minimum rating requirements under the Exemption, certain Plans may be eligible to purchase certificates pursuant to Sections I and III of PTCE 95-60 which permits insurance company general accounts as defined in PTCE 95-60 to purchase such certificates if they otherwise meet all of the other requirements of the Exemption.

- Insurance companies contemplating the investment of general account assets in the securities are encouraged to consult with their legal advisors with respect to the applicability of Section 401(c) of ERISA. The DOL issued final regulations under Section 401(c) which became effective on July 5, 2001.

## Revolving pool features.

The Exemption only covers certificates backed by a "fixed" pool of loans which requires that all the loans must be transferred to the trust fund or identified at closing (or transferred within the pre-funding period, if pre-funding meeting the conditions described above is used). Accordingly, certificates issued by trust funds which feature revolving pools of assets will not be eligible for a purchase by Plans.  However, securities which are notes backed by revolving pools

137

of assets may be eligible for purchase by Plans pursuant to certain other prohibited transaction exemptions.  See discussion below in "ERISA Considerations Relating to Notes."

## ERISA Considerations Relating to Notes

Under the DOL Regulations, the assets of the trust fund would be treated as "plan assets" of a Plan for the purposes of ERISA and the Code only if the Plan acquires an "equity interest" in the trust fund and none of the exceptions contained in the DOL Regulations is applicable. An equity interest is defined under the DOL Regulations as an interest other than an instrument which is treated as indebtedness under applicable local law and which has no substantial equity features. Assuming that the notes are treated as indebtedness without substantial equity features for purposes of the DOL Regulations, then such notes will be eligible for purchase by Plans. However, without regard to whether the notes are treated as an "equity interest" for such purposes, the acquisition or holding of notes by or on behalf of a Plan could be considered to give rise to a prohibited transaction if the trust fund or any of its affiliates is or becomes a party in interest or disqualified person with respect to such Plan, or in the event that a note is purchased in the secondary market and such purchase constitutes a sale or exchange between a Plan and a party in interest or disqualified person with respect to such Plan. There can be no assurance that the trust fund or any of its affiliates will not be or become a party in interest or a disqualified person with respect to a Plan that acquires notes.

The Exemption permits trust funds which are grantor trusts, owner-trusts or REMICs to issue notes, as well as certificates, provided a legal opinion is received to the effect that the noteholders have a perfected security interest in the trust fund's assets. The exemptive relief provided under the Exemption for any prohibited transactions which could be caused as a result of the operation, management or servicing of the trust fund and its assets would not be necessary with respect to notes with no substantial equity features which are issued as obligations of the trust fund. Nevertheless, because other prohibited transactions might be involved, the Exemption would provide prohibited transaction exemptive relief, provided that the same conditions of the Exemption described above relating to certificates are met with respect to the notes. The same limitations of such exemptive relief relating to acquisitions of certificates by fiduciaries with respect to Excluded Plans would also be applicable to the notes as described herein.

In the event that the Exemption is not applicable to the notes, one or more other prohibited transactions exemptions may be available to Plans purchasing or transferring the notes depending in part upon the type of Plan fiduciary making the decision to acquire the notes and the circumstances under which such decision is made. These exemptions include, but are not limited to, PTCE 90-1 (regarding investments by insurance company pooled separate accounts), PTCE 91-38 (regarding investments by bank collective investments funds), PTCE 84-14 (regarding transactions effected by "qualified professional asset managers"), PTCE 95-60 (regarding investments by insurance company general accounts) and PTCE 96-23 (regarding transactions effected by "in-house asset managers") (collectively, the "Investor-Based Exemptions"). However, even if the conditions specified in these Investor-Based Exemptions are met, the scope of the relief provided under such Exemptions might or might not cover all acts which might be construed as prohibited transactions.

