# EXHIBIT 60

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
DEXIA SA/NV, DEXIA HOLDINGS
INC.,  FSA ASSET MANAGEMENT LLC
and DEXIA CREDIT LOCAL SA,
               Plaintiffs,
          vs.                              No.  12-CV-4761
BEAR STEARNS AND CO., INC., THE
BEAR STEARNS COMPANIES, INC.,
BEAR STEARNS ASSET BACKED
SECURITIES I LLC, EMC MORTGAGE
LLC (f/k/a EMC MORTGAGE
CORPORATION), STRUCTURED ASSET
MORTGAGE INVESTMENTS II, INC., J.P.
MORGAN MORTGAGE ACQUISITION
CORPORATION, J.P. MORGAN SECURITIES,
LLC (f/k/a JP MORGAN SECURITIES INC.),
WAMU ASSET ACCEPTANCE CORP.,
WAMU CAPITAL CORP.,  WAMU MORTGAGE
SECURITIES CORP., JPMORGAN CHASE & CO.
and JPMORGAN CHASE BANK, N.A.,
          Defendants.
------------------------------------X


          *** CONFIDENTIAL ***
     VIDEOTAPED DEPOSITION OF
     JEFFREY LOUIS VERSCHLEISER

          New York, New York

          January 11, 2013




Reported by:
Bonnie Pruszynski, RMR
JOB NO. 57107

1                   Confidential - J. Verschleiser

2          A        Either associate director or managing

3   director.   I don't recall which one.

4          Q        Did you hold both titles at some

5   point in time during your tenure at Bear Stearns?

6          A        I'm not sure.

7          Q        When were you promoted to either

8   associate or managing director?

9          A        I don't recall.

10          Q        When you were the associate or

11   managing director, were you still in the mortgage

12   department?

13          A        Yes.

14          Q        And were you at some point promoted

15   from an associate or managing director?

16          A        Yes.

17          Q        And what were you promoted to?

18          A        A senior managing director.

19          Q        And when were you promoted to senior

20   managing director?

21          A        I don't recall the exact year.

22          Q        Do you recall generally the time

23   frame?

24          A        Generally, I believe it was between

25   '96 and '98.

1              Confidential - J. Verschleiser

2         Q         And how long were you a senior

3    managing director?

4         A         Until the time I left Bear Stearns.

5         Q         So, between '96 and '98, until you

6    left in June of 2008, you were not promoted again;

7    is that correct?

8         A         With respect to title, that is

9    correct.

10        Q         Did you receive a promotion that was

11   not with respect to title?

12        A         If you are asking about job function,

13   my job function changed over time.  If you are

14   asking with respect to hierarchy within the

15   officers within Bear Stearns, I -- I did not -- it

16   is -- I stayed the same, senior managing director

17   level.

18        Q         What were your job functions when you

19   were first promoted to senior managing director in

20   the 1996 to 1998 timeframe?

21        A         In the '96 to '98 timeframe, I was

22   trading mortgage-backed securities.

23        Q         What do you mean, "trading

24   mortgage-backed securities"?

25        A              Could you elaborate on your

1                    Confidential - J. Verschleiser

2          Q         Did you purchase RMBS, meaning

3    residential mortgage-backed securities, while you

4    were senior managing director in the 1996 to 1998

5    timeframe?

6          A         Yes.

7          Q         Was that part of the job function of

8    the mortgage department where you worked?

9          A         Yes.

10         Q         Did that job function change at all

11   between 1998 and, let's say, 2007?

12         A         For the department or for myself?

13         Q         Let's start with the department.

14         A         From 1996 through 2008, Bear Stearns

15   was involved in purchasing mortgage-backed

16   securities of all sorts and asset-backed

17   securities of all sorts, through 2008.

18         Q         And did your job function throughout

19   that timeframe include purchasing residential

20   mortgage-backed securities?

21         A         At certain times, yes.

22                   (Interruption in proceedings.)

23         Q         What was your job function,

24   generally, in 2005 to 2008, before you left Bear

25   Stearns?  And if it changed over that time, let me

1          Confidential - J. Verschleiser

2    know, and we can break it down.

3          A          Over the 2005 to 2008 period, I don't

4    recall if it changed or didn't change, but I know

5    for a period of that time, perhaps the entire

6    time, I was supervising the non-agency

7    mortgage-backed security desk and asset-backed

8    desk at Bear Stearns, and for a period of that

9    time, I was named co-head of mortgage trading.

