# EXHIBIT 61

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
DEXIA SA/NV, DEXIA HOLDINGS INC., FSA
ASSET MANAGEMENT LLC and DEXIA CREDIT
LOCAL SA,

                        PLAINTIFFS,


        -against-

BEAR STEARNS AND CO., INC., THE BEAR
STEARNS COMPANIES, INC., BEAR STEARNS
ASSET BACKED SECURITIES I LLC, EMC
MORTGAGE LLC (f/k/a EMC MORTGAGE
CORPORATION), STRUCTURED ASSET MORTGAGE
INVESTMENTS II, INC., J.P. MORGAN
MORTGAGE ACQUISITION CORPORATION, J.P.
MORGAN SECURITIES LLC (f/k/a JPMORGAN
SECURITIES INC.), WAMU ASSET ACCEPTANCE
CORP., WAMU CAPITAL CORP., WAMU MORTGAGE
SECURITIES CORP., JP MORGAN CHASE & CO.,
and JPMORGAN CHASE BANK, N.A.,


                        DEFENDANTS.

No. 12-cv-4761
--------------------------------------X



            DEPOSITION OF MARY HAGGERTY

            New York, New York

        Wednesday, December 19, 2012




Reported by:

Rebecca Schaumloffel, RPR, CLR

Job No: 56641

1                     M. HAGGERTY

2    to explain in general how an entity would

3    make money on securitization.

4         Q.     Let's -- I believe I understand

5    your concern, which is when the profits came

6    in to the corporate entity, it was under Bear

7    Stearns and Co., Inc.  You don't know as you

8    sit here today how that was allocated down to

9    the various entities; is that correct?

10        A.     That's correct.

11        Q.     Do you know how profits came in

12   to the corporate structure through the

13   securitization business?

14        A.     I don't know specifically.  I can

15   tell you generally from my general

16   understanding of how the business worked.

17        Q.     Generally, how did the Bear

18   Stearns and Company, Inc. corporate family

19   earn profits in the securitization business?

20        A.     My general understanding of how

21   this worked was as follows:  The trading desk

22   at Bear Stearns determined what the prices

23   would be to pay for the mortgage loans that

24   EMC was going to buy in the conduit business.

25   We are not speaking of this scratch-and-dent

1                    M. HAGGERTY

2    business at all here.   We are talking about

3    newly originated loans, whether it is flow

4    conduits or whether it is bulk packages.

5              So the trading desk was

6    responsible for coming up with those prices,

7    and I believe they came up with those prices

8    based on their understanding of where they

9    could several months later execute in a

10   securitization structure.   So there is that

11   aspect of pay money to purchase an asset,

12   hold it for a period of time, during which

13   time you would earn what we call the carry,

14   the difference between the interest income

15   that you earn on that asset by owning it and

16   what it cost you to finance it.

17             You also have expenses.   Those

18   expenses hedge your interest rate risk.   And

19   then obviously you have operating expenses.

20             And then you have the proceeds

21   from the sale of securitizations -- of the

22   securitization -- sorry, of the certificates

23   issued in connection with the securitization.

24   Sometimes certain of the certificates issued

25   are retained by either EMC or Bear Stearns,

                          M. HAGGERTY

1    and a profit would be determined by putting a

2    mark to market value on that retained

3    instrument.

4            So a profit from a transaction

5    would be basically what you paid to acquire

6    it, what carry you earned on it, and then

7    what the proceeds were, whether they were

8    cash proceeds from the sale or a valuation

9    put on the asset at that time.   There was

10   also typically a value ascribed to the

11   servicing asset that was created when you

12   securitized.   And then there is operating

13   expenses and transaction expenses that were

14   then deducted.

15       Q.     Were these profits generated on a

16   securitization-by-securitization basis?

17       A.     I believe that there was a daily

18   calculation of P&L, profit and loss, and that

19   daily calculation would be on the loan

20   position itself.   My understanding is that

21   you start to calculate P&L when you do the

22   trade to purchase the asset.   It is what we

23   refer to as being long the asset.

24            So if you have a long position,

1                    M. HAGGERTY

2    of it, but the offering part of the

3    underwritten transactions was handled by the

4    syndicate desk, and that was Carol Fuller.

5         Q.    In the instances where Bear

6    Stearns served only as an underwriter, did

7    Bear Stearns conduct any due diligence on the

8    offerings?

9         A.    I don't have specific information

10   about that, because I was not involved

11   specifically with those transactions.  Again,

12   my general recollection of having worked

13   there at the time is yes.

14        Q.    Who would conduct that due

15   diligence?

16        A.    Typically it would have been

17   third-party due diligence firms.

18        Q.    Clayton, for example?

19        A.    Clayton is an example of a

20   third-party due diligence firm that was quite

21   prominent during that time period.

22        Q.    It was one of the third-party due

23   diligence firms that Bear Stearns retained,

24   correct?

25        A.    I know for sure we used Clayton

1                    M. HAGGERTY

2             But with respect to the

3  collateral that was sourced through EMC,

4  through the flow conduit or through the bulk

5  acquisition channels, the data that was sent

6  by the analyst in the mortgage finance group

7  came out of a system called WITS, which was

8  an EMC proprietary database that contained

9  data on the mortgage loans that were in

10 inventory.

11        Q.    You made a -- I believe you made

12 a distinction in your answer where you

13 referred to underwriter transactions.  Do you

14 recall that?

15        A.    Yes.

16        Q.    What were you referring to when

17 you said underwriter transactions?

18        A.    We spoke earlier about Matt

19 Perkins' line of business where Bear Stearns

20 and Co. acted as underwriter for mortgage

21 securitization and was not the issuer.

22        Q.    In those transactions, did Bear

23 Stearns communicate with the rating agencies

24 regarding the structure?

25        A.    They did, yes.

Page 90

1                    M. HAGGERTY

2    information that was provided to them?

3         A.    I believe the rating agencies

4    relied on the accuracy of the information in

5    the data files that they received.

6         Q.    Whether they received it from

7    Bear Stearns or perhaps the originator on the

8    deal in -- or the issuer on the deal in an

9    underwriting deal?

10        A.    Correct.

11        Q.    Correct?

12              So we started this line of

13   questioning with a general explanation of the

14   process of how a mortgage loan makes its way

15   into a securitization.  Do you recall that?

16        A.    Yes.

17        Q.    It begins with the purchase,

18   correct?

19        A.    Yes.

20        Q.    At least at Bear Stearns, it

21   begins with the purchase of a mortgage loan,

22   correct?

23        A.    I am hesitating because there

24   were situations which were called pre-funding

25   accounts where some securitizations, to my

M. HAGGERTY

in that securitization; it just may have come
after the structuring of the securitization,
correct?

    A.   Correct.

    Q.   How did EMC purchase loans?

    A.   EMC purchased loans through a
number of channels.  The first one I will
describe is the bulk channel.  What bulk
purchase refers to is a circumstance where an
approved seller presents a pool of loans that
they had originated to Bear Stearns and to
other potential investors.  Bear Stearns and
other potential investors then choose to bid
on the entire pool or some portion of the
pool or choose not to bid.

       And they would -- if they do
choose to bid, they will submit those bids to
the seller.  The seller receives the bids
from Bear Stearns and the other competitors,
evaluates those bids and makes a
determination as to which entity to transact
with.

       So once that entity is noticed,
in the case, let's say, Bear Stearns wins

1                        M. HAGGERTY

2    that bid, what would happen next is that a

3    transaction deal manager would be notified by

4    the trader that the bid had been won, and

5    that deal manager would receive from the

6    trader the loan-level detail of the loans to

7    be purchased.

8              The transaction manager would

9    write a commitment draft -- a commitment

10   letter document saying -- it's kind of the

11   high-level points of the transaction, send it

12   to the seller, and the seller and the deal

13   manager would agree, yes, here is the

14   aggregate unpaid principal balance, here is

15   the purchase price, here is the settlement

16   date, here is a stratification of the loan

17   pool, so we can see what the agreed-upon

18   attributes are, like weighted average coupon,

19   percent purchase money, things of that

20   nature.

21             And the next thing that would

22   happen is settlement date is scheduled.  The

23   transaction manager coordinates with a due

24   diligence manager.  We have identified those

25   people earlier, John Mongelluzzo and the

Page 94

1                        M. HAGGERTY

2    other four people we mentioned in that

3    conversation.

4              We then work with one of the

5    third-party due diligence firms to arrange

6    for due diligence.  Typically, on the bulk

7    transactions, the third-party due diligence

8    firm would travel to the seller's office to

9    review the loan files.

10             Separate from that third-party

11   due diligence review of the loan files, there

12   is also a process by which the live

13   collateral, meaning the note and the mortgage

14   and the preliminary title commitment, would

15   be sent to a document custodian to be

16   reviewed as well.  The reason for that is

17   that the way that Bear Stearns typically

18   financed its bulk purchases was with a trust

19   receipt, and they would pledge that trust

20   receipt in the market to get repo financing

21   for the loans to buy them.

22             So the third-party custodian had

23   to receive the collateral and check it, so

24   they can issue the trust receipt that Bear

25   Stearns could then use to pledge to get the

1                    M. HAGGERTY

2    funds to buy the loan and settle the

3    transaction.

4              So the third-party due diligence

5    firm is doing a review of the loans.  In some

6    cases they look at every single loan, and in

7    some cases they look at a sample of a loan.

