# EXHIBIT 62

Fenton

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------x
DEXIA SA/NV, DEXIA HOLDINGS
INC., FSA ASSET MANAGEMENT
LLC and DEXIA CREDIT LOCAL SA,

               Plaintiffs,

      vs.          Case No. 12-Civ-4761

BEAR STEARNS AND CO., INC.,
THE BEAR STEARNS COMPANIES,
INC., BEAR STEARNS ASSET
BACKED SECURITIES I LLC,
EMC MORTGAGE LLC (f/k/a
EMC MORTGAGE CORPORATION),
STRUCTURED ASSET MORTGAGE
INVESTMENTS II, INC.,
J.P. MORGAN MORTGAGE
ACQUISITION CORPORATION,
J.P. MORGAN SECURITIES,
LLC (f/k/a JP MORGAN
SECURITIES INC.), WAMU
ASSET ACCEPTANCE CORP.,
WAMU CAPITAL CORP., WAMU
MORTGAGE SECURITIES CORP.,
JPMORGAN CHASE & CO. and
JPMORGAN CHASE BANK, N.A.,

               Defendants.
-----------------------------x

SETH M. FENTON

New York, New York

Friday, January 18, 2013

Reported by:  Steven Neil Cohen, RPR

Job No. 57365

Page 10

                              Fenton

1

2    and mortgage loan whole loan transactions.

3              The clients I typically

4    represented ran the gamut from mortgage loan

5    originators, rating agencies, trustees and

6    most of the investment banks on the street.

7        Q.      Then did you say it was 2005 that

8    you left Cadwalader?

9        A.      That is correct.

10       Q.      Then you went to J.P. Morgan?

11       A.      That's correct.

12       Q.      What did you do, why don't you

13   tell me -- and you are currently still at

14   J.P. Morgan, right?

15       A.      That is correct.

16       Q.      What was your original title?

17       A.      I -- well, I worked for J.P.

18   Morgan Securities LLC formerly J.P. Morgan

19   Securities, Inc. at the time in question.

20              I work in what is the securitized

21   products group which deals with

22   securitizations and securitized products.

23   Within that there is a subgroup called

24   transaction management.

25              That was the group that I was

```
 1                    Fenton
 2   hired into and I still work in.
 3           I am a deal manager and I am a
 4   vice president at J.P. Morgan Securities.
 5   My primary responsibility was to facilitate
 6   the acquisition of residential mortgage
 7   loans by J.P. Morgan in connection with
 8   possible shelf securitizations that we would
 9   do or whole loan sales which we would do.
10      Q.    Okay.  Can you just explain, in
11   your own words, the difference between whole
12   loan sales of mortgages and shelf
13   securitization?
14      A.    Sure.
15           Once the investment bank purchased
16   loans from either mortgage loan originators
17   or from aggregators themselves that bought
18   loans from other parties what J.P. Morgan
19   Securities would do, so it had an inventory
20   of hundreds of thousands of loans, it would
21   determine to either securitize the loans or
22   to do a whole loan sale.
23           In a whole loan sale you are
24   selling a pool of loans subject to certain
25   representations and warranties to a
```

Page 32

                              Fenton

1    we focus it is that -- is it J.P. Morgan

2    issued RMBS securities that contained

3    mortgages that had been originated by

4    complete third parties as well as mortgages

5    that had been originated through J.P. Morgan

6    affiliates, correct?

7        A.    Sorry.  Maybe I have just worked

8    there so long.

9            To me J.P. Morgan means both, you

10   know, from the holding company on down so

11   when you are asking, J.P. Morgan Securities

12   issued securitizations off its own shelf

13   that did contain loans, not always, some

14   deals might have had all the loans from --

15   through the commercial bank but for some of

16   the subprime loans but most of the Alt A or

17   prime transactions the investment bank was

18   aggregating loans that had -- that came from

19   both Chase and other third parties.

20       Q.    On the securitization side how did

21   J.P. Morgan make money through the

22   securitization process?

23       A.    My understanding is that when the

24   bonds are placed or -- the loans are

1                    Fenton

2    originated at a particular price, you know,

3    the borrowers get a loan with their bank.

4              The loan is then sold to the

5    investment bank at close to par, you know

6    maybe a little below, a little above

7    depending upon the interest rate and other

8    factors.

9              And then the investment bank would

10   put the loan into the trust and issue bonds

11   and then there would be an underwriter

12   discount.

13             And that discount strip would be

14   the proceeds, and that is where the

15   investment bank would make its money on the

16   transaction when it placed those -- those

17   bonds in the market.

18   Q.    Is that the same thing as the

19   spread?

20             I can't tell if you are talking

21   about underwriting fees separate and apart

22   from the spread on acquiring the loans and

23   selling them at a higher price.  Are you

24   differentiating the two?

25       A.    I am talking about the

```
 1                        Fenton
 2             And, you know, to me non -- agency
 3   means loans that the commercial bank could
 4   then sell to Fannie Mae or Freddie Mac.
 5             And everything non-agency, you
 6   know, falls outside that rubric and
 7   typically jumbo loans or what have you and
 8   those are the types of loans that the
 9   commercial bank was then selling to the
10   investment bank so we could -- the
11   investment bank could then include them in
12   our shelf securitizations.
13       Q.     They worked together, right, the
14   home lending and the investment bank worked
15   together on that, right?
16       A.     Well, as you have pointed out I
17   have lived through it.  To me the
18   relationship between the commercial bank and
19   the investment bank were separate in that
20   the commercial bank dealt with origination
21   of loans, servicing of loans and selling
22   loans both to the agencies and to us.
23             We, the investment bank had to
24   negotiate pricing with the commercial bank.
25             We had purchase agreements in
```

1                    Fenton

2     place with representations and warranties

3     and recourse back to the commercial bank so

4     it was sort of an arms length transaction.

