# EXHIBIT 65

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
DEXIA SA/NV, DEXIA HOLDINGS INC., FSA
ASSET MANAGEMENT LLC and DEXIA CREDIT
LOCAL SA,

                          PLAINTIFFS,


        -against-

BEAR STEARNS AND CO., INC., THE BEAR
STEARNS COMPANIES, INC., BEAR STEARNS
ASSET BACKED SECURITIES I LLC, EMC
MORTGAGE LLC (f/k/a EMC MORTGAGE
CORPORATION), STRUCTURED ASSET MORTGAGE
INVESTMENTS II, INC., J.P. MORGAN
MORTGAGE ACQUISITION CORPORATION, J.P.
MORGAN SECURITIES LLC (f/k/a JPMORGAN
SECURITIES INC.), WAMU ASSET ACCEPTANCE
CORP., WAMU CAPITAL CORP., WAMU MORTGAGE
SECURITIES CORP., JP MORGAN CHASE & CO.,
and JPMORGAN CHASE BANK, N.A.,


                          DEFENDANTS.

No. 12-cv-4761
--------------------------------------X


        ***CONFIDENTIAL***

        DEPOSITION OF ROBERT MILLER

           New York, New York

        Friday, February 1, 2013




Reported by:

Rebecca Schaumloffel, RPR, CLR

Job No: 57722

```
 1                    R. MILLER

 2   loans from third parties?                        09:49AM

 3        A.    That was a very involved process.     09:49AM

 4   Should I give you a summary?                      09:49AM

 5        Q.    That would be great.                   09:49AM

 6        A.    The process was that outside          09:50AM

 7   originators would provide us with what were      09:50AM

 8   known as bid lists or bids in comp. Phrase       09:50AM

 9   that is I am happy to describe if need be.       09:50AM

10   But essentially they would offer pools of        09:50AM

11   loans that we would be -- we being my trading    09:50AM

12   deck would evaluate those loans and we would     09:50AM

13   determine a price and we would begin initial     09:50AM

14   discussions with the seller of those loans       09:50AM

15   and if it turned out to be, where we would       09:50AM

16   have the highest bid, sort of speak, we would    09:50AM

17   win that pool and that would bin the process.    09:51AM

18   That wasn't necessarily a real pool.  It may     09:51AM

19   have been what was described as an indicative    09:51AM

20   pool and we would essentially be bidding on      09:51AM

21   parameters or characteristic of a pool to be     09:51AM

22   ultimately differed to us.  And continuing       09:51AM

23   just in the summary, we would make               09:51AM

24   projections about prepays, expected losses,      09:51AM

25   projected execution and a securitization and     09:51AM
```

```
 1                    R. MILLER
 2   we would evaluate the overall economics of        09:51AM
 3   that transaction when trying to determine         09:51AM
 4   what price to bid.  I am happy to provide         09:51AM
 5   anymore details.                                  09:51AM
 6       Q.    I will ask you a few follow-up          09:51AM
 7   questions along that process.  What was the       09:51AM
 8   intent or what was going to happen to these       09:51AM
 9   loans after you bought them?                      09:52AM
10       A.    Ultimately, they would be               09:52AM
11   securitized.  In the interim, they would be       09:52AM
12   acquired, put into a quote unquote warehouse      09:52AM
13   and then securitized.                             09:52AM
14       Q.    The intent of making the whole          09:52AM
15   loan purchases from third parties was to          09:52AM
16   ultimately securitize those loans, correct?       09:52AM
17       A.    Yes, sir.                               09:52AM
18       Q.    During the process of receiving         09:52AM
