# EXHIBIT 66

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW JERSEY

CASE NO. 12-CV-4761 (JSR)

------------------------------------------x

DEXIA SA/NV, DEXIA HOLDINGS, INC, FSA ASSET
MANAGEMENT LLC and DEXIA CREDIT LOCAL SA,

              Plaintiffs,

   v.

BEAR STEARNS & CO., INC., THE BEAR STEARNS
COMPANIES, INC., BEAR STEARNS ASSET BACKED
SECURITIES I LLC, EMC MORTGAGE, LLC (F/K/A
EMC MORTGAGE CORPORATION), STRUCTURED ASSET
MORTGAGE INVESTMENTS II INC., J.P. MORGAN
MORTGAGE ACQUISITION CORPORATION, J.P. MORGAN
SECURITIES, LLC, (F/K/A JPMORGAN SECURITIES,
INC.), WAMU ASSET ACCEPTANCE CORP., WAMU
CAPITAL CORP., WAMU MORTGAGE SECURITIES CORP.,
JPMORGAN CHASE & CO. AND JPMORGAN CHASE BANK,
N.A.,

              Defendants.

------------------------------------------x

    VIDEOTAPED DEPOSITION OF DOUGLAS POTOLSKY

      New York, New York

      Friday, January 25, 2013

Reported by:
Amy A. Rivera, CSR, RPR, CLR
JOB NO. 57634

```
 1                    DOUGLAS POTOLSKY
 2          A.    That is correct.
 3          Q.    Okay.  Within the bulk purchase unit
 4   that you set up at Washington Mutual, did --
 5   did -- was due diligence conducted there?
 6          A.    Correct.
 7          Q.    It was?
 8          A.    It was.
 9          Q.    Okay.  Was this the due diligence team
10   that you used?
11                And what I mean by "this," is the one
12   described here that lists Tom Lehmann as well as
13   Juanity Gephardt, Eric Heise, Joshua Hogan, George
14   Wynne, William Miller, Janice Adler, Olin Dain,
15   Debbie Basch?
16          A.    The -- also joining -- the sentence
17   beginning "also joining," you mean, those -- the
18   folks -- those folks would -- were generally the
19   subprime diligence team.
20          Q.    Okay.  So I'm clear, George Wynne,
21   William Miller, Janice Adler, Olin Dain, Debbie
22   Basch, those were the subprime due diligence
23   managers?
24          A.    Due -- yeah, due diligence team.
25          Q.    Due diligence team.
```

1                    DOUGLAS POTOLSKY
2         A.     Yes, they were.
3         Q.     Did they have titles or --
4         A.     I don't remember.
5         Q.     Okay.  And what was their function
6    within your subprime bulk conduit unit?
7         A.     Well, to support the due diligence
8    efforts, you know, on -- on the subprime conduit.
9         Q.     And for the jury, can you just
10   describe generally what that means, "support the
11   due diligence efforts for the subprime conduit"?
12        A.     Well, this team was actually -- they
13   were actually underwriters --
14        Q.     Okay.
15        A.     -- so they were credit underwriters --
16   they were trained credit underwriters with
17   subprime experience that would be used to review
18   credit files for purchase.
19        Q.     Okay.  So, would they themselves --
20   let's -- for example, if a -- a bulk purchase was
21   identified from a seller, would these individuals
22   themselves conduct the due diligence or would they
23   hire an outside third party to do the due
24   diligence?
25        A.     It would depend -- if I remember

1                    DOUGLAS POTOLSKY

2        Q.    At any point in time in 2005 and 2007
3   did the subprime capital markets have its own due
4   diligence department separate and apart from what
5   Susan Sinn was responsible for?
6        A.    No, it did not.
7        Q.    Okay.
8              Was Susan Sinn's department, in fact,
9   the due diligence department for subprime capital
10  markets?
11       A.    Yes, for the -- Susan Sinn was
12  responsible for subprime due diligence for the
13  conduit, yes.
14       Q.    For the conduit.
15             The conduit, you are referring to the
16  purchase of bulk home loans standard, correct?
17       A.    That is accurate.
18       Q.    Okay.  As well as flow?
19       A.    If she would -- if we had flow up and
20  running, she would have been responsible for flow.
21       Q.    Okay.  But if flow was never up and
22  running prior to the acquisition by JPMorgan in
23  2008, correct?
24       A.    We were in the process of building the
25  flow program.  I don't believe it ever took off

1                    DOUGLAS POTOLSKY

2    correct.

