# EXHIBIT 69

Prospectus Supplement to Prospectus Dated January 6, 2006

# Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE2 Trust

### Issuing Entity

## WaMu Asset Acceptance Corp.

### Depositor

## Washington Mutual Mortgage Securities Corp.

### Sponsor

## Washington Mutual Bank

### Servicer

## $457,265,000

### (Approximate)

Consider carefully the risk factors beginning on page S-12 in this prospectus supplement and on page 5 in the accompanying prospectus.

The certificates will represent interests only in the issuing entity which is the Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE2 Trust and will not represent interests in or obligations of Washington Mutual Bank, Washington Mutual Mortgage Securities Corp., WaMu Asset Acceptance Corp., Washington Mutual, Inc. or any of their affiliates.

Neither these certificates nor the underlying mortgage loans are guaranteed by any agency or instrumentality of the United States.

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

The Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE2 Trust will issue fourteen classes of offered certificates and six classes of privately placed certificates. Each class of offered certificates will be entitled to receive monthly distributions of interest or principal or both, beginning on June 26, 2006. The pass-through rate for each class of offered certificates will be variable and will be based in part on the one-month LIBOR index. The table on page S-6 contains a list of the classes of offered certificates, including the original certificate principal balance of each class and pass-through rate.

The primary asset of the trust will be a pool of sub-prime first and second lien, adjustable-rate and fixed-rate residential mortgage loans. The trust will also contain other assets, which are described on page S-48 of this prospectus supplement.

### The Offered Certificates

| | |
|---|---|
| Total principal amount (approximate) | $457,265,000 |
| First payment date | June 26, 2006 |
| Interest and/or principal paid | Monthly |
| Last scheduled distribution date | May 2036 |

Credit enhancement for the offered certificates is being provided by one class of privately offered subordinate certificates, which has an aggregate principal balance of approximately $4,719,000. Further credit enhancement for the senior certificates is being provided by ten classes of mezzanine certificates, which will be subordinated to the senior certificates. Credit enhancement for the offered certificates is also being provided in the form of excess interest, overcollateralization and allocation of losses. The offered certificates will have the benefit of a swap agreement.

The underwriters listed below will offer the offered certificates at varying prices to be determined at the time of sale. The proceeds to WaMu Asset Acceptance Corp. from the sale of the offered certificates will be approximately 99.63% of the principal balance of the offered certificates, before deducting expenses. The underwriters' commission will be the difference between the price paid to WaMu Asset Acceptance Corp. for the offered certificates and the amount received from the sale of the offered certificates to the public.

Neither the SEC nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.

*Underwriters*

## WaMu Capital Corp.     Banc of America Securities LLC

May 23, 2006

Confidential

**Important Notice About Information Presented in this
Prospectus Supplement and the Accompanying Prospectus**

We provide information to you about the offered certificates in two separate documents that progressively provide more detail: (a) the accompanying prospectus, which provides general information, some of which may not apply to your series of certificates, and (b) this prospectus supplement, which describes the specific terms of your series of certificates.

**You should be certain to review the information in this prospectus supplement for a description of the specific terms of your certificates.**

We include cross-references in this prospectus supplement and the accompanying prospectus to captions in these materials where you can find further related discussions. The following table of contents and the table of contents included in the accompanying prospectus provide the pages on which these captions are located.

You can find a listing of the pages where some of the capitalized terms used in this prospectus supplement and the accompanying prospectus are defined under the caption "Index of Defined Terms" in this prospectus supplement and under the caption "Glossary" beginning on page 142 in the accompanying prospectus. Capitalized terms used in this prospectus supplement and not otherwise defined in this prospectus supplement have the meanings assigned in the accompanying prospectus.

Confidential

JPMC_DEX_000070837

**European Economic Area**

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), the underwriters have represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of certificates to the public in that Relevant Member State at any time:

(a)    to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b)    to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(c)    in any other circumstances which do not require the publication by the issuing entity of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of certificates to the public" in relation to any certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the certificates to be offered so as to enable an investor to decide to purchase or subscribe to the certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

**United Kingdom**

The underwriters have represented and agreed that:

(a)    it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act) received by it in connection with the issue or sale of the certificates in circumstances in which Section 21(1) of the Financial Services and Markets Act does not apply to the issuing entity; and

(b)    it has complied and will comply with all applicable provisions of the Financial Services and Markets Act with respect to anything done by it in relation to the certificates in, from or otherwise involving the United Kingdom.

S-2

Confidential

**TABLE OF CONTENTS**

| | Page |
|---|---|
| SUMMARY INFORMATION | S-5 |
| TRANSACTION PARTICIPANTS | S-5 |
| TRANSACTION | S-5 |
| WHAT YOU OWN | S-5 |
| THE CERTIFICATES | S-6 |
| DISTRIBUTIONS ON THE CERTIFICATES | S-7 |
| CREDIT ENHANCEMENT | S-8 |
| SWAP AGREEMENT | S-10 |
| FINAL MATURITY RESERVE ACCOUNT | S-10 |
| OPTIONAL TERMINATION | S-10 |
| YIELD CONSIDERATIONS | S-10 |
| BOOK-ENTRY REGISTRATION | S-10 |
| DENOMINATIONS | S-10 |
| LEGAL INVESTMENT | S-11 |
| ERISA CONSIDERATIONS | S-11 |
| FEDERAL INCOME TAX CONSEQUENCES | S-11 |
| RATINGS | S-11 |
| RISK FACTORS | S-12 |
| THE SPONSOR | S-33 |
| General | S-33 |
| The Sponsor's Origination Channels | S-33 |
| STATIC POOL INFORMATION | S-35 |
| THE ORIGINATORS | S-36 |
| Long Beach Mortgage Company | S-36 |
| Home Loan Corporation | S-36 |
| LIME Financial Services, LTD. | S-37 |
| Mandalay Mortgage, LLC | S-37 |
| UNDERWRITING OF THE MORTGAGE LOANS | S-38 |
| General | S-38 |
| Evaluation of the Borrower's Credit Standing | S-38 |
| Evaluation of the Borrower's Repayment Ability | S-38 |
| Evaluation of the Adequacy of Collateral | S-39 |
| Documentation Programs | S-39 |
| Due Diligence and Quality Control Review | S-40 |
| Risk Categories | S-40 |
| Exceptions to Program Parameters | S-42 |
| Long Beach Mortgage Company's Underwriting Standards | S-42 |
| THE DEPOSITOR | S-46 |
| THE TRUST | S-47 |
| Assignment of the Mortgage Loans and Other Assets to the Trust | S-47 |
| Restrictions on Activities of the Trust | S-49 |
| Discretionary Activities With Respect to the Trust | S-49 |
| THE SERVICERS | S-51 |
| General | S-51 |

| | Page |
|---|---|
| The Servicer | S-51 |
| The Calculation Agent | S-58 |
| The Trustee | S-59 |
| Special Servicing Agreements | S-62 |
| THE DELAWARE TRUSTEE | S-63 |
| General | S-63 |
| Limitations on the Delaware Trustees' Liability | S-63 |
| Resignation and Removal of the Delaware Trustee | S-63 |
| AFFILIATIONS AND RELATED TRANSACTIONS | S-64 |
| THE MORTGAGE POOL | S-65 |
| Representations and Warranties Regarding the Mortgage Loans | S-67 |
| Criteria for Selection of Mortgage Loans | S-69 |
| DESCRIPTION OF THE CERTIFICATES | S-70 |
| General | S-70 |
| Book Entry Certificates | S-71 |
| Definitive Certificates | S-72 |
| Allocation of Available Funds | S-72 |
| Credit Enhancement | S-76 |
| The Swap Agreement | S-80 |
| The Swap Counterparty | S-84 |
| The Final Maturity Reserve Account | S-85 |
| The Trustee of the Supplemental Interest Trust and the Final Maturity Reserve Trust | S-86 |
| Definitions | S-87 |
| Pass-Through Rates | S-97 |
| Calculation of One-Month LIBOR | S-99 |
| Optional Termination of the Trust | S-100 |
| Amendment of the Pooling Agreement | S-101 |
| Servicing Compensation, Payment of Expenses and Compensating Interest | S-102 |
| Reports and Other Information | S-106 |
| YIELD, PREPAYMENT AND MATURITY CONSIDERATIONS | S-109 |
| Additional Information | S-111 |
| Weighted Average Lives | S-111 |
| Yield Sensitivity of the Mezzanine Certificates and the Class B Certificates | S-117 |
| USE OF PROCEEDS | S-118 |
| MATERIAL FEDERAL INCOME TAX CONSEQUENCES | S-118 |
| Allocation of Purchase Price and Sales Price | S-119 |
| Original Issue Discount and Premium | S-119 |
| The NPC Component | S-120 |
| Payments on the Final Scheduled Distribution Date | S-122 |

Confidential

JPMC_DEX_000070839

4

## TABLE OF CONTENTS

**Page**

Potential Alternative Treatment of Right
to Receive Payments Outside of the
REMIC ................................................ S-122
Treatment as Real Estate Assets................... S-122
Prohibited Transactions ............................... S-122
Tax Return Disclosure Requirements............ S-123
ERISA CONSIDERATIONS .............................. S-123
While the Supplemental Interest Trust and
the Final Maturity Reserve Trust are
in Existence ........................................... S-124
After Termination of the Supplemental
Interest Trust and the Final Maturity
Reserve Trust........................................... S-124
LEGAL INVESTMENT CONSIDERATIONS ... S-125
METHOD OF DISTRIBUTION ......................... S-125
LEGAL MATTERS .............................................. S-126
RATINGS.............................................................. S-126
ANNEX I.............................................................. S-128
APPENDIX A  DECREMENT TABLES ............ S-130
APPENDIX B  MORTGAGE LOAN TABLES . S-144
INDEX OF DEFINED TERMS ........................... S-157

S-4

JPMC_DEX_000070840

# SUMMARY INFORMATION

- *The following summary highlights selected information from this prospectus supplement. It does not contain all of the information that you need to consider in making your investment decision. To understand the terms of the offered certificates, read carefully this entire prospectus supplement and the accompanying prospectus.*

- *This summary provides an overview of certain calculations, cash flows and other information to aid your understanding. This summary is qualified by the full description of these calculations, cash flows and other information in this prospectus supplement and the accompanying prospectus.*

## TRANSACTION PARTICIPANTS

## TRANSACTION

On or about May 25, 2006, which is the closing date, the mortgage loans that support the certificates will be sold by Washington Mutual Mortgage Securities Corp., the sponsor of the securitization transaction, to WaMu Asset Acceptance Corp., the depositor. On the closing date, the depositor will sell the mortgage loans and related assets to the Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE2 Trust. In exchange for the mortgage loans and related assets, the trust will issue the certificates pursuant to the order of the depositor.

The sponsor purchased the mortgage loans directly or indirectly from affiliated or unaffiliated third parties who either originated the mortgage loans or purchased the mortgage loans through correspondent or broker lending. The following entities originated at least 10% of the mortgage loans (by aggregate scheduled principal balance of the mortgage loans as of May 1, 2006): Long Beach Mortgage Company, approximately 32.5%, Home Loan Corporation, approximately 11.8%, Lime Financial Services, Ltd., approximately 11.2% and Mandalay Mortgage, LLC, approximately 16.7%. No other entity originated more than 10% of the mortgage loans.

The mortgage loans will be serviced by Washington Mutual Bank. Washington Mutual Mortgage Securities Corp. will act as calculation agent and will be responsible for calculating loan payoff amounts for each monthly distribution on the certificates. Some servicing functions will be performed by LaSalle Bank National Association, as trustee. Some servicing functions will be outsourced to third party vendors.

The trustee of the trust will be LaSalle Bank National Association, and the Delaware trustee will be Christiana Bank & Trust Company. LaSalle Bank National Association will also review the mortgage

notes, mortgages and certain other legal documents related to the mortgage loans as custodian for the trust in accordance with the review requirements of the pooling agreement.

## NIMS Insurer

In the future, the depositor may decide to proceed with the issuance of net interest margin securities ("**NIMS**") to be backed, in whole or in part, by the Class C Certificates and the Class P Certificates. The NIMS, if issued, would be issued by an affiliate of the depositor or by one or more entities sponsored by an affiliate of the depositor after the closing date. One or more insurance companies ("**NIMS insurer**") may issue a financial guaranty insurance policy covering certain payments to be made on the NIMS, if issued. In such event, the NIMS insurer will have various rights under the pooling agreement and will be able to exercise certain rights that could adversely impact the certificateholders.

See *"Risk Factors—Certain Rights of the NIMS Insurer May Adversely Affect the Rights of Holders of Offered Certificates and the Class B Certificates"* in this prospectus supplement.

## WHAT YOU OWN

**Your certificates represent interests *only* in the assets of the issuing entity. All payments to you will come only from the amounts received in connection with those assets.**

The issuing entity will own a pool of mortgage loans and other assets, as described under "The Trust" in this prospectus supplement.

On the closing date, there will be no outstanding series or classes of securities that are backed by the assets of the issuing entity or otherwise have claims on the assets of the issuing entity, other than the certificates. The depositor does not expect that any securities representing additional interests in or

Confidential

JPMC_DEX_000070841

6

claims on the assets of the issuing entity will be issued in the future.

**Information About the Mortgage Pool**

The mortgage pool consists of 2,579 mortgage loans with an aggregate principal balance as of May 1, 2006 of approximately $472,002,321. All of the mortgage loans are secured by residential properties and each is set to mature within 40 years of the date it was originated.

In the event of a material breach of the representations and warranties made by the sponsor or the depositor, as applicable, with respect to the mortgage loans, or in the event that a required loan document is not included in the mortgage files for the mortgage loans, the sponsor will, unless it has cured the breach in all material respects, be required to repurchase the affected mortgage loan or substitute a new mortgage loan for the affected mortgage loan.

*See "Description of the Mortgage Pool— Representations and Warranties Regarding the Mortgage Loans" in this prospectus supplement.*

**THE CERTIFICATES**

**The Offered Certificates**

| Class | Approximate Original Certificate Principal Balance | Pass-Through Rate | Type |
|---|---|---|---|
| A-1 | $190,671,000 | Variable | Senior |
| A-2 | 58,648,000 | Variable | Senior |
| A-3 | 86,414,000 | Variable | Senior |
| A-4 | 31,165,000 | Variable | Senior |
| M-1 | 18,168,000 | Variable | Mezzanine |
| M-2 | 16,516,000 | Variable | Mezzanine |
| M-3 | 9,910,000 | Variable | Mezzanine |
| M-4 | 8,494,000 | Variable | Mezzanine |
| M-5 | 8,022,000 | Variable | Mezzanine |
| M-6 | 7,786,000 | Variable | Mezzanine |
| M-7 | 7,078,000 | Variable | Mezzanine |
| M-8 | 5,191,000 | Variable | Mezzanine |
| M-9 | 4,483,000 | Variable | Mezzanine |
| M-10 | 4,719,000 | Variable | Mezzanine |

The pass-through rates for the offered certificates will be calculated at the per annum rate of one-month LIBOR plus the related margin as specified below, subject to the limitations described in this prospectus supplement.

| | Margin | |
|---|---|---|
| Class | (1) | (2) |
| A-1 | 0.040% | 0.080% |
| A-2 | 0.090% | 0.180% |
| A-3 | 0.150% | 0.300% |
| A-4 | 0.240% | 0.480% |
| M-1 | 0.270% | 0.405% |
| M-2 | 0.290% | 0.435% |
| M-3 | 0.310% | 0.465% |
| M-4 | 0.350% | 0.525% |
| M-5 | 0.380% | 0.570% |
| M-6 | 0.460% | 0.690% |
| M-7 | 0.870% | 1.305% |
| M-8 | 1.050% | 1.575% |
| M-9 | 1.850% | 2.775% |
| M-10 | 2.500% | 3.750% |

[1] For each distribution date up to and including the Optional Termination Date.
[2] For each distribution date after the Optional Termination Date.

*See "Description of the Certificates   Pass-Through Rates" in this prospectus supplement for additional information.*

**The Non-Offered Certificates**

In addition to the offered certificates, the trust will also issue the Class B Certificates, the Class C Certificates, the Class P Certificates, the Class R Certificates, the Class R-CX Certificates and the Class R-PX Certificates. **These certificates are not being offered by this prospectus supplement.**

The approximate initial class principal balance, annual certificate interest rate and type of each of the Class B Certificates, the Class C Certificates, the Class P Certificates, the Class R Certificates, the Class R-CX and the Class R-PX Certificates will be as follows:

| Class | Approximate Original Certificate Principal Balance | Pass-Through Rate | Type |
|---|---|---|---|
| B | $ 4,719,000 | Variable (1) | Subordinate |
| C | 10,018,220 | Variable (2) | Subordinate |
| P | 100 | (3) | Prepayment Charge |
| R | 0 | (3) | Residual |
| R-CX | 0 | (3) | Residual |
| R-PX | 0 | (3) | Residual |

(1) one-month LIBOR plus 2.500% for each distribution date up to and including the Optional Termination Date, and one-month LIBOR plus 3.750% for each distribution date after the Optional Termination Date.

(2) The Class C Certificates will accrue interest as provided in the pooling agreement.

Confidential

JPMC_DEX_000070842

7

(3) The Class P, Class R, Class R-CX and Class R-PX Certificates will not accrue interest on their class principal balance.

The original certificate principal balance of the Class C Certificates is approximately equal to the initial overcollateralization that will be required by the pooling agreement. The certificate principal balance of the Class C Certificates on any date will represent the overcollateralization for the offered certificates and the Class B Certificates and may change from time to time as provided in the pooling agreement. The Class C Certificates will initially evidence an interest of approximately 2.10% of the aggregate principal balance of the mortgage loans in the trust on the closing date.

The Class P Certificates will have an original certificate principal balance of $100 and will not be entitled to distributions in respect of interest. The Class P Certificates will be entitled to receive certain prepayment premiums or charges received in respect of the mortgage loans.

The Class R Certificates, the Class R-CX Certificates and the Class R-PX Certificates will not have an original principal balance and are the classes of certificates representing the residual interests in the trust.

The Class B Certificates will be sold to WaMu Capital Corp. and Banc of America Securities LLC on the closing date. The Class C Certificates, the Class P Certificates, the Class R Certificates, the Class R-CX Certificates and the Class R-PX Certificates will be delivered to the sponsor or an affiliate of the sponsor or its designee as partial consideration for the mortgage loans.

*See "Description of the Certificates—General" in this prospectus supplement.*

### Designations

| Designation | Class of Certificates |
| --- | --- |
| *Offered Certificates* | Class A Certificates and Mezzanine Certificates |
| *Class A Certificates* | Class A-1 Certificates, Class A-2 Certificates, Class A-3 Certificates and Class A-4 Certificates |

| Designation | Class of Certificates |
| --- | --- |
| *Mezzanine Certificates* | Class M-1 Certificates, Class M-2 Certificates, Class M-3 Certificates, Class M-4 Certificates, Class M-5 Certificates, Class M-6 Certificates, Class M-7 Certificates, Class M-8 Certificates, Class M-9 Certificates and Class M-10 Certificates |
| *Residual Certificates* | Class R Certificates, Class R-CX Certificates and Class R-PX Certificates |
| *Subordinate Certificates* | Mezzanine Certificates, Class B Certificates and Class C Certificates |

### Last Scheduled Distribution Date

The last scheduled distribution date for each class of certificates is the distribution date in May 2036.

It is intended that the amounts deposited in the final maturity reserve account will be sufficient to retire the offered certificates on the last scheduled distribution date, even though the outstanding principal balance of the mortgage loans having 40-year original terms to maturity have not been reduced to zero on the last scheduled distribution date. The actual final distribution date for each class of the offered certificates and the Class B Certificates may be earlier or later, and could be substantially earlier, than the distribution date in May 2036.

*See "Description of the Certificates—General" in this prospectus supplement.*

### DISTRIBUTIONS ON THE CERTIFICATES

#### Monthly Distributions

Each month, the trustee, LaSalle Bank National Association, will make distributions of interest and/or principal to the holders of the certificates. Distributions will be made on the 25th day of each month, or if the 25th day is not a business day, on the next business day. The first distribution date will be June 26, 2006.

*Source of Payments.* The mortgagors will pay their interest and principal during the month to the servicer. Each month, the servicer will subtract the servicing fee and other servicing compensation and

S-7

JPMC_DEX_000070843

8

will send the remainder to the trustee. On the distribution date for that month, the trustee will subtract the trustee fee and distribute that amount to the holders of the certificates in the order described in "Description of the Certificates – Allocation of Available Funds" in this prospectus supplement. The servicing fee for the mortgage loans will be 0.50% per annum and the trustee fee for the mortgage loans will be 0.0033% per annum, in each case, on the principal balance of each mortgage loan.

*Advances.* For any month, if the servicer receives a payment on a mortgage loan that is less than the full scheduled payment or if no payment is received at all, the servicer will advance funds held by the servicer for future distribution, or its own funds, to cover that shortfall. However, the servicer will not be required to make advances if it determines that those advances will not be recoverable from future payments or collections on that mortgage loan.

*See "The Servicers—The Servicer—Servicing Procedures—Advances" in this prospectus supplement.*

### Distributions of Interest

The offered certificates and the Class B Certificates will accrue interest for any distribution date from the previous distribution date (or, in the case of the first accrual period, from the closing date) to the day prior to the current distribution date. Interest will be calculated for the offered certificates and the Class B Certificates on the basis of the actual number of days in the accrual period, based on a 360-day year. On each distribution date interest will be distributed to these classes of certificates in the order described in "Description of the Certificates—Allocation of Available Funds—*Interest Distributions on the Offered Certificates and the Class B Certificates*" in this prospectus supplement.

The offered certificates and the Class B Certificates will accrue interest on their certificate principal balances outstanding immediately prior to each distribution date.

The Class C Certificates will accrue interest as provided in the pooling agreement. The Class P Certificates and the Residual Certificates will not accrue interest.

*See "Description of the Certificates" in this prospectus supplement for additional information.*

### Compensating Interest and Interest Shortfalls

When mortgagors make prepayments in full, they need not pay a full month's interest. Instead, they are required to pay interest only to the date of their prepayment. When mortgagors make partial prepayments, they do not pay interest on the amount of that prepayment. To compensate certificateholders for the shortfall in interest this causes, the servicer may pay compensating interest to the certificateholders out of the servicing fee it collects. For a description of how compensating interest is allocated among the certificates, as well as important limitations on the amount of compensating interest that will be allocated among the certificates, see "Description of the Certificates—Servicing Compensation, Payment of Expenses and Compensating Interest" in this prospectus supplement.

### Distributions of Principal

Principal will be distributed to holders of the offered certificates and the Class B Certificates on each distribution date in the priority, in the amounts and to the extent described in this prospectus supplement under "Description of the Certificates—Allocation of Available Funds."

