**Prepayment Penalty Terms of the Mortgage Loans**

| Prepayment Penalty Terms (Months) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| None | 697 | $106,943,487.44 | 22.66% |
| 6 | 3 | 884,212.52 | 0.19 |
| 12 | 116 | 32,210,573.37 | 6.82 |
| 24 | 1,300 | 249,000,069.66 | 52.75 |
| 36 | 463 | 82,963,977.72 | 17.58 |
| Total | 2,579 | $472,002,320.71 | 100.00% |

S-149

Confidential

JPMC_DEX_000070985

**Geographic Distribution of the Mortgaged Properties relating to the Mortgage Loans[1]**

| Location | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Alabama | 25 | $  2,329,156.55 | 0.49% |
| Alaska | 7 | 1,386,808.17 | 0.29 |
| Arizona | 126 | 22,902,432.01 | 4.85 |
| Arkansas | 5 | 400,516.45 | 0.08 |
| California | 619 | 174,829,813.44 | 37.04 |
| Colorado | 67 | 11,040,354.97 | 2.34 |
| Connecticut | 44 | 7,382,201.08 | 1.56 |
| Delaware | 2 | 139,826.22 | 0.03 |
| District of Columbia | 3 | 625,345.30 | 0.13 |
| Florida | 352 | 61,136,594.61 | 12.95 |
| Georgia | 54 | 6,885,846.69 | 1.46 |
| Hawaii | 3 | 1,145,010.84 | 0.24 |
| Idaho | 2 | 317,956.01 | 0.07 |
| Illinois | 91 | 16,999,321.53 | 3.60 |
| Indiana | 16 | 1,093,467.44 | 0.23 |
| Iowa | 19 | 2,116,907.99 | 0.45 |
| Kansas | 8 | 550,505.21 | 0.12 |
| Kentucky | 4 | 289,165.06 | 0.06 |
| Louisiana | 20 | 2,606,463.09 | 0.55 |
| Maine | 2 | 285,164.38 | 0.06 |
| Maryland | 43 | 10,379,111.57 | 2.20 |
| Massachusetts | 17 | 3,345,655.97 | 0.71 |
| Michigan | 59 | 6,558,408.17 | 1.39 |
| Minnesota | 58 | 8,625,125.65 | 1.83 |
| Missouri | 98 | 9,088,960.44 | 1.93 |
| Montana | 3 | 1,003,018.57 | 0.21 |
| Nebraska | 11 | 677,341.61 | 0.14 |
| Nevada | 71 | 12,300,256.15 | 2.61 |
| New Hampshire | 1 | 134,767.70 | 0.03 |
| New Jersey | 45 | 11,152,716.82 | 2.36 |
| New Mexico | 6 | 791,375.06 | 0.17 |
| New York | 30 | 8,941,219.97 | 1.89 |
| North Carolina | 54 | 6,123,407.02 | 1.30 |
| Ohio | 36 | 3,418,275.74 | 0.72 |
| Oklahoma | 29 | 2,521,732.61 | 0.53 |
| Oregon | 38 | 7,244,312.86 | 1.53 |
| Pennsylvania | 32 | 4,542,196.43 | 0.96 |
| Rhode Island | 2 | 391,900.85 | 0.08 |
| South Carolina | 29 | 2,984,111.23 | 0.63 |
| Tennessee | 42 | 5,646,011.62 | 1.20 |
| Texas | 231 | 21,635,684.92 | 4.58 |
| Utah | 34 | 3,467,998.24 | 0.73 |
| Virginia | 43 | 9,828,093.17 | 2.08 |
| Washington | 82 | 14,459,331.79 | 3.06 |
| Wisconsin | 13 | 1,954,490.13 | 0.41 |
| Wyoming | 3 | 323,959.38 | 0.07 |
| Total | 2,579 | $472,002,320.71 | 100.00% |

[1]   The greatest ZIP Code geographic concentration of the mortgage loans was approximately 0.6% in the 90660 ZIP Code.

Confidential

JPMC_DEX_000070986

**Documentation Level of the Mortgage Loans**

| Documentation Level | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Full Documentation ....................... | 1,541 | $254,859,821.09 | 54.00% |
| Limited Documentation ..................... | 77 | 13,381,615.06 | 2.84 |
| Stated Income Documentation .............. | 961 | 203,760,884.56 | 43.17 |
| Total ........................... | 2,579 | $472,002,320.71 | 100.00% |

**Credit Grade for the Mortgage Loans[1]**

| Credit Grade | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| A+ ............................................. | 2,095 | $374,114,327.57 | 79.26% |
| A ............................................... | 144 | 31,495,053.89 | 6.67 |
| A- .............................................. | 116 | 25,205,060.68 | 5.34 |
| B ............................................... | 130 | 22,913,448.47 | 4.85 |
| C ............................................... | 94 | 18,274,430.10 | 3.87 |
| Total ........................... | 2,579 | $472,002,320.71 | 100.00% |

---

[1] For a description of Credit Grade, *see* "Underwriting of the Mortgage Loans" in this prospectus supplement.

**Credit Scores for the Mortgage Loans[1]**

| Credit Score | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 500 - 524 .................................... | 97 | $ 18,260,860.89 | 3.87% |
| 525 - 549 .................................... | 132 | 25,472,012.84 | 5.40 |
| 550 - 574 .................................... | 199 | 37,383,652.53 | 7.92 |
| 575 - 599 .................................... | 364 | 64,036,073.79 | 13.57 |
| 600 - 624 .................................... | 566 | 93,685,842.10 | 19.85 |
| 625 - 649 .................................... | 528 | 94,610,862.27 | 20.04 |
| 650 - 674 .................................... | 294 | 55,437,325.86 | 11.75 |
| 675 - 699 .................................... | 205 | 43,341,472.15 | 9.18 |
| 700 - 813 .................................... | 194 | 39,774,218.28 | 8.43 |
| Total ........................... | 2,579 | $472,002,320.71 | 100.00% |

---

[1] The weighted average credit score of the mortgage loans that had credit scores was approximately 625.

Confidential

JPMC_DEX_000070987

**Current Mortgage Rates of the Mortgage Loans[1]**

| Current Mortgage Rate (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 5.500 - 5.999 ................................ | 18 | $   5,320,835.12 | 1.13% |
| 6.000 - 6.499 ................................ | 67 | 17,782,062.30 | 3.77 |
| 6.500 - 6.999 ................................ | 193 | 51,169,824.69 | 10.84 |
| 7.000 - 7.499 ................................ | 248 | 60,949,200.16 | 12.91 |
| 7.500 - 7.999 ................................ | 382 | 83,249,375.01 | 17.64 |
| 8.000 - 8.499 ................................ | 304 | 69,812,293.40 | 14.79 |
| 8.500 - 8.999 ................................ | 352 | 68,486,411.70 | 14.51 |
| 9.000 - 9.499 ................................ | 193 | 34,259,944.24 | 7.26 |
| 9.500 - 9.999 ................................ | 227 | 32,735,580.80 | 6.94 |
| 10.000 - 10.499 ................................ | 118 | 13,996,000.20 | 2.97 |
| 10.500 - 10.999 ................................ | 122 | 12,802,056.77 | 2.71 |
| 11.000 - 11.499 ................................ | 127 | 8,407,132.88 | 1.78 |
| 11.500 - 11.999 ................................ | 94 | 6,065,130.87 | 1.28 |
| 12.000 - 12.499 ................................ | 72 | 4,063,762.81 | 0.86 |
| 12.500 - 12.999 ................................ | 40 | 1,850,025.93 | 0.39 |
| 13.000 - 13.499 ................................ | 10 | 589,526.68 | 0.12 |
| 13.500 - 13.999 ................................ | 7 | 332,495.37 | 0.07 |
| 14.000 - 14.499 ................................ | 3 | 76,172.34 | 0.02 |
| 14.500 - 14.600 ................................ | 2 | 54,489.44 | 0.01 |
| Total ................................ | 2,579 | $472,002,320.71 | 100.00% |

---

[1]   The weighted average current Mortgage Rate of the mortgage loans as of the cut-off date was approximately 8.295% per annum.

Confidential

JPMC_DEX_000070988

### Delinquencies of the Mortgage Loans[1]

| Delinquency | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 1 x 30 or Less Past Delinquency[2]........ | 2,579 | $472,002,320.71 | 100.00% |
| Total ..................... | 2,579 | $472,002,320.71 | 100.00% |

[1]  Information with respect to past delinquencies refers to the 12-month period immediately preceding the cut-off-date, or such shorter period as has elapsed from the date of the origination of the mortgage loan by the sponsor or its affiliates or, if originated by an unaffiliated party, from the date of acquisition of the mortgage loan by the sponsor or its affiliates.

[2]  As of the date of this prospectus supplement, all payments due on the mortgage loan have been made and the mortgage loan was delinquent (that is, more than 30 days past due) no more than once during the applicable period and such delinquency lasted for no more than 30 days.

### Maximum Mortgage Rates of the Adjustable-Rate Mortgage Loans[1]

| Maximum Mortgage Rate (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 11.500 - 11.999 ...................................... | 16 | $   4,853,480.94 | 1.20% |
| 12.000 - 12.499 ...................................... | 51 | 13,924,598.34 | 3.44 |
| 12.500 - 12.999 ...................................... | 131 | 34,478,653.60 | 8.53 |
| 13.000 - 13.499 ...................................... | 154 | 40,508,149.05 | 10.02 |
| 13.500 - 13.999 ...................................... | 266 | 63,644,041.47 | 15.74 |
| 14.000 - 14.499 ...................................... | 256 | 62,732,551.97 | 15.51 |
| 14.500 - 14.999 ...................................... | 335 | 71,137,221.65 | 17.59 |
| 15.000 - 15.499 ...................................... | 203 | 41,952,307.82 | 10.37 |
| 15.500 - 15.999 ...................................... | 174 | 34,249,872.42 | 8.47 |
| 16.000 - 16.499 ...................................... | 89 | 15,611,241.26 | 3.86 |
| 16.500 - 16.999 ...................................... | 85 | 13,602,281.20 | 3.36 |
| 17.000 - 17.499 ...................................... | 40 | 4,655,144.25 | 1.15 |
| 17.500 - 17.999 ...................................... | 17 | 1,881,817.07 | 0.47 |
| 18.000 - 18.499 ...................................... | 8 | 804,376.12 | 0.20 |
| 18.500 - 18.999 ...................................... | 2 | 166,337.19 | 0.04 |
| 19.000 - 19.499 ...................................... | 1 | 199,967.03 | 0.05 |
| Total............................................... | 1,828 | $404,402,041.38 | 100.00% |

[1]  The weighted average maximum mortgage rate of the adjustable-rate mortgage loans as of the cut-off date was approximately 14.378% per annum.

Confidential

JPMC_DEX_000070989

**Minimum Mortgage Rates of the Adjustable-Rate Mortgage Loans[1]**

| Minimum Mortgage Rate (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 0.000 - 4.999 .......................... | 1 | $ 248,052.99 | 0.06% |
| 5.000 - 5.499 .......................... | 2 | 650,194.32 | 0.16 |
| 5.500 - 5.999 .......................... | 26 | 6,876,847.57 | 1.70 |
| 6.000 - 6.499 .......................... | 70 | 18,431,298.01 | 4.56 |
| 6.500 - 6.999 .......................... | 165 | 42,229,909.15 | 10.44 |
| 7.000 - 7.499 .......................... | 228 | 56,174,243.07 | 13.89 |
| 7.500 - 7.999 .......................... | 318 | 73,661,208.43 | 18.21 |
| 8.000 - 8.499 .......................... | 272 | 64,817,636.53 | 16.03 |
| 8.500 - 8.999 .......................... | 292 | 60,070,958.01 | 14.85 |
| 9.000 - 9.499 .......................... | 162 | 31,994,043.17 | 7.91 |
| 9.500 - 9.999 .......................... | 124 | 25,162,322.18 | 6.22 |
| 10.000 - 10.499 .......................... | 63 | 9,748,820.27 | 2.41 |
| 10.500 - 10.999 .......................... | 59 | 9,067,372.56 | 2.24 |
| 11.000 - 11.499 .......................... | 25 | 2,820,509.56 | 0.70 |
| 11.500 - 11.999 .......................... | 11 | 1,333,955.50 | 0.33 |
| 12.000 - 12.499 .......................... | 7 | 748,365.84 | 0.19 |
| 12.500 - 12.999 .......................... | 2 | 166,337.19 | 0.04 |
| 13.000 - 13.499 .......................... | 1 | 199,967.03 | 0.05 |
| Total.......................... | 1,828 | $404,402,041.38 | 100.00% |

[1]   The weighted average minimum mortgage rate of the adjustable-rate mortgage loans as of the cut-off date was approximately 8.108% per annum.

**Gross Margins of the Adjustable-Rate Mortgage Loans[1]**

| Gross Margin (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 3.000 - 4.999.......................... | 517 | $116,632,288.26 | 28.84% |
| 5.000 - 5.999.......................... | 405 | 96,933,016.96 | 23.97 |
| 6.000 - 6.499.......................... | 208 | 47,980,120.08 | 11.86 |
| 6.500 - 6.999.......................... | 264 | 62,143,880.82 | 15.37 |
| 7.000 - 11.400.......................... | 434 | 80,712,735.26 | 19.96 |
| Total.......................... | 1,828 | $404,402,041.38 | 100.00% |

[1]   The weighted average Gross Margin of the adjustable-rate mortgage loans as of the cut-off date was approximately 6.080% per annum.

Confidential

JPMC_DEX_000070990

**Next Adjustment Dates for the Adjustable-Rate Mortgage Loans**

| Next Adjustment Date | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| July 1, 2007............................................ | 1 | $      107,171.67 | 0.03% |
| August 1, 2007...................................... | 2 | 261,485.70 | 0.06 |
| September 1, 2007 ................................. | 3 | 424,381.89 | 0.10 |
| October 1, 2007..................................... | 10 | 2,227,024.62 | 0.55 |
| November 1, 2007 ................................. | 50 | 12,177,350.18 | 3.01 |
| December 1, 2007.................................. | 144 | 33,749,206.66 | 8.35 |
| January 1, 2008...................................... | 273 | 59,598,232.03 | 14.74 |
| February 1, 2008.................................... | 388 | 86,823,923.61 | 21.47 |
| March 1, 2008........................................ | 334 | 71,869,088.65 | 17.77 |
| April 1, 2008.......................................... | 399 | 88,498,510.35 | 21.88 |
| October 1, 2008..................................... | 4 | 1,231,486.37 | 0.30 |
| November 1, 2008 ................................. | 15 | 2,811,994.26 | 0.70 |
| December 1, 2008.................................. | 48 | 8,587,153.43 | 2.12 |
| January 1, 2009...................................... | 19 | 3,459,007.19 | 0.86 |
| February 1, 2009.................................... | 19 | 3,496,031.20 | 0.86 |
| March 1, 2009........................................ | 15 | 3,023,784.37 | 0.75 |
| April 1, 2009.......................................... | 28 | 6,156,451.09 | 1.52 |
| December 1, 2010.................................. | 1 | 108,367.28 | 0.03 |
| January 1, 2011...................................... | 1 | 75,000.00 | 0.02 |
| February 1, 2011.................................... | 2 | 491,509.95 | 0.12 |
| March 1, 2011........................................ | 6 | 1,687,763.09 | 0.42 |
| April 1, 2011.......................................... | 66 | 17,537,117.79 | 4.34 |
| Total....................................... | 1,828 | $404,402,041.38 | 100.00% |

S-155

Confidential

**Initial Periodic Rate Caps of the Adjustable-Rate Mortgage Loans**[1]

| Initial Periodic Rate Cap (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 1.000 | 42 | $ 13,227,887.76 | 3.27% |
| 1.500 | 11 | 1,707,633.72 | 0.42 |
| 2.000 | 400 | 86,095,223.64 | 21.29 |
| 3.000 | 1,372 | 302,804,786.31 | 74.88 |
| 5.000 | 3 | 566,509.95 | 0.14 |
| Total | 1,828 | $404,402,041.38 | 100.00% |

[1] Relates solely to initial rate adjustments. The weighted average initial periodic rate cap of the adjustable-rate mortgage loans as of the cut-off date was approximately 2.718%.

**Subsequent Periodic Rate Caps of the Adjustable-Rate Mortgage Loans**[1]

| Subsequent Periodic Rate Cap (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 1.000 | 1,574 | $358,666,430.22 | 88.69% |
| 1.500 | 254 | 45,735,611.16 | 11.31 |
| Total | 1,828 | $404,402,041.38 | 100.00% |

[1] Relates to all rate adjustments subsequent to initial rate adjustments. The weighted average subsequent periodic rate cap of the adjustable-rate mortgage loans as of the cut-off date was approximately 1.057%.

Confidential

JPMC_DEX_000070992

## INDEX OF DEFINED TERMS

accrual period ............................................... S-87
additional termination events ...................... S-82
adjusted net maximum mortgage rate ......... S-98
adjusted net mortgage rate ........................... S-97
advances ....................................................... S-55
Allocated Realized Loss Amount ............... S-87
available funds ............................................ S-72
BBA ............................................................ S-99
book-entry certificates ................................ S-71
BSFP ........................................................... S-84
Certificate Margin ...................................... S-98
certificate owners ........................................ S-71
certificate principal balance ........................ S-87
Class A Principal Distribution Amount ....... S-87
Class B Principal Distribution Amount ....... S-87
Class M-1 Principal Distribution Amount ... S-88
Class M-10 Principal Distribution Amount . S-92
Class M-2 Principal Distribution Amount ... S-88
Class M-3 Principal Distribution Amount ... S-89
Class M-4 Principal Distribution Amount ... S-89
Class M-5 Principal Distribution Amount ... S-89
Class M-6 Principal Distribution Amount ... S-90
Class M-7 Principal Distribution Amount ... S-90
Class M-8 Principal Distribution Amount ... S-91
Class M-9 Principal Distribution Amount ... S-91
Clearstream ................................................. S-71
closing date ................................................. S-47
Code ............................................................ S-118
Commission ................................................. S-107
compensating interest ................................. S-105
Counterparty Payment ................................ S-81
CPR ............................................................. S-111
Credit Enhancement Percentage ................. S-93
Cumulative Loss Trigger Event .................. S-93
cut-off date ................................................. S-47
Delinquency Trigger Event .......................... S-93
delinquent ................................................... S-93
Designated Telerate Page ............................ S-99
determination date ...................................... S-105
distribution date .......................................... S-71
DTC ............................................................. S-71
due date ....................................................... S-67
due period ................................................... S-93
Euroclear ..................................................... S-71
events of default .......................................... S-81
Extra Principal Distribution Amount .......... S-94
Federal Truth-in-Lending Act ...................... S-28
Fidelity ........................................................ S-52

Fidelity System ........................................... S-52
final maturity reserve account ..................... S-85
Final Maturity Reserve Amount .................. S-94
Final Maturity Reserve Funding Date ......... S-94
final maturity reserve trust .......................... S-85
Fitch ............................................................ S-82
Formula Rate ............................................... S-98
gross margin ................................................ S-66
HOEPA ....................................................... S-28
index ............................................................ S-66
initial periodic rate cap ............................... S-66
insurance proceeds ...................................... S-94
Interest Remittance Amount ........................ S-94
Interest Settlement Rate ............................... S-98
issuing entity .............................................. S-65
LaSalle ........................................................ S-59
last scheduled distribution date ................... S-71
LIBOR Business Day .................................. S-100
LIBOR Determination Date ......................... S-99
LIME .......................................................... S-37
liquidated mortgage loan ............................ S-96
Long Beach ................................................. S-36
Mandalay .................................................... S-37
Maximum Cap Rate ..................................... S-98
Monthly Interest Distributable Amount ....... S-94
Moody's ...................................................... S-126
mortgage ..................................................... S-65
mortgage loan purchase agreement ............. S-65
mortgaged property ..................................... S-65
Net Counterparty Payment .......................... S-94
net liquidation proceeds .............................. S-96
Net Monthly Excess Cashflow .................... S-94
Net Swap Payment ...................................... S-95
Net WAC Rate ............................................. S-97
Net WAC Rate Carryover Amount .............. S-99
NIMS .......................................................... S-5
NIMS insurer .............................................. S-5
NIMS insurer default ................................... S-30
NIMS policy ............................................... S-30
nonrecoverable advance .............................. S-55
Notional Principal Contract Regulations ... S-120
NPC component ........................................... S-118
offered certificate ....................................... S-109
OID Regulations ......................................... S-119
one-month LIBOR ....................................... S-98
Optional Termination Date .......................... S-95
Overcollateralization Deficiency Amount ... S-95
Overcollateralization Floor ......................... S-95

Confidential

JPMC_DEX_000070993

Overcollateralization Release Amount ........ S-95
Overcollateralization Target Amount .......... S-95
Overcollateralized Amount .......................... S-95
Pass-Through Rate ....................................... S-97
pooling agreement ....................................... S-65
Post-Stepdown Monthly Principal
      Distribution .......................................... S-75
Prepayment Assumption ............................ S-111
prepayment interest excess ....................... S-105
prepayment interest shortfall.................... S-105
prepayment period ...................................... S-96
Principal Distribution Amount .................... S-96
Principal Remittance Amount ..................... S-96
PTCE .......................................................... S-124
reacquired mortgage loan............................ S-48
realized loss ................................................ S-96
record date.................................................. S-71
reference banks ......................................... S-100
Relevant Implementation Date..................... S-2
Relevant Member State ................................ S-2
Relief Act ................................................... S-25
Remaining Principal Distribution Amount .. S-96
REMIC ....................................................... S-118
REMIC regular interest component ........... S-118
REO property ............................................ S-106
reserve fund................................................ S-98
reserve interest rate ................................... S-100
Residual Certificates ................................. S-17
S&P ........................................................... S-126
scheduled principal balance ........................ S-65
servicing advances ...................................... S-55
servicing fee .............................................. S-104

servicing fee rate........................................ S-104
six-month LIBOR ........................................ S-66
sponsor........................................................ S-48
stated principal balance ............................... S-96
Stepdown Date ............................................ S-96
Structuring Assumptions ............................ S-112
Subordinate Certificates ............................. S-70
subsequent periodic rate cap ...................... S-66
subsequent recoveries ................................. S-97
substitute mortgage loan ............................. S-48
substitution price......................................... S-48
supplemental interest account..................... S-81
supplemental interest trust ......................... S-81
swap agreement .......................................... S-80
swap counterparty ....................................... S-81
swap counterparty ratings requirement........ S-83
swap counterparty ratings threshold ........... S-83
swap default ................................................ S-81
swap event of default ................................... S-81
swap notional amount .................................. S-81
Swap Payment ............................................. S-81
swap termination date .................................. S-81
Swap Termination Payment......................... S-83
termination event ........................................ S-82
termination payment ................................... S-121
Trigger Event .............................................. S-97
trust ............................................................ S-65
trustee fee................................................... S-105
trustee fee rate............................................ S-105
Unpaid Interest Shortfall Amount .............. S-97
vector ......................................................... S-111
WMMSC ..................................................... S-61

Confidential

JPMC_DEX_000070994

**PROSPECTUS**

**Mortgage Pass-Through Certificates**
**Mortgage Trust Certificates**
**Mortgage-Backed Notes**
**(Issuable in Series)**


**WaMu ASSET ACCEPTANCE CORP.**
**Depositor**

---

### You should consider carefully the risk factors beginning on page 5 of this prospectus and in the prospectus supplement.

The prospectus together with the accompanying prospectus supplement will constitute the full prospectus.

---

**The Securities:**

WaMu Asset Acceptance Corp., as depositor, will sell the securities, which may be in the form of mortgage pass-through certificates, mortgage-backed notes or mortgage trust certificates. Each issue of securities will have its own series designation and will evidence either:

- the ownership of assets held by a trust, or

- debt obligations secured by assets held by a trust.

**The Trust and Its Assets:**

The assets of a trust will primarily include any combination of various types of:

- one-to-four-family residential first and junior lien mortgage loans,

- multifamily first and junior mortgage loans,

- commercial first and junior mortgage loans,

- mixed-use residential and commercial first and junior mortgage loans,

- home equity lines of credit,

- cooperative apartment loans, or

- home equity revolving lines of credit, including partial balances of those lines of credit or beneficial interests in those lines of credit.

The assets of the trust may also include mortgage securities and rights to excess servicing fees.

The assets of the trust for a series of securities may also include financial guaranty insurance policies, pool insurance policies, letters of credit, reserve funds or currency or interest rate exchange agreements or any combination of credit support. Credit enhancement may also be provided by means of subordination of one or more classes of securities, by cross-collateralization or by overcollateralization.

**Neither the Securities and Exchange Commission nor any state securities commission has approved these securities or determined that this prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

The date of this prospectus is January 6, 2006.

Confidential

JPMC_DEX_000070995

## IMPORTANT NOTICE ABOUT INFORMATION PRESENTED IN THIS PROSPECTUS AND THE ACCOMPANYING PROSPECTUS SUPPLEMENT

We provide information to you about the offered securities in two separate documents that progressively provide more detail:

- this prospectus, which provides general information, some of which may not apply to your series of securities; and

- the accompanying prospectus supplement, which describes the specific terms of your series of securities.

You should rely only on the information provided in this prospectus and the accompanying prospectus supplement, including the information incorporated by reference. We have not authorized anyone to provide you with different information. We are not offering the securities in any state where the offer is not permitted. We do not claim the accuracy of the information in this prospectus or the accompanying prospectus supplement as of any date other than the dates stated on their respective covers.

We include cross-references in this prospectus and the accompanying prospectus supplement to captions in these materials where you can find further related discussions. The following Table of Contents and the Table of Contents included in the accompanying prospectus supplement provide the pages on which these captions are located.

