# EXHIBIT 71

Page 1

C. Gething

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------x
DEXIA SA/NV, DEXIA HOLDINGS, INC.,
FSA ASSET MANAGEMENT LLC and
DEXIA CREDIT LOCAL SA,                    EFC Case

        Plaintiffs,
                    No. 12-cv-1761 (JSR)
  vs.

BEAR STEARNS AND CO., INC., THE
BEAR STEARNS COMPANY, INC., BEAR
STEARNS ASSET BACKED SECURITIES I
LLC, EMC MORTGAGE LLC (f/k/a EMC
MORTGAGE CORPORATION), STRUCTURED
ASSET MORTGAGE INVESTMENTS II, INC.,
J.P. MORGAN MORTGAGE ACQUISITION
CORPORATION, J.P. MORGAN SECURITIES
LLC (f/k/a JPMORGAN SECURITIES, INC.),
WAMU ASSET ACCEPTANCE CORP., WAMU
CAPITAL CORP., WAMU MORTGAGE
SECURITIES CORP., JPMORGAN CHASE & CO.,
and JPMORGAN CHASE BANK, N.A.,

        Defendants.
---------------------------------x

VIDEOTAPED DEPOSITION OF CHRISTOPHER M. GETHING

New York, New York

Thursday, January 31, 2013

Reported by:

THOMAS A. FERNICOLA, RPR

JOB NO. 57720

```
 1                     C. Gething
 2         Q.   No, I understand.  And just to
 3   clarify, I mean, the pricing of a pool of loans
 4   is not just based on the coupon; right?
 5         A.   Correct.
 6         Q.   It's based on many, many inputs;
 7   correct?
 8         A.   Correct.
 9         Q.   And all that I'm trying to understand
10   is whether -- and I think you've said this.
11   Maybe you said this and we just
12   miscommunicated, so let me withdraw my comment
13   and ask you a question.
14              Part of your own assessment of the
15   quality of the loans going into any pool that
16   you may be purchasing would typically include
17   understanding the underwriting guidelines
18   applicable to those mortgages; right?
19         A.   Part of it.  But, more importantly,
20   would be whether or not those underwriting
21   guidelines were adhered to.
22         Q.   Why is that?
23         A.   Because if they're not adhered to,
24   then they don't meet those guidelines, do they?
25         Q.   And why does that matter?
```

Page 56

1                    C. Gething
2       A.    Because if I'm buying that pool, I
3  want to ensure that what we're paying for is,
4  in fact, consistent with what we've been --
5  what has been described to us in the disclosure
6  materials.
7       Q.    Okay.
8             And do you have any estimate during
9  the '04 to '07 period of how many whole loan
10 acquisitions you oversaw?
11      A.    I don't recollect.
12      Q.    Okay.
13            Can you give any estimate, I mean --
14 well, any estimate either by dollar volume,
15 loan volume, any way to say that in a typical
16 year I would have overseen, you know, X dollars
17 of mortgage acquisitions?
18      A.    It was many hundreds of millions is
19 only -- possibly billions comment that I can
20 make.
21      Q.    Okay.
22      A.    And only because --
23      Q.    That's the magnitude of it.  It may
24 even be -- it's not 10 billion; right?
25      A.    It's - could have been much more.

```
 1                    C. Gething
 2   generally confirmed to me that these processes
 3   were adhered to, consistently I might add.
 4      Q.    Okay.
 5            But what you're confirming is that
 6   these processes were adhered to.  My question
 7   is different.
 8            Is the only way that you determined
 9   that these processes were themselves reasonable
10   is your own view of what's reasonable; correct?
11      A.    I have -- yes.  I have a view of what
12   I would have expected to be reasonable.  And,
13   again, using the materials that were made
14   available to me, I determined that what they
15   referred -- what they've told me was, in fact,
16   consistent with my understanding of industry
17   standard and reasonableness.
18      Q.    Let's understand the diligence
19   process a little bit here.
20            My question for you is:  What is the
21   purpose of conducting diligence on a pool of
22   mortgages in a securitization context?
23      A.    You want a securitization context, as
24   opposed to -- I want to be clear.
25            MR. SLIFKIN:  I'm going to object to
```

```
 1                          C. Gething
 2         form.
 3                  MR. LEBOVITCH:  Okay.
 4   BY MR. LEBOVITCH:
 5         Q.    In other words, are you
 6   distinguishing the diligence done in the
 7   purchase context and the securitization
 8   context?
 9         A.    Yes, sir.
10         Q.    Okay.
11               Why don't you tell me the purpose of
12   conducting diligence in the purchase context,
13   and then I will ask you, you know, and you can
14   do this at all once, how does it differ in the
15   securitization context.
16               If you want to take the first
17   question, go ahead.
18         A.    Thank you.
19               The purpose of diligent on a whole
20   loan purchase is to confirm by visiting the
21   files, that description of the mortgage pool as
22   described in the trade document, which is
23   usually a trade ticket, in fact, are there.
24   That the files themselves conform to your
25   understanding and the material nature of the
```

```
 1                       C. Gething
 2    assets.
 3       Q.    And what is the purpose of diligence
 4    in the securitization context?
 5       A.    In the purpose -- the purpose of
 6    diligence in a securitization setting is to
 7    ensure that the material disclosures in the
 8    various disclosure documents, one of which
 9    might be a prospectus or a prospectus
10    supplement, were, in fact, consistent with
11    what's in the files, the loan files.
12       Q.    Okay.
13             And we'll go to it, but if you can
14    remember, when you discuss each individual
15    defendant at the end of each discussion, you
16    talk about the diligence they perform in their
17    role as underwriters; correct?
18       A.    Correct.
19       Q.    Okay.
20             And you say that it's your view that
21    the diligence they performed when they were
22    serving as underwriters was substantially
23    similar to the diligence they performed when
24    acquiring the loans; right?
25       A.    What that means -- it has to be
```

