# EXHIBIT 76

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW JERSEY

```
DEXIA SA/NV, DEXIA HOLDINGS, INC.,)
FSA ASSET MANAGEMENT, LLC and     )
DEXIA CREDIT LOCAL SA,            )
                                  )CASE NO.
            Plaintiffs,           )12-CV-4761 (JSR)
                                  )
        vs.                       )
                                  )
BEAR STEARNS & CO., INC., THE BEAR)
STEARNS COMPANIES, INC., BEAR     )
STEARNS ASSET BACKED SECURITIES I )
LLC, EMC MORTGAGE LLC (F/K/A EMC  )
MORTGAGE CORPORATION), STRUCTURED )
ASSET MORTGAGE INVESTMENTS II     )
INC., J.P. MORGAN MORTGAGE        )
ACQUISITION CORPORATION, J.P.     )
MORGAN SECURITIES LLC (F/K/A      )
PJMORGAN SECURITIES INC.), WAMU   )
ASSET ACCEPTANCE CORP., WAMU      )
CAPITAL CORP., WAMU MORTGAGE      )
SECURITIES CORP., JPMORGAN CHASE &)
CO. AND JPMORGAN CHASE BANK, N.A.,)
                                  )
            Defendants.           )
----------------------------------)
```

CONFIDENTIAL VIDEOTAPED DEPOSITION OF
JOEL READENCE
New York, New York
Wednesday, January 23, 2013

Reported by:
JOMANNA DeROSA, CSR
JOB NO. 57599

1                J. READENCE - CONFIDENTIAL

2                A.    Correct.

3                Q.    And then you said you were tasked

4    with the review of all the loans in the pool?

5                A.    We were tasked with pick --

6    selecting a sample of loans out of the entire pool

7    and reviewing those loans.

8                Q.    So, you did not review all the

9    loans in the pool?

10               A.    Correct.  Actually, sometimes we

11   did review all the loans in the pool.  My

12   apologies.

13               Q.    When would you review all the loans

14   in the pool?

15               A.    If it was a very small pool or if

16   we were dealing with a new seller.

17               Q.    And who would make the

18   determination as to whether or not -- strike that.

19                     Whose decision was it to review

20   only a sample, as opposed to the entire pool?

21               A.    When I came into the position,

22   there were already -- that -- that process was

23   already in place, but I would assume it was

24   William Buell.

25               Q.    If it was a new seller, did you

```
 1              J. READENCE - CONFIDENTIAL
 2    have the authority to only review a sample of the
 3    loans?
 4              A.    I don't recall that ever being the
 5    case.  I don't remember.
 6              Q.    Did you ever go to Mr. Buell and
 7    ask if you could review just a sample of a new
 8    seller's loans?
 9              A.    I don't recall.
10              Q.    And were you responsible for
11    selecting the sample?
12              A.    Yes, I was.
13              Q.    You then said you would tie out
14    with the seller the final population of loans.
15              A.    Correct.
16              Q.    Is that correct?
17              A.    Yes.
18              Q.    What do you mean by that?
19              A.    I would review the final due
20    diligence reports with them, and I would let them
21    know what loans I was recommending be purchased,
22    and what loans I was recommending being kicked
23    from the trade.
24              Q.    And was that an iterative process
25    between you and the seller?
```

1                    J. READENCE - CONFIDENTIAL

2              Q.    And then JPMorgan bought the loans

3    and owned them.  Correct?

4              A.    As I understand it, yes.

5              Q.    And then do you know what JPMorgan

6    did with those loans?

7              A.    Some loans would be securitized.  I

8    think the other loans were -- would be sold again.

9              Q.    Did JPMorgan acquire any of the

10   loans for investment?

11             A.    I don't know.

12                   THE VIDEOGRAPHER:  The time is

13       10:07.  We're going off the record.

14                   (Recess taken.)

15                   THE VIDEOGRAPHER:  The time is

16       10:09.  We're back on the record.

17             Q.    Mr. Readence, you indicated that

18   part of your job responsibility was selecting the

19   sample of loans to review.  Correct?

20             A.    Correct.

21             Q.    How did you select the sample?

22             A.    We selected a random population and

23   an adverse population.  A random population is

24   exactly as it sounds.  We simply selected loans

25   randomly through the pool.

Page 33

```
 1              J. READENCE - CONFIDENTIAL

 2                   An adverse selection was -- was

 3    selected by higher risk indicators of the loans.

 4    For example, if they had higher loan to value,

 5    higher combined loan to value, higher debt ratio,

 6    high loan amounts; things of that nature.

 7              Q.    How did you look -- prior to

 8    joining JPMorgan in 2005, had you ever selected a

 9    sample of loans?

10              A.    No, not that I recall.

11              Q.    How did you learn the process?

12              A.    As a -- as somebody who's worked,

13    you know -- worked with, you know, loan files for

14    years, they -- there -- it's industry standard,

15    the certain, you know, areas, the certain criteria

16    like the ones I just mentioned to you that -- that

17    could be considered higher risk.  So if you have a

18    loan program guideline, and there's a loan amount

19    and a higher end to that, that could be, you

20    know -- that loan, for example, could be

21    considered higher risk, so you might want to

22    select a sample of those to, you know, look at

23    those.

24              Q.    And when you randomly selected the

25    loans, how did you do that?
```

Page 34

```
 1              J. READENCE - CONFIDENTIAL

 2              A.    I literally randomly selected it.

 3   I just scrolled through the tape and hit X, X, X

 4   all the way down, random.

 5              Q.    And how would you determine the

 6   number of loans you would randomly select?

 7              A.    We had a due diligence sample size

 8   that we used.

 9              Q.    And did that sample size vary from

10   deal to deal?

11              A.    Yes, it did.   It depended on the

12   loan program.

13              Q.    And did it depend on who the seller

14   of the loans was as well?

15              A.    I don't recall that.

16              Q.    Did you have any involvement in

17   deciding the size of the sample?

18              A.    No, I did not.

19              Q.    You were told what the size was.

20   Correct?

21              A.    Correct.

22              Q.    Who told you?

23              A.    Ralph Lenzi or William Buell.

24              Q.    Did you have any involvement in

25   determining the size of the adverse sample?
```

Page 36

1              J. READENCE - CONFIDENTIAL

2      the sample?

