# EXHIBIT 77

TESTIMONY OF VICKI BEAL
SENIOR VICE PRESIDENT
CLAYTON HOLDINGS

BEFORE THE FINANCIAL CRISIS INQUIRY COMMISSION
SEPTEMBER 23, 2010



DEPOSITION EXHIBIT 556
Gething
1-31-13
PENGAD 800-631-6989

Good afternoon. I am Vicki Beal, Senior Vice President of Clayton Holdings, a mortgage services outsourcing, analytics and consulting company headquartered in Shelton, Connecticut.

## CLAYTON HISTORY

Clayton pioneered the residential mortgage loan due diligence business with its formation in 1990. In 2005, the company combined with the top credit risk management surveillance firm (which was founded in 1997) creating a leading information and analytics company serving investment banks, commercial banks, mortgage insurance companies, fixed income investors and loan servicers, primarily in the secondary market for non-agency mortgages. With a full suite of outsourced services, information-based analytics and specialty consulting services, Clayton helps its clients enhance liquidity, grow revenues, reduce costs and manage risk.

## COMPETITION

The market for due diligence services is highly fragmented, highly competitive and rapidly changing. Because there are very few publicly traded firms specializing in due diligence, little is known about the majority of service providers in terms of loan review volume, market share and revenue. Nevertheless, some of our competitors include Core Logic's Bohan Group unit, Fidelity Information Services Watterson Prime unit, 406 Partners, Allonhill, American Mortgage Consultants, Opus Capital Markets Consultants, and RR Donnelly.

## **DUE DILIGENCE – INTRODUCTION**

We are retained by our clients to review samples of closed loan pools that they are considering for purchase. Clayton is not retained by its clients to provide an opinion as to whether a loan is a good loan or a bad loan. Rather, our clients use Clayton's due diligence to identify issues with loans, negotiate better prices on pools of loans they are considering for purchase, negotiate expanded representations and warranties in purchase and sale agreements from sellers, and, on occasion, to negotiate an increase in pool sample sizes where the results indicate to the client that a broader review is necessary.

The type and scope of our due diligence work is <u>dictated by our clients based on their individual objectives</u>. Our assessments are performed on a <u>sample of loans</u> being purchased for likely placement in a residential mortgage-backed security (RMBS). Clients select the samples, generally 10% to 20% of the total pool of loans.

Clayton typically reviews loans against the seller or originating institution's guidelines and the client's tolerance. Clayton reviews for: (1) adherence to seller credit underwriting guidelines and client risk tolerances; (2) compliance with federal, state and local regulatory laws, and; (3) the integrity of electronic loan data provided by the seller to the prospective buyer. This review scope is commonly referred to as a ***credit and compliance review***.

Our diligence clients include investment banks, commercial banks and other financial institutions, mortgage and bond insurance companies and more recently government agencies, private equity firms and hedge funds. Clayton's contractual relationships with its diligence clients are standard, fee for service vendor contract

arrangements. Clayton's fees are not contingent on its findings; rather we are typically compensated with a standard service fee for each loan reviewed.

Accordingly, Clayton is not paid any fees based on: (1) its grading of the loans it reviews, (2) the ultimate performance of the loans it reviews, (3) the securitization of any loans it reviews, or (4) the ultimate disposition of the loans in any structured finance transaction.

The work product produced by Clayton is comprised of reports that include loan-level data reports and loan exception reports. Such reports are "works for hire", the property of our clients and provided exclusively to our clients. When Clayton provides its reports to its clients, its work on those loans is generally completed — Clayton is not involved in the further processes of securitizing the loans and does not review nor opine on the securitization prospectus. To our knowledge, prospectuses do not refer to Clayton and its due diligence work. Moreover, Clayton does not participate in the securities sales process, nor does it have knowledge of our loan exception reports being provided to investors or the rating agencies as part of the securitization process.

## DUE DILIGENCE REVIEW STAFFING

The individuals who conduct the due diligence reviews for Clayton consist of (1) a client services manager, (2) loan underwriters, (3) a lead underwriter and (4) a quality control specialist. The client services manager works with a client's transaction manager to facilitate the flow of information between the operations at Clayton and the client. The client services manager is responsible for providing the reports that Clayton produces to its clients.

The actual review of the loan files is performed by contract underwriters, who review the loan file, compare tape data with hard copy or scanned file data to verify loan information and identify discrepancies of key data points, calculate income (for full verification loans) and grade loans based on seller guidelines and client tolerances (if applicable to a transaction). These individuals are managed by "lead underwriters," who are more experienced underwriters. Lead underwriters manage the transaction, coordinate the delivery of the loan files, set up equipment (for deals at a seller or client site), manage underwriters and quality control, and run reports that summarize the daily findings. The lead underwriters communicate with the client services manager and clients about particular loan exceptions. They also clear stipulations, meaning that they will regrade loans after a seller cures a loan exception (such as when a seller provides missing file documentation). A quality control (QC) specialist, helps ensure that the data in the CLAS system is accurate and complete and verifies that the loan grades and, in particular, exceptions are warranted.

With the deterioration of the non-agency and mortgage market since mid-2007, Clayton has not had enough due diligence work for many underwriters — forcing them to find other types of work.

