# EXHIBIT 101

Prospectus Supplement dated April 5, 2006 (To Prospectus Dated April 4, 2006)

*$895,148,000 (APPROXIMATE)*

*J.P. MORGAN MORTGAGE ACQUISITION TRUST 2006-NC1*
*Issuing Entity*

*ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2006-NC1*

## J.P. MORGAN MORTGAGE ACQUISITION CORP.
*Sponsor and Seller*

## J.P. MORGAN ACCEPTANCE CORPORATION I
*Depositor*

## NEW CENTURY MORTGAGE CORPORATION
*Originator and Initial Servicer*

## JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
*Servicer*

---

**Consider carefully the risk factors beginning on page S-11 in this prospectus supplement and on page 7 in the prospectus.**

The certificates will represent obligations of the J.P. Morgan Mortgage Acquisition Trust 2006-NC1 only and will not represent an interest in, or an obligation of J.P. Morgan Acceptance Corporation I, J.P. Morgan Mortgage Acquisition Corp., J.P. Morgan Securities Inc. or any other entity.

J.P. Morgan Mortgage Acquisition Trust 2006-NC1 will issue:

- Five classes of senior certificates;
- Eleven classes of subordinate certificates, two of which are not offered hereby; and
- Three classes of non-offered certificates.

The classes of certificates offered by this prospectus supplement and the initial class principal amounts thereof and interest rates thereon are listed or described in the table on page S-1 of this prospectus supplement. This prospectus supplement and the accompanying prospectus relate only to the offering of certificates listed in the table that begins on page S-1 under "Summary—Offered Certificates" and not to the other classes of certificates that will be issued by the trust fund listed under "Summary—Offered Certificates".

The assets of the trust fund will primarily consist of a pool of first and second lien adjustable rate and fixed rate mortgage loans. The mortgage loans will be segregated into two groups, one consisting of mortgage loans with principal balances that conform to certain agency principal balance guidelines and one consisting of mortgage loans with principal balances that may or may not conform to such principal balance guidelines. The mortgage loans will have the additional characteristics described in "Description of the Mortgage Pool" in this prospectus supplement.

Principal and interest on the certificates will be payable monthly, beginning on the distribution date in May 2006, as described in this prospectus supplement. Credit enhancement for the offered certificates will consist of subordination, overcollateralization, excess interest and an interest rate swap agreement provided by JPMorgan Chase Bank, National Association.

J.P. Morgan Securities Inc., referred to as the underwriter, will offer the offered certificates from time to time to the public in negotiated transactions or otherwise at varying prices to be determined at the time of sale. The underwriter has the right to reject any order. Proceeds to J.P. Morgan Acceptance Corporation I from the sale of the offered certificates before deducting expenses and underwriting fees, will be approximately $895,148,000. Expenses are estimated to be $1,000,000. The Underwriter's commission will be any positive difference between the price it pays to the Depositor for the offered certificates underwritten by it and the amount it receives from the sale of such securities to the public. See "Method of Distribution" in this prospectus supplement.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the certificates or determined if this prospectus supplement or the accompanying prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

Delivery of the offered certificates will be made on or about April 27, 2006 in book-entry form.

## JPMorgan

Confidential



EXHIBIT
366

JPMC_DEX_000402629

1

## IMPORTANT NOTICE ABOUT THE INFORMATION PRESENTED IN THIS PROSPECTUS SUPPLEMENT AND THE ACCOMPANYING PROSPECTUS

We tell you about the certificates in two separate documents that progressively provide more detail: (1) the accompanying prospectus, which provides general information, some of which may not apply to your certificates, and (2) this prospectus supplement, which describes the specific terms of your certificates and may be different from the information in the prospectus.

You should be certain to review the information in this prospectus supplement for a description of the specific terms of your certificates and the prospectus for additional information concerning your certificates.

We include cross-references in this prospectus supplement and the accompanying prospectus to captions in these materials where you can find further related discussions. The table of contents for this prospectus supplement and the table of contents included in the accompanying prospectus provide the pages on which these captions are located.

You can find a listing of the pages where capitalized terms used in this prospectus supplement are defined under "Index of Certain Definitions" in this prospectus supplement.

## WHERE YOU CAN FIND MORE INFORMATION

Federal securities law requires the filing of certain information with the Securities and Exchange Commission (the "SEC"), including annual, quarterly and special reports, proxy statements and other information. You can read and copy these documents at the public reference facility maintained by the SEC at 100 F Street, N.E., Washington, DC 20549.

Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms. SEC filings are also available to the public on the SEC's web site at http://www.sec.gov. The SEC allows us to "incorporate by reference" the information we file with it, which means that we can disclose important information to you by referring you to those documents. The information that we incorporate by reference is considered to be part of this prospectus supplement, and later information that we file with the SEC will automatically update and supersede this information.

This prospectus supplement and the accompanying prospectus are part of a registration statement filed by the depositor with the SEC. You may request a free copy of any of the above filings by writing or calling:

J.P. MORGAN SECURITIES INC.
JPMSI OPERATIONS
10 SOUTH DEARBORN STREET
MAIL CODE IL1-0237
CHICAGO, ILLINOIS 60670
(312) 732-8505

You should rely only on the information provided in this prospectus supplement or the accompanying prospectus or incorporated by reference herein. We have not authorized anyone else to provide you with different information.

Confidential

JPMC_DEX_000402630

# TABLE OF CONTENTS

## PROSPECTUS SUPPLEMENT

SUMMARY ....................................................... S-1
RISK FACTORS ............................................ S-11
DESCRIPTION OF THE MORTGAGE
  POOL ........................................................ S-21
  General ..................................................... S-21
  The Mortgage Loans ............................... S-21
DELINQUENCY AND FORECLOSURE
  INFORMATION FOR THE MORTGAGE
  LOANS ..................................................... S-52
THE DEPOSITOR ......................................... S-52
THE SPONSOR .............................................. S-53
  General ..................................................... S-53
  Securitization Activities of the Sponsor ...... S-53
STATIC POOL INFORMATION ..................... S-54
THE ORIGINATOR ....................................... S-54
  General ..................................................... S-54
  New Century Mortgage Corporation ......... S-54
  Underwriting Standards ............................ S-55
AFFILIATES AND RELATED
  TRANSACTIONS ...................................... S-59
THE SERVICER ............................................. S-60
  JPMorgan Chase Bank, National
    Association ............................................. S-60
DESCRIPTION OF THE CERTIFICATES ......... S-63
  General ..................................................... S-63
  Book-Entry Certificates ............................ S-64
  Glossary .................................................... S-64
  Allocation of Available Funds .................. S-71
  Distributions of Interest ........................... S-72
  Distributions of Principal ......................... S-73
  Credit Enhancement ................................. S-76
  Overcollateralization Provisions ............... S-76
  Allocation of Losses; Subordination .......... S-79
  Certificate Interest Rates .......................... S-79
  Net WAC Reserve Fund ........................... S-81
  The Interest Rate Swap Agreement, the
    Swap Provider and the Swap Account .... S-81
  Calculation of Certificate Index ............... S-84
  Example of Distributions .......................... S-85
  Reports to Certificateholders .................... S-86
  Final Scheduled Distribution Date ............ S-87
  Optional Clean-Up Call ........................... S-87
FEES AND EXPENSES OF THE TRUST
  FUND ....................................................... S-88
THE POOLING AGREEMENT ...................... S-89
  General ..................................................... S-89
  Assignment of the Mortgage Loans ........... S-89
  Servicing and Administrative
    Responsibilities ...................................... S-91
  Payments on Mortgage Loans; Deposits
    to Collection Account and
    Distribution Account .............................. S-93

Modifications of Mortgage Loan Terms ........ S-93
Advances ...................................................... S-93
Servicing and Other Compensation and
  Payment of Expenses ............................... S-94
Servicer Events of Default ............................ S-95
The Issuing Entity ........................................ S-96
The Trustee and the Securities
  Administrator ........................................... S-97
The Trust Oversight Manager ..................... S-100
Voting Rights .............................................. S-100
Compliance with Applicable Servicing
  Criteria and Servicer Attestation ........... S-100
Amendment ................................................ S-100
YIELD, PREPAYMENT AND WEIGHTED
  AVERAGE LIFE ..................................... S-101
  Additional Information ........................... S-103
  Weighted Average Lives .......................... S-103
  Yield Sensitivity of the Subordinate
    Certificates ........................................... S-113
USE OF PROCEEDS ................................... S-113
MATERIAL FEDERAL INCOME TAX
  CONSEQUENCES ................................... S-113
  General ................................................... S-113
  Tax Treatment of the Offered
    Certificates ........................................... S-113
  Additional Considerations with Respect
    to the Offered Certificates .................... S-114
  Reportable Transactions .......................... S-116
  Other Taxes ............................................ S-116
ERISA MATTERS ....................................... S-116
  General ................................................... S-116
  Application of the Underwriter's
    Exemption ............................................. S-116
  ERISA Considerations with respect to
    the Interest Rate Swap Agreement ........ S-117
METHOD OF DISTRIBUTION ................... S-118
LEGAL MATTERS ...................................... S-118
RATINGS ................................................... S-119
LEGAL INVESTMENT ............................... S-119
INDEX OF CERTAIN DEFINITIONS ......... S-120
GLOBAL CLEARANCE, SETTLEMENT
  AND TAX DOCUMENTATION
  PROCEDURES ......................................... I-1
INTEREST RATE SWAP SCHEDULE .......... II-1

iii

 JPMC_DEX_000402631

3

# TABLE OF CONTENTS

## PROSPECTUS

Risk Factors ..................................................... 7
  Yield is Sensitive to Rate of Principal
    Prepayment .............................................. 7
  Limited Resale Market for Securities Could
    Adversely Affect Your Ability to
    Liquidate Your Investment .......................... 8
  Protection Against Losses is Limited Since
    Securities Will Receive Payments Only
    From Specified Sources .............................. 9
  Nature of Mortgages Securing the Loans
    May Delay Receipt of, or Result in
    Shortfalls in Proceeds Payable on a Loan ... 10
  You Could Be Adversely Affected By
    Violations of Consumer Protection Laws .... 12
  You Could Be Adversely Affected By
    Violations of Environmental Laws ............. 13
  Value of Trust Assets May Be Less Than
    Outstanding Principal Balance of the
    Related Securities .................................... 13
  Weighted Average Net Mortgage Rate on
    the Loans May Limit Interest Rate on the
    Securities ............................................... 13
  Risks Related to Loans with Interest-only
    Payments ............................................... 14
  High Balance Loans Increase Risk of
    Default .................................................. 14
  Simultaneous Second Lien Risk ................... 14
  Geographic Concentration of Loans Could
    Adversely Affect Your Investment ............. 15
  Military Action and Terrorist Attacks May
    Impact the Return on Your Security ........... 15
  Book-Entry System for Certain Classes May
    Decrease Liquidity and Delay Payment ...... 15
  Bankruptcy and Insolvency Risks ................. 16
  Borrower May be Unable to Make Balloon
    Payment ................................................ 16
  High Loan-to-Value Ratios Increase Risk of
    Loss ...................................................... 17
  Mortgage Loans Originated According to
    Non-Agency Underwriting Guidelines
    May Have Higher Expected
    Delinquencies ........................................ 17
  A Transfer of Servicing May Result in
    Increased Losses and Delinquencies on
    the Loans .............................................. 18
  The Recording of the Mortgages in the
    Name of MERS May Affect the Yield on
    the Securities ......................................... 18
  Risks Related to the Residual Interest
    Securities ............................................... 19
The Trust Fund ................................................ 19
  General ................................................... 19

The Loans ...................................................... 22
Underwriting Standards .................................. 28
Modification of Loans .................................... 29
Agency Securities .......................................... 29
Private Mortgage-Backed Securities ................ 36
Representations by Sellers or Originators;
  Repurchases ............................................ 38
Substitution of Trust Fund Assets ................... 41
Use of Proceeds ............................................. 41
The Depositor ................................................ 41
The Sponsor .................................................. 42
  General ................................................... 42
  Securitization Activities of the Sponsor ......... 42
Description of the Securities ............................ 43
  General ................................................... 44
  Distributions on Securities ......................... 46
  Advances ................................................ 48
  Reports to Securityholders ......................... 49
  Categories of Classes of Securities .............. 50
  Indices Applicable to Floating Rate and
    Inverse Floating Rate Classes ................. 54
  Book-Entry Registration of Securities .......... 61
  Exchangeable Securities ............................ 65
  Purchase Obligations ................................ 67
  Mandatory Auctions ................................. 68
Credit Enhancement ....................................... 68
  General ................................................... 68
  Subordination .......................................... 69
  Letter of Credit ........................................ 70
  Insurance Policies, Surety Bonds and
    Guaranties ........................................... 70
  Over-Collateralization ............................... 71
  Spread Account ........................................ 71
  Reserve Accounts ..................................... 71
  Pool Insurance Policies .............................. 73
  Cross-Collateralization .............................. 75
  Other Insurance, Surety Bonds, Guaranties,
    and Letters of Credit ............................. 75
  Derivative Products .................................. 76
Yield and Prepayment Considerations ............... 76
The Agreements ............................................. 79
  Servicing ................................................ 79
  Assignment of the Trust Fund Assets ........... 80
  No Recourse to Sellers, Originators,
    Depositor or Master Servicer .................. 83
  Payments on Loans; Deposits to Security
    Account .............................................. 83
  Pre-Funding Account ................................. 85
  Hazard Insurance ..................................... 87
  Realization Upon Defaulted Loans .............. 90
  Servicing and Other Compensation and
    Payment of Expenses ............................ 91

iv

Evidence as to Compliance.................................92
Matters Regarding the Master Servicer and
   the Depositor...........................................92
Events of Default; Rights Upon Event of
   Default...................................................93
Amendment ..................................................96
Termination; Optional Termination.................97
The Trustee...................................................98
The Securities Administrator..........................98
Material Legal Aspects of the Loans ........................98
General .......................................................98
Foreclosure/Repossession............................100
Environmental Risks....................................103
Rights of Redemption..................................104
Anti-deficiency Legislation and Other
   Limitations on Lenders.............................104
Due-on-Sale Clauses....................................105
Enforceability of Prepayment and Late
   Payment Fees..........................................106
Applicability of Usury Laws.........................107
The Contracts..............................................107
Installment Contracts...................................110
Servicemembers Civil Relief Act .................111
Junior Mortgages; Rights of Senior
   Mortgagees.............................................111
Commercial Loans........................................112
The Title I Program .....................................114
Consumer Protection Laws...........................118
Material Federal Income Tax Consequences..........118
General .......................................................118
Taxation of Debt Securities .........................120
Taxation of the REMIC and Its Holders ........126
REMIC Expenses; Single Class REMICS......127
Taxation of the REMIC ................................128
Taxation of Holders of Residual Interest
   Securities ...............................................129
Administrative Matters .................................134
Tax Status as a Grantor Trust .......................134
Sale or Exchange ........................................137
Miscellaneous Tax Aspects ...........................138
Tax Treatment of Foreign Investors ..............138
Tax Characterization of the Trust Fund as a
   Partnership..............................................140
Tax Consequences to Holders of the Notes ....140
Tax Consequences to Holders of the
   Certificates .............................................143
State Tax Considerations.....................................148
ERISA Considerations.........................................148
General .......................................................148
Prohibited Transactions .................................149
Plan Asset Regulation....................................149
Prohibited Transaction Class Exemption
   83-1 .......................................................150
The Underwriter's Exemption .........................152
Insurance Company Purchasers ......................154
Consultation with Counsel..............................154

Legal Investment.........................................154
Method of Distribution .................................157
Legal Matters..............................................158
Financial Information....................................158
Rating.........................................................158
Where You Can Find More Information...........160
Incorporation Of Certain Documents By Reference 160
Static Pool Information..................................160
Glossary .....................................................161

v

JPMC_DEX_000402633

5

## SUMMARY

This summary highlights selected information from this prospectus supplement and does not contain all the information that you need to consider in making your investment decision.  Please read this entire prospectus supplement and the accompanying prospectus carefully for additional information about the offered certificates.

## OFFERED CERTIFICATES

The J.P. Morgan Mortgage Acquisition Trust 2006-NC1 Asset-Backed Pass-Through Certificates, Series 2006-NC1 consist of the classes of certificates listed in the table below.  Only the offered certificates listed in the table below are being offered by this prospectus supplement:

| CLASS | INITIAL CLASS PRINCIPAL AMOUNT (1) | CERTIFICATE INTEREST RATE | DESIGNATION | S&P RATING(6) | FITCH RATING(6) | MOODY'S RATING(6) | CUSIP |
|---|---|---|---|---|---|---|---|
| **OFFERED CERTIFICATES** | | | | | | | |
| Class A-1 | $345,251,000 | Floating (2) | Senior | AAA | AAA | Aaa | 46626LJL5 |
| Class A-2 | $192,137,000 | Floating (2) | Senior/Seq | AAA | AAA | Aaa | 46626LJM3 |
| Class A-3 | $71,443,000 | Floating (2) | Senior/Seq | AAA | AAA | Aaa | 46626LJN1 |
| Class A-4 | $79,871,000 | Floating (2) | Senior/Seq | AAA | AAA | Aaa | 46626LJP6 |
| Class A-5 | $43,143,000 | Floating (2) | Senior/Seq | AAA | AAA | Aaa | 46626LJQ4 |
| Class M-1 | $42,803,000 | Floating (2) | Subordinate | AA+ | AA+ | Aa1 | 46626LJR2 |
| Class M-2 | $30,707,000 | Floating (2) | Subordinate | AA | AA | Aa2 | 46626LJS0 |
| Class M-3 | $17,214,000 | Floating (2) | Subordinate | AA- | AA- | Aa3 | 46626LJT8 |
| Class M-4 | $13,958,000 | Floating (2) | Subordinate | A+ | A+ | A1 | 46626LJU5 |
| Class M-5 | $13,027,000 | Floating (2) | Subordinate | A | A | A2 | 46626LJV3 |
| Class M-6 | $13,492,000 | Floating (2) | Subordinate | A- | A- | A3 | 46626LJW1 |
| Class M-7 | $13,492,000 | Floating (2) | Subordinate | BBB+ | BBB+ | Baa1 | 46626LJX9 |
| Class M-8 | $10,701,000 | Floating (2) | Subordinate | BBB | BBB | Baa2 | 46626LJY7 |
| Class M-9 | $7,909,000 | Floating (2) | Subordinate | BBB- | BBB- | Baa3 | 46626LJZ4 |
| **NON-OFFERED CERTIFICATES** | | | | | | | |
| Class M-10 | $6,048,000 | Floating (2) | Subordinate | BB+ | BB+ | Ba1 | 46626LKA7 |
| Class M-11 | $9,304,000 | Floating (2) | Subordinate | BB | BB | Ba2 | 46626LKB5 |
| Class C | Notional(3) | N/A | Subordinate Prepayment | Not Rated | Not Rated | Not Rated | N/A |
| Class P | $100 | N/A(4) | Premium Only | Not Rated | Not Rated | Not Rated | N/A |
| Class R | N/A(5) | N/A | Residual | Not Rated | Not Rated | Not Rated | N/A |

(1)  These balances are approximate and are subject to an increase or decrease of up to 5%, as described in this prospectus supplement.

(2)  The interest rate on this class of certificates may change from distribution date to distribution date based on changes in the level of one-month LIBOR.  The interest rate for any such class is the lesser of one-month LIBOR plus the applicable margin set forth below and a cap as described in this prospectus supplement. See "Description of the Certificates—Certificate Interest Rates" in this prospectus supplement.  The certificate margins are as follows:

|  | On or prior to the Optional Termination Date | After the Optional Termination Date |
|---|---|---|
| Class A-1 | 0.170% | 0.340% |
| Class A-2 | 0.060% | 0.120% |
| Class A-3 | 0.120% | 0.240% |
| Class A-4 | 0.170% | 0.340% |
| Class A-5 | 0.270% | 0.540% |
| Class M-1 | 0.320% | 0.480% |
| Class M-2 | 0.340% | 0.510% |
| Class M-3 | 0.360% | 0.540% |
| Class M-4 | 0.440% | 0.660% |
| Class M-5 | 0.460% | 0.690% |
| Class M-6 | 0.540% | 0.810% |
| Class M-7 | 1.100% | 1.650% |
| Class M-8 | 1.200% | 1.800% |
| Class M-9 | 2.000% | 3.000% |
| Class M-10 | 2.500% | 3.750% |

S-1

JPMC_DEX_000402634

| | | |
|---|---|---|
| Class M-11 | 2.500% | 3.750% |

(3)  The Class C certificates will not have a class principal amount.

(4)  The Class P certificates will not be entitled to distributions in respect of interest.  The Class P Certificates will be entitled to all prepayment premiums or charges received in respect of the mortgage loans.

(5)  The Class R certificates will not have a class principal amount and are the class of certificates representing the residual interest in the trust.

(6)  The ratings are not recommendations to buy, sell or hold these certificates.  A rating may be changed or withdrawn at any time by the assigning rating agency. The ratings do not address the possibility that, as a result of principal prepayments, the yield on your certificates may be lower than anticipated. *We refer you to "Ratings" in this prospectus supplement for a more complete discussion of the certificate ratings.*

The J.P. Morgan Mortgage Acquisition Trust 2006-NC1 Asset-Backed Pass-Through Certificates, Series 2006-NC1 will also have the following characteristics:

| CLASS | RECORD DATE(1) | DELAY/ ACCRUAL PERIOD(2) | INTEREST ACCRUAL CONVENTION | EXPECTED FINAL DISTRIBUTION DATE (3) | FINAL SCHEDULED DISTRIBUTION DATE (4) | MINIMUM DENOMINATION | INCREMENTAL DENOMINATIONS |
|---|---|---|---|---|---|---|---|
| Class A-1 | DD | 0 day | Actual/360 | November 2012 | April 2036 | $100,000 | $1 |
| Class A-2 | DD | 0 day | Actual/360 | February 2008 | January 2032 | $100,000 | $1 |
| Class A-3 | DD | 0 day | Actual/360 | September 2008 | April 2036 | $100,000 | $1 |
| Class A-4 | DD | 0 day | Actual/360 | August 2011 | April 2036 | $100,000 | $1 |
| Class A-5 | DD | 0 day | Actual/360 | November 2012 | April 2036 | $100,000 | $1 |
| Class M-1 | DD | 0 day | Actual/360 | November 2012 | April 2036 | $100,000 | $1 |
| Class M-2 | DD | 0 day | Actual/360 | November 2012 | April 2036 | $100,000 | $1 |
| Class M-3 | DD | 0 day | Actual/360 | November 2012 | April 2036 | $100,000 | $1 |
| Class M-4 | DD | 0 day | Actual/360 | November 2012 | April 2036 | $100,000 | $1 |
| Class M-5 | DD | 0 day | Actual/360 | November 2012 | April 2036 | $100,000 | $1 |
| Class M-6 | DD | 0 day | Actual/360 | November 2012 | April 2036 | $100,000 | $1 |
| Class M-7 | DD | 0 day | Actual/360 | November 2012 | April 2036 | $100,000 | $1 |
| Class M-8 | DD | 0 day | Actual/360 | November 2012 | April 2036 | $100,000 | $1 |
| Class M-9 | DD | 0 day | Actual/360 | November 2012 | April 2036 | $100,000 | $1 |
| Class M-10 | DD | 0 day | Actual/360 | November 2012 | April 2036 | $250,000 | $1 |
| Class M-11 | DD | 0 day | Actual/360 | November 2012 | April 2036 | $250,000 | $1 |

(1)  DD = For any distribution date, the close of business on the business day immediately before that distribution date.

(2)  0 day = For any distribution date, the interest accrual period will be the period beginning on the immediately preceding distribution date (or the closing date for the first interest accrual period) through the day prior to the related distribution date

(3)  The expected final distribution date for each class of offered certificates is based upon (i) the applicable prepayment assumption for the mortgage loans, (ii) the modeling assumptions used in this prospectus supplement, as described under "Yield, Prepayment and Weighted Average Life—Weighted Average Lives " and (iii) assuming the option to purchase the mortgage loans is exercised by the terminating entity at the earliest possible distribution date, as described in this prospectus supplement under "Description of the Certificates—Optional Clean-Up Call" and adding one month.

(4)  The final scheduled distribution date for each class of offered certificates, other than the Class A-2 Certificates, is the distribution date in the month following the scheduled maturity date for the latest maturing mortgage loan.  The final scheduled distribution date for the Class A-2 Certificates is calculated assuming a prepayment assumption of 0% and adding one month.

Confidential

JPMC_DEX_000402635

The certificates offered by this prospectus supplement will be issued in book-entry form and in the minimum denominations (or multiples thereof) set forth under "Description of the Certificates—General" in this prospectus supplement.

The certificates represent ownership interests in a trust fund which will consist primarily of two separate groups of mortgage loans, "group 1" and "group 2". Group 1 and group 2 together are sometimes referred to in this prospectus supplement as the "aggregate pool".

Generally, distributions to the Class A-1 Certificates will be solely derived from collections on the group 1 mortgage loans and distributions to the Class A-2, Class A-3, Class A-4 and Class A-5 Certificates will be solely derived from collections on the group 2 mortgage loans.

Collections from all the mortgage loans will be available to make distributions on the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates.

## ISSUING ENTITY

J.P. Morgan Mortgage Acquisition Trust 2006-NC1, a common law trust formed under the laws of the State of New York, will issue the certificates. The issuing entity, also referred to as the trust, will be formed pursuant to a pooling and servicing agreement among the depositor, the servicer, the securities administrator and the trustee. The certificates solely represent beneficial ownership interests in the trust fund created under the pooling and servicing agreement and not an interest in, or the obligation of, the depositor, the sponsor or any other person.

## THE TRUSTEE

U.S. Bank National Association, a national banking association, will act as trustee of the trust fund under the pooling and servicing agreement.

## THE ORIGINATOR

All of the mortgage loans were originated or acquired by New Century Mortgage Corporation, a California Corporation.

*We refer you to "Description of the Mortgage Pool" in this prospectus supplement for more information.*

## THE SPONSOR AND SELLER

J.P. Morgan Mortgage Acquisition Corp., a Delaware corporation, has previously acquired the mortgage loans from the originator. On the closing date, J.P. Morgan Mortgage Acquisition Corp., as seller, will sell all of its interest in the mortgage loans to the depositor.

## THE DEPOSITOR

On the closing date, J.P. Morgan Acceptance Corporation I, a Delaware corporation, will assign all of its interest in the mortgage loans to the trustee for the benefit of certificateholders.

## THE CUSTODIAN

J.P. Morgan Trust Company, National Association, a national banking association, will maintain custody of the mortgage files relating to the mortgage loans on behalf of the trust fund.

## THE SECURITIES ADMINISTRATOR

JPMorgan Chase Bank, National Association, a national banking association, will act as securities administrator under the pooling and servicing agreement. The securities administrator will be responsible for performing certain calculations relating to distributions on the certificates, making payments on the certificates, acting as certificate registrar and transfer agent for the trust.

## THE SERVICER

Prior to the servicing transfer date, which is expected to be May 1, 2006, New Century Mortgage Corporation will act as servicer of the mortgage loans pursuant to an assignment of a mortgage loan purchase agreement. Following the servicing transfer date, JPMorgan Chase Bank, National Association, a national banking association, will act as servicer of the mortgage loans.

*We refer you to "The Servicer" and "The Pooling Agreement" in this prospectus supplement for more information.*

S-3

JPMC_DEX_000402636

8

## THE SWAP PROVIDER

JPMorgan Chase Bank, National Association will be the swap provider under the interest rate swap agreement.

*We refer you to "Description of the Certificates—The Interest Rate Swap Agreement, the Swap Provider and the Swap Account" in this prospectus supplement for more information.*

## THE TRUST OVERSIGHT MANAGER

Pentalpha Surveillance LLC will act as trust oversight manager. The trust oversight manager will have the right to make certain recommendations with respect to the trust, but will not have any servicing responsibilities or rights with respect to the assets of the trust.

*We refer you to "The Pooling Agreement—The Trust Oversight Manager" in this prospectus supplement for more information.*

## NIMS INSURER

One or more insurance companies (together, the "NIMS Insurer") may issue a financial guaranty insurance policy covering certain payments to be made on net interest margin securities to be issued by a separate trust and secured by all or a portion of the Class C Certificates and the Class P Certificates. In such event, the NIMS Insurer will be able to exercise rights which could adversely impact the certificateholders.

*We refer you to "Risk Factors—Rights of NIMS Insurer" in this prospectus supplement for more information.*

## CUT-OFF DATE

*Close of business on April 1, 2006.* The cut-off date is the date on and after which the trust fund will be entitled to receive all collections on and proceeds of the mortgage loans.

## DISTRIBUTION DATE

The 25th day of each month or, if such day is not a business day, the next business day thereafter, commencing in May 2006. Distributions on each distribution date will be made to certificateholders of record as of the related record date, except that the final distribution on the certificates will be made only

upon presentment and surrender of the certificates at the corporate trust office of the securities administrator.

## RECORD DATE

The record date for the offered certificates, for so long as they are held in book-entry form, will be the business day immediately preceding a distribution date, and for any offered certificate that is not held in book-entry form, will be the last business day of the month preceding the month of a distribution date.

## DISTRIBUTIONS OF INTEREST

On each distribution date, to the extent funds are available from the related mortgage group or mortgage groups, each class of certificates will be entitled to receive accrued and unpaid interest determined on the basis of the outstanding class principal amount of such class immediately prior to such distribution date, the applicable certificate interest rate and the related accrual period in the order or priority specified under "Description of the Certificates—Distributions of Interest". On each distribution date, interest will accrue on each class of certificates at the least of (1) one-month LIBOR plus the related margin, (2) the net WAC rate and (3) the maximum cap rate for that distribution date. The net WAC rate is a limitation generally based on the weighted average mortgage rates of the mortgage loans during the applicable due period, net of certain allocable fees and expenses of the trust fund and any swap payments owed to the swap counterparty. The maximum cap rate is a limitation generally based on the weighted average of the maximum rates of the mortgage loans during the applicable due period, net of certain fees and expenses of the trust fund and any swap payments owed to the swap counterparty.

For each distribution date, the accrual period for the offered certificates, Class M-10 and Class M-11 Certificates will be the period from the previous distribution date or, in the case of the first accrual period, the closing date, to the day prior to the current distribution date. Interest on all classes of certificates for all accrual periods will be calculated and payable on the basis of the actual number of days in the accrual period, based on a 360-day year.

Interest payments will be allocated among certificateholders of a class of certificates on a *pro rata* basis.

S-4

Confidential  JPMC_DEX_000402637

9

*We refer you to "Description of the Certificates—Distributions of Interest" in this prospectus supplement for more information.*

### DISTRIBUTIONS OF PRINCIPAL

The amount of principal distributable on the certificates on any distribution date will be determined by (1) formulas that allocate principal payments received on the mortgage loans among the different classes of certificates and (2) the amount of funds actually received on the mortgage loans and available to make distributions on the certificates. Funds actually received on the mortgage loans may consist of scheduled payments and unscheduled payments resulting from prepayments by borrowers, liquidation of defaulted mortgage loans or repurchases of mortgage loans under the circumstances described in this prospectus supplement.

On each distribution date, each class of certificates will receive principal payments in accordance with the priorities set forth in "Description of the Certificates—Distributions of Principal" and based on principal collections from the related mortgage group or mortgage groups for the related due period.

The manner of allocating payments of principal on the mortgage loans among the related certificates will differ, as described in this prospectus supplement, depending upon the occurrence of several different events or triggers:

- whether a distribution date occurs before, or on or after, the "stepdown date," which is the later of (1) the distribution date in May 2009 and (2) the first distribution date on which the ratio of (a) the total principal balance of the subordinate certificates plus any overcollateralization amount to (b) the total principal balance of the mortgage loans equals or exceeds the applicable percentage specified in this prospectus supplement;

- whether a "cumulative loss trigger event" occurs, which is when cumulative losses on the mortgage loans are higher than certain levels specified in this prospectus supplement;

- whether a "delinquency event" occurs, which is when the rate of delinquencies of the mortgage loans over any three-month

period is higher than certain levels set forth in this prospectus supplement; and

- whether the total principal balance of the senior certificates has been reduced to zero.

*We refer you to "Description of the Certificates—Distributions of Principal" in this prospectus supplement and "Description of the Securities Distributions on Securities" in the prospectus for more information.*

### FINAL SCHEDULED DISTRIBUTION DATE

The final scheduled distribution date for the offered certificates, other than the Class A-2 Certificates, is the distribution date in April 2036 which is the distribution date in the month following the scheduled maturity date for the latest maturing mortgage loan. The final scheduled distribution date for the Class A-2 Certificates is the distribution date in January 2032, which is calculated assuming a prepayment assumption of 0% and adding one month. It is expected that the actual final distribution date for any class of offered certificates may occur earlier than the final scheduled distribution date because of prepayments on the related mortgage loans.

### OPTIONAL CLEAN-UP REDEMPTION OF THE CERTIFICATES

On any distribution date on or after the distribution date on which the aggregate outstanding principal balance of the mortgage loans is equal to or less than 10% of the aggregate principal balance of the mortgage loans as of the cut-off date, as described herein, the servicer will have the option to purchase all of the mortgage loans thereby causing an early retirement of the certificates. If the servicer elects not to exercise its option, the majority holder of the Class C Certificates or the NIMS Insurer may have the right to direct the servicer to exercise that option on its behalf.

*We refer you to "Description of the Certificates—Optional Clean-Up Call" in this prospectus supplement for more information.*

### CREDIT ENHANCEMENT

***Subordination***. The subordinate classes of certificates will provide credit enhancement for the senior certificates. In addition, the Class M-1 Certificates will have a payment priority over the

S-5

JPMC_DEX_000402638

Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates; the Class M-2 Certificates will have a payment priority over the Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates; the Class M-3 Certificates will have a payment priority over the Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates; the Class M-4 Certificates will have a payment priority over the Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates; the Class M-5 Certificates will have a payment priority over the Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates; the Class M-6 Certificates will have a payment priority over the Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates; the Class M-7 Certificates will have a payment priority over the Class M-8, Class M-9, Class M-10 and Class M-11 Certificates; the Class M-8 Certificates will have a payment priority over the Class M-9, Class M-10 and Class M-11 Certificates; and the Class M-9 Certificates will have a payment priority over the Class M-10 and Class M-11 Certificates.

If the mortgage loans in any group experience losses, then, generally, after the exhaustion or any available excess interest and any available net swap payments from the swap provider and after the reduction of the overcollateralized amount to zero, the principal amount of the subordinate class of certificates that is lowest in seniority and still outstanding will be reduced by the amount of those realized losses until the total outstanding principal balance of such class equals zero.

If a loss has been allocated to reduce the class principal amount of your class of certificates, you will receive no payment in respect of that reduction (except to the limited extent of Subsequent Recoveries). If the subordination of the subordinate certificates is insufficient to absorb losses, then the senior certificates relating to the group incurring the realized losses may never receive all of their principal payments.

Subordination is intended to enhance the likelihood of regular distributions of interest and principal on the more senior certificates and to afford those certificates protection against realized losses on the mortgage loans.

*We refer you to "Risk Factors—Potential Inadequacy of Credit Enhancement" and "Description of the*

*Certificates" in this prospectus supplement for more information.*

**Overcollateralization.** The mortgage loans bear interest each month in an amount that is expected to exceed the amount needed to pay monthly interest on the certificates and to pay the fees and expenses of the trust. A portion of this excess interest will be applied to pay principal on the offered certificates and the Class M-10 and Class M-11 Certificates until the required level of overcollateralization is reached. This application will reduce the class principal amounts of the offered certificates faster than the principal balances of the mortgage loans. As a result, the aggregate principal balance of the mortgage loans is expected to exceed the aggregate class principal amount of the offered, Class M-10, Class M-11 and Class P Certificates. This feature is referred to as "overcollateralization." The required level of overcollateralization may increase or decrease over time. We cannot assure you that sufficient excess interest will be generated by the mortgage loans to create or maintain the required level of overcollateralization.

*We refer you to "Description of the Certificates Overcollateralization Provisions" in this prospectus supplement for more information.*

**Excess Interest.** The mortgage loans bear interest each month that in the aggregate is expected to exceed the amount needed to pay monthly interest on the certificates and to pay the fees and expenses of the trust (including any Net Swap Payment owed to the Swap Provider and any Swap Termination Payment owed to the Swap Provider, other than any Swap Termination Payment resulting from a Swap Provider Trigger Event). The excess interest from the mortgage loans each month will be available to absorb realized losses on the mortgage loans and to create or maintain overcollateralization at required levels as described in the pooling agreement.

*We refer you to "Description of the Certificates— Allocation of Available Funds" and "— Overcollateralization Provisions" in this prospectus supplement for additional information.*

**Interest Rate Swap Agreement.** The securities administrator, on behalf of a trust separate from the trust fund, referred to in this prospectus supplement as the supplemental interest trust, is expected to enter into an Interest Rate Swap Agreement with JPMorgan Chase Bank, National Association as swap provider (referred to in this prospectus supplement as the Swap Provider). Under the Interest Rate Swap

Confidential

JPMC_DEX_000402639

Agreement, on each distribution date, the supplemental interest trust will be obligated to make fixed payments as specified in the Interest Rate Swap Agreement based on a schedule and the Swap Provider will be obligated to make floating payments equal to the product of (x) one-month LIBOR (as determined pursuant to the Interest Rate Swap Agreement), (y) the notional amount for that distribution date and (z) a fraction, the numerator of which is the actual number of days elapsed from the previous distribution date to but excluding the current distribution date (or, for the first distribution date, the actual number of days elapsed from the closing date to but excluding the first distribution date), and the denominator of which is 360. To the extent that the fixed payment exceeds the floating payment on any distribution date, amounts otherwise available to certificateholders will be applied to make a net payment to the Swap Provider, and to the extent that the floating payment exceeds the fixed payment on any distribution date, the Swap Provider will make a Net Swap Payment for deposit into a segregated trust account established on the closing date (referred to in this prospectus supplement as the Swap Account) pursuant to the pooling agreement.

Upon early termination of the Interest Rate Swap Agreement, the supplemental interest trust or the Swap Provider may be liable to make a Swap Termination Payment to the other party (regardless of which party caused the termination). The Swap Termination Payment will be computed in accordance with the procedures set forth in the Interest Rate Swap Agreement. In the event that the supplemental interest trust is required to make a Swap Termination Payment, that payment will be paid on the related distribution date, and on any subsequent distribution dates until paid in full, generally prior to any distribution to certificateholders.

*We refer you to "Description of the Certificates—The Interest Rate Swap Agreement, the Swap Provider and the Swap Account" in this prospectus supplement for more information.*

Net Swap Payments and Swap Termination Payments payable by the supplemental interest trust (other than Swap Termination Payments resulting from a Swap Provider Trigger Event) will be deducted from available funds before distributions to certificateholders and will first be deposited into the Swap Account before payment to the Swap Provider.

**Allocation of Losses.** If on any distribution date there is not sufficient excess interest or

overcollateralization to absorb realized losses on the mortgage loans as described under "Description of the Certificates—Overcollateralization Provisions" in this prospectus supplement or Net Swap Payments received under the Interest Rate Swap Agreement, then realized losses on the mortgage loans will be allocated to the subordinate certificates as described below. If realized losses on the mortgage loans are allocated to the subordinate certificates, they will be allocated first, to the Class M-11 Certificates, second, to the Class M-10 Certificates, third, to the Class M-9 Certificates, fourth, to the Class M-8 Certificates, fifth, to the Class M-7 Certificates, sixth, to the Class M-6 Certificates, seventh, to the Class M-5 Certificates, eighth, to the Class M-4 Certificates, ninth, to the Class M-3 Certificates, tenth, to the Class M-2 Certificates and eleventh, to the Class M-1 Certificates. The pooling agreement does not permit the allocation of realized losses on the mortgage loans to the Class A or Class P Certificates; however, investors in the Senior Certificates should realize that under certain loss scenarios there will not be enough principal and interest on the mortgage loans on a distribution date to pay the Senior Certificates all interest and principal amounts to which those certificates are then entitled.

Realized losses allocated to the subordinate certificates will cause a permanent reduction to their class principal amounts (except for any reinstatement in respect of Subsequent Recoveries). However, the amount of any realized losses allocated to the subordinate certificates may be paid to the holders of these certificates according to the priorities set forth under "Description of the Certificates—Overcollateralization Provisions" and "Description of the Certificates—The Interest Rate Swap Agreement, the Swap Provider and the Swap Account" in this prospectus supplement.

*We refer you to "Description of the Certificates Allocation of Losses; Subordination" in this prospectus supplement for more information.*

## THE MORTGAGE LOANS

**Statistical Information.** The statistical information on the mortgage loans presented herein is based on the principal balance of such mortgage loans as of the close of business on April 1, 2006 (referred to herein as the "cut-off date"). Such information does not take into account defaults, delinquencies and prepayments that may have occurred with respect to the mortgage loans since such date. As a result, the statistical distribution of the characteristics in the final mortgage groups as of the closing date will vary

Confidential

JPMC_DEX_000402640

from the statistical distribution of such characteristics as presented in this prospectus supplement, although such variance will not be material.

*General*.  On the cut-off date, the assets of the trust fund consisted of 4,209 mortgage loans with a total principal balance of approximately $930,509,120. The mortgage loans consist primarily of adjustable and fixed rate, conventional, first and second lien residential mortgage loans, substantially all of which have an original term to stated maturity of 30 years.

*Group 1 Characteristics*.  As of the cut-off date, group 1 consisted of 2,274 mortgage loans having a total principal balance of approximately $438,971,249 (or approximately 47.18% of the aggregate cut-off date balance of the aggregate pool). Approximately 77.26% and 3.25% of the group 1 mortgage loans adjust, commencing approximately two and three years, respectively, after origination, based on the Six-Month LIBOR Index.  The mortgage interest rates of approximately 19.49% of the group 1 mortgage loans are fixed.  Approximately 0.01%, 0.31%, 0.44%, 0.06% and 99.18% of the group 1 mortgage loans have original terms to maturity of approximately 10, 15, 20, 25 and 30 years, respectively.

Approximately 5.30% of the group 1 mortgage loans provide for payments of interest at the related mortgage interest rate, but no payments of principal, for a period of five years following origination of such mortgage loan.  Following such five-year period, the monthly payment with respect to each such group 1 mortgage loan will be increased to an amount sufficient to amortize the principal balance of such mortgage loan over its remaining 25-year term and to pay interest at the related mortgage interest rate.  None of the group 1 mortgage loans with original terms to maturity of approximately 10, 15, 20 or 25 years provide for payments of interest at the related mortgage interest rate, but no payments of principal, for any period following origination of such mortgage loan.

*Group 2 Characteristics*.  As of the cut-off date, group 2 consisted of 1,935 mortgage loans having a total principal balance of approximately $491,537,872 (or approximately 52.82% of the aggregate cut-off date balance of the aggregate pool). Approximately 78.35% and 2.68% of the group 2 mortgage loans adjust, commencing approximately two or three years, respectively, after origination, based on the Six-Month LIBOR Index. The mortgage interest rates of approximately 18.97% of the group 2 mortgage loans are fixed.  Approximately 0.02%,

0.24%, 0.08% and 99.66% of the group 2 mortgage loans have original terms to maturity of approximately 10, 15, 20 and 30 years, respectively.

Approximately 9.17% of the group 2 mortgage loans provide for payments of interest at the related mortgage interest rate, but no payments of principal, for a period of five years following origination of such mortgage loan.  Following such five-year period, the monthly payment with respect to each such group 2 mortgage loan will be increased to an amount sufficient to amortize the principal balance of such mortgage loan over its remaining 25-year term and to pay interest at the related mortgage interest rate.  None of the group 2 mortgage loans with original terms of maturity of approximately 10, 15 or 20 years provide for payments of interest at the related mortgage interest rate, but no payments of principal, for any period following origination of such mortgage loan.

*We refer you to "Description of the Mortgage Pool" in this prospectus supplement for more information.*

*Summary Statistical Data*.  The following table summarizes the characteristics of the mortgage loans in the aggregate pool and each group as of the cut-off date. Tabular information concerning the statistical characteristics of the mortgage loans in the aggregate pool and each mortgage group as of the cut-off date can be found at "Description of the Mortgage Pool— Tabular Characteristics of the Mortgage Loans" in this prospectus supplement.

| Aggregate Outstanding Principal Balance | |
| --- | --- |
| Aggregate Pool | $930,509,120 |
| Group 1 | $438,971,249 |
| Group 2 | $491,537,872 |

| Aggregate Number of Mortgage Loans | |
| --- | --- |
| Aggregate Pool | 4,209 |
| Group 1 | 2,274 |
| Group 2 | 1,935 |

| Average Stated Principal Balance | |
| --- | --- |
| Aggregate Pool | $221,076 |
| Group 1 | $193,039 |
| Group 2 | $254,025 |

| Weighted Average Current Mortgage Rate | |
| --- | --- |
| Aggregate Pool | 8.170% |
| Group 1 | 8.170% |
| Group 2 | 8.170% |

| Weighted Average Margin | |
| --- | --- |
| Aggregate Pool | 6.197% |
| Group 1 | 6.193% |
| Group 2 | 6.200% |

Confidential

JPMC_DEX_000402641

| Weighted Average Original Term to Maturity | |
|---|---|
| Aggregate Pool | 359 months |
| Group 1: | 359 months |
| Group 2: | 359 months |

| Weighted Average Remaining Term to Maturity | |
|---|---|
| Aggregate Pool | 357 months |
| Group 1: | 356 months |
| Group 2: | 357 months |

## SERVICING OF THE MORTGAGE LOANS

Prior to the servicing transfer date, which is expected to be May 1, 2006, New Century Mortgage Corporation will service the mortgage loans under the mortgage loan purchase agreement and after the servicing transfer date, JPMorgan Chase Bank, National Association, a national banking association, will service the mortgage loans under the pooling agreement.

Under the pooling agreement or the mortgage loan purchase agreement, as applicable, the servicer is generally obligated to make monthly advances of cash (to the extent such advances are deemed recoverable), which will be included with mortgage principal and interest collections, in an amount equal to any delinquent monthly payments due on the related mortgage loans on the immediately preceding determination date.

The servicer will be entitled to reimburse itself for any such advances from future payments and collections (including insurance or liquidation proceeds) with respect to the related mortgage loans. However, if the servicer makes advances which are determined to be nonrecoverable from future payments and collections on the related mortgage loan, the servicer will be entitled to reimbursement for such advances prior to any distributions to certificateholders. Advances are intended to maintain a regular flow of scheduled interest and principal distributions on the certificates and are not intended to guarantee or insure against losses

*We refer you to "The Pooling Agreement Advances" in this prospectus supplement for more detail.*

## FEES AND EXPENSES

Before payments are made on the certificates, the servicer will be paid a monthly fee calculated at an annual rate of 0.50% on the principal balance of the mortgage loans as described under "The Pooling Agreement—Servicing and Other Compensation and Payment of Expenses" in this prospectus supplement.

In addition, before payments are made on the certificates, each of the securities administrator, the trustee, the trust oversight manager and the custodian will be paid a monthly fee on the principal balance of the mortgage loans as described under "Description of the Certificates—Distributions of Interest" in this prospectus supplement. Expenses of, and certain other amounts owed to, the servicer, the custodian, the securities administrator, the trustee and the trust oversight manager will be reimbursed before payments are made on the certificates.

*See "Fees and Expenses of the Trust Fund" in this prospectus supplement.*

## MATERIAL FEDERAL INCOME TAX CONSEQUENCES

For federal income tax purposes, a designated portion of the trust fund will comprise multiple REMICs in a tiered structure. Each offered certificate will represent a regular interest in a REMIC, coupled with certain contractual rights and obligations.

*We refer you to "Material Federal Income Tax Consequences" in this prospectus supplement and in the prospectus for more information.*

## ERISA MATTERS

The offered certificates may be eligible for acquisition by persons investing assets of employee benefit plans or other retirement arrangements that are subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") ("Plans") provided the acquisition and holding of such offered certificates is eligible for the exemptive relief available under one of the class exemptions described in this prospectus supplement under "ERISA Considerations".

*We refer you to "ERISA Matters" in this prospectus supplement and "ERISA Considerations" in the accompanying prospectus for more information.*

## LEGAL INVESTMENT

The certificates will not constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984 ("SMMEA"). You should consult your legal advisor in determining whether and to what extent the offered certificates constitute legal investments for you.

Confidential

JPMC_DEX_000402642

**14**

There are other restrictions on the ability of certain types of investors to purchase the certificates that prospective investors should consider.

*We refer you to "Legal Investment" in the prospectus for more information.*

### RATING OF THE CERTIFICATES

The certificates offered by this prospectus supplement will initially have ratings at least as high as the ratings specified on page S-1 from Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc., Fitch, Inc. and Moody's Investors Service, Inc.

S-10

Confidential

JPMC_DEX_000402643

15

## RISK FACTORS

Investors should consider the following factors in connection with the purchase of certificates. You should also consider the risk factors described in the accompanying prospectus. All statistical information referred to in this section is based on the mortgage groups as constituted on the cut-off date.

### The Underwriting Standards of the Originator Are Not as Stringent as those of Fannie Mae and Freddie Mac, Which May Result in Losses

The originator's underwriting standards are primarily intended to assess the value of the mortgaged property and to evaluate the adequacy of that property as collateral for the mortgage loan and the applicant's credit standing and ability to repay. The originator provides loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac guidelines but who generally have equity in their property. While the primary consideration in underwriting a mortgage loan is the value and adequacy of the mortgaged property as collateral, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. The originator's underwriting standards do not prohibit a mortgagor from obtaining secondary financing at the time of origination of the first lien, which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the originator's loan-to-value ratio determination.

The mortgage loans may have been made to mortgagors with imperfect credit histories, ranging from minor delinquencies to bankruptcy or mortgagors with relatively high ratios of monthly mortgage payments to income or relatively high ratios of total monthly credit payments to income.

As a result of these underwriting standards, the mortgage loans are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner.

Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the mortgage loans in the mortgage group than on mortgage loans originated in a more traditional manner. We cannot assure you that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans.

### Prepayments Are Unpredictable and Affect Yield

The rate of principal distributions and yield to maturity on the certificates will be directly related to the rate of principal payments on the mortgage loans of the related mortgage group or mortgage groups.

Approximately 61.55%, 68.06% and 64.99% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), require the mortgagor to pay a charge in certain instances if the mortgagor prepays the mortgage loan during a stated period, which may be from twelve to thirty-six months after the mortgage loan was originated. A prepayment charge may or may not discourage a mortgagor from prepaying the mortgage loan during the applicable period.

See "Risk Factors — Yield is Sensitive to Rate of Principal Prepayment" in the prospectus and "Yield, Prepayment and Weighted Average Life" and "Description of the Certificates—Distributions of Principal" in this prospectus supplement for a description of the factors that may influence the rate and timing of prepayments on the mortgage loans.

### Rights of the NIMS Insurer

Pursuant to the terms of the pooling agreement, unless there exists a continuance of any failure by the NIMS Insurer, if any, to make a required payment under the policy insuring the net interest margin securities (such event, a "NIMS Insurer Default"), such NIMS Insurer will be entitled to exercise, among others, the following rights

S-11

Confidential

of the holders of the Senior and Subordinate Certificates, without the consent of such holders, and the holders of the Senior and Subordinate Certificates may exercise such rights only with the prior written consent of such NIMS Insurer: (i) the right to provide notices of servicer defaults and the right to direct the trustee or the securities administrator to terminate the rights and obligations of the servicer under the pooling agreement in the event of a default by the servicer; (ii) the right to remove the trustee, the securities administrator or any co-trustee or custodian pursuant to the pooling agreement; and (iii) the right to direct the trustee or the securities administrator to make investigations and take actions pursuant to the pooling agreement. In addition, unless a NIMS Insurer Default exists, such NIMS Insurer's consent will be required prior to, among other things, (i) the removal or replacement of the servicer, any successor servicer or the trustee, (ii) the appointment or termination of any subservicer or co-trustee or (iii) any amendment to the pooling agreement.

Investors in the Senior and Subordinate Certificates should note that:

- any insurance policy issued by the NIMS Insurer, if any, will not cover, and will not benefit in any manner whatsoever, the Senior and Subordinate Certificates;

- the rights to be granted to the NIMS Insurer, if any, are extensive;

- the interests of the NIMS Insurer, if any, may be inconsistent with, and adverse to the interests of the holders of the Senior and Subordinate Certificates and the NIMS Insurer, if any, has no obligation or duty to consider the interests of the Senior and Subordinate Certificates in connection with the exercise or nonexercise of such NIMS Insurer's rights;

- such NIMS Insurer's exercise of the rights and consents set forth above may negatively affect the Senior and Subordinate Certificates and the existence of such NIMS Insurer's rights, whether or not exercised, may adversely affect the liquidity of the Senior and Subordinate Certificates relative to other asset-backed certificates backed by comparable mortgage loans and with comparable payment priorities and ratings; and

- there may be more than one series of notes insured by the NIMS Insurer and the NIMS Insurer will have the rights set forth herein so long as any such series of notes remain outstanding.

**Mortgage Loans with Interest-only Payments**

Approximately 5.30%, 9.17% and 7.35% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), provide for payment of interest at the related mortgage rate, but no payment of principal, for a period of five years following the origination of the related mortgage loan. Following the applicable interest-only period, the monthly payment with respect to each such mortgage loan will be increased to an amount sufficient to amortize the principal balance of such mortgage loan over its remaining term, and to pay interest at the related mortgage interest rate.

Such interest-only mortgage loans will, absent other considerations, result in longer weighted average lives of the certificates when compared to certificates backed by fully amortizing mortgage loans. If you purchase a certificate at a discount, you should consider that the extension of its weighted average life could result in a lower yield than would be the case if such mortgage loans provided for payment of principal and interest on every distribution date. In addition, a borrower may view the absence of any obligation to make a payment of principal during the first five years of the term of the mortgage loan as a disincentive to prepayment.

If a recalculated monthly payment as described above is substantially higher than a borrower's previous interest-only monthly payment, that loan may also be subject to an increased risk of delinquency and loss.

See "Description of the Mortgage Pool" in this prospectus supplement.

S-12

Confidential

JPMC_DEX_000402645

**Credit Enhancement for the Offered Certificates May Be Inadequate**

The credit enhancement features described in this prospectus supplement are intended to enhance the likelihood that holders of the Senior Certificates, and to a limited extent, the holders of the offered subordinate certificates, will receive regular payments of interest and principal, as applicable. However, we cannot assure you that the applicable credit enhancement will adequately cover any shortfalls in cash available to pay your certificates as a result of delinquencies or defaults on the mortgage loans. If delinquencies or defaults occur on the mortgage loans, neither the servicer nor any other entity will advance scheduled monthly payments of interest and principal on delinquent or defaulted mortgage loans if such advances are not likely to be recovered.

If substantial losses occur as a result of defaults and delinquent payments on the mortgage loans, you may suffer losses.

**Excess Interest Generated By the Mortgage Loans May Be Insufficient To Create or Maintain Overcollateralization**

We expect the mortgage loans to generate more interest than is needed to pay interest owed on the offered certificates and the Class M-10 and Class M-11 Certificates and to pay certain fees and expenses of the trust (including any Net Swap Payment owed to the Swap Provider and any Swap Termination Payment, other than a Swap Termination Payment resulting from a Swap Provider Trigger Event). Any remaining interest generated by the mortgage loans will then be used to absorb losses that occur on the mortgage loans. After these financial obligations of the trust are covered, the available excess interest generated by the mortgage loans will be used to create or maintain overcollateralization. We cannot assure you, however, that enough excess interest will be generated to create or maintain the required level of overcollateralization. The factors described below will affect the amount of excess interest that the mortgage loans will generate.

- Every time a mortgage loan is prepaid in full or in part, excess interest may be reduced because the mortgage loan will no longer be outstanding and generating interest or, in the case of a partial prepayment, will be generating less interest.

- Every time a mortgage loan is liquidated or written off, excess interest may be reduced because such mortgage loan will no longer be outstanding and generating interest.

- If the rates of delinquencies, defaults or losses on the mortgage loans turn out to be higher than expected, excess interest will be reduced by the amount necessary to compensate for any shortfalls in cash available on the applicable date to make required distributions on the certificates.

- Approximately 80.51%, 81.03% and 80.79% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date) are adjustable-rate mortgage loans. The first adjustment of the mortgage rates for approximately 77.26%, 78.35% and 77.84% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date) will not occur for approximately two years after the date of origination, based on the Six-Month LIBOR Index. The first adjustment of the mortgage rates for approximately 3.25%, 2.68% and 2.95% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date) will not occur for approximately three years after the date of origination, based on the Six-Month LIBOR Index. As a result, the interest rates on the offered certificates may increase relative to the interest rates on the mortgage loans, or may remain constant as the interest rates on the mortgage loans decline. In either case, this would require that more of the interest generated by the mortgage loans be applied to cover interest on the offered certificates.

S-13

JPMC_DEX_000402646

18

**Mortgage Loan Rates May Adversely Affect the Yield on the Offered Certificates**

The offered certificates accrue interest at certificate interest rates based on the one-month LIBOR index plus specified margins, but are subject to a limit. The limit on the certificate interest rates on the offered certificates is based on the weighted average of the interest rates on the mortgage loans, net of certain fees and expenses of the trust and the supplemental interest trust (including any Net Swap Payment owed to the Swap Provider and any Swap Termination Payment owed to the Swap Provider, other than a Swap Termination Payment due to a Swap Termination Trigger Event). The mortgage rates on the mortgage loans are either fixed-rate or adjust based on a six-month LIBOR index. All of the adjustable-rate mortgage loans have periodic and maximum limitations on adjustments to their interest rates. As a result, the offered certificates may accrue less interest than they would accrue if their interest rates were based solely on the one-month LIBOR index plus the specified margins.

A variety of factors could limit the interest rates on the offered certificates and may adversely affect the yields to maturity on the offered certificates. Some of these factors are described below.

- The certificate interest rates for the offered certificates adjust monthly while the mortgage rates on the mortgage loans either do not adjust or may adjust less frequently. Consequently, the cap on the offered certificates may limit increases in the interest rates for extended periods in a rising interest rate environment.

- Six-month LIBOR may change at different times and in different amounts than one-month LIBOR. As a result, it is possible that the six-month LIBOR rate applicable to the adjustable-rate mortgage loans may decline while the one-month LIBOR rate applicable to the offered certificates is stable or rising, increasing the likelihood that the interest rate applicable to one or more classes of offered certificates is the cap rate. It is also possible that the six-month LIBOR rate applicable to the adjustable-rate mortgage loans and the one-month LIBOR rate applicable to the offered certificates may decline or increase during the same period, but one-month LIBOR may decline more slowly or increase more rapidly.

If the interest rates on the offered certificates are limited for any distribution date, the resulting basis risk shortfalls may be recovered by the holders of these classes of certificates on such distribution date or on future distribution dates to the extent that there is sufficient available funds remaining after distributions on the offered certificates and the Class M-10 and Class M-11 Certificates and the payment of certain fees and expenses of the trust and the supplemental interest trust (including any Net Swap Payment owed to the Swap Provider and any Swap Termination Payment owed to the Swap Provider, other than a Swap Termination Payment due to a Swap Termination Trigger Event). No assurances can be given that such additional funds will be available.

Amounts distributed on the offered certificates in respect of such shortfalls may be supplemented by the Interest Rate Swap Agreement to the extent that the floating payment by the Swap Provider exceeds the fixed payment by the supplemental interest trust on any distribution date and such amount is available in the priority described in this prospectus supplement. However, the amount received from the Swap Provider under the Interest Rate Swap Agreement may be insufficient to pay the holders of the applicable certificates the full amount of interest which they would have received absent the limitations of the rate cap.

**The Offered Subordinate Certificates Involve Additional Risks**

The weighted average lives of, and the yields to maturity on, the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates will be progressively more sensitive in that order to the rate and timing of mortgagor defaults and the severity of ensuing losses on the mortgage loans. If the actual rate and severity of losses on the mortgage loans is higher than those assumed by an investor in such certificates, the actual yield to maturity of those certificates may be lower than the yield anticipated by such investor. The timing of losses on the mortgage loans will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of the mortgage group are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the mortgage loans, to the extent they exceed the amount of overcollateralization following distributions of

S-14

JPMC_DEX_000402647

principal on the related distribution date and any Net Swap Payment received under the Interest Rate Swap Agreement, will reduce the class principal amount of the class of subordinate certificates then outstanding with the lowest payment priority. As a result of these reductions, less interest will accrue on that class of subordinate certificates than would otherwise be the case. Once a realized loss is allocated to a subordinate certificate, no amounts will be distributable with respect to the written down amount, except to the limited extent pursuant to the priorities set forth under "Description of the Certificates—Overcollateralization Provisions" and "Description of the Certificates—The Interest Rate Swap Agreement, the Swap Provider and the Swap Account" in this prospectus supplement. Unless the aggregate class principal amount of the Senior Certificates has been reduced to zero, the offered subordinate certificates will not be entitled to any principal distributions until at the earliest the distribution date in May 2009 or a later date as provided in this prospectus supplement or during any period in which delinquencies or losses on the mortgage loans exceed certain levels. As a result, the weighted average lives of those certificates will be longer than would otherwise be the case if distributions of principal were allocated among all of the certificates at the same time. As a result of the longer weighted average lives of such certificates, the holders of those certificates have a greater risk of suffering a loss on their investments. Further, because such certificates might not receive any principal if certain delinquency levels occur, it is possible for those certificates to receive no principal distributions even if no losses have occurred on the mortgage group.

**Yields on the Offered Subordinate Certificates are Sensitive to Prepayments and Losses**

The multiple class structure of the Subordinate Certificates causes the yield of such classes to be particularly sensitive to changes in the rates of prepayment of the mortgage loans. Because distributions of principal will be made to such certificates according to the priorities described in this prospectus supplement, the yield to maturity on such certificates will be sensitive to the rates of prepayment on the mortgage loans experienced both before and after the commencement of principal distributions on those classes. The yield to maturity on those certificates will also be extremely sensitive to losses due to defaults on the mortgage loans (and the timing thereof), to the extent the losses are not covered by excess interest, overcollateralization or a class of offered subordinate certificates with a lower payment priority. Furthermore, as described in this prospectus supplement, the timing of receipt of principal and interest by the offered subordinate certificates may be adversely affected by losses even if such classes of certificates are subsequently reimbursed for such losses.

**Prepayment Interest Shortfalls and Relief Act Interest Shortfalls May Reduce Your Yield**

When a mortgage loan is prepaid, the borrower is charged interest on the amount prepaid only up to the date on which the prepayment is made, rather than for an entire month. This may result in a shortfall in interest collections available for payment on the next distribution date. The servicer is required to cover a portion of the shortfall in interest collections that are attributable to prepayments in full on the mortgage loans during that portion of the related prepayment period in the preceding calendar month, but only up to one-half of the amount of the servicer's servicing fee for the related calendar month received by such servicer.

In addition, certain shortfalls in interest collections arising from the application of the Servicemembers Civil Relief Act, as amended, or comparable state laws (together, for purposes of this prospectus supplement, the "Relief Act") may occur (the "Relief Act Interest Shortfalls"). The Relief Act provides relief to borrowers who enter active military service and to borrowers in reserve status who are called to active duty after the origination of their mortgage loan. These borrowers may not be charged interest on a mortgage loan in excess of 6% per annum during the period of the borrower's active duty. These shortfalls are not required to be paid by the borrower at any future time, will not be advanced by the servicer, and, to the extent excess interest is insufficient, will reduce accrued interest on each class of certificates on a *pro rata* basis. In addition, the Relief Act imposes certain limitations that would impair the servicer's ability to foreclose on an affected mortgage loan during the borrower's period of active service and, under some circumstances, during an additional period thereafter.

In response to the terrorist attacks in the United States on September 11, 2001 and the current situation in Iraq, the United States has initiated military operations and has placed a substantial number of military reservists and members of the National Guard on active duty status. It is possible that the number of reservists and members of the National Guard placed on active duty status in the near future may increase. These operations will increase the likelihood that Relief Act Interest Shortfalls may occur.

S-15

JPMC_DEX_000402648

On any distribution date, any Relief Act Interest Shortfalls and (to the extent not covered by compensating interest paid by the servicer) any prepayment interest shortfalls will be allocated, first, to the excess interest, and thereafter, to the interest otherwise due with respect to the offered certificates, Class M-10 and Class M-11 Certificates on a *pro rata* basis based on the respective amounts of interest accrued on those certificates for the distribution date. If Relief Act Interest Shortfalls or prepayment interest shortfalls are allocated to the offered certificates, Class M-10 and Class M-11 Certificates, the amount of interest paid on those certificates will be reduced, adversely affecting the yield on these certificates.

**High Loan-to-Value Ratios Increase Risk of Loss**

Mortgage loans with high loan-to-value ratios may present a greater risk of loss than mortgage loans with lower loan-to-value ratios. Approximately 43.75%, 30.74% and 36.88% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date) had loan-to-value ratios at origination in excess of 80%, but no more than 100%. Additionally, the originator's determination of the value of a mortgaged property used in the calculation of the loan-to-values ratios of the mortgage loans may differ from the actual value of such mortgaged properties. None of the mortgage loans in the mortgage group were covered by a primary mortgage insurance policy at origination.

**Simultaneous Second Lien Risk**

With respect to approximately 19.34%, 43.60% and 32.15% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), at the time of origination of the first lien mortgage loan, the related originator also originated a second lien mortgage loan which may or may not be included in the trust. The weighted average original loan-to-value ratio of such mortgage loans in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date) is approximately 80.37%, 80.06% and 80.14% and the weighted average original combined loan-to-value ratio of such mortgage loans (including the second lien) in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date) is approximately 99.23%, 99.59% and 99.49%. With respect to mortgage loans that have second lien mortgage loans encumbering the same mortgaged property, foreclosure frequency may be increased relative to mortgage loans that do not have subordinate financing behind them since mortgagors have less equity in the mortgaged property. In addition, the servicer may declare a default on the second lien loan even though the first lien loan is current which would constitute a default on the first lien loan. In addition to the mortgage loans discussed above that have simultaneous subordinate financing provided by the originator, with respect to certain other mortgage loans, at the time of origination of the first lien mortgage loan, the related mortgaged property was also encumbered by a second lien mortgage to a mortgagee other than the originator. Investors should also note that any mortgagor may obtain subordinate financing at any time subsequent to the date of origination of their mortgage loan from the originator or from any other lender.

**There are Risks Relating to Mortgage Loans Secured by Second Liens**

None of the group 1 mortgage loans and approximately 4.77% of the group 2 mortgage loans and 2.52% of the aggregate pool (in each case, by aggregate principal balance of the related group or the aggregate pool, as appropriate, as of the cut-off date), respectively, are secured by a second lien that is subordinate to the rights of the mortgagee under a first mortgage loan on the related mortgaged property. The proceeds from any liquidation, insurance or condemnation proceeding will be available to satisfy the outstanding principal balance of such subordinate mortgage loans only to the extent that the claims of the senior mortgage loans have been satisfied in full, including any foreclosure costs. In certain circumstances where the servicer determines that it would be uneconomical to foreclose on the mortgaged property, the servicer may modify or waive any term of the mortgage loan, including accepting a lesser amount than stated in the mortgage note in satisfaction of the mortgage note. The servicer may charge off any second lien mortgage loan that is 180 days or more delinquent. The foregoing consideration will be particularly applicable to subordinate mortgage loans that have high combined loan-to-value ratios because the servicer is more likely to determine that foreclosure would be uneconomical. You should consider the risk that to the extent losses on second lien mortgage loans are not covered by available credit enhancement, such losses will be borne by the holders of the certificates.

S-16

Confidential

JPMC_DEX_000402649

**A Decrease in the Value of Mortgaged Property May Increase the Risk of Loss**

There are several factors that could adversely affect the value of a mortgaged property and cause the outstanding balance of the related mortgage loan, together with any senior financing, to equal or exceed the value of that mortgaged property. Among the factors that could adversely affect the value of a mortgaged property are:

- an overall decline in the residential real estate market in the areas in which the mortgaged properties are located;

- a decline in the general condition of the mortgaged properties as a result of failure of borrowers to maintain adequately the mortgaged properties; or

- natural disasters that are not necessarily covered by insurance, including earthquakes, hurricanes, wildfires, floods and eruptions.

If a decline in the value of the mortgaged properties occurs, the actual rates of delinquencies, foreclosure and losses on the mortgage loans could be higher than those currently experienced in the mortgage lending industry in general and you could suffer a loss.

**Geographic Concentration of Mortgage Loans Could Adversely Affect Your Investment**

Approximately 28.08%, 51.71% and 40.56% of the mortgage loans included in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), are secured by mortgaged properties located in California. Property in California may be more susceptible than homes located in other parts of the country to some types of uninsurable hazards, such as earthquakes, mudslides, hurricanes, floods, wildfires and eruptions, and civil disturbances such as riots. Since 2001, California has experienced intermittent energy shortages that have resulted in unpredictable rolling blackouts and higher energy costs. This potential crisis could someday spread to other states and affect the entire nation. In addition, recently the cost of crude oil reached record highs. These higher energy and fuel costs could reduce the amount of money that the affected obligors have available to make monthly payments. Higher energy costs and blackouts could also cause business disruptions, which could cause unemployment and an economic downturn. Such obligors could potentially become delinquent in making monthly payments or default if they were unable to make payments due to increased energy or fuel bills or unemployment. Amounts available to make distributions on the certificates could be adversely affected if the related obligors were unable to make timely payments. The depositor cannot predict whether, or to what extent or for how long, such events may occur.

There are also significant concentrations of mortgage loans in other states as described under "Description of the Mortgage Pool—Tabular Characteristics of the Mortgage Loans" in this prospectus supplement. Consequently, losses and prepayments on the mortgage loans in a particular group and the resultant payments on the related certificates may be affected significantly by changes in the housing markets and the regional economies in any of these areas and by the occurrence of natural disasters, such as earthquakes, hurricanes, tornadoes, tidal waves, mudslides, fires and floods in these areas.

**Delinquencies May Adversely Affect Investment**

The mortgage loans were either originated or acquired in accordance, generally, with the underwriting guidelines described in this prospectus supplement. We cannot assure you that the values of the mortgaged properties have remained or will remain at levels in effect on the date of origination of the related mortgage loans.

**The Seller and the Originator may not be able to repurchase defective mortgage loans**

Each of the seller and the originator has made various representations and warranties related to the mortgage loans with respect to the mortgage loans sold by it. Those representations are summarized in "The Pooling Agreement—Assignment of the Mortgage Loans" in this prospectus supplement.

S-17

Confidential

JPMC_DEX_000402650

If the seller or the originator fails to cure a material breach of its representations and warranties with respect to any mortgage loan in a timely manner, then the seller or the originator would be required to repurchase or substitute for the defective mortgage loan. It is possible that the seller or the originator may not be capable of repurchasing or substituting any defective mortgage loans, for financial or other reasons. The inability of the seller or the originator to repurchase or substitute for defective mortgage loans would likely cause the mortgage loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on the certificates could occur.

**Reimbursement of Advances by the Servicer Could Delay Distributions on the Certificates**

Under the pooling agreement, the servicer will generally make cash advances to cover delinquent payments of principal and interest to the extent it reasonably believes that the cash advances are recoverable from future payments or recoveries on the mortgage loans. The servicer may make such advances from amounts held for future distribution. In addition, the servicer may withdraw from the collection account funds that were not included in available funds for the preceding distribution date to reimburse itself for advances previously made. Any such amounts withdrawn by the servicer in reimbursement for advances previously made are generally required to be replaced by the servicer on or before the next distribution date, subject to subsequent withdrawal. To the extent that the servicer is unable to replace any amounts withdrawn in reimbursement of advances previously made, there could be a delay in distributions on the offered certificates. Furthermore, the servicer's right to reimburse itself for advances previously made from funds held for future distribution could lead to amounts required to be restored to the collection account by the servicer that are higher, and potentially substantially higher, than one month's advance obligation.

**The Certificates are Obligations of the Trust Only**

The certificates will not represent an interest in or obligation of the depositor, the servicer, the sponsor, the originator, the seller, the trustee, the securities administrator, the trust oversight manager, the swap provider or any of their respective affiliates. Neither the offered certificates nor the mortgage loans will be guaranteed or insured by any governmental agency or instrumentality, or by the depositor, the servicer, the sponsor, the originator, the seller, the trustee, the securities administrator, the trust oversight manager, the swap provider or any of their respective affiliates. Proceeds of the assets included in the trust will be the sole source of payments on the offered certificates, and there will be no recourse to any entity in the event that those proceeds are insufficient or otherwise unavailable to make all payments provided for under the offered certificates.

**The Interest Rate Swap Agreement and the Swap Provider**

Any amounts received from the Swap Provider under the Interest Rate Swap Agreement will be applied as described in this prospectus supplement to cover losses, maintain overcollateralization, pay interest shortfalls and basis risk shortfalls. However, no amounts will be payable by the Swap Provider unless the floating amount owed by the Swap Provider on a distribution date exceeds the fixed amount owed to the Swap Provider on such distribution date. This will not occur except in periods when one-month LIBOR (as determined pursuant to the Interest Rate Swap Agreement) generally exceeds 5.100%. No assurance can be made that any amounts will be received under the Interest Rate Swap Agreement, or that any such amounts that are received will be sufficient to maintain required overcollateralization or to cover interest shortfalls, basis risk shortfalls and losses on the loans. Any net payment payable to the Swap Provider under the terms of the Interest Rate Swap Agreement will reduce amounts available for distribution to certificateholders, and may reduce the pass-through rates of the certificates. If the rate of prepayments on the loans is faster than anticipated, the schedule on which payments due under the Interest Rate Swap Agreement are calculated may exceed the aggregate principal balance of the loans, thereby increasing the relative proportion of interest collections on the loans that must be applied to make net payments to the Swap Provider. The combination of a rapid rate of prepayment and low prevailing interest rates could adversely affect the yields on the offered certificates, Class M-10 and Class M-11 Certificates. In addition, any termination payment payable to the Swap Provider (other than a termination payment resulting from a Swap Provider Trigger Event) in the event of early termination of the Interest Rate Swap Agreement will reduce amounts available for distribution to certificateholders.

S-18

Confidential

JPMC_DEX_000402651

Upon early termination of the Interest Rate Swap Agreement, the supplemental interest trust or the Swap Provider may be liable to make a Swap Termination Payment to the other party (regardless of which party caused the termination). The Swap Termination Payment will be computed in accordance with the procedures set forth in the Interest Rate Swap Agreement. In the event that the supplemental interest trust is required to make a Swap Termination Payment, that payment will be paid on the related distribution date, and on any subsequent distribution dates until paid in full, generally prior to distributions to certificateholders. This feature may result in losses on the certificates. Due to the priority of the applications of the available funds, the subordinate certificates will bear the effects of any shortfalls resulting from a Net Swap Payment or Swap Termination Payment by the supplemental interest trust before such effects are borne by the senior certificates and one or more classes of subordinate certificates may suffer a loss as a result of such payment. Investors should note that the level of one-month LIBOR as of April 3, 2006 is approximately 4.830% which means the supplemental interest trust will make a Net Swap Payment to the Swap Provider unless and until one-month LIBOR exceeds approximately 5.100%.

To the extent that distributions on the offered certificates, Class M-10 and Class M-11 Certificates depend in part on payments to be received by the supplemental interest trust under the Interest Rate Swap Agreement, the ability of the Securities Administrator to make such distributions on such certificates will be subject to the credit risk of the Swap Provider to the Interest Rate Swap Agreement. The credit ratings of the Swap Provider as of the date of this prospectus supplement are lower than the ratings assigned to the senior certificates. See "Description of the Certificates—The Interest Rate Swap Agreement, the Swap Provider and the Swap Account" in this prospectus supplement.

**The Offered Certificates are not Suitable Investments for All Investors**

The offered certificates are not suitable investments for any investor that requires a regular or predictable schedule of payments or payment on any specific date. The offered certificates are complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment, and the interaction of these factors.

**You Could Be Adversely Affected By Violations of Consumer Protection Laws**

Applicable state laws generally regulate interest rates and other charges and require certain disclosures. In addition, state and federal consumer protection laws, unfair and deceptive practices acts and debt collection practices acts may apply to the origination or collection of the mortgage loans. Depending on the provisions of the applicable law, violations of these laws may limit the ability of the servicer to collect all or part of the principal of or interest on the mortgage loans, may entitle the borrower to a refund of related amounts previously paid and, in addition, could subject the servicer to damages and administrative enforcement.

The Federal Home Ownership and Equity Protection Act of 1994, commonly known as HOEPA, prohibits inclusion of some provisions in mortgage loans that have mortgage rates or origination costs in excess of prescribed levels, and requires that borrowers be given certain disclosures prior to the consummation of such mortgage loans. Some states, as in the case of Georgia's Fair Lending Act of 2002, have enacted, or may enact, similar laws or regulations, which in some cases impose restrictions and requirements greater than those in HOEPA. Failure to comply with these laws, to the extent applicable to any of the mortgage loans, could subject the trust as an assignee of the mortgage loans, to monetary penalties and could result in the borrowers rescinding such mortgage loans against the trust fund. Lawsuits have been brought in various states making claims against assignees of high cost loans for violations of state law. Named defendants in these cases have included numerous market participants within the secondary mortgage market, including some securitization trusts. The originator and the seller have warranted that the mortgage loans do not include any mortgage loan in violation of HOEPA or similar state laws. However, if the trust fund should include loans subject to HOEPA or in material violation of similar state laws, it will have repurchase remedies against the originator or the seller, as applicable.

Given that the mortgage lending and servicing business involves the compliance with numerous local, state and federal lending laws, lenders and servicers, including the originator from which the seller purchased the mortgage loans, are subject to numerous claims, legal actions (including class action lawsuits), investigations, subpoenas and inquiries in the ordinary course of business. It is impossible to determine the outcome of any such

S-19

JPMC_DEX_000402652

actions, investigations or inquiries and the resultant legal and financial liability with respect thereto. If any finding were to have a material adverse effect on the financial condition of the servicer or on the validity of the mortgage loans, losses on the certificates could result.

See "Material Legal Aspects of the Loans" in the accompanying prospectus.

**Bankruptcy and Insolvency Risks**

It is believed that the transfer of the mortgage loans from the seller to the depositor and from the depositor to the trust fund will each be treated as a sale rather than a secured financing for purposes of federal and state law. Counsel for the seller and the depositor will render an opinion on the closing date that in the event of the bankruptcy of either the seller or the depositor, the mortgage loans and other assets of the trust fund would not be considered part of the seller's or depositor's bankruptcy estates and, thus, would not be available to their creditors. On the other hand, a bankruptcy trustee or one of the creditors of the seller or the depositor might challenge this conclusion and argue that the transfer of the mortgage loans should be characterized as a pledge of assets in a secured borrowing rather than as a sale. Such an attempt, even if unsuccessful, might result in delays in distributions on the certificates.

**Transfers of Servicing May Result in Increased Delinquencies or Defaults**

The servicing function with respect to the mortgage loans is expected to be transferred from New Century Mortgage Corporation to JPMorgan Chase Bank, National Association, after the closing date. Servicing transfers can result in a temporary increase in delinquencies or defaults on the transferred loans. Any such delinquency or defaults on the mortgage loans may result in shortfalls in amounts available to make distributions on your certificates.

**The Balloon Loans in the Mortgage Pool Have a Greater Degree of Risk of Default**

Approximately 59.51%, 58.23% and 58.84% of the mortgage loans included in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), will not fully amortize over their terms to maturity and, thus, will require principal payments at their stated maturity, which may be substantially greater than the monthly payments otherwise due on such mortgage loans (*i.e.*, balloon payments). Mortgage loans with balloon payments involve a greater degree of risk because the ability of a mortgagor to make a balloon payment typically will depend on the mortgagor's ability either to timely refinance the mortgage loan or to timely sell the mortgaged property. The ability of a mortgagor to refinance the mortgage loan or sell the related mortgaged property will be affected by a number of factors, including:

- the level of available mortgage interest rates at the time of refinancing or sale;

- the mortgagor's equity in the related mortgaged property;

- prevailing general economic conditions; and

- the availability of credit for residential properties generally.

S-20

Confidential

JPMC_DEX_000402653

## DESCRIPTION OF THE MORTGAGE POOL

**General**

The following is a summary description of the Mortgage Loans in the Mortgage Groups as of the close of business on April 1, 2006 (the "Cut-off Date"). The information presented herein does not take into account any Mortgage Loans that have or may prepay in full or have been or may be removed because of incomplete documentation or otherwise for the period from the Cut-off Date to the Closing Date, or other Mortgage Loans that may be substituted therefor. As a result, the information regarding the Mortgage Loans may vary from comparable information based upon the actual composition of the Mortgage Groups as of the Closing Date, although such variance will not be material.

Whenever reference is made herein to a percentage of some or all of the Mortgage Loans or some or all of a Mortgage Group, such percentage is determined on the basis of the Stated Principal Balance (as defined below at "Description of the Certificates—Glossary") of the Mortgage Loans in aggregate or of a particular Mortgage Group as of the Cut-off Date.

The Mortgage Loans were previously acquired by the Seller directly from the Originator pursuant to a mortgage loan sale and servicing agreement between the Originator and the Seller (the "Mortgage Loan Purchase Agreement"). Under an assignment, assumption and recognition agreement, dated as of the Closing Date, among the Originator, the Trustee, the Seller and the Depositor (the "Assignment, Assumption and Recognition Agreement"), the Originator will make, as of the Closing Date, certain representations and warranties to the Trust relating to, among other things, the due execution and enforceability of the Mortgage Loan Purchase Agreement and the Assignment, Assumption and Recognition Agreement and certain characteristics of the Mortgage Loans. The Seller will assign the Mortgage Loans and all of its rights under the Mortgage Loan Purchase Agreement to the Depositor pursuant to one or more assignment and assumption agreements. Pursuant to a pooling and servicing agreement, dated as of April 1, 2006, among the Seller, the Depositor, JPMorgan Chase Bank, National Association, as servicer, the Securities Administrator, the Trust Oversight Manager and the Trustee (the "Pooling Agreement"), the Depositor will cause the Mortgage Loans to be assigned to the Trust for the benefit of the certificateholders. Subject to certain limitations, pursuant to the Mortgage Loan Purchase Agreement, the Originator will be obligated to repurchase, or substitute a similar mortgage loan for, any Mortgage Loan as to which there exists deficient documentation or an uncured breach of certain representations or warranties, if such breach of any such representation or warranty materially and adversely affects the interests of the certificateholders in such Mortgage Loan. Subject to certain limitations, the Seller will be obligated to repurchase, or substitute a similar loan for, any Mortgage Loan as to which there exists an uncured breach of certain representations and warranties, if such breach of any such representation or warranty materially and adversely affects the interests of the certificateholders in such Mortgage Loan, made by the Seller in the Pooling Agreement, as described in "The Pooling Agreement—Assignment of Mortgage Loans" in this prospectus supplement. The Seller is selling the Mortgage Loans to the Depositor without recourse and will have no obligation with respect to the certificates in its capacity as Seller other than the repurchase or substitution obligations described in this prospectus supplement. The Depositor is also selling the Mortgage Loans without recourse and will have no obligation with respect to the certificates in its capacity as Depositor. The Originator will not have any obligation with respect to the certificates in its capacity as originator other than the repurchase or substitution obligations described in this prospectus supplement.

**The Mortgage Loans**

At the Cut-off Date, the assets of the Trust Fund consisted of two groups ("Group 1" and "Group 2", respectively, and each, a "Mortgage Group") having, in aggregate, 4,209 fixed and adjustable rate mortgage loans (the "Mortgage Loans") secured by first and second liens on one- to four-family residential properties (each, a "Mortgaged Property"), substantially all of which have original terms to maturity of 30 years having an aggregate Stated Principal Balance as of the cut-off date of approximately $930,509,120 (the "Aggregate Cut-off Date Balance"). Group 1 and Group 2 are collectively referred to in this prospectus supplement as the "Aggregate Pool".

The Mortgage Loans are subject to the "due-on-sale" provisions included therein which, among other things, may provide that the Mortgage Loan is assumable by a creditworthy purchaser of the related Mortgaged Property (as defined herein).

Confidential

JPMC_DEX_000402654

As described herein at "Description of the Certificates—General," the Mortgage Loans have been segregated into Group 1 and Group 2 for the purpose of allocating distributions among the Senior Certificates. Each Mortgage Group has the characteristics described below.

Group 1 consists of 2,274 Mortgage Loans (the "Group 1 Mortgage Loans") having a Cut-off Date balance of approximately $438,971,249 (approximately 47.18% of the Aggregate Cut-off Date Balance). Group 1 consists of Mortgage Loans with original principal balances that conform to the guidelines of Fannie Mae or Freddie Mac. Approximately 80.51% and 19.49% of the Group 1 Mortgage Loans are Six Month LIBOR indexed Mortgage Loans and fixed rate Mortgage Loans, respectively (see "—The Index" below). Approximately 0.01%, 0.31%, 0.44%, 0.06% and 99.18% of Group 1 Mortgage Loans have original terms to maturity of approximately 10, 15, 20, 25 and 30 years, respectively. Approximately 5.30% of the Group 1 Mortgage Loans provide for payment of interest at the related rate at which interest accrues on the related Mortgage Loan (the "Mortgage Rate"), but no payment of principal, for a period of five years following the origination of the related Mortgage Loan. Following such five-year interest-only period, the Scheduled Payment with respect to each such Group 1 Mortgage Loan will be increased to an amount sufficient to amortize the principal balance of such Mortgage Loan over its remaining term, and to pay interest at the related current Mortgage Rate.

As of the Cut-off Date, with respect to the Group 1 Mortgage Loans, the weighted average current Mortgage Rate is approximately 8.170% per annum, the weighted average margin for the Group 1 adjustable rate loans is approximately 6.193%, the weighted average remaining term to maturity is approximately 356 months and the weighted average remaining interest-only term of the interest-only Group 1 Mortgage Loans is approximately 57 months.

Approximately 77.26% and 3.25% of the Group 1 Mortgage Loans adjust, commencing approximately two or three years, respectively, after origination, based on the Six-Month LIBOR Index.

Group 2 consists of 1,935 Mortgage Loans (the "Group 2 Mortgage Loans") having a Cut-off Date balance of approximately $491,537,872 (approximately 52.82% of the Aggregate Cut-off Date Balance). Group 2 consists of Mortgage Loans with original principal balances that may or may not conform to the guidelines of Fannie Mae or Freddie Mac. Approximately 81.03% and 18.97% of the Group 2 Mortgage Loans are Six Month LIBOR indexed Mortgage Loans and fixed rate Mortgage Loans, respectively (see "—The Index" below). Approximately 0.02%, 0.24%, 0.08% and 99.66% of the Group 2 Mortgage Loans have original terms to maturity of approximately 10, 15, 20 and 30 years, respectively. Approximately 9.17% of the Group 2 Mortgage Loans provide for payment of interest at the related Mortgage Rate, but no payment of principal, for a period of five years following the origination of the related Mortgage Loan. Following such five-year interest-only period, the Scheduled Payment with respect to each such Group 2 Mortgage Loan will be increased to an amount sufficient to amortize the principal balance of such Mortgage Loan over its remaining term, and to pay interest at the related current Mortgage Rate.

As of the Cut-off Date, with respect to the Group 2 Mortgage Loans, the weighted average current Mortgage Rate is approximately 8.170% per annum, the weighted average margin for the Group 2 adjustable rate loans is approximately 6.200%, the weighted average remaining term to maturity is approximately 357 months and the weighted average remaining interest-only term of the interest-only Group 2 Mortgage Loans is approximately 58 months.

Approximately 78.35% and 2.68% of the Group 2 Mortgage Loans adjust, commencing approximately two or three years, respectively, after origination, based on the Six-Month LIBOR Index.

Approximately 59.51% and 58.23% of the Group 1 Mortgage Loans and Group 2 Mortgage Loans, respectively, will not fully amortize over their terms to maturity and, thus, will require principal payments at their stated maturity (the "Balloon Loans").

All of the Mortgage Loans were originated or acquired initially by New Century Mortgage Corporation ("New Century" or the "Originator").

S-22

JPMC_DEX_000402655

27

Certain general information with respect to the Mortgage Loans is set forth below. Prior to the Closing Date, Mortgage Loans may be removed from the Trust Fund and other mortgage loans may be substituted therefor. The Depositor believes that the information set forth herein with respect to the Mortgage Loans as presently constituted is representative of the characteristics of the Mortgage Loans as they will be constituted at the Closing Date, although the numerical data and certain other characteristics of the Mortgage Loans described herein may vary within a range of plus or minus 5%.

None of the Mortgage Loans will be guaranteed by any governmental agency. Pursuant to the Assignment, Assumption and Recognition the Originator, the Seller will assign to the Trustee, on behalf of the Trust Fund, its interests in the Mortgage Loan Purchase Agreement.

The Mortgage Loans have been acquired directly or indirectly by the Seller from the Originator in the ordinary course of its business pursuant to the Mortgage Loan Purchase Agreement. All of the Mortgage Loans were underwritten by the Originator substantially in accordance with the related underwriting criteria specified herein. See "The Originator—Underwriting Standards" below. Prior to the transfer of servicing to JPMorgan Chase Bank, National Association, expected to be May 1, 2006 (the "Servicing Transfer Date"), New Century Mortgage Corporation will service the Mortgage Loans pursuant to the Mortgage Loan Purchase Agreement. Following the Servicing Transfer Date, JPMorgan Chase Bank, National Association, will service the Mortgage Loans pursuant to the Pooling Agreement.

Substantially all of the Mortgage Loans provide for payments due on the first day of each month (the "Due Date"). Due to the provisions for monthly advances by the Servicer, scheduled payments made by the borrowers either earlier or later than the scheduled Due Dates thereof will not affect the amortization schedule or the relative application of such payments to principal and interest.

The Mortgage Loans were originated from July 2005 through February 2006. No more than approximately 0.49% of the Mortgage Loans are secured by Mortgaged Properties located in any one zip code area. The latest stated maturity date of any Mortgage Loan is March 2036. As of the Cut-off Date, none of the mortgage loans were 30 or more days delinquent. As of the Cut-off Date, the weighted average current Mortgage Rate of the Mortgage Loans is approximately 8.170% per annum, the weighted average margin of the adjustable rate loans is approximately 6.197%, the weighted average remaining term to maturity is approximately 357 months and the weighted average remaining interest-only term of the interest-only Mortgage Loans is approximately 58 months. No Mortgage Loan had a Loan-to-Value Ratio at origination of more than 100%.

The "Loan-to-Value Ratio" or "LTV" of a first lien mortgage loan as of the date of origination is a fraction, expressed as a percentage, the numerator of which is the principal balance of the mortgage loan at the date of origination and the denominator of which is (a) in the case of a mortgage loan other than a refinancing mortgage loan or a mortgage loan originated in connection with a lease-option purchase, the lesser of (i) the purchase price paid for the related Mortgaged Property by the mortgagor with the proceeds of the mortgage loan and (ii) the value of the related Mortgaged Property as determined by an appraisal in accordance with the originator's guidelines in effect at origination of the mortgage loan, (b) in the case of a refinancing mortgage loan, the value of the related Mortgaged Property as determined by an appraisal in accordance with the originator's guidelines in effect at the time of such refinance or (c) in the case of a mortgage loan originated in connection with a lease-option purchase, the value of the related Mortgaged Property as determined by an appraisal in accordance with the Originator's guidelines in effect at origination of the mortgage loan or, if and only if the lease option purchase price was set less than twelve months prior to origination and the resulting amount is lower, the sale price of the related Mortgaged Property.

The LTV of a second lien mortgage loan as of the date of origination is a fraction, expressed as a percentage, the numerator of which is the sum of the principal balance of such mortgage loan at the date of origination plus the outstanding principal balance of the senior mortgage loan at the date of origination of such mortgage loan and the denominator of which is (a) in the case of a mortgage loan other than a refinancing mortgage loan or a mortgage loan originated in connection with a lease-option purchase, the lesser of (i) the purchase price paid for the related Mortgaged Property by the mortgagor with the proceeds of the mortgage loan and (ii) the value of the related Mortgaged Property as determined by an appraisal in accordance with the originator's guidelines in effect at origination of the mortgage loan, (b) in the case of a refinancing mortgage loan, the value of the related

S-23

JPMC_DEX_000402656

Mortgaged Property as determined by an appraisal in accordance with the Originator's guidelines in effect at the time of such refinance or (c) in the case of a mortgage loan originated in connection with a lease-option purchase, the value of the related Mortgaged Property as determined by an appraisal in accordance with the originator's guidelines in effect at origination of the mortgage loan or, if and only if the lease option purchase price was set less than twelve months prior to origination and the resulting amount is lower, the sale price of the related Mortgaged Property.

No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values overall or in a particular geographic area decline, the LTVs might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur on the Mortgage Loans.

As set forth in the "Credit Scores" table below, credit scores have been supplied with respect to the mortgagors. Credit scores are obtained by many mortgage lenders in connection with mortgage loan applications to help assess a borrower's creditworthiness. Credit scores are generated by models developed by third party credit reporting organizations which analyzed data on consumers in order to establish patterns which are believed to be indicative of a borrower's probability of default. The credit score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit, and bankruptcy experience. Credit scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. However, a credit score purports only to be a measurement of the relative degree of risk a borrower represents to a lender, i.e., that a borrower with a higher score is statistically expected to be less likely to default in payment than a borrower with a lower score. In addition, it should be noted that credit scores were developed to indicate a level of default probability over a two-year period which does not correspond to the life of a mortgage loan. Furthermore, credit scores were not developed specifically for use in connection with mortgage loans, but for consumer loans in general. Therefore, a credit score does not take into consideration the effect of mortgage loan characteristics (which may differ from consumer loan characteristics) on the probability of repayment by the borrower. There can be no assurance that a credit score will be an accurate predictor of the likely risk or quality of the related mortgage loan.

S-24

Confidential

JPMC_DEX_000402657

**Tabular Characteristics of the Mortgage Loans (Aggregate Pool)**

The Mortgage Loans are expected to have the following approximate aggregate characteristics as of the Cut-off Date.

| | |
|---|---:|
| Number of Mortgage Loans in Aggregate Pool | 4,209 |
| Total Stated Principal Balance | $930,509,120 |
| Current Mortgage Rates: | |
| Weighted Average | 8.170% |
| Range | 5.000% - 13.900% |
| Weighted Average Margin | 6.197% |
| Weighted Average Remaining Term to Maturity (in months) | 357 |

The Stated Principal Balances of the Mortgage Loans range from approximately $29,964 to approximately $968,811. The Mortgage Loans have an average Stated Principal Balance of approximately $221,076.

The weighted average Loan-to-Value Ratio at origination of the Mortgage Loans is approximately 80.50% and no Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 100%.

No more than approximately 0.49% of the Mortgage Loans are secured by Mortgaged Properties located in any one zip code area.

The following tables set forth certain information, as of the Cut-off Date, as to the Mortgage Loans. Other than with respect to rates of interest, percentages (approximate) are stated by Stated Principal Balance of the Mortgage Loans as of the Cut-off Date and, due to rounding, may not total 100%.

S-25

Confidential

| Stated Principal Balance ($) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 50,000 or less | 91 | $ 3,859,348.12 | 0.41% | 10.609% | 346 | 92.27% | 626 |
| 50,001 - 100,000 | 739 | 55,926,566.46 | 6.01 | 9.336 | 354 | 82.39 | 609 |
| 100,001 - 150,000 | 800 | 99,618,584.10 | 10.71 | 8.653 | 355 | 79.16 | 606 |
| 150,001 - 200,000 | 619 | 108,352,239.76 | 11.64 | 8.391 | 357 | 77.89 | 607 |
| 200,001 - 250,000 | 507 | 114,060,974.68 | 12.26 | 8.206 | 357 | 78.67 | 615 |
| 250,001 - 300,000 | 443 | 121,796,095.37 | 13.09 | 7.942 | 357 | 79.38 | 618 |
| 300,001 - 350,000 | 290 | 94,469,070.80 | 10.15 | 7.889 | 357 | 80.03 | 626 |
| 350,001 - 400,000 | 245 | 91,567,552.51 | 9.84 | 8.078 | 357 | 81.83 | 625 |
| 400,001 - 450,000 | 161 | 68,294,668.39 | 7.34 | 7.848 | 357 | 82.41 | 644 |
| 450,001 - 500,000 | 122 | 57,988,509.32 | 6.23 | 7.881 | 357 | 82.75 | 641 |
| 500,001 - 550,000 | 79 | 41,390,811.37 | 4.45 | 7.625 | 355 | 82.61 | 650 |
| 550,001 - 600,000 | 49 | 28,278,502.18 | 3.04 | 7.758 | 357 | 82.89 | 641 |
| 600,001 - 650,000 | 29 | 18,143,794.83 | 1.95 | 7.650 | 357 | 82.95 | 651 |
| 650,001 - 700,000 | 7 | 4,712,041.93 | 0.51 | 7.983 | 357 | 85.91 | 647 |
| 700,001 - 750,000 | 17 | 12,451,954.47 | 1.34 | 8.034 | 357 | 83.42 | 647 |
| 750,001 - 800,000 | 1 | 781,697.87 | 0.08 | 9.350 | 358 | 85.00 | 566 |
| 800,001 - 850,000 | 4 | 3,296,583.23 | 0.35 | 7.769 | 358 | 80.59 | 675 |
| 850,001 - 900,000 | 3 | 2,630,021.91 | 0.28 | 7.738 | 358 | 80.00 | 645 |
| 950,001 - 1,000,000 | 3 | 2,890,102.89 | 0.31 | 7.768 | 358 | 83.35 | 650 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

As of the Cut-off Date, the average Stated Principal Balance of the Mortgage Loans in the Aggregate Pool is expected to be approximately $221,076

| Current Mortgage Rate (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 5.000 - 5.499 | 1 | $ 349,081.27 | 0.04% | 5.000% | 356 | 82.35% | 732 |
| 5.500 - 5.999 | 70 | 23,583,508.33 | 2.53 | 5.826 | 354 | 76.73 | 653 |
| 6.000 - 6.499 | 225 | 63,334,648.04 | 6.81 | 6.276 | 355 | 77.61 | 649 |
| 6.500 - 6.999 | 376 | 101,249,834.53 | 10.88 | 6.763 | 356 | 77.72 | 636 |
| 7.000 - 7.499 | 415 | 105,299,092.50 | 11.32 | 7.274 | 357 | 80.13 | 629 |
| 7.500 - 7.999 | 704 | 177,060,626.92 | 19.03 | 7.772 | 357 | 79.59 | 630 |
| 8.000 - 8.499 | 465 | 106,167,304.44 | 11.41 | 8.242 | 357 | 80.30 | 626 |
| 8.500 - 8.999 | 594 | 130,167,827.22 | 13.99 | 8.737 | 357 | 80.68 | 611 |
| 9.000 - 9.499 | 358 | 69,615,489.54 | 7.48 | 9.235 | 357 | 81.26 | 612 |
| 9.500 - 9.999 | 399 | 74,134,475.15 | 7.97 | 9.733 | 357 | 83.42 | 600 |
| 10.000 - 10.499 | 193 | 30,020,812.46 | 3.23 | 10.201 | 356 | 83.42 | 590 |
| 10.500 - 10.999 | 169 | 25,456,989.15 | 2.74 | 10.722 | 356 | 85.56 | 598 |
| 11.000 - 11.499 | 87 | 10,784,836.12 | 1.16 | 11.236 | 357 | 88.65 | 609 |
| 11.500 - 11.999 | 58 | 4,957,619.57 | 0.53 | 11.760 | 357 | 89.82 | 611 |
| 12.000 - 12.499 | 57 | 5,023,880.08 | 0.54 | 12.205 | 355 | 94.57 | 620 |
| 12.500 - 12.999 | 33 | 2,946,343.95 | 0.32 | 12.725 | 357 | 98.41 | 622 |
| 13.000 - 13.499 | 2 | 176,860.16 | 0.02 | 13.177 | 357 | 100.00 | 585 |
| 13.500 - 13.999 | 3 | 179,890.76 | 0.02 | 13.724 | 358 | 100.00 | 630 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

As of the Cut-off Date, the weighted average current Mortgage Rate of the Mortgage Loans in the Aggregate Pool is expected to be approximately 8.170% per annum

S-26

JPMC_DEX_000402659

| Credit Score | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 500 – 524 | 299 | $ 52,616,280.84 | 5.65% | 9.389% | 357 | 73.52% | 513 |
| 525 – 549 | 329 | 60,600,424.63 | 6.51 | 8.802 | 357 | 73.35 | 536 |
| 550 – 574 | 385 | 78,955,235.04 | 8.49 | 8.518 | 357 | 76.94 | 562 |
| 575 – 599 | 554 | 112,123,762.09 | 12.05 | 8.337 | 357 | 80.61 | 588 |
| 600 – 624 | 721 | 157,230,345.13 | 16.90 | 7.885 | 357 | 80.76 | 612 |
| 625 – 649 | 754 | 172,959,627.68 | 18.59 | 7.962 | 356 | 81.96 | 637 |
| 650 – 674 | 533 | 135,615,110.35 | 14.57 | 7.942 | 356 | 82.43 | 661 |
| 675 – 699 | 303 | 74,804,929.70 | 8.04 | 7.894 | 355 | 83.23 | 686 |
| 700 – 724 | 168 | 43,063,023.61 | 4.63 | 7.864 | 356 | 83.84 | 711 |
| 725 – 749 | 92 | 22,331,108.12 | 2.40 | 7.990 | 357 | 84.00 | 735 |
| 750 – 774 | 51 | 13,841,120.45 | 1.49 | 8.436 | 355 | 84.20 | 762 |
| 775 – 799 | 16 | 5,762,021.07 | 0.62 | 7.623 | 357 | 85.65 | 785 |
| 800 – 824 | 4 | 606,131.48 | 0.07 | 8.932 | 357 | 91.02 | 802 |
| **Total** | **4,209** | **$930,509,120.19** | **100.00%** | **8.170%** | **357** | **80.50%** | **623** |

| Original LTV (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 0.01 – 50.00 | 118 | $17,081,050.95 | 1.84% | 7.880% | 355 | 41.58% | 578 |
| 50.01 – 55.00 | 67 | 12,214,002.86 | 1.31 | 7.926 | 355 | 52.87 | 586 |
| 55.01 – 60.00 | 110 | 21,993,325.40 | 2.36 | 7.794 | 354 | 58.09 | 591 |
| 60.01 – 65.00 | 160 | 33,368,093.20 | 3.59 | 7.774 | 355 | 63.37 | 594 |
| 65.01 – 70.00 | 194 | 39,916,068.66 | 4.29 | 8.151 | 354 | 68.60 | 586 |
| 70.01 – 75.00 | 288 | 64,983,631.93 | 6.98 | 8.145 | 356 | 73.86 | 586 |
| 75.01 – 80.00 | 1652 | 397,804,250.75 | 42.75 | 7.914 | 357 | 79.83 | 634 |
| 80.01 – 85.00 | 114 | 96,668,294.00 | 10.39 | 8.137 | 357 | 84.50 | 607 |
| 85.01 – 90.00 | 655 | 158,317,669.49 | 17.01 | 8.513 | 357 | 89.74 | 630 |
| 90.01 – 95.00 | 243 | 61,381,836.63 | 6.60 | 8.275 | 356 | 94.68 | 654 |
| 95.01 – 100.00 | 308 | 26,780,896.32 | 2.88 | 11.019 | 356 | 99.97 | 658 |
| **Total** | **4,209** | **$930,509,120.19** | **100.00%** | **8.170%** | **357** | **80.50%** | **623** |

| Original Term (months) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 120 | 3 | $ 146,331.61 | 0.02% | 8.565% | 118 | 66.50% | 608 |
| 180 | 23 | 2,562,271.98 | 0.28 | 8.373 | 177 | 75.44 | 634 |
| 240 | 21 | 2,306,014.90 | 0.25 | 7.629 | 237 | 70.14 | 638 |
| 300 | 1 | 248,655.28 | 0.03 | 6.475 | 296 | 55.56 | 650 |
| 360 | 4,161 | 925,245,846.42 | 99.43 | 8.172 | 357 | 80.55 | 623 |
| **Total** | **4,209** | **$930,509,120.19** | **100.00%** | **8.170%** | **357** | **80.50%** | **623** |

As of the Cut-off Date, the weighted average Original Term to Maturity of the Mortgage Loans in the Aggregate Pool is expected to be approximately 359 months.

Confidential

JPMC_DEX_000402660

| Stated Remaining Term (months) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 61 - 120 | 3 | $146,331.61 | 0.02% | 8.565% | 118 | 66.50% | 608 |
| 121 - 180 | 23 | 2,562,271.98 | 0.28 | 8.373 | 177 | 75.44 | 634 |
| 181 - 240 | 21 | 2,306,014.90 | 0.25 | 7.629 | 237 | 70.14 | 638 |
| 241 - 300 | 1 | 248,655.28 | 0.03 | 6.475 | 296 | 55.56 | 650 |
| 301 - 360 | 4,161 | 925,245,846.42 | 99.43 | 8.172 | 357 | 80.55 | 623 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Debt Ratio (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 0.01 - 20.00 | 121 | $21,233,448.46 | 2.28% | 8.633% | 357 | 80.21% | 616 |
| 20.01 - 25.00 | 145 | 26,565,713.15 | 2.85 | 8.386 | 356 | 78.65 | 616 |
| 25.01 - 30.00 | 258 | 44,598,053.23 | 4.79 | 8.144 | 357 | 79.62 | 618 |
| 30.01 - 35.00 | 405 | 79,529,850.47 | 8.55 | 8.213 | 356 | 79.81 | 620 |
| 35.01 - 40.00 | 627 | 131,347,794.39 | 14.12 | 8.264 | 356 | 79.95 | 625 |
| 40.01 - 45.00 | 898 | 206,060,244.87 | 22.14 | 8.188 | 356 | 81.02 | 625 |
| 45.01 - 50.00 | 1,456 | 354,942,390.31 | 38.14 | 8.155 | 357 | 82.32 | 628 |
| 50.01 - 55.00 | 286 | 63,777,767.25 | 6.85 | 7.767 | 356 | 72.61 | 597 |
| 55.01 - 60.00 | 13 | 2,453,858.06 | 0.26 | 7.185 | 357 | 69.23 | 620 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

As of the Cut-off Date, the weighted average Debt Ratio of the Mortgage Loans in the Aggregate Pool is expected to be approximately 41.94%.

| Fixed Rate/Adjustable Rate | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Adjustable Rate | 3,183 | $751,727,557.97 | 80.79% | 8.264% | 358 | 80.34% | 619 |
| Fixed Rate | 1,026 | 178,781,562.22 | 19.21 | 7.775 | 352 | 81.16 | 639 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Product | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 2/28 ARM | 962 | $197,557,901.47 | 21.23% | 8.996% | 358 | 79.99% | 595 |
| 2/28 ARM Balloon | 1,890 | 467,838,770.15 | 50.28 | 8.061 | 358 | 80.33 | 624 |
| 2/28 ARM IO | 210 | 58,872,122.74 | 6.33 | 7.773 | 358 | 80.73 | 658 |
| 3/27 ARM | 64 | 10,471,138.41 | 1.13 | 8.090 | 356 | 79.91 | 606 |
| 3/27 ARM Balloon | 30 | 7,498,722.17 | 0.81 | 7.917 | 357 | 88.32 | 619 |
| 3/27 ARM IO | 27 | 9,488,903.03 | 1.02 | 6.601 | 356 | 82.28 | 647 |
| Fixed | 762 | 106,641,286.45 | 11.46 | 8.297 | 349 | 82.79 | 637 |
| Fixed Balloon | 264 | 72,140,275.77 | 7.75 | 7.004 | 356 | 78.74 | 643 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

S-28

JPMC_DEX_000402661

| Interest Only | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Not Interest Only | 3,972 | $862,148,094.42 | 92.65% | 8.215% | 356 | 80.46% | 620 |
| Interest Only | 237 | 68,361,025.77 | 7.35 | 7.610 | 358 | 80.94 | 656 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Prepayment Penalty Original Term | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| None | 1,566 | $325,797,234.19 | 35.01% | 8.764% | 357 | 81.14% | 620 |
| 12 months | 137 | 37,913,056.03 | 4.07 | 8.087 | 356 | 80.45 | 643 |
| 24 months | 1,945 | 448,790,803.81 | 48.23 | 7.997 | 358 | 80.28 | 620 |
| 36 months | 561 | 118,008,026.16 | 12.68 | 7.217 | 353 | 79.57 | 637 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

As of the Cut-off Date, the non-zero weighted average Original Prepayment Penalty Term of the Mortgage Loans in the Aggregate Pool is expected to be approximately 26 months.

| Lien | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| First Lien | 3,911 | $907,051,878.79 | 97.48% | 8.089% | 357 | 80.00% | 622 |
| Second Lien | 298 | 23,457,241.40 | 2.52 | 11.308 | 355 | 99.85 | 656 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Documentation Type | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Full Documentation | 2,399 | $477,725,272.90 | 51.34% | 7.719% | 356 | 80.03% | 609 |
| Limited Documentation | 66 | 15,149,985.49 | 1.63 | 7.776 | 350 | 80.19 | 610 |
| Stated Documentation | 1,744 | 437,633,861.80 | 47.03 | 8.676 | 357 | 81.02 | 639 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Loan Purpose | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Purchase | 1,731 | $378,987,084.76 | 40.73% | 8.384% | 357 | 83.41% | 650 |
| Cash-Out Refinance | 2,071 | 460,279,384.88 | 49.47 | 8.085 | 356 | 77.89 | 600 |
| Rate_ Term Refinance | 407 | 91,242,650.55 | 9.81 | 7.718 | 356 | 81.60 | 628 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Property Type | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Single Family | 3,111 | $676,091,509.04 | 72.66% | 8.136% | 356 | 80.04% | 618 |
| Multi Family | 284 | 81,917,340.49 | 8.80 | 8.181 | 357 | 81.45 | 648 |
| PUD | 513 | 110,000,544.91 | 11.82 | 8.334 | 356 | 82.39 | 627 |
| Condo | 301 | 62,499,725.75 | 6.72 | 8.238 | 357 | 80.86 | 637 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

Confidential

| Occupancy Status | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Owner | 3,686 | $826,040,104.33 | 88.77% | 8.053% | 356 | 79.99% | 619 |
| Non-Owner | 384 | 76,876,110.45 | 8.26 | 9.216 | 358 | 85.14 | 656 |
| Second Home | 139 | 27,592,905.41 | 2.97 | 8.764 | 357 | 82.80 | 659 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Credit Grade | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| AA | 3,236 | $735,464,120.81 | 79.04% | 8.030% | 356 | 81.77% | 635 |
| A+ | 360 | 80,319,761.13 | 8.63 | 8.329 | 358 | 79.89 | 595 |
| A- | 209 | 44,802,764.50 | 4.81 | 8.524 | 357 | 76.59 | 576 |
| B | 197 | 36,291,650.61 | 3.90 | 9.098 | 355 | 73.45 | 558 |
| C | 192 | 31,225,307.36 | 3.36 | 9.281 | 357 | 67.32 | 553 |
| C- | 15 | 2,405,515.78 | 0.26 | 10.816 | 357 | 62.16 | 553 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

S-30

JPMC_DEX_000402663

| State | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Alabama | 42 | $ 3,833,089.42 | 0.41% | 9.227% | 358 | 83.60% | 594 |
| Alaska | 10 | 1,895,858.02 | 0.20 | 8.626 | 358 | 81.73 | 593 |
| Arizona | 183 | 34,005,056.57 | 3.65 | 8.410 | 356 | 80.93 | 617 |
| Arkansas | 23 | 2,674,782.64 | 0.29 | 8.623 | 358 | 85.64 | 613 |
| California | 1,193 | 377,415,142.09 | 40.56 | 7.842 | 357 | 79.45 | 629 |
| Colorado | 47 | 8,763,821.94 | 0.94 | 7.967 | 357 | 84.12 | 627 |
| Connecticut | 53 | 11,056,174.36 | 1.19 | 8.519 | 349 | 80.36 | 606 |
| Delaware | 9 | 1,636,107.74 | 0.18 | 8.978 | 358 | 80.40 | 598 |
| District Of Columbia | 4 | 1,175,874.45 | 0.13 | 8.495 | 358 | 86.45 | 621 |
| Florida | 424 | 76,441,230.50 | 8.21 | 8.610 | 356 | 80.60 | 623 |
| Georgia | 120 | 17,613,222.25 | 1.89 | 8.594 | 357 | 83.44 | 608 |
| Hawaii | 55 | 18,077,863.29 | 1.94 | 7.148 | 356 | 82.39 | 669 |
| Idaho | 22 | 3,132,164.94 | 0.34 | 8.536 | 358 | 81.24 | 628 |
| Illinois | 154 | 28,235,195.00 | 3.03 | 8.566 | 358 | 82.04 | 611 |
| Indiana | 25 | 2,631,926.49 | 0.28 | 8.148 | 357 | 85.49 | 623 |
| Iowa | 22 | 1,769,388.52 | 0.19 | 8.543 | 358 | 83.03 | 614 |
| Kansas | 15 | 1,844,721.56 | 0.20 | 9.250 | 357 | 81.24 | 598 |
| Kentucky | 8 | 689,820.08 | 0.07 | 8.072 | 338 | 81.90 | 603 |
| Louisiana | 10 | 1,116,651.79 | 0.12 | 8.417 | 357 | 80.99 | 618 |
| Maine | 25 | 4,581,066.94 | 0.49 | 9.146 | 358 | 84.02 | 590 |
| Maryland | 128 | 27,483,381.75 | 2.95 | 8.324 | 356 | 78.43 | 597 |
| Massachusetts | 141 | 38,991,680.22 | 4.19 | 8.256 | 357 | 80.76 | 616 |
| Michigan | 77 | 8,297,515.43 | 0.89 | 9.006 | 356 | 82.54 | 598 |
| Minnesota | 42 | 6,946,309.20 | 0.75 | 8.072 | 353 | 79.96 | 633 |
| Mississippi | 15 | 1,805,907.79 | 0.19 | 8.444 | 357 | 85.09 | 602 |
| Missouri | 27 | 3,708,512.37 | 0.40 | 9.350 | 352 | 82.03 | 607 |
| Montana | 6 | 746,531.51 | 0.08 | 8.122 | 357 | 84.07 | 607 |
| Nebraska | 8 | 684,997.12 | 0.07 | 9.170 | 358 | 88.46 | 606 |
| Nevada | 90 | 18,108,630.16 | 1.95 | 8.286 | 357 | 82.82 | 650 |
| New Hampshire | 10 | 2,180,312.68 | 0.23 | 9.069 | 351 | 80.58 | 573 |
| New Jersey | 202 | 52,297,632.72 | 5.62 | 8.446 | 356 | 80.25 | 620 |
| New Mexico | 32 | 5,480,047.31 | 0.59 | 8.464 | 357 | 80.76 | 605 |
| New York | 178 | 49,474,440.12 | 5.32 | 7.927 | 357 | 80.31 | 643 |
| North Carolina | 29 | 3,638,939.58 | 0.39 | 8.697 | 358 | 82.26 | 608 |
| North Dakota | 3 | 250,326.73 | 0.03 | 9.494 | 358 | 90.02 | 682 |
| Ohio | 71 | 7,511,269.60 | 0.81 | 9.043 | 358 | 86.61 | 599 |
| Oklahoma | 15 | 1,529,006.02 | 0.16 | 8.054 | 357 | 81.88 | 620 |
| Oregon | 42 | 7,329,357.81 | 0.79 | 8.138 | 356 | 81.88 | 620 |
| Pennsylvania | 49 | 7,114,203.28 | 0.76 | 8.531 | 354 | 80.19 | 601 |
| Rhode Island | 16 | 3,720,283.77 | 0.40 | 8.895 | 358 | 85.83 | 615 |
| South Carolina | 41 | 5,322,106.16 | 0.57 | 8.595 | 357 | 82.19 | 603 |
| South Dakota | 1 | 60,690.07 | 0.01 | 9.500 | 358 | 75.00 | 519 |
| Tennessee | 41 | 4,750,541.99 | 0.51 | 8.545 | 352 | 80.52 | 624 |
| Texas | 268 | 32,278,397.94 | 3.47 | 8.640 | 349 | 79.84 | 599 |
| Utah | 35 | 6,378,035.81 | 0.69 | 8.730 | 354 | 81.81 | 639 |
| Vermont | 1 | 247,235.58 | 0.03 | 9.125 | 358 | 90.00 | 651 |
| Virginia | 58 | 11,557,903.48 | 1.24 | 8.029 | 357 | 83.53 | 622 |
| Washington | 69 | 15,047,910.41 | 1.62 | 7.917 | 357 | 81.91 | 622 |
| West Virginia | 3 | 389,978.32 | 0.04 | 9.095 | 357 | 85.32 | 683 |
| Wisconsin | 66 | 8,527,963.33 | 0.92 | 8.935 | 358 | 79.16 | 591 |
| Wyoming | 1 | 59,913.34 | 0.01 | 7.200 | 356 | 80.00 | 717 |
| Total | 4,209 | $930,509,120.19 | 100.00% | 8.170% | 357 | 80.50% | 623 |

As of the Cut-off Date, no more than approximately 0.49% of the Mortgage Loans in the Aggregate Pool will be secured by Mortgaged Properties in any one postal zip code area

S-31

Confidential

JPMC_DEX_000402664

36

| Margin (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 3.000 - 3.499 | 2 | $  164,638.18 | 0.02% | 9.551% | 358 | 76.44% | 561 |
| 3.500 - 3.999 | 1 | 173,675.80 | 0.02 | 7.450 | 353 | 90.00 | 728 |
| 4.000 - 4.499 | 2 | 283,199.18 | 0.04 | 9.770 | 357 | 67.59 | 505 |
| 5.000 - 5.499 | 5 | 1,144,150.65 | 0.15 | 7.452 | 355 | 81.32 | 639 |
| 5.500 - 5.999 | 933 | 217,073,728.20 | 28.88 | 7.792 | 357 | 80.40 | 621 |
| 6.000 - 6.499 | 1,904 | 463,998,749.16 | 61.72 | 8.344 | 358 | 81.36 | 626 |
| 6.500 - 6.999 | 188 | 39,856,986.64 | 5.30 | 9.137 | 358 | 76.35 | 577 |
| 7.000 - 7.499 | 144 | 27,543,086.80 | 3.66 | 9.399 | 358 | 68.57 | 558 |
| 7.500 - 7.999 | 2 | 495,451.88 | 0.07 | 8.371 | 358 | 77.59 | 586 |
| 8.000 - 8.499 | 1 | 534,891.48 | 0.07 | 7.990 | 358 | 80.00 | 653 |
| 8.500 - 8.999 | 1 | 459,000.00 | 0.06 | 8.250 | 358 | 89.13 | 603 |
| **Total** | **3,183** | **$751,727,557.97** | **100.00%** | **8.264%** | **358** | **80.34%** | **619** |

As of the Cut-off Date, the weighted average Margin of the Adjustable-Rate Mortgage Loans in the Aggregate Pool is expected to be approximately 6.197%

| Minimum Rate (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 5.500 - 5.999 | 46 | $ 15,688,898.53 | 2.09% | 5.752% | 357 | 76.85% | 651 |
| 6.000 - 6.499 | 62 | 15,856,015.48 | 2.11 | 6.304 | 357 | 75.39 | 640 |
| 6.500 - 6.999 | 254 | 71,656,996.40 | 9.53 | 6.781 | 357 | 77.36 | 633 |
| 7.000 - 7.499 | 336 | 88,638,508.32 | 11.79 | 7.284 | 357 | 80.67 | 628 |
| 7.500 - 7.999 | 606 | 158,062,167.70 | 21.03 | 7.776 | 358 | 79.82 | 629 |
| 8.000 - 8.499 | 407 | 97,568,761.86 | 12.98 | 8.242 | 358 | 80.49 | 627 |
| 8.500 - 8.999 | 521 | 118,723,532.67 | 15.79 | 8.735 | 358 | 80.60 | 610 |
| 9.000 - 9.499 | 326 | 65,305,299.69 | 8.69 | 9.234 | 358 | 81.33 | 612 |
| 9.500 - 9.999 | 309 | 65,336,827.93 | 8.69 | 9.726 | 358 | 83.21 | 599 |
| 10.000 - 10.499 | 146 | 25,120,946.83 | 3.34 | 10.197 | 358 | 82.03 | 583 |
| 10.500 - 10.999 | 107 | 20,215,970.65 | 2.69 | 10.708 | 358 | 83.75 | 588 |
| 11.000 - 11.499 | 43 | 6,769,168.56 | 0.90 | 11.236 | 358 | 82.21 | 575 |
| 11.500 - 11.999 | 11 | 1,520,721.96 | 0.20 | 11.751 | 358 | 68.85 | 545 |
| 12.000 - 12.499 | 7 | 1,094,124.56 | 0.15 | 12.181 | 358 | 77.17 | 551 |
| 12.500 - 12.999 | 2 | 169,616.83 | 0.02 | 12.731 | 357 | 72.43 | 512 |
| **Total** | **3,183** | **$751,727,557.97** | **100.00%** | **8.264%** | **358** | **80.34%** | **619** |

As of the Cut-off Date, the weighted average Minimum Rate of the Adjustable-Rate Mortgage Loans in the Aggregate Pool is expected to be approximately 8.264% per annum.

Confidential

JPMC_DEX_000402665

| Maximum Rate (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 12.500 - 12.999 | 48 | $ 15,931,976.55 | 2.12% | 5.768% | 357 | 77.01% | 651 |
| 13.000 - 13.499 | 63 | 16,032,284.27 | 2.13 | 6.312 | 357 | 75.44 | 640 |
| 13.500 - 13.999 | 254 | 71,747,964.90 | 9.54 | 6.786 | 357 | 77.34 | 633 |
| 14.000 - 14.499 | 337 | 88,759,862.71 | 11.81 | 7.287 | 357 | 80.71 | 628 |
| 14.500 - 14.999 | 609 | 158,978,214.37 | 21.15 | 7.782 | 358 | 79.84 | 629 |
| 15.000 - 15.499 | 415 | 99,233,103.62 | 13.20 | 8.263 | 358 | 80.47 | 626 |
| 15.500 - 15.999 | 520 | 118,458,695.72 | 15.76 | 8.745 | 358 | 80.63 | 610 |
| 16.000 - 16.499 | 318 | 63,602,466.17 | 8.46 | 9.237 | 358 | 81.37 | 612 |
| 16.500 - 16.999 | 307 | 65,044,844.08 | 8.65 | 9.736 | 358 | 83.10 | 599 |
| 17.000 - 17.499 | 144 | 24,861,815.41 | 3.31 | 10.196 | 358 | 81.98 | 583 |
| 17.500 - 17.999 | 105 | 19,522,698.26 | 2.60 | 10.707 | 358 | 84.03 | 590 |
| 18.000 - 18.499 | 43 | 6,769,168.56 | 0.90 | 11.236 | 358 | 82.21 | 575 |
| 18.500 - 18.999 | 11 | 1,520,721.96 | 0.20 | 11.751 | 358 | 68.85 | 545 |
| 19.000 - 19.499 | 7 | 1,094,124.56 | 0.15 | 12.181 | 358 | 77.17 | 551 |
| 19.500 - 19.999 | 2 | 169,616.83 | 0.02 | 12.731 | 357 | 72.43 | 512 |
| Total | 3,183 | $751,727,557.97 | 100.00% | 8.264% | 358 | 80.34% | 619 |

As of the Cut-off Date, the weighted average Maximum Rate of the Adjustable-Rate Mortgage Loans in the Aggregate Pool is expected to be approximately 15.259% per annum.

| Initial Periodic Rate Cap (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 1.000 | 21 | $ 4,211,564.80 | 0.56% | 9.189% | 358 | 84.18% | 588 |
| 1.500 | 3,162 | 747,515,993.17 | 99.44 | 8.259 | 358 | 80.32 | 619 |
| Total | 3,183 | $751,727,557.97 | 100.00% | 8.264% | 358 | 80.34% | 619 |

As of the Cut-off Date, the weighted average Initial Periodic Rate Cap of the Adjustable-Rate Mortgage Loans in the Aggregate Pool is expected to be approximately 1.497%.

| Subsequent Periodic Rate Cap (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 1.000 | 21 | $4,211,564.80 | 0.56% | 9.189% | 358 | 84.18% | 588 |
| 1.500 | 3,162 | 747,515,993.17 | 99.44 | 8.259 | 358 | 80.32 | 619 |
| Total | 3,183 | $751,727,557.97 | 100.00% | 8.264% | 358 | 80.34% | 619 |

As of the Cut-off Date, the weighted average Subsequent Periodic Rate Cap of the Adjustable-Rate Mortgage Loans in the Aggregate Pool is expected to be approximately 1.497%.

| Months to Next Rate Adjustment | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 16 – 18 | 3 | $ 739,337.40 | 0.10% | 7.238% | 354 | 82.32% | 620 |
| 19 – 21 | 864 | 208,661,090.25 | 27.76 | 7.838 | 357 | 79.48 | 618 |
| 22 – 24 | 2,195 | 514,868,366.71 | 68.49 | 8.478 | 358 | 80.55 | 620 |
| 28 – 30 | 26 | 5,144,974.56 | 0.68 | 6.495 | 354 | 83.73 | 640 |
| 31 – 33 | 43 | 12,190,699.83 | 1.62 | 7.137 | 356 | 83.77 | 634 |
| 34 – 36 | 52 | 10,123,089.22 | 1.35 | 8.524 | 358 | 81.77 | 603 |
| Total | 3,183 | $751,727,557.97 | 100.00% | 8.264% | 358 | 80.34% | 619 |

As of the Cut-off Date, the weighted average Months to Next Rate Adjustment of the Adjustable-Rate Mortgage Loans in the Aggregate Pool is expected to be approximately 22 months.

S-33

JPMC_DEX_000402666

**Tabular Characteristics of the Group 1 Mortgage Loans**

The Group 1 Mortgage Loans are expected to have the following approximate aggregate characteristics as of the Cut-off Date.

| | |
|---|---|
| Number of Group 1 Mortgage Loans | 2,274 |
| Total Stated Principal Balance................................................................................................. | $438,971,249 |
| Current Mortgage Rates: | |
|     Weighted Average............................................................................................... | 8.170% |
|     Range............................................................................................................... | 5.000% - 12.200% |
| Weighted Average Margin ......................................................................................... | 6.193% |
| Weighted Average Remaining Term to Maturity (in months)........................................... | 356 |

The Stated Principal Balances of the Group 1 Mortgage Loans range from approximately $49,269 to approximately $633,535. The Group 1 Mortgage Loans have an average Stated Principal Balance of approximately $193,039.

The weighted average Loan-to-Value Ratio at origination of the Group 1 Mortgage Loans is approximately 80.50% and no Group 1 Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 100%.

No more than approximately 0.58% of the Group 1 Mortgage Loans are secured by Mortgaged Properties located in any one zip code area.

The following tables set forth certain information, as of the Cut-off Date, as to the Group 1 Mortgage Loans. Other than with respect to rates of interest, percentages (approximate) are stated by Stated Principal Balance of the Group 1 Mortgage Loans as of the Cut-off Date and, due to rounding, may not total 100%.

S-34

JPMC_DEX_000402667

| Stated Principal Balance ($) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 50,000 or less | 10 | $498,567.80 | 0.11% | 8.417% | 346 | 68.27% | 616 |
| 50,001 - 100,000 | 439 | 33,539,956.27 | 7.64 | 8.709 | 353 | 81.09 | 615 |
| 100,001 - 150,000 | 515 | 64,088,983.23 | 14.60 | 8.311 | 354 | 78.98 | 615 |
| 150,001 - 200,000 | 384 | 67,051,935.22 | 15.27 | 8.305 | 357 | 79.56 | 614 |
| 200,001 - 250,000 | 307 | 69,077,795.38 | 15.74 | 8.236 | 357 | 79.66 | 622 |
| 250,001 - 300,000 | 242 | 66,691,488.74 | 15.19 | 7.873 | 357 | 80.14 | 624 |
| 300,001 - 350,000 | 171 | 55,807,234.02 | 12.71 | 7.981 | 357 | 80.77 | 623 |
| 350,001 - 400,000 | 134 | 50,070,766.20 | 11.41 | 8.138 | 358 | 82.65 | 630 |
| 400,001 - 450,000 | 47 | 19,524,906.71 | 4.45 | 7.945 | 357 | 83.59 | 639 |
| 450,001 - 500,000 | 14 | 6,723,621.15 | 1.53 | 7.949 | 357 | 85.74 | 688 |
| 500,001 - 550,000 | 9 | 4,701,764.68 | 1.07 | 7.528 | 356 | 80.16 | 661 |
| 550,001 - 600,000 | 1 | 560,694.27 | 0.13 | 9.550 | 357 | 85.00 | 717 |
| 600,001 - 650,000 | 1 | 633,534.97 | 0.14 | 7.150 | 358 | 93.24 | 699 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

As of the Cut-off Date, the average Stated Principal Balance of the Mortgage Loans in Group 1 is expected to be approximately **$193,039.**

| Current Mortgage Rate (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 5.000 - 5.499 | 1 | $349,081.27 | 0.08% | 5.000% | 356 | 82.85% | 732 |
| 5.500 - 5.999 | 26 | 7,228,594.40 | 1.65 | 5.875 | 351 | 76.19 | 686 |
| 6.000 - 6.499 | 82 | 19,716,100.99 | 4.49 | 6.276 | 353 | 77.60 | 674 |
| 6.500 - 6.999 | 250 | 56,450,207.70 | 12.86 | 6.745 | 356 | 76.71 | 630 |
| 7.000 - 7.499 | 259 | 53,667,817.72 | 12.23 | 7.271 | 356 | 80.04 | 627 |
| 7.500 - 7.999 | 416 | 82,552,041.23 | 18.81 | 7.761 | 356 | 79.83 | 622 |
| 8.000 - 8.499 | 264 | 46,665,096.11 | 10.63 | 8.216 | 357 | 80.42 | 617 |
| 8.500 - 8.999 | 350 | 65,861,366.43 | 15.00 | 8.740 | 357 | 81.44 | 614 |
| 9.000 - 9.499 | 210 | 33,299,385.43 | 7.59 | 9.245 | 356 | 82.20 | 612 |
| 9.500 - 9.999 | 213 | 39,876,467.74 | 9.08 | 9.727 | 357 | 84.01 | 614 |
| 10.000 - 10.499 | 97 | 14,798,282.46 | 3.37 | 10.190 | 356 | 84.37 | 612 |
| 10.500 - 10.999 | 74 | 13,422,578.91 | 3.06 | 10.681 | 358 | 85.24 | 608 |
| 11.000 - 11.499 | 24 | 3,772,137.88 | 0.86 | 11.204 | 358 | 82.19 | 594 |
| 11.500 - 11.999 | 5 | 671,945.61 | 0.15 | 11.800 | 358 | 77.10 | 575 |
| 12.000 - 12.499 | 3 | 640,144.76 | 0.15 | 12.164 | 358 | 80.41 | 579 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

As of the Cut-off Date, the weighted average current Mortgage Rate of the Mortgage Loans in Group 1 is expected to be approximately 8.170% per annum.

S-35

JPMC_DEX_000402668

| Credit Score | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 500 - 524 | 63 | S 10,698,534.45 | 2.44% | 9.353% | 358 | 75.77% | 515 |
| 525 - 549 | 79 | 13,922,641.10 | 3.17 | 9.112 | 358 | 74.19 | 536 |
| 550 - 574 | 310 | 57,432,929.82 | 13.08 | 8.577 | 357 | 77.17 | 562 |
| 575 - 599 | 389 | 69,443,307.56 | 15.82 | 8.421 | 357 | 80.27 | 588 |
| 600 - 624 | 448 | 86,697,011.44 | 19.75 | 7.946 | 357 | 80.28 | 612 |
| 625 - 649 | 378 | 71,985,993.04 | 16.40 | 8.077 | 355 | 81.97 | 637 |
| 650 - 674 | 282 | 58,250,483.29 | 13.27 | 7.790 | 355 | 81.91 | 660 |
| 675 - 699 | 157 | 33,646,614.92 | 7.66 | 7.844 | 356 | 82.02 | 686 |
| 700 - 724 | 81 | 16,537,323.51 | 3.77 | 7.846 | 355 | 84.25 | 710 |
| 725 - 749 | 55 | 12,268,314.90 | 2.79 | 7.995 | 357 | 83.86 | 734 |
| 750 - 774 | 26 | 6,392,581.66 | 1.46 | 8.466 | 355 | 84.71 | 761 |
| 775 - 799 | 4 | 1,234,617.89 | 0.28 | 6.914 | 358 | 72.66 | 782 |
| 800 - 824 | 2 | 460,895.06 | 0.10 | 8.063 | 357 | 88.19 | 800 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

| Original LTV (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 0.01 - 50.00 | 33 | S5,904,152.16 | 1.14% | 7.908% | 355 | 46.41% | 594 |
| 50.01 - 55.00 | 45 | 7,702,991.32 | 1.75 | 7.864 | 355 | 52.87 | 606 |
| 55.01 - 60.00 | 69 | 14,004,793.33 | 3.19 | 7.716 | 352 | 58.17 | 617 |
| 60.01 - 65.00 | 112 | 21,077,594.20 | 4.80 | 7.744 | 355 | 63.27 | 610 |
| 65.01 - 70.00 | 119 | 23,191,853.75 | 5.28 | 7.987 | 352 | 68.56 | 606 |
| 70.01 - 75.00 | 158 | 31,551,288.14 | 7.19 | 8.166 | 356 | 73.87 | 601 |
| 75.01 - 80.00 | 791 | 144,410,245.86 | 32.90 | 7.964 | 357 | 79.69 | 625 |
| 80.01 - 85.00 | 274 | 58,168,925.89 | 13.25 | 8.168 | 357 | 84.44 | 613 |
| 85.01 - 90.00 | 489 | 95,140,886.84 | 21.67 | 8.657 | 358 | 89.73 | 633 |
| 90.01 - 95.00 | 177 | 37,559,578.92 | 8.56 | 8.354 | 356 | 94.63 | 650 |
| 95.01 - 100.00 | 7 | 1,158,938.23 | 0.26 | 8.328 | 357 | 99.91 | 699 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

| Original Term (months) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 120 | 1 | S 59,327.73 | 0.01% | 7.615% | 118 | 69.77% | 594 |
| 180 | 14 | 1,375,522.70 | 0.31 | 8.409 | 178 | 71.98 | 643 |
| 240 | 17 | 1,931,386.00 | 0.44 | 7.467 | 237 | 68.51 | 645 |
| 300 | 1 | 248,655.28 | 0.06 | 6.475 | 296 | 55.56 | 650 |
| 360 | 2,241 | 435,356,356.93 | 99.18 | 8.174 | 357 | 80.59 | 623 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

As of the Cut-off Date, the weighted average Original Term to Maturity of the Mortgage Loans in Group 1 is expected to be approximately 359 months.

S-36

JPMC_DEX_000402669

| Stated Remaining Term (months) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 61 - 120 | 1 | $ 59,327.73 | 0.01% | 7.615% | 118 | 69.77% | 594 |
| 121 - 180 | 14 | 1,375,522.70 | 0.31 | 8.409 | 178 | 71.98 | 643 |
| 181 - 240 | 17 | 1,931,386.00 | 0.44 | 7.467 | 237 | 68.51 | 645 |
| 241 - 300 | 1 | 248,655.28 | 0.06 | 6.475 | 296 | 55.56 | 650 |
| 301 - 360 | 2,241 | 435,356,356.93 | 99.18 | 8.174 | 357 | 80.59 | 623 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

| Debt Ratio (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 0.01 - 20.00 | 80 | $ 13,429,278.34 | 3.06% | 8.665% | 357 | 80.40% | 616 |
| 20.01 - 25.00 | 79 | 11,704,289.96 | 2.67 | 8.471 | 355 | 79.21 | 614 |
| 25.01 - 30.00 | 169 | 27,046,672.85 | 6.16 | 8.116 | 357 | 79.76 | 625 |
| 30.01 - 35.00 | 228 | 42,318,793.68 | 9.64 | 8.144 | 356 | 80.22 | 621 |
| 35.01 - 40.00 | 336 | 64,058,667.99 | 14.59 | 8.342 | 356 | 80.07 | 628 |
| 40.01 - 45.00 | 468 | 94,152,129.41 | 21.45 | 8.218 | 356 | 80.27 | 623 |
| 45.01 - 50.00 | 738 | 151,366,151.77 | 34.48 | 8.129 | 357 | 82.69 | 624 |
| 50.01 - 55.00 | 170 | 33,972,653.14 | 7.74 | 7.686 | 355 | 73.62 | 613 |
| 55.01 - 60.00 | 6 | 923,211.50 | 0.21 | 7.796 | 357 | 78.11 | 691 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

As of the Cut-off Date, the weighted average Debt Ratio of the Mortgage Loans in Group 1 is expected to be approximately 41.27%.

| Fixed Rate/Adjustable Rate | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Adjustable Rate | 1,790 | $353,410,761.66 | 80.51% | 8.356% | 358 | 81.06% | 619 |
| Fixed Rate | 484 | 85,560,486.98 | 19.49 | 7.405 | 351 | 78.16 | 639 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

| Product | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 2/28 ARM | 530 | $ 96,764,720.68 | 22.04% | 9.027% | 358 | 81.01% | 605 |
| 2/28 ARM Balloon | 1,093 | 222,492,740.43 | 50.69 | 8.156 | 358 | 81.02 | 622 |
| 2/28 ARM IO | 93 | 19,880,567.87 | 4.53 | 7.699 | 358 | 78.93 | 643 |
| 3/27 ARM | 41 | 5,563,680.39 | 1.27 | 8.197 | 356 | 79.35 | 609 |
| 3/27 ARM Balloon | 21 | 5,321,602.55 | 1.21 | 7.785 | 357 | 91.34 | 634 |
| 3/27 ARM IO | 12 | 3,387,449.74 | 0.77 | 7.307 | 356 | 84.09 | 643 |
| Fixed | 329 | 52,125,027.42 | 11.87 | 7.609 | 347 | 77.66 | 633 |
| Fixed Balloon | 155 | 33,435,459.56 | 7.62 | 7.087 | 356 | 78.94 | 647 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

| Interest Only | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Not Interest Only | 2,169 | $415,703,231.03 | 94.70% | 8.200% | 356 | 80.54% | 622 |
| Interest Only | 105 | 23,268,017.61 | 5.30 | 7.642 | 357 | 79.68 | 643 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

S-37

JPMC_DEX_000402670

| Prepayment Penalty Original Term | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| None | 880 | $168,781,456.46 | 38.45% | 8.679% | 356 | 81.38% | 623 |
| 12 months | 68 | 17,060,962.62 | 3.89 | 8.013 | 356 | 81.09 | 639 |
| 24 months | 997 | 192,672,387.84 | 43.89 | 8.017 | 357 | 80.26 | 616 |
| 36 months | 329 | 60,456,441.72 | 13.77 | 7.282 | 353 | 78.61 | 640 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

As of the Cut-off Date, the non-zero weighted average Original Prepayment Penalty Term of the Mortgage Loans in Group I is expected to be approximately 26 months.

| Lien | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| First Lien | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

| Documentation Type | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Full Documentation | 1,384 | $247,969,360.90 | 56.49% | 7.711% | 356 | 80.55% | 615 |
| Limited Documentation | 28 | 6,005,254.95 | 1.37 | 7.911 | 358 | 80.92 | 621 |
| Stated Documentation | 862 | 184,996,632.79 | 42.14 | 8.794 | 356 | 80.41 | 633 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

| Loan Purpose | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Purchase | 590 | $ 94,694,953.82 | 21.57% | 8.732% | 357 | 84.59% | 651 |
| Cash-Out Refinance | 1,378 | 281,488,977.52 | 64.12 | 8.084 | 356 | 78.84 | 611 |
| Rate / Term Refinance | 306 | 62,787,317.30 | 14.30 | 7.710 | 356 | 81.76 | 634 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

| Property Type | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Single Family | 1,693 | $312,766,899.65 | 71.25% | 8.126% | 356 | 80.14% | 617 |
| 2-4 Family | 174 | 48,869,194.42 | 11.13 | 8.283 | 357 | 81.16 | 642 |
| PUD | 248 | 50,218,544.93 | 11.44 | 8.269 | 356 | 81.64 | 629 |
| Condo | 159 | 27,116,609.64 | 6.18 | 8.291 | 358 | 81.32 | 641 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

| Occupancy Status | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Owner | 1,824 | $353,052,307.22 | 80.43% | 7.937% | 356 | 79.40% | 615 |
| Non-Owner | 348 | 65,811,816.94 | 14.99 | 9.239 | 358 | 86.18 | 657 |
| Second Home | 102 | 20,107,124.48 | 4.58 | 8.766 | 357 | 81.09 | 656 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

S-38

JPMC_DEX_000402671

| Credit Grade | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| AA | 1,709 | $330,476,715.09 | 75.28% | 8.013% | 356 | 81.84% | 633 |
| A+ | 237 | 49,024,180.01 | 11.17 | 8.290 | 358 | 78.94 | 604 |
| A- | 116 | 22,422,068.48 | 5.11 | 8.510 | 356 | 78.51 | 591 |
| B | 105 | 19,772,887.51 | 4.50 | 9.028 | 356 | 74.58 | 575 |
| C | 99 | 16,022,545.35 | 3.65 | 9.331 | 358 | 68.91 | 570 |
| C- | 8 | 1,252,852.20 | 0.29 | 10.599 | 357 | 64.09 | 584 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

S-39

Confidential

JPMC_DEX_000402672

| State | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Alabama | 30 | $ 2,484,212.84 | 0.57% | 9.013% | 358 | 83.81% | 609 |
| Alaska | 6 | 1,220,212.92 | 0.28 | 8.395 | 358 | 83.60 | 604 |
| Arizona | 110 | 19,249,943.73 | 4.39 | 8.308 | 356 | 80.74 | 621 |
| Arkansas | 14 | 1,663,121.05 | 0.38 | 8.389 | 358 | 82.35 | 616 |
| California | 442 | 123,239,258.74 | 28.07 | 7.831 | 358 | 77.99 | 622 |
| Colorado | 37 | 6,989,234.88 | 1.59 | 7.925 | 357 | 84.95 | 634 |
| Connecticut | 32 | 6,818,647.43 | 1.55 | 8.483 | 357 | 80.41 | 600 |
| Delaware | 8 | 1,553,346.47 | 0.35 | 8.769 | 358 | 79.35 | 596 |
| District Of Columbia | 2 | 536,290.71 | 0.12 | 8.470 | 359 | 86.21 | 654 |
| Florida | 236 | 41,112,832.05 | 9.37 | 8.487 | 357 | 80.11 | 627 |
| Georgia | 83 | 12,403,166.11 | 2.83 | 8.487 | 357 | 84.47 | 617 |
| Hawaii | 22 | 7,507,474.26 | 1.71 | 6.994 | 357 | 78.38 | 671 |
| Idaho | 17 | 2,580,672.88 | 0.59 | 8.500 | 358 | 81.31 | 633 |
| Illinois | 91 | 16,476,973.53 | 3.75 | 8.337 | 358 | 82.25 | 617 |
| Indiana | 22 | 2,277,281.97 | 0.52 | 8.175 | 357 | 85.79 | 624 |
| Iowa | 19 | 1,509,969.01 | 0.34 | 8.534 | 358 | 84.56 | 623 |
| Kansas | 8 | 1,091,873.71 | 0.25 | 8.524 | 357 | 81.74 | 623 |
| Kentucky | 7 | 624,249.06 | 0.14 | 7.985 | 336 | 82.10 | 612 |
| Louisiana | 9 | 1,061,094.36 | 0.24 | 8.253 | 357 | 80.25 | 619 |
| Maine | 13 | 2,633,276.93 | 0.60 | 9.162 | 358 | 83.56 | 584 |
| Maryland | 78 | 15,899,902.51 | 3.62 | 8.061 | 356 | 79.60 | 611 |
| Massachusetts | 79 | 21,425,531.05 | 4.88 | 8.169 | 357 | 81.80 | 625 |
| Michigan | 53 | 5,312,558.98 | 1.21 | 8.724 | 355 | 83.56 | 613 |
| Minnesota | 34 | 6,098,075.10 | 1.39 | 7.905 | 353 | 80.45 | 641 |
| Mississippi | 13 | 1,498,116.89 | 0.34 | 8.125 | 357 | 85.59 | 606 |
| Missouri | 20 | 2,491,288.08 | 0.57 | 9.448 | 358 | 84.56 | 606 |
| Montana | 2 | 242,916.29 | 0.06 | 7.917 | 358 | 88.51 | 687 |
| Nebraska | 6 | 508,645.25 | 0.12 | 8.760 | 358 | 87.03 | 615 |
| Nevada | 43 | 9,194,969.44 | 2.09 | 8.125 | 357 | 82.82 | 654 |
| New Hampshire | 7 | 1,580,469.79 | 0.36 | 8.579 | 349 | 80.37 | 592 |
| New Jersey | 105 | 24,687,571.05 | 5.62 | 8.429 | 355 | 80.65 | 625 |
| New Mexico | 17 | 2,632,191.17 | 0.60 | 8.577 | 357 | 84.73 | 622 |
| New York | 85 | 22,826,858.11 | 5.20 | 7.914 | 356 | 78.68 | 635 |
| North Carolina | 21 | 2,920,363.02 | 0.67 | 8.491 | 358 | 83.38 | 617 |
| North Dakota | 3 | 250,326.73 | 0.06 | 9.494 | 358 | 90.02 | 682 |
| Ohio | 54 | 5,252,673.71 | 1.20 | 8.858 | 358 | 87.15 | 617 |
| Oklahoma | 10 | 848,757.06 | 0.19 | 8.427 | 357 | 82.68 | 617 |
| Oregon | 28 | 5,361,562.39 | 1.22 | 8.057 | 357 | 83.38 | 625 |
| Pennsylvania | 31 | 3,912,433.98 | 0.89 | 8.238 | 357 | 81.17 | 617 |
| Rhode Island | 11 | 2,726,761.72 | 0.62 | 8.486 | 358 | 86.10 | 622 |
| South Carolina | 28 | 3,790,665.22 | 0.86 | 8.429 | 358 | 82.05 | 611 |
| Tennessee | 25 | 2,406,602.81 | 0.55 | 8.422 | 349 | 80.13 | 632 |
| Texas | 163 | 18,464,931.00 | 4.21 | 8.495 | 344 | 79.28 | 606 |
| Utah | 24 | 3,965,614.35 | 0.90 | 8.831 | 352 | 82.02 | 634 |
| Vermont | 1 | 247,235.58 | 0.06 | 9.125 | 358 | 90.00 | 651 |
| Virginia | 29 | 5,173,556.90 | 1.18 | 7.663 | 357 | 82.90 | 616 |
| Washington | 45 | 9,846,695.09 | 2.24 | 7.974 | 357 | 85.15 | 632 |
| West Virginia | 2 | 329,054.45 | 0.07 | 8.872 | 357 | 82.60 | 680 |
| Wisconsin | 48 | 5,982,474.94 | 1.36 | 8.736 | 358 | 80.73 | 608 |
| Wyoming | 1 | 59,913.34 | 0.01 | 7.200 | 356 | 80.00 | 717 |
| Total | 2,274 | $438,971,248.64 | 100.00% | 8.170% | 356 | 80.50% | 623 |

As of the Cut-off Date, no more than approximately 0.58% of the Mortgage Loans in Group 1 will be secured by Mortgaged Properties in any one postal zip code area.

S-40

Confidential

JPMC_DEX_000402673

| Margin (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 3.000 - 3.499 | 2 | $ 164,638.18 | 0.05% | 9.551% | 358 | 76.44% | 561 |
| 3.500 - 3.999 | 1 | 173,675.80 | 0.05 | 7.450 | 353 | 90.00 | 728 |
| 4.000 - 4.499 | 1 | 146,743.68 | 0.04 | 9.650 | 357 | 70.00 | 503 |
| 5.000 - 5.499 | 2 | 301,198.32 | 0.09 | 7.171 | 355 | 85.00 | 596 |
| 5.500 - 5.999 | 548 | 105,800,087.78 | 29.94 | 7.877 | 357 | 81.74 | 617 |
| 6.000 - 6.499 | 1,054 | 209,779,138.93 | 59.36 | 8.456 | 358 | 82.06 | 627 |
| 6.500 - 6.999 | 110 | 23,217,238.89 | 6.57 | 9.062 | 358 | 76.31 | 588 |
| 7.000 - 7.499 | 70 | 13,332,588.20 | 3.77 | 9.348 | 358 | 68.41 | 575 |
| 7.500 - 7.999 | 2 | 495,451.88 | 0.14 | 8.371 | 358 | 77.59 | 586 |
| Total | 1,790 | $353,410,761.66 | 100.00% | 8.356% | 358 | 81.06% | 619 |

As of the Cut-off Date, the weighted average Margin of the Adjustable-Rate Mortgage Loans in Group 1 is expected to be approximately 6.193%.

| Minimum Rate (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 5.500 - 5.999 | 14 | $ 3,975,060.32 | 1.12% | 5.804% | 357 | 76.22% | 685 |
| 6.000 - 6.499 | 14 | 2,974,271.67 | 0.84 | 6.282 | 357 | 75.14 | 655 |
| 6.500 - 6.999 | 157 | 37,689,400.57 | 10.66 | 6.766 | 357 | 76.56 | 627 |
| 7.000 - 7.499 | 193 | 41,710,259.26 | 11.80 | 7.278 | 357 | 81.04 | 626 |
| 7.500 - 7.999 | 340 | 69,267,378.85 | 19.60 | 7.765 | 358 | 80.14 | 621 |
| 8.000 - 8.499 | 222 | 41,159,619.42 | 11.65 | 8.215 | 358 | 80.52 | 617 |
| 8.500 - 8.999 | 302 | 59,294,903.19 | 16.78 | 8.740 | 358 | 81.42 | 612 |
| 9.000 - 9.499 | 186 | 30,235,341.11 | 8.56 | 9.244 | 358 | 82.32 | 611 |
| 9.500 - 9.999 | 186 | 36,777,130.34 | 10.41 | 9.726 | 358 | 84.42 | 617 |
| 10.000 - 10.499 | 79 | 12,732,516.53 | 3.60 | 10.181 | 358 | 84.68 | 614 |
| 10.500 - 10.999 | 65 | 12,510,652.15 | 3.54 | 10.680 | 358 | 86.12 | 611 |
| 11.000 - 11.499 | 24 | 3,772,137.88 | 1.07 | 11.204 | 358 | 82.19 | 594 |
| 11.500 - 11.999 | 5 | 671,945.61 | 0.19 | 11.800 | 358 | 77.10 | 575 |
| 12.000 - 12.499 | 3 | 640,144.76 | 0.18 | 12.164 | 358 | 80.41 | 579 |
| Total | 1,790 | $353,410,761.66 | 100.00% | 8.356% | 358 | 81.06% | 619 |

As of the Cut-off Date, the weighted average Minimum Rate of the Adjustable-Rate Mortgage Loans in Group 1 is expected to be approximately 8.356% per annum.

S-41

| Maximum Rate (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 12.500 - 12.999 | 16 | $ 4,218,138.34 | 1.19% | 5.863% | 357 | 76.85% | 681 |
| 13.000 - 13.499 | 15 | 3,150,540.46 | 0.89 | 6.322 | 357 | 75.41 | 653 |
| 13.500 - 13.999 | 157 | 37,780,369.07 | 10.69 | 6.776 | 357 | 76.52 | 627 |
| 14.000 - 14.499 | 194 | 41,831,613.65 | 11.84 | 7.285 | 357 | 81.12 | 625 |
| 14.500 - 14.999 | 339 | 69,193,028.95 | 19.58 | 7.767 | 358 | 80.14 | 621 |
| 15.000 - 15.499 | 222 | 41,340,871.44 | 11.70 | 8.227 | 358 | 80.57 | 618 |
| 15.500 - 15.999 | 304 | 59,867,609.98 | 16.94 | 8.755 | 358 | 81.49 | 612 |
| 16.000 - 16.499 | 185 | 29,882,260.44 | 8.46 | 9.249 | 358 | 82.20 | 609 |
| 16.500 - 16.999 | 185 | 36,637,999.32 | 10.37 | 9.744 | 358 | 84.21 | 617 |
| 17.000 - 17.499 | 78 | 12,606,722.00 | 3.57 | 10.180 | 358 | 84.63 | 613 |
| 17.500 - 17.999 | 63 | 11,817,379.76 | 3.34 | 10.677 | 358 | 86.72 | 615 |
| 18.000 - 18.499 | 24 | 3,772,137.88 | 1.07 | 11.204 | 358 | 82.19 | 594 |
| 18.500 - 18.999 | 5 | 671,945.61 | 0.19 | 11.800 | 358 | 77.10 | 575 |
| 19.000 - 19.499 | 3 | 640,144.76 | 0.18 | 12.164 | 358 | 80.41 | 579 |
| Total | 1,790 | $353,410,761.66 | 100.00% | 8.356% | 358 | 81.06% | 619 |

As of the Cut-off Date, the weighted average Maximum Rate of the Adjustable-Rate Mortgage Loans in Group 1 is expected to be approximately 15.246% per annum.

| Initial Periodic Rate Cap (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 1.000 | 11 | $ 2,348,698.18 | 0.66% | 9.314% | 357 | 84.38% | 581 |
| 1.500 | 1,779 | 351,062,063.48 | 99.34 | 8.349 | 358 | 81.04 | 619 |
| Total | 1,790 | $353,410,761.66 | 100.00% | 8.356% | 358 | 81.06% | 619 |

As of the Cut-off Date, the weighted average Initial Periodic Rate Cap of the Adjustable-Rate Mortgage Loans in Group 1 is expected to be approximately 1.497%.

| Subsequent Periodic Rate Cap (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 1.000 | 11 | $2,348,698.18 | 0.66% | 9.314% | 357 | 84.38% | 581 |
| 1.500 | 1,779 | 351,062,063.48 | 99.34 | 8.349 | 358 | 81.04 | 619 |
| Total | 1,790 | $353,410,761.66 | 100.00% | 8.356% | 358 | 81.06% | 619 |

As of the Cut-off Date, the weighted average Subsequent Periodic Rate Cap of the Adjustable-Rate Mortgage Loans in Group 1 is expected to be approximately 1.497%.

| Months to Next Rate Adjustment | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 16 - 18 | 1 | $244,655.93 | 0.07% | 8.550% | 353 | 90.00% | 664 |
| 19 - 21 | 471 | 93,801,628.31 | 26.54 | 7.868 | 357 | 80.16 | 619 |
| 22 - 24 | 1,244 | 245,091,744.74 | 69.35 | 8.572 | 358 | 81.17 | 619 |
| 28 - 30 | 16 | 2,221,390.21 | 0.63 | 6.993 | 354 | 85.88 | 634 |
| 31 - 33 | 25 | 5,707,744.83 | 1.62 | 7.603 | 356 | 86.34 | 633 |
| 34 - 36 | 33 | 6,343,597.64 | 1.79 | 8.332 | 358 | 83.37 | 618 |
| Total | 1,790 | $353,410,761.66 | 100.00% | 8.356% | 358 | 81.06% | 619 |

As of the Cut-off Date, the weighted average Months to Next Rate Adjustment of the Adjustable-Rate Mortgage Loans in Group 1 is expected to be approximately 22 months.

Confidential

JPMC_DEX_000402675

**Tabular Characteristics of the Group 2 Mortgage Loans**

The Group 2 Mortgage Loans are expected to have the following approximate aggregate characteristics as of the Cut-off Date.

| | |
|---|---|
| Number of Group 2 Mortgage Loans | 1,935 |
| Total Stated Principal Balance | $491,537,872 |
| Current Mortgage Rates: | |
| Weighted Average | 8.170% |
| Range | 5.500% - 13.900% |
| Weighted Average Margin | 6.200% |
| Weighted Average Remaining Term to Maturity (in months) | 357 |

The Stated Principal Balances of the Group 2 Mortgage Loans range from approximately $29,964 to approximately $968,811. The Group 2 Mortgage Loans have an average Stated Principal Balance of approximately $254,025.

The weighted average Loan-to-Value Ratio at origination of the Group 2 Mortgage Loans is approximately 80.50% and no Group 2 Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 100%.

No more than approximately 0.74% of the Group 2 Mortgage Loans are secured by Mortgaged Properties located in any one zip code area.

The following tables set forth certain information, as of the Cut-off Date, as to the Group 2 Mortgage Loans.  Other than with respect to rates of interest, percentages (approximate) are stated by Stated Principal Balance of the Group 2 Mortgage Loans as of the Cut-off Date and, due to rounding, may not total 100%.

S-43

Confidential

JPMC_DEX_000402676

48

| Stated Principal Balance ($) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 50,000  or less | 81 | $3,360,780.32 | 0.68% | 10.935% | 346 | 95.83% | 628 |
| 50,001 - 100,000 | 300 | 22,386,610.19 | 4.55 | 10.275 | 355 | 84.33 | 661 |
| 100,001 - 150,000 | 285 | 35,529,630.87 | 7.23 | 9.271 | 356 | 79.49 | 590 |
| 150,001 - 200,000 | 235 | 41,300,304.54 | 8.40 | 8.531 | 357 | 75.18 | 594 |
| 200,001 - 250,000 | 200 | 44,983,179.30 | 9.15 | 8.159 | 357 | 77.16 | 664 |
| 250,001 - 300,000 | 201 | 55,104,606.63 | 11.21 | 8.025 | 357 | 78.46 | 611 |
| 300,001 - 350,000 | 119 | 38,661,836.78 | 7.87 | 7.756 | 357 | 78.97 | 631 |
| 350,001 - 400,000 | 111 | 41,496,786.31 | 8.44 | 8.006 | 357 | 80.83 | 620 |
| 400,001 - 450,000 | 114 | 48,769,761.68 | 9.92 | 7.809 | 357 | 81.93 | 647 |
| 450,001 - 500,000 | 108 | 51,264,888.17 | 10.43 | 7.873 | 357 | 82.36 | 634 |
| 500,001 - 550,000 | 70 | 36,689,046.69 | 7.46 | 7.637 | 355 | 82.92 | 649 |
| 550,001 - 600,000 | 48 | 27,717,897.91 | 5.64 | 7.722 | 357 | 82.85 | 640 |
| 600,001 - 650,000 | 28 | 17,510,259.86 | 3.56 | 7.668 | 357 | 82.58 | 649 |
| 650,001 - 700,000 | 7 | 4,712,041.93 | 0.96 | 7.983 | 357 | 85.91 | 647 |
| 700,001 - 750,000 | 17 | 12,451,954.47 | 2.53 | 8.034 | 357 | 83.42 | 647 |
| 750,001 - 800,000 | 1 | 781,697.87 | 0.16 | 9.350 | 358 | 85.00 | 566 |
| 800,001 - 850,000 | 4 | 3,296,583.23 | 0.67 | 7.769 | 358 | 80.59 | 675 |
| 850,001 - 900,000 | 3 | 2,630,021.91 | 0.54 | 7.738 | 358 | 80.00 | 645 |
| 950,001 - 1,000,000 | 3 | 2,890,102.89 | 0.59 | 7.768 | 358 | 83.35 | 650 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

As of the Cut-off Date, the average Stated Principal Balance of the Mortgage Loans in Group 2 is expected to be approximately $254,025.

| Current Mortgage Rate (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 5.500 - 5.999 | 44 | $16,354,913.93 | 3.33% | 5.805% | 356 | 76.96% | 638 |
| 6.000 - 6.499 | 143 | 43,618,547.05 | 8.87 | 6.259 | 355 | 77.62 | 638 |
| 6.500 - 6.999 | 126 | 44,799,626.83 | 9.11 | 6.786 | 355 | 79.00 | 644 |
| 7.000 - 7.499 | 156 | 51,631,274.78 | 10.50 | 7.278 | 357 | 80.21 | 631 |
| 7.500 - 7.999 | 288 | 94,508,585.69 | 19.23 | 7.782 | 357 | 79.38 | 636 |
| 8.000 - 8.499 | 201 | 59,502,208.33 | 12.11 | 8.263 | 358 | 80.21 | 633 |
| 8.500 - 8.999 | 244 | 64,306,460.79 | 13.08 | 8.734 | 358 | 79.91 | 609 |
| 9.000 - 9.499 | 148 | 36,316,104.11 | 7.39 | 9.227 | 357 | 80.39 | 611 |
| 9.500 - 9.999 | 186 | 34,258,007.41 | 6.97 | 9.740 | 357 | 82.73 | 583 |
| 10.000 - 10.499 | 96 | 15,222,530.00 | 3.10 | 10.211 | 356 | 82.50 | 569 |
| 10.500 - 10.999 | 95 | 12,034,410.24 | 2.45 | 10.768 | 354 | 85.92 | 587 |
| 11.000 - 11.499 | 63 | 7,012,698.24 | 1.43 | 11.252 | 357 | 92.12 | 617 |
| 11.500 - 11.999 | 53 | 4,285,673.96 | 0.87 | 11.754 | 357 | 91.81 | 616 |
| 12.000 - 12.499 | 54 | 4,383,735.32 | 0.89 | 12.211 | 354 | 96.64 | 625 |
| 12.500 - 12.999 | 33 | 2,946,343.95 | 0.60 | 12.725 | 357 | 98.41 | 622 |
| 13.000 - 13.499 | 2 | 176,860.16 | 0.04 | 13.177 | 357 | 100.00 | 585 |
| 13.500 - 13.999 | 3 | 179,890.76 | 0.04 | 13.723 | 358 | 100.00 | 630 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

As of the Cut-off Date, the weighted average current Mortgage Rate of the Mortgage Loans in Group 2 is expected to be approximately 8.170% per annum.

S-44

JPMC_DEX_000402677

| Credit Score | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 500 - 524 | 236 | $41,917,746.39 | 8.53% | 9.398% | 357 | 72.94% | 512 |
| 525 - 549 | 250 | 46,677,783.53 | 9.50 | 8.709 | 356 | 73.10 | 537 |
| 550 - 574 | 75 | 21,522,305.22 | 4.38 | 8.361 | 357 | 76.32 | 562 |
| 575 - 599 | 165 | 42,680,454.53 | 8.68 | 8.201 | 357 | 81.17 | 588 |
| 600 - 624 | 273 | 70,533,333.69 | 14.35 | 7.812 | 357 | 81.36 | 613 |
| 625 - 649 | 376 | 100,973,634.64 | 20.54 | 7.880 | 357 | 81.95 | 637 |
| 650 - 674 | 251 | 77,364,627.06 | 15.74 | 8.057 | 357 | 82.83 | 662 |
| 675 - 699 | 146 | 41,158,314.78 | 8.37 | 7.936 | 355 | 84.23 | 685 |
| 700 - 724 | 87 | 26,525,700.10 | 5.40 | 7.875 | 357 | 83.57 | 712 |
| 725 - 749 | 37 | 10,962,793.22 | 2.05 | 7.985 | 357 | 84.18 | 736 |
| 750 - 774 | 25 | 7,448,538.79 | 1.52 | 8.411 | 356 | 83.77 | 762 |
| 775 - 799 | 12 | 4,527,403.18 | 0.92 | 7.817 | 357 | 89.19 | 786 |
| 800 - 824 | 2 | 145,236.42 | 0.03 | 11.693 | 357 | 100.00 | 807 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Original LTV (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 0.01 - 50.00 | 85 | $12,076,898.79 | 2.46% | 7.868% | 355 | 39.58% | 571 |
| 50.01 - 55.00 | 22 | 4,511,011.54 | 0.92 | 8.032 | 357 | 52.87 | 553 |
| 55.01 - 60.00 | 41 | 7,988,532.07 | 1.63 | 7.932 | 357 | 57.96 | 547 |
| 60.01 - 65.00 | 48 | 12,290,499.00 | 2.50 | 7.826 | 357 | 63.55 | 566 |
| 65.01 - 70.00 | 75 | 16,724,214.91 | 3.40 | 8.379 | 356 | 68.67 | 559 |
| 70.01 - 75.00 | 130 | 33,432,343.79 | 6.80 | 8.126 | 356 | 73.85 | 571 |
| 75.01 - 80.00 | 861 | 253,394,004.89 | 51.55 | 7.886 | 357 | 79.91 | 640 |
| 80.01 - 85.00 | 140 | 38,499,368.11 | 7.83 | 8.090 | 357 | 84.58 | 597 |
| 85.01 - 90.00 | 166 | 63,176,782.65 | 12.85 | 8.297 | 356 | 89.75 | 626 |
| 90.01 - 95.00 | 66 | 23,822,257.71 | 4.85 | 8.152 | 357 | 94.75 | 661 |
| 95.01 - 100.00 | 301 | 25,621,958.09 | 5.21 | 11.141 | 356 | 99.97 | 656 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Original Term (months) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 120 | 2 | $887,003.88 | 0.02% | 9.213% | 118 | 64.27% | 617 |
| 180 | 9 | 1,186,749.28 | 0.24 | 8.331 | 176 | 79.45 | 624 |
| 240 | 4 | 374,628.90 | 0.08 | 8.463 | 238 | 78.53 | 599 |
| 360 | 1,920 | 489,889,489.49 | 99.66 | 8.170 | 357 | 80.51 | 623 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

As of the Cut-off Date, the weighted average Original Term to Maturity of the Mortgage Loans in Group 2 is expected to be approximately 359 months.

S-45

Confidential

JPMC_DEX_000402678

| Stated Remaining Term (months) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 61 - 120 | 2 | $87,003.88 | 0.02% | 9.213% | 118 | 64.27% | 617 |
| 121 - 180 | 9 | 1,186,749.28 | 0.24 | 8.331 | 176 | 79.45 | 624 |
| 181 - 240 | 4 | 374,628.90 | 0.08 | 8.463 | 238 | 78.53 | 599 |
| 301 - 360 | 1,920 | 489,889,489.49 | 99.66 | 8.170 | 357 | 80.51 | 623 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Debt Ratio (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 0.01 - 20.00 | 41 | $7,804,170.12 | 1.59% | 8.578% | 358 | 79.89% | 615 |
| 20.01 - 25.00 | 66 | 14,861,423.19 | 3.02 | 8.320 | 357 | 78.22 | 617 |
| 25.01 - 30.00 | 89 | 17,551,380.38 | 3.57 | 8.187 | 357 | 79.40 | 606 |
| 30.01 - 35.00 | 177 | 37,211,056.79 | 7.57 | 8.292 | 354 | 79.34 | 619 |
| 35.01 - 40.00 | 291 | 67,289,726.40 | 13.69 | 8.190 | 357 | 79.84 | 622 |
| 40.01 - 45.00 | 430 | 111,908,115.46 | 22.77 | 8.163 | 357 | 81.64 | 626 |
| 45.01 - 50.00 | 718 | 203,576,238.54 | 41.42 | 8.173 | 357 | 82.04 | 632 |
| 50.01 - 55.00 | 116 | 29,805,114.11 | 6.06 | 7.860 | 357 | 71.47 | 580 |
| 55.01 - 60.00 | 7 | 1,530,646.56 | 0.31 | 6.816 | 357 | 63.87 | 578 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

As of the Cut-off Date, the weighted average Debt Ratio in Group 2 is expected to be approximately 42.54%.

| Fixed Rate/Adjustable Rate | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Adjustable Rate | 1,393 | $398,316,796.31 | 81.03% | 8.183% | 358 | 79.71% | 619 |
| Fixed Rate | 542 | 93,221,075.24 | 18.97 | 8.115 | 353 | 83.90 | 640 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Product | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 2/28 ARM | 432 | $100,793,180.79 | 20.51% | 8.965% | 358 | 78.83% | 586 |
| 2/28 ARM Balloon | 797 | 245,346,029.72 | 49.91 | 7.974 | 358 | 79.69 | 626 |
| 2/28 ARM IO | 117 | 38,991,554.87 | 7.93 | 7.810 | 358 | 81.64 | 665 |
| 3/27 ARM | 23 | 4,907,458.02 | 1.00 | 7.969 | 356 | 80.54 | 602 |
| 3/27 ARM Balloon | 9 | 2,177,119.62 | 0.44 | 8.240 | 357 | 80.96 | 584 |
| 3/27 ARM IO | 15 | 6,101,453.29 | 1.24 | 6.209 | 355 | 81.27 | 650 |
| Fixed | 433 | 54,516,259.03 | 11.09 | 8.955 | 351 | 87.69 | 640 |
| Fixed Balloon | 109 | 38,704,816.21 | 7.87 | 6.932 | 356 | 78.57 | 640 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Interest Only | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Not Interest Only | 1,803 | $446,444,863.39 | 90.83% | 8.229% | 357 | 80.39% | 619 |
| Interest Only | 132 | 45,093,008.16 | 9.17 | 7.594 | 358 | 81.59 | 663 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

S-46

JPMC_DEX_000402679

| Prepayment Penalty Original Term | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| None | 686 | $157,015,777.73 | 31.94% | 8.855% | 357 | 80.88% | 616 |
| 12 months | 69 | 20,852,093.41 | 4.24 | 8.147 | 357 | 79.93 | 646 |
| 24 months | 948 | 256,118,415.97 | 52.11 | 7.982 | 358 | 80.30 | 623 |
| 36 months | 232 | 57,551,584.44 | 11.71 | 7.448 | 352 | 80.58 | 634 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

As of the Cut-off Date, the non-zero weighted average original Prepayment Penalty Term in Group 2 is expected to be approximately 25 months.

| Lien | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| First Lien | 1,637 | $468,080,630.15 | 95.23% | 8.013% | 357 | 79.53% | 622 |
| Second Lien | 298 | 23,457,241.40 | 4.77 | 11.368 | 355 | 99.85 | 656 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Documentation Type | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Full Documentation | 1,015 | $229,755,912.00 | 46.74% | 7.728% | 357 | 79.48% | 602 |
| Limited Documentation | 38 | 9,144,730.54 | 1.86 | 7.688 | 346 | 79.71 | 603 |
| Stated Documentation | 882 | 252,637,229.01 | 51.40 | 8.590 | 357 | 81.46 | 643 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Loan Purpose | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Purchase | 1,141 | $284,292,130.94 | 57.84% | 8.267% | 357 | 83.02% | 649 |
| Cash-Out Refinance | 693 | 178,790,407.36 | 36.37 | 8.085 | 356 | 76.39 | 583 |
| Rate / Term Refinance | 101 | 28,455,333.25 | 5.79 | 7.735 | 357 | 81.23 | 614 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Property Type | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Single Family | 1,418 | $363,324,609.39 | 73.92% | 8.145% | 357 | 79.96% | 619 |
| Multi Family | 110 | 33,048,146.07 | 6.72 | 8.031 | 357 | 81.88 | 657 |
| PUD | 265 | 59,781,999.98 | 12.16 | 8.388 | 357 | 83.01 | 625 |
| Condo | 142 | 35,383,116.11 | 7.20 | 8.197 | 357 | 80.51 | 635 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

| Occupancy Status | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Owner | 1,862 | $472,987,797.11 | 96.23% | 8.140% | 357 | 80.43% | 622 |
| Non-Owner | 36 | 11,064,293.51 | 2.25 | 9.079 | 358 | 78.95 | 652 |
| Second Home | 37 | 7,485,780.93 | 1.52 | 8.774 | 357 | 87.40 | 667 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

S-47

| Credit Grade | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| AA | 1,527 | $404,987,405.72 | 82.39% | 8.044% | 357 | 81.72% | 637 |
| A+ | 123 | 31,295,581.12 | 6.37 | 8.391 | 358 | 81.38 | 581 |
| A- | 93 | 22,380,696.02 | 4.55 | 8.537 | 357 | 74.68 | 560 |
| B | 92 | 16,518,763.10 | 3.36 | 9.183 | 355 | 72.09 | 537 |
| C | 93 | 15,202,762.01 | 3.09 | 9.229 | 356 | 65.65 | 535 |
| C- | 7 | 1,152,663.58 | 0.23 | 11.053 | 357 | 60.06 | 520 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

S-48

Confidential

JPMC_DEX_000402681

53

| State | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Alabama | 12 | $1,348,876.58 | 0.27% | 9.620% | 358 | 83.22% | 566 |
| Alaska | 4 | 675,645.10 | 0.14 | 9.043 | 358 | 78.37 | 575 |
| Arizona | 73 | 14,755,112.84 | 3.00 | 8.543 | 357 | 81.18 | 612 |
| Arkansas | 9 | 1,011,661.59 | 0.21 | 9.009 | 358 | 91.03 | 608 |
| California | 751 | 254,175,883.35 | 51.71 | 7.847 | 357 | 80.16 | 632 |
| Colorado | 10 | 1,774,587.06 | 0.36 | 8.129 | 357 | 80.83 | 598 |
| Connecticut | 21 | 4,237,526.93 | 0.86 | 8.576 | 335 | 80.29 | 616 |
| Delaware | 1 | 82,761.27 | 0.02 | 12.900 | 358 | 100.00 | 636 |
| District Of Columbia | 2 | 639,583.74 | 0.13 | 8.515 | 357 | 86.65 | 593 |
| Florida | 188 | 35,328,398.45 | 7.19 | 8.754 | 355 | 81.18 | 620 |
| Georgia | 37 | 5,210,056.14 | 1.06 | 8.848 | 356 | 80.96 | 588 |
| Hawaii | 33 | 10,570,389.03 | 2.15 | 7.257 | 356 | 85.24 | 667 |
| Idaho | 5 | 551,492.06 | 0.11 | 8.703 | 357 | 80.89 | 602 |
| Illinois | 63 | 11,758,221.47 | 2.39 | 8.744 | 358 | 81.74 | 603 |
| Indiana | 3 | 354,644.52 | 0.07 | 7.976 | 357 | 83.57 | 615 |
| Iowa | 3 | 259,419.51 | 0.05 | 8.593 | 358 | 74.14 | 559 |
| Kansas | 7 | 752,847.85 | 0.15 | 10.303 | 357 | 80.52 | 562 |
| Kentucky | 1 | 65,571.02 | 0.01 | 8.990 | 358 | 80.00 | 523 |
| Louisiana | 1 | 55,557.43 | 0.01 | 11.550 | 359 | 95.00 | 585 |
| Maine | 12 | 1,947,790.01 | 0.40 | 9.125 | 358 | 84.63 | 598 |
| Maryland | 50 | 11,583,479.24 | 2.36 | 8.684 | 356 | 76.82 | 577 |
| Massachusetts | 62 | 17,565,149.17 | 3.57 | 8.361 | 357 | 79.50 | 604 |
| Michigan | 24 | 2,984,956.45 | 0.61 | 9.509 | 358 | 80.72 | 572 |
| Minnesota | 8 | 848,234.10 | 0.17 | 9.270 | 357 | 76.42 | 575 |
| Mississippi | 2 | 307,790.90 | 0.06 | 9.999 | 358 | 82.69 | 581 |
| Missouri | 7 | 1,217,224.29 | 0.25 | 9.149 | 339 | 76.84 | 608 |
| Montana | 4 | 503,615.22 | 0.10 | 8.220 | 357 | 81.93 | 569 |
| Nebraska | 2 | 176,351.87 | 0.04 | 10.352 | 358 | 92.61 | 580 |
| Nevada | 47 | 8,913,660.72 | 1.81 | 8.451 | 357 | 82.82 | 646 |
| New Hampshire | 3 | 599,842.89 | 0.12 | 10.359 | 358 | 81.12 | 520 |
| New Jersey | 97 | 27,610,061.67 | 5.62 | 8.461 | 357 | 79.89 | 615 |
| New Mexico | 15 | 2,847,856.14 | 0.58 | 8.360 | 357 | 77.09 | 590 |
| New York | 93 | 26,647,582.01 | 5.42 | 7.939 | 357 | 81.70 | 650 |
| North Carolina | 8 | 718,576.56 | 0.15 | 9.535 | 358 | 77.71 | 570 |
| Ohio | 17 | 2,258,595.89 | 0.46 | 9.475 | 357 | 85.36 | 556 |
| Oklahoma | 5 | 680,248.96 | 0.14 | 7.588 | 356 | 80.87 | 625 |
| Oregon | 14 | 1,967,795.42 | 0.40 | 8.361 | 354 | 77.77 | 605 |
| Pennsylvania | 18 | 3,201,769.30 | 0.65 | 8.889 | 351 | 79.00 | 582 |
| Rhode Island | 5 | 993,522.05 | 0.20 | 10.101 | 358 | 85.09 | 593 |
| South Carolina | 13 | 1,532,040.94 | 0.31 | 9.006 | 357 | 82.54 | 585 |
| South Dakota | 1 | 60,690.07 | 0.01 | 9.500 | 358 | 75.00 | 519 |
| Tennessee | 16 | 2,343,939.18 | 0.48 | 8.671 | 354 | 80.93 | 615 |
| Texas | 105 | 13,813,466.94 | 2.81 | 8.835 | 356 | 80.60 | 589 |
| Utah | 11 | 2,412,421.46 | 0.49 | 8.564 | 357 | 81.47 | 647 |
| Virginia | 29 | 6,384,346.58 | 1.30 | 8.326 | 357 | 84.04 | 626 |
| Washington | 24 | 5,201,215.32 | 1.06 | 7.809 | 357 | 75.79 | 602 |
| West Virginia | 1 | 60,923.87 | 0.01 | 10.390 | 357 | 100.00 | 695 |
| Wisconsin | 18 | 2,545,488.39 | 0.52 | 9.402 | 358 | 75.46 | 553 |
| Total | 1,935 | $491,537,871.55 | 100.00% | 8.170% | 357 | 80.50% | 623 |

As of the Cut-off Date, no more than approx. mately 0.74% of the Mortgage Loans in Group 2 will be secured by Mortgaged Properties in any one postal zip code area.

S-49

Confidential

JPMC_DEX_000402682

54

| Margin (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 4.000 - 4.499 | 1 | $136,455.50 | 0.03% | 9.990% | 358 | 65.00% | 507 |
| 5.000 - 5.499 | 3 | 842,952.33 | 0.21 | 7.552 | 354 | 80.00 | 655 |
| 5.500 - 5.999 | 385 | 111,273,640.42 | 27.94 | 7.711 | 357 | 79.13 | 624 |
| 6.000 - 6.499 | 850 | 254,219,610.23 | 63.82 | 8.252 | 358 | 80.78 | 625 |
| 6.500 - 6.999 | 78 | 16,639,747.75 | 4.18 | 9.242 | 358 | 76.40 | 561 |
| 7.000 - 7.499 | 74 | 14,210,498.60 | 3.57 | 9.448 | 358 | 68.71 | 542 |
| 8.000 - 8.499 | 1 | 534,891.48 | 0.13 | 7.990 | 358 | 80.00 | 653 |
| 8.500 - 8.999 | 1 | 459,000.00 | 0.12 | 8.250 | 358 | 89.13 | 603 |
| Total | 1,393 | $398,316,796.31 | 100.00% | 8.183% | 358 | 79.71% | 619 |

As of the Cut-off Date, the weighted average Margin of the Adjustable-Rate Mortgage Loans in Group 2 is expected to be approximately 6.200%.

| Minimum Rate (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 5.500 - 5.999 | 32 | $11,713,838.21 | 2.94% | 5.734% | 356 | 77.07% | 640 |
| 6.000 - 6.499 | 48 | 12,881,743.81 | 3.23 | 6.309 | 357 | 75.44 | 637 |
| 6.500 - 6.999 | 97 | 33,967,595.83 | 8.53 | 6.797 | 357 | 78.26 | 640 |
| 7.000 - 7.499 | 143 | 46,928,249.06 | 11.78 | 7.289 | 357 | 80.34 | 630 |
| 7.500 - 7.999 | 266 | 88,794,788.85 | 22.29 | 7.784 | 358 | 79.57 | 635 |
| 8.000 - 8.499 | 185 | 56,409,142.44 | 14.16 | 8.262 | 358 | 80.47 | 633 |
| 8.500 - 8.999 | 219 | 59,428,629.48 | 14.92 | 8.730 | 358 | 79.79 | 608 |
| 9.000 - 9.499 | 140 | 35,069,958.58 | 8.80 | 9.225 | 358 | 80.48 | 612 |
| 9.500 - 9.999 | 123 | 28,559,697.59 | 7.17 | 9.725 | 358 | 81.71 | 576 |
| 10.000 - 10.499 | 67 | 12,388,430.30 | 3.11 | 10.213 | 358 | 79.30 | 551 |
| 10.500 - 10.999 | 42 | 7,705,318.50 | 1.93 | 10.754 | 358 | 79.90 | 551 |
| 11.000 - 11.499 | 19 | 2,997,030.68 | 0.75 | 11.275 | 358 | 82.24 | 550 |
| 11.500 - 11.999 | 6 | 848,776.35 | 0.21 | 11.712 | 357 | 62.32 | 522 |
| 12.000 - 12.499 | 4 | 453,979.80 | 0.11 | 12.205 | 358 | 72.60 | 513 |
| 12.500 - 12.999 | 2 | 169,616.83 | 0.04 | 12.731 | 357 | 72.43 | 512 |
| Total | 1,393 | $398,316,796.31 | 100.00% | 8.183% | 358 | 79.71% | 619 |

As of the Cut-off Date, the weighted average Minimum Rate of the Adjustable-Rate Mortgage Loans in Group 2 is expected to be approximately 8.183% per annum.

| Maximum Rate (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 12.500 - 12.999 | 32 | $11,713,838.21 | 2.94% | 5.734% | 356 | 77.07% | 640 |
| 13.000 - 13.499 | 48 | 12,881,743.81 | 3.23 | 6.309 | 357 | 75.44 | 637 |
| 13.500 - 13.999 | 97 | 33,967,595.83 | 8.53 | 6.797 | 357 | 78.26 | 640 |
| 14.000 - 14.499 | 143 | 46,928,249.06 | 11.78 | 7.289 | 357 | 80.34 | 630 |
| 14.500 - 14.999 | 270 | 89,785,185.42 | 22.54 | 7.794 | 358 | 79.62 | 635 |
| 15.000 - 15.499 | 193 | 57,892,232.18 | 14.53 | 8.289 | 358 | 80.39 | 631 |
| 15.500 - 15.999 | 216 | 58,591,085.74 | 14.71 | 8.734 | 358 | 79.75 | 608 |
| 16.000 - 16.499 | 133 | 33,720,205.73 | 8.47 | 9.226 | 358 | 80.64 | 615 |
| 16.500 - 16.999 | 122 | 28,406,844.76 | 7.13 | 9.726 | 358 | 81.66 | 577 |
| 17.000 - 17.499 | 66 | 12,255,093.41 | 3.08 | 10.213 | 358 | 79.24 | 551 |
| 17.500 - 17.999 | 42 | 7,705,318.50 | 1.93 | 10.754 | 358 | 79.90 | 551 |
| 18.000 - 18.499 | 19 | 2,997,030.68 | 0.75 | 11.275 | 358 | 82.24 | 550 |
| 18.500 - 18.999 | 6 | 848,776.35 | 0.21 | 11.712 | 357 | 62.32 | 522 |
| 19.000 - 19.499 | 4 | 453,979.80 | 0.11 | 12.205 | 358 | 72.60 | 513 |
| 19.500 - 19.999 | 2 | 169,616.83 | 0.04 | 12.731 | 357 | 72.43 | 512 |
| Total | 1,393 | $398,316,796.31 | 100.00% | 8.183% | 358 | 79.71% | 619 |

As of the Cut-off Date, the weighted average Maximum Rate of the Adjustable-Rate Mortgage Loans in Group 2 is expected to be approximately 15.176% per annum.

S-50

Confidential

JPMC_DEX_000402683

| Initial Periodic Rate Cap (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 1.000 | 10 | $1,862,866.62 | 0.47% | 9.031% | 358 | 83.93% | 597 |
| 1.500 | 1,383 | 396,453,929.69 | 99.53 | 8.179 | 358 | 79.69 | 619 |
| Total | 1,393 | $398,316,796.31 | 100.00% | 8.183% | 358 | 79.71% | 619 |

As of the Cut-off Date, the weighted average Initial Periodic Rate Cap of the Adjustable-Rate Mortgage Loans in Group 2 is expected to be approximately 1.498%.

| Subsequent Periodic Rate Cap (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 1.000 | 10 | $1,862,866.62 | 0.47% | 9.031% | 358 | 83.93% | 597 |
| 1.500 | 1,383 | 396,453,929.69 | 99.53 | 8.179 | 358 | 79.69 | 619 |
| Total | 1,393 | $398,316,796.31 | 100.00% | 8.183% | 358 | 79.71% | 619 |

As of the Cut-off Date, the weighted average Subsequent Periodic Rate Cap of the Adjustable-Rate Mortgage Loans in Group 2 is expected to be approximately 1.498%.

| Months to Next Rate Adjustment | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 16 - 18 | 2 | $494,681.47 | 0.12% | 6.589% | 354 | 78.52% | 599 |
| 19 - 21 | 393 | 114,859,461.94 | 28.84 | 7.814 | 357 | 78.93 | 617 |
| 22 - 24 | 951 | 269,776,621.97 | 67.73 | 8.392 | 358 | 79.98 | 620 |
| 28 - 30 | 10 | 2,923,584.35 | 0.73 | 6.117 | 354 | 82.11 | 645 |
| 31 - 33 | 18 | 6,482,955.00 | 1.63 | 6.727 | 356 | 81.50 | 634 |
| 34 - 36 | 19 | 3,779,491.58 | 0.95 | 8.846 | 358 | 79.10 | 579 |
| Total | 1,393 | $398,316,796.31 | 100.00% | 8.183% | 358 | 79.71% | 619 |

As of the Cut-off Date, the weighted average Months to Next Rate Adjustment of the Adjustable-Rate Mortgage Loans in Group 2 is expected to be approximately 22 months.

Confidential

JPMC_DEX_000402684

**The Index**

    The Mortgage Rate for all of the adjustable rate Mortgage Loans will be adjusted semi-annually on the related adjustment date. The index for the Mortgage Rate borne by all of the Mortgage Loans may be calculated as follows (in each case, rounded to the nearest one-eighth of one percent):

    SIX-MONTH LIBOR. The Mortgage Rate borne by approximately 80.79% of the Mortgage Loans (by Aggregate Cut-off Date Balance) is adjusted, after the end of the applicable fixed rate period, every six months to equal the London interbank offered rate for Six-Month U.S. dollar deposits as listed under "Money Rates" in The Wall Street Journal most recently available as of 30 or 45 days, as applicable, prior to the related adjustment date ("Six-Month LIBOR") plus a margin of ranging from 3.290% to 8.560%.

## DELINQUENCY AND FORECLOSURE INFORMATION FOR THE MORTGAGE LOANS

    The following table sets forth certain information regarding delinquency with respect to the Mortgage Loans as of the Statistical Calculation Date.

| Total | During the 12 months prior to April 1, 2006 | | | |
| --- | --- | --- | --- | --- |
| | Number of Loans With One Instance | | Scheduled Principal Balance of Loans With One Instance | |
| | Number of Loans | Percentage of Loans | Scheduled Principal Balance | Percentage of Scheduled Principal Balance |
| Period of Delinquency | | | | |
| 30-59 days | 25 | 0.59% | $6,162,891.69 | 0.66% |
| 60-89 days | 0 | 0.00% | $0.00 | 0.00% |
| 90 days or more | 0 | 0.00% | $0.00 | 0.00% |
| Foreclosures, Bankruptcies or Real Estate Owned | 0 | 0.00% | $0.00 | 0.00% |
| Total Portfolio | 4,209 | | $930,509,120.19 | |

| Total | During the 12 months prior to April 1, 2006 | | | |
| --- | --- | --- | --- | --- |
| | Number of Loans With Two Instances of Delinquency | | Scheduled Principal Balance of Loans With Two Instances of Delinquency | |
| | Number of Loans | Percentage of Loans | Scheduled Principal Balance | Percentage of Scheduled Principal Balance |
| Period of Delinquency | | | | |
| 30-59 days | 2 | 0.05% | $293,110.99 | 0.03% |
| 60-89 days | 0 | 0.00% | $0.00 | 0.00% |
| 90 days or more | 0 | 0.00% | $0.00 | 0.00% |
| Foreclosures, Bankruptcies or Real Estate Owned | 0 | 0.00% | $0.00 | 0.00% |
| Total Portfolio | 4,209 | | $930,509,120.19 | |

No Mortgage Loan has had more than two instances of delinquency.

## THE DEPOSITOR

    J.P. Morgan Acceptance Corporation I, a Delaware corporation incorporated on June 27, 1988, is a direct, wholly-owned subsidiary of JPMorgan Securities Holdings LLC and will act as the depositor for the trust. The principal executive offices of the depositor are located at 270 Park Avenue, New York, New York 10017. As

Confidential

depositor it will establish the trust and will be the party that deposits, sells or otherwise conveys the trust fund assets to the trust. Its telephone number is (212) 270-8863.

The depositor has been engaged in the securitization of loans, contracts and mortgage-backed securities since its incorporation. The depositor is generally engaged in the business of acting as depositor of one or more trusts that issues series of notes, bonds or other evidence or indebtedness and certificates that are secured by or represent interests in the assets of a trust fund. The depositor is also generally engaged in acquiring, owning, holding and pledging as collateral and otherwise dealing with loans and mortgage-backed securities. The depositor acquires the loans and mortgaged-backed securities for inclusion in a securitization from the sponsor, or if specified in the prospectus supplement, from another seller, in each case in privately negotiated transactions.

The certificate of incorporation of the depositor provides that the depositor may not conduct any activities other than those related to issuing and selling one or more series of securities, acquiring and selling loans and mortgage-backed securities, serving as depositor of the trusts and engaging in activities incidental to the foregoing.

The depositor will have limited obligations with respect to a series of securities. The depositor will obtain representations and warranties from the originator and sponsor regarding the assets included in the related trust fund. The depositor will also assign to the trustee the depositor's rights with respect to those representations and warranties. See "The Agreements—Assignment of the Trust Fund Assets" in the prospectus. In addition, after the issuance of the certificates, the depositor has limited obligations with respect to the preparation of any reports filed under the Exchange Act and providing notices and other information to certain parties under the operative agreements.

The depositor does not have, nor is it expected in the future to have, any significant assets. Neither the depositor nor any of the depositor's affiliates will insure or guarantee distributions on the certificates.

## THE SPONSOR

### General

J.P. Morgan Mortgage Acquisition Corp., or JPMAC, will act as sponsor of the trust fund. The sponsor will sell the mortgage loans directly to the depositor for sale or transfer to a trust.

JPMAC, a Delaware corporation incorporated on July 12, 2002, is a direct, wholly-owned subsidiary of JPMorgan Chase Bank, N.A. The principal executive offices of the sponsor are located at 270 Park Avenue, New York, New York 10017. Its telephone number is (212) 270-8863.

### Securitization Activities of the Sponsor

JPMAC has been engaged in the securitization of assets since its incorporation. In connection with these activities, JPMAC uses special purpose entities, such as the depositor, primarily for (but not limited to) the securitization of commercial and residential mortgages and home equity loans.

During fiscal years 2003 and 2004, JPMAC securitized approximately $275,299,016 and $4,510,234,249 of residential mortgages, respectively. During this period, no securitizations sponsored by JPMAC have defaulted or experienced an early amortization or trigger event.

Through its affiliates, JPMAC services and master services loans. After the Servicing Transfer Date, the mortgage loans will be serviced by an affiliate of JPMAC.

In the normal course of its securitization program, JPMAC acquires loans from third party originators and through its affiliates. Employees of JPMAC or its affiliates structure securitization transactions in which the loans are sold to the depositor. In consideration for the assets which JPMAC sells to the depositor, the depositor issues the securities supported by the cash flows generated by the assets.

S-53

Confidential

JPMC_DEX_000402686

JPMAC has obtained appropriate representations and warranties from the originator upon the acquisition of the mortgage loans and will assign its rights under these representations and warranties for the benefit of the depositor (or the trustee).  See The Trust Fund—Representations by Seller or Originators; Repurchases" in the prospectus.

## STATIC POOL INFORMATION

The depositor shall make available any of the sponsor's material static pool information as required under the SEC's rules and regulations.  The static pool information material to this offering of certificates is located at http://Ap01.jpmorgan.com/docs.nsf/web/JPMAC2006-NC1. The static pool information includes (i) information about the original characteristics of each prior securitized pool as of the cut-off date for that pool and (ii) delinquency, loss and prepayment information about each prior securitized pool.

The static pool information is not deemed to be a part of this prospectus or the registration statement of which this prospectus is a part to the extent that the static pool information relates to (a) any trust fund that was established before January 1, 2006 and (b) information relating to assets of any trust fund established on or after January 1, 2006, which information relates to periods prior to January 1, 2006.

## THE ORIGINATOR

### General

The Mortgage Loans were previously purchased by the Seller from New Century Mortgage Corporation ("New Century" or, the "Originator"), which originated or acquired the Mortgage Loans in the ordinary course of business.  Prior to the Servicing Transfer Date, New Century will service the Mortgage Loans (in such capacity and for such period the "Servicer") pursuant to the Mortgage Loan Purchase Agreement, following the Servicing Transfer Date, JPMorgan Chase Bank, National Association ("JPMorgan"), will service the Mortgage Loans (in such capacity and for such period the "Servicer") pursuant to the Pooling Agreement.

### New Century Mortgage Corporation

*General.*  The information set forth in the following paragraphs has been provided by the Originator.  None of the Depositor, the Seller, JPMorgan, the Securities Administrator, the Trustee, the Swap Provider, the Trust Oversight Manager, the Underwriter, any of their affiliates, or any other person has made or will make any representation as to the accuracy or completeness of such information.

All of the Mortgage Loans were originated or acquired by New Century.  New Century is a wholly owned operating subsidiary of New Century Financial Corporation, a publicly traded company.  Founded in 1995 and headquartered in Irvine, California, New Century Financial Corporation is a real estate investment trust and a full service mortgage finance company, providing first and second mortgage products to borrowers nationwide.  New Century Financial Corporation offers a broad range of mortgage products designed to meet the needs of all borrowers.

New Century is a consumer finance and mortgage banking company that originates, purchases and sells first lien and second lien mortgage loans and other consumer loans.  A substantial number of the mortgage loans originated by New Century Mortgage Corporation are commonly referred to as non-conforming "B&C" mortgage loans or subprime mortgage loans.

As of December 31, 2005, New Century Financial Corporation employed approximately 7,200 associates and originated loans through its wholesale network of more than 47,000 independent mortgage brokers through 35 regional processing centers operating in 18 states.  Its retail network operates through 222 sales offices in 35 states. For the year ending December 31, 2005, New Century Financial Corporation originated $56.1 billion in mortgage loans.

Confidential

The following table describes the size, composition and growth of New Century's total residential mortgage loan production over the periods indicated.

| Lien Position | December 31, 2003 | | December 31, 2004 | | December 31, 2005 | |
|---|---|---|---|---|---|---|
| | Number | Total Portfolio of Loans | Number | Total Portfolio of Loans | Number | Total Portfolio of Loans |
| Residential Mortgage Loans ........... | 164,373 | 27,382,838 | 242,877 | 42,119,640 | 310,389 | 56,108,241 |

## Underwriting Standards

The information set forth in this section regarding the underwriting standards of New Century has been provided by New Century to the Depositor (the "New Century Underwriting Guidelines"). None of the Depositor, the Trustee, the Servicer, the Securities Administrator, the Sponsor, the Trust Oversight Manager, the Underwriter, or any of their respective affiliates has made any independent investigation of this information or has made or will make any representation as to the accuracy or completeness of this information.

All of the Mortgage Loans will be acquired on the Closing Date by the Depositor from the Sponsor and were acquired by the Sponsor from New Century prior to the Closing Date. All of the Mortgage Loans were originated or acquired by New Century in accordance with the New Century Underwriting Guidelines. The following is a general summary of the New Century Underwriting Guidelines as generally applied, with some variation, by New Century. This summary does not purport to be a complete description of the underwriting standards of New Century.

The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the related Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the Mortgage Loan. All of the Mortgage Loans were also underwritten with a view toward the resale of the Mortgage Loans in the secondary mortgage market. While New Century's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, New Century also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. The Mortgage Loans, in most cases, bear higher rates of interest than mortgage loans that are originated in accordance with Fannie Mae and Freddie Mac standards, which is likely to result in rates of delinquencies and foreclosures that are higher, and that may be substantially higher, than those experienced by portfolios of mortgage loans underwritten in a more traditional manner. As a result of New Century's underwriting criteria, changes in the values of the related Mortgaged Properties may have a greater effect on the delinquency, foreclosure and loss experience on the Mortgage Loans than these changes would be expected to have on mortgage loans that are originated in a more traditional manner. No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans. In addition, there can be no assurance that the value of the related Mortgaged Property estimated in any appraisal or review is equal to the actual value of that Mortgaged Property at the time of that appraisal or review.

The Mortgage Loans have been originated in accordance with the New Century Underwriting Guidelines. On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist. It is expected that a substantial portion of the Mortgage Loans will represent these exceptions.

Each applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The New Century Underwriting Guidelines require a credit report on each applicant from a credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments. Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. These appraisers inspect and appraise

S-55

JPMC_DEX_000402688

the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The New Century Underwriting Guidelines require a review of the appraisal by a qualified employee of New Century or by an appraiser retained by New Century. New Century uses the value as determined by the review in computing the loan-to-value ratio of the related mortgage loan if the appraised value of a mortgaged property, as determined by a review, is (i) more than 10% greater but less than 25% lower than the value as determined by the appraisal for mortgage loans having a loan-to-value ratio or a combined loan-to-value ratio of up to 90%, and (ii) more than 5% greater but less than 25% lower than the value as determined by the appraisal for mortgage loans having a loan-to-value ration or a combined loan-to-value ratio of between 91-95%. For mortgage loans having a loan-to-value ratio or a combined loan-to-value ratio greater than 95%, the appraised value as determined by the review is used in computing the loan-to-value ratio of the related mortgage loan. If the appraised value of a mortgaged property as determined by a review is 25% or more lower than the value as determined by the appraisal, then New Century obtains a new appraisal and repeats the review process.

The Mortgage Loans were originated consistent with and generally conform to the New Century Underwriting Guidelines' full documentation, limited documentation and stated income documentation residential loan programs. Under each of the programs, New Century reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property. In determining the ability of the applicant to repay the loan, a qualifying rate has been created under the New Century Underwriting Guidelines that generally is equal to the interest rate on that loan. The New Century Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and requires New Century's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal, currently supports the outstanding loan balance. In general, the maximum loan amount for mortgage loans originated under the programs is $500,000 (additional requirements may be imposed in connection with Mortgage Loans in excess of $500,000). The New Century Underwriting Guidelines generally permit loans on one- to four-family residential properties to have a loan-to-value ratio as low as 95% with respect to first liens loans. The maximum loan-to-value ratio depends on, among other things, the purpose of the mortgage loan, a borrower's credit history, home ownership history, mortgage payment history or rental payment history, repayment ability and debt service-to-income ratio, as well as the type and use of the property. With respect to mortgage loans secured by mortgaged properties acquired by a mortgagor under a "lease option purchase," the loan-to-value ratio of the related mortgage loan is based on the lower of the appraised value at the time of origination of the mortgage loan or the sale price of the related mortgaged property if the "lease option purchase price" was set less than 12 months prior to origination and is based on the appraised value at the time of origination if the "lease option purchase price" was set 12 months or more prior to origination.

The New Century Underwriting Guidelines require that the income of each applicant for a mortgage loan under the full documentation program be verified. The specific income documentation required for New Century's various programs is as follows: under the full documentation program, applicants usually are required to submit one written form of verification of stable income for at least 12 months from the applicant's employer for salaried employees and 24 months for self-employed applicants; under the limited documentation program, applicants usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal checking account bank statements, and under the stated income documentation program, an applicant may be qualified based upon monthly income as stated on the mortgage loan application if the applicant meets certain criteria. All the foregoing programs require that, with respect to salaried employees, there be a telephone verification of the applicant's employment. Verification of the source of funds, if any, that are required to be deposited by the applicant into escrow in the case of a purchase money loan is required.

In evaluating the credit quality of borrowers, New Century utilizes credit bureau risk scores, or a FICO score, a statistical ranking of likely future credit performance developed by Fair, Isaac & Company and the three national credit data repositories: Equifax, TransUnion and Experian.

S-56

Confidential

JPMC_DEX_000402689

The New Century Underwriting Guidelines have the following categories and criteria for grading the potential likelihood that an applicant will satisfy the repayment obligations of a mortgage loan:

"AA" Risk.   Under the "AA" risk category, the applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount.  Two or more tradelines (one of which with 24 months history and no late payments) are required for loan-to-value ratios above 90%.  The borrower must have no late mortgage payments within the last 12 months on an existing mortgage loan.  An existing mortgage loan must be less than 30 days late at the time of funding of the loan.  No bankruptcy may have occurred during the preceding year for borrowers with a FICO score of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan.  A maximum loan-to-value ratio of 95% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding.  A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550, or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550).  No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 95% is permitted for a mortgage loan on an owner occupied single family or two unit property.  A maximum loan-to-value ratio of 90% is permitted for a mortgage loan on a non-owner occupied single family or two unit property, an owner occupied high-rise condominium or a three to four family residential property.  The maximum loan-to-value ratio for owner occupied rural, remote or unique properties and non-owner occupied three to four family residential properties or high-rise condominiums is 85%.  The maximum loan-to-value ratio for non-owner occupied rural, remote or unique properties is 80%.  The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for either a refinance loan or a purchase money loan.  The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

"A+" Risk.   Under the "A+" risk category, the applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount.  Two or more tradelines (one of which with 24 months history and no late payments) are required for loan-to-value ratios above 90%  A maximum of one 30 day late payment within the last 12 months is acceptable on an existing mortgage loan.  An existing mortgage loan must be less than 60 days late at the time of funding of the loan.  No bankruptcy may have occurred during the preceding year for borrowers with FICO scores of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan.  A maximum loan-to-value ratio of 95% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding.  A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550 or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550).  No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 95% (or 90% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on an owner occupied single family or two unit property.  A maximum loan-to-value ratio of 90% (or 85% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on a non-owner occupied property single family or two unit property, and an owner occupied high-rise condominium or a three to four family residential property.  The maximum loan-to-value ratio for owner occupied rural, remote or unique properties and a non-owner occupied three to four family residential property or high-rise condo is 85% (or 80% for mortgage loans originated under the stated income documentation program).  The maximum loan-to-value ratio for non-owner occupied rural, remote or unique properties is 80% (or 75% for mortgage loans originated under the stated income documentation program).  The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for either a refinance loan or a purchase money loan.  The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

"A-" Risk.   Under the "A-" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount.  A maximum of three 30 day late payments within the last 12 months is acceptable on an existing mortgage loan.  An existing mortgage loan must be less than 60 days late at the time of

S-57

JPMC_DEX_000402690

funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with FICO scores of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan-to-value ratio of 95% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550 (or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 95% (or 85% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on an owner occupied single family or two unit property. A maximum loan-to-value ratio of 90% (or 80% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on a non-owner occupied single family or two unit property, and an owner occupied high-rise condominium or three to four family residential property. The maximum loan-to-value ratio for owner occupied rural, remote, or unique properties, and non-owner occupied three to four family residential properties or high rise condominiums is 85% (or 80% for mortgage loans originated under the stated income documentation program). The maximum loan-to-value ratio for a non-owner occupied rural, remote or unique property is 85% (or 75% for mortgage loans originated under the stated income documentation program). The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for a refinance loan and 100%, for a purchase money loan. The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

"B" Risk.  Under the "B" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Unlimited 30 day late payments and a maximum of one 60 day late payment within the last 12 months are acceptable on an existing mortgage loan. An existing mortgage loan must be less than 90 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with a FICO score less than or equal to 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 may have occurred as long as such bankruptcy has been discharged at least one day prior to funding of the loan. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (such loan may not exceed an 90% loan-to-value ratio for borrowers with a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding 18 months. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 90% (or 80% for mortgage loans originated under the stated income documentation program), is permitted for a mortgage loan on an owner occupied singe family or two unit property. A maximum loan-to-value ratio of 85% (or 75% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on a non-owner occupied single family or two unit property, and an owner occupied high-rise condominium or a three to four family residential property. The maximum loan-to-value ratio for owner occupied rural, remote or unique property, and a non-owner occupied three to four family property or high-rise condo is 80% (or 70% for mortgage loans originated under the stated income documentation program). The maximum loan-to-value ratio for a non-owner occupied rural, remote or unique property is 80% (or 70% for mortgage loans originated under the stated income documentation program). The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for a refinance loan and for a purchase money loan. The maximum debt service-to-income ratio is usually 50%, unless the loan-to-value ratio is reduced.

"C" Risk.  Under the "C" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Unlimited 30 day and 60 day late payments and a maximum of one 90 day late payment within the last 12 months are acceptable on an existing mortgage loan. An existing mortgage loan must be less than 120 days late at the time of funding of the loan. All bankruptcies must be discharged at least one day prior to funding of the loan; provided, however, that Chapter 13 bankruptcies may be discharged with loan proceeds. No notice of default filings may have occurred during the preceding 12 months. The mortgaged property must be in at least average condition. In most cases, a maximum loan-to-value ratio of 80% (or 75% for mortgage loans originated under the stated income documentation program) for a mortgage loan on an owner occupied single family or two unit property is permitted. A maximum loan-to-value ratio of 75% is permitted for a mortgage loan on a non-owner occupied single family or 2 unit property (refinance only), or an owner occupied high-rise condominium or three to four family residential property (or 70% for mortgage loans originated under the stated income

S-58

Confidential

JPMC_DEX_000402691

documentation program). The maximum loan-to-value ratio for owner occupied rural, remote or unique properties, and non-owner occupied three to four family residential properties or high-rise condos is 70% (or 65% for mortgages originated under the stated income documentation program). The maximum loan-to-value ratio for a non-owner occupied rural, remote or unique property (refinance only) is 70% (or 60% for mortgage loans originated under the stated income documentation program). The maximum combined loan-to-value ratio, including any related subordinate lien, is 85% for a refinance loan and for a purchase money loan. The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

"C-" Risk.   Under the "C-" risk category, an applicant must have a FICO score of 500, or greater. Unlimited 30, 60 and 90 day late payments and a maximum of one 120 day late payment is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 150 days late at the time of funding of the loan. There may be no current notice of default and all bankruptcies must be discharged at least one day prior to funding of the loan; provided, however, that Chapter 13 bankruptcies may be discharged with loan proceeds. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 70% (55% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on a owner occupied single family or two unit property. A maximum loan-to-value ratio of 65% is permitted for a mortgage loan on a non-owner occupied property single family or two unit property (refinance only), and an owner occupied high-rise condominium or a three to four family residential property (50% for a mortgage loan on a non-owner occupied property, an owner occupied high-rise condominium or a three to four family residential property originated under the stated income documentation program). Rural, remote or unique properties are not allowed. The maximum combined loan-to-value ratio, including any related subordinate lien, is 80% for a refinance loan and 80% for a purchase money loan. The maximum debt service-to-income ratio is usually 55%.

Special Programs. New Century originates loans which it calls "special programs" to enable borrowers with higher FICO scores and good mortgage histories the ability to obtain larger loan amounts or higher loan-to-value ratios. Special programs extend loan-to-value ratios to a maximum of 100%, and combined 80/20 (first/second) loan combinations to 100% combined loan-to-value ratios and loan amounts to $1,500,000 with higher minimum FICO scores and paid-as-agreed minimum tradeline requirements. No bankruptcy filing may have occurred during the preceding year for borrowers with FICO scores less than 580, under the full income documentation program and the limited income documentation program or 620 under the stated income documentation program (Chapter 13 bankruptcies may not be paid off with loan proceeds) for combined 80%/20% (first/second) loan combinations. For first mortgage loans having 100% loan-to-value ratios, no bankruptcy filing may have occurred during the preceding two years. No notice of default filings may have occurred during the preceding two years. The mortgaged property must be in at least average condition. The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for either a refinance loan or a purchase money loan. The maximum debt service-to-income ratio is usually 50%.

Exceptions. As described above, the foregoing categories and criteria are guidelines only. On a case by case basis, it may be determined that an applicant warrants a debt service-to-income ratio exception, a pricing exception, a loan-to-value ratio exception, an exception from certain requirements of a particular risk category, etc. An exception may be allowed if the application reflects compensating factors, such as: low loan-to-value ratio; pride of ownership; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years. An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more. Accordingly, a mortgagor may qualify in a more favorable risk category than, in the absence of compensating factors, would satisfy only the criteria of a less favorable risk category. It is expected that a substantial portion of the Mortgage Loans will represent these kinds of exceptions.

## AFFILIATES AND RELATED TRANSACTIONS

The Sponsor and the Depositor are affiliated entities and wholly owned subsidiaries of JPMorgan Chase Bank, National Association. JPMorgan Chase Bank, National Association is a Servicer of the Mortgage Loans, the Securities Administrator and the Swap Provider. J.P. Morgan Trust Company, National Association is the Custodian for the mortgage files. There is not currently and there was not during the past two years any material business relationship, arrangement or other understanding between any of the Sponsor, the Depositor, the Securities Administrator, the Swap Provider, the Custodian or JPMorgan Chase Bank, National Association that was entered

S-59

JPMC_DEX_000402692

into outside the ordinary course of business of each such party or in terms other than would be obtained in an arm's length transaction with unaffiliated entities.

## THE SERVICER

### JPMorgan Chase Bank, National Association

JPMorgan Chase Bank, National Association ("JPMorgan") is a wholly-owned bank subsidiary of JPMorgan Chase & Co., a Delaware corporation whose principal office is located in New York, New York. JPMorgan is a commercial bank offering a wide range of banking services to its customers both domestically and internationally. It is chartered, and its business is subject to examination and regulation, by the Office of the Comptroller of the Currency. JPMorgan's main office is located in Columbus, Ohio. JPMorgan is a member of the Federal Reserve System and its deposits are insured by the Federal Deposit Insurance Corporation. JPMorgan is an affiliate of the Sponsor, the Depositor and J.P. Morgan Securities Inc., the underwriter. JPMorgan is rated "RPS1", "Strong" and "SQ1" by Fitch S&P and Moody's, respectively. JPMorgan does not believe that its financial condition will have any adverse effect on its ability to service the mortgage loans in accordance with the terms set forth in the Pooling Agreement.

Prior to January 1, 2005, JPMorgan formed Chase Home Finance LLC ("CHF"), a wholly-owned, limited liability company. Prior to January 1, 2005, Chase Manhattan Mortgage Corporation ("CMMC"), was engaged in the mortgage origination and servicing businesses. On January 1, 2005, CMMC merged with and into CHF with CHF as the surviving entity

In its capacity as Servicer, JPMorgan will be responsible for servicing the Mortgage Loans in accordance with the terms set forth in the Pooling and Servicing Agreement. JPMorgan may perform any or all of its obligations under its servicing agreement through one or more subservicers. JPMorgan has engaged CHF as its subservicer to perform loan servicing activities for the Mortgage Loans on its behalf. JPMorgan will remain liable for its servicing duties and obligations under the Pooling Agreement as if JPMorgan alone were servicing the Mortgage Loans. As a result we are providing disclosure regarding CHF. CHF (or its predecessors in interest) has serviced mortgage loans (including mortgage loans similar to the Mortgage Loans) for over fifteen years.

JPMorgan is the product of numerous mergers and acquisitions. Since the creation of the founding entities, mortgage products and loan servicing have been a part of the bank's operations. As JPMorgan's mortgage servicing activities have evolved over the past several decades and in the modern era, its portfolio has included prime loans (conforming, jumbo, Alt-A, community development programs and rural housing), manufactured housing loans, home equity loans and lines of credit, and subprime mortgage loan products.

Servicing operations, for "subprime" quality mortgage loans are audited internally by JPMorgan's General Audit and Risk groups and are subject to external audits by various investors, master servicers and the Office of the Comptroller of the Currency. JPMorgan utilizes committees assembled on a quarterly basis to analyze compliance to fair debt collection and fair lending legislation. JPMorgan employs a dual control process to review accounts for fee waivers and loss mitigation rejections in order to monitor compliance with internal procedures.

As of December 31, 2003, December 31, 2004 and September 30, 2005, JPMorgan's portfolio of closed-end subprime mortgage loans equaled approximately $27.5 billion, $45.4 billion and $58.5 billion, respectively.

Neither JPMorgan nor CHF is in default or has been terminated for cause under any servicing agreement with respect to closed-end subprime mortgage loans to which it is a party.

JPMorgan, through its subsidiary CHF, employs a collections strategy that is based on risk scoring and dialer strategy to make appropriate contact with delinquent customers. Outbound calling is made five days a week from 8:00 a.m. Eastern time to 9:00 p.m. Pacific time, and under reduced operational hours on Saturday and Sunday. There are special service teams to address the specific needs of Spanish-speaking customers and those impacted by natural disasters.

Attempts to assist mortgagors to re-perform under their mortgage commitments are made prior to referring loans to foreclosure. Loss mitigation efforts are run concurrently with the migration of a loan to foreclosure and continue until the foreclosure sale is executed. Loss mitigation solicitation efforts include outbound calling

Confidential

JPMC_DEX_000402693

strategies, inbound dedicated loss mitigation analysis teams and targeted assistance letters. In addition to the Chase internet site delivering applications and program overviews, high risk property managers review options during site inspections and local housing association referrals.

CHF has created a legal network where home product loans are referred for bankruptcy, foreclosure, real estate owned (REO) and loss mitigation legal actions. Attorneys are monitored for performance to action initiation requirements, adherence to the timeline set forth by the state or federal jurisdictions and within the boundaries of the mortgage insurer or investor. Status is monitored between operational teams for managing bankruptcy case filings, loss mitigation programs and transfers to REO status. Performance to these timelines is periodically monitored to increase loss mitigation opportunities, billing accurately, managing data securely, and effectively managing any initiated legal action.

Under the terms of the Pooling Agreement, the Servicer may agree to modification upon the request of the mortgagor provided the modification is in lieu of a refinancing and the Servicer purchases the related mortgage loan for a price equal to the outstanding principal balance of the Mortgage Loan.

Under the terms of the Pooling Agreement, the Servicer generally will not be liable for any losses on the Mortgage Loans.

The Servicer is required to make advances of delinquent monthly payments of interest and principal to the extent described in this prospectus supplement. *See "The Pooling and Servicing Agreement—Advances."* The Servicer has not failed to make a required advance in connection with any mortgage-backed securitization.

*Chase Home Finance LLC.* Because JPMorgan does not itself perform the servicing function on mortgage loans as to which it is the named servicer, JPMorgan does not have meaningful historical servicing data with respect to delinquencies, foreclosure or losses.

Due to JPMorgan's engagement of CHF as its subservicer, CHF is providing below historical delinquency, foreclosure and loan loss data for its portfolio of fixed rate and adjustable rate subprime mortgage loans which were originated or purchased by CHF and subsequently securitized in asset-backed transactions (the "CHF Subprime Securitized Servicing Portfolio"). The CHF Subprime Securitized Servicing Portfolio represents only a portion of the total servicing portfolio of CHF. There can be no assurance that the delinquency, foreclosure and loan loss experience on the mortgage loans subserviced by CHF for JPMorgan in this transaction will correspond to the delinquency, foreclosure and loan loss experience shown in the tables below, and the actual delinquency, foreclosure and loan loss experience on the mortgage loans subserviced by CHF for JPMorgan in this transaction could be significantly worse. Moreover, any mortgage loans subserviced by CHF for JPMorgan in this transaction could be significantly worse. Moreover, any mortgage loans subserviced by CHF for JPMorgan in this transaction were acquired by the Seller from New Century Mortgage Corporation and were not originated by CHF and as a result, the actual delinquency, loss and foreclosure experience on such mortgage loans could be significantly worse than the delinquency, foreclosure and loan loss experience shown in the tables below.

Confidential

JPMC_DEX_000402694

*CHF Subprime Securitized Servicing Portfolio.* The following tables contain information relating to the delinquency, loan loss and foreclosure experience with respect to the CHF Subprime Securitized Servicing Portfolio

**Delinquency and Foreclosure Experience of the**
**CHF Subprime Securitized Servicing Portfolio**
**(Dollars in Thousands)**

| | As of September 30, | | As of December 31, | | | | | |
| | 2005 | | 2004 | | 2003 | | 2002 | |
| Period of Delinquency | Number of Loans | Dollar Amount | Number of Loans | Dollar Amount | Number of Loans | Dollar Amount | Number of Loans | Dollar Amount |
|---|---|---|---|---|---|---|---|---|
| Portfolio | 54,143 | $6,440,312 | 75,898 | $9,388,238 | 90,370 | $11,146,244 | 73,597 | $8,326,818 |
| Delinquency | | | | | | | | |
| 30 to 59 days | 2.78% | 2.28% | 2.41% | 1.83% | 2.40% | 1.83% | 2.69% | 2.28% |
| 60 to 89 days | 0.87% | 0.71% | 0.70% | 0.54% | 0.84% | 0.66% | 0.86% | 0.72% |
| 90 days or more | 1.94% | 1.40% | 1.75% | 1.31% | 1.43% | 1.15% | 1.41% | 1.21% |
| Total | 5.59% | 4.39% | 4.86% | 3.68% | 4.67% | 3.64% | 4.96% | 4.21% |
| Foreclosure rate | 2.75% | 2.34% | 2.72% | 2.20% | 2.47% | 2.66% | 2.65% | 2.48% |
| REO properties | 407 | N/A | 504 | N/A | 532 | N/A | 480 | N/A |

The delinquency statistics set forth above were calculated using the OTS methodology. Under the OTS methodology, a mortgage loan is not considered delinquent until any payment is contractually past due 30 days or more, assuming 30-day months. For example, a mortgage loan due on the first day of a month is not considered delinquent until the first day of the next month. The delinquency statistics for the period exclude mortgage loans in foreclosure. The portfolio statistics set forth above exclude REO Properties.

The foreclosure rate reflects the number of mortgage loans in foreclosure as a percentage of the total number of mortgage loans or the dollar amount of mortgage loans in foreclosure as a percentage of the total dollar amount of mortgage loans, as the case may be, as of the date indicated. REO properties are real estate owned properties which relate to foreclosed mortgages or properties for which deeds in lieu of foreclosure have been accepted, and held by CHF pending disposition.

**Loan Loss Experience of the**
**CHF Subprime Securitized Servicing Portfolio**
**(Dollars in Thousands)**

| | Nine Months Ending September 30, | Year Ending December 31, | | |
| | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|
| Average amount outstanding | $7,688,139 | $10,443,888 | $9,642,035 | $7,902,732 |
| Net losses | $ 47,426 | $ 73,858 | $ 73,504 | $ 43,458 |
| Net losses as a percentage of average amount outstanding | 0.62% | 0.71% | 0.76% | 0.55% |

The average amount outstanding during the period is the arithmetic average of the principal balances of the mortgage loans outstanding on the last business day of each month during the period. Net losses are amounts relating to mortgage loans which have been determined by CHF to be uncollectible, less amounts received by CHF as recoveries from liquidation proceeds and deficiency judgments.

There can be no assurance that the delinquency, foreclosures and loss experience on the Mortgage Loans will correspond to the delinquency, foreclosure and loss experience set forth in the foregoing tables. Moreover, the Mortgage Loans subserviced by CHF for JPMorgan in this transaction were acquired by the Seller from an originator other than CHF. In general, during periods in which the residential real estate market is experiencing an overall decline in property values such that the principal balances of the Mortgage Loans and any secondary financing on the related Mortgaged Properties become equal to or greater than the value of the related Mortgaged Properties, rates of delinquencies, foreclosure and losses could be significantly higher than might otherwise be the case. In addition, adverse economic conditions (which may affect real property values) may affect the timely

S-62

payment by Mortgagors of Monthly Payments, and accordingly, the actual rates of delinquencies, foreclosures and losses with respect to the Mortgage Loans in the Trust Fund.

**Collection Procedures**

CHF employs a variety of collection techniques during the various stages of delinquency. The primary purpose of all collection efforts performed by CHF is to bring a delinquent mortgage loan current in as short a time as possible. Phone calls are used as the principal form of contacting a mortgagor. CHF utilizes a combination of predictive and preview dealer strategies to maximize the results of collection calling activity. Prior to initiating foreclosure proceedings, CHF makes every reasonable effort to determine the reason for the default, whether the delinquency is a temporary or permanent condition, and the mortgagor's attitude toward the mitigation. CHF will take action to foreclose a mortgage only once every reasonable effort to cure the default has been made and a projection of the ultimate gain or loss on REO sale is determined. In accordance with accepted servicing practices, foreclosures are processed within individual state guidelines and in accordance with the provisions of the mortgage and applicable state law.

## DESCRIPTION OF THE CERTIFICATES

**General**

On or about April 27, 2006 (the "Closing Date"), the Certificates will be issued pursuant to the Pooling Agreement. Set forth below are summaries of the specific terms and provisions of the Pooling Agreement. The following summaries are subject to, and are qualified in their entirety by reference to, the provisions of the Pooling Agreement. When particular provisions or terms used in the Pooling Agreement are referred to, the actual provisions (including definitions of terms) are incorporated by reference.

The Certificates will consist of (a) the Class A-1, Class A-2, Class A-3, Class A-4 and Class A-5 Certificates (the "Senior Certificates") and (b) the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates (the "Subordinate Certificates" or the "Subordinate Classes") and the Class C, Class P and Class R Certificates (the "Non-Offered Certificates"). The Senior Certificates and the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates are sometimes collectively referred to herein as the "Offered Certificates." Only the Offered Certificates are offered under this prospectus supplement. The Class M-10 and Class M-11 Certificates are referred to as the "Privately-Offered Certificates." The Privately-Offered Certificates and the Non-Offered Certificates are not offered under this prospectus supplement. Accordingly, the description of the Privately-Offered Certificates and the Non-Offered Certificates provided in this prospectus supplement is solely for informational purposes. The Class C, Class P and Class R Certificate will initially be retained by an affiliate of the Depositor, the Sponsor and the Underwriter.

The Offered Certificates will be issued in the initial Class Principal Amounts set forth in the table under "Summary—Offered Certificates". The Class M-10 and Class M-11 Certificates will be issued in the initial Class Principal Amount set forth in the table under "Summary—Offered Certificates".

The initial Class Principal Amounts of each class may be increased or decreased by up to 5% to the extent that the Stated Principal Balance of the Mortgage Loans is increased or decreased as described at "Description of the Mortgage Pool." In addition, percentages and dollar figures set forth in this prospectus supplement are subject to a variance of plus or minus 5%.

The Offered Certificates will be issued in minimum denominations in principal amounts of $100,000 and integral multiples of $1 in excess thereof.

The Certificates represent beneficial ownership interests in a trust fund (the "Trust Fund"), the assets of which on the Closing Date will consist primarily of (1) the Mortgage Loans; (2) such assets as from time to time are identified as deposited in respect of the Mortgage Loans in the Collection Account and the Distribution Account (see "The Pooling Agreement—Payments on Mortgage Loans; Deposits to Collection Account and Distribution Account" below); (3) property acquired by foreclosure of the Mortgage Loans or deed in lieu of foreclosure; (4) any applicable insurance policies; and (5) the distribution on and proceeds of all of the foregoing.

S-63

JPMC_DEX_000402696

Solely for purposes of determining distributions of interest and principal on the Senior Certificates, the Senior Certificates have been divided into the following payment groups (each a "Certificate Group"):

THE GROUP 1 CERTIFICATES: The Class A-1 Certificates are referred to herein as the "Group 1 Certificates." Distributions of interest and principal on the Class A-1 Certificates will be based primarily on interest and principal received on, or advanced with respect to, the Group 1 Mortgage Loans.

THE GROUP 2 CERTIFICATES: The Class A-2, Class A-3, Class A-4 and Class A-5 Certificates are referred to herein as the "Group 2 Certificates." Distributions of interest and principal on the Class A-2, Class A-3, Class A-4 and Class A-5 Certificates will be based primarily on interest and principal received on, or advanced with respect to, the Group 2 Mortgage Loans.

Distributions of interest and principal on the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 and the other Subordinate Classes will be based solely on interest and principal received on, or advanced with respect to, the Group 1 and Group 2 Mortgage Loans in the aggregate.

Distributions on the Certificates will be made by the Securities Administrator on the 25th day of each month, or if such day is not a Business Day, on the first Business Day thereafter commencing in May 2006 (each, a "Distribution Date"), to the persons in whose names such Certificates are registered on the Record Date. For this purpose, a "Business Day" is any day other than (i) a Saturday or Sunday, or (ii) a day on which banking institutions in The City of New York, New York, the Commonwealth of Pennsylvania, the States of California, Texas, New Jersey and Minnesota or the city in which the Corporate Trust Office of the Trustee or Securities Administrator is located are authorized or obligated by law or executive order to be closed. A "Record Date" with respect to any Distribution Date and the Offered Certificates for so long as they are in book-entry form is the Business Day immediately preceding that Distribution Date and the Record Date for any book-entry certificate that becomes a definitive certificate is the last Business Day of the month preceding the month of that Distribution Date.

Payments on each Distribution Date will be made by check mailed to the address of the holder of the certificate (the "Certificateholder") entitled thereto as it appears on the applicable certificate register or, in the case of a Certificateholder who holds Certificates with an aggregate initial Class Principal Amount of $1,000,000 or more and who has so notified the Securities Administrator in writing in accordance with the Pooling Agreement, by wire transfer in immediately available funds to the account of such Certificateholder at a bank or other depository institution having appropriate wire transfer facilities; provided, however, that the final payment in retirement of the Certificates will be made only upon presentment and surrender of such Certificates at the Corporate Trust Office of the Securities Administrator. See "—Book–Entry Certificates" below for the method of payment to Beneficial Owners of Book-Entry Certificates.

**Book-Entry Certificates**

The Offered Certificates will be book-entry certificates (the "Book-Entry Certificates"). For a description of the procedures generally applicable to the Book-Entry Certificates, see "Description of the Securities—Book-Entry Registration of Securities" in the accompanying prospectus.

**Glossary**

The "Accrual Period" for the Offered Certificates for any Distribution Date will be the actual number of days (based on a 360-day year) included in the period commencing on the immediately preceding Distribution Date (or, in the case of the first such Accrual Period, commencing on the Closing Date) and ending on the day immediately preceding such Distribution Date.

The "Administrative Fee" for any Distribution Date is the sum of the Servicing Fee, the Securities Administrator Fee, the Custodian Fee, the Trustee Fee and the Trust Oversight Manager Fee, each for such Distribution Date.

An "Allocated Realized Loss Amount" with respect to any class of Subordinate Certificates and any Distribution Date is an amount equal to the sum of (i) any Realized Loss allocated to that class of certificates on that Distribution Date and (ii) any Realized Loss allocated to that class of certificates on any previous Distribution Date

S-64

that has not been reimbursed as reduced by an amount equal to the increase in the related Class Principal Amount due to the receipt of Subsequent Recoveries.

The "Class Principal Amount" of any Offered Certificate, Class M-10, Class M-11 or Class P Certificate immediately prior to any Distribution Date will be equal to the Class Principal Amount thereof on the Closing Date (the "Original Class Principal Amount") reduced by the sum of (a) all amounts actually distributed in respect of principal of such class and (b) with respect to the Subordinate Certificates, any reductions in the Class Principal Amount thereof deemed to have occurred in connection with allocations of Realized Losses on all prior Distribution Dates. The Class Principal Amount of the Subordinate Certificates with respect to which there is an unpaid Allocated Realized Loss Amount may be increased by the amount of any Subsequent Recoveries as set forth in the Pooling Agreement.

The "Class A Principal Distribution Amount" is an amount equal to the excess of (x) the aggregate Class Principal Amount of the Senior Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (1) approximately 57.30% and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period minus the Overcollateralization Floor.

The "Class M-1 Principal Distribution Amount" is an amount equal to, with respect to any Distribution Date, the excess of (x) the sum of (1) the aggregate Class Principal Amount of the Senior Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date) and (2) the Class Principal Amount of the Class M-1 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (1) approximately 66.50% and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period minus the Overcollateralization Floor.

The "Class M-2 Principal Distribution Amount" is an amount equal to, with respect to any Distribution Date, the excess of (x) the sum of (1) the aggregate Class Principal Amount of the Senior Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (2) the Class Principal Amount of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date) and (3) the Class Principal Amount of the Class M-2 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (1) approximately 73.10% and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period minus the Overcollateralization Floor.

The "Class M-3 Principal Distribution Amount" is an amount equal to, with respect to any Distribution Date, the excess of (x) the sum of (1) the aggregate Class Principal Amount of the Senior Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (2) the Class Principal Amount of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Class Principal Amount of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date) and (4) the Class Principal Amount of the Class M-3 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (1) approximately 76.80% and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period minus the Overcollateralization Floor.

The "Class M-4 Principal Distribution Amount" is an amount equal to, with respect to any Distribution Date, the excess of (x) the sum of (1) the aggregate Class Principal Amount of the Senior Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (2) the Class Principal Amount of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Class Principal Amount of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Class Principal Amount of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date) and (5) the Class Principal Amount of the Class M-4 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (1) approximately 79.80% and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due

S-65

JPMC_DEX_000402698

Period and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period minus the Overcollateralization Floor.

The "Class M-5 Principal Distribution Amount" is an amount equal to, with respect to any Distribution Date, the excess of (x) the sum of (1) the aggregate Class Principal Amount of the Senior Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (2) the Class Principal Amount of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Class Principal Amount of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Class Principal Amount of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (5) the Class Principal Amount of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date) and (6) the Class Principal Amount of the Class M-5 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (1) approximately 82.60% and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period minus the Overcollateralization Floor.

The "Class M-6 Principal Distribution Amount" is an amount equal to, with respect to any Distribution Date, the excess of (x) the sum of (1) the aggregate Class Principal Amount of the Senior Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (2) the Class Principal Amount of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Class Principal Amount of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Class Principal Amount of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (5) the Class Principal Amount of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (6) the Class Principal Amount of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date) and (7) the Class Principal Amount of the Class M-6 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (1) approximately 85.50% and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period minus the Overcollateralization Floor.

The "Class M-7 Principal Distribution Amount" is an amount equal to, with respect to any Distribution Date, the excess of (x) the sum of (1) the aggregate Class Principal Amount of the Senior Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (2) the Class Principal Amount of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Class Principal Amount of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Class Principal Amount of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (5) the Class Principal Amount of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (6) the Class Principal Amount of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date), (7) the Class Principal Amount of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such Distribution Date) and (8) the Class Principal Amount of the Class M-7 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (1) approximately 88.40% and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period minus the Overcollateralization Floor.

The "Class M-8 Principal Distribution Amount" is an amount equal to, with respect to any Distribution Date, the excess of (x) the sum of (1) the aggregate Class Principal Amount of the Senior Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (2) the Class Principal Amount of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Class Principal Amount of the Class M-2 Certificates (after

S-66

Confidential

JPMC_DEX_000402699

taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Class Principal Amount of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (5) the Class Principal Amount of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (6) the Class Principal Amount of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date), (7) the Class Principal Amount of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such Distribution Date), (8) the Class Principal Amount of the Class M-7 Certificates (after taking into account the payment of the Class M-7 Principal Distribution Amount on such Distribution Date) and (9) the Class Principal Amount of the Class M-8 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (1) approximately 90.70% and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period minus the Overcollateralization Floor.

The "Class M-9 Principal Distribution Amount" is an amount equal to, with respect to any Distribution Date, the excess of (x) the sum of (1) the aggregate Class Principal Amount of the Senior Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (2) the Class Principal Amount of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Class Principal Amount of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Class Principal Amount of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (5) the Class Principal Amount of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (6) the Class Principal Amount of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date), (7) the Class Principal Amount of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such Distribution Date), (8) the Class Principal Amount of the Class M-7 Certificates (after taking into account the payment of the Class M-7 Principal Distribution Amount on such Distribution Date), (9) the Class Principal Amount of the Class M-8 Certificates (after taking into account the payment of the Class M-8 Principal Distribution Amount on such Distribution Date) and (10) the Class Principal Amount of the Class M-9 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (1) approximately 92.40% and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period minus the Overcollateralization Floor.

The "Class M-10 Principal Distribution Amount" is an amount equal to, with respect to any Distribution Date, the excess of (x) the sum of (1) the aggregate Class Principal Amount of the Senior Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (2) the Class Principal Amount of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Class Principal Amount of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Class Principal Amount of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (5) the Class Principal Amount of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (6) the Class Principal Amount of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date), (7) the Class Principal Amount of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such Distribution Date), (8) the Class Principal Amount of the Class M-7 Certificates (after taking into account the payment of the Class M-7 Principal Distribution Amount on such Distribution Date), (9) the Class Principal Amount of the Class M-8 Certificates (after taking into account the payment of the Class M-8 Principal Distribution Amount on such Distribution Date), (10) the Class Principal Amount of the Class M-9 Certificates (after taking into account the payment of the Class M-9 Principal Distribution Amount on such Distribution Date) and (11) the Class Principal Amount of the Class M-10 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (1) approximately 93.70% and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period minus the Overcollateralization Floor.

S-67

JPMC_DEX_000402700

The "Class M-11 Principal Distribution Amount" is an amount equal to, with respect to any Distribution Date, the excess of (x) the sum of (1) the aggregate Class Principal Amount of the Senior Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (2) the Class Principal Amount of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (3) the Class Principal Amount of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (4) the Class Principal Amount of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (5) the Class Principal Amount of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (6) the Class Principal Amount of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date), (7) the Class Principal Amount of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such Distribution Date), (8) the Class Principal Amount of the Class M-7 Certificates (after taking into account the payment of the Class M-7 Principal Distribution Amount on such Distribution Date), (9) the Class Principal Amount of the Class M-8 Certificates (after taking into account the payment of the Class M-8 Principal Distribution Amount on such Distribution Date), (10) the Class Principal Amount of the Class M-9 Certificates (after taking into account the payment of the Class M-9 Principal Distribution Amount on such Distribution Date), (11) the Class Principal Amount of the Class M-10 Certificates (after taking into account the payment of the Class M-10 Principal Distribution Amount on such Distribution Date) and (12) the Class Principal Amount of the Class M-11 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (1) approximately 95.70% and (2) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period minus the Overcollateralization Floor.

A Mortgage Loan is "Delinquent" if any monthly payment due on a Due Date is not made by the close of business on the next scheduled Due Date for such Mortgage Loan. A Mortgage Loan is "30 days Delinquent" if such monthly payment has not been received by the close of business on the corresponding day of the month immediately succeeding the month in which such monthly payment was due or, if there was no such corresponding day (e.g., as when a 30-day month follows a 31-day month in which a payment was due on the 31st day of such month), then on the last day of such immediately succeeding month; and similarly for "60 days Delinquent" and "90 days Delinquent," etc.

A "Due Period" with respect to any Distribution Date is the period commencing on the second day of the month preceding the month in which such Distribution Date occurs and ending on the first day of the month in which such Distribution Date occurs.

The "Group 1 Basic Principal Distribution Amount" with respect to any Distribution Date is the excess of (i) the Group 1 Principal Remittance Amount for such Distribution Date over (ii) the Overcollateralization Release Amount, if any, for such Distribution Date multiplied by the Group 1 Percentage.

The "Group 1 Interest Remittance Amount" with respect to any Distribution Date is that portion of the Available Funds for such Distribution Date attributable to interest received or advanced with respect to the Group 1 Mortgage Loans and Compensating Interest paid by the Servicer with respect to the Group 1 Mortgage Loans.

The "Group 1 Percentage" is an amount equal to, with respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the Group 1 Principal Remittance Amount for such Distribution Date and the denominator of which is the Principal Remittance Amount for such Distribution Date.

The "Group 1 Principal Distribution Amount" with respect to any Distribution Date is sum of (i) the Group 1 Basic Principal Distribution Amount for such Distribution Date and (ii) the Overcollateralization Increase Amount for such Distribution Date multiplied by the Group 1 Percentage.

The "Group 1 Principal Remittance Amount" means, with respect to any Distribution Date, the portion of the Principal Remittance Amount for such Distribution Date derived from the Group 1 Mortgage Loans.

The "Group 1 Senior Principal Distribution Amount" is an amount equal to Class A Principal Distribution Amount multiplied by the Group 1 Percentage.

S-68

Confidential

JPMC_DEX_000402701

The "Group 2 Basic Principal Distribution Amount" with respect to any Distribution Date is the excess of (i) the Group 2 Principal Remittance Amount for such Distribution Date over (ii) the Overcollateralization Release Amount, if any, for such Distribution Date multiplied by the Group 2 Percentage.

The "Group 2 Interest Remittance Amount" with respect to any Distribution Date is that portion of the Available Funds for such Distribution Date attributable to interest received or advanced with respect to the Group 2 Mortgage Loans and Compensating Interest paid by the Servicer with respect to the Group 2 Mortgage Loans.

The "Group 2 Percentage" is an amount equal to, with respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the Group 2 Principal Remittance Amount for such Distribution Date and the denominator of which is the Principal Remittance Amount for such Distribution Date.

The "Group 2 Principal Distribution Amount" with respect to any Distribution Date is sum of (i) the Group 2 Basic Principal Distribution Amount for such Distribution Date and (ii) the Overcollateralization Increase Amount for such Distribution Date multiplied by the Group 2 Percentage.

The "Group 2 Principal Remittance Amount" means, with respect to any Distribution Date, the portion of the Principal Remittance Amount for such Distribution Date derived from the Group 2 Mortgage Loans.

The "Group 2 Senior Principal Distribution Amount" is an amount equal to the Class A Principal Distribution Amount multiplied by the Group 2 Percentage.

The "Interest Remittance Amount" with respect to any Distribution Date is that portion of the Available Funds for such Distribution Date attributable to interest received or advanced with respect to the Mortgage Loans and Compensating Interest paid by the Servicer with respect to the Mortgage Loans.

The "Monthly Interest Distributable Amount" for any Distribution Date and each class of Offered, Class M-10 and Class M-11 Certificates will equal the amount of interest accrued during the related Accrual Period at the related Certificate Interest Rate on the Class Principal Amount for such Distribution Date, reduced by any Net Prepayment Interest Shortfalls and Relief Act Interest Shortfalls allocated to such class (allocated to each class based on its respective entitlements to interest irrespective of any Net Prepayment Interest Shortfalls or Relief Act Interest Shortfalls for such Distribution Date).

The "Net Monthly Excess Cashflow" for any Distribution Date is equal to the sum of (a) any Overcollateralization Release Amount and (b) the excess of (x) the Available Funds for such Distribution Date over (y) the sum for such Distribution Date of (A) the Monthly Interest Distributable Amounts for the Offered Certificates, the Class M-10 Certificates and the Class M-11 Certificates, (B) the Unpaid Interest Shortfall Amounts for the Senior Certificates and (C) the Principal Remittance Amount.

An "Overcollateralization Deficiency Amount" with respect to any Distribution Date equals the amount, if any, by which the Overcollateralization Target Amount exceeds the Overcollateralized Amount on such Distribution Date (after giving effect to distributions in respect of the aggregate Principal Remittance Amount on such Distribution Date).

The "Overcollateralization Floor" with respect to any Distribution Date is an amount equal to the product of (i) 0.50% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date.

The "Overcollateralization Increase Amount" for any Distribution Date is the lesser of (x) the Net Monthly Excess Cashflow for such Distribution Date and (y) the Overcollateralization Deficiency Amount for such Distribution Date.

The "Overcollateralization Release Amount" means, with respect to any Distribution Date, the lesser of (x) the Principal Remittance Amount for such Distribution Date and (y) the excess, if any, of (1) the Overcollateralized Amount for such Distribution Date over (2) the Overcollateralization Target Amount for such Distribution Date.

S-69

JPMC_DEX_000402702

The "Overcollateralization Target Amount" means with respect to any Distribution Date (1) prior to the Stepdown Date, approximately 2.15% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date, (2) on or after the Stepdown Date provided a Trigger Event is not in effect, the greater of (x) 4.30% of the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period and (y) the Overcollateralization Floor , and (3) on or after the Stepdown Date if a Trigger Event is in effect, the Overcollateralization Target Amount for the immediately preceding Distribution Date.

The "Overcollateralized Amount" for any Distribution Date is the amount, if any, by which (x) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period exceeds (y) the sum of the aggregate Class Principal Amount of the Offered Certificates, the Class M-10 Certificates, the Class M-11 Certificates and the Class P Certificates as of such Distribution Date (assuming that 100% of the Principal Remittance Amount is applied as a principal payment on such Distribution Date). Initially, the Overcollateralized Amount will be approximately 2.15% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date, which is approximately $20,009,120.

The "Prepayment Period" for any Distribution Date and any principal prepayment in full received on a Mortgage Loan, is the period that (a) commences on the 16th calendar day in the month immediately preceding the month in which such Distribution Date occurs and (b) ends on the 15th calendar day in the month in which such Distribution Date occurs. The Prepayment Period for any Distribution Date and any principal prepayment in part received on a Mortgage Loan, is the calendar month preceding that Distribution Date.

The "Principal Distribution Amount" means with respect to any Distribution Date the sum of the Group 1 Principal Distribution Amount and the Group 2 Principal Distribution Amount, in each case, for such Distribution Date.

The "Principal Remittance Amount" means with respect to any Distribution Date, that portion of Available Funds equal to the sum of (i) all scheduled payments of principal collected or advanced on the Mortgage Loans by the Servicer that were due during the related Due Period, (ii) the principal portion of all partial and full principal prepayments of the Mortgage Loans applied by the Servicer during the related Prepayment Period, (iii) the principal portion of all related Net Liquidation Proceeds, Subsequent Recoveries, condemnation proceeds and insurance proceeds received during the calendar month preceding the month of such Distribution Date, (iv) that portion of the Purchase Price, representing principal of any repurchased Mortgage Loan, deposited in the Collection Account during the calendar month preceding the month of such Distribution Date, (v) the principal portion of any related Substitution Adjustments deposited in the Collection Account during the calendar month preceding the month of such Distribution Date, and (vi) on the Distribution Date on which the Trust is to be terminated in accordance with the Pooling Agreement, that portion of the Termination Price, in respect of principal.

A "Realized Loss" means, with respect to any defaulted Mortgage Loan that is finally liquidated (a "Liquidated Mortgage Loan"), the amount of loss realized equal to the portion of the Stated Principal Balance remaining unpaid after application of all liquidation proceeds net of amounts reimbursable to the Servicer for related Advances, Servicing Advances, Servicing Fees and liquidation expenses (such amount, the "Net Liquidation Proceeds") in respect of such Mortgage Loan. If the Servicer receives any Subsequent Recoveries with respect to any Mortgage Loan, the amount of the Realized Loss with respect to that Mortgage Loan will be deemed reduced to the extent such recoveries are included in the Principal Remittance Amount on any Distribution Date.

The "Senior Enhancement Percentage" for any Distribution Date is the percentage obtained by dividing (x) the sum of (i) the aggregate Class Principal Amount of the Subordinate Certificates (after giving effect to the distribution of the Principal Distribution Amount on such Distribution Date) and (ii) the Overcollateralized Amount (after giving effect to the distribution of the Principal Distribution Amount on such Distribution Date) by (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period.

The "Stated Principal Balance" of a Mortgage Loan at any Due Date is equal to the unpaid principal balance of such Mortgage Loan as of the Cut-off Date as specified in the mortgage loan schedule less any amounts received representing payments or recoveries of principal or advances in lieu thereof.

The "Stepdown Date" means the earlier to occur of (1) the Distribution Date on which the aggregate Class Principal Amount of the Senior Certificates has been reduced to zero and (2) the later to occur of (x) the Distribution

S-70

JPMC_DEX_000402703

Date occurring May 2009, and (y) the first Distribution Date on which the Senior Enhancement Percentage is greater than or equal to 42.70% (for the purpose of this definition only, the Senior Enhancement Percentage shall be calculated prior to the distribution of Principal Distribution Amount on the Subordinate Certificates).

"Subsequent Recoveries" are, in the case of any Distribution Date, unexpected amounts received by the Servicer (net of any related reimbursable expenses) specifically related to a Mortgage Loan as to which a Realized Loss was incurred in connection with a final liquidation of such Mortgage Loan occurring prior to the related Prepayment Period for such Distribution Date. It is not expected that there will be any material amount of Subsequent Recoveries.

A "Trigger Event" is in effect with respect to any Distribution Date on or after the Stepdown Date if either (i) the percentage obtained by dividing (x) the aggregate Stated Principal Balance of the Mortgage Loans that are 60 days or more Delinquent or REO or in bankruptcy or in foreclosure as of the last day of the prior calendar month by (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the previous calendar month exceeds 37.40% of the Senior Enhancement Percentage for such Distribution Date or (ii) the cumulative Realized Losses (after reduction for all Subsequent Recoveries received from the Cut-off Date through the last day of the related Due Period) as a percentage of the original aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date is greater than the percentage set forth in the following table:

| Range of Distribution Dates | Percentage* |
| --- | --- |
| May 2008 – April 2009 | 1.20% |
| May 2009 – April 2010 | 2.65% |
| May 2010 – April 2011 | 4.15% |
| May 2011 – April 2012 | 5.35% |
| May 2012 and thereafter | 6.00% |

\* The percentages indicated are the percentages applicable for the first Distribution Date in the corresponding range of Distribution Dates. The percentage for each succeeding Distribution Date in a range increases incrementally by 1/12th of the positive difference between the percentage applicable to the first Distribution Date in that range and the percentage applicable to the first Distribution Date in the succeeding range.

The "Unpaid Interest Shortfall Amount" means (i) for the first Distribution Date and with respect to the Senior Certificates and the Subordinate Certificates, zero, and (ii) for such class of certificates and any Distribution Date after the first Distribution Date, the amount, if any, by which (a) the sum of (1) the Monthly Interest Distributable Amount for such class of certificates for the immediately preceding Distribution Date and (2) the outstanding Unpaid Interest Shortfall Amount, if any, for such class of certificates for such preceding Distribution Date exceeds (b) the aggregate amount distributed on such class of certificates in respect of interest on such preceding Distribution Date, plus interest on the amount of interest due but not paid on the class of certificates on such preceding Distribution Date, to the extent permitted by law, at the Certificate Interest Rate on such Distribution Date for such class of certificates for the related Accrual Period.

The "Unpaid Realized Loss Amount" means for any class of Subordinate Certificates, the portion of the aggregate Allocated Realized Loss Amount previously allocated to that class remaining unpaid from prior Distribution Dates.

**Allocation of Available Funds**

Distributions to holders of each class of Offered Certificates will be made on each Distribution Date from Available Funds. With respect to any Distribution Date, "Available Funds" will be equal to the sum of the following amounts with respect to the Mortgage Loans, net of amounts reimbursable therefrom to the Servicer, the Securities Administrator, the Custodian, the Trust Oversight Manager and the Trustee in respect of expenses and indemnification as described in the Pooling Agreement and amounts reimbursable to the Swap Provider (including any Net Swap Payment and any amount, if any, owed by the supplemental interest trust to the Swap Provider upon a Swap Early Termination (the "Swap Termination Payment") owed to the Swap Provider but excluding any Swap Termination Payment owed to the Swap Provider resulting from any Swap Termination Payment that is triggered upon: (i) an Event of Default under the Interest Rate Swap Agreement with respect to which the Swap Provider is a Defaulting Party (as defined in the Interest Rate Swap Agreement), (ii) a Termination Event under the Interest Rate

S-71

Swap Agreement with respect to which the Swap Provider is the sole Affected Party (as defined in the Interest Rate Swap Agreement) or (iii) an Additional Termination Event under the Interest Rate Swap Agreement with respect to which the Swap Provider is the sole Affected Party ("Swap Provider Trigger Event"):

- the aggregate amount of scheduled monthly payments on the Mortgage Loans due during the related Due Period and received by the related Determination Date, after deduction of the Servicing Fee, the Custodian Fee, the Trust Oversight Management Fee and the Securities Administrator Fee and any Prepayment Interest Excess for such Distribution Date and any accrued and unpaid Servicing Fees in respect of any prior Distribution Dates;

- unscheduled full and partial prepayments for such Mortgage Loans occurring during the related Prepayment Period (excluding prepayment premiums) and insurance proceeds, condemnation proceeds, Net Liquidation Proceeds, Subsequent Recoveries and proceeds from repurchases of and substitutions for such Mortgage Loans occurring during the calendar month preceding the month of such Distribution Date; and

- payments from the Servicer in connection with Advances and Compensating Interest for such Distribution Date.

The holders of the Class P Certificates will be entitled to all prepayment premiums received on the Mortgage Loans and such amounts will not be available for distribution to the holders of the Offered Certificates.

**Distributions of Interest**

On each Distribution Date the Securities Administrator will withdraw from the Distribution Account that portion of Available Funds, after paying itself the Securities Administrator Fee and paying the Custodian the Custodian Fee and the Trust Oversight Manager the Trust Oversight Management Fee, for such Distribution Date consisting of the Interest Remittance Amount for such Distribution Date and make the following disbursements and transfers in the order of priority described below, in each case to the extent of the Interest Remittance Amount remaining for such Distribution Date.

1. *concurrently*, to the holders of the Senior Certificates, the related Monthly Interest Distributable Amount for each such class for such Distribution Date, on a *pro rata* basis with respect to the Senior Certificates of the same Group, based on the entitlement of each such class pursuant to this Clause 1, and applied in accordance with the allocation rules set forth below;

2. *concurrently*, to the holders of the Senior Certificates, the related Unpaid Interest Shortfall Amount, if any, for each such class for each such Distribution Date, on a *pro rata* basis with respect to the Senior Certificates of the same Group, based on the entitlement of each such class pursuant to this Clause 2, and applied in accordance with the allocation rules set forth below;

3. to the holders of the Class M-1 Certificates, the Monthly Interest Distributable Amount allocable to such certificates;

4. to the holders of the Class M-2 Certificates, the Monthly Interest Distributable Amount allocable to such certificates;

5. to the holders of the Class M-3 Certificates, the Monthly Interest Distributable Amount allocable to such certificates;

6. to the holders of the Class M-4 Certificates, the Monthly Interest Distributable Amount allocable to such certificates;

7. to the holders of the Class M-5 Certificates, the Monthly Interest Distributable Amount allocable to such certificates;

S-72

Confidential

JPMC_DEX_000402705

77

8.      to the holders of the Class M-6 Certificates, the Monthly Interest Distributable Amount allocable to such certificates.

9.      to the holders of the Class M-7 Certificates, the Monthly Interest Distributable Amount allocable to such certificates;

10.     to the holders of the Class M-8 Certificates, the Monthly Interest Distributable Amount allocable to such certificates;

11.     to the holders of the Class M-9 Certificates, the Monthly Interest Distributable Amount allocable to such certificates;

12.     to the holders of the Class M-10 Certificates, the Monthly Interest Distributable Amount allocable to such certificates; and

13.     to the holders of the Class M-11 Certificates, the Monthly Interest Distributable Amount allocable to such certificates.

The Interest Remittance Amount distributed pursuant to Clauses 1. and 2. above will be applied to the Senior Certificates as follows:

1.      amounts distributed to the Class A-1 Certificates will reduce the Group 1 Interest Remittance Amount before any reduction to the Group 2 Interest Remittance Amount in respect of such distribution; and

2.      amounts distributed to the Class A-2, Class A-3, Class A-4 and Class A-5 Certificates will reduce the Group 2 Interest Remittance Amount before any reduction to the Group 1 Interest Remittance Amount in respect of such distribution.

Any Interest Remittance Amounts remaining undistributed following these distributions will be used in determining the amount of Net Monthly Excess Cashflow, if any, for such Distribution Date. On any Distribution Date, any Relief Act Interest Shortfalls and any Prepayment Interest Shortfalls to the extent not covered by Compensating Interest paid by the Servicer will first reduce Net Monthly Excess Cashflow as provided under "– Overcollateralization Provisions" and then reduce the Monthly Interest Distributable Amounts with respect to the Offered Certificates, the Class M-10 Certificates and the Class M-11 Certificates on a *pro rata* basis based on the respective amounts of interest accrued on such certificates for such Distribution Date.

**Distributions of Principal**

A.      On each Distribution Date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect, the Securities Administrator will withdraw from the Distribution Account that portion of Available Funds equal to the Group 1 Principal Distribution Amount for such Distribution Date, and make the following disbursements and transfers in the order of priority described below, in each case to the extent of the Group 1 Principal Distribution Amount remaining for such Distribution Date:

1.      to the holders of the Group 1 Certificates, until the Class Principal Amount thereof has been reduced to zero; and

2.      to the holders of the Group 2 Certificates, allocated as provided below, until the Class Principal Amounts thereof have been reduced to zero.

B.      On each Distribution Date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect, the Securities Administrator will withdraw from the Distribution Account that portion of Available Funds equal to the Group 2 Principal Distribution Amount for such Distribution Date, and make the following disbursements and transfers in the order of priority described below, in each case to the extent of the Group 2 Principal Distribution Amount remaining for such Distribution Date:

S-73

JPMC_DEX_000402706

1.      to the holders of the Group 2 Certificates, allocated as provided below, until the Class Principal Amounts thereof have been reduced to zero; and

2.      to the holders of the Group 1 Certificates, until the Class Principal Amount thereof has been reduced to zero.

C.      On each Distribution Date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect, the Securities Administrator will withdraw from the Distribution Account that portion of Available Funds equal to the remaining Group 1 Principal Distribution Amount and the Group 2 Principal Distribution Amount for such Distribution Date, and make the following disbursements and transfers in the order of priority described below:

1.      to the holders of the Class M-1 Certificates, until the Class Principal Amount thereof has been reduced to zero;

2.      to the holders of the Class M-2 Certificates, until the Class Principal Amount thereof has been reduced to zero;

3.      to the holders of the Class M-3 Certificates, until the Class Principal Amount thereof has been reduced to zero;

4.      to the holders of the Class M-4 Certificates, until the Class Principal Amount thereof has been reduced to zero;

5.      to the holders of the Class M-5 Certificates, until the Class Principal Amount thereof has been reduced to zero;

6.      to the holders of the Class M-6 Certificates, until the Class Principal Amount thereof has been reduced to zero;

7.      to the holders of the Class M-7 Certificates, until the Class Principal Amount thereof has been reduced to zero;

8.      to the holders of the Class M-8 Certificates, until the Class Principal Amount thereof has been reduced to zero;

9.      to the holders of the Class M-9 Certificates, until the Class Principal Amount thereof has been reduced to zero;

10.     to the holders of the Class M-10 Certificates, until the Class Principal Amount thereof has been reduced to zero; and

11.     to the holders of the Class M-11 Certificates, until the Class Principal Amount thereof has been reduced to zero.

D.      On each Distribution Date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, the holders of each Group 1 Principal Distribution Amount will be distributed in the following amounts and order of priority:

1.      the holders of the Group 1 Certificates, the Group 1 Senior Principal Distribution Amount until the Class Principal Amounts thereof have been reduced to zero; and

2.      to the holders of each class of Group 2 Certificates, allocated as provided below, an amount equal to the excess, if any, of (x) the amount required to be distributed pursuant to clause E.1. below for such Distribution Date over (y) the amount actually distributed pursuant to clause E.1. below from the Group 2 Principal Distribution Amount on such Distribution Date.

S-74

JPMC_DEX_000402707

E. On each Distribution Date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, the Group 2 Principal Distribution Amount will be distributed in the following order of priority:

1. to the holders of each class of the Group 2 Certificates, allocated as provided below, the Group 2 Senior Principal Distribution Amount, until the Class Principal Amount thereof has been reduced to zero; and

2. to the holders of each class of the Group 1 Certificates, an amount equal to the excess, if any, of (x) the amount required to be distributed pursuant to clause D.1. above for such Distribution Date over (y) the amount actually distributed pursuant to clause D.1. below from the Group 1 Principal Distribution Amount on such Distribution Date.

F. On each Distribution Date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, any remaining Group 1 Principal Distribution amount and Group 2 Principal Distribution Amount will be distributed in the following order of priority:

1. to the holders of the Class M-1 Certificates, the Class M-1 Principal Distribution Amount for such Distribution Date until the Class Principal Amount thereof has been reduced to zero;

2. to the holders of the Class M-2 Certificates, the Class M-2 Principal Distribution Amount for such Distribution Date until the Class Principal Amount thereof has been reduced to zero;

3. to the holders of the Class M-3 Certificates, the Class M-3 Principal Distribution Amount for such Distribution Date until the Class Principal Amount thereof has been reduced to zero;

4. to the holders of the Class M-4 Certificates, the Class M-4 Principal Distribution Amount for such Distribution Date until the Class Principal Amount thereof has been reduced to zero;

5. to the holders of the Class M-5 Certificates, the Class M-5 Principal Distribution Amount for such Distribution Date until the Class Principal Amount thereof has been reduced to zero;

6. to the holders of the Class M-6 Certificates, the Class M-6 Principal Distribution Amount for such Distribution Date until the Class Principal Amount thereof has been reduced to zero;

7. to the holders of the Class M-7 Certificates, the Class M-7 Principal Distribution Amount for such Distribution Date until the Class Principal Amount thereof has been reduced to zero;

8. to the holders of the Class M-8 Certificates, the Class M-8 Principal Distribution Amount for such Distribution Date until the Class Principal Amount thereof has been reduced to zero;

9. to the holders of the Class M-9 Certificates, the Class M-9 Principal Distribution Amount for such Distribution Date until the Class Principal Amount thereof has been reduced to zero;

10. to the holders of the Class M-10 Certificates, the Class M-10 Principal Distribution Amount for such Distribution Date until the Class Principal Amount thereof has been reduced to zero; and

11. to the holders of the Class M-11 Certificates, the Class M-11 Principal Distribution Amount for such Distribution Date until the Class Principal Amount thereof has been reduced to zero.

With respect to the Group 2 Certificates, distributions of principal will be made sequentially to the Class A-2, Class A-3, Class A-4 and Class A-5 Certificates, in that order, until the Class Principal Amounts thereof have been reduced to zero; provided, however, that on any Distribution Date after the aggregate Class Principal Amount of the Subordinate Certificates has been reduced to zero, distributions of principal to the Class A-2, Class A-3, Class A-4 and Class A-5 Certificates will be made pro rata to such Classes based on their respective Class Principal Amounts.

S-75

JPMC_DEX_000402708

80

**Credit Enhancement**

The credit enhancement provided for the benefit of the holders of the Offered Certificates consists of subordination, overcollateralization, excess interest and the Interest Rate Swap Agreement.

The rights of the holders of the Subordinate Certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the holders of the Senior Certificates. This subordination is intended to enhance the likelihood of regular receipt by the holders of the Senior Certificates of the full amount of their scheduled monthly payments of interest and principal, as applicable, and to afford such holders protection against Realized Losses.

The protection afforded to the holders of the Senior Certificates by means of the subordination of the Subordinate Certificates will be accomplished by the preferential right of the holders of the Senior Certificates to receive on any Distribution Date, prior to distribution on the Subordinate Certificates, distributions in respect of interest and principal, as applicable.

In addition, the rights of the holders of the Subordinate Certificates with lower payment priorities will be junior to the rights of holders of the Subordinate Certificates with higher payment priorities, and the rights of the holders of the Subordinate Certificates to receive distributions in respect of the Mortgage Loans will be senior to the rights of the holders of the Class C Certificates to the extent described in this prospectus supplement. This subordination is intended to enhance the likelihood of regular receipt by the more senior classes of certificates of distributions in respect of interest and principal and to afford such classes protection against Realized Losses.

**Overcollateralization Provisions**

The weighted average net Mortgage Rate for the Mortgage Loans is generally expected to be higher than the weighted average of the Certificate Interest Rates on the Offered Certificates, the Class M-10 Certificates and the Class M-11 Certificates. As a result, interest collections on the Mortgage Loans are expected to be generated in excess of the amount of interest payable to the Offered Certificates, the Class M-10 Certificates and the Class M-11 Certificates and the fees and expenses payable by the Trust and Supplemental Interest Trust (including any Net Swap Payment owed to the Swap Provider and any Swap Termination Payment owed to the Swap Provider, other than any Swap Termination Payment resulting from a Swap Provider Trigger Event). The Pooling Agreement requires that on each Distribution Date, the Net Monthly Excess Cashflow, if any, be applied on such Distribution Date as an accelerated payment of principal on the class or classes of Offered Certificates, Class M-10 Certificates and Class M-11 Certificates then entitled to receive distributions in respect of principal, but only to the limited extent hereafter described.

With respect to any Distribution Date, any Net Monthly Excess Cashflow will be paid as follows:

1.      to the holders of the class or classes of Offered Certificates, the Class M-10 and Class M-11 Certificates then entitled to receive distributions in respect of principal, in an amount equal to the principal portion of any Realized Losses experienced on the related Mortgage Loans during the preceding month, payable to such holders as part of the Principal Distribution Amount;

2.      to the holders of the class or classes of Offered Certificates, the Class M-10 Certificates and Class M-11 Certificates then entitled to receive distributions in respect of principal, in an amount equal to the Overcollateralization Increase Amount (without taking into account amounts, if any, received under the Interest Rate Swap Agreement), payable to such holders as part of the Group 1 Principal Distribution Amount or Group 2 Principal Distribution Amount, as applicable, as described under "—Allocation of Available Funds—Distributions of Principal" above;

3.      to the holders of the Class M-1 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount allocable to such class;

4.      to the holders of the Class M-2 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount allocable to such class;

S-76

Confidential

JPMC_DEX_000402709

5.      to the holders of the Class M-3 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount allocable to such class;

6.      to the holders of the Class M-4 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount allocable to such class;

7.      to the holders of the Class M-5 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount allocable to such class;

8.      to the holders of the Class M-6 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount allocable to such class;

9.      to the holders of the Class M-7 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount allocable to such class;

10.     to the holders of the Class M-8 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount allocable to such class;

11.     to the holders of the Class M-9 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount allocable to such class;

12.     to the holders of the Class M-10 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount allocable to such class;

13.     to the holders of the Class M-11 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount allocable to such class;

14.     concurrently, to the holders of the Senior Certificates, pro rata, in an amount equal to each such class' previously allocated and not reimbursed share of Net Prepayment Interest Shortfalls, if any;

15.     to the holders of the Class M-1 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Net Prepayment Interest Shortfalls, if any;

16.     to the holders of the Class M-2 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Net Prepayment Interest Shortfalls, if any;

17.     to the holders of the Class M-3 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Net Prepayment Interest Shortfalls, if any;

18.     to the holders of the Class M-4 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Net Prepayment Interest Shortfalls, if any;

19.     to the holders of the Class M-5 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Net Prepayment Interest Shortfalls a, if any;

20.     to the holders of the Class M-6 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Net Prepayment Interest Shortfalls, if any;

21.     to the holders of the Class M-7 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Net Prepayment Interest Shortfalls, if any;

22.     to the holders of the Class M-8 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Net Prepayment Interest Shortfalls, if any;

23.     to the holders of the Class M-9 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Net Prepayment Interest Shortfalls, if any;

S-77

24.    to the holders of the Class M-10 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Net Prepayment Interest Shortfalls, if any;

25.    to the holders of the Class M-11 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Net Prepayment Interest Shortfalls, if any;

26.    to the Net WAC Reserve Fund for distribution to the Offered Certificates, Class M-10 Certificates and Class M-11 Certificates, an amount equal to any Net WAC Rate Carryover Amount for the Offered Certificates, Class M-10 Certificates and Class M-11 Certificates for such Distribution Date (without taking into account amounts, if any, received under the Interest Rate Swap Agreement that are available to pay any Net WAC Rate Carryover Amounts on such Distribution Date);

27.    concurrently, to the holders of the Senior Certificates, pro rata, in an amount equal to each such class' previously allocated and not reimbursed share of Relief Act Interest Shortfalls, if any;

28.    to the holders of the Class M-1 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Relief Act Interest Shortfalls, if any;

29.    to the holders of the Class M-2 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Relief Act Interest Shortfalls, if any;

30.    to the holders of the Class M-3 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Relief Act Interest Shortfalls, if any;

31.    to the holders of the Class M-4 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Relief Act Interest Shortfalls, if any;

32.    to the holders of the Class M-5 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Relief Act Interest Shortfalls a, if any;

33.    to the holders of the Class M-6 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Relief Act Interest Shortfalls, if any;

34.    to the holders of the Class M-7 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Relief Act Interest Shortfalls, if any;

35.    to the holders of the Class M-8 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Relief Act Interest Shortfalls, if any;

36.    to the holders of the Class M-9 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Relief Act Interest Shortfalls, if any;

37.    to the holders of the Class M-10 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Relief Act Interest Shortfalls, if any;

38.    to the holders of the Class M-11 Certificates, in an amount equal to such class' previously allocated and not reimbursed share of Relief Act Interest Shortfalls, if any;

39.    to the Securities Administrator, the Custodian, the Trust Oversight Manager or the Trustee in respect of any unreimbursed expenses and indemnifications owing thereto;

40.    sequentially, to the holders of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates, in that order, any related Allocated Realized Loss Amount allocable to such class not previously reimbursed;

Confidential

JPMC_DEX_000402711

41.    to the Swap Provider, any Swap Termination Payments resulting from a Swap Provider Trigger Event;

42.    to the holders of the Class C Certificates as provided in the Pooling Agreement; and

43.    to the holders of the Residual Certificates, any remaining amounts.

On each Distribution Date, after making the distributions of the Available Funds as described above, the Securities Administrator will withdraw from the Net WAC Reserve Fund the amount deposited therein pursuant to subclause 26. above and will distribute these amounts to the holders of the Offered Certificates, Class M-10 Certificates and Class M-11 Certificates in the same order of priority as the Monthly Interest Distributable Amount is allocated to such classes of certificates.

On each Distribution Date, Securities Administrator will withdraw from the Distribution Account all amounts representing prepayment premiums in respect of the Mortgage Loans received during the related Prepayment Period and will distribute these amounts to the holders of the Class P Certificates. On the first Distribution Date immediately following the expiration of the latest prepayment premium term with respect to the Mortgage Loans and if funds are available on such date, the Class P Certificates shall be entitled to its outstanding Class Principal Amount prior to any distributions of Net Monthly Excess Cashflow on such Distribution Date.

**Allocation of Losses; Subordination**

Any Realized Losses on the Mortgage Loans will be allocated on any Distribution Date, first, to any excess interest that may be payable on the Class C Certificates, second, to the Overcollateralized Amount, third, to Net Swap Payments received under the Interest Rate Swap Agreement, fourth, to the Class M-11 Certificates, fifth, to the Class M-10 Certificates, sixth, to the Class M-9 Certificates, seventh, to the Class M-8 Certificates, eighth, to the Class M-7 Certificates, ninth, to the Class M-6 Certificates, tenth, to the Class M-5 Certificates, eleventh, to the Class M-4 Certificates, twelfth, to the Class M-3 Certificates, thirteenth, to the Class M-2 Certificates and fourteenth, to the Class M-1 Certificates, in each instance until their Class Principal Amounts are reduced to zero.

The Pooling Agreement does not permit the allocation of Realized Losses to the Senior Certificates or the Class P Certificates. Investors in the Senior Certificates should note that although Realized Losses cannot be allocated to such Certificates, under certain loss scenarios there may not be enough interest and principal on the Mortgage Loans to distribute to the Senior Certificates all interest and principal amounts to which they are then entitled.

Once Realized Losses have been allocated to the Subordinate Certificates, such amounts with respect to such Certificates will no longer accrue interest nor will such amounts be reinstated thereafter (except to the extent of Subsequent Recoveries as set forth in the Pooling Agreement). However, Allocated Realized Loss Amounts may be paid to the holders of the Subordinate Certificates from Net Monthly Excess Cashflow, according to the priorities set forth under "_Overcollateralization Provisions_" above or from the Swap Account, according to the priorities set forth under "—The Interest Rate Swap Agreement, the Swap Provider and the Swap Account" below.

Any allocation of a Realized Loss to a Certificate will be made by reducing the Class Principal Amount thereof by the amount so allocated as of the Distribution Date in the month following the calendar month in which such Realized Loss was incurred. Notwithstanding anything to the contrary described herein, in no event will the Class Principal Amount of any Certificate be reduced more than once in respect of any particular amount both (i) allocable to such Certificate in respect of Realized Losses and (ii) distributable as principal to the holder of such Certificate from Net Monthly Excess Cashflow.

**Certificate Interest Rates**

The "Certificate Interest Rate" on any Distribution Date with respect to any class of Offered, Class M-10 and Class M-11 Certificates will equal the least of (a) the related Formula Rate, (b) the Net WAC Rate and (c) the Maximum Cap Rate for such Distribution Date. With respect to the Offered Certificates, the Class M-10 and Class M-11 Certificates, interest in respect of any Distribution Date will accrue during the related Accrual Period on the basis of a 360-day year and the actual number of days elapsed.

S-79

JPMC_DEX_000402712

The "Net WAC Rate" for any Distribution Date with respect to the Offered Certificates, Class M-10 Certificates and Class M-11 Certificates (subject to adjustment based on the actual number of days elapsed in the related Accrual Period) shall be a per annum rate equal to 12 times the quotient of (x) the total scheduled interest on the Mortgage Loans for the related Accrual Period, net of the sum of (1) the Administrative Fee, (2) any Net Swap Payment owed to the Swap Provider and (3) any Swap Termination Payment (other than any Swap Termination Payment resulting from a Swap Provider Trigger Event), payable by the Supplemental Interest Trust and (y) the aggregate principal balance of the mortgage loans as of the first day of the applicable collection period.

If on any Distribution Date, the Certificate Interest Rate for any class of Offered Certificates, Class M-10 Certificates or Class M-11 Certificates is the Net WAC Rate, then the "Net WAC Rate Carryover Amount" for any such class for such Distribution Date is an amount equal to the sum of (x) the amount of interest such class of Offered Certificates, Class M-10 Certificates or Class M-11 Certificates accrued on such Distribution Date at the related Formula Rate (up to the related Maximum Cap Rate) with respect to the Offered Certificates, Class M-10 Certificates or Class M-11 Certificates, over (y) the amount of interest such class of certificates accrued for such Distribution Date at the Net WAC Rate and (ii) the unpaid portion of any related Net WAC Rate Carryover Amount from the prior Distribution Date together with interest accrued on such unpaid portion for the most recently ended Accrual Period at the Formula Rate applicable for such class of Offered Certificates, Class M-10 Certificates and Class M-11 Certificates, for the related Accrual Period.  Any Net WAC Rate Carryover Amount on the Offered Certificates, Class M-10 Certificates or Class M-11 Certificates will be paid on that Distribution Date and on future Distribution Dates from and to the extent of funds available therefor in accordance with the priorities described above.

The "Maximum Cap Rate" for any Distribution Date is the per annum rate (subject to adjustment based on the actual number of days elapsed in the related Accrual Period) equal to the sum of (x) the weighted average Expense Adjusted Net Maximum Mortgage Rates of the Mortgage Loans and (y) the Net Swap Payment, if any, made by the Swap Provider, expressed as a percentage of the principal balance of the Mortgage Loans multiplied by 12.

The "Expense Adjusted Net Maximum Mortgage Rate" for any Mortgage Loan is the Maximum Mortgage Rate for such Mortgage Loan less the rate at which the Administrative Fee accrues with respect to such Mortgage Loan.

The "Maximum Mortgage Rate " for any Mortgage Loan is the maximum rate at which interest is permitted to accrue on such Mortgage Loan pursuant to the terms of the related Mortgage Note or applicable law.

The "Formula Rate" for any class of Offered Certificates , the Class M-10 or Class M-11 Certificates is the sum of (i) the interbank offered rate for one-month United States dollar deposits in the London market as of the related LIBOR Determination Date (the "Certificate Index") and (ii) a related margin (the "Certificate Margin"). The Certificate Margins with respect to the Classes of Offered Certificates, Class M-10 Certificates or Class M-11 Certificates on each Distribution Date will be as follows:

| Class of Certificates | Certificate Margin to and Including the Optional Clean-Up Call Date | Certificate Margin after the Optional Clean-Up Call Date |
| --- | --- | --- |
| Class A-1 | 0.170% | 0.340% |
| Class A-2 | 0.060% | 0.120% |
| Class A-3 | 0.120% | 0.240% |
| Class A-4 | 0.170% | 0.340% |
| Class A-5 | 0.270% | 0.540% |
| Class M-1 | 0.320% | 0.480% |
| Class M-2 | 0.340% | 0.510% |
| Class M-3 | 0.360% | 0.540% |
| Class M-4 | 0.440% | 0.660% |
| Class M-5 | 0.460% | 0.690% |
| Class M-6 | 0.540% | 0.810% |
| Class M-7 | 1.100% | 1.650% |
| Class M-8 | 1.200% | 1.800% |

S-80

Confidential

| | | |
|---|---|---|
| Class M-9 | 2.000% | 3.000% |
| Class M-10 | 2.500% | 3.750% |
| Class M-11 | 2.500% | 3.750% |

**Net WAC Reserve Fund**

On the Closing Date, the Securities Administrator will establish a reserve fund account (the "Net WAC Reserve Fund") from which payments in respect of Net WAC Rate Carryover Amounts on the Offered Certificates, Class M-10 Certificates and Class M-11 Certificates will be made. The Net WAC Reserve Fund will be an asset of the Trust but not of any REMIC. On each Distribution Date, to the extent required following the distribution of Available Funds as described under "—Allocation of Available Funds" above deposited into the Net WAC Reserve Fund, the Securities Administrator will withdraw from amounts in the Net WAC Reserve Fund to pay the Offered Certificates, Class M-10 Certificates and Class M-11 Certificates any Net WAC Rate Carryover Amounts in the following order of priority, in each case to the extent of amounts remaining in the Net WAC Reserve Fund:

1.      *concurrently*, to the Senior Certificates, *pro rata*, based on their respective remaining Net WAC Rate Carryover Amounts;

2.      to the Class M-1 Certificates;

3.      to the Class M-2 Certificates;

4.      to the Class M-3 Certificates;

5.      to the Class M-4 Certificates;

6.      to the Class M-5 Certificates;

7.      to the Class M-6 Certificates;

8.      to the Class M-7 Certificates;

9.      to the Class M-8 Certificates;

10.     to the Class M-9 Certificates;

11.     to the Class M-10 Certificates, and

12.     to the Class M-11 Certificates.

**The Interest Rate Swap Agreement, the Swap Provider and the Swap Account**

*The Interest Rate Swap Agreement*

On or before the Closing Date, the Securities Administrator on behalf of the supplemental interest trust, as directed by the Depositor, will enter into an Interest Rate Swap Agreement (the "Interest Rate Swap Agreement") with the Swap Provider. On each Distribution Date, the Securities Administrator, will deposit into the Swap Account certain amounts, if any, received from the Swap Provider from which distributions in respect of Unpaid Interest Shortfall Amounts, Net WAC Rate Carryover Amounts, amounts necessary to maintain the applicable Overcollateralization Target Amount and Allocated Realized Loss Amounts on the Subordinate Certificates will be made. The Swap Account will be an asset of the supplemental interest trust but not of any REMIC.

The Significance Percentage of the Interest Rate Swap Agreement will be less than 10% as of the Closing Date. The Significance Percentage is calculated by reference to the "Significance Estimate" of the Interest Rate Swap Agreement which is determined based on a reasonable good faith estimate of maximum probable exposure represented by the Interest Rate Swap Agreement made in substantially the same manner as that used in the

S-81

JPMC_DEX_000402714

Sponsor's internal risk management process in respect of similar instruments. The "Significance Percentage" is the percentage that the amount of the significance estimate represents of the aggregate principal balance of the Mortgage Loans.

Under the Interest Rate Swap Agreement, on each Distribution Date, the supplemental interest trust will be obligated to pay to the Swap Provider from amounts available therefor pursuant to the Pooling Agreement, a Fixed Swap Payment based on a schedule, a copy of which is attached hereto as Annex II for that Distribution Date, and the Swap Provider will be obligated to pay to the Securities Administrator a floating amount equal to the product of (x) one-month LIBOR (as determined pursuant to the Interest Rate Swap Agreement), (y) the notional amount for that Distribution Date and (z) a fraction, the numerator of which is the actual number of days elapsed from the previous Distribution Date to but excluding the current Distribution Date (or, for the first Distribution Date, the actual number of days elapsed from the closing date to but excluding the first Distribution Date), and the denominator of which is 360. The "Fixed Swap Payment" for any Distribution Date shall be the product of 5.100% and the notional amount for such Distribution Date (as set forth on Annex II hereof) multiplied by a fraction, the numerator of which is 30 and the denominator of which is 360. A net payment will be required to be made on each Distribution Date (each such net payment, a "Net Swap Payment") (a) by the supplemental interest trust, to the Swap Provider, to the extent that the fixed amount exceeds the corresponding floating amount, or (b) by the Swap Provider to the supplemental interest trust to the extent that the floating amount exceeds the corresponding fixed amount.

The Interest Rate Swap Agreement will terminate immediately after the Distribution Date in April 2010, unless terminated earlier upon the occurrence of a Swap Default, an Early Termination Event or an Additional Termination Event. "Swap Default" means an Event of Default under the Interest Rate Swap Agreement. "Events of Default" under the Interest Rate Swap Agreement include the following standard events of default under the ISDA Master Agreement:

- "Failure to Pay or Deliver,"

- "Bankruptcy" (as amended in the Interest Rate Swap Agreement) and

- "Merger without Assumption" (but only with respect to the Swap Provider), as described in Sections 5(a)(i), 5(a)(vii) and 5(a)(viii) of the ISDA Master Agreement.

The respective obligations of the Swap Provider and the supplemental interest trust to pay specified amounts due under the Interest Rate Swap Agreement will be subject to the following conditions precedent: (1) no Swap Default or event that with the giving of notice or lapse of time or both would become a Swap Default, in each case, in respect of the other party, shall have occurred and be continuing with respect to the Interest Rate Swap Agreement and (2) no "Early Termination Date" (as defined in the ISDA Master Agreement) has occurred or been effectively designated with respect to the Interest Rate Swap Agreement.

Upon the occurrence of any Swap Default under the Interest Rate Swap Agreement, the non-defaulting party will have the right to designate an Early Termination Date. With respect to Termination Events (including Additional Termination Events), an Early Termination Date may be designated by one of the parties (as specified in the Interest Rate Swap Agreement) and will occur only after notice has been given of the Termination Event, all as set forth in the Interest Rate Swap Agreement. A "Termination Event" shall be defined in the Interest Rate Swap Agreement.

Upon any occurrence of an Early Termination Date under the Interest Rate Swap Agreement (a "Swap Early Termination"), the supplemental interest trust or the Swap Provider may be liable to make a Swap Termination Payment to the other (regardless, if applicable, of which of the parties has caused the termination). The Swap Termination Payment will be based on the value of the Interest Rate Swap Agreement computed in accordance with the procedures set forth in the Interest Rate Swap Agreement taking into account the present value of the unpaid amounts that would have been owed to and by the Swap Provider under the remaining scheduled term of the Interest Rate Swap Agreement. In the event that the supplemental interest trust is required to make a Swap Termination Payment, that payment will be paid from the supplemental interest trust on the related Distribution Date, and on any subsequent Distribution Dates until paid in full, generally prior to distributions to certificateholders.

S-82

JPMC_DEX_000402715

Upon a Swap Early Termination, the Securities Administrator, at the direction of the depositor and with the consent of the NIMS Insurer, if any, will seek a replacement swap provider to enter into a replacement interest rate swap agreement or similar agreement. To the extent the trust receives a Swap Termination Payment from the Swap Provider, the supplemental interest trust will apply, as set forth in the Pooling Agreement, all or such portion of such Swap Termination Payment as may be required to the payment of amounts due to a replacement swap provider under a replacement interest rate swap agreement or similar agreement. Furthermore, to the extent the supplemental interest trust is required to pay a Swap Termination Payment to the Swap Provider, the supplemental interest trust will apply all or a portion of such amount received from a replacement swap provider upon entering into a replacement interest rate swap agreement or similar agreement to the Swap Termination Payment amount owing to the Swap Provider.

"Downgrade Provisions" of the Interest Rate Swap Agreement will be triggered if the Swap Provider's short-term or long-term credit ratings fall below the levels specified in the ISDA Master Agreement. Upon the occurrence of a Downgrade Provision, the Swap Provider will be required to (1) post collateral securing its obligations under the Interest Rate Swap Agreement or (2) obtain a substitute Swap Provider acceptable to the Rating Agencies and the NIMS Insurer, if any (such consent by the NIMS Insurer not to be unreasonably withheld), that will assume the obligations of the Swap Provider under the Interest Rate Swap Agreement.

*The Swap Provider*

JPMorgan Chase Bank, National Association (in such capacity, "JPMCB" or the "Swap Provider"), a national banking association, is a wholly-owned bank subsidiary of JPMorgan Chase & Co., a Delaware corporation whose principal office is located in New York, New York. JPMCB will be the swap provider and has long term, unsecured ratings, as of the date of this prospectus supplement, of "AA-" from Standard & Poor's, "A+" from Fitch Ratings and "Aa2" from Moody's Investors Service, Inc.

*The information under this heading "—The Swap Provider" has been provided by JPMorgan Chase Bank, National Association for use in this prospectus supplement. The Swap Account*

The Interest Rate Swap Agreement will be administered by the Securities Administrator pursuant to the Pooling Agreement. Any Net Swap Payments made by the Swap Provider will be distributed in accordance with the Pooling Agreement. The Securities Administrator will be required to deposit into a segregated trust account, in which payments owed to or received from, the Swap Provider will be deposited (the "Swap Account"), an amount equal to any remaining Unpaid Interest Shortfall Amounts, Net WAC Rate Carryover Amounts, Allocated Realized Loss Amounts and amounts necessary to maintain the applicable Overcollateralization Target Amount on the Senior Certificates and Subordinate Certificates, up to the Net Swap Payment received by the Securities Administrator from the Swap Provider.

Net Swap Payments and Swap Termination Payments (other than any Swap Termination Payment resulting from a Swap Provider Trigger Event) payable by the supplemental interest trust will be deducted from Available Funds before distributions to certificateholders and will first be deposited into the Swap Account before payment to the Swap Provider.

On each Distribution Date, to the extent required, following the distribution of the Net Monthly Excess Cashflow as described in "—*Overcollateralization Provisions*" above and withdrawals from the Net WAC Reserve Fund as described in "—*Net WAC Reserve Fund*" above, the Securities Administrator will withdraw from amounts in the Swap Account to distribute to the Swap Provider and to the Senior Certificates and Subordinate Certificates in the following order of priority:

*first*, to the Swap Provider, any Net Swap Payment owed to the Swap Provider pursuant to the Swap Agreement for such Distribution Date;

*second*, to the Swap Provider, any Swap Termination Payment owed to the Swap Provider not resulting from a Swap Provider Trigger Event pursuant to the Swap Agreement;

*third*, to the holders of the class or classes of Offered Certificates, the Class M-10 and Class M-11 Certificates then entitled to receive distributions in respect of principal, in an amount equal to any Realized Losses

S-83

JPMC_DEX_000402716

experienced on the Mortgage Loans during the preceding month, payable to such holders as part of the Principal Distribution Amount; remaining undistributed after distribution of the Net Monthly Excess Cashflow;

*fourth*, to the holders of the class or classes of Offered Certificates, the Class M-10 Certificates and Class M-11 Certificates then entitled to receive distributions in respect of principal, in an amount necessary to maintain the Overcollateralization Target Amount, payable to such holders as part of the Principal Distribution Amount as described under "—Allocation of Available Funds—Distributions of Principal" above to the extent not otherwise paid;

*fifth*, to the Senior Certificates, the related Monthly Interest Distributable Amount and Unpaid Interest Shortfall Amount remaining undistributed after the distribution of the Interest Remittance Amount;

*sixth*, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates, in that order, the related Monthly Interest Distributable Amount and Unpaid Interest Shortfall Amount, to the extent remaining undistributed after the distributions of the Interest Remittance Amount and the Net Monthly Excess Cashflow;

*seventh*, concurrently, to the holders of the Senior Certificates, pro rata, in an amount equal to each such class' previously allocated and not reimbursed share of Net Prepayment Interest Shortfalls, if any, to the extent remaining undistributed after the distributions of the Interest Remittance Amount and the Net Monthly Excess Cashflow;

*eighth*, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates, in that order, the related Net Prepayment Interest Shortfalls, to the extent remaining undistributed after the distributions of the Interest Remittance Amount and the Net Monthly Excess Cashflow;

*ninth*, sequentially, to the Senior, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates, in that order, the related Net WAC Rate Carryover Amount, to the extent remaining undistributed after distributions are made from the Net WAC Reserve Fund;

*tenth*, concurrently, to the holders of the Senior Certificates, pro rata, in an amount equal to each such class' previously allocated and not reimbursed share of Relief Act Interest Shortfalls, if any, to the extent remaining undistributed after the distributions of the Interest Remittance Amount and the Net Monthly Excess Cashflow;

*eleventh*, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates, in that order, the related Relief Act Interest Shortfalls, to the extent remaining undistributed after the distributions of the Interest Remittance Amount and the Net Monthly Excess Cashflow;

*twelfth*, sequentially, to the holders of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates, in that order, any related Allocated Realized Loss Amount allocable to such class not previously reimbursed; and

*thirteenth*, to the Class C holders as specified in the Pooling Agreement, any remaining amount.

**Calculation of Certificate Index**

On the second LIBOR Business Day preceding the commencement of each Accrual Period for the Offered Certificates, Class M-10 Certificates and Class M-11 Certificates (each such date, a "LIBOR Determination Date"), the Securities Administrator will determine the Certificate Index for such Accrual Period for the Offered Certificates, Class M-10 Certificates and Class M-11 Certificates on the basis of the London interbank offered rate for one-month United States dollar deposits, as such rates appear on the Telerate Page 3750, as of 11:00 a.m. (London time) on such LIBOR Determination Date. If such rate does not appear on Telerate Page 3750, the rate for that day will be determined on the basis of the offered rates of the Reference Banks for one-month United States

S-84

JPMC_DEX_000402717

dollar deposits, as of 11:00 a.m. (London time) on such LIBOR Determination Date. The Securities Administrator, on behalf of Trustee, will request the principal London office of each of the Reference Banks to provide a quotation of its rate. If on such LIBOR Determination Date two or more Reference Banks provide such offered quotations, the Certificate Index for the related Accrual Period will be the arithmetic mean of such offered quotations (rounded upwards if necessary to the nearest whole multiple of 0.0625%). If on such LIBOR Determination Date fewer than two Reference Banks provide such offered quotations, the Certificate Index for the related Accrual Period shall be the higher of (x) the Certificate Index as determined on the previous LIBOR Determination Date and (y) the Reserve Interest Rate.

As used in this section, "LIBOR Business Day" means a day on which banks are open for dealing in foreign currency and exchange in London; "Telerate Page 3750" means the display page currently so designated on the Moneyline Telerate Capital Markets Report (or such other page as may replace that page on that service for the purpose of displaying comparable rates or prices); "Reference Banks" means leading banks selected by the Depositor and engaged in transactions in Eurodollar deposits in the international Eurocurrency market (1) with an established place of business in London, (2) which have been designated as such by the Depositor, and (3) not controlling, controlled by or under common control with, the Depositor, the Servicer or any successor servicer or the Originator; and "Reserve Interest Rate" shall be the rate per annum that the Securities Administrator determines to be either (x) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 0.0625%) of the one-month United States dollar lending rates which New York City banks selected by the Depositor are quoting on the relevant LIBOR Determination Date to the principal London offices of leading banks in the London interbank market or (y) in the event that the Securities Administrator can determine no such arithmetic mean, the lowest one-month United States dollar lending rate which New York City banks selected by the Depositor are quoting on such LIBOR Determination Date to leading European banks.

The establishment of the Certificate Index on each LIBOR Determination Date by the Securities Administrator and its calculation of the rates of interest applicable to the Offered Certificates, Class M-10 Certificates and Class M-11 Certificates for the related Accrual Period will (in the absence of manifest error) be final and binding.

**Example of Distributions**

The following sets forth an example of collection of payments from borrowers on the Mortgage Loans, transfer of amounts among the Trust Accounts, and distributions on the Certificates for the Distribution Date in May 2006:

| April 2 through May 1 ......................................... | Due Period: | Payments due during the related Collection Period (April 2 through May 1) from borrowers will be deposited in the Servicer's Collection Account as received and will include scheduled principal payments due during the related Due Period and interest accrued on the ending scheduled balance from the prior Due Period. |
|---|---|---|
| April 1 through April 30 ......................................... | Prepayment Period for partial prepayments received from Mortgage Loans: | Partial principal prepayments received by the Servicer during the related Prepayment Period (April 1 through April 30) will be deposited into the Servicer's Collection Account for remittance to the Securities Administrator on the Servicer Remittance Date. |
| April 16 through May 15 ......................................... | Prepayment Period for prepayments in full received from Mortgage Loans: | Prepayments in full received during the related Prepayment Period from Mortgage Loans will be deposited into the Servicer's Collection Account for remittance to the Securities Administrator on the Servicer Remittance Date. |

S-85

Confidential

| | | |
|---|---|---|
| May 24.......................................... | Servicer Remittance Date: | The Servicer will remit collections, advances and recoveries in respect of the Mortgage Loans to the Securities Administrator for deposit into the Distribution Account on or prior to the business day immediately preceding the related Distribution Date, as specified in the Pooling Agreement. |
| May 24.......................................... | Record Date: | Distributions will be made to Certificateholders of record for all applicable classes as of the business day immediately before the related Distribution Date. |
| May 23 ........................................ | Any payment received from the Swap Provider under the Interest Rate Swap Agreement: | Two Business Days immediately before the related Distribution Date, the Swap Provider will pay to the Securities Administrator for deposit into the Swap Account any Net Swap Payments or Swap Termination Payments required to be paid by the Swap Provider and the Securities Administrator will remit any Net Swap Payments or Swap Termination Payments to the Swap Provider from amounts on deposit in the Swap Account, in each case under the Interest Rate Swap Agreement. |
| May 25.......................................... | Distribution Date: | On the 25th day of each month (or if the 25th day is not a business day, the next business day), the Securities Administrator will make distributions to Certificateholders from amounts on deposit in the Distribution Account and the Swap Account. |

Succeeding months follow the same pattern.

**Reports to Certificateholders**

On each Distribution Date, the Securities Administrator will make available to the Trustee, the Depositor, each Certificateholder, the NIMS Insurer, if any, the Trust Oversight Manager, the Swap Provider and the rating agencies a statement (based solely on information received from the Servicer) generally setting forth, among other things:

- the amount of the distributions, separately identified, with respect to each class of Certificates;

- the amount of the distributions set forth in the first clause above allocable to principal, separately identifying the aggregate amount of any principal prepayments or other unscheduled recoveries of principal included in that amount;

- the amount of the distributions set forth in the first clause above allocable to interest and how it was calculated;

- the amount of any unpaid Interest Shortfall with respect to each class of Certificates;

- the Class Principal Amount of each class of Certificates after giving effect to the distribution of principal on that Distribution Date;

- the Group Balance for the Aggregate Pool, the Stated Principal Balance of the Mortgage Loans in each Mortgage Group at the end of the related Prepayment Period, and the applicable Net WAC of the Mortgage Loans in each Mortgage Group at the beginning of the related Due Period;

- with respect to each Mortgage Group and the Aggregate Pool, the number and aggregate principal balance of the Mortgage Loans that were (A) delinquent (exclusive of Mortgage Loans in foreclosure) (1) 30 to 59 days, (2) 60 to 89 days and (3) 90 or more days, (B) in foreclosure and delinquent (1) 30 to

S-86

Confidential

JPMC_DEX_000402719

59 days, (2) 60 to 89 days and (3) 90 or more days and (C) in bankruptcy as of the close of business on the last day of the calendar month preceding that Distribution Date;

- with respect to each Mortgage Group and the Aggregate Pool, the total number and principal balance of any REO properties as of the close of business on the last day of the preceding Due Period;

- with respect to each Mortgage Group and the Aggregate Pool, the amount of Realized Losses incurred during the preceding calendar month;

- with respect to each Mortgage Group and the Aggregate Pool, the cumulative amount of Realized Losses incurred since the Closing Date; and

- the Certificate Interest Rate for each class of Certificates for that Distribution Date.

The Securities Administrator may make available each month, to any interested party, the monthly statement to Certificateholders via the Securities Administrator's website. The Securities Administrator's website will be located at www.jpmorgan.com/sfr, and assistance in using the website can be obtained by calling the Securities Administrator's customer service desk at (877) 722-1095. Parties that are unable to use the above distribution option are entitled to have a paper copy mailed to them via first class mail by notifying the Securities Administrator at the following address: 4 New York Plaza, 6th Floor, New York, New York 10004, Attention: Worldwide Securities Services/Structured Finance Services - JPMAC 2006-NC1. The Securities Administrator will have the right to change the way such reports are distributed in order to make such distributions more convenient and/or more accessible, and the Securities Administrator will provide timely and adequate notification to such parties regarding any such changes.

In addition, within a reasonable period of time after the end of each calendar year, the Securities Administrator will, upon written request, prepare and deliver to each holder of a Certificate of record during the previous calendar year a statement containing information necessary to enable holders of the Certificates to prepare their tax returns. These statements will not have been examined and reported upon by an independent public accountant.

**Final Scheduled Distribution Date**

The "Final Scheduled Distribution Date" for the Offered Certificates, other than the Class A-2 Certificates, is the Distribution Date in April 2036, which is the Distribution Date in the month following the scheduled maturity date for the latest maturing Mortgage Loan. The Final Scheduled Distribution Date for the Class A-2 Certificates is the Distribution Date in January 2032, which is calculated assuming a 0% prepayment assumption and adding one month. The actual final Distribution Date of any class of Certificates may be earlier or later, and could be substantially earlier, than such class's Final Scheduled Distribution Date.

**Optional Clean-Up Call**

On the first Distribution Date on which the aggregate outstanding principal balance of the Mortgage Loans as of the related Due Date is equal to or less than 10% of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date, the Servicer will have the option to purchase the Mortgage Loans (and if the Servicer does not, the majority holder of the Class C Certificates, the NIMS Insurer, if any, may have the right to direct the Servicer to exercise, on its behalf) at a price equal to the greater of (a) the sum of (i) 100% of the aggregate outstanding principal balance of the Mortgage Loans plus accrued interest thereon at the applicable Mortgage Rate to but not including the Due Date in the month of such Distribution Date, (ii) the fair market value of all other property of the Trust Fund, (iii) any unreimbursed advances, fees, servicing fees and other amounts payable to the Servicer, the Securities Administrator and the Trustee and (iv) any Swap Termination Payment payable to the Swap Provider then remaining unpaid or which is due because of the exercise of such option and (b) the fair market value, determined in accordance with the terms of the Pooling Agreement, of all outstanding Mortgage Loans (other than Liquidated Mortgage Loans), all property acquired in respect of any such Mortgage Loans remaining in the Trust Fund and all other property included in any REMIC formed under the Pooling Agreement. This option may only be exercised if the proceeds will also be sufficient to pay all interest accrued on, as well as amounts necessary to retire the principal

S-87

JPMC_DEX_000402720

balance of, the notes guaranteed by the NIMS Insurer and any amounts owed to the NIMS Insurer at the time the option is exercised.

If such option is exercised, and the amount specified in clause (b) of the preceding paragraph exceeds the amount specified in clause (a) of that paragraph, then a residual class specified in the Pooling Agreement will be entitled to receive the amount of such excess. These residual classes are not offered hereby.

If the option is exercised, it will effect an early retirement of the related Certificates. Distributions on the Certificates will be treated as a prepayment of the Mortgage Loans and the amounts paid in connection with the optional termination will be paid in accordance with the priorities and amounts set forth herein. With respect to an optional termination, the proceeds for that distribution may not be sufficient to distribute the full amount to which each class of Certificates is entitled. Upon the termination, any funds or property remaining in the Trust Fund will be liquidated and the Trust Fund will terminate.

## FEES AND EXPENSES OF THE TRUST FUND

In consideration of their duties on behalf of the Trust Fund, the Servicer, the Securities Administrator, the Custodian and the Trustee will receive from the assets of the Trust Fund certain fees as set forth in the following table:

| Fee Payable to: | Frequency of Payment: | Amount of Fee: | How and When Fee Is Paid: |
|---|---|---|---|
| Servicer | monthly | A monthly fee paid to the Servicer out of interest collections received from the related Mortgage Loan calculated on the outstanding principal balance of each Mortgage Loan at 0.50% per annum. | Deducted by the Servicer from the Collection Account in respect of each Mortgage Loan serviced by that Servicer, before payment of any amounts to Certificateholders. |
| Securities Administrator | monthly | A monthly fee paid to the Securities Administrator out of interest collections received from the related Mortgage Loan calculated on the outstanding principal balance of each Mortgage Loan at 0.004% per annum, with a monthly minimum of at least $500. | Deducted by the Securities Administrator before payment of any amounts to Certificateholders. |
| Trustee | annually | An annual fee paid to the Trustee by the Securities Administrator out of the Securities Administrator's fee. | Paid by the Securities Administrator before payment of any amounts to Certificateholders. |
| Custodian | monthly | A monthly fee paid to the Custodian out of interest collections received from the related Mortgage Loans calculated on the outstanding principal balance of each Mortgage Loan at 0.002% per annum. | Paid by the Securities Administrator before payment of any amounts to Certificateholders. |
| Trust Oversight Manager | monthly | A monthly fee paid to the trust oversight manager out of interest collections received from the related Mortgage Loans calculated on the outstanding principal balance of each Mortgage Loan at 0.015% per annum, subject to a monthly minimum of $1,250. | Paid by the Securities Administrator before payment of any amounts to Certificateholders. |

S-88

Confidential

None of the fees set forth in table above may be changed without amendment of the Pooling Agreement as described under "The Pooling Agreement—Amendment" below or, in the case of the Custodian fee, the related custodial agreement.

Expenses of the Servicer, the Custodian, the Trustee, the Securities Administrator and the Trust Oversight Manager will be reimbursed before payments are made on the Certificates. Reimbursement of indemnification costs and expenses of the Trustee, the Securities Administrator, the Custodian and the Trust Oversight Manager will be reimbursed up to an annual amount specified in the Pooling Agreement before payments of interest and principal are made on the Certificates; any additional unpaid indemnification costs and expenses above such amount in any year will be paid to such party to the extent of any remaining interest collections after all payments of all other amounts due as described under "Description of the Certificates—Overcollateralization Provisions" are made.

## THE POOLING AGREEMENT

**General**

The Offered Certificates will be issued pursuant to the Pooling Agreement. The assets of the Trust created under the Pooling Agreement will consist of (i) all of the Depositor's right, title and interest in the Mortgage Loans, the related mortgage notes, mortgages and other related documents, (ii) all payments on or collections in respect of the Mortgage Loans due after the Cut-off Date, together with any proceeds thereof, (iii) any Mortgaged Properties acquired on behalf of certificateholders by foreclosure or by deed in lieu of foreclosure, and any revenues received thereon, (iv) the rights of the Trustee under all insurance policies required to be maintained pursuant to the Pooling Agreement, (v) the Net WAC Reserve Fund and (vi) the rights of the Seller under the Mortgage Loan Purchase Agreement. The Offered Certificates will be transferable and exchangeable at the Corporate Trust Office of the Securities Administrator.

The Interest Rate Swap Agreement, the Swap Account and the right to any Net Swap Payment and any Swap Termination Payment made by the Swap Provider and deposited into the Swap Account are not assets of the trust, but instead are assets of the separate supplemental interest trust.

The NIMS Insurer, if any, will be a third party beneficiary of the Pooling Agreement to the extent set forth in the Pooling Agreement. In addition, the NIMS Insurer, if any, will have various rights under the Pooling Agreement including, but not limited to, the rights set forth under "Risk Factors—Rights of the NIMS Insurer" in this prospectus supplement.

**Assignment of the Mortgage Loans**

Under the Assignment Agreement, J.P. Morgan Mortgage Acquisition Corp. (the "Seller") will sell the Mortgage Loans to the Depositor and the Depositor will sell the Mortgage Loans to the Trust Fund. Pursuant to the Assignment Agreement, the Seller will transfer to the Depositor and the Depositor will transfer to the Trustee its rights under the Mortgage Loan Purchase Agreement with respect to certain representations, warranties and covenants made by the Originator relating to, among other things, certain characteristics of the Mortgage Loans. In addition, pursuant to the Pooling Agreement, the Seller will make certain representations, warranties and covenants relating to certain characteristics of the related Mortgage Loans. Subject to the limitations described below, the Originator or the Seller will be obligated as described herein to purchase or substitute a similar mortgage loan for any related Mortgage Loan as to which there exists deficient documentation or as to which there has been an uncured breach of any such representation or warranty relating to the characteristics of the Mortgage Loan that materially and adversely affects the value of such Mortgage Loan or the interests of the Certificateholders in such Mortgage Loan (a "Defective Mortgage Loan"). See "The Trust Fund—Representations by Sellers or Originator; Repurchases" in the accompanying prospectus.

Pursuant to the Pooling Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations). The obligations of the Originator and the Seller with respect to the Certificates are limited to their respective obligations to purchase or substitute for Defective Mortgage Loans.

S-89

JPMC_DEX_000402722

In connection with such transfer and assignment of the Mortgage Loans, the Depositor will deliver or cause to be delivered to the Trustee or its custodian, among other things, the original promissory note (the "Mortgage Note") (and any modification or amendment thereto) endorsed in blank without recourse, the original instrument creating a first or second lien on the related Mortgaged Property (the "Mortgage") with evidence of recording indicated thereon, an assignment in recordable form of the Mortgage, all recorded intervening assignments of the Mortgage and any modifications to such Mortgage Note and Mortgage (except for any such document other than Mortgage Notes not available on the Closing Date, which will be delivered to the Trustee or its custodian as soon as the same is available to the Depositor) (collectively, the "Mortgage File"). Assignments of the Mortgage Loans to the Trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states where, in the opinion of counsel, such recording is not required to protect the Trustee's interest in the Mortgage Loans against the claim of any subsequent transferee or any successor to or creditor of the Depositor. It is expected that the Depositor will not submit the Assignments of Mortgage for recordation in any jurisdiction.

J.P. Morgan Trust Company, National Association, as custodian (the "Custodian"), on behalf of the Trustee, will review each Mortgage File within the time period specified in the related Custodial Agreement or promptly after the Custodian's receipt of any document permitted to be delivered after the Closing Date. The Custodian will hold such Mortgage Files in trust for the benefit of the Certificateholders. The Custodian shall be entitled to a monthly fee (the "Custodian Fee") calculated at 0.002% per annum (the "Custodian Fee Rate") on the aggregate Stated Principal Balance of the Mortgage Loans. If at the end of such specified period, any document in a Mortgage File is found to be missing or defective in a material respect and the Originator or the Seller, as applicable, does not cure such omission or defect within the time period required under the Pooling Agreement, then the Originator, or, if applicable, the Seller under the Pooling Agreement, is obligated to purchase the related Defective Mortgage Loan from the Trust Fund at the price specified in the Pooling Agreement. Rather than purchase the Defective Mortgage Loan as provided above, the Originator or the Seller may remove such Mortgage Loan (a "Deleted Mortgage Loan") from the Trust Fund and substitute in its place one or more mortgage loans of like kind (such loan a "Replacement Mortgage Loan"); provided, however, that such substitution is permitted only within two years after the Closing Date and may not be made unless an opinion of counsel is provided to the effect that such substitution would not disqualify the REMIC elections or result in a prohibited transaction tax under the Code.

Any Replacement Mortgage Loan generally will, on the date of substitution, among other characteristics set forth in the Pooling Agreement, (i) have an outstanding principal balance, after deduction of all Scheduled Payments due in the month of substitution, not in excess of the Stated Principal Balance of the related Deleted Mortgage Loan (the amount of any shortfall to be deposited in the Distribution Account in the month of substitution), (ii) have a maximum Mortgage Rate not less than (and not more than two percentage points greater than) the maximum mortgage rate of the related Deleted Mortgage Loan, (iii) have a gross margin not less than that of the related Deleted Mortgage Loan, (iv) have a Loan-to-Value Ratio equal to or less than that of the related Deleted Mortgage Loan, (v) have a remaining term to maturity not greater than (and not more than one year less than) that of the related Deleted Mortgage Loan, (vi) have the same adjustment date as that of the related Deleted Mortgage Loan, (vii) have a minimum rate not less than that of the related Deleted Mortgage Loan, (viii) have the same index as that of the related Deleted Mortgage Loan and (ix) comply with all of the representations and warranties set forth in the Pooling Agreement, as modified by the related Assignment Agreement (if applicable). This cure, repurchase or substitution obligation constitutes the sole remedy available to the Certificateholders or the Trustee for omission of, or a material defect in, a Mortgage File.

Under the Reconstitution Agreement, the Originator will make certain representations and warranties as to the accuracy in all material respects of certain information furnished to the Trustee with respect to each Mortgage Loan (e.g., Cut-off Date Principal Balance and the Mortgage Rate). In addition, the Originator will make certain other representations and warranties with respect to each related Mortgage Loan, including, but not limited to, the following: (i) all of the prepayment premium terms on the related Mortgage Loans with prepayment premium terms expire no later than three years following the origination of the related Mortgage Loan; (ii) no Mortgage Loan will be subject to the Home Ownership and Equity Protection Act of 1994 or any comparable local, state or federal law; (iii) no Group 1 Mortgage Loan originated on or after October 1, 2002 and before March 7, 2003 is secured by property located in the State of Georgia; (iv) no proceeds from any Mortgage Loan were used to finance single-premium credit insurance policies; and (v) no Group 1 Mortgage Loan originated on or after March 7, 2003 is a "high cost home loan" as defined under the Georgia Fair Lending Act. Furthermore, the Originator will represent and warrant with respect to each Mortgage Loan as of the Closing Date that, among other things, at the time of transfer to the Seller, each of the Originator and those of its affiliates that are parties to the Mortgage Loan Purchase

Confidential

JPMC_DEX_000402723

Agreement has transferred and assigned all of its right, title and interest in each related Mortgage Loan and the Mortgage Loan Documents, free of any lien. The Seller will represent and warrant in the Pooling Agreement with respect to each Mortgage Loan that (i) each Mortgage Loan at the time of origination complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable predatory and abusive lending laws, and (ii) no Mortgage Loan is a "high cost" mortgage loan, as defined by the applicable predatory and abusive lending laws.

Upon discovery of a breach of any representation and warranty made by the Originator or the Seller with respect to the Mortgage Loans which materially and adversely affects the interests of the certificateholders in the related Mortgage Loan and Mortgage Loan Documents, the Originator or the Seller, as applicable, will have a period of 60 days after discovery or notice of the breach to effect a cure. If the breach cannot be cured within the 60-day period, the Originator or the Seller, as applicable, will be obligated to (x) substitute for such Mortgage Loan a Qualified Substitute Mortgage Loan or (y) purchase such Mortgage Loan from the Trust at the Purchase Price, plus any costs and damages incurred by the Trust in connection with any violation of any predatory or abusive lending law with respect to such Mortgage Loan. However, a substitution of the related Mortgage Loan is permitted only within two years of the Closing Date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any REMIC or result in a prohibited transaction tax under the Internal Revenue Code.

Pursuant to the Pooling Agreement, the Servicer will service and administer the Mortgage Loans as more fully set forth therein.

**Servicing and Administrative Responsibilities**

The Servicer, the Securities Administrator, the Trustee and the Custodian will have the following responsibilities with respect to the Trust Fund:

| **Party:** | **Responsibilities:** |
| --- | --- |
| **Servicer** | Performing the servicing functions with respect to the Mortgage Loans and the Mortgaged Properties in accordance with the provisions of the Pooling Agreement or the Mortgage Loan Purchase Agreement, as applicable, including, but not limited to: |

- collecting monthly remittances of principal and interest on the Mortgage Loans from the related borrowers, depositing such amounts in the Collection Account, and delivering all amounts on deposit in the Collection Account to the Securities Administrator for deposit in the Distribution Account on the Servicer Remittance Date;

- collecting amounts in respect of taxes and insurance from the related borrowers, depositing such amounts in the related escrow account, and paying such amounts to the related taxing authorities and insurance providers, as applicable;

- making Advances with respect to delinquent payments of principal and interest on the Mortgage Loans, to the extent that the Servicer believes such Advances will be recoverable;

- paying, as servicing advances, customary costs and expenses incurred in the performance by the Servicer of its servicing obligations, including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) taxes, assessments and other charges which are or may become a lien upon the Mortgaged Property or (c) borrower-paid primary mortgage insurance policy premiums and fire and hazard insurance coverage, to the extent not paid by the borrower;

- providing monthly loan-level reports to the Securities Administrator;

S-91

JPMC_DEX_000402724

| Party: | Responsibilities: |
|---|---|

|  | • maintaining certain insurance policies relating to the Mortgage Loans; and |
|  | • enforcement of foreclosure proceedings. |
|  | *See "The Servicer" above and the other sections of "The Pooling Agreement" herein.* |
| **Securities Administrator** | Performing the securities administrator functions in accordance with the provisions of the Pooling Agreement, including but not limited to: |
|  | • creating and maintaining the Distribution Account, the Swap Account and the Net WAC Reserve Fund; |
|  | • receiving monthly remittances from the Servicer for deposit in the Distribution Account and distributing all amounts on deposit in the Distribution Account to the Certificateholders and the Swap Account in accordance with the priorities described under "Description of the Certificates—Distributions of Interest," "—Distributions of Principal" and "—Credit Enhancement—Overcollateralization Provisions," on each Distribution Date; |
|  | • preparing and distributing annual investor reports necessary to enable Certificateholders to prepare their tax returns; |
|  | • preparing and distributing the monthly distribution date statement to Certificateholders based on information received from the Servicer and the Swap Provider; |
|  | • depositing any Net Swap Amounts received from the Swap Provider into the Swap Account; |
|  | • distributing amounts on deposit in the Swap Account to the Certificateholders and the Swap Provider in accordance with the priorities described under "Description of the Certificates—The Interest Rate Swap Agreement, the Swap Provider and the Swap Account" with respect to each Distribution Date; |
|  | *See "The Pooling Agreement—The Trustee and the Securities Administrator," and "Description of the Certificates—Reports to Certificateholders".* |
| **Trustee** | • exercising remedies upon a Servicer Event of Default where a responsible officer of the trustee has actual knowledge of the default and is instructed by certificateholder to enforce such remedies; |
|  | • upon the failure of a Servicer to make Advances with respect to a Mortgage Loan and the occurrence of a Servicer Event of Default where a responsible officer of the Trustee has actual knowledge of the default or has received notice of a default, making those Advances to the extent provided in the Pooling Agreement; and |
|  | • until a successor servicer is appointed, acting as successor servicer in the event the Servicer resigns or is removed by the Trustee, subject to a 90-day transition period during which time the Servicer will continue to perform the majority of the servicing obligations with respect to the Mortgage Loans. |
|  | *See "The Pooling Agreement—The Trustee and the Securities Administrator," and "—Servicer Events of Default".* |

Confidential

JPMC_DEX_000402725

| Party: | Responsibilities: |
|---|---|
| Custodian | Performing the custodial functions in accordance with the provisions of the custodial agreements, including but not limited to: |

- holding and maintaining the Mortgage Loan documents related to the Mortgage Loans in a fireproof facility intended for the safekeeping of mortgage loan files on behalf of the Trustee.

*See "—Assignment of the Mortgage Loans" above.*

**Payments on Mortgage Loans; Deposits to Collection Account and Distribution Account**

The Servicer shall establish and maintain or cause to be maintained a separate trust account (the "Collection Account") for the benefit of the certificateholders. The Collection Account will be an Eligible Account (as defined in the Pooling Agreement). Upon receipt by the Servicer of amounts in respect of the Mortgage Loans (excluding amounts representing the Servicing Fee or other servicing compensation, reimbursement for Advances and Servicing Advances (each, as defined below), condemnation proceeds required to be released to a mortgagor, insurance proceeds to be applied to the restoration or repair of a Mortgaged Property and similar items), the Servicer will deposit such amounts in the Collection Account. Amounts so deposited may be invested in Permitted Investments (as described in the Pooling Agreement) maturing no later than one business day prior to the date on which the amount on deposit therein is required to be deposited in the Distribution Account, which is the Servicer Remittance Date (as defined below). Any investment earnings on funds on deposit in the Collection Account shall be for the benefit of the Servicer and will not be available for distribution to the certificateholders. The amount of any losses on the investment of funds on deposit in the Collection Account shall be deposited by the Servicer in the Collection Account out of its own funds with no right of reimbursement.

The Securities Administrator will establish an account (the "Distribution Account") into which will be deposited amounts withdrawn from the Collection Account on the Servicer Remittance Date and deposited to the Distribution Account for distribution to certificateholders on a Distribution Date. The Distribution Account will be an Eligible Account, and amounts on deposit therein shall remain uninvested.

**Modifications of Mortgage Loan Terms**

In the event that a Mortgage Loan is in default or, in the judgment of the Servicer, such default is reasonably foreseeable, the Servicer, consistent with the standards set forth in the Pooling Agreement, may waive, modify or vary any term of such Mortgage Loan (including modifications that would change the related Mortgage Rate, forgive the payment of principal or interest or extend the final maturity date of such Mortgage Loan), accept payment from the related Mortgagor of an amount less than the Stated Principal Balance in final satisfaction of such Mortgage Loan or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any related borrower.

**Advances**

Subject to the following limitations, the Servicer will be obligated to advance or cause to be advanced on or before each Distribution Date its own funds, or funds in the Collection Account that are not included in the Available Funds for such Distribution Date, or both (each, an "Advance"), in an amount equal to the aggregate of all payments of principal and interest (net of Servicing Fees) that were due during the related Due Period on the Mortgage Loans and that were delinquent on the related Determination Date, plus certain amounts representing assumed payments not covered by any current net income on the Mortgaged Properties acquired by foreclosure or deed in lieu of foreclosure.

Advances are required to be made only to the extent they are deemed by the Servicer to be recoverable from related late collections, insurance proceeds, condemnation proceeds or liquidation proceeds. The purpose of

Confidential

JPMC_DEX_000402726

making such Advances is to maintain a regular cash flow to the certificateholders, rather than to guarantee or insure against losses. The Servicer will not be required, however, to make any Advances with respect to reductions in the amount of the monthly payments on the Mortgage Loans due to bankruptcy proceedings or the application of the Relief Act. Subject to the recoverability standard below, the Servicer's obligation to make Advances as to any Mortgage Loan will continue until the Mortgage Loan is paid in full or until the recovery of all liquidation proceeds thereon.

All Advances will be reimbursable to the Servicer from late collections, insurance proceeds, condemnation proceeds and liquidation proceeds from the Mortgage Loan as to which such unreimbursed Advance was made, unless such amounts are deemed to be nonrecoverable by the Servicer, in which case reimbursement will be made to the Servicer from the general funds in the Collection Account. The Servicer may recover from amounts in the Collection Account the amount of any Advance that remains unreimbursed to the Servicer from the related liquidation proceeds after the final liquidation of the related Mortgage Loan, and such reimbursement amount will not be available for remittance to the Securities Administrator for distribution on the Offered Certificates. In the event the Servicer fails in its obligation to make any required Advance, the Trustee, in its capacity as successor servicer, will be obligated to make any such Advance, to the extent required in the Pooling Agreement. The Trustee, in its capacity as successor servicer, shall be entitled to all reimbursements in the same manner and priority as the predecessor servicer.

In the course of performing its servicing obligations, the Servicer will pay all reasonable and customary "out-of-pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance of its servicing obligations, including, but not limited to, the cost of (i) the preservation, restoration, inspection and protection of the Mortgaged Properties, (ii) any enforcement or judicial proceedings, including foreclosures, and (iii) the management and liquidation of Mortgaged Properties acquired in satisfaction of the related mortgage. Each such expenditure will constitute a "Servicing Advance." The Servicer is obligated to pay certain insurance premiums and certain ongoing expenses associated with the Mortgage Loans and incurred by the Servicer in connection with its responsibilities under the Pooling Agreement and is entitled to reimbursement therefor as provided in the Pooling Agreement. The Servicer is required to make a Servicing Advance only to the extent it is deemed by the Servicer to be recoverable from related late collections, insurance proceeds, condemnation proceeds or liquidation proceeds.

The Servicer is also obligated to accurately and fully report its borrower credit files to all three credit repositories in a timely manner.

The Servicer's right to reimbursement for Servicing Advances is limited to late collections, liquidation proceeds, condemnation proceeds, released Mortgaged Property proceeds, insurance proceeds and such other amounts as may be collected by the Servicer from the related Mortgagor or otherwise relating to the Mortgage Loan in respect of which such unreimbursed amounts are owed, unless such amounts are deemed to be nonrecoverable by the Servicer, in which event reimbursement will be made to the Servicer from general funds in the Collection Account.

### Servicing and Other Compensation and Payment of Expenses

The principal compensation to be paid to the Servicer in respect of its servicing activities (the "Servicing Fee") will be calculated at the "Servicing Fee Rate" of 0.50% per annum on the Principal Balance of each Mortgage Loan. As additional servicing compensation, the Servicer is entitled to retain any interest received in connection with any prepayment in full received by the Servicer between the first and fifteenth day of the calendar month for the related Distribution Date (the "Prepayment Interest Excess"), all service-related fees collected from mortgagors, including assumption fees, modification fees, extension fees, late payment charges and non-sufficient fund fees, and other ancillary income derived from the Mortgage Loans (but not prepayment premiums, which will be distributed to the holders of the Class P Certificates), together with any interest or other income earned on funds held in the Collection Account. For each Distribution Date, the Servicer is obligated to deposit into the Collection Account the lesser of (i) the aggregate amount of any Prepayment Interest Shortfalls for such Distribution Date and (ii) one-half of the aggregate amount of the Servicing Fees payable to the Servicer for such Distribution Date (any payments made by the Servicer in satisfaction of such obligation, "Compensating Interest").

S-94

Confidential

JPMC_DEX_000402727