The "Servicer Remittance Date" is the business day prior to each Distribution Date. The "Determination Date" with respect to any Distribution Date, will be the 15th day of the calendar month in which such Distribution Date occurs or, if such 15th day is not a Business Day, the Business Day immediately preceding such 15th day.

With respect to any Distribution Date and each Mortgage Loan as to which a voluntary principal prepayment in full was applied during the related Prepayment Period (other than prepayments received in the month of such Distribution Date), the "Prepayment Interest Shortfall" is an amount equal to the interest at the applicable Mortgage Rate (net of the Servicing Fee) on the amount of such principal prepayment for the number of days from the date on which the principal prepayment is applied through the last day of the calendar month preceding such Distribution Date.

A "Net Prepayment Interest Shortfall", with respect to any Distribution Date, is the amount by which the sum of the Prepayment Interest Shortfalls for such Distribution Date exceeds the sum of (i) all Prepayment Interest Excess for such Distribution Date and (ii) Compensating Interest payments made with respect to such Distribution Date. The Servicer shall not be obligated to pay Compensating Interest with respect to any interest shortfalls due to application of the Relief Act.

## Servicer Events of Default

As provided in the Pooling Agreement, the Servicer may be removed as the servicer of the mortgage loans if there is a Servicer Event of Default. The Servicer Events of Default include the following events with respect to the Servicer:

1.  any failure by the Servicer to remit to the Securities Administrator for distribution to the certificateholders any payment (other than Advances that are required to be made from its own funds) which continues unremedied for a period of one business day after the date upon which written notice of such failure, requiring the same to be remedied, shall have been received by the Servicer from the Depositor, the Securities Administrator or the Trustee, or received by the Servicer, the Depositor, the Securities Administrator and the Trustee from the holders of certificates entitled to at least 25% of the voting rights; or

2.  any failure on the part of the Servicer duly to observe or perform in any material respect any of the covenants or agreements on the part of the Servicer contained in the Pooling Agreement which continues unremedied for a period of 30 days after the earlier of (x) the date on which written notice of such failure, requiring the same to be remedied, shall have been received by the Servicer from the Depositor or the Trustee, or received by the Servicer, the Depositor, the Securities Administrator and the Trustee from the holders of certificates entitled to at least 25% of the voting rights and (y) actual knowledge of such failure by a Servicing Officer of the Servicer; or

3.  a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceeding, or for the winding-up or liquidation of its affairs, shall have been entered against the Servicer and if such proceeding is being contested by the Servicer in good faith, such decree or order shall have remained in force undischarged or unstayed for a period of 60 days or results in the entry of an order for relief or any such adjudication or appointment; or

4.  the Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to it or of or relating to all or substantially all of its property; or

5.  the Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations, or

6.  any failure of the Servicer to make any Advances when due and that continue unremedied until 3:00 p.m. New York time on the first business day after the date upon which written notice of such failure, requiring the same to be remedied, shall have been received by the Servicer from the Depositor, the Securities Administrator or the Trustee.

S-95

Confidential

JPMC_DEX_000402728

If a Servicer Event of Default described in clauses 1. through 5. occurs, then, so long as the Servicer Event of Default shall not have been remedied, the Depositor or the Trustee upon notice or actual knowledge may, and at the written direction of the holders of the certificates entitled to at least 51% of voting rights, the Trustee shall, by notice in writing to the Servicer (and to the Depositor if given by the Trustee or to the Trustee if given by the Depositor), terminate all of the rights and obligations of the Servicer in its capacity as the Servicer under the Pooling Agreement. If the Servicer Event of Default described in clause 6. occurs and notice thereof has been delivered to the Trustee, the Trustee shall, by notice in writing to the Servicer, the Seller, the Securities Administrator and the Depositor, terminate all of the rights and obligations of the Servicer in its capacity as the servicer under the Pooling Agreement.

No assurance can be given that termination of the rights and obligations of the Servicer under the Pooling Agreement would not adversely affect the servicing of the Mortgage Loans, including the delinquency experience of the Mortgage Loans. In the event the Trustee is required to act as successor servicer, it will act to become the successor servicer within 90 days of the Servicer's termination. During this 90-day period, the terminated Servicer will continue to (a) service the Mortgage Loans, although the Trustee will be obligated, to the extent required in the Pooling Agreement, to make all Advances and remit all Compensating Interest required in respect of the Mortgage Loans, and (b) receive or retain all Servicing Fees and other servicing compensation. If JPMorgan Chase Bank, National Association is terminated as the Servicer, it shall also resign as Securities Administrator, and another successor securities administrator shall be appointed as provided in the Pooling Agreement.

**The Issuing Entity**

On the Closing Date, and until the termination of the Trust Fund pursuant to the Pooling Agreement, J.P. Morgan Mortgage Acquisition Trust 2006-NC1 will be a common law trust formed under the laws of the state of New York. The Issuing Entity will be created under the Pooling Agreement by the Depositor and its assets will consist of the Trust Fund. The Issuing Entity will not have any liabilities as of the Closing Date. The fiscal year end of the Issuing Entity will be December 31 of each year.

In addition, on the Closing Date the Supplemental Interest Trust will be created under the Pooling Agreement, and its assets will consist of the Interest Rate Swap Agreement and such assets as from time to time are deposited in the Swap Account. The Supplemental Interest Trust will be a common law trust formed under the laws of the state of New York. All assets of the Supplemental Interest Trust are payable under the Pooling Agreement to the Trust Fund. See "Description of the Certificates—The Interest Rate Swap Agreement, the Swap Provider and the Swap Account."

The Issuing Entity will not have any employees, officers or directors. The Securities Administrator, the Trustee, the Depositor, the Servicer and the Custodian will act on behalf of the Issuing Entity, and may only perform those actions on behalf of the Issuing Entity that are specified in the Pooling Agreement, the Mortgage Loan Purchase Agreement and the Custodial Agreement.

The Trustee, on behalf of the Issuing Entity, is only permitted to take such actions as are specifically set forth in the Pooling Agreement. Under the Pooling Agreement, the Trustee on behalf of the Issuing Entity will not have the power to issue additional certificates representing interests in the Pooling Agreement. Except for transactions and activities entered into in connection with the securitization that is the subject of the Pooling Agreement, the Issuing Entity is not authorized and has no power to: borrow money or issue debt; merge with another entity, reorganize, liquidate or sell assets; or engage in any business or activities.

Each party to the Pooling Agreement will agree that it will not file an involuntary bankruptcy petition or initiate any other form of insolvency proceeding against the Trust Fund until one year and one day after the Certificates have been paid in full. No changes to these restrictions may be made without the amendment of the Pooling Agreement by Certificateholders and the other parties thereto as described under "—The Pooling Agreement—Amendment."

If the assets of the Trust Fund are insufficient to pay the Certificateholders all principal and interest owed, holders of Subordinate Certificates will not receive all of their expected payments of interest and principal and will suffer a loss. The Issuing Entity, as a common law trust, is not eligible to be a debtor in a bankruptcy proceeding. In

Confidential

JPMC_DEX_000402729

the event of bankruptcy of the Sponsor, the Depositor or any Originator, it is not anticipated that the Trust Fund would become part of the bankruptcy estate or subject to the bankruptcy control of a third party.

**The Trustee and the Securities Administrator**

*Trustee.* U.S. Bank National Association, a national banking association, will be the Trustee under the Pooling Agreement. The Trustee will be paid an annual fee by the Securities Administrator from the Securities Administrator Fee. The Trustee's "Corporate Trust Office" is located at 209 S. LaSalle Street, Suite 300, Chicago, Illinois 60604, Attention: JPMAC 2006-NC1, or at such other addresses as the Trustee may designate from time to time. The Trustee will be entitled to reimbursement from the Trust Fund for certain expenses, indemnities and other amounts prior to payment of any amounts to Certificateholders.

*U.S. Bank General.* U.S. Bank National Association (*"U.S. Bank"*) will act as trustee under the pooling and servicing agreement. U.S. Bank is a national banking association and a wholly-owned subsidiary of U.S. Bancorp, which is currently ranked as the sixth largest bank holding company in the United States with total assets exceeding $209 billion as of December 31, 2005. As of December 31, 2005, U.S. Bancorp served approximately 13.4 million customers, operated 2,419 branch offices in 24 states and had over 51,000 employees. A network of specialized U.S. Bancorp offices across the nation, inside and outside its 24-state footprint, provides a comprehensive line of banking, brokerage, insurance, investment, mortgage, trust and payment services products to consumers, businesses, governments and institutions.

*Corporate Trust General.* U.S. Bank has one of the largest corporate trust businesses in the country with offices in 31 U.S. cities. The pooling and servicing agreement will be administered from U.S. Bank's corporate trust office located at 209 South LaSalle Street, Suite 300, Chicago, Illinois 60604.

U.S. Bank has provided corporate trust services since 1924. As of December 31, 2005, U.S. Bank was acting as trustee with respect to 54,019 issuances of securities with an aggregate outstanding principal balance of over $1.5 trillion. This portfolio includes corporate and municipal bonds, mortgage-backed and asset-backed securities and collateralized debt obligations.

On December 30, 2005, U.S. Bank purchased the corporate trust and structured finance trust services businesses of Wachovia Corporation. Following the closing of the acquisition, the Wachovia affiliate named as fiduciary or agent, as applicable, under each client agreement will continue in that role until U.S. Bank succeeds to that role in accordance with the terms of the governing instrument or agreement and applicable law.

As of December 31, 2005, U.S. Bank (and its affiliate U.S. Bank Trust National Association) was acting as trustee on 343 issuances of sub-prime mortgage-backed securities with an outstanding aggregate principal balance of approximately $90,186,200,000.

*Securities Administrator.* JPMorgan Chase Bank, National Association, as Securities Administrator, will perform certain administrative duties with respect to the Certificates including acting as authentication agent, certificate registrar, calculation agent, paying agent, and the party responsible for (i) preparing distribution statements and tax information for Certificateholders and preparing tax and SEC filings for the Trust and (ii) opening and holding the Distribution Account, the Swap Account and the Net WAC Reserve Fund on behalf of the Trust Fund. The Securities Administrator's "Corporate Trust Office" for purposes of presentment and surrender of the Certificates for final payment thereon is 2001 Bryan Street, 9th Floor, Dallas, Texas, 75201, Attention: WSS – Structured Finance Payment Area. The Securities Administrator will be entitled to reimbursement from the Trust Fund for certain expenses, indemnities and other amounts prior to payment of any amounts to Certificateholders.

The Securities Administrator is JPMorgan Chase Bank, National Association, a national banking association organized under the laws of the United States and a wholly owned subsidiary of J.P. Morgan Chase & Co., a holding company with assets in excess of $1.2 trillion and operations in more than 50 countries. The operations include investment banking, financial services for consumers and businesses, financial transaction processing, asset and wealth management and private equity. JPMorgan Chase Bank, National Association, acts as Securities Administrator through its Worldwide Securities Services division of the Treasury & Securities Services line of business. JPMorgan Worldwide Securities Services offers a full range of trust and administrative services for

S-97

prime and sub-prime asset-backed transactions from its office at 4 New York Plaza, 6th Floor, New York, New York 10004 and other offices worldwide.

Asset classes for which JPMorgan Worldwide Securities Services has been responsible for calculating or making distributions include residential and commercial mortgages, credit cards, auto loans, equipment loans and leases, home equity loans, trade receivables, commercial leases, franchise loans, and student loans.

Since 1990, JPMorgan Chase Bank, National Association or its predecessors have been responsible for calculating and making distributions to holders of asset-backed securities. As of March 31, 2006, JPMorgan Worldwide Securities Services performed such functions for approximately 855 asset-backed transactions, including about 442 residential mortgage receivables transactions.

Under the terms of the pooling and servicing agreement, JPMorgan Chase Bank, National Association, in its capacity as Securities Administrator, is responsible for securities administration, which includes pool performance calculations, distribution calculations, the preparation of monthly distribution reports, and the preparation and filing of tax returns on behalf of the trust REMICs, monthly reports on Form 10-D (based on information included in the monthly distribution date statements and other information provided by other transaction parties) and annual reports on Form 10-K that are required to be filed with the Securities and Exchange Commission on behalf of the issuing entity.

JPMorgan Chase Bank, National Association, will also act as paying agent and certificate registrar for the certificates.

JPMorgan Chase & Co. ("JPMorgan Chase") has entered into an agreement with The Bank of New York Company ("BONY") pursuant to which JPMorgan Chase intends to exchange portions of its corporate trust business, including municipal and corporate trusteeships, for BONY's consumer, small business and middle market banking businesses. This transaction has been approved by both companies' boards of directors and is subject to regulatory approvals. It is expected to close in the late third quarter or fourth quarter of 2006. Following the Closing Date, JPMorgan Chase Bank, National Association will continue to act as Securities Administrator until BONY succeeds to that role in accordance with the terms of the Pooling Agreement and applicable law.

The Securities Administrator shall be entitled to a monthly fee (the "Securities Administrator Fee") calculated at 0.004% per annum (the "Securities Administrator Fee Rate") on the aggregate Stated Principal Balance of the Mortgage Loans; _provided_, that the Securities Administrator will be paid a minimum Securities Administrator Fee of $500 per month.

The Securities Administrator will serve as paying agent and certificate registrar. The Securities Administrator will be responsible under the Pooling Agreement for preparing the monthly distribution date statement to Certificateholders, providing certain information available to the Securities Administrator to Certificateholders to enable them to prepare their tax returns and preparing and filing the Trust Fund's tax information returns. The Securities Administrator will prepare the Distribution Date statements, tax returns, tax information and required reports based solely on information provided by the Servicer by the time such information is required to be delivered to the Securities Administrator and will make payments to the Swap Provider based solely on information provided by the Servicer. The Securities Administrator will not be required to confirm, verify, recalculate or recompute any such information, but will be entitled to rely conclusively on such information. The Securities Administrator will make the distribution date statement available each month to Certificateholders.

_Limitation of Liability and Duties._ Neither the Securities Administrator nor the Trustee will have any liability arising out of or in connection with the Pooling Agreement, except that each such entity may be held liable for its own negligent action or failure to act, or for its own willful misconduct; _provided, however_, that neither the Securities Administrator nor the Trustee will be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Certificateholders in an Event of Default, and neither the Securities Administrator nor the Trustee will be deemed to have notice of any Event of Default, Swap Default or Swap Termination unless a responsible officer of the Securities Administrator or the Trustee, as applicable, has actual knowledge of the Event of Default, Swap Default or Swap Termination or written notice of an Event of Default, Swap Default or Swap Termination is received by the Securities Administrator or the Trustee at the applicable Corporate Trust Office. Neither the Securities Administrator nor the Trustee is required to

S-98

Confidential

JPMC_DEX_000402731

expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under the Pooling Agreement, or in the exercise of any of its rights or powers, if it has reasonable grounds for believing that repayment of those funds or adequate indemnity against risk or liability is not reasonably assured to it.

The Trustee will have no duties under the Pooling Agreement with respect to any claim or notice it may receive or which may be alleged to have been delivered to or served upon it by the parties as a consequence of the assignment of any Mortgage Loan under the Pooling Agreement; however, the Trustee will remit to the Servicer and the Securities Administrator any claim or notice it may receive which is delivered to the applicable Corporate Trust Office and which contains information sufficient to permit the Trustee to make a determination that the real property to which such document relates is a Mortgaged Property.

None of the provisions in the Pooling Agreement shall in any event require the Trustee or the Securities Administrator to perform, or be responsible for the manner of performance of, any of the obligations of the Servicer, or of the Swap Provider under the Interest Rate Swap Agreement. Neither the Securities Administrator nor the Trustee will be responsible for any act or omission of the Servicer, the Depositor, the Swap Provider, the Trust Oversight Manager or any other party.

The Trustee will not be responsible for (a) any recording or filing of any agreement or of any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing which may have been made, or the validity, priority, perfection or sufficiency of the security for the Certificates, (b) the payment of any insurance related to the Certificates or the Mortgage Loans or (c) the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Fund, other than from funds available in the Collection Account or the Distribution Account. The Trustee is not responsible for the validity of the Pooling Agreement, the Interest Rate Swap Agreement or the Certificates or the validity, priority, perfection or sufficiency of the security for the Certificates.

*Expenses and Reimbursements.* Each of the Securities Administrator and the Trustee will be entitled to reimbursement of all reasonable expenses, disbursements and advances incurred or made by such entity in accordance with the Pooling Agreement, except for expenses, disbursements and advances incurred by the Securities Administrator in the routine administration of its respective duties under the Pooling Agreement and except for any expenses arising from its negligence, bad faith or willful misconduct. Each of the Securities Administrator and the Trustee will also be entitled to indemnification from the Trust Fund for any loss, liability or expense incurred, arising out of, or in connection with, the acceptance or administration of the trusts created under the Pooling Agreement or in connection with the performance of its duties under the Pooling Agreement, the Interest Rate Swap Agreement, or the Custodial Agreement, including the costs and expenses of defending itself against any claim in connection with the exercise or performance of any of its powers or duties under the Pooling Agreement.

The Securities Administrator and the Trustee will be entitled to reimbursement for its expenses and indemnification amounts as described above, prior to distribution of any amounts to Certificateholders; *provided* that such reimbursement does not exceed a specified dollar limitation set forth in the Pooling Agreement. Any reimbursement due the Securities Administrator or the Trustee above such limitation for any given year or any previous year will be paid from any remaining Net Monthly Excess Cashflow remaining for such application as described under "—*Overcollateralization Provisions*" above.

*Resignation and Removal of Trustee.* The Trustee may at any time resign and be discharged from the trust created under the Pooling Agreement by giving written notice thereof to the Depositor, the Seller, the Servicer and the Rating Agencies. Upon receiving such notice of resignation of the Trustee, the Depositor shall promptly appoint a successor Trustee that meets the requirements in the Pooling Agreement, by written instrument, in duplicate, one copy of which instrument shall be delivered to each of the resigning Trustee and one copy to the successor Trustee. If no successor Trustee shall have been so appointed and having accepted appointment within 30 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee.

If at any time the Trustee shall cease to be eligible in accordance with the provisions of the Pooling Agreement or if at any time the Trustee shall be legally unable to act, or shall be adjudged a bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of

S-99

JPMC_DEX_000402732

the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Depositor may remove the Trustee.

The holders of Certificates entitled to at least 51% of the voting rights may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, signed by such Holders or their attorneys-in-fact duly authorized, one complete set of which instruments shall be delivered to the Depositor, one complete set to the Trustee so removed and one complete set to the successor so appointed. A copy of such instrument shall be delivered to the Certificateholders, the Trustee and the Servicer by the Depositor.

Any resignation or removal of the Trustee and appointment of a successor Trustee shall not become effective until acceptance of appointment by the successor Trustee, as provided in the Pooling Agreement.

**The Trust Oversight Manager**

Pentalpha Surveillance LLC, as Trust Oversight Manager (the "Trust Oversight Manager"), will monitor the performance of the Servicer, and make recommendations to the Servicer regarding certain delinquent and defaulted Mortgage Loans, subject to a Trust Oversight Agreement (the "Trust Oversight Agreement") being entered into by the Depositor, the Trust Oversight Manager and the Servicer on or prior to the Closing Date. The Trust Oversight Manager will rely upon mortgage loan data that is provided to it by the Servicer in performing its advisory and monitoring functions. The Trust Oversight Manager shall be entitled to a monthly fee (the "Trust Oversight Manager Fee") until (i) the termination of the Trust, (ii) the termination of the Servicer's rights and obligations under the Pooling Agreement or (iii) its removal by the Depositor or its assigns and the appointment of a successor trust oversight manager. Such fee will be paid by the Trust and will be equal to 0.015% per annum (the "Trust Oversight Manager Fee Rate") on the aggregate Stated Principal Balance of the Mortgage Loans, subject to a monthly minimum of $1,250.

The Trust Oversight Manager will be entitled to reimbursement from the Trust Fund for certain expenses, indemnities and other amounts prior to payment of any amounts to Certificateholders.

**Voting Rights**

The Class C, Class P and Class R Certificates will each be allocated 1% of all voting rights and the other classes of Certificates will be allocated 97% of all voting rights under the Pooling Agreement. Voting rights will be allocated among these other classes of Certificates in proportion to their respective Class Principal Amounts and among Certificates of such class in proportion to their Percentage Interests. The "Percentage Interest" of a Certificate will be a fraction, expressed as a percentage, the numerator of which is that Certificate's Certificate Principal Amount and the denominator of which is the applicable Class Principal Amount.

**Compliance with Applicable Servicing Criteria and Servicer Attestation**

The Pooling Agreement provides that on or before a specified date in each year for which the Depositor is required to file a 10-K, each party participating in the servicing function of the trust provide a report on an assessment of compliance with the servicing criteria set forth in Item 1122 of Regulation AB. Together with the assessment of compliance, a firm of independent public accountants will be required to furnish a an attestation report compliant with Item 1122 of Regulation AB on the party's assessment of compliance with the applicable servicing criteria as an exhibit.

The Pooling Agreement also provides for delivery to the Trustee, the Depositor and the Securities Administrator, on or before a specified date in each, of an annual officer's certificate to the effect that the Servicer has fulfilled its obligations under the Pooling Agreement throughout the preceding year.

**Amendment**

The Pooling Agreement may be amended by the Depositor, the Seller, the Servicer, the Securities Administrator and the Trustee, with the consent of the Swap Provider and the NIMS Insurer, if any, but without the consent of any of the certificateholders to cure any ambiguity, to correct, modify or supplement any provision in the

Confidential

JPMC_DEX_000402733

Pooling Agreement, to make any other provisions with respect to matters or questions arising under the Pooling Agreement which are not inconsistent with the provisions of the Pooling Agreement, or to maintain the qualification of the Trust as a REMIC or to comply with the provisions of Regulation AB, provided that the action will not adversely affect in any material respect the interests of any certificateholder. The Pooling Agreement may also be amended by the Depositor, the Seller, the Servicer, the Securities Administrator and the Trustee, with the consent of the Swap Provider and the NIMS Insurer, if any, and the holders of certificates evidencing not less than 66% of the voting rights for any purpose, but that no amendment may:

- reduce in any manner the amount of or delay the timing of, payments received on the Mortgage Loans which are required to be distributed on any certificate without the consent of the holder of the certificate,

- adversely affect in any material respect the interests of the holders of any class of certificates in a manner other than as described in the preceding bullet point, without the consent of the holders of certificates of that class evidencing not less than 66% of the aggregate voting rights of that class, or

- reduce the percentage of voting rights required by the preceding bullet point for the consent to any amendment without the consent of the holders of all certificates covered by the Pooling Agreement then outstanding.

However, the Trustee, among other things, need not consent to any amendment of the Pooling Agreement unless it shall first have received an opinion of counsel to the effect that the amendment will not cause the Trust to fail to qualify as a REMIC at any time that the related certificates are outstanding.

## YIELD, PREPAYMENT AND WEIGHTED AVERAGE LIFE

The yields to maturity of the Offered Certificates will be sensitive to defaults on the Mortgage Loans. If a purchaser of an Offered Certificate calculates its anticipated yield based on an assumed rate of default and amount of losses that is lower than the default rate and amount of losses actually incurred, its actual yield to maturity will be lower than that so calculated. In general, the earlier a loss occurs, the greater is the effect on an investor's yield to maturity. There can be no assurance as to the delinquency, foreclosure or loss experience with respect to the Mortgage Loans. Because the Mortgage Loans were underwritten in accordance with standards less stringent than those generally acceptable to Fannie Mae and Freddie Mac with regard to a borrower's credit standing and repayment ability, the risk of delinquencies with respect to, and losses on, the Mortgage Loans will be greater than that of mortgage loans underwritten in accordance with Fannie Mae and Freddie Mac standards.

The rate of principal payments, the aggregate amount of distributions and the yields to maturity of the Offered Certificates will be affected by the rate and timing of payments of principal on the Mortgage Loans. In particular, the yields to maturity of each class of Senior Certificates will be most affected by the rate and timing of payments of principal on the Mortgage Loans in the related Group. The rate of principal payments on the Mortgage Loans will in turn be affected by the amortization schedules of the Mortgage Loans and by the rate of principal prepayments (including for this purpose prepayments resulting from refinancing, liquidations of the Mortgage Loans due to defaults, casualties or condemnations and purchases by the Originator or the Servicer). Because certain of the Mortgage Loans contain prepayment premiums, the rate of principal payments may be less than the rate of principal payments for Mortgage Loans that did not have prepayment premiums. The Mortgage Loans are subject to the "due-on-sale" provisions included therein that provide that the Mortgage Loan is assumable by a creditworthy purchaser of the related Mortgaged Property. See "Description of the Mortgage Pool" herein.

Prepayments, liquidations and purchases of the Mortgage Loans (including any optional purchase) will result in distributions on the Offered Certificates of principal amounts that would otherwise be distributed over the remaining terms of the Mortgage Loans. Since the rate of payment of principal on the Mortgage Loans will depend on future events and a variety of other factors, no assurance can be given as to such rate or the rate of principal prepayments. The extent to which the yield to maturity of a class of Offered Certificates may vary from the anticipated yield will depend upon the degree to which such class of Offered Certificates is purchased at a discount or premium. Further, an investor should consider the risk that, in the case of any Offered Certificate purchased at a discount, a slower than anticipated rate of principal payments (including prepayments) on the Mortgage Loans could

S-101

JPMC_DEX_000402734

result in an actual yield to such investor that is lower than the anticipated yield and, in the case of any Offered Certificate purchased at a premium, a faster than anticipated rate of principal payments on the Mortgage Loans could result in an actual yield to such investor that is lower than the anticipated yield.

The rate of principal payments (including prepayments) on groups of mortgage loans may vary significantly over time and may be influenced by a variety of economic, geographic, social and other factors, including changes in mortgagors' housing needs, job transfers, unemployment, mortgagors' net equity in the mortgaged properties and servicing decisions. In general, if prevailing interest rates were to fall significantly below the Mortgage Rates on the Mortgage Loans, such Mortgage Loans could be subject to higher prepayment rates than if prevailing interest rates were to remain at or above the Mortgage Rates on such Mortgage Loans. Conversely, if prevailing interest rates were to rise significantly, the rate of prepayments on such Mortgage Loans would generally be expected to decrease. The Mortgage Loans may be subject to a greater rate of principal prepayments in a low interest rate environment. For example, if prevailing interest rates were to fall, mortgagors may be inclined to refinance their Mortgage Loans with a fixed-rate loan to "lock in" a lower interest rate or to refinance their Mortgage Loans with other more competitive adjustable-rate mortgage loans. The existence of the applicable Periodic Rate Cap and Maximum Rate with respect to the adjustable-rate Mortgage Loans also may affect the likelihood of prepayments resulting from refinancings. No assurances can be given as to the rate of prepayments on the Mortgage Loans in stable or changing interest rate environments. In addition, substantially all of the adjustable-rate Mortgage Loans will not have their initial Adjustment Date for two or three years after the origination thereof. The prepayment experience of these delayed first adjustment Mortgage Loans may differ from that of the other Mortgage Loans. The delayed first adjustment Mortgage Loans may be subject to greater rates of prepayments as they approach their initial Adjustment Dates even if market interest rates are only slightly higher or lower than the Mortgage Rates on such Mortgage Loans as borrowers seek to avoid changes in their monthly payments.

The interest-only feature of the Interest Only Mortgage Loans may reduce the perceived benefits of refinancing to take advantage of lower market interest rates or to avoid adjustments in the Mortgage Rates. However, as a Mortgage Loan with such a feature nears the end of its interest-only period, the borrower may be more likely to refinance the Mortgage Loan, even if market interest rates are only slightly less than the Mortgage Rate in order to avoid the increase in the monthly payments to amortize the Mortgage Loan over its remaining life.

Except in the circumstances described in this prospectus supplement, principal distributions on the Group 1 Certificates relate to principal payments on the Group 1 Mortgage Loans and principal distributions on the Group 2 Certificates relate to principal payments on the Group 2 Mortgage Loans.

Approximately 61.55%, 68.06% and 64.99% of the Mortgage Loans in Group 1, Group 2 and the Aggregate Pool, respectively (in each case, by aggregate Principal Balance of the related Group or Aggregate Pool, as applicable, as of the Cut-off Date) provide for payment by the borrower of a prepayment premium in limited circumstances on certain prepayments. The holders of the Class P Certificates will be entitled to all prepayment premiums received on the Mortgage Loans, and such amounts will not be available for distribution on the other classes of certificates. Under certain circumstances, as described in the Pooling Agreement, the Servicer may waive the payment of any otherwise applicable prepayment premium. Investors should conduct their own analysis of the effect, if any, that the prepayment premiums, and decisions by the Servicer with respect to the waiver thereof, may have on the prepayment performance of the Mortgage Loans. The Depositor makes no representations as to the effect that the prepayment premiums, and decisions by the Servicer with respect to the waiver thereof, may have on the prepayment performance of the Mortgage Loans.

To the extent the Net WAC Rate is paid on the Offered Certificates, a shortfall in interest distributions to these certificateholders equal to the Net WAC Rate Carryover Amount will occur. Such shortfall will only be payable from amounts paid under the Interest Rate Swap Agreement, but only in the priorities described under "Description of the Certificates—The Interest Rate Swap Agreement, the Swap Provider and the Swap Account" in this prospectus supplement, and the Net Monthly Excess Cashflow, but only to the extent that the Overcollateralization Target Amount has been reached or maintained and certain other amounts have been paid. See "Description of the Certificates—Overcollateralization Provisions" in this prospectus supplement.

S-102

JPMC_DEX_000402735

**Additional Information**

The Depositor has filed certain yield tables and other computational materials with respect to the Offered Certificates with the Securities and Exchange Commission (the "Commission") and may file certain additional yield tables and other computational materials with respect to the Offered Certificates with the Commission pursuant to Rule 433. Such tables and materials were prepared by the Underwriter at the request of certain prospective investors, based on assumptions provided by, and satisfying the special requirements of, such prospective investors. Such tables and assumptions may be based on assumptions that differ from the Structuring Assumptions (as defined herein). Accordingly, such tables and other materials may not be relevant to or appropriate for investors other than those specifically requesting them.

**Weighted Average Lives**

The timing of changes in the rate of principal prepayments on the Mortgage Loans may significantly affect an investor's actual yield to maturity, even if the average rate of principal prepayments is consistent with such investor's expectation. In general, the earlier a principal prepayment on the Mortgage Loans occurs, the greater the effect of such principal prepayment on an investor's yield to maturity. The effect on an investor's yield of principal prepayments occurring at a rate higher (or lower) than the rate anticipated by the investor during the period immediately following the issuance of the Offered Certificates may not be offset by a subsequent like decrease (or increase) in the rate of principal prepayments.

The weighted average life of an Offered Certificate is the average amount of time that will elapse from the Closing Date, until each dollar of principal is repaid to the investors in such Offered Certificate. Because it is expected that there will be prepayments and defaults on the Mortgage Loans, the actual weighted average lives of the Offered Certificates are expected to vary substantially from the weighted average remaining terms to stated maturity of the Mortgage Loans as set forth herein under "Description of the Mortgage Pool."

The Final Scheduled Distribution Date for the Offered Certificates is as set forth in this prospectus supplement under "Description of the Certificates—Final Scheduled Distribution Date." The weighted average lives of the Offered Certificates are likely to be shorter than would be the case if payments actually made on the Mortgage Loans conformed to the foregoing assumptions, and the actual final Distribution Date with respect to the Offered Certificates could occur significantly earlier than the Final Scheduled Distribution Date because

- prepayments are likely to occur,

- excess cashflow, if any, will be applied as principal of the Senior Certificates and the Subordinate Certificates as described herein,

- the Overcollateralization Target Amount may change as described in the Pooling Agreement, and

- the Servicer or the NIMS Insurer, if any, may cause a termination of the Trust as provided herein.

Prepayments of mortgage loans are commonly measured relative to a prepayment standard or model. The model used in this prospectus supplement (the "Prepayment Assumption") assumes a prepayment rate for the fixed rate Mortgage Loans of 100% of the Fixed Rate Prepayment Vector and a prepayment rate for the adjustable rate Mortgage Loans of 100% of the Adjustable Rate Prepayment Vector.

(i)     A Fixed Rate Prepayment Vector assumes a constant prepayment rate ("CPR") of 4.00% per annum of the then unpaid principal balance of such Mortgage Loans in the first month of the life of such Mortgage Loans and an additional approximately 1.4545% (precisely 16/11%) per annum in each month thereafter until the 12th month. Beginning in the 12th month and in each month thereafter during the life of such Mortgage Loans, such prepayment vector assumes a 20% per annum.

(ii)    An Adjustable Rate Prepayment Vector assumes a CPR of 2.0% per annum of the then unpaid principal balance of such Mortgage Loans in the first month of the life of such Mortgage Loans

S-103

JPMC_DEX_000402736

and an additional approximately 2.545% (precisely 28%/11) per annum in each month thereafter until the 12th month. Beginning in the 12th month and until and including the 22nd month, such prepayment vector assumes a CPR of 30% per annum. Beginning in the 23rd month and until and including the 27th month, such prepayment vectors assumes a CPR of 50% per annum. Beginning in the 28th month and in each month thereafter during the life of such Mortgage Loans, such prepayment vectors assumes a CPR of 35% per annum provided however that the prepayment rate will not exceed 90% CPR in any period for any given percentage of the adjustable rate prepayment vector.