In the event that the Exemption is not applicable to the notes, there can be no assurance that any class of notes will be treated as indebtedness without substantial equity features for purposes of the DOL Regulations. There is increased uncertainty regarding the characterization of debt instruments that do not carry an investment grade rating. Consequently, in the event of a withdrawal or downgrade to below investment grade of the rating of a class of notes, the subsequent transfer of such notes or any interest therein to a Plan trustee or other person acting on behalf of a Plan, or using Plan Assets to effect such transfer, will be restricted. Unless otherwise stated in the related prospectus supplement, by acquiring a note, each purchaser will be deemed to represent that either (1) it is not acquiring the note with Plan Assets; or (2) (A) either (i) none of the issuing entity, the depositor any underwriter, the trustee, the master servicer, any other servicer or any of their affiliates is a party in interest with respect to such purchaser that is a Plan or (ii) PTCE 90-1, PTCE 91-38, PTCE 84-14, PTCE 95-60, PTCE 96-23 or some other prohibited transaction exemption is applicable to the acquisition and holding of the note by such purchaser and (B) the notes are rated investment grade or better and such person believes that the notes are properly treated as indebtedness without substantial equity features for purposes of the DOL Regulations, and agrees to so treat the notes. Alternatively, regardless of the rating of the notes, such person may provide the trustee with an opinion of counsel, which opinion of counsel will not be at the expense of the issuing entity, the depositor, the trustee, the master servicer or any other servicer, which opines that the purchase, holding and transfer of such note or interest therein is permissible under applicable law, will not constitute or result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the issuing entity, the depositor, the trustee, the master servicer or any other servicer to any obligation in addition to those undertaken in the indenture.

EACH PROSPECTUS SUPPLEMENT WILL CONTAIN INFORMATION CONCERNING CONSIDERATIONS RELATING TO ERISA AND THE CODE THAT ARE APPLICABLE TO THE RELATED SECURITIES. BEFORE PURCHASING SECURITIES IN RELIANCE ON THE EXEMPTION, THE INVESTOR-BASED EXEMPTIONS OR ANY OTHER EXEMPTION, A FIDUCIARY OF A PLAN SHOULD ITSELF CONFIRM THAT REQUIREMENTS SET FORTH IN SUCH EXEMPTION WOULD BE SATISFIED.

ANY PLAN INVESTOR WHO PROPOSES TO USE "PLAN ASSETS" OF ANY PLAN TO PURCHASE SECURITIES OF ANY SERIES OR CLASS ARE ENCOURAGED TO CONSULT WITH ITS COUNSEL WITH RESPECT TO THE POTENTIAL CONSEQUENCES UNDER ERISA AND SECTION 4975 OF THE CODE OF THE ACQUISITION AND OWNERSHIP OF SUCH SECURITIES.

## Exchangeable Securities

With respect to those classes of exchangeable securities which were eligible for exemptive relief under the Exemption when purchased, the Exemption would also cover the acquisition or disposition of such exchangeable securities when the securityholder exercises its exchange rights.  However, with respect to classes of exchangeable securities which were not eligible for exemptive relief under the Exemption when purchased, the exchange, purchase or sale of such securities pursuant to the exercise of exchange rights or call rights may give rise to prohibited transactions if a Plan and a Party in Interest with respect to such Plan are involved in

the transaction. However, one or more Investor-Based Exemptions discussed above may be applicable to these transactions.

## Tax Exempt Investors

A Plan that is exempt from federal income taxation pursuant to Section 501 of the Code nonetheless will be subject to federal income taxation to the extent that its income is "unrelated business taxable income" within the meaning of Section 512 of the Code.

## Consultation with Counsel

There can be no assurance that the Exemption or any other DOL exemption will apply with respect to any particular Plan that acquires the securities or, even if all the conditions specified therein were satisfied, that any such exemption would apply to transactions involving the trust fund. Prospective Plan investors are encouraged to consult with their legal counsel concerning the impact of ERISA and the Code and the potential consequences to their specific circumstances prior to making an investment in the securities. Neither the depositor, the trustees, the master servicer nor any of their respective affiliates will make any representation to the effect that the securities satisfy all legal requirements with respect to the investment therein by Plans generally or any particular Plan or to the effect that the securities are an appropriate investment for Plans generally or any particular Plan.