10         Q          Were you --

11         A          And for -- and for a period of that

12   time, I was working on seeing if Bear Stearns

13   should work with outside -- outside capital to

14   invest in the mortgage area.

15         Q          And what do you mean when you

16   describe working on seeing if Bear Stearns should

17   work with outside capital to invest in the

18   mortgage area?

19         A          At some point in 2007, or 2008, Bear

20   Stearns was exploring the idea of working with

21   capital provided by outside investors to the

22   capital that Bear Stearns had in investing in the

23   securities and loan market of the mortgage area.

24         Q          Did Bear Stearns ultimately invest in

25   the mortgage area?

1              Confidential - J. Verschleiser

2      well as certain mortgage loans.

3           Q        At that point in time, were you still

4      working for the mortgage department?

5           A        Yes.

6           Q        Did the mortgage department purchase

7      loans for investment purposes?

8           A        Can you define by what you mean by

9      "investment purposes"?

10          Q        Did the mortgage department in Bear

11     Stearns, in the 2005 to 2008 timeframe, purchase

12     residential mortgage loans for the purpose of

13     maintaining them on its own balance sheet.

14          A        And when you say maintaining on its

15     own balance sheet, is that until the maturity of

16     the loan?

17          Q        Correct.

18          A        And is that for residential loans or

19     commercial loans or any type of loans?

20          Q        I'm speaking specifically about

21     residential.

22          A        I don't believe Bear Stearns

23     purchased residential mortgage loans to maintain,

24     to use your term, on the firm's balance sheet.

25          Q        During that timeframe, Bear Stearns

```
 1              Confidential - J. Verschleiser
 2  mind between "structure" and "issue"?
 3       A      Yes.
 4       Q      What's your distinction?
 5       A      My distinction would be "structure"
 6  would mean that they came up -- came up with the
 7  cash flow structure of the bonds that were being
 8  issued by a certain entity.
 9       Q      And what do you mean by "issue"?
10       A      Issue -- well, I can't give you an
11  exact legal term, I assume you and my counsel
12  probably could give a better example -- is a legal
13  entity that issues the bond, and that legal entity
14  being an entity, a subsidiary of Bear Stearns or
15  within Bear Stearns versus being an entity outside
16  of Bear Stearns.
17       Q      When Bear Stearns -- did Bear Stearns
18  structure the cash flow when it served as the
19  underwriter for residential, non-agency
20  residential mortgage-backed securities issued by
21  other entities?
22       A      Generally, my recollection is when
23  you acted as underwriter for an issuer, one of
24  your responsibilities was contributing to what the
25  cash flow structure would be of the bonds issued.
```

1                Confidential - J. Verschleiser

2    for that word, if you meant issue versus whether

3    you meant acted as underwriter.

4         Q       Correct.  And I am just getting to

5    your clarification between "issue" and

6    "structure."

7         A       Um-hum.

8         Q       And your clarification, when you said

9    "structure," you identified "structure" as those

10   instances where Bear Stearns was not -- did not

11   issue the certificates but acted as an underwriter

12   who assisted in the structure of the cash flows

13   for securitizations issued by other entities;

14   correct?

15        A       No.

16        Q       What did you mean by "structure"?

17        A       I believe what you just said to me

18   was, you made a distinction that if you -- you

19   either structured or you issued.

20                What I was trying to explain was that

21   whether you were the issuer of a non-agency

22   mortgage-backed security, and you were selling --

23   acting as underwriter and distributing those

24   bonds, or you were just acting as underwriter and

25   not the issuer, you were structuring in both of

Page 66

1                  Confidential - J. Verschleiser

2        after?

3             A         Sure.

4                       The firm could make money in the

5        securitization process before by -- in the time

6        from the settlement of the loans on the firm's

7        balance sheet until they were securitized, the

8        firm may make carry, which would be the difference

9        where the firm financed itself versus what the

10       loans paid.

11                      The firm may make money prior to and

12       at the time of securitization based on the

13       difference between where the firm bought the loans

14       and ultimately securitized the loans.

15                      The firm could have made money after

16       the process on the securities the firm still held

17       from that securitization, and the firm could

18       potentially have made money if on the particular

19       mortgage-backed securities the firm issued they

20       act as servicer, and they could have made money on

21       that servicing asset.

22                      Those were areas where the firm could

23       have made money that I recall.