8    In all cases, it was typical with respect to

9    each loan that they looked at to verify the

10   data per the electronic data file to the

11   actual documents in the file.  So in other

12   words, if the note rates as 5%, they view the

13   copy of the note in the file to see that 5%

14   matches.  And we would typically do that for

15   the collateral attributes that went into

16   pricing, that were sent to the rating

17   agencies, that flowed through to offering

18   documents and securitization, and then

19   sometimes that we would need for servicing.

20             The second thing that the

21   third-party due diligence firm would do, they

22   would review the file and re-review it to see

23   if the file documents on their face conformed

24   with the agreed-upon underwriting guidelines

25   supplied by the seller.

1                   M. HAGGERTY

2    banks, correct?

3         A.    Other Wall Street banks and other

4    investors.  Sometimes we competed against

5    Countrywide, for example.

6         Q.    Would the percentage of due

7    diligence to be conducted on a particular

8    pool of loans be included in the bid?

9         A.    What we would do when we gave our

10   bid, we give a list of bid stipulations, and

11   typically the level of due diligence would be

12   included in those bid stipulations, yes.

13        Q.    Were you aware, in 2005-2007

14   timeframe, what the competitive market was

15   requesting in terms of the amount of due

16   diligence to perform on a pool in a bulk

17   purchase?

18        A.    I would say that in a general

19   matter, yes.

20        Q.    What was that percentage?

21        A.    Generally, for Alt-A collateral,

22   it was about 20% sample.  And then generally

23   for subprime, the market was doing 100%

24   review.  I would say for very small bulk

25   packages of Alt-A from small originators, it

```
 1                    M. HAGGERTY
 2   may have been typical to do 100% really
 3   because of the low small numbers.  If they
 4   are showing you 15 loans, you may as well
 5   just review all 15 loans.
 6             So I would say for Alt-A the
 7   percentages varied from 20 to 100, somewhat
 8   dependent on the size of the package being
 9   offered.  And then for subprime, it was
10   typically 100, although some market
11   participants, sellers, that is, could demand
12   a smaller percentage.
13        Q.    When you say 100%, what do you
14   mean 100%?
15        A.    I mean that with respect to a
16   pool of subprime loans, for example, the
17   third-party due diligence firm would look at
18   every single loan in the pool.
19        Q.    Would they re-underwrite every
20   single loan in the pool to confirm that it
21   met the stated underwriting guidelines?
22        A.    They would review every single
23   loan in the pool, the documents on their face
24   in the file, to confirm that they conformed
25   with the agreed-upon underwriting guidelines.
```

1                     M. HAGGERTY

2    agreed-upon underwriting guidelines.

3         Q.    And when you say that you review,

4    were they looking at the loan file to ensure

5    that the FICO score in the loan file matched

6    the FICO score in the data?

7         A.    Yes.  That is the data integrity

8    portion of the third-party review that I have

9    described.

10        Q.    Did they conduct a verification

11   of owner occupancy on 100% of the loans?

12        A.    They did not conduct an

13   independent verification of owner occupancy

14   on any of the loans.  Independent

15   verification was not part of the scope of the

16   up-front due diligence.

17        Q.    Did they determine -- make a

18   determination on the reasonableness of stated

19   income for 100% of the loans?

20        A.    In instances where the due

21   diligence was done on 100% of the loans, I

22   believe it was within the scope of the

23   third-party due diligence review to review

24   the stated income for reasonableness.

25        Q.    Which bulk approved sellers

1                    M. HAGGERTY

2    agreed in the 2000 -- let's say 2006, what

3    bulk approved seller agreed to allow Bear

4    Stearns to conduct due diligence on 100% of

5    the loan pool?

6         A.    I am trying to think of names.

7    The subprime originator -- an example that

8    comes to mind, and I am not 100% sure of this

9    recollection, we can go back and check the

10   record, but an example that comes to mind is

11   Quick Loan Funding.

12        Q.    Any others?

13        A.    I am sorry, I don't have a

14   command of the names of all the originators

15   at this point as I sit here today.

16        Q.    What about Countrywide?

17        A.    I believe it would be unusual to

18   do 100% review of Countrywide.

19        Q.    How about Wells Fargo?

20        A.    I believe it would be unusual to

21   do 100% review of Countrywide.  Sorry, of

22   Wells Fargo.

23        Q.    How about IndyMac?

24        A.    If IndyMac showed a small package

25   of subprime loans, I believe we would have

1                    M. HAGGERTY

2    loans, that was completed within the 30- to

3    45-day time period between the bid and the

4    settlement date?

5         A.    That's correct.

6         Q.    And that was done by third-party

7    due diligence firms?

8         A.    Yes.  I think at one point in the

9    process, we may have taken some of the

10   smaller bulks in-house and reviewed them in

11   the flow conduit operation of EMC.  We may

12   have done that.  That's ringing a bell.  But

13   typically, it was done by the third-party due

14   diligence firms.

15              I think there were some instances

16   where we may have done some due diligence

17   post closing.  I can't tell you again with

18   specificity which transactions.  I just

19   recall that that may have been done from time

20   to time.

21        Q.    What's the difference between

22   pre-closing and post-closing due diligence?

23        A.    The term "closing" in this

24   context, I just mean the settlement date.  So

25   as I said, typically, we completed all of the

1                    M. HAGGERTY

2    due diligence prior to settlement.  I think

3    in some instances, we may have purchased

4    loans and settled on them and then completed

5    the diligence after.

6         Q.    So any diligence conducted after

7    the settlement date would be post-closing due

8    diligence, correct?

9         A.    In the context of what we are

10   discussing right now, yes.

11        Q.    How long was it between

12   settlement date and the securitization of the

13   loans into an offering?

14        A.    That varied based on market

15   conditions.  It also varied based on the

16   schedule for transferring the servicing from

17   the seller to EMC.  And there was a period of

18   time at EMC where we said we would not

19   securitize until after the servicing had been

20   transferred.

21             So the process of transferring

22   servicing requires at least 15-day notice to

23   the borrower.  It is called a 15-day RESPA

24   letter, where you give the borrower notice

25   that the servicing is going to transfer.  So

                          M. HAGGERTY

1      I would say that servicing would transfer

2  anywhere between 30 to 60 days after the

3  settlement date, then could securitize after

4  that.

5            And I would also say from time to

6  time exceptions may have been made to that

7  rule.

8      Q.    You indicated that Bear Stearns'

9  policy was that if the sample came back with

10  exceptions in excess of 3%, the sample would

11  be expanded; is that correct?

12      A.    That was the practice during that

13  time.  And to be clearer about it, you know,

14  as we have described, we had three levels of

15  due diligence: compliance, the file review to

16  the underwriting guidelines, and the data

17  integrity.  So if you had a mistake in 3% of

18  the note rates, for example, you would expand

19  the sample.

20            So the percentage of error kind

21  of came to the -- at the loan attribute rate,

22  or level, I should say.  If you had 3% error

23  rate in underwriting guidelines not being

24  conformed to, you would expand the sample,

1                    M. HAGGERTY

2   and if you had a 3% error rate in a

3   compliance issue, you would expand the

4   sample, in each case most likely with respect

5   to whatever attribute tripped the 3%.

6        Q.     If you found that 3% or more of

7   the loans did not conform to the stated

8   underwriting guidelines, why would you expand

9   the sample?

10       A.     The samples were partially

11  adversely selected and partially randomly

12  selected.  So you had to first look and see

13  what the breakout between the exceptions were

14  between adverse and random.

15            But you would expand it to see on

16  the random part, to see if you just happened

17  to find a couple of outliers that were not

18  really representative of what the seller had

19  done.  So you would expand the sample to see

20  if you were continuing to see that 3 or

21  4% error rate or if you somehow just happened

22  to happen upon the few loans that had an

23  issue, and as you expanded it, you found that

24  the rest of the loans were in compliance.

25       Q.     Was 3% enough to cause concern

1                      M. HAGGERTY

2    that you needed to expand the sample?

3         A.    That was our practice at the

4    time.

5         Q.    Did it cause you concern among

6    Bear Stearns if in excess of 3% did not

7    conform to the stated guidelines?

8         A.    As I said, it was our practice at

9    the time, if we tripped 3%, to expand the

10   sample and look at more loans.

11        Q.    How would you expand the sample?

12        A.    I believe the due diligence

13   manager would look at the list of the loans

14   that were not sampled and pick another random

15   sample, and I don't remember exactly how many

16   more we would test.  I would have to go back

17   and try to find that.  I do not recall it as

18   I sit here today.

19        Q.    He would have to get approval

20   from the seller, correct?

21        A.    Yes, that's right.  And the

22   commitment letters that I described earlier

23   typically describe that we would do

24   loan-level due diligence on the files.  And I

25   believe that they had a provision that

1                         M. HAGGERTY

2    explained to the seller that if the due

3    diligence was unsatisfactory, we might seek

4    to do more.   In the instances where we were

5    doing a sample.

6         Q.     But even in that instance, you

7    had to get approval from the seller to expand

8    the sample, correct?

9         A.     You know, I think that's a

10   question, right?   If they said I don't want

11   you to do any more loans, then I think you

12   have a broken trade.   And then you are kind

13   of getting into a legal discussion.

14        Q.     I understand that, but you

15   couldn't go and sample and expand the sample

16   without their approval?

17        A.     They control the loan files,

18   that's correct.

19        Q.     And would there be -- how would

20   the deal manager communicate the request for

21   an expanded sample to the seller?