5              We worked to a certain extent in

6     conjunction but we were separate entities,

7     we had separate reporting lines and you

8     know, so it wasn't the same company.

9        Q.    I understand that.

10             But you worked in conjunction like

11    you said, right, the home lending originated

12    mortgages and to the extent it was

13    non-agency it typically sold those mortgages

14    to the investment bank for further

15    distribution, right?

16       A.    It would sell non-agency jumbo

17    loans to the investment bank which would

18    then be securitized or sold to third

19    parties.

20       Q.    Okay.  And the investment bank was

21    not looking to have acquire mortgages for it

22    to sit on its balance sheet, right?

23       A.    That is my understanding, that the

24    investment bank was not looking to hold

25    mortgage loans long term, that when the

Page 54

                              Fenton

1
2       investment bank acquired loans from the
3       commercial bank, Chase, or from third-party
4       originators, the intent was to either put
5       them into a shelf securitization within a
6       certain time period or to then place them
7       with a third-party, through a whole loan
8       sale because these are were typically newly
9       originated loans, performing loans and, with
10      full reps and recourse back to the mortgage
11      sellers.
12              And we, the investment bank wanted
13      to then turn around with reps and warranties
14      and put them into securitization or sell
15      them when they could.
16          Q.    All right.
17              That is how the investment bank
18      made money is through the securitization of
19      the mortgages, right?
20          A.    Or through third-party sales.
21          Q.    Right.  It was not the strategy of
22      J.P. Morgan to hold the mortgages and bear
23      the risk of default on those mortgages,
24      correct?
25          A.    The investment bank during this

1                    Fenton

2   time period was purchasing loans that were

3   performing either -- you know, newly

4   originated product.

5           The securitizations in which they

6   would place them in would require loans to

7   be performing with very few delinquencies in

8   the payment history on the loans and

9   likewise the investors and third-party sales

10  were also looking for performing loans.

11          We weren't in the business of

12  buying what we would call scratch and dent

13  loans where we would in the scratch and dent

14  context you are buying loans at a

15  substantial discount in hopes of either

16  being able to liquidate the asset or able to

17  rework something with the borrower and come

18  to terms.

19          So the investment bank would buy

20  loans with the expectation that it had

21  recourse back to potential -- to the sellers

22  either through breaches of representations

23  and warranties or EPD claims.

24          And so the investment bank was not

25  intending to sit on loans until the loans

1                           Fenton

2     matured and/or bear the risk long term of

3     having, you know, the loan go delinquent.

4        Q.     You said that you would securitize

5     loans that had very few delinquencies.

6                What do you mean by "very few

7     delinquencies"?

8        A.     Well, as would have been disclosed

9     in the Pro Supp, Prospectus Supplement, for

10    each of the transactions the securitizations

11    for, prime, Alt A, subprime, are -- the

12    loans that go into that are going to be cash

13    flowing at least at the beginning where

14    they, the borrowers are making their

15    payments, the payments are getting processed

16    through and are paid to the bondholders.

17                So you are typically going to

18    have, for especially prime and Alt A

19    borrowers, people that have perfect pay

20    histories, they have always been paying on

21    their loans and you know, likewise for the

22    subprime you will have newly originated

23    loans so they should be making all the

24    payments or if they have missed a payment or

25    two over time they, they are going to be

1                    Fenton

2           And just to clarify, our due

3  diligence team within transaction management

4  would work with the banking team for a

5  third-party underwriting transactions.

6           So that in those cases the

7  investment bank wasn't purchasing loans,

8  they weren't on our books, but the loans

9  would be put into a deal by an Indy Mac or

10  RFC and the banking team would coordinate

11  with the due diligence team within

12  transaction management to pick a sample of

13  loans that would undergo a very similar

14  credit compliance and property valuation

15  review before those loans were then put into

16  that third-party underwriting

17  securitization.

18      Q.    Was the diligence that J.P. Morgan

19  performed when it was acting solely as an

20  underwriter as rigorous as the diligence

21  that was performed when it was actually

22  acquiring the loans and held them on its

23  books?

24      A.    The review process was generally

25  the same regardless if we were buying loans

Page  72

                              Fenton

1

2    from a third-party, the investment bank was

3    buying loans from a third-party or if we

4    were underwriting a deal and the rational --

5    well, in terms of the sample sizes that were

6    picked for a property, credit compliance

7    would vary based on securitizations or whole

8    loan trades based on counterparties or the

9    transaction.

10            It wasn't like one percentage --

11       Q.    Right.

12       A.    -- for each --

13       Q.    Sellers -- sorry.  Finish.  I just

14   wanted to clarify.

15            So the size of a sample when you

16   were buying mortgages was sometimes driven

17   by the bid parameters from the seller,

18   right, where they would say make a bid and

19   here is the size of the sample for your

20   diligence, right?

21       A.    It would -- that would have been

22   one of the factors in terms of the sample

23   size picked for a diligence review when we

24   were purchasing loans.

25            It would -- the size would vary

```
 1                     Fenton
 2    based upon the counterparty and what they
 3    had negotiated in the trade.
 4              It would also depend upon the size
 5    of the transaction, if it was ten loans in
 6    the deal versus, you know, 5,000 loans in a
 7    deal.
 8        Q.    Right.
 9        A.    And it would also depend upon if
10    it was a first time we had done a
11    transaction.
12              If we had, you know, a
13    long-standing track record with a
14    counterparty where we could compare
15    diligence results over a course of time with
16    them in other transactions that would all be
17    factored in when we were purchasing loans.
18              Then in terms of an underwriting
19    deal that would have been a suggestion
20    between the bankers, the counterparty and
21    the due diligence team as to picking a
22    representative sample of loans to review.
23              But after the sample sizes were
24    picked the review process was the same.  You
25    would have -- a third-party vendor would
```

Page 74

1                        Fenton

2   have been hired by the diligence team, you

3   know, Clayton or some other industry known

4   vendor who would then commence and complete

5   a review of the credit and compliance

6   components.