19   the bid list and conducting your evaluation       09:52AM
20   and determining the price that you were           09:52AM
21   willing to bid, did you, when I say you, I        09:52AM
22   mean JP Morgan, conduct any due diligence on      09:52AM
23   the pool at that time?                            09:52AM
24       A.    If by due diligence you are             09:53AM
25   referring to a physical loan file review, no.     09:53AM
```

```
 1                    R. MILLER

 2    if on an all in basis you can sell the -- you      10:02AM

 3    can sell it for a higher price than you            10:02AM

 4    bought it.                                          10:02AM

 5        Q.    What data from the loan tape             10:02AM

 6    would you use in your evaluation process?          10:02AM

 7        A.    Dozens if not hundreds of pieces         10:02AM

 8    of data.  But typical ones that would be           10:02AM

 9    talked about would be on a loan level basis,       10:02AM

10    loan to value, credit scores, geography,           10:02AM

11    meaning the location of the home, and a            10:02AM

12    number of other factors such as whether it         10:02AM

13    was an owner occupied property, an investment      10:03AM

14    property, what type of a property it was, and      10:03AM

15    so on.                                              10:03AM

16        Q.    Were each of those data points           10:03AM

17    entered into the models that were used to          10:03AM

18    evaluate the overall loan pool?                    10:03AM

19        A.    Yes.                                      10:03AM

20        Q.    Did you ever not include those           10:03AM

21    data points in the models when evaluating a        10:03AM

22    pool?                                               10:03AM

23        A.    My best recollection is that we          10:03AM

24    always included those.                              10:03AM

25        Q.    Were of any those data points you        10:03AM
```

```
 1                    R. MILLER
 2   identified more important than others?          10:03AM
 3        A.   There was certainly a hierarchy.      10:03AM
 4   I am not sure more important is how I would     10:03AM
 5   characterize it it.   But there was some that   10:04AM
 6   carried the heavier weight in the analysis      10:04AM
 7   than others.   But they were all important.     10:04AM
 8        Q.   Which of the data points carried      10:04AM
 9   a heavier weight?                               10:04AM
10        A.   In general, my best recollection      10:04AM
11   is items such as loan to value, credit score    10:04AM
12   would be key points.   The type of              10:04AM
13   documentation used would be a key point.        10:04AM
14   Geography would be a key point.   The coupon    10:04AM
15   on the loan, the type of loans would all be     10:04AM
16   key points.   But I can't say that one of them  10:04AM
17   was the most and others weren't and             10:04AM
18   vice-versa.   They were all important.   And    10:04AM
19   depending on the analysis of each pool, any     10:05AM
20   one of those factors could come into focus      10:05AM
21   more than others.                               10:05AM
22        Q.   Why was the type of documentation     10:05AM
23   a key point?                                    10:05AM
24        A.   It -- well with the types of          10:05AM
25   documentation tended to be whether a            10:05AM
```