3         Q.    Okay.

4              And when you look at combined original

5    LTV, that's based upon an appraisal report,

6    correct?

7         A.    Correct.

8         Q.    And that appraisal report is found in

9    the loan file, correct?

10        A.    It should be, yes.

11        Q.    Okay.

12              Now, the purchasers of these

13   certificates do not get access to those loan

14   files, correct?

15        A.    Correct.

16        Q.    And the purchasers of these

17   certificates are depending upon the

18   representations made to them by the sellers of

19   these offerings, correct?

20        A.    Representations in the prospectus and

21   disclosures, correct.

22        Q.    Right, concerning such parameters as

23   FICO score and cumulative loan-to-value and

24   debt-to-income ratios, correct?

25        A.    Confirming the data integrity.  I

```
 1                    DOUGLAS POTOLSKY
 2     can't specifically speak to every one, but the
 3     integrity of the data.
 4          Q.    Right.  And they -- depending upon
 5     those representations in those prospectuses,
 6     correct?
 7          A.    I can't tell you what they are looking
 8     at, but.
 9          Q.    But they don't get the actual loan
10     files themselves?
11          A.    They don't get the actual loan files
12     themselves.
13          Q.    Right.  And they can't go digging
14     through those loan files to make sure that the
15     appraisals there, that the CLTV, correct --
16          A.    Correct.
17          Q.    -- is correctly computated?
18          A.    That's correct.
19          Q.    Okay.  And the purchasers of the
20     certificates, they -- they can't actually go out
21     and make sure that the owner-occupancy
22     representation is accurate, correct?
23          A.    I can't -- I don't have total
24     knowledge of what they have access to or not as a
25     bondholder.
```

```
 1                    DOUGLAS POTOLSKY
 2         Q.    Okay.
 3         A.    All I do know is if they have
 4   access -- one bondholder has access to it,
 5   everyone has to have -- have access to it.
 6         Q.    And that information that they're
 7   relying upon is provided by the issuer of the
 8   mortgage-backed securities, correct?
 9         A.    Issuer as defined as deposit of the
10   loans into the trust, yes.
11         Q.    Without access to the actual loan
12   files, how could a purchaser of mortgage-backed
13   securities actually determine whether or not the
14   data in the loan files is the same as that is
15   represented on the loan tapes?
16         A.    No, I've never purchased -- no, it's
17   never been my role, but as you mention, there is
18   information -- there's collateral information in
19   the offering documents, and they base -- I -- I
20   would assume -- one would assume they would base
21   their information on -- their decision based on
22   that.
23               There's also a history out on
24   performance on loans, similar type of loans,
25   similar type of issuances.  You know, prudent
```

```
 1                    DOUGLAS POTOLSKY
 2   wrote had to do with misrep or fraud on these
 3   loans, correct?
 4         A.    Typically, when you have first- or
 5   early-payment default, that's typically some of
 6   the issues.
 7         Q.    Now, you just said "typically."
 8         A.    Typically.
 9         Q.    I want to know -- yeah, but
10   specifically here --
11         A.    I don't know specifically which loans
12   they're talking about, but typically, if someone
13   doesn't pay their first payment, there can be some
14   fraud and misrep involved in that.
15         Q.    Right.  And here you wrote:  "We are
16   finding 60 percent plus misrep or fraud on these
17   loans as well."
18               Do you see that?
19         A.    Yes, I do.
20         Q.    So, here, you were not talking about
21   typically, correct?
22         A.    I was talking about these specific
23   loans, correct.
24         Q.    Okay.  The loans mentioned in --
25         A.    That --
```