### Performance Triggers

The priority of the distribution of principal to the holders of the offered certificates and the Class B Certificates will be altered after the stepdown date if cumulative losses on the mortgage loans exceed a specified percentage on any distribution date in or after June 2008, or if mortgage loan delinquencies exceed a specified percentage on any distribution date.

*See "Description of the Certificates—Allocation of Available Funds" in this prospectus supplement.*

### CREDIT ENHANCEMENT

### Subordination

- the rights of the Mezzanine Certificates, the Class B Certificates and the Class C Certificates to receive distributions will be subordinated to the rights of the Class A Certificates;

- the rights of the Mezzanine Certificates with higher numerical class designations to receive distributions will be subordinated to

S-8

Confidential

9

the rights of the Mezzanine Certificates with lower numerical class designations; and

- the rights of the Class B Certificates and the Class C Certificates to receive distributions will be subordinated to the rights of the Mezzanine Certificates;

in each case, to the extent described in this prospectus supplement.

Subordination is intended to enhance the likelihood of regular distributions on the more senior classes of certificates in respect of interest and principal and to afford such certificates protection against realized losses on the mortgage loans.

*See "Description of the Certificates—Credit Enhancement—Subordination" in this prospectus supplement.*

**Excess Interest**

The mortgage loans bear interest each month that in the aggregate is expected to exceed the amount needed to pay monthly interest on the certificates, the fees and expenses of the trust and certain net amounts owed to the swap counterparty. The excess interest from the mortgage loans each month will be available to absorb realized losses on the mortgage loans and to maintain overcollateralization at required levels as described in the pooling agreement.

*See "Description of the Certificates—Allocation of Available Funds" and "—Credit Enhancement— Excess Interest" in this prospectus supplement.*

**Overcollateralization**

As of the closing date, the aggregate principal balance of the mortgage loans as of the cut-off date will exceed the aggregate certificate principal balance of the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class P Certificates on the closing date by approximately $10,018,220, which will be equal to the original certificate principal balance of the Class C Certificates. Such amount represents approximately 2.10% of the aggregate principal balance of the mortgage loans as of the cut-off date, and is approximately equal to the initial amount of overcollateralization that will be required to be provided under the pooling agreement. Excess interest generated by the mortgage loans will be distributed as a payment of principal to the offered certificates and the Class B Certificates then entitled to distributions of principal to the extent necessary to

maintain the required level of overcollateralization. The required level of overcollateralization may be permitted to step down as provided in the pooling agreement. We cannot assure you that sufficient interest will be generated by the mortgage loans to maintain the required level of overcollateralization.

*See "Description of the Certificates—Credit Enhancement—Overcollateralization Provisions" in this prospectus supplement.*

**Allocation of Losses**

If, on any distribution date, excess interest, overcollateralization and any net payments by the swap counterparty pursuant to the swap agreement are not sufficient to absorb realized losses on the mortgage loans as described under "Description of the Certificates—Credit Enhancement— Overcollateralization Provisions" in this prospectus supplement, then realized losses on such mortgage loans will be allocated to the Mezzanine Certificates and the Class B Certificates. If realized losses on the mortgage loans are allocated to the Mezzanine Certificates and the Class B Certificates, such losses will be allocated *first*, to the Class B Certificates, *second*, to the Class M-10 Certificates, *third*, to the Class M-9 Certificates, *fourth*, to the Class M-8 Certificates, *fifth*, to the Class M-7 Certificates, *sixth*, to the Class M-6 Certificates, *seventh*, to the Class M-5 Certificates, *eighth*, to the Class M-4 Certificates, *ninth*, to the Class M-3 Certificates, *tenth*, to the Class M-2 Certificates and *eleventh*, to the Class M-1 Certificates. The pooling agreement does not permit the allocation of realized losses on the mortgage loans to the Class A Certificates, the Class P Certificates or the Residual Certificates; however, investors in the Class A Certificates should be aware that under certain loss scenarios there will not be enough interest and principal on the mortgage loans to pay the Class A Certificates all interest and principal amounts to which the Class A Certificates are then entitled.

Once realized losses are allocated to the Mezzanine Certificates or the Class B Certificates, such amounts will not be reinstated after that (other than the amounts reinstated due to a subsequent recovery on a liquidated mortgage loan). However, the amount of any realized losses allocated to the Mezzanine Certificates or the Class B Certificates may be paid to the holders of those certificates at a later date from net monthly excess cash flow, to the extent available, and from amounts, if any, received from the swap counterparty pursuant to the swap agreement according to the priorities described under

S-9

Confidential

JPMC_DEX_000070845

"Description of the Certificates—Credit Enhancement—*Excess Interest*" in this prospectus supplement.

*See "Description of the Certificates—Credit Enhancement   Allocation of Losses" in this prospectus supplement.*

## SWAP AGREEMENT

On the closing date, the supplemental interest trust will enter into a swap agreement with Bear Stearns Financial Products Inc. as swap counterparty.  On each distribution date from the second distribution date through the distribution date in January 2011, the supplemental interest trust will be obligated to make a payment to the swap counterparty at a rate equal to 5.352% per annum, and the swap counterparty will be obligated to make a payment to the supplemental interest trust at a rate equal to one-month LIBOR (as determined pursuant to the swap agreement), in each case, on a scheduled notional amount specified on Annex I attached to this prospectus supplement based upon a 30/360 convention in the case of the payment by the supplemental interest trust and adjusted to an actual/360 basis in the case of the payment by the counterparty.  Payments under the swap agreement will be made on a net basis.  To the extent that the fixed payment exceeds the floating payment on any distribution date, amounts otherwise available to certificateholders will be applied to make a net swap payment to the swap counterparty, and to the extent that the floating payment exceeds the fixed payment on any distribution date, the swap counterparty will owe a net swap payment to the supplemental interest trust.  Any net amounts received by the supplemental interest trust under the swap agreement will generally be applied to maintain overcollateralization, pay interest shortfalls and repay losses, as described in this prospectus supplement.

*See "Description of the Certificates—The Swap Agreement" in this prospectus supplement.*

## FINAL MATURITY RESERVE ACCOUNT

On and after the distribution date in May 2026, all amounts otherwise payable to the Class C Certificates will be deposited in the final maturity reserve account until the amounts on deposit in the final maturity reserve account are equal to the stated principal balance of the mortgage loans with 40-year original terms to maturity.  On the earlier of the last scheduled distribution date and the termination of the trust, any amounts on deposit in the final maturity reserve account will be applied as payment of principal or

interest with respect to the offered certificates and the Class B Certificates as described in this prospectus supplement.

*See "Description of the Certificates—The Final Maturity Reserve Account" in this prospectus supplement.*

## OPTIONAL TERMINATION

The servicer (or if the servicer fails to exercise such right, the NIMS insurer, if any) may purchase all of the mortgage loans and retire the certificates when the aggregate stated principal balance of the mortgage loans and the REO properties is equal to or less than 10% of the aggregate stated principal balance of the mortgage loans as of the cut-off date, subject to certain limitations.

*See "Description of the Certificates—Optional Termination of the Trust" in this prospectus supplement and "Description of the Securities— Termination of the Trust and Disposition of Trust Assets" in the accompanying prospectus.*

## YIELD CONSIDERATIONS

The yield to maturity of each class of offered certificates and the Class B Certificates will depend upon, among other things:

- the price at which the certificates are purchased;
- the applicable pass-through interest rate; and
- the rate of prepayments (including liquidations) on the related mortgage loans.

*See "Risk Factors" and "Yield and Prepayment Considerations" in this prospectus supplement.*

## BOOK-ENTRY REGISTRATION

In general, the offered certificates and the Class B Certificates will be available only in book-entry form through the facilities of The Depository Trust Company, Euroclear and Clearstream.

*See "Description of the Securities—Form of Securities" in the accompanying prospectus.*

## DENOMINATIONS

The offered certificates and the Class B Certificates are offered in minimum denominations of $25,000 initial class principal balance each and multiples of $1 in excess of $25,000.

S-10

JPMC_DEX_000070846

## LEGAL INVESTMENT

None of the offered certificates will constitute "mortgage related securities" for purposes of SMMEA.

*See "Legal Investment Considerations" in this prospectus supplement and "Certain Legal Investment Aspects" in the accompanying prospectus.*

## ERISA CONSIDERATIONS

Subject to important considerations set forth in "*ERISA Considerations*" in this prospectus supplement and in the accompanying prospectus, the offered certificates will be eligible for purchase by persons investing assets of employee benefit plans or individual retirement accounts. Prior to the termination of the supplemental interest trust and the final maturity reserve trust, employee benefit plans or individual retirement accounts or persons purchasing with employee benefit plan or individual retirement account assets may purchase the offered certificates only if the purchase and holding meets the requirements of an investor-based class exemption issued by the Department of Labor.

*See "ERISA Considerations" in this prospectus supplement and in the accompanying prospectus.*

## FEDERAL INCOME TAX CONSEQUENCES

For federal income tax purposes, the trustee will cause one or more REMIC elections to be made with respect to the trust (exclusive of the reserve fund, the supplemental interest trust, the supplemental interest account, the swap agreement and the final maturity reserve account, as described in this prospectus supplement). The certificates, other than the Residual Certificates, will represent ownership of REMIC regular interests, coupled with (other than the Class C Certificates and the Class P Certificates) an interest in the swap agreement and the right to receive basis risk shortfalls, and will generally be treated as representing ownership of debt for federal income tax purposes. You will be required to include in income all interest and original issue discount on these certificates in accordance with the accrual method of accounting regardless of your usual methods of accounting. For federal income tax purposes, the Residual Certificates will represent ownership of the REMIC residual interests.

*See "Material Federal Income Tax Consequences" in this prospectus supplement and in the accompanying prospectus.*

## RATINGS

It is a condition to the issuance of the offered certificates that they receive ratings not lower than the following by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. and Moody's Investors Service, Inc.

| Class | Rating Agency | |
|---|---|---|
| | S&P | Moody's |
| A-1 ............... | AAA | Aaa |
| A-2 ............... | AAA | Aaa |
| A-3 ............... | AAA | Aaa |
| A-4 ............... | AAA | Aaa |
| M-1 ............... | AA+ | Aa1 |
| M-2 ............... | AA | Aa2 |
| M-3 ............... | AA | Aa3 |
| M-4 ............... | AA- | A1 |
| M-5 ............... | A | A2 |
| M-6 ............... | A | A3 |
| M-7 ............... | A- | Baa1 |
| M-8 ............... | BBB+ | Baa2 |
| M-9 ............... | BBB- | Baa3 |
| M-10 ............ | BBB- | Ba1 |

The ratings on the offered certificates address the likelihood of the receipt by holders of the offered certificates of all distributions on the underlying mortgage loans to which they are entitled. They do not address the likely actual rate of prepayments. The rate of prepayments, if different than originally anticipated, could adversely affect the yield realized by holders of the offered certificates or cause the holders of the certificates entitled to interest only to fail to recover their initial investment.

*See "Ratings" in this prospectus supplement and "Rating" in the accompanying prospectus.*

S-11

Confidential

## RISK FACTORS

**The offered certificates and the Class B Certificates are not suitable investments for all investors.  In particular, you should not purchase any class of offered certificates or the Class B Certificates unless you understand and are able to bear the prepayment, credit, liquidity and market risks associated with that class.**

**The offered certificates and the Class B Certificates are complex securities and it is important that you possess, either alone or together with an investment advisor, the expertise necessary to evaluate the information contained in this prospectus supplement and the accompanying prospectus in the context of your financial situation.**

**Mortgage Loans Originated under the Sponsor's Underwriting Guidelines Carry a Risk of High Delinquencies**

The originators provide mortgage loans primarily to borrowers who generally do not qualify for loans conforming to the underwriting guidelines typically applied by banks and other primary lending institutions, particularly with respect to a prospective borrower's credit history and debt-to-income ratio.  Borrowers who qualify under the sponsor's underwriting guidelines generally have equity in their property and repayment ability but may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies.  The originators originate mortgage loans based on their underwriting guidelines and do not determine whether such mortgage loans would be acceptable for purchase by Fannie Mae or Freddie Mac.

The sponsor's underwriting guidelines are primarily intended to evaluate the applicant's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral for the mortgage loan.  The originator's considerations in originating a mortgage loan include a mortgagor's credit history, repayment ability and debt service-to-income ratio and the value and adequacy of the mortgaged property as collateral, as well as the type and use of the mortgaged property.  The sponsor's underwriting guidelines do not prohibit a mortgagor from obtaining secondary financing, from the originator or from another source, at the time of origination of the originator's first lien, which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the originator's loan-to-value ratio determination.

As a result of such underwriting guidelines, the mortgage loans in the mortgage pool are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner.

S-12

Confidential

JPMC_DEX_000070848

13

Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the mortgage loans than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans. *See* "Underwriting of the Mortgage Loans" in this prospectus supplement.

**The Yield on Your Certificates is Directly Related to the Prepayment Rate on the Related Mortgage Loans**

Mortgagors may prepay their mortgage loans in whole or in part at any time. The yield to maturity on your certificates is directly related to the rate at which the mortgagors pay principal on the related mortgage loans. We cannot predict the rate at which mortgagors will repay their mortgage loans. A prepayment of a mortgage loan generally will result in a prepayment on the certificates.

- If you purchase your certificates at a discount and principal is repaid slower than you anticipate, then your yield may be lower than you anticipate.

- If you purchase your certificates at a premium and principal is repaid faster than you anticipate, then your yield may be lower than you anticipate.

- The rate of prepayments on the mortgage loans may be sensitive to prevailing interest rates. Generally, if prevailing interest rates decline significantly below the interest rates on the fixed-rate mortgage loans, those mortgage loans are more likely to prepay than if prevailing rates remain above the interest rates on those mortgage loans. In addition, if interest rates decline, adjustable-rate mortgage loan prepayments may increase due to the availability of fixed-rate mortgage loans or other adjustable-rate mortgage loans at lower interest rates. Conversely, if prevailing interest rates rise significantly, the prepayments on fixed-rate and adjustable-rate mortgage loans may decrease. Furthermore, adjustable-rate mortgage loans may prepay at different rates and in response to different factors than fixed-rate mortgage loans; the inclusion of both types of mortgage loans in the mortgage pool may increase the difficulty in analyzing possible prepayment rates.

- The prepayment behavior of the adjustable-rate mortgage loans and of the fixed-rate mortgage loans may respond to different factors, or may respond differently to the same factors. If, at the time of their first adjustment, the mortgage rates on any of the adjustable-rate mortgage loans would be subject to adjustment to a rate higher than the then prevailing mortgage rates available to the related mortgagors, such mortgagors may prepay their adjustable-rate mortgage loans. The adjustable-rate mortgage loans may also suffer an increase in defaults and liquidations following upward adjustments of their mortgage rates, especially following their initial adjustments.

S-13

- Approximately 77.3% of the mortgage loans (by aggregate scheduled principal balance as of the cut-off date) require the mortgagor to pay a prepayment charge in certain instances if the mortgagor prepays the mortgage loan during a stated period, which may be from six months to three years after the mortgage loan was originated.  A prepayment charge may or may not discourage a mortgagor from prepaying the related mortgage loan during the applicable period.

- The sponsor may be required to purchase mortgage loans from the trust in the event certain breaches of representations and warranties occur and have not been cured.  In addition, the holder of the Class C Certificates, except if such holder is the sponsor or any of its affiliates (or if the holder of the Class C Certificates fails to exercise such option, the NIMS insurer, if any), has the option to purchase mortgage loans that become 90 days or more delinquent, which option is subject to certain limitations and conditions described in the pooling agreement.  If the Class C Certificates are serving as collateral for the NIMS, the holder of the NIMS residual will have the rights of the holder of the Class C Certificates described in the immediately preceding sentence.  These purchases will have the same effect on the holders of the offered certificates and the Class B Certificates as a prepayment of those mortgage loans.

- The servicer (or if the servicer fails to exercise such right, the NIMS insurer, if any) may purchase all of the mortgage loans and retire the certificates when the aggregate stated principal balance of the mortgage loans and the REO properties is equal to or less than 10% of the aggregate stated principal balance of the mortgage loans as of the cut-off date, subject to certain limitations.  Such purchases will result in an earlier return of the principal on the certificates and will affect the yield on the offered certificates and the Class B Certificates in a manner similar to the manner in which principal prepayments on the mortgage loans will affect the yield on the offered certificates and the Class B Certificates.

- If the rate of default and the amount of losses on the mortgage loans is higher than you expect, then your yield may be lower than you expect.

S-14

JPMC_DEX_000070850

- As a result of the absorption of realized losses on the mortgage loans by excess interest, overcollateralization and certain payments from the swap counterparty as described in this prospectus supplement, liquidations of defaulted mortgage loans, whether or not realized losses are incurred upon such liquidations, will result in an earlier return of the principal of the offered certificates and the Class B Certificates and will influence the yield on the offered certificates and the Class B Certificates in a manner similar to the manner in which principal prepayments on the mortgage loans will influence the yield on the offered certificates and the Class B Certificates.

- The overcollateralization provisions are intended to result in an accelerated rate of principal distributions to the offered certificates and the Class B Certificates then entitled to principal distributions at any time that the overcollateralization provided by the mortgage pool falls below the required level.  An earlier return of principal to the holders of the offered certificates and the Class B Certificates as a result of the overcollateralization provisions will influence the yield on the offered certificates in a manner similar to the manner in which principal prepayments on the mortgage loans will influence the yield on the offered certificates and the Class B Certificates.

S-15

Confidential

JPMC_DEX_000070851

- The multiple class structure of the offered certificates and the Class B Certificates will cause the yield of certain classes of the offered certificates and the Class B Certificates to be particularly sensitive to changes in the rates of prepayments of mortgage loans. Because distributions of principal will be made to the classes of certificates according to the priorities described in this prospectus supplement, the yield to maturity on the offered certificates and the Class B Certificates will be sensitive to the rates of prepayment on the mortgage loans experienced both before and after the commencement of principal distributions on such classes of offered certificates and the Class B Certificates. In particular, the Mezzanine Certificates and the Class B Certificates will not receive any portion of the amount of principal payable to the certificates prior to the distribution date in June 2009 or a later date as provided in the pooling agreement, unless the certificate principal balance of the Class A Certificates has been reduced to zero. After that, subject to the loss and delinquency performance of the mortgage pool, the Mezzanine Certificates and the Class B Certificates may continue (unless the certificate principal balance of the Class A Certificates has been reduced to zero) to receive no portion of the amount of principal then payable to the certificates. The weighted average lives of the Mezzanine Certificates and the Class B Certificates will therefore be longer than would otherwise be the case. The effect on the market value of the Mezzanine Certificates and the Class B Certificates of changes in market interest rates or market yields for similar securities may be greater than for the Class A Certificates.

*See "Yield, Prepayment and Maturity Considerations" in this prospectus supplement for a description of factors that may influence the rate and timing of prepayments on the mortgage loans.*

**Balloon Mortgage Loans are More Likely to Incur Losses**

Balloon mortgage loans pose a risk because a mortgagor must make a large lump sum payment of principal at the end of the loan term. If the mortgagor is unable to pay the lump sum or refinance such amount, you may suffer a loss. Approximately 19.2% of the mortgage loans (by aggregate scheduled principal balance as of the cut-off date) are balloon mortgage loans.

**Junior Lien Mortgage Loans are More Likely to Incur Losses and May be Subject to Higher Rates of Prepayments than First Lien Mortgage Loans**

Approximately 5.5% of the mortgage loans (by aggregate scheduled principal balance as of the cut-off date) are junior lien mortgage loans. All of the junior lien mortgage loans are fixed-rate mortgage loans. The primary risk to holders of mortgage loans secured by junior liens is the possibility that adequate funds will not be received in connection with a foreclosure of the related senior lien to satisfy fully both the senior lien and the junior lien. The claims of the holders of the senior lien will be satisfied in full out of proceeds of the liquidation of a junior lien mortgage loan before the trust, as holder of the junior lien, receives any payments in respect of such mortgage loan. If the servicer were to foreclose on any junior lien mortgage loan, it would do so subject to any related senior lien. In order for the

S-16

Confidential

debt related to the mortgage loan to be paid in full at this type of sale, a bidder at the foreclosure sale of a junior lien mortgage loan would have to bid an amount sufficient to pay off all sums due under the junior lien mortgage loan and the senior lien or purchase the mortgaged property subject to the senior lien. Liquidation expenses with respect to defaulted junior lien mortgage loans do not vary directly with the outstanding principal balance of the loan at the time of default. A decline in the value of the mortgaged properties securing the mortgage loans with junior liens may increase the likelihood that, in the event of a default by the related mortgagors, liquidation or other proceeds will be insufficient to satisfy the junior lien mortgage loans after satisfaction of any senior liens and the payment of any liquidation expenses. In the event that the proceeds from a foreclosure or similar sale of the related mortgaged property are insufficient to satisfy the senior lien and the junior lien mortgage loan in the aggregate, the trust, as the holder of the junior lien mortgage loan, will bear:

- the risk of delay in distributions while a deficiency judgment against the borrower is obtained,

- the risk of loss if the deficiency judgment is not realized upon, and

- the risk that deficiency judgments may not be available in all jurisdictions.

Other factors may affect the prepayment rate of junior lien mortgage loans, such as the amounts of, and interest on, the related senior lien mortgage loans and the use of senior lien mortgage loans as long term financing for home purchases and junior lien mortgage loans as shorter term financing for a variety of purposes, such as home improvement, educational expenses and purchases of consumer durables such as automobiles. Accordingly, junior lien mortgage loans may experience a higher rate of prepayments than traditional senior lien mortgage loans. In addition, any future limitations on the rights of borrowers to deduct interest payments on junior lien mortgage loans for federal income tax purposes may further increase the rate of prepayments on junior lien mortgage loans.

**A Conflict of Interest Exists Between the Interests of the Sponsor, an Affiliate of the Servicer, as Holder of the Class C Certificates and the Interests of Holders of the Offered Certificates and the Class B Certificates**

The sponsor, an affiliate of the servicer, will initially, directly or indirectly, own all or a portion of the Class C Certificates and the Residual Certificates. The timing of mortgage loan foreclosures and sales of the related mortgaged properties may affect the weighted average lives and yields of the offered certificates and the Class B Certificates. Investors should consider that the timing of such foreclosures or sales may not be in the best interests of all certificateholders and that no formal policies or guidelines have been established to resolve or minimize such a conflict of interest.