Several capitalized terms are used in this prospectus to assist you in understanding the terms of the securities. Some of the capitalized terms used in this prospectus are defined in the glossary beginning on page 142 in this prospectus.

2

# TABLE OF CONTENTS

| | Page |
|---|---|
| RISK FACTORS | 5 |
| ADDITIONAL RISK FACTORS APPLICABLE TO NEGATIVE AMORTIZATION LOANS | 25 |
| DESCRIPTION OF THE TRUSTS | 28 |
| Description of the Mortgage Assets to be Held By a Trust | 28 |
| Mortgage Loan Information in Prospectus Supplement | 35 |
| Static Pool Information | 36 |
| DESCRIPTION OF THE PRE-FUNDING ACCOUNT FOR THE PURCHASE OF ADDITIONAL MORTGAGE LOANS | 36 |
| THE DEPOSITOR, THE SPONSOR, THE SERVICER AND CERTAIN OTHER TRANSACTION PARTIES | 37 |
| USE OF PROCEEDS | 37 |
| YIELD AND MATURITY CONSIDERATIONS | 38 |
| Maturity and Weighted Average Life | 40 |
| THE DEPOSITOR'S MORTGAGE LOAN PURCHASE PROGRAM | 43 |
| Underwriting Standards | 43 |
| Qualifications of Originators and Mortgage Loan Sellers | 45 |
| DESCRIPTION OF THE SECURITIES | 45 |
| Form of Securities | 46 |
| Exchangeable Securities | 49 |
| Assignment of Trust Assets; Review of Files by Trustee | 51 |
| Representations and Warranties Regarding the Mortgage Loans; Remedies for Breach | 52 |
| Establishment of Custodial Account; Deposits to Custodial Account In Respect of Trust Assets | 54 |
| Deposits to Distribution Account | 58 |
| Distributions on the Securities | 58 |
| Advances by Servicer in Respect of Delinquencies on the Trust Assets | 60 |
| Form of Reports to Securityholders | 61 |
| Collection and Other Servicing Procedures Employed by the Servicer, Manager, Bond Administrator or Certificate Administrator | 61 |
| Description of Sub-Servicing | 63 |
| Procedures for Realization Upon Defaulted Mortgage Assets | 64 |
| Retained Interest; Servicing or Administration Compensation and Payment of Expenses | 65 |
| Annual Servicing Compliance Reports | 66 |
| Matters Regarding the Servicer and the Depositor | 67 |
| Events of Default Under the Governing Agreement and Rights Upon Events of Default | 67 |

| | Page |
|---|---|
| Amendment of the Governing Agreements | 70 |
| Termination of the Trust and Disposition of Trust Assets | 71 |
| Description of the Trustee | 71 |
| Duties of the Trustee | 72 |
| DESCRIPTION OF CREDIT SUPPORT | 73 |
| Subordination | 73 |
| Letter of Credit | 74 |
| Mortgage Pool Insurance Policy | 76 |
| Special Hazard Insurance Policy | 77 |
| Bankruptcy Bond | 79 |
| Fraud Bond | 79 |
| Financial Guarantee Insurance | 79 |
| Reserve Fund | 79 |
| Overcollateralization | 79 |
| Cross-Support Features | 80 |
| OTHER FINANCIAL OBLIGATIONS RELATED TO THE SECURITIES | 80 |
| Swaps and Yield Supplement Agreements | 80 |
| Purchase Obligations | 80 |
| Mandatory Auctions | 81 |
| DESCRIPTION OF PRIMARY INSURANCE POLICIES | 82 |
| Primary Mortgage Insurance Policies | 82 |
| Primary Hazard Insurance Policies | 82 |
| FHA Insurance | 83 |
| VA Guarantees | 86 |
| LEGAL ASPECTS OF MORTGAGE ASSETS | 86 |
| Mortgage Loans | 87 |
| Cooperative Loans | 87 |
| Foreclosure on Mortgages | 88 |
| Foreclosure on Mortgaged Properties Located in the Commonwealth of Puerto Rico | 90 |
| Foreclosure on Cooperative Shares | 90 |
| Rights of Redemption with Respect to Mortgage Loans | 91 |
| Anti-Deficiency Legislation and Other Limitations on Lenders | 91 |
| Junior Mortgages | 93 |
| Home Equity Line of Credit Loans | 93 |
| Enforceability of Due-on-Sale Clauses | 94 |
| Prepayment Charges and Prepayments | 94 |
| Leases and Rents | 94 |
| Subordinate Financing | 95 |
| Applicability of Usury Laws | 95 |
| Alternative Mortgage Instruments | 95 |
| Servicemembers Civil Relief Act | 96 |
| Environmental Legislation | 96 |
| Forfeitures in Drug and RICO Proceedings | 97 |

3

Confidential

| | Page |
|---|---|
| Negative Amortization Loans . . . . . . . . . . | 97 |
| MATERIAL FEDERAL INCOME TAX CONSEQUENCES . . . . . . . . . . . . . . . . . . . . . . | 98 |
| General . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 98 |
| Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . | 99 |
| REMICs . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100 |
| Taxation of Owners of REMIC Regular Certificates . . . . . . . . . . . . . . . . . . . . . . . . . | 101 |
| Taxation of Owners of REMIC Residual Certificates . . . . . . . . . . . . . . . . . . . . . . . | 108 |
| Matters Relevant to Holders of All REMIC Certificates . . . . . . . . . . . . . . . . . | 113 |
| Withholding Regulations . . . . . . . . . . . . . . . | 118 |
| Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 118 |
| Grantor Trusts . . . . . . . . . . . . . . . . . . . . . . . | 118 |
| Partnership Trusts . . . . . . . . . . . . . . . . . . . . | 126 |
| Tax Return Disclosure and Investor List Requirements . . . . . . . . . . . . . . . . . . . . . . | 131 |
| STATE AND OTHER TAX CONSEQUENCES . . . . . . . . . . . . . . . . . . . . . . | 131 |
| ERISA CONSIDERATIONS . . . . . . . . . . . . . . . . | 131 |

| | Page |
|---|---|
| Plan Asset Regulation . . . . . . . . . . . . . . . . . . | 132 |
| Underwriter's and WCC Exemption . . . . . | 132 |
| Other Exemptions . . . . . . . . . . . . . . . . . . . . . | 135 |
| Insurance Company General Accounts . . . | 136 |
| Representations from Investing Plans . . . . | 136 |
| Tax-Exempt Plan Investors . . . . . . . . . . . . . | 136 |
| Consultation with Counsel . . . . . . . . . . . . . | 137 |
| CERTAIN LEGAL INVESTMENT ASPECTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 137 |
| METHODS OF DISTRIBUTION . . . . . . . . . . . | 139 |
| LEGAL MATTERS . . . . . . . . . . . . . . . . . . . . . . | 140 |
| FINANCIAL INFORMATION . . . . . . . . . . . . . . | 140 |
| RATINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 140 |
| AVAILABLE INFORMATION . . . . . . . . . . . . . | 140 |
| INCORPORATION OF CERTAIN INFORMATION BY REFERENCE . . . . . . . | 140 |
| GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 142 |
| APPENDIX A: Global Clearance, Settlement and Tax Documentation Procedures With Respect to Book-Entry Securities . . . . . . . . . | 147 |

4

JPMC_DEX_000070998

163

## RISK FACTORS

**The offered securities are not suitable investments for all investors. In particular, you should not purchase the offered securities unless you understand and are able to bear the prepayment, credit, liquidity and market risks associated with the securities.**

**You should carefully consider the following risk factors in connection with the purchase of the offered securities as well as the additional risk factors in the prospectus supplement related to your security and, if applicable, the additional risk factors described under "Additional Risk Factors Applicable to Negative Amortization Loans" below.**

| | |
|---|---|
| **The Securities Will Have Limited Liquidity So Investors May Be Unable to Sell Their Securities or May Be Forced to Sell Them at a Discount From Their Initial Offering Price** | There can be no assurance that a resale market for the securities of any series will develop following the issuance and sale of any series of securities. Even if a resale market does develop, it may not provide securityholders with liquidity of investment or continue for the life of the securities of any series. The prospectus supplement for any series of securities may indicate that an underwriter specified in the prospectus supplement intends to establish a secondary market in the securities; however no underwriter will be obligated to do so. As a result, any resale prices that may be available for any offered security in any market that may develop may be at a discount from the initial offering price. The offered securities will not be listed on any securities exchange. |
| **Credit Support May Be Limited; The Failure of Credit Support to Cover Losses on the Trust Assets Will Result in Losses Allocated to the Related Securities** | Credit support is intended to reduce the effect of delinquent payments or losses on the assets of the trust on those classes of securities that have the benefit of the credit support. With respect to each series of securities, credit support may be provided in one or more of the forms referred to in this prospectus. Regardless of the form of credit support provided, the amount of coverage will usually be limited in amount and in many cases will be subject to periodic reduction in accordance with a schedule or formula. Furthermore, credit support may provide only very limited coverage as to particular types of losses or risks, and may provide no coverage as to other types of losses or risks. If losses on the trust assets exceed the amount of coverage provided by any credit support or the losses are of a type not covered by any credit support, these losses will be borne by the holders of the related securities or specific classes of the related securities. See "Description of Credit Support." |
| **The Mortgaged Properties May Fail to Provide Adequate Security for the Mortgage Loans** | The securities will be directly or indirectly backed by mortgage loans. If the mortgaged properties fail to provide adequate security for the mortgage loans held by a trust, any resulting losses, to the extent not covered by credit support, will be allocated to the related securities in the manner described in the related prospectus supplement and consequently would adversely affect the yield to maturity on those securities. Some types of mortgage loans held by a trust may have a greater likelihood of delinquency and foreclosure than other mortgage loans, and a greater likelihood of loss in the event of delinquency and foreclosure. The prospectus supplement for each series of |

5

JPMC_DEX_000070999

securities will describe the mortgage loans that are to be held by the trust issuing your security and risks associated with those mortgage loans, which you should carefully consider in connection with the purchase of your security.

In addition, for some mortgage loans, the values of the related mortgaged properties may have substantially declined since the appraisals were obtained in connection with the origination of those mortgage loans. In the event that such a mortgage loan becomes delinquent and is liquidated, a larger loss may occur than would otherwise be expected based on the appraised value.

**Foreclosure of Mortgage Loans May Result In Limitations or Delays In Recovery and Losses Allocated to the Securities**

Even assuming that the mortgaged properties provide adequate security for the mortgage loans, substantial delays can be encountered in connection with the liquidation of defaulted mortgage loans, and corresponding delays in the receipt of related proceeds by the securityholders could occur. An action to foreclose on a mortgaged property securing a mortgage loan is regulated by state statutes, rules and judicial decisions and is subject to many of the delays and expenses of other lawsuits if defenses or counterclaims are interposed, sometimes requiring several years to complete. In several states an action to obtain a deficiency judgment is not permitted following a nonjudicial sale of a mortgaged property. In the event of a default by a mortgagor, these restrictions may impede the ability of the servicer to foreclose on or sell the mortgaged property or to obtain liquidation proceeds sufficient to repay all amounts due on the related mortgage loan. The servicer will be entitled to deduct from liquidation proceeds all advances of scheduled principal and interest and all expenses incurred in attempting to recover amounts due on the related liquidated mortgage loan and not yet repaid, including payments to prior lienholders, legal fees and costs of legal action, real estate taxes, maintenance and preservation expenses and other reimbursable servicing advances. If any mortgaged properties fail to provide adequate security for the mortgage loans held by the trust issuing your security and insufficient funds are available from any applicable credit support, you could experience a loss on your investment.

Liquidation expenses with respect to defaulted mortgage loans do not vary directly with the outstanding principal balance of the loan at the time of default. Therefore, assuming that a servicer takes the same steps in realizing upon a defaulted mortgage loan having a small remaining principal balance as it would in the case of a defaulted mortgage loan having a larger principal balance, the amount realized after expenses of liquidation would be less as a percentage of the outstanding principal balance of the smaller principal balance mortgage loan than would be the case with a larger principal balance loan.

6

JPMC_DEX_000071000

**There May Be a Greater Likelihood of Losses on Mortgage Loans Originated Under Some Underwriting Standards**

Each mortgage loan to be transferred to a trust will have been originated in accordance with the underwriting standards applied by the originator of that mortgage loan. Underwriting standards may vary significantly among originators. While the underwriting standards of each originator will have been approved by an affiliate of the depositor, the underwriting standards, including documentation requirements, of some originators may be less restrictive than those of other originators. Moreover, some underwriting standards may result in a less accurate assessment of the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. As a result, there may be a greater likelihood of default on mortgage loans originated under some underwriting standards, and a greater likelihood that the related mortgaged properties will fail to provide adequate security in the event of such default. In turn, there may be a greater likelihood that losses, to the extent not covered by credit support, will be allocated to the related securities.

**Mortgaged Properties Are Subject to Environmental Risks and the Cost of Environmental Clean-Up May Increase Losses on the Mortgage Loans**

Under various federal, state and local environmental laws, ordinances and regulations, a current or previous owner of real property may be liable for the costs of removal or remediation of hazardous or toxic substances on, under or in the property. These laws often impose liability whether or not the owner or operator knew of, or was responsible for, the presence of the hazardous or toxic substances. A lender also risks liability on foreclosure of the mortgage on the property. In addition, the presence of hazardous or toxic substances, or the failure to properly remediate the property, may adversely affect the owner's or operator's ability to sell the property. Although the incidence of environmental contamination of residential properties is less common than that for commercial properties, some mortgage loans held by a trust could be secured by mortgaged properties that are subject to environmental law violations. The servicer is generally prohibited from foreclosing on a mortgaged property unless it has taken adequate steps to ensure environmental compliance with respect to the mortgaged property. However, if the servicer errs and forecloses on mortgaged property that is subject to environmental law violations, or to the extent a mortgage loan seller does not provide adequate representations and warranties against environmental law violations, or is unable to honor its obligations, including the obligation to repurchase a mortgage loan upon the breach of a representation or warranty, a trust could experience losses which, to the extent not covered by credit support, could adversely affect the yield to maturity on the securities issued by that trust.

7

Confidential

JPMC_DEX_000071001

**The Ratings of Your Securities May Be Lowered Or Withdrawn Which May Adversely Affect the Liquidity or Market Value of Your Securities**

It is a condition to the issuance of the securities that each series of securities be rated in one of the four highest rating categories by a nationally recognized statistical rating agency. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time. No person is obligated to maintain the rating on any security, and accordingly, there can be no assurance that the ratings assigned to any security on the date on which the security is originally issued will not be lowered or withdrawn by a rating agency at any time thereafter. The ratings of any series of securities by any applicable rating agency may be lowered following the initial issuance of the securities as a result of factors that the rating agency considers significant, such as the downgrading of the obligations of any applicable credit support provider, or as a result of losses on the related mortgage assets in excess of the levels contemplated by the rating agency at the time of its initial rating analysis. None of the sponsor, the depositor, the servicer or any of their respective affiliates will have any obligation to replace or supplement any credit support, or to take any other action to maintain any ratings of any series of securities. If any rating is revised or withdrawn, the liquidity or the market value of your security may be adversely affected.

**Failure of the Mortgage Loan Seller or Originator to Repurchase or Replace a Mortgage Loan May Result in Losses Allocated to the Related Securities**

Generally, each mortgage loan seller will have made representations and warranties in respect of the mortgage loans sold by the mortgage loan seller and related to a series of securities. If the mortgage loan seller did not originate the mortgage loans that it sold, the representations and warranties may in some cases instead have been made by the originator. In the event of a breach of a mortgage loan seller's or originator's representation or warranty that materially adversely affects the interests of the securityholders or the trust in a mortgage loan, the mortgage loan seller or originator will be obligated to cure the breach or repurchase or, if permitted, replace the mortgage loan as described under "Description of the Securities--Representations and Warranties Regarding the Mortgage Loans; Remedies for Breach." However, there can be no assurance that a mortgage loan seller or originator will honor its obligation to cure, repurchase or, if permitted, replace any mortgage loan as to which a breach of a representation or warranty arises. A mortgage loan seller's or originator's failure or refusal to honor its repurchase obligation could lead to losses that, to the extent not covered by credit support, may adversely affect the yield to maturity of the securities issued by the trust.

When a mortgage loan seller or originator is unable, or disputes its obligation, to repurchase affected mortgage loans from the trust, the servicer or, if multiple servicers, a designated servicer, or the depositor may negotiate and enter into one or more settlement agreements with the

8

JPMC_DEX_000071002

mortgage loan seller or originator that could provide for the purchase of only a portion of the affected mortgage loans. Any settlement could lead to losses on the mortgage loans which would be borne by the related securities. The depositor will not be obligated to purchase a mortgage loan if a mortgage loan seller or originator defaults on its obligation to do so, and no assurance can be given that the mortgage loan sellers or originators will carry out their repurchase obligations. In no event will any other person be obligated to purchase any mortgage loan. A default by a mortgage loan seller or originator is not a default by the depositor or by the servicer. Any mortgage loan not so repurchased or substituted for will continue to be held by the trust and any related losses will be allocated to the related credit support, to the extent available, and otherwise to one or more classes of securities issued by the trust.

The representations and warranties of a mortgage loan seller or originator in respect of a mortgage loan may have been made as of a date prior to the date of initial issuance of the related series of securities, and a substantial period of time may have elapsed between the date as of which the representations and warranties were made and the date of initial issuance of the related series of securities. Accordingly, the occurrence of events during this period that are not covered by a mortgage loan seller's or originator's repurchase or substitution obligation could lead to losses that, to the extent not covered by credit support, may adversely affect the yield to maturity of the related securities.

**The Yield to Maturity on Your Securities Will Depend on a Variety of Factors Including Prepayments**

The timing of principal payments on the securities of a series will be affected by a number of factors, including the following:

- the extent of prepayments on the underlying assets held by the trust;

- how payments of principal are allocated among the classes of securities of that series as specified in the related prospectus supplement;

- if any party has an option to terminate the related trust early, the effect of the exercise of the option;

- the rate and timing of defaults and losses on the assets held by the trust;

- repurchases of assets of the trust as a result of material breaches of representations and warranties made by the depositor or a mortgage loan seller or originator; and

- with respect to a trust holding home equity revolving credit loans, additional draws on under the related credit line agreements.

Prepayments on mortgage loans may be influenced by prevailing mortgage interest rates. In general, in the case

9

of fixed-rate mortgage loans, and in the case of ARM Loans during an initial fixed-rate period, if prevailing mortgage interest rates decline significantly below the mortgage interest rates on the mortgage loans, the prepayment rate may increase. In addition, if prevailing mortgage interest rates decline significantly, ARM Loans could be subject to higher prepayment rates both during and after any initial fixed-rate period because the availability of fixed-rate mortgage loans at competitive interest rates may encourage mortgagors to refinance their mortgage loans to "lock in" lower fixed interest rates.

Penalties for early prepayment may also affect the prepayment rate, as they may discourage mortgagors from prepaying their mortgage loans during the period such prepayment penalties are in effect, even in a declining interest rate environment.

To the extent that a mortgage loan contains a "due-on-sale" clause and such clause is exercised, the sale of a mortgaged property may also cause a prepayment in full on the related mortgage loan.

Local and regional economic conditions and homeowner mobility may also affect the prepayment rate.

To the extent amounts in any pre-funding account have not been used to purchase additional mortgage loans, holders of the related securities may receive an additional prepayment.

The rate of prepayment of the mortgage loans included in or underlying the assets held by each trust may affect the yield to maturity of the securities. In general, if you purchase a class of offered securities at a price higher than its outstanding principal balance and principal distributions on your class occur faster than you anticipate at the time of purchase, the yield will be lower than you anticipate. Conversely, if you purchase a class of offered securities at a price lower than its outstanding principal balance and principal distributions on that class occur more slowly than you anticipate at the time of purchase, the yield will be lower than you anticipate.

The yield to maturity on some types of classes of securities, including securities that are entitled to principal distributions only or interest distributions only, securities as to which all or a portion of accrued interest will not be distributed but rather added to the principal balance of the security, and securities with an interest rate which fluctuates inversely with an index, may be relatively more sensitive to the rate of prepayment on the related mortgage loans than other classes of securities and, if applicable, to the occurrence of an early retirement of the securities. The prospectus supplement for a series will set forth the related classes of securities that may be more sensitive to prepayment rates.

10

Confidential

See "Yield and Maturity Considerations" in this prospectus.

**The Exercise of an Optional Termination Right Will Affect the Yield to Maturity on the Related Securities**

The prospectus supplement for each series of securities will identify the party or parties that may, at its option, purchase the assets held by the trust if the aggregate principal balance of the mortgage loans and other assets held by the trust is less than the percentage specified in the related prospectus supplement of the aggregate principal balance of the outstanding mortgage loans and other trust assets at the cut-off date for that trust. The exercise of this option to terminate will result in the early retirement of the securities issued by that trust. The prospectus supplement for each series of securities will state the price to be paid by the terminating party and the amounts that the holders of the securities will be entitled to receive upon early retirement.

A trust may also be terminated and the securities retired upon the determination of the depositor, bond administrator or trustee, as applicable, based upon an opinion of counsel, that the REMIC status of the trust has been lost or that a substantial risk exists that the REMIC status will be lost for the then current tax year.

The termination of a trust and the early retirement of securities by any party would decrease the average life of the securities and would adversely affect the holders of securities that are entitled to interest distributions only. In addition, any other class of securities purchased at a premium could be adversely affected by an optional termination.

**Violations of Consumer Protection Laws May Result in Losses on the Mortgage Loans and the Securities Backed By Those Mortgage Loans**

Federal and state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices:

- regulate interest rates and other charges on mortgage loans;
- require specific disclosures to borrowers;
- require licensing of originators; and
- regulate generally the origination, servicing and collection process for the mortgage loans.

Depending on the specific facts and circumstances involved, violations may limit the ability of a trust to collect all or a part of the principal of or interest on the mortgage loans, may entitle the borrower to a refund of amounts previously paid and could result in liability for damages and administrative enforcement against the originator or an assignee of the originator, like a trust, or the initial servicer or a subsequent servicer, as the case may be. In particular, it is possible that mortgage loans held by a trust will be subject to the Home Ownership and Equity Protection Act of 1994 ("HOEPA"). HOEPA adds additional provisions to Regulation Z, the

11

JPMC_DEX_000071005

implementing regulation of the Federal Truth-In-Lending Act. These provisions impose additional disclosure and other requirements on creditors with respect to nonpurchase money mortgage loans with interest rates or origination costs in excess of prescribed levels. The provisions of HOEPA apply to mortgage loans that were originated on or after October 1, 1995. These provisions can impose specific statutory liabilities upon creditors who fail to comply with their provisions and may affect the enforceability of the related loans. In addition, any assignee of the creditor, like a trust, would generally be subject to all claims and defenses that the consumer could assert against the creditor, including the right to rescind the mortgage loan. Class action lawsuits under HOEPA have been brought naming as defendants securitization trusts like the trusts described in this prospectus.

The mortgage loan seller or originator will represent that all applicable federal and state laws were complied with in connection with the origination of the mortgage loans. If there is a breach of a representation that materially and adversely affects the interest of the trust, the mortgage loan seller or originator will be obligated to purchase the affected mortgage loan or to substitute a qualifying replacement mortgage loan. If the mortgage loan seller or originator fails to repurchase or substitute, a trust could experience losses which, to the extent not covered by credit support, could adversely affect the yield to maturity on the related securities. See "Legal Aspects of Mortgage Assets."

**Modification of a Mortgage Loan by the Servicer May Reduce the Yield on the Related Securities**

If a mortgage asset is in default or default is reasonably foreseeable, the servicer for the trust or the underlying Mortgage Security, if it determines that modification of the mortgage asset could reasonably be expected to result in collections and other recoveries for that mortgage asset in excess of the liquidation proceeds that would be recovered upon foreclosure of, or other realization upon, that mortgage asset, may permit modifications of the mortgage asset rather than proceeding with foreclosure. Modification may have the effect of reducing the interest rate on the mortgage asset, forgiving the payment of principal or interest or extending the final maturity date of the mortgage asset. Any modified mortgage asset held by the trust may result in reduced collections from that mortgage asset and, to the extent not covered by the related credit support, reduced distributions on one or more classes of the related securities. Any mortgage asset modified to extend the final maturity of the mortgage asset may result in extending the final maturity of one or more classes of the related securities. See "Collection and Other Servicing Procedures Employed by the Servicer."

The servicing agreement may permit the servicer to deliver to a lender an assignment of mortgage and the related endorsed mortgage note in connection with a refinance of

12

JPMC_DEX_000071006

the related mortgaged property. As a result, it may be possible to refinance a mortgage loan through modification of an existing mortgage note, reducing the costs and documentation burden of the refinancing. The depositor and its affiliates do not have substantial experience with this method of financing except in states, such as New York, in which it is the usual standard of practice of mortgage lending. It is unknown to what extent, if any, the availability of refinancing through this mechanism may affect the rate at which prepayments on the mortgage loans would otherwise occur.

**The Return on Your Securities Could be Reduced due to the Servicemembers Civil Relief Act or any Comparable State Legislation**

Following the terrorist attacks in the United States on September 11, 2001, the United States has increased its active military operations (including, most recently, significant military actions in Iraq) and has placed a substantial number of military reservists and members of the National Guard on active duty status. It is possible that the number of reservists and members of the National Guard placed on active duty status in the near future may increase. Calling reservists, members of the National Guard and civilians to active military duty may adversely affect the performance of your securities. Under the Servicemembers Civil Relief Act, as amended (the "Relief Act"), persons in active military service are provided relief from the performance of some payment obligations. The relief includes a 6.000% per annum interest rate cap on each mortgage loan, provided that the mortgage loan was obtained before the commencement of active military service. In addition, all civil court actions, such as bankruptcy and foreclosure proceedings, are delayed. See "Legal Aspects of Mortgage Assets—Servicemembers Civil Relief Act."