1                    C. Gething
2     clarified.  What that means is that the process
3     of using a vendor, picking a sample, evaluating
4     the loans, resolving many of the loans --
5          Q.    Uh-huh.
6          A.    -- that and filing a report, the
7     grades, the whole thing, that's what I'm
8     referring to.  So, yes, if that's what you
9     mean, yes.
10         Q.    Is the diligence process a means by
11    which the banks confirmed that the loan tape
12    provided to rating agencies accurately
13    reflected the loans that were in the pool?
14         A.    If you'll allow me to --
15         Q.    You can answer and then you can talk
16    about it.
17         A.    It's -- the reason I was hesitating
18    is that, in part, that's true.
19         Q.    So why don't you explain to me what
20    part's true and what part's wrong.
21         A.    The data tape consists of upwards
22    of -- it depends, but let's just say for
23    argument's sake, 50 to 75 data fields.  A
24    goodly portion of them consist of what we call
25    the money terms of the mortgage, and the

```
 1                       C. Gething
 2    it be done, and the answer is it could be done.
 3         Q.    You said earlier, when I asked for
 4    circumstances in which it would not be
 5    appropriate to securitize a loan, you used the
 6    phrase "I could go on and oh."
 7               So you've identified one example,
 8    which is that they didn't get a mortgage;
 9    right?
10         A.    Okay.
11         Q.    Now, go on and on.
12         A.    If you're asking me, you are, you're
13    asking me to comment on whether or not
14    documentation that's missing is an appropriate
15    loan, if it's missing, is it an appropriate
16    loan to securitize.
17               And the vast preponderance of
18    documents that go missing or loans that have
19    documents that go missing can, in fact, be
20    securitized because there's a remedial process
21    that is undertaken by the seller to go out and
22    obtain the documents missing.
23               So I don't have reams -- if I said on
24    and on in the context of there are many, many
25    types of loans that you should securitize if
```

```
 1                    C. Gething
 2    they're not a true mortgage, no, I don't -- I
 3    shouldn't have said that.
 4             But what I am saying is that it is
 5    possible to securitize a mortgage if it's
 6    missing a document.  It depends on what the
 7    document is, it depends on the ability to cure
 8    it, and so on.
 9        Q.   How about if it's fraudulent or it
10    appears to be fraudulent?
11        A.   I can't say -- appears to be
12    fraudulent means to me it's not fraudulent.
13    It's only fraudulent in the event that someone
14    has had a gain on that -- on that loan and you
15    can prove it, and it has to be material.  And
16    I'm not an expert on fraud.
17        Q.   Okay.
18             Was the diligence process that's
19    industry standard concerned with determining if
20    loans to be securitized were the product of
21    fraud?
22        A.   It was a concern.
23        Q.   Okay.
24             And, in fact, the diligence process
25    is supposed to concern itself with whether the
```

```
 1                       C. Gething
 2   loans being securitized were the product of
 3   fraud; correct?
 4       A.    It's very difficult in a diligence
 5   process that we've described thus far to
 6   confirm there's fraud on the part of the
 7   borrower, which I presume you mean.
 8       Q.    Well, what about if the file
 9   indicates that someone's income was overstated,
10   is that a problem?
11       A.    How are you proving it?  I have to
12   ask a question.  Because unless and until there
13   is proof that the borrower has overstated their
14   income, there is no overstated income.
15       Q.    Does the due diligence process have
16   any function to assess whether someone's
17   representation about income was not reliable?
18       A.    They had alternative ways to vet the
19   stated income as provided by the borrower.
20       Q.    Was it important to try to assess the
21   reasonableness of a borrower's stated income?
22       A.    Yes.
23       Q.    Why?
24       A.    Because it went to whether or not he
25   had the ability to make the repayments.
```