3              A.    I don't recall.

4              Q.    When you were at MortgageIT, did

5      you ever have discussions with the Wall Street

6      banks regarding the selection of the sample?

7              A.    I don't recall.

8              Q.    Once you selected the sample, what

9      was the next step in your process?

10             A.    We would request the sellers

11     provided the loan files.  Back then we dealt for

12     the most part, the vast majority of the time, we

13     dealt with physical files, and those files would

14     either be reviewed at the vendor or on-site at the

15     seller.  So we would request those loans be

16     shipped to the appropriate location it required.

17             Q.    When you say "at the vendor," who

18     are you referring to?

19             A.    Our due diligence vendor who was

20     reviewing the loans.

21             Q.    Was that a third-party due

22     diligence provider?

23             A.    Yes, it was.

24             Q.    Did you conduct any of the due

25     diligence in-house?

1                  J. READENCE - CONFIDENTIAL

2                  A.      No, we did not.

3                  Q.      So while you were there between

4       2005 and 2008 in your job responsibilities, all

5       the due diligence that you were responsible for

6       was performed by a third-party due diligence

7       vendor.  Is that correct?

8                  A.      As I remember, yes.

9                  Q.      Who was responsible for retaining

10      the third-party vendor?

11                 A.      When I -- oh, we had a select group

12      of vendors, and we could choose which vendor we

13      wanted to use.  Oftentimes during -- at this time

14      it was very busy, so sometimes it was just simply

15      based on the availability.

16                 Q.      At what point in this process that

17      we're walking through, did you select the

18      third-party due diligence vendor?

19                 A.      Generally around the same time that

20      we selected the sample, we selected our vendor as

21      well.

22                 Q.      Did the vendor have any involvement

23      in the selection of the sample?

24                 A.      No, they did not.

25                 Q.      How long did this process take from

Page 45

1                J. READENCE - CONFIDENTIAL

2    no, I would not.

3            Q.    Would you work with an outside

4    third party who was going to ultimately purchase

5    and securitize the loans, and JPMorgan was going

6    to act as an underwriter on that securitization?

7            A.    We did have those types of deals.

8    My interaction -- I don't recall if I had direct

9    interaction with those specific third parties.

10           Q.    In those types of deals where

11   JPMorgan was going to serve as an underwriter, did

12   you still conduct the same due diligence?

13           A.    Yes, I did.

14           Q.    And did you have the same job

15   responsibilities as you had on the other deals we

16   previously talked about?

17           A.    Yes, I did.

18           Q.    Is there any difference between

19   those two situations?

20           A.    None that I can recall.

21           Q.    Did you -- in the situation where

22   JPMorgan was acting as an underwriter, did you

23   receive the due diligence reports from the

24   vendors?

25           A.    Yes, I did.

Page 46

1                J. READENCE - CONFIDENTIAL

2                    Q.    Did you make the decision on which

3    due diligence vendor to retain?

4                    A.    I believe I did.

5                    Q.    And were you involved in the

6    clearing of exceptions and the tie-out process?

7                    A.    As I recall, I was, yes.

8                    Q.    And was the third-party entity that

9    was going to securitize the loans also involved in

10   that loss?

11                   A.    I don't recall.  I don't believe

12   so.  I don't remember that happening.

13                   Q.    Are you familiar with the

14   terminology EV-1, EV-2 and EV-3?

15                   A.    Yes, I am.

16                   Q.    What is EV-1?

17                   A.    EV1 is a grade that was applied to

18   a loan that was reviewed through the due diligence

19   process, and it was shown that it was underwritten

20   correctly.

21                   Q.    And whose terminology is EV-1?

22                   A.    I believe it was industry standard.

23                   Q.    Industry standard for whom?

24                   A.    Due diligence.  I mean, just across

25   the board I believe that all -- anyone who's

Page 47

1                    J. READENCE - CONFIDENTIAL

2      involved in the due diligence process working with

3      vendors use that terminology, as I understood it.

4              Q.    And the vendors that you retained

5      would identify a loan and label it EV-1.

6                    Is that correct?

7              A.    That was -- yes, that was one of

8      the grades they used, correct.

9              Q.    So EV-1 is a grade used by the

10     third party due diligence vendors.   Correct?

11             A.    The ones we use, they did use those

12     grades, yes.

13             Q.    And that was industry standard for

14     the due diligence vendors.   Correct?

15             A.    As I remember, yes.

16             Q.    And it was the due diligence

17     vendors who made the determination of what grade

18     to assign to a particular loan.   Is that correct?

19             A.    As part of their review, the

20     preliminary results, yes.

21             Q.    And what is an EV-2?

22             A.    An EV-2 is a loan that has passed

23     the due diligence review that might be -- might

24     not conform to the loan guidelines, but has

25     sufficient compensating factors in the file to

Page 48

1                J. READENCE - CONFIDENTIAL

2      support it.

3              Q.     And what is an EV-3?

4              A.     An EV-3 is a loan file that has --

5      that there is something wrong with it, that

6      there's an issue with the underwriting of the

7      file, and in order -- and the loan needs to be --

8      that there either is missing documentation, it was

9      underwritten correctly, something like that, that

10     there's a serious issue with the loan.

11             Q.     Have you heard it referred to as

12     "material exceptions"?

13             A.     Yes, I have.

14             Q.     Have you heard it referred to as

15     "critical exceptions"?

16             A.     I don't recall.

17             Q.     Why would missing documentation be

18     a material exception?

19             A.     It depends on the type of

20     documentation, but if it were -- if it were

21     documents that were critical to the loan being

22     underwritten, like, for example, if we didn't have

23     the borrower's loan application, that would be,

24     you know, a critical document that we needed to

25     retrieve.