### THE DUE DILIGENCE REVIEW PROCESS

The loan review process is conducted as follows:

- A client reviews a pool of loans and selects a sample of loans for diligence review. The sample can be adverse or random – Clayton is generally not told whether sample is adverse or random. An example of an adverse sample is

4

- loans where a certain characteristic (i.e. below x borrower credit score) might be of concern to a client in their assessment of the pool value.
- Client hires Clayton to perform diligence on the sample. Client gives Clayton's Client Services Manager instructions on the type and scope of review and the time frame for the deal.
- Client sends or has sent to Clayton a tape containing loan information from the originator, which Clayton programmers "crack" and loads into our CLAS system.
- At the end of each day, the lead underwriter generates reports for the client that summarizes Clayton's findings, including exception reports.
- Exception reports are provided to the client and seller. The seller then begins process of "stip-clearing" (usually providing additional information to Clayton on specific loans). The seller tries to cure an exception by providing missing documentation or otherwise explaining to Clayton why a loan should not be graded EV-3 (more particularly defined below). This iterative process is on-going throughout the transaction and continues until a deal "tie-out" call is conducted between the client and seller.
- Once stips have been cleared by Clayton and reports are given to client, Clayton's review is complete.
- Prior to closing date, the seller and client have an independent "tie-out" call where they discuss EV-3 loans, negotiate prices and additional representations and warranties, and finalize the purchase of loans. Clayton generally does not participate in that "tie-out" call unless the client and/or seller have a question

about a specific loan. Clayton generally does not know which or how many loans the client ultimately purchases.

Any time a grade change is made, Clayton documents the basis for the change in the exception report. Clayton will make changes to loan grades if they are justified, meaning:

- Clayton clearly made a mistake in grading the loan;
- The seller provided missing documentation; or
- Clayton determines that compensating factors were sufficient or insufficient, thereby warranting a grade change.

Separately, a client can waive an exception, which results in the loan received a grade of EV-2W.

## **EXCEPTIONS**

An important part of Clayton's diligence service is the production of exception reports. Prior to Clayton instituting an exception tracking system across its client base in late 2005, continuing through 2006, loans were simply graded as follows:

EV-1: Loans that meet guidelines;

EV-2: Loans that do not meet guidelines, but have sufficient compensating factors; and

EV3: Loans that did not meet guidelines and had insufficient compensating factors.

Exceptions to underwriting guidelines can vary from being severe — such as the valuation of a property not being supported by an appraisal, stated income not being reasonable for the job stated, or missing critical documents in a file such as a HUD-1, loan application, or an appraisal — to benign, such as a debt to income ratio exception of

less than 5%, or a loan to value exception of 5% or less, or a credit score that is within an acceptable tolerance (i.e. 650 score required, 640 actual).

Our exception numbers should not be viewed in isolation. Exceptions must be reviewed in conjunction with the corresponding underwriting guidelines and client tolerances. Simply stated, a Clayton grade of EV-1 does not mean that a loan is good or is likely to perform. Nor does a Clayton grade of EV-3 mean that a loan is bad and is not likely to perform. Moreover, it may not be possible to draw an "apples to apples" comparison of deals from different clients and/or different sellers.

Beginning in 2003, Clayton worked to develop a more comprehensive scoring system for its clients, one which would allow Clayton to expand its exception review system to more specifically identify and track exceptions. The new system was called Exception Tracking and it allowed our clients to better manage exceptions (*E.g.*, show client what portfolio would look like if seller cured what it could) and it allowed for better reporting to clients.

Exception Tracking provided more granularity into the reporting of loan exceptions to its clients. All exceptions to guidelines or client tolerances are tagged with specific exception codes. Underwriter comments and exceptions are then tied together so they can be reviewed and discussed by relevant parties. Under Exception Tracking Clayton grades loans as follows:

EV-1: Loans that meet guidelines

EV-2: Loans that do not meet guidelines but have sufficient compensating factors

EV-2W: Loans that are graded EV-3 by Clayton, but waived by the client

EV-2T: Loans for which side letters are issued allowing seller 30 days after closing to cure exceptions

EV-3C: Loans that do not meet guidelines but have curable exceptions

EV-3D: Loans that do not meet guidelines due to missing material documentation

EV-3: Loans that do not meet guidelines and have insufficient compensating factors

## DUE DILIGENCE – WHAT IT IS NOT

It is important to understand what Clayton does not do. Clayton does **not**:

- Confirm the authenticity of information in the file — the loan has already closed, and due diligence firms historically have relied on the documentation within the file for the review
- Know whether a loan was placed into securitization, the type of securitization or if it was held in portfolio by the client
- Tell clients which loans to buy or not buy
- Participate in the actual trading of or pricing of the loans
- Participate in the structuring or rating of a security
- Participate in deciding which rating agency should be used to rate a security.

**DUE DILIGENCE IN THE FUTURE**

There are many improvements that need to be made throughout the mortgage industry, which will help restore investor confidence and rebuild the mortgage market. Clayton fully supports the Asset Securitization Forum (ASF) and Securities Industry and Financial Markets Association (SIFMA) who are making significant contributions to the development of asset securitization markets that investors will have confidence in. Specifically in the area of due diligence, we have seen the rating agencies adopt specific improvements that relate to mortgage securitization which call for:

1. Independent, third-party pre-securitization review of samples of underlying mortgage loans, and including disclosure to investors of all exceptions found- and an assessment of underwriting guidelines
2. Standardized post-securitization forensic reviews
3. Expanded loan-level data reporting of initial mortgage pool and ongoing loan performance

It should also be noted that the rating agencies in a limited number of mortgage transactions they have recently rated, have taken a more active role in the due diligence review process, reviewing due diligence findings prior to issuing ratings in those transactions. Clayton views this as a significant and positive change that over time will help the market to recover.

We are also hopeful that the SEC will adopt these requirements and others as part of their new Regulation AB, following the enactment of Financial Reform legislation. We believe that such reforms will provide greater disclosure and transparency for investors.