CPR is a prepayment assumption that represents a constant assumed rate of prepayment each month relative to the then outstanding principal balance of a group of mortgage loans for the life of such mortgage loans. The model does not purport to be either an historical description of the prepayment experience of any group of mortgage loans or a prediction of the anticipated rate of prepayment of any mortgage loans, including the Mortgage Loans to be included in the Trust. Each of the "Prepayment Scenarios" in the table below assumes the respective percentages of the applicable Prepayment Assumption, indicated for such scenario.

The tables entitled "Percentage of Initial Class Principal Amount of the Offered Certificates Outstanding at the Following Prepayment Scenarios" were prepared on the basis of the assumptions in the following paragraph and the table set forth below. There are certain differences between the loan characteristics included in such assumptions and the characteristics of the actual Mortgage Loans. Any such discrepancy may have an effect upon the percentages of Initial Class Principal Amounts outstanding and weighted average lives of the Offered Certificates set forth in that table. In addition, since the actual Mortgage Loans in the Trust will have characteristics that differ from those assumed in preparing the tables set forth below, the distributions of principal of the Offered Certificates may be made earlier or later than indicated in the table.

The percentages and weighted average lives in the tables entitled "Percentage of Initial Class Principal Amount of the Offered Certificates Outstanding at the Following Prepayment Scenarios" were determined assuming that (the "Structuring Assumptions"):

- the Mortgage Loans have the characteristics set forth in the tables below.

- the closing date for the Offered Certificates occurs on April 27, 2006.

- distributions on the Offered Certificates are made on the 25th day of each month regardless of the day on which the Distribution Date actually occurs, commencing in May 2006.

- the prepayment rates are those indicated in the "Prepayment Scenarios" table below.

- the Originator is not required to substitute or repurchase any or all of the Mortgage Loans pursuant to the Pooling Agreement and no optional termination is exercised, except with respect to the entries identified by the row captioned "Weighted Average Life (years) to Clean-Up Call" in the tables below.

- scheduled payments for all Mortgage Loans are received on the first day of each month commencing in May 2006, the principal portion of such payments is computed prior to giving effect to prepayments received in such month and there are no losses or delinquencies with respect to such Mortgage Loans.

- all related Mortgage Loans prepay at the same rate and all such payments are treated as prepayments in full of individual Mortgage Loans, with no shortfalls in collection of interest.

- such prepayments are received on the last day of each month commencing in the month of the Closing Date.

- the original Principal Balance of the Class P Certificates is equal to $0.

- the Fixed Swap Payment is calculated based on a schedule, a copy of which is attached hereto as Annex II and no Swap Termination Payment is made.

S-104

Confidential

JPMC_DEX_000402737

- the Certificate Index is at all times equal to 4.840%,

- Six-Month LIBOR is at all times equal to 5.160%,

- the Mortgage Rate for each adjustable-rate Mortgage Loan is adjusted on its next Adjustment Date (and on subsequent Adjustment Dates, if necessary) to equal the sum of (a) the assumed level of the Six-Month LIBOR and (b) the respective Gross Margin (such sum being subject to the applicable Periodic Rate Caps, Minimum Mortgage Rates and Maximum Mortgage Rates), and

- the Administrative Fee rate is initially approximately 0.525% per annum, subject to adjustment.

Nothing contained in the foregoing assumptions should be construed as a representation that the Mortgage Loans will not experience delinquencies or losses.

### Prepayment Scenarios

|  | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Fixed-Rate Mortgage Loans[1] | 0% | 50% | 100% | 150% | 200% |
| Adjustable-Rate Mortgage Loans[2] | 0% | 50% | 100% | 150% | 200% |

[1] Percentage of the Prepayment Assumption.
[2] Percentage of the Prepayment Assumption.

S-105

Confidential

## ASSUMED MORTGAGE LOAN CHARACTERISTICS

| Group | Aggregate Principal Balance ($) | Current Mortgage Rate (%) | Original Term to Maturity (months) | Remaining Term to Maturity (months) | Margin (%) | Maximum Mortgage Rate (%) | Minimum Mortgage Rate (%) | Months to Next Rate Adjustment Date | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Original Interest Only Period (months) | Original Amortization Term (months) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 71,901,764.55 | 9.133 | 360 | 358 | 6.263 | 16.394 | 9.133 | 22 | 1.486 | 1.486 | 0 | 360 |
| 1 | 283,220.01 | 9.500 | 360 | 358 | 6.550 | 16.800 | 9.500 | 22 | 1.500 | 1.500 | 0 | 360 |
| 1 | 3,326,235.88 | 7.977 | 360 | 358 | 6.136 | 14.977 | 7.977 | 22 | 1.500 | 1.500 | 0 | 360 |
| 1 | 2,208,924.69 | 9.255 | 360 | 358 | 6.242 | 16.130 | 9.255 | 22 | 1.500 | 1.500 | 0 | 360 |
| 1 | 1,910,995.54 | 8.973 | 360 | 358 | 6.329 | 15.973 | 8.973 | 22 | 1.500 | 1.500 | 0 | 360 |
| 1 | 1,685,128.31 | 8.706 | 360 | 358 | 6.232 | 15.706 | 8.706 | 22 | 1.500 | 1.500 | 0 | 360 |
| 1 | 365,081.91 | 8.580 | 360 | 359 | 6.054 | 15.580 | 8.580 | 23 | 1.500 | 1.500 | 0 | 360 |
| 1 | 492,739.31 | 9.800 | 360 | 358 | 5.997 | 16.800 | 9.800 | 22 | 1.500 | 1.500 | 0 | 360 |
| 1 | 14,587,531.68 | 8.736 | 360 | 358 | 6.318 | 15.736 | 8.736 | 22 | 1.500 | 1.500 | 0 | 360 |
| 1 | 61,735,418.60 | 8.632 | 360 | 358 | 6.185 | 15.632 | 8.632 | 22 | 1.500 | 1.500 | 0 | 480 |
| 1 | 1,792,305.25 | 8.663 | 360 | 358 | 6.240 | 15.663 | 8.663 | 22 | 1.500 | 1.500 | 0 | 480 |
| 1 | 482,115.55 | 9.008 | 360 | 358 | 5.413 | 16.408 | 9.008 | 22 | 1.500 | 1.500 | 0 | 480 |
| 1 | 3,728,229.01 | 8.664 | 360 | 358 | 5.231 | 15.564 | 8.664 | 22 | 1.500 | 1.500 | 0 | 480 |
| 1 | 5,338,652.40 | 8.851 | 360 | 358 | 6.125 | 15.851 | 8.851 | 22 | 1.500 | 1.500 | 0 | 480 |
| 1 | 8,525,882.79 | 8.074 | 360 | 358 | 6.110 | 15.074 | 8.074 | 22 | 1.500 | 1.500 | 0 | 480 |
| 1 | 10,914,374.87 | 8.096 | 360 | 358 | 6.135 | 15.096 | 8.096 | 22 | 1.500 | 1.500 | 0 | 480 |
| 1 | 345,386.16 | 8.302 | 360 | 358 | 6.237 | 15.302 | 8.302 | 22 | 1.500 | 1.500 | 0 | 480 |
| 1 | 1,812,948.68 | 7.109 | 360 | 357 | 6.086 | 14.109 | 7.109 | 21 | 1.500 | 1.500 | 0 | 480 |
| 1 | 127,867,377.12 | 7.896 | 360 | 358 | 6.186 | 14.896 | 7.896 | 22 | 1.500 | 1.500 | 0 | 480 |
| 1 | 5,560,448.68 | 7.910 | 360 | 358 | 6.116 | 14.881 | 7.910 | 22 | 1.486 | 1.486 | 60 | 360 |
| 1 | 684,250.00 | 8.280 | 360 | 358 | 6.283 | 15.280 | 8.280 | 22 | 1.500 | 1.500 | 60 | 360 |
| 1 | 154,749.99 | 7.775 | 360 | 358 | 6.050 | 14.775 | 7.775 | 22 | 1.500 | 1.500 | 60 | 360 |
| 1 | 162,000.00 | 7.580 | 360 | 358 | 6.800 | 14.480 | 7.450 | 22 | 1.500 | 1.500 | 60 | 360 |
| 1 | 1,665,500.00 | 7.777 | 360 | 358 | 6.063 | 14.777 | 7.777 | 22 | 1.500 | 1.500 | 60 | 360 |
| 1 | 79,360.00 | 8.375 | 360 | 358 | 6.050 | 15.375 | 8.375 | 22 | 1.500 | 1.500 | 60 | 360 |
| 1 | 584,800.00 | 6.792 | 360 | 357 | 5.992 | 13.792 | 6.792 | 21 | 1.500 | 1.500 | 60 | 360 |
| 1 | 209,000.00 | 9.800 | 360 | 358 | 6.300 | 16.800 | 9.800 | 22 | 1.500 | 1.500 | 60 | 360 |
| 1 | 10,760,859.20 | 7.547 | 360 | 358 | 6.084 | 14.547 | 7.547 | 22 | 1.500 | 1.500 | 60 | 360 |
| 1 | 5,878,109.27 | 7.919 | 360 | 356 | 6.059 | 14.856 | 7.919 | 32 | 1.469 | 1.469 | 0 | 360 |
| 1 | 173,675.80 | 7.450 | 360 | 353 | 3.900 | 14.450 | 7.450 | 29 | 1.500 | 1.500 | 0 | 360 |
| 1 | 162,996.14 | 8.406 | 360 | 358 | 6.337 | 15.406 | 8.406 | 34 | 1.500 | 1.500 | 0 | 360 |
| 1 | 115,833.35 | 12.000 | 360 | 358 | 5.950 | 19.900 | 12.000 | 34 | 1.500 | 1.500 | 0 | 360 |
| 1 | 184,485.30 | 7.534 | 360 | 356 | 5.965 | 14.534 | 7.554 | 32 | 1.500 | 1.500 | 0 | 360 |
| 1 | 1,048,580.53 | 9.012 | 360 | 358 | 5.360 | 16.312 | 9.012 | 34 | 1.500 | 1.500 | 0 | 360 |
| 1 | 2,242,584.60 | 8.193 | 360 | 357 | 5.137 | 15.193 | 8.193 | 33 | 1.500 | 1.500 | 0 | 480 |
| 1 | 1,295,752.89 | 7.258 | 360 | 352 | 5.972 | 14.258 | 7.258 | 33 | 1.500 | 1.500 | 0 | 480 |
| 1 | 246,341.31 | 7.300 | 360 | 356 | 5.953 | 14.300 | 7.300 | 32 | 1.500 | 1.500 | 0 | 480 |
| 1 | 1,540,342.95 | 7.711 | 360 | 357 | 6.013 | 14.711 | 7.711 | 33 | 1.500 | 1.500 | 0 | 480 |
| 1 | 2,187,999.74 | 6.962 | 360 | 356 | 5.975 | 13.962 | 6.962 | 32 | 1.500 | 1.500 | 60 | 360 |
| 1 | 415,200.00 | 8.990 | 360 | 357 | 5.050 | 15.990 | 8.990 | 33 | 1.500 | 1.500 | 60 | 360 |
| 1 | 784,250.00 | 7.377 | 360 | 357 | 6.009 | 14.377 | 7.377 | 33 | 1.500 | 1.500 | 60 | 360 |
| 1 | 4,757,514.35 | 7.401 | 360 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 1 | 358,663.16 | 7.293 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 1 | 1,967,424.45 | 7.091 | 360 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 1 | 1,278,757.47 | 8.215 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 1 | 376,606.68 | 8.227 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 1 | 1,336,095.09 | 7.655 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 1 | 1,762,701.92 | 7.427 | 360 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 1 | 83,944.17 | 7.525 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 1 | 204,773.27 | 6.700 | 360 | 352 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 1 | 21,331,995.10 | 6.903 | 360 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 1 | 16,537,616.67 | 7.973 | 346 | 343 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 346 |
| 1 | 292,373.36 | 7.600 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 1 | 2,900,762.22 | 7.560 | 349 | 348 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 349 |
| 1 | 53,964.04 | 10.880 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 1 | 276,348.98 | 5.990 | 240 | 234 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 240 |
| 1 | 783,474.10 | 7.664 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 1 | 2,451,613.59 | 8.535 | 354 | 352 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 354 |
| 1 | 2,366,599.07 | 6.950 | 349 | 345 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 349 |
| 1 | 1,886,822.06 | 7.222 | 360 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 1 | 115,558.73 | 7.100 | 240 | 238 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 240 |
| 1 | 1,321,251.72 | 6.223 | 341 | 336 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 341 |

S-106

Confidential

JPMC_DEX_000402739

111

| Group | Aggregate Principal Balance ($) | Current Mortgage Rate (%) | Original Term to Maturity (months) | Remaining Term to Maturity (months) | Margin (%) | Maximum Mortgage Rate (%) | Minimum Mortgage Rate (%) | Months to Next Rate Adjustment Date | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Original Interest Only Period (months) | Original Amortization Term (months) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 23,145,946.94 | 7.467 | 355 | 352 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 355 |
| 2 | 73,678,301.09 | 8.976 | 360 | 358 | 6.292 | 15.951 | 8.976 | 22 | 1.489 | 1.489 | 0 | 360 |
| 2 | 325,776.85 | 11.210 | 360 | 358 | 6.142 | 18.210 | 11.210 | 22 | 1.500 | 1.500 | 0 | 360 |
| 2 | 356,507.01 | 11.235 | 360 | 358 | 6.895 | 18.235 | 11.235 | 22 | 1.500 | 1.500 | 0 | 360 |
| 2 | 4,011,907.80 | 8.925 | 360 | 358 | 6.242 | 15.925 | 8.925 | 22 | 1.500 | 1.500 | 0 | 360 |
| 2 | 2,323,003.76 | 9.653 | 360 | 358 | 6.341 | 16.653 | 9.653 | 22 | 1.500 | 1.500 | 0 | 360 |
| 2 | 1,663,441.95 | 8.858 | 360 | 358 | 6.128 | 15.858 | 8.858 | 22 | 1.500 | 1.500 | 0 | 360 |
| 2 | 1,943,925.81 | 8.555 | 360 | 358 | 6.341 | 15.555 | 8.555 | 22 | 1.500 | 1.500 | 0 | 360 |
| 2 | 14,490,414.52 | 8.772 | 360 | 358 | 6.359 | 15.744 | 8.772 | 22 | 1.500 | 1.500 | 0 | 480 |
| 2 | 47,649,314.35 | 8.790 | 360 | 358 | 6.163 | 15.790 | 8.790 | 22 | 1.500 | 1.500 | 0 | 480 |
| 2 | 483,117.38 | 9.430 | 360 | 358 | 6.121 | 16.430 | 9.430 | 22 | 1.500 | 1.500 | 0 | 480 |
| 2 | 5,666,330.51 | 8.156 | 360 | 357 | 6.172 | 15.156 | 8.156 | 21 | 1.500 | 1.500 | 0 | 480 |
| 2 | 2,212,066.51 | 9.404 | 360 | 357 | 6.159 | 16.404 | 9.404 | 21 | 1.500 | 1.500 | 0 | 480 |
| 2 | 4,417,161.96 | 8.093 | 360 | 357 | 6.101 | 15.093 | 8.093 | 21 | 1.500 | 1.500 | 0 | 480 |
| 2 | 6,387,661.90 | 8.283 | 360 | 358 | 6.235 | 15.283 | 8.283 | 22 | 1.500 | 1.500 | 0 | 480 |
| 2 | 65,571.02 | 8.900 | 360 | 358 | 5.950 | 15.900 | 8.900 | 22 | 1.500 | 1.500 | 0 | 480 |
| 2 | 639,383.74 | 8.515 | 360 | 357 | 6.050 | 15.515 | 8.515 | 21 | 1.500 | 1.500 | 0 | 480 |
| 2 | 183,825,222.35 | 7.747 | 360 | 358 | 6.186 | 14.747 | 7.747 | 22 | 1.500 | 1.500 | 0 | 480 |
| 2 | 21,025,598.97 | 8.644 | 360 | 358 | 6.097 | 15.628 | 8.644 | 22 | 1.492 | 1.492 | 50 | 300 |
| 2 | 757,000.00 | 7.277 | 360 | 358 | 6.152 | 14.277 | 7.277 | 22 | 1.500 | 1.500 | 60 | 300 |
| 2 | 893,499.99 | 7.809 | 360 | 358 | 6.050 | 14.809 | 7.806 | 22 | 1.500 | 1.500 | 60 | 300 |
| 2 | 26,315,455.91 | 7.476 | 360 | 358 | 6.114 | 14.476 | 7.476 | 22 | 1.500 | 1.500 | 60 | 300 |
| 2 | 2,995,468.42 | 7.569 | 360 | 355 | 6.094 | 14.529 | 7.569 | 31 | 1.500 | 1.500 | 0 | 360 |
| 2 | 119,812.95 | 9.250 | 360 | 357 | 6.700 | 15.250 | 9.250 | 33 | 1.500 | 1.500 | 0 | 360 |
| 2 | 85,029.34 | 6.450 | 360 | 354 | 5.950 | 13.450 | 6.450 | 30 | 1.500 | 1.500 | 0 | 360 |
| 2 | 1,707,147.31 | 8.657 | 360 | 358 | 6.002 | 15.657 | 8.657 | 34 | 1.506 | 1.500 | 0 | 360 |
| 2 | 1,085,729.37 | 8.566 | 360 | 357 | 6.207 | 15.566 | 8.566 | 33 | 1.500 | 1.500 | 0 | 480 |
| 2 | 161,946.77 | 7.725 | 360 | 359 | 5.950 | 14.725 | 7.725 | 35 | 1.500 | 1.500 | 0 | 480 |
| 2 | 929,444.48 | 7.949 | 360 | 356 | 6.420 | 14.949 | 7.949 | 44 | 1.500 | 1.500 | 0 | 480 |
| 2 | 4,175,473.56 | 6.322 | 360 | 356 | 5.908 | 13.322 | 6.322 | 32 | 1.500 | 1.500 | 60 | 300 |
| 2 | 423,500.00 | 6.850 | 360 | 356 | 5.950 | 13.850 | 6.850 | 32 | 1.500 | 1.500 | 60 | 300 |
| 2 | 1,502,479.73 | 5.712 | 360 | 355 | 5.950 | 12.712 | 5.712 | 31 | 1.500 | 1.500 | 60 | 300 |
| 2 | 4,044,428.16 | 7.781 | 360 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 2 | 4,732,060.11 | 7.630 | 360 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 2 | 807,159.42 | 9.087 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 2 | 147,150.27 | 9.862 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 2 | 340,028.45 | 6.316 | 360 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 2 | 505,886.18 | 7.150 | 360 | 354 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 2 | 28,130,119.62 | 6.623 | 360 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 480 |
| 2 | 7,670,752.71 | 7.699 | 360 | 352 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 386 |
| 2 | 3,652,975.19 | 6.500 | 360 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 165,629.95 | 10.350 | 360 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 345,523.40 | 8.021 | 360 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 952,276.84 | 7.819 | 336 | 332 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 336 |
| 2 | 1,389,745.59 | 6.677 | 360 | 354 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 707,194.32 | 5.957 | 360 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 16,176,126.03 | 7.085 | 349 | 348 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 349 |
| 2 | 8,691,411.10 | 11.613 | 358 | 355 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 358 |
| 2 | 42,437.20 | 10.500 | 360 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 823,981.36 | 11.952 | 360 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 77,353.97 | 11.855 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 443,906.46 | 11.779 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 747,191.82 | 10.307 | 360 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 107,886.31 | 10.850 | 360 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 8,430,258.84 | 11.246 | 359 | 356 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 359 |
| 2 | 88,480.80 | 11.237 | 360 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 455,317.71 | 10.781 | 360 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 107,883.28 | 10.367 | 360 | 357 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 360 |
| 2 | 3,441,132.54 | 10.394 | 354 | 354 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | 354 |

The actual characteristics and the performance of the Mortgage Loans will differ from the assumptions used in constructing the tables set forth below, which are hypothetical in nature and are provided only to give a general sense of how the principal cash flows might behave under varying prepayment scenarios. For example, it is not expected that the Mortgage Loans will prepay at a constant rate until maturity, that all of the Mortgage Loans will prepay at the same rate or that there will be no defaults or delinquencies on the Mortgage Loans. Moreover, the

S-107

JPMC_DEX_000402740

diverse remaining terms to maturity and the Mortgage Rates of the Mortgage Loans could produce slower or faster principal distributions than indicated in the tables at the various prepayment scenarios specified, even if the weighted average remaining term to maturity and weighted average Mortgage Rate of the Mortgage Loans are assumed.  Any difference between such assumptions and the actual characteristics and performance of the Mortgage Loans, or actual prepayment or loss experience, will cause the percentages of initial Class Principal Amounts outstanding over time and the weighted average lives of the Offered Certificates to differ (which difference could be material) from the corresponding information in the tables for each indicated prepayment scenario.

Subject to the foregoing discussion and assumptions, the following tables indicate the weighted average lives of the Offered Certificates and set forth the percentages of the initial Class Principal Amounts of the Offered Certificates that would be outstanding after each of the Distribution Dates shown at various prepayment scenarios.

The weighted average life of an Offered Certificate is determined by (1) multiplying the net reduction, if any, of the applicable Class Principal Amount by the number of years from the date of issuance of the Offered Certificate to the related Distribution Date, (2) adding the results and (3) dividing the sum by the aggregate of the net reductions of Class Principal Amount described in (1) above.

S-108

JPMC_DEX_000402741

## PERCENTAGE OF INITIAL CLASS PRINCIPAL AMOUNT OF THE OFFERED CERTIFICATES OUTSTANDING AT THE FOLLOWING PREPAYMENT SCENARIOS

| Distribution Date | Class A-1 Certificates | | | | | Class A-2 Certificates | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | V | I | II | III | IV | V |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2007 | 99 | 87 | 74 | 61 | 47 | 99 | 73 | 47 | 21 | 0 |
| April 2008 | 99 | 67 | 49 | * | 0 | 98 | 44 | 0 | 0 | 0 |
| April 2009 | 98 | 51 | 18 | 0 | 0 | 97 | 2 | 0 | 0 | 0 |
| April 2010 | 98 | 39 | 18 | 0 | 0 | 96 | 0 | 0 | 0 | 0 |
| April 2011 | 97 | 32 | 12 | 0 | 0 | 94 | 0 | 0 | 0 | 0 |
| April 2012 | 96 | 27 | 9 | 0 | 0 | 93 | 0 | 0 | 0 | 0 |
| April 2013 | 96 | 22 | 5 | 0 | 0 | 92 | 0 | 0 | 0 | 0 |
| April 2014 | 95 | 19 | 4 | 0 | 0 | 90 | 0 | 0 | 0 | 0 |
| April 2015 | 94 | 16 | 3 | 0 | 0 | 88 | 0 | 0 | 0 | 0 |
| April 2016 | 93 | 13 | 2 | 0 | 0 | 86 | 0 | 0 | 0 | 0 |
| April 2017 | 91 | 11 | 2 | 0 | 0 | 84 | 0 | 0 | 0 | 0 |
| April 2018 | 90 | 9 | 1 | 0 | 0 | 81 | 0 | 0 | 0 | 0 |
| April 2019 | 89 | 8 | 1 | 0 | 0 | 78 | 0 | 0 | 0 | 0 |
| April 2020 | 87 | 7 | 1 | 0 | 0 | 75 | 0 | 0 | 0 | 0 |
| April 2021 | 85 | 6 | * | 0 | 0 | 72 | 0 | 0 | 0 | 0 |
| April 2022 | 84 | 5 | * | 0 | 0 | 68 | 0 | 0 | 0 | 0 |
| April 2023 | 81 | 4 | 0 | 0 | 0 | 64 | 0 | 0 | 0 | 0 |
| April 2024 | 79 | 3 | 0 | 0 | 0 | 59 | 0 | 0 | 0 | 0 |
| April 2025 | 76 | 3 | 0 | 0 | 0 | 54 | 0 | 0 | 0 | 0 |
| April 2026 | 74 | 2 | 0 | 0 | 0 | 48 | 0 | 0 | 0 | 0 |
| April 2027 | 70 | 2 | 0 | 0 | 0 | 41 | 0 | 0 | 0 | 0 |
| April 2028 | 67 | 2 | 0 | 0 | 0 | 34 | 0 | 0 | 0 | 0 |
| April 2029 | 63 | 1 | 0 | 0 | 0 | 26 | 0 | 0 | 0 | 0 |
| April 2030 | 59 | 1 | 0 | 0 | 0 | 17 | 0 | 0 | 0 | 0 |
| April 2031 | 54 | 1 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 0 |
| April 2032 | 48 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| April 2033 | 42 | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| April 2034 | 36 | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| April 2035 | 32 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| April 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years to Maturity | 23.34 | 4.91 | 2.46 | 1.31 | 1.04 | 17.93 | 1.65 | 1.00 | 0.73 | 0.60 |
| Weighted Average Life in Years to Clean-Up Call | 23.34 | 4.54 | 2.25 | 1.31 | 1.04 | 17.93 | 1.65 | 1.00 | 0.73 | 0.60 |

| Distribution Date | Class A-3 Certificates | | | | | Class A-4 Certificates | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | V | I | II | III | IV | V |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2007 | 100 | 100 | 100 | 100 | 87 | 100 | 100 | 100 | 100 | 100 |
| April 2008 | 100 | 100 | 60 | 0 | 0 | 100 | 100 | 100 | 17 | 0 |
| April 2009 | 100 | 100 | 0 | 0 | 0 | 100 | 100 | 30 | 0 | 0 |
| April 2010 | 100 | 57 | 0 | 0 | 0 | 100 | 100 | 30 | 0 | 0 |
| April 2011 | 100 | 0 | 0 | 0 | 0 | 100 | 99 | 5 | 0 | 0 |
| April 2012 | 100 | 0 | 0 | 0 | 0 | 100 | 74 | 0 | 0 | 0 |
| April 2013 | 100 | 0 | 0 | 0 | 0 | 100 | 54 | 0 | 0 | 0 |
| April 2014 | 100 | 0 | 0 | 0 | 0 | 100 | 46 | 0 | 0 | 0 |
| April 2015 | 100 | 0 | 0 | 0 | 0 | 100 | 22 | 0 | 0 | 0 |
| April 2016 | 100 | 0 | 0 | 0 | 0 | 100 | 10 | 0 | 0 | 0 |
| April 2017 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2018 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2019 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2020 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2021 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2022 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2023 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2024 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2025 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2026 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2027 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2028 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2029 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2030 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2031 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2032 | 90 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2033 | 57 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2034 | 22 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2035 | 0 | 0 | 0 | 0 | 0 | 90 | 0 | 0 | 0 | 0 |
| April 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years to Maturity | 27.21 | 3.89 | 2.00 | 1.50 | 1.14 | 29.72 | 7.47 | 3.25 | 1.90 | 1.55 |
| Weighted Average Life in Years to Clean-Up Call | 27.24 | 3.89 | 2.00 | 1.50 | 1.14 | 29.72 | 7.47 | 3.25 | 1.90 | 1.55 |

Confidential

| Distribution Date | Class A-5 Certificates | | | | | Class M-1 Certificates | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | V | I | II | III | IV | V |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2007 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2008 | 100 | 100 | 100 | 100 | 0 | 100 | 100 | 100 | 100 | 49 |
| April 2009 | 100 | 100 | 100 | 0 | 0 | 100 | 100 | 100 | 98 | 49 |
| April 2010 | 100 | 100 | 100 | 0 | 0 | 100 | 100 | 50 | 95 | 49 |
| April 2011 | 100 | 100 | 100 | 0 | 0 | 100 | 87 | 34 | 82 | 27 |
| April 2012 | 100 | 100 | 76 | 0 | 0 | 100 | 73 | 24 | 49 | 12 |
| April 2013 | 100 | 100 | 54 | 0 | 0 | 100 | 61 | 17 | 31 | 2 |
| April 2014 | 100 | 100 | 38 | 0 | 0 | 100 | 51 | 12 | 18 | 0 |
| April 2015 | 100 | 100 | 28 | 0 | 0 | 100 | 43 | 9 | 8 | 0 |
| April 2016 | 100 | 100 | 20 | 0 | 0 | 100 | 36 | 6 | 2 | 0 |
| April 2017 | 100 | 99 | 14 | 0 | 0 | 100 | 30 | 5 | 0 | 0 |
| April 2018 | 100 | 84 | 11 | 0 | 0 | 100 | 26 | 3 | 0 | 0 |
| April 2019 | 100 | 70 | 8 | 0 | 0 | 100 | 22 | 1 | 0 | 0 |
| April 2020 | 100 | 59 | 5 | 0 | 0 | 100 | 18 | 0 | 0 | 0 |
| April 2021 | 100 | 50 | 2 | 0 | 0 | 100 | 15 | 0 | 0 | 0 |
| April 2022 | 100 | 42 | 0 | 0 | 0 | 100 | 13 | 0 | 0 | 0 |
| April 2023 | 100 | 35 | 0 | 0 | 0 | 100 | 11 | 0 | 0 | 0 |
| April 2024 | 100 | 29 | 0 | 0 | 0 | 100 | 9 | 0 | 0 | 0 |
| April 2025 | 100 | 24 | 0 | 0 | 0 | 100 | 7 | 0 | 0 | 0 |
| April 2026 | 100 | 20 | 0 | 0 | 0 | 100 | 6 | 0 | 0 | 0 |
| April 2027 | 100 | 17 | 0 | 0 | 0 | 100 | 5 | 0 | 0 | 0 |
| April 2028 | 100 | 14 | 0 | 0 | 0 | 100 | 4 | 0 | 0 | 0 |
| April 2029 | 100 | 11 | 0 | 0 | 0 | 100 | 3 | 0 | 0 | 0 |
| April 2030 | 100 | 9 | 0 | 0 | 0 | 100 | 2 | 0 | 0 | 0 |
| April 2031 | 100 | 7 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2032 | 100 | 4 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2033 | 100 | 2 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2034 | 100 | * | 0 | 0 | 0 | 93 | 0 | 0 | 0 | 0 |
| April 2035 | 100 | 0 | 0 | 0 | 0 | 87 | 0 | 0 | 0 | 0 |
| April 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years to Maturity | 29.83 | 16.33 | 8.09 | 2.38 | 1.85 | 29.61 | 9.77 | 5.27 | 6.35 | 3.64 |
| Weighted Average Life in Years to Clean-Up Call | 29.83 | 13.02 | 6.27 | 2.38 | 1.85 | 29.61 | 8.82 | 4.73 | 3.92 | 2.36 |

| Distribution Date | Class M-2 Certificates | | | | | Class M-3 Certificates | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | V | I | II | III | IV | V |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2007 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2008 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2009 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 17 |
| April 2010 | 100 | 100 | 48 | 83 | 12 | 100 | 100 | 48 | 19 | 7 |
| April 2011 | 100 | 87 | 34 | 31 | 4 | 100 | 87 | 34 | 11 | * |
| April 2012 | 100 | 73 | 24 | * | 0 | 100 | 73 | 24 | * | 0 |
| April 2013 | 100 | 61 | 17 | 1 | 0 | 100 | 61 | 17 | * | 0 |
| April 2014 | 100 | 51 | 12 | 0 | 0 | 100 | 51 | 12 | 0 | 0 |
| April 2015 | 100 | 43 | 9 | 0 | 0 | 100 | 43 | 9 | 0 | 0 |
| April 2016 | 100 | 36 | 6 | 0 | 0 | 100 | 36 | 6 | 0 | 0 |
| April 2017 | 100 | 30 | 5 | 0 | 0 | 100 | 30 | 5 | 0 | 0 |
| April 2018 | 100 | 26 | 2 | 0 | 0 | 100 | 26 | 2 | 0 | 0 |
| April 2019 | 100 | 22 | 0 | 0 | 0 | 100 | 22 | 0 | 0 | 0 |
| April 2020 | 100 | 18 | 0 | 0 | 0 | 100 | 18 | 0 | 0 | 0 |
| April 2021 | 100 | 15 | 0 | 0 | 0 | 100 | 15 | 0 | 0 | 0 |
| April 2022 | 100 | 13 | 0 | 0 | 0 | 100 | 13 | 0 | 0 | 0 |
| April 2023 | 100 | 11 | 0 | 0 | 0 | 100 | 11 | 0 | 0 | 0 |
| April 2024 | 100 | 6 | 0 | 0 | 0 | 100 | * | 0 | 0 | 0 |
| April 2025 | 100 | * | 0 | 0 | 0 | 100 | * | 0 | 0 | 0 |
| April 2026 | 100 | 6 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2027 | 100 | 5 | 0 | 0 | 0 | 100 | 5 | 0 | 0 | 0 |
| April 2028 | 100 | 4 | 0 | 0 | 0 | 100 | * | 0 | 0 | 0 |
| April 2029 | 100 | 2 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2030 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2031 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2032 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2033 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2034 | 99 | 0 | 0 | 0 | 0 | 99 | 0 | 0 | 0 | 0 |
| April 2035 | 87 | 0 | 0 | 0 | 0 | 87 | 0 | 0 | 0 | 0 |
| April 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years to Maturity | 29.61 | 9.76 | 5.12 | 1.55 | 3.96 | 29.61 | 9.76 | 5.03 | 4.11 | 3.07 |
| Weighted Average Life in Years to Clean-Up Call | 29.61 | 8.81 | 4.61 | 3.96 | 2.72 | 29.61 | 8.82 | 4.55 | 3.80 | 2.74 |