**Before purchasing a security in reliance on the Exemption, or an Investor-Based Exemption, or any other exemption, a fiduciary of a Plan or other Plan Asset investor should itself confirm that (a) all the specific and general conditions set forth in the Exemption, an Investor-Based Exemption or other exemption would be satisfied and (b) in the case of a security purchased under the Exemption, the security constitutes a "security" for purposes of the Exemption. In addition to making its own determination as to the availability of the exemptive relief provided in the Exemption, and Investor-Based Exemption or other exemption, the Plan fiduciary should consider its general fiduciary obligations under ERISA in determining whether to purchase the securities on behalf of a Plan.**

A governmental plan as defined in Section 3(32) of ERISA is not subject to ERISA, or Code Section 4975. However, such governmental plan may be subject to federal, state and local law, which is, to a material extent, similar to the provisions of ERISA or a Code Section 4975. A fiduciary of a governmental plan should make its own determination as to the propriety of such investment under applicable fiduciary or other investment standards, and the need for the availability of any exemptive relief under any similar law.

## Method of Distribution

The depositor will offer the securities in series. The distribution of the securities may be effected from time to time in one or more transactions, including negotiated transactions, at a fixed public offering price or at varying prices to be determined at the time of sale or at the time of commitment therefor. If so specified in the related prospectus supplement, Bear, Stearns & Co. Inc., an affiliate of the depositor, acting as underwriter with other underwriters, if any,

named in such prospectus supplement will distribute the securities in a firm commitment underwriting, subject to the terms and conditions of the underwriting agreement.  In such event, the related prospectus supplement may also specify that the underwriters will not be obligated to pay for any securities agreed to be purchased by purchasers pursuant to purchase agreements acceptable to the depositor. In connection with the sale of the securities, underwriters may receive compensation from the depositor or from purchasers of the securities in the form of discounts, concessions or commissions.  The related prospectus supplement will describe any such compensation that is paid by the depositor.

As to any offering of securities, in addition to the method of distribution as described in the prospectus supplement and this base prospectus, the distribution of any class of the offered securities may be effected through one or more resecuritization transactions, in accordance with Rule 190(b).

Alternatively, the related prospectus supplement may specify that Bear, Stearns & Co. Inc. acting as agent or in some cases as principal with respect to securities that it has previously purchased or agreed to purchase, will distribute the securities.  If Bear, Stearns & Co. Inc. acts as agent in the sale of securities, Bear, Stearns & Co. Inc. will receive a selling commission with respect to each series of securities, depending on market conditions, expressed as a percentage of the aggregate principal balance of the securities sold hereunder as of the closing date.  The exact percentage for each series of securities will be disclosed in the related prospectus supplement. To the extent that Bear, Stearns & Co. Inc. elects to purchase securities as principal, Bear, Stearns & Co. Inc. may realize losses or profits based upon the difference between its purchase price and the sales price.  The related prospectus supplement with respect to any series offered other than through underwriters will contain information regarding the nature of such offering and any agreements to be entered into between the depositor and purchasers of securities of such series.

The depositor will indemnify Bear, Stearns & Co. Inc. and any underwriters against certain civil liabilities, including liabilities under the Securities Act of 1933, or will contribute to payments Bear, Stearns & Co. Inc. and any underwriters may be required to make in respect thereof.

In the ordinary course of business, the depositor and Bear, Stearns & Co. Inc. may engage in various securities and financing transactions, including repurchase agreements to provide interim financing of the depositor's mortgage loans pending the sale of such mortgage loans or interests in such mortgage loans, including the securities.

Bear, Stearns & Co. Inc. may use this prospectus and the related prospectus supplement in connection with offers and sales related to market-making transactions in the securities.  Bear, Stearns & Co. Inc. may act as principal or agent in such transactions.  Such sales will be made at prices related to prevailing market prices at the time of sale or otherwise.

The depositor anticipates that the securities will be sold primarily to institutional investors or sophisticated non-institutional investors.  Purchasers of securities, including dealers, may, depending on the facts and circumstances of such purchases, be deemed to be "underwriters" within the meaning of the Securities Act of 1933 in connection with reoffers and

sales by them of securities. Securityholders are encouraged to consult with their legal advisors in this regard before any such reoffer or sale.