24             Q         Anything else?

25             A         There may be, but nothing that I

1                Confidential - J. Verschleiser

2    an affiliate that retained servicing, so the

3    performance of that loan if it went delinquent

4    affected it.

5                Bear Stearns or its subsidiaries gave

6    certain reps and warranties that would affect it

7    if -- could affect it.

8                That's -- that's what I can think of

9    right now.

10       Q    So why didn't you just keep the

11   loans?

12       A    Why didn't Bear Stearns keep every

13   loan?

14       Q    Right.  If they still carried all

15   this risk, why wouldn't they keep the loan and

16   enjoy the benefits of the principal and interest

17   payments on the loans?

18       A    Many reasons.

19       Q    Because it transferred part of the

20   risk; correct?

21       A    One of the reasons.  The balance

22   sheet of Bear Stearns would have been much bigger,

23   is another reason.

24       Q    Bear Stearns didn't want these loans

25   on its balance sheet, did it?

1              Confidential - J. Verschleiser

2         A       As I said earlier, Bear Stearns

3    didn't have any loans that I am aware of at --

4    when they purchased them as a strategy to put on

5    their balance sheet.   Bear Stearns was in the

6    business of the securitization or whole loan sales

7    being a spread, not holding for the sake of having

8    a balance sheet, as certain other banks may have

9    had.

10         Q      They were in the business of buying

11   loans and selling them either in whole loan sales

12   or in securitization, to investors at a spread to

13   increase their profit; correct?

14         A      They were in the business -- when

15   they bought whole loans, the objective was to

16   distribute those whole loans, whether through a

17   whole loan sale or through a security, and in that

18   process, the firm did try to make a profit.

19         Q      When the loan -- when the individual

20   mortgage loans were packaged into a non-agency

21   RMBS securitization and sold to investors, Bear

22   Stearns transferred all right, title and interest

23   in those loans to the trust for the benefit of the

24   certificate holders; correct?

25         A      What does "all right, title and

Page 94

1                Confidential - J. Verschleiser

2      the daily volume of loans that were being

3      acquired?

4           A      As I testified before, I had regular

5      dialogue with Ms. Haggerty.   I don't recall

6      specifics of any particular dialogue, but I don't

7      recall ever having conversation that there would

8      be 500 loans or any amount purchased every day.

9                MR. DeLANGE:   I'll ask the court

10              reporter to mark a document as Exhibit 243.

11                (Verschleiser Exhibit 243 marked for

12              identification as of this date.)

13          Q       The court reporter has handed you a

14     document that has been marked as Exhibit 243.

15     It's an e-mail bearing Bates label

16     JPMC_DEX_000934688.   And it again has an Excel

17     spreadsheet attached to it that was produced in

18     native format.   This is an e-mail from you,

19     Mr. Verschleiser, to Michael Cohn, Robert Durden,

20     with a cc to Keith Lind and Chris Scott, dated

21     Tuesday, July 18, 2006.

22                Do you see that?

23          A      I see the e-mail, yes.

24          Q      Do you recognize this document?

25          A      No, I do not.

1              Confidential - J. Verschleiser

2         A       As I don't recall specific

3    conversations from that time period, I can't

4    testify if I did or did not.

5         Q       Did you have concerns during that

6    time that too many loans remained in inventory and

7    had not been securitized?

8         A       I don't recall if I had specific

9    conversations or concerns about that specific

10   issue.

11        Q       But you want -- you didn't want loans

12   in inventory.  You wanted them securitized;

13   correct?

14        A       At what period of time?  Are you

15   saying what I didn't want --

16        Q       Two thousand --

17        A       Are you asking me was the strategy of

18   the firm to hold loans in inventory or securitize

19   them?

20        Q       You already testified the strategy

21   and goal of the firm was to securitize them and

22   not hold them on its balance sheet; correct?

23        A       Securitize or sell as whole loans,

24   yes.

25        Q       And I'm saying, did you have concerns

1          Confidential - J. Verschleiser

2    during this time period 2005 to 2007, that there

3    were too many loans in inventory that had not been

4    securitized?

5          A      During my entire period at Bear

6    Stearns, we worked on securitizing loans and not

7    having them be in inventory.  So, 2005 and 2007

8    falls into that period.

9          Q      Would it reflect negatively on your

10   performance if Bear Stearns was carrying too many

11   loans in inventory?

12         A      It would depend.

13         Q      Depend on what?

14         A      At certain times we may carry a lot

15   of loans in inventory because there is a lot of

16   demand from clients to buy mortgage-backed

17   securities.  At certain times we may not have any

18   or very little because there is very little

19   origination or very little demand.