22        A.     I don't know with specificity.

23   Based on my general knowledge from having

24   worked there, I believe they would have

25   called them on the phone.

1                    M. HAGGERTY

2        Q.      There would be no written

3   documentation of the request for an expanded

4   sample?

5        A.      There may or may not have been.

6   If the request was accepted, a loan list

7   would have been communicated, most typically

8   by E-mail.

9        Q.      Have you seen any e-mails within

10  Bear Stearns or EMC requesting an expanded

11  sample?

12       A.      As I sit here today, I can't

13  recall one specifically.  I remember a

14  transaction we did on some seasoned

15  collateral with Bank One where we had to

16  expand the sample, and I remember that.  But

17  away from that, that's the only recollection

18  I have as I sit here today.

19       Q.      Did you ever extrapolate the

20  results of the sample to the entire pool?

21       A.      What do you mean by that?

22       Q.      Did you -- if you had in excess

23  of 3% of loans in your sample that did not

24  conform to the stated guidelines, did you

25  ever extrapolate those results to the

1                    M. HAGGERTY

2    remaining pool?  For example, if 3% of the

3    sample doesn't conform, it is likely that 3%

4    of the remaining portion of the pool does not

5    conform?

6         A.    As I said earlier, if we tripped

7    the 3%, what my belief is typically would

8    occur is that the sample would be expanded.

9    More loans would be looked at, until the

10   aggregate exception rate was less than 3%.

11        Q.    Did you ever disclose to

12   investors in the certificates the percentage

13   of loans from the sample that did not conform

14   to underwriting guidelines?

15        A.    The -- in the proprietary

16   business, in other words, in the instances

17   where Bear Stearns was securitizing loans

18   that it had purchased from one of its

19   affiliates, there was not a connection

20   between the up-front due diligence and --

21   typically not -- and what went through to the

22   securitization.  So loans in a particular

23   pool may have ended up in different

24   securitizations.  So in that instance,

25   certainly not.

1                    M. HAGGERTY

2    what they were asking.

3         A.    I have finished reading.

4         Q.    Those questions and answers were

5    with respect to due diligence performed on

6    mortgages generated by Bear Stearns

7    Residential Mortgage Funding, correct?

8         A.    They were questions with respect

9    to third-party due diligence performed on

10   Bear Res loans, yes.

11        Q.    And at one point in time, Clayton

12   was brought in to perform due diligence for

13   those mortgages, correct?

14        A.    Yes.

15        Q.    And then at some point in time,

16   you no longer used Clayton to conduct due

17   diligence; is that correct?

18        A.    Correct.

19        Q.    And at that point in time, after

20   Clayton departed, Bear Stearns did not

21   conduct due diligence on those loans; is that

22   correct?

23        A.    At that point, Bear Stearns did

24   not engage third-party due diligence

25   providers to conduct due diligence.   The view

1                    M. HAGGERTY

2      was that a Bear Stearns entity was

3      originating those loans, and the act of

4      origination includes a due diligence review.

5           Q.    The due diligence review was part

6      of the origination process at that point in

7      time?

8           A.    Yes.

9           Q.    Correct?

10          A.    Yes.

11          Q.    Do you have, sitting here

12     today -- and during your interview at the

13     FCIC, you couldn't place a time on when the

14     Clayton folks departed?

15          A.    That's right.

16          Q.    As you sit here today, do you

17     have any recollection of when they departed?

18          A.    As I sit here today, I do not.

19          Q.    Does this testimony that you read

20     accurately -- or the transcript of the

21     interview accurately reflect your

22     recollection of the interview and your

23     responses?

24          A.    I don't recall the interview and

25     my responses in that level of detail.  But

Page 132

```
 1                    M. HAGGERTY

 2   from Mr. Krebs, and you can read through

 3   line 25.

 4        A.    Okay.  Starting on page 104,

 5   reading from line three.

 6             "Miss Haggerty:  We saw an

 7   increase in the volume in general, and with

 8   that came an increase in the number of early

 9   default payments.  Part of the quality

10   control review that was done that I described

11   and then some of the reasons that things were

12   put back is things that we learned.  And so

13   in response to learning those things, we

14   tried to implement procedures before we

15   bought the loans to detect those types of

16   problems and avoid them.

17             "So one of the things that we did

18   is, we did a newsletter to all our sellers to

19   point out some of these things that we had

20   seen, like misrepresentation of occupancy.

21   Like the undisclosed debts.  Because the

22   originator is obviously much closer to the

23   situation.

24             "Mr. Krebs:  Yeah.

25             "Miss Haggerty:  And should
```

1                    M. HAGGERTY

2    undertake procedures to prevent these types

3    of things from happening."

4         Q.    Was this response to the FCIC

5    truthful at the time you provided it?

6         A.    As I have said earlier, yes.

7         Q.    If you continue, and feel free to

8    read -- I am not going to have a question on

9    page 105.  My next question is going to be on

10   page 106, but in order to give you the

11   context, please read page 105 and on to

12   page 106.  Beginning at line nine, Mr. Krebs

13   asks you, "Can you tell us the approximate

14   time that you began to see it."

15        A.    Sorry, where did you want me to

16   read to?

17        Q.    Up to the question starting on

18   line nine of page 106.

19        A.    Oh, okay.  Yes.

20        Q.    And starting on line nine on

21   page 106, Mr. Krebs asks, "Can you tell us

22   the approximate time that you began to see

23   it.  And it all -- it may have been gradual,

24   but what period of time would this -- this

25   have been when you began to notice these

1              M. HAGGERTY

2    changes?"

3              And then can you please read your

4    response on page 106, starting at line 15.

5         A.   Starting at line 15, my response

6    says, "I don't recall specifically, but I --

7    if I had to, I would say certainly in 2006

8    timeframe.  Exactly when, I can't tell you,

9    sitting here today.  May have been before."

10        Q.   Was this an accurate response

11   when you provided it to the government?

12        A.   Yes.

13        Q.   Did Bear Stearns disclose to

14   Dexia that in the 2006 timeframe and maybe

15   even before it had become aware and concerned

16   with the quality of loans that it was seeing?

17        A.   Can you repeat that question,

18   please.

19        Q.   Did Bear Stearns disclose to

20   Dexia that in the 2006 timeframe and maybe

21   before it had become concerned with the

22   quality of loans that it was seeing?

23        A.   As I sit here today, I don't know

24   one way or the other what Bear Stearns

25   disclosed to Dexia.  I believe Dexia received

1                    M. HAGGERTY

2    in the context of someone that is making the

3    loan initially.

4              So I would just like to make that

5    clarifying point.  We can agree on that

6    definition.

7         Q.    So for the purposes of discussing

8    the due diligence with respect to the flow

9    conduit, to the extent we talk about

10   underwriters, we are referring to the

11   internal terminology of those underwriters

12   being the due diligence personnel?

13        A.    That's correct.

14        Q.    Fair?

15        A.    Yes.

16        Q.    Understood.

17        A.    Yes.  Now, I lost track of your

18   question.  So could you please repeat it.

19        Q.    Were the EMC underwriters in

20   Texas placed into separate color-coded teams?

21        A.    I have a recollection from

22   different -- preparation for different

23   depositions that I have done that at certain

24   points in time, yes, they were placed into

25   color-coded teams.

1                   M. HAGGERTY

2          Q.     Do you recall a blue team?

3          A.     I recall an orange and a white

4    team.  I don't recall a blue team.

5          Q.     Do you recall a yellow team?

6          A.     As I sit here today, I do not.

7          Q.     Do you recall a pink team?

8          A.     As I sit here today, I do not.

9    If you have documentation as to that, I am

10   sure I can take a look at it.

11         Q.     Did you prepare -- in preparation

12   for your testimony today as a corporate

13   designee, did you conduct any -- look at any

14   documents or talk to anyone regarding the

15   color-coded teams in the flow conduit?

16         A.     No.

17         Q.     Were the different color-coded

18   teams assigned different sellers?

19         A.     My general recollection is that

20   was the case.  Although I am not 100% sure.

21         Q.     And were they --

22         A.     But I think that would be in the

23   record.

24         Q.     As you sit here today, as the

25   corporate witness for the company, were the

1                    M. HAGGERTY

2    color-coded teams assigned to different

3    sellers?

4        A.    As I sit here today, that's what

5    I recall to the best of my recollection.

6        Q.    And were the color-coded teams

7    assigned to different sellers based on the

8    tiering of the sellers?

9        A.    That -- that sounds familiar.  As

10   I sit here today, I am not 100% sure.

11       Q.    And were certain tiers of sellers

12   entitled to more streamlined due diligence

13   procedures?

14       A.    My recollection is as time went

15   on, one particular seller that I can recall

16   switched its due diligence protocol from

17   looking at 100% of the loans to a sample.

18       Q.    Who was that?

19       A.    My recollection is that it was

20   Pulte Mortgage.

21       Q.    Was one of the color-coded teams

22   only required to simply check whether or not

23   the loan files contained the required closing

24   documentation?

25       A.    I don't remember one way or the

Page 218

1                        M. HAGGERTY

2    other at this moment in time.

3        Q.    Was there a team of

4    underwriters -- let me start over.

5              Was there a color-coded team of

6    underwriters that was assigned solely to

7    small sellers that EMC had no prior history

8    with?