7             Another vendor might be hired to

8   do a property valuation review and when the

9   results were finally -- came back in from

10  the vendors over the course of the month and

11  the diligence manager was reviewing them

12  they wouldn't make a -- you know, you don't

13  really make a distinction if it is in one of

14  the deals for the whole loan purchases we

15  were buying versus a securitization deal.

16            So when it came to finally tying

17  out on the population of loans, you know,

18  the only differences on a whole loan

19  transaction the deal manager is talking to

20  me as a deal manager versus in a

21  third-party securitization context the deal

22  manager is talking to someone on the banking

23  team that is working on that transaction.

24     Q.     Okay.   Let me show you a document.

25  We have covered a lot of this.

Page 85

                              Fenton

2       understanding from the industry practice

3       was that mortgage originators, subprime

4       mortgage originators were starting to

5       offer up additional loan products.

6           And maybe in those cases were

7       lowering the requirements for potential

8       borrowers in order to qualify for those

9       loan products.

10  BY MR. LEBOVITCH:

11       Q.    Okay.   Whatever those underwriting

12   standards were you were informing investors

13   that you would ensure that the loans that

14   were securitized had been underwritten in

15   accordance with the seller's guidelines,

16   correct?

17       A.    I believe it is disclosed in the

18   relevant prospectus supplements that the

19   loans are generally underwritten in

20   compliance with the relevant seller

21   guidelines.

22       Q.    In order to get comfort that the

23   loans were in fact underwritten in

24   accordance with the seller's underwriting

25   guidelines you would typically reunderwrite

Page 86

                              Fenton

1    a sample of the loan pools put in

2    securitizations, correct?

3

4        A.    For both loans that we purchased,

5    the investment bank both purchased and later

6    securitized, we would pick a representative

7    sample of the loans, again, it would vary

8    based upon the transaction and the factors I

9    mentioned before about first time

10   counterparty, size of the deal, what was

11   negotiated in the transaction, and we

12   would -- the diligence process -- during the

13   diligence process we would verify if the

14   sample of loans was originated in compliance

15   with those guidelines.

16       Q.    Okay.   And you would hire the

17   third-party diligence providers to help in

18   the reunderwriting process, correct?

19       A.    Yes.

20       Q.    They provided reports, right?

21       A.    Over the course of a transaction,

22   let me just walk you through it then.

23             So once a whole loan, and I will

24   just -- I will give an example of a whole

25   loan transaction.   It generally applies to

Page 87

```
 1                      Fenton
 2  the third-party securitization as well.
 3              So at the time of the successful
 4  bid by the investment bank on a pool of
 5  loans the -- we would get a loan list, let's
 6  just say, for example, 1,000 loans are in a
 7  whole loan transaction.  And a 20 percent
 8  sample is being selected.
 9              So 200 loans are being chosen for
10  review for credit compliance in this case.
11              So the diligence manager assigned
12  to the transaction would pick 200 loans and
13  the general selection process was to pick
14  50 percent of those loans based upon what
15  they deemed to be adverse characteristics,
16  potential adverse characteristics of the
17  loans based on geographic concentration or
18  particular product type or document type of
19  the borrowers.
20              And then the other 50 percent of
21  the sample would be selected by the
22  diligence manager based just randomly from
23  the population of loans.
24              And so they would take that list
25  of 200 loans along with data points that we
```

Page 88

1                        Fenton

2    had gotten on the loans and the diligence

3    manager would hire a third-party diligence

4    company who would then take that data and

5    they would do a -- an underwriting review on

6    the relevant mortgage documents relating to

7    that trans -- to that loan.

8              What that typically meant during

9    the 2005 to 2007 time period was that the

10   third-party vendor would send a team to the

11   mortgage company that was selling the loans

12   and that team would stay on site reviewing

13   physical files as they would go through the

14   documents there or they might have gotten a

15   CD copy of the documents to review.

16             You know, the industry practice at

17   the time was generally to still have

18   physical paperwork credit files for them to

19   review.

20             Later things have become more

21   electronically available, you know, where

22   you could just go onto a system and review

23   the documents as they have been scanned on

24   to the system.

25             During this time period most of

```
 1                    Fenton
 2   the review was physical, you know, hands-on
 3   on location.
 4           And so the diligence vendor's team
 5   would review documents over the course of a
 6   couple of weeks typically and they would
 7   provide interim reports back to J.P. Morgan.
 8           So they would e-mail back reports,
 9   this is our progress report, here is your
10   sample size, 200 loans, and these are our
11   initial findings and we are going to give an
12   interim rating on the loans that we have
13   reviewed and these are the outstanding items
14   that we need to clarify with them.  We
15   haven't received these files.  We are
16   missing these documents from these files for
17   review or these are issues that are coming
18   up.
19           And the diligence manager would
20   coordinate between the vendor and someone on
21   the seller side to try to ensure that the
22   documents would be located at the seller to
23   be provided to the vendor so then they could
24   provide additional reports over the course
25   of the month and then final -- and then some
```

1                    Fenton

2  Do you see that?

3          Is that consistent with your

4  understanding of what happened with J.P.

5  Morgan securitizations of RMBS?

6     A.     I see the statement and my

7  understanding is that all loans that J.P.

8  Morgan gave a final EV 3 rating to were

9  deemed to be excluded from purchase.

10     Q.     So there were times when the due

11  diligence provider would say this is an EV 3

12  but J.P. Morgan could override that,

13  correct?