1                    R. MILLER

2    borrower, what was known as full                    10:05AM

3    documentation or limited documentation or            10:05AM

4    stated documentation and that came to my             10:05AM

5    attention as of when I first took this role          10:05AM

6    on working on securitizations.  It was               10:05AM

7    driven, one, by -- as I learned it initially         10:05AM

8    from the rating agencies as they ascribed            10:05AM

9    different levels of risk to those different          10:06AM

10   documentation and I subsequently learned that        10:06AM

11   doing analysis slash research regarding              10:06AM

12   performance of loans, different types of             10:06AM

13   documentation -- sorry, different                    10:06AM

14   documentation types had different overall            10:06AM

15   performance profiles.                                10:06AM

16        Q.    And would a limited documentation         10:06AM

17   loan have a higher risk than a full                  10:06AM

18   documentation loan?                                  10:06AM

19        A.    All other things being equal, to          10:06AM

20   the best of my memory, in most cases, it             10:06AM

21   would.                                               10:06AM

22        Q.    And the rating agencies had               10:06AM

23   ascribed a different level of risk to each of        10:06AM

24   those documentation programs in running their        10:06AM

25   models; is that right?                               10:06AM

Page  30

1                    R. MILLER

2              MR. PASKIN:   Objection.                    10:06AM

3          Objection to form.   Calls for                  10:06AM

4          speculation.                                    10:06AM

5          A.    I am not sure.                            10:06AM

6          Q.    Let me back up.   You testified           10:07AM

7    earlier that you became aware that the rating         10:07AM

8    agencies had ascribed different levels of             10:07AM

9    risk to each of these documentation types,            10:07AM

10   right?                                                10:07AM

11         A.    Yes.                                      10:07AM

12         Q.    How did you learn that?                   10:07AM

13         A.    Initially, there was a model that         10:07AM

14   was provided by the rating agency.   By one           10:07AM

15   particular rating agency, called S S P.               10:07AM

16   Called S&P levels and that was essentially a          10:07AM

17   software that they would allow you as a               10:07AM

18   securitizer to use.   Well, they sold it, the         10:07AM

19   software and it would give you an indication          10:07AM

20   as to what kind of losses and expectations it         10:07AM

21   it would be regarding a number of these               10:07AM

22   characteristics of the loans.   And in using          10:07AM

23   the S&P the model, it would be -- you can             10:07AM

24   quantify that there were different                    10:07AM

25   expectations regarding different                      10:08AM

Page 45

```
 1                    R. MILLER
 2   loan pool, what would you have done?          10:29AM
 3          MR. PASKIN:   Objection to form.       10:29AM
 4      A.    I'm not certain how to answer.       10:29AM
 5   It is very general.                           10:29AM
 6      Q.    Does whether or not -- strike        10:29AM
 7   that.  Let me start over.  Did you make any   10:29AM
 8   assumptions in evaluating the underlying data 10:29AM
 9   in the loan tape?                             10:29AM
10      A.    The word assumption took on a        10:29AM
11   particular meaning in the evaluation of       10:30AM
12   mortgage pools.  So I would say it was a      10:30AM
13   market convention to use the word assumption  10:30AM
14   as a catch all for projections that were made 10:30AM
15   -- that were based on an analytical review.   10:30AM
16   So I would assumption in layman's terms is    10:30AM
17   not what we used.  We did analysis and made   10:30AM
18   projections.  At the risk of being re at the  10:30AM
19   time TIFF, those were often called            10:30AM
20   assumptions.  So prepaid assumption, loss     10:30AM
21   assumptions.  But I would not really          10:30AM
22   characterize them as a Websters dictionary    10:30AM
23   assumptions.                                  10:30AM
24      Q.    Let me make sure I understand.       10:30AM
25   The assumptions were what was built into the  10:30AM
```