Confidential

JPMC_DEX_000070853

| | |
|---|---|
| **The First Payment Date on Some Mortgage Loans Has Not Occurred Yet Meaning that those Borrowers Could Not be Delinquent on the Referenced Monthly Payment** | Investors in the offered certificates and the Class B Certificates should realize that approximately 28.4% of the mortgage loans (by aggregate scheduled principal balance as of the cut-off date) have a first payment date occurring on or after May 2006 and, therefore, such mortgage loans could not have been delinquent with respect to their May 1, 2006 monthly payment on the date of this prospectus supplement. |
| **A Simultaneous-Second Lien Mortgage Loan on a Mortgaged Property May Increase the Risk that the Related Mortgage Loan Becomes Subject to Foreclosure** | With respect to approximately 41.1% of the mortgage loans (by aggregate scheduled principal balance as of the cut-off date), at the time of origination of such first lien mortgage loan, the originator also originated a second lien mortgage loan which may or may not be included in the trust. The weighted average original loan-to-value ratio of such mortgage loans is approximately 79.8% and the weighted average original combined loan-to-value ratio of such mortgage loans (including the related simultaneous second lien) is approximately 99.3%. With respect to such mortgage loans, foreclosure frequency may be increased relative to mortgage loans that were originated without a simultaneous second lien because mortgagors with a simultaneous second lien have less equity in the mortgaged property. Investors should also note that any mortgagor may obtain secondary financing at any time subsequent to the date of origination of their mortgage loan from the sponsor or from any other lender. |
| **Credit Enhancement for the Offered Certificates and the Class B Certificates May be Inadequate** | The credit enhancement features described in the summary of this prospectus supplement are intended to enhance the likelihood that holders of the Class A Certificates, and to a limited extent, the holders of the Mezzanine Certificates and the Class B Certificates, will receive regular payments of interest and principal. However, we cannot assure you that the applicable credit enhancement will adequately cover any shortfalls in cash available to pay your certificates as a result of delinquencies or defaults on the mortgage loans. If delinquencies or defaults occur on the mortgage loans, neither the servicer nor any other entity will advance scheduled monthly payments of interest and principal on delinquent or defaulted mortgage loans if such advances are not likely to be recovered. If substantial losses occur as a result of defaults and delinquent payments on the mortgage loans you may suffer losses. |

Confidential

JPMC_DEX_000070854

**Enhancement Provided by the Swap Agreement May Not be Adequate**

Any amounts received by the supplemental interest trust under the swap agreement will be applied as described in this prospectus supplement to maintain overcollateralization, pay interest shortfalls and repay realized losses. However, no amounts will be payable to the supplemental interest trust by the swap counterparty unless the floating amount owed by the swap counterparty on a distribution date exceeds the fixed amount owed to the swap counterparty. This will not occur except in periods when one-month LIBOR (as determined pursuant to the swap agreement) exceeds the applicable rate of payment owed by the supplemental interest trust, which will be 5.352% per annum. We cannot assure you that any amounts will be received by the supplemental interest trust under the swap agreement, or that any such amounts that are received will be sufficient to maintain overcollateralization, pay interest shortfalls or repay realized losses on the mortgage loans. See "Description of the Certificates— The Swap Agreement."

**Excess Interest from the Mortgage Loans May Not be Sufficient to Maintain Overcollateralization And Absorb Losses**

The weighted average of the mortgage rates on the mortgage loans each month is expected to be higher than the weighted average pass-through rate on the offered certificates and the Class B Certificates for the related distribution date. The mortgage loans are expected to generate more interest each month than is needed to pay interest owed on the offered certificates and the Class B Certificates, to pay certain net amounts owed to the swap counterparty and to pay the fees and expenses of the trust on the related distribution date. Any remaining interest generated by the mortgage loans each month will then be used to absorb losses that occur on the mortgage loans. After these financial obligations of the trust are covered, the available excess interest generated by the mortgage loans each month will be used to maintain overcollateralization at the required level determined as provided in the pooling agreement. We cannot assure you, however, that enough excess interest will be generated to absorb losses or to maintain the required level of overcollateralization. The factors described below, as well as the factors described in the next risk factor, will affect the amount of excess interest that the mortgage loans will generate:

• Every time a mortgage loan is prepaid in full or in part, excess interest may be reduced because the mortgage loan will no longer be outstanding and generating interest or, in the case of a partial prepayment, may be generating less interest.

• Every time a mortgage loan is liquidated or written off, excess interest will be reduced because such mortgage loan will no longer be outstanding and generating interest.

S-19

Confidential

JPMC_DEX_000070855

- If the rates of delinquencies, defaults or losses on the mortgage loans are higher than expected, excess interest will be reduced by the amount necessary to compensate for any shortfalls in cash available to make required distributions on the offered certificates and the Class B Certificates.

- The adjustable-rate mortgage loans have mortgage rates that adjust based on an index that is different from the index used to determine the pass-through rates on the offered certificates and the Class B Certificates and the fixed-rate mortgage loans have mortgage rates that do not adjust.  In addition, the first adjustment of the mortgage rates for approximately 75.4% of the mortgage loans (by aggregate scheduled principal balance as of the cut-off date) will not occur until two years after the date of origination, the first adjustment of the mortgage rates for approximately 6.1% of the mortgage loans (by aggregate scheduled principal balance as of the cut-off date) will not occur until three years after the date of origination and the first adjustment of the mortgage rates for approximately 4.2% of the mortgage loans (by aggregate scheduled principal balance as of the cut-off date) will not occur until five years after the date of origination.  As a result, the pass-through rates on the offered certificates and the Class B Certificates may increase relative to the weighted average of the mortgage rates, or the pass-through rate on such certificates may remain constant as the weighted average of the mortgage rates on the mortgage loans decline.  In either case, this would require that more of the interest generated by the mortgage loans be applied to cover interest on the offered certificates and the Class B Certificates.

- If prepayments, defaults and liquidations occur more rapidly on the mortgage loans with relatively higher mortgage rates than on the mortgage loans with relatively lower mortgage rates, the amount of excess interest generated by the mortgage loans will be less than would otherwise be the case.

- If neither the servicer nor the NIMS insurer, if any, terminates the trust on the Optional Termination Date, then the pass-through rates on the offered certificates and the Class B Certificates will, subject to the limitation described in the next risk factor below, increase. Any such increase will reduce the amount of excess interest that could become available for other purposes.

S-20

JPMC_DEX_000070856

**Mortgage Loan Interest Rates May Limit Pass-Through Rates on the Offered Certificates and the Class B Certificates**

The offered certificates and the Class B Certificates accrue interest at pass-through rates based on the one-month LIBOR index plus specified margins, but all of such pass-through rates are subject to a limit. The limit on the pass-through rate for the offered certificates and the Class B Certificates is based on the weighted average of the mortgage rates on the mortgage loans, net of certain net amounts owed to the swap counterparty and certain fees and expenses of the trust.

A variety of factors, in addition to those described in the previous risk factor, could limit the pass-through rates and adversely affect the yield to maturity on the offered certificates and the Class B Certificates. Some of these factors are described below:

- The mortgage rates on the fixed-rate mortgage loans will not adjust, and the mortgage rates on the adjustable rate mortgage loans generally are based on a six-month LIBOR index. Generally, the adjustable-rate mortgage loans have periodic and maximum limitations on adjustments to their mortgage rates, and approximately 85.7% of the mortgage loans (by aggregate scheduled principal balance as of the cut-off date), will not have the first adjustment to their mortgage rates until two years, three years or five years after the origination. As a result of the limits on the pass-through rates for the offered certificates and the Class B Certificates, such certificates may accrue less interest than they would accrue if their pass-through rates were based solely on the one-month LIBOR index plus the specified margins.

- Six-month LIBOR may change at different times and in different amounts than one-month LIBOR. As a result, it is possible that mortgage rates on certain of the adjustable-rate mortgage loans may decline while the pass-through rates on the offered certificates and the Class B Certificates are stable or rising. It is also possible that the mortgage rates on the adjustable-rate mortgage loans and the pass-through rates for the offered certificates and the Class B Certificates may decline or increase during the same period, but that the pass-through rates on these certificates may decline more slowly or increase more rapidly.

- The pass-through rates for the offered certificates and the Class B Certificates adjust monthly while the mortgage rates on the adjustable-rate mortgage loans adjust less frequently and the mortgage rates on the fixed rate mortgage loans do not adjust. Consequently, the limits on the pass-through rates for the offered certificates and the Class B Certificates may limit increases in the pass-through rates for such certificates for extended periods in a rising interest rate environment.

S-21

Confidential

JPMC_DEX_000070857

- If prepayments, defaults and liquidations occur more rapidly on the mortgage loans with relatively higher mortgage rates than on the mortgage loans with relatively lower mortgage rates, the pass-through rates on the offered certificates and the Class B Certificates are more likely to be limited.

- The required payment by the supplemental interest trust of certain net amounts payable to the swap counterparty will result in the limit on the pass-through rates on the offered certificates and the Class B Certificates being lower than would be the case if the trust did not have such obligation.

If the pass-through rates on the offered certificates and the Class B Certificates are limited for any distribution date, the resulting basis risk shortfalls may be recovered on the same distribution date or on future distribution dates on a subordinated basis to the extent that on such distribution date or future distribution dates there are available funds remaining after certain other distributions on the offered certificates, the payments of certain net amounts made to the swap counterparty and the payment of the fees and expenses of the trust. The ratings on the offered certificates and the Class B Certificates will not address the likelihood of any such recovery of basis risk shortfalls by holders of the offered certificates and the Class B Certificates.

Amounts used to pay basis risk shortfalls on the offered certificates and the Class B Certificates may be supplemented by amounts, if any, received by the trustee of the supplemental interest trust under the swap agreement.  However, the amount received under the swap agreement may be insufficient to pay the holders of the applicable certificates the full amount of interest which they would have received absent the limits on the pass-through rates.  The swap agreement will terminate after the distribution date in January 2011.

**Payments to the Swap Counterparty Will Reduce Amounts Available for Distribution to the Offered Certificates and the Class B Certificates**

Any net swap payment, including certain termination payments payable by the supplemental interest trust, payable to the swap counterparty under the terms of the swap agreement will reduce amounts available for distribution to the offered certificates and the Class B Certificates, and may reduce payments of interest on the offered certificates and the Class B Certificates.  If the rate of prepayments on the mortgage loans is faster than anticipated, the scheduled notional amount on which payments due under the swap agreement are calculated may exceed the total principal balance of the mortgage loans, thereby increasing the relative proportion of interest collections on the mortgage loans that must be applied to make swap payments to the swap counterparty and, under certain circumstances, requiring application of principal received on the mortgage loans to make net swap payments to the swap counterparty.  Therefore, the combination of a rapid rate of prepayments and low prevailing interest rates could adversely affect the yields on the offered certificates and the Class B Certificates.

S-22

JPMC_DEX_000070858

23

In the event that the supplemental interest trust, after application of all interest and principal received on the mortgage loans, cannot make the required net swap payments to the swap counterparty, a swap termination payment as described in this prospectus supplement may be owed to the swap counterparty. Any termination payment payable to the swap counterparty in the event of early termination of the swap agreement will reduce amounts available for distribution to the offered certificates and the Class B Certificates, unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement).

**A Reduction of the Swap Counterparty's Ratings May Reduce the Ratings of the Offered Certificates and the Class B Certificates**

As of the date of this prospectus supplement, the swap counterparty currently has the ratings described under "Description of the Certificates—The Swap Counterparty." The ratings of the offered certificates and the Class B Certificates are dependent in part upon the credit ratings of the swap counterparty. If a credit rating of the swap counterparty is qualified, reduced or withdrawn and the swap counterparty does not post collateral securing its obligations under the swap agreement or does not furnish a guaranty of its obligations under the swap agreement or a substitute counterparty is not obtained in accordance with the terms of the swap agreement, the ratings of the offered certificates and the Class B Certificates may be qualified, reduced or withdrawn. In that event, the value and marketability of those offered certificates or the Class B Certificates will be adversely affected. See "Description of the Certificates—Swap Agreement."

**The Mezzanine Certificates and the Class B Certificates Have a Greater Risk of Loss Than the Class A Certificates**

The weighted average lives of, and yields to maturity on, the Class B Certificates, the Class M-10 Certificates, the Class M-9 Certificates, the Class M-8 Certificates, the Class M-7 Certificates, the Class M-6 Certificates, the Class M-5 Certificates, the Class M-4 Certificates, the Class M-3 Certificates, the Class M-2 Certificates and the Class M-1 Certificates will be more sensitive, in that order, to the rate and timing of mortgagor defaults and the severity of ensuing losses on the mortgage loans. If the actual rate and severity of losses on mortgage loans is higher than those assumed by an investor in such certificates, the actual yield to maturity of such certificates may be lower than the yield anticipated by such investor based on such assumption. The timing of losses on the mortgage loans will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of such mortgage loans are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the mortgage loans, to the extent they exceed the amount of overcollateralization and excess interest following distributions of principal on the related distribution date, will reduce the certificate principal balance of the Class B Certificates, the Class M-10 Certificates, the Class M-9 Certificates, the Class M-8 Certificates, the Class M-7 Certificates, the Class M-6 Certificates, the Class M-5 Certificates, the Class M-4 Certificates, the Class M-3 Certificates, the Class M-2 Certificates and the Class M-1 Certificates, in that order. As a result of such reductions, less interest will accrue on such

S-23

JPMC_DEX_000070859

class of Mezzanine Certificates and the Class B Certificates, as applicable, than would otherwise be the case. Once a realized loss is allocated to a Mezzanine Certificate or a Class B Certificate, no principal or interest will be distributable with respect to such written down amount unless such written down amount is reinstated due to a subsequent recovery on a liquidated mortgage loan. However, the amount of any realized losses allocated to the Mezzanine Certificates may be paid to the Mezzanine Certificates or the Class B Certificates on a later distribution date from collections on the mortgage loans and from amounts, if any, received from the swap counterparty pursuant to the swap agreement, according to the priorities specified under "Description of the Certificates—Credit Enhancement—*Excess Interest*" in this prospectus supplement.

Unless the certificate principal balance of each Class A Certificate has been reduced to zero, neither the Mezzanine Certificates nor the Class B Certificates will be entitled to any principal distributions until June 2009 or a later date as provided in this prospectus supplement, or during any period in which delinquencies or cumulative realized losses on the related mortgage loans exceed certain levels. As a result, the weighted average lives of the Mezzanine Certificates and the Class B Certificates will be longer than would otherwise be the case if distributions of principal were allocated among all of the certificates at the same time. As a result of the longer weighted average lives of the Mezzanine Certificates and the Class B Certificates, the holders of such certificates have a greater risk of suffering a loss on their investments. Further, because such certificates might not receive any principal if certain delinquency levels occur, it is possible for such certificates to receive no principal distributions even if no losses have occurred on the mortgage pool.

In addition, the multiple class structure of the Mezzanine Certificates and the Class B Certificates causes the yield of such classes to be particularly sensitive to changes in the rates of prepayment of the mortgage loans. Because distributions of principal will be made to such certificates according to the priorities described in this prospectus supplement, the yield to maturity on the Mezzanine Certificates and the Class B Certificates will be sensitive to the rates of prepayment on the mortgage loans experienced both before and after the commencement of principal distributions on such classes of certificates. The yield to maturity on the Mezzanine Certificates and the Class B Certificates will also be extremely sensitive to losses due to defaults on the mortgage loans (and their timing), to the extent such losses are not covered by excess interest, overcollateralization or the Class B Certificates or the Mezzanine Certificates with a lower payment priority. Furthermore, as described in this prospectus supplement, the timing of receipt of principal and interest by the Mezzanine Certificates and the Class B Certificates may be adversely affected by losses even if such classes of certificates do not ultimately bear such loss.

Confidential

JPMC_DEX_000070860

**The Return on Your Certificates Could be Reduced Due to Prepayment Interest Shortfalls and Relief Act Shortfalls**

When a mortgage loan is prepaid, the mortgagor is charged interest on the amount prepaid only up to the date on which the prepayment is made, rather than for an entire month. This may result in a shortfall in interest collections available for payment on the next distribution date. The servicer is required to cover a portion of the shortfall in interest collections that is attributable to prepayments (except in respect of principal prepayments in full received during the period from the first through the 14th day of the month of the related distribution date), but only up to the amount of the servicer's servicing fee for the related calendar month. In addition, certain shortfalls in interest collections arising from the application of the Servicemembers Civil Relief Act, as amended (the "**Relief Act**") or similar state or local law, will not be covered by the servicer.

On any distribution date, any shortfalls resulting from the application of the Relief Act or similar state or local law, and any prepayment interest shortfalls to the extent not covered by compensating interest paid by the servicer will be allocated, first, to the current interest with respect to the Class C Certificates, and after that, to the current interest with respect to the offered certificates and the Class B Certificates, on a *pro rata* basis based on the respective amounts of interest accrued on such certificates for such distribution date. The holders of the offered certificates and the Class B Certificates will not be entitled to reimbursement for prepayment interest shortfalls not covered by compensating interest or for shortfalls resulting from application of the Relief Act or similar state or local law. If these shortfalls are allocated to the offered certificates or the Class B Certificates the amount of interest paid on those certificates will be reduced, adversely affecting the yield on your investment.

**Delays in Liquidating Delinquent Mortgage Loans May Result in Losses**

Substantial delays could be encountered in connection with the liquidation of delinquent mortgage loans. Further, reimbursement of advances made on a mortgage loan, liquidation expenses such as legal fees, real estate taxes, hazard insurance and maintenance and preservation expenses may reduce the portion of liquidation proceeds payable on the certificates. If a mortgaged property fails to provide adequate security for the related mortgage loan, you could incur a loss on your investment if the credit enhancements are insufficient to cover the loss.

Confidential

JPMC_DEX_000070861

| | |
|---|---|
| **Mortgages with High Loan-to-Value Ratios May have a Greater Risk of Loss** | Mortgage loans with higher loan-to-value ratios may present a greater risk of loss than mortgage loans with loan-to-value ratios of 80% or below. Approximately 30.4% of the mortgage loans (by aggregate scheduled principal balance as of the cut-off date) had loan-to-value ratios at origination (or combined loan-to-value ratio in the case of second lien mortgage loans) in excess of 80%, but no more than 100%. Additionally, the originator's determination of the value of a mortgaged property used in the calculation of the loan-to-values ratios of the mortgage loans may differ from the appraised value of such mortgaged properties or the actual value of such mortgaged properties. |
| **The Yield on Your Certificates May be Affected by Commencement of Amortization of the Interest Only Mortgage Loans** | Approximately 21.0 % of the mortgage loans (by aggregate scheduled principal balance as of the cut-off date) require the mortgagors to make monthly payments only of accrued interest for the first two, three or five years following origination. |
| | After such interest only period, the mortgagor's monthly payment will be recalculated to cover both interest and principal so that the mortgage loan will amortize fully on or prior to its final payment date. If the monthly payment increases, the related mortgagor may not be able to pay the increased amount and may default on or may refinance the related mortgage loan to avoid the higher payment. Because no principal payments are required on such mortgage loans during such interest only period, the offered certificates and the Class B Certificates then entitled to distributions of principal will receive smaller principal distributions during such period than they would have received if the related mortgagors were required to make monthly payments of interest and principal for the entire lives of such mortgage loans. This slower rate of principal distributions may reduce the return on an investment in the related offered certificates and the Class B Certificates that are purchased at a discount. |
| **Performance of Forty Year Mortgage Loans is Subject to Greater Uncertainties** | Approximately 3.2% of the mortgage loans (by aggregate scheduled principal balance as of the cut-off date) have an original term to maturity of 480 months. These mortgage loans are a relatively new product and there is little statistical information or history with respect to defaults and prepayment experience for mortgage loans of this type. It may be difficult to judge prospective defaults on these mortgage loans based on examination of the credit score(s) used in determining the creditworthiness of a prospective mortgagor because the mortgagor's credit is subject to a greater possible fluctuation due to the extended payment period. Furthermore, a term to maturity of 480 months permits the mortgagor to have a lower monthly payment than would be the case with the same down payment under a similar mortgage loan with a 360 month original term to maturity, which results in less of an increase in equity in the mortgaged property over time. |

S-26

Confidential

**The Geographic Concentration of the Mortgaged Properties in Certain States Increases the Risk of the Related Mortgage Loans Incurring Losses Due to Developments in those States**

Mortgaged properties in California may be particularly susceptible to certain types of uninsurable hazards, such as earthquakes, floods, mudslides and other natural disasters not covered by standard hazard insurance policies for each mortgage loan or otherwise insured against for the benefit of the trust.

In addition, the conditions below will have a disproportionate impact on the mortgage loans in general:

- Economic conditions in states with high concentrations of mortgage loans may affect the ability of mortgagors to repay their loans on time even if such conditions do not affect real property values.

- Declines in the residential real estate markets in the states with high concentrations of mortgage loans may reduce the values of properties located in those states, which would result in an increase in loan-to-value ratios.

- Any increase in the market value of properties located in the states with high concentrations of mortgage loans would reduce loan-to-value ratios and could, therefore, make alternative sources of financing available to mortgagors at lower interest rates, which could result in an increased rate of prepayment of the mortgage loans.

**Violation of Federal or State Laws May Result in Losses on the Mortgage Loans**

Applicable state laws generally regulate interest rates and other charges, require certain disclosure, and generally require licensing of the originator. In addition, other state laws, municipal ordinances, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices (including predatory lending practices), and debt collection practices may apply to the origination, servicing and collection of the mortgage loans.

The mortgage loans are also subject to federal laws, including:

- the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the mortgagors regarding the terms of the mortgage loans;

- the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

- the Fair Credit Reporting Act, which regulates the use and reporting of information related to the mortgagor's credit experience.

S-27

Confidential

JPMC_DEX_000070863

Violations of certain provisions of these federal laws may limit the ability of the servicer to collect all or part of the principal of or interest on the mortgage loans and in addition could subject the trust to damages and administrative enforcement.  In particular, the sponsor's failure to comply with certain requirements of the Federal Truth-in-Lending Act, as implemented by Regulation Z, could subject the trust (and other assignees of the mortgage loans) to monetary penalties, and could result in the obligors' rescinding the mortgage loans against either the trust or subsequent holders of the mortgage loans.  *See* "Legal Aspects of Mortgage Assets—Anti-Deficiency Legislation and Other Limitations on Lenders" in the accompanying prospectus.

The sponsor will represent that at origination each mortgage loan complied with all applicable federal and state laws and regulations.  In addition, the sponsor will represent that none of the mortgage loans is subject to the requirements of the Home Ownership and Equity Protection Act of 1994 ("**HOEPA**") or is a "high cost" or "predatory" loan under any state or local law or regulation applicable to the originator of such mortgage loan, or which would result in liability to the purchaser or assignee of such mortgage loan under any predatory or abusive lending law.  In the event of a breach of any of such representations, the sponsor will be obligated to cure such breach or repurchase or replace the affected mortgage loan, in the manner and to the extent described under "The Trust—Assignment of the Mortgage Loans and Other Assets to the Trust" in this prospectus supplement.