State legislation may provide similar relief for military personnel placed on active duty status.

The application of the interest rate cap to any mortgage loan would result in securityholders receiving less interest than they would otherwise be entitled to (to the extent that the interest rate otherwise payable by the borrower under the terms of the applicable mortgage note exceeded 6.000%), unless covered by credit support described in the related prospectus supplement.

The effect of a delay in foreclosure proceedings with respect to any mortgage loan by application of the Relief Act may be to cause a loss, or increase the severity of any loss that would have otherwise occurred, upon the final liquidation of the mortgage loan. These losses would be allocated to securityholders in the manner described in the related prospectus supplement, unless covered by credit support described in the prospectus supplement.

13

Confidential

JPMC_DEX_000071007

**Interest Only Loans Have a Greater Degree of Risk if a Default Occurs Because They do not Provide for any Payments of Scheduled Principal During an Initial Interest-Only Period**

If the mortgage pool includes mortgage loans that do not provide for any payments of scheduled principal during an initial interest-only period, the related prospectus supplement will specify the percentage of such interest only loans in the mortgage pool. During the initial interest-only period, monthly payments on the interest only loans will be comprised solely of interest accrued on the outstanding principal balance of the mortgage loan during the preceding calendar month. Since the mortgagors are not required to make scheduled principal payments on these mortgage loans during the interest-only period, the principal balance of the mortgage loan may be higher than the principal balance of a similar mortgage loan which requires the payment of both principal and interest throughout the entire term of the mortgage loan. A higher principal balance may result in a greater loss upon the liquidation of the mortgage loan due to a default.

**For transactions in which the offered securities are mortgage pass-through certificates, investors should consider the following ten risk factors:**

**The Trust May Not Have a Perfected Interest In Collections Commingled by the Servicer With Its Own Funds, Which Could Cause Delayed or Reduced Distributions on the Certificates**

The servicer will be permitted to commingle collections on the mortgage loans with its own funds, and may use the commingled funds for its own benefit. The trust may not have a perfected interest in these amounts, and thus distributions on the certificates could be delayed or reduced if the servicer were to enter conservatorship, receivership, or bankruptcy, were to become insolvent, or were to fail to perform its obligations under the related pooling agreement.

**The Conservatorship, Receivership, Bankruptcy, or Insolvency of WMB as Servicer, the Depositor, or the Trust Could Result In Delayed or Reduced Distributions on the Certificates**

**For transactions in which WMB acts as the initial servicer, investors should consider the following:**

WMB is the initial servicer of the mortgage loans and provides administrative services to the depositor. WMB is a federal savings association, and its deposits are insured by the FDIC. If certain events occur relating to WMB's financial condition or the propriety of its actions, the FDIC may be appointed as conservator or receiver for WMB.

The FDIC may be able to obtain a stay of any action by the trust, the trustee, or any holder of certificates to enforce any obligations of WMB under any transaction document or to collect any amount owing by WMB under any transaction document. The FDIC also may require that its claims process be followed before payments on the mortgage loans are released to the trustee. The delay caused by any of these actions could result in losses to holders of the certificates.

The FDIC, moreover, may have the power to choose whether or not the terms of the transaction documents will

14

JPMC_DEX_000071008

173

continue to apply. Thus, regardless of what the transaction documents provide, the FDIC could:

- authorize WMB to stop servicing the mortgage loans or to stop providing administrative services to the depositor;

- prevent the appointment of a successor servicer or the appointment of a successor administrator for the depositor; or

- alter the terms on which WMB continues to service the mortgage loans or provide administrative services to the depositor, including the amount or the priority of the fees paid to WMB.

If any of these events were to occur, the trust's rights under the transaction documents may be limited or eliminated. Such a repudiation by the FDIC could also excuse the other parties to the transaction documents from performing any of their obligations. Payments to holders of the certificates could be delayed or reduced. Holders of the certificates also may suffer a loss if the FDIC were to argue that any term of the transaction documents violates applicable regulatory requirements.

The depositor is a wholly-owned subsidiary of WMB. Certain banking laws and regulations may apply not only to WMB but to its subsidiaries as well. If the depositor were found to have violated any of these laws or regulations, holders of the certificates could suffer a loss on their investment.

Arguments also may be made that the FDIC's rights and powers extend to the depositor and the trust and that, as a consequence, the FDIC could repudiate or otherwise directly affect the rights of holders of the certificates under the transaction documents. If the FDIC were to take this position, losses to holders of the certificates could result.

In addition, no assurance can be given that the FDIC would not attempt to exercise control over the mortgage loans or the other assets of the depositor or the trust on an interim or a permanent basis. If this were to occur, distributions on the certificates could be delayed or reduced.

Furthermore, if a conservator or receiver for WMB were to argue that any of the conservator's or receiver's administrative expenses relate to the mortgage loans or the transaction documents, those expenses could be paid from collections on the mortgage loans before the trustee receives any payments, which could result in losses to holders of the certificates.

The depositor has been established and each trust will have been established so as to minimize the risk that either of them would become insolvent or enter

15

Confidential

JPMC_DEX_000071009

bankruptcy. Nevertheless, each of them may be eligible to file for bankruptcy, and no assurance can be given that the risk of insolvency or bankruptcy has been eliminated. If the depositor or the trust were to become insolvent or were to enter bankruptcy, distributions on the certificates could be delayed or reduced. Risks also exist that, if the depositor or the trust were to enter bankruptcy, the other entity and its assets (including the mortgage loans) would be treated as part of the bankruptcy estate.

Regardless of any decision made by the FDIC or ruling made by a court, moreover, the mere fact that WMB, the depositor, the trust, or any of their affiliates has become insolvent or entered conservatorship, receivership, or bankruptcy could have an adverse effect on the value of the mortgage loans and on the liquidity and value of the certificates.

There may be other possible effects of a receivership, conservatorship, bankruptcy, or insolvency of WMB, the depositor, or the trust that could result in delays or reductions in distributions on the certificates.

**The Conservatorship, Receivership, or Insolvency of WMB as Mortgage Loan Seller Could Result In Delayed or Reduced Distributions on the Certificates**

**For transactions in which WMB is a mortgage loan seller, investors should consider the following:**

WMB sells mortgage loans to the depositor. WMB is a federal savings association, and its deposits are insured by the FDIC. If certain events occur relating to WMB's financial condition or the propriety of its actions, the FDIC may be appointed as conservator or receiver for WMB.

WMB will treat its transfer of mortgage loans to the depositor as a sale. Arguments may be made, however, that the transfer of the mortgage loans constitutes only the grant of a security interest under applicable law.

Nevertheless, the FDIC has issued a regulation surrendering certain rights to reclaim, recover, or recharacterize a financial institution's transfer of financial assets such as the mortgage loans if:

- the transfer involved a securitization of the financial assets and meets specified conditions for treatment as a sale under relevant accounting principles;

- the financial institution received adequate consideration for the transfer;

- the parties intended that the transfer constitute a sale for accounting purposes; and

- the financial assets were not transferred fraudulently, in contemplation of the financial institution's insolvency, or with the intent to hinder, delay, or defraud the financial institution or its creditors.

WMB's transfer of the mortgage loans will be intended to satisfy all of these conditions.

16

JPMC_DEX_000071010

If a condition required under the FDIC's regulation were found not to have been met, however, the FDIC could seek to reclaim, recover, or recharacterize WMB's transfer of the related mortgage loans. The FDIC may not be subject to an express time limit in deciding whether to take these actions, and a delay by the FDIC in making a decision could result in delays or reductions in distributions on the certificates. If the FDIC were successful in any of these actions, moreover, holders of the certificates may not be entitled under applicable law to the full amount of their damages.

Even if the conditions set forth in the regulation were satisfied and the FDIC did not reclaim, recover, or recharacterize WMB's transfer of the related mortgage loans, distributions to holders of the certificates could be delayed or reduced if WMB entered conservatorship or receivership.

The FDIC may be able to obtain a stay of any action by the trust, the trustee, the servicer, or any holder of certificates to enforce any obligations of WMB under any transaction document or to collect any amount owing by WMB under any transaction document. The FDIC also may require that its claims process be followed before payments on the mortgage loans are released to the trustee. The delay caused by any of these actions could result in losses to holders of the certificates.

The FDIC, moreover, may have the power to choose whether or not the terms of the transaction documents will continue to apply. Thus, regardless of what the transaction documents provide, the FDIC could authorize WMB to refuse to perform its obligations under the mortgage loan sale agreement pursuant to which it sold mortgage loans to the depositor, including its obligations to make payments or to repurchase or substitute for mortgage loans.

If this were to occur, the trust's rights under the transaction documents may be limited or eliminated. Such a repudiation by the FDIC could also excuse the other parties to the transaction documents from performing any of their obligations. Payments to holders of the certificates could be delayed or reduced. Holders of the certificates also may suffer a loss if the FDIC were to argue that any term of the transaction documents violates applicable regulatory requirements.

There may be other possible effects of a receivership, conservatorship, bankruptcy, or insolvency of WMB, the depositor, or the trust that could result in delays or reductions in distributions on the certificates.

17

Confidential

**The Conservatorship, Receivership, or Insolvency of WMB fsb as Mortgage Loan Seller Could Result In Delayed or Reduced Distributions on the Certificates**

**For transactions in which WMB fsb is a mortgage loan seller, investors should consider the following:**

WMB fsb sells mortgage loans to the depositor. WMB fsb is a federal savings bank, and its deposits are insured by the FDIC. If certain events occur relating to WMB fsb's financial condition or the propriety of its actions, the FDIC may be appointed as conservator or receiver for WMB fsb.

WMB fsb will treat its transfer of mortgage loans to the depositor as a sale. Arguments may be made, however, that the transfer of the mortgage loans constitutes only the grant of a security interest under applicable law.

Nevertheless, the FDIC has issued a regulation surrendering certain rights to reclaim, recover, or recharacterize a financial institution's transfer of financial assets such as the mortgage loans if:

- the transfer involved a securitization of the financial assets and meets specified conditions for treatment as a sale under relevant accounting principles;

- the financial institution received adequate consideration for the transfer;

- the parties intended that the transfer constitute a sale for accounting purposes; and

- the financial assets were not transferred fraudulently, in contemplation of the financial institution's insolvency, or with the intent to hinder, delay, or defraud the financial institution or its creditors.

WMB fsb's transfer of the mortgage loans will be intended to satisfy all of these conditions.

If a condition required under the FDIC's regulation were found not to have been met, however, the FDIC could seek to reclaim, recover, or recharacterize WMB fsb's transfer of the related mortgage loans. The FDIC may not be subject to an express time limit in deciding whether to take these actions, and a delay by the FDIC in making a decision could result in delays or reductions in distributions on the certificates. If the FDIC were successful in any of these actions, moreover, holders of the certificates may not be entitled under applicable law to the full amount of their damages.

Even if the conditions set forth in the regulation were satisfied and the FDIC did not reclaim, recover, or recharacterize WMB fsb's transfer of the related mortgage loans, distributions to holders of the certificates could be delayed or reduced if WMB fsb entered conservatorship or receivership.

The FDIC may be able to obtain a stay of any action by the trust, the trustee, the servicer, or any holder of certificates to enforce any obligations of WMB fsb under

18

JPMC_DEX_000071012

any transaction document or to collect any amount owing by WMB fsb under any transaction document. The FDIC also may require that its claims process be followed before payments on the mortgage loans are released to the trustee. The delay caused by any of these actions could result in losses to holders of the certificates.

The FDIC, moreover, may have the power to choose whether or not the terms of the transaction documents will continue to apply. Thus, regardless of what the transaction documents provide, the FDIC could authorize WMB fsb to refuse to perform its obligations under the mortgage loan sale agreement pursuant to which it sold mortgage loans to the depositor, including its obligations to make payments or to repurchase or substitute for mortgage loans.

If this were to occur, the trust's rights under the transaction documents may be limited or eliminated. Such a repudiation by the FDIC could also excuse the other parties to the transaction documents from performing any of their obligations. Payments to holders of the certificates could be delayed or reduced. Holders of the certificates also may suffer a loss if the FDIC were to argue that any term of the transaction documents violates applicable regulatory requirements.

There may be other possible effects of a receivership, conservatorship, or insolvency of WMB fsb that could result in delays or reductions in distributions on the certificates.

**The Bankruptcy or Insolvency of WMMSC Could Result In Delayed or Reduced Distributions on the Certificates**

**For transactions in which WMMSC is a mortgage loan seller, investors should consider the following:**

WMMSC sells mortgage loans to the depositor. WMMSC will represent and warrant in the mortgage loan sale agreement that the transfer of the mortgage loans to the depositor is an absolute sale, so that the depositor is the sole owner of each mortgage loan. WMMSC is eligible to be the debtor in a bankruptcy case. If WMMSC were to become a debtor in a bankruptcy case, and a party in interest (including WMMSC itself) were to take the position that the transfer of the mortgage loans to the depositor is not a sale, but rather should be recharacterized as the grant of a security interest in the mortgage loans to secure a borrowing of WMMSC, delays in distributions on the certificates could result. If a court were to adopt such a position, then delays or reductions in distributions on the certificates could result.

WMMSC and the depositor have taken steps to minimize the risk that in the event WMMSC were to become the debtor in a bankruptcy case, a court would order that the assets and liabilities of the depositor be substantively consolidated with those of WMMSC. The depositor is a separate special purpose corporation. If a party in interest (including WMMSC itself) asserted that the depositor's

19

Confidential

JPMC_DEX_000071013

assets and liabilities should be consolidated with those of WMMSC, delays in distributions on the certificates could result. If the court ordered that the depositor's assets and liabilities be consolidated with those of WMMSC, there could be delays or reductions in distributions on certificates.

Should WMMSC go into bankruptcy, there could be other adverse effects on the holders of the certificates that could result in delays or reductions in distributions on certificates. These adverse effects could include, but may not be limited to, one or more of the following. The automatic stay provisions of the bankruptcy laws could prevent (unless approval of the bankruptcy court was obtained) any action by the depositor, the trust, the trustee, the servicer, or any holder of certificates to enforce any obligations of WMMSC under any transaction document or to collect any amount owing by WMMSC under any transaction document. In addition, with the authorization of the bankruptcy court, WMMSC may be able to repudiate any of the transaction documents to which it is a party. Such a repudiation would excuse WMMSC from performing any of its obligations (including payment obligations). The rights of the trust under the transaction documents may be limited or eliminated. Such a repudiation could also excuse the other parties to the transaction documents from performing any of their obligations. In particular, WMMSC may be able to repudiate its obligations to make payments or to repurchase or substitute for mortgage loans as required by the mortgage loan sale agreement.

Regardless of any ruling made by a court, moreover, the mere fact that WMMSC or any of its affiliates has become insolvent or gone into bankruptcy, conservatorship, or receivership could have an adverse effect on the value of the mortgage loans and on the liquidity and value of the certificates.

There may be other possible effects of a bankruptcy or insolvency of WMMSC that could result in delays or reductions in distributions on the certificates.

**The Bankruptcy, Conservatorship, Receivership, or Insolvency of a Mortgage Loan Seller Could Result In Delayed or Reduced Distributions on the Certificates**

**For transactions in which an entity other than WMB, WMB fsb or WMMSC is a mortgage loan seller, investors should consider the following:**

The transfer of mortgage loans by a mortgage loan seller (other than WMB, WMB fsb or WMMSC) to WMB, WMB fsb, WMMSC, or the depositor will be structured as an absolute sale, so that the transferee is the sole owner of each mortgage loan. If the mortgage loan seller were to become the subject of a receivership, conservatorship, bankruptcy, or other insolvency proceeding, and a party in interest (including the mortgage loan seller itself) were to take the position that the transfer of the mortgage loans is not a sale, but rather

20

JPMC_DEX_000071014

should be recharacterized as the grant of a security interest in the mortgage loans to secure a borrowing of the mortgage loan seller, delays in distributions on the certificates could result. If a court (or other relevant entity) were to adopt such a position, then delays or reductions in distributions on the certificates could result.

**Regulatory Action With Respect to WMB or WMB fsb Could Result In Losses**

Each of WMB and WMB fsb is regulated and supervised by the Office of Thrift Supervision and the FDIC. These regulatory authorities, and possibly others, have broad powers of enforcement with respect to WMB, WMB fsb, and their affiliates.

If any of these regulatory authorities were to conclude that an obligation under a transaction document to which WMB or WMB fsb is a party were an unsafe or unsound practice or violated any law, regulation, written condition, or agreement applicable to WMB, WMB fsb, or their affiliates, that authority may have the power to order WMB, WMB fsb, or the related affiliate to rescind the transaction document, to refuse to perform the obligation, to amend the terms of the obligation, or to take any other action determined by that authority to be appropriate. In addition, WMB, WMB fsb, or the related affiliate probably would not be liable to holders of certificates for contractual damages for complying with such an order, and holders of certificates would be unlikely to have any recourse against the regulatory authority. Therefore, if such an order were issued, distributions on the certificates could be delayed or reduced.

In one case of which the depositor is aware, the regulatory authority ordered the financial institution to immediately resign as servicer and to cease performing its duties as servicer within approximately 120 days, to immediately withhold and segregate funds from collections for payment of its servicing fee (notwithstanding the priority of payments in the securitization documents and the perfected security interest of the relevant trust in those funds), and to increase its servicing fee percentage above that which was specified in the securitization documents.

**Some Interests Could Have Priority Over the Trust's Interest In the Mortgage Loans, Which Could Cause Delayed or Reduced Distributions on the Certificates**

**For transactions in which WMB fsb holds some or all of the mortgage notes and mortgages as custodian on behalf of the trust, investors should consider the following:**

The trustee will not physically possess some or all of the mortgage notes and mortgages related to the mortgage loans owned by the Trust. Instead, WMB fsb will hold some or all of the mortgage notes and mortgages as custodian on behalf of the trust. The mortgage notes and mortgages held by WMB fsb will not be endorsed or otherwise marked to reflect the transfer to the trust, and assignments of the mortgages to the trust will not be prepared or recorded. As a result, if a third party were to obtain physical possession of those mortgage notes or

21

JPMC_DEX_000071015

mortgages without actual knowledge of the prior transfer to the trust, the trust's interest in those mortgage notes and mortgages could be defeated, thereby likely resulting in delays or reductions in distributions on the certificates.

**Assignments of Mortgages to the Trustee or the Trust Will Not Be Prepared or Recorded**

**For transactions in which WMB fsb holds some or all of the mortgage notes and mortgages as custodian on behalf of the trust, investors should consider the following:**

With respect to each mortgage held by WMB fsb as custodian on behalf of the trust, an assignment of the mortgage transferring the beneficial interest under the mortgage to the trustee or the trust will not be prepared or recorded. In addition, an assignment of the mortgage will not be prepared or recorded in connection with the sale of the mortgage loan from the mortgage loan seller to the depositor. In many states, the recording of a separate assignment of the mortgage is not required to validly transfer ownership of the mortgage loan. However, at any time until an assignment of the mortgage with respect to a mortgage loan is recorded in the name of the trustee or the trust in the appropriate jurisdiction, (a) the mortgage loan seller, as the existing mortgagee of record, could execute another assignment of mortgage to any party with respect to such mortgage, which assignment of mortgage could be recorded prior to any recording of an assignment of the mortgage to the trustee or the trust and which would support an adverse claim of such other party with respect to the mortgage loan and/or result in delay in enforcing the mortgage, (b) the mortgage loan seller, as the existing mortgagee of record, could execute and deliver to the mortgagor an instrument of discharge and satisfaction with respect to the mortgage, which would generally be effective upon recording to release the lien of such mortgage loan, (c) the trustee or the trust may not have a claim against the mortgagor for payments made to the mortgage loan seller, as the existing mortgagee of record, but instead may be required to proceed against the mortgage loan seller to recover the amount of any such payment made, (d) the trustee or the trust may not be able, acting directly in its own name, to enforce the mortgage against the related mortgaged property or mortgagor and may be required to act indirectly through the mortgage loan seller, as the existing mortgagee of record, and (e) the mortgage loan seller, and not the trustee or the trust, would be entitled to receive any notice with respect to any mortgage required to be given to the mortgagee of record. The occurrence of any of these could result in delays or reductions in distributions on the certificates.

22

Confidential

**The Conservatorship, Receivership, or Insolvency of WMB fsb as Custodian Could Result In Delayed or Reduced Distributions on the Certificates**

**For transactions in which WMB fsb holds some or all of the mortgage notes and mortgages as custodian on behalf of the trust, investors should consider the following:**

WMB fsb is the custodian of some or all of the mortgage loan files. WMB fsb is a federal savings bank, and its deposits are insured by the FDIC. If certain events occur relating to WMB fsb's financial condition or the propriety of its actions, the FDIC may be appointed as conservator or receiver for WMB fsb.

The FDIC may be able to obtain a stay of any action by the trust, the trustee, the servicer, or any holder of certificates to enforce any obligations of WMB fsb under any transaction document or to collect any amount owing by WMB fsb under any transaction document. The FDIC also may require that its claims process be followed before payments on the mortgage loans are released to the trustee. The delay caused by any of these actions could result in losses to holders of the certificates.

The FDIC, moreover, may have the power to choose whether or not the terms of the transaction documents will continue to apply. Thus, regardless of what the transaction documents provide, the FDIC could:

- authorize WMB fsb to stop providing custodial services;

- prevent the appointment of a successor custodian; or

- alter the terms on which WMB fsb continues to provide custodial services, including the amount or the priority of the fees paid to WMB fsb.

If any of these events were to occur, the trust's rights under the transaction documents may be limited or eliminated. Such a repudiation by the FDIC could also excuse the other parties to the transaction documents from performing any of their obligations. Payments to holders of the certificates could be delayed or reduced. Holders of the certificates also may suffer a loss if the FDIC were to argue that any term of the transaction documents violates applicable regulatory requirements.

The depositor is an affiliate of WMB fsb. Certain banking laws and regulations may apply not only to WMB fsb but to its affiliates as well. If the depositor were found to have violated any of these laws or regulations, holders of the certificates could suffer a loss on their investment. Arguments also may be made that the FDIC's rights and powers extend to the depositor and the trust and that, as a consequence, the FDIC could repudiate or otherwise directly affect the rights of holders of the certificates under the transaction documents. If the FDIC were to take this position, losses to holders of the certificates could result. In addition, no assurance can be given that the FDIC would not attempt to exercise control over the mortgage loans or the other assets of the depositor or the

23

JPMC_DEX_000071017

trust on an interim or a permanent basis. If this were to occur, distributions on the certificates could be delayed or reduced.

Regardless of any decision made by the FDIC or ruling made by a court, moreover, the mere fact that WMB fsb or any of its affiliates has become insolvent or entered conservatorship, receivership, or bankruptcy could have an adverse effect on the value of the mortgage loans and on the liquidity and value of the certificates.

There may be other possible effects of a receivership, conservatorship, or insolvency of WMB fsb that could result in delays or reductions in distributions on the certificates.

24

Confidential

## ADDITIONAL RISK FACTORS APPLICABLE TO NEGATIVE AMORTIZATION LOANS

The following risk factors apply to any offered securities backed by Negative Amortization Loans. If your security is backed by Negative Amortization Loans, as described in the prospectus supplement, you should carefully consider the following factors in connection with the purchase of your security as well as the other risk factors in this prospectus and in the prospectus supplement related to your security.

**The Yield on Your Securities May be Limited by Maximum Mortgage Interest Rates**

Each Negative Amortization Loan has a maximum mortgage interest rate, which may prevent the mortgage interest rate on a mortgage loan from increasing, despite prevailing market interest rates. As a result, the yield on your securities may be adversely affected.

**Increases in the Related Index May Increase the Likelihood of Negative Amortization**

After the initial fixed-rate period, the mortgage interest rate on each Negative Amortization Loan will be adjusted monthly to equal the sum of the related index and a margin. Since the mortgage interest rate on each Negative Amortization Loan adjusts monthly and the minimum monthly payment adjusts annually (unless the principal balance of the mortgage loan would otherwise exceed a certain percentage, specified in the related mortgage note and in the related prospectus supplement, of its original principal balance), increases in the index will cause a larger portion of the minimum monthly payment to be allocated to interest and a smaller portion to principal. If the interest due on the Negative Amortization Loan exceeds the minimum monthly payment, the excess interest will be added to its outstanding principal balance in the form of "negative amortization." In addition, on any adjustment date until the fifth anniversary of the first due date, the minimum monthly payment may not increase by more than 7.5% (unless the principal balance of the Negative Amortization Loan would otherwise exceed a specified percentage of its original principal balance), which may not be enough to raise the minimum monthly payment to the amount necessary to avoid negative amortization.

Increases in the related index are a significant possibility for any Negative Amortization Loan, particularly if it was originated at a time when the value of the index was low relative to historical values. Many factors, including changes in economic conditions and monetary policy of the U.S. Federal Reserve Bank, may lead to increases in the index.