Page 86

```
 1                  J. READENCE - CONFIDENTIAL

 2              Q.    Did you expand the sample on this

 3      pool of loans as a result of this high EV-3

 4      fallout?

 5              A.    I do not recall.

 6              Q.    If you turn to -- I believe it's

 7      the third attachment, in the bottom right-hand

 8      corner of the document there's a -- it says

 9      "document provided in native format," and there's

10      a Bates label that is JPMC_DEX_001670472.

11                  MR. SLIFKIN:   That's the second

12          attachment.

13                  THE WITNESS:   Yes, that's the

14          second one.

15                  MR. DeLANGE:   Sorry.

16              A.    Okay.   I'm there.

17              Q.    And the attachment should be -- it

18      looks to me -- I think it's a -- a small printout

19      of an Excel spreadsheet.   I just want to make sure

20      we're on the same -- looking at the same --

21              A.    We're on the same page.

22              Q.    Okay.   Do you recognize this

23      attachment?

24              A.    I recognize it as a due diligence

25      report.
```

Page 87

```
 1                  J. READENCE - CONFIDENTIAL

 2                  Q.     And what is this reporting?

 3                  A.     This appears to be a due diligence

 4      report on the entire due diligence population

 5      showing Event Level 1, 2, and 3 loans, and showing

 6      for the Event Level 3s what -- you know, what

 7      appears to be wrong with each one of the loans.

 8                  Q.     And what appears to be wrong is

 9      that in the column labeled at the top "EX

10      description"?

11                  A.     Yes.

12                  Q.     And if you look on the first page,

13      almost in the middle of the page, there's a loan

14      to Elizabeth Saule, S-A-U-L-E.   Do you see that?

15                  A.     Yes, I do.

16                  Q.     And do you see the description is:

17                         "Income does not meet guidelines

18      for grade/doc type."

19                         Do you see that?

20                  A.     Yes, I do.

21                  Q.     Do you see that?

22                  A.     Yes, I do.

23                  Q.     Is that a missing doc issue?

24                  A.     That's more than a missing doc

25      issue.
```

Page 88

1          J. READENCE - CONFIDENTIAL

2               Q.    And, in fact, this loan has

3   multiple issues identified.  Correct?

4               A.    I see income docs do not meet

5   guidelines for grade type.  Oh, okay.  I see what

6   you're saying.  Yes, it appears that it's

7   missing -- it appears that there are a number of

8   things wrong with it.

9               Q.    Including the property type is

10  unacceptable under the guidelines.  Correct?

11              A.    Yes.  I see that, "property type

12  unacceptable under guidelines."

13              Q.    And if you continue down on this

14  page, the second-to-last loan identified, do you

15  see that as also a 3C?

16              A.    Yes, I do.

17              Q.    And it says:

18                    "Income does not meet guidelines

19  for grade/doc type."

20                    Correct?

21              A.    Yes, it does.

22              Q.    And that's not a missing

23  documentation issue; is it?

24              A.    No, that doesn't appear to be so.

25              Q.    If you turn to the next page, there

Page 89

1                    J. READENCE - CONFIDENTIAL

2    is a loan -- I'm going to give you -- well --

3                         MR. DeLANGE:   Let me go off the

4         record for just a second.

5                         THE VIDEOGRAPHER:   The time is

6         11:22.  We're going off the record.

7                         (Recess taken.)

8                         THE VIDEOGRAPHER:   The time is

9         11:24.  We're back on the record.

10                        MR. SLIFKIN:   Now that we're back

11        on the record, I'd like to designate the

12        entire transcript as confidential, and we can

13        deal with de-designations later, given the

14        people's personal financial information is in

15        these exhibits.

16                        And, also, to the extent that there

17        were printouts from native files, and those

18        printouts aren't stamped confidential, you

19        know, I think, counsel, we all understand that

20        they are to be treated as confidential, given

21        the nature of the information contained

22        therein.

23                        MR. DeLANGE:   The only thing I

24        would add -- and I believe the document

25        indicating it was produced in the native is

Page 90

```
 1                J. READENCE - CONFIDENTIAL

 2          stamped confidential.

 3                     MR. SLIFKIN:   Yes, exactly.

 4             Q.    Mr. Readence, if you look -- we're

 5   now on the second page of this exhibit.   If you

 6   look, I believe it's the third or fourth loan

 7   down.   It's 501036892.

 8             A.    Got it.

 9             Q.    Do you see that?

10             A.    Yes, I do.

11             Q.    Actually, the fourth entry under

12   that loan says:

13                  "Appraisal form does not match

14   property type."

15                  Do you see that?

16             A.    Yes, I do.

17             Q.    Is that a missing documentation

18   issue?

19                   MR. SLIFKIN:   I'm sorry, guys.   I'm

20      just not with you.   It's the one ending 382?

21                   MR. DeLANGE:   892.

22             Q.    And to be clear, there's an

23   indication:

24                  "Appraisal form does not match

25   property type."
```

```
 1                  J. READENCE - CONFIDENTIAL

 2                      Correct?

 3            A.      That is correct.

 4            Q.      And that's not a missing

 5    documentation issue; is it?

 6            A.      No, it's not.

 7            Q.      If you go down to almost the middle

 8    of the page, loan ending -- or Loan No. 501110114.

 9                    Do you see that?

10            A.      Ending in 114?

11            Q.      Yes.

12            A.      Oh, got it.   Okay.

13            Q.      It says:

14                    "Income does not guidelines for

15    grade/doc type."

16                    Do you see that?

17            A.      Yes, I do.

18            Q.      That's not a missing documentation

19    issue; is it?

20            A.      No, it's not.

21            Q.      Two -- three loans down, ending in

22    4001.   Do you see that?

23            A.      Yes, I do.

24            Q.      And the second entry for that loan

25    indicates debt ratio greater than 55 percent.
```

Page 92

```
 1                   J. READENCE - CONFIDENTIAL
 2                        Do you see that?
 3              A.     Yes, I do.
 4              Q.     Is that a missing documentation
 5   issue?
 6              A.     No, it's not.
 7              Q.     And for each one of those entries
 8   that are "income does not meet guidelines for
 9   grade/doc type, debt to income ratio greater than
10   55 percent," those are not missing documentation
11   issues; are they?
12              A.     No, they're not.
13              Q.     If you could turn to the third
14   page, and it's the second entry of loans ending
15   782.
16              A.     Got them.
17              Q.     The fourth entry in that loan says:
18                        "Assets are not sufficient to
19   close."
20                        Do you see that?
21              A.     Yes, that is correct.
22              Q.     And that's not a missing
23   documentation issue; is it?
24              A.     No, it's not.
25              Q.     And other entries indicating assets
```

Page 93

1              J. READENCE - CONFIDENTIAL

2   are not sufficient to close is not a missing

3   documentation issue; is it?