*Indicates a number that is greater than zero but less than 0.5%

S-110

Confidential

JPMC_DEX_000402743

## PERCENTAGE OF INITIAL CLASS PRINCIPAL AMOUNT OF THE OFFERED CERTIFICATES OUTSTANDING AT THE FOLLOWING PREPAYMENT SCENARIOS

| Distribution Date | Class M-4 Certificates | | | | | Class M-5 Certificates | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | V | I | II | III | IV | V |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2007 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2008 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2009 | 100 | 100 | 100 | 100 | 15 | 100 | 100 | 100 | 100 | 15 |
| April 2010 | 100 | 100 | 48 | 19 | * | 100 | 100 | 48 | 13 | 7 |
| April 2011 | 100 | 87 | 34 | 11 | 0 | 100 | 87 | 34 | 11 | 0 |
| April 2012 | 100 | 73 | 24 | * | 0 | 100 | 73 | 24 | * | 0 |
| April 2013 | 100 | 61 | 17 | 0 | 0 | 100 | 61 | 17 | 0 | 0 |
| April 2014 | 100 | 51 | 12 | 0 | 0 | 100 | 51 | 12 | 0 | 0 |
| April 2015 | 100 | 43 | 9 | 0 | 0 | 100 | 43 | 9 | 0 | 0 |
| April 2016 | 100 | 36 | 6 | 0 | 0 | 100 | 36 | 0 | 0 | 0 |
| April 2017 | 100 | 30 | 2 | 0 | 0 | 100 | 30 | 0 | 0 | 0 |
| April 2018 | 100 | 26 | 0 | 0 | 0 | 100 | 26 | 0 | 0 | 0 |
| April 2019 | 100 | 22 | 0 | 0 | 0 | 100 | 22 | 0 | 0 | 0 |
| April 2020 | 100 | 18 | 0 | 0 | 0 | 100 | 18 | 0 | 0 | 0 |
| April 2021 | 100 | 15 | 0 | 0 | 0 | 100 | 15 | 0 | 0 | 0 |
| April 2022 | 100 | 13 | 0 | 0 | 0 | 100 | 13 | 0 | 0 | 0 |
| April 2023 | 100 | 11 | 0 | 0 | 0 | 100 | 11 | 0 | 0 | 0 |
| April 2024 | 100 | 9 | 0 | 0 | 0 | 100 | 9 | 0 | 0 | 0 |
| April 2025 | 100 | 7 | 0 | 0 | 0 | 100 | 7 | 0 | 0 | 0 |
| April 2026 | 100 | 6 | 0 | 0 | 0 | 100 | 6 | 0 | 0 | 0 |
| April 2027 | 100 | 5 | 0 | 0 | 0 | 100 | 1 | 0 | 0 | 0 |
| April 2028 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2029 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2030 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2031 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2032 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2033 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2034 | 99 | 0 | 0 | 0 | 0 | 99 | 0 | 0 | 0 | 0 |
| April 2035 | 87 | 0 | 0 | 0 | 0 | 87 | 0 | 0 | 0 | 0 |
| April 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years to Maturity | 29.61 | 9.67 | 4.99 | 3.91 | 2.88 | 29.61 | 9.63 | 4.95 | 3.78 | 2.75 |
| Weighted Average Life in Years to Clean-Up Call | 29.61 | 8.81 | 4.52 | 3.67 | 2.68 | 29.61 | 8.82 | 4.51 | 3.50 | 2.57 |

| Distribution Date | Class M-6 Certificates | | | | | Class M-7 Certificates | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | V | I | II | III | IV | V |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2007 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2008 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2009 | 100 | 100 | 100 | 100 | 15 | 100 | 100 | 100 | 95 | 15 |
| April 2010 | 100 | 100 | 98 | 13 | * | 100 | 100 | 98 | 13 | 2 |
| April 2011 | 100 | 87 | 34 | 11 | 0 | 100 | 87 | 34 | 11 | 0 |
| April 2012 | 100 | 73 | 24 | 0 | 0 | 100 | 73 | 24 | 0 | 0 |
| April 2013 | 100 | 61 | 17 | 0 | 0 | 100 | 61 | 17 | 0 | 0 |
| April 2014 | 100 | 51 | 12 | 0 | 0 | 100 | 51 | 12 | 0 | 0 |
| April 2015 | 100 | 43 | 9 | 0 | 0 | 100 | 43 | 8 | 0 | 0 |
| April 2016 | 100 | 36 | 3 | 0 | 0 | 100 | 36 | 0 | 0 | 0 |
| April 2017 | 100 | 30 | 0 | 0 | 0 | 100 | 30 | 0 | 0 | 0 |
| April 2018 | 100 | 26 | 0 | 0 | 0 | 100 | 26 | 0 | 0 | 0 |
| April 2019 | 100 | 22 | 0 | 0 | 0 | 100 | 22 | 0 | 0 | 0 |
| April 2020 | 100 | 18 | 0 | 0 | 0 | 100 | 18 | 0 | 0 | 0 |
| April 2021 | 100 | 15 | 0 | 0 | 0 | 100 | 15 | 0 | 0 | 0 |
| April 2022 | 100 | 13 | 0 | 0 | 0 | 100 | 13 | 0 | 0 | 0 |
| April 2023 | 100 | 11 | 0 | 0 | 0 | 100 | 11 | 0 | 0 | 0 |
| April 2024 | 100 | 9 | 0 | 0 | 0 | 100 | 9 | 0 | 0 | 0 |
| April 2025 | 100 | 7 | 0 | 0 | 0 | 100 | 3 | 0 | 0 | 0 |
| April 2026 | 100 | 3 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2027 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2028 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2029 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2030 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2031 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2032 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2033 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2034 | 99 | 0 | 0 | 0 | 0 | 99 | 0 | 0 | 0 | 0 |
| April 2035 | 87 | 0 | 0 | 0 | 0 | 87 | 0 | 0 | 0 | 0 |
| April 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years to Maturity | 29.61 | 9.58 | 4.89 | 3.66 | 2.61 | 29.61 | 9.51 | 4.81 | 3.56 | 2.55 |
| Weighted Average Life in Years to Clean-Up Call | 29.61 | 8.82 | 4.48 | 3.40 | 2.47 | 29.61 | 8.82 | 4.47 | 3.33 | 2.40 |

*Indicates a number that is greater than zero but less than 0.5%.

Confidential

JPMC_DEX_000402744

## PERCENTAGE OF INITIAL CLASS PRINCIPAL AMOUNT OF THE OFFERED CERTIFICATES OUTSTANDING AT THE FOLLOWING PREPAYMENT SCENARIOS

| Distribution Date | Class M-8 Certificates | | | | | Class M-9 Certificates | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | V | I | II | III | IV | V |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2007 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2008 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| April 2009 | 100 | 100 | 100 | 35 | 15 | 100 | 100 | 100 | 35 | 15 |
| April 2010 | 100 | 100 | 48 | 19 | 0 | 100 | 100 | 48 | 19 | 0 |
| April 2011 | 100 | 87 | 34 | 11 | 0 | 100 | 87 | 34 | 3 | 0 |
| April 2012 | 100 | 73 | 24 | 0 | 0 | 100 | 73 | 24 | 0 | 0 |
| April 2013 | 100 | 61 | 17 | 0 | 0 | 100 | 61 | 17 | 0 | 0 |
| April 2014 | 100 | 51 | 12 | 0 | 0 | 100 | 51 | 0 | 0 | 0 |
| April 2015 | 100 | 43 | 0 | 0 | 0 | 100 | 43 | 0 | 0 | 0 |
| April 2016 | 100 | 36 | 0 | 0 | 0 | 100 | 35 | 0 | 0 | 0 |
| April 2017 | 100 | 30 | 0 | 0 | 0 | 100 | 30 | 0 | 0 | 0 |
| April 2018 | 100 | 26 | 0 | 0 | 0 | 100 | 26 | 0 | 0 | 0 |
| April 2019 | 100 | 22 | 0 | 0 | 0 | 100 | 22 | 0 | 0 | 0 |
| April 2020 | 100 | 18 | 0 | 0 | 0 | 100 | 18 | 0 | 0 | 0 |
| April 2021 | 100 | 15 | 0 | 0 | 0 | 100 | 15 | 0 | 0 | 0 |
| April 2022 | 100 | 13 | 0 | 0 | 0 | 100 | 11 | 0 | 0 | 0 |
| April 2023 | 100 | 10 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2024 | 100 | 2 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2025 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2026 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2027 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2028 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2029 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2030 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2031 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2032 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2033 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| April 2034 | 99 | 0 | 0 | 0 | 0 | 99 | 0 | 0 | 0 | 0 |
| April 2035 | 87 | 0 | 0 | 0 | 0 | 87 | 0 | 0 | 0 | 0 |
| April 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years to Maturity | 29.61 | 9.40 | 4.76 | 3.45 | 2.47 | 29.61 | 9.27 | 4.69 | 3.36 | 2.40 |
| Weighted Average Life in Years to Clean-Up Call | 29.61 | 8.81 | 4.45 | 3.26 | 2.35 | 29.61 | 8.82 | 4.45 | 3.21 | 2.31 |

*Indicates a number that is greater than zero and less than 0.5%

S-112

Confidential

JPMC_DEX_000402745

117

**Yield Sensitivity of the Subordinate Certificates**

If the sum of the Overcollateralized Amount and the Class Principal Amount of each class of Subordinate Certificates with a lower payment priority have been reduced to zero, the yield to maturity on the remaining class of Subordinate Certificates with the lowest payment priority will become extremely sensitive to losses on the Mortgage Loans (and the timing thereof) that are covered by subordination, because the entire amount of any Realized Losses (to the extent not covered by Net Monthly Excess Cashflow or by amounts paid under the Interest Rate Swap Agreement and available for that purpose), will be allocated to those Certificates. The initial undivided interests in the Trust evidenced by the Class M-1 Certificates, the Class M-2 Certificates, the Class M-3 Certificates, the Class M-4 Certificates, the Class M-5 Certificates, the Class M-6 Certificates, the Class M-7 Certificates, the Class M-8 Certificates, the Class M-9 Certificates, the Class M-10 Certificates and the Class M-11 Certificates are approximately 4.60%, approximately 3.30%, approximately 1.85%, approximately 1.50%, approximately 1.40%, approximately 1.45%, approximately 1.45%, approximately 1.15%, approximately 0.85%, approximately 0.65% and approximately 1.00%, respectively, and the initial Overcollateralized Amount is approximately 2.15% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date. Investors in the Subordinate Certificates should fully consider the risk that Realized Losses on the Mortgage Loans could result in the failure of such investors to fully recover their investments. In addition, once Realized Losses have been allocated to a class of Subordinate Certificates, such amounts with respect to such Certificates will not longer accrue interest and will not be reinstated thereafter (except to the extent of Subsequent Recoveries as set forth in the Pooling Agreement) and no amounts in respect thereof will be distributable to the Holders of those Certificates. However, Allocated Realized Loss Amounts may be paid to the holders of the applicable Subordinate Certificates from Net Monthly Excess Cashflow in the priority set forth under "Description of the Certificates—Overcollateralization Provisions" and "Description of the Certificates—The Interest Rate Swap Agreement, the Swap Provider and the Swap Account" in this prospectus supplement.

The Subordinate Certificates will not be entitled to any principal distributions until the Stepdown Date or during any period in which a Trigger Event is in effect, unless the aggregate Class Principal Amount of the Senior Certificates has been reduced to zero. As a result, the weighted average lives of the Subordinate Certificates will be longer than would otherwise be the case if distributions of principal were allocated on a *pro rata* basis among the Senior and Subordinate Certificates. As a result of the longer weighted average lives of the Subordinate Certificates, the holders of such Certificates have a greater risk of suffering a loss on their investments. Further, because a Trigger Event may be based on delinquencies, it is possible for the Subordinate Certificates to receive no principal distributions (unless the Class Principal Amount of the Senior Certificates has been reduced to zero) on and after the Stepdown Date even if no losses have occurred on the Mortgage Group.

## USE OF PROCEEDS

The net proceeds from the sale of the Offered Certificates will be applied by the Depositor to pay for the acquisition of the Mortgage Loans from the Seller. See "Use of Proceeds" in the accompanying prospectus and "Method of Distribution" in this prospectus supplement.

## MATERIAL FEDERAL INCOME TAX CONSEQUENCES

**General**

In the opinion of McKee Nelson LLP, counsel to the Underwriter and special tax counsel to the Depositor, a designated portion of the Trust Fund will comprise multiple REMICs for federal income tax purposes; and each of the Net WAC Reserve Fund and the supplemental interest trust, including any amounts deposited in the Swap Account from the Interest Rate Swap Agreement, will be an "outside reserve fund" for purposes of the Treasury regulations promulgated under the REMIC provisions of the Code.

**Tax Treatment of the Offered Certificates**

The Pooling Agreement provides that, for federal income tax information reporting purposes, the Securities Administrator will treat each holder of an Offered Certificate (i) as holding an undivided interest in a REMIC regular interest (a "REMIC regular interest component") and (ii) as having entered into a limited recourse interest rate cap contract written by the holders of the Class C Certificates (the "Cap Contract"). For this purpose, the

S-113

Confidential                                                                                       JPMC_DEX_000402746

REMIC regular interest component of an Offered Certificate will be entitled to receive interest and principal payments at the times and in the amounts equal to those made on the corresponding certificates, except that (i) any Swap Termination Payment will be treated as being payable solely from Net Monthly Excess Cashflow and (ii) the maximum interest rate of the corresponding REMIC regular interest will equal the Net WAC Rate, computed for this purpose by limiting the notional amount of the Interest Rate Swap Agreement to the aggregate principal balance of the Mortgage Loans.

As a result of the foregoing, the amount of distributions on the REMIC regular interest corresponding to an Offered Certificate may exceed the actual amount of distributions on the Offered Certificate. Any amount payable on an Offered Certificate in excess of the amount payable on the corresponding REMIC regular interest will be deemed to have been paid to the holder of that Offered Certificate pursuant to the Cap Contract. Alternatively, any amount payable on the REMIC regular interest corresponding to an Offered Certificate in excess of the amount payable on the Offered Certificate will be treated as having been received by the holder of that Offered Certificate and then as having been paid by such holder pursuant to the Cap Contract.

Each holder of an Offered Certificate will be required to report income accruing with respect to the REMIC regular interest component of that certificate as discussed under "Material Federal Income Tax Consequences" in the accompanying prospectus. In addition, each such certificateholder will be required to report net income with respect to the Cap Contract and will be permitted to recognize a net deduction with respect to the Cap Contract component, subject to the discussion under "Additional Considerations with Respect to the Offered Certificates—The Cap Contract Component" below. Prospective investors should review the discussion under "Material Federal Income Tax Consequences" in the accompanying prospectus and should consult their own tax advisors regarding the consequences to them in light of their own particular circumstances of taxing separately the two components constituting each Offered Certificate.

The remaining portion of this discussion assumes that the rights of the holders of Offered Certificates to receive payments in excess of the amounts payable on the corresponding REMIC regular interests will be treated as rights under a notional principal contract rather than as a partnership for federal income tax purposes. Treatment of such rights as a partnership interest could result in differing timing and character consequences to certificateholders and withholding tax consequences for certificateholders who are foreign persons. Prospective investors should consult their tax advisors regarding the appropriate tax treatment of the right to receive payments on an Offered Certificate in excess of the amounts payable on the corresponding REMIC regular interest.

**Additional Considerations with Respect to the Offered Certificates**

*Allocations*

A holder of an Offered Certificate must allocate its purchase price for a certificate between its components—the REMIC regular interest component and the Cap Contract component. In addition, upon the sale, exchange, or other disposition of such a certificate, the certificateholder must allocate the amount realized between the components of the certificate based on the relative fair market values of those components at the time of sale and must treat the sale, exchange or other disposition as a sale, exchange or disposition of the REMIC regular interest component and the Cap Contract component.

The Pooling Agreement provides that, for information reporting purposes, the Securities Administrator will treat the Cap Contract component as having nominal value. The Cap Contract is difficult to value, and the IRS could assert that the value of the Cap Contract component as of the closing date is greater than the value used for information reporting purposes. Prospective investors should consider the tax consequences to them if the IRS were to assert a different value for the Cap Contract component.

*Original Issue Discount*

The REMIC regular interest component of certain classes of Offered Certificates may be issued with original issue discount ("OID") for federal income tax purposes. The prepayment assumption that will be used for purposes of computing OID, if any, for federal income tax purposes will be the related Prepayment Assumption. No representation is made that the Mortgage Loans will, in fact, prepay at this rate or any other rate. Computing accruals of OID in the manner described in the prospectus may (depending on the actual rate of prepayments during

S-114

JPMC_DEX_000402747

the accrual period) result in the accrual of negative amounts of OID on the certificates issued with OID in an accrual period. Holders will be entitled to offset negative accruals of OID only against future OID accruals on their certificates.

*The Cap Contract Component*

The portion of the overall purchase price of an Offered Certificate attributable to the Cap Contract component must be amortized over the life of such certificate, taking into account the declining balance of the REMIC regular interest component. Treasury regulations concerning notional principal contracts provide alternative methods for amortizing the purchase price of an interest rate cap contract. Under one method—the level yield constant interest method—the price paid for an interest rate cap is amortized over the life of the cap as though it were the principal amount of a loan bearing interest at a reasonable rate. Prospective investors are urged to consult their tax advisors concerning the methods that can be employed to amortize the portion of the purchase price paid for the Cap Contract component of a certificate.

The Pooling Agreement provides that any payments made to a certificateholder in excess of the amounts payable on the corresponding REMIC regular interest will be treated by the Securities Administrator as periodic payments on an interest rate cap contract. To the extent the sum of such periodic payments for any year exceeds that year's amortized cost of the Cap Contract component, such excess represents net income for that year. Conversely, to the extent that the amount of that year's amortized cost exceeds the sum of the period payments, such excess shall represent a net deduction for that year. Although not clear, net income or a net deduction should be treated as ordinary income or as an ordinary deduction.

A certificateholder's ability to recognize a net deduction with respect to the Cap Contract component may be limited in the case of (i) estates and trusts and (ii) individuals owning an interest in such component directly or through a "pass-through entity" (other than in connection with such individual's trade or business). Pass-through entities include partnerships, S corporations, grantor trusts and non-publicly offered regulated investment companies, but do not include estates, nongrantor trusts, cooperatives, real estate investment trusts and publicly offered regulated investment companies. Further, such a certificateholder will not be able to recognize a net deduction with respect to the Cap Contract component in computing the certificateholder's alternative minimum tax liability.

Because a certificateholder will be required to include in income the amount deemed to have been paid by such holder pursuant to the Cap Contract but may not be able to deduct that amount from income, a beneficial owner of an Offered Certificate may have income that exceeds cash distributions on the Offered Certificate, in any period and over the term of the Offered Certificate. As a result, the Offered Certificates may not be a suitable investment for any taxpayer whose net deduction with respect to the Cap Contract would be subject to the limitations described above.

Assuming that the certificate is held as a "capital asset" within the meaning of section 1221 of the Code, gain or loss on the disposition of an interest in the Cap Contract component should be capital gain or loss.

*Status of the Offered Certificates*

The REMIC regular interest components of the Offered Certificates will be treated as assets described in Section 7701(a)(19)(C) of the Code, and as "real estate assets" under Section 856(c)(5)(B) of the Code, generally, in the same proportion that the assets of the Trust Fund, exclusive of the assets not included in any REMIC, would be so treated. In addition, the interest derived from the REMIC regular interest component of an Offered Certificate will be interest on obligations secured by interests in real property for purposes of section 856(c)(3) of the Code, subject to the same limitation in the preceding sentence. The Cap Contract components of the Offered Certificate will not qualify, however, as an asset described in Section 7701(a)(19)(C) of the Code or as a real estate asset under Section 856(c)(5)(B) of the Code. As a result of the obligations represented by the Cap Contract components, the Offered Certificates generally will not be a suitable investment for a REMIC.

S-115

JPMC_DEX_000402748

120

**Reportable Transactions**

Pursuant to recently enacted legislation, a penalty in the amount of $10,000 in the case of a natural person and $50,000 in any other case is imposed on any taxpayer that fails to file timely an information return with the IRS with respect to a "reportable transaction" (as defined in Section 6011 of the Code). The rules defining "reportable transactions" are complex and include transactions that result in certain losses that exceed threshold amounts. Prospective investors are advised to consult their own tax advisers regarding any possible disclosure obligations in light of their particular circumstances.

**Other Taxes**

No representations are made regarding the tax consequences of the purchase, ownership or disposition of the certificates under any state, local or foreign tax law.

**All investors should consult their own advisors regarding the federal, state, local or foreign tax consequences of purchasing, owning or disposing of the certificates.**

**ERISA MATTERS**

**General**

Any plan fiduciary that proposes to cause a Plan to acquire any of the offered certificates should consult with its counsel about the potential consequences under ERISA, and/or the Code, of the Plan's acquisition and ownership of those certificates. See "ERISA Considerations" in the prospectus. Section 406 of ERISA and Section 4975 of the Internal Revenue Code prohibit parties in interest with respect to a Plan engaging in specific transactions involving that Plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes various excise taxes on prohibited transactions involving Plans. ERISA authorizes the imposition of civil penalties for prohibited transactions involving plans not subject to the requirements of Section 4975 of the Code.

Some employee benefit plans, including governmental plans and some church plans, are not subject to ERISA's requirements. Accordingly, assets of those plans may be invested in the offered certificates without regard to the ERISA considerations described in this prospectus supplement and in the prospectus, subject to the provisions of other applicable federal and state law. However, any of these plans that are qualified and exempt from taxation under Sections 401(a) and 501(a) of the Code may be subject to the prohibited transaction rules described in Section 503 of the Code.

Except as noted above, investments by Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a Plan's investments be made in accordance with the documents governing the Plan. A fiduciary that decides to invest the assets of a Plan in the offered certificates should consider, among other factors, the extreme sensitivity of the investment to the rate of principal payments, including prepayments, on the Loans.

**Application of the Underwriter's Exemption**

Any person purchasing an offered certificate otherwise eligible for purchase by Plans under the Underwriter's Exemption, which certificate entitles the holder to receive payments under the Interest Rate Swap Agreement from the supplemental interest trust, will be deemed to have acquired for purposes of ERISA and Section 4975 of the Code the right to receive such offered certificate without the right to receive payments from the supplemental interest trust, together with the right to receive such payments.

The U.S. Department of Labor has granted individual administrative exemptions to J.P. Morgan Securities Inc. (the "Exemption") from some of the prohibited transaction rules of ERISA and the related excise tax provisions of Section 4975 of the Code for the initial purchase, the holding and the subsequent resale by Plans of securities, including certificates, issued by asset backed entities, including trusts, that consist of particular receivables, loans and other obligations that meet the conditions and requirements of the Exemption. Assuming that the general

S-116

conditions of the Exemption are met, the Exemption applies to mortgage loans like the mortgage loans, and to certificates that qualify for the Exemption and represent fractional undivided interests in a trust consisting of mortgage loans like the mortgage loans.

For a general description of the Exemption as amended by PTE 2002-41, 67 Fed. Reg. 54487, (2002), and the conditions that must be satisfied for the Exemption to apply and the limitations on the exemptive relief provided by the Exemption, see "ERISA Considerations" in the prospectus. It is expected that the Exemption will apply to the acquisition and holding by Plans of the offered certificates, other than the Residual Certificates (excluding the right to receive payments from the supplemental interest trust), and that all conditions of the Exemption other than those within the control of the investors will be met, although each fiduciary of a Plan should satisfy itself that the conditions of the Exemption have been satisfied with respect to such Plan. In addition, as of the date hereof, there is no single mortgagor that is the obligor on five percent of the mortgage loans included in the trust by aggregate unamortized principal balance of the assets of the trust.

The rating of a security may change. If a class of certificates is no longer rated at least BBB- or Baa3, certificates of that class will no longer be eligible for relief under the Exemption (although a Plan that had purchased the certificate when it had an investment grade rating would not be required by the Exemption to dispose of it). Consequently, transfers of any offered certificates rated below investment grade (collectively, "ERISA Restricted Offered Certificates") will not be registered by the securities administrator unless the securities administrator and the trustee receive the following:

- a representation from the transferee of the ERISA Restricted Offered Certificates, acceptable to and in form and substance satisfactory to the securities administrator and the trustee, to the effect that such transferee is not a Plan, nor a person acting on behalf of a Plan or using the assets of a Plan to effect the transfer;

- if the purchaser is an insurance company, a representation that the purchaser is an insurance company which is purchasing the ERISA Restricted Offered Certificates with funds contained in an "insurance company general account," as that term is defined in Section V(e) of Prohibited Transaction Class Exemption 95-60, or PTCE 95 60, and that the purchase and holding of the ERISA Restricted Offered Certificates are covered under Sections I and III of PTCE 95-60; or

- an opinion of counsel satisfactory to the securities administrator and the trustee that the purchase or holding of the ERISA Restricted Offered Certificates by a Plan, any person acting on behalf of a Plan or using a Plan's assets, will not result in prohibited transactions under Section 406 of ERISA and/or Section 4975 of the Code and will not subject the trustee, the securities administrator, the depositor, the transferor or the servicer to any obligation in addition to those undertaken in the pooling and servicing agreement.

**ERISA Considerations with respect to the Interest Rate Swap Agreement**

The Underwriter's Exemption may not apply to the acquisition, holding or resale of the right to receive payments from the supplemental interest trust by a Plan. The right to receive such payments could also result in a prohibited transaction if the Swap Provider is a party in interest with respect to such Plan, unless another administrative exemption is available. Accordingly, no Plan or other person using Plan assets may acquire or hold an offered certificate otherwise eligible for the Underwriter's Exemption before the termination of the Interest Rate Swap Agreement, unless such acquisition or holding is eligible for the exemptive relief available under Department of Labor Prohibited Transaction Class Exemption 84-14 (for transactions by independent "qualified professional asset managers"), 91-38 (for transactions by bank collective investment funds), 90-1 (for transactions by insurance company pooled separate accounts), 95-60 (for transactions by insurance company general accounts) or 96-23 (for transactions effected by "in-house asset managers"). Plan fiduciaries should consult their legal counsel concerning this issue. Each beneficial owner of an offered certificate or any interest therein, shall be deemed to have represented, by virtue of its acquisition or holding of the offered certificate, or interest therein, that either (i) it is not a Plan or (ii) the acquisition and holding of such Certificate are eligible for the exemptive relief available under one of the five Prohibited Transaction Class Exemptions as required immediately above. It should be noted that as PTCE 95-60 would cover the prohibited transactions discussed herein in connection with the Interest Rate Swap Agreement, any offered certificate whose rating has fallen to below BBB- could be purchased by insurance company general accounts pursuant to such exemption prior to the termination of the Interest Rate Swap Agreement.

S-117

Confidential

If any offered certificate, or any interest therein, is acquired or held in violation of the provisions of the preceding paragraph, the next preceding permitted beneficial owner will be treated as the beneficial owner of that certificate, retroactive to the date of transfer to the purported beneficial owner. Any purported beneficial owner whose acquisition or holding of an offered certificate, or interest therein, was effected in violation of the provisions of the preceding paragraph shall indemnify to the extent permitted by law and hold harmless the depositor, the transferor, the trustee, the securities administrator and the servicer from and against any and all liabilities, claims, costs or expenses incurred by such parties as a result of such acquisition or holding.

In the event that the representation is violated, or any attempt to transfer to a Plan or person acting on behalf of a Plan or using a Plan's assets is attempted without the opinion of counsel, the attempted transfer or acquisition shall be void and of no effect.

Prospective Plan investors should consult with their legal advisors concerning the impact of ERISA and Section 4975 of the Code, the effect of the assets of the trust being deemed "plan assets," the applicability of the Exemption and the potential consequences in their specific circumstances, prior to making an investment in the offered certificates. Moreover, each Plan fiduciary should determine whether under the general fiduciary standards of investment prudence and diversification, an investment in the offered certificates is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio.

## METHOD OF DISTRIBUTION

Subject to the terms and conditions set forth in the Underwriting Agreement among the Depositor, J.P. Morgan Securities Inc. (the "Underwriter"), the Depositor has agreed to sell the Offered Certificates to the Underwriter and the Underwriter has agreed to purchase from the Depositor the Offered Certificates.

Distribution of the Offered Certificates will be made by the Underwriter from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale. The Underwriter may effect such transactions by selling Offered Certificates to or through dealers and such dealers may receive from the Underwriter, for which it acts as agent, compensation in the form of underwriting discounts, concessions or commissions. The Underwriter and any dealers that participate with the Underwriter in the distribution of such Offered Certificates may be deemed to be underwriters, and any discounts, commissions or concessions received by them, and any profits on resale of the classes of certificates purchased by them, may be deemed to be underwriting discounts and commissions under the Securities Act of 1933, as amended (the "Act"). Proceeds to the Depositor from the sale of the Offered Certificates, before deducting underwriting fees and expenses payable by the Depositor, will be approximately $895,148,000. The Underwriter's commission will be any positive difference between the price it pays to the Depositor for the Offered Certificates underwritten by it and the amount it receives from the sale of the Offered Certificates to the public.

The Underwriter intends to make a secondary market in the Offered Certificates, but have no obligation to do so. There can be no assurances that a secondary market for the Offered Certificates will develop or, if it does develop, that it will continue or that it will provide Certificateholders with a sufficient level of liquidity of investment. The Offered Certificates will not be listed on any national securities exchange.

The Depositor has agreed to indemnify the Underwriter against, or make contributions to the Underwriter with respect to, certain liabilities, including liabilities under the Securities Act of 1933, as amended. J.P. Morgan Securities Inc. is an affiliate of the Depositor, the Securities Administrator, the Swap Provider, the Servicer, the Custodian and the Seller. The obligations of each of the Depositor, the Securities Administrator, the Swap Provider, the Servicer, the Custodian and the Seller are in the ordinary course of business.

## LEGAL MATTERS

The validity of the Certificates will be passed upon for the Depositor by McKee Nelson LLP, New York, New York. Certain tax matters will be passed upon for the Depositor by McKee Nelson LLP. McKee Nelson LLP will act as counsel for the Underwriter.

Confidential

JPMC_DEX_000402751

## RATINGS

It is a condition of the issuance of the Offered Certificates that they be rated as indicated on page S-1 by each of Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. ("S&P"), Fitch, Inc. ("Fitch") and Moody's Investors Service, Inc. ("Moody's" and, together with S&P and Fitch, the "Rating Agencies"), as applicable.

The ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued. Such ratings take into consideration the credit quality of the related mortgage group, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage group is adequate to make the payments required by such certificates. The ratings on the Offered Certificates do not, however, constitute statements regarding the likelihood or frequency of prepayments on the Mortgage Loans, the payment of the Net WAC Rate Carryover Amount or the possibility that a holder of an Offered Certificate might realize a lower than anticipated yield.

The Depositor has not requested a rating of the Offered Certificates by any rating agency other than the Rating Agencies; there can be no assurance, however, as to whether any other rating agency will rate the Offered Certificates or, if it does, what rating would be assigned by such other rating agency. The rating assigned by such other rating agency to the Offered Certificates could be lower than the respective ratings assigned by the Rating Agencies.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each security rating should be evaluated independently of any other security rating. In the event that the ratings initially assigned to any of the Offered Certificates by the Rating Agencies are subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to such Offered Certificates.

## LEGAL INVESTMENT

The Offered Certificates will **not** constitute "mortgage related securities" for purposes of SMMEA.

The Depositor makes no representations as to the proper characterization of any class of the Offered Certificates for legal investment or other purposes, or as to the ability of particular investors to purchase any class of the Offered Certificates under applicable legal investment restrictions. These uncertainties may adversely affect the liquidity of any class of Offered Certificates. Accordingly, all institutions whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their legal advisors in determining whether and to what extent any class of the Offered Certificates constitutes a legal investment or is subject to investment, capital or other restrictions.

See "Legal Investment" in the prospectus.