## Legal Matters

Legal matters in connection with the securities of each series, including both federal income tax matters and the legality of the securities being offered will be passed upon by Thacher Proffitt & Wood LLP, Orrick, Herrington & Sutcliffe LLP and Greenberg Traurig LLP or other counsel designated in the prospectus supplement.

## Financial Information

A new trust fund will be formed for each series of securities. No trust fund will engage in any business activities or have any assets or obligations prior to the issuance of the related series of securities. Accordingly, no financial statements with respect to any trust fund will be included in this prospectus or in the related prospectus supplement.

## Available Information

The depositor is subject to the informational requirements of the Exchange Act and in accordance therewith files reports and other information with the Commission. Reports and other information filed by the depositor can be inspected and copied at the Public Reference Room maintained by the Commission at 100 F Street NE, Washington, DC 20549, and its Regional Offices located as follows: Chicago Regional Office, 500 West Madison, 14th Floor, Chicago, Illinois 60661; New York Regional Office, 233 Broadway, New York, New York 10279. Copies of the material can also be obtained from the Public Reference Section of the Commission, 100 F Street NE, Washington, DC 20549, at prescribed rates and electronically through the Commission's Electronic Data Gathering, Analysis and Retrieval system at the Commission's Website (http://www.sec.gov). Information about the operation of the Public Reference Room may be obtained by calling the Securities and Exchange Commission at (800) SEC-0330. Exchange Act reports as to any series filed with the Commission will be filed under the issuing entity's name. The depositor does not intend to send any financial reports to security holders.

The issuing entity's annual reports on Form 10-K (including reports of assessment of compliance with the AB Servicing Criteria, attestation reports, and statements of compliance, discussed in "Reports to Holders" in this prospectus and "Servicing of Loans — Evidence as to Compliance" in the related prospectus supplement, required to be filed under Regulation AB), periodic distribution reports on Form 10-D, current reports on Form 8-K and amendments to those reports, together with such other reports to security holders or information about the securities as shall have been filed with the Commission will be posted on the trustee's or the securities administrator's internet web site as soon as reasonably practicable after it has been electronically filed with, or furnished to, the Commission. The address of the website will be provided in the related Prospectus Supplement.

This prospectus does not contain all of the information set forth in the registration statement (of which this prospectus forms a part) and exhibits thereto which the depositor has filed with the Commission under the Securities Act and to which reference is hereby made.

## Incorporation of Certain Information by Reference

This prospectus incorporates by reference all documents, including but not limited to the financial statements and reports filed or incorporated by reference by the depositor, Bear Stearns Asset Backed Securities I LLC, with respect to a trust fund pursuant to the requirements of Section 13(a), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, prior to the termination of the offering of the related securities; provided, however, this prospectus and any related prospectus supplement do not incorporate by reference any of the issuing entity's annual reports filed on Form 10-K with respect to a trust fund. Upon request by any person to whom this prospectus is delivered in connection with the offering of one or more classes securities, the depositor will provide or cause to be provided without charge a copy of any of the documents and/or reports incorporated herein by reference, in each case to the extent the documents or reports relate to those classes of securities, other than the exhibits to the documents (unless the exhibits are specifically incorporated by reference in such documents). Requests to the depositor should be directed in writing to: Bear Stearns Asset Backed Securities I LLC, 383 Madison Avenue, New York, New York 10179, telephone number (212) 272-2000.  The depositor has determined that its financial statements are not material to the offering of any securities.

Investors may read and copy the documents and/or reports incorporated herein by reference at the Public Reference Room of the Securities and Exchange Commission at 450 Fifth Street, N.W., Washington, D.C. 20549.  Investors may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330.  In addition, the SEC maintains a website containing reports, proxy and information statements and other information regarding issuing entities, including each trust fund, that file electronically with the SEC.

## Ratings

It is a condition to the issuance of the securities of each series offered by this prospectus and the accompanying prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the prospectus supplement.