20              So, the absolute amount, I don't

21   believe in and of itself was a reflection on me.

22         Q      If you had an absolute amount in

23   inventory that could have been securitized and was

24   not, did you potentially lose the opportunity to

25   increase profits through those securitizations?

Page 155

1              Confidential - J. Verschleiser

2        A       The due diligence group, as I recall,

3   reported up to Baron Silverstein and Mary

4   Haggerty.

5        Q       And then Baron --

6        A       Within Bear Stearns.

7        Q       And then Baron and Mary reported to

8   whom?

9        A       As I said before, at periods of time,

10  Baron reported in to Michael Nierenberg, and at

11  other periods of time, he reported in to Mr. Tom

12  Marano.

13             Ms. Haggerty at periods of time

14  reported in to myself, and at other periods of

15  time reported to Tom Marano.

16             I do not know during the 2005 to 2008

17  period what their reporting structure was or if

18  they reported in to Michael or myself in those

19  periods of time.

20        Q       I'm going to hand you a document I'm

21  going to mark as Exhibit 249.

22             (Verschleiser Exhibit 249 marked for

23        identification as of this date.)

24        Q       Mr. Verschleiser, I have handed you a

25  document that has been marked as Exhibit 249.  It

Page 221

1                 Confidential - J. Verschleiser

2          A       I don't recall if it was or wasn't.

3          Q       Do you have any reason to doubt that

4     that was the process at the time?

5          A       I don't know if it was or wasn't, so

6     I can't doubt it.

7          Q       As you sit here today, do you think

8     this representation from PWC regarding existing

9     processes is incorrect?

10               MS. JAMES:  Objection.

11          A       I -- I see where it says, "Buyouts

12    are processed after the receipt of put-back funds

13    from the seller," under the column "Existing

14    Processes."

15               I have no idea in the context that

16    that's written.  This is a tremendous document.

17          Q       I understand.  I just want to make

18    sure, because I am entitled to your best testimony

19    today, and I just want to make sure that if you

20    have any doubt as to its accuracy, that I get that

21    from you.  And if you don't know one way or the

22    other, that's fine.  I just -- I want to know.

23               MS. JAMES:  He said that already.

24               MR. DeLANGE:  He didn't say -- he

25    didn't answer.

Page 222

1              Confidential - J. Verschleiser

2         A        I don't know one way or the other.

3         Q        And the additional controls

4    considered in the proposed processes is, "The

5    immediate processing of the buyout if there is a

6    clear breach in the PSA agreement to match common

7    industry practices, the expectation of investors,

8    and to comply with the provisions in the PSA

9    agreement."

10                 Do you see that?

11        A        I do.

12        Q        Do you recall those additional

13   controls being proposed?

14        A        I don't recall what was or wasn't

15   proposed.

16        Q        Do you know if those additional

17   processes were implemented?

18        A        I don't know if they were or were

19   not.

20        Q        Did you personally implement those

21   policies?

22        A        Did I personally imp- -- I didn't --

23   I don't recall personally implementing any of

24   these processes.

25        Q        Did you comply or -- well, back up.

Page 254

```
 1              Confidential - J. Verschleiser
 2       A       Um-hum.
 3       Q       Do you see it says "Collection
 4  Process"?
 5       A       Yes.
 6       Q       And "Resolution experience, May 2006
 7  through April 2007"?
 8       A       Yes.
 9       Q       And then there is a total claim
10  amount resolved of $1.9 billion.  Do you see that?
11       A       I do.
12       Q       Is that consistent with your
13  understanding of the value of claims resolved
14  between May 2006 and April 2007?
15              MS. JAMES:  Objection, foundation.
16       A       I have no recollection of what was or
17  wasn't resolved, regardless of what your
18  definition of that term is, and I have no idea
19  what this 1945420708 refers to.
20       Q       This presentation is referring to a
21  collection process for early payment defaults; is
22  that right?
23       A       The title of this page is "Collection
24  Process."
25       Q       And the title of the document is "EPD
```

1              Confidential - J. Verschleiser

2        A      I am not sure how this spreadsheet

3    relates to this e-mail, and I am not sure this

4    23 million was or was not released -- was taken

5    into P&L.  I just -- I'm not sure what he means

6    here.

7        Q      You forwarded this to Whitney Long;

8    correct?