9        A.    I don't remember specifically.

10   But that sounds familiar.

11       Q.    Was there another team that was

12   dedicated to sellers who had the ability and

13   financial wherewithal to repurchase defective

14   loans?

15       A.    I don't recall one way or the

16   other.

17       Q.    Who would know this?

18       A.    It is possible it is documented

19   in E-mails or in the firm's record.  Jo

20   Whitlock may recall that.

21       Q.    Where is Jo currently?

22       A.    I don't know.

23       Q.    When is the last time you talked

24   to Miss Whitlock?

25       A.    I don't remember.

1                    M. HAGGERTY

2        Q.     And you didn't look through any

3   of the firm's records in preparation of the

4   deposition today on this issue, did you?

5        A.     I did not.

6        Q.     Was there another color-coded

7   team that was assigned to loans submitted by

8   sellers with known problems?

9        A.     I don't recall that one way or

10  the other.

11       Q.     Did EMC's policy on the due

12  diligence in the flow conduit require

13  approval from an underwriting supervisor in

14  order for an underwriter to decline it for

15  purchase?

16       A.     I don't know one way or the

17  other.  And that may have -- that practice

18  may have changed over time.  I don't know as

19  I sit here today.

20       Q.     Were EMC's conduit flow policies

21  documented?

22       A.     I believe that from time to time,

23  procedures were documented.  I don't know

24  that EMC had policies per se.  But I believe

25  from time to time, procedures were

Page 220

1                     M. HAGGERTY

2    documented.   I believe they changed over

3    time.

4         Q.    As you sit here today, as the

5    corporate designee on behalf of the company,

6    do you know whether or not there was a policy

7    that required approval of a supervisor in

8    order for an underwriter to decline a loan?

9         A.    I do not know.

10         Q.    Was there a policy that allowed

11   an underwriter to accept a loan for purchase

12   without supervisor approval?

13         A.    I don't know one way or the

14   other.

15         Q.    If you wanted to know that, who

16   would you ask?

17         A.    I would also ask Jo Whitlock.

18         Q.    If you wanted to find the

19   documentation, where would you look?

20         A.    I would look in her E-mail

21   records, and I would look in whatever

22   electronic records she had associated with

23   her.

24         Q.    Did EMC train its underwriters in

25   the context of the flow conduit due

1                    M. HAGGERTY

2    diligence?

3         A.    It is my general recollection

4    that they did, yes.

5         Q.    Was it a formal training program?

6         A.    I don't have any detail on it as

7    I sit here today.

8         Q.    Is it possible there was no

9    training program?

10        A.    I don't think so.

11        Q.    You don't think so; you're not

12   sure, though?

13        A.    Correct.

14        Q.    So as you sit here today on

15   behalf of the corporation, you're not sure

16   whether or not there was training for the

17   underwriters that performed due diligence,

18   correct?

19        A.    I think you asked me if it was

20   possible there was no training program, and I

21   said I didn't -- I guess I said I didn't

22   think it was possible that there wasn't any.

23   I believe that the underwriters or everybody

24   that went to work there received some sort of

25   training.   I don't know the degree of

1                     M. HAGGERTY

2    training or how formal it was.

3         Q.     Or how long it was?

4         A.     Correct.

5         Q.     Who would you ask if you wanted

6    to know the answers to that?

7         A.     I would ask Jo Whitlock.

8         Q.     Have you ever seen a document

9    outlining the training program for

10   underwriters in the flow conduit?

11        A.     Not that I recall, no.

12        Q.     Did you ever draft any such

13   training program?

14        A.     I did not personally.

15        Q.     Did you ever -- sorry.

16        A.     I did not personally, no.

17        Q.     Did you ever review any such

18   training program?

19        A.     Not that I recall, no.

20        Q.     How many loans did -- were the

21   underwriters in Texas required to review per

22   day?

23        A.     I don't know that they had a

24   minimum requirement one way or the other.

25        Q.     Did EMC pressure them to review a

1                      M. HAGGERTY

2    high volume of loans on a daily basis?

3         A.    I don't know one way or the other

4    as I sit here today.  I just don't recall.  I

5    don't believe so.  But, you know, I only know

6    what I know.

7         Q.    Did you ever go to the facilities

8    in Texas and monitor the due diligence being

9    conducted?

10        A.    I visited the facilities in Texas

11   and met with Jo Whitlock and certain of her

12   staff.  But I would not say I monitored what

13   the individual reviewers were doing, no.

14        Q.    That was Jo's responsibility?

15        A.    Yes.

16        Q.    Were their directives to not

17   check third-party sources, for example,

18   salary.com, with respect to stated income

19   loans?

20        A.    I don't believe there was any

21   directive to not check salary.com, unless for

22   some reason someone felt that it was not a

23   reliable source.  So I don't know one way or

24   the other.

25        Q.    If you wanted to know that, you

Page 224

1                     M. HAGGERTY

2   would ask Jo?

3        A.     I would.

4        Q.     Did Jo have complete control over

5   the due diligence process in Texas?

6        A.     Jo had conference calls and

7   discussions from time to time with Pattie

8   Sears and John Mongelluzzo, who managed the

9   third-party due diligence process, and I

10  believe they exchanged -- or I believe they

11  discussed the process itself and what the

12  protocols were.  I have a recollection of

13  that.

14            Also, there was a quality control

15  department at EMC that would speak to Jo and

16  give feedback from what was found in quality

17  control.  So I think she had feedback from

18  those two sources as well.

19            But in terms of managing the

20  process and what was done, that was her

21  responsibility.

22       Q.     Who did Jo report to?

23       A.     She reported to Sherri Lauritsen

24  and David Hamilton for some of the period.

25  She reported to me for some of the period.

1                    M. HAGGERTY

2     She reported to Leslie Foster for some of the

3     period.  She reported to John Vella for some

4     of the period.

5         Q.    During the time that she reported

6     to you, did you ever question her regarding

7     the due diligence process being undertaken in

8     Texas?

9         A.    I don't remember specifically the

10    time period when she reported to me.  I

11    remember having conversations with her about

12    using certain tools, like AppIntell, DISSCO

13    or ValVerify.  I remember having general

14    conversations about the scope of the due

15    diligence review, and, you know, as we

16    understood it, being performed by third

17    parties.  In other words, to make sure it

18    covered the three aspects that I described

19    earlier: data integrity, underwriting

20    compliance and a compliance review.

21        Q.    Was the due diligence conducted

22    in the flow conduit on 100% of the loans?

23        A.    It started out that way, and then

24    it started to vary depending on the seller.

25    There was a channel called mini bulk that was

1                    M. HAGGERTY

2    exclusively loans from Waterfield Mortgage.

3    That was not the flow conduit, but it was

4    processed in that operation, and I believe

5    that was a post-closing sample due diligence

6    review.

7         Q.    So in a post-closing sample due

8    diligence review, there would be no diligence

9    done prior to closing, correct?

10        A.    I will be more clearer.  Post

11   purchase.  Post settlement of purchase.  So

12   the way Waterfield Mortgage worked, and

13   Waterfield Mortgage was a wholly owned

14   subsidiary of Union Federal Bank of

15   Indianapolis, is that Waterfield would close

16   the loans and deliver them to EMC, and then

17   EMC would pay Waterfield for the loans.  They

18   would settle the transaction, and then on a

19   sample basis the loans would be looked at

20   after that settlement.

21        Q.    Then what would be done with the

22   results of the sample?

23        A.    It would be reviewed by, I

24   believe it was the transaction manager for

25   that, Biff Rogers.  And I don't have specific

1                    M. HAGGERTY

2    recollection of what would happen with that.

3         Q.    Would they expand the sample

4    size?

5         A.    If there were enough defects,

6    that I believe they would do that, that was

7    the understanding of what would happen.  But

8    as I sit here today, I can't tell you

9    precisely what happened with that.

10        Q.    Is there any documentation that

11   would express what they are supposed to do in

12   the flow conduit on post-closing due

13   diligence of a sample?

14        A.    Well, this was what we called

15   mini bulk, so it was a separate channel from

16   the flow conduit.  I don't know whether or

17   not there is written documentation.  We set

18   up that arrangement in, I believe, 2002.

19        Q.    Did EMC permit a deviation of up

20   to 10% from the DTI, LTV and CLTV ratios?

21        A.    I am not -- that's a very broad

22   question.  Can you make it more specific?

23        Q.    I am not sure it's that broad.

24              Did EMC have a policy where they

25   permitted a deviation of up to 10% from the

1                    M. HAGGERTY

2    stated guidelines for the DTI, LTV and CLTV

3    requirements?

4         A.    So to make sure I understand, so

5    you are asking, if the requirement for the

6    rest of the loan was to have a maximum DTI of

7    40%, and are you asking me that without any

8    other compensating factors, was there a

9    policy to make it -- allow it to be 44%?

10        Q.    Correct.

11        A.    I have no recollection of that

12   policy.

13        Q.    But EMC did permit deviation from

14   those percentages provided there were

15   compensating factors, correct?

16        A.    My understanding and recollection

17   is that as a general business matter,

18   exceptions to guidelines could be evaluated

19   in light of compensating factors, yes.

20        Q.    That would include deviations

21   from the DTI, CLTV and LTV ratios, correct?

22        A.    It could.

23        Q.    And can you look at Exhibits 141

24   through 143.   Those were the E-mails that we

25   previously looked at from you to Jo Whitlock.