14     A.     There were times where a

15  third-party vendor could -- would have

16  provided a -- what their last report would

17  have included a loan as an EV 3 but either

18  based upon information that was provided

19  after that last report to J.P. Morgan or the

20  vendor, the score could have changed or

21  there were other compensating factors that

22  were taken into account by the investment

23  bank that would deem the loan acceptable for

24  purchase.

25             MR. LEBOVITCH:   I think our video

Page 102

1                    Fenton

2          Mr. Fenton, I am only going to ask

3    you about the first two pages.  Okay.

4      A.    I am sorry.

5      Q.    So I just want to know if the

6    document, okay, the second page, you see an

7    e-mail discussion but my question is about

8    the document that is the second page of this

9    so if you fold over the page, do you see

10   that?

11         Is that a request for bid from

12   American Home to among others J.P. Morgan

13   Chase?

14         You can see it says in the top

15   right corner "Express Bid."

16     A.    Yes.  This appears to be a

17   secondary market bid proposal from American

18   Home to the secondary market participants

19   including J.P. Morgan for a pool of loans

20   prime express package of loans.

21     Q.    Then J.P. Morgan acquired loans

22   through -- sometimes in bulk, right, or

23   would buy it from a bidder and buy a bulk, a

24   large volume of loans all at once, right?

25     A.    The general idea is that the

Page 103

                              Fenton

1       investment bank would buy loans either

2       through one of two mechanisms.

3              One is what I would refer to as

4       bulk as you are mentioning which is a

5       package of loans that is being placed in a

6       secondary market for competitive bid or

7       maybe directly offered to a single potential

8       purchaser.

9              And at the time the loans are

10      purchased in that one bulk transaction we

11      also would purchase loans through what we

12      call a flow transaction where individual

13      loans were purchased over a course of time

14      and I don't know if you want me to go

15      explain that.

16  Q.    You anticipated my next question.

17  But I appreciate that this time.

18         You would also acquire loans on a

19  flow basis from certain mortgage originators

20  with whom you had a relationship, right?

21  A.    That is correct.

22  Q.    Okay.  And now this is a bulk

23  purchase from American Home under a program

24  called an express bid process, right?

1                    Fenton

2       A.    That is what it says here in the

3   e-mail, yes.

4       Q.    Okay.  And stips at the bottom of

5   the second page, they give characteristics

6   about the loans and then they say stips.

7              Do you see that?  What are the

8   stips?

9       A.    These are stipulations that a

10  mortgage seller, in this case American Home,

11  is attaching to their potential bid or when

12  they put this out for competitive bid they

13  are delineating a number of requirements

14  that they want to achieve during the bidding

15  process.

16              And when -- for example, here,

17  they are talking about these are the

18  relevant prime express guidelines with I

19  guess some noted updates to it that are

20  highlighted.

21              They are indicating if the loan

22  has mortgage insurance.  They want to put a

23  maximum amount of due diligence at

24  10 percent and they put in some dates as to

25  when the due diligence needs to be selected

```
 1                    Fenton
 2   due diligence on loans through the flow
 3   program with PHH after we purchased the
 4   loans from PHH.
 5      Q.    And did Mike Cook express to you
 6   that PHH had the impression that J.P. Morgan
 7   preferred the less strict review process?
 8      A.    Again, I don't read that into this
 9   at all.  It is talking about as he says,
10   specific deadlines.
11           He is talking about the timing of
12   the review process, not that we were
13   reviewing to a lesser standard of review
14   which I would think if we actually were
15   reviewing to a more lenient style review
16   that that would make him happier because
17   that would mean that they were selling us
18   more loans and that we wouldn't be putting
19   more loans back to them.
20      Q.    Right.  Sellers preferred if you
21   conducted a lesser level of diligence,
22   correct?
23      A.    That is my general understanding
24   that sellers would want to have smaller
25   sample sizes selected and a shorter time
```

1                    Fenton

2   period and more loans purchased.

3      Q.    And investors, purchasers of our

4   RMBS you understood would prefer more

5   rigorous diligence, correct?

6      A.    Again, I can't speak to what an

7   investor would want but J.P. Morgan in terms

8   of us purchasing loans we would still select

9   representative sample sizes of the loans we

10  were purchasing because not only were we

11  going to take on the risk when we bought the

12  loans, you know, we were holding the

13  residual bonds in most of the securities as

14  well, you know, there are many factors as to

15  why we would yourselves want a vigorous

16  diligence result, you know, for reputational

17  risk and residual bond holdings and just our

18  risk of holding a loan and our ability to

19  put loans back to counterparties.

20     Q.    Okay.  When you held residuals the

21  J.P. Morgan trading desks also did what they

22  could to sell residuals to other investors,

23  correct?

24     A.    I don't know -- every time a J.P.

25  Morgan shelf securitization was created

Page 124

1                        Fenton

2    thing to have these, to have a meeting where

3    you would review the different sellers, is

4    that what you recall?

5         A.    As I said I don't recall, you know

6    if there actually was any meetings or how

7    many there were.

8              I just recall being asked, you

9    know for input in preparing some materials.

10        Q.    Okay.  Understood.

11             So I have a very simple question

12   for you that again just in the interest of

13   time I just want to see if you can flip

14   through this and recognize this document

15   that I have marked Exhibit 354 as some of

16   the materials that were put together for a

17   quarterly seller review meeting at J.P.

18   Morgan.

19             (Materials for quarterly seller

20   review meeting at J.P. Morgan was marked

21   Exhibit 354 for identification)

22   BY MR. LEBOVITCH:

23        Q.    If you look at it and see that is

24   not what I am talking about just let me

25   know.

Page 125

1                       Fenton

2           For example, the page you are

3    looking at, the quarterly, it is the due

4    diligence score card is that the page you

5    are looking at, sir?

6        A.     Yes.  That is the first page of

7    the attachment.

8        Q.     Yes.  Have you ever seen anything

9    like this?