1                    R. MILLER

2   model that was run to determine the overall        10:30AM

3   price you were willing to pay for that pool         10:30AM

4   of loans?                                           10:31AM

5        A.    Once again, not the layman's            10:31AM

6   interpretation of the word assumptions.             10:31AM

7   Projection were developed based on analysis,        10:31AM

8   based on prior performance that were                10:31AM

9   characterized and moniker assumption was put        10:31AM

10  on them.   I would not say they were                10:31AM

11  assumptions in the sense of oh, I just think        10:31AM

12  this is going to happen.   They were based on        10:31AM

13  analytical reviews.                                 10:31AM

14       Q.    Did you assume, for example, that       10:31AM

15  the LTV ratios in the loan tape were                10:31AM

16  accurate?                                           10:31AM

17       A.    Now we are going back to the            10:31AM

18  regular use of the word assume?                     10:31AM

19       Q.    I am trying to, yes.                     10:31AM

20       A.    I can't say that I assumed it.   I       10:31AM

21  don't think that would be a proper                  10:32AM

22  characterization.   I think I would more say        10:32AM

23  that to begin the analytical process, we used       10:32AM

24  the initial information that was provided to        10:32AM

25  us.   But that was just to begin the process.       10:32AM

Page 51

```
 1                    R. MILLER
 2   we did not seek to verify the information.        10:37AM
 3       Q.     You relied on the accuracy of the      10:38AM
 4   loan tape the originator provided to you?         10:38AM
 5       A.     We relied on the information           10:38AM
 6   provided to us to determine a bid price           10:38AM
 7   which, as we said earlier, was contingent on      10:38AM
 8   ultimately verifying that the information was     10:38AM
 9   correct.                                          10:38AM
10       Q.     But in determining -- I                10:38AM
11   understand that you had the process after the     10:38AM
12   bid, and I am focusing on the process up          10:38AM
13   until the point you made your initial bid.        10:38AM
14       A.     Um-hum.                                10:38AM
15       Q.     And the analysis and evaluation        10:38AM
16   up to that point with respect to the type of      10:38AM
17   documentation, you relied on the accuracy of     10:38AM
18   the representation from the originator in the     10:38AM
19   loan tape, correct?                               10:38AM
20              MR. PASKIN:   Objection; asked         10:38AM
21       and answered.                                 10:38AM
22       A.     In order to develop a bid price,       10:38AM
23   we used the information provided in the bid       10:39AM
24   tape understanding that it would ultimately       10:39AM
25   be evaluated and verified by other groups.        10:39AM
```

Page 52

```
 1                    R. MILLER
 2      Q.     You did not evaluate and verify        10:39AM
 3  the information prior to making the initial       10:39AM
 4  bid, correct?                                     10:39AM
 5      A.     We reviewed the information in         10:39AM
 6  the loan tape.  We looked to see that             10:39AM
 7  mathematically, it made sense, the totals         10:39AM
 8  added up.  There were not loan level              10:39AM
 9  inconsistencies.  If by asking if we looked       10:39AM
10  to validate the accuracy, if you are asking       10:39AM
11  whether we looked at loan files, we did not.      10:39AM
12      Q.     What did you do prior to the           10:39AM
13  initial bid to verify that a full                 10:39AM
14  documentation loan included all the               10:40AM
15  documentations necessary to qualify as a full     10:40AM
16  documentation loan under that originator's        10:40AM
17  guidelines?                                       10:40AM
18          MR. PASKIN:   Objection.                  10:40AM
19      A.     Once again, the information            10:40AM
20  provided to us was what was used to create an     10:40AM
21  initial bid and then that information would       10:40AM
22  subsequently be evaluated.                        10:40AM
23      Q.     And how would that information         10:40AM
24  subsequently be evaluated?                        10:40AM
25      A.     Through a due diligence process.       10:40AM
```

Page 53

```
 1                    R. MILLER
 2        Q.      That included a loan level review      10:40AM
 3   of the loan pool, correct?                          10:40AM
 4        A.      To the best of my knowledge, yes.      10:40AM
 5        Q.      And that loan level review was          10:40AM
 6   your protections you described earlier to           10:40AM
 7   ensure that the information you were told on         10:40AM
 8   the loan tape was accurate, correct?                10:40AM
 9        A.      I don't believe I used the word         10:41AM
10   protection.  If I did, it strikes me as a           10:41AM
11   little bit out of place.  I would look at it        10:41AM
12   as a validation.                                    10:41AM
13        Q.      I am going rephrase the question        10:41AM
14   and use your word so I don't put words in           10:41AM
15   your mouth.  The loan level review was your         10:41AM
16   validation to ensure the information that           10:41AM
17   were you told on the loan tape was accurate;        10:41AM
18   is that correct?                                    10:41AM
19            MR. PASKIN:   Objection to form.           10:41AM
20        A.      The loan level review was the           10:41AM
21   validation process in place that our desk          10:41AM
22   relied upon for affirming the accuracy.            10:41AM
23        Q.      Would you have made a bid on a          10:41AM
24   pool of loans that did not have that                10:42AM
25   validation process in place?                        10:42AM
```