Under the anti-predatory lending laws of some states, the mortgagor is required to meet a net tangible benefits test in connection with the origination of the related mortgage loan.  This test may be highly subjective and open to interpretation.  As a result, a court may determine that a mortgage loan does not meet the test even if an originator reasonably believed that the test was satisfied.  Any determination by a court that a mortgage loan does not meet the test will result in a violation of the state anti-predatory lending law, in which case the sponsor will be required to repurchase such mortgage loan from the trust.

Confidential

JPMC_DEX_000070864

In addition to HOEPA, a number of legislative proposals have been introduced at the federal, state and local level that are designed to discourage predatory lending practices. Some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in mortgage loans that have mortgage rates or origination costs in excess of prescribed levels, and require that mortgagors be given certain disclosures prior to the consummation of such mortgage loans. In some cases, state law may impose requirements and restrictions more stringent than those in HOEPA. The originator's failure to comply with these laws could subject the trust, and other assignees of the mortgage loans, to monetary penalties and could result in mortgagors exercising their rights to rescind their mortgage loans against either the trust or subsequent holders of the mortgage loans. Lawsuits have been brought in various states making claims against assignees of high cost mortgage loans for violations of state law. Named defendants in these cases include numerous participants within the secondary mortgage market, including some securitization trusts.

**Proceeds of the Assets in the Trust are the Sole Source of Payment on the Certificates**

The certificates will not represent an interest in or obligation of the depositor, the sponsor, the servicer, the originators, the trustee, the Delaware trustee or any of their respective affiliates. None of the offered certificates, the Class B Certificates or the underlying mortgage loans will be guaranteed or insured by any governmental agency or instrumentality, or by the depositor, the servicer, the originators, the trustee, the Delaware trustee or any of their respective affiliates. Proceeds of the assets included in the trust will be the sole source of payments on the offered certificates and the Class B Certificates, and there will be no recourse to the depositor, the sponsor, the originators, the trustee, the Delaware trustee or any other entity in the event that such proceeds are insufficient or otherwise unavailable to make all payments provided for under the offered certificates and the Class B Certificates.

**The Lack of a Secondary Market May Make it Difficult for You to Resell Your Certificates**

The underwriters intend to make a secondary market in the classes of offered certificates actually purchased by them, but they have no obligation to do so. There is no assurance that such a secondary market will develop or, if it develops, that it will continue. Consequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield. The market values of the offered certificates and the Class B Certificates are likely to fluctuate; these fluctuations may be significant and could result in significant losses to you.

The secondary markets for asset-backed securities have experienced periods of illiquidity and can be expected to do so in the future. Illiquidity can have a severely adverse effect on the prices of securities that are especially sensitive to prepayment, credit, or interest rate risk, or that have been structured to meet the investment requirements of limited categories of investors.

S-29

Confidential

JPMC_DEX_000070865

**Reduction or Withdrawal of Ratings of the Offered Certificates May Affect Their Market Value and Liquidity**

Each rating agency rating the offered certificates may change or withdraw its initial ratings at any time in the future if, in its judgment, circumstances warrant a change. No person is obligated to maintain the ratings at their initial levels. If a rating agency reduces or withdraws its rating on one or more classes of the offered certificates, the liquidity and market value of the affected certificates is likely to be reduced.

**Certain Rights of the NIMS Insurer May Adversely Affect the Rights of Holders of Offered Certificates and the Class B Certificates**

A financial guaranty insurance policy or policies ("**NIMS policy**") may be issued by the NIMS insurer, if any, covering certain payments to be made on NIMS which may be issued by an affiliate of the depositor or by one or more entities sponsored by an affiliate of the depositor after the closing date. The NIMS are not offered hereby and, if issued, the NIMS would be backed, in whole or in part, by cashflow received on the Class C Certificates and the Class P Certificates, which are not offered hereby. The NIMS, if issued, *would not* be backed by the trust (other than the interests represented by the Class C Certificates and the Class P Certificates) or by any of the offered certificates or the Class B Certificates.

Notwithstanding the foregoing, pursuant to the terms of the pooling agreement, unless there exists a continuance of any failure by the NIMS insurer, if any, to make a required payment under the NIMS policy ("**NIMS insurer default**"), the NIMS insurer will be entitled to exercise, among others, certain rights that preempt the rights of the holders of the offered certificates and the Class B Certificates, without the consent of such holders, and the holders of the offered certificates and the Class B Certificates may exercise such rights only with the prior written consent of the NIMS insurer. Such rights are expected to include (i) the right to provide notices of servicer defaults and the right to direct the trustee to terminate the rights and obligations of the servicer under the pooling agreement in the event of a default by the servicer; (ii) the right to remove the trustee or the Delaware trustee pursuant to the pooling agreement; and (iii) the right to direct the trustee to make investigations and take actions pursuant to the pooling agreement. In addition, unless a NIMS insurer default exists, the NIMS insurer's consent will be required prior to, among other things: (i) the appointment of any successor servicer or the removal of the trustee or the Delaware trustee; (ii) the appointment of any subservicer or any co-trustee and the removal of any subservicer; or (iii) any amendment to the pooling agreement regardless of whether such amendment would affect the Class C Certificates, the Class P Certificates or the Class R Certificates.

Investors in the offered certificates and the Class B Certificates should note that:

- any NIMS policy will not cover, or benefit in any manner whatsoever, the offered certificates or the Class B Certificates;

- the rights granted to any NIMS insurer are extensive;

S-30

JPMC_DEX_000070866

- the interests of any NIMS insurer may be inconsistent with, and adverse to, the interests of the holders of the offered certificates, and the NIMS insurer has no obligation or duty to consider the interests of the offered certificates or the Class B Certificates in connection with the exercise or non-exercise of the NIMS insurer's rights;

- any NIMS insurer's exercise of the rights and consents described above may negatively affect the offered certificates and the Class B Certificates, and the existence of such rights, whether or not exercised, may adversely affect the liquidity of the offered certificates and the Class B Certificates relative to other asset-backed certificates backed by comparable mortgage loans and with comparable payment priorities and ratings; and

- there may be more than one series of notes insured by the NIMS insurer and the NIMS insurer will have the rights described in this prospectus supplement and in the pooling agreement so long as any such series of notes remain outstanding.

|   |   |
|---|---|
| **The Return on Your Certificates Could be Reduced due to the Application of the Servicemembers Civil Relief Act or any Comparable State Legislation** | Following the terrorist attacks in the United States on September 11, 2001, the United States has increased its active military operations (including, most recently, significant military actions in Iraq) and has placed a substantial number of military reservists and members of the National Guard on active duty status. It is possible that the number of reservists and members of the National Guard placed on active duty status in the near future may increase. Calling reservists, members of the National Guard and civilians to active military duty may adversely affect the performance of your certificates. Under the Relief Act, persons in active military service are provided relief from the performance of some payment obligations. The relief includes a 6.000% per annum interest rate cap on each mortgage loan, provided that the mortgage loan was obtained before the commencement of active military service. In addition, all civil court actions, such as bankruptcy and foreclosure proceedings, are delayed. Furthermore, the servicer will be required to waive any prepayment charge that would otherwise be due during the time that any mortgage loans is subject to the Relief Act.

State legislation may provide similar relief for military personnel placed on active duty status. For the purpose of this prospectus supplement, references to the Relief Act include any such comparable state legislation. *See* "Legal Aspects of Mortgage Assets—Servicemembers Civil Relief Act" in the accompanying prospectus. |

Confidential

JPMC_DEX_000070867

**The Offered Certificates and the Class B Certificates May Not be Suitable Investments For Certain Investors**

The offered certificates and the Class B Certificates are not suitable investments for any investor that requires a regular or predictable schedule of monthly payments or payment on any specific date.  The offered certificates and the Class B Certificates are complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment and the interaction of these factors.

S-32

JPMC_DEX_000070868

## THE SPONSOR

### General

Washington Mutual Mortgage Securities Corp., the sponsor of the securitization transaction, is a Delaware corporation and a wholly-owned subsidiary of Washington Mutual Bank and an indirect wholly-owned subsidiary of Washington Mutual, Inc.  At March 31, 2006, Washington Mutual, Inc. and its subsidiaries had assets of $348.7 billion.  The sponsor engages in the business of (i) purchasing mortgage loans on a servicing retained and servicing released basis, (ii) selling mortgage loans in whole loan transactions and securitizing mortgage loans through affiliated and unaffiliated depositors, (iii) master servicing mortgage loans, (iv) acting as administrative agent of Washington Mutual Bank and its affiliates with respect to mortgage loans serviced by Washington Mutual Bank and its affiliates, and (v) providing securitization services.  The sponsor generally acts as master servicer or administrative agent with respect to all mortgage loans securitized by the sponsor.

Securitization of mortgage loans is an integral part of the sponsor's conduit program.  It has engaged in securitizations of prime first lien single-family residential mortgage loans through WaMu Asset Acceptance Corp., as depositor, since 2005, and has acted as its own depositor from 1979 until 2005.  The sponsor has engaged in purchases of sub-prime first and second lien residential mortgage loans since October 2005.  This securitization transaction is the second securitization of sub-prime mortgage loans sponsored by Washington Mutual Mortgage Securities Corp.

The sponsor participated with the underwriters in structuring the securitization transaction.

The following table shows, for each indicated period, the aggregate principal balance of prime first lien single-family residential mortgage loans purchased by the sponsor during that period (except mortgage loans purchased in its capacity as depositor from an affiliated sponsor) and the portion of those mortgage loans securitized during that period in securitization transactions for which it or WaMu Asset Acceptance Corp. acted as depositor.

### The Sponsor's Purchase and Securitization of Prime Single-Family Residential Mortgage Loans

| | Year ended December 31 | | | Three months ended |
|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **March 31, 2006** |
| | (Dollar Amounts in Millions) | | | |
| Aggregate Principal Balance of Mortgage Loans Purchased by Sponsor.......................................... | $26,057 | $10,803 | $11,265 | $5,084 |
| Aggregate Principal Balance of Mortgage Loans Securitized .......... | $8,542 | $1,045 | $7,149 | $4,803 |

### The Sponsor's Origination Channels

All of the mortgage loans owned by the trust have been purchased by the sponsor either from Long Beach Mortgage Company, an affiliate of sponsor, or from approved mortgage loan sellers.  Through the sponsor's conduit program, the sponsor purchases mortgage loans in bulk from approved mortgage loan sellers on both a servicing retained and servicing released basis.  In initially approving a mortgage loan seller, the sponsor takes into account the following: annual origination volume, tenure of business and key staff in originating loans, policies and procedures for originating loans including quality control and appraisal review, review audits performed on mortgage loan seller by rating agencies, regulatory agencies and government sponsored entities, the mortgage loan seller's financial statements, errors and omissions insurance coverage and fidelity bond and liability insurance coverage.  Approved mortgage loan sellers' financial statements,

Confidential

JPMC_DEX_000070869

insurance coverage and new review audits are reviewed on an annual basis.   Additionally, the sponsor performs a monthly ongoing performance review of previously purchased mortgage loans for trends in delinquencies, losses and repurchases.  The mortgage loan sellers' underwriting guidelines are reviewed for consistency with the sponsor's credit parameters and conformity with the underwriting standards described under "Underwriting of the Mortgage Loans" below and are either approved or approved with exceptions.  The mortgage loan sellers represent to the sponsor upon sale that the mortgage loans have been underwritten in accordance with the approved underwriting guidelines.

The sponsor purchases some mortgage loans from Long Beach Mortgage Company, a wholly owned subsidiary of Washington Mutual Bank.  Long Beach Mortgage Company originates, purchases and sells sub-prime mortgage loans secured by first and second liens on one- to four-family residences that generally do not conform to the underwriting guidelines typically applied by banks and other primary lending institutions, particularly with respect to a prospective borrower's credit history and debt-to-income ratio.  All of the mortgage loans purchased from Long Beach Mortgage Company have been either originated by Long Beach Mortgage Company through wholesale brokers or purchased by Long Beach Mortgage Company from approved correspondents and were underwritten or re-underwritten by Long Beach Mortgage Company generally in accordance with its underwriting guidelines as described in this prospectus supplement.  Long Beach Mortgage Company originates mortgage loans through its network of mortgage lending offices and loan origination centers.

S-34

JPMC_DEX_000070870

## STATIC POOL INFORMATION

The sponsor began purchasing sub-prime mortgage loans in 2005 and this securitization transaction is the second securitization of sub-prime mortgage loans that it has sponsored. Accordingly, the sponsor has very limited historical delinquency, loss and prepayment information relating to the subprime mortgage loans that it has purchased and no information relating to prior securitized pools of sub-prime mortgage loans. The sponsor's affiliate, Long Beach Mortgage Company, has engaged in securitizations of sub-prime first and second lien mortgage loans through Long Beach Securities Corp., as depositor, since 2000. From 1997 until 2000, Long Beach Mortgage Company engaged in securitizations of sub-prime mortgage loans through unaffiliated depositors. The sponsor has determined that the static pool information for the prior securitized pools of sub-prime mortgage loans sponsored by Long Beach Mortgage Company should be provided in this prospectus supplement. On May 15, 2006, Long Beach Securities Corp., an affiliate of the sponsor and a wholly owned subsidiary of Long Beach Mortgage Company, filed with the Securities and Exchange Commission, as Exhibit 99.1 to a Current Report on Form 8-K, static pool information about prior securitized pools of mortgage loans of Long Beach Mortgage Company (sub-prime first and second lien mortgage loans), which information is incorporated by reference into this prospectus supplement. The static pool information includes (i) information about the original characteristics of each prior securitized pool of Long Beach Mortgage Company as of the cut-off date for that pool and (ii) delinquency, loss and prepayment information about each such prior securitized pool in quarterly increments from the related cut-off date through March 31, 2005. The static pool information about prior securitized pools of sub-prime mortgage loans of Long Beach Mortgage Company that were established before January 1, 2006 is not deemed to be a part of this prospectus supplement, the prospectus or the related registration statement. No static pool information is available from Home Loan Corporation, LIME Financial Services, LTD. or Mandalay Mortgage, LLC, three of the originators, for prior securitized pools because they do not continue to service mortgage loans after origination except for a generally short period before sale.

**There can be no assurance that the rates of delinquencies, losses and prepayments experienced by the prior securitized pools of Long Beach Mortgage Company will be comparable to delinquencies, losses and prepayments expected to be experienced by the mortgage loans owned by the trust.**

Confidential

## THE ORIGINATORS

The sponsor purchased the mortgage loans directly or indirectly from affiliated or unaffiliated third parties who either originated the mortgage loans or purchased the mortgage loans through correspondent or broker lending.  The following originated at least 10% of the mortgage loans (by aggregate scheduled principal balance of the mortgage loans as of the cut-off date):  Long Beach Mortgage Company, approximately 32.5%, Home Loan Corporation, approximately 11.8%, LIME Financial Services, LTD., approximately 11.2% and Mandalay Mortgage, LLC, approximately 16.7%.  No other originator originated more than 10% of the mortgage loans.

### Long Beach Mortgage Company

Long Beach Mortgage Company ("**Long Beach**") is a Delaware corporation that originates, purchases and sells sub-prime mortgage loans secured by first and second liens on one- to four-family residences that generally do not conform to the underwriting guidelines typically applied by banks and other primary lending institutions, particularly with respect to a prospective borrower's credit history and debt-to-income ratio.  Borrowers who qualify under Long Beach's underwriting guidelines generally have equity in their property and repayment ability but may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies.  Long Beach originates mortgage loans based on its underwriting guidelines and does not determine whether such mortgage loans would be acceptable for purchase by Fannie Mae or Freddie Mac.  The mortgage loans originated by Long Beach are not insured by the Federal Housing Administration or partially guaranteed by the U.S. Department of Veteran Affairs.  Long Beach is a direct wholly owned subsidiary of Washington Mutual Bank.

The following table shows, for each indicated period, the aggregate principal balance of all sub-prime first and second lien residential mortgage loans originated by Long Beach (including those purchased by Long Beach from correspondent lenders) during that period.

#### Long Beach's Origination and Securitization of Sub-prime
#### Residential Mortgage Loans

| | Year ended December 31 | | | Three months ended |
| --- | --- | --- | --- | --- |
| | 2003 | 2004 | 2005 | March 31, 2006 |
| | (Dollar Amounts in Millions) | | | |
| Aggregate Principal Balance of Mortgage Loans Originated by Long Beach.................................... | $11,497 | $16,175 | $29,781 | $6,434 |
| Aggregate Principal Balance of Mortgage Loans Securitized ............ | $6,026 | $13,338 | $15,444 | $11,234 |

### Home Loan Corporation

Home Loan Corporation is a privately held mortgage originator that was founded in 1989.  Although licensed in 44 states, Home Loan Corporation's corporate office is located in Houston, Texas.  Home Loan Corporation originates one-to-four family residential mortgage loans through a retail and wholesale platform.  The retail platform originates agency type mortgage loans and is an approved seller servicer for Fannie Mae, and Freddie Mac.  The wholesale platform originates loans from third party categories as sub prime and ALT A.  The originator realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting.  Each case is weighed individually on its own merits and exceptions to the underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk.

Confidential

JPMC_DEX_000070872

**LIME Financial Services, LTD.**

The information in this section has been provided to the depositor by LIME Financial Services, LTD. ("**LIME**").

LIME is an Oregon corporation and a wholly owned subsidiary of LIME Holdings LLC, a Delaware limited liability company.

LIME is a wholesale non prime residential mortgage lender.  LIME originates, finances, services and sells 1st and 2nd mortgage loans secured by residential property.  LIME accepts mortgage loan applications through a network of independent mortgage brokers. LIME funds loans for non prime residential home buyers and owners who are customers of the brokers.  LIME funds loans based upon the borrower's ability to repay the loan and the adequacy of the collateral.

LIME uses secured credit facilities to finance loans from the time of origination until the loan is sold. LIME typically holds loans for a period of 30 to 90 days and then sells them in a pool.

LIME is currently lending in or licensed to lend in 43 states and the District of Columbia.  LIME is headquartered in Lake Oswego, Oregon and has a regional Operations Center in Chantilly, Virginia.

Founded in 1999, LIME turned its focus to wholesale non prime residential lending in 2003 which is now LIME's sole business.  Our founders have a record of non prime experience.  They previously founded Trillium Mortgage which was acquired by First Franklin and Meritage Mortgage which is now a part of NetBank.

**Mandalay Mortgage, LLC**

Founded in July 1999, Mandalay Mortgage, LLC ("**Mandalay**") is a non-prime residential wholesale mortgage lender.  Mandalay provides first and second mortgage products to borrowers on properties located mostly in the western United States.  In July 2005, Mandalay initiated a phased national expansion plan and is currently lending in 29 states.

Mandalay focuses on originating mortgage loans to borrowers with unique circumstances, including those with less than perfect credit, that have difficulty proving income, need cash out, require high loan-to-value financing, or otherwise might not qualify for "agency" (Fannie Mae and Freddie Mac) financing.  These loans are commonly referred to as "sub-prime" or "non-prime" mortgage loans.  All of Mandalay's mortgage loan originations are wholesale (i.e., conducted through a network of mortgage brokers). As a HUD approved, Equal Housing Lender, Mandalay does not discriminate against applicants on the basis of race, color, religion, national origin, gender, marital status or age (subject to legal age requirements).

Mandalay's total annual mortgage loan production has increased steadily from $175 million in 2002 to $380 million in 2003, $1.4 billion in 2004 and $2.0 billion in 2005.  As of April 1, 2006, Mandalay had 185 full time employees.  Loans are originated from 2 production centers, one in Irvine, California and corporate headquarters in Woodland Hills, California.

S-37

Confidential

JPMC_DEX_000070873

## UNDERWRITING OF THE MORTGAGE LOANS

**General**

All of the mortgage loans owned by the trust have been originated generally in accordance with the underwriting guidelines of the sponsor described in this section or the underwriting guidelines of Long Beach. The sponsor's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral.

Prospective borrowers are required to complete a standard loan application in which they provide financial information regarding the amount of income and related sources, liabilities and related monthly payments, credit history and employment history, as well as certain other personal information. During the underwriting process, the loan underwriter reviews and verifies the prospective borrower's sources of income (only under the full documentation residential loan program), calculates the amount of income from all such sources indicated on the loan application, reviews the credit history and credit score(s) of the prospective borrower and calculates the debt-to-income ratio to determine the prospective borrower's ability to repay the loan, and determines whether the mortgaged property complies with the sponsor's underwriting guidelines.

All of the mortgage loans owned by the trust generally do not conform to the underwriting guidelines typically applied by prime lending institutions, Fannie Mae or Freddie Mac, particularly with respect to a prospective borrower's credit history, credit score(s), LTV, original loan balances, income documentation type, debt-to-income ratio, occupancy of the mortgaged property, and interest rates. Borrowers who qualify under the sponsor's underwriting guidelines may have equity in their property and repayment ability but may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies, or may require a specific income documentation type. All debts in bankruptcy must be paid off or discharged or the proceeding dismissed prior to the funding of the mortgage loan. The underwriting guidelines permit Chapter 13 bankruptcy buyouts. In addition, certain exceptions to the underwriting guidelines may be made in the event that compensating factors are demonstrated by the borrower.

**Evaluation of the Borrower's Credit Standing**

The loan underwriter obtains a credit report on each prospective borrower from a credit reporting company. The report typically contains information relating to such matters as credit payment history with local and national merchants and lenders, installment debt payments, credit score(s) and any record of defaults, bankruptcy, repossession, suits or judgments.

In most cases the credit report provides a credit score for the borrower, which represents a numerical weighing of the borrower's credit characteristics. Credit scores are designed to assess a borrower's creditworthiness and likelihood to default on an obligation over a defined period (usually two to three years) based on a borrower's credit history. Credit scores do not necessarily correspond to the probability of default over the life of a mortgage loan because they reflect past credit history, rather than an assessment of future payment performance. In addition, credit scores only indicate general creditworthiness, and credit scores are not intended to specifically apply to mortgage debt. The credit scoring methodology generates a credit score usually ranging from around 300 to 800, with a higher score indicating a borrower with a relatively more favorable credit history. The credit score is based upon such factors as the prospective borrower's payment history, delinquencies on accounts, levels of outstanding debt, length of credit history and types of credit and bankruptcy experience.