**Even if the Related Index Remains Constant, the Minimum Monthly Payment on the Negative Amortization Loans May be Less Than the Actual Interest Due For the First Five Years, Increasing the Likelihood of Negative Amortization During the Early Years of the Negative Amortization Loans**

The minimum monthly payment for the entire first year following origination of each Negative Amortization Loan reflects the fixed rate in effect during the initial fixed-rate period, which will generally be lower than the fully indexed rate in effect at any time during the first year. Therefore, after the initial fixed-rate period, even if the related index does not increase, the minimum monthly payment during the first year of the mortgage loan may not be enough to pay the amount of interest due on the mortgage loan, which is calculated based on the sum of

25

Confidential

the index and the margin. If the mortgagor chooses to pay the minimum monthly payment rather than a higher payment that includes all interest due, this will lead to an increase in the outstanding principal balance of the mortgage loan in the form of negative amortization.

Even after the first year, when the minimum monthly payment may increase by 7.5%, this adjustment may not be enough to raise the minimum monthly payment to the amount necessary to pay the interest due on the mortgage loan based on the sum of the index and the margin in effect during the following year. If during the following year the new minimum monthly payment is still less than the amount of interest due, there will continue to be negative amortization if the mortgagor chooses to pay the minimum monthly payment.

Therefore the effect of the initial fixed rate at the beginning of the life of the mortgage loan may be to continue to cause the minimum monthly payment to be less than the monthly interest due on the mortgage loan until the fifth anniversary of the first due date (or until such due date as the principal balance of the mortgage loan would otherwise exceed a specified percentage of its original principal balance) when the minimum monthly payment will be reset to a fully-amortizing payment regardless of the 7.5% limit.

**Negative Amortization May Increase Losses Applied to Your Securities**

When interest due on a Negative Amortization Loan is added to the principal balance of the mortgage loan through negative amortization, the mortgaged property provides proportionally less security for the repayment of the mortgage loan. Therefore, if the mortgagor defaults on the mortgage loan there is a greater likelihood that a loss will be incurred upon the liquidation of the mortgaged property. Furthermore, the loss will be larger than would otherwise have been recognized in the absence of negative amortization. Securityholders will bear these losses, to the extent not covered by credit support, as described in the related prospectus supplement.

**Allocations of Net Negative Amortization May Affect Your Yield**

For any given month in which interest due on Negative Amortization Loans is added to the principal balances of those mortgage loans through negative amortization, the reduction in interest distributions resulting from such negative amortization may, if so provided in the related prospectus supplement, be offset, in part, by applying principal prepayments received on the mortgage loans to interest distributions on the related securities. For any distribution date, the amount of negative amortization on the mortgage loans, to the extent not offset by principal prepayments received on the mortgage loans, referred to as "Net Negative Amortization," will be deducted from the interest payable to the related securities, as described in the related prospectus supplement. The amount of the reduction of accrued interest distributable to each class of securities attributable to Net Negative Amortization will be

26

Confidential

added to the class principal balance of that class. The increase in the class principal balance of any class of securities will have the effect of increasing the applicable investors' exposure to realized losses on the related mortgage loans. In addition, because the allocation of principal prepayments between senior and subordinate securities may be determined based on the relationship between the aggregate class principal balance of the senior securities and the aggregate class principal balance of the subordinate securities, this method of allocating Net Negative Amortization may affect the rate and timing of distributions of principal prepayments among the classes of securities, as described in the related prospectus supplement.

**As a Result of Negative Amortization, Additional Negative Amortization Loans Not Covered by Primary Insurance May in the Future Have a Loan-to-Value Ratio in Excess of 80%**

The related prospectus supplement will describe the percentage, if any, of Negative Amortization Loans not covered by a primary insurance policy as of the related cut-off date, whose loan-to-value ratio was less than or equal to 80% at the time of origination but increased to more than 80% as a result of negative amortization.

Additional Negative Amortization Loans not covered by a primary insurance policy, whose loan-to-value ratio was less than or equal to 80% at the time of origination, may after the related cut-off date experience an increase in their loan-to-value ratio to exceed 80%, as a result of negative amortization.

**A Declining Interest Rate Environment May Accelerate the Payment on Your Securities**

If a decline in the related index causes the interest due on a Negative Amortization Loan to be less than the current minimum monthly payment, the amount of that difference will be subtracted from the outstanding principal balance of the mortgage loan and remitted to the related securityholders as principal distributions on their securities. To the extent that these amounts are greater than the principal payments on the Negative Amortization Loans you anticipated, the principal balance of your securities may be reduced to zero sooner than you expected.

27

Confidential

JPMC_DEX_000071021

186

## DESCRIPTION OF THE TRUSTS

Each trust will hold assets consisting of:

- a segregated pool of various types of first and junior lien mortgage loans, construction loans, cooperative apartment loans, home equity revolving lines of credit (including partial balances of those lines of credit or beneficial interests in those lines of credit as are subject to the related agreement governing the trust), or Mortgage Securities;

- amounts on deposit in the distribution account, pre-funding account, if applicable, or any other account maintained for the benefit of the securityholders;

- property acquired on behalf of securityholders by foreclosure, deed in lieu of foreclosure or repossession and any revenues received on the property;

- any hazard insurance policies, FHA insurance policies, VA guarantees and primary mortgage insurance policies held by the trust, each as described under "Description of Primary Insurance Policies";

- the rights of the depositor under the agreement or agreements under which it acquired the mortgage assets held by the trust;

- any cash advance reserve fund or surety bond held by the trust, each as described under "Description of the Securities—Advances by Servicer in Respect of Delinquencies on the Trust Assets"; and

- any letter of credit, mortgage pool insurance policy, special hazard insurance policy, bankruptcy bond, fraud bond, financial guarantee insurance policy, reserve fund, currency or interest rate exchange agreement or guarantee, each as described under "Description of Credit Support."

The mortgage loans may be mortgage loans that have been consolidated and/or have had various terms changed, mortgage loans that have been converted from adjustable rate loans to fixed rate loans, or construction loans which have been converted to permanent loans.

Any Mortgage Securities that are held by a trust may have been issued previously by the depositor or an affiliate of the depositor, a financial institution, another entity engaged in the business of mortgage lending or a limited purpose entity organized for the purpose of, among other things, acquiring and depositing mortgage loans into trusts, and selling beneficial interests in such trusts. If any of the Mortgage Securities held by a trust are Agency Securities, such Agency Securities may have been guaranteed and/or issued by Ginnie Mae, Freddie Mac, or Fannie Mae. As to any series of securities, the accompanying prospectus supplement will include a description of the Mortgage Securities and any related credit enhancement, and the mortgage loans underlying those Mortgage Securities will be described together with any other mortgage loans included in the mortgage pool relating to that series. References in this prospectus to Advances to be made and other actions to be taken by the servicer in connection with the mortgage loans may include Advances made and other actions taken under the terms of the Mortgage Securities. Each security will evidence an interest in only the related trust, and not in any other trust.

A portion of the interest received on a mortgage loan may not be included in the assets of the related trust. Instead, that interest may be retained by or payable to the originator, servicer or seller (or a designee of one of the foregoing) of the loan, free and clear of the interest of securityholders under the related agreement.

### Description of the Mortgage Assets to be Held By a Trust

Each mortgage asset will be originated by a person other than the depositor. Each mortgage asset will be selected by the depositor for sale to a trust from among those purchased by the depositor, either directly or through its affiliates, from Washington Mutual Bank, the parent of the depositor, and its affiliates or from banks, savings and loan associations, mortgage bankers, mortgage brokers, investment banking firms, the Federal Deposit Insurance Corporation and other mortgage loan originators or sellers not affiliated with the depositor. Each seller of mortgage assets to the depositor will be referred to in this prospectus and the related prospectus supplement as a mortgage loan seller. Each mortgage asset may have been originated by the mortgage loan seller or by a mortgage loan originator from which the mortgage

28

JPMC_DEX_000071022

loan seller or an intervening seller of the mortgage asset purchased the mortgage asset. The mortgage assets acquired by the depositor will have been originated in accordance with the underlying criteria described in this prospectus under "The Depositor's Mortgage Loan Purchase Program—Underwriting Standards" or in the prospectus supplement. All mortgage assets held by a trust as of the Closing Date will have been purchased by the depositor on or before the Closing Date. However, in the case of pre-funding, the agreement governing the trust may provide for the transfer by the mortgage loan seller of additional mortgage assets to the related trust after the Closing Date. See "Description of the Pre-Funding Account for the Purchase of Additional Mortgage Loans."

The mortgage assets held by a trust will be evidenced by a promissory note or contract, referred to in this prospectus as a mortgage note, and may be secured by any of the following:

- first or junior liens on one-to-four-family residential properties including detached and attached dwellings, townhouses, rowhouses, individual condominium units, individual units in planned-unit developments and individual units in de minimis planned-unit developments. Loans secured by this type of property are referred to in this prospectus as single-family loans and may be conventional loans, FHA-insured loans or VA-guaranteed loans as specified in the related prospectus supplement;

- first or junior liens secured by shares in a private cooperative housing corporation that give the owner of the shares the right to occupy a particular dwelling unit in the cooperative;

- rental apartments or projects, including apartment buildings owned by cooperative housing corporations, containing five or more dwelling units. The multifamily properties may include high-rise, mid-rise or garden apartments. Loans secured by this type of property may be conventional loans or FHA-insured loans as specified in the related prospectus supplement;

- properties consisting of mixed residential and commercial structures;

- commercial properties including office buildings, retail buildings and a variety of other commercial properties as may be described in the related prospectus supplement; provided, however, that no more than 10% of the assets held by a trust, by original principal balance, will be secured by these types of commercial properties;

- leasehold interests in residential properties, which are interests held by a mortgagor who is leasing the property, as lessee under a long term ground lease, from the fee owner of the property;

- manufactured homes that are permanently affixed to their site; or

- real property acquired upon foreclosure or comparable conversion of the mortgage loans held by a trust.

Mortgage loans made with respect to multifamily or commercial property may entail risks of delinquency and foreclosure, and risks of loss in the event of a delinquency and foreclosure, that are greater than similar risks associated with single-family property. The ability of a mortgagor to repay a loan secured by an income-producing property typically is dependent primarily upon the successful operation of such property rather than any independent income or assets of the mortgagor. Thus, the value of an income-producing property is directly related to the net operating income derived from such property. In contrast, the ability of a mortgagor to repay a single-family loan typically is dependent primarily upon the mortgagor's household income, rather than the capacity of the related property to produce income. Thus, other than in geographical areas where employment is dependent upon a particular employer or an industry, the mortgagor's income tends not to reflect directly the value of a single-family property. A decline in the net operating income of an income-producing property will likely affect both the performance of the related loan as well as the liquidation value of such property, whereas a decline in the income of a mortgagor on a single-family property will likely affect the performance of the related loan but may not affect the liquidation value of such property.

The performance of a mortgage loan secured by an income-producing property leased by the mortgagor to tenants, as well as the liquidation value of such property, may be dependent upon the business operated by such tenants in connection with such property, the creditworthiness of such tenants or both. The risks associated with such loans may be offset by the number of tenants or, if applicable, a

29

diversity of types of business operated by such tenants. Commercial mortgage loans held by a trust may be secured by liens on owner-occupied mortgaged properties or on mortgaged properties leased to a single tenant. Accordingly, a decline in the financial condition of the borrower or single tenant, as applicable, may have a disproportionately greater effect on the net operating income from such mortgaged properties than would be the case with respect to mortgaged properties with multiple tenants. Furthermore, the value of any commercial or multifamily mortgaged property may be adversely affected by risks generally incident to interests in real property, including:

- changes in general or local economic conditions and/or specific industry segments;

- declines in real estate values;

- declines in rental or occupancy rates;

- increases in interest rates, real estate tax rates and other operating expenses;

- changes in governmental rules, regulations and fiscal policies, including environmental legislation;

- acts of God; and

- other factors beyond the control of the depositor, the servicer or the trust.

Commercial and multifamily mortgage loans that are held by a trust may be nonrecourse loans or loans for which borrower recourse may be restricted or unenforceable, as to which, in the event of mortgagor default, recourse may be had only against the specific multifamily or commercial property and such other assets, if any, as have been pledged to secure the mortgage loan. With respect to those mortgage loans that provide for recourse against the mortgagor and its assets generally, there can be no assurance that such recourse will ensure a recovery in respect of a defaulted mortgage loan greater than the liquidation value of the related mortgaged property.

The term of any leasehold interest that secures a mortgage loan will generally exceed the term of the related mortgage note by at least five years.

The manufactured homes securing the mortgage loans will consist of manufactured homes within the meaning of 42 United States Code, Section 5402(6), which defines a manufactured home as "a structure, transportable in one or more sections, which in the traveling mode, is eight body feet or more in width or forty body feet or more in length, or, when erected on site, is three hundred twenty or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air conditioning, and electrical systems contained therein; except that such term shall include any structure which meets all the requirements of this paragraph except the size requirements and with respect to which the manufacturer voluntarily files a certification required by the Secretary of Housing and Urban Development and complies with the standards established under this chapter."

The mortgaged properties may be located in any one of the fifty states, the District of Columbia, Guam, Puerto Rico or any other territory of the United States. The mortgaged properties may include vacation, second and nonowner occupied homes.

The mortgage assets to be held by a trust may be any one of the following types of mortgage assets:

- Fully amortizing mortgage loans with a fixed rate of interest and level monthly payments to maturity;

- Fully amortizing mortgage loans with an interest rate that adjusts periodically, with corresponding adjustments in the amount of monthly payments, to equal the sum, which may be rounded, of a fixed percentage amount and an index;

- ARM Loans that provide for an election, at the borrower's option, to convert the adjustable interest rate to a fixed interest rate, which will be described in the related prospectus supplement;

- Negative Amortization Loans that provide for negative amortization or accelerated amortization resulting from delays in or limitations on the payment adjustments necessary to amortize fully

30

JPMC_DEX_000071024

the outstanding principal balance of the loan at its then applicable interest rate over its remaining term;

- Fully amortizing mortgage loans with a fixed interest rate and level monthly payments, or payments of interest only, during the early years of the term, followed by periodically increasing or decreasing monthly payments of principal and interest for the duration of the term or for a specified number of years, which will be described in the related prospectus supplement;

- Fixed interest rate mortgage loans providing for level payment of principal and interest on the basis of an assumed amortization schedule and a balloon payment at the end of a specified term;

- Mortgage loans that provide for a line of credit under which amounts may be advanced to the borrower from time to time including home equity revolving credit loans;

- Fixed interest rate mortgage loans that provide that the interest may increase upon default, which increased rate may be subject to adjustment and may or may not convert back to the original fixed interest rate upon cure of the default;

- Fixed interest rate mortgage loans that provide for increases or reductions in the interest rate, and corresponding monthly payment, during the first 36, 60, 84 or 120 months (or other specified period) of the term of the mortgage loan;

- Limited documentation or no documentation mortgage loans;

- Additional Collateral Loans;

- Previously issued Mortgage Securities; and

- "Re-performing loans," which term includes mortgage loans that are subject to a repayment plan or bankruptcy plan, and that had arrearages of at least three monthly payments when the repayment plan or bankruptcy plan was entered into, and mortgage loans that have been modified. These mortgage loans may be acquired by the depositor from a wide variety of sources through bulk or periodic sales. The rate of default on re-performing mortgage loans may be higher than the rate of default on mortgage loans that have not previously been in arrears.

Each single-family loan having a loan-to-value ratio at origination in excess of 80% may be required to be covered by a primary mortgage guaranty insurance policy insuring against default on the mortgage loan as to at least the amount of the mortgage loan exceeding 75% of the value of the mortgaged property at origination. This type of insurance will remain in force at least until the mortgage loan amortizes to a level that would produce a loan-to-value ratio lower than 80%. See "Description of Primary Insurance Policies—Primary Mortgage Insurance Policies."

The trust may hold mortgage loans secured by junior liens, and the related senior lien may not be held by the trust. The primary risk to holders of mortgage loans secured by junior liens is the possibility that adequate funds will not be received in connection with a foreclosure of the related senior liens to satisfy fully both the senior liens and the junior mortgage loan. In addition, some or all of the single-family loans secured by junior liens may be High LTV Loans. See "Legal Aspects of Mortgage Assets—Foreclosure on Mortgages."

The loan-to-value ratio of a mortgage loan at any given time is the ratio, expressed as a percentage, of the then outstanding principal balance of the mortgage loan, or, in the case of a home equity line of credit loan, the maximum principal amount which may be advanced over the term of the loan, plus, in the case of a mortgage loan secured by a junior lien, the outstanding principal balance of the related senior liens, to the value of the related mortgaged property. The value of a single-family property or cooperative unit generally is the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of the loan and (b) if the mortgaged property is being purchased in conjunction with the origination of the mortgage loan, the sales price for the property.

The underwriting standards of the mortgage loan originator or mortgage loan seller may require an internal review of the appraisal (a "review appraisal") used to determine the loan-to-value of a mortgage

31

JPMC_DEX_000071025

loan which may be performed by underwriters rather than a licensed appraiser. Where the review appraisal results in a valuation of the mortgaged property that is less than a specified percentage of the original appraisal, the loan-to-value ratio of the related mortgage loan will be based on the review appraisal.

See "Description of the Securities—Representations and Warranties Regarding the Mortgage Loans; Remedies for Breach" in this prospectus for a description of representations made by or on behalf of mortgage loan sellers at the time mortgage loans are sold.

The trust may hold mortgage loans subject to temporary buydown plans which provide that the monthly payments made by the borrower in the early years of the mortgage loan will be less than the scheduled monthly payments on the mortgage loan, the resulting difference to be made up from (a) an amount contributed by the borrower, the seller of the mortgaged property, or another source and placed in a custodial account and (b) in some cases, investment earnings on the buydown funds. The borrower under a buydown mortgage loan is usually qualified at the lower monthly payment taking into account the funds on deposit in the custodial account. Accordingly, the repayment of a buydown mortgage loan is dependent on the ability of the borrower to make larger level monthly payments after the funds in the custodial account have been depleted. See "The Depositor's Mortgage Loan Purchase Program— Underwriting Standards" for a discussion of loss and delinquency considerations relating to buydown mortgage loans.

The trust may hold mortgage loans with respect to which a portion of the loan proceeds are held back from the mortgagor until required repairs or improvements on the mortgaged property are completed, in accordance with the mortgage loan seller's underwriting standards.

The trust may hold mortgage loans that are delinquent as of the related cut-off date. In that case, the related prospectus supplement will set forth, as to each mortgage loan, available information as to the period of delinquency and any other information relevant for a prospective purchaser to make an investment decision. No mortgage loan held by a trust will be more than 90 days delinquent and no trust will hold 20% or more (by principal balance) of mortgage loans which are more than 30 days delinquent.

A mortgage loan may contain a prohibition on prepayment or a Lockout Period or require payment of a prepayment charge. A multifamily, commercial or mixed-use loan may also contain a provision that entitles the lender to a share of profits realized from the operation or disposition of the related mortgaged property. If the holders of any class or classes of offered securities of a series will be entitled to all or a portion of this type of equity participation, the related prospectus supplement will describe the equity participation and the method or methods by which distributions in respect of the equity participations will be made.

*Limited Documentation and No Documentation Mortgage Loans*

Limited documentation and no documentation mortgage loans are mortgage loans which require less documentation and verification than other mortgage loans, and which may be originated with minimal or no investigation into the related borrower's credit history and income profile by the originator. The underwriting for limited documentation or no documentation loans may be based primarily or entirely on an appraisal or other valuation of the mortgaged property and the LTV or combined LTV ratio at origination.

*Additional Collateral Loans*

A trust may hold Additional Collateral Loans, which are mortgage loans that are secured by both the related mortgaged property and certain additional collateral which will consist of (i) a security interest in financial assets owned by the mortgagor (which will consist of securities, insurance policies, annuities, certificates of deposit, cash, accounts or similar assets) and/or (ii) a third party guarantee (usually by a relative of the mortgagor), which in turn is secured by a security interest in financial assets of the type described in clause (i) above or in residential property owned by the guarantor. The amount of such additional collateral will be determined by the mortgage loan seller in accordance with its underwriting standards, and the requirement to maintain the additional collateral will terminate when the loan-to-value ratio of the Additional Collateral Loan is reduced to a predetermined level (which will be specified in the accompanying prospectus supplement) as a result of a reduction in the principal balance of the mortgage loan caused by principal payments by the mortgagor or an increase in the appraised value of the related mortgaged property. The servicer will be required to attempt to realize on any such additional collateral,

32

JPMC_DEX_000071026

in addition to the related mortgaged property, if the Additional Collateral Loan is liquidated upon default. No assurance can be given as to the amount of proceeds, if any, that might be realized on any Additional Collateral Loan from the additional collateral.

*Home Equity Revolving Credit Loans*

*General.* The home equity revolving credit loans will be originated under credit line agreements subject to a maximum amount or credit limit. In most instances, interest on each home equity revolving credit loan will be calculated based on the average daily balance outstanding during the billing cycle. The billing cycle in most cases will be the calendar month preceding a due date. Each home equity revolving credit loan will have a loan rate that is subject to adjustment on the day specified in the related mortgage note, which may be daily or monthly, equal to the sum of the index on the day specified in the accompanying prospectus supplement, and the gross margin specified in the related mortgage note, subject to the maximum rate specified in the mortgage note and the maximum rate permitted by applicable law. Some home equity revolving credit loans may be teaser loans with an introductory rate that is lower than the rate that would be in effect if the applicable index and gross margin were used to determine the loan rate. As a result of the introductory rate, interest collections on the loans may initially be lower than expected. Commencing on their first adjustment date, the loan rates on the teaser loans will be based on the applicable index and gross margin.

The borrower for each home equity revolving credit loan may draw money, in most cases with either checks or credit cards, on such home equity revolving credit loan at any time during the period specified in the related credit line agreement, which period we refer to in this prospectus as the draw period. If the draw period is less than the full term of the home equity revolving credit loan, the borrower will not be permitted to make any draw during the repayment period. Prior to the repayment period, or prior to the date of maturity for loans without repayment periods, the borrower for each home equity revolving credit loan will be obligated to make monthly payments on the home equity revolving credit loan in a minimum amount as specified in the related mortgage note, which usually will be the finance charge for each billing cycle as described in the second following paragraph. In addition, if a home equity revolving credit loan has a repayment period, during this period, the borrower is required to make monthly payments consisting of principal installments that would substantially amortize the principal balance by the maturity date, and to pay any current finance charges and additional charges.

The borrower for each home equity revolving credit loan will be obligated to pay off the remaining account balance on the related maturity date, which may be a substantial principal amount. The maximum amount of any draw for any home equity revolving credit loan is equal to the excess, if any, of the credit limit over the principal balance outstanding under the mortgage note at the time of the draw. Draws will be funded by the servicer or other entity specified in the accompanying prospectus supplement.

For each home equity revolving credit loan:

- the finance charge for any billing cycle, in most cases, will be an amount equal to the aggregate of, as calculated for each day in the billing cycle, the then-applicable loan rate divided by 365 multiplied by that day's principal balance,

- the account balance on any day in most cases will be the aggregate of the unpaid principal of the home equity revolving credit loan outstanding at the beginning of the day, plus all related draws funded on that day and outstanding at the beginning of that day, plus the sum of any unpaid finance charges and any unpaid fees, insurance premiums and other charges, collectively known as additional charges, that are due on the home equity revolving credit loan minus the aggregate of all payments and credits that are applied to the repayment of any draws on that day, and

- the principal balance on any day usually will be the related account balance minus the sum of any unpaid finance charges and additional charges that are due on the home equity revolving credit loan.

Payments made by or on behalf of the borrower for each home equity revolving credit loan, in most cases, will be applied, first, to any unpaid finance charges that are due on the home equity revolving

33

JPMC_DEX_000071027

credit loan, second, to any unpaid additional charges that are due thereon, and third, to any related draws outstanding.

The mortgaged property securing each home equity revolving credit loan will be subject to the lien created by the related loan in the amount of the outstanding principal balance of each related draw or portion of draw, if any, that is not included in the related pool, whether made on or before the related cut-off date or after that cut-off date. The lien will be the same rank as the lien created by the mortgage relating to the home equity revolving credit loan, and monthly payments, collections and other recoveries under the credit line agreement related to the home equity revolving credit loan will be allocated as described in the related prospectus supplement among the home equity revolving credit loan and the outstanding principal balance of each draw or portion of draw excluded from the pool. The depositor, an affiliate of the depositor or an unaffiliated seller may have an interest in any draw or portion of draw excluded from the pool. If any entity with an interest in a draw or portion of draw excluded from the pool or any other excluded balance were to become a debtor under the Bankruptcy Code or the subject of a receivership or conservatorship and regardless of whether the transfer of the related home equity revolving credit loan constitutes an absolute assignment, a party in interest (including such entity itself) could assert that such entity retains rights in the related home equity revolving credit loan and therefore compel the sale of such home equity revolving credit loan over the objection of the trust and the securityholders. If that occurs, delays and reductions in payments to the trust and the securityholders could result.

In most cases, each home equity revolving credit loan may be prepaid in full or in part at any time and without penalty, and the related borrower will have the right during the related draw period to make a draw in the amount of any prepayment made for the home equity revolving credit loan.

The mortgage note or mortgage related to each home equity revolving credit loan will usually contain a customary "due-on-sale" clause.

As to each home equity revolving credit loan, the borrower's rights to receive draws during the draw period may be suspended, or the credit limit may be reduced, for cause under a limited number of circumstances, including, but not limited to:

- a materially adverse change in the borrower's financial circumstances;
- a decline in the value of the mortgaged property below its appraised value at origination; or
- a payment default by the borrower.