4              A.    That is correct.

5              Q.    Is a missing verbal VOE required by

6   guidelines a missing documentation issue?

7              A.    Can you tell me where you're at,

8   please?

9              Q.    I can.  If you turn to the next

10  page, which is 4.

11             A.    Flip it over?

12             Q.    Yes.

13             A.    Okay.

14             Q.    There is -- there are a couple

15  entries on this page.  The first one is about a

16  quarter of the way down.  It says:

17                   "Missing verbal VOE required by

18  guidelines."

19                   Do you see that?

20             A.    Yes, I do.

21             Q.    What does that mean?

22             A.    That would be a doc.  That would be

23  a document.  There's a form, a VOE verbal form

24  that they were to fill out for the guideline to be

25  satisfied.

Page 94

```
 1              J. READENCE - CONFIDENTIAL

 2              Q.    And is a VOE a verification of

 3  employment?

 4              A.    Yes, it is.

 5              Q.    If you turn to the next page, which

 6  is page 5, the first loan at the top is 188.

 7              A.    Got it.

 8              Q.    The entry says:

 9                    "Asset docs do not meet guidelines

10  for grade/doc type."

11              A.    Yes.

12              Q.    That's not a missing doc issue; is

13  it?

14              A.    No, it's not.

15              Q.    If you go about two-thirds of the

16  way down the page, the loan ending in 8163.

17              A.    Yes.

18              Q.    Do you see that?

19              A.    Yes, I do.

20              Q.    It says:

21                    "Cash reserves less than required."

22              A.    Yes.

23              Q.    That's not a missing doc issue; is

24  it?

25              A.    No, it's not.
```

Page 95

```
 1                J. READENCE - CONFIDENTIAL

 2                    Q.    If you turn to -- I believe it's

 3    page 7, the loan at the top ends in 706.

 4                          MS. KONANOVA:   Page 8.

 5                          MR. DeLANGE:   Page 8.

 6                    Q.    Are you on that page, Mr. Readence?

 7                    A.    I am.

 8                    Q.    If you look at -- I believe it's

 9    the third loan -- fourth loan on this page.   It

10    ends in 3021.   Do you see that?

11                    A.    Yes, I do.

12                    Q.    Again, debt ratio greater than 55

13    percent.   Correct?

14                    A.    Correct.

15                    Q.    And if you look down two more

16    loans, ending in 6100.   Do you see that?

17                    A.    Yes, I do.

18                    Q.    There is an entry indicating:

19                          "Debt ratio exception greater than

20    10 percent."

21                          Do you see that?

22                    A.    Yes, I do.

23                    Q.    That's not a missing documentation

24    issue; is it?

25                    A.    No, it's not.
```

Page 96

1               J. READENCE - CONFIDENTIAL

2                   Q.    If you turn to, I believe, page 10,

3    the top loan is 7690.

4                   A.    Yes.

5                   Q.    If you look, the fourth loan on

6    this page -- fifth loan on this page, excuse me,

7    ends in 0955.  Do you see that?

8                   A.    Yes, I do.

9                   Q.    And the last entry for that loan

10   says:

11                       "Occupancy status not supported by

12   file documentation."

13                   A.    Yes.

14                   Q.    Is that a missing doc issue?

15                   A.    No, it's not.

16                   Q.    If you turn to what I believe is

17   page 10, the top loan for point of reference is

18   8 -- ends in 8469.

19                   A.    Okay.  I'm here.

20                   Q.    And if you look all the way towards

21   the bottom, right above where there's -- it's -- I

22   guess it's the last loan on this page, and it ends

23   in 2736.  Do you see that?

24                   A.    Yes, I do.

25                   Q.    And the first entry for that loan

Page 97

```
 1            J. READENCE - CONFIDENTIAL
 2    says:
 3                   "Value used by lender not
 4    supported."
 5            A.    Correct.
 6            Q.    Do you see that?
 7            A.    Yes, I do.
 8            Q.    That's not a missing doc issue; is
 9    it?
10            A.    No, it's not.
11            Q.    Once you received this report, what
12    did you do?
13            A.    I most likely reviewed the reports,
14    and then shortly thereafter it appears I shared it
15    with my supervisor, and with the deal manager, and
16    everybody else.
17            Q.    And would you work with the seller
18    on attempting to clear the EV-3s to --
19            A.    Yes.
20            Q.    -- EV-2s?
21            A.    Sorry.  Yes, I would.
22                 (Exhibit 382 marked for
23          identification.)
24                 MR. DeLANGE:  Mr. Readence, I've
25          handed you a document the court reporter has
```