Confidential

JPMC_DEX_000402752

## INDEX OF CERTAIN DEFINITIONS

Accrual Period .................................................................................................................. S-64
Act ................................................................................................................................... S-118
Administrative Fee ............................................................................................................ S-64
Advance ............................................................................................................................ S-93
Aggregate Cut-off Date Balance ...................................................................................... S-21
Aggregate Pool ................................................................................................................. S-21
Allocated Realized Loss Amount ..................................................................................... S-64
Assignment, Assumption and Recognition Agreement .................................................... S-21
Available Funds ................................................................................................................ S-71
Balloon Loans ................................................................................................................... S-22
BONY ............................................................................................................................... S-98
Book-Entry Certificates .................................................................................................... S-64
Business Day ..................................................................................................................... S-64
Cap Contract ..................................................................................................................... S-113
Certificate Group .............................................................................................................. S-64
Certificate Index ............................................................................................................... S-80
Certificate Interest Rate .................................................................................................... S-79
Certificate Margin ............................................................................................................ S-80
Certificateholder ............................................................................................................... S-64
CIIF .................................................................................................................................. S-60
Class A Principal Distribution Amount ............................................................................ S-65
Class M-1 Principal Distribution Amount ........................................................................ S-65
Class M-10 Principal Distribution Amount ...................................................................... S-67
Class M-11 Principal Distribution Amount ...................................................................... S-68
Class M-2 Principal Distribution Amount ........................................................................ S-65
Class M-3 Principal Distribution Amount ........................................................................ S-65
Class M-4 Principal Distribution Amount ........................................................................ S-65
Class M-5 Principal Distribution Amount ........................................................................ S-66
Class M-6 Principal Distribution Amount ........................................................................ S-66
Class M-7 Principal Distribution Amount ........................................................................ S-66
Class M-8 Principal Distribution Amount ........................................................................ S-66
Class M-9 Principal Distribution Amount ........................................................................ S-67
Class Principal Amount ..................................................................................................... S-65
Closing Date ..................................................................................................................... S-63
CMMC ............................................................................................................................. S-60
Collection Account ........................................................................................................... S-93
Commission ...................................................................................................................... S-103
Compensating Interest ...................................................................................................... S-94
CPR ................................................................................................................................... S-103
Custodian .......................................................................................................................... S-90
Custodian Fee ................................................................................................................... S-90
Custodian Fee Rate ........................................................................................................... S-90
Cut-off Date ...................................................................................................................... S-21
Defective Mortgage Loan ................................................................................................. S-89
Deleted Mortgage Loan .................................................................................................... S-90
Determination Date ........................................................................................................... S-95
Distribution Account ......................................................................................................... S-93
Distribution Date .............................................................................................................. S-64
Downgrade Provisions ...................................................................................................... S-83
Due Date ........................................................................................................................... S-23
Due Period ........................................................................................................................ S-68
Early Termination Date ..................................................................................................... S-82

Confidential

JPMC_DEX_000402753

ERISA Restricted Offered Certificates...........................................................S-117
Events of Default.......................................................................................S-82
Exemption.................................................................................................S-116
Expense Adjusted Net Maximum Mortgage Rate.........................................S-80
Final Scheduled Distribution Date...............................................................S-87
Fitch........................................................................................................S-119
Formula Rate............................................................................................S-80
Global Securities.........................................................................................S-1
Group 1....................................................................................................S-21
Group 1 Basic Principal Distribution Amount..............................................S-68
Group 1 Certificates..................................................................................S-64
Group 1 Interest Remittance Amount..........................................................S-68
Group 1 Mortgage Loans............................................................................S-22
Group 1 Percentage...................................................................................S-68
Group 1 Principal Distribution Amount........................................................S-68
Group 1 Principal Remittance Amount.........................................................S-68
Group 1 Senior Principal Distribution Amount.............................................S-68
Group 2....................................................................................................S-21
Group 2 Basic Principal Distribution Amount..............................................S-69
Group 2 Certificates..................................................................................S-64
Group 2 Interest Remittance Amount..........................................................S-69
Group 2 Mortgage Loans............................................................................S-22
Group 2 Percentage...................................................................................S-69
Group 2 Principal Distribution Amount........................................................S-69
Group 2 Principal Remittance Amount.........................................................S-69
Group 2 Senior Principal Distribution Amount.............................................S-69
Interest Rate Swap Agreement....................................................................S-81
Interest Remittance Amount.......................................................................S-69
JPMCB.....................................................................................................S-83
JPMorgan...........................................................................................S-54, 60
JPMorgan Chase........................................................................................S-98
LIBOR Business Day.................................................................................S-85
LIBOR Determination Date........................................................................S-84
Loan-to-Value Ratio..................................................................................S-23
LTV..........................................................................................................S-23
Maximum Cap Rate...................................................................................S-80
Maximum Mortgage Rate...........................................................................S-80
Monthly Interest Distributable Amount.......................................................S-69
Moody's..................................................................................................S-119
Mortgage..................................................................................................S-90
Mortgage File...........................................................................................S-90
Mortgage Group........................................................................................S-21
Mortgage Loan Purchase Agreement...........................................................S-21
Mortgage Loans........................................................................................S-21
Mortgage Note..........................................................................................S-90
Mortgaged Property...................................................................................S-21
Net Monthly Excess Cashflow....................................................................S-69
Net Prepayment Interest Shortfall...............................................................S-95
Net Swap Payment.....................................................................................S-82
Net WAC Rate...........................................................................................S-80
Net WAC Rate Carryover Amount...............................................................S-80
Net WAC Reserve Fund.............................................................................S-81
New Century........................................................................................S-22, 54
New Century Underwriting Guidelines.........................................................S-55
Non-Offered Certificates...........................................................................S-63
Offered Certificates...................................................................................S-63

S-121

JPMC_DEX_000402754

126

OID .......................................................................................................... S-114
Original Class Principal Amount ............................................................. S-65
Originator ................................................................................... S-22, 54
Overcollateralization Deficiency Amount ................................................ S-69
Overcollateralization Floor ..................................................................... S-69
Overcollateralization Increase Amount ................................................... S-69
Overcollateralization Release Amount .................................................... S-69
Overcollateralization Target Amount ...................................................... S-70
Overcollateralized Amount ..................................................................... S-70
Percentage Interest ............................................................................... S-100
Pooling Agreement ................................................................................. S-21
Prepayment Assumption ........................................................................ S-103
Prepayment Interest Excess ................................................................... S-94
Prepayment Interest Shortfall ................................................................ S-95
Prepayment Period ................................................................................. S-70
Principal Distribution Amount ................................................................ S-70
Principal Remittance Amount ................................................................. S-70
Privately-Offered Certificates ................................................................ S-63
Rating Agencies ..................................................................................... S-119
Realized Loss .......................................................................................... S-70
Record Date ............................................................................................ S-64
Relief Act ................................................................................................ S-15
Relief Act Interest Shortfalls ................................................................. S-15
REMIC regular interest component ...................................................... S-113
Replacement Mortgage Loan .................................................................. S-90
S&P ......................................................................................................... S-119
SEC ......................................................................................................... S-ii
Securities Administrator Fee .................................................................. S-98
Securities Administrator Fee Rate ......................................................... S-98
Seller ....................................................................................................... S-89
Senior Certificates ................................................................................. S-63
Senior Enhancement Percentage ............................................................ S-70
Servicer ................................................................................................... S-54
Servicer Remittance Date ....................................................................... S-95
Servicing Advance .................................................................................. S-94
Servicing Fee .......................................................................................... S-94
Servicing Fee Rate .................................................................................. S-94
Servicing Transfer Date .......................................................................... S-23
Significance Estimate ............................................................................. S-81
Significance Percentage .......................................................................... S-82
Six-Month LIBOR ................................................................................... S-52
Stated Principal Balance ......................................................................... S-70
Stepdown Date ........................................................................................ S-70
Structuring Assumptions ........................................................................ S-104
Subordinate Certificates ......................................................................... S-63
Subordinate Classes ............................................................................... S-63
Subsequent Recoveries ........................................................................... S-71
Swap Account .......................................................................................... S-83
Swap Default ........................................................................................... S-82
Swap Early Termination .......................................................................... S-82
Swap Provider ......................................................................................... S-83
Swap Provider Trigger Event .................................................................. S-72
Swap Termination Payment ..................................................................... S-71
Telerate Page 3750 .................................................................................. S-85
Termination Event ................................................................................... S-82
Trigger Event ........................................................................................... S-71

Confidential

JPMC_DEX_000402755

Trust Fund ............................................................................................................ S-63
Trust Oversight Agreement .................................................................................. S-100
Trust Oversight Manager ...................................................................................... S-100
Trust Oversight Manager Fee ............................................................................... S-100
Trust Oversight Manager Fee Rate ....................................................................... S-100
U.S. Bank .............................................................................................................. S-97
Underwriter ........................................................................................................... S-118
Unpaid Interest Shortfall Amount ........................................................................ S-71
Unpaid Realized Loss Amount ............................................................................. S-71

S-123

## ANNEX I

## GLOBAL CLEARANCE, SETTLEMENT AND
## TAX DOCUMENTATION PROCEDURES

Except in certain limited circumstances, the Offered Certificates will be offered globally (the "Global Securities") and will be available only in book-entry form. Investors in the Global Securities may hold such Global Securities through any of The Depository Trust Company ("DTC"), Clearstream or Euroclear. The Global Securities will be tradable as home market instruments in both the European and U.S. domestic markets. Initial settlement and all secondary trades will settle in same-day funds.

Secondary market trading between investors holding Global Securities through Clearstream and Euroclear will be conducted in the ordinary way in accordance with their normal rules and operating procedures and in accordance with conventional eurobond practice (i.e., seven calendar day settlement).

Secondary market trading between investors holding Global Securities through DTC will be conducted according to the rules and procedures applicable to U.S. corporate debt obligations.

Secondary cross-market trading between Clearstream or Euroclear and DTC Participants holding Certificates will be effected on a delivery-against-payment basis through the respective Depositaries of Clearstream and Euroclear (in such capacity) and as DTC Participants.

Non-U.S. holders (as described below) of Global Securities will be Subject to U.S. withholding taxes unless such holders meet certain requirements and deliver appropriate U.S. tax documents to the securities clearing organizations or their participants.

**Initial Settlement**

All Global Securities will be held in book-entry form by DTC in the name of Cede & Co. as nominee of DTC. Investors' interests in the Global Securities will be represented through financial institutions acting on their behalf as direct and indirect Participants in DTC. As a result, Clearstream and Euroclear will hold positions on behalf of their participants through their respective Depositaries, which in turn will hold such positions in accounts as DTC Participants.

Investors electing to hold their Global Securities through DTC will follow the settlement practices applicable to conventional eurobonds, except that there will be no temporary global Security and no "lock-up" or restricted period. Investor securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold their Global Securities through Clearstream or Euroclear accounts will follow the settlement procedures applicable to conventional eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period. Global Securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

**Secondary Market Trading**

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

*Trading between DTC Participants.* Secondary market trading between DTC Participants will be settled using the procedures applicable to prior mortgage loan asset-backed certificates issues in same-day funds.

I-1

JPMC_DEX_000402757

*Trading between Clearstream and/or Euroclear Participants.* Secondary market trading between Clearstream Participants or Euroclear *Participants* will be settled using the procedures applicable to conventional eurobonds in same-day funds.

*Trading between DTC Seller and Clearstream or Euroclear purchaser.* When Global Securities are to be transferred from the account of a DTC Participant to the account of a Clearstream Participant or a Euroclear Participant, the purchaser will send instructions to Clearstream or Euroclear through a Clearstream Participant or Euroclear *Participant* at least one business day prior to settlement. Clearstream or Euroclear will instruct the respective Depositary, as the case may be, to receive the Global Securities against payment. Payment will include interest accrued on the Global Securities from and including the last coupon payment date to and excluding the settlement date, on the basis of the actual number of days in such accrual period, and a year assumed to consist of 360 days. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. Payment will then be made by the respective Depositary of the DTC Participant's account against delivery of the Global Securities. After settlement has been completed, the Global Securities will be credited to the respective clearing system and by the clearing system, in accordance with its usual procedures, to the Clearstream Participant's or Euroclear Participant's account. The Securities credit will appear the next day (European time) and the cash debt will be back-valued to, and the interest on the Global Securities will accrue from, the value date (which would be the preceding day when settlement occurred in New York). If settlement is not completed on the intended value date (i.e., the trade fails), the Clearstream or Euroclear cash debt will be valued instead as of the actual settlement date.

Clearstream Participants and Euroclear Participants will need to make available to the respective clearing systems the funds necessary to process same-day funds settlement. The most direct means of doing so is to preposition funds for settlement, either from cash on hand or existing lines of credit, as they would for any settlement occurring within Clearstream or Euroclear. Under this approach, they may take on credit exposure to Clearstream or Euroclear until the Global Securities are credited to their accounts one day later.

As an alternative, if Clearstream or Euroclear has extended a line of credit to them, Clearstream Participants or Euroclear Participants can elect not to preposition funds and allow that credit line to be drawn upon the finance settlement. Under this procedure, Clearstream Participants or Euroclear Participants purchasing Global Securities would incur overdraft charges for one day, assuming they cleared the overdraft when the Global Securities were credited to their accounts. However, interest on the Global Securities would accrue from the value date. Therefore, in many cases the investment income on the Global Securities earned during that one-day period may substantially reduce or offset the amount of such overdraft charges, although this result will depend on each Clearstream Participant's or Euroclear Participant's particular cost of funds.

Since the settlement is taking place during New York business hours, DTC Participants can employ their usual procedures for sending Global Securities to the respective European Depositary for the benefit of Clearstream Participants or Euroclear Participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC Participants a cross-market transaction will settle no differently than a trade between two DTC Participants.

*Trading between Clearstream or Euroclear Seller and DTC Purchaser.* Due to time zone differences in their favor, Clearstream Participants and Euroclear Participants may employ their customary procedures for transactions in which Global Securities are to be transferred by the respective clearing system, through the respective Depositary, to a DTC Participant. The seller will send instructions to Clearstream or Euroclear through a Clearstream Participant or Euroclear Participant at least one business day prior to settlement. In these cases Clearstream or Euroclear will instruct the respective Depositary, as appropriate, to deliver the Global Securities to the DTC Participant's account against payment. Payment will include interest accrued on the Global Securities from and including the last Coupon payment to and excluding the settlement date on the basis of the actual number of days in such accrual period and a year assumed to consist of 360 days. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. The payment will then be reflected in the account of the Clearstream Participant or Euroclear Participant the following day, and receipt of the cash proceeds in the Clearstream Participant's or Euroclear Participant's account would be back-valued to the value date (which would be the preceding day, when settlement occurred in New York). Should the Clearstream Participant or Euroclear Participant have a line of credit with its respective clearing system and elect to

I-2

be in debt in anticipation of receipt of the sale proceeds in its account. the back-valuation will extinguish any overdraft incurred over that one-day period. If settlement is not completed on the intended value date (i.e., the trade fails). receipt of the cash proceeds in the Clearstream Participant's or Euroclear Participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Clearstream or Euroclear and that purchase Global Securities from DTC Participants for delivery to Clearstream Participants or Euroclear Participants should note that these trades would automatically fail on the sale side unless affirmative action were taken. At least three techniques should be readily available to eliminate this potential problem:

borrowing through Clearstream or Euroclear for one day (until the purchase side of the day trade is reflected in their Clearstream or Euroclear accounts) in accordance with the clearing System's Customary procedures;

borrowing the Global Securities in the U.S. from a DTC Participant no later than one day prior to settlement, which would give the Global Securities sufficient time to be reflected in their Clearstream or Euroclear account in order to settle the sale side of the trade; or

staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the DTC Participant is at least one day prior to the value date for the sale to the Clearstream Participant or Euroclear Participant.

**Certain U.S. Federal Income Tax Documentation Requirements**

A beneficial owner of Global Securities holding Securities through Clearstream or Euroclear (or through DTC if the holder has an address outside the U.S.) will be subject to the 30% U.S. back-up withholding tax that generally applies to payments of interest (including original issue discount) on registered debt issued by U.S. Persons. unless (i) each clearing system, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business in the chain of intermediaries between such beneficial owner and the U.S. entity required to withhold tax complies with applicable certification requirements and (ii) such beneficial owner takes one of the following steps to obtain an exemption or reduced tax rate:

*Exemption for non-U.S. Persons (Form W-8BEN).* Beneficial owners of Global Securities that are non-U.S. Persons, either individuals or entities treated as corporations, can obtain a complete exemption from the withholding tax by filing a signed Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding). Non-U.S. Persons that are Certificate Owners residing in a country that has a tax treaty with the United States can obtain an exemption or reduced tax rate (depending on the treaty terms) by filing Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding). If the information shown on Form W-8BEN changes, a new Form W-8BEN must be filed within 30 days of such change.

*Exemption for non-U.S. Persons with effectively connected income (Form W-8ECI).* A non-U.S. Person, including a non-U.S. corporation or bank with a U.S. branch, for which the interest income is effectively connected with its conduct of a trade or business in the United States, can obtain an exemption from the withholding tax by filing Form W-8ECI (Certificate of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with the Conduct of a Trade or Business in the United States).

*Exemptions for U.S. Persons (Form W-9).* U.S. Persons can obtain a complete exemption from the withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

*U.S. Federal Income Tax Reporting Procedure.* The Certificate Owner of a Global Security files by submitting the appropriate form to the person through whom it holds (the clearing agency, in the case of persons holding directly on the books of the clearing agency). Form W-8BEN and Form W-8ECI are generally effective until the third succeeding calendar year from the date such form is signed.

The term "U.S. Person" means (i) a citizen or resident of the United States, (ii) a corporation, partnership or other entity treated as a corporation or partnership for United States federal income tax purposes organized in or

I-3

JPMC_DEX_000402759

under the laws of the United States or any state thereof or the District of Columbia (unless, in the case of a partnership, Treasury regulations provide otherwise), (iii) an estate the income of which is includible in gross income for United States tax purposes, regardless of its source, or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have authority to control all substantial decisions of the trust. Notwithstanding the preceding sentence, to the extent provided in Treasury regulations, certain trusts in existence on August 20, 1996, and treated as United States persons prior to such date, that elect to continue to be treated as United States persons will also be U.S. Persons.  This summary does not deal with all aspects of U.S. Federal income tax withholding that may be relevant to foreign holders of the Global Securities.  Investors are advised to consult their own tax advisors for specific tax advice concerning their holding and disposing of the Global Securities.

I-4

Confidential

## ANNEX II
### INTEREST RATE SWAP SCHEDULE

| Distribution Date in | Notional Schedule ($) | Distribution Date in | Notional Schedule ($) |
|---|---|---|---|
| May 2006 | $895,151,174.11 | April 2009 | $59,285,608.68 |
| June 2006 | $885,350,310.41 | May 2009 | $57,640,033.54 |
| July 2006 | $872,595,019.83 | June 2009 | $56,035,461.56 |
| August 2006 | $856,880,033.80 | July 2009 | $54,471,162.83 |
| September 2006 | $838,226,417.44 | August 2009 | $52,946,401.13 |
| October 2006 | $816,682,930.07 | September 2009 | $51,460,435.53 |
| November 2006 | $807,681,477.57 | October 2009 | $50,012,520.77 |
| December 2006 | $780,630,011.70 | November 2009 | $48,601,909.78 |
| January 2007 | $751,079,523.44 | December 2009 | $47,227,852.90 |
| February 2007 | $719,387,336.15 | January 2010 | $45,889,600.42 |
| March 2007 | $685,997,290.94 | February 2010 | $44,407,008.05 |
| April 2007 | $654,153,538.20 | March 2010 | $42,931,968.05 |
| May 2007 | $623,785,352.42 | April 2010 | $41,501,010.38 |
| June 2007 | $594,823,079.25 | May 2010 | $0.00 |
| July 2007 | $567,200,392.37 | | |
| August 2007 | $540,854,133.29 | | |
| September 2007 | $515,718,982.26 | | |
| October 2007 | $491,741,204.99 | | |
| November 2007 | $468,740,480.18 | | |
| December 2007 | $446,500,550.87 | | |
| January 2008 | $424,696,663.54 | | |
| February 2008 | $378,795,292.31 | | |
| March 2008 | $87,432,023.84 | | |
| April 2008 | $83,463,232.77 | | |
| May 2008 | $79,961,396.75 | | |
| June 2008 | $76,696,427.05 | | |
| July 2008 | $73,599,008.73 | | |
| August 2008 | $70,608,254.53 | | |
| September 2008 | $67,717,938.82 | | |
| October 2008 | $64,897,246.69 | | |
| November 2008 | $62,185,730.30 | | |
| December 2008 | $58,900,736.66 | | |
| January 2009 | $54,765,241.37 | | |
| February 2009 | $61,008,294.53 | | |
| March 2009 | $60,997,830.54 | | |

II-1

Confidential

Prospectus

<table>
<tr><td>

**Consider carefully the risk factors beginning on page 7 of this prospectus.**

The securities represent obligations of the issuing entity only and do not represent an interest in or obligation of J.P. Morgan Acceptance Corporation I, J.P. Morgan Mortgage Acquisition Corp. or any of their affiliates.

This prospectus may be used to offer and sell the securities only if accompanied by a prospectus supplement.

No market will exist for the securities of any series before the securities are issued. In addition, even after the securities of a series have been issued and sold, there can be no assurance that a resale market will develop.

</td><td>

J.P. Morgan Acceptance Corporation I
Depositor
Asset Backed Securities
(Issuable in Series)

———————————

J.P. Morgan Acceptance Corporation I may periodically establish trusts which will issue securities. The securities may be in the form of asset-backed certificates or asset-backed notes. Each issue of securities will have its own series designation.

Each series of securities will:

- be backed by one or more pools of mortgage loans, manufactured housing contracts or mortgage backed securities; and

- consist of one or more classes of securities.

Each class of securities:

- will be entitled to all, some or none of the interest payments and principal payments on the assets of the trust;

- may be senior or subordinate in right of payment to other classes; and

- may receive payments from an insurance policy, cash account or other form of credit enhancement to cover losses on the trust assets.

</td></tr>
</table>

Neither the SEC nor any state securities commission has approved or disapproved these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

April 4, 2006

Confidential

**Important Notice About Information Presented In This Prospectus
and the Accompanying Prospectus Supplement**

We provide information to you about the securities in two separate documents that progressively provide more detail:

> (a)      this prospectus, which provides general information, some of which may not apply to your series of securities and

> (b)      the accompanying prospectus supplement, which describes the specific terms of your series of securities.

If the terms of a particular series of securities vary between this prospectus and the accompanying prospectus supplement, you should rely on the information in the prospectus supplement.

You should rely only on the information provided in this prospectus and the accompanying prospectus supplement, including the information incorporated by reference. We have not authorized anyone to provide you with different information. We are not offering the securities in any state where the offer is not permitted.

We include cross-references in this prospectus and the accompanying prospectus supplement to captions in these materials where you can find further related discussions. There is a Glossary on page 161 where you will find definitions of the capitalized terms used in this prospectus. The following Table of Contents and the Table of Contents included in the accompanying prospectus supplement provide the pages on which these captions are located.

2

Confidential

JPMC_DEX_000402763

135

## Table of Contents

Page

Risk Factors ...................................................................................................7
    Yield is Sensitive to Rate of Principal Prepayment ...............................7
    Limited Resale Market for Securities Could Adversely Affect Your
    Ability to Liquidate Your Investment ....................................................8
    Protection Against Losses is Limited Since Securities Will Receive
    Payments Only From Specified Sources ................................................9
    Nature of Mortgages Securing the Loans May Delay Receipt of, or Result
    in Shortfalls in Proceeds Payable on a Loan ........................................10
    You Could Be Adversely Affected By Violations of Consumer Protection
    Laws .....................................................................................................12
    You Could Be Adversely Affected By Violations of Environmental Laws ..................... 13
    Value of Trust Assets May Be Less Than Outstanding Principal Balance
    of the Related Securities .......................................................................13
    Weighted Average Net Mortgage Rate on the Loans May Limit Interest
    Rate on the Securities ...........................................................................13
    Risks Related to Loans with Interest-only Payments ...........................14
    High Balance Loans Increase Risk of Default .....................................14
    Simultaneous Second Lien Risk ..........................................................14
    Geographic Concentration of Loans Could Adversely Affect Your
    Investment ............................................................................................15
    Military Action and Terrorist Attacks May Impact the Return on Your
    Security ................................................................................................15
    Book-Entry System for Certain Classes May Decrease Liquidity and
    Delay Payment ....................................................................................15
    Bankruptcy and Insolvency Risks ........................................................16
    Borrower May be Unable to Make Balloon Payment ..........................16
    High Loan-to-Value Ratios Increase Risk of Loss ..............................17
    Mortgage Loans Originated According to Non-Agency Underwriting
    Guidelines May Have Higher Expected Delinquencies .......................17
    A Transfer of Servicing May Result in Increased Losses and
    Delinquencies on the Loans .................................................................18
    The Recording of the Mortgages in the Name of MERS May Affect the
    Yield on the Securities .........................................................................18
    Risks Related to the Residual Interest Securities .................................19

The Trust Fund ................................................................................................19
    General .................................................................................................19
    The Loans .............................................................................................22
    Underwriting Standards ........................................................................28
    Modification of Loans ..........................................................................29
    Agency Securities .................................................................................29
    Private Mortgage-Backed Securities ....................................................36

3

JPMC_DEX_000402764

Representations by Sellers or Originators; Repurchases ...................................38
Substitution of Trust Fund Assets.........................................................................41

Use of Proceeds .................................................................................................................41

The Depositor.....................................................................................................................41

The Sponsor .......................................................................................................................42
General ..................................................................................................................42
Securitization Activities of the Sponsor .............................................................42

Description of the Securities..............................................................................................43
General ..................................................................................................................44
Distributions on Securities...................................................................................46
Advances...............................................................................................................48
Reports to Securityholders...................................................................................49
Categories of Classes of Securities......................................................................50
Indices Applicable to Floating Rate and Inverse Floating Rate Classes .............54
Book-Entry Registration of Securities .................................................................61
Exchangeable Securities.......................................................................................65
Purchase Obligations ...........................................................................................67
Mandatory Auctions.............................................................................................68

Credit Enhancement...........................................................................................................68
General ..................................................................................................................68
Subordination........................................................................................................69
Letter of Credit.....................................................................................................70
Insurance Policies, Surety Bonds and Guaranties...............................................70
Over-Collateralization..........................................................................................71
Spread Account.....................................................................................................71
Reserve Accounts..................................................................................................71
Pool Insurance Policies ........................................................................................73
Cross-Collateralization ........................................................................................75
Other Insurance, Surety Bonds, Guaranties, and Letters of Credit......................75
Derivative Products...............................................................................................76

Yield and Prepayment Considerations ..............................................................................76

The Agreements..................................................................................................................79
Servicing ...............................................................................................................79
Assignment of the Trust Fund Assets ..................................................................80
No Recourse to Sellers, Originators, Depositor or Master Servicer.....................83
Payments on Loans; Deposits to Security Account ..............................................83
Pre-Funding Account ...........................................................................................85
Hazard Insurance ..................................................................................................87
Realization Upon Defaulted Loans ......................................................................90
Servicing and Other Compensation and Payment of Expenses............................91

4

JPMC_DEX_000402765

137

Evidence as to Compliance........................................................................................92
Matters Regarding the Master Servicer and the Depositor......................................92
Events of Default; Rights Upon Event of Default....................................................93
Amendment................................................................................................................96
Termination; Optional Termination..........................................................................97
The Trustee................................................................................................................98
The Securities Administrator.....................................................................................98

Material Legal Aspects of the Loans.................................................................................98
General.......................................................................................................................98
Foreclosure/Repossession.......................................................................................100
Environmental Risks...............................................................................................103
Rights of Redemption..............................................................................................104
Anti-deficiency Legislation and Other Limitations on Lenders.............................104
Due-on-Sale Clauses...............................................................................................105
Enforceability of Prepayment and Late Payment Fees...........................................106
Applicability of Usury Laws...................................................................................107
The Contracts...........................................................................................................107
Installment Contracts...............................................................................................110
Servicemembers Civil Relief Act............................................................................111
Junior Mortgages; Rights of Senior Mortgagees....................................................111
Commercial Loans....................................................................................................112
The Title 1 Program.................................................................................................114
Consumer Protection Laws......................................................................................118

Material Federal Income Tax Consequences..................................................................118
General.....................................................................................................................118
Taxation of Debt Securities.....................................................................................120
Taxation of the REMIC and Its Holders.................................................................126
REMIC Expenses; Single Class REMICS...............................................................127
Taxation of the REMIC...........................................................................................128
Taxation of Holders of Residual Interest Securities...............................................129
Administrative Matters.............................................................................................134
Tax Status as a Grantor Trust...................................................................................134
Sale or Exchange......................................................................................................137
Miscellaneous Tax Aspects......................................................................................138
Tax Treatment of Foreign Investors........................................................................138
Tax Characterization of the Trust Fund as a Partnership.........................................140
Tax Consequences to Holders of the Notes.............................................................140
Tax Consequences to Holders of the Certificates....................................................143

State Tax Considerations.................................................................................................148

ERISA Considerations.....................................................................................................148
General.....................................................................................................................148
Prohibited Transactions............................................................................................149
Plan Asset Regulation...............................................................................................149

5

JPMC_DEX_000402766

Prohibited Transaction Class Exemption 83-1 ........................................................150
The Underwriter's Exemption .................................................................................152
Insurance Company Purchasers ..............................................................................154
Consultation with Counsel ......................................................................................154

Legal Investment.........................................................................................................154

Method of Distribution ................................................................................................157

Legal Matters ................................................................................................................158

Financial Information....................................................................................................158

Rating.............................................................................................................................158

Where You Can Find More Information .....................................................................160

Incorporation Of Certain Documents By Reference ..................................................160

Static Pool Information.................................................................................................160

Glossary .........................................................................................................................161

Confidential

JPMC_DEX_000402767

139

**Risk Factors**

You should consider the following risk factors in deciding whether to purchase any of the securities.

**Yield is Sensitive to Rate of Principal Prepayment**

The yield on the securities of each series will depend in part on the rate of principal payment on the assets of the trust fund.  The rate of principal payments will be affected by:

- the amortization schedules of the loans;

- the extent of prepayments of the loans, including partial prepayments and full prepayments resulting from:

  - refinancing by borrowers;

  - liquidations of defaulted loans by a servicer and the receipt of liquidation proceeds in connection therewith; and

  - repurchases of mortgage loans by an originator or the seller as a result of defective documentation or breaches of representations and warranties.

- the allocation of principal, interest and/or other payments among the classes of securities of a series as specified in the related prospectus supplement;

- the exercise of any right of optional termination; and

- the rate and timing of payment defaults and losses incurred with respect to the assets of the trust fund.

The rate of prepayments on loans is influenced by a number of economic, geographic, social and other factors, including:

- prevailing market interest rates for the particular asset;

- local and national interest rates;

- homeowner mobility; and

- the ability of the borrower to obtain refinancing.

For example, if interest rates for similar loans fall below the interest rates on the loans in the trust, the rate of prepayment would generally be expected to increase.  Conversely, if interest rates on similar loans rise above the interest rates on the loans in the trust, the rate of prepayment would generally be expected to decrease.  Borrowers may prepay their loans in whole or in part at any time; however, some or all of the loans to be included in the trust fund may require the

7

Confidential

payment of a prepayment premium in connection with any voluntary prepayments in full and certain voluntary prepayments in part, made during periods ranging from the periods specified in the related prospectus supplement. These prepayment premiums may discourage borrowers from prepaying their loans during the applicable period.

Prepayments on the mortgage loans may occur as a result of solicitations of the borrowers by loan originators, including the seller and its affiliates, a servicer or any master servicer.

We cannot predict the rate at which borrowers will repay their loans. Please consider the following:

- if you purchase a security at a discount, especially a principal-only security, your yield may be lower than expected if principal payments on the related loans occur at a slower rate than you expected;

- if you purchase a security at a premium, especially an interest-only security, your yield may be lower than expected if principal payments on the related loans occur at a faster rate than you expected, and you could lose your initial investment;

- if the rate of default and the amount of losses on the loans in the trust are higher than you expect, then your yield may be lower than you expect, and you could lose all or a portion of your initial investment;

- the earlier a payment of principal occurs, the greater the impact on your yield. For example, if you purchase any security at a premium, although the average rate of principal payments is consistent with your expectations, if the rate of principal payments occurs initially at a rate higher than expected, which would adversely impact your yield, a subsequent reduction in the rate of principal payments will not offset any adverse yield effect; and

- the priorities governing payments of scheduled and unscheduled principal will have the effect of accelerating the rate of principal payments to holders of the classes of senior securities relative to the classes of subordinate securities.

**Limited Resale Market for Securities Could Adversely Affect Your Ability to Liquidate Your Investment**

No market will exist for the securities of any series before they are issued and no underwriter will be required to assist investors in resales of their securities. We cannot give you any assurances that a resale market will develop following the issuance and sale of any series of securities. There have been times in the past when the absence of a liquid resale market for similar asset backed securities has rendered investors unable to sell their securities at all or at other than a significant loss. Consequently, at a time when you desire to sell your securities, you may not be able to do so. Alternatively, you may be able to do so only at a price significantly below that which would be obtainable were there a liquid resale market for your securities. The market values of securities are likely

8

JPMC_DEX_000402769

to fluctuate; these fluctuations may be significant and could result in significant losses to you. The secondary market for mortgage pass-through securities has experienced periods of illiquidity and can be expected to do so in the future. Illiquidity can have a severe adverse effect on the prices of securities that are especially sensitive to prepayment, credit or interest rate risk, or that have been structured to meet the investment requirements of limited categories of investors.

**Protection Against Losses is Limited Since Securities Will Receive Payments Only From Specified Sources**

The securities of each series will be payable solely from the assets of the related trust, including any applicable credit enhancement. In addition, at the times specified in the related prospectus supplement, some assets of the trust may be released to the seller, the depositor, the master servicer, a credit enhancement provider or other person. Once released, those assets will no longer be available to make payments to securityholders.

The securities will not represent an interest in the seller, the depositor, the master servicer or any of their respective affiliates, nor will the securities represent an obligation of any of them. The originator or other seller of loans or mortgage backed securities to the depositor for inclusion in a trust will make particular representations and warranties as to those assets. Those representations and warranties will be described in the related prospectus supplement. The only obligation of the seller with respect to a trust will be to repurchase a trust asset if the seller or originator breaches a representation and warranty concerning the related trust asset. There will be no recourse against the originator, the seller, the depositor, the master servicer or the servicers if any required distribution on the securities is not made. Consequently, you will be reliant entirely on the trust assets and any available credit enhancement for payments on the securities. If payments on the trust assets are insufficient to make all payments required on the securities you may incur a loss of your investment.