Each such rating will be based on, among other things, the adequacy of the value of the trust fund assets and any credit enhancement with respect to the related class and will reflect the rating agency's assessment solely of the likelihood that the related holders will receive payments to which they are entitled.  No rating will constitute an assessment of the likelihood that principal prepayments on the related loans will be made, the degree to which the rate of prepayments might differ from that originally anticipated or the likelihood of early optional termination of the securities.  A rating should not be deemed a recommendation to purchase, hold or sell securities, inasmuch as it does not address market price or suitability for a particular investor.  A rating will not address the possibility that prepayment at higher or lower rates than anticipated by an investor may cause such investor to experience a lower than anticipated yield or that an investor purchasing a security at a significant premium might fail to recoup its initial investment under certain prepayment scenarios.

There is also no assurance that any rating will remain in effect for any given period of time or that it may not be lowered or withdrawn entirely by the applicable rating agency in the

future if in its judgment circumstances so warrant.  In addition to being lowered or withdrawn due to any erosion in the adequacy of the value of trust fund assets or any credit enhancement with respect to a series, a rating might also be lowered or withdrawn because of, among other reasons, an adverse change in the financial or other condition of a credit enhancement provider or a change in the rating of the credit enhancement provider's long-term debt.

The amount, type and nature of any credit enhancement established with respect to a series of securities will be determined on the basis of criteria established by each rating agency named in the related prospectus supplement.  These criteria are sometimes based upon an actuarial analysis of the behavior of mortgage loans in a larger group.  Such analysis is often the basis upon which each rating agency determines the amount of credit enhancement required with respect to each class of securities.  There can be no assurance that the historical data supporting any such actuarial analysis will accurately reflect future experience nor any assurance that the data derived from a large pool of mortgage loans will accurately predict the delinquency, foreclosure or loss experience of any particular pool of loans.  No assurance can be given that values of any properties have remained or will remain at their levels on the respective dates of origination of the related loans.  If residential real estate markets should experience an overall decline in property values such that the principal balances of the loans in a particular trust fund and any secondary financing on the related properties become equal to or greater than the value of those properties, the rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry.  In additional, adverse economic conditions (which may or may not affect real property values) may affect the timely payment by borrowers of scheduled payments of principal of and interest on the loans and, accordingly, the rates of delinquencies, foreclosures and losses with respect to any trust fund.  To the extent that losses are not covered by credit enhancement, losses will be borne, at least in part, by the holders of one or more classes of the securities of the related series.

## Legal Investment Considerations

Each class of certificates offered by this prospectus and by the related prospectus supplement will be rated at the date of issuance in one of the four highest rating categories by at least one rating agency. If so specified in the related prospectus supplement, each such class that is rated in one of the two highest rating categories by at least one rating agency will constitute "mortgage related securities" for purposes of SMMEA, and, as such, will be legal investments for persons, trusts, corporations, partnerships, associations, business trusts and business entities (including depository institutions, life insurance companies and pension funds) created pursuant to or existing under the laws of the United States or of any State whose authorized investments are subject to state regulation to the same extent that, under applicable law, obligations issued by or guaranteed as to principal and interest by the United States or any agency or instrumentality thereof constitute legal investments for the entities. Under SMMEA, if a State enacted legislation on or prior to October 3, 1991 specifically limiting the legal investment authority of any such entities with respect to "mortgage related securities," such securities will constitute legal investments for entities subject to the legislation only to the extent provided therein. Some States have enacted legislation which overrides the preemption provisions of SMMEA. SMMEA provides, however, that in no event will the enactment of any such legislation affect the validity of any contractual commitment to purchase, hold or invest in "mortgage related securities," or

144

require the sale or other disposition of the securities, so long as the contractual commitment was made or the securities acquired prior to the enactment of the legislation.

SMMEA also amended the legal investment authority of federally-chartered depository institutions as follows: federal savings and loan associations and federal savings banks may invest in, sell or otherwise deal with "mortgage related securities" without limitation as to the percentage of their assets represented thereby, federal credit unions may invest in the securities, and national banks may purchase the securities for their own account without regard to the limitations generally applicable to investment securities set forth in 12 U.S.C. 24 (Seventh), subject in each case to such regulations as the applicable federal regulatory authority may prescribe.