9        A      Yes, I did.

10        Q      Did you ask Ms. Long to clarify what

11    Mr. Flanagan's e-mail meant?

12        A      I don't recall this e-mail.  I don't

13    recall forwarding it.  I do see in this e-mail

14    where I forwarded it, underneath where I forwarded

15    it there was no language.  I don't recall any

16    specific conversations about this either.

17        Q      And again, who is Whitney Long?

18        A      Whitney Long worked for Steve Golden.

19        Q      Did you have regular communications

20    with Ms. Long and Mr. Flanagan in your employment

21    at Bear Sterns during the November to December,

22    2006 timeframe?

23        A      When I was at Bear Stearns, at

24    periods of time I had dialogue with both Ms. Long

25    and Mr. Flanagan.  Whether there was regular

1           Confidential - J. Verschleiser

2    you received this e-mail on March 17, 2006, from

3    Mr. Perkins?

4           A      I do not.

5           Q      The e-mail says, "Ann, on the Encore

6    securitization, Encore offered to remove the use

7    of a comanager and pay us .25 percent on the

8    entire deal size if we credited 20 percent of our

9    fee against the existing PD claims."

10                  Do you see that?

11          A      Yes.

12          Q      What are PD claims?

13          A      I'm not sure what PD claims are.

14          Q      Are those payment default claims?

15          A      I'm not sure.   The subject of this

16   e-mail is "Encore EPD."

17          Q      Are they potentially existing EPD

18   claims?

19          A      Maybe.

20          Q      It continues, it says, "Jeff

21   Verschleiser agreed."   Do you see that?

22          A      I do.

23          Q      Did you agree to this deal with

24   Encore?

25          A      I don't recall.

Page 287

1                    Confidential - J. Verschleiser

2           Q        Do you have any reason to doubt that

3    you did?

4           A        I don't recall the deal, so I don't

5    recall if I did or did not agree to it.

6           Q        If you look on the page ending 550.

7    Mr. Golden asks Mr. Perkins, and copies you, "Can

8    the language be broad enough to allow us to apply

9    the 25 BP" -- meaning basis points; is that right?

10          A        That's what I think BP is.

11          Q        -- "against marks not UPB and include

12   all claims, not just EPD.  Is it at their option

13   to apply or ours?"

14                   Do you see that?

15          A        I do.

16          Q        Does that refresh your recollection

17   about negotiations you had with Encore regarding a

18   settlement of these EPD claims?

19          A        No, it does not.

20          Q        The next e-mail from Mr. Perkins

21   responds to Mr. Golden's suggestion and again

22   copies you; correct?

23          A        Yes.

24          Q        And it says, "Right now we have a

25   concept worked out with Encore... and nothing has

Page 288

1                   Confidential - J. Verschleiser

2       been put to paper."

3                       Do you see that?

4           A       I do.

5           Q       And then Matt says, "However you want

6       to apply these funds is fine with me."  Do you see

7       that?

8           A       I do.

9           Q       Did you agree with the decision to

10      apply these funds any way Steve wanted to?

11                  MS. JAMES:  Objection, foundation.

12          A       I don't know if a decision was ever

13      made.

14          Q       You received this e-mail from

15      Mr. Perkins on or about March 20, 2006; correct?

16          A       It says that right here.

17          Q       You have no reason to doubt it;

18      correct?

19          A       I have no reason to doubt that I

20      received this e-mail.

21          Q       Was this deal ultimately finalized?

22          A       As I said before, I don't recall this

23      deal, so I don't know if it was finalized.

24          Q       How would you find out if this was a

25      finalized settlement agreement that you entered

Page 289

1          Confidential - J. Verschleiser

2     into?

3          A      If these were the terms of it?

4          Q      Yes.

5          A      I don't know if I could.

6          Q      You had authority to enter and

7     approve these settlement discussions; correct?

8          A      Based on the document you showed me

9     earlier, yes.

10               MR. DeLANGE:  Could we take a quick

11          break.

12               THE VIDEOGRAPHER:  Off the record,

13          3:55 p.m.

14               (Recess taken.)

15               THE VIDEOGRAPHER:  Back on the record

16          at 3:59 p.m.

17               MR. DeLANGE:  Mr. Verschleiser, I

18          understand you have a hard cutoff time at

19          4 o'clock today, and you let us know in

20          advance, so I have no further questions.

21          Thank you for your time today.

22               THE WITNESS:  Thank you.

23               MR. EARNHARDT:  I have just a few

24          questions.

25