Page 229

1                    M. HAGGERTY

2   And my only question is, looking at those

3   three E-mails, does that refresh your

4   recollection as to the timing of when Jo

5   reported to you?

6       A.    It does not.

7       Q.    Those E-mails were in early 2006.

8   Do you recall that?

9       A.    That's what it says on the

10  E-mails.

11      Q.    But that doesn't refresh your

12  recollection that she reported to you at that

13  time?

14      A.    It is correct, it does not

15  reflect -- refresh my recollection as to

16  whether or not she reported to me at that

17  time.

18      Q.    What was Jo Whitlock's

19  background?

20      A.    I believe that she had worked at

21  Fannie Mae, and I believe she had worked at

22  Wells Fargo, and I believe her background was

23  in mortgage loan underwriting.

24      Q.    Had she -- did she have any

25  experience in due diligence prior to her

Page 230

1                    M. HAGGERTY

2    employment at Bear Stearns, or EMC, I should

3    say?

4         A.    As I sit here today, I don't

5    recall one way or the other.

6         Q.    I am going to hand you what I

7    have marked as Exhibit 149.

8              (Whereupon, a document,

9         DEX DEP00025180-'186 was marked as

10        Plaintiff's Exhibit 149 for

11        identification as of this date by the

12        Reporter.)

13        Q.    Exhibit 149 is a multiple-page

14   document bearing Bates Number DEX DEP00025180

15   through '5186.

16             Miss Haggerty, I will give you a

17   moment to review the document.  My first

18   question is, do you recognize this document?

19             Do you recognize this document?

20        A.    I do not recognize this document.

21        Q.    Are these EMC's bulk procedures

22   as of May 17, 2006?

23        A.    This appears to be something

24   created by Joe Carrion that outlines the bulk

25   procedures at this point in time.  March 1st,

 1                    M. HAGGERTY

 2    '06, is when -- the date on this.  Although,

 3    page 4.0.1 says 4/30/05.  But then the other

 4    pages say 3/1/06.

 5              And certainly the description of

 6    what's written here seems familiar to me,

 7    with how the business was done at that time.

 8    This is a set of procedures that he wrote and

 9    distributed.  Whether it is the procedures, I

10    can't tell you.  But it certainly looks

11    consistent with how I knew the business

12    operated at that time.

13         Q.    So these procedures contained

14    within this document are consistent with your

15    understanding of what the procedures were as

16    of March 1st, 2006?

17         A.    Not with specificity to the date.

18    You know, and for example, there is a

19    reference to getting automated collateral

20    values from Hansen Quality.  That was

21    something that I know happened later in the

22    business rather than earlier.  So it makes

23    sense to me that that was present in the '06

24    timeframe.

25              But, again, it is difficult to

Page 232

1                      M. HAGGERTY

2     match the exact processes with a date and

3     time like that.

4          Q.    Were the --

5          A.    Seem reasonable, though.

6          Q.    Okay.  And the document refers to

7     procedures, and your testimony referred to

8     processes, and I am just curious if you are

9     making a distinction between the two.

10         A.    I am not making a distinction

11    between process versus procedure.

12         Q.    If you turn to the page that's

13    numbered 4.1.1.

14         A.    Yes.

15         Q.    The very top says, "Bulk trades

16    require that an outsourced vendor perform due

17    diligence reviews of loans being considered

18    for purchase."

19               Do you see that?

20         A.    I do.

21         Q.    Does that refer to the fact that

22    bulk trades require the third-party due

23    diligence firm?

24         A.    Well, I am a little surprised at

25    the use of the term "require," because I

1                    M. HAGGERTY

2    think that if a bulk purchase of ten loans

3    came in to EMC, we would be very happy for

4    Joe Carrion to review them.  So the use of

5    the word "require" seems a little strong to

6    me.

7              I think what this is referring to

8    is, as a normal course of business, bulk loan

9    due diligences were performed by Clayton and

10   Watterson Prime.

11        Q.    And the next sentence starts with

12   "The sample selection, coordination of file

13   review and final loan purchase decision is

14   handled by an EMC representative in the

15   following manner."

16              Do you see that?

17        A.    I do.

18        Q.    And does that indicate that the

19   bulk trades were reviewed based on a sample?

20        A.    Sample selection could be 100% if

21   that was the sample selection.  But, yeah, it

22   is certainly talking about sample selection.

23   But I don't think that's saying that all of

24   the bulk trades handled at EMC were samples.

25   I would take that to mean sample selection if

Page 234

```
 1                    M. HAGGERTY

 2     applicable.

 3          Q.     It does not say "if applicable."

 4          A.     It does not, but this is Joe

 5     Carrion.

 6          Q.     And is there something --

 7          A.     It's not drafted by a lawyer.

 8          Q.     Who is Joe Carrion?

 9          A.     Joe Carrion was somebody

10     responsible for due diligence reviews

11     in-house at EMC.  You see it says subprime or

12     underwriting manager.  He originally was

13     brought on to be the specialist doing due

14     diligence reviews pre-purchase on subprime

15     loans sourced in the flow business.  As it

16     turned out, we did not source much product,

17     much subprime product in the flow business,

18     so we used him to work on bulk transaction

19     due diligence coordination.

20          Q.     So this is the area that he

21     worked in?

22          A.     Yes.

23          Q.     If you turn to the next page

24     under -- I am going to call the column on the

25     left by the number seven, if you see the very
```

1                    M. HAGGERTY

2    left-hand column in the chart.

3         A.     We are on Page 4.1.2?

4         Q.     Exactly.

5         A.     Okay.

6         Q.     And number seven says "bulk

7    underwriter."  Do you see that?

8         A.     Yes.

9         Q.     Was the bulk underwriter

10   responsible for making the sample selection?

11        A.     Before we get to that, I am just

12   going to point you to sample selections of

13   less than 100%.

14        Q.     Correct?

15        A.     That to me says he is counting

16   his sample selection of 100%.  Right?  He is

17   making the distinction that you are going to

18   select a sample if it is less than 100%

19   sample.  So I think that goes to the point

20   you were making before.

21        Q.     Was the bulk underwriter -- I

22   will start over.

23               Was the bulk underwriter the

24   individual who made the determination or

25   selected the sample?

Page 236

1                    M. HAGGERTY

2        A.    The way I think about it is that

3    the Pattie Sears role or John Mongelluzzo

4    role would have selected the sample.  So to

5    the extent that's what they mean here by

6    "bulk underwriter," which I assume they do,

7    then yes.

8        Q.    If you turn to the next page,

9    under 12, it talks about the due diligence

10   firm.  Do you see that?

11       A.    Yes.

12       Q.    If you look at the last two

13   sentences, it says, "The bulk underwriter

14   must also review the potential number of

15   drops the moment the final report is

16   submitted on all sample selections, and

17   should there be greater than 3% drop rate,

18   the deal manager should be informed and

19   recommend the sample selection be increased."

20             Do you see that?

21       A.    I do.

22       Q.    Is that consistent with your

23   earlier testimony regarding the procedure if

24   greater than 3% of the drop rate -- if there

25   is a greater than 3% drop rate from the

1                    M. HAGGERTY

2    sample?

3          A.     It is.

4          Q.     Did you understand that question?

5          A.     I did.  Did you?

6          Q.     Let me rephrase it.

7                 This is consistent with your

8    prior testimony that should there be greater

9    than a 3% drop rate from the sample, that the

10   deal manager should recommend the sample

11   selection be increased, correct?

12         A.     It generally is consistent.  I

13   think what I said was that the sample, not

14   should be, but is expanded.  So that the use

15   of the word "should be" is a little troubling

16   here.  But I think it is relatively

17   consistent with the notion.

18         Q.     Again, this would have to be

19   approved by the seller, correct?

20         A.     Yes.  You know, in the most

21   practical sense of the term, yes.  But if the

22   seller didn't approve it, we can take a view

23   that you violated the terms of our commitment

24   letter and we are not going to settle and you

25   owe us a tear-up fee.

1                    M. HAGGERTY

2         Q.    As you sit here today, as the

3    corporate designee of Bear Stearns, do you

4    know of a pool of loans that Bear Stearns

5    refused to purchase between 2005 and 2007

6    because the seller refused to increase the

7    sample size?

8         A.    As I sit here today, I cannot

9    identify any pool like that.

10        Q.    If you turn to the next page

11   under the heading 20.  Do you see that?

12        A.    Yes.

13        Q.    It says, "Once the due diligence

14   is 'tied out' with the seller, the final

15   underwriting report is created and a copy is

16   sent to the deal manager and the seller."

17               Do you see that?

18        A.    Yes.

19        Q.    Was that part of the procedures?

20        A.    It is my understanding that the

21   results of the due diligence is shared with

22   the seller, and you tie out on a final

23   universe, yes.

24        Q.    Were the underwriting reports

25   shared with anyone else?

Page 239

                        M. HAGGERTY

1

2       A.     I don't believe so, no.

3       Q.     It says, "The report should

4    include a brief summary listing drops, side

5    letter items, if any, and purchased loans."

6            Do you see that?

7       A.     Yes.

8       Q.     What side letter items would

9    there be?

10      A.     My understanding of what side

11   letter items means is items of documentation

12   that we would like to have in the loan file

13   that we would allow the seller to deliver

14   after we settle the purchase.

15      Q.     And it continues, "The bulk

16   underwriter has the responsibility for

17   purging all of the older reports on the

18   trade, leaving only the final reports."