10       A.     Yes, I have.  Right.

11       Q.     Is this something that J.P. Morgan

12   regularly prepared internally?

13       A.     Again, I couldn't quantify how

14   often this was prepared.

15       Q.     Okay.  Is it something that was

16   prepared more than once?

17       A.     I couldn't tell you.

18              I would note that after May of

19   2007 a number of these counterparties were

20   no longer in business by the end of 2007.

21       Q.     Right.  I just want to see if I

22   understand.

23              Just looking at the due diligence

24   score card which may be one of the only

25   pages we spend a lot of time looking at,

Page 126

1                          Fenton

2    Chase Mortgage is listed as one of the

3    sellers, right?

4            It is about six down, seven down.

5    Let me know if you see it.

6        A.    Yes.    I see Chase.

7        Q.    Okay.   So am I right that the

8    score internally that the J.P. Morgan

9    transaction management team assigned to

10   Chase Mortgage for underwriting was poor for

11   documentation, was poor and delivery was

12   poor.

13           Am I reading that correctly?

14       A.    Based on this diligence score

15   card, and the rankings, yes.   Those are poor

16   rankings for Chase.

17           And to explain my understanding of

18   how those were derived since this would have

19   been prepared by the relevant due diligence

20   managers which are listed on the right-hand

21   side, this is really a relationship score

22   with a counterparty.

23           I know that is one of the

24   subcategories here but it is basically how

25   was the counterparty in terms of working

```
 1                    Fenton
 2    with the J.P. Morgan Securities due
 3    diligence group in terms of selecting
 4    diligence samples, making documents
 5    available, clearing exceptions.
 6            And, you know, these are how we
 7    would interact with each counterparty and
 8    Chase as I mentioned earlier we would treat
 9    as a separate counterparty and, you know, in
10    an arms length transaction.
11            And the diligence team at J.P.
12    Morgan Securities, you know, didn't
13    necessarily feel they were the most
14    cooperative in terms of providing documents
15    or being helpful in the diligence process.
16       Q.   Okay.  So this wasn't a reflection
17    of the perception of the quality of the work
18    which Chase was doing, this is just the
19    people at the other subsidiary of J.P.
20    Morgan were not cooperative, is that it?
21       A.    It is an internal view of -- by
22    the investment bank diligence team as to the
23    cooperation relationship they are having
24    with the counterparty.
25            This doesn't reflect how -- I
```

Page 134

1                          Fenton

2       Q.     Yes.   Well, let me actually ask a

3   broader question.

4              Can you identify this package of

5   materials as information being -- that J.P.

6   Morgan would be providing to investors in

7   connection with the marketing of the deal so

8   you would have term sheet, collateral

9   supplement, and certain other marketing

10  materials?

11      A.     Well, again, I didn't work

12  directly on this transaction or directly in

13  third-party underwriting transactions but I

14  believe it would be consistent based on the

15  e-mails that these were documents provided

16  to investors, preliminary documents and then

17  later final documents.

18      Q.     Okay.   So now let's go to 548542.

19             Are you there?

20      A.     Are we looking at --

21      Q.     There is a series of charts.   I

22  mean let's just look at the second chart

23  there, the original loan -- yes.

24             The bottom chart is what I am

25  going to focus on.

Page 144

1                        Fenton

2        A.    Like 25 percent.

3        Q.    Right.  Just under 25 percent?

4        A.    Are preliminarily event level 3s.

5        Q.    Okay.  So when you get the event

6    level 3s some effort is made to look into

7    them and correct if there is missing

8    documents to fill the documents so it is not

9    an event level 3, right?

10        A.    Yes.  There is ongoing review

11    between the vendor and Indy Mac and the

12    diligence manager, the J.P. Morgan diligence

13    manager to ascertain why these are event

14    level 3s potentially because those documents

15    haven't been provided for the review or

16    maybe some item actually has come up during

17    the review that needs to be corrected or the

18    loan needs to be removed.

19        Q.    Okay.  Well, once it comes up as

20    an event level 3 why not just remove it from

21    the securitization?

22        A.    First of all, the securitization

23    hasn't closed at the point of this review.

24        Q.    Right.

25        A.    And event level 3 at the time of

Page  145

1                          Fenton

2     this preliminary report just is -- it is a

3     catchall that anything that hasn't been

4     cleared based upon the materials that have

5     been provided fall into that category event

6     level 3.

7                    So if a file is missing certain

8     documents because the loan has just been

9     originated and not all of the documents made

10    it to the vendor reviewing the file and the

11    others -- the other documents have to be

12    tracked down and provided to them, at the

13    time of the review it is deemed an event

14    level 3.

15         Q.    Let me ask you something.  Earlier

16    you described the event levels and you said

17    event level 2 means that it was not written

18    to underwriting guidelines but that there

19    appears to be a compensating factors in the

20    loan, right?

21         A.    No.  That is not what I said.

22         Q.    That is not -- okay.  Fine.

23                And did you call event level 3s

24    material defects?

25         A.    At the time of the rating that

Page 150

1                       Fenton

2    level 3.

3       Q.    So while the documents haven't yet

4    gotten to us maybe an event level 3 there

5    are also event level 3s that actually go to

6    the quality of the loan, correct?

7       A.    As I said during the diligence

8    review process that they might have had

9    sufficient documents and they still

10   identified issues that came up that either

11   require some type of solution or the loan

12   would have to be removed.

13      Q.    Okay.  So if you found a problem

14   within the sample there was some effort made

15   to cleanse that file so that it could be

16   securitized, right?

17      A.    At this preliminary stage in the

18   review process they would continue to try to

19   locate missing documents or if there were

20   issues that needed to be cleared up see if

21   those items could be cleared up.

22      Q.    If within the sample there was

23   some percentage of defects with the file you

24   would assume that that is generally

25   distributable across the entire pool,

1                    Fenton

2      A.      -- based on adverse or random

3   samples.