Page 54

1                      R. MILLER

2        A.      To the best of my knowledge, I        10:42AM

3    never made a bid or we never made a bid on an    10:42AM

4    a pool of loans that did not have that in        10:42AM

5    place.                                           10:42AM

6               MR. DeLANGE:   Let's take a quick     10:42AM

7        break.                                       10:42AM

8               THE VIDEOGRAPHER:   This marks        10:42AM

9        the end of tape number one; we are           10:42AM

10       going off the record at 10:41 a.m.           10:42AM

11               (Whereupon, a recess was held.)      10:51AM

12               THE VIDEOGRAPHER:   This marks       10:51AM

13       the start of tape number two.   We are       10:51AM

14       back on the record at 10:50 a.m.             10:51AM

15       Q.     Mr. Miller in conducting your         10:51AM

16   evaluation of the data on the loan tapes in      10:51AM

17   connection with determining your initial bid,    10:51AM

18   did you have an expectation that the             10:51AM

19   originator were following the underwriting       10:51AM

20   guidelines they explained to you?                10:51AM

21       A.     I generally had an expectation,       10:51AM

22   sorry for this poor phrasing, they would         10:51AM

23   generally be following their guidelines.   But   10:51AM

24   there was certainly within the industry an       10:51AM

25   understanding that there could be some           10:51AM

Page 55

```
 1                    R. MILLER
 2  exceptions or there could be some loans that    10:51AM
 3  would be outside of guidelines.  But the        10:52AM
 4  expectation would also be that there would be   10:52AM
 5  a reasonable explanation for that.              10:52AM
 6      Q.    And I believe in that situation,      10:52AM
 7  the reasonable explanation that you described   10:52AM
 8  earlier was -- I used the phrase compensating   10:52AM
 9  factors.  I think you might have said           10:52AM
10  mitigating factors.  Is that what you           10:52AM
11  referring to?                                   10:52AM
12      A.    Yes, sir, I equate those.             10:52AM
13      Q.    I will ask the Court Reporter to      10:52AM
14  mark as Exhibit 615.                            10:52AM
15          (Whereupon, Replace Exhibit            10:52AM
16          Replace, replace was marked for         10:52AM
17          identification as of this date by the   10:52AM
18          Reporter.)                              10:53AM
19      Q.    Mr. Miller, I have handed you a       10:53AM
20  Document 615 JPMC_DEX_008348623 through 8656.   10:53AM
21  Mr. Miller, do you recognize this document?     10:53AM
22      A.    The first one?                        10:53AM
23      Q.    The E-mail and then there is an       10:53AM
24  attachment to the E-mail.  Let's start, do      10:53AM
25  you recognize the cover E-mail to this          10:53AM
```

Page 149

```
 1                  R. MILLER
 2    2006-dash H three.  Do you see that?          02:00PM
 3        A.    Yes, sir.                           02:00PM
 4        Q.    Is that refresh your recollection   02:00PM
 5    that H three was in fact one of the deals     02:00PM
 6    where you were including leftover loans from  02:00PM
 7    the warehouse?                                02:00PM
 8        A.    I do recall that the deals with     02:00PM
 9    the designation HE were multiple originators  02:00PM
10    and we did look to include the loans that     02:00PM
11    were in the warehouse.  The term leftover, I  02:00PM
12    would just characterize as a colloquialism,   02:00PM
13    saying to loans for whatever reason were not  02:00PM
14    included in the prior securitization.         02:00PM
15        Q.    Who us minute Rivera or /OS man?     02:00PM
16        A.    /OZ man worked -- worked /POR me    02:00PM
17    on the trading desk for a couple of years.    02:00PM
18        Q.    O S M I N: And the E-mail at the    02:00PM
19    bottom of the string, Mr. Re very is says we  02:01PM
20    decided we want to include as many of the     02:01PM
21    loans that did not make it into some of our   02:01PM
22    prior deals in the upcoming JPM A C 2006-dash 02:01PM
23    H three deal.  Do you see that?               02:01PM
24        A.    Yes, sir.                           02:01PM
25        Q.    How did you determine what loans    02:01PM
```