**Evaluation of the Borrower's Repayment Ability**

The sponsor's underwriting guidelines permit first lien mortgage loans with loan-to-value ratios at origination of up to 100%, or 80% if at the time of origination of the first lien mortgage loan, the originator

S-38

JPMC_DEX_000070874

also originated a second lien mortgage loan.  The sponsor's second lien mortgage underwriting guidelines permit second lien mortgage loans with a combined loan-to-value ratios at origination of up to 100%.  The maximum allowable loan-to-value ratio varies based upon the residential loan program, income documentation, property type, creditworthiness and debt service-to-income ratio of the prospective borrower and the overall risks associated with the loan decision.  The maximum combined loan-to-value ratio, including any second lien mortgage subordinate to the sponsor's first lien mortgage, is generally 100% under the "Premium A/A+" "A," "A-," "B+" and "B" risk categories, and 95% under the "C" risk category.

**Evaluation of the Adequacy of Collateral**

The adequacy of the mortgaged property as collateral is generally determined by an appraisal of the mortgaged property that generally conforms to Fannie Mae and Freddie Mac appraisal standards and a review of that appraisal.  The mortgaged properties are appraised by licensed independent appraisers.  In most cases, properties in below average condition, including properties requiring major deferred maintenance, are not acceptable under the sponsor's underwriting programs.  Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.

Every independent appraisal is reviewed through an appraisal valuation process. Depending upon the original principal balance and loan-to-value ratio of the mortgaged property, the appraisal review may include an administrative review, technical review, desk review or field review of the original appraisal.

The sponsor requires that all mortgage loans have title insurance and are secured by liens on real property.  The sponsor also requires that fire and extended coverage casualty insurance be maintained on the mortgaged property in an amount at least equal to the principal balance of the mortgage loan or the replacement cost of the property, whichever is less.  The sponsor does not require that the mortgage loans be covered by a primary mortgage insurance policy.

**Documentation Programs**

The mortgage loans have been underwritten generally in accordance with guidelines established by the sponsor under its full documentation, limited documentation or stated income documentation residential loan programs.

Under the full documentation residential loan program, salaried prospective borrowers are generally required to submit their most recent W-2s and pay stubs and self-employed prospective borrowers are generally required to submit their most recent federal income tax return.  Under the stated income documentation residential loan program, prospective borrowers are required to state their income on the application but are not required to submit any documents in support.  Under the limited documentation residential loan program, salaried prospective borrowers or self-employed prospective borrowers are generally required to submit their most recent six months of personal bank statements or business bank statements.  Under the limited documentation and stated income documentation residential loan programs, the prospective borrower's employment and income sources must be stated on the prospective borrower's application.  The prospective borrower's income as stated must be reasonable for the related occupation and such determination as to reasonableness is subject to the loan underwriter's discretion.  However, the prospective borrower's income as stated on the application is not independently verified.  Verification of employment is required for salaried prospective borrowers.  Maximum loan-to-value ratios under the stated income documentation residential loan programs are generally lower than those permitted under the full documentation and limited documentation residential loan programs.  Generally, the same underwriting guidelines that apply to the full documentation and limited documentation residential loan programs, except as noted in this section, apply to the stated income documentation residential loan programs.

S-39

Confidential

JPMC_DEX_000070875

**Due Diligence and Quality Control Review**

The sponsor's engages an approved third party due diligence vendor for a complete credit and compliance review of mortgage loans prior to purchase from unaffiliated mortgage loan sellers. A third party vendor is engaged for an appraisal valuation process that includes the use of an automated valuation model to identify mortgage loans that are considered potential collateral risk. This process is executed on all mortgage loans purchased from unaffiliated sellers. For loans purchased from affiliated sellers, a sample of loans is reviewed.

**Risk Categories**

Under the sponsor's underwriting programs, various risk categories are used to grade the likelihood that the prospective borrower will satisfy the repayment conditions of the mortgage loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the prospective borrower's credit history and debt ratio. These risk categories are based on the borrower's credit history, including mortgage history, bankruptcy/foreclosure history, and credit score. The following categories and criteria are used for general grading the potential likelihood that a prospective borrower will satisfy the repayment obligations of a mortgage loan:

Credit Grade: "Premium A/A+". Under the "Premium A" risk category, the prospective borrower must have a credit report reflecting a one to two year credit history and a prior mortgage or rental history evidencing no 30-day late payments during the last 12 months. No notice of default filings or foreclosures may have occurred during the preceding 36 months. No open lawsuits are permitted; however, the prospective borrower may be a plaintiff in a lawsuit if a reasonable explanation is provided. Maximum qualifying debt service-to-income ratio is 55. A maximum loan-to-value ratio of 100% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 95% is permitted for second homes, and a maximum loan-to-value ratio of 85% is permitted for owner occupied mortgage properties consisting of three-to-four units. A maximum loan-to-value ratio of 95% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 80% is permitted for non-owner occupied properties consisting of three-to-four units.

Credit Grade: "A". Under the "A" risk category, a maximum of one 30-day late payment within the last 12 months is permitted on an existing mortgage loan. A maximum of one rolling 30-day late payment is allowed. No notice of default filings or foreclosures may have occurred during the preceding 36 months. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 100% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 95% is permitted for second homes, and a maximum loan-to-value ratio of 85% is permitted for owner occupied mortgaged properties consisting of three-to-four units. A maximum loan-to-value ratio of 95% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 80% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units. Generally, the debt service-to-income ratio maximum may be 55% based on the prospective borrower's net disposable income and if the loan-to-value ratio is less than or equal to 90%. In addition, the prospective borrower must have a credit score of 500 or higher (550 or higher for interest only mortgage loans).

Credit Grade: "A-". Under the "A-" risk category, a maximum of three 30-day late payments within the last 12 months is permitted on an existing mortgage loan. A maximum of two rolling 30-day late payments is allowed. No notice of default filings or foreclosures may have occurred during the preceding 36 months. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 95% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 90% is permitted for second homes, and a maximum loan-to-value ratio of 85% is permitted

S-40

Confidential

for owner occupied mortgaged properties consisting of three-to-four units. A maximum loan-to-value ratio of 90% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 80% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units. Generally, the debt service-to-income ratio maximum may be 55% based on the prospective borrower's net disposable income and if the loan-to-value ratio is less than or equal to 90%. In addition, the prospective borrower must have a credit score of 500 or higher (550 or higher for interest only mortgage loans).

Credit Grade: "B+". Under the "B+" risk category, a maximum of three 30-day late payments within the last 12 months is permitted on an existing mortgage loan. No notice of default filings or foreclosures may have occurred during the preceding 24 months. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 95% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 90% is permitted for second homes, and a maximum loan-to-value ratio of 85% is permitted for owner occupied mortgaged properties consisting of three-to-four units. A maximum loan-to-value ratio of 90% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 80% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units. Generally, the debt service-to-income ratio must be 55% or less based on the prospective borrower's net disposable income and/or loan-to-value ratio. In addition, the prospective borrower must have a credit score of 500 or higher (550 or higher for interest only mortgage loans).

Credit Grade: "B". Under the "B" risk category, a maximum of multiple 60-day late payment within the last 12 months is permitted on an existing mortgage loan. No notice of default filings or foreclosures may have occurred during the preceding 18 months. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 90% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 85% is permitted for second homes, and a maximum loan-to-value ratio of 80% is permitted for owner occupied mortgaged properties consisting of three-to-four units. A maximum loan-to-value ratio of 85% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 75% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units. Generally, the debt service-to-income ratio must be 55% or less based on the prospective borrower's net disposable income and/or loan-to-value ratio. In addition, the prospective borrower must have a credit score of 500 or higher (550 or higher for interest only mortgage loans).

Credit Grade: "C". Under the "C" risk category, the prospective borrower may have experienced significant credit problems in the past. A maximum of multiple 60-day late payments and no 90-day late payments, or multiple 60-day late payments and multiple 90-day late payment, or if the loan-to-value ratio does not exceed 70% within the last 12 months is permitted on an existing mortgage loan. No notice of default filings or foreclosures may have occurred during the preceding 12 months. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 85% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 80% is permitted for second homes, and a maximum loan-to-value ratio of 75% is permitted for owner occupied mortgaged properties consisting of three-to-four units. A maximum loan-to-value ratio of 80% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 70% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units. Generally, the debt service-to-income ratio must not exceed 55%.

In general, higher credit risk mortgage loans are graded in categories which permit higher debt ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however, the sponsor's underwriting programs establish lower maximum loan-to-value ratios and maximum loan amounts for loans graded in such categories.

Confidential

JPMC_DEX_000070877

**Exceptions to Program Parameters**

There can be no assurance that every mortgage loan owned by the trust was originated in conformity with the applicable underwriting guidelines in all material respects. The application of the sponsor's underwriting guidelines does not imply that each specific criterion was satisfied with respect to every mortgage loan. Rather, a mortgage loan will be considered to be originated in accordance with a given set of underwriting guidelines if, based on an overall qualitative evaluation, the mortgage loan is in substantial compliance with those underwriting guidelines. For example, a mortgage loan may be considered to comply with a set of underwriting guidelines, even if one or more specific criteria included in those underwriting guidelines were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting guidelines. The sponsor applies its underwriting guidelines in accordance with a procedure that complies with applicable federal and state laws and regulations.

**Long Beach Mortgage Company's Underwriting Standards**

*General*

The mortgage loans originated by Long Beach and owned by the trust have been originated by Long Beach through wholesale brokers or re-underwritten upon acquisition from correspondents by Long Beach generally in accordance with the underwriting guidelines described in this section. Long Beach's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral.

Prospective borrowers are required to complete a standard loan application in which they provide financial information regarding the amount of income and related sources, liabilities and related monthly payments, credit history and employment history, as well as certain other personal information. During the underwriting or re-underwriting process, Long Beach reviews and verifies the prospective borrower's sources of income (only under the full documentation residential loan program), calculates the amount of income from all such sources indicated on the loan application, reviews the credit history and credit score(s) of the prospective borrower and calculates the debt-to-income ratio to determine the prospective borrower's ability to repay the loan, and determines whether the mortgaged property complies with Long Beach's underwriting guidelines.

The mortgage loans originated by Long Beach and owned by the trust generally do not conform to the underwriting guidelines typically applied by prime lending institutions, Fannie Mae or Freddie Mac, particularly with respect to a prospective borrower's credit history, credit score(s), LTV and debt-to-income ratio. Borrowers who qualify under Long Beach's underwriting guidelines may have equity in their property and repayment ability but may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies. All debts in bankruptcy must be paid off or discharged or the proceeding dismissed prior to the funding of the mortgage loan. The underwriting guidelines permit Chapter 13 bankruptcy buyouts.

*Evaluation of the Borrower's Credit Standing*

Long Beach obtains a credit report on each prospective borrower from a credit reporting company in addition to the one obtained from the wholesale broker or correspondent. Long Beach then compares the two credit reports. The report typically contains information relating to such matters as credit payment history with local and national merchants and lenders, installment debt payments, credit score(s) and any record of defaults, bankruptcy, repossession, suits or judgments.

S-42

JPMC_DEX_000070878

Long Beach uses a credit scoring methodology as part of its underwriting and re-underwriting process. The credit scoring methodology assesses a prospective borrower's ability to repay a mortgage loan based upon predetermined mortgage loan characteristics and credit risk factors. The credit scoring methodology generates a credit score usually ranging from around 300 to 800, with a higher score indicating a borrower with a relatively more favorable credit history. The credit score is based upon such factors as the prospective borrower's payment history, delinquencies on accounts, levels of outstanding debt, length of credit history and types of credit and bankruptcy experience.

*Evaluation of the Borrower's Repayment Ability*

Long Beach's underwriting guidelines permit first lien mortgage loans with loan-to-value ratios at origination of up to 100%, or 80% if at the time of origination of the first lien mortgage loan, the originator also originated a second lien mortgage loan. Long Beach's second lien mortgage underwriting guidelines permit second lien mortgage loans with a combined loan-to-value ratios at origination of up to 100%. The maximum allowable loan-to-value ratio varies based upon the residential loan program, income documentation, property type, creditworthiness and debt service-to-income ratio of the prospective borrower and the overall risks associated with the loan decision. The maximum combined loan-to-value ratio, including any second lien mortgage subordinate to Long Beach's first lien mortgage, is generally 100% under the "Premium A," "A," "A-," "B+" and "B" risk categories, and 95% under the "C" risk category.

*Evaluation of the Adequacy of Collateral*

The adequacy of the mortgaged property as collateral is generally determined by an appraisal of the mortgaged property that generally conforms to Fannie Mae and Freddie Mac appraisal standards and a review of that appraisal. The mortgaged properties are appraised by licensed independent appraisers who have satisfied Long Beach's appraiser screening process. In most cases, properties in below average condition, including properties requiring major deferred maintenance, are not acceptable under Long Beach's underwriting programs. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.

Every independent appraisal is reviewed by an underwriter of Long Beach or its affiliate and is reviewed by one or more third party vendors which may refer to Long Beach or one of its affiliates for additional further review before the loan is funded or re-underwritten. Depending upon the original principal balance and loan-to-value ratio of the mortgaged property, the appraisal review may include an administrative review, technical review, desk review or field review of the original appraisal.

Long Beach requires that all mortgage loans in its underwriting programs have title insurance and be secured by liens on real property. Long Beach also requires that fire and extended coverage casualty insurance be maintained on the mortgaged property in an amount at least equal to the principal balance of the mortgage loan or the replacement cost of the property, whichever is less. Long Beach does not require that the mortgage loans originated or re-underwritten under its underwriting programs be covered by a primary mortgage insurance policy.

*Underwriting Exceptions*

On a case-by-case basis and only with the approval of an employee with appropriate risk level authority, Long Beach may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under its underwriting risk category guidelines warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit history, stable employment and time in residence at the prospective borrower's current address. It

Confidential

JPMC_DEX_000070879

is expected that some of the mortgage loans originated by Long Beach and owned by the trust will be underwriting exceptions.

*Documentation Programs*

The mortgage loans have been originated or re-underwritten upon acquisition generally in accordance with guidelines established by Long Beach under its full documentation, limited documentation or stated income documentation residential loan programs.

Under the full documentation residential loan program, salaried prospective borrowers are generally required to submit their most recent W-2s and pay stubs and self-employed prospective borrowers are generally required to submit their most recent federal income tax return. Under the stated income documentation residential loan program, prospective borrowers are required to state their income on the application but are not required to submit any documents in support. Under the limited documentation residential loan program, salaried prospective borrowers or self-employed prospective borrowers are generally required to submit their most recent six months of personal bank statements or business bank statements. Under the limited documentation and stated income documentation residential loan programs, the prospective borrower's employment and income sources must be stated on the prospective borrower's application. The prospective borrower's income as stated must be reasonable for the related occupation and such determination as to reasonableness is subject to the loan underwriter's discretion. However, the prospective borrower's income as stated on the application is not independently verified. Verification of employment is required for salaried prospective borrowers. Maximum loan-to-value ratios under the stated income documentation residential loan programs are generally lower than those permitted under the full documentation and limited documentation residential loan programs. Generally, the same underwriting guidelines that apply to the full documentation and limited documentation residential loan programs, except as noted in this section, apply to the stated income documentation residential loan programs.

*Quality Control Review*

As part of its quality control system, Long Beach re-verifies information that has been provided by the mortgage brokerage company prior to funding a loan and Long Beach conducts a post-funding audit of every origination file. In addition, Washington Mutual Bank, as servicer, periodically audits files based on a statistical sample of closed loans. In the course of its pre-funding review, Long Beach re-verifies the income of each prospective borrower or, for a self-employed prospective borrower, reviews the income documentation obtained under the full documentation and limited documentation residential loan programs. Long Beach generally requires evidence of funds to close on the mortgage loan.

*Risk Categories*

Under Long Beach's underwriting programs, various risk categories are used to grade the likelihood that the prospective borrower will satisfy the repayment conditions of the mortgage loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the prospective borrower's credit history and debt ratio.

Mortgage loans are originated under Long Beach's underwriting guidelines using the following categories and criteria for grading the potential likelihood that a prospective borrower will satisfy the repayment obligations of a mortgage loan:

Credit Grade: "Premium A". Under the "Premium A" risk category, the prospective borrower must have a credit report reflecting a one year credit history and a prior mortgage or rental history evidencing no 30-day late payments during the last 12 months. No notice of default filings or foreclosures may have

Confidential

JPMC_DEX_000070880

occurred during the preceding 36 months.  No open lawsuits are permitted; however, the prospective borrower may be a plaintiff in a lawsuit if a reasonable explanation is provided.  Maximum qualifying debt service-to-income ratio is 55.  A maximum loan-to-value ratio of 100% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 95% is permitted for second homes, and a maximum loan-to-value ratio of 85% is permitted for owner occupied mortgage properties consisting of three-to-four units.  A maximum loan-to-value ratio of 90% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 80% is permitted for non-owner occupied properties consisting of three-to-four units.

Credit Grade:  "A".  Under the "A" risk category, a maximum of one 30-day late payment within the last 12 months is permitted on an existing mortgage loan.  A maximum of one rolling 30-day late payment is allowed.  No notice of default filings or foreclosures may have occurred during the preceding 36 months.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 100% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 95% is permitted for second homes, and a maximum loan-to-value ratio of 85% is permitted for owner occupied mortgaged properties consisting of three-to-four units.  A maximum loan-to-value ratio of 90% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 80% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units.  Generally, the debt service-to-income ratio maximum may be 55% based on the prospective borrower's net disposable income and if the loan-to-value ratio is less than or equal to 90%.  In addition, the prospective borrower must have a credit score of 500 or higher (550 or higher for interest only mortgage loans).

Credit Grade:  "A-".  Under the "A-" risk category, a maximum of two 30-day late payments within the last 12 months is permitted on an existing mortgage loan.  A maximum of two rolling 30-day late payments is allowed.  No notice of default filings or foreclosures may have occurred during the preceding 36 months.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 95% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 90% is permitted for second homes, and a maximum loan-to-value ratio of 85% is permitted for owner occupied mortgaged properties consisting of three-to-four units.  A maximum loan-to-value ratio of 90% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 80% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units.  Generally, the debt service-to-income ratio maximum may be 55% based on the prospective borrower's net disposable income and if the loan-to-value ratio is less than or equal to 90%.  In addition, the prospective borrower must have a credit score of 500 or higher (550 or higher for interest only mortgage loans).

Credit Grade:  "B+".  Under the "B+" risk category, a maximum of three 30-day late payments within the last 12 months is permitted on an existing mortgage loan.  No notice of default filings or foreclosures may have occurred during the preceding 24 months.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 95% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 90% is permitted for second homes, and a maximum loan-to-value ratio of 85% is permitted for owner occupied mortgaged properties consisting of three-to-four units.  A maximum loan-to-value ratio of 90% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 80% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units.  Generally, the debt service-to-income ratio must be 55% or less based on the prospective borrower's net disposable income and/or loan-to-value ratio.  In addition, the prospective borrower must have a credit score of 500 or higher (550 or higher for interest only mortgage loans).

S-45

JPMC_DEX_000070881

Credit Grade: "B". Under the "B" risk category, a maximum of one 60-day late payment within the last 12 months is permitted on an existing mortgage loan. No notice of default filings or foreclosures may have occurred during the preceding 18 months. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 90% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 85% is permitted for second homes, and a maximum loan-to-value ratio of 80% is permitted for owner occupied mortgaged properties consisting of three-to-four units. A maximum loan-to-value ratio of 85% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 75% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units. Generally, the debt service-to-income ratio must be 55% or less based on the prospective borrower's net disposable income and/or loan-to-value ratio. In addition, the prospective borrower must have a credit score of 500 or higher (550 or higher for interest only mortgage loans).

Credit Grade: "C". Under the "C" risk category, the prospective borrower may have experienced significant credit problems in the past. A maximum of four 60-day late payments and no 90-day late payments, or three 60-day late payments and one 90-day late payment, or if the loan-to-value ratio does not exceed 70%, two 90-day late payments and one 120-day late payment, within the last 12 months is permitted on an existing mortgage loan. No notice of default filings or foreclosures may have occurred during the preceding 12 months. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 85% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 80% is permitted for second homes, and a maximum loan-to-value ratio of 75% is permitted for owner occupied mortgaged properties consisting of three-to-four units. A maximum loan-to-value ratio of 80% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 70% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units. Generally, the debt service-to-income ratio must not exceed 55%.

In general, higher credit risk mortgage loans are graded in categories which permit higher debt ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however, Long Beach's underwriting programs establish lower maximum loan-to-value ratios and maximum loan amounts for loans graded in such categories.

*Exception to Program Parameters*

There can be no assurance that every mortgage loan originated by Long Beach and owned by the trust was originated in conformity with the applicable underwriting guidelines in all material respects. Long Beach's underwriting guidelines include a set of specific criteria pursuant to which the underwriting evaluation is made. The application of Long Beach's underwriting guidelines does not imply that each specific criterion was satisfied with respect to every mortgage loan. Rather, a mortgage loan will be considered to be originated in accordance with a given set of underwriting guidelines if, based on an overall qualitative evaluation, the mortgage loan is in substantial compliance with those underwriting guidelines. For example, a mortgage loan may be considered to comply with a set of underwriting guidelines, even if one or more specific criteria included in those underwriting guidelines were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting guidelines. Long Beach applies its underwriting guidelines in accordance with a procedure that complies with applicable federal and state laws and regulations.

## THE DEPOSITOR

WaMu Asset Acceptance Corp., the depositor, is a Delaware corporation and a wholly owned subsidiary of Washington Mutual Bank. The depositor engages in no activities other than securitizing assets. It will have no material continuing obligations with respect to the mortgage loans or the certificates following

Confidential

JPMC_DEX_000070882

the issuance of the certificates, other than the obligations (i) to file financing statements perfecting the trust's interest in the mortgage loans, (ii) to repurchase or substitute for affected mortgage loans in the event of a material breach of a representation and warranty made by the depositor in the pooling agreement that has not been remedied and (iii) to indemnify the underwriters against some civil liabilities, including liabilities under the Securities Act of 1933.

## THE TRUST

The issuer of the certificates, the Washington Mutual Asset-Backed Certificates WMABS 2006-HE2 Trust, will be a statutory trust formed under the laws of the State of Delaware pursuant to a trust agreement between WaMu Asset Acceptance Corp., as depositor, and Christiana Bank & Trust Company, as Delaware trustee. The pooling agreement among the depositor, Washington Mutual Bank, as servicer, the Delaware trustee and LaSalle Bank National Association, as trustee, will restate the trust agreement and will be the governing instrument of the trust.