However, as to each home equity revolving credit loan, a suspension or reduction usually will not affect the payment terms for previously drawn balances. The servicer will have no obligation to investigate as to whether any of those circumstances have occurred or may have no knowledge of their occurrence. Therefore, there can be no assurance that any borrower's ability to receive draws will be suspended or reduced if the foregoing circumstances occur. In the event of default under a home equity revolving credit loan, at the discretion of the servicer, the home equity revolving credit loan may be terminated and declared immediately due and payable in full. For this purpose, a default includes but is not limited to:

- the borrower's failure to make any payment as required;
- any action or inaction by the borrower that materially and adversely affects the mortgaged property or the rights in the mortgaged property; or
- any fraud or material misrepresentation by a borrower in connection with the loan.

The servicer will have the option to allow an increase in the credit limit applicable to any home equity revolving credit loan in certain limited circumstances. In most cases, the servicer will have an unlimited ability to allow increases provided that the specified conditions are met including:

- a new appraisal or other indication of value is obtained; and
- the new combined LTV ratio is less than or equal to the original combined LTV ratio.

If a new appraisal is not obtained and the other conditions in the preceding sentence are met, the servicer will have the option to allow a credit limit increase for any home equity revolving credit loan subject to the limitations described in the related agreement.

34

Confidential

The proceeds of the home equity revolving credit loans may be used by the borrower to improve the related mortgaged properties, may be retained by the related borrowers or may be used for purposes unrelated to the mortgaged properties.

*Allocation of Home Equity Revolving Credit Loan Balances.* For any series of securities backed by home equity revolving credit loans, the related trust may hold either (i) the entire principal balance of each home equity revolving credit loan outstanding at any time, including balances attributable to draws made after the related cut-off date, or (ii) a specified portion of the total principal balance of each home equity revolving credit loan outstanding at any time, which will consist of all or a portion of the principal balance as of the cut-off date minus the portion of all payments and losses after the cut-off date that are allocated to such balance, and may not include some portion of the principal balance attributable to draws made after the cut-off date. In this prospectus, we refer to the principal balance or portion of the principal balance of each home equity revolving credit loan outstanding at any time and held by the trust as the trust balance.

The accompanying prospectus supplement will describe the specific provisions by which payments and losses on any home equity revolving credit loan will be allocated as between the trust balance and any portion of the principal balance of a home equity revolving credit loan, if any, not included in the trust balance at any time, which may include balances attributable to draws after the cut-off date and may include a portion of the principal balance outstanding as of the cut-off date. In this prospectus, we refer to the portion of the principal balance of each home equity revolving credit loan outstanding at any time and not held by the trust as the excluded balance. Typically, the provisions (i) may provide that principal payments made by the borrower will be allocated as between the trust balance and any excluded balance either on a pro rata basis, or first to the trust balance until reduced to zero, then to the excluded balance, or according to other priorities specified in the accompanying prospectus supplement, and (ii) may provide that interest payments, as well as liquidation proceeds or similar proceeds following a default and any realized losses, will be allocated between the trust balance and any excluded balance on a pro rata basis or according to other priorities specified in the accompanying prospectus supplement.

Even if a trust initially holds the entire principal balance of the home equity revolving credit loans, the related agreement may provide that after a specified date or on the occurrence of specified events, the trust will not acquire balances attributable to additional draws made thereafter. The accompanying prospectus supplement will describe these provisions as well as the related allocation provisions that would be applicable.

### Mortgage Loan Information in Prospectus Supplement

Each prospectus supplement will contain specific information with respect to the mortgage assets held by the related trust, as of the cut-off date specified in the prospectus supplement, which will usually be close of business on the first day of the month of formation of the related trust, to the extent specifically known to the depositor as of the date of the prospectus supplement, including, in summary form, the following:

- the aggregate outstanding principal balance, and the largest, smallest and average outstanding principal balance, of the mortgage assets,

- the type of property securing the mortgage assets and the percentage of mortgage assets in the related mortgage pool which are secured by that type of property,

- the range of original terms to maturity of the mortgage assets,

- the latest maturity date,

- the aggregate principal balance of mortgage loans having loan-to-value ratios at origination exceeding 80%, or, with respect to mortgage loans secured by a junior lien, the aggregate principal balance of mortgage loans having combined loan-to-value ratios exceeding 80%,

- the interest rates or range of interest rates borne by the mortgage loans,

- the geographical distribution of the mortgaged properties on a state-by-state basis,

- the number and aggregate principal balance of buydown mortgage loans, if any,

35

JPMC_DEX_000071029

- a description of the retained interest, if any,

- with respect to ARM Loans, the index, the adjustment dates, the gross margins, and the maximum interest rate variation at the time of any adjustment and over the life of the ARM Loan,

- the range of debt service coverage ratios for mortgage loans secured by multifamily properties or commercial properties, and

- whether the mortgage loans provide for payments of interest only for any period and the frequency and amount by which, and the term during which, monthly payments adjust.

The composition and characteristics of a mortgage pool containing revolving credit loans may change from time to time as a result of any draws made after the related cut-off date under the related credit line agreements. If mortgage assets are transferred to or repurchased from the trust after the date of the related prospectus supplement other than as a result of any draws under credit line agreements relating to revolving credit loans, the addition or deletion will be noted in a Distribution Report on Form 10-D or a Current Report on Form 8-K, as appropriate. In no event, however, will more than 5%, by principal balance at the cut-off date, of the mortgage assets deviate from the characteristics of the mortgage assets set forth in the related prospectus supplement other than as a result of any draws under credit line agreements relating to revolving credit loans.

## Static Pool Information

In addition to the information about the mortgage assets held by the related trust, the prospectus supplement will also provide, or incorporate by reference, static pool information about prior securitized pools of mortgage assets of the sponsor for the same asset type, or about originations or purchases by the sponsor for the same asset type. Static pool information may be posted on an Internet Web site and, if so, the prospectus supplement will provide the Internet address for such Internet Web site.

## DESCRIPTION OF THE PRE-FUNDING ACCOUNT
## FOR THE PURCHASE OF ADDITIONAL MORTGAGE LOANS

The agreement governing the trust may provide for the purchase of additional mortgage assets by the trust after the date of initial issuance of the securities. In that case, the trust will include a pre-funding account, into which all or a portion of the proceeds of the sale of one or more classes of securities of the related series will be deposited to be released as additional mortgage assets are purchased. Additional mortgage assets will be required to conform to the requirements set forth in the related agreement or other agreement providing for the transfer, and will be underwritten to the same standards as the mortgage assets initially held by the trust. The pre-funding account will be required to be maintained with an eligible institution under the related agreement. The pre-funding account may be interest-bearing or the amount held in the account may be invested in U.S. government securities and other high-quality investments specified in the related agreement. The amount held in the pre-funding account shall at no time exceed 25% of the aggregate outstanding principal balance of the securities. The agreement governing the trust will generally provide that the period for purchasing additional mortgage assets will terminate on the earliest of (i) a specified date, which may not be later than six months or, if a REMIC election has been made with respect to the trust, three months, after the date on which the related securities were issued, (ii) the date on which the amount on deposit in the pre-funding account falls below a specified amount and (iii) the occurrence of a servicing default under the related agreement. Any amounts remaining in the pre-funding account at the end of the pre-funding period will be deemed to be principal prepayments and applied in the manner set forth in the related prospectus supplement.

The depositor or the mortgage loan seller will be required to provide data regarding the additional mortgage assets to the rating agencies and the security insurer, if any, sufficiently in advance of the scheduled transfer to permit review by the rating agencies and the security insurer. Transfer of the additional mortgage assets will be further conditioned upon confirmation by the rating agencies that the transfer of mortgage assets to the trust will not result in the downgrading of the securities or, in the case of a series guaranteed or supported by a security insurer, will not adversely affect the capital requirements

36

JPMC_DEX_000071030

195

of the security insurer. Finally, a legal opinion to the effect that the conditions to the transfer of the additional mortgage assets have been satisfied may be required.

The agreement governing the trust will require the trustee, at the end of the pre-funding period, to send to securityholders or make available on an Internet Web site updated pool composition information reflecting the additional mortgage assets purchased by the trust during the pre-funding period. In addition, such information will be reported in a Distribution Report on Form 10-D or a Current Report on Form 8-K, as appropriate.

## THE DEPOSITOR, THE SPONSOR, THE SERVICER AND CERTAIN OTHER TRANSACTION PARTIES

The depositor, a Delaware corporation, is a wholly-owned indirect subsidiary of Washington Mutual, Inc., a savings and loan holding company. The depositor was organized for the purpose of providing mortgage lending institutions, including affiliated institutions, with greater financing and lending flexibility by purchasing mortgage loans from such institutions and issuing mortgage-backed securities. The depositor engages in no activities other than securitizing assets. The depositor's principal executive offices are located at 1201 Third Avenue, WMT 1706A, Seattle, Washington 98101. The depositor's telephone number is (206) 554-8838.

The depositor does not have, and it may not in the future have, any significant assets. The prospectus supplement for each series of securities will disclose if the depositor is a party to any legal proceedings that could have a material negative impact on the related trust and the interests of the potential investors.

The sponsor of the securitization transaction will be specified in the related prospectus supplement, and may be Washington Mutual Bank, the parent of the depositor, another affiliate of the depositor or an unaffiliated entity. Washington Mutual Bank is a federal savings association and a wholly-owned subsidiary of Washington Mutual, Inc. The principal executive offices of Washington Mutual Bank are located at 1201 Third Avenue, WMT 1706, Seattle, Washington 98101.

The servicer will be specified in the related prospectus supplement, and may be Washington Mutual Bank. There may be multiple servicers, each of which will act as a servicer for a certain group of the mortgage assets. In that case, each servicer will have all of the rights and responsibilities described in this prospectus for only the mortgage loans it is servicing, and the related servicing agreement or pooling and servicing agreement will be signed by each servicer and will make clear which mortgage loans are being serviced by which servicer. In addition, a servicer may perform some or all of its obligations through the use of one or more sub-servicers. A servicer may appoint a special servicer to perform certain functions, such as loan work-outs.

A master servicer may be appointed to supervise the servicer or servicers and to perform other roles typically performed by the servicer or servicers. In addition, a bond or certificate administrator may be appointed whose role is primarily to calculate and determine the monthly payments to be made to the securityholders.

## USE OF PROCEEDS

The net proceeds to be received from the sale of the securities will be applied by the depositor to the purchase of assets to be transferred to the related trust or will be used by the depositor to pay costs of structuring and issuing the securities. The depositor expects that it will make additional sales of securities similar to the securities from time to time, but the timing and amount of offerings of securities will depend on a number of factors, including the volume of mortgage assets acquired by the depositor, prevailing interest rates, availability of funds and general market conditions.

Confidential

JPMC_DEX_000071031

## YIELD AND MATURITY CONSIDERATIONS

The yield on any offered security will depend on many factors, including:

- the price paid by the securityholder,

- the rate at which interest accrues on the security,

- the receipt and timing of receipt of distributions on the security,

- the weighted average life of the mortgage assets held by the related trust,

- liquidations of mortgage assets following mortgagor defaults,

- purchases of mortgage assets in the event of optional termination of the trust or breaches of representations made in respect of those mortgage assets by the depositor, the servicer, the mortgage loan seller or others, and

- in the case of securities evidencing interests in ARM Loans, by changes in the interest rates or the conversions of ARM Loans to a fixed interest rate.

*Security Interest Rate.* Securities of any class within a series may have fixed, variable or adjustable security interest rates, which may or may not be based upon the interest rates borne by the mortgage assets held by the related trust. The prospectus supplement with respect to any series of securities will specify the security interest rate for each class of securities or, in the case of a variable or adjustable security interest rate, the method of determining the security interest rate. Holders of Stripped Interest Securities or a class of securities having a security interest rate that varies based on the weighted average interest rate of the underlying mortgage assets will be affected by disproportionate prepayments and repurchases of mortgage assets having higher interest rates than the average interest rate.

*Timing of Payment of Interest and Principal.* The effective yield to securityholders entitled to payments of interest will be slightly lower than the yield otherwise produced by the applicable security interest rate because, while interest on the mortgage assets may accrue from the first day of each month, the distributions of such interest will not be made until the distribution date, which may be as late as the 28th day of the month following the month in which interest accrues on the mortgage assets. On each distribution date, a payment of interest on the securities, or addition to the principal balance of a class of Accrual Securities, will include interest accrued during the interest accrual period described in the related prospectus supplement for that remittance date. If the interest accrual period ends on a date other than a remittance date for the related series, the yield realized by the holders of the securities may be lower than the yield that would result if the interest accrual period ended on the remittance date. In addition, interest accrued for an interest accrual period for one or more classes of securities may be calculated on the assumption that distributions of principal, and additions to the principal balance of Accrual Securities, and allocations of losses on the mortgage assets may be made on the first day of the interest accrual period for a remittance date and not on the remittance date. This method would produce a lower effective yield than if interest were calculated on the basis of the actual principal amount outstanding during an interest accrual period.

When a principal prepayment in full is made on a mortgage loan, the borrower is charged interest only for the period from the due date of the preceding monthly payment up to the date of the prepayment, instead of for a full month. When a partial prepayment is made on a mortgage loan other than a home equity revolving credit loan, the mortgagor is not charged interest on the amount of the prepayment for the month in which the prepayment is made. Accordingly, the effect of principal prepayments in full during any month will be to reduce the aggregate amount of interest collected that is available for distribution to securityholders. The mortgage loans held by a trust may contain provisions limiting prepayments or requiring the payment of a prepayment charge upon prepayment in full or in part. Any such prepayment charges may be applied to offset the above-described shortfalls in interest collections, may be available for distribution only to a specific class of securities or may not be available for distribution to any class of securities. Full and partial principal prepayments collected during the applicable Prepayment Period will be available for distribution to securityholders on the related distribution date. Neither the trustee nor the depositor will be obligated to fund shortfalls in interest collections resulting from prepayments. The prospectus supplement for a series of securities may specify that the servicer will be obligated to pay from its own funds, without reimbursement, those interest shortfalls

38

attributable to full and/or partial prepayments by mortgagors but only up to the specific amounts described in the prospectus supplement. See "Description of the Securities."

The outstanding principal balances of home equity revolving credit loans are, in most cases, much smaller than traditional first lien mortgage loan balances, and the original terms to maturity of those loans are often shorter than those of traditional first lien mortgage loans. As a result, changes in interest rates will not affect the monthly payments on those loans to the same degree that changes in mortgage interest rates will affect the monthly payments on traditional first lien mortgage loans. Consequently, the effect of changes in prevailing interest rates on the prepayment rates on shorter-term, smaller balance loans may not be similar to the effects of those changes on traditional first lien mortgage loan prepayment rates, or those effects may be similar to the effects of those changes on mortgage loan prepayment rates, but to a smaller degree.

For some loans, including home equity revolving credit loans and ARM loans, the loan rate at origination may be below the rate that would result if the index and margin relating thereto were applied at origination. Under the applicable underwriting standards, the borrower under each of the loans, other than a home equity revolving credit loan, may be qualified on the basis of the loan rate in effect at origination, and borrowers under home equity revolving credit loans may be qualified based on an assumed payment which reflects a rate significantly lower than the maximum rate. The repayment of any such loan may thus be dependent on the ability of the borrower to make larger monthly payments following the adjustment of the loan rate. In addition, depending upon the use of the revolving credit line and the payment patterns, during the repayment period, a borrower may be obligated to make payments that are higher than the borrower originally qualified for. Some of the home equity revolving credit loans are not expected to significantly amortize prior to maturity. As a result, a borrower will, in these cases, be required to pay a substantial principal amount at the maturity of a home equity revolving credit loan.

The prospectus supplement for each series of securities may set forth additional information regarding yield considerations.

*Principal Prepayments.* The yield to maturity on the securities will be affected by the rate of principal payments on the mortgage assets, including principal prepayments, curtailments, defaults and liquidations. The rate at which principal prepayments occur on the mortgage assets will be affected by a variety of factors, including, without limitation, the following:

- the terms of the mortgage assets,
- the level of prevailing interest rates,
- the availability of mortgage credit,
- in the case of multifamily loans and commercial loans, the quality of management of the mortgaged properties, and
- economic, demographic, geographic, tax, legal and other factors.

In general, however, if prevailing interest rates fall significantly below the interest rates on the mortgage assets held by a particular trust, those mortgage assets are likely to be the subject of higher principal prepayments than if prevailing rates remain at the rates borne by those mortgage assets. Conversely, if prevailing interest rates rise significantly above the interest rates on the mortgage assets held by a particular trust, those mortgage assets are likely to be the subject of lower principal prepayments than if prevailing rates remain at the rates borne by those mortgage assets. The rate of principal payments on some or all of the classes of securities of a series will correspond to the rate of principal payments on the mortgage assets held by the related trust and is likely to be affected by the existence of prepayment penalty provisions of the mortgage assets in a mortgage pool, and by the extent to which the servicer of any such mortgage asset is able and willing to enforce such provisions. There can be no certainty as to the rate of prepayments on the mortgage assets during any period or over the life of the related securities.

If the purchaser of a security offered at a discount calculates its anticipated yield to maturity based on an assumed rate of distributions of principal that is faster than that actually experienced on the mortgage assets, the actual yield to maturity will be lower than that so calculated. Conversely, if the purchaser of a security offered at a premium calculates its anticipated yield to maturity based on an assumed rate of distributions of principal that is slower than that actually experienced on the mortgage

39

Confidential

JPMC_DEX_000071033

198

assets, the actual yield to maturity will be lower than that so calculated. In either case, the effect on yield of prepayments on one or more classes of securities of a series may be mitigated or exacerbated by the priority of distributions of principal to those classes as provided in the related prospectus supplement.

The timing of changes in the rate of principal payments on the mortgage assets may significantly affect an investor's actual yield to maturity, even if the average rate of distributions of principal is consistent with an investor's expectation. In general, the earlier a principal payment is received on the mortgage assets and distributed in respect of a security, the greater the effect on such investor's yield to maturity. The effect on an investor's yield of principal payments occurring at a rate higher or lower than the rate anticipated by the investor during a given period may not be offset by a subsequent like decrease or increase in the rate of principal payments.

*Defaults.* The rate of defaults on the mortgage assets will also affect the rate and timing of principal payments on the mortgage assets and thus the yield on the securities. In general, defaults on single-family loans are expected to occur with greater frequency in their early years. However, mortgage assets that require balloon payments, including multifamily loans, risk default at maturity, or that the maturity of the balloon loan may be extended in connection with a workout. The rate of default on mortgage loans that are refinance, limited documentation or no documentation mortgage loans, mortgage assets with high loan-to-value ratios and ARM Loans may be higher than for other types of mortgage assets. Likewise, the rate of default on loans that have been originated under lower than traditional underwriting standards may be higher than those originated under traditional standards. Furthermore, the rate and timing of defaults and liquidations on the mortgage assets will be affected by the general economic condition of the region of the country in which the related mortgaged properties are located. The risk of delinquencies and loss is greater and prepayments are less likely in regions where a weak or deteriorating economy exists, as may be evidenced by, among other factors, increasing unemployment or falling property values.

A trust may hold mortgage loans that are one month or more delinquent at the time of offering of the related series of securities or which have recently been several months delinquent. The rate of default on delinquent mortgage loans or mortgage loans with a recent history of delinquency, including re-performing loans, is likely to be higher than the rate of default on loans that have a current payment status.

The rate of defaults and the severity of losses on mortgage loans with documentation deficiencies may be higher than for mortgage loans with no documentation deficiencies. To the extent that any document relating to a mortgage loan is not in the possession of the trustee or its custodian, the deficiency may make it difficult or impossible to realize on the mortgaged property in the event of foreclosure, which will affect the timing and the amount of liquidation proceeds received by the trustee.

## Maturity and Weighted Average Life

*Prepayments.* The rates at which principal payments are received on the mortgage assets held by a trust and the rate at which payments are made from any credit support for the related series of securities may affect the ultimate maturity and the weighted average life of each class of the series. Weighted average life refers to the average amount of time that will elapse from the date of issue of a security until each dollar of principal of that security will be repaid to the investor. The weighted average life of a class of securities of a series will be influenced by, among other factors, the rate at which principal on the related mortgage assets is paid to that class, which may be in the form of scheduled amortization or prepayments. For this purpose, the term prepayment includes prepayments, in whole or in part, and liquidations due to default. Prepayments on the mortgage assets will generally accelerate the rate at which principal is paid on some or all of the classes of the securities of the related series.

One or more classes of securities may have a final scheduled remittance date, which is the date on or before which the principal balance of that class is scheduled to be reduced to zero, calculated on the basis of the assumptions applicable to that series as described in the prospectus supplement.

In addition, the weighted average life of the securities may be affected by the varying maturities of the related mortgage assets. If any mortgage assets have actual terms to maturity less than those assumed in calculating the final scheduled remittance dates for the classes of securities of the related series, one or more classes of the securities may be fully paid prior to their respective final scheduled remittance dates,

40

JPMC_DEX_000071034

even in the absence of prepayments. Accordingly, the prepayment experience of the mortgage pool will, to some extent, be a function of the mix of interest rates and maturities of the mortgage assets in that mortgage pool. See "Description of the Trusts."

Prepayments on loans are also commonly measured relative to a prepayment standard or model, such as the Constant Prepayment Rate prepayment model or the Standard Prepayment Assumption prepayment model, each as described below. CPR represents a constant assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of loans for the life of those loans. SPA represents an assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of loans. A prepayment assumption of 100% of SPA assumes prepayment rates of 0.2% per annum of the then outstanding principal balance of the loans in the first month of the life of the loans and an additional 0.2% per annum in each month thereafter until the thirtieth month. Beginning in the thirtieth month and in each month thereafter during the life of the loans, 100% of SPA assumes a constant prepayment rate of 6% per annum each month.

Neither CPR nor SPA nor any other prepayment model or assumption purports to be an historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of loans. Moreover, CPR and SPA were developed based upon historical prepayment experience for single-family loans. Thus, it is likely that prepayment of any mortgage assets will not conform to any particular level of CPR or SPA.

The prospectus supplement with respect to each series of securities may contain tables, if applicable, setting forth the projected weighted average life of one or more classes of offered securities of the series and the percentage of the initial principal balance of each class that would be outstanding on specified remittance dates based on the assumptions stated in that prospectus supplement, including assumptions that prepayments on the related mortgage assets are made at rates corresponding to various percentages of CPR, SPA or at other rates specified in the prospectus supplement. Tables and assumptions are intended to illustrate the sensitivity of the weighted average life of the securities to various prepayment rates and are not intended to predict or to provide information that will enable investors to predict the actual weighted average life of the securities. It is unlikely that prepayment of any mortgage assets for any series will conform to any particular level of CPR, SPA or any other rate specified in the related prospectus supplement.

There can be no assurance as to the rate of prepayment of the mortgage loans underlying or comprising the assets of any trust.

*Type of Mortgage Asset.* The type of mortgage assets held by a trust may affect the weighted average life of the related securities. A number of mortgage assets may have balloon payments due at maturity, and because the ability of a mortgagor to make a balloon payment typically will depend upon its ability either to refinance the loan or to sell the related mortgaged property, there is a risk that mortgage assets having balloon payments may default at maturity, or that the servicer may extend the maturity of the mortgage asset in connection with a workout. In addition, a number of mortgage assets may be junior mortgage loans. The rate of default on junior mortgage loans may be greater than that of mortgage loans secured by first liens on comparable properties. In the case of defaults, recovery of proceeds may be delayed by, among other things, bankruptcy of the mortgagor or adverse conditions in the market where the property is located. In order to minimize losses on defaulted mortgage assets, the servicer may, to the extent and under the circumstances set forth in this prospectus and in the related servicing agreement, be permitted to modify mortgage assets that are in default or as to which a payment default appears imminent. Any defaulted balloon payment or modification that extends the maturity of a mortgage asset will tend to extend the weighted average life of the securities, thereby lengthening the period of time elapsed from the date of issuance of a security until it is retired.

Although the interest rates on ARM Loans will be subject to periodic adjustments, adjustments will (1) except in the case of Negative Amortization Loans, not increase or decrease the interest rate by more than a fixed percentage amount on each adjustment date, (2) not increase the interest rate over a fixed percentage amount during the life of any ARM Loan and (3) be based on an index, which may not rise and fall identically with the mortgage interest rate due to limitations on the amount or timing of adjustments, plus the related fixed percentage set forth in the related mortgage note, which may be different from margins being used at the time for newly originated adjustable rate mortgage loans. In

41

JPMC_DEX_000071035

addition, for some ARM Loans interest may during an initial period accrue at a fixed rate. For all of the foregoing reasons, the interest rates on the ARM Loans in a mortgage pool at any time may not equal the prevailing rates for similar, newly originated adjustable rate mortgage loans. In certain interest rate environments, the prevailing interest rates on fixed rate mortgage loans may be sufficiently low in relation to the then-current interest rates on ARM Loans with the result that the rate of prepayments may increase as a result of refinancings. There can be no certainty as to the rate of prepayments on the mortgage assets during any period or over the life of any series of securities.

The interest rates on Negative Amortization Loans adjust monthly, after an initial fixed rate period, and their minimum monthly payments adjust less frequently. During a period of rising interest rates, the amount of accrued interest may exceed the amount of the minimum monthly payment. In addition, during the first year after the initial fixed rate period, and in some cases during the first several years, the amount of accrued interest may also exceed the minimum monthly payment even if the index does not rise, because the minimum monthly payment during the entire first year is calculated based on the initial fixed rate, which is generally lower than the fully indexed rate. As a result, if the mortgagor chooses to pay the minimum monthly payment rather than one of the higher payment options, a portion of the accrued interest will be deferred and added to the principal balance of the Negative Amortization Loan, which is referred to as "negative amortization," and will bear interest at the applicable interest rate. All or a portion of the accrued interest that is added to the principal balances of Negative Amortization Loans through negative amortization may be deducted from the interest payable to the related class or classes of securities and added to the principal balances of those securities, as described in the related prospectus supplement. The addition of any deferred interest to the principal balance of any class or classes of related securities will lengthen the weighted average life of that class and may adversely affect the securityholder's yield to maturity depending on the price at which the securities were purchased. In addition, during a period of declining interest rates, a larger portion of the minimum monthly payment will be allocated to principal and a smaller portion to interest, and since principal payments on the Negative Amortization Loans will be applied to reduce the principal balance of the related class or classes of securities, the weighted average life of the securities will be shortened which may adversely affect securityholder's yield to maturity depending upon the price at which such securities were purchased.