Page 104

```
 1              J. READENCE - CONFIDENTIAL

 2              Q.    Do you have any reason to doubt

 3      that you received this e-mail from Mr. Bradley on

 4      or about September 18th, 2006 at 10:35 a.m.?

 5              A.    No, I do not.

 6              Q.    And the FCE reports that all 396

 7      have been reviewed and QC'ed.  Correct?

 8              A.    Yes.

 9              Q.    And he reports that 214 EV-3 loans

10      have been identified.  Correct?

11              A.    Correct.

12              Q.    More than half.  Correct?

13              A.    Correct.

14              Q.    Did you expand the sample on this

15      pool of loans?

16              A.    I do not recall.

17              Q.    And after receiving this, your job

18      would be to work with Debra to clear any of the

19      EV-3s and EV-2s.  Correct?

20              A.    Correct.

21              Q.    Did you have any other job

22      responsibilities at that point in time on that

23      deal?

24              A.    No.

25                    MR. DeLANGE:  I'll ask the court
```

```
 1              J. READENCE - CONFIDENTIAL
 2    Correct?
 3              A.    Yes.
 4              Q.    And were you ever pressured by the
 5    banking group to complete your due diligence
 6    quicker?
 7              A.    Not that I recall.
 8              Q.    Were you ever pressured by the
 9    banking group to approve more loans?
10              A.    Not that I recall.
11              Q.    Did the banking group ever override
12    loans?
13              A.    No.
14              Q.    That wouldn't make sense; would it?
15              A.    No.
16              Q.    Why not?
17              A.    Because of the due diligence.
18    They're outside of due diligence.
19              Q.    And they have a financial incentive
20    to securitize and sell as many loans as possible.
21                    Correct?
22              A.    Honestly, I don't know what their
23    incentive was.  I didn't know very much about
24    them.
25              Q.    But they were -- their business was
```

Page 122

1          J. READENCE - CONFIDENTIAL

2     to package loans, securitize them and sell them.

3               Correct?

4          A.    Yes, that I know.

5          Q.    Would you consider it a problem if

6     the banking group were overriding EV-3s to EV-2?

7          A.    I would consider it something that

8     shouldn't be happening.

9               MR. DeLANGE:   Have the court

10    reporter mark Exhibit 385.

11               (Exhibit 385 marked for

12    identification.)

13               MR. DeLANGE:   Mr. Readence, the

14    court reporter has handed you a document that

15    we've marked as Exhibit 385.   It's an e-mail

16    from you to Brian Simons, Bates numbered

17    JPMC_DEX_008621996, and it has an attachment

18    that was produced in the native format and is

19    printed out here.

20          Q.    Do you recognize this document?

21          A.    The e-mail, I don't recognize it

22    off the top of my head, no.

23          Q.    Who is Brian Simons?

24          A.    Brian Simons was a deal manager

25    within our group and within the transaction

Page 142

```
 1              J. READENCE - CONFIDENTIAL

 2    responsibilities were in the banking group?

 3         A.    I'm not completely certain, but I

 4    think he may have been a deal manager or what

 5    their idea of a deal manager was, if I remember

 6    correctly.

 7         Q.    But he was involved in the

 8    ultimate -- in the securitization of loans after

 9    they had gone through the due diligence process.

10              Correct?

11         A.    I believe so.

12         Q.    Was Tom Roh in the banking group

13    the entire time you were at JPMorgan?

14         A.    As -- as far as I recall.

15              MR. DeLANGE:  I'm going to ask the

16         court reporter to mark the next document.

17              (Exhibit 389 marked for

18         identification.)

19              MR. DeLANGE:  Mr. Readence, the

20         court reporter has marked a document as 389

21         bearing Bates No. JPMC_DEX_001904126.

22         Q.    Do you recognize this document?

23         A.    No, I do not.

24         Q.    Who is Ann Ayers?

25         A.    According to this e-mail, she works
```

Page 144

```
 1              J. READENCE - CONFIDENTIAL

 2    2006-W4-041806 final overrides.  Correct?

 3              A.    Correct.

 4              Q.    And this e-mail was sent on April

 5    18th, 2006.  Is that correct?

 6              A.    Correct.

 7              Q.    Do you have any reason to doubt

 8    that you sent this e-mail on that date?

 9              A.    No, I do not.

10              Q.    And the e-mail is to Ann and

11    Debbie.  Correct?

12              A.    Yes, it is.

13              Q.    And you instruct them to override

14    all credit exception loans to an Event Level 2,

15    per Tom Roh in the banking group.

16              A.    Correct.

17              Q.    With the exception of the following

18    loans, which will remain Event Level 3s, and then

19    you list eight loans.  Correct?

20              A.    Yes, I do.

21              Q.    So, Mr. Roh in the banking group

22    was providing the override of EV-3s to EV-2.

23                    Correct?

24              A.    To my recollection, the banking

25    group had nothing to do with overriding loans,
```

```
 1              J. READENCE - CONFIDENTIAL
 2              A.    That is my understanding of the
 3    process.
 4              Q.    And you'll see that Ms. Ayers, nine
 5    minutes after you sent the e-mail, responded
 6    saying "these are done."  Correct?
 7              A.    Yes, I do.
 8              Q.    Did anyone at Clayton ever question
 9    you on your overrides?
10              A.    I don't recall.
11              Q.    They -- you had the ability to
12    override.  Correct?
13              A.    I had the ability to override, yes.
14              Q.    And if they -- and if you said
15    we're going to override, Clayton would just follow
16    your instructions.  Correct?
17              A.    I don't remember.
18              Q.    You don't recall any instances
19    where they questioned your overrides.  Correct?
20              A.    No.  I did -- I did -- I -- I
21    remember working well with them, so, I would --
22    you know, I would surmise that they -- you know,
23    if I did something, and I was missing something, I
24    would assume they would point it out to me.
25              Q.    Do you recall -- can you -- as you
```

1              J. READENCE - CONFIDENTIAL

2    here.  Do you recognize this document?

3              A.    I do not recognize this document,

4    no.

5              Q.    This is an e-mail from you to

6    Amanda Weber and J. Madura at Clayton.  Do you see

7    that?

8              A.    Yes.

9              Q.    And you recall Ms. Weber being at

10   Clayton at or about this time.  Correct?

11             A.    Correct.

12             Q.    And who is J. Madura?

13             A.    I don't know.

14             Q.    And you copied Ms. Bauer in the

15   banking group.  Correct?

16             A.    That is correct.

17             Q.    And the subject is:  "CBASS

18   2007-CB6 Overrides."  Correct.

19             A.    Correct.

20             Q.    And that's the same deal that we

21   just looked at where Ms. Bauer instructed you to

22   work with Clayton.  Correct?