Credit enhancement is intended to reduce the effect of delinquent payments or loan losses on those classes of securities that have the benefit of the credit enhancement. Additional credit enhancement in the form of one or more derivative agreements may be provided to alleviate the effect of the application of any cap on the interest rate of the securities equal to the net mortgage rate of the related loans on the payments of interest to the securities. However, the amount of any credit enhancement may decline or be depleted before the securities are paid in full. Third party providers of credit enhancement such as insurance policies or derivative agreements could default. In addition, credit enhancement may not cover all potential sources of loss, including, for instance, a loss resulting from fraud or negligence by a loan originator or other party. Credit enhancement may therefore be limited in coverage and in amount. It may also include the credit risk of a third party like an insurer. The terms of any credit enhancement and the limitations will be described in the related prospectus supplement.

You must carefully assess the specific assets of the trust issuing your securities and any credit enhancement because they will be your only protection against losses on your investment.

9

Confidential

**Nature of Mortgages Securing the Loans May Delay Receipt of, or Result in Shortfalls in Proceeds Payable on a Loan**

- *Decline in Property Values May Increase Loan Losses.* Your investment may be adversely affected by declines in property values. If the outstanding balance of a mortgage loan or contract and any secondary financing on the underlying property is greater than the value of the property, there is an increased risk of delinquency, foreclosure and loss. A decline in property values could extinguish the value of a mortgagee's interest in a property and, thus, reduce proceeds payable to the securityholders.

- *Delays Due to Liquidation Procedures.* Substantial delays may occur before defaulted loans are liquidated and the proceeds forwarded to investors. Property foreclosure actions are regulated by state statutes and rules and, like many lawsuits, are characterized by significant delays and expenses if defenses or counterclaims are made. As a result, foreclosure actions can sometimes take several years to complete and property proceeds may not cover the defaulted loan amount. Some states prohibit a mortgage lender from obtaining a judgment against the borrower for amounts not covered by property proceeds if the property is sold outside of a judicial proceeding. As a result, you may experience delays in receipt of moneys payable to you. Further, liquidation expenses, such as legal fees, real estate taxes and maintenance and preservation expenses, will reduce the security for the related mortgage loans and could thereby reduce the proceeds payable to securityholders.

We refer you to "Material Legal Aspects of the Loans—Anti-Deficiency Legislation and other Limitations on Lenders" for additional information.

- *Junior Liens Satisfied After Senior Liens.* The trust may contain loans that are in a junior lien position. Mortgages or deeds of trust securing junior loans will be satisfied after the claims of the senior mortgage holders and the foreclosure costs are satisfied. In addition, a junior mortgage lender may only foreclose in a manner that is consistent with the rights of the senior mortgage lender. As a result, the junior mortgage lender generally must either pay the related senior mortgage lender in full at or before the foreclosure sale or agree to make the regular payments on the senior mortgage. Since the trust will not have any source of funds to satisfy any senior mortgage or to continue making payments on that mortgage, the trust's ability as a practical matter to foreclose on any junior mortgage will be limited. In addition, since foreclosure proceeds first retire any senior liens, the foreclosure proceeds may not be sufficient to pay all amounts owed to you.

- *Regulated by Consumer Protection Laws.* Most states have laws and public policies for the protection of consumers that prohibit unfair and deceptive practices in the origination, servicing and collection of loans, regulate interest rates and other loan changes and require licensing of loan originators and

10

JPMC_DEX_000402771

servicers. Violations of these laws may limit the ability of the master servicer or a servicer to collect interest or principal on the loans and may entitle the borrowers to a refund of amounts previously paid. Any limit on the master servicer's or servicer's ability to collect interest or principal on a loan may result in a loss to you.

The loans may also be governed by federal laws relating to the origination and underwriting of loans. These laws:

- require specified disclosures to the borrowers regarding the terms of the loans;

- prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the consumer credit protection act in the extension of credit;

- regulate the use and reporting of information related to the borrower's credit experience;

- require additional application disclosures, limit changes that may be made to the loan documents without the borrower's consent and restrict a lender's ability to declare a default or to suspend or reduce a borrower's credit limit to enumerated events;

- permit a homeowner to withhold payment if defective craftsmanship or incomplete work do not meet the quality and durability standards agreed to by the homeowner and the contractor; and

- limit the ability of the master servicer to collect full amounts of interest on some loans and interfere with the ability of the master servicer to foreclose on some properties.

If particular provisions of these federal laws are violated, the master servicer or servicer may be unable to collect all or part of the principal or interest on the loans. The trust also could be exposed to damages and administrative enforcement. In either event, losses on your investment could result.

We refer you to "Material Legal Aspects of the Loans" for additional information.

- *Non-Owner Occupied Properties.* The mortgaged properties in the trust fund may not be owner occupied. Rates of delinquencies, foreclosures and losses on mortgage loans secured by non-owner occupied properties may be higher than mortgage loans secured by a primary residence.

*Some pools may include a small portion of commercial mortgage loans.* Mortgage loans made with respect to commercial properties, including commercial properties, and multifamily and mixed use properties that are predominantly used for commercial

11

JPMC_DEX_000402772

purposes, will present different risks than residential mortgage loans, and may entail greater risks of delinquency and foreclosure, and risks of loss. The ability of a mortgagor to repay a loan secured by an income-producing property typically is dependent primarily upon the successful operation of the property rather than any independent income or assets of the mortgagor. The successful operation of the property may in turn be dependant on the creditworthiness of tenants to whom commercial space is leased and the business operated by them, while the risks associated with tenants may be offset by the number of tenants or, if applicable, a diversity of types of business operated by them. A decline in the net operating income of an income-producing property will likely affect both the performance of the related loan as well as the liquidation value of the property. By contrast, a decline in the income of a mortgagor on a single family property will likely affect the performance of the related loan but may not affect the liquidation value of the property.

Commercial mortgage loans may be nonrecourse loans to the assets of the mortgagor. Further, the concentration of default, foreclosure and loss risks in individual mortgagors or commercial mortgage loans could be greater than for residential loans because the related mortgage loans could have higher principal balances.

**You Could Be Adversely Affected By Violations of Consumer Protection Laws**

Applicable state laws generally regulate interest rates and other charges and require certain disclosures. In addition, state and federal consumer protection laws, unfair and deceptive practices acts and debt collection practices acts may apply to the origination or collection of the loans in the trust. Depending on the provisions of the applicable law, violations of these laws may limit the ability of the servicers to collect all or part of the principal of or interest on the loans in the trust, may entitle the borrower to a refund of related amounts previously paid and, in addition, could subject the servicer to damages and administrative enforcement.

The Federal Home Ownership and Equity Protection Act of 1994, commonly known as HOEPA, prohibits inclusion of some provisions in mortgage loans that have mortgage rates or origination costs in excess of prescribed levels, and requires that borrowers be given certain disclosures prior to the consummation of such mortgage loans. Some states, as in the case of Georgia's Fair Lending Act of 2002, have enacted, or may enact, similar laws or regulations, which in some cases impose restrictions and requirements greater than those in HOEPA. Failure to comply with these laws, to the extent applicable to any of the loans in the trust, could subject the trust as an assignee of the loans, to monetary penalties and could result in the borrowers rescinding such loans against the trust fund. Lawsuits have been brought in various states making claims against assignees of high cost loans for violations of state law. Named defendants in these cases have included numerous participants within the secondary mortgage market, including some securitization trusts. The seller will warranted that the loans in the trust do not include any mortgage loan in violation of HOEPA or similar state laws. However, if the trust fund should include loans subject to HOEPA or in material violation of similar state laws, it will have repurchase remedies against the related originator or the seller, as applicable.

12

JPMC_DEX_000402773

See "Material Legal Aspects of the Loans" for additional information.

**You Could Be Adversely Affected By Violations of Environmental Laws**

Under the laws of some states, contamination of a property may give rise to a lien on the property to assure the costs of cleanup. In several states, a lien to assure cleanup has priority over the lien of an existing mortgage. In addition, the trust issuing your securities, because it is a mortgage holder, may be held responsible for the costs associated with the clean up of hazardous substances released at a property. Those costs could result in a loss to the securityholders.

We refer you to "Material Legal Aspects of the Loans—Environmental Risks" for additional information.

**Value of Trust Assets May Be Less Than Outstanding Principal Balance of the Related Securities**

There is no assurance that the value of the trust assets for any series of securities at any time will equal or exceed the principal amount of the outstanding securities of the series. If trust assets have to be sold because of an event of default or otherwise, providers of services to the trust (including the trustee, the master servicer and the credit enhancer, if any) generally will be entitled to receive the proceeds of the sale to the extent of their unpaid fees and other amounts due them before any proceeds are paid to securityholders. As a result, you may not receive the full amount of interest and principal due on your security.

If specified in the related prospectus supplement, the securities may benefit from credit enhancement from one or more external credit enhancement providers, such as primary mortgage insurers, financial guaranty insurance providers or derivative providers. If the ratings assigned by a rating agency to the securities of a series are dependent upon the financial strength of any such credit enhancement provider, any qualification, reduction or withdrawal of the financial strength ratings assigned to such credit enhancement provider could result in the reduction of the ratings assigned to your securities, which could in turn affect the liquidity and market value of your securities.

**Weighted Average Net Mortgage Rate on the Loans May Limit Interest Rate on the Securities**

As specified in the related prospectus supplement, the interest rate payable on your security may be limited by the interest paid on the loans and other assets of the trust fund, net of certain fees and expenses of the trust fund. The loans in a trust fund will have interest rates that are either fixed or adjustable based on an index, as described in the related prospectus supplement.

Any adjustable rate loans may have interest rates that are fixed for an initial period after origination and may have periodic or annual limits on adjustments to their interest rates. As a result, the securities may accrue less interest than if the related loans accrued interest based solely on the related index and margin.

13

Confidential

The interest rates on the securities may adjust based on an index different from the index on which the interest rate of the related loans adjust or at different times. As a result, the limits on the interest rates on the securities may prevent increases in those interest rates for an extend period of time during a period of rising interest rates. The interest rates on adjustable rate loans may respond to different economic and market factors than those factors affecting the interest rates on the related securities. It is possible that the interest rates on your securities may react more slowly, more quickly or in a different direction than the interest rates on the loans, which may result in the application of the limit on the interest rates on the securities. In addition, delinquencies, defaults or prepayments on the loans may make it more likely that the interest rate limit on the securities will apply.

**Risks Related to Loans with Interest-only Payments**

If specified in the related prospectus supplement, some of the loans in the related trust fund may provide for payments of interest at the related interest rate, but no payments of principal, for the period following origination specified in the related prospectus supplement. Following the applicable interest-only period, the monthly payment will be increased to an amount sufficient to amortize the principal balance of the loan over the remaining term and to pay interest at the applicable interest rate.

Such interest-only loans will, absent other considerations, result in longer weighted average lives of the related securities when compared to securities backed by non-interest-only loans. If you purchase a security at a discount, you should consider that the extension of its weighted average life could result in a lower yield than would be the case if such loans provided for payment of principal and interest on every distribution date. In addition, a borrower may view the absence of any obligation to make a payment of principal during the interest-only term of the loan as a disincentive to prepayment.

If the monthly payment after the interest-only term is substantially higher than a borrower's previous interest-only monthly payment, that loan may also be subject to an increased risk of delinquency and loss.

**High Balance Loans Increase Risk of Default**

If specified in the related prospectus supplement, a trust fund may include loans that have a principal balance as of the applicable cut-off date in excess of $1,000,000. You should consider the risk that the loss and delinquency experience on these high balance loans may have a disproportionate effect on the related trust fund.

**Simultaneous Second Lien Risk**

The originator or other lender may have originated a second lien mortgage loan which is not included in the trust fund to the borrower on a first lien mortgage loan that is included in the trust fund. In addition, other borrowers whose first lien loans are included in the trust fund may have obtained secondary mortgage financing following origination of the first lien loans. With respect to mortgage loans that have second lien mortgage loans encumbering the same mortgaged property, foreclosure frequency may be increased relative to mortgage loans that do not have subordinate financing behind them since

14

Confidential

JPMC_DEX_000402775

mortgagors have less equity in the mortgaged property. In addition, the servicer may declare a default on the second lien loan, even though the first lien loan is current, which would constitute a default on the first lien loan.

In addition, the nature of any second lien may influence the prepayment characteristics of the first lien included in the trust fund. Borrowers may be more likely to refinance the first lien when any secondary mortgage financing becomes due in full, and consequently you should be aware that the rate of prepayment of the first lien mortgage loans in a trust fund may be affected by any second lien on the related mortgage properties.

**Geographic Concentration of Loans Could Adversely Affect Your Investment**

The yield to maturity on your securities may be affected by the geographic concentration of the mortgaged properties securing the loans in the related trust fund. Any significant concentration of the mortgaged properties in particular geographic regions subject to adverse economic conditions or special hazards, such as earthquakes, hurricanes, windstorms, wildfires, mudslides, hurricanes or tornadoes, might increase the rate of delinquencies, defaults and losses on the related loans. Consequently, the geographic concentration of the loans in a trust fund could result in shortfalls in distributions due on your securities or losses on your securities greater than would be the case if the mortgaged properties were more geographically diversified.

**Military Action and Terrorist Attacks May Impact the Return on Your Security**

The effects that military action by U.S. forces in Iraq or other regions and terrorist attacks in the United States or other incidents and related military action, may have on the performance of the loans or on the values of mortgaged properties cannot be determined at this time. You should consider the possible effects on delinquency, default,loss and prepayment experience of the loans. Federal agencies and non-government lenders have and may continue to defer, reduce or forgive payments and delay foreclosure proceedings in respect of loans to borrowers affected in some way by recent and possible future events. In addition, activation of a substantial number of U.S. military reservists or members of the National Guard may significantly increase the proportion of mortgage loans whose mortgage rates are reduced by application of a Relief Act and any comparable state law, and neither a master servicer nor any other servicers will be required to advance for any interest shortfall caused by any such reduction. Shortfalls in interest may result from the application of the Relief Act or comparable state law. Interest payable to securityholders will be reduced by any reductions in the amount of interest collectible as a result of application of a Relief Act or comparable state law in the manner specified in the prospectus supplement.

**Book-Entry System for Certain Classes May Decrease Liquidity and Delay Payment**

Transactions in the classes of book-entry securities of any series generally can be effected only through The Depository Trust Company and its participating members, securities intermediaries and certain banks. Therefore:

15

Confidential

- the liquidity of book-entry securities in the secondary trading market that may develop may be limited because investors may be unwilling to purchase securities for which they cannot obtain physical securities;

- your ability to pledge a security to persons or entities that do not participate in the DTC system, or otherwise to take action in respect of the securities, may be limited due to lack of a physical security representing the securities; and

- you may experience some delay in receiving distributions of interest and principal on your securities because the trustee will make distributions to DTC or its participating members. DTC will then be required to credit the distributions to the accounts of the participating organizations. Only then will the distributions be credited to your account either directly or indirectly through Securities Intermediaries.

See *"Description of the Securities—Book-Entry Registration of Securities"* in this prospectus.

## Bankruptcy and Insolvency Risks

Each transfer of a loan from a seller to the depositor and from the depositor to the trust fund will be intended to be an absolute and unconditional sale of that loan rather than a secured financing for purposes of federal and state law. However, in the event of the bankruptcy or insolvency of a prior owner of a loan, a bankruptcy trustee or receiver or one of the creditors of the insolvent party might challenge this conclusion and argue that the transfer of the loans should be characterized as a pledge of assets in a secured borrowing rather than as a sale. Such an attempt, even if unsuccessful, might result in delays in distributions on the securities. If such an attempt were successful, it is possible that the affected loans could be sold in order to liquidate the assets of the insolvent entity. There can be no assurance that the proceeds of such a liquidation would be sufficient to repay the securities in full.

## Borrower May be Unable to Make Balloon Payment

If specified in the related prospectus supplement, certain loans in a trust fund may not fully amortize over their terms to maturity and, thus, may require principal payments, *i.e.*, balloon payments, at their stated maturity. Loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on the borrower's ability to:

- timely refinance the loan; or

- timely sell the related mortgaged property.

A number of factors will affect a borrower's ability to accomplish either of these goals, including:

- the level of available mortgage rates at the time of sale or refinancing;

16

JPMC_DEX_000402777

- the borrower's equity in the related residential property;

- the financial condition of the borrower; and

- the tax laws.

A borrower's failure to make a balloon payment would increase the risk that you might not receive all payments to which you are entitled.

**High Loan-to-Value Ratios Increase Risk of Loss**

If specified in the related prospectus supplement, certain of the loans included in a trust fund may have loan-to-value ratios greater than 80%. Loans with higher loan-to-value ratios may present a greater risk of loss than loans with loan-to-value ratios of 80% or below. Even if the related loans have primary mortgage insurance, we cannot assure you that the primary mortgage insurance coverage will be adequate to cover any losses that might be experienced by those loans.

The determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios of the loans for the purpose of determining whether primary mortgage insurance is required may differ from the appraised value of such mortgaged properties for loans obtained for the purpose of acquiring the related mortgaged property. Loan-to-value ratios for loans are generally determined based upon the lesser of the selling price of the mortgaged property or its appraised value at the time of sale, although this calculation may vary depending on the state in which the mortgaged property is located.

**Mortgage Loans Originated According to Non-Agency Underwriting Guidelines May Have Higher Expected Delinquencies**

If specified in the related prospectus supplement, the loans may have been originated according to underwriting guidelines that do not comply with Fannie Mae or Freddie Mac guidelines. These types of loans are sometimes referred to as "subprime," "non-prime" or "non-conforming" mortgage loans. Whereas "prime" loans are typically made to borrowers who have a strong credit history and can demonstrate a capacity to repay their loans, subprime loans are typically made to borrowers who are perceived as deficient in either or both of these respects. The borrowers may have imperfect credit histories, ranging from minor delinquencies to bankruptcy, or relatively high ratios of monthly mortgage payments to income or relatively high ratios of total monthly credit payments to income. While lenders consider a borrower's credit history when determining whether a loan is other than prime, they also consider the mortgage loan characteristics, such as loan-to-value ratio, or attributes of the property that may cause the loan to carry elevated credit risk.

Compared with prime loans, subprime loans typically have higher loan-to-value ratios, reflecting the greater difficulty that subprime borrowers have in making down payments and the propensity of these borrowers to extract equity during refinancing. Historically,

17

Confidential

JPMC_DEX_000402778

subprime borrowers pay higher rates of interest, go into delinquency more often, and have their properties foreclosed at a higher rate than either prime borrowers or borrowers of mortgage loans originated in accordance with Fannie Mae or Freddie Mac guidelines. Loans in the trust fund may have been classified in these relatively low (*i.e.,* relatively higher risk) credit categories.

Rising unemployment, higher interest rates, or a decline in housing prices generally or in certain regions of the United States may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of subprime mortgage loans and other loans of relatively low credit quality than on loans originated under stricter guidelines. We cannot assure you that the values of the mortgaged properties have remained or will remain at levels in effect on the dates of origination of the related loans.

If specified in the related prospectus supplement, the trust fund may include mortgage loans originated according to "Alternative-A" or "Alt-A" underwriting guidelines. Although Alt-A loans are typically made to borrowers who have a strong credit history and can demonstrate a capacity to repay their loans, Alt-A mortgage loans may have some of the characteristics and risks of subprime mortgage loans described above. In particular, Alt-A mortgage loans (1) are often originated under underwriting guidelines with more limited and reduced documentation requirements, (2) are likely to have higher loan-to-value ratios than prime loans, (3) are more likely to be secured by properties not primarily occupied by the related borrower than prime loans and (4) often have prepayment penalties. You should consider the risks discussed above if the trust fund contains Alt-A mortgage loans.

Consequently, loans originated according to underwriting guidelines that are not as strict as Fannie Mae or Freddie Mac guidelines may be likely to experience rates of delinquency, foreclosure and bankruptcy that are higher than those experienced by loans underwritten in accordance with Fannie Mae or Freddie Mac guidelines.

**A Transfer of Servicing May Result in Increased Losses and Delinquencies on the Loans**

If specified in the related prospectus supplement, the servicing responsibilities with respect to certain of the loans will be transferred to a new servicer shortly after the related closing date. In addition, servicing of the loans may be transferred in the future to other servicers in accordance with provisions of the trust agreement or pooling and servicing agreement, as applicable. Investors should note that when the servicing of loans is transferred, there is generally a rise in delinquencies associated with such transfer. Such increase in delinquencies may result in losses, which, to the extent they are not absorbed by credit enhancement, will cause losses or shortfalls to be incurred by the holders of the related securities.

**The Recording of the Mortgages in the Name of MERS May Affect the Yield on the Securities**

The mortgages or assignments of mortgage for some of the loans have been or may be recorded in the name of Mortgage Electronic Registration Systems, Inc. or MERS, solely

18

JPMC_DEX_000402779

as nominee for the seller and its successors and assigns. Subsequent assignments of those mortgages are registered electronically through the MERS system. However, if MERS discontinues the MERS system and it becomes necessary to record an assignment of mortgage to the related trustee, then any related expenses will be paid by the related trust and will reduce the amount available to pay principal of and interest on the securities.

The recording of mortgages in the name of MERS is a new practice in the mortgage lending industry. Public recording officers and others may have limited, if any, experience with lenders seeking to foreclose mortgages, assignments of which are registered with MERS. Accordingly, delays and additional costs in commencing, prosecuting and completing foreclosure proceedings and conducting foreclosure sales of the mortgaged properties could result. Those delays and the additional costs could in turn delay the distribution of liquidation proceeds to securityholders and increase the amount of losses on the loans.

## Risks Related to the Residual Interest Securities

The holders of the Residual Interest Securities must include the taxable income or loss of the related REMIC in determining their federal taxable income. Prospective investors are cautioned that the residual interest securityholders' REMIC taxable income and the tax liability associated therewith may be substantial during certain periods, in which event the holders thereof must have sufficient sources of funds to pay such tax liability. It is not anticipated that the residual interest securityholders will receive distributions from the trust. Furthermore, prospective investors in the Residual Interest Securities should expect that all of the related REMIC's income includible by the holders of the Residual Interest Securities will be treated as "excess inclusion" income, resulting in (i) the inability of such holders to use net operating losses to offset such income, (ii) the treatment of such income as "unrelated business taxable income" to certain holders who are otherwise tax exempt, and (iii) the treatment of such income as subject to 30% withholding tax to certain non-U.S. investors, with no exemption or treaty reduction. Under the provisions of the Internal Revenue Code of 1986 relating to REMICs, it is likely that the Residual Interest Securities will be considered to be "non-economic residual interests," with the result that transfers thereof would be disregarded for federal income tax purposes if any significant purpose of the transferor was to impede the assessment or collection of tax. See *"Material Federal Income Tax Consequences—Taxation of Owners of Residual Interest Securities"*.

## The Trust Fund

## General

The certificates of each series will represent interests in the assets of a trust fund established by the depositor, and the notes of each series will be secured by the pledge of the assets of the related trust fund. The trust fund for each series will be held by the trustee for the benefit of the related securityholders. For each series, a separate trust fund in the form of a common law trust or a Delaware business trust will be formed under the related pooling and servicing agreement or trust agreement. The assets of each trust fund will consist primarily of a

19

JPMC_DEX_000402780

pool comprised of, as specified in the related prospectus supplement, any one or more of the following (referred to herein as the "Assets"):

    (a)    residential mortgage loans, including

- mortgage loans secured by first, second and/or more subordinate liens on one- to four-family residential properties,

- closed-end and/or revolving home equity loans secured by first, second and/or more subordinate liens on one- to four-family residential properties,

- home improvement installment sale contracts and installment loan agreements that are either unsecured or secured by first, second and/or more subordinate liens on one to four-family residential properties, or by purchase money security interests in the financed home improvements, including loans insured under the FHA Title I Credit Insurance program administered pursuant to the National Housing Act of 1934, and

- manufactured housing installment sales contracts and installment loan agreements secured by first, second and/or more subordinate liens on manufactured homes or by mortgages on real estate on which the related manufactured homes are located;

    (b)    commercial mortgage loans, including mortgage loans secured by traditional commercial properties, multifamily and mixed use properties that are primarily used for commercial purposes, but as of the creation date of the related pool, no more than 5% of the assets of the trust fund may be comprised of commercial mortgage loans;

    (c)    mortgaged-backed securities issued or guaranteed by Ginnie Mae, Fannie Mae or Freddie Mac;

    (d)    privately issued mortgaged-backed securities representing interests in any of the above asset types; and

    (e)    all monies due under each of the loans or securities held in the trust fund, net, if and as provided in the related prospectus supplement, of required amounts payable to the servicer of the loans, agency securities or private mortgaged-backed securities, together with payments in respect of, and other accounts, obligations or agreements, in each case, as specified in the related prospectus supplement.

    The pool will be created on the first day of the month of the issuance of the related series of securities or any other date specified in the related prospectus supplement, which date is the cut-off date. The securities will be entitled to payment from the assets of the related trust fund or funds or other assets pledged for the benefit of the securityholders, as specified in the related prospectus supplement, and will not be entitled to payments in respect of the assets of any other trust fund established by the depositor.

    The Assets will be acquired by the depositor, either directly or through affiliates, from the sponsor. The sponsor may be an affiliate of the depositor. Loans acquired by the depositor will have been originated in accordance with the underwriting criteria described in this prospectus

Confidential

under "The Loans—Underwriting Standards" or otherwise in accordance with the standards set forth in the prospectus supplement. The depositor will cause the Assets to be assigned without recourse to the trustee named in the related prospectus supplement for the benefit of the holders of the securities of the related series. The master servicer named in the related prospectus supplement will service the Assets, either directly or through other servicing institutions as subservicers, under a pooling and servicing agreement among the depositor, the master servicer and the trustee with respect to a series consisting of certificates, or a master servicing agreement or a sale and servicing agreement between the trustee and the master servicer with respect to a series consisting of notes or of certificates and notes, and will receive a fee for its services. See "The Agreements." With respect to loans serviced by the master servicer through a subservicer, the master servicer will remain liable for its servicing obligations under the related agreement as if the master servicer alone were servicing those loans.

Any mortgage backed securities issued or guaranteed by Ginnie Mae, Fannie Mae or Freddie Mac will be securities that are exempt from registration under the Securities Act of 1933.

As used in this prospectus, "agreement" means, with respect to a series consisting of certificates, the pooling and servicing agreement, and with respect to a series consisting of notes or of certificates and notes, the trust agreement, the indenture and the master servicing agreement, as the context requires.

If so specified in the related prospectus supplement, a trust fund relating to a series of securities may be a business trust formed under the laws of the State of Delaware pursuant to a trust agreement between the depositor and the trustee of the related trust fund.

With respect to each trust fund, prior to the initial offering of the related series of securities, the trust fund will have no assets or liabilities. No trust fund is expected to engage in any activities other than acquiring, managing and holding the related trust fund assets and other assets contemplated in this prospectus and in the related prospectus supplement, issuing securities and making payments and distributions on the securities and related activities. No trust fund is expected to have any source of capital other than its assets and any related credit enhancement.

The obligations of the master servicer with respect to the loans included in a trust fund will consist principally of its contractual servicing obligations under the related agreement, including its obligation to enforce the obligations of the subservicers or sellers, or both, as more fully described in this prospectus under "The Trust Fund—Representations by Sellers or Originators; Repurchases" and "The Agreements—Servicing" and "—Assignment of the Trust Fund Assets", and its obligation, if any, to make cash advances in the event of recoverable delinquencies in payments on or with respect to the loans. Any obligation of the master servicer to make advances will be limited in the manner described in this prospectus under "Description of the Securities—Advances."

The following is a brief description of the assets expected to be included in the trust funds. If specific information respecting the trust fund assets is not known at the time the related series of securities initially is offered, more general information of the nature described in this prospectus will be provided in the related prospectus supplement, and specific information will

21

be set forth in a Current Report on Form 8-K to be filed with the SEC within fifteen days after the initial issuance of those securities. A copy of the agreement with respect to each series of securities will be attached to the Form 8-K and will be available for inspection at the corporate trust office of the trustee specified in the related prospectus supplement. A schedule of the loans, agency securities and/or private mortgage-backed securities relating to a series will be attached to the agreement delivered to the trustee upon delivery of the securities. If so specified in the related prospectus supplement, the actual statistical characteristics of a pool as of the closing date may differ from those set forth in the prospectus supplement. However, in no event will more than five percent of the assets as a percentage of the cut-off date pool principal balance vary from the characteristics described in the related prospectus supplement.

**The Loans**

*General.* Loans may consist of mortgage loans or deeds of trust secured by first or subordinated liens on one- to four-family residential properties, home equity loans, home improvement contracts or manufactured housing contracts. If so specified, the loans may include cooperative apartment loans secured by security interests in shares issued by private, non-profit, cooperative housing corporations and in the related proprietary leases or occupancy agreements granting exclusive rights to occupy specific dwelling units in the cooperatives' buildings. If so specified, the loans may also include, to a limited extent, mortgage loans or deeds of trust secured by liens on commercial properties, multifamily properties and mixed use properties that are primarily used for commercial purposes. As more fully described in the related prospectus supplement, the loans may be "conventional" loans or loans that are insured or guaranteed by a governmental agency like the FHA or VA. The loans will have been originated in accordance with the underwriting criteria specified in the related prospectus supplement.

In general, the loans in a pool will have monthly payments due on the first day of each month. However, as described in the related prospectus supplement, the loans in a pool may have payments due more or less frequently than monthly. In addition, payments may be due on any day during a month. The payment terms of the loans to be included in a trust fund will be described in the related prospectus supplement and may include any of the following features, all as described in this prospectus or in the related prospectus supplement:

- Interest may be payable at a fixed rate, a rate adjustable from time to time in relation to an index specified in the related prospectus supplement, a rate that is fixed for a period of time or under limited circumstances and is followed by an adjustable rate, a rate that otherwise varies from time to time, or a rate that is convertible from an adjustable rate to a fixed rate. Changes to an adjustable rate may be subject to periodic limitations, maximum rates, minimum rates or a combination of those limitations. As specified in the related prospectus supplement, the loans may provide for payments in level monthly installments, for balloon payments, or for payments that are allocated to principal and interest according to the "sum of the digits" or "Rule of 78s" methods. Accrued interest may be deferred and added to the principal of a loan for the periods and under the circumstances as may be specified in the related prospectus supplement. Loans may provide for the payment of interest at a rate lower than the loan rate for a period of time or for the life of the loan, and the amount of any

22

JPMC_DEX_000402783

difference may be contributed from funds supplied by the seller of the property or another source.

- Principal may be payable on a level debt service basis to fully amortize the loan over its term, may be calculated on the basis of an assumed amortization schedule that is significantly longer than the original term to maturity or on an interest rate that is different from the loan rate or may not be amortized during all or a portion of the original term. Payment of all or a substantial portion of the principal may be due on maturity —a balloon payment. Principal may include interest that has been deferred and added to the principal balance of the loan.

- Monthly payments of principal and interest may be fixed for the life of the loan, may increase over a specified period of time or may change from period to period. Loans may include limits on periodic increases or decreases in the amount of monthly payments and may include maximum or minimum amounts of monthly payments.

- Prepayments of principal may be conditioned on payment of a prepayment fee, which may be fixed for the life of the loan or may decline over time, and may be prohibited for the life of the loan or for particular lockout periods. Some loans may permit prepayments after expiration of the applicable lockout period and may require the payment of a prepayment fee in connection with any subsequent prepayment. Other loans may permit prepayments without payment of a fee unless the prepayment occurs during specified time periods. The loans may include "due on sale" clauses which permit the mortgagee to demand payment of the entire loan in connection with the sale or transfers of the related property. Other loans may be assumable by persons meeting the then applicable underwriting standards of the related seller.

- The loans may provide for payments of interest at the related interest rate, but no payments of principal, for a specified period following origination. Following the applicable interest-only period, the monthly payment will be increased to an amount sufficient to amortize the principal balance of the loan over the remaining term and to pay interest at the applicable interest rate.

A trust fund may contain buydown loans that include provisions for a third party to subsidize partially the monthly payments of the borrowers on those loans during the early years of those loans, the difference to be made up from a buydown fund contributed by that third party at the time of origination of the loan. A buydown fund will be in an amount equal either to the discounted value or full aggregate amount of future payment subsidies. The underlying assumption of buydown plans is that the income of the borrower will increase during the buydown period as a result of normal increases in compensation and inflation, so that the borrower will be able to meet the full loan payments at the end of the buydown period. If assumption of increased income is not fulfilled, the possibility of defaults on buydown loans is increased. The related prospectus supplement will contain information with respect to any buydown loan concerning limitations on the interest rate paid by the borrower initially, on annual increases in the interest rate and on the length of the buydown period.

23

JPMC_DEX_000402784

The real property which secures repayment of the loans is referred to as the mortgaged properties. Home improvement contracts and manufactured housing contracts may, and the other loans will, be secured by mortgages or deeds of trust or other similar security instruments creating a lien on a mortgaged property. In the case of home equity loans, the related liens may be subordinated to one or more senior liens on the related mortgaged properties as described in the related prospectus supplement. As specified in the related prospectus supplement, home improvement contracts and manufactured housing contracts may be unsecured or secured by purchase money security interests in the financed home improvements and the financed manufactured homes. The mortgaged properties, the home improvements and the manufactured homes are collectively referred to in this prospectus as the properties. The properties relating to loans will consist primarily of detached or semi-detached one- to four-family dwelling units, townhouses, rowhouses, individual condominium units, individual units in planned unit developments, and other dwelling units—single-family properties—or mixed-use properties. Any mixed-use property will be predominantly one- to four-family residential in that its primary use will be for dwelling, with the remainder of its space for retail, professional or other commercial uses. Properties may include vacation and second homes, investment properties, leasehold interests and commercial properties. In the case of leasehold interests, the term of the leasehold will exceed the scheduled maturity of the loan by a time period specified in the related prospectus supplement. The properties may be located in any one of the fifty states, the District of Columbia, Guam, Puerto Rico or any other territory of the United States.