The Federal Financial Institutions Examination Council has issued a supervisory policy statement applicable to all depository institutions, setting forth guidelines for and significant restrictions on investments in "high-risk mortgage securities." The policy statement has been adopted by the Federal Reserve Board, the Office of the Comptroller of the Currency, the FDIC and the OTS with an effective date of February 10, 1992. The policy statement generally indicates that a mortgage derivative product will be deemed to be high risk if it exhibits greater price volatility than a standard fixed rate thirty-year mortgage security. According to the policy statement, prior to purchase, a depository institution will be required to determine whether a mortgage derivative product that it is considering acquiring is high-risk, and if so that the proposed acquisition would reduce the institution's overall interest rate risk. Reliance on analysis and documentation obtained from a securities dealer or other outside party without internal analysis by the institution would be unacceptable. There can be no assurance as to which classes of offered securities will be treated as high-risk under the policy statement.

The predecessor to the OTS issued a bulletin, entitled, "Mortgage Derivative Products and Mortgage Swaps", which is applicable to thrift institutions regulated by the OTS. The bulletin established guidelines for the investment by savings institutions in certain "high-risk" mortgage derivative securities and limitations on the use of the securities by insolvent, undercapitalized or otherwise "troubled" institutions. According to the bulletin, such "high-risk" mortgage derivative securities include securities having specified characteristics, which may include some classes of offered securities. In addition, the National Credit Union Administration has issued regulations governing federal credit union investments which prohibit investment in specified types of securities, which may include some classes of offered securities. Similar policy statements have been issued by regulators having jurisdiction over other types of depository institutions.

Any class of securities that is not rated in one of the two highest rating categories by at least one rating agency, and any other class of securities specified in the related prospectus supplement, will not constitute "mortgage related securities" for purposes of SMMEA. Prospective investors in these classes of securities, in particular, should consider the matters discussed in the following paragraph.

There may be other restrictions on the ability of investors either to purchase some classes of offered securities or to purchase any class of offered securities representing more than a specified percentage of the investors' assets. The depositor will make no representations as to the

proper characterization of any class of offered securities for legal investment or other purposes, or as to the ability of particular investors to purchase any class of certificates under applicable legal investment restrictions. These uncertainties may adversely affect the liquidity of any class of certificates. Accordingly, all investors whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities are encouraged to consult with their own legal advisors in determining whether and to what extent the offered securities of any class thereof constitute legal investments or are subject to investment, capital or other restrictions, and, if applicable, whether SMMEA has been overridden in any jurisdiction relevant to the investor.

## Plan of Distribution

The depositor may offer each series of securities through BS&Co. or one or more other firms that may be designated at the time of the related offering. The participation of BS&Co. in any offering will comply with Schedule E to the By-Laws of the National Association of Securities Dealers, Inc. The prospectus supplement relating to each series of securities will set forth the specific terms of the offering of the series and of each class within the series, the names of the underwriters, the purchase price of the securities, the proceeds to the depositor from the sale, any securities exchange on which the securities may be listed, and, if applicable, the initial public offering prices, the discounts and commissions to the underwriters and any discounts and concessions allowed or reallowed to dealers. The place and time of delivery of each series of securities will also be set forth in the related prospectus supplement. BS&Co. is an affiliate of the depositor.

## Glossary of Terms

Agency Securities. Mortgage-backed securities issued or guaranteed by Ginnie Mae, Fannie Mae or Freddie Mac.

Agreement. An owner trust agreement, servicing agreement or indenture.

Asset Value. With respect to the primary assets in the trust fund, the *product* of the Asset Value percentage set forth in the related indenture *multiplied by* the *lesser* of

- the stream of remaining regularly scheduled payments in the primary assets net of certain amounts payable as expenses, together with income earned on each regularly scheduled payment received through the day preceding the next distribution date at the Assumed Reinvestment Rate, if any, discounted to present value at the highest interest rate on the notes of the series over periods equal to the interval between payments on the notes *and*

- the then outstanding principal balance of the primary assets.