19            Do you see that?

20      A.     Yes.

21      Q.     And was that the EMC policy at

22   the time?

23      A.     I don't know if it was a policy

24   so much as the practice that's described

25   here.  It would make sense to me, though,

1                         M. HAGGERTY

2      because when you read through all the other

3      processes or procedures here, you have an

4      initial report that might list some

5      exceptions that subsequently get cleared

6      because the seller is providing additional

7      information.

8                    So once that additional

9      information is received and the exception is

10     cleared, you are going to have a final

11     report.  So it would make sense to me that --

12     in the avoidance of confusion, to just retain

13     the final report in the record.

14          Q.    But just so I am clear, EMC did

15     purge the older reports?

16          A.    I don't know whether or not they

17     did.  I read the words here, but I don't know

18     whether or not they did.

19          Q.    But that was the practice, to do

20     so, correct?

21          A.    Again, I can't tell you.  It

22     looks like Joe Carrion thinks it was.

23          Q.    According to this report, which

24     you testified adequately displayed what the

25     procedures or process were, that the bulk

Page 241

                          M. HAGGERTY

1

2   underwriter has the responsibility for

3   purging all of the older reports on the

4   trade, leaving only the final reports,

5   correct?

6        A.    I think I said that I thought the

7   process looked consistent with what I knew,

8   and with respect to this particular item, I

9   don't know whether or not that practice was

10  followed at EMC.

11       Q.    Have you seen any of the older

12  reports?

13       A.    I have seen the individual asset

14  summaries from time to time.  I don't believe

15  I have seen full reports from the third-party

16  due diligence firms.  I may have.  But all I

17  really recall is having seen particular asset

18  summaries.

19       Q.    The older reports would include

20  communications between EMC and the due

21  diligence -- third-party due diligence firm

22  regarding exceptions, correct?

23       A.    My sense of what the older

24  reports would be would be, yes, to show what

25  the exceptions were, and to the extent that

                              M. HAGGERTY

1    exception gets cleared, a new report would be

2    generated to show that the loan was now

3    cleared and correct, or whatever the defect

4    was, was no longer in existence.

5         Q.     But because those reports have

6    been purged, we don't know why, correct?

7         A.     I don't know whether or not they

8    were.  I agree with you that it says here

9    that the bulk underwriter has that

10   responsibility.  Whether or not that happened

11   in practice, I can't tell you.

12        Q.     As the corporate designee for the

13   company, sitting here today, do you know

14   whether or not those reports were purged?

15        A.     Sitting here today, I do not know

16   whether or not those reports were purged.

17        Q.     Did you ask in preparation for

18   this deposition whether or not those reports

19   were in fact saved?

20        A.     I did not.

21        Q.     Did you ask to see any of those

22   reports?

23        A.     I did not.

24             MR. DeLANGE:    Let's take a short

Page  243

1                    M. HAGGERTY

2        break.

3              THE WITNESS:   Great.   Thank you.

4              THE VIDEOGRAPHER:   The time is

5        2:26 p.m., and this completes tape

6        number three of the videotaped

7        deposition of Miss Mary Haggerty.

8              (Whereupon, a recess was held.)

9              THE VIDEOGRAPHER:   The time is

10       2:39 p.m., and this begins tape number

11       four of the video deposition of

12       Miss Mary Haggerty.

13    BY MR. DeLANGE:

14       Q.      Miss Haggerty, I have handed you

15    a document that I have marked as Exhibit 150.

16    It is a two-page document with Bates Number

17    DEX DEP00020258 through '259.

18              I will give you a moment to

19    review it and ask if you recognize this

20    document.

21              (Whereupon, a document,

22       DEX DEP00020258-'259, was marked as

23       Plaintiff's Exhibit 150 for

24       identification as of this date by the

25       Reporter.)

Page 244

```
 1                    M. HAGGERTY

 2         A.    Okay.

 3         Q.    Do you recognize this document?

 4         A.    Not per se.  But I have seen the

 5   E-mail, the John Mongelluzzo E-mail before.

 6         Q.    The original E-mail on the bottom

 7   of the page, correct?

 8         A.    Yes, in preparation for other

 9   testimony.

10         Q.    And you are a cc on that E-mail,

11   correct?

12         A.    Yes.

13         Q.    Did you review that E-mail --

14   that portion of the E-mail, did you review

15   that yesterday in preparation for your

16   deposition today?

17         A.    It may have been yesterday.  It

18   may have been another time.  I know I have

19   seen this before.

20         Q.    Do you recall receiving this

21   E-mail in or around February 11th of 2005?

22         A.    I do not.

23         Q.    Did you have regular E-mail

24   communications with Mr. Mongelluzzo in

25   February of 2005 in the course of your
```

1                       M. HAGGERTY

2    business at Bear Stearns?

3         A.    Yes.   Less so than other people,

4    but yes.

5         Q.    Do you have any reason to doubt

6    that you did not receive the bottom portion

7    of this E-mail from Mr. Mongelluzzo?

8         A.    I have no reason to doubt that I

9    received this E-mail.

10        Q.    The E-mail starts -- and I am

11   looking at the first E-mail that starts at

12   the bottom of the page.   It starts, "Mary

13   informed us today."

14        A.    Yes.

15        Q.    Do you understand that to be

16   referring to you?

17        A.    I do.

18        Q.    Who is Chris Scott?

19        A.    Chris Scott was the trader that

20   was responsible for bidding subprime bulk

21   packages.

22        Q.    Was there anyone else responsible

23   for that?

24        A.    No.

25        Q.    So all subprime bulk packages

1                    M. HAGGERTY

2   were bid by Chris Scott at this time?

3        A.    That's correct.   I assume that

4   from time to time, if he was on vacation or

5   out sick, somebody else may have.   But my

6   best recollection was that it was solely

7   Chris.

8        Q.    Do you recall Chris Scott making

9   a decision to reduce the amount of required

10  due diligence with the larger subprime

11  sellers?

12       A.    I don't recall any specific

13  transaction.   Although, my general market

14  knowledge makes me understand that New

15  Century was an example of a large bulk seller

16  that I was aware of that was requiring people

17  they sold to, to do less than 100% due

18  diligence.

19             It is possible other large

20  sellers -- one that comes to mind is Fremont,

21  might also be someone that did that, but it

22  is interesting when you read John's E-mail,

23  because he makes it very clear that it is a

24  25% credit review, but the compliance review

25  and appraisal review seems to be still at

1                    M. HAGGERTY

2    100%.

3         Q.    That's what the E-mail indicates,

4    correct?

5         A.    That's what the E-mail indicates

6    here.  And then he also goes on to make the

7    point that we need to track the loans in

8    WITS, and he believes that -- at least he

9    says in this E-mail, "We will in all

10   likelihood put the loan in different shelves

11   based on the types of due diligence done."

12   Which indicates to me something that makes

13   sense, that if it is a larger bulk

14   originator, sometimes you would do

15   stand-alone deals with just their collateral.

16              So, again, I think we have to

17   look at the record to see if we ever did any

18   like these and trace through where the loans

19   went.  But that sort of makes sense to me.

20   If you are going to buy 500 million from

21   Fremont and do 100% compliance and 100%

22   appraisal but scale it back to 25% credit,

23   that would go into a Fremont deal, or maybe

24   it is off our shelf but with the designation

25   of Fremont.

1                    M. HAGGERTY

2                    And, again, my understanding of

3    any situation where we have -- where we have

4    a sample is that if we tripped the 3% -- 3%

5    error rate on the underwriting review, we

6    would expand it.

7        Q.    Where in the E-mail does it say

8    that they would continue the 100% appraisal

9    review?

10       A.    My interpretation of the sentence

11   that says -- it starts with "100% compliance

12   review."

13       Q.    I see that.

14       A.    "And continue to perform the same

15   real estate methodology for the entire pool."

16   So I am interpreting "real estate

17   methodology" to be the appraisal due

18   diligence.  And for the entire pool to mean

19   100%.

20       Q.    What was the -- what was the real

21   estate methodology?

22       A.    My general recollection from this

23   time period was that with respect to subprime

24   loans, we did extra due diligence on the

25   appraisal.  At one period of time, we ordered

Page 249

1                        M. HAGGERTY

2    broker's price opinions of value on each of

3    the properties.   At other periods of time, we

4    maybe used automated valuation calculations

5    in conjunction with drive-by appraisals.

6              But there was more than what I

7    would call up to that time a normal file on

8    its face review of the appraisal, was done

9    with respect to subprime loans.

10       Q.    Why did you do extra due

11   diligence on the appraisals in the subprime

12   arena?

13       A.    That was very much what the

14   industry was doing at that point, and I

15   believe that was based on a concern about

16   property value in subprime.   Subprime by its

17   very nature tends to be more of a debt

18   consolidation refinance type transaction.   So

19   you don't have a property put out and listed

20   like you do in a purchase money transaction.

21             So as a general matter, refinance

22   transactions with cash out, which is what

23   these debt consolidation subprime loans

24   really are, tend to be thought of as riskier

25   in terms of the value.   So I think that that

Page 250

1                        M. HAGGERTY

2      was the business reasoning at that time for

3      doing extra work on subprime.

4           Q.     And that business reasoning was a

5      business reasoning within the industry; is

6      that correct?

7           A.     Yes.

8           Q.     And Bear Stearns followed that

9      industry reasoning?

10          A.     Correct.

11          Q.     Did Chris Scott communicate

12     directly to you his decision to reduce the

13     amount of required due diligence with the

14     larger subprime sellers at this time?