4            So they would produce a data tape

5   with the loans in question and one of the

6   fields they would include was whether they

7   had picked the loan as part of the adverse

8   sample or the random sample.  So that they

9   could track over the course of the

10  transaction if the issues were coming up on

11  the adverse side, random side, both sides,

12  whatever.

13            And when the diligence was finally

14  settled on, the population was settled on,

15  as the typical process for the diligence

16  manager on a whole loan transaction and to a

17  certain extent on the third-party

18  underwriting deals, was to provide a final

19  report on their findings and which we would

20  need, what I would need as a deal manager on

21  a whole loan purchase and, you know, what

22  the bankers would need for their

23  securitizations in order to get the

24  transaction closed.

25            And so the results I would get

```
 1                     Fenton

 2    from the diligence manager usually came in

 3    an Excel spreadsheet with a summary page

 4    that would identify the loans in the pool,

 5    the number of loans that were selected for

 6    diligence review and then break out which

 7    were in the adverse selection population,

 8    what were in the random population.

 9              I think they were in some of the

10    materials you provided to me earlier to look

11    at, and they would break out the number of

12    loans, the principal balance and the

13    percentages as to what the loans were for

14    credit compliance and property valuation and

15    the results that went along with it.

16        Q.    Okay.  If I understood something

17    you maybe implied earlier is that it is only

18    from the random sample that you could

19    actually extrapolate to the broader loan

20    pool, right?

21              You wouldn't expect the adverse

22    sample to necessarily be an indicator of how

23    the rest of the pool looks, isn't that kind

24    of what you implied?

25        A.    Well, the focus would be on the
```

Page 162

1                      Fenton

2    a process to say I want to know of these

3    original EV 3s how many came from the random

4    sample because from that I could extrapolate

5    to what is in the rest of the pool?

6         A.    Again, the diligence manager who

7    is tracking these preliminary results over

8    the course of the month is seeing what loans

9    they apply to.

10              So they are monitoring, you know,

11   what loans have potential issues, if it is

12   just missing documents or an incurable item

13   has been identified and they can identify if

14   it is from the random portion, the adverse

15   portion, you know, because they have that

16   loan level detail in the report back from

17   the vendor.

18              But, you know, is that relevant

19   to -- because at this point it is still just

20   preliminary, it is all mostly because of the

21   missing documents that are later going to be

22   cured.

23        Q.    You assume that is the predominant

24   EV 3, right?

25        A.    That is my general understanding

```
1                         Fenton

2      delinquency history on the loans that

3      comprise the securitization?

4           A.    I am still reading through it.   I

5      haven't identified it yet.

6                 In reading through this

7      preliminary free writing prospectus I have

8      not found anything relating to the current

9      payment history on the loans.

10          Q.    Okay.  Now I am going to hand you

11     Exhibit 366.

12                (Prospectus Supplement for the

13     JPMac 2006NC1 transaction was marked Exhibit

14     366 for identification)

15     BY MR. LEBOVITCH:

16          Q.    See if you can identify it as the

17     prospectus supplement for the JPMac 2006NC1

18     transaction.

19                You are not going to read the

20     whole thing, are you?

21          A.    You just handed me this 150-page

22     document.

23          Q.    No, I understand.  You can flip

24     through it and recognize it as a prospectus

25     supplement for this transaction, couldn't
```

Page 254

```
 1                      Fenton
 2    Morgan had even picked a diligence sample
 3    so, you know, I don't know if I could
 4    conclude that J.P. Morgan ended up buying
 5    the pool.
 6        Q.    What I am saying is accept a
 7    premise that if you look at the actual loan
 8    tape for the securitization, okay, if you
 9    can show that 1150 of the loans that were on
10    that original due diligence pool that were
11    delinquent also appeared in the NC1
12    transaction.  Just accept that.
13        A.    I am sorry.
14        Q.    Okay.  You remember the e-mail
15    said there were 400 delinquent loans out of
16    the 500 that were seasoned, right?
17        A.    Correct.
18        Q.    And I had said there were over
19    1200 in that original list that were
20    delinquent.  I am going to ask you to accept
21    my representation on that.
22              Do you remember that conversation?
23        A.    Yes, I do.
24        Q.    Now I am asking you to, if I tell
25    you to assume that 1150 of the original
```

Page 255

1                    Fenton

2    delinquent loans are actually in the NC1

3    offering I am asking you to provide any

4    explanation for how that could take place.

5        A.    Well, again --

6             MR. SLIFKIN:  I object to the

7    hypothetical nature of the question.

8             Go ahead.

9             THE WITNESS:  You know, again, I

10   don't know what the basis would be to

11   conclude that there were 1100 delinquent

12   loans or 1300 delinquent loans in what

13   J.P. Morgan ultimately bought in that

14   pool from New Century.

15  BY MR. LEBOVITCH:

16        Q.    And what I am saying -- what I am

17   saying is if I asked you to accept that over

18   1100 of the loans that are on the list we

19   looked at where people identified

20   delinquencies actually ended up in the NC1

21   deal.  Okay?

22        A.    In the whole loan deal or the

23   securitization?

24        Q.    They ended up in the

25   securitization.  How can that take place?

Page 256

1                          Fenton

2          A.      How delinquent?

3          Q.      It was 1100 different loans, some

4    were 30, some were 60.   We looked at the

5    list.

6          A.      I wouldn't have an explanation.

7                  Again, I don't know the basis

8    would be to conclude those were in the final

9    securitization population.

10         Q.      Okay.   Let me ask you something

11    else.

12                 When you found EV 3s in your

13    diligence process you said that there was

14    some effort to find the missing documents,

15    right?