Page 150

```
 1                    R. MILLER
 2    could go into an HE deal?                02:01PM
 3         A.    What made the HE deals different   02:01PM
 4    than most of our other deals is that they    02:01PM
 5    were put together from a -- from multiple    02:01PM
 6    originators.  So those deals were good       02:01PM
 7    potential targets for including, if I can use 02:01PM
 8    the common term one offs or loans that had   02:01PM
 9    otherwise come into our possession, our      02:02PM
10    warehouse that hadn't previously been        02:02PM
11    securitized.  As far as what this E-mail     02:02PM
12    seems to be bringing up is just the initial  02:02PM
13    review to determine what could be included in 02:02PM
14    the securitization.                          02:02PM
15         Q.    Would you include loans that had  02:02PM
16    EPD claims in the HE deals?                  02:02PM
17              MR. PASKIN:   Objection to form.   02:02PM
18         A.    I can't say that I recollect what 02:02PM
19    reasoning at the point we would or wouldn't  02:02PM
20    have for including or not including EPD       02:02PM
21    claims.  An EPD claim is something that we   02:02PM
22    have a right to claim but it is not something 02:02PM
23    that we have -- depending on the specific    02:02PM
24    contract or the specific negotiation, we may 02:03PM
25    have a right, not an obligation to claim it, 02:03PM
```

Page 151

1              R. MILLER

2    and it is all, you know, try to deal with          02:03PM

3    EPD's in a measured and considerate manner         02:03PM

4    /TPH-PLT all case it is wasn't necessarily         02:03PM

5    black and white. And we would try and make         02:03PM

6    the best decisions possible with respect to        02:03PM

7    them: My recollection is in most cases we          02:03PM

8    tried to enforce EPD claims.                        02:03PM

9         Q.    Did you include any loans that          02:03PM

10   you had a /ERTD EPD claims on in the HE            02:03PM

11   securitizations?                                    02:03PM

12        A.    I don't recall.                          02:03PM

13        Q.    Would that have been appropriate        02:03PM

14   to do so?                                           02:03PM

15             MR. PASKIN:   Objection to form.         02:03PM

16        A.    I don't recall what would or            02:03PM

17   wouldn't have been appropriate at the time.        02:03PM

18        Q.    What's a basis for an EPD claim?        02:03PM

19        A.    An EPD claim is where, when you         02:03PM

20   purchase a loan from a seller, it gives the        02:04PM

21   purchaser the right under some terms to            02:04PM

22   either put that loan back to the originator        02:04PM

23   or to otherwise receive some compensation for      02:04PM

24   the loan having some sort of a delinquency,        02:04PM

25   EPD /STAPDZ for early paid default.   So           02:04PM

Page 152

```
 1                    R. MILLER
```

| | | |
|---|---|---|
| 2 | sometime in the fault generally the first | 02:04PM |
| 3 | month, the first several months, after you | 02:04PM |
| 4 | take ownership of the loan.  So one of the | 02:04PM |
| 5 | purposes would be that when you purchase a | 02:04PM |
| 6 | loan, if there was nonpayment by the | 02:04PM |
| 7 | borrower, that might be an indication that | 02:05PM |
| 8 | the loan was -- was riskier than you thought | 02:05PM |
| 9 | it would be and you would like to put it back | 02:05PM |
| 10 | to the borrower.  That was not always the | 02:05PM |
| 11 | case.  Sometimes the early payment default | 02:05PM |
| 12 | could be simply a matter of the funds being | 02:05PM |
| 13 | miss directed in terms of there might have | 02:05PM |
| 14 | been a servicing transfer or for some reason, | 02:05PM |
| 15 | the borrower did make a payment and it wasn't | 02:05PM |
| 16 | properly attributed to that borrower's | 02:05PM |
| 17 | account.  So there could be EPD's related to | 02:05PM |
| 18 | purely credit related issues.  There could be | 02:05PM |
| 19 | technical issues.  It could be servicing | 02:05PM |
| 20 | transfer issues.  There could be just | 02:05PM |
| 21 | misunderstandings.  So in terms of how we do | 02:05PM |
| 22 | /WAO* /TAOEL with EPDs, do the best we do to | 02:05PM |
| 23 | understand what the source of the EPD was and | 02:06PM |
| 24 | then deal with it in as pragmatic matter as | 02:06PM |
| 25 | practical. | 02:06PM |