The trust will not own any assets other than the mortgage loans and the other assets described below. The trust will not have any liabilities other than those incurred in connection with the pooling agreement and any related agreement. The trust will not have any directors, officers, or other employees. No equity contribution will be made to the trust by the sponsor, the depositor or any other party, except for a de minimis contribution made by the depositor pursuant to the trust agreement, and the trust will not have any other capital. The fiscal year end of the trust will be December 31. The trust will act through the trustee and the Delaware trustee. The trustee, whose initial acceptance fees will be paid by the sponsor, will act on behalf of the trust and the certificateholders in accordance with the terms of the pooling agreement. The trustee will be entitled to the trustee fee and to income earnings on deposits in the distribution account.

### Assignment of the Mortgage Loans and Other Assets to the Trust

A pool of mortgage loans, as described in this prospectus supplement, will be sold to the trust on or about May 25, 2006 (the "**closing date**"). The trust will own the right to receive all payments of principal and interest on the mortgage loans due after May 1, 2006 (the "**cut-off date**"). A schedule to the pooling agreement will include information about each mortgage loan, including:

- the scheduled principal balance as of the close of business on the cut-off date;

- the term of the mortgage loan; and

- the mortgage interest rate as of the close of business on the cut-off date and information about how that mortgage interest rate adjusts, if applicable.

The mortgage notes will be endorsed in blank or to the trustee and assignments of the mortgages to the trust will be prepared in blank or to the trustee but will not be recorded. The sponsor will not be required to provide assignments of mortgage or intervening assignments of mortgage if the related mortgage is held through the MERS® system. In addition, the mortgages for some or all of the mortgage loans that are not already held through the MERS® system may, at the discretion of the servicer, in the future be held through the MERS® system. LaSalle Bank National Association, the trustee, as custodian, will have possession of and will review the mortgage notes, mortgages and mortgage files containing the documents specified in the pooling agreement in accordance with its terms. See "The Servicer—The Trustee—*The Custodian*" in this prospectus supplement.

The trustee, as custodian, will review each mortgage file either on or before the closing date or within one year of the closing date or subsequent transfer date, as applicable (or promptly after the trustee's receipt

S-47

JPMC_DEX_000070883

of any document permitted to be delivered after the closing). If any document in a mortgage file is found to be missing or not executed and the sponsor does not cure that defect within 90 days of notice (or within a longer period after the closing date as provided in the mortgage loan purchase agreement in the case of missing documents not returned from the public recording office), the sponsor will be obligated to repurchase the related mortgage loan from the trust. See "The Mortgage Pool—Representations and Warranties Regarding the Mortgage Loans" in this prospectus supplement for a description of the requirements with respect to repurchases of mortgage loans.

Rather than repurchase the mortgage loan as provided above, the sponsor may remove the mortgage loan (a "**reacquired mortgage loan**") from the trust and substitute in its place another mortgage loan (a "**substitute mortgage loan**"); however, substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the trustee to the effect that substitution will not disqualify the trust as a REMIC or result in a prohibited transaction tax under the Code. Any substitute mortgage loan generally will, on the date of substitution, among other characteristics specified in the pooling agreement:

- have a principal balance, after deduction of all scheduled payments due in or prior to the month of substitution, not in excess of, and not more than 5% less than, the outstanding principal balance of the reacquired mortgage loan (the amount of the difference between the purchase price of the reacquired mortgage loan and the principal balance of the substitute mortgage loan will be deposited by the seller and held for distribution to the certificateholders on the related distribution date (a "**substitution price**")),

- have a current mortgage rate not lower than, and not more than 1% per annum higher than, that of the reacquired mortgage loan,

- with respect to an adjustable-rate mortgage loan, (a) have a mortgage rate subject to a minimum mortgage rate not less than the minimum mortgage rate applicable to the reacquired mortgage loan, (b) have a margin at least equal to that of the reacquired mortgage loan, (c) have a mortgage rate subject to a maximum rate that is not greater than the maximum rate applicable to the reacquired mortgage loan and (d) have a next adjustment date that is not more than two months later than the next adjustment date on the reacquired mortgage loan,

- have a loan-to-value ratio not higher than that of the reacquired mortgage loan,

- have a remaining term to maturity not later than (and not more than one year less than) that of the reacquired mortgage loan, and

- comply with all of the representations and warranties applicable to the mortgage loans as specified in the mortgage loan purchase agreement as of the date of substitution.

This cure, repurchase or substitution obligation constitutes the sole remedy available to certificateholders or the trustee for omission of, or a material defect in, a mortgage loan document.

The mortgage pool will be the primary asset of the trust. The trust will also contain other assets, including:

- insurance policies related to individual mortgage loans, if applicable;

- any property that secured a mortgage loan that the trust acquires after the cut-off date by foreclosure or deed in lieu of foreclosure;

S-48

- the rights to receive certain payments paid to the supplemental interest trust under the swap agreement; and

- amounts held in the distribution account, the reserve fund, and the final maturity reserve account.

In exchange for the mortgage loans and the other assets described above, the trustee will authenticate and deliver the certificates pursuant to the order of the depositor.  It is the intent of the parties to the pooling agreement that the conveyance of the mortgage loans and the related assets to the trust constitute an absolute sale of those assets.  However, in the event that the pooling agreement for any reason is held or deemed to create a security interest in those assets, then the pooling agreement will constitute a security agreement and the depositor will grant to the trust a security interest in those assets.

### Restrictions on Activities of the Trust

Pursuant to the pooling agreement, the trust will have the power and authority (i) to acquire, hold, lease, manage, administer, control, invest, reinvest, operate and transfer assets of the trust, (ii) to issue and make distributions on the certificates and (iii) to engage in such other activities as are described in the pooling agreement.  The trust will be required to act in accordance with requirements specified in the pooling agreement that are designed to maintain the trust's existence as a legal entity separate and distinct from any other entity.  The trust will not be permitted to do any of the following:

- to engage in any business or activity other than those described in the pooling agreement;

- to incur or assume any indebtedness other than indebtedness incurred under the pooling agreement or any related agreement;

- to guarantee or otherwise assume liability for the debts of any other entity;

- to confess a judgment against the trust;

- to possess or assign the assets of the trust for other than a trust purpose;

- to lend any funds to any entity, except as contemplated by the pooling agreement; or

- to do other actions prohibited by the pooling agreement.

The permissible activities of the Trust may not be modified except by an amendment to the pooling agreement. See "Description of the Certificates—Amendment of the Pooling Agreement" in this prospectus supplement.

### Discretionary Activities With Respect to the Trust

The following is a description of material discretionary activities that may be taken with regard to the administration of the mortgage loans or the certificates:

- The servicer will be authorized under the pooling agreement to exercise discretion with regard to its servicing of the mortgage loans in accordance with the servicing standard specified in the pooling agreement.  See "The Servicers——The Servicer—*Servicing Procedures—Servicing Standard; Waivers and Modifications*" in this prospectus supplement.

- The servicer will be authorized to engage subservicers to service the mortgage loans in accordance with the servicing standard specified in the pooling agreement and may terminate any subservicer

Confidential

with the consent of the NIMS insurer, if any.  See "Description of the Securities—Description of Sub-Servicing" in the prospectus.

- The sponsor will have discretion to determine whether to repurchase a mortgage loan or to substitute for a mortgage loan, if required under the pooling agreement to repurchase or substitute for a defective mortgage loan.  See "The Trust—Assignment of the Mortgage Loans and Other Assets to the Trust" in this prospectus supplement.

- On the Optional Termination Date, the servicer, or if the servicer does not exercise such right, the NIMS insurer, if any, will be permitted to purchase all of the mortgage loans owned by the trust, subject to certain limitations. See "Description of the Certificates—Optional Termination of the Trust" in this prospectus supplement.

- In the event of certain transfers of a Residual Certificate to a person who is not a permitted transferee under the pooling agreement, the trustee and the depositor will have the right to arrange a sale of the Residual Certificate.

- In the event that certain events of default by the servicer under the pooling agreement have not been remedied, either the depositor, the trustee, holders of certificates evidencing at least 51% of the voting rights or the NIMS insurer, if any, will have the right to terminate the servicer.  In the event that the servicer fails to perform its advancing obligations and such event of default has been unremedied, the trustee will be required to terminate the servicer.  If the servicer is terminated or resigns, the trustee will become the successor servicer; however, the trustee will have the right to appoint, or to petition a court to appoint, a successor servicer.  See "The Servicers—The Trustee—*Events of Default or Breaches Under the Pooling Agreement*" in this prospectus supplement.

- In the event that the trustee or the Delaware trustee resigns or is no longer qualified to perform its duties, the servicer, with the consent of the NIMS insurer, if any, and the NIMS insurer, if any, will have the right to appoint a successor trustee or Delaware trustee.  The servicer, with the consent of the NIMS insurer, if any, and the NIMS insurer, if any, may remove a trustee or Delaware trustee at any time and appoint a successor trustee or Delaware trustee.  See "The Servicers—The Trustee—*Resignation or Removal of the Trustee*" and "The Delaware Trustee—Resignation and Removal of the Delaware Trustee" in this prospectus supplement.

- In the event the swap agreement is cancelled or terminated, the depositor (with the consent of the NIMS insurer, if any) and the NIMS insurer, if any, will have the discretion to choose a replacement counterparty.

- As a third party beneficiary of the pooling agreement, the NIMS insurer, if any, will be entitled to enforce certain designated rights granted to the NIMS insurer by the pooling agreement. See "Risk Factors—Certain Rights of the NIMS Insurer May Adversely Affect the Rights of Holders of Offered Certificates and the Class B Certificates" in this prospectus supplement.

- As a third party beneficiary of the pooling agreement, the swap counterparty will be entitled to consent to any amendments to the pooling agreement that materially affects the swap counterparty's rights or interests under the pooling agreement.  See "Description of the Certificates—Amendment of the Pooling Agreement" in this prospectus supplement.

- Holders of certificates evidencing more than 50% of the voting rights will have the right, with the consent of the NIMS insurer, if any, at any time to remove the trustee or the Delaware trustee and to appoint an eligible successor trustee.

S-50

Confidential

JPMC_DEX_000070886

## THE SERVICERS

### General

All of the mortgage loans owned by the trust will be serviced by Washington Mutual Bank, as servicer, pursuant to the pooling agreement. Washington Mutual Mortgage Securities Corp. will act as calculation agent and be responsible for calculating loan payoff amounts for each monthly distribution on the certificates. The trustee will be responsible for calculating monthly distributions on the certificates, preparing monthly distribution reports and other functions, as described under "—The Trustee—*Material Duties of the Trustee*" below. The trustee will have possession of the mortgage files as custodian for the trust. See "—The Trustee—*The Custodian*" below.

The servicer will outsource to third party vendors some servicing functions, as described under "—The Servicer—Servicing Procedures—*The Servicer's Third Party Vendors*" below.

### The Servicer

*The Servicer's Servicing Experience*

The servicer has been servicing residential mortgage loans for over 100 years. The residential mortgage loans serviced by the servicer have included, since 2001, sub-prime residential mortgage loans serviced for Long Beach Mortgage Company and for its securitization trusts.

The following table shows the number and aggregate principal balance of sub-prime first and second lien mortgage loans serviced by the servicer as of each indicated date.

#### Sub-prime Mortgage Loans Serviced by the Servicer

| | As of December 31 | | | As of March 31, 2006 |
|---|---|---|---|---|
| | 2003 | 2004 | 2005 | |
| | (Dollar Amounts in Millions) | | | |
| Number of Sub-prime Mortgage Loans Serviced for Sponsor, Servicer or Their Affiliates (or Their Securitization Trusts) | 141,986 | 167,572 | 198,556 | 243,641 |
| Aggregate Principal Balance | $19,853 | $24,835 | $33,132 | $41,134 |
| Number of Sub-prime Mortgage Loans Serviced for Third Parties | 492 | 11,423 | 40,920 | 5,362 |
| Aggregate Principal Balance | $60 | $678 | $6,377 | $805 |

*Servicing Procedures*

*Servicing Functions.* The functions to be performed by the servicer will include payment collection and payment application, investor reporting and other investor services, default management and escrow administration. The servicer will perform its servicing functions at loan servicing centers located in Florence, South Carolina; Milwaukee, Wisconsin; Northridge/Chatsworth, California; and Jacksonville, Florida.

*Servicing Standard; Waivers and Modifications.* Pursuant to the pooling agreement, the servicer will be required to service the mortgage loans in the best interests and for the benefit of the certificateholders (as determined by the servicer in its reasonable judgment) in accordance with the terms of the pooling agreement and related mortgage loans and (unless inconsistent with those servicing practices) in the same manner in

Confidential

JPMC_DEX_000070887

which it services and administers similar mortgage loans for its own portfolio, considering customary and usual standards of practice of lenders and servicers administering similar mortgage loans in the local area where the mortgaged property is located. The servicer will be required to make reasonable efforts to collect or cause to be collected all payments under the mortgage loans and, to the extent consistent with the pooling agreement and applicable insurance policies, follow such collection procedures as it would follow with respect to comparable mortgage loans that are held for its own account.

Consistent with the servicing standard described above, the servicer will be permitted to waive, modify or vary any term of any mortgage loan, subject to certain conditions, as described in "Description of the Securities—Collection and Other Servicing Procedures Employed by the Servicer, Manager, Bond Administrator or Certificate Administrator" in the prospectus.

*Mortgage Loan Servicing System.* In performing its servicing functions, the servicer will use computerized mortgage loan servicing systems that it leases from Fidelity Information Services, a division of Fidelity National Financial ("**Fidelity**"), a third party vendor (collectively, the "**Fidelity System**"). The Fidelity System produces detailed information about the financial status of each mortgage loan, including outstanding principal balance, current interest rate and the amount of any advances, unapplied payments, outstanding fees, escrow deposits or escrow account overdrafts, and about transactions that affect the mortgage loan, including the amount and due date of each payment, the date of receipt of each payment (including scheduled payments and prepayments), and how the payment was applied. The Fidelity System also produces additional information about mortgage loans that are in default, including the amount of any insurance and liquidation proceeds received. The servicer began using the Fidelity System in 1996. Prior to July 2004, the servicer serviced some mortgage loans using a proprietary mortgage loan servicing system; in July 2004, the servicer consolidated servicing into a single servicing platform by converting approximately 1.2 million loan records from the proprietary mortgage loan servicing system to the Fidelity System.

*Collection Account, Servicing Account, Reserve Account and Distribution Account.* Mortgagor payments on the mortgage loans, including scheduled monthly payments, any full or partial prepayments and any escrow payments (which are payments made by some mortgagors and held by the servicer in escrow for future payment of taxes and insurance), will initially be deposited into either a lockbox account maintained by a third party financial institution or a payment clearing account maintained by the servicer. Payments deposited into the lockbox account will be transferred by the servicer into the payment clearing account. Other collections on the mortgage loans, including liquidation proceeds and insurance proceeds (other than insurance proceeds required for the restoration or repair of the related mortgaged property, which the servicer will retain for such purpose), will also initially be deposited into a payment clearing account maintained by the servicer. Within 48 hours of receipt, the servicer will (i) transfer all such collections on the mortgage loans (other than escrow payments) into a collection account maintained by the servicer and (ii) transfer all escrow payments into a servicing account maintained by the servicer.

The servicer will deposit into the collection account any required advances of principal and interest. See "—*Advances*" below. The sponsor or the depositor, as applicable, will also deposit into the collection account any proceeds from the repurchase of any of the mortgage loans. See "The Mortgage Pool— Representations and Warranties Regarding the Mortgage Loans" below.

Under the pooling agreement, the collection account will be an investment account maintained with an eligible institution under the pooling agreement, and the funds held in the collection account may be invested in eligible investments, for the servicer's benefit, before those funds are to be transferred to a distribution account maintained by the trustee.

On the business day immediately preceding each distribution date, the servicer will transfer from the collection account into the distribution account the funds held in the collection account that are required to be

S-52

JPMC_DEX_000070888

distributed to certificateholders on that distribution date. The trustee may invest funds held in the distribution account in eligible investments, for the trustee's benefit, before those funds are to be distributed to certificateholders.

Payments made under the swap agreement by the swap counterparty and payments made by the supplemental interest trust to the swap counterparty will be deposited in a separate reserve account maintained by the trustee of the supplemental interest trust.

On each distribution date, the trustee will withdraw from the distribution account and each of the reserve accounts the funds required to be distributed to certificateholders and/or into the supplemental interest account on that distribution date; and the trustee of the supplemental interest trust will withdraw from the supplemental interest account the funds required to be distributed to the swap counterparty on that date.

Certain amounts on deposit in the distribution account will be deposited in the final maturity reserve account maintained by the trustee on specified distribution dates as described in "Description of the Certificates—The Final Maturity Reserve Account" in this prospectus supplement. On the earlier of the last scheduled distribution date and the termination of the trust, any amounts on deposit in the final maturity reserve account will be applied by the trustee as payment of principal or interest as described in "Description of the Certificates—The Final Maturity Reserve Account" in this prospectus supplement.

Scheduled monthly payments on the mortgage loans generally will be held pending distribution to certificateholders from the date of receipt by the servicer until the immediately following distribution date. However, if a monthly payment is received prior to its scheduled due date, that payment will be held until the distribution date in the calendar month in which it was due. Payoffs received by the servicer in any prepayment period (that is, from the 15th day of a calendar month until the 14th day of the next calendar month) will be held until the distribution date immediately following the end of that prepayment period. Partial prepayments, liquidation proceeds, insurance proceeds, subsequent recoveries and repurchase proceeds will be held from the date of receipt by the servicer until the distribution date in the immediately succeeding calendar month.

Funds held in the lockbox accounts and the payment clearing accounts may be commingled with collections on other mortgage loans serviced by the servicer. Funds held in the collection account, the servicing account, the reserve account and the distribution account will not be commingled with collections on mortgage loans that are not owned by the trust.

Only the servicer or the third party financial institutions that maintain the lockbox accounts will have access to funds held in those accounts. Only the servicer will have access to funds held in the payment clearing accounts, the collection account and the servicing account. Only the trustee will have direct access to funds held in the reserve accounts and the distribution account; however, the trustee may invest funds in the distribution account for the trustee's benefit and may make certain withdrawals from that account.

All of the transaction accounts described above will be reconciled on a monthly basis. There will not be any external verification of activity in the transaction accounts, except as may occur in connection with the annual examination by Washington Mutual, Inc.'s independent accountants in connection with their audit of Washington Mutual, Inc. and its subsidiaries, or in connection with periodic examination by the servicer's regulatory authorities.

The diagram on the next page illustrates the flow of collections and other payments on the mortgage loans and payments by the swap counterparty through the transaction accounts described above.

S-53

JPMC_DEX_000070889

Flow of Payments



S-54

Confidential

JPMC_DEX_000070890

*Permitted Withdrawals.*  The pooling agreement will permit the servicer to make withdrawals, from time to time, from the collection account, for the following purposes:

- to reimburse itself for advances and servicing advances, as described under "—*Advances*" below;

- to pay to itself the servicing fee (to the extent not applied to pay compensating interest);

- to pay to itself investment earnings earned on funds held in the collection account (to the extent not applied to pay compensating interest);

- to pay to itself interest that was accrued and received on payoffs received during the period from the first day through the 14th day of any month;

- to reimburse itself or the depositor or any of their directors, officers, employees or agents for certain expenses, costs and liabilities incurred in connection with any legal action relating to the pooling agreement or the certificates, as and to the extent described under "Description of the Securities— Matters Regarding the Servicer and the Depositor" in the prospectus; and

- other permitted purposes described in the pooling agreement.

*Advances.*  The servicer will be required under the pooling agreement to advance its own funds (or, in the case of advances described in clause (i), either its own funds or funds held by it for future distribution) (i) to cover any shortfalls between payments of principal and interest scheduled to be received in respect of the mortgage loans, other than balloon payments, each month and the amounts actually received and, with respect to balloon mortgage loans, with respect to which the balloon payment is not made when due, an assumed monthly payment that would have been due on the related due date based on the original principal amortization schedule for such balloon mortgage loan, and (ii) to pay all reasonable and customary "out-of-pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance of its servicing obligations, including, but not limited to, the cost of (A) the preservation, restoration, inspection and protection of the mortgaged properties, (B) environmental audit reports, (C) any enforcement or judicial proceedings, including foreclosures, (D) the management and liquidation of mortgaged properties acquired in satisfaction of the related mortgage and (E) certain insurance premiums and certain ongoing expenses associated with the mortgage pool and incurred by the servicer in connection with its responsibilities under the pooling agreement.  The amounts described in clause (i) of this paragraph are referred to as "**advances**" and the amounts described in clause (ii) of this paragraph are referred to as "**servicing advances**" in this prospectus supplement.   The servicer, however, will not make any of the advances or servicing advances if it determines in its good faith business judgment they would not be recoverable from late payments, insurance proceeds or liquidation proceeds on a mortgage loan ("**nonrecoverable advance**"); *provided further*, that the servicer will not make advances for the restoration of foreclosure properties unless it determines that the restoration will increase the liquidation proceeds after reimbursement to itself for those advances.  The servicer will not charge interest or other fees with respect to any advances or servicing advances.

If the servicer determines that any advance or servicing advance is a nonrecoverable advance, the servicer will be entitled to be reimbursed for such advance from collections on other mortgage loans owned by the trust.

*Servicing of Delinquent Mortgage Loans; Foreclosure.*  The servicer will make reasonable efforts to collect or cause to be collected all delinquent payments (that is, payments that are more than 30 days past due).  Such efforts may include payment reminder telephone calls to the mortgagor, letter campaigns and drive-by property inspections.  The servicer will be required under the pooling agreement to make reasonable

S-55

Confidential

efforts to foreclose upon the mortgaged property related to each defaulted mortgage loan as to which no satisfactory arrangements can be made for collection of delinquent payments. Under the pooling agreement, the servicer will be permitted in lieu of foreclosure to accept a payment of less than the outstanding principal balance of the defaulted mortgage loan if in the judgment of the servicer doing so could reasonably be expected to result in collections and other recoveries with respect to the mortgage loan in excess of net liquidation proceeds that would be recoverable upon foreclosure. The servicer will not be permitted to foreclose upon a mortgaged property if it is aware of evidence of toxic waste or other environmental contamination on the mortgaged property except as provided in the pooling agreement. See "Description of the Securities—Procedures for Realization Upon Defaulted Mortgage Assets" and "Legal Aspects of the Mortgage Assets—Foreclosure on Mortgages" in the prospectus.

*Sub-prime Mortgage Loans; Default Management.* Sub-prime borrowers generally are a higher credit risk than prime borrowers. Following foreclosure, sub-prime mortgaged properties are sometimes stripped of furnishings or vandalized.