There can be no assurance as to the rate of principal payments or draws on the home equity revolving credit loans. In most cases, the home equity revolving credit loans may be prepaid in full or in part without penalty. The prospectus supplement will specify whether loans may not be prepaid in full or in part without penalty. The rate of principal payments and the rate of draws, if applicable, may fluctuate substantially from time to time. Such loans may experience a higher rate of prepayment than typical first lien mortgage loans. Due to the unpredictable nature of both principal payments and draws, the rates of principal payments net of draws for those loans may be much more volatile than for typical first lien mortgage loans.

For any series of securities backed by home equity revolving credit loans, provisions governing whether future draws on the home equity revolving credit loans will be transferred to the trust will have a significant effect on the rate and timing of principal payments on the securities. The rate at which additional balances are generated may be affected by a variety of factors. The yield to maturity of the securities of any series, or the rate and timing of principal payments on the loans may also be affected by the risks associated with other loans.

As a result of the payment terms of the home equity revolving credit loans or of the mortgage provisions relating to future draws, there may be no principal payments on those securities in any given month. In addition, it is possible that the aggregate draws on home equity revolving credit loans held by a trust may exceed the aggregate payments of principal on those home equity revolving credit loans for the related period. A series of securities may provide for a period during which all or a portion of the principal collections on the home equity revolving credit loans are reinvested in additional balances or are accumulated in a trust account pending commencement of an amortization period relating to the securities.

*Mortgage Securities.* Some Mortgage Securities held by a trust may be backed by underlying mortgage loans having differing interest rates. Accordingly, the rate at which principal payments are received on the securities will, to some extent, depend on the interest rates on the underlying mortgage loans.

42

JPMC_DEX_000071036

*Foreclosures and Payment Plans.* The number of foreclosures and the principal amount of the mortgage assets that are foreclosed in relation to the number of mortgage assets that are repaid in accordance with their terms will affect the weighted average life of those mortgage assets and that of the related series of securities. Servicing decisions made with respect to the mortgage assets, including the use of payment plans prior to a demand for acceleration and the restructuring of mortgage assets in bankruptcy proceedings, may also have an effect upon the payment patterns of particular mortgage assets and thus the weighted average life of the securities.

*Due-On-Sale Clauses.* Acceleration of mortgage payments as a result of certain transfers of or the creation of encumbrances upon underlying mortgaged properties is another factor affecting prepayment rates that may not be reflected in the prepayment standards or models used in the relevant prospectus supplement. In most cases the mortgage assets will include "due-on-sale" clauses that permit the lender in certain instances to accelerate the maturity of the loan if the borrower sells, transfers or conveys the property. The servicer will employ its usual practices in determining whether to exercise any right that the trust may have as mortgagee to accelerate payment of the mortgage asset. An ARM Loan may be assumable under some conditions if the proposed transferee of the related mortgaged property establishes its ability to repay the mortgage asset and, in the reasonable judgment of the servicer or the related sub-servicer, the security for the ARM Loan would not be impaired by the assumption. The extent to which ARM Loans are assumed by purchasers of the mortgaged properties rather than prepaid by the related mortgagors in connection with the sales of the mortgaged properties will affect the weighted average life of the related series of securities. See "Legal Aspects of Mortgage Assets—Enforceability of Provisions."

## THE DEPOSITOR'S MORTGAGE LOAN PURCHASE PROGRAM

The mortgage loans to be transferred to a trust will be purchased by the depositor, either directly or indirectly, from the mortgage loan sellers, which may include Washington Mutual Bank or other affiliates of the depositor.

### Underwriting Standards

The mortgage loans to be transferred to each trust will be subject to the various credit, appraisal and underwriting standards described herein and in the prospectus supplement. The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. The depositor expects the credit, appraisal and underwriting standards described herein to be continuously revised based on opportunities and prevailing conditions in the residential mortgage market and the market for the depositor's mortgage pass-through certificates, mortgage-backed notes and mortgage trust certificates.

The underwriting criteria applied by the originators of the mortgage loans transferred to a trust may vary significantly among originators. The mortgage loan sellers will generally review only a limited portion of the mortgage loans in any delivery of such mortgage loans for conformity with the applicable credit, appraisal and underwriting standards. For each originator of 20% or more of the mortgage loans transferred to a trust, the accompanying prospectus supplement will describe, to the extent material, the originator's origination program and how long the originator has been engaged in originating assets. The description will include, to the extent material, a description of the originator's experience in originating mortgage loans of the type transferred to the trust and the originator's underwriting criteria for those mortgage loans.

The underwriting standards of any particular originator typically include a set of specific criteria by which the underwriting evaluation is made. However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually. Rather, a mortgage loan will be considered to be originated generally in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards. For example, a loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the

43

JPMC_DEX_000071037

criteria that were not satisfied or if the loan is considered to be in substantial compliance with the underwriting standards.

The depositor anticipates that some of the mortgage loans held by a trust for certain series of securities will have been originated based on underwriting standards and documentation requirements that are less restrictive than for other mortgage loan lending programs. In such cases, borrowers may have credit histories that contain delinquencies on mortgage and/or consumer debts. Some borrowers may have initiated bankruptcy proceedings within a few years of the time of origination of the related loan. In addition, loans held by a trust may have been originated in connection with a governmental program under which underwriting standards were significantly less stringent and designed to promote home ownership or the availability of affordable residential rental property regardless of higher risks of default and losses.

The mortgage loan seller's underwriting standards are intended to evaluate a prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgage property as collateral. In the loan application process, prospective mortgagors generally will be required to provide information regarding such factors as their assets, liabilities, income, credit history, employment history and other related items. Each prospective mortgagor generally will also provide an authorization to apply for a credit report which summarizes the mortgagor's credit history. With respect to establishing the prospective mortgagor's ability to make timely payments, the mortgage loan seller may require evidence regarding the mortgagor's employment and income, and of the amount of deposits made to financial institution where the mortgagor maintains demand or savings accounts. If a prospective mortgagor meets certain eligibility criteria, the mortgage loan seller may waive some of its documentation requirements and may not obtain information about the mortgagor's income and assets or may obtain but not verify such information.

In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The appraiser, or an agent on its behalf, is generally required to personally inspect the property and verify that it is in adequate condition and that construction, if new, has been substantially completed. However, in some cases an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Some of the mortgage loans may be re-underwritten by a mortgage loan seller.

Certain states where mortgage properties may be located are "anti-deficiency" states, where, in general, lenders providing credit on on-to-four-family properties must look solely to the property for repayment in the event of foreclosure. See "Legal Aspects of the Mortgage Loans—Anti-Deficiency Legislation and Other Limitation on Lenders". Underwriting standards in all states (including anti-deficiency states) will require that the underwriting officers are satisfied that the value of the property being financed, as indicated by the independent appraisal, currently supports and is anticipated to support in the future the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values.

In the case of a mortgage loan secured by a leasehold interest in a residential property, commercial property or mixed-use property the title to which is held by a third party lessor, the mortgage loan seller, or another party on its behalf, will be required to warrant, among other things, that the remaining term of the lease and any sublease be at least five years longer than the remaining term of the mortgage loan.

For any loan insured by the FHA, the mortgage loan seller is required to represent that the FHA loan complies with the applicable underwriting policies of the FHA. See "Description of Primary Insurance Policies—FHA Insurance."

For any loan guaranteed by the VA, the mortgage loan seller will be required to represent that the VA loan complies with the applicable underwriting policies of the VA. See "Description of Primary Insurance Policies—VA Guarantees."

44

JPMC_DEX_000071038

203

The recent foreclosure or repossession and delinquency experience with respect to mortgage loans serviced by the servicer or, if applicable, the master servicer or a significant sub-servicer will be provided in the related prospectus supplement.

**Qualifications of Originators and Mortgage Loan Sellers**

Each originator will be required to satisfy the qualifications set forth in this paragraph. Each originator must be an institution experienced in originating conventional mortgage loans in accordance with customary and reasonable practices and the mortgage loan seller's or the depositor's guidelines, and must maintain satisfactory facilities to originate those loans. Each originator must be a HUD-approved mortgagee or an institution the deposit accounts in which are insured by the FDIC. In addition, with respect to FHA loans or VA loans, each originator must be approved to originate the mortgage loans by the FHA or VA, as applicable. Each originator and mortgage loan seller must also satisfy criteria as to financial stability evaluated on a case by case basis by the depositor.

## DESCRIPTION OF THE SECURITIES

The securities will be issued in series. Each series of certificates evidencing interests in a trust holding mortgage loans will be issued in accordance with a pooling and servicing agreement among the depositor, the servicer and the trustee named in the prospectus supplement. Each series of notes evidencing indebtedness of a trust holding mortgage loans will be issued in accordance with an indenture between the related issuer and the trustee named in the prospectus supplement. The issuer of notes will be the depositor or a trust established under a trust agreement between the depositor and the trustee for the purpose of issuing a series of notes. Where the issuer is a trust, the ownership of the trust will be evidenced by equity certificates issued under the trust agreement. Each series of securities evidencing interests in a trust whose assets consist of Mortgage Securities will be issued in accordance with an agreement among the depositor, the trustee, and a manager, bond administrator or certificate administrator. The provisions of each agreement will vary depending upon the nature of the securities to be issued and the nature of the related trust. Forms of pooling and servicing agreement, servicing agreement, trust agreement and indenture have been filed as exhibits to the registration statement of which this prospectus is a part. The following summaries describe specific provisions which will appear in each agreement. The prospectus supplement for a series of securities will describe additional provisions of the agreement relating to a series. This prospectus together with the prospectus supplement will describe the material terms of the agreement governing the trust related to a series of securities. As used in the prospectus supplement with respect to any series, the term "certificate" or the term "note" refers to all of the certificates or notes of that series, whether or not offered by this prospectus and by the related prospectus supplement, unless the context otherwise requires.

Each series of securities may consist of either:

- a single class of securities evidencing the entire beneficial interest in or indebtedness of the related trust;

- two or more classes of securities evidencing the entire beneficial interest in or indebtedness of the related trust, one or more classes of which will be senior in right of payment to one or more of the other classes;

- two or more classes of securities, one or more classes of which are entitled to (a) principal distributions, with disproportionate, nominal or no interest distributions or (b) interest distributions, with disproportionate, nominal or no principal distributions; or

- two or more classes of securities which differ as to timing, sequential order, priority of payment, security interest rate or amount of distributions of principal or interest or both, or as to which distributions of principal or interest or both on any class may be made upon the occurrence of specified events, in accordance with a schedule or formula, or on the basis of collections from designated portions of the mortgage pool, and one or more classes of securities as to which all or a portion of accrued interest will not be distributed but rather will be added to the principal balance of the security on each distribution date in the manner described in the related prospectus supplement.

45

Confidential

With respect to any series of notes, the equity certificates, insofar as they represent the beneficial ownership interest in the issuer, will be subordinate to the related notes.

A class of securities may have a principal balance or notional amount, and may be entitled to payments of interest on the principal balance or notional amount based on a fixed, variable or adjustable interest rate. See "—Distributions on the Securities" below.

The specific percentage ownership interest of each class of securities and the minimum denomination for each security will be specified in the related prospectus supplement.

As to each series of certificates with respect to which a REMIC election is to be made, the servicer, REMIC administrator, or the trustee will be obligated to take all actions required in order to comply with applicable laws and regulations, and will be obligated to pay any Prohibited Transaction Taxes or Contribution Taxes arising out of a breach of its obligations with respect to its compliance without any right of reimbursement from the trust or from any securityholder. A Prohibited Transaction Tax or Contribution Tax resulting from any other cause will be paid by the related trust, resulting in a reduction in amounts otherwise distributable to securityholders. See "Material Federal Income Tax Consequences."

**Form of Securities**

The certificates of each series, including any class of nonoffered certificates, will be issued either as physical certificates or in book-entry form and will represent the entire beneficial interest in the trust created by the related pooling and servicing agreement. The notes of each series, including any class of nonoffered notes, will be issued either as physical notes or in book-entry form and will represent indebtedness of the issuer. The securities will be transferable and exchangeable for like securities of the same class and series in authorized denominations at the corporate trust office of the trustee. The prospectus supplement for each series of securities will describe any limitations on transferability. No service charge will be made for any registration of exchange or transfer of securities, but the depositor or the trustee or any agent of the trustee may require payment of a sum sufficient to cover any tax or other governmental charge.

If a class of securities of any series is issued in book-entry form, The Depository Trust Company ("DTC") will act as securities depository for such class. Such class will be initially represented by a single security registered in the name of a nominee of Cede & Co., DTC's partnership nominee, or such other name as may be requested by DTC. If the initial principal balance of such class exceeds $500 million, a single security will be issued with respect to each $500 million of initial principal balance and an additional security will be issued with respect to any remaining principal balance of such class. The interests of beneficial owners of book-entry securities will be represented by entries on the records of DTC participants or indirect DTC participants. Physical certificates or notes will be available to beneficial owners of book-entry securities only under the limited circumstances described in the first paragraph under "—Definitive Securities" below.

DTC has advised the depositor that it is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation, which, in turn, is owned by a number of DTC participants, the New York Stock Exchange, Inc., the American Stock Exchange LLC, the National Association of Securities Dealers, Inc. and other entities.

DTC holds securities that its participants deposit with DTC. DTC also facilitates the settlement among DTC participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in DTC participants' accounts, which eliminates the need for physical movement of securities. DTC participants include underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and similar organizations. Indirect access to the DTC system is also available to other entities, referred to as indirect DTC participants, such as securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a DTC participant, either directly or indirectly. DTC has no knowledge of the

46

JPMC_DEX_000071040

actual beneficial owners of the book-entry securities; DTC's records reflect only the identity of the DTC participants to whose accounts the book-entry securities are credited, which may or may not be the beneficial owners of the book-entry securities. DTC participants and indirect DTC participants are responsible for keeping account of their holdings on behalf of their customers. Beneficial owners of book-entry securities will not receive written confirmation from DTC of their purchases, but are expected to receive written confirmations providing details of their transactions, as well as periodic statements of their holdings, from the related DTC participants and indirect DTC participants.

Under the rules, regulations and procedures creating and affecting DTC and its operations, DTC is required to make book-entry transfers among DTC participants on whose behalf it acts and is required to receive and transmit payments of principal and interest, if any, on the book-entry securities. DTC participants and indirect DTC participants with whom beneficial owners of book-entry securities have accounts similarly are required to make book-entry transfers and receive and transmit payments on behalf of their respective beneficial owners. Accordingly, although beneficial owners of book-entry securities will not possess definitive securities, the DTC rules and the rules of DTC participants provide a mechanism by which beneficial owners of book-entry securities will receive payments and will be able to transfer their interests.

Beneficial owners of book-entry securities may hold their book-entry securities through DTC, if they are DTC participants, or indirectly through organizations that are DTC participants, including Euroclear Bank S.A./N.V. ("Euroclear") or Clearstream Banking, société anonyme ("Clearstream"). Euroclear and Clearstream will hold interests on behalf of their participants through customers' securities accounts in Euroclear's and Clearstream's names on the books of the depositaries that serve Euroclear and Clearstream. Those depositaries, in turn, will hold those interests in customers' securities accounts in the depositaries' names on the books of DTC.

Beneficial owners of book-entry securities will not be recognized by the trustee, the depositor, the issuer or the servicer as holders of the related securities for purposes of the related agreement, and beneficial owners will be able to exercise their rights as owners of their securities only indirectly through DTC or DTC participants. Any beneficial owner that desires to purchase, sell or otherwise transfer any interest in book-entry securities may do so only through DTC or through DTC participants. In addition, beneficial owners of book-entry securities will receive all distributions of principal and interest on the book-entry securities through DTC or DTC participants. Beneficial owners may experience delays in the receipt of payments relating to their securities because, although payments are required to be forwarded to DTC on each Distribution Date, DTC will forward payments to DTC participants, which will then be required to forward them to indirect DTC participants. Payments on book-entry securities held through Euroclear or Clearstream will be credited to the cash accounts of Euroclear participants or Clearstream participants in accordance with the relevant system's rules and procedures, to the extent received by the relevant depositary. The payments will be subject to tax reporting in accordance with relevant United States tax laws and regulations. *See Appendix A to this prospectus.*

Transfers between DTC participants will occur in accordance with DTC rules. Transfers between Clearstream participants and Euroclear participants will occur in accordance with their respective rules and operating procedures. *See Appendix A to this prospectus.*

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream participants or Euroclear participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by the relevant depositaries; however, the cross market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in that system in accordance with its rules and procedures and within its established deadlines defined with respect to European time. The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to its depositary to take action to effect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same day funds settlement applicable to DTC. Clearstream participants and Euroclear participants may not deliver instructions directly to the depositaries. *See Appendix A to this prospectus.*

47

JPMC_DEX_000071041

206

Neither DTC nor Cede & Co., nor any other DTC nominee, will consent or vote with respect to book-entry securities unless authorized by a DTC participant in accordance with DTC's procedures. Under its usual procedures, DTC mails an omnibus proxy to the issuer as soon as possible after the applicable record date. The omnibus proxy assigns Cede & Co.'s consenting or voting rights to those DTC participants to whose accounts book-entry securities are credited on the record date. Euroclear or Clearstream, as the case may be, will take any action permitted to be taken by securityholders under the related agreement on behalf of a Euroclear participant or Clearstream participant only in accordance with its relevant rules and procedures and subject to the ability of the relevant depositary to effect the actions on its behalf through DTC.

Clearstream, as a professional depository, holds securities for its participating organizations and facilitates the clearance and settlement of securities transactions between Clearstream participants through electronic book-entry changes in accounts of Clearstream participants, thereby eliminating the need for physical movement of securities. As a professional depository, Clearstream is subject to regulation by the Luxembourg Monetary Institute.

The Euroclear system was created to hold securities for its participating organizations and to clear and settle transactions between Euroclear participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of securities and any risk from lack of simultaneous transfers of securities and cash. The operator of the Euroclear system is Euroclear, under contract with the clearance cooperative, Euroclear System Clearance Systems S.C., a Belgian co-operative corporation. All operations are conducted by Euroclear, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with Euroclear, not the clearance cooperative.

The Euroclear clearance cooperative establishes policy for Euroclear on behalf of Euroclear participants. Securities clearance accounts and cash accounts with Euroclear are governed by the Terms and Conditions Governing Use of Euroclear and the related operating procedures of Euroclear and applicable Belgian law. The terms and conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments for securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific securities to specific securities clearance accounts.

None of the sponsor, the servicer, the trustee or any of their respective affiliates will have any liability for any actions taken by DTC or its nominee or Clearstream or Euroclear, for any aspect of the records relating to or payments made on account of beneficial owner of book-entry securities, or for maintaining, supervising or reviewing any records relating to those beneficial ownership interests.

For a discussion of certain federal income tax consequences applicable to holders of book-entry securities who hold such securities through Clearstream or Euroclear, or through DTC if the holder has an address outside the United States, see Appendix A to this prospectus.

*Definitive Securities*

If a class of securities of any series is initially issued in book-entry form, such class will be issued in fully registered, certificated form to securityholders or their nominees, rather than to DTC or its nominee, only if:

- the servicer advises the trustee in writing that DTC is no longer willing or able to discharge properly its responsibilities as depository with respect to the book-entry securities and the trustee or the servicer is unable to locate a qualified successor;

- the servicer, to the extent permitted by law, advises the trustee in writing that it elects to terminate the book-entry system with respect to the book-entry securities; or

- after the occurrence of an event of default under the related pooling and servicing agreement, in the case of certificates, or the related indenture, in the case of notes, as applicable, holders of book-entry securities evidencing not less than 66⅔% of the voting rights advise the trustee and DTC through DTC participants in writing that the continuation of a book-entry system through DTC (or its successor) is no longer in the best interest of the securityholders.

48

JPMC_DEX_000071042

If any of the above events occurs, DTC is required to notify all DTC participants of the availability of definitive securities. When DTC surrenders its physical securities and provides instructions for re-registration, the trustee will be required to issue definitive securities to replace the book-entry securities. After that happens, the trustee will recognize the holders of those definitive securities as securityholders under the related pooling and servicing agreement or indenture, as applicable.

Definitive securities will be transferable and exchangeable at the office or agency of the trustee. A reasonable service charge may be imposed for any registration of transfer or exchange, and the trustee or its agent may require payment of a sum sufficient to cover any tax or other governmental charge imposed in connection with registration of transfer or exchange.

## Exchangeable Securities

*General.* If so stated in the related prospectus supplement, a series of securities may include one or more classes of exchangeable securities. In any of these series, the holders of one or more of the classes of exchangeable securities will be entitled, after notice and payment to the trustee of an administrative fee, to exchange all or a portion of those classes for proportionate interests in one or more of the other classes of exchangeable securities. The classes of securities that are exchangeable for one another will be referred to in the related prospectus supplement as "related" to each other, and each related grouping of exchangeable securities will be referred to as a "combination." Each combination of exchangeable securities will be issued by the related trust and, in the aggregate, will represent a distinct combination of interests in the trust. At any time after their initial issuance, any class of exchangeable securities may be exchanged for the related class or classes of exchangeable securities. In some cases, multiple classes of exchangeable securities may be exchanged for one or more classes of related exchangeable securities. Exchanges of securities will be permitted only if payments on the exchangeable securities received in the exchange, in the aggregate, will be made in the same amounts and at the same times as the aggregate payments that would have been made on the exchanged securities.

Descriptions in the related prospectus supplement about the securities of that series, including descriptions of principal and interest distributions, registration and denomination of securities, credit enhancement, yield and prepayment considerations and tax, ERISA and legal investment considerations, will also apply to each class of exchangeable securities. The related prospectus supplement will separately describe the yield and prepayment considerations applicable to, and the risks of investment in, each class of exchangeable securities in a combination. For example, separate decrement tables and yield tables, if applicable, will be included for each class of a combination of exchangeable securities.

*Exchanges.* In order for a holder of exchangeable securities to exchange them for the related exchangeable securities, the following three conditions must be satisfied:

- the aggregate principal balance of the exchangeable securities received in the exchange, immediately after the exchange, must equal the aggregate principal balance, immediately prior to the exchange, of the exchanged securities;

- the aggregate annual amount of interest of the exchangeable securities received in the exchange must equal the aggregate annual amount of interest of the exchanged securities; and

- the class or classes of exchangeable securities must be exchanged in the applicable proportions, if any, described in the related prospectus supplement.

There are many different types of combinations of exchangeable securities. Any individual series of securities may have multiple types of combinations. Some examples of combinations of exchangeable securities include:

- Two classes of exchangeable securities—one with an interest rate that varies directly with changes in an index and the other with an interest rate that varies indirectly with changes in that same index—may be exchanged, together, for a single class of securities with a fixed interest rate. In this case, the two classes with interest rates that varied with an index would be exchanged for a single class with a fixed interest rate. In addition, the aggregate principal balance of the two classes would equal the principal balance of the class with the fixed interest rate.

49

JPMC_DEX_000071043

- Two classes of exchangeable securities—one that is an interest only class and one that is a principal only class—may be exchanged, together, for a single class of securities that is entitled to both principal and interest payments. The principal balance of the new principal and interest class would be equal to the principal balance of the exchanged principal only class, and the interest rate on the new principal and interest class would be a fixed rate that when applied to the principal balance of this class would generate an annual interest amount equal to the annual interest amount of the exchanged interest only class.

- Two classes of exchangeable securities—each a principal and interest class with different fixed interest rates—may be exchanged, together, for a single class that is entitled to both principal and interest payments, with a principal balance equal to the aggregate principal balance of the two exchanged classes, and a fixed interest rate that when applied to the principal balance of the new class, would generate an annual interest amount equal to the aggregate annual interest amount of the two exchanged classes.

These examples of combinations of exchangeable securities describe combinations of exchangeable securities which differ in their interest characteristics. In some series, a securityholder may be able to exchange its exchangeable securities for other exchangeable securities that have different principal payment characteristics. Examples of these types of combinations include:

- Two classes of exchangeable securities—one that is an accrual class that accretes interest for a specified period, with the accreted amount added to the principal balance of that accrual class, and one that is an accretion-directed class that receives principal payments from these accretions—may be exchanged, together, for a single class that receives payments of principal continuously from the first distribution date on which it receives interest until it is retired.

- Two classes of exchangeable securities—one that receives principal payments in accordance with a predetermined schedule, such as a planned amortization class, and one that only receives principal payments on a distribution date if scheduled payments have been made according to schedule—may be exchanged, together, for a single class of exchangeable securities that receives principal payments without regard to the schedule from the first distribution date on which it receives principal until it is retired.

These examples of combinations of exchangeable securities describe exchanging multiple classes of securities for a single class of securities. If so stated in the related prospectus supplement, it is also possible that a single class of exchangeable securities may be exchanged for two or more classes of securities in the same type of combinations as described in these examples.