23             A.    That is correct.

24             Q.    And you are sending overrides to

25   Clayton.  Correct?

Page 179

```
 1              J. READENCE - CONFIDENTIAL
 2              A.      Correct.
 3              Q.      And these are overrides of EV-3s to
 4   EV-2.  Correct?
 5              A.      Correct.
 6              Q.      And you're copying Ms. Bauer in the
 7   banking group about the overrides.  Correct?
 8              A.      Correct.
 9              Q.      If you look at the attachment, and
10   it was produced in native format, and you flip
11   through to about the sixth or seventh page, you'll
12   see a final column that looks like it has some
13   shading on it.
14              A.      Yes.
15              Q.      And then there's -- at the bottom
16   it says:
17                      "JPM Comment."
18                      Do you see that?
19              A.      Yes, I do.
20              Q.      And then there's entries as you
21   scroll down those that say:
22                      "Please clear to EV-2."
23              A.      Yes.
24              Q.      Do you see that?
25              A.      Yes, I do.
```

Page 180

```
 1              J. READENCE - CONFIDENTIAL
 2                   Q.    Are those your overrides?
 3                   A.    I don't recall.
 4                   Q.    Would you typically send your
 5     overrides to Clayton in a format like this where
 6     you would add in a column with JPMorgan comments
 7     indicating "please clear"?
 8                   A.    I believe so, yes.
 9                   Q.    So this is -- while you don't
10     recall this specific document, this is the format
11     that you would transmit your overrides to Clayton?
12                   A.    I believe so, yes.
13                   Q.    If you turn to the second to the
14     last page, the second column down where you have a
15     "please clear to an EV-2," do you see that?
16                   A.    Yes, I do.
17                   Q.    And then the column right next to
18     it says:
19                         "Loan was 30 days delinquent at
20     time of closing."
21                         Do you see that?
22                   A.    Yes, I do.
23                   Q.    And it says:
24                         "Lis pendens is on title, no date."
25                         What does that mean?
```

Page 181

```
 1                   J. READENCE - CONFIDENTIAL
 2                   A.     I don't know.
 3                   Q.     Looking at this, do you have any
 4   idea why you cleared this?
 5                   A.     No, I do not.
 6                   Q.     And so I'm clear, these are your
 7   overrides.  Correct?
 8                   A.     I'm not sure -- I don't know if I
 9   had conversations with William and Ralph.  I don't
10   know the source of these, no.  I don't have
11   access -- you know, there's a lot of documentation
12   and other things that you have access to in a
13   trade that I don't hear, so I don't know.  I'm
14   definitely the one that's on the e-mail.
15                   Q.     Were these Kathryn's overrides?
16                   A.     These are -- no one from the
17   banking group, like I told you before, should have
18   been making any overrides.  If there were
19   discussions -- I mean, there could have
20   been discussions with the banking group from Ralph
21   and Lenzi, and then as a result of those
22   discussions, some overrides were made, but not --
23   you know, as I recall, there were no banking group
24   overrides made.
25                   Q.     And that would be, as you said
```

Page 182

1                  J. READENCE - CONFIDENTIAL

2      earlier, that would be inappropriate to have the

3      banking group do that.   Correct?

4                  A.    That was not the normal course of

5      action, as I recall.

6                  Q.    And you indicated you would have

7      concern if that was happening.   Correct?

8                  A.    Yes.

9                  Q.    I hand you a document that's

10     previously been marked as Exhibit 374.   374 is an

11     e-mail, Bates numbered JPMC_DEX_008469356 through

12     357, with a document provided in native format,

13     Bates numbered ending in 358.   Again, we printed

14     out the spreadsheet without the native format.

15                 Do you recognize this document,

16     Mr. Readence?

17                 A.    No, I do not.

18                 Q.    This is an e-mail ending --

19     the last e-mail is from you to Jessica Madura and

20     Amanda Weber at Clayton.   Do you see that?

21                 A.    Yes.

22                 Q.    Does now seeing the name Jessica

23     Madura ever refresh your recollection on who that

24     is at Clayton?

25                 A.    Actually, no, I don't -- I don't

```
 1              J. READENCE - CONFIDENTIAL

 2              Q.    And did you care, when you were

 3    conducting your diligence, whether JPMorgan was

 4    going to purchase the whole loans or serve as the

 5    underwriter on a GMAC shelf?

 6              A.    Did I care?

 7              Q.    Yes.

 8              A.    I don't know.  I mean, insomuch as

 9    it impacted my job, if it impacted my job in some

10    manner I guess I would care, yes, but that doesn't

11    sound -- what you're telling me doesn't sound like

12    it would impact the due diligence process.

13              Q.    Your due diligence process was the

14    same, irrespective of whether you were going to

15    purchase the loans or you were going to serve as

16    an underwriter?

17              A.    As I recall, yes.

18              Q.    Do you recall what happened with

19    that deal?

20              A.    No, I do not.

21              (Exhibit 399 marked for

22        identification.)

23              MR. DeLANGE:  Mr. Readence, we've

24        handed you a document marked as Exhibit 399.

25        It's an e-mail with an attachment, Bates
```

Page 204

1          J. READENCE - CONFIDENTIAL

2                Q.    And they completed that review in

3    ten days or less, if it's the same deal?

4                A.    We don't know when the due

5    diligence process started.  We couldn't -- you

6    know what I mean?  Just because we sent that

7    initial e-mail out on the -- on the 7th -- you

8    know, the 7th, we may have not had the diligence

9    start.  If this is the same pool, it may not have

10   started for another week, I don't know.  So,

11   between the 7th and the 17th, assuming this is the

12   same pool, yes, we -- we've completed 519 loans.

13               Q.    But it couldn't have started

14   earlier than the 7th when you received your first

15   instructions from Mr. White?

16               A.    If this is the same pool, it

17   shouldn't have been able to, no.

18               Q.    Okay.  And Mr. DiNielli -- I have

19   no idea if I'm saying that right -- is reporting

20   that as of August 17th, 2006, 134 out of the 519

21   loan files are EV-3.  Correct?