Loans with specified loan-to-value ratios and/or principal balances may be covered wholly or partially by primary mortgage guaranty insurance policies. The existence, extent and duration of any coverage provided by primary mortgage guaranty insurance policies will be described in the related prospectus supplement.

The aggregate principal balance of loans secured by properties that are owner-occupied will be disclosed in the related prospectus supplement. Typically, the basis for a representation that a given percentage of the loans is secured by single family properties that are owner-occupied will be either (1) the making of a representation by the borrower at the loan's origination either that the underlying property will be used by the borrower for a period of at least six months every year or that the borrower intends to use the property as a primary residence or (2) a finding that the address of the underlying property is the borrower's mailing address.

*Home Equity Loans.* As more fully described in the related prospectus supplement, interest on each revolving credit line loan, excluding introduction rates offered from time to time during promotional periods, is computed and payable monthly on the average daily outstanding principal balance of that loan. Principal amounts on a revolving credit line loan may be drawn down, subject to a maximum amount as set forth in the related prospectus supplement, or repaid under each revolving credit line loan from time to time, but may be subject to a minimum periodic payment. The related prospectus supplement will indicate the extent, if any, to which the trust fund will include any amounts borrowed under a revolving credit line loan after the cut-off date.

The full amount of a closed-end loan is advanced at the inception of the loan and generally is repayable in equal, or substantially equal, installments of an amount sufficient to

24

JPMC_DEX_000402785

amortize fully the loan at its stated maturity.  Except to the extent provided in the related prospectus supplement, the original terms to stated maturity of closed-end loans generally will not exceed 360 months.  If specified in the related prospectus supplement, the terms to stated maturity of closed-end loans may exceed 360 months.

*Home Improvement Contracts.*  The trust fund assets for a series of securities may consist, in whole or in part, of home improvement contracts originated by a commercial bank, a savings and loan association, a commercial mortgage banker or other financial institution in the ordinary course of business.  The home improvements securing the home improvement contracts may include, but are not limited to, replacement windows, house siding, new roofs, swimming pools, satellite dishes, kitchen and bathroom remodeling goods and solar heating panels.  As specified in the related prospectus supplement, the home improvement contracts will either be unsecured or secured by mortgages on properties which are generally subordinate to other mortgages on the same property, or secured by purchase money security interests in the financed home improvements.  The home improvement contracts may be fully amortizing or provide for balloon payments and may have fixed interest rates or adjustable interest rates and may provide for other payment characteristics as in this prospectus and in the related prospectus supplement.  The initial loan-to-value ratio of a home improvement contract will be computed in the manner described in the related prospectus supplement.

*Manufactured Housing Contracts.*  The trust fund assets for a series may consist, in whole or part, of manufactured housing installment sales contracts and installment loan agreements, originated by a manufactured housing dealer in the ordinary course of business.  As specified in the related prospectus supplement, the manufactured housing contracts will be secured by manufactured homes, located in any of the fifty states or the District of Columbia or by mortgages on the real estate on which the manufactured homes are located.

The manufactured homes securing the manufactured housing contracts will consist of manufactured homes within the meaning of 42 United States Code, Section 5402(6), or manufactured homes meeting those other standards as shall be described in the related prospectus supplement.  Section 5402(6) defines a "manufactured home" as "a structure, transportable in one or more sections, which, in the traveling mode, is eight body feet or more in width or forty body feet or more in length, or, when erected on site, is three hundred twenty or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air conditioning and electrical systems contained therein; except that the term shall include any structure which meets all the requirements of [this] paragraph except the size requirements and with respect to which the manufacturer voluntarily files a certification required by the Secretary of Housing and Urban Development and complies with the standards established under [this] chapter."

Manufactured homes, and home improvements, unlike mortgaged properties, generally depreciate in value.  Consequently, at any time after origination it is possible, especially in the case of contracts with high loan-to-value ratios at origination, that the market value of a manufactured home or home improvement may be lower than the principal amount outstanding under the related contract.

25

Confidential

*Commercial Loans.* The trust fund assets for a series may include commercial loans, in an amount not to exceed, as of the related cut-off date, 5% by principal balance of the trust fund assets. The commercial mortgage loans may be secured by liens on, or security interests in, mortgaged properties consisting of (1) primarily residential properties consisting of five or more rental or cooperatively owned dwelling units in high-rise, mid-rise or garden apartment buildings and which may include limited retail, office or other commercial space, (2) multifamily properties, (3) retail stores and establishments, (4) office buildings, or (5) hotels or motels, nursing homes, assisted living facilities, continuum care facilities, day care centers, schools, hospitals or other healthcare related facilities, industrial properties, warehouse facilities, mini-warehouse facilities, self-storage facilities, distribution centers, transportation centers, parking facilities, entertainment and/or recreation facilities, movie theaters, restaurants, golf courses, car washes, automobile dealerships, mobile home parks, mixed use properties, including mixed commercial uses and mixed commercial and residential uses, and/or unimproved land. The mortgage loans will be secured by first or junior mortgages or deeds of trust or other similar security instruments creating a first or junior lien on mortgaged property. Commercial loans will generally also be secured by an assignment of leases and rents and/or operating or other cash flow guarantees relating to the mortgage loan. It is anticipated that the mortgagors will be required to maintain hazard insurance on the mortgaged properties in accordance with the terms of the underlying mortgage loan documents.

Multifamily properties are residential income-producing properties consisting of five or more rental or cooperatively owned dwelling units in high-rise, mid-rise or garden apartment buildings and which may include limited retail, office or other commercial space. Multifamily leases tend to be relatively short-term (i.e., one to five years). Multifamily properties face competition from other such properties within the same geographical area, and compete on the basis of rental rates, amenities, physical condition and proximity to retail centers and transportation. Certain states and municipalities may regulate the relationships between landlords and residential tenants and may impose restrictions on rental rates.

Retail properties are income-producing properties leased by borrowers to tenants that sell various goods and services. Tenant leases may have a base rent component and an additional component tied to sales. Retail properties may include single- or multiple-tenant properties, in the latter case such as shopping malls or strip shopping centers. Some retail properties have anchor tenants or are located adjacent to an anchor store. While there is no strict definition of an anchor, it is generally understood that a retail anchor tenant is proportionately larger in size and is vital in attracting customers to the retail property, whether or not such retail anchor is located on the related mortgaged property. Catalogue retailers, home shopping networks, the internet, telemarketing and outlet centers all compete with more traditional retail properties for consumer dollars spent on products and services sold in retail stores. Continued growth of these alternative retail outlets, which are often characterized by lower operating costs, could adversely affect the rents collectible at retail properties.

Pursuant to a lease assignment, the related mortgagor may assign its rights, title and interest as lessor under each lease and the income derived therefrom to the related mortgagee, while retaining a license to collect the rents for so long as there is no default. If the mortgagor defaults, the license terminates and the mortgagee or its agent is entitled to collect the rents from the related lessee or lessees for application to the monetary obligations of the mortgagor. State

26

Confidential

JPMC_DEX_000402787

law may limit or restrict the enforcement of the lease assignments by a mortgagee until it takes possession of the related mortgaged property and/or a receiver is appointed.

*Additional Information.* Each prospectus supplement will contain information, as of the date of that prospectus supplement or the related cut-off date and to the extent then specifically known to the depositor, with respect to the loans contained in the related pool, including:

- the aggregate outstanding principal balance and the average outstanding principal balance of the loans as of the applicable cut-off date,

- the type of property securing the loan—e.g., single family residences, individual units in condominium apartment buildings, two- to four-family dwelling units, other real property, home improvements or manufactured homes,

- the original terms to maturity of the loans,

- the largest principal balance and the smallest principal balance of any of the loans,

- the earliest origination date and latest maturity date of any of the loans,

- the loan-to-value ratios or combined loan-to-value ratios, as applicable, of the loans,

- the loan interest rates or range of loan interest rates borne by the loans,

- the maximum and minimum per annum loan interest rates, and

- the geographical location of the loans.

If specific information about the loans is not known to the depositor at the time the related securities are initially offered, more general information of the nature described above will be provided in the related prospectus supplement, and specific information will be set forth in the Current Report on Form 8-K filed within 15 days of the closing date.

No assurance can be given that values of the properties have remained or will remain at their levels on the dates of origination of the related loans. If the residential real estate market should experience an overall decline in property values causing the sum of the outstanding principal balances of the loans and any primary or secondary financing on the properties, as applicable, in a particular pool to become equal to or greater than the value of the properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry. In addition, adverse economic conditions and other factors, which may or may not affect real property values, may affect the timely payment by borrowers of scheduled payments of principal and interest on the loans and, accordingly, the actual rates of delinquencies, foreclosures and losses with respect to any pool. To the extent that losses are not covered by subordination provisions or alternative arrangements, those losses will be borne, at least in part, by the holders of the securities of the related series.

*Underwriting Standards.* The loans will be acquired by the depositor, either directly or through affiliates, from the sellers. The depositor does not originate loans and has not identified

27

JPMC_DEX_000402788

specific originators or sellers of loans from whom the depositor, either directly or through affiliates, will purchase the loans to be included in a trust fund. The underwriting standards for loans of a particular series will be described in the related prospectus supplement. Each seller or originator will represent and warrant that all loans originated and/or sold by it to the depositor or one of its affiliates will have been underwritten in accordance with standards consistent with those utilized by lenders generally during the period of origination for similar types of loans. As to any loan insured by the FHA or partially guaranteed by the VA, the seller or originator will represent that it has complied with underwriting policies of the FHA or the VA, as the case may be.

Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property, home improvements or manufactured home, as applicable, as collateral.

The maximum loan amount will vary depending upon a borrower's credit grade and loan program but will not generally exceed an amount specified in the related prospectus supplement. Variations in maximum loan amount limits will be permitted based on compensating factors. Compensating factors may generally include, but are not limited to, and to the extent specified in the related prospectus supplement, low loan-to-value ratio, low debt-to-income ratio, stable employment, favorable credit history and the nature of the underlying first mortgage loan, if applicable.

**Underwriting Standards**

Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In most cases, an employment verification is obtained from an independent source (typically the borrower's employer), which verification reports, among other things, the length of employment with that organization, the current salary, and whether it is expected that the borrower will continue such employment in the future. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts. See "The Trust Fund—The Loans—Underwriting Standards" in this prospectus.

A lender may also originate mortgage loans pursuant to alternative sets of underwriting criteria under reduced or limited documentation programs. These programs are designed to facilitate the loan approval process. Under these programs, certain documentation concerning income/employment and asset verification is reduced or excluded. Loans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion. Permitted maximum loan-to-

28

Confidential

value ratios under these programs are generally more restrictive than those under the lender's standard underwriting criteria.

From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

**Modification of Loans**

The master servicer for the loans of a particular series will be authorized to modify, waive or amend any term of a loan in a manner that is consistent with the servicing standard and the specific limitations set forth in the servicing agreement and described in the related prospectus supplement. However, those agreements will require that the modification, waiver or amendment not affect the tax status of the trust fund or cause any tax to be imposed on the trust fund or materially impair the security for the related loan.

**Agency Securities**

*Ginnie Mae.* Ginnie Mae is a wholly-owned corporate instrumentality of HUD. Section 306(g) of Title II of the National Housing Act of 1934, as amended, authorizes Ginnie Mae to, among other things, guarantee the timely payment of principal of and interest on certificates which represent an interest in a pool of mortgage loans insured by the FHA under the National Housing Act or Title V of the National Housing Act of 1949, or partially guaranteed by the VA under the Servicemen's Readjustment Act of 1944, as amended, or Chapter 37 of Title 38, United States Code.

Section 306(g) of the National Housing Act provides that "the full faith and credit of the United States is pledged to the payment of all amounts which may be required to be paid under any guarantee under this subsection." In order to meet its obligations under any guarantee under Section 306(g) of the National Housing Act, Ginnie Mae may. under Section 306(d) of the National Housing Act, borrow from the United States Treasury in an amount which is at any time sufficient to enable Ginnie Mae, with no limitations as to amount, to perform its obligations under its guarantee.

*Ginnie Mae Certificates.* Each Ginnie Mae certificate held in a trust fund for a series of securities will be a "fully modified pass-through" mortgaged-backed certificate issued and serviced by a mortgage banking company or other financial concern approved by Ginnie Mae or approved by Fannie Mae as a seller-servicer of FHA Loans and/or VA Loans. Each Ginnie Mae certificate may be a GNMA I certificate or a GNMA II certificate. The mortgage loans underlying the Ginnie Mae certificates will consist of FHA Loans and/or VA Loans. Each mortgage loan of this type is secured by a one- to four-family residential property or a manufactured home. Ginnie Mae will approve the issuance of each Ginnie Mae certificate in accordance with a guaranty agreement between Ginnie Mae and the issuer and servicer of the Ginnie Mae certificate. Pursuant to its guaranty agreement, a Ginnie Mae servicer will be required to advance its own funds in order to make timely payments of all amounts due on each of the related Ginnie Mae certificates. even if the payments received by the Ginnie Mae servicer

29

JPMC_DEX_000402790

on the FHA Loans or VA Loans underlying each of those Ginnie Mae certificates are less than the amounts due on those Ginnie Mae certificates.

The full and timely payment of principal of and interest on each Ginnie Mae certificate will be guaranteed by Ginnie Mae, which obligation is backed by the full faith and credit of the United States. Each Ginnie Mae certificate will have an original maturity of not more than 40 years (but may have original maturities of substantially less than 40 years). Each Ginnie Mae certificate will provide for the payment by or on behalf of the Ginnie Mae servicer to the registered holder of the Ginnie Mae certificate of scheduled monthly payments of principal and interest equal to the registered holder's proportionate interest in the aggregate amount of the monthly principal and interest payment on each FHA Loan or VA Loan underlying the Ginnie Mae certificate, less the applicable servicing and guarantee fee which together equal the difference between the interest on the FHA Loans or VA Loans and the pass-through rate on the Ginnie Mae certificate. In addition, each payment will include proportionate pass-through payments of any prepayments of principal on the FHA Loans or VA Loans underlying the Ginnie Mae certificate and liquidation proceeds in the event of a foreclosure or other disposition of any the related FHA Loans or VA Loans.

If a Ginnie Mae servicer is unable to make the payments on a Ginnie Mae certificate as it becomes due, it must promptly notify Ginnie Mae and request Ginnie Mae to make the payment. Upon notification and request, Ginnie Mae will make payments directly to the registered holder of a Ginnie Mae certificate. In the event no payment is made by a Ginnie Mae servicer and the Ginnie Mae servicer fails to notify and request Ginnie Mae to make the payment, the holder of the related Ginnie Mae certificate will have recourse only against Ginnie Mae to obtain the payment. The trustee or its nominee, as registered holder of the Ginnie Mae certificates held in a trust fund, will have the right to proceed directly against Ginnie Mae under the terms of the guaranty agreements relating to the Ginnie Mae certificates for any amounts that are not paid when due.

All mortgage loans underlying a particular Ginnie Mae certificate must have the same interest rate, except for pools of mortgage loans secured by manufactured homes, over the term of the loan. The interest rate on a GNMA I certificate will equal the interest rate on the mortgage loans included in the pool of mortgage loans underlying the GNMA I certificate, less one-half percentage point per annum of the unpaid principal balance of the mortgage loans.

Mortgage loans underlying a particular GNMA II certificate may have per annum interest rates that vary from each other by up to one percentage point. The interest rate on each GNMA II certificate will be between one-half percentage point and one and one-half percentage points lower than the highest interest rate on the mortgage loans included in the pool of mortgage loans underlying the GNMA II certificate (except for pools of mortgage loans secured by manufactured homes).

Regular monthly installment payments on each Ginnie Mae certificate will be comprised of interest due as specified on a Ginnie Mae certificate plus the scheduled principal payments on the FHA Loans or VA Loans underlying a Ginnie Mae certificate due on the first day of the month in which the scheduled monthly installments on a Ginnie Mae certificate is due. Regular monthly installments on each Ginnie Mae certificate are required to be paid to the trustee

Confidential

identified in the related prospectus supplement as registered holder by the 15th day of each month in the case of a GNMA I certificate and are required to be mailed to the Trustee by the 20th day of each month in the case of a GNMA II certificate. Any principal prepayments on any FHA Loans or VA Loans underlying a Ginnie Mae certificate held in a trust fund or any other early recovery of principal on a loan will be passed through to the trustee identified in the related prospectus supplement as the registered holder of a Ginnie Mae certificate.

Ginnie Mae certificates may be backed by graduated payment mortgage loans or by "buydown" mortgage loans for which funds will have been provided, and deposited into escrow accounts, for application to the payment of a portion of the borrowers' monthly payments during the early years of the mortgage loan. Payments due the registered holders of Ginnie Mae certificates backed by pools containing "buydown" mortgage loans will be computed in the same manner as payments derived from other Ginnie Mae certificates and will include amounts to be collected from both the borrower and the related escrow account. The graduated payment mortgage loans will provide for graduated interest payments that, during the early years of the mortgage loans, will be less than the amount of stated interest on the mortgage loans. The interest not so paid will be added to the principal of the graduated payment mortgage loans and, together with interest on that interest, will be paid in subsequent years. The obligations of Ginnie Mae and of a Ginnie Mae issuer/servicer will be the same irrespective of whether the Ginnie Mae certificates are backed by graduated payment mortgage loans or "buydown" mortgage loans. No statistics comparable to the FHA's prepayment experience on level payment, non-buydown loans are available in inspect of graduated payment or buydown mortgages. Ginnie Mae certificates related to a series of certificates may be held in book-entry form.

*Fannie Mae*. Fannie Mae is a federally chartered and privately owned corporation organized and existing under the Federal National Mortgage Association Charter Act. Fannie Mae was originally established in 1938 as a United States government agency to provide supplemental liquidity to the mortgage market and was transformed into a stockholder-owned and privately managed corporation by legislation enacted in 1968.

Fannie Mae provides funds to the mortgage market primarily by purchasing mortgage loans from lenders. Fannie Mae acquires funds to purchase mortgage loans from many capital market investors that may not ordinarily invest in mortgages. In so doing, it expands the total amount of funds available for housing. Operating nationwide, Fannie Mae helps to redistribute mortgage funds from capital-surplus to capital-short areas.

*Fannie Mae Certificates*. Fannie Mae certificates are either guaranteed mortgage pass-through certificates or stripped mortgage-backed securities. The following discussion of Fannie Mae certificates applies equally to both types of Fannie Mae certificates, except as otherwise indicated. Each Fannie Mae certificate included in the trust fund for a series will represent a fractional undivided interest in a pool of mortgage loans formed by Fannie Mae. Each pool formed by Fannie Mae will consist of mortgage loans of one of the following types:

- fixed-rate level installment conventional mortgage loans;

31

JPMC_DEX_000402792

- fixed-rate level installment mortgage loans that are insured by FHA or partially guaranteed by the VA;

- adjustable rate conventional mortgage loans; or

- adjustable rate mortgage loans that are insured by the FHA or partially guaranteed by the VA.

Each mortgage loan must meet the applicable standards set forth under the Fannie Mae purchase program. Each of those mortgage loans will be secured by a first lien on a one- to four-family residential property.

Each Fannie Mae certificate will be issued pursuant to a trust indenture. Original maturities of substantially all of the conventional, level payment mortgage loans underlying a Fannie Mae certificate are expected to be between either 8 to 15 years or 20 to 40 years. The original maturities of substantially all of the fixed rate level payment FHA Loans or VA Loans are expected to be 30 years.

Mortgage loans underlying a Fannie Mae certificate may have annual interest rates that vary by as much as two percentage points from each other. The rate of interest payable on a Fannie Mae guaranteed mortgage-backed certificate and the series pass-through rate payable with respect to a Fannie Mae stripped mortgage-backed securities is equal to the lowest interest rate of any mortgage loan in the related pool, less a specified minimum annual percentage representing servicing compensation and Fannie Mae's guaranty fee. Under a regular servicing option pursuant to which the mortgagee or other servicer assumes the entire risk of foreclosure losses, the annual interest rates on the mortgage loans underlying a Fannie Mae certificate will be between 50 basis points and 250 basis points greater than the annual pass-through rate, in the case of a Fannie Mae guaranteed mortgage-backed certificate, or the series pass-through rate in the case of a Fannie Mae stripped mortgage-backed security. Under a special servicing option (pursuant to which Fannie Mae assumes the entire risk for foreclosure losses), the annual interest rates on the mortgage loans underlying a Fannie Mae certificate will generally be between 55 basis points and 255 basis points greater than the annual pass-through rate, in the case of a Fannie Mae guaranteed mortgage-backed certificate, or the series pass-through rate in the case of a Fannie Mae stripped mortgage-backed security.

Fannie Mae guarantees to each registered holder of a Fannie Mae certificate that it will distribute on a timely basis amounts representing that holder's proportionate share of scheduled principal and interest payments at the applicable pass-through rate provided for by the Fannie Mae certificate on the underlying mortgage loans, whether or not received, and the holder's proportionate share of the full principal amount of any foreclosed or other finally liquidated mortgage loan, whether or not the principal amount is actually recovered. The obligations of Fannie Mae under its guarantees are obligations solely of Fannie Mae and are not backed by, nor entitled to, the full faith and credit of the United States. If Fannie Mae were unable to satisfy its obligations, distributions to holders of Fannie Mae certificates would consist solely of payments and other recoveries on the underlying mortgage loans and, accordingly, monthly distributions to holders of Fannie Mae certificates would be affected by delinquent payments and defaults on those mortgage loans.

32

Confidential

Fannie Mae stripped mortgage-backed securities are issued in series of two or more classes, with each class representing a specified undivided fractional interest in principal distributions and interest distributions, adjusted to the series pass-through rate, on the underlying pool of mortgage loans. The fractional interests of each class in principal and interest distributions are not identical, but the classes in the aggregate represent 100% of the principal distributions and interest distributions, adjusted to the series pass-through rate, on the respective pool. Because of the difference between the fractional interests in principal and interest of each class, the effective rate of interest on the principal of each class of Fannie Mae stripped mortgage-backed securities may be significantly higher or lower than the series pass-through rate and/or the weighted average interest rate of the underlying mortgage loans.

Unless otherwise specified by Fannie Mae, Fannie Mae certificates evidencing interests in pools of mortgages formed on or after May 1, 1985 will be available in book-entry form only. Distributions of principal and interest on each Fannie Mae certificate will be made by Fannie Mae on the 25th day of each month to the persons in whose name the Fannie Mae certificate is entered in the books of the Federal Reserve Banks, or registered on the Fannie Mae certificate register in the case of fully registered Fannie Mae certificates as of the close of business on the last day of the preceding month. With respect to Fannie Mae certificates issued in book-entry form, distributions on the Fannie Mae certificates will be made by wire, and with respect to fully registered Fannie Mae certificates, distributions on the Fannie Mae certificates will be made by check.

*Freddie Mac.* Freddie Mac is a publicly held United States government sponsored enterprise created pursuant to the Federal Home Loan Mortgage Corporation Act, Title III of the Emergency Home Finance Act of 1970, as amended. The common stock of Freddie Mac is owned by the Federal Home Loan Banks. Freddie Mac was established primarily for the purpose of increasing the availability of mortgage credit for the financing of urgently needed housing. It seeks to provide an enhanced degree of liquidity for residential mortgage investments primarily by assisting in the development of secondary markets for conventional mortgages. The principal activity of Freddie Mac currently consists of the purchase of first lien conventional mortgage loans FHA Loans, VA Loans or participation interests in those mortgage loans and the sale of the loans or participations so purchased in the form of mortgage securities, primarily Freddie Mac certificates. Freddie Mac is confined to purchasing, so far as practicable, mortgage loans that it deems to be of the quality, type and class which meet generally the purchase standards imposed by private institutional mortgage investors.

*Freddie Mac Certificates.* Each Freddie Mac certificate included in a trust fund for a series will represent an undivided interest in a pool of mortgage loans that may consist of first lien conventional loans, FHA Loans or VA Loans. Freddie Mac certificates are sold under the terms of a mortgage participation certificate agreement. A Freddie Mac certificate may be issued under either Freddie Mac's Cash Program or Guarantor Program. Typically, mortgage loans underlying the Freddie Mac certificates held by a trust fund will consist of mortgage loans with original terms to maturity of between 10 and 40 years. Each of those mortgage loans must meet the applicable standards set forth in the law governing Freddie Mac. A Freddie Mac certificate group may include whole loans, participation interests in whole loans and undivided interests in whole loans and/or participations comprising another Freddie Mac certificate group. Under the

33

JPMC_DEX_000402794

guarantor program, any Freddie Mac certificate group may include only whole loans or participation interests in whole loans.

Freddie Mac guarantees to each registered holder of a Freddie Mac certificate the timely payment of interest on the underlying mortgage loans to the extent of the applicable certificate rate on the registered holder's pro rata share of the unpaid principal balance outstanding on the underlying mortgage loans in the Freddie Mac certificate group represented by a Freddie Mac certificate, whether or not received. Freddie Mac also guarantees to each registered holder of a Freddie Mac certificate ultimate receipt by a holder of all principal on the underlying mortgage loans, without any offset or deduction, to the extent of that holder's pro rata share, but does not, except if and to the extent specified in the prospectus supplement for a series, guarantee the timely payment of scheduled principal. Under Freddie Mac's Gold PC Program, Freddie Mac guarantees the timely payment of principal based on the difference between the pool factor published in the month preceding the month of distribution and the pool factor published in the related month of distribution. Pursuant to its guarantees, Freddie Mac indemnifies holders of Freddie Mac certificates against any diminution in principal by reason of charges for property repairs, maintenance and foreclosure. Freddie Mac may remit the amount due on account of its guarantee of collection of principal at any time after default on an underlying mortgage loan, but not later than (1) 30 days following foreclosure sale, (2) 30 days following payment of the claim by any mortgage insurer, or (3) 30 days following the expiration of any right of redemption, whichever occurs later, but in any event no later than one year after demand has been made upon the mortgagor for accelerated payment of principal. In taking actions regarding the collection of principal after default on the mortgage loans underlying Freddie Mac certificates, including the timing of demand for acceleration, Freddie Mac reserves the right to exercise its judgment with respect to the mortgage loans in the same manner as for mortgage loans which it has purchased but not sold. The length of time necessary for Freddie Mac to determine that a mortgage loan should be accelerated varies with the particular circumstances of each mortgagor, and Freddie Mac has not adopted standards which require that the demand be made within any specified period.

Freddie Mac certificates are not guaranteed by the United States or by any Federal Home Loan Bank and do not constitute debts or obligations of the United States or any Federal Home Loan Bank. The obligations of Freddie Mac under its guarantee are obligations solely of Freddie Mac and are not backed by, nor entitled to, the full faith and credit of the United States. If Freddie Mac were unable to satisfy its obligations, distributions to holders of Freddie Mac certificates would consist solely of payments and other recoveries on the underlying mortgage loans and, accordingly, monthly distributions to holders of Freddie Mac certificates would be affected by delinquent payments and defaults on those mortgage loans.

Registered holders of Freddie Mac certificates are entitled to receive their monthly pro rata share of all principal payments on the underlying mortgage loans received by Freddie Mac, including any scheduled principal payments, full and partial prepayments of principal and principal received by Freddie Mac by virtue of condemnation, insurance, liquidation or foreclosure, and repurchases of the mortgage loans by Freddie Mac or by the party that sold the related mortgage loans to Freddie Mac. Freddie Mac is required to remit each registered Freddie Mac certificateholder's pro rata share of principal payments on the underlying mortgage loans,

34

Confidential

interest at the Freddie Mac pass-through rate and any other sums like prepayment fees, within 60 days of the date on which those payments are deemed to have been received by Freddie Mac.

Under Freddie Mac's Cash Program, with respect to pools formed prior to June 1, 1987, there is no limitation on be amount by which interest rates on the mortgage loans underlying a Freddie Mac certificate may exceed the pass-through rate on the Freddie Mac certificate. With respect to Freddie Mac certificates issued on or after June 1, 1987, the maximum interest rate on the mortgage loans underlying those Freddie Mac certificates may exceed the pass-through rate of the Freddie Mac certificates by 50 to 100 basis points. Under that program, Freddie Mac purchases groups of whole mortgage loans from sellers at specified percentages of their unpaid principal balances, adjusted for accrued or prepaid interest, which when applied to the interest rate of the mortgage loans and participations purchased, results in the yield expressed as a percentage required by Freddie Mac. The required yield, which includes a minimum servicing fee retained by the servicer, is calculated using the outstanding principal balance. The range of interest rates on the mortgage loans and participations in a Freddie Mac certificate group under the Cash Program will vary since mortgage loans and participations are purchased and assigned to a Freddie Mac certificate group based upon their yield to Freddie Mac rather than on the interest rate on the underlying mortgage loans.

Under Freddie Mac's Guarantor Program, the pass-through rate on a Freddie Mac certificate is established based upon the lowest interest rate on the underlying mortgage loans, minus a minimum servicing fee and the amount of Freddie Mac's management and guaranty income as agreed upon between the seller and Freddie Mac. For Freddie Mac certificate groups formed under the Guarantor Program with certificate numbers beginning with 18-012, the range between the lowest and the highest annual interest rates on the mortgage loans in a Freddie Mac certificate group may not exceed two percentage points.

Freddie Mac certificates duly presented for registration of ownership on or before the last business day of a month are registered effective as of the first day of the month. The first remittance to a registered holder of a Freddie Mac certificate will be distributed so as to be received normally by the 15th day of the second month following the month in which the purchaser became a registered holder of the Freddie Mac certificates. Subsequent remittances will be distributed monthly to the registered holder so as to be received normally by the 15th day of each month. The Federal Reserve Bank of New York maintains book-entry accounts with respect to Freddie Mac certificates sold by Freddie Mac on or after January 2, 1985, and makes payments of principal and interest each month to the registered holders of Freddie Mac certificates in accordance with the holders' instructions.

*Stripped Mortgage-Backed Securities.* Agency securities may consist of one or more stripped mortgage-backed securities, each as described in this prospectus and in the related prospectus supplement. Each Agency security which consists of one or more stripped mortgage-backed securities will represent an undivided interest in all or part of either the principal distributions or the interest distributions, or in some specified portion of the principal and interest distributions, on particular Freddie Mac, Fannie Mae, Ginnie Mae or other government agency or government-sponsored agency certificates. The underlying securities will be held under a trust agreement by Freddie Mac, Fannie Mae, Ginnie Mae or another government agency or government-sponsored agency, each as trustee, or by another trustee named in the related

35

prospectus supplement. Freddie Mac, Fannie Mae, Ginnie Mae or another government agency or government-sponsored agency will guarantee each stripped agency security to the same extent as the applicable entity guarantees the underlying securities backing the stripped agency security, unless otherwise specified in the related prospectus supplement.

*Other Agency Securities.* If specified in the related prospectus supplement, a trust fund may include other mortgage pass-through certificates issued or guaranteed by Ginnie Mae, Fannie Mae, Freddie Mac or other government agencies or government-sponsored agencies. The characteristics of any other mortgage pass-through certificates issued or guaranteed by Ginnie Mae, Fannie Mae, Freddie Mac or other government agencies or government-sponsored agencies will be described in that prospectus supplement. If so specified, a combination of different types of agency securities may be held in a trust fund.

**Private Mortgage-Backed Securities**

*General.* Private mortgage-backed securities may consist of mortgage pass-through certificates evidencing an undivided interest in an asset pool, or collateralized mortgage obligations secured by an asset pool. Each asset pool will consist either of loans or mortgage-backed securities that would otherwise qualify for inclusion as trust assets under this prospectus. Private mortgage-backed securities will have been issued pursuant to an agreement that will be described in the related prospectus supplement. That agreement will have appointed a trustee to act for the benefit of the PMBS holders. The PMBS trustee or its agent, or a custodian, will possess the loans underlying the private mortgage-backed security. Loans underlying a private mortgage-backed security will be serviced by the PMBS servicer directly or by one or more sub-servicers under the supervision of the PMBS servicer.

The issuer of the private mortgage-backed security will be a financial institution or other entity engaged generally in the business of mortgage lending or the acquisition of mortgage loans, a public agency or instrumentality of a state, local or federal government, or a limited purpose or other corporation organized for the purpose of, among other things, establishing trusts and acquiring and selling housing loans to those trusts and selling beneficial interests in those trusts. If so specified in the prospectus supplement, the PMBS issuer may be an affiliate of the depositor. If the PMBS issuer is not an affiliate of the depositor, the related private mortgage-backed security:

- will be acquired in the secondary market and not pursuant to an initial offering of the securities,

- the related PMBS issuer will generally not be involved in the issuance of the securities other than as set forth in the next two succeeding sentences, and

- will have previously been registered under the Securities Act of 1933 or will be freely transferable pursuant to Rule 144(k) promulgated under the Securities Act of 1933.