Assumed Reinvestment Rate. With respect to a series of securities, the highest rate permitted by the rating agencies named in the related prospectus supplement or a rate insured by means of a surety bond, guaranteed investment contract, reinvestment agreement or other arrangement satisfactory to the rating agencies.

146

Assumption Fee.  The fee paid to the mortgagee upon the assumption of the primary liability for payment of the mortgage.

Benefit Plan Investors.  Plans subject to Part 4 of Title I of ERISA or Section 4975 of the Code and any entity whose underlying assets include Plan Assets by reason of any such Plan's investment in the entity.

Closing Date.  With respect to any series of bonds, the date on which the bonds are issued.

Code.  The Internal Revenue Code of 1986.

DOL.  The U.S. Department of Labor.

DOL Regulations.  Regulations by the DOL promulgated at 29 C.F.R. §2510.3-101.

DTC Registered Bond.  Any bond initially issued through the book-entry facilities of the DTC.

Eligible Account: Any of (i) an account or accounts maintained with a federal or state chartered depository institution or trust company, the long-term unsecured debt obligations and short-term unsecured debt obligations of which (or, in the case of a depository institution or trust company that is the principal subsidiary of a holding company, the debt obligations of such holding company, so long as Moody's is not a rating agency) are rated by each rating agency in one of its two highest long-term and its highest short-term rating categories, respectively, at the time any amounts are held on deposit therein; provided, that following a downgrade, withdrawal, or suspension of such institution's rating as set forth above, each account shall promptly (and in any case within not more than 30 calendar days) be moved to one or more segregated trust accounts in the trust department of such institution, or to an account at another institution that complies with the above requirements, or (ii) a trust account or accounts maintained with the corporate trust department of a federal or state chartered depository institution or trust company having capital and surplus of not less than $50,000,000, acting in its fiduciary capacity or (iii) any other account acceptable to the rating agencies, as evidenced in writing. Eligible Accounts may bear interest, and may include, if otherwise qualified under this definition, accounts maintained with the trustee.  The ratings in clause (i) may be amended, without the consent of the Securityholders, provided that a letter is obtained from each rating agency stating that such amendment would not result in the downgrading or withdrawal of the respective ratings then assigned to the related Securities.

Exemption.  An individual prohibited transactions exemption issued by the DOL to an underwriter, as amended by Prohibited Transaction Exemption ("PTE") 97-34, 62 Fed. Reg. 39021 (July 21, 1997), PTE 2000-58, 65 Fed. Reg. 67765 (November 13, 2000) and PTE 2002-41, 67 Fed. Reg. 54487 (August 22, 2002) or any amendment thereto.

Exemption Rating Agency.  Standard & Poor's, a division of The McGraw-Hill Companies, Inc., Moody's Investors Service, Inc., or Fitch, Inc or any other "Rating Agency" within the meaning of the Exemption.

Home Equity Loans.   Closed-end loans and/or revolving credit line loans secured by mortgages, deeds of trust or other similar security instruments creating senior or junior liens on one- to four-family residential properties or mixed-use properties.

Home Improvement Contracts.   Home Improvement installment sales contracts and installment loan agreements which are either unsecured or secured by mortgages, deeds of trust or similar security instruments creating generally junior liens on one- to four-family residential properties or mixed-use properties or secured by purchase money security interests in the related home improvements.

Insurance Proceeds.   Amounts received by the related servicer under any title insurance policy, hazard insurance policy or other insurance policy covering any primary asset in a trust fund, other than amounts to be applied to the restoration or repair of the related property or released to the borrower under the related agreement.

Issuing Entity.   The Delaware statutory trust or other trust, created pursuant to the owner trust agreement, that issues the bonds.

Liquidation Proceeds.   Amounts received by the related servicer in connection with the liquidation of the primary assets or related real property in a trust fund, whether through foreclosure sale, repossession or otherwise, including payments in connection with the primary assets received from the borrower, other than amounts required to be paid or refunded to the borrower under the applicable loan documents or pursuant to law, net of the related liquidation expenses.