15          A.     First of all, you see here it

16     says it will be done on a trade-by-trade

17     basis.  So again, we don't know from reading

18     this whether or not we ever did any trades

19     like that.

20               I can only infer from what's

21     written here that Chris informed me of --

22     Mongelluzzo is saying I informed him what

23     Chris said.  That's the best I can do.

24          Q.     But you don't -- and what I am

25     trying to get at is your recollection.

Page 251

1                    M. HAGGERTY

2          A.     I don't know --

3          Q.     And my recollection is -- or my

4    recollection, I don't have a recollection of

5    this E-mail, by the way.

6                  My question, what I am trying to

7    find is, are you interpreting the E-mail as

8    you read it today or do you have a

9    recollection of the conversation with

10   Mr. Scott wherein he told you of this

11   decision?

12         A.     I am interpreting the E-mail.   I

13   do not have a recollection of the

14   conversation with Chris Scott.

15         Q.     Was Chris Scott in New York?

16         A.     Yes.

17         Q.     Was he on the same floor as you?

18         A.     No.   Chris Scott was on the

19   trading floor, on the seventh floor.   And I

20   was either on the 11th floor or the 28th

21   floor at different times.

22         Q.     Did you have any conversations

23   with Mr. Scott regarding the need to be more

24   competitive in the market?

25         A.     No.

Page 252

1                    M. HAGGERTY

2        Q.      But Mr. Scott would be the person

3    who would know that since he was the one

4    responsible for bidding on the bulk

5    purchases, correct?

6        A.      Yes.

7        Q.      Was your competition in the

8    market performing less due diligence than

9    Bear Stearns at this time?

10       A.      I am not sure one way or the

11   other.  I have a general recollection that

12   some of the others, in particular, Morgan

13   Stanley, did less than 100% due diligence on

14   New Century.  But away from that -- and it is

15   a vague recollection.  I don't have any other

16   direct recollection, and that's a personal

17   recollection.  That's nothing that would be

18   in the corporate record.

19       Q.      Miss Haggerty, I am handing you a

20   document that I have marked as 151.

21              (Whereupon, a document, DEX

22        DEP00022296-'2300, was marked as

23        Plaintiff's Exhibit 151 for

24        identification as of this date by the

25        Reporter.)

```
 1                    M. HAGGERTY

 2        Q.    And Exhibit 151 is a multi-page

 3   document bearing Bates Number DEX DEP00022296

 4   through '2300.   I will also note,

 5   Miss Haggerty, that this appears to have been

 6   marked as an exhibit in one of your prior

 7   depositions.   You may see the sticker in the

 8   bottom right-hand corner.

 9        A.    I have taken a quick look at it.

10        Q.    Do you recognize this document?

11        A.    I don't recognize this document.

12        Q.    You see on the front page, you

13   are cc'd on an E-mail from Jo-Karen Whitlock

14   to Mr. Verschleiser on October 17, 2005?

15        A.    I see that.

16        Q.    And the subject line is "Forward

17   Tiered Sellers."   Do you see that?

18        A.    I do.

19        Q.    Do you have any reason to doubt

20   that you did not receive this E-mail from

21   Miss Whitlock in October of 2005?

22        A.    I don't have any reason to doubt

23   that I received this E-mail.

24        Q.    Did EMC have a list of tiers for

25   its sellers?
```

Page 254

1                        M. HAGGERTY

2          A.      When I look at the schedule, and

3    I see the names and "streamline" and "post"

4    and "yes" and "no," it is bringing to mind

5    that with respect to the flow business, I

6    think I testified to this earlier, is that

7    over time, we made some changes to the due

8    diligence review in the flow conduit for

9    certain flow sellers.  And if you recall, I

10   gave Pulte Mortgage as an example, and we see

11   Pulte here as the second item under

12   "Currently streamline, post, reduced review,

13   forward comm, no."

14              So this brings to mind that

15   discussion.

16        Q.      And does it refresh your

17   recollection that there was a list of tiers

18   for the sellers at EMC?

19        A.      It does.

20        Q.      And was there a reduced diligence

21   based on the tier of the seller?

22        A.      It refreshes my recollection that

23   there were different due diligence

24   methodologies.  When we say reduced, I think

25   that I would characterize it as sample versus

1                    M. HAGGERTY

2    100% rather than reduced.

3         Q.    This may answer my question.  I

4    was going to have you turn to the page ending

5    in Bates number '299.  You were just

6    referring to where it had "post" and "reduced

7    review"?

8         A.    Yes.

9         Q.    And my question was, what does

10   "reduced review" mean?

11        A.    I don't know as I sit here today

12   looking at this document.  My sense is that

13   it referred to a sample methodology, which

14   would make sense to me based on what I know

15   of the business we were doing.

16             SunTrust, for example, my

17   recollection is they sold us a lot of second

18   liens through the flow conduit, and if

19   SunTrust had shown us a bulk package of

20   second liens, we most surely would have done

21   a sampling.  So it makes sense to me those

22   sellers listed there would have gone to a

23   sample review.

24        Q.    And would that be for all the

25   sellers with a one under "Reduced Review"?

1                    M. HAGGERTY

2          A.    I am not entirely sure.  It's

3    possible, but I don't want to say.  I don't

4    know for sure.

5          Q.    And what does "post" mean under

6    the "Currently Streamline" heading?

7          A.    I don't know for sure.  But based

8    on my knowledge of what the business was at

9    the time, that, to me, would mean that we did

10   the sample due diligence or certainly a

11   portion of the sample due diligence after we

12   settled the purchase of the loan.

13              I think in preparation for some

14   of my other depositions, I have seen better

15   documentation on what the different due

16   diligence protocols were in EMC flow, and I

17   think that looking at that would be helpful

18   in explaining it.

19        Q.    Did you look at any of that

20   documentation to prepare for your testimony

21   today as the corporate designee of Bear

22   Stearns?

23        A.    I looked very briefly yesterday

24   at a description of, I think it was "slim

25   pack" and some other terminology like that,

1                    M. HAGGERTY

2   and sitting here at this moment, I don't

3   recall the distinctions.

4        Q.    Internally at EMC there was a

5   distinction between the due diligence

6   performed based on the tiering of the

7   sellers, correct?

8        A.    I think over time it got there,

9   and just by way of background, I think I said

10  this earlier, the flow conduit started in

11  2002, and I don't recall exactly when we

12  started buying loans from Pulte or SunTrust.

13  But, you know, over time, my recollection is

14  that the diligence results were quite good

15  for Pulte, for example, and they did a large

16  volume, and again, they had the financial

17  wherewithal to buy any loans back that had

18  any problems.   They were a highly regarded

19  seller and a Fannie Mae approved seller.

20           So I believe the thought process

21  was, if they were aggregating and selling us

22  bulk Alt-A, which is what they sold us, we

23  would do a sample.   So we translated that

24  thought process and methodology to the flow

25  channel, which really originally had not been

1              M. HAGGERTY

2   set up to do samples.   It had been set up to

3   review every single loan.   Because the notion

4   was that the flow channel was going to be

5   used by smaller sellers that didn't really

6   have the ability to hedge their position.

7        Q.    Was that process of sampling

8   within the flow channel documented anywhere?

9        A.    As I sit here today, I can't tell

10  you with certainty, although I believe I have

11  seen descriptions of the -- of that in

12  documents that I have reviewed for prior

13  depositions.

14       Q.    And that sampling would be done

15  in-house, correct?

16       A.    Yes.

17       Q.    As opposed to sent -- being sent

18  out to a third-party due diligence firm?

19       A.    Oh, as I sit here today, I don't

20  know the answer to that.

21       Q.    I am going to hand you what I

22  have marked as Exhibit 152.   Exhibit 152 is a

23  two-page document with Bates Number

24  DEX DEP00022301 through '302.

25              (Whereupon, a document,

1                    M. HAGGERTY

2    to Clayton during that quarter for review?

3        A.    I don't have a specific viewpoint

4    on that.  Off the top of my head, that looks

5    right.  But, again, I don't know.  I really

6    would need to --

7        Q.    So for the first quarter -- for

8    the first quarter of 2006, 1555 plus 10,573

9    is roughly 12,000 loans, correct?

10       A.    Right.

11       Q.    Does that seem right?  I am just

12   asking your recollection.  And does that seem

13   like --

14       A.    Yeah, I don't have a --

15       Q.    -- you sent more than that to

16   Clayton during that time period?

17       A.    Sorry.  I don't have a good

18   recollection.  It would be very useful to

19   marry these up with the purchases in the bulk

20   channel during that same period, and then it

21   would be easier to understand if that seemed

22   right or not.

23              I do recollect that the practice

24   was to send Clayton the subprime loans, and

25   the practice was to send Watterson Prime

```
 1                    M. HAGGERTY
 2     Alt-A loans and not subprime.  And I believe
 3     Clayton also got Alt-A.
 4          Q.    Do you see column E, on the
 5     second page it says "EV3"?
 6          A.    Yes.
 7          Q.    Do you have an understanding of
 8     what that means?
 9          A.    I believe that stands for event
10     level three.
11          Q.    What does that mean?
12          A.    Event level three was a
13     terminology used in connection with each of
14     the compliance reviews that Clayton typically
15     performed and the -- it was called the credit
16     review, but what it really meant was a review
17     of the documents in the loan file on their
18     face to see if they conformed with the
19     agreed-upon underwriting guidelines.
20               So event level three meant that
21     the guidelines were out of compliance or
22     there was a compliance issue subject -- such
23     that the loan did not meet either the
24     underwriting guidelines as stated or the
25     compliance requirements as stated.
```

1                    M. HAGGERTY

2    preparation for your deposition today?