16         A.      Correct.   During -- if at a

17    preliminary state -- status of the due

18    diligence review process, a loan that was

19    identified as an EV 3 because of missing

20    documents or an issue had come up, the --

21    that report provided by the vendor would be

22    shared with the J.P. Morgan diligence

23    manager and information like that may be not

24    as much detail would be provided back to the

25    seller at the same time.

Page 257

1                        Fenton

2            So that they would know that based

3    on this preliminary results, you know

4    items -- problematic issues had been

5    identified and so over the course -- you

6    know, from the remainder of the period until

7    the whole loan transaction closed the

8    mortgage loan seller would, you know, have

9    people try to track down missing documents

10   or try to clear up issues and, you know,

11   there would be some ongoing discussions

12   between the diligence manager, the diligence

13   vendor and the seller as to what those items

14   were and what could be done to clear up

15   those issues.

16      Q.    Okay.   I mean it would take a

17   considerable amount of effort at times to go

18   back to the seller and go back to the vendor

19   and find the missing documents, right?

20      A.    Possibly.   I mean.

21      Q.    Sometimes you would find the

22   documents easily, right?

23      A.    Well, again I don't think J.P.

24   Morgan would find the documents.

25            I think the seller would produce

```
 1                     Fenton

 2          no diligence rating of EV 1, 2 or 3

 3          applied to it so there was nothing to

 4          cure.

 5    BY MR. LEBOVITCH:

 6          Q.    Well -- but let me ask something.

 7     You acknowledge though that you did a

 8     diligence pool with a sample so you could

 9     get some sense of what types of problems are

10     in the pool as a whole, right?

11          A.    A representative sample of

12     somewhere between 5 and 100 percent was

13     selected to review loans from a diligence

14     perspective.

15          Q.    It was often somewhere between 10

16     and 30 percent; right?

17          A.    That is a fair representation,

18     yes.

19          Q.    Okay.  So what I am saying is you

20     would do your diligence sample and you would

21     learn based on the original diligence sample

22     that there is some likely proportion of the

23     overall pool that has certain missing

24     documents or credit flaws or other types of

25     potential defects, right?
```

```
 1                    Fenton

 2   contributor that proved costly for

 3   consumers, the entire financial system and

 4   our economy?"

 5       A.    I am sorry.  Where are we?

 6       Q.    Top bullet, first sentence.

 7             I want to know if that is a true

 8   statement by your CEO, Jamie Dimon.  Well, I

 9   want to know if it is a true statement.

10       A.    If you don't mind I would like to

11   read the statement.

12       Q.    Go read it.

13       A.    I have read the statement.

14       Q.    Okay.  Is that an accurate

15   statement?

16       A.    Based on the testimony of Jamie

17   Dimon nothing comes my knowledge that

18   would -- to bring -- would disagree with

19   this, that would lead me to believe this was

20   not an accurate statement.

21             He is indicating, you know, some

22   of the reasons why the mortgage market

23   meltdown occurred and he highlights pay

24   option arms as a definite problem which as I

25   pointed out was a product that J.P. Morgan
```

Page 283

```
 1                    Fenton
 2   never originated and we didn't purchase.
 3      Q.    All right.
 4            In your experience being a
 5   transaction manager doing deals including
 6   subprime deals, you agree that poorly
 7   underwritten mortgage products were a
 8   significant contributor to the market --
 9   mortgage market meltdown, correct?
10      A.    I mean, I believe that in general
11   poorly underwritten mortgage loans were a
12   contributing factor.
13            I couldn't quantify for you how
14   much this affected the mortgage meltdown, if
15   it was the contributing factor or there were
16   other factors such as higher unemployment,
17   you know, other factors involved.
18      Q.    Okay.  We are going to turn our
19   focus to another deal now.
20            Did you ever hear the phrase CBASS
21   as a issuer of RMBS securities?
22            Are you familiar with that, CBASS?
23      A.    I am familiar with the company
24   CBASS.
25      Q.    What is CBASS?  Here.  There are
```

Page 289

1                         Fenton

2       Q.     Okay.  So you see here that

3  Kathryn writes to Joel Readence in the

4  diligence group, "Please coordinate

5  diligence with Clayton for the upcoming

6  CBASS 2007-CB 6 transaction," right?

7       A.     Yes.  She has contacted Joel

8  Readence in the transaction management due

9  diligence manager group to coordinate due

10  diligence for credit and compliance through

11  a vendor named Clayton in connection with

12  the CBASS 2007 CB 6 transaction.

13       Q.     Joel asks, "Hi Kathryn, am I doing

14  gay property review on the sample?"

15            Do you see that?

16       A.     I see that.

17       Q.     She says, "No property review.

18  Thanks."

19            Do you see that?

20       A.     Yes, I do.

21       Q.     In the normal course the diligence

22  team would do a property review on the

23  sample, wouldn't it?

24       A.     It depended on the transaction.

25  It depended on the time period.  It depended

1                    Fenton

2   their final set of reports to the J.P.

3   Morgan manager, due diligence manager, and

4   he concludes through ongoing discussions

5   with the seller or internal discussions

6   within due diligence or the transaction

7   management group to override the prior grade

8   by the vendor, then that might show up in

9   e-mails, there might be additional notations

10  in the specific trade folder or there might

11  have been manual notations.

12           But that is where I would likely

13  expect to see that, mostly in the shared

14  file, you know, what is reflected in the

15  final summary report of the diligence

16  manager's results when they concluded the

17  summary, what they found as their ultimate

18  results in here would be reflected as having

19  overridden a prior decision.

20      Q.    What is the point of having

21  third-party due diligence vendors conduct

22  the diligence?

23      A.    Due diligence vendors such as

24  Clayton or other -- you know, we had a

25  number of them, probably over ten different

Page 290

1                        Fenton

2   on the type of loans in question.