Page  153

```
 1                    R. MILLER

 2      Q.     Within the industry, EPDs were          02:06PM

 3   known to be a potential indicator of fraud,       02:06PM

 4   correct?                                          02:06PM

 5              MR. PASKIN:   Objection to form.        02:06PM

 6      A.     I would say that there was some          02:06PM

 7   general understanding in the industry that        02:06PM

 8   historically speaking, EPDs had been              02:06PM

 9   understood to be an indicator of potential        02:06PM

10   bad performance.  I do recall that the fraud      02:06PM

11   -- that the levels of fraud began to increase     02:06PM

12   during the timeframe 2005, 2006.  But I don't     02:06PM

13   know specifically that EPDs and fraud were        02:07PM

14   correlated or to what extent they were            02:07PM

15   correlated.                                       02:07PM

16      Q.     Did you read any mortgage               02:07PM

17   industry materials identifying the fact that      02:07PM

18   EPDs were a potential indicator of fraud?         02:07PM

19      A.     I was aware that they were a            02:07PM

20   potential indicator of fraud.  But I don't        02:07PM

21   recall there being any specific levels of         02:07PM

22   correlation, whether it was a very high           02:07PM

23   indicator or locator.  Whether it was             02:07PM

24   specific to some originators, specific to         02:07PM

25   some types.  I just recall in that timeframe,     02:07PM
```