The servicer's sub-prime default management efforts focus on early intervention and dialogue with potentially troubled borrowers in order to avoid and minimize the effects of delinquencies. The front-end strategy of the sub-prime collections and loss mitigation group includes using behavioral scoring tools to focus on high risk accounts and address small issues before they become significant problems. If a sub-prime borrower fails to make a payment when due on a mortgage loan, the servicer calls this borrower as early as the third day after the payment due date. First payment defaults are segmented from the general loan population and monitored daily when the loan becomes five days delinquent. The servicer also focuses its efforts on late stage (i.e., two or more months delinquent) delinquency management. The primary focus of the late stage delinquency strategy is detailed management of troubled loans.

Although the servicer focuses on rehabilitating delinquent loans and preventing foreclosure, asset recovery is an important component of sub-prime default management. The servicer has procedures for dealing with all aspects of asset recovery, including bankruptcy and foreclosure. The servicer has a detailed regimen for addressing bankruptcy and foreclosure activity. Bankruptcy and foreclosure cases are referred to attorneys upon the occurrence of certain events, and various procedures ensure that bankruptcies and foreclosures are tracked throughout the case. Overall bankruptcy and foreclosure performance is monitored through daily, weekly and monthly reports. The servicer uses outside vendors experienced in the sale of sub-prime REO properties to manage the sale of REO properties. The servicer oversees the outside vendors and has adopted strategies for the sale of manufactured homes, low value properties, aged inventories and distressed properties. New REO properties are allocated to high performing vendors.

In addition to its asset recovery processes, the servicer engages in extensive loss mitigation efforts for loans that are transferred into foreclosure. Mortgagors' financial statements are updated to determine whether a stipulated repayment agreement, short sale or deed in lieu of foreclosure is an appropriate workout alternative. Loans subject to stipulated repayment agreements remain classified as foreclosures. A mortgagor typically pays a specified percentage of the arrearage in a stipulated repayment plan, and the plans generally average less than a year in length. The servicer has implemented processes to reduce the number of mortgagors who fail to meet their repayment obligations, and management reviews broken repayment plans. An economic analysis is completed to determine the loss severity of all potential short sales, process all potential loan modifications and validate mortgagors' ability and intent to repay a modified payment.

*Maintenance of Hazard and Flood Insurance.* The servicer will be required to maintain or cause to be maintained hazard insurance and, if applicable, flood insurance for each mortgage loan.

Confidential

JPMC_DEX_000070892

*Limitations on the Servicer's Liability.*  See "Description of the Securities—Matters Regarding the Servicer and the Depositor" in the prospectus for a description of certain limitations on the servicer's liability under the pooling agreement.

*Back-up Servicing.*  See "Description of the Securities—Events of Default Under the Governing Agreement and Rights Upon Events Of Default" in the prospectus for a description of the material terms under the pooling agreement regarding the servicer's replacement, resignation or transfer.

*The Servicer's Third Party Vendors.*  The servicer expects to outsource to third party vendors a portion, or in its entirety, the following servicing functions:  (i) processing and monitoring of foreclosure actions, (ii) processing and monitoring of mortgagor bankruptcy proceedings, (iii) preservation of properties related to delinquent loans, (iv) maintenance, marketing and sale of REO properties, (v) assuring that hazard insurance coverage is maintained, (vi) determining whether flood insurance coverage is required and assuring that any required coverage is maintained, (vii) tax bill procurement and tracking of delinquent tax payments, (viii) printing and mailing billing statements and (ix) depositing mortgagor payments into a lockbox account. From time to time, the servicer may cease to outsource one or more of the foregoing servicing functions or may choose to outsource additional servicing functions.  Some vendors may perform more than one function, and some functions may be performed by more than one vendor.

The servicer has entered into service level agreements with some of its vendors, which specify detailed performance criteria, including, in some cases, minimum time requirements for completing specified tasks and maximum error rates, and which in some cases impose penalties for non-compliance with such criteria.  The servicer will monitor vendor compliance as necessary with the applicable servicing procedures through quality control measures that include reviews of a statistical sampling of mortgage loans.

*The Servicer's Quality Control Procedures*

The servicer uses a combination of management controls and technology controls to ensure the accuracy and integrity of servicing records.  Management controls include the use of approval levels, the segregation of duties, and reconciliations of servicing data and accounts, among others.  Technology controls include the use of data security controls and interface controls to ensure that only authorized persons have the ability to access and change system data or to submit data to or receive data from vendors and investors. Specific security profiles for each job function include a predetermined set of data security controls that are appropriate for that job function.  The data center for the Fidelity System, which is located in Jacksonville, Florida, is kept in a fire protected environment, and commercial electrical power is backed up by generators.

In addition, the servicer conducts periodic internal audits of critical servicing and technology functions.  External audits by entities such as Fannie Mae, Freddie Mac and Ginnie Mae and the annual examination by Washington Mutual, Inc.'s independent accountants in connection with their audit of Washington Mutual, Inc. and its subsidiaries may provide independent verification of the adequacy of such functions.  Periodic examination by the servicer's regulatory authorities may provide additional independent review of the servicer's management controls.

Both the servicer and Fidelity maintain detailed business continuity plans to enable each entity to resume critical business functions in the event of a disaster or other serious system outage, which plans are reviewed and updated periodically.  Fidelity is contractually obligated to return the servicer to full functionality within 48 hours of a reported system outage.  The servicer and Fidelity perform annual disaster recovery tests in which they reroute data and servicing system operations to Fidelity's back-up site, and then process sample transactions from all servicing locations to ensure the functionality of the back-up site.

S-57

JPMC_DEX_000070893

It is the servicer's policy to require its other third party vendors to implement measures similar to those described above to ensure the accuracy and integrity of servicing records.

**The Calculation Agent**

*The Calculation Agent's Experience*

Washington Mutual Mortgage Securities Corp., the calculation agent, is a Delaware corporation and a wholly owned subsidiary of the servicer. The calculation agent has been master servicing residential mortgage loans since before 1979. The calculation agent has been acting as calculation agent of the servicer with respect to residential mortgage loans serviced by the servicer since February 2005. The calculation agent will calculate the amount of loan payoffs to be included in each monthly distribution.

*Services Performed by the Calculation Agent*

The servicer and the calculation agent are parties to an agreement under which the calculation agent has agreed to perform some of the services required to be performed by the servicer under the pooling agreement. The calculation agent will perform the following services: (1) calculate the amount of loan payoffs to be included in each monthly distribution, (2) calculate compensating interest to be paid by the servicer for each monthly distribution, and (3) other services specified in the agreement.

The calculation agent's principal offices are located in Vernon Hills, Illinois. The calculation agent will perform its services using a proprietary computerized mortgage loan servicing system, which it has been using since approximately 1990. The calculation agent's proprietary mortgage loan servicing system produces detailed information about the financial status of each mortgage loan, including outstanding principal balance and current interest rate, and about transactions that affect the mortgage loan, including the amount and due date of each scheduled payment, the amount and date of receipt of each prepayment in full on a mortgage loan, the amount and month of receipt of all other unscheduled payments, and how each payment was applied. Each month, the calculation agent will receive from the servicer a servicing report generated by the Fidelity System with respect to the mortgage loans owned by the trust, and will input data from that servicing report into its own mortgage loan servicing system.

The servicer will pay the calculation agent a fee for its services under the agreement. Payment of this fee will not affect distributions to certificateholders.

*The Calculation Agent's Quality Control Procedures*

The calculation agent uses substantially the same management and technology controls as those of the servicer to ensure the accuracy and integrity of servicing records. See "—The Servicer—*The Servicer's Quality Control Procedures*" above.

The calculation agent conducts periodic internal audits of critical servicing and technology functions. Investor reviews and the annual examination by Washington Mutual, Inc.'s independent accountants in connection with their audit of Washington Mutual, Inc. and its subsidiaries may provide independent verification of the adequacy of such functions. Periodic examination by the servicer's regulatory authorities may provide additional independent review of the calculation agent's management controls.

The calculation agent maintains a detailed business continuity plan to enable it to resume critical business functions in the event of a disaster or other serious servicing system outage, which plan is reviewed and updated periodically. The calculation agent performs annual disaster recovery tests in which it reroutes

Confidential

JPMC_DEX_000070894

data and servicing system operations to a back-up site, and then processes sample transactions to ensure the functionality of the back-up site.

It is the calculation agent's policy to require its third party vendors to implement measures similar to those described above to ensure the accuracy and integrity of servicing records.

## The Trustee

### General

LaSalle Bank National Association ("**LaSalle**") will be the trustee under the pooling agreement. LaSalle Bank National Association is a national banking association formed under the federal laws of the United States of America. Its parent company, LaSalle Bank Corporation, is an indirect subsidiary of ABN AMRO Bank N.V., a Netherlands banking corporation. LaSalle has extensive experience serving as trustee on securitizations of residential mortgage loans. Since January 1994, LaSalle has served as trustee or paying agent on over 400 residential mortgage-backed security transactions involving assets similar to the mortgage loans. As of April 30, 2006, LaSalle's portfolio of residential mortgage-backed security transactions for which it serves as trustee numbers 323 with an outstanding certificate balance of approximately $110.5 billion. The depositor and servicer may maintain other banking relationships in the ordinary course of business with the trustee. The trustee's corporate trust office is located at 135 South LaSalle Street, Suite 1625, Chicago, Illinois, 60603, Attention: Global Securities and Trust Services—Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE2, or at such other address as the trustee may designate from time to time.

The trustee will be calculating certain items and reporting as described in the pooling agreement. Using information set forth in this prospectus supplement, the trustee will develop the cashflow model for the trust. Based on the monthly loan information provided by the servicer and the calculation agent, the trustee will calculate the amount of principal and interest to be paid to each class of certificates on each distribution date. In accordance with the cashflow model and based on the monthly loan information provided by the servicer and the calculation agent, the trustee will perform distribution calculations, remit distributions on the distribution date to certificateholders and prepare a monthly statement to certificateholders detailing the payments received and the activity on the Mortgage Loans during the collection period. In performing these obligations, the trustee will be able to conclusively rely on the information provided to it by the servicer and the calculation agent, and the trustee will not be required to recompute, recalculate or verify the information provided to it by such persons. The trustee may perform certain of its obligations through one or more third party vendors. However, the trustee will remain liable for the duties and obligations required of it under the pooling agreement.

### Material Duties of the Trustee

The trustee will have the following material duties under the pooling agreement:

- to authenticate and deliver the certificates, pursuant to the order of the depositor;

- to maintain a certificate register and, upon surrender of certificates for registration of transfer or exchange, to authenticate and deliver new certificates;

- to calculate and make the required distributions to certificateholders on each distribution date;

- to prepare and make available to certificateholders the monthly distribution reports and any other reports required to be delivered by the trustee under the pooling agreement.

S-59

Confidential

- if the remaining certificate principal balance of a class of certificates is to be paid on a specified distribution date, to send a notice to that effect to the holders of that class of certificates;

- to act as successor servicer, or to appoint a successor servicer, to the extent described under "— *Events of Default or Breaches Under the Pooling Agreement*" below; and

- to communicate with investors and rating agencies with respect to the certificates as specified in the pooling agreement.

*Events of Default or Breaches Under the Pooling Agreement*

If certain events of default by the servicer under the pooling agreement occur and remain unremedied, either the trustee, depositor, NIMS insurer, if any, or holders of certificates evidencing at least 51% of the voting rights will have the right to terminate the servicer. In the event that the servicer fails to perform its advancing obligations and such event of default has not been remedied, the trustee will be required to terminate the servicer. If the servicer is terminated, or the servicer resigns because its duties under the pooling agreement are no longer permitted under applicable law, the trustee will be required to become the successor servicer, as provided in the pooling agreement. However, if the trustee is unwilling or unable to act as successor servicer, it may appoint, or petition a court to appoint, a successor servicer.

The trustee will be required to notify certificateholders and the rating agencies of any event of a default by the servicer actually known to a responsible officer of the trustee, and of the appointment of any successor servicer.

The trustee will be required to notify the depositor and the servicer if it discovers a breach of any of the representations or warranties made by the sponsor in the mortgage loan purchase agreement with respect to any mortgage loan which materially and adversely affects the value of such mortgage loan or the interests of the certificateholders in such mortgage loan.

See "Description of the Securities—Events of Default Under the Governing Agreement and Rights Upon Events of Default" in the prospectus.

*Limitations on the Trustee's Liability*

The trustee will not be liable under the pooling agreement:

- except for the performance of such duties and obligations as are specifically specified in the pooling agreement prior to the occurrence of a servicer event of default and after the curing of such servicer event of default;

- for any action taken or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the pooling agreement; or

- for any action taken or omitted by it in good faith in accordance with the direction of the NIMS insurer, if any, or the holders of certificates evidencing at least 25% of the voting rights relating to the time, method and place of conducting any proceeding for any remedy available to the trustee, or exercise of any trust or power conferred upon the trustee under the pooling agreement.

In the absence of bad faith, the trustee may conclusively rely upon any certificates or opinions of counsel furnished to the trustee under the pooling agreement. Any such opinion of counsel will be full and complete authorization and protection in respect of any action taken or omitted to be taken by the trustee in

S-60

JPMC_DEX_000070896

good faith and in accordance with such opinion of counsel.  The trustee will not be deemed to have knowledge or notice of any matter, including an event of default, unless actually known to it or unless it has received written notice of that matter.

*Resignation and Removal of the Trustee*

The trustee may at any time resign by giving written notice to the servicer, the NIMS insurer, if any, the depositor, and the certificateholders.  Upon receiving such notice of resignation, the servicer will be required to appoint a successor trustee.  If the trustee ceases to be eligible under the pooling agreement and fails to resign or if the trustee becomes incapable of acting, the servicer, with the consent of the NIMS insurer, if any, or the NIMS insurer, if any, may remove such trustee and appoint a successor trustee acceptable to the NIMS insurer, if any.  The holders of certificates evidencing at least 50% of the voting rights, with the consent of the NIMS insurer, if any, may at any time remove the trustee and appoint a successor trustee.

Any expenses associated with the resignation of the trustee will be required to be paid by the trustee, and any expenses associated with the removal of the trustee will be required to be paid by the servicer.

*The Custodian*

The trustee will act as custodian for the trust pursuant to the pooling agreement.  In its capacity as trustee, LaSalle will hold the mortgage loan files exclusively for the use and benefit of the trust.  LaSalle will not have any duty or obligation to inspect, review or examine any of the documents, instruments, certificates or other papers relating to the mortgage loans delivered to it to determine that the same are valid.  The disposition of the mortgage loan files will be governed by the pooling agreement.  LaSalle provides custodial services on over 1,000 residential, commercial and asset-backed securitization transactions and maintains almost 2.5 million custodial files in its two vault locations in Elk Grove, Illinois and Irvine, California.  LaSalle's two vault locations can maintain a total of approximately 6 million custody files.  All custody files are segregated and maintained in secure and fire resistant facilities in compliance with customary industry standards.  The vault construction complies with Fannie Mae/Ginnie Mae guidelines applicable to document custodians.  LaSalle maintains disaster recovery protocols to ensure the preservation of custody files in the event of force majeure and maintains, in full force and effect, such fidelity bonds and/or insurance policies as are customarily maintained by banks which act as custodians.  LaSalle uses unique tracking numbers for each custody file to ensure segregation of collateral files and proper filing of the contents therein and accurate file labeling is maintained through a monthly quality assurance process.  LaSalle uses a licensed collateral review system to track and monitor the receipt and movement internally or externally of custody files and any release or reinstatement of collateral.

Also, LaSalle Bank National Association and Washington Mutual Mortgage Securities Corp. ("**WMMSC**") are parties to a custodial agreement whereby LaSalle, for consideration, provides custodial services to WMMSC for certain residential mortgage loans purchased by it.  Pursuant to this custodial agreement, LaSalle may  be providing currently custodial services for some of the mortgage loans to be sold by WMMSC to the Depositor in connection with this securitization.  The terms of the custodial agreement are customary for the residential mortgage-backed securitization industry providing for the delivery, receipts, review and safekeeping of mortgage loan files.

In the event of the termination of the trustee as custodian pursuant to the pooling agreement, the trustee will be required to deliver all mortgage files in the trustee's custody to the successor custodian.  The servicer will pay the custodian fee.

Confidential

JPMC_DEX_000070897

**Special Servicing Agreements**

The pooling agreement permits the servicer to enter into one or more special servicing agreements with unaffiliated owners of one or more classes of Subordinate Certificates or of a class of securities representing interests in one or more classes of Subordinate Certificates.  Under those agreements, the owner may, for delinquent mortgage loans:

(a)     instruct the servicer to start or delay foreclosure proceedings, provided that the owner deposits a specified amount of cash with the servicer, which will be available for distribution to certificateholders if liquidation proceeds are less than they otherwise may have been had the servicer acted pursuant to its normal servicing procedures;

(b)     purchase those delinquent mortgage loans from the trust immediately before the beginning of foreclosure proceedings at a price equal to the aggregate outstanding principal balance of the mortgage loans, plus accrued interest at the applicable mortgage interest rates through the last day of the month in which the mortgage loans are purchased; and/or

(c)     assume all of the servicing rights and obligations for the delinquent mortgage loans so long as (i) the servicer has the right to transfer the servicing rights and obligations of the mortgage loans to another servicer and (ii) the owner will service the mortgage loans according to the servicer's servicing guidelines.

S-62

Confidential

JPMC_DEX_000070898

## THE DELAWARE TRUSTEE

### General

Christiana Bank & Trust Company, the Delaware trustee under the pooling agreement, is a Delaware banking corporation. The Delaware trustee has served as Delaware trustee for asset-backed securities transactions involving residential mortgage loans since approximately January 2002.

The Delaware trustee will serve as trustee for the trust for the sole purpose of satisfying the requirement under the Delaware statutory trust statute that the trust have at least one trustee with a principal place of business in Delaware. The Delaware trustee's duties under the pooling agreement will be limited to (i) accepting legal process served on the trust in the State of Delaware and (ii) executing any certificates with respect to the trust which the Delaware Trustee is required to execute under the Delaware statutory trust statute.

### Limitations on the Delaware Trustees' Liability

The Delaware trustee will not be liable under the pooling agreement:

- except for the performance of such duties and obligations as are specifically set forth in the pooling agreement;

- for any action taken or omitted by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by the pooling agreement; or

- for any action taken or omitted by it in good faith in accordance with the direction of the NIMS insurer, if any, or the holders of certificates evidencing at least 25% of the voting rights relating to the time, method and place of conducting any proceeding for any remedy available to the Delaware trustee, or relating to the exercise of any trust or power conferred upon the Delaware trustee under the pooling agreement.

In the absence of bad faith, the Delaware trustee may conclusively rely upon any certificates or opinions of counsel furnished to the Delaware under the pooling agreement. Any such opinion of counsel will be full and complete authorization and protection in respect of any action taken or omitted to be taken by the Delaware trustee in good faith and in accordance with such opinion of counsel. The Delaware trustee will not be deemed to have knowledge or notice of any matter, including an event of default, unless actually known to it or unless it has received written notice thereof.

### Resignation and Removal of the Delaware Trustee

The Delaware trustee may at any time resign by giving written notice thereof to the servicer under the pooling agreement. Upon receiving such notice of resignation, the servicer will be required to appoint a successor Delaware trustee. If the Delaware trustee ceases to be eligible under the pooling agreement and fails to resign, or the Delaware trustee becomes incapable of acting, the servicer, with the consent of the NIMS insurer, if any, or the NIMS insurer, if any, may remove the Delaware trustee and appoint a successor Delaware trustee. The holders of certificates evidencing at least 50% of the voting rights may at any time remove the Delaware trustee and appoint a successor Delaware trustee.

Any expenses associated with the resignation of the Delaware trustee will be required to be paid by the Delaware trustee, and any expenses associated with the removal of the Delaware trustee will be required to be paid by the servicer.

Confidential

JPMC_DEX_000070899

## AFFILIATIONS AND RELATED TRANSACTIONS

The sponsor, the depositor, the calculation agent, Long Beach Mortgage Company and WaMu Capital Corp. are all wholly owned subsidiaries of Washington Mutual Bank. Washington Mutual Bank is the servicer of all of the mortgage loans.  Long Beach Mortgage Company is the originator of some of the mortgage loans.

There is not currently, and there was not during the past two years, any material business relationship, agreement, arrangement, transaction or understanding that is or was entered into outside the ordinary course of business or is or was on terms other than would be obtained in an arm's length transaction with an unrelated third party, between (a) any of the sponsor, the depositor and the trust and (b) any of the servicer, the trustee, any originator of the mortgage loans or the swap counterparty.

S-64

Confidential

JPMC_DEX_000070900

# THE MORTGAGE POOL

The statistical information presented in this prospectus supplement relates to the mortgage loans and related mortgaged properties as of May 1, 2006, the cut-off date.  As of the cut-off date, the mortgage pool will consist of approximately 2,579 mortgage loans with an aggregate scheduled principal balance as of the cut-off date of approximately $472,002,321.  Prior to the closing date, mortgage loans may be removed from the mortgage pool as a result of incomplete documentation, delinquency, payment in full, insufficient collateral value or otherwise if the depositor deems such removal necessary or desirable, and may be prepaid at any time, and some mortgage loans may be added to the mortgage pool.  As a result, the characteristics of the mortgage loans on the closing date may differ from the characteristics presented in this prospectus supplement; however, such differences are not expected to be material.

Unless otherwise noted, all statistical percentages or weighted averages presented in this prospectus supplement are measured as a percentage of the aggregate scheduled principal balance as of the cut-off date of the mortgage loans or of the indicated subset of the mortgage loans.  The "**scheduled principal balance**" of a mortgage loan as of any date is equal to the principal balance of that mortgage loan at its origination, less the sum of all scheduled payments in respect of principal due on that mortgage loan on or before that date, whether or not received.

References in this prospectus supplement to the loan-to-value ratios of the mortgage loans, in the case of junior lien mortgage loans, unless indicated otherwise, refer to the quotient of (x) the sum of the principal balance of the applicable junior lien mortgage loan and the principal balance of all mortgage indebtedness secured by any senior lien(s) on the related mortgaged property divided by (y) the value (as determined as described in this prospectus supplement, and which may not be the actual value) of such related mortgaged property.

Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE2 Trust (the "**trust**" or the "**issuing entity**") will consist of a pool of residential mortgage loans, which consist of fixed-rate and adjustable-rate, first and second lien residential mortgage loans.  The mortgage loans have original terms to maturity ranging from 15 years to 40 years and an aggregate scheduled principal balance as of the cut-off date of approximately $472,002,321.  All of the mortgage loans will be secured by first or second mortgages or deeds of trust or other similar security instruments (each, a "**mortgage**").  The mortgages create first liens or second liens on one- to four-family residential properties consisting of attached or detached one- to four-family dwelling units and individual condominium units (each, a "**mortgaged property**").  Approximately 94.5% of the mortgage loans are secured by first liens on the related mortgaged property and approximately 5.5% of the mortgage loans are secured by second liens on the related mortgaged property.