A number of factors may limit the ability of an exchangeable securityholder to effect an exchange. For example, the securityholder must own, at the time of the proposed exchange, the class or classes necessary to make the exchange in the necessary proportions. If a securityholder does not own the necessary classes or does not own the necessary classes in the proper proportions, the securityholder may not be able to obtain the desired class of exchangeable securities. The securityholder desiring to make the exchange may not be able to purchase the necessary class from the then-current owner at a reasonable price or the necessary proportion of the needed class may no longer be available due to principal payments or prepayments that have been applied to that class.

*Procedures.* The related prospectus supplement will describe the procedures that must be followed to make an exchange. A securityholder will be required to provide notice to the trustee a specified number of days prior to the proposed exchange date. The notice must include the outstanding principal or notional amount of the securities to be exchanged and to be received, and the proposed exchange date. When the trustee receives this notice, it will provide instructions to the securityholder regarding delivery of the securities and payment of the administrative fee. A securityholder's notice to the trustee will become irrevocable on the second business day prior to the proposed exchange date. Any exchangeable securities in book-entry form will be subject to the rules, regulations and procedures applicable to DTC's book-entry securities.

If the related prospectus supplement describes exchange proportions for a combination of classes of exchangeable securities, these proportions will be based on the original, rather than the outstanding, principal or notional amounts of these classes.

50

JPMC_DEX_000071044

**Assignment of Trust Assets; Review of Files by Trustee**

At the time of issuance of any series of securities, the depositor will cause the pool of mortgage assets or Mortgage Securities to be transferred to the related trust, together with all principal and interest received on or with respect to the mortgage assets or Mortgage Securities after the related cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest. The trustee will, concurrently with the assignment of mortgage assets or Mortgage Securities, deliver the securities to the depositor in exchange for the trust assets. Each mortgage asset will be identified in a schedule appearing as an exhibit to the related agreement. The schedule of mortgage assets will include detailed information as to the mortgage assets held by the trust, including the outstanding principal balance of each mortgage asset after application of payments due on the cut-off date, information regarding the interest rate on the mortgage asset, the interest rate net of the sum of the rates at which the servicing fee and the retained interest, if any, are calculated, the retained interest, if any, the current scheduled monthly payment of principal and interest, the maturity of the mortgage note, the value of the mortgaged property and other information with respect to the mortgage assets. Each Mortgage Security will be identified in the related agreement, which will specify as to each Mortgage Security information regarding the original principal amount and outstanding principal balance of each Mortgage Security as of the cut-off date, as well as the annual pass-through rate or interest rate for each Mortgage Security sold to the trust.

If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc., or MERS®, assignments of the mortgages for the mortgage loans held by the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS® System. With respect to mortgage loans registered through the MERS® System, MERS® shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trust and will not have any interest in any of those mortgage loans.

The depositor will, with respect to each mortgage asset, deliver or cause to be delivered to the trustee, or to the custodian, a mortgage note endorsed to the trustee, the trust, or in blank, the original recorded mortgage with evidence of recording or filing indicated on it, and an assignment (except as to any mortgage loan registered on the MERS® System) to the trustee, the trust, or in blank of the mortgage in a form for recording or filing as may be appropriate in the state where the mortgaged property is located; or, in the case of each cooperative loan, the related cooperative note endorsed to the trustee, the trust, or in blank, the original security agreement, the proprietary lease or occupancy agreement, the assignment of the proprietary lease to the originator of the cooperative loan, the recognition agreement, the related stock certificate and related blank stock powers, a copy of the original filed financing statement, and an assignment to the trustee or the trust of the security agreement, the assignment of proprietary lease and the financing statement; *provided, however,* that if so indicated in the applicable prospectus supplement, the depositor will not deliver to the trustee or to the custodian mortgage notes endorsed to the trustee, the trust or in blank, assignments of mortgage to the trustee, the trust, or in blank, or assignments to the trustee or the trust of the other documents relating to cooperative loans described above.

With respect to any mortgage loan secured by a mortgaged property located in Puerto Rico, the mortgages with respect to these mortgage loans either (a) secure a specific obligation for the benefit of a specified person or (b) secure an instrument transferable by endorsement. Endorsable Puerto Rico Mortgages do not require an assignment to transfer the related lien. Rather, transfer of endorsable mortgages follows an effective endorsement of the related mortgage note and, therefore, delivery of the assignment referred to in the paragraph above would be inapplicable. Direct Puerto Rico Mortgages that secure a specific obligation for the benefit of a specified person, however, require an assignment to be recorded with respect to any transfer of the related lien and the assignment for that purpose would be delivered to the trustee.

With respect to any security backed by a Mortgage Security, the depositor will transfer, convey and assign to the trust all right, title and interest of the depositor in the Mortgage Securities and related property. The assignment will include all principal and interest due on or with respect to the Mortgage Securities after the cut-off date specified in the accompanying prospectus supplement. The depositor will

51

cause the Mortgage Securities to be registered in the name of the trust, the trustee or its nominee, and the trust will concurrently authenticate and deliver the securities. The trustee will not be in possession of or be assignee of record of any underlying assets for a Mortgage Security.

Mortgage loans may be transferred to a trust with documentation defects or omissions, such as missing notes or mortgages or missing title insurance policies. The related prospectus supplement will state whether the mortgage loan seller, the depositor or any other person will be required to cure those defects or repurchase or substitute for those mortgage loans if the defect or omission is not cured.

If stated in the related prospectus supplement, for up to 50% of the total number of mortgage loans as of the cut-off date, the depositor may deliver all or a portion of each related mortgage file (including the related mortgage note) to the trustee within 30 days after the Closing Date. Should the depositor fail to deliver all or a portion of any mortgage files to the trustee within that period, the depositor will be required to use its best efforts to deliver a replacement mortgage loan for the related delay delivery mortgage loan or repurchase the related delay delivery mortgage loan.

The trustee will be authorized, with the consent of the depositor and the servicer, to appoint a custodian pursuant to a custodial agreement to maintain possession of documents relating to the mortgage loans as the agent of the trustee.

### Representations and Warranties Regarding the Mortgage Loans; Remedies for Breach

*Representations by the Mortgage Loan Seller or Originator.* Each mortgage loan seller, or a party on its behalf, generally will have made representations and warranties in respect of the mortgage loans sold by that mortgage loan seller to the depositor. If the mortgage loan seller did not originate the mortgage loans, the mortgage loan seller may in some cases instead have assigned to the depositor the representations and warranties made to the mortgage loan seller by the mortgage loan originator, an intervening seller of the mortgage loans, or a party on its behalf. The depositor will assign to the trust those representations and warranties made or assigned to the depositor. The representations and warranties will be made as of a specified date, which may be the Closing Date for the initial issuance of the related series of securities, the cut-off date or a different date on which the mortgage loans were sold by the mortgage loan seller or the originator, as applicable. The representations and warranties will include, by way of example, the following:

- Each mortgage is a valid and enforceable lien on the related mortgaged property, except as such enforcement may be limited by laws affecting the enforcement of creditors' rights generally and principles of equity, and except as provided in the applicable sale agreement;

- The purchaser of the mortgage loans will be the legal owner of each mortgage loan, free and clear of any encumbrance or lien (other than any lien under the applicable sale agreement);

- No mortgage loan is more than a specified number of days delinquent;

- There are no delinquent assessments or taxes outstanding against any mortgaged property;

- Each mortgaged property is free of damage and in good repair, ordinary wear and tear excepted;

- Each mortgage loan at the time it was made complied with all applicable local, state and federal laws;

- Each mortgage loan (except mortgage loans secured by cooperative properties) is covered by a title insurance policy insuring the lien status of the mortgage, subject to the exceptions set forth in the policy; and

- All required hazard insurance or other insurance has been validly issued and remains in full force and effect.

If a person makes any of the foregoing representations and warranties on behalf of a mortgage loan seller or originator, the identity of the person will be specified in the related prospectus supplement. Any such person will be an affiliate of the mortgage loan seller or originator or a person acceptable to the depositor having knowledge regarding the subject matter of those representations and warranties.

52

JPMC_DEX_000071046

If the foregoing representations and warranties are made prior to the Closing Date and assigned by the depositor to the trust, a substantial period of time may have elapsed between the date the representations and warranties were made and the Closing Date. If so, and unless the representations and warranties are later restated, the person who made the representations and warranties will have a cure, repurchase or substitution obligation (as described below) in connection with any breach of a representation and warranty only if the relevant event that caused the breach occurred prior to the date of sale of the applicable mortgage loan by the person who made the representation and warranty. However, the depositor will not transfer any mortgage loan to a trust if anything has come to the depositor's attention that would cause it to believe that the representations and warranties made in respect of a mortgage loan will not be accurate and complete in all material respects as of the Closing Date.

*Representations by the Depositor.* The depositor will only represent and warrant, in respect of the mortgage loans, that as of the Closing Date, the trust will be the legal owner of each mortgage loan, free and clear of any encumbrance or lien (other than (i) any lien arising before the depositor's purchase of the mortgage loan from the mortgage loan seller and (ii) any lien under the agreement governing the trust).

*Remedies for Breach.* Upon a breach of any representation and warranty of the depositor, a mortgage loan seller, an originator or another party on behalf of a mortgage loan seller or originator that materially and adversely affects the value of a mortgage asset or the interests of the securityholders or the trust in the mortgage asset, the person who made the representation and warranty will be obligated either to cure the breach in all material respects, repurchase the mortgage asset at the Purchase Price or substitute for that mortgage asset as described in the next paragraph.

If the depositor, a mortgage loan seller, an originator or another party who made a representation and warranty on behalf of a mortgage loan seller or originator discovers or receives notice of any breach of its representations and warranties with respect to a mortgage asset, such person may be permitted, rather than to repurchase the mortgage asset, to reacquire the mortgage asset from the trust and substitute in its place one or more mortgage assets, but only if (a) with respect to a trust for which a REMIC election is to be made, the substitution is effected within two years of the date of initial issuance of the certificates, plus permissible extensions, or (b) with respect to a trust for which no REMIC election is to be made, the substitution is effected within 180 days of the date of initial issuance of the securities. Each substitute mortgage asset will, on the date of substitution, comply with the following requirements:

(1) have an outstanding principal balance, after deduction of all scheduled payments due in the month of substitution, not in excess of the outstanding principal balance, after deduction of all unpaid scheduled payments due as of the date of substitution, of the reacquired mortgage asset,

(2) have an interest rate not less than, and not more than 1% greater than, the interest rate of the reacquired mortgage asset,

(3) have a remaining term to maturity not greater than, and not more than two years less than, that of the reacquired mortgage asset,

(4) have a Lockout Date, if applicable, not earlier than the Lockout Date on the reacquired mortgage loan, and

(5) comply with all of the representations and warranties set forth in the applicable agreement as of the date of substitution.

In connection with any substitution, an amount generally equal to the difference between the outstanding principal balance of the reacquired mortgage asset and the outstanding principal balance of the substitute mortgage asset, together with (i) one month's interest at the applicable rate at which interest accrued on the reacquired mortgage asset (net of the rate at which the servicing fee is calculated) on the difference and (ii) the amounts described in clauses (3), (4) and (5) of the definition of "Purchase Price," will be deposited in the distribution account and distributed to securityholders on the first distribution date following the Prepayment Period in which the substitution occurred. In the event that one mortgage asset is substituted for more than one reacquired mortgage asset, or more than one mortgage asset is substituted for one or more reacquired mortgage assets, then the principal balances described in clause (1) above will be the applicable aggregate principal balances, the interest rate described in clause (2) above with respect to reacquired mortgage assets will be the weighted average interest rate, the remaining term described in

53

JPMC_DEX_000071047

212

clause (3) above with respect to reacquired mortgage assets will be the weighted average remaining term, and the Lockout Date described in clause (4) above with respect to reacquired mortgage assets will be the weighted average Lockout Date.

An independent verification of the substituting party's compliance with the foregoing requirements with respect to substitutions of mortgage assets may be made by the rating agencies that rated the related securities. Securityholders will be notified of changes to the pool assets in the monthly report to securityholders.

With respect to any series as to which credit support is provided by means of a mortgage pool insurance policy, in addition to making the representations and warranties described above, the depositor, a mortgage loan seller, an originator or another party on behalf of a mortgage loan seller or originator, as specified in the related prospectus supplement, will represent and warrant that no action has been taken or failed to be taken, no event has occurred and no state of facts exists or has existed which has resulted or will result in the exclusion from, denial of or defense to coverage under any applicable primary mortgage insurance policy, FHA insurance policy, mortgage pool insurance policy, special hazard insurance policy or bankruptcy bond, irrespective of the cause of the failure of coverage but excluding any failure of an insurer to pay by reason of the insurer's own breach of its insurance policy or its financial inability to pay. This representation is referred to in this prospectus and the related prospectus supplement as the insurability representation. Upon a breach of the insurability representation which materially and adversely affects the interests of the securityholders in a mortgage loan, the person making such representation will be obligated either to cure the breach in all material respects or to purchase the affected mortgage asset at the Purchase Price. The related prospectus supplement may provide that the performance of an obligation to repurchase mortgage assets following a breach of an insurability representation will be ensured in the manner specified in the prospectus supplement. See "Description of Primary Insurance Policies" and "Description of Credit Support" in this prospectus and in the related prospectus supplement for information regarding the extent of coverage under the aforementioned insurance policies.

The obligation to repurchase or, other than with respect to the insurability representation if applicable, to substitute mortgage loans constitutes the sole remedy available to the securityholders or the trustee for any breach of the representations. The depositor will not be obligated to repurchase or substitute for a mortgage loan if a mortgage loan seller, originator or other person defaults on its obligation to do so, and no assurance can be given that mortgage loan sellers, originators or other persons will carry out their repurchase or substitution obligations with respect to mortgage loans.

The servicer will make representations and warranties regarding its authority to enter into, and its ability to perform its obligations under, the servicing agreement. Upon a breach of any representation of the servicer which materially and adversely affects the interests of the securityholders, the servicer will be obligated to cure the breach in all material respects.

## Establishment of Custodial Account; Deposits to Custodial Account In Respect of Trust Assets

The servicer or the trustee will, as to each trust, establish and maintain or cause to be established and maintained one or more separate accounts for the collection of payments on the related trust assets. These accounts are collectively referred to in this prospectus as the custodial account. The custodial account must be either

- maintained with an eligible institution with minimum debt ratings as specified in the related servicing agreement or otherwise satisfactory to the rating agency or agencies rating any class of securities of the series;

- an account or accounts the deposits in which are insured by the FDIC, to the limits established by the FDIC; or

- a trust account or accounts maintained with the corporate trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity.

A custodial account may be maintained as an interest bearing or a noninterest bearing account, or the funds held in the custodial account may be invested pending each succeeding distribution date in U.S. government securities and other high-quality investments specified in the related servicing agreement. Any

54

JPMC_DEX_000071048

213

interest or other income earned on funds in the custodial account will either (i) be paid to the servicer or the trustee or their designee as additional compensation, or (ii) be paid as is set forth in the applicable prospectus supplement. The custodial account may be maintained with an institution that is an affiliate of the servicer or the trustee, provided that the institution meets the standards set forth in the bullet points above. If permitted by the rating agency or agencies and so specified in the related prospectus supplement, a custodial account may contain funds relating to more than one series of securities and may, if applicable, contain other funds respecting payments on mortgage loans belonging to the servicer or serviced by it on behalf of others.

Each sub-servicer servicing a trust asset under a sub-servicing agreement will establish and maintain one or more separate accounts which may be interest bearing and which will comply with the standards with respect to custodial accounts or other standards as may be acceptable to the servicer. The sub-servicer will be required to credit to the related sub-servicing account on a daily basis the amount of all proceeds of mortgage assets received by the sub-servicer, less its servicing compensation. The sub-servicer will remit to the servicer by wire transfer of immediately available funds all funds held in the sub-servicing account with respect to each mortgage asset on the monthly remittance date or dates specified in the related servicing agreement.

The servicer will deposit or cause to be deposited in the custodial account for each trust that holds mortgage loans, the following payments and collections received, or advances made, by the servicer or on its behalf subsequent to the cut-off date, other than payments due on or before the cut-off date and exclusive of any retained interest and net of any portion retained by the servicer or a sub-servicer as its servicing compensation:

(1) all payments on account of principal, including principal prepayments, on the mortgage assets or Mortgage Securities;

(2) all payments on account of interest on the mortgage assets or Mortgage Securities;

(3) all proceeds of the hazard insurance policies and any special hazard insurance policy, other than amounts applied to the restoration or repair of the property or released to the mortgagor in accordance with the normal servicing procedures of the servicer or the related sub-servicer, subject to the terms and conditions of the related Mortgage and mortgage note, any primary mortgage insurance policy, any FHA insurance policy, any VA guarantee, any bankruptcy bond and any mortgage pool insurance policy and all other amounts received and retained in connection with the liquidation of defaulted mortgage loans, by foreclosure or otherwise, together with the net proceeds on a monthly basis with respect to any mortgaged properties acquired for the benefit of securityholders by foreclosure or by deed in lieu of foreclosure or otherwise;

(4) any amounts required to be paid under any letter of credit, as described below under "Description of Credit Support—Letter of Credit";

(5) any advances made as described below under "Advances by the Servicer in respect of Delinquencies on the Trust Assets";

(6) if applicable and if so specified in the related prospectus supplement, all amounts required to be transferred to the custodial account from a reserve fund, as described below under "Description of Credit Support—Reserve Fund";

(7) any buydown funds and, if applicable, investment earnings on those funds, required to be deposited in the custodial account as described in the first paragraph below;

(8) all proceeds of any mortgage loan or property in respect of any mortgage asset purchased by, and all amounts paid in connection with any substitution of mortgage assets by, the depositor or any mortgage loan seller or originator as described under "—Representations and Warranties Regarding the Mortgage Loans; Remedies for Breach" above, exclusive of the retained interest, if any, in respect of the mortgage asset;

(9) all payments required to be deposited in the custodial account with respect to any deductible clause in any blanket insurance policy described under "Description of Primary Insurance Policies—Primary Hazard Insurance Policies"; and

Confidential

JPMC_DEX_000071049

(10) any amount required to be deposited by the servicer in connection with net losses realized on investments for the benefit of the servicer of funds held in the custodial account.

For each buydown mortgage loan, the servicer, or a sub-servicer, will deposit related buydown funds in a custodial account, which may be interest bearing, and that otherwise meets the standards for custodial accounts. This account is referred to in this prospectus and the related prospectus supplement as a buydown account. The terms of all buydown mortgage loans provide for the contribution of buydown funds in an amount not less than either (a) the total payments to be made from the buydown funds under the related buydown plan or (b) if the buydown funds are present valued, that amount that, together with investment earnings on those funds at a specified rate, compounded monthly, will support the scheduled level of payments due under the buydown mortgage loan. Neither the servicer, any sub-servicer nor the depositor will be obligated to add to the buydown funds any of its own funds should investment earnings prove insufficient to maintain the scheduled level of payments. To the extent that any insufficiency in buydown funds is not recoverable from the borrower, distributions to securityholders will be affected. For each buydown mortgage loan, the servicer will deposit in the custodial account the amount, if any, of the buydown funds, and, if applicable, investment earnings on those funds, so that when added to the amount due from the borrower on the buydown mortgage loan, it equals the full monthly payment which would be due if it were not subject to the buydown plan.

If a buydown mortgage loan is prepaid in full or liquidated, the related buydown funds will be applied as follows. If the mortgagor on a buydown mortgage loan prepays the loan in its entirety during the buydown period, the servicer will withdraw from the buydown account and remit to the mortgagor in accordance with the related buydown plan any buydown funds remaining in the buydown account. If a prepayment by a mortgagor during the buydown period together with buydown funds will result in a prepayment in full, the servicer will withdraw from the buydown account for deposit in the custodial account the buydown funds and investment earnings on those funds, if any, which together with the prepayment will result in a prepayment in full. If the mortgagor defaults during the buydown period with respect to a buydown mortgage loan and the mortgaged property is sold in liquidation, either by the servicer or the insurer under any related insurance policy, the servicer will withdraw from the buydown account the buydown funds and all investment earnings on those funds, if any, for deposit in the custodial account or remit the same to the insurer if the mortgaged property is transferred to the insurer and the insurer pays all of the loss incurred in respect of the default. In the case of any prepaid or defaulted buydown mortgage loan the buydown funds in respect of which were supplemented by investment earnings, the servicer will withdraw from the buydown account and either deposit in the custodial account or remit to the borrower, depending upon the terms of the buydown plan, any investment earnings remaining in the related buydown account.

Any buydown funds and any investment earnings on those funds deposited in the custodial account in connection with a full prepayment of the related buydown mortgage loan will be deemed to reduce the amount that would be required to be paid by the borrower to repay fully the related mortgage loan if the mortgage loan were not subject to the buydown plan.

With respect to Mortgage Securities, the trustee, manager, bond administrator or certificate administrator, as specified in the accompanying prospectus supplement, will deposit in the custodial account all payments on the Mortgage Securities as they are received after the cut-off date. If the trustee has not received a distribution for any Mortgage Security by the second business day after the date on which such distribution was due and payable, the trustee will request the issuer or guarantor, if any, of such Mortgage Security to make such payment as promptly as possible and legally permitted. The trustee may take any legal action against the related issuer or guarantor as is appropriate under the circumstances, including the prosecution of any claims in connection therewith. The reasonable legal fees and expenses incurred by the trustee in connection with the prosecution of any legal action will be reimbursable to the trustee out of the proceeds of the action and will be retained by the trustee prior to the deposit of any remaining proceeds in the custodial account pending distribution of those proceeds to the securityholders of the affected series. If the trustee has reason to believe that the proceeds of the legal action may be insufficient to cover its projected legal fees and expenses, the trustee will notify the related securityholders that it is not obligated to pursue any available remedies unless adequate indemnity for its legal fees and expenses is provided by the securityholders.

56

JPMC_DEX_000071050

*Withdrawals.* With respect to each series of securities, the servicer, trustee or special servicer may make withdrawals from the custodial account for the related trust for any of the following purposes, unless otherwise provided in the related agreement:

(1) to make distributions to the related securityholders on each distribution date;

(2) to reimburse the servicer or any other specified person for unreimbursed advances made by it in respect of mortgage assets held by the trust as described under "—Advances by Servicer in Respect of Delinquencies on the Trust Assets" below or unreimbursed servicing expenses incurred by it with respect to mortgage assets held by the trust and properties acquired in respect of those assets, these reimbursements to be made out of late collections of interest and principal, Insurance Proceeds, Liquidation Proceeds or other amounts received on the particular mortgage assets or related properties with respect to which the advances were made;

(3) to reimburse the servicer or any other specified person for any advances or servicing expenses described in clause (2) above made or incurred by it which, in the good faith judgment of the servicer or the other person, will not be recoverable from the amounts described in clause (2) above, the reimbursement to be made from amounts collected on other mortgage assets held by the trust;

(4) if so specified in the related prospectus supplement, to pay the servicer, a special servicer or another specified entity (including a provider of credit enhancement) interest accrued on the advances or expenses described in clause (2) above made or incurred by it while these remain outstanding and unreimbursed;

(5) to reimburse the servicer, the depositor, or any of their respective directors, officers, employees and agents, as the case may be, for expenses, costs and liabilities incurred thereby, as and to the extent described under "—Matters Regarding the Servicer and the Depositor";

(6) if so specified in the related prospectus supplement, to pay the fees of the trustee or, if applicable, the custodian;

(7) if so specified in the related prospectus supplement, to pay any ongoing fees of a credit support provider, if applicable;

(8) if so specified in the related prospectus supplement, to reimburse the trustee or any of its directors, officers, employees and agents, as the case may be, for expenses, costs and liabilities incurred thereby, as and to the extent described under "—Description of the Trustee";

(9) to pay the servicer, the trustee, or such other person designated in the applicable prospectus supplement as additional compensation, interest and investment income earned in respect of amounts held in the custodial account;

(10) if one or more elections have been made to treat the trust or designated assets held by the trust as a REMIC, to pay any federal, state or local taxes imposed on the trust or its assets or transactions, as and to the extent described under "Material Federal Income Tax Consequences—REMICS—Prohibited Transactions and Other Possible REMIC Taxes";

(11) if so specified in the related prospectus supplement, to pay for the cost of an independent appraiser or other expert in real estate matters retained to determine a fair sale price for a defaulted mortgage loan or a property acquired in respect of that loan in connection with the liquidation of the mortgage loan or property;

(12) if so specified in the related prospectus supplement, to pay for the cost of various opinions of counsel obtained pursuant to the related agreement for the benefit of the related securityholders;

(13) if so specified in the related prospectus supplement, to pay for costs and expenses incurred by the trust for environmental site assessments performed with respect to multifamily properties that constitute security for defaulted mortgage loans, and for any containment, clean-up or remediation of hazardous wastes and materials present on those mortgaged properties, as described under "Procedures for Realization Upon Defaulted Mortgage Assets";

(14) to make any other withdrawals permitted by the related agreement and described in the related prospectus supplement;

Confidential

JPMC_DEX_000071051

(15) to clear and terminate the custodial account upon the termination of the trust; and

(16) to correct for any amounts deposited in error.

## Deposits to Distribution Account

The trustee will, as to the related trust, establish and maintain a distribution account which must be an eligible account. The trustee will deposit or cause to be deposited in the distribution account for the related trust amounts received from the servicer or otherwise in respect of the related securities.