22               A.    That is correct.

23                     (Exhibit 400 marked for

24        identification.)

25                     MR. DeLANGE:  Marked as Exhibit

1                J. READENCE - CONFIDENTIAL

2         400, a document Bates numbered

3         JPMC_DEX_001839433.

4              Q.    Mr. Readence, do you recognize this

5    document?

6              A.    No, I do not.

7              Q.    This is an e-mail string that you

8    forwarded on August 18th, 2006 to Paul White,

9    Jamie Gordon, with a cc to Robert Miller.

10                   Do you see that?

11             A.    Yes, I do.

12             Q.    And you're forwarding an e-mail

13   from Mr. DiNielli.  Correct?

14             A.    Correct.

15             Q.    And Mr. DiNielli's e-mail on August

16   18th is providing you additional preliminary

17   reports for the RASC-KS7 deal.  Correct?

18             A.    That is correct.

19             Q.    Do you have any reason to doubt

20   that you received and forwarded this e-mail on or

21   about August 18th, 2006 in the ordinary course of

22   your business at JPMorgan?

23             A.    No, I do not.

24             Q.    Who is Jamie Gordon?

25             A.    I don't know.

Page 206

```
 1              J. READENCE - CONFIDENTIAL
 2                   Q.    Is he in the banking group with
 3     Mr. White?
 4                   A.    I don't know.
 5                   Q.    And who is Robert Miller?
 6                   A.    Robert Miller was a trader.
 7                   Q.    And what do you mean "trader"?
 8                   A.    He was down on the trading floor.
 9     I don't know what his exact responsibilities were.
10                   Q.    Who would he trade with?
11                   A.    I don't know.
12                   Q.    Do you know what he traded?
13                   A.    I don't know.
14                   Q.    Did he trade whole loan purchases
15     or did he trade securitizations?
16                   A.    I'm not sure.
17                   Q.    Why did you copy Mr. Miller on this
18     e-mail?
19                   A.    He may have -- he may have traded
20     deals.  I don't know.  I'm assuming he's involved
21     in this transaction.
22                   Q.    And this e-mail -- why did you
23     forward this preliminary report to Mr. White,
24     Mr. Gordon, and Mr. Miller?
25                   A.    They may have asked for an update.
```

Page 207

1              J. READENCE - CONFIDENTIAL

2     Their contacts at the seller may have asked for an

3     update, and so, I was providing them an update.

4              Q.    And this update that you provide

5     them reports that out of 725 loan files completed

6     to date, 165 are EV-3s.   Correct?

7              A.    Correct.

8              Q.    And, again, this is one day after

9     the prior exhibit.   Is that right?

10             A.    Right.   We're not out of the due

11    diligence review yet.

12                   (Exhibit 401 marked for

13        identification.)

14                   MR. DeLANGE:   Exhibit 401 is an

15        e-mail string bearing Bates

16        No. JPMC_DEX_001839444 through 446, with a

17        document produced in native format Bates

18        numbered 447.   There may be multiple documents

19        in native format here.

20             Q.    Mr. Readence, do you recognize this

21    string of e-mails?

22             A.    No, I do not.

23             Q.    Who is Jennifer Latzka?

24             A.    She works at GMAC-RFC, according to

25    this e-mail.   I recognize the name.   I don't

1              J. READENCE - CONFIDENTIAL

2       remember her specifically.

3              Q.    You recognize the name as someone

4       that you worked with while you were employed at

5       JPMorgan?

6              A.    According to this e-mail, yes.

7              Q.    It indicates Ms. Latzka is an

8       underwriting associate.  Do you see that?

9              A.    Yes, I do.

10             Q.    And this is -- the subject of the

11      e-mail is "CRS Appraisal Audit for JPMorgan

12      RASC-KS7."  Do you see that?

13             A.    Yes, I do.

14             Q.    This is the same deal that we were

15      looking at previously, correct, in the prior

16      exhibits?

17             A.    Yes, it is.

18             Q.    Do you have any reason to doubt

19      that you sent and received these e-mails from

20      Ms. Latzka in the ordinary course of your business

21      on or about or between -- you know, on or about

22      August 21st, 2006?

23             A.    No, I do not.

24             Q.    What role did GMAC have in this

25      deal?

Page 209

```
 1                 J. READENCE - CONFIDENTIAL

 2                 A.      I don't recall.

 3                 Q.      Were these GMAC loans?

 4                 A.      I don't recall.

 5                 Q.      Were they -- if you look at the

 6   first on the string of e-mails, which is on the

 7   second page, do you see that?   It's an e-mail from

 8   Nicole Goehring --

 9                 A.      Yes.

10                 Q.      -- at collrisk.com.   Do you see

11   that?

12                 A.      Yes.

13                 Q.      That's Collateral Risk Solutions.

14   Right?

15                 A.      Correct.

16                 Q.      And they -- does Collateral Risk

17   Solutions provide your appraisal audits?

18                 A.      The property reviews, yes.

19                 Q.      And Nicole is sending to Jennifer,

20   with a copy to you and others, the final EV-3

21   report for the JPMorgan RASC-KS7 appraisal review.

22                         Correct?

23                 A.      That is correct.

24                 Q.      Flipping back to the first page,

25   Ms. Latzka is sending an e-mail to you.   Correct?
```

Page 210

```
 1                J. READENCE - CONFIDENTIAL
 2              A.    At the top?
 3              Q.    Yes.
 4              A.    Yes.
 5              Q.    I'm sorry.  The last in the string
 6   of e-mails at the top.
 7              A.    Yes.
 8              Q.    And she says "wonderful."  Correct?
 9              A.    Yes.
10              Q.    And then:
11                    "I am down to 41 Level 3 from the
12   diligence."
13                    Do you see that?
14              A.    Yes.
15              Q.    Was Ms. Latzka in charge of the
16   diligence on this deal?
17              A.    I don't know.
18              Q.    Did Ms. Latzka have override
19   authority on this deal?
20              A.    No, she would not.
21              Q.    That would be your authority.
22   Correct?
23              A.    Mine, Ralph, and William Buell.
24              Q.    JPMorgan's?
25              A.    JPMorgan, correct.
```