The obligations of the PMBS issuer will generally be limited to representations and warranties with respect to the assets conveyed by it to the related trust. Unless otherwise specified in the related prospectus supplement, the PMBS issuer will not have guaranteed any of the assets

36

conveyed to the related trust or any of the PMBS. Additionally, although the mortgage loans underlying the private mortgage-backed securities may be guaranteed by an agency or instrumentality of the United States, the private mortgage-backed securities themselves will not be so guaranteed.

Distributions of principal and interest will be made on the private mortgage-backed securities on the dates specified in the related prospectus supplement. The private mortgage-backed securities may be entitled to receive nominal or no principal distributions or nominal or no interest distributions. Principal and interest distributions will be made on the private mortgage-backed securities by the PMBS trustee or the PMBS servicer. The PMBS issuer or the PMBS servicer may have the right to repurchase assets underlying the private mortgage-backed securities after a specified date or under other circumstances specified in the related prospectus supplement.

*Underlying Loans.* The mortgage loans underlying the private mortgage-backed securities may consist of, but are not limited to, fixed rate, level payment, fully amortizing or graduated payment mortgage loans, buydown loans, adjustable rate mortgage loans, loans having balloon or other special payment features, home equity loans, including closed-end loans and revolving lines of credit, home improvement contracts, manufactured housing contracts and cooperative loans. As described in the prospectus supplement,

- no mortgage loan underlying the private mortgage-backed securities will have had a combined loan-to-value ratio at origination in excess of the percentage set forth in the related prospectus supplement,

- the underlying mortgage loan may have had an original term to stated maturity of not less than 5 years and not more than 40 years or any other term specified in the related prospectus supplement,

- the underlying mortgage loan, other than cooperative loans, may be required to be covered by a standard hazard insurance policy, which may be a blanket policy, and

- the underlying mortgage loan other than cooperative loans or contracts secured by a manufactured home, may be covered by a Title Insurance policy.

*Credit Support Relating to Private Mortgage-Backed Securities.* Credit support in the form of subordination of other private mortgage certificates issued under the same issuance agreement, reserve funds, insurance policies, letters of credit, financial guaranty insurance policies, derivative agreements, guarantees or other types of credit support may be provided with respect to the mortgage loans underlying the PMBS or with respect to the PMBS themselves.

*Additional Information.* The prospectus supplement for a series for which the related trust fund includes private mortgage-backed securities will specify:

(1)     the aggregate approximate principal amount and type of the private mortgage-backed securities to be included in the trust fund;

37

JPMC_DEX_000402798

(2)     characteristics of the mortgage loans underlying the private mortgage-backed securities including (A) the payment features of the mortgage loans, (B) the approximate aggregate principal balance, if known, of underlying mortgage loans insured or guaranteed by a governmental entity, (C) the servicing fee or range of servicing fees with respect to the underlying mortgage loans, and (D) the minimum and maximum stated maturities of the underlying mortgage loans at origination;

(3)     the maximum original term-to-stated maturity of the private mortgage-backed securities;

(4)     the weighted average term-to-stated maturity of the private mortgage-backed securities;

(5)     the pass-through or certificate rate of the private mortgage-backed securities;

(6)     the weighted average pass-through or certificate rate of the private mortgage-backed securities;

(7)     the PMBS issuer, the PMBS servicer, and the PMBS trustee for the private mortgage-backed securities;

(8)     characteristics of credit support, if any, such as reserve funds, insurance policies, derivative agreements, letters of credit or guarantees relating to the mortgage loans underlying the private mortgage-backed securities or to the private mortgage-backed securities themselves;

(9)     the terms on which the underlying mortgage loans for the private mortgage-backed securities may, or are required to, be purchased prior to their stated maturity or the stated maturity of the private mortgage-backed securities; and

(10)    the terms on which other mortgage loans may be substituted for those originally underlying the private mortgage-backed securities.

**Representations by Sellers or Originators; Repurchases**

Each seller or originator of loans that are included in a trust fund for a series of securities will have made representations and warranties in respect of the loans sold by that seller or originated by that originator. Unless otherwise specified in the related prospectus supplement, the representations and warranties typically include the following:

- The information set forth in the schedule relating to the loans attached to the applicable sale agreement is true and correct in all material respects;

- Title Insurance, or in the case of properties located in areas where those policies are generally not available, an attorney's certificate of title, and any required hazard insurance policy were effective at origination of each loan, other than a cooperative loan, and that each policy, or certificate of title as applicable, remained in effect on the

38

JPMC_DEX_000402799

date of purchase of the loan from the originator by the seller or the depositor or from the seller by or on behalf of the depositor;

- The seller or originator had good title to each loan and that loan was subject to no offsets, defenses, counterclaims or rights of rescission except to the extent that any buydown agreement may forgive some indebtedness of a borrower;

- Each loan constituted a valid lien on, or a perfected security interest with respect to, the related property, subject only to permissible liens disclosed, if applicable, Title Insurance exceptions, if applicable, and other exceptions described in the related agreement, and that the property was free from damage and was in acceptable condition;

- There were no delinquent tax or assessment liens against the property;

- No required payment on a loan was delinquent more than the number of days specified in the related prospectus supplement;

- Each loan was made in compliance with, and is enforceable under, all applicable local, state and federal laws and regulations in all material respects;

- The terms of the mortgage note and mortgage have not been impaired, waived, altered or modified in any respect, other than by a written instrument which has been recorded;

- The related mortgaged property is undamaged by water, fire, earthquake or earth movement, windstorm, flood, tornado or other casualty so as to materially affect adversely the value of the mortgaged property;

- The mortgage or mortgage note contains an enforceable provision, to the extent not prohibited by law, for the acceleration of the payment of the unpaid principal balance of the mortgage loan in the event that the related mortgaged property is sold or transferred without the prior written consent of the mortgagee;

- All provisions of any primary mortgage insurance policies have been and are being complied with; and

- The mortgage has not been satisfied, cancelled, subordinated or rescinded, in whole or in part, and the related mortgage property has not been released from the lien of the mortgage, in whole or in part, nor has any instrument been executed that would effect any such satisfaction, release, cancellation, subordination or rescission.

However, the prospectus supplement relating to a series of securities may contain additional or different representations and warranties for the loans in the related trust fund.

If so specified in the related prospectus supplement, the representations and warranties of a seller or originator in respect of a loan will be made not as of the cut-off date but as of the

39

JPMC_DEX_000402800

closing date or the date on which the applicable originator sold the loan to the seller or the depositor or the applicable seller sold the loan to the depositor or one of its affiliates. Under those circumstances, a substantial period of time may have elapsed between the sale date and the date of initial issuance of the series of securities evidencing an interest in the loan. Since the representations and warranties of a seller or originator do not address events that may occur following the sale of a loan by that seller or originator, its repurchase obligation described in this prospectus will not arise if the relevant event that would otherwise have given rise to a repurchase obligation with respect to a loan occurs after the date of sale of the loan by the applicable originator or seller. However, the depositor will not include any loan in the trust fund for any series of securities if anything has come to the depositor's attention that would cause it to believe that the representations and warranties of a seller or originator will not be accurate and complete in all material respects in respect of the loan as of the date of initial issuance of the related series of securities. If the master servicer is also a seller or originator of loans with respect to a particular series of securities, the representations will be in addition to the representations and warranties made by the master servicer in its capacity as a master servicer.

The master servicer or the trustee, if the master servicer is also the seller or originator, will promptly notify the relevant seller or originator of any breach of any representation or warranty made by it in respect of a loan which materially and adversely affects the interests of the securityholders in the loan. If the applicable seller or originator cannot cure a breach within the time period specified in the related prospectus supplement following notice from the master servicer or the trustee, as the case may be, then that seller or originator will be obligated either (1) to repurchase the loan from the trust fund at a price equal to 100% of its unpaid principal balance as of the date of the repurchase plus accrued interest on the unpaid principal balance to the first day of the month following the month of repurchase at the loan interest rate, less any advances or amount payable as related servicing compensation if the seller or originator is the master servicer, or (2) substitute for the loan a replacement loan that satisfies the criteria specified in the related prospectus supplement. If a REMIC election is to be made with respect to a trust fund, the master servicer or a holder of the related residual certificate generally will be obligated to pay any prohibited transaction tax which may arise in connection with any repurchase or substitution and the trustee must have received a satisfactory opinion of counsel that the repurchase or substitution will not cause the trust fund to lose its status as a REMIC or otherwise subject the trust fund to a prohibited transaction tax. The master servicer may be entitled to reimbursement for any payment from the assets of the related trust fund or from any holder of the related residual certificate. See "Description of the Securities—General." Except in those cases in which the master servicer is the seller or originator, the master servicer will be required under the applicable agreement to enforce this obligation for the benefit of the trustee and the holders of the securities, following the practices it would employ in its good faith business judgment were it the owner of the loan. This repurchase or substitution obligation will constitute the sole remedy available to holders of securities or the trustee for a breach of representation by a seller or originator.

Neither the depositor nor the master servicer, unless the master servicer is the seller or originator, will be obligated to purchase or substitute a loan if a seller or originator defaults on its obligation to do so, and no assurance can be given that sellers or originators will carry out their respective repurchase or substitution obligations with respect to loans. However, to the extent that a breach of a representation and warranty of a seller or originator may also constitute a

40

Confidential

JPMC_DEX_000402801

breach of a representation made by the master servicer, the master servicer may have a repurchase or substitution obligation as described under "The Agreements—Assignment of Trust Fund Assets."

**Substitution of Trust Fund Assets**

Substitution of trust fund assets will be permitted in the event of breaches of representations and warranties with respect to any original trust fund asset or in the event the documentation with respect to any trust fund asset is determined by the trustee to be incomplete. The period during which the substitution will be permitted will be indicated in the related prospectus supplement. Substitution of trust fund assets will be permitted if, among other things, the credit criteria relating to the origination of the initial trust fund assets is substantially equivalent to the credit criteria relating to the origination of the substitute trust fund assets. The related prospectus supplement will describe any other conditions upon which trust fund assets may be substituted for trust fund assets initially included in the trust fund.

**Use of Proceeds**

The depositor will apply all or substantially all of the net proceeds from the sale of each series of securities for one or more of the following purposes:

- to purchase the related trust fund assets;

- to establish any pre-funding account, capitalized interest account or reserve account as described in the related prospectus supplement; and

- to pay the costs of structuring and issuing the securities, consisting generally of legal, accounting and rating agency fees and the costs of obtaining any credit enhancement as described under "Credit Enhancement".

The depositor expects to sell securities in series from time to time, but the timing and amount of offerings of securities will depend on a number of factors, including the volume of trust fund assets acquired by the depositor, prevailing interest rates, availability of funds and general market conditions.

**The Depositor**

J.P. Morgan Acceptance Corporation I, a Delaware corporation incorporated on June 27, 1988, is a direct, wholly-owned subsidiary of JPMorgan Securities Holdings LLC and will act as the depositor for the trust with respect to each series of securities. The principal executive offices of the depositor are located at 270 Park Avenue, New York, New York 10017. As depositor it will establish the trust and will be the party that deposits, sells or otherwise conveys the trust fund assets to the trust. Its telephone number is (212) 270-8863.

The depositor has been engaged in the securitization of loans, contracts and mortgage-backed securities since its incorporation. The depositor is generally engaged in the business of acting as depositor of one or more trusts that issues series of notes, bonds or other evidence or indebtedness and certificates that are secured by or represent interests in the assets of a trust

41

JPMC_DEX_000402802

fund. The depositor is also generally engaged in acquiring, owning, holding and pledging as collateral and otherwise dealing with loans and mortgaged-backed securities. The depositor acquires the loans and mortgaged-backed securities for inclusion in a securitization from the sponsor, or if specified in the prospectus supplement, from another seller, in each case in privately negotiated transactions.

The certificate of incorporation of the depositor provides that the depositor may not conduct any activities other than those related to issuing and selling one or more series of securities, acquiring and selling loans and mortgage-backed securities, serving as depositor of the trusts and engaging in activities incidental to the foregoing.

The depositor will have limited obligations with respect to a series of securities. The depositor will obtain representations and warranties from the originators, sponsor or other sellers regarding the assets included in the related trust fund. The depositor will also assign to the trustee for the related series the depositor's rights with respect to those representations and warranties. See "The Agreements -Assignment of the Trust Fund Assets." In addition, after the issuance of a series of securities, the depositor may have limited obligations with respect to that series which may include making filings necessary to maintain the perfected status of a trustee's securities interest or lien on the related assets, appointing a successor master servicer, securities administrator, trustee or other transaction participant that resigns or is otherwise removed, preparation of any reports filed under the Exchange Act and providing notices and other information to certain parties under the operative agreements.

The depositor does not have, nor is it expected in the future to have, any significant assets. Neither the depositor nor any of the depositor's affiliates will insure or guarantee distributions on the securities of any series.

## The Sponsor

### General

Unless otherwise specified in the prospectus supplement, J.P. Morgan Mortgage Acquisition Corp. will act as sponsor of the trust fund. Any other entity that acts as sponsor instead of J.P. Morgan Mortgage Acquisition Corp. will be described in the related prospectus supplement. A sponsor will organize and initiate a securitization by selling or otherwise transferring assets directly or indirectly, through an affiliate, to the depositor for sale or transfer to a trust.

JPMAC, a Delaware corporation incorporated on July 12, 2002, is a direct, wholly-owned subsidiary of JPMorgan Chase Bank, N.A. The principal executive offices of the sponsor are located at 270 Park Avenue, New York, New York 10017. Its telephone number is (212) 270-8863.

### Securitization Activities of the Sponsor

JPMAC has been engaged in the securitization of assets since its incorporation. In connection with these activities, JPMAC uses special purpose entities, such as the depositor,

42

JPMC_DEX_000402803

primarily for (but not limited to) the securitization of commercial and residential mortgages and home equity loans.

During fiscal years 2004 and 2003, JPMAC securitized approximately $275,299,016 and $ 4,510,234,249 of residential mortgages, respectively. During this period, no securitizations sponsored by JPMAC have defaulted or experienced an early amortization or trigger event.

Through its affiliates, JPMAC services and master services loans. If specified in the prospectus supplement, a trust may include loans serviced and master serviced by one or more of these affiliates.

In the normal course of its securitization program, JPMAC acquires loans from third party originators and through its affiliates. Employees of JPMAC or its affiliates structure securitization transactions in which the loans are sold to the depositor. In consideration for the Assets which JPMAC sells to the depositor, the depositor issues the securities supported by the cash flows generated by the Assets.

Pursuant to the agreement conveying Assets from JPMAC to the depositor, JPMAC may make representations and warranties regarding the Assets. If it is later determined that the Assets fail to conform to the specified representations and warranties, JPMAC may have an obligation to repurchase such Assets from the depositor (or directly from the trustee) or it may have an obligation to indemnify the depositor (or the trustee) against any losses on the Assets. To the extent Assets being securitized have been originated by third parties, JPMAC will generally obtain appropriate representations and warranties from such third parties upon the acquisition of such Assets and will assign its rights under these representations and warranties for the benefit of the depositor (or the trustee). See The Trust Fund — Representations by Seller or Originators; Repurchases".

## Description of the Securities

Each series of certificates will be issued pursuant to separate pooling and servicing agreements or trust agreements among the depositor and the entities named in the related prospectus supplement as master servicer and trustee. A form of each of the pooling and servicing agreement and trust agreement has been filed as an exhibit to the registration statement of which this prospectus forms a part. Each series of notes will be issued pursuant to an indenture between the related trust fund and the entity named in the related prospectus supplement as indenture trustee, and the related loans will be serviced by the master servicer pursuant to a master servicing agreement or a sale and servicing agreement. A form of indenture and a form of master servicing agreement have been filed as exhibits to the registration statement of which this prospectus forms a part. A series of securities may consist of both notes and certificates. The provisions of each of the above agreements will vary depending upon the nature of the securities to be issued and the nature of the related trust fund. The following are descriptions of the material provisions which may appear in any of the above agreements. The prospectus supplement for a series of securities will describe more fully the provisions of the agreements for the related series. The descriptions are subject to, and are qualified in their entirety by reference to, all of the provisions of the agreements for each series of securities and the applicable prospectus supplement.

43

JPMC_DEX_000402804

**General**

The securities of each series will be issued in book-entry or fully registered form, in the authorized denominations specified in the related prospectus supplement. If the securities are certificates, they will evidence specified beneficial ownership interests in the assets of the related trust fund. If the securities are notes, they will be debt obligations secured by the assets of the related trust fund. The securities generally will not be entitled to payments in respect of the assets included in any other trust fund established by the depositor. However, if so specified in the related prospectus supplement, the securities may be entitled to payments in respect of the assets of other trust funds established by the depositor. In general, the securities will not represent obligations of the depositor or any affiliate of the depositor. A trust fund may include loans that are guaranteed or insured as set forth in the related prospectus supplement. Each trust fund will consist of, to the extent provided in the related agreement:

- the trust fund assets that are included from time to time in the related trust fund, exclusive of any retained interest described in the related prospectus supplement, including all payments of interest and principal received after the cut-off date with respect to the loans included in the trust fund assets to the extent not applied in computing the principal balance of the loans as of the cut-off date;

- the assets that from time to time have been deposited in the related security account, as described in this prospectus under "The Agreements—Payments on Loans; Deposits to Security Account";

- property which secured a loan and which is acquired on behalf of the securityholders by foreclosure or deed in lieu of foreclosure; and

- any insurance policies or other forms of credit enhancement required to be maintained pursuant to the related agreement.

If so specified in the related prospectus supplement, a trust fund may also include one or more of the following: reinvestment income on payments received on the trust fund assets, a reserve account, a mortgage pool insurance policy, a special hazard insurance policy, a bankruptcy bond, one or more letters of credit, a surety bond, guaranties or similar instruments or other agreements.

Each series of securities will be issued in one or more classes. Each class of certificates of a series will evidence beneficial ownership of a specified percentage or portion of future interest and principal payments on the related trust fund assets. A class of certificates may represent different specified percentages or portions of interest and principal payments on the related trust fund assets. In each case, that percentage or portion may be zero or may represent any other specified interest up to and including 100%, as specified in the related prospectus supplement. Each class of notes of a series will be secured by the related trust fund assets. A series of securities may include one or more classes that are senior in right to payment to one or more other classes of securities of the series. A series or classes of securities may be covered by insurance policies, surety bonds or other forms of credit enhancement, in each case as described under "Credit Enhancement" and in the related prospectus supplement. One or more classes of

44

JPMC_DEX_000402805

securities of a series may be entitled to receive distributions of principal, interest or any combination of principal or interest. Distributions on one or more classes of a series of securities may be made prior to one or more other classes, after the occurrence of specified events, in accordance with a schedule or formula or on the basis of collections from designated portions of the related trust fund assets, in each case as specified in the related prospectus supplement. The timing and amounts of distributions may vary among classes or over time as specified in the related prospectus supplement.

Distributions of principal and interest or of principal only or interest only, as applicable, on the related securities will be made by the trustee on each distribution date, which may be monthly, quarterly, semi-annually or at other intervals and on the dates as are specified in the related prospectus supplement. Distributions of principal and interest or of principal only or interest only, as applicable, will be made in proportion to the percentages specified in the related prospectus supplement. Distributions will be made to the persons in whose names the securities are registered at the close of business on the related record date specified in the related prospectus supplement. Distributions will be made in the manner specified in the related prospectus supplement to the persons entitled to distributions at the address appearing in the security register; provided, however, that the final distribution in retirement of the securities will be made only upon presentation and surrender of the securities at the office or agency of the trustee or other person specified in the notice to securityholders of that final distribution.

The securities will be freely transferable and exchangeable at the corporate trust office of the trustee as set forth in the related prospectus supplement. No service charge will be made for any registration of exchange or transfer of securities of any series, but the trustee may require payment of a sum sufficient to cover any related tax or other governmental charge.

Under current law the purchase and holding of a class of securities by or on behalf of any employee benefit plan or other retirement arrangement, including individual retirement accounts and annuities, Keogh plans and collective investment funds in which those plans, accounts or arrangements are invested, subject to provisions of ERISA or the Internal Revenue Code, could result in prohibited transactions, within the meaning of ERISA and the Internal Revenue Code. See "ERISA Considerations." Each prospectus supplement may identify one or more classes of securities that are restricted from purchases by plans. The transfer of securities of a restricted class will not be registered unless the transferee (i) represents that it is not, and is not purchasing on behalf of, any plan, account or arrangement or (ii) provides an opinion of counsel satisfactory to the trustee and the depositor that the purchase of securities of that class by or on behalf of that plan, account or arrangement is permissible under applicable law and will not subject the trustee, the master servicer or the depositor to any obligation or liability in addition to those undertaken in the agreements. If the restricted class of securities is held in book-entry form, the conditions in the preceding sentence may be deemed satisfied by the transferee's acceptance of the security.

As to each series, an election may be made to treat the related trust fund or designated portions of the trust fund as a REMIC as defined in the Internal Revenue Code. The related prospectus supplement will specify whether a REMIC election is to be made. Alternatively, the agreement for a series may provide that a REMIC election may be made at the discretion of the depositor or the master servicer and may only be made if specified conditions are satisfied. As to any of those series, the terms and provisions applicable to the making of a REMIC election will

45

JPMC_DEX_000402806

be set forth in the related prospectus supplement.  If a REMIC election is made with respect to a series, one of the classes will be designated as evidencing the sole class of "residual interests" in the related REMIC, as defined in the Internal Revenue Code.  All other classes of securities in that series will constitute "regular interests" in the related REMIC, as defined in the Internal Revenue Code.  As to each series with respect to which a REMIC election is to be made, the trustee, the master servicer or a holder of the related residual certificate will be obligated to take all actions required in order to comply with applicable laws and regulations and will be obligated to pay any prohibited transaction taxes.  The trustee or the master servicer may be entitled to reimbursement for any payment in respect of prohibited transaction taxes from the assets of the trust fund or from any holder of the related residual certificate if so specified in the related prospectus supplement.

**Distributions on Securities**

*General.*  In general, the method of determining the amount of distributions on a particular series of securities will depend on the type of credit support, if any, that is used with respect to the series.  See "Credit Enhancement."  Set forth below are descriptions of various methods that may be used to determine the amount of distributions on the securities of a particular series.  The prospectus supplement for each series of securities will describe the method to be used in determining the amount of distributions on the securities of that series.

Distributions allocable to principal and interest on the securities will be made by the trustee out of, and only to the extent of, funds in the related security account, including any funds transferred from any reserve account.  As between securities of different classes and as between distributions of principal, and, if applicable, between distributions of principal prepayments and scheduled payments of principal, and interest, distributions made on any distribution date will be applied as specified in the related prospectus supplement.  The prospectus supplement will also describe the method for allocating the distributions among securities of a particular class.

*Available Funds.*  All distributions on the securities of each series on each distribution date will be made from the available funds, in accordance with the terms described in the related prospectus supplement and specified in the agreement.  Available funds for each distribution date will generally equal the amount on deposit in the related security account allocable to the securities of that series on that distribution date, net of related fees and expenses payable by the related trust fund, other than amounts to be held in that security account for distribution on future distribution dates.  Distributions on any class of securities in a series may also be made from amounts received in respect of any derivative agreement with respect to such class.

*Distributions of Interest.*  Interest will accrue on each class of securities entitled to interest at the interest rate specified in the related prospectus supplement.  In any case, the rate will be a fixed rate per annum or a variable rate calculated in the method and for the periods described in the related prospectus supplement.  To the extent funds are available, interest accrued during the specified period on each class of securities entitled to interest, other than a class of securities that provides for interest that accrues, but is not currently payable will be distributable on the distribution dates specified in the related prospectus supplement until the aggregate class security balance of the securities of that class has been distributed in full or, in the case of securities entitled only to distributions allocable to interest, until the aggregate

46

Confidential

notional amount of those securities is reduced to zero or for the period of time designated in the related prospectus supplement. The original class security balance of each security will equal the aggregate distributions allocable to principal to which that security is entitled. Distributions allocable to interest on each security that is not entitled to distributions allocable to principal will be calculated based on the notional amount of that security. The notional amount of a security will not evidence an interest in or entitlement to distributions allocable to principal but will be used solely for convenience in expressing the calculation of interest and for other specified purposes.

Interest payable on the securities of a series on a distribution date will include all interest accrued during the period specified in the related prospectus supplement. In the event interest accrues over a period ending two or more days prior to a distribution date, the effective yield to securityholders will be reduced from the yield that would otherwise be obtainable if interest payable on the security were to accrue through the day immediately preceding that distribution date, and the effective yield at par to securityholders will be less than the indicated coupon rate.

*Distributions of Principal.* The related prospectus supplement will specify the method by which the amount of principal to be distributed on the securities on each distribution date will be calculated and the manner in which that amount will be allocated among the classes of securities entitled to distributions of principal. The aggregate class security balance of any class of securities entitled to distributions of principal generally will be the aggregate original class security balance of that class of securities specified in the related prospectus supplement, reduced by all distributions reported to the holders of that securities as allocable to principal and, (1) in the case of accrual securities, unless otherwise specified in the related prospectus supplement, increased by all interest accrued but not then distributable on the accrual securities and (2) in the case of adjustable rate securities, reduced by the effect of negative amortization, if applicable.

If so provided in the related prospectus supplement, one or more classes of securities will be entitled to receive all or a disproportionate percentage of the payments of principal which are received from borrowers, including principal prepayments, which are received in advance of their scheduled due dates and are not accompanied by amounts representing scheduled interest due after the month of those payments in the percentages and under the circumstances or for the periods specified in the prospectus supplement. Any allocation of those principal payments to a class or classes of securities will have the effect of accelerating the amortization of those securities while increasing the interests evidenced by one or more other classes of securities in the trust fund. Increasing the interests of the some classes of securities relative to that of other securities is intended to preserve the availability of the subordination provided by the other securities. See "Credit Enhancement—Subordination."

*Unscheduled Distributions.* If specified in the related prospectus supplement, the securities may receive distributions before the next scheduled distribution date under the circumstances and in the manner described in this prospectus and in that prospectus supplement. If applicable, the trustee will be required to make unscheduled distributions on the day and in the amount specified in the related prospectus supplement if, due to substantial payments of principal, including principal prepayments, on the trust fund assets, the trustee or the master servicer determines that the funds available or anticipated to be available from the security account and, if applicable, any reserve account, may be insufficient to make required

47

JPMC_DEX_000402808

distributions on the securities on the related distribution date. Typically, the amount of any unscheduled distribution that is allocable to principal will not exceed the amount that would otherwise have been required to be distributed as principal on the securities on the next distribution date; however, if so specified in the related prospectus supplement, it may. The unscheduled distributions may or may not include interest at the applicable pass-through rate, if any, or interest rate, if any, on the amount of the unscheduled distribution allocable to principal for the period and to the date specified in that prospectus supplement.

**Advances**

If so specified in the related prospectus supplement, the master servicer will be required to advance on or before each distribution date from its own funds, funds advanced by sub-servicers or funds held in the security account for future distributions to the holders of securities of the related series, an amount equal to the aggregate of payments of interest and/or principal that were delinquent on the date specified in the related prospectus supplement and were not advanced by any sub-servicer, net of the servicing fee. The master servicer will make advances if the master servicer determines that those advances may be recoverable out of late payments by borrowers, liquidation proceeds, insurance proceeds or otherwise. In the case of cooperative loans, the master servicer also may be required to advance any unpaid maintenance fees and other charges under the related proprietary leases as specified in the related prospectus supplement. In addition, to the extent provided in the related prospectus supplement, a cash account may be established to provide for advances to be made in the event of payment defaults or collection shortfalls on trust fund assets.

In making advances, the master servicer will endeavor to maintain a regular flow of scheduled interest and principal payments to holders of the securities, rather than to guarantee or insure against losses. If advances are made by the master servicer from cash being held for future distribution to securityholders, the master servicer will replace those funds on or before any future distribution date to the extent that funds in the applicable security account on that distribution date would be less than the amount required to be available for distributions to securityholders on that date. Any master servicer funds advanced will be reimbursable to the master servicer out of recoveries on the specific loans with respect to which the advances were made, e.g., late payments made by the related borrower, any related insurance proceeds, liquidation proceeds or proceeds of any loan purchased by the depositor, a sub-servicer or a seller pursuant to the related agreement. Advances by the master servicer, and any advances by a sub-servicer, also will be reimbursable to the master servicer, or sub-servicer, from cash otherwise distributable to securityholders, including the holders of senior securities, to the extent that the master servicer determines that any advances previously made are not ultimately recoverable as described above. To the extent provided in the related prospectus supplement, the master servicer also will be obligated to make advances, to the extent recoverable out of insurance proceeds, liquidation proceeds or otherwise, in respect of taxes and insurance premiums not paid by borrowers on a timely basis. Funds so advanced are reimbursable to the master servicer to the extent permitted by the related agreement. The obligations of the master servicer to make advances may be supported by a cash advance reserve fund, a surety bond or other arrangement, in each case as described in the related prospectus supplement.

48

JPMC_DEX_000402809

If so specified in the related prospectus supplement, in the event the master servicer or a sub-servicer fails to make a required advance, the trustee will be obligated to make an advance in its capacity as successor servicer. If the trustee makes an advance, it will be entitled to be reimbursed for that advance to the same extent and degree as the master servicer or a sub-servicer is entitled to be reimbursed for advances. See "—Distributions on Securities" above.

**Reports to Securityholders**

Prior to or concurrently with each distribution on a distribution date, the master servicer or the trustee will furnish to each securityholder of record of the related series a statement setting forth, to the extent applicable to that series of securities, among other things:

- the amount of the distribution allocable to principal, separately identifying the aggregate amount of any principal prepayments and if so specified in the related prospectus supplement, any applicable prepayment penalties included in that distribution;

- the amount of the distribution allocable to interest and how it was calculated;

- the amount of any unpaid interest shortfall;

- the amount of any advance;

- the aggregate amount (1) otherwise allocable to the subordinated securityholders on that distribution date, or (2) withdrawn from the reserve account, if any, that is included in the amounts distributed to the senior securityholders;

- the outstanding principal balance or notional amount of each class of the related series after giving effect to the distribution of principal on that distribution date;

- the outstanding principal balance for any pool and the principal balance of the loans in any pool at the end of the related prepayment period, and the applicable net mortgage rate of the loans in any pool at the beginning of the related due period;

- the percentage of principal payments on the loans, excluding prepayments, if any, which each class will be entitled to receive on the following distribution date;

- the percentage of principal prepayments on the loans, if any, which each class will be entitled to receive on the following distribution date;

- the related amount of the servicing compensation retained or withdrawn from the security account by the master servicer, and the amount of additional servicing compensation received by the master servicer attributable to penalties, fees, excess liquidation proceeds and other similar charges and items;

- the number and aggregate principal balances of loans that are either delinquent, but not in foreclosure or are in foreclosure, (1) 1 to 30 days, (2) 31 to 60 days, (3) 61 to 90

49

JPMC_DEX_000402810

days and (4) 91 or more days, as of the close of business on the last day of the calendar month preceding that distribution date;

- with respect to any pool, the cumulative amount of realized losses incurred since the closing date;

- the book value of any real estate acquired through foreclosure or grant of a deed in lieu of foreclosure;

- the pass-through rate or interest rate, as applicable, if adjusted from the date of the last statement, of any class expected to be applicable to the next distribution to that class;

- if applicable, the amount remaining in any reserve account at the close of business on the distribution date;

- the pass-through rate or interest rate, as applicable, as of the day prior to the immediately preceding distribution date; and

- any amounts remaining under letters of credit, pool policies or other forms of credit enhancement.

Where applicable, any amount set forth above may be expressed as a dollar amount per single security of the relevant class having the percentage interest specified in the related prospectus supplement. The report to securityholders for any series of securities may include additional or other information of a similar nature to that specified above.

In addition, within a reasonable period of time after the end of each calendar year, the master servicer or the trustee will mail to each securityholder of record at any time during that calendar year a report (a) as to the aggregate of amounts reported pursuant to (1) and (2) above for that calendar year or, in the event that person was a securityholder of record during a portion of that calendar year, for the applicable portion of that year and (b) any other customary information as may be deemed necessary or desirable for securityholders to prepare their tax returns.

**Categories of Classes of Securities**

The securities of any series may be comprised of one or more classes. Classes of securities, in general, fall into different categories. The following chart identifies and generally describes the more typical categories. The prospectus supplement for a series of securities may identify the classes which comprise that series by reference to the following categories.