Manufactured Housing Contracts.   Manufactured housing installment sales contracts and installment loan agreements secured by senior or junior liens on the related manufactured homes or secured by mortgages, deeds of trust or other similar security instruments creating senior or junior liens on the real estate on which the related manufactured homes are located.

MBA Method – The method of calculating delinquencies in accordance with the methodology used by the Mortgage Bankers Association, as described in "The Trust Funds – Methods of Delinquency Calculation" in this prospectus.

OID Regulations.  Sections 1271 through 1275 of the Internal Revenue Code of 1986, as amended, and the Treasury regulations issued thereunder on February 2, 1994 and amended on June 11, 1996.

OTS Method – The method of calculating delinquencies in accordance with the methodology used by lenders regulated by the Office of Thrift Supervision, as described in "The Trust Funds – Methods of Delinquency Calculation" in this prospectus.

Parity Act.  The Alternative Mortgage Transaction Parity Act of 1982.

Parties in Interest.  With respect to a Plan, persons who have specified relationships to the Plans, either "Parties in Interest" within the meaning of ERISA or "Disqualified Persons" within the meaning of Section 4975 of the Code.

Plan Assets.  "Plan assets" of a Plan within the meaning of the DOL Regulations.

Plans.  ERISA Plans and Tax Favored Plans.

Private Label Securities.  Private mortgage-backed securities, other than Agency Securities, backed or secured by underlying loans that may be Residential Loans, Home Equity Loans, Home Improvement Contracts and/or Manufactured Housing Contracts.

Residential Loans.  Loans secured by mortgages, deeds of trust or other similar security instruments creating senior or junior liens on one- to four-family residential properties.

RICO — The Racketeer Influenced and Corrupt Organizations statute.

Tax Favored Plans.  Plans that meet the definition of "plan" in Section 4975(e)(1) of the Code, including tax-qualified retirement plans described in Section 401(a) of the Code and individual retirement accounts and annuities described in Section 408 of the Code.

U.S. Person.  Any of the following:

- a citizen or resident of the United States;

- a corporation or a partnership (including an entity treated as a corporation or partnership for U.S. federal income tax purposes) organized in or under the laws of the United States, or any State thereof or the District of Columbia (unless in the case of a partnership Treasury regulations are adopted that provide otherwise);

- an estate whose income from sources outside the United States is includible in gross income for federal income tax purposes regardless of its connection with the conduct of a trade or business within the United States; or

- a trust if a court within the United States is able to exercise primary supervision of the administration of the trust and one or more U.S. Persons have the authority to control all substantial decisions of the trust.

In addition, certain trusts which would not qualify as U.S. Persons under the above definition but which are eligible to and make an election to be treated as U.S. Persons will also be treated as U.S. Persons.

# $1,036,250,000 (Approximate)

## NEWCASTLE MORTGAGE SECURITIES TRUST 2007-1
*Issuing Entity*

## NEWCASTLE INVESTMENT CORP.
*Sponsor*

## BEAR STEARNS ASSET BACKED SECURITIES I LLC
*Depositor*

## WELLS FARGO BANK, N.A.

*Master Servicer, Securities Administrator and Custodian*

## NATIONSTAR MORTGAGE LLC
*Servicer*

## FREMONT INVESTMENT & LOAN

*Originator*

## ASSET-BACKED NOTES, SERIES 2007-1

————————————

**Prospectus Supplement**

————————————

## Bear, Stearns & Co. Inc.
**Underwriter**

**You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus. We have not authorized anyone to provide you with different information.**

**We are not offering the offered notes in any state where the offer is not permitted.**

Dealers will be required to deliver a prospectus supplement and prospectus when acting as underwriters of the notes offered by this prospectus supplement and with respect to their unsold allotments or subscriptions. In addition, all dealers selling the offered notes, whether or not participating in this offering, may be required to deliver a prospectus supplement and prospectus for 90 days after the date of this prospectus supplement.