3         A.    No.

4         Q.    Did you have any communications

5    with anyone other than counsel regarding

6    EMC's settlement policies with respect to

7    early payment default claims with sellers in

8    preparation for your deposition today?

9         A.    No.

10        Q.    Are you aware of EMC's practice

11   to negotiate down bids rather than demand

12   repurchase on loans that had suffered from

13   early payment default?

14        A.    As a general matter, yes.

15        Q.    What's your familiarity with

16   that?

17        A.    My familiarity with what a down

18   bid was, was that, as I have testified

19   earlier, EMC had a separate line of business

20   called the scratch-and-dent business.  That

21   business was in the business of buying

22   defective mortgage loans, whether they are

23   nonperforming or have some other sort of

24   defect.

25                So my understanding of what a

1                  M. HAGGERTY

2    down bid is, is that rather than have the

3    seller have to repurchase a delinquent or

4    defective mortgage loan and put it back on

5    his warehouse line, where he may or may not

6    have the opportunity to do that, he may or

7    may not have room on his warehouse line, or

8    sometimes the warehouse liner does not permit

9    defective loans to be put on a warehouse

10   line, instead, the EMC scratch-and-dent line

11   of business offered to buy that loan from the

12   seller at a reduced price.

13             So the EMC -- to give an example,

14   let's say the purchase request was for 103%

15   of the unpaid principal balance, which was

16   the purchase price that EMC paid.  Then the

17   scratch-and-dent bid was 80.  The

18   scratch-and-dent desk pays 80, and the seller

19   pays 23 points.

20        Q.    And that 23 points goes to EMC,

21   correct?

22        A.    Yes.  In that instance, EMC has

23   the collateral to deliver to the scratch-and

24   dent desk.  That's right.

25        Q.    I will hand you a document that I

1                    M. HAGGERTY

2         A.    In a general manner, yes.

3         Q.    What does that mean?

4         A.    My recollection is that means if

5    you took a number of claims, whether they are

6    for monetary or QC -- no, monetary or -- I

7    guess it means that if you took a number of

8    claims and put them together and settled for

9    a percentage of the total claim amount.

10        Q.    Did EMC negotiate bulk

11   settlements with sellers in lieu of

12   repurchase claims?

13        A.    My understanding is that yes, EMC

14   did that from time to time.

15        Q.    And in the course of negotiating

16   those bulk settlements, did EMC contribute

17   the money to the trust?

18        A.    My understanding is that there

19   was -- when you securitize a loan, there are

20   only certain ways that you can get the loan

21   out of the trust to redeliver.  So to the

22   extent that a loan can be repurchased out of

23   a trust, if there was a breach of the

24   securitization representation and warranty

25   that occurred, that was found.

Page 305

1                    M. HAGGERTY

2   holding Matt to a performance metric to get

3   that accomplished.

4        Q.    But if you look at the bottom

5   E-mail, Matt is putting together the P&L

6   summary for the group, correct?

7        A.    Let's read the whole thing.  The

8   way that I interpret this -- and if you look

9   at the date, it is in November of the year,

10  which is getting close to year end, which it

11  would be typical for people like Matt Perkins

12  to start to put together their justification

13  for discretionary bonus, maybe.

14             So as I interpret this, he is

15  putting together a P&L summary for our group.

16  P&L summary for him in this context means the

17  underwriting fees the firm earned off the

18  clients that he brought in structured deals

19  for.

20             So then he goes on to say, "Just

21  wondering, does the ARM desk show any P&L on

22  this transaction?"  It looks to me like he

23  wants to get credit in his discretionary

24  bonus for any P&L that his transactions

25  brought, because he is saying it was done

1                    M. HAGGERTY

2    with Impact whole loans we bought, which he

3    is saying he structured and negotiated the

4    purchase of.

5              So if we bought whole loans, that

6    would have fallen into the proprietary book

7    as opposed to the underwritten book.  And

8    since Matt had the relationship with Impact,

9    he is making a plea here to get compensation

10   for the revenue from that.

11             And then I interpret the rest of

12   this as like, and I am also being a good guy

13   to help out the firm with Bill Ashmore

14   because of my relationship to get the EPD

15   claims done.

16             So I view his E-mail to Tom is

17   setting forth his justification for a

18   discretionary bonus maybe.

19        Q.    And part of his justification for

20   a discretionary bonus payment is his

21   involvement in putting the deal to market,

22   correct?

23        A.    With respect to the Impact whole

24   loans, I think it is his acquisition of it.

25   He says he has structured and negotiated the

Page 307

                        M. HAGGERTY

1

2   purchase.   When he says "structured,"

3   sometimes that could mean he structured the

4   security.   But in this context it looks like

5   he structured and negotiated the purchase of

6   the whole loans.   So it is not clear.

7        Q.     The discretionary bonus was tied

8   in part to the P&L, correct?

9        A.     On that particular transaction,

10  he is asking for that.   And typically, in his

11  line of business, his P&L would just be

12  underwriting fees.

13       Q.     But that P&L, at least for him,

14  was one factor in his discretionary bonus?

15       A.     Yes.

16       Q.     If you look at the top E-mail,

17  from Mr. Marano, it says, "I want the Impact

18  EPD cleaned up Thanksgiving.   He knows that."

19  What do you interpret "he knows that," the

20  "he" to be referring to?

21       A.     I certainly don't know with any

22  level of certainty.   I would interpret that

23  to mean Bill Ashmore.   And I believe that

24  because I know Tom Marano had a good

25  relationship with Bill Ashmore and spoke to

```
 1                    M. HAGGERTY
 2   him from time to time.
 3        Q.     And Bill Ashmore was at Impact?
 4        A.     Correct.
 5        Q.     Did you have a relationship with
 6   Mr. Ashmore?
 7        A.     I had met him a couple of times.
 8   I did not know him well.
 9               MR. SLIFKIN:  Is this a good
10        time for a break?
11               MR. DeLANGE:  Go off the record.
12               THE VIDEOGRAPHER:  The time is
13        4:03 p.m., and this concludes tape
14        number four in the videotaped
15        deposition of Miss Mary Haggerty.
16            (Whereupon, a recess was held.)
17               THE VIDEOGRAPHER:  The time is
18        4:15 p.m., and this begins tape number
19        five of the videotaped deposition of
20        Miss Mary Haggerty.
21   BY MR. DeLANGE:
22        Q.   Miss Haggerty, earlier you
23   testified that you were interviewed by the
24   SEC in approximately December of 2011?
25        A.     Yes.
```

Page 322

                    M. HAGGERTY

1

2        4:34 p.m., and we are off the record.

3            (Whereupon, an off-the-record

4        discussion was held.)

5            THE VIDEOGRAPHER:  The time is

6        4:35 p.m., and we are back on the

7        record.

8    BY MR. DeLANGE:

9        Q.    Miss Haggerty, if you can turn to

10   the page ending in Bates number '909.  It is

11   entitled "Sold Residual Exposure."

12            Do you see that?

13       A.    I do.

14       Q.    What does "sold residual

15   exposure" mean?

16       A.    Give me a minute to take a look

17   at this.

18            I am not familiar with this

19   slide, so I can't tell you for sure what it

20   means.  But if you look at the table, it is a

21   list of security names.  I recognize those as

22   deals issued by the Bear Stearns entity or

23   Bear Stearns shelf.

24            And then there is a column that

25   says "Percent Residual Owned."  Looks like

Page 323

                          M. HAGGERTY

1

2   they are all 100 except for the First Balta

3   2005-9, which is 67.

4             And then there is a claim

5   exposure number, and I do not know what that

6   refers to.

7        Q.    If you turn to the document

8   ending in Bates Number '912.

9        A.    Yes.

10       Q.    And this is resolved claims

11  settlements.  Do you see that?

12       A.    I'm sorry, '912?  I was on '910.

13             '912, resolved claims

14  settlements.  Yes, I see that.

15       Q.    And you see the line second from

16  the bottom, "cash to income"?  Do you see

17  that?

18       A.    I do.

19       Q.    Is that the cash that EMC

20  received from settlements that went into its

21  income?

22       A.    Give me a minute to look at the

23  sheet, and then I will answer your question.

24             I see the numbers, this

25  45 million, and I see inventory exposure, PSA

1                    M. HAGGERTY

2    breach exposure, future claims and

3    uncollected cash, and then I see cash to

4    income of 14 million.

5                And as I sit here today, I don't

6    know what that refers to.

7        Q.    Earlier, we had looked at an

8    earlier slide that ends in '903.

9        A.    Yes.

10       Q.    And it had an asterisk at the

11   bottom that said, "Not all resolution options

12   result in cash to firm.  For cash received

13   amount, see page 12."

14       A.    Yes.

15       Q.    Do you have any idea if this cash

16   to income here is what that note is referring

17   to?

18       A.    I don't know.  I don't know one

19   way or the other.

20       Q.    I am going to mark three internal

21   audit reports and hand them to you at the

22   same time and ask you to review them and if

23   you recognize them and what they are.

24       A.    Okay.

25       Q.    Miss Haggerty, I am handing you