3              For loans that J.P. Morgan was

4   purchasing it was standard course in 2007 to

5   do property valuation in addition to

6   selecting a credit and compliance sample.

7              However, in a third-party

8   underwriting deal although the process was

9   the same once you hired the vendor and how

10  you reviewed loans and ultimately decided

11  what loans were in, you know, the sample

12  sizes or if a property valuation was done,

13  that was up to a particular deal in a

14  discussion between the J.P. Morgan banking

15  team as underwriters and CBASS and the due

16  diligence managers in the transaction

17  management group.

18             The transaction manager asks a

19  question about property review.

20             The banking team said that no

21  property review was going to be done for

22  this transaction.

23     Q.    Understood.

24             What are diligence overrides?

25  Have you heard the phrase "overrides" in

Page 294

1                         Fenton

2    appraise values.

3              So vendors, you serve an important

4    function in being able based on their

5    expertise and their manpower to go and do a

6    large amount of review of diligence files on

7    a fair amount of loans in a certain time

8    period.

9        Q.    Okay.   If J.P. Morgan internal

10   personnel could just override what the

11   outside vendors say doesn't that undermine

12   the value of what the experts are supposed

13   to be providing?

14       A.    I wouldn't agree with that

15   statement.

16             The due diligence managers at J.P.

17   Morgan responsible for reviewing the whole

18   loan trades, they themselves all had prior

19   expertise and experience in underwriting

20   loans and reviewing for a credit or

21   compliance.   They were hired to manage these

22   teams of vendors to do reviews.

23             Now, if for -- you know, when it

24   came time for a final conclusion and a

25   particular loan had been determined by the

```
 1                    Fenton
 2    vendor to not be acceptable and information
 3    came in after that point, a compensating
 4    factor came in after that point that J.P.
 5    Morgan deemed sufficient then, you know, it
 6    was perfectly within the due diligence
 7    manager's right and authority to change the
 8    grading in order to say the loan was
 9    acceptable.
10            Now, that decision to override is
11    based on their own experience and based
12    upon, you know, what the standard we had in
13    the transaction management team.
14            Was there situations where due
15    diligence managers were overriding a large
16    number of results from vendors, no, I don't
17    think that happened.
18       Q.    Okay.  The internal due diligence
19    managers had some of their bonus tied to the
20    profitability of the mortgage trading desk,
21    right?
22       A.    My understanding of the due
23    diligence managers was their compensation
24    structure was the same as my compensation
25    structure which I explained before.
```

Page 306

1                    Fenton

2      Q.    Mr. Fenton, let me ask you.

3  People on the due diligence team internally

4  at J.P. Morgan had authority to override the

5  third-party due diligence providers,

6  correct?

7      A.    That is my understanding, yes.

8      Q.    Did bankers have authority to

9  override the third-party due diligence

10 providers?

11     A.    I don't know if they had on a

12 particular loan but they had the ability in

13 conjunction with the rest of the transaction

14 management in whatever internal discussions

15 they had to conclude that loans were

16 acceptable to be put into the deal.

17     Q.    Okay.  Okay.  But in the normal

18 course the bankers are not supposed to have

19 the decision making power over -- for

20 overrides, correct?

21     A.    I don't know what the general

22 practice is.  I know in a whole loan

23 transaction that after the due diligence

24 manager had concluded what loans were

25 acceptable and the loans were put in for,

1                          Fenton

2     products sales force whose names I am

3     familiar with so I am assuming that is how

4     these documents were distributed.

5          Q.    How much time does it normally

6     take to go through the due diligence process

7     on a loan purchase?

8               MR. SLIFKIN:  On a what purchase?

9               MR. LEBOVITCH:  A whole loan

10         purchase.

11              THE WITNESS:  Okay.  Well, do you

12         want me to talk about property valuation

13         or just credit compliance?

14    BY MR. LEBOVITCH:

15         Q.    Let's first ask the direct

16    question.  The credit and compliance due

17    diligence process how much time typically

18    would it take if there was some typical

19    amount or a range?

20         A.    Nuts to bolts from the time a loan

21    population was picked for a due diligence

22    sample from when J.P. Morgan was the

23    successful bidder on a pool of loans it

24    would typically take about a month to settle

25    the trade.

Page 323

1                          Fenton

2              And within that month the due

3    diligence process would take up a subset of

4    that, maybe three weeks would be a realistic

5    on a prime or Alt A deal where you are

6    talking about a -- you know, we are not

7    talking about thousands of loans, we are

8    talking about hundreds of loans.

9              If you are talking about a flow

10   transaction where you are buying individual

11   loans, that is just an ongoing process and

12   there is no real time period set aside for

13   that.

14             As for subprime bulk purchases

15   where you are talking about thousands of

16   loans, that due diligence process might take

17   more than a month or so because you are

18   reviewing a much larger volume of loans, you

19   have to send vendors on site to the seller's

20   location.

21             And as I was explaining before you

22   might have multiple rounds of due diligence

23   and subsequent funding so, you know, it

24   might be an ongoing process for three

25   months.

1                     Fenton

2            So it just depends on the product

3   type, it depends on the size of the loan

4   population.  But that is typically what a

5   credit or compliance review would take.

6            Property valuation, that is an

7   automated process initially.  That doesn't

8   take too long.

9            Once you get back those automated

10   results if the original appraised value of

11   the loan is still outside of 15 percent

12   value variance then it might take a few

13   weeks to continue to have like brokers go

14   out, take photos of the property and try to

15   tie out the valuation on the property.  So

16   you know that could also take a while.

17       Q.    Okay.  So the date on this term

18   sheet for the RASC06KS7 securitization is

19   August 11, right?

20       A.    That is the date of the free

21   writing prospectus, yes.

22       Q.    Okay.  Now I am going to hand you

23   Exhibit 379.

24            (E-mail was marked Exhibit 379 for

25   identification)