1                      R. MILLER

2    it was 60 percent in cash and 40% in stock        04:17PM

3    that was deferred over roughly a three-year        04:17PM

4    period.                                            04:18PM

5         Q.    What do you mean by the stock was       04:18PM

6    deferred over roughly a three-year period?         04:18PM

7         A.    I received restricted stock which       04:18PM

8    had a vesting schedule over three years.  I        04:18PM

9    don't recall the exact specifics.  But I           04:18PM

10   believe it was a three-year for each of three      04:18PM

11   years subsequent.  /(.                             04:18PM

12        Q.    And does that mean that under the       04:18PM

13   terms of the bonus or the terms of the             04:18PM

14   restricted stock, that you didn't actually         04:18PM

15   receive the value of all of that stock until       04:18PM

16   those three years had passed?                      04:18PM

17        A.    Yes.  I could not convert it it         04:18PM

18   into cash.  I could only -- it was only            04:18PM

19   designated to me in a restricted fashion.          04:18PM

20             MR. PASKIN:  I have nothing              04:18PM

21        further.  EXAMINATION BY.                     04:18PM

22             MR. DeLANGE:                             04:18PM

23        Q.    Just a few followups.  Mr.              04:18PM

24   Miller, did the -- did investors -- strike         04:19PM

25   that.  Were investors provided the underlying      04:19PM

Page 241

1                        R. MILLER

2    loan files?                                04:19PM

3         A.    To the best of my knowledge,    04:19PM

4    investors did not ever have access to      04:19PM

5    underlying loan files.                      04:19PM

6         Q.    Mr. Paskin asked you about the  04:19PM

7    difference between the 45-year product and 04:19PM

8    the 50-year product.  Do you recall that   04:19PM

9    testimony?                                  04:19PM

10        A.    Yes, sir.                        04:19PM

11        Q.    And he asked if the information  04:19PM

12   regarding the 45 and 50-year products was  04:19PM

13   disclosed on the tape?                      04:19PM

14        A.    Yes, sir.                        04:19PM

15        Q.    And you indicated that was       04:19PM

16   disclosed on the tape?                      04:19PM

17        A.    To the best of my knowledge, that 04:19PM

18   would be disclosed on the tape.            04:19PM

19        Q.    And it was your expectation that 04:19PM

20   those products were underwritten and       04:19PM

21   according to the guidelines that accompanied 04:19PM

22   those products, correct?                    04:19PM

23             MR. PASKIN:  Objection to form.   04:19PM

24        A.    It would be my expectation that  04:19PM

25   all the legal compliance issues would be   04:19PM

1                    R. MILLER

2    followed and that with the reasonable         04:20PM

3    compensating factors, that these would be     04:20PM

4    reasonable with respect to the guidelines of  04:20PM

5    the originator.                                04:20PM

6        Q.      Did you ever personally           04:20PM

7    communicate with investors regarding the      04:20PM

8    marketing or attempt to sell JP Morgan RMBS,   04:20PM

9    residence mortgage-backed securities?          04:20PM

10       A.      Just as a point of clarification,  04:20PM

11   the desk that I did was actually considered    04:20PM

12   to be ABS, not RMBS.  So, no, not RMBS.  But,  04:20PM

13   yes, with respect to the securitization of     04:20PM

14   sub-prime mortgages, I did talk to potential   04:20PM

15   investors.                                     04:20PM

16       Q.      In connection with -- what's your  04:20PM

17   distinction between ABS and RMBS?              04:20PM

18       A.      Just trying to be technically      04:21PM

19   right.  Sub-prime mortgages are generally      04:21PM

20   considered to be an ABS, an asset backed       04:21PM

21   securitization product.  Often, also,          04:21PM

22   referred to as home equity ABS.  While RMBS    04:21PM

23   tends to be more associated prime mortgages    04:21PM

24   or agency mortgages.                           04:21PM

25       Q.      What communications did you have   04:21PM

1                    R. MILLER

2    with investors regarding the home equity        04:21PM

3    products?                                        04:21PM

4        A.    Phone calls, face-to-face             04:21PM

5    meetings, usually -- usually a custom --         04:21PM

6    usually with the sales force or introduced by    04:21PM

7    sales force to the customer.                     04:21PM

8        Q.    What information would you             04:21PM

9    provide to the investor?                         04:21PM

10       A.    I don't recall the specifics.          04:21PM

11   But in general, talking about the attributes     04:21PM

12   of a particular deal or speaking about how we    04:22PM

13   ran our program.                                 04:22PM

14       Q.    Did you ever disclose to any           04:22PM

15   investor the results of the loan level due       04:22PM

16   diligence?                                       04:22PM

17       A.    I don't recall specifically what       04:22PM

18   we didn't say -- did or didn't say to            04:22PM

19   investors.  I do recall having conversations     04:22PM

20   saying that we did due diligence.  I do          04:22PM

21   recall having conversations talking about who    04:22PM

22   the diligence parties were that we engaged       04:22PM

23   but not necessarily the specific diligence       04:22PM

24   party on a specific deal.  But I don't recall    04:22PM

25   ever discussing the results per se that here     04:23PM

Page  244

```
 1                    R. MILLER

 2    is the diligence summary.  But just talking      04:23PM

 3    in general that all of our loan pools were       04:23PM

 4    subjected to loan level due diligence.           04:23PM

 5       Q.    Did you ever have any                    04:23PM

 6    communications with anyone from financial         04:23PM

 7    services asset management, FSA M?                 04:23PM

 8       A.    I don't recall that acronym or           04:23PM

 9    that name.                                        04:23PM

10       Q.    Do you recall -- do you know who         04:23PM

11    Jake hendrickson is?                              04:23PM

12       A.    I don't recall that name.               04:23PM

13       Q.    Do you know who Glenn So is?            04:23PM

14       A.    Glenn so, no, I am sorry, I don't       04:23PM

15    know who that is.                                 04:23PM

16            MR. DeLANGE:  I have nothing             04:23PM

17       further.                                       04:23PM

18            THE VIDEOGRAPHER:  This                  04:23PM

19       concludes the deposition.  We are              04:23PM

20       going off the record at 422:00 P.M..           04:23PM

21            (Whereupon, a recess was held.)          04:24PM

22            (Whereupon, at replace

23       ^ a.m. ^ p.m., the Examination of this

24       Witness was concluded.)

25
```