The depositor will purchase the mortgage loans from the sponsor pursuant to the mortgage loan purchase agreement (the "**mortgage loan purchase agreement**") between the sponsor and the depositor.  Pursuant to the pooling and servicing agreement, dated as of May 1, 2006 (the "**pooling agreement**"), among the depositor, the servicer, the Delaware trustee and the trustee, the depositor will cause the mortgage loans to be assigned to the trustee for the benefit of the certificateholders. *See* "The Trust—Assignment of the Mortgage Loans and Other Asset to the Trust" in this prospectus supplement.

The sponsor purchased the mortgage loans directly or indirectly from affiliated or unaffiliated third parties who either originated the applicable mortgage loans or purchased the mortgage loans through correspondent or broker lending programs operated by these third parties. See "The Sponsor—The Sponsor's Origination Channels," "Underwriting of the Mortgage Loans" and "The Originators" in this prospectus supplement.

Confidential

JPMC_DEX_000070901

No proceeds from any mortgage loan were, or will be, used to finance single-premium credit insurance policies.

Each mortgage loan will accrue interest at the fixed rate or adjustable rate calculated as specified under the terms of the related mortgage note.

Approximately 14.3% of the mortgage loans are fixed-rate mortgage loans that have mortgage rates that are fixed for the life of the related mortgage loan.

Approximately 85.7% of the mortgage loans are adjustable-rate mortgage loans. Each adjustable-rate mortgage loan accrues interest at a mortgage rate that adjusts from time to time as described below. Generally, the adjustable-rate mortgage loans provide for semi-annual adjustment of their mortgage rates and for corresponding adjustments to the monthly payment amount due on the mortgage loans, in each case on each adjustment date applicable to the mortgage loan; provided, that the first adjustment for the adjustable-rate mortgage loans will occur within an initial period of two years, in the case of approximately 75.4% of the mortgage loans, three years, in the case of approximately 6.1% of the mortgage loans and five years, in the case of approximately 4.2% of the mortgage loans. On each adjustment date for each adjustable-rate mortgage loan, the mortgage rate will be adjusted to equal the sum, rounded to the nearest 0.125%, of six-month LIBOR and a related fixed percentage amount specified in the mortgage note ("**gross margin**").

The mortgage rate on each adjustable-rate mortgage loan will not decrease or increase on the first related adjustment date by more than a stated percentage specified in the related mortgage note on the first related adjustment date ("**initial periodic rate cap**") and will not increase or decrease by more than a stated percentage specified in the related mortgage note on any adjustment date after that ("**subsequent periodic rate cap**"). Each mortgage rate on each adjustable-rate mortgage loan will not exceed a specified maximum mortgage rate over the life of such mortgage loan or be less than a specified minimum mortgage rate over the life of such mortgage loan. Effective with the first monthly payment due on each adjustable-rate mortgage loan after each related adjustment date, the monthly payment amount will be adjusted to an amount that will amortize fully the outstanding scheduled principal balance of the related mortgage loan over its remaining term, and pay interest at the mortgage rate as so adjusted. Due to the application of the periodic rate caps and the maximum mortgage rates, the mortgage rate on each such adjustable-rate mortgage loan, as adjusted on any related adjustment date, may be less than the sum of the index and the related gross margin, rounded as described in this prospectus supplement. None of the adjustable-rate mortgage loans permits the related mortgagor to convert the adjustable mortgage rate to a fixed mortgage rate. With respect to the adjustable-rate mortgage loans, the "**index**" is generally the average of interbank offered rates for six month U.S. dollar deposits in the London market based on quotations of major banks, and most recently available as of a day specified in the related note as published in the Western Edition of *The Wall Street Journal* ("**six-month LIBOR**"). If the index is no longer published or is otherwise unavailable, the servicer will select an alternative index which is based upon comparable information.

Approximately 6.3%, 0.7% and 14.0% of the mortgage loans require the mortgagors to make monthly payments only of accrued interest for the first two, three and five years, respectively, following origination. At the end of such periods, the monthly payments on each such interest only mortgage loan will be recalculated to provide for amortization of the principal balance by the maturity date and payment of interest at the then-current mortgage rate.

Approximately 77.3% of the mortgage loans provide for payment by the mortgagor of a prepayment charge in limited circumstances on certain prepayments. *See Appendix B for tables showing prepayment charge terms of the mortgage loans.* Generally, the mortgage loans with prepayment charges provide for the payment of a penalty in connection with certain voluntary, full or partial prepayments made within a period of time specified in the related mortgage note and generally ranging from six months to three years from the date

Confidential

JPMC_DEX_000070902

of origination of such mortgage loan. The amount of the applicable prepayment charge, to the extent permitted under applicable law, is as provided in the related mortgage note. Some of the mortgage loans impose penalties for early prepayments but contain an exception for prepayments in full made in connection with a bona fide and arm's length sale of the related mortgaged property during a certain period following origination, or after a certain period following origination, as specified in the mortgage note. Under certain circumstances described in the pooling agreement, the servicer may waive a prepayment charge. All prepayment charges remitted to the trust with respect to voluntary full prepayments will be distributed to the holders of the Class P Certificates. The holders of the Class P Certificates will not receive any prepayment charges with respect to voluntary partial prepayments; each such payment will be retained by the servicer as additional servicing compensation. No prepayment charges will be available for distribution to holders of the other classes of certificates. Investors should conduct their own analysis of the effect, if any, that the prepayment charges, and decisions by the servicer with respect to the waiver of prepayment charges, may have on the prepayment performance of the mortgage loans. The depositor makes no representations as to the effect that the prepayment charges, and decisions by the servicer with respect to the waiver of prepayment charges, may have on the prepayment performance of the mortgage loans.

Approximately 30.4% of the mortgage loans had loan-to-value ratios at origination in excess of 80%. No mortgage loan had a loan-to-value ratio at origination in excess of 100%, and the weighted average loan-to-value ratio of the mortgage loans at origination was approximately 80.6%. There can be no assurance that the loan-to-value ratio of any mortgage loan determined at any time after origination is less than or equal to its original loan-to-value ratio. Additionally, the servicer's determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios of the mortgage loans may differ from the appraised value of such mortgaged property or the actual value of such mortgaged property.

Approximately 19.2% of the mortgage loans are balloon mortgage loans.

All of the mortgage loans have a scheduled payment due each month on the first day of the month (the "**due date**").

The weighted average remaining term to maturity of the mortgage loans was approximately 352 months as of the cut-off date. None of the mortgage loans had a first due date prior to August 1, 2005 or after May 1, 2006 or will have a remaining term to maturity of less than 172 months or greater than 479 months as of the cut-off date. The latest maturity date of any mortgage loan is April 1, 2046.

The average principal balance of the mortgage loans at origination was approximately $183,249.

The first adjustment date following the cut-off date on any adjustable-rate mortgage loan will occur on July 1, 2007, and the weighted average time until the first adjustment date for the adjustable-rate mortgage loans following the cut-off date is approximately 24 months.

The mortgage loans are expected to have the characteristics as of the cut-off date (the sum in any column may not equal the total indicated due to rounding) described under "Mortgage Loan Tables" in Appendix B (which is incorporated by reference into this prospectus supplement).

**Representations and Warranties Regarding the Mortgage Loans**

Under the mortgage loan purchase agreement pursuant to which the sponsor will sell the mortgage loans to the depositor, the sponsor will make representations and warranties in respect of the mortgage loans, which representations and warranties the depositor will assign to the trust pursuant to the pooling agreement. Among those representations and warranties are the following:

Confidential

JPMC_DEX_000070903

- Each mortgage is a valid and enforceable first or second lien on the mortgaged property, except as provided in the mortgage loan purchase agreement;

- Immediately prior to the assignment of the mortgage loans to the depositor, the sponsor had good title to, and was the sole legal and beneficial owner of, each mortgage loan, free and clear of any pledge, lien, encumbrance or security interest and has full right and authority, subject to no interest or participation of, or agreement with, any other party to sell and assign the mortgage loan;

- There are no mortgage loans with respect to which the monthly payment due thereon in April 2006 had not been made, none of the mortgage loans has been contractually delinquent for more than 30 days more than twice during the preceding twelve months and, no mortgage loan has ever experienced a delinquency of 60 or more days since the origination thereof;

- There are no delinquent tax or assessments liens against any mortgaged property;

- There is no valid offset, defense or counterclaim to any mortgage note or mortgage;

- Each mortgaged property is free of material damage and at least in average repair;

- Each mortgage loan at origination complied in all material respects with applicable local, state and federal laws, including, without limitation, predatory and abusive lending usury, equal credit opportunity, real estate settlement procedures, truth-in-lending and disclosure laws;

- A lender's policy of title insurance together with a condominium endorsement and extended coverage endorsement, if applicable, and, with respect to each adjustable rate mortgage loan, an adjustable rate mortgage endorsement in an amount at least equal to the balance of the mortgage loan as of the cut-off date or a commitment (binder) to issue the same was effective on the date of the origination of each mortgage loan, and each such policy is valid and remains in full force and effect;

- The loan-to-value ratio for each mortgage loan was no greater than 100% at the time of origination;

- The improvements upon each mortgage property are covered by a valid and existing hazard insurance policy required under the mortgage loan purchase agreement;

- The mortgage note and the related mortgage are genuine, and each is the legal, valid and binding obligation of the mortgagor enforceable against the mortgagor by the mortgagee or its representative in accordance with its terms, except only as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by law; and

- Each mortgage loan constitutes a qualified mortgage within the meaning of Section 860G(a)(3) of the Code.

Pursuant to the pooling agreement, the depositor will represent and warrant to the trust that, as of the closing date, the trust will be the legal owner of each mortgage loan, free and clear of any encumbrance or lien (other than (i) any lien arising before the depositor's purchase of the mortgage loan from the sponsor and (ii) any lien under the pooling agreement).

In the event of a material breach of the representations and warranties made by the sponsor or the depositor, the sponsor or the depositor will be required to either cure the breach in all material respects, repurchase the affected mortgage loan or substitute for the affected mortgage loan. In the event that a

S-68

JPMC_DEX_000070904

required loan document is not included in the mortgage files for the mortgage loans, the sponsor generally will also be required to either cure the defect or repurchase or substitute for the affected mortgage loan. The repurchase price for each mortgage loan repurchased by the sponsor or the depositor, as applicable, will be equal to the stated principal balance of that mortgage loan as of the date of purchase, plus all accrued and unpaid interest on that mortgage loan, computed at the applicable mortgage rate through the end of the calendar month in which the purchase is effected, plus the amount of any unreimbursed advances and servicing advances made by the servicer, plus in the case of a mortgage loan required to be purchased because that mortgage loan is in breach of the representation that it is in compliance with certain predatory and abusive-lending laws, any additional costs or damages incurred by the trust as assignee or purchaser of that mortgage loan. The proceeds of the purchase will be treated as a prepayment of the mortgage loan for purposes of distributions to certificateholders. See "The Trust—Assignment of the Mortgage Loans and Other Assets to the Trust" in this prospectus supplement for a description of the requirements with respect to substitutions of mortgage loans.

**Criteria for Selection of Mortgage Loans**

The sponsor selected the mortgage loans from among its portfolio of mortgage loans held for sale based on a variety of considerations, including type of mortgage loan, geographic concentration, range of mortgage interest rates, principal balance, credit scores and other characteristics described in Appendix B (which is incorporated by reference into this prospectus supplement) to this prospectus supplement, and taking into account investor preferences and the depositor's objective of obtaining the most favorable combination of ratings on the certificates.

S-69

JPMC_DEX_000070905

## DESCRIPTION OF THE CERTIFICATES

**General**

The offered certificates and the Class B Certificates will be issued pursuant to the pooling agreement. Summaries of the specific terms and provisions pursuant to which such certificates will be issued are presented below. The following summaries do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the provisions of the pooling agreement. When particular provisions or terms used in the pooling agreement are referred to, the actual provisions (including definitions of terms) are incorporated by reference.

Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE2 Trust will consist of the following classes:

- Class A-1
- Class A-2
- Class A-3
- Class A-4
- Class M-1
- Class M-2
- Class M-3

- Class M-4
- Class M-5
- Class M-6
- Class M-7
- Class M-8
- Class M-9
- Class M-10

- Class B
- Class C
- Class P
- Class R
- Class R-CX
- Class R-PX

Collectively, the certificates will represent all of the beneficial interests in the trust. The certificates will have the following designations:

| | |
|---|---|
| Class A Certificates | Class A-1 Certificates, Class A-2 Certificates, Class A-3 Certificates and Class A-4 Certificates. |
| Mezzanine Certificates | Class M-1 Certificates, Class M-2 Certificates, Class M-3 Certificates, Class M-4 Certificates, Class M-5 Certificates, Class M-6 Certificates, Class M-7 Certificates, Class M-8 Certificates, Class M-9 Certificates and Class M-10 Certificates. |
| Residual Certificates | Class R Certificates, Class R-CX Certificates and Class R-PX Certificates. |
| Certificates | Class A Certificates, Mezzanine Certificates, Class B Certificates, Class C Certificates, Class P Certificates and Residual Certificates. |
| Subordinate Certificates | Mezzanine Certificates, Class B Certificates and Class C Certificates. |

Only the Class A Certificates and the Mezzanine Certificates are offered by this prospectus supplement. The Class B Certificates, the Class C Certificates, the Class P Certificates and the Residual Certificates are not offered by this prospectus supplement.

The Class A Certificates and the Mezzanine Certificates will have the original certificate principal balances specified on page S-8 of this prospectus supplement. The Class B Certificates will have an original certificate principal balance of $4,719,000. The original certificate principal balance of

Confidential

JPMC_DEX_000070906

the Class C Certificates will be approximately $10,018,220, which will be equal to the excess of the aggregate principal balance of the mortgage loans as of the cut-off date over the original certificate principal balances of the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class P Certificates. The Class P Certificates will have an original certificate principal balance of $100 and will not bear interest. The Class P Certificates will be entitled to all prepayment charges received in respect of voluntary prepayments in full and the servicer will be entitled to all prepayment charges received in respect of voluntary prepayments in part on the related mortgage loans, and such amounts will not be available for distribution to the holders of the offered certificates or the Class B Certificates. The Residual Certificates will not have original certificate principal balances and will not bear interest.

The offered certificates and the Class B Certificates will be issued in book-entry form as described below. The offered certificates and the Class B Certificates will be issued in minimum denominations of $25,000 original certificate principal balance and integral multiples of $1.00 in excess thereof. The "**last scheduled distribution date**" for the offered certificates and the Class B Certificates is in May 2036. It is intended that the amounts deposited in the final maturity reserve account will be sufficient to retire the offered certificates and the Class B Certificates on the last scheduled distribution date, even though mortgage loans having 40-year original terms to maturity may remain outstanding. The actual final distribution date for the offered certificates or the Class B Certificates may occur earlier or later, and could be significantly earlier, than the last scheduled distribution date.

Distributions on the offered certificates and the Class B Certificates will be made by the trustee on the 25th day of each month, or if such day is not a business day, on the first business day after that, commencing in June 2006 (each, a "**distribution date**"), to the persons in whose names such certificates are registered at the close of business on the related record date. The "**record date**" for the offered certificates and the Class B Certificates and any distribution date (for so long as they are book-entry certificates) is the business day immediately preceding such distribution date and the "**record date**" for any book-entry certificate that becomes a definitive certificate is the last business day of the month immediately preceding the month in which the related distribution date occurs.

A NIMS policy may be issued by the NIMS insurer covering certain payments to be made on NIMS which may be issued by an affiliate of the depositor or by one or more entities sponsored by an affiliate of the depositor after the closing date. The NIMS are not offered hereby and, if issued, the NIMS would be backed, in whole or in part, by cashflow received on the Class C Certificates and the Class P Certificates, which are not offered hereby. The NIMS, if issued, *would not* be backed by the trust (other than by the interests represented by the Class C Certificates and the Class P Certificates) or by any of the offered certificates and the Class B Certificates.

**Book Entry Certificates**

The offered certificates and the Class B Certificates will be "**book-entry certificates**" (for so long as they are registered in the name of the applicable depository or its nominee). Persons acquiring beneficial ownership interests in the book-entry certificates ("**certificate owners**") will hold such certificates through The Depository Trust Company ("**DTC**") in the United States, or, upon request, through Clearstream Banking Luxembourg, formerly known as Cedelbank SA ("**Clearstream**"), or the Euroclear System ("**Euroclear**") in Europe, if they are participants of such systems, or indirectly through organizations which are participants in such systems. The book-entry certificates will be issued in one or more certificates which equal the aggregate certificate principal balance of such certificates and will initially be registered in the name of Cede & Co., the nominee of DTC. See "Description of the Securities—Form of Securities" in the accompanying prospectus for a description of the book-entry system.

S-71

JPMC_DEX_000070907

**Definitive Certificates**

Definitive certificates will be issued to certificate owners of the book-entry certificates, or their nominees, rather than to DTC or its nominee, only if (a) DTC or the depositor advises the trustee in writing that DTC is no longer willing, qualified or able to discharge properly its responsibilities as nominee and depository with respect to the book-entry certificates and the depositor or the trustee is unable to locate a qualified successor, (b) the depositor notifies the trustee and DTC of its intent to terminate the book-entry system through DTC and, upon receipt of notice of such intent from DTC, the participants with a position in the book-entry certificates agree to initiate such termination or (c) after the occurrence of a Servicer Event of Default (as defined in the pooling agreement), certificate owners having percentage interests aggregating not less than 51% of the book-entry certificates advise the trustee and DTC through the financial intermediaries and the DTC participants in writing that the continuation of a book-entry system through DTC (or a successor thereto) is no longer in the best interests of certificate owners.

The trustee or its paying agent, if any, will make distributions of principal and interest on the definitive certificates directly to holders of those definitive certificates in accordance with the pooling agreement procedures described in this prospectus supplement.  Distributions of principal and interest on each distribution date will be made to holders in whose names certificates were registered at the close of business on the related record date.  Distributions will be made by wire transfer in immediately available funds for the account of each holder of a certificate or, if a holder has not provided wire instructions at least five business days prior to the related record date, by check mailed to the address of the holder as it appears on the register maintained by the trustee.  The final payment on any certificate will be made only on presentation and surrender of the certificate at the offices of the trustee or its agent or such office or agency as is specified in the notice of final distribution to holders of certificates being retired.

Definitive certificates will be transferable and exchangeable at the office or agency of the trustee maintained for that purpose, which initially shall be at the corporate trust office located at 135 South LaSalle Street, Suite 1625, Chicago, Illinois.  No service charge may be imposed for any registration of transfer or exchange, but the trustee may require payment of a sum sufficient to cover any tax or other governmental charge imposed in connection with registration of transfer or exchange.

**Allocation of Available Funds**

Distributions with respect to the offered certificates and the Class B Certificates will be made on each distribution date primarily from available funds.  With respect to any distribution date, funds available for distribution to the certificateholders ("**available funds**") will be equal to the sum of the following amounts with respect to the mortgage loans, net of amounts payable or reimbursable therefrom to the servicer or the trustee from the trust:  (i) the aggregate amount of monthly payments on the mortgage loans due on the related due date and received by the determination date, after deduction of the servicing fee and the trustee fee for such distribution date and any accrued and unpaid servicing fees and trustee fees in respect of any prior distribution dates, (ii) certain unscheduled payments in respect of the mortgage loans, including any prepayments, insurance proceeds, net liquidation proceeds, subsequent recoveries, termination price deposits and proceeds from repurchases of and substitutions for such mortgage loans occurring during the related prepayment period, excluding prepayment charges and any prepayment interest excess, and (iii) payments from the servicer in connection with advances and prepayment interest shortfalls for such distribution date.  The holders of the Class P Certificates will be entitled to all prepayment charges received in respect of voluntary prepayments in full and the servicer will be entitled to all prepayment charges received in respect of voluntary prepayments in part on the mortgage loans, and such amounts will not be part of available funds or available for distribution with respect to the offered certificates or the Class B Certificates.

S-72

JPMC_DEX_000070908

*Interest Distributions on the Offered Certificates and the Class B Certificates*

On each distribution date, the trustee will withdraw from the distribution account that portion of available funds equal to the Interest Remittance Amount for such distribution date, and make the following disbursements and transfers in the order of priority described below, to the extent of the Interest Remittance Amount, as applicable, remaining for such distribution date:

*first,* to the supplemental interest trust for payment to the swap counterparty, the Net Swap Payment, provided a swap default with respect to the swap counterparty has not occurred and is not continuing, and any unpaid Swap Termination Payment (including any amount remaining unpaid from prior distribution dates) (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each, as defined in the swap agreement)), as applicable for the related distribution date;

*second,* concurrently, to the Class A-1 Certificates, the Class A-2 Certificates, the Class A-3 Certificates and the Class A-4 Certificates, the Monthly Interest Distributable Amount and any Unpaid Interest Shortfall Amount for such classes, in each case allocated among the Class A-1 Certificates, the Class A-2 Certificates, the Class A-3 Certificates and the Class A-4 Certificates, *pro rata,* based on their respective entitlements;

*third,* to the Class M-1 Certificates, the related Monthly Interest Distributable Amount;

*fourth,* to the Class M-2 Certificates, the related Monthly Interest Distributable Amount;

*fifth,* to the Class M-3 Certificates, the related Monthly Interest Distributable Amount;

*sixth,* to the Class M-4 Certificates, the related Monthly Interest Distributable Amount;

*seventh,* to the Class M-5 Certificates, the related Monthly Interest Distributable Amount;

*eighth,* to the Class M-6 Certificates, the related Monthly Interest Distributable Amount;

*ninth,* to the Class M-7 Certificates, the related Monthly Interest Distributable Amount;

*tenth,* to the Class M-8 Certificates, the related Monthly Interest Distributable Amount;

*eleventh,* to the Class M-9 Certificates, the related Monthly Interest Distributable Amount;

*twelfth,* to the Class M-10 Certificates, the related Monthly Interest Distributable Amount; and

*thirteenth,* to the Class B Certificates, the related Monthly Interest Distributable Amount.

Any Interest Remittance Amount remaining undistributed following these distributions will be used in determining the amount of Net Monthly Excess Cashflow, if any, for such distribution date.

On any distribution date, any shortfalls resulting from the application of the Relief Act or similar state or local law and any prepayment interest shortfalls to the extent not covered by compensating interest paid by the servicer will be allocated, first, to the Monthly Interest Distributable Amount with respect to the Class C Certificates and after that, to the Monthly Interest Distributable Amounts with respect to the offered certificates and the Class B Certificates, on a *pro rata* basis based on the respective

Confidential

JPMC_DEX_000070909