## Distributions on the Securities

Distributions allocable to principal and interest on the securities of each series will be made by or on behalf of the trustee each month on each date as specified in the related prospectus supplement and referred to as a distribution date, generally commencing with the month following the month in which the applicable cut-off date occurs. Distributions will be made to the persons in whose names the securities are registered at the close of business on the Record Date, and the amount of each distribution will be determined as of the close of business on the date specified in the related prospectus supplement and referred to as the determination date. All distributions with respect to each class of securities on each distribution date will be allocated pro rata among the outstanding securities of that class. Payments to the holders of securities of any class on each distribution date will be made to the securityholders of the respective class of record on the next preceding Record Date, other than in respect of the final distribution, based on the aggregate fractional undivided interests in that class represented by their respective securities. Payments will be made by wire transfer in immediately available funds to the account of, or by check mailed to, each securityholder, as specified by each securityholder and at the address of such holder as it appears on the security register maintained by the trustee or its agent. The final distribution in retirement of the securities will be made only upon presentation and surrender of the securities at the office or agency specified in the notice to securityholders of the final distribution. With respect to each series of certificates or notes, the security register will be referred to as the certificate register or note register, respectively.

For each class of securities of any series that is issued in book-entry form, such class will be represented by a single security registered in the name of a nominee of DTC, and beneficial owners of such book-entry securities will receive all distributions of principal and interest through DTC or DTC participants. See "—Form of Securities" above.

All distributions on the securities of each series on each distribution date will be made from the available distribution amount described in the next sentence, in accordance with the terms of the applicable pooling and service agreement or indenture. The available distribution amount for each series of securities will be described in the related prospectus supplement and will include the following amounts for each distribution date:

(1) the total amount of all cash received by or on behalf of the servicer with respect to the mortgage assets by the related determination date and not previously distributed, except:

(a) all scheduled payments of principal and interest collected but due on a date subsequent to the related Due Date;

(b) all prepayments received subsequent to the related Prepayment Period (together with any interest payment received with prepayments in full to the extent that it represents the payment of interest accrued on the mortgage asset for the period after the previous Due Period);

(c) Liquidation Proceeds, Insurance Proceeds and other unscheduled recoveries received subsequent to the related Prepayment Period;

(d) all amounts that are due or reimbursable to the depositor, the trustee, a mortgage loan seller, a sub-servicer or the servicer or that are payable in respect of specified expenses of the related trust; and

(e) any other amounts described in the related prospectus supplement;

58

Confidential

(2) if the related prospectus supplement so provides, interest or investment income on amounts on deposit in the distribution account;

(3) all advances with respect to the distribution date;

(4) if the related prospectus supplement so provides, Compensating Interest;

(5) to the extent not included under clause (1) above, any amounts collected under, from or in respect of any credit support with respect to the distribution date; and

(6) any other amounts described in the related prospectus supplement.

The entire available distribution amount will be distributed among the related securities, including any nonoffered securities, on each distribution date, and accordingly will not be available for any future distributions.

*Distributions of Interest on the Securities.* Each class of securities may earn interest at a different rate, which may be a fixed, variable or adjustable security interest rate. The related prospectus supplement will specify the security interest rate for each class, or, in the case of a variable or adjustable security interest rate, the method for determining the security interest rate.

With respect to each class of securities entitled to interest and each distribution date, the distribution in respect of interest will be equal to one month's interest on the outstanding principal balance of the security immediately prior to the distribution date, at the applicable security interest rate, subject to the following. As to each Strip Security with no or a nominal principal balance, the distributions in respect of interest on any distribution date will be on the basis of a notional amount and equal one month's Stripped Interest. Prior to the time interest is distributable on any class of Accrual Securities, interest accrued on that class will be added to the principal balance of that class on each distribution date. Interest distributions on each security of a series will be reduced in the event of shortfalls in collections of interest resulting from prepayments on mortgage loans, as described below, to the extent not covered by Compensating Interest, with that shortfall allocated among the securities of that series as specified in the related prospectus supplement. See "Yield and Maturity Considerations" in this prospectus.

*Distributions of Principal of the Securities.* The principal balance of a security, at any time, will equal the maximum amount that the holder will be entitled to receive in respect of principal out of the future cash flow on the mortgage assets and other assets held by the related trust. The principal balance of each offered security will be stated in the related prospectus supplement as the certificate principal balance with respect to a certificate and the note balance with respect to a note. The outstanding principal balance of a security will be reduced to the extent of distributions of principal on that security, and, if and to the extent so provided on the related prospectus supplement, by the amount of any realized losses allocated to that security. The outstanding principal balance of a security may be increased by any deferred interest if so specified in the related prospectus supplement. The initial aggregate principal balance of a series and each class of securities related to a series will be specified in the related prospectus supplement. Distributions of principal will be made on each distribution date to the class or classes of securities entitled to principal until the principal balance of that class has been reduced to zero. Distributions of principal of any class of securities will be made on a pro rata basis among all of the securities of the class. Securities with no principal balance will not receive distributions of principal.

*Prepayment Interest Shortfalls and Compensating Interest.* When a borrower prepays a mortgage loan in full between scheduled due dates for the mortgage loan, the borrower pays interest on the amount prepaid only to but not including the date on which the principal prepayment is made. Similarly, Liquidation Proceeds from a mortgaged property will not include interest for any period after the date on which the liquidation took place. Partial prepayments will in most cases be applied as of the most recent due date, so that no interest is due on the following due date on the amount prepaid.

If so stated in the accompanying prospectus supplement, to the extent funds are available from amounts that may include the servicing fee, the servicer may make an additional payment to securityholders to cover certain prepayment interest shortfalls with respect to loans that prepaid during the related prepayment period, referred to as Compensating Interest. Compensating Interest will be limited to the amount specified in the accompanying prospectus supplement and may not be sufficient to cover the prepayment interest shortfalls. If so stated in the accompanying prospectus supplement, no Compensating

59

JPMC_DEX_000071053

Interest may be paid at all. Compensating Interest will generally not be paid with respect to closed-end home equity loans and revolving credit loans. If so stated in the accompanying prospectus supplement, prepayment interest shortfalls may be applied to reduce interest otherwise payable to all or some classes of securities of a series.

*Allocation to Securityholders of Losses on the Trust Assets.* With respect to any defaulted mortgage loan that is finally liquidated, through foreclosure sale or otherwise, the amount of the realized loss incurred in connection with liquidation will equal the excess, if any, of the unpaid principal balance of the liquidated loan immediately prior to liquidation, over the aggregate amount of Liquidation Proceeds derived from liquidation remaining after application of the proceeds to unpaid accrued interest on the liquidated loan and to reimburse the servicer or any sub-servicer for related unreimbursed advances and expenses. With respect to mortgage loans the principal balances of which have been reduced in connection with bankruptcy proceedings, the amount of that reduction also will be treated as a realized loss. As to any series of securities, other than a Senior/Subordinate Series, any realized loss not covered as described under "Description of Credit Support" will be allocated among all of the securities on a pro rata basis. As to any Senior/Subordinate Series, realized losses will be allocated first to the most subordinate class of securities as described below under "Description of Credit Support—Subordination."

## Advances by Servicer in Respect of Delinquencies on the Trust Assets

With respect to any series of securities, the servicer will advance, on or before each distribution date, from funds held by the servicer for future distribution, or from its own funds, the amount of interest that was due on each mortgage asset on the related Due Date and was delinquent on the related determination date. The prospectus supplement for a series may also provide that the servicer will advance the amount of principal that was due on the related Due Date and was delinquent on the related determination date, except that, with respect to balloon loans, the servicer will not have to advance a delinquent balloon payment. Notwithstanding the foregoing, the servicer will not make an advance if it determines, in good faith, that the advance would not be recoverable from late payments, Insurance Proceeds, Liquidation Proceeds or other amounts received for the mortgage asset with respect to the which the advance was made.

Advances are intended to maintain a regular flow of scheduled interest and principal payments to holders of the class or classes of securities entitled to payments, rather than to guarantee or insure against losses. An advance of the servicer's funds will be reimbursable only out of recoveries on the mortgage asset with respect to the which the advance was made, including amounts received under any form of credit support; provided, however, that an advance will be reimbursable from recoveries on other mortgage assets in the event that the servicer determines that the advance is not ultimately reimbursable from recoveries on the related mortgage asset. If advances have been made by the servicer from funds held by the servicer for future distribution, the servicer will replace those funds on any future distribution date to the extent that funds available for distribution on that distribution date are less than distributions required to be made to securityholders on that date. If so specified in the related prospectus supplement, the obligations of the servicer to make advances may be secured by a cash advance reserve fund or a surety bond. If applicable, information regarding the characteristics of, and the identity of any obligor on, any surety bond, will be set forth in the related prospectus supplement.

Advances in respect of delinquencies will not be made in connection with home equity revolving credit loans. In the case of home equity revolving credit loans, the servicer may be required to advance funds to cover any draws made on a home equity revolving credit loan, subject to reimbursement by the entity specified in the accompanying prospectus supplement, provided that draws may be covered first from principal collections on the other loans in the mortgage pool.

As specified in the accompanying prospectus supplement for any series of securities as to which the trust holds Mortgage Securities, any advancing obligations will be under the terms of the Mortgage Securities and may differ from the provisions relating to advances described in this prospectus.

60

JPMC_DEX_000071054

**Form of Reports to Securityholders**

On each distribution date, the servicer or the trustee will make available to each securityholder and to such other parties as may be specified in the related servicing agreement, a statement setting forth the following as of the distribution date:

(1) the total amount of (i) interest, (ii) scheduled principal, (iii) principal prepayments, (iv) liquidation proceeds, (v) repurchase proceeds and (vi) subsequent recoveries on mortgage loans after such mortgage loans were liquidated, available for distribution to the securities on that distribution date;

(2) the amount of (i) interest and (ii) principal to be distributed to each class of securities on that distribution date;

(3) the amount of (i) any realized losses and (ii) any shortfall in interest collections resulting from prepayments (to the extent not covered by Compensating Interest) or from application of the Relief Act to be allocated to each class of securities on that distribution date;

(4) the principal balance for each class of securities before and after giving effect to such distributions and allocations;

(5) the amount of any advances of scheduled principal and interest made by the servicer during the related distribution period;

(6) the number and aggregate principal balance of the mortgage loans at the beginning and end of the distribution period;

(7) updated aggregate pool information, including weighted average pass-through rate, weighted average remaining term and geographic concentrations;

(8) delinquency information for the distribution period, including (i) the number and aggregate principal balance of the mortgage loans delinquent one, two and three months or more, (ii) the number and aggregate principal balance of the mortgage loans with respect to which foreclosure proceedings have been initiated and (iii) the number and aggregate principal balance of the mortgage loans with respect to which the related mortgaged properties have been acquired by the trust through foreclosure;

(9) the amount deposited in a reserve fund, if any, on that distribution date;

(10) the amount remaining in the reserve fund, if any, as of the close of business on that distribution date;

(11) in the case of securities that accrue interest at the variable rate, the security interest rate applicable to that distribution date, as calculated in accordance with the method specified in the related prospectus supplement; and

(12) as to any series which includes credit support, the amount of coverage of each instrument of credit support as of the close of business on that distribution date.

In addition, by the date required by applicable tax law of each calendar year, the servicer will furnish, to each person who at any time during the calendar year was a holder of a security, a statement setting forth the aggregate amount of interest and principal distributed to each class of securities and the aggregate amount of administration or servicing compensation received by the trustee or the servicers for that calendar year or the applicable portion of that year during which that person was a securityholder, and such other customary information as the servicer determines to be necessary to enable securityholders to prepare their tax returns for such calendar year or portion of such calendar year.

**Collection and Other Servicing Procedures Employed by the Servicer, Manager, Bond Administrator or Certificate Administrator**

The servicer, directly or through sub-servicers, will make reasonable efforts to collect all scheduled payments under the mortgage loans and will follow or cause to be followed the collection procedures as it would follow with respect to mortgage assets that are comparable to the mortgage assets and held for its own account, provided these procedures are consistent with the related servicing agreement and any related

61

insurance policy, bankruptcy bond, letter of credit or other insurance instrument described under "Description of Primary Insurance Policies" or "Description of Credit Support." The servicer, however, will not be required to make Nonrecoverable Advances. Consistent with this servicing standard, the servicer may, in its discretion, waive any late payment charge in respect of a late mortgage loan payment and, only upon determining that the coverage under any related insurance instrument will not be affected, extend or cause to be extended the due dates for payments due on a mortgage note for a period not greater than 180 days.

In instances in which a mortgage asset is in default, or if default is reasonably foreseeable, and if determined by the servicer or special servicer, if applicable, to be in the best interests of the related securityholders, the servicer may permit modifications of the mortgage asset rather than proceeding with foreclosure. In making that determination, the estimated realized loss that might result if the mortgage asset were liquidated would be taken into account. Modifications may have the effect of reducing the interest rate on the mortgage asset, forgiving the payment of principal or interest or extending the final maturity date of the mortgage asset. Any modified mortgage asset will continue to be held by the related trust, and the reduction in collections resulting from the modification may result in reduced distributions of interest, or other amounts, on, or may extend the final maturity of, one or more classes of the related securities.

In connection with any significant partial prepayment of a mortgage asset, the servicer, to the extent not inconsistent with the terms of the mortgage note and local law and practice, may permit the mortgage asset to be reamortized so that the monthly payment is recalculated as an amount that will fully amortize the remaining principal amount of the mortgage asset by the original maturity date based on the original interest rate. This will not be permitted if it would constitute a modification of the mortgage asset for federal income tax purposes.

In any case in which property securing a mortgage asset has been, or is about to be, conveyed by the borrower, or in any case in which property securing a multifamily loan or commercial loan has been, or is about to be, encumbered by the borrower, the servicer will exercise or cause to be exercised on behalf of the related trust the lender's rights to accelerate the maturity of the mortgage asset under any due-on-sale or due-on-encumbrance clause applicable to that mortgage asset. The servicer will exercise these rights only if the exercise of any of these rights is permitted by applicable law and will not impair or threaten to impair any recovery under any related insurance instrument. If these conditions are not met or if the servicer reasonably believes it is unable under applicable law to enforce a due-on-sale or due-on-encumbrance clause, the servicer will enter into or cause to be entered into an assumption and modification agreement with the person to whom the property has been or is about to be conveyed or encumbered, under which that person becomes liable under the mortgage note or cooperative note and, to the extent permitted by applicable law, the borrower remains liable on it. The original mortgagor may be released from liability on a mortgage asset if the servicer shall have determined in good faith that a release will not adversely affect the collectability of the mortgage asset. An ARM Loan may be assumed if the ARM Loan is by its terms assumable and if, in the reasonable judgment of the servicer, the proposed transferee of the related mortgaged property establishes its ability to repay the loan and the security for the ARM Loan would not be impaired by the assumption. If a mortgagor transfers the mortgaged property subject to an ARM Loan without consent, that ARM Loan may be declared due and payable. Any fee collected by or on behalf of the servicer for entering into an assumption agreement will be retained by or on behalf of the servicer as additional servicing compensation. In connection with any assumption, the terms of the related mortgage asset may not be changed except in the instance where an assumption is related to a defaulted cure. See "Legal Aspects of Mortgage Assets—Enforceability of Provisions."

In the case of multifamily loans, commercial loans or mixed-use loans, a mortgagor's failure to make scheduled payments may mean that operating income is insufficient to service the mortgage debt, or may reflect the diversion of that income from the servicing of the mortgage debt. In addition, a mortgagor under a multifamily loan, commercial loan or mixed-use loan that is unable to make scheduled payments may also be unable to make timely payment of all required taxes and otherwise to maintain and insure the related mortgaged property. In general, the servicer will be required to monitor any multifamily loan, commercial loan or mixed-use loan that is in default, evaluate whether the causes of the default can be

Confidential

corrected over a reasonable period without significant impairment of the value of the related mortgaged property, initiate corrective action in cooperation with the mortgagor if cure is likely, inspect the related mortgaged property and take such other actions as are consistent with the related servicing agreement. A significant period of time may elapse before the servicer is able to assess the success of any such corrective action or the need for additional initiatives. The time within which the servicer can make the initial determination of appropriate action, evaluate the success of corrective action, develop additional initiatives, institute foreclosure proceedings and actually foreclose (or accept a deed to a mortgaged property in lieu of foreclosure) on behalf of the securityholders of the related series may vary considerably depending on the particular multifamily loan, commercial loan or mixed-use loan, the mortgaged property, the mortgagor, the presence of an acceptable party to assume the multifamily loan, commercial loan or mixed-use loan and the laws of the jurisdiction in which the mortgaged property is located.

If a mortgagor files a bankruptcy petition, the servicer may not be permitted to accelerate the maturity of the related mortgage asset or to foreclose on the mortgaged property for a considerable period of time. See "Legal Aspects of Mortgage Assets."

For any series of securities for which the trust holds Mortgage Securities, the servicing and administration obligations of the manager, bond administrator or certificate administrator, as applicable, will be described in the accompanying prospectus supplement.

## Description of Sub-Servicing

Any servicer may delegate its servicing obligations in respect of the mortgage assets to sub-servicers, but the servicer will remain obligated under the related servicing agreement. Each sub-servicer will be required to perform the customary functions of a servicer of comparable assets, including:

- collecting payments from borrowers and remitting the collections to the servicer,
- maintaining primary hazard insurance as described in this prospectus and in any related prospectus supplement,
- filing and settling claims under primary hazard insurance policies, which may be subject to the right of the servicer to approve in advance any settlement,
- maintaining escrow or impound accounts of borrowers for payment of taxes, insurance and other items required to be paid by any borrower in accordance with the mortgage asset,
- processing assumptions or substitutions where a due-on-sale clause is not exercised,
- attempting to cure delinquencies,
- supervising foreclosures or repossessions,
- inspecting and managing mortgaged properties, if applicable, and
- maintaining accounting records relating to the mortgage assets.

The servicer will be responsible for filing and settling claims in respect of mortgage assets in a particular mortgage pool under any applicable mortgage pool insurance policy, bankruptcy bond, special hazard insurance policy or letter of credit. See "Description of Credit Support."

The sub-servicing agreement between any servicer and a sub-servicer will be consistent with the terms of the related servicing agreement and will not result in a withdrawal or downgrading of any class of securities issued in accordance with the related agreement. With respect to those mortgage assets serviced by the servicer through a sub-servicer, the servicer will remain liable for its servicing obligations under the related pooling and servicing agreement or servicing agreement as if the servicer alone were servicing those mortgage assets. Although each sub-servicing agreement will be a contract solely between the servicer and the sub-servicer, the agreement under which a series of securities is issued will provide that, if for any reason the servicer for the series of securities is no longer acting in a servicing capacity, the trustee or any successor servicer must recognize the sub-servicer's rights and obligations under the sub-servicing agreement.

Confidential

JPMC_DEX_000071057

The servicer will be solely liable for all fees owed by it to any sub-servicer, irrespective of whether the servicer's compensation under the related agreement is sufficient to pay the fees. However, a sub-servicer may be entitled to a retained interest in mortgage assets. Each sub-servicer will be reimbursed by the servicer for expenditures which it makes, generally to the same extent the servicer would be reimbursed under the related servicing agreement. See "Description of the Securities—Retained Interest; Servicing or Administration Compensation and Payment of Expenses."

The servicer may require any sub-servicer to agree to indemnify the servicer for any liability or obligation sustained by the servicer in connection with any act or failure to act by the sub-servicer in its servicing capacity. Each sub-servicer is required to maintain a fidelity bond and an errors and omissions policy with respect to its officers, employees and other persons acting on its behalf or on behalf of the servicer.

### Procedures for Realization Upon Defaulted Mortgage Assets

The servicer will be required to foreclose upon or otherwise take title in the name of the trustee or the trust of mortgaged properties relating to defaulted mortgage assets to which no satisfactory arrangements can be made for collection of delinquent payments, but the servicer will not be required to foreclose if it determines that foreclosure would not be in the best interests of the securityholders or the provider of credit support, if any. If the mortgage loan is an Additional Collateral Loan, the servicer may proceed against the related mortgaged property or the related additional collateral first, or may proceed against both concurrently, as permitted by applicable law and the terms under which the additional collateral is held, including any third-party guarantee. See "Legal Aspects of the Mortgage Assets—Anti-Deficiency Legislation and Other Limitations on Lenders."

In addition, the servicer may not acquire title to any one-to-four-family residential property securing a mortgage loan if the servicer is aware of evidence of toxic waste or other environmental contamination on the property and it determines that it would be imprudent to foreclose. The servicer may not acquire title to any multifamily residential property or commercial property securing a mortgage loan or take any other action that would cause the related trustee, the trust or any other specified person to be considered to hold title to, to be a "mortgagee-in-possession" of, or to be an "owner" or an "operator" of such mortgaged property within the meaning of federal environmental laws, unless the servicer has previously determined, based on a report prepared by a person who regularly conducts environmental audits (which report will be an expense of the trust), that either:

(1) the mortgaged property is in compliance with applicable environmental laws and regulations or, if not, that taking actions as are necessary to bring the mortgaged property into compliance with these laws is reasonably likely to produce a greater recovery on a present value basis than not taking those actions; and

(2) there are no circumstances or conditions present at the mortgaged property that have resulted in any contamination for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any applicable environmental laws and regulations or, if those circumstances or conditions are present for which any such action could be required, taking those actions with respect to the mortgaged property is reasonably likely to produce a greater recovery on a present value basis than not taking those actions. See "Legal Aspects of Mortgage Assets—Environmental Legislation."

As servicer of the mortgage loans, the servicer will present claims to the insurer under each insurance instrument, and will take reasonable steps as are necessary to receive payment or to permit recovery with respect to defaulted mortgage assets. The servicer, however, will not be required to make Nonrecoverable Advances. As set forth above under "—Collection and Other Servicing Procedures Employed by the Servicer," all collections by or on behalf of the servicer under any insurance instrument, other than amounts to be applied to the restoration of a mortgaged property or released to the mortgagor, are to be deposited in the custodial account for the related trust, subject to withdrawal as previously described. The servicer or its designee will not receive payment under any letter of credit included as an insurance instrument with respect to a defaulted mortgage asset unless all Liquidation Proceeds and

64

JPMC_DEX_000071058

Insurance Proceeds which it deems to be finally recoverable have been realized; however, the servicer will be entitled to reimbursement for any unreimbursed advances and reimbursable expenses.

If any property securing a defaulted mortgage asset is damaged and proceeds, if any, from the related hazard insurance policy or special hazard insurance policy are insufficient to restore the damaged property to a condition sufficient to permit recovery under the related credit insurance instrument, if any, the servicer is not required to expend its own funds to restore the damaged property unless it determines (a) that the restoration will increase the proceeds to securityholders on liquidation of the mortgage loan after reimbursement of the servicer for its expenses and (b) that its expenses will be recoverable by it from related Liquidation Proceeds.

If recovery on a defaulted mortgage asset under any related credit insurance instrument is not available for the reasons set forth in the preceding paragraph, the servicer nevertheless will be obligated to follow or cause to be followed the normal practices and procedures as it deems necessary or advisable to realize upon the defaulted mortgage asset. If the proceeds of any liquidation of the property securing the defaulted mortgage asset are less than the outstanding principal balance of the defaulted mortgage asset plus interest accrued at the interest rate plus the aggregate amount of unreimbursed servicing expenses incurred with respect to the mortgage asset and unreimbursed advances of delinquent monthly payments made with respect to the mortgage asset, the trust will realize a loss in the amount of the difference.

If the servicer or its designee recovers Insurance Proceeds with respect to any defaulted mortgage asset, the servicer will be entitled to retain, from the portion of those proceeds distributed to securityholders, the aggregate amount of unreimbursed servicing expenses incurred with respect to the mortgage asset and unreimbursed advances of delinquent monthly payments made with respect to the mortgage asset. Because Insurance Proceeds cannot exceed deficiency claims and expenses incurred by the servicer, no payment or recovery will result in a recovery to the trust which exceeds the principal balance of the defaulted mortgage asset together with accrued interest thereon at the interest rate net of servicing fees and the retained interest, if any. In addition, when property securing a defaulted mortgage asset can be resold for an amount exceeding the outstanding principal balance of the mortgage asset together with accrued interest and expenses, it may be expected that, if legally permissible, the insurer will exercise its right under any related mortgage pool insurance policy to purchase the property and realize for itself any excess proceeds. See "Description of Primary Insurance Policies" and "Description of Credit Support."

With respect to collateral securing a cooperative loan, any prospective purchaser will generally have to obtain the approval of the board of directors of the relevant cooperative before purchasing the shares and acquiring rights under the proprietary lease or occupancy agreement securing the cooperative loan. This approval is usually based on the purchaser's income and net worth and numerous other factors. The necessity of obtaining board approval could limit the number of potential purchasers for those shares and otherwise limit the servicer's ability to sell, and realize the value of, those shares. See "Legal Aspects of Mortgage Assets—Foreclosure on Cooperative Shares."

The manager, bond administrator or certificate administrator, as applicable, will deal with any defaulted Mortgage Securities in the manner described in the accompanying prospectus supplement.

**Retained Interest; Servicing or Administration Compensation and Payment of Expenses**

The prospectus supplement for a series of securities will specify whether there will be any retained interest in the trust assets. A retained interest in a trust asset represents a specified portion of the interest payable on that asset. The retained interest will be deducted from borrower payments as received and will not be transferred to the related trust. Any partial recovery of interest on a mortgage asset, after deduction of all applicable servicing fees, may be allocated pro rata between the retained interest, if any, and interest at the net interest rate on the mortgage asset. If the holder of the retained interest were to become the subject of a receivership, conservatorship, bankruptcy, or other insolvency proceeding, a party in interest (including the holder itself) could assert that such holder retains rights in the related trust assets and therefore compel the sale of such trust assets over the objection of the trust and the securityholders. If that occurs, delays and reductions in payments to the trust and the securityholders could result.

The servicer's primary compensation with respect to a series of securities will come from the monthly payment to it of an amount equal to one-twelfth of the servicing fee rate specified in the related

Confidential