Page 215

```
1              J. READENCE - CONFIDENTIAL

2              A.    Correct.

3              Q.    And that's part of the process that

4    you were involved in, which is you had received

5    the report of the EV-3s, and you tried to cure and

6    clear those EV-3s, and override them to an EV-2.

7                    Correct?

8              A.    The seller would provide missing

9    documents or -- or underwriter justification for

10   any issues in the file.   The seller would provide

11   missing documentation and underwriter --

12   additional underwriter information to clear EV-3s

13   to EV-2s.

14                   And in addition to that, I would

15   review loan files myself to see if there were any

16   loan files that can be cleared from EV-3 to EV-2,

17   based on compensating factors.

18             Q.    And that was your job at JPMorgan

19   from 2005 to 2008?

20             A.    To -- to -- to be the due diligence

21   man in charge of the due diligence process of

22   transactions, yes, correct.

23             Q.    And in that process you didn't

24   review the EV-1s.   Correct?

25             A.    No, no, no, no, not on a regular
```

1                    J. READENCE - CONFIDENTIAL

2      basis.

3                    Q.    What did you do with the remaining

4      pool that was not sampled?

5                    A.    Can you give me a little more than

6      that?

7                    Q.    Well, you said that you would look

8      at -- you didn't look at the EV-1s.  Correct?

9                    A.    No.

10                    Q.    You'd look at the EV-3s, and the

11     seller would try to provide missing documentation

12     to the third-party vendor, correct, to try to cure

13     whatever material exceptions existed?

14                    A.    Yes.

15                    Q.    You would also look at some of the

16     EV-3 loan files to determine whether you could

17     clear it or override it based on compensating

18     factors.  Correct?

19                    A.    Correct.

20                    Q.    What did you do with the remaining

21     loans in the pool that were not part of the

22     sample?

23                    A.    The rest of the loan population

24     outside of the due diligence sample?

25                    Q.    Correct.

```
 1              J. READENCE - CONFIDENTIAL
 2              A.    Well, I didn't do anything with
 3       them.
 4              Q.    And that wasn't part of your
 5       process.  Correct?
 6              A.    That was not part of my process.
 7                    (Exhibit 403 marked for
 8       identification.)
 9                    MR. DeLANGE:  Mr. Readence, Exhibit
10       403 is another e-mail with attachments, Bates
11       numbered JPMC_DEX_001598943.
12              Q.    Do you recognize this document?
13              A.    No, I do not.
14              Q.    This is Brad Bradley.  And we've
15       seen previous e-mails from Mr. Bradley at Clayton
16       to yourself and others.  Correct?
17              A.    Yes.
18              Q.    Was Mr. Bradley employed at
19       Clayton, and one of your contacts at Clayton
20       during your employment at JPMorgan during this
21       time frame?
22              A.    Based on the e-mails we looked at,
23       yes, he was.
24              Q.    Do you have any reason to doubt
25       that you received this e-mail from Mr. Bradley on
```

Page 294

```
 1            J. READENCE - CONFIDENTIAL
 2                 Q.    And is this internal information
 3    that you don't want investors and rating agencies
 4    to know about?
 5                 A.    I don't recall what this was.
 6                 Q.    Turn to the page ending in 521.
 7                 A.    I'm there.
 8                 Q.    It's Flagstar.  Do you see that?
 9                 A.    Yes, I do.
10                 Q.    Did you write this?
11                 A.    I don't recall.
12                 Q.    See under "Credit Issues" the first
13    one is "LTV/CLTV Exceptions."  Do you see that?
14                 A.    Yes, I do.
15                 Q.    Did you write that?
16                 A.    I don't recall.
17                 Q.    Do you agree with that?
18                 A.    I don't recall.
19                 Q.    And the next one is "DTI
20    Exceptions."  Do you see that?
21                 A.    Yes, I do.
22                 Q.    Did you agree with that?
23                 A.    I don't recall.
24                 Q.    And three more down is "Guideline
25    Violations."  Do you see that?
```

Page 295

```
 1                    J. READENCE - CONFIDENTIAL

 2              A.      Yes, I do.

 3              Q.      Do you agree with that?

 4              A.      I don't recall.

 5              Q.      And then "Unacceptable Property

 6     Types."  Do you see that?

 7              A.      Yes, I do.

 8              Q.      Did you agree with that?

 9              A.      I don't recall.

10              Q.      Have you come across any JPMorgan

11     internal reports that you felt were inaccurate?

12              A.      I don't recall.

13              Q.      Did you have any involvement with

14     Washington Mutual?

15              A.      I don't recall.

16              Q.      You don't recall if you ever had a

17     deal where you conducted due diligence on

18     Washington Mutual loans?

19              A.      Right.  I don't recall that.

20              Q.      Turn to the very last page, Bates

21     No. 559.

22              A.      I'm there.

23              Q.      It's headed "Claims/Risk

24     Commentary."  Do you see that?

25              A.      Yes, I do.
```

Page 296

1          J. READENCE - CONFIDENTIAL

2               Q.    It's similar to the document

3    reviewed earlier in this attachment.   Correct?

4               A.    Correct.

5               Q.    It had the seller and the common

6    issues.   Do you see that?

7               A.    Yes.

8               Q.    And for certain of these Chase, one

9    of the common issues is "does not meet

10   guidelines."   Correct?

11              A.    According to this list, yes.

12              Q.    And for Countrywide, "does not meet

13   guidelines."   Correct?

14              A.    Correct.

15              Q.    Green Point, "does not meet

16   guidelines."   Correct?

17              A.    Correct.

18              Q.    Did you ever tell anybody that you

19   disagreed with this internal report?

20              A.    I do not recall this report, so I

21   wouldn't recall commentary around it.

22              Q.    Do you have any basis, as you sit

23   here today, to disagree with it?

24              A.    I don't recall.

25              MR. DeLANGE:   I have no further