Categories of Classes

Principal Types

| | |
|---|---|
| Accretion Directed .......................................... | A class that receives principal payments from the accreted interest from specified accrual classes. An accretion directed class also may |

50

Confidential

|  | receive principal payments from principal paid on the underlying trust fund assets for the related series. |
|---|---|
| Component Securities | A class consisting of components. The components of a class of component securities may have different principal and/or interest payment characteristics but together constitute a single class. Each component of a class of component securities may be identified as falling into one or more of the categories in this chart. |
| Lockout/NAS Securities | A class that will not be entitled to payments of principal for a specified number of distribution dates following the related closing date. |
| Notional Amount Securities | A class having no principal balance and bearing interest on a notional amount. The notional amount is used for purposes of the determination of interest distributions. |
| Planned Principal Class or PACs | A class that is designed to receive principal payments using a predetermined principal balance schedule derived by assuming two constant prepayment rates for the underlying trust fund assets. These two rates are the endpoints for the "structuring range" for the planned principal class. The planned principal classes in any series of securities may be subdivided into different categories—e.g., primary planned principal classes, secondary planned principal classes and so forth—having different effective structuring ranges and different principal payment priorities. The structuring range for the secondary planned principal class of a series of securities will be narrower than that for the primary planned principal class of that series. |
| Scheduled Principal Class | A class that is designed to receive principal payments using a predetermined principal balance schedule but is not designated as a planned principal class or targeted principal class. In many cases, the schedule is derived by assuming two constant prepayment rates for the underlying trust fund assets. These two rates |

51

JPMC_DEX_000402812

|  |  |
|---|---|
|  | are the endpoints for the "structuring range" for the scheduled principal class. |
| Senior Support Class............................. | A class of senior securities that will be allocated any realized losses that would otherwise be allocated to the related Super Senior Class until the principal balance of such Senior Support Class has been reduced to zero. |
| Sequential Pay Class.................................... | Classes that receive principal payments in a prescribed sequence, that do not have predetermined principal balance schedules and that under all circumstances receive payments of principal continuously from the first distribution date on which they receive principal until they are retired. A single class that receives principal payments before or after all other classes in the same series of securities may be identified as a sequential pay class. |
| Strip........................................................ | A class that receives a constant proportion, or "strip," of the principal payments on the underlying trust fund assets. |
| Super Senior Class ......................................... | A class of senior securities for which any realized losses that would otherwise be allocated to such class will instead be allocated to the related Senior Support Class until the principal balance of such Senior Support Class has been reduced to zero. |
| Support Class or Companion Class................ | A class that receives principal payments on any distribution date only if scheduled payments have been made on specified planned principal classes, targeted principal classes and/or scheduled principal classes on that distribution date. |
| Targeted Principal Class or TACs ................. | A class that is designed to receive principal payments using a predetermined principal balance schedule derived by assuming a single constant prepayment rate for the underlying trust fund assets. |

52

Confidential

Interest Types

| | |
|---|---|
| Fixed Rate | A class with an interest rate that is fixed throughout the life of that class. |
| Floating Rate | A class with an interest rate that resets periodically based upon a designated index and that varies directly with changes in that index as specified in the related prospectus supplement. Interest payable to a floating rate class on a distribution date may be subject to a cap based on the amount of funds available to pay interest on that distribution date. |
| Inverse Floating Rate | A class with an interest rate that resets periodically based upon a designated index as specified in the related prospectus supplement and that varies inversely with changes in that index. |
| Variable Rate | A class with an interest rate that resets periodically and is calculated by reference to the rate or rates of interest applicable to specified assets or instruments—e.g., the loan rates borne by the underlying loans. |
| Auction Rate | A class with an interest rate that resets periodically to an auction rate that is calculated on the basis of auction procedures described in the related prospectus supplement. |
| Interest Only | A class that receives some or all of the interest payments made on the underlying trust fund assets or other assets of the trust fund and little or no principal. Interest only classes have either a nominal principal balance or a notional amount. A nominal principal balance represents actual principal that will be paid on the class. It is referred to as nominal since it is extremely small compared to other classes. A notional amount is the amount used as a reference to calculate the amount of interest due on an interest only class that is not entitled to any distributions in respect of principal. |

53

Confidential

| | |
|---|---|
| Principal Only .................................................. | A class that does not bear interest and is entitled to receive distributions in respect of principal only. |
| Partial Accrual ................................................ | A class that accretes a portion of the amount of accrued interest with respect to that class. The accreted interest will not be distributed but will instead be added to the principal balance of that class on each applicable distribution date, with the remainder of the accrued interest to be distributed currently as interest on that class. This partial accrual without distribution may continue until a specified event has occurred or until the partial accrual class is retired. |
| Accrual .......................................................... | A class that accretes the full amount of accrued interest with respect to that class.<br><br>The accreted interest will not be distributed but will instead be added as principal to the principal balance of that class on each applicable distribution date. This accrual without distribution may continue until some specified event has occurred or until the accrual class is retired. |

**Indices Applicable to Floating Rate and Inverse Floating Rate Classes**

The indices applicable to floating rate and inverse floating rate classes will be LIBOR, COFI, the Treasury Index, the Prime Rate, the Federal Funds Rate, the CMT Rate, in each case calculated as described in this prospectus or any other index on debt described in the related prospectus supplement; provided however, that no index will be a commodities or securities index.

*LIBOR*

On the date specified in the related prospectus supplement for any class of securities the interest rate of which is determined by reference to an index designated as LIBOR, the calculation agent designated in the prospectus supplement will determine LIBOR for the related interest accrual period. On that determination date, the calculation agent will determine the quotations, as of 11:00 a.m., London time, offered by the principal London office of each of the designated reference banks meeting the criteria set forth below, for making one-month, six-month or one-year, as applicable, United States dollar deposits in the London Interbank market. The calculation agent will determine those quotations by reference to the Reuters Screen LIBOR Page, as defined in the International Swap Dealers Association, Inc. Code of Standard Wording, Assumptions and Provisions for Swaps, 1986 Edition, or to the Telerate Screen Page 3750. In lieu of relying on the quotations for those reference banks that appear at that time on the Reuters

54

Confidential

Screen LIBOR Page or on the Telerate Screen Page 3750, the calculation agent may request each of the reference banks to provide offered quotations at that time.

LIBOR will be established as follows:

(a)     If on any LIBOR determination date two or more reference banks provide offered quotations, LIBOR for the next interest accrual period shall be the arithmetic mean of the offered quotations (rounded upwards if necessary to the nearest whole multiple of 1/32%).

(b)     If on any LIBOR determination date only one or none of the reference banks provides offered quotations, LIBOR for the next interest accrual period shall be whichever is the higher of (1) LIBOR as determined on the previous LIBOR determination date or (2) the reserve interest rate, which is the rate per annum which the calculation agent determines to be either (a) the arithmetic mean, rounded upwards if necessary to the nearest whole multiple of 1/32%, of the one-month United States dollar lending rates that New York City banks selected by the calculation agent are quoting, on the relevant LIBOR determination date, to the principal London offices of at least two of the reference banks to which quotations are, in the opinion of the calculation agent, being so made, or (b) in the event that the calculation agent can determine no arithmetic mean, the lowest one-month United States dollar lending rate which New York City banks selected by the calculation agent are quoting on the LIBOR determination date to leading European banks.

(c)     If on any LIBOR determination date for a class specified in the related prospectus supplement, the calculation agent is required but is unable to determine the reserve interest rate in the manner provided in paragraph (b) above, LIBOR for the next interest accrual period shall be LIBOR as determined on the preceding LIBOR determination date, or, in the case of the first LIBOR determination date, LIBOR shall be deemed to be the per annum rate specified as such in the related prospectus supplement.

Each reference bank (1) shall be a leading bank engaged in transactions in Eurodollar deposits in the international Eurocurrency market; (2) shall not control, be controlled by, or be under common control with the calculation agent; and (3) shall have an established place of business in London.  If any reference bank should be unwilling or unable to act or if appointment of any reference bank is terminated, another leading bank meeting the criteria specified above will be appointed.

The establishment of LIBOR on each LIBOR determination date by the calculation agent and its calculation of the rate of interest for the applicable classes for the related interest accrual period shall, in the absence of manifest error, be final and binding.

*COFI*

On the date specified in the related prospectus supplement for any class of securities the interest rate of which is determined by reference to an index designated as COFI, the calculation agent designated in the prospectus supplement will ascertain the Eleventh District Cost of Funds Index for the related interest accrual period.  The Eleventh District Cost of Funds Index is designed to represent the monthly weighted average cost of funds for savings institutions in Arizona, California and Nevada that are member institutions of the Eleventh Federal Home Loan

55

JPMC_DEX_000402816

Bank District.  The Eleventh District Cost of Funds Index for a particular month reflects the interest costs paid on all types of funds held by Eleventh District member institutions and is calculated by dividing the cost of funds by the average of the total amount of those funds outstanding at the end of that month and of the prior month and annualizing and adjusting the result to reflect the actual number of days in the particular month.  If necessary, before these calculations are made, the component figures are adjusted by the Federal Home Loan Bank of San Francisco, or FHLBSF, to neutralize the effect of events such as member institutions leaving the Eleventh District or acquiring institutions outside the Eleventh District.  The Eleventh District Cost of Funds Index is weighted to reflect the relative amount of each type of funds held at the end of the relevant month.  The major components of funds of Eleventh District member institutions are:

- savings deposits,

- time deposits,

- FHLBSF advances,

- repurchase agreements, and

- all other borrowings.

Because the component funds represent a variety of maturities whose costs may react in different ways to changing conditions, the Eleventh District Cost of Funds Index does not necessarily reflect current market rates.

A number of factors affect the performance of the Eleventh District Cost of Funds Index, which may cause it to move in a manner different from indices tied to specific interest rates, such as United States Treasury bills or LIBOR.  Because the liabilities upon which the Eleventh District Cost of Funds Index is based were issued at various times under various market conditions and with various maturities, the Eleventh District Cost of Funds Index may not necessarily reflect the prevailing market interest rates on new liabilities with similar maturities.  Moreover, as stated above, the Eleventh District Cost of Funds Index is designed to represent the average cost of funds for Eleventh District savings institutions for the month prior to the month in which it is due to be published.  Additionally, the Eleventh District Cost of Funds Index may not necessarily move in the same direction as market interest rates at all times, since, as longer term deposits or borrowings mature and are renewed at prevailing market interest rates, the Eleventh District Cost of Funds Index is influenced by the differential between the prior and the new rates on those deposits or borrowings.  In addition, movements of the Eleventh District Cost of Funds Index, as compared to other indices tied to specific interest rates, may be affected by changes instituted by the FHLBSF in the method used to calculate the Eleventh District Cost of Funds Index.

The FHLBSF publishes the Eleventh District Cost of Funds Index in its monthly Information Bulletin.  Any individual may request regular receipt by mail of Information Bulletins by writing the Federal Home Loan Bank of San Francisco, P.O. Box 7948, 600 California Street, San Francisco, California 94120, or by calling (415) 616-1000.  In addition, the

Confidential

JPMC_DEX_000402817

Eleventh District Cost of Funds Index may also be obtained by calling the FHLBSF at (415) 616-2600.

The FHLBSF has stated in its Information Bulletin that the Eleventh District Cost of Funds Index for a month "will be announced on or near the last working day" of the following month and also has stated that it "cannot guarantee the announcement" of the index on an exact date.  On the tenth day, or any other day of the month specified in the related prospectus supplement, COFI for each class of COFI securities for the interest accrual period commencing in that month shall be the most recently published Eleventh District Cost of Funds Index, unless the most recently published index relates to a month prior to the third preceding month.  If the most recently published Eleventh District Cost of Funds Index relates to a month prior to the third preceding month, COFI for the current interest accrual period and for each succeeding interest accrual period will, except as described in the next to last sentence of this paragraph, be based on the National Cost of Funds Index published by the OTS.  Information on the National Cost of Funds Index may be obtained by writing the OTS at 1700 G Street, N.W., Washington, D.C. 20552 or calling (202) 906-6677, and the current National Cost of Funds Index may be obtained by calling (202) 906-6988.  If COFI is based on the National Cost of Funds Index it will be based on the most recently published index, unless the most recently published index, as of the tenth or other designated day of the month in which an interest accrual period commences, relates to a month prior to the fourth preceding month.  In that case, the index applicable to each class of COFI securities, for that interest accrual period and each succeeding interest accrual period will be based on LIBOR, as determined by the calculation agent in accordance with the agreement relating to the related series of securities.  A change of index from the Eleventh District Cost of Funds Index to an alternative index will result in a change in the index level, and, particularly if LIBOR is the alternative index, could increase its volatility.

The establishment of COFI by the calculation agent and its calculation of the rates of interest for the applicable classes for the related interest accrual period shall, in the absence of manifest error, be final and binding.

*Treasury Index*

On the date specified in the related prospectus supplement for any class of securities the interest rate of which is determined by reference to an index denominated as a Treasury Index, the calculation agent designated in the prospectus supplement will ascertain the Treasury Index for Treasury securities of the maturity and for the period, or, if applicable, date, specified in the prospectus supplement.  As described in the related prospectus supplement, the Treasury Index for any period means the average of the yield for each business day during the period specified in the related prospectus supplement, and for any date means the yield for that date, expressed as a per annum percentage rate, on (1) U.S. Treasury securities adjusted to the "constant maturity" specified in that prospectus supplement or (2) if no "constant maturity" is so specified, U.S. Treasury securities trading on the secondary market having the maturity specified in that prospectus supplement, in each case as published by the Federal Reserve Board in its Statistical Release No. H.15(519).  Statistical Release No. H.15(519) is published on Monday or Tuesday of each week and may be obtained by writing or calling the Publications Department at the Board of Governors of the Federal Reserve System, 21st and C Streets, Washington, D.C. 20551,

57

JPMC_DEX_000402818

190

(202) 452-3244.  If the calculation agent has not yet received Statistical Release No. H.15(519) for that week, then it will use the Statistical Release from the immediately preceding week.

Yields on U.S. Treasury securities at "constant maturity" are derived from the U.S Treasury's daily yield curve.  This curve, which relates the yield on a security to its time to maturity, is based on the closing market bid yields on actively traded Treasury securities in the over-the-counter market.  These market yields are calculated from composites of quotations reported by five leading U.S. government securities dealers to the Federal Reserve Bank of New York.  This method provides a yield for a given maturity even if no security with that exact maturity is outstanding.  In the event that the Treasury Index is no longer published, a new index based upon comparable data and methodology will be designated in accordance with the agreement relating to the particular series of securities.  The calculation agent's determination of the Treasury Index, and its calculation of the rates of interest for the applicable classes for the related interest accrual period, shall, in the absence of manifest error, be final and binding.

*Prime Rate*

On the date specified in the related prospectus supplement for any class of securities the interest rate of which is determined by reference to an index denominated as the Prime Rate, the calculation agent designated in the prospectus supplement will ascertain the Prime Rate for the related interest accrual period.  As described in the related prospectus supplement, the Prime Rate for an interest accrual period will be the "Prime Rate" as published in the "Money Rates" section of The Wall Street Journal, or if not so published, the "Prime Rate" as published in a newspaper of general circulation selected by the calculation agent in its sole discretion, on the related determination date.  If a prime rate range is given, then the average of the range will be used.  In the event that the Prime Rate is no longer published, a new index based upon comparable data and methodology will be designated in accordance with the agreement relating to the particular series of securities.  The calculation agent's determination of the Prime Rate and its calculation of the rates of interest for the related interest accrual period shall in the absence of manifest error, be final and binding.

*Federal Funds Rate*

On the date specified in the related prospectus supplement for any class of securities the interest rate of which is determined by reference to an index denominated as the Federal Funds Rate, the calculation agent designated in the prospectus supplement will ascertain the Federal Funds Rate for the related interest accrual period.  The Federal Funds Rate for an interest accrual period will be the rate for U.S. Dollar Federal funds, as published in H.15(519) for that day opposite the caption "Federal Funds (Effective)" as that rate is displayed on that date on Moneyline Telerate Page 120 under the heading "Federal Funds Rate". The calculation agent will observe the following procedures if the Federal Funds Rate cannot be determined as described above:

- If the rate described above does not appear on Moneyline Telerate Page 120 or is not yet published in H.15(519) by 3:00 p.m., New York City time, on the date specified in the related prospectus supplement, unless the calculation is made earlier and the rate was available from that source at that time, then the Federal

Confidential

JPMC_DEX_000402819

Funds Rate for the relevant interest accrual period will be the rate described above in H.15 Daily Update, or any other recognized electronic source used for the purpose of displaying such rate, opposite the heading "Federal Funds (Effective)".

- If the rate described above does not appear on Moneyline Telerate Page 120 or is not yet published in H.15(519), H.15 Daily Update or another recognized electronic source for displaying such rate by 3:00 p.m., New York City time, on the date specified in the related prospectus supplement, the Federal Funds Rate for that interest accrual period will be the arithmetic mean of the rates for the last transaction in overnight U.S. Dollar Federal funds arranged by three leading brokers of Federal Funds transactions in New York City, selected by the administrator, on that interest determination date.

- If fewer than three brokers selected by the calculation agent are quoting as described above, the Federal Funds Rate will remain the Federal Funds Rate then in effect on the date specified in the related prospectus supplement.

The calculation agent's determination of the Federal Funds Rate and its calculation of the rates of interest for the related interest accrual period shall in the absence of manifest error, be final and binding.

*U.S. Treasury Constant Maturity Rate*

On the date specified in the related prospectus supplement for any class of securities the interest rate of which is determined by reference to an index denominated as the U.S. Treasury constant maturity rate (which is referred to as the "CMT Rate"), the calculation agent designated in the prospectus supplement will ascertain the CMT Rate for the related interest accrual period. The CMT Rate for an interest accrual period will be the rate displayed on the applicable Designated CMT Moneyline Telerate Page shown below by 3:00 p.m., New York City time, on the date specified in the related prospectus supplement under the caption ". . . Treasury Constant Maturities . . . Federal Reserve Board Release H.15 . . . Mondays Approximately 3:45 p.m.," under the column for:

- if the Designated CMT Moneyline Telerate Page is 7051, the rate on the date specified in the related prospectus supplement, or

- if the Designated CMT Moneyline Telerate Page is 7052, the average for the week, or the month, as specified in the related prospectus supplement, ended immediately before the week or month, as applicable, of the date specified in the related prospectus supplement occurs.

The following procedures will apply if the CMT Rate cannot be determined as described above:

- If the rate described above is not displayed on the relevant page by 3:00 p.m., New York City time, on the date specified in the related prospectus supplement, unless the calculation is made earlier and the rate is available from that source at that time on that date, then the CMT Rate will be the Treasury constant maturity

59

JPMC_DEX_000402820

rate having the designated index maturity, as published in H.15(519) or another recognized electronic source for displaying the rate.

- If the applicable rate described above is not published in H.15(519) or another recognized electronic source for displaying such rate by 3:00 p.m., New York City time, on the date specified in the related prospectus supplement, unless the calculation is made earlier and the rate is available from one of those sources at that time, then the CMT Rate will be the Treasury constant maturity rate, or other United States Treasury rate, for the index maturity and with reference to the relevant date, that is published by either the Board of Governors of the Federal Reserve System or the United States Department of the Treasury and that the administrator determine to be comparable to the rate formerly displayed on the Designated CMT Moneyline Telerate Page shown above and published in H.15(519).

- If the rate described in the prior paragraph cannot be determined, then the calculation agent will determine the CMT Rate to be a yield to maturity based on the average of the secondary market closing offered rates as of approximately 3:30 p.m., New York City time, on the date specified in the related prospectus supplement, reported, according to their written records, by leading primary United States government securities dealers in New York City. The calculation agent will select five such securities dealers and will eliminate the highest and lowest quotations or, in the event of equality, one of the highest and lowest quotations, for the most recently issued direct noncallable fixed rate obligations of the United States Treasury (which we refer to as Treasury Notes) with an original maturity of approximately the designated index maturity and a remaining term to maturity of not less than the designated index maturity minus one year in a representative amount.

- If the calculation agent cannot obtain three Treasury Note quotations of the kind described in the prior paragraph, the calculation agent will determine the CMT Rate to be the yield to maturity based on the average of the secondary market bid rates for Treasury Notes with an original maturity longer than the designated CMT index maturity which have a remaining term to maturity closest to the designated CMT index maturity and in a representative amount, as of approximately 3:30 p.m., New York City time, on the date specified in the related prospectus supplement, of leading primary United States government securities dealers in New York City. In selecting these offered rates, the calculation agent will request quotations from at least five such securities dealers and will disregard the highest quotation (or if there is equality, one of the highest) and the lowest quotation (or if there is equality, one of the lowest). If two Treasury Notes with an original maturity longer than the designated CMT index maturity have remaining terms to maturity that are equally close to the designated CMT index maturity, the calculation agent will obtain quotations for the Treasury Note with the shorter remaining term to maturity.

60

Confidential

- If three or four but not five leading primary United States government securities dealers are quoting as described in the prior paragraph, then the CMT Rate for the date specified in the related prospectus supplement will be based on the average of the bid rates obtained and neither the highest nor the lowest of those quotations will be eliminated.

If fewer than three leading primary United States government securities dealers selected by the calculation agent are quoting as described above, the CMT Rate will remain the CMT Rate then in effect on the date specified in the related prospectus supplement.

The calculation agent's determination of the CMT Rate and its calculation of the rates of interest for the related interest accrual period shall in the absence of manifest error, be final and binding.

**Book-Entry Registration of Securities**

As described in the related prospectus supplement, if not issued in fully registered form, each class of securities will be registered as book-entry securities. Persons acquiring beneficial ownership interests in the securities—the security owners—will hold their securities through The Depository Trust Company in the United States, or Clearstream Banking (formerly Cedelbank) or Euroclear in Europe if they are participants of the systems, or indirectly through organizations that are participants in those systems. The book-entry securities will be issued in one or more certificates which equal the aggregate principal balance of the securities and will initially be registered in the name of Cede & Co., the nominee of DTC. Clearstream Banking and Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream Banking's and Euroclear's names on the books of their respective depositaries which in turn will hold those positions in customers' securities accounts in the depositaries' names on the books of DTC. Citibank, N.A., will act as depositary for Clearstream Banking and The Chase Manhattan Bank will act as depositary for Euroclear. Except as described in this prospectus, no person acquiring a book-entry security will be entitled to receive a physical certificate representing that security. Unless and until definitive securities are issued, it is anticipated that the only securityholders of the securities will be Cede & Co., as nominee of DTC. Security owners are only permitted to exercise their rights indirectly through participants and DTC.

The beneficial owner's ownership of a book-entry security will be recorded on the records of the brokerage firm, bank, thrift institution or other financial intermediary that maintains the beneficial owner's account for that purpose. In turn, the financial intermediary's ownership of a book-entry security will be recorded on the records of DTC or of a participating firm that acts as agent for the financial intermediary, whose interest will in turn be recorded on the records of DTC, if the beneficial owner's financial intermediary is not a DTC participant, and on the records of Clearstream Banking or Euroclear, as appropriate.

Security owners will receive all distributions of principal of, and interest on, the securities from the trustee through DTC and DTC participants. While the securities are outstanding, except under the circumstances described in this prospectus, under the rules, regulations and procedures creating and affecting DTC and its operations, DTC is required to

61

Confidential

make book-entry transfers among participants on whose behalf it acts with respect to the securities and is required to receive and transmit distributions of principal of, and interest on, the securities. Participants and indirect participants with whom security owners have accounts with respect to securities are similarly required to make book-entry transfers and receive and transmit the distributions on behalf of their respective security owners. Accordingly, although security owners will not possess certificates, the DTC rules provide a mechanism by which security owners will receive distributions and will be able to transfer their interest.

Security owners will not receive or be entitled to receive certificates representing their respective interests in the securities, except under the limited circumstances described in this prospectus. Unless and until definitive securities are issued, security owners who are not participants may transfer ownership of securities only through participants and indirect participants by instructing the participants and indirect participants to transfer securities, by book-entry transfer, through DTC for the account of the purchasers of those securities, which account is maintained with their respective participants. Under the DTC rules and in accordance with DTC's normal procedures, transfers of ownership of securities will be executed through DTC and the accounts of the respective participants at DTC will be debited and credited. Similarly, the participants and indirect participants will make debits or credits, as the case may be, on their records on behalf of the selling and purchasing security owners.

Because of time zone differences, credits of securities received in Clearstream Banking or Euroclear as a result of a transaction with a participant will be made during subsequent securities settlement processing and dated the business day following the DTC settlement date. Credits or any transactions in securities settled during the processing will be reported to the relevant Euroclear or Clearstream Banking participants on that business day. Cash received in Clearstream Banking or Euroclear as a result of sales of securities by or through a Clearstream Banking participant or Euroclear participant to a DTC participant will be received with value on the DTC settlement date but will be available in the relevant Clearstream Banking or Euroclear cash account only as of the business day following settlement in DTC.

Transfers between participants will occur in accordance with the DTC rules. Transfers between Clearstream Banking participants and Euroclear participants will occur in accordance with their respective rules and operating procedures.

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream Banking participants or Euroclear participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by the relevant depositary; however, cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in that system in accordance with its rules and procedures and within its established deadlines. The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to the relevant depositary to take action to effect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same day funds settlement applicable to DTC. Clearstream Banking participants and Euroclear participants may not deliver instructions directly to the European depositaries.

62

Confidential

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC is owned by a number of its direct participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc. and the National Association of Securities Dealers, Inc.

Clearstream Banking is a duly licensed bank organized as a "societe anonyme", limited company, under the laws of Luxembourg. Clearstream Banking holds securities for its participants, or participating organizations and facilitates the clearance and settlement of securities transactions between Clearstream Banking participants through electronic book-entry changes in accounts of Clearstream Banking participants, eliminating the need for physical movement of certificates. Transactions may be settled in Clearstream Banking in any of 37 currencies, including United States dollars. Clearstream Banking provides to As Clearstream Banking participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream Banking interfaces with domestic markets in several countries. As a licensed bank, Clearstream Banking is regulated by the Luxembourg Monetary Institute. Clearstream Banking participants are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and other organizations. Indirect access to Clearstream Banking is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Clearstream Banking participant, either directly or indirectly.

Euroclear was created in 1968 to hold securities for its participants and to clear and settle transactions between Euroclear participants through simultaneous electronic book-entry delivery against payment, eliminating the need for physical movement of certificates. Transactions may be settled in any of 32 currencies, including United States dollars. Euroclear includes various other services, including securities lending and borrowing and interfaces with domestic markets in several countries generally similar to the arrangements for cross-market transfers with DTC described above. Euroclear is operated by the Brussels, Belgium office of Euroclear Bank, as Euroclear operator, under contract with Euroclear Clearance Systems S.C., a Belgian cooperative corporation. All operations are conducted by Euroclear Bank, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with the Euroclear operator, not the Belgian cooperative. The Belgian cooperative establishes policy for Euroclear on behalf of Euroclear participants. Euroclear participants include banks, central banks, securities brokers and dealers and other professional financial intermediaries. Indirect access to Euroclear is also available to other firms that clear through or maintain a custodial relationship with a Euroclear participant, either directly or indirectly.

Securities clearance accounts and cash accounts for Euroclear participants with Euroclear Bank are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear system and applicable Belgian law. The Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to

63

Confidential

JPMC_DEX_000402824

specific securities clearance accounts. The Euroclear operator acts under the Terms and Conditions only on behalf of Euroclear participants, and has no record of or relationship with persons holding through Euroclear participants.

Under a book-entry format, beneficial owners of the book-entry securities may experience some delay in their receipt of payments, since payments will be forwarded by the trustee to Cede & Co., as nominee of DTC. Distributions with respect to securities held through Clearstream Banking or Euroclear will be credited to the cash accounts of Clearstream Banking participants or Euroclear participants in accordance with the relevant system's rules and procedures, to the extent received by the relevant depositary. Distributions will be subject to tax reporting in accordance with relevant United States tax laws and regulations. See "Material Federal Income Tax Consequences—Tax Treatment of Foreign Investors" and "—Tax Consequences to Holders of the Notes—Backup Withholding." Because DTC can only act on behalf of financial intermediaries, the ability of a beneficial owner to pledge book-entry securities to persons or entities that do not participate in the depository system, may be limited due to the lack of physical certificates for book-entry securities.

Monthly and annual reports on the trust fund will be provided to Cede & Co., as nominee of DTC, and may be made available by Cede & Co. to beneficial owners upon request, in accordance with the rules, regulations and procedures creating and affecting the depository, and to the financial intermediaries to whose DTC accounts the book-entry securities of those beneficial owners are credited.

DTC has advised the depositor that, unless and until definitive securities are issued, DTC will take any action permitted to be taken by the holders of the book-entry securities under the applicable agreement only at the direction of one or more financial intermediaries to whose DTC accounts the book-entry securities are credited, to the extent that actions are taken on behalf of financial intermediaries whose holdings include those book-entry securities. Clearstream Banking or the Euroclear operator, as the case may be, will take any other action permitted to be taken by a securityholder under the agreement on behalf of a Clearstream Banking participant or Euroclear participant only in accordance with its and DTC's relevant rules and procedures. DTC may take actions, at the direction of the related participants, with respect to some securities which conflict with actions taken with respect to other securities.

Upon the occurrence of any of the events described in the immediately preceding paragraph, the trustee will be required to notify all beneficial owners of the occurrence of that event and the availability through DTC of definitive securities. Upon surrender by DTC of the global certificate or certificates representing the book-entry securities and instructions for re-registration, the issuer will issue and the trustee will authenticate definitive securities and then will recognize the holders of the definitive securities as securityholders under the applicable agreement.

Although DTC, Clearstream Banking and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of securities among participants of DTC, Clearstream Banking and Euroclear, they are under no obligation to perform or continue to perform those procedures and those procedures may be discontinued at any time.

Confidential

JPMC_DEX_000402825

None of the master servicer, the servicers, the depositor or the trustee will have any responsibility for any aspect of the records relating to or payments made on account of beneficial ownership interests of the book-entry securities held by Cede & Co., as nominee of DTC, or for maintaining, supervising or reviewing any records relating to the beneficial ownership interests.

## Exchangeable Securities

### General

If specified in the related prospectus supplement, a series of securities may include one or more classes that are exchangeable securities.  In any of these series, the holders of one or more of the classes of exchangeable securities will be entitled, after notice and payment to the trustee of an administrative fee, to exchange all or a portion of those classes for proportionate interests in one or more of the other classes of exchangeable securities.

If a series includes exchangeable securities as described in the related prospectus supplement, all of these classes of exchangeable securities will be listed in the prospectus supplement.  The classes of securities that are exchangeable for one another will be referred to in the related prospectus supplement as "related" to each other, and each related grouping of exchangeable securities will be referred to as a "combination."  Each combination of exchangeable securities will be issued by the related trust fund and, in the aggregate, will represent a distinct combination of uncertificated interests in the trust fund. At any time after their initial issuance, any class of exchangeable securities may be exchanged for the related class or classes of exchangeable securities. In some cases, multiple classes of exchangeable securities may be exchanged for one or more classes of related exchangeable securities.

The descriptions in the related prospectus supplement of the securities of a series that includes exchangeable securities, including descriptions of principal and interest distributions, registration and denomination of securities, credit enhancement, yield and prepayment considerations and tax, ERISA and legal investment considerations, also will apply to each class of exchangeable securities. The related prospectus supplement will separately describe the yield and prepayment considerations applicable to, and the risks of investment in, each class of exchangeable securities in a combination. For example, separate decrement tables and yield tables, if applicable, will be included for each class of a combination of exchangeable securities.

### Exchanges

If a holder elects to exchange its exchangeable securities for related exchangeable securities, the following three conditions must be satisfied:

- the aggregate principal balance of the exchangeable securities received in the exchange, immediately after the exchange, must equal the aggregate principal balance, immediately prior to the exchange, of the exchanged securities (for purposes of this condition, an interest-only class will have a principal balance of zero);

- the aggregate amount of interest payable on any distribution date with respect to the exchangeable securities received in the exchange must equal the aggregate amount of interest payable on such distribution date with respect to the exchanged securities; and

65

JPMC_DEX_000402826

- the class or classes of exchangeable securities must be exchanged in the applicable proportions, if any, described in the related prospectus supplement.

There are different types of combinations that can exist. Any individual series of securities may have multiple types of combinations. Some examples of combinations of exchangeable securities that differ in their interest characteristics include:

- A class of exchangeable securities with an interest rate that varies directly with changes in an index and a class of exchangeable securities with an interest rate that varies indirectly with changes in an index may be exchangeable for a class of exchangeable securities with a fixed interest rate. In this case, the classes with interest rates that vary with an index would produce, in the aggregate, an annual interest amount equal to that generated by the class with a fixed interest rate. In addition, the aggregate principal balance of the two classes with interest rates that vary with an index would equal the principal balance of the class with the fixed interest rate.

- An interest-only class and a principal only class of exchangeable securities may be exchangeable, together, for a class that is entitled to both principal and interest payments. The principal balance of the principal and interest class would be equal to the principal balance of the exchangeable principal only class, and the interest rate on the principal and interest class would be a fixed rate that, when applied to the principal balance of this class, would generate an annual interest amount equal to the annual interest amount of the exchangeable interest-only class in distributions that have identical amounts and identical timing.

- Two classes of principal and interest classes with different fixed interest rates may be exchangeable, together, for a class that is entitled to both principal and interest payments, with a principal balance equal to the aggregate principal balance of the two exchanged classes, and a fixed interest rate that, when applied to the principal balance of the exchanged for class, would generate an annual interest amount equal to the aggregate amount of annual interest of the two exchanged classes.

In some series, a securityholder may be able to exchange its exchangeable securities for other exchangeable securities that have different principal payment characteristics. Examples of these types of combinations include:

- A class of exchangeable securities that accretes all of its interest for a specified period, with the accreted amount added to the principal balance of the accreting class, and a class of exchangeable securities that receives principal payments from these accretions may be exchangeable, together, for a single class of exchangeable securities that receives payments of interest continuously from the first distribution date on which it receives interest until it is retired.

- A class of exchangeable securities that is a Planned Principal Class or Targeted Principal Class, and a class of exchangeable securities that only receives principal payments on a distribution date if scheduled payments have been made on the Planned Principal Class or Targeted Principal Class, as applicable, may be exchangeable,

66

JPMC_DEX_000402827