# EXHIBIT 115

SEARS

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


----------------------------

DEXIA SA/NV; DEXIA HOLDINGS,
INC.; FSA ASSET MANAGEMENT LLC;
DEXIA CREDIT LOCAL SA,

                    Plaintiffs

vs.                          No. 12-cv-4761
                                  (JSR)

BEAR STEARNS & CO., INC.,
et al.,

                    Defendants.
----------------------------


VIDEOTAPED DEPOSITION OF PATTIE SEARS

            DALLAS, TEXAS

            JANUARY 8, 2013







Reported by:  Susan S. Klinger, RMR-CRR, CSR

Job No.:  56832

```
 1                      SEARS

 2  supervisor.

 3        Q.    And did you maintain that same title

 4  until your transfer to Texas?

 5        A.    I maintained the same job

 6  description.

 7        Q.    Okay.  What was that job

 8  description?

 9        A.    Due diligence manager.

10        Q.    Did anything else change with

11  respect to your job duties between your

12  obtaining the full-time position in July 1996

13  until your move to Texas?

14        A.    No, and not -- not specifically.  As

15  with all work, things evolve.

16        Q.    Well, in general, what were your job

17  duties as the due diligence manager during that

18  time period?  And that's the 1996 to 2005 time

19  period.

20        A.    When the desk would purchase whole

21  loans, then they would send out the information

22  to the deal manager and to the due diligence

23  manager.  I would take the information, hire an

24  independent third-party review firm, arrange

25  with the seller to have the review done, have
```

1                          SEARS

2       the files available and ready at a certain

3       time, determine the length of time the review

4       should be and when it should be conducted and

5       completed, and arrange for the third-party firm

6       to be on-site to review the loans, to report

7       back the results on a daily basis, and then

8       working with the deal manager to decide which

9       loans were acceptable, which would be

10      purchased, which would not, and then the deal

11      manager would settle the trade.

12           Q.    And that was your general

13      description from 1996 until 2005 while you were

14      in New York City; correct?

15           A.    That continued when I transferred.

16           Q.    Okay.  I want to focus on that first

17      time period while you were in New York City.

18           A.    Okay.

19           Q.    For that time period that you

20      just -- and the duties that you discussed,

21      those duties applied to that time period;

22      correct?

23           A.    Yes.

24           Q.    Okay.  And when you first obtained

25      this full-time position in July 1996, do you

1                    SEARS

2        A.    Yes.

3        Q.    I'm sorry?

4        A.    Yes.

5        Q.    You probably learned that in

6   obtaining your accounting degree back in

7   college; correct?

8        A.    There is nothing shameful in making

9   a profit.

10       Q.    Right.  And in doing more business;

11   correct?

12       A.    Correct.

13       Q.    And getting paid for doing more

14   business; correct?

15       A.    That's right.

16       Q.    It's the American way; right?

17       A.    I believe so.

18       Q.    Although having a pleasant

19   personality does help too; correct?  Getting

20   along with your co-workers?

21       A.    I suppose so.

22       Q.    Now I want to transition to when you

23   moved to Texas.  Did you maintain -- and that

24   was in about June of 2005.  Did you maintain

25   the same title, due diligence manager?

1                        SEARS

2          A.    Yes.

3          Q.    And again, that was about June of

4    2005 until when?

5          A.    I would say approximately June of

6    2008.

7          Q.    What happened in June 2008?

8          A.    I believe that is the approximate

9    date when I became an employee of JPMorgan

10   Chase.

11         Q.    That was as a result of the

12   acquisition --

13         A.    Yes.

14         Q.    -- of JPMorgan -- acquisition of

15   Bear Stearns by JPMorgan?

16         A.    Yes.

17         Q.    What was your title then as a result

18   of -- as a result of that acquisition?

19         A.    I was still -- I don't know that I

20   specifically had a title.  I -- I was to work

21   what I -- what I did was work either in the

22   purchase or the sale of whole loans with

23   JPMorgan securities.

24         Q.    Okay.  We'll get back to that.  I'm

25   jumping around a bit, I apologize.

Page 50

1                          SEARS

2      performance evaluations were positive; correct?

3           A.      Yes.

4           Q.      2005, do you recall whether you had

5      a positive performance review?

6           A.      Yes.

7           Q.      In 2006, do you recall whether you

8      had a positive performance review?

9           A.      I believe so.

10          Q.      Do you recall what your bonus was --

11          A.      No, I don't.

12          Q.      -- for those two years?

13                  2007, did you have a positive

14      performance review?

15          A.      I believe so.

16          Q.      Do you recall whether or not your

17      bonus was higher or lower?

18          A.      I don't -- I don't remember.

19          Q.      For 2007, do you recall whether your

20      bonus was higher or lower than the previous

21      year?

22          A.      I don't remember.

23          Q.      For 2006, do you recall whether your

24      bonus was higher or lower than the previous

25      year?

1                         SEARS

2    finished.

3         A.    (Reviewing document.)  Okay.

4         Q.    Are those functions that you would

5    typically perform as a due diligence manager?

6         A.    Sample selection, yes.  If you had a

7    seller that was -- the desk had determined that

8    you were going to do a sample review, and that

9    was typically Alt-A or possibly the HELOCs.  It

10   was not typically a subprime transaction.

11        Q.    What about for prime, would the

12   sample be done for prime?

13        A.    We did very little prime, because

14   Bear Stearns was not competitive in bids for

15   prime.

16        Q.    And why was that?

17        A.    We wouldn't -- I didn't do the

18   bidding, but apparently we didn't bid up for

19   prime, but some people did.

20        Q.    For those purchases that were less

21   than 100 percent sample, did you ever conduct

22   such a sample?

23        A.    Yes.

24        Q.    How did you conduct those samples?

25        A.    Normally a sample would be 20

1                        SEARS

2    would be more attractive for the seller from a

3    trading perspective?

4         A.    Well, if all you are trying to do is

5    save money, don't do any.

6         Q.    Okay.  But that's not my question.

7    From a --

8         A.    Well --

9         Q.    From a trading perspective --

10        A.    I --

11              MR. SLIFKIN:  Let her finish.

12        A.    I'm not a trader.

13        Q.    Let's look at the box number 12,

14   Ms. Sears, same document.  It says, "Due

15   Diligence Firm," and then in the box it says,

16   "Upon completion of file review, sends out a

17   final data report upload."  Do you see that?

18        A.    Uh-huh.

19        Q.    That's a "yes"?  I'm sorry, for the

20   record, we need yeses and noes.

21        A.    Yes.

22        Q.    Okay.  Thanks.

23              What is a final data report?

24        A.    That is a data tape from the -- the

25   due diligence firm's underwriting program that

1                          SEARS

2    tells -- that is all the data collected in the

3    review.

4        Q.   And so why is this prepared?

5        A.   Because you need to know what was

6    found in the individual files.

7        Q.   Individual loan files?

8        A.   Individual loan files.

9        Q.   Okay.  And who prepared this report?

10       A.   The due diligence firm.

11       Q.   The third-party due diligence

12   firm --

13       A.   Yes.

14       Q.   -- that you would hire -- Bear

15   Stearns would hire; correct?

16       A.   Yes.

17       Q.   And how were these prepared, if you

18   know?

19       A.   I'm not a computer person.  They

20   just had -- it just appeared.

21       Q.   Okay.  But they reviewed the files

22   and accumulated the report, or did you ever

23   have any discussions to understand how these

24   were prepared?

25       A.   We told them what format we wanted

1                       SEARS

2    the information in.  They gave it back to us in

3    our format.

4         Q.    Okay.  And how often did you receive

5    these?

6         A.    We received them daily, and then we

7    would get a final.

8         Q.    Okay.  So you received preliminary

9    reports or draft reports daily and --

10        A.    Yes.

11        Q.    -- and then you would get a final.

12   When would the final --

13        A.    When the -- normally when the review

14   was complete.

15        Q.    The due diligence review?

16        A.    Yes.

17        Q.    And who received these preliminary

18   reports?

19        A.    The due diligence manager.

20        Q.    Anybody else?

21        A.    Not usually.  We got -- we got them,

22   and then I distributed back to the seller and

23   to my deal manager on a daily basis.

24        Q.    And you received these by e-mail;

25   correct?

```
                          SEARS
```

1                          SEARS

2          A.    E-mail or, you know, FTP, whatever.

3          Q.    Download a site?

4          A.    Yes.

5          Q.    Log-in with a password --

6          A.    Uh-huh.

7          Q.    -- and the report would show up?

8          A.    Yes.

9          Q.    What percentage was e-mail versus

10   FTP sites, if you can recall, ball-park?

11         A.    We tried to use the -- the FTP site

12   or whatever, because you could do big, big

13   files, and it was secure, so we had those set

14   up for our sellers and our, you know, and

15   ourselves.  And so you could leave them out

16   there for a while if you didn't copy it to

17   your -- it was a -- it's a really good system.

18         Q.    Because -- I'm sorry, go ahead.

19         A.    Because you don't have to -- to

20   e-mail.

21         Q.    If you are receiving these by lots

22   of e-mails every day on a daily basis, it would

23   probably jam up your e-mail account; correct?

24         A.    Yes.

25         Q.    At least slow it down?

SEARS

1
2        A.      Yes.   And we are also limited as to
3  size sometimes.
4        Q.      You mean by storage capacity for
5  electronic documents?
6        A.      No.   The megabytes that can come in
7  in one e-mail.
8        Q.      Got you.   So sometimes an e-mail
9  would get rejected because it was too large?
10        A.      Yes.
11        Q.      And you said these were -- these
12  reports were updated routinely.   How often were
13  they updated generally?   Was it daily or
14  hourly?
15        A.      Oh, daily.
16        Q.      Did you expect to receive an update
17  at least daily?
18        A.      Yes.   I wanted them waiting for me
19  when I came in at 7:30 in the morning.   I
20  didn't always get them.
21        Q.      Got it.   Because then you could
22  start your day checking out --
23        A.      Yes.
24        Q.      -- the progress?   Is that correct?
25        A.      Yes.

SEARS

1                                 SEARS

2        Q.    Were the older versions retained?

3        A.    Some of the people did.  I always

4 worked on a cumulative basis, so I only kept

5 the latest version.

6        Q.    Well, let's look -- let's talk about

7 the FTP site versions first.

8        A.    Uh-huh.

9        Q.    Okay.  When you received the next

10 daily update, what happened to the previous

11 day's version?

12        A.    I would think it was -- generally it

13 was left in the FTP for -- until it just -- it

14 may have been left in the FTP site until it

15 just went away, because I think they were

16 purged after a certain period of time.

17        Q.    Did you purge them, or how did that

18 happen?

19        A.    I could, but they just went away

20 after, I don't know, 90 days, something like

21 that.

22        Q.    Was this Bear Stearns' FTP site?

23        A.    I believe so.

24        Q.    You had a --

25        A.    Because we set up -- we set up the

Page 118

1                              SEARS

2     sellers.

3          Q.    I see.  So you had one that you

4     would -- one FTP site that you would routinely

5     log in to, and the sellers had access to that

6     site and they would send these reports to that

7     site; correct?

8          A.    Yes, and I would get a notice that I

9     had a delivery.

10         Q.    I see.  So this was a way for you to

11    manage these reports as they came in on a daily

12    basis; correct?

13         A.    Yes.

14         Q.    And that's the final data reports?

15         A.    And all the preliminaries, too.

16         Q.    Okay.

17         A.    Because I got dailies and then I got

18    finals.

19         Q.    I see.  So there were actually two

20    different types of reports we've been

21    discussing, the daily data reports and then a

22    final data report?

23         A.    Yes.  They were just different --

24    they were just successive versions of the same

25    thing.

1                    SEARS

2    listed here I would like to ask you about.

3    Item 12, "After the final data report, there is

4    an individual asset report"?

5         A.    Yes.

6         Q.    Okay.  So what is -- what is an

7    individual asset report?

8         A.    It's a PDF report that sets out the

9    specifics of an individual loan.  That's why

10   it's called an individual asset report, and it

11   will show the name.  It will have the LTV and

12   the purchase price and the -- the appraisal

13   value.  It will have a credit recap, and it

14   will have a discussion of any issues that were

15   found.  And on the second page, it will have a

16   recap of the compliance review.

17        Q.    And why were these prepared?

18        A.    Because they were very -- they were

19   a summary of each loan, and it was quite easy

20   to read them because this was a snapshot of the

21   loan.  It told you -- it was -- instead of

22   looking at just a spreadsheet that might have

23   hundreds -- or what felt like hundreds of

24   columns to follow, this is a two-page snapshot

25   or three-page that you can read through in an

1                        SEARS

2        Q.     20 percent of the bulk loans were --

3   were sampled --

4        A.     Of Alt-A --

5        Q.     -- of Alt-A?

6        A.     -- bulk loans.

7        Q.     Right.  And during your time at Bear

8   Stearns in 2005 to 2008, you estimate that

9   about 20 percent of your experience was with

10  Alt-A sellers; correct?

11       A.     No more than that, I would say.

12       Q.     No more than that, okay.  And what I

13  mean by "streamlined due diligence," I'm not

14  talking about a sample versus 100 percent.  I'm

15  talking about the type of due diligence that is

16  conducted, which is a due diligence review that

17  does not require a review of all of the

18  supporting documents in the loan file, okay?

19               So my question is, during 2005 to

20  2008, were you aware of large bulk loan sellers

21  being provided or being permitted to undergo

22  streamlined due diligence in order to make Bear

23  Stearns' bids for those loans more competitive?

24       A.     No, I am not aware of that.

25               (Exhibit 189 marked.)

1                       SEARS

2    subprime sellers, is going to reduce the amount

3    of required due diligence."  Do you see that?

4         A.    Yes, I do.

5         Q.    Does that refresh your memory as to

6    whether or not between 2005 and 2008 that

7    subprime sellers received a reduced amount of

8    required due diligence in order to make Bear

9    Stearns' bids more competitive?

10         A.    This will be done on a

11    trade-by-trade basis.  And we will do 25

12    percent credit review, 100 percent compliance

13    review, and 100 percent real estate review.  It

14    says the same methodology, but that is 100

15    percent.

16              I know of two trades that I worked

17    that we did a 25 percent credit, 100 percent

18    compliance and 100 percent of the appraisal,

19    but I do not -- I did not -- to me, what this

20    says bears no relation to what you said -- what

21    you asked.  This is not streamlined.  This is a

22    portion -- a sample of credit review, and 100

23    percent compliance and 100 percent appraisal.

24         Q.    Let me -- let me stop you there.  I

25    asked the question in two ways.  First I asked

1                    SEARS

2    whether or not you were aware of instances

3    where large loan -- large bulk loan sellers to

4    Bear Stearns received streamlined due diligence

5    in order to make Bear Stearns' bids more

6    competitive, and then I asked whether you were

7    aware of any instances where subprime sellers

8    of bulk loans received reduced due diligence,

9    and --

10             MR. SLIFKIN:  Yeah, and you posed

11        them to mislead her, right, obviously?

12             MR. MIDDLETON:  No, no.  I'm trying

13        to make -- the reason I'm making the

14        clarification right now is so that it's not

15        misleading to her.  That's why I'm, Dave --

16             MR. SLIFKIN:  Dan.

17             MR. MIDDLETON:  Daniel, I'm sorry --

18        that's why I'm making clarification.

19             MR. SLIFKIN:  Well, I have my

20        opinion of you, and you disagree with that.

21             MR. MIDDLETON:  That's fine.  It's a

22        speaking objection.

23        Q.    Let me just finish.  Let me just ask

24    you a question and see if we can just -- the

25    reason I'm showing you this document is to see

1                    SEARS

2   if it refreshes your memory as to whether or

3   not you recall any instances where a subprime

4   seller of bulk loans received reduced due

5   diligence in order to make Bear Stearns' bids

6   more competitive?

7        A.    I know on two trades we did a

8   sample, we followed this procedure, that I'm

9   aware of trades that I handled.  There may have

10  been others.  I might not be aware of them.

11       Q.    Okay.

12       A.    But --

13       Q.    So it is correct that during 2005, a

14  large bulk seller of home loans received

15  reduced due diligence so that Bear Stearns

16  could be more competitive in its bidding for

17  those two instances; correct?

18       A.    Yes.  I -- I didn't -- I should have

19  asked you to define "streamlined," and when I

20  did, I think you said would not have to look at

21  all the documents.  And I view that as a

22  completely different matter than doing a sample

23  and 100 percent compliance and appraisal.

24       Q.    And --

25       A.    So it may be just semantics, but I

Page 214

1                       SEARS

2        A.    Apparently so.

3              MR. SLIFKIN:  The question, Pattie,

4        was, does it refresh your recollection.

5        Having looked at this, do you now say, yes,

6        I remember that?

7              THE WITNESS:  Yes.

8              MR. SLIFKIN:  Or are you just

9        reading it?

10       A.    I do now that I think I remember

11   that SouthStar, Platinum and Countrywide did

12   some, but they were John's clients.

13       Q.    And this was in the 2006 time

14   period?

15       A.    Yes.  And I may have been aware, but

16   it was not something that my sellers did.  We

17   were fairly compartmentalized with our sellers.

18       Q.    Did you respond to Mr. Rogers, do

19   you recall, in response to his request?

20       A.    I don't know.  I may have, but I

21   don't -- I don't remember.

22       Q.    If you did, it would be on the

23   server; right?

24       A.    Yes.

25       Q.    Okay.  And Mr. Mongelluzzo responds

```
 1                      SEARS

 2   to believe that the due diligence provider is

 3   not being told to, or not provided the lineal

 4   documentation to clear these loans."  Do you

 5   see that?

 6        A.    That's final.

 7        Q.    I'm sorry?

 8        A.    Final documentation.

 9        Q.    What did I -- what did I say?

10              MR. SLIFKIN:  You said lineal.

11        Q.    Oh, final.  I'm sorry.  I didn't

12   read the F.  Well, it looks like an L to me,

13   but I'm not going to mischaracterize it.  If

14   you think that means final, then --

15        A.    I believe it does.

16        Q.    Okay.  During this time period, did

17   Bear due diligence managers such as yourself

18   have the power to override the third-party due

19   diligence providers to clear loans that were

20   previously rated as event grade 3s?

21        A.    Yes, we could, but we would provide

22   a reason to the firm, and that should be -- the

23   event should be changed from 3 to -- and

24   sometimes we used a 4, but before a 4, we could

25   have changed it to a 1 or a 2.
```

1                          SEARS

2          Q.    What time period was that?

3          A.    John Mongelluzzo wrote the memos,

4    and I don't remember specifically.  I would

5    think it's probably in 2007, but it could be.

6          Q.    Could be when?

7          A.    I'm not really good with dates, but

8    I know it will be in what was produced for you.

9          Q.    You know that for a fact?

10         A.    Well, I know it was in our hard

11   drive, in our e-mails, so if you got all our

12   e-mails, --

13         Q.    We're still trying.

14               MR. MIDDLETON:  I would like to mark

15   as the next Exhibit 198.

16               (Exhibit 198 marked.)

17         Q.    For the record, 198 bears Bates

18   stamp 24633 and concludes at 24641.  Do you

19   recognize this document, Ms. Sears?

20         A.    Yes.

21         Q.    You prepared the attachment;

22   correct?

23         A.    Yes.

24         Q.    And you wrote the e-mail on the

25   top -- well, you wrote both e-mails here;

1                        SEARS

2    correct?

3         A.    Yes.

4         Q.    Did you draft the attachment around

5    May of 2007?

6         A.    Yes.

7         Q.    Why did you draft it at that time?

8         A.    At that time, if my recollection is

9    correct, what we were trying to do is make sure

10   that each of the due diligence firms used, and

11   there were times when Watterson-Prime was quite

12   busy or Clayton was busy, and we were looking

13   to add an additional firm, which may have

14   been -- I know we tried using one called

15   OfficeTiger on one trade and that was not good.

16   We tried using we added MDMC, but what we were

17   trying to do was make sure that everybody

18   used -- everybody used the same -- collected

19   the same data fields.

20        Q.    Let's look at the attachment the

21   last page.

22        A.    Uh-huh.

23        Q.    It says, "Questions for due

24   diligence firms regarding the process for bulk

25   reviews."   Did you prepare that page?

Page 235

                          SEARS

1

2      A.    Yes.

3      Q.    How did you come up with this list

4  of questions for the due diligence firms?

5      A.    I believe that -- I don't know if

6  it's at the same time, but I do know that John

7  Mongelluzzo and I and a few other people

8  conducted third party -- we went out and

9  visited the firms and gave them questions to

10  ask -- or questions to answer and this -- these

11  were certain things that we consider important.

12  And we wanted them to tell us how they would

13  train and staff their people or -- and then the

14  other is things we had found and we want

15  answers what you -- what are you going to do

16  about it, in other words.

17      Q.    Was this intended for Clayton as

18  well?

19      A.    It would have been intended for I

20  think all of our third-party firms.

21      Q.    So Watterson-Prime as well?

22      A.    Yes.

23      Q.    And in addition to new due

24  diligence --

25      A.    Anyone --

Page 236

1                          SEARS

2        Q.    -- firms that you have not yet

3  worked with?

4        A.    Yes, and John and I and I believe Jo

5  Whitworth and some other people, and I don't

6  remember everybody who went on every trip, but

7  we went to Michigan or Wisconsin -- Wisconsin

8  because they're from a small town in Wisconsin.

9  We went to see MDMC, we went to Tampa to see --

10 we met in Clayton -- at Clayton in Tampa and

11 saw them, and then we went to Watterson-Prime.

12 I'm not sure -- I don't remember where we went

13 for them.

14       Q.    You discussed all of the items here

15 listed --

16       A.    Yes.

17       Q.    -- on document bearing Bates number

18 24641 --

19       A.    Yes.

20       Q.    -- with Clayton; correct?

21       A.    With Clayton.

22       Q.    And with Watterson-Prime?

23       A.    I believe with Watterson-Prime, and

24 then whether it was at this point or not or

25 later, we also went to MDMC and talked to them

1                           SEARS

2     Actually the e-mails are on the first page.

3                    Does this refresh your memory at the

4     point of time in which you decided you would no

5     longer recommend Watterson-Prime?

6         A.      Yes, I believe that -- okay, Debbie

7     Rich worked for Steve Golden in the company he

8     formed after he left Bear Stearns, EMC.  And

9     Debbie Rich had worked for EMC, so I would not

10    send this type of e-mail to just anyone.  This

11    was almost family.

12        Q.      Understood.

13        A.      Okay.  And the problems that we had

14    had with Watterson-Prime had occurred earlier,

15    and may have been in 2007.  It could have been

16    earlier, because I know at one time they were

17    suspended.  We had a problem with the way

18    option ARMs were calculated in their system,

19    and we didn't use them for a while.  And it

20    seems like we also had a problem earlier with

21    prepayment penalties as to whether they were

22    hard or soft, and that we had had some work

23    redone on that.

24        Q.      Let me direct you then to a part of

25    the e-mail, and we can just cut through this.

1                        SEARS

2          next Exhibit 207 an e-mail along with an

3          attachment.

4                   (Exhibit 207 marked.)

5          Q.      For the record, this Exhibit 207

6   bears Bates number DEXDEP-00024689 and

7   concludes at 24719.  It's an e-mail from

8   Fernando Serrano to Jo-Karen Whitlock, John

9   Mongelluzzo and Pattie Sears, Jose Carrion, and

10  then CCed to Stephan Golden and Mary Haggerty

11  dated January 9th, 2007.  Do you recall

12  receiving this e-mail, Ms. Sears?

13         A.      Yes, I do.

14         Q.      And do you recall receiving the

15  attachment that it is attached to?

16         A.      Yes.

17         Q.      And is this a report prepared by

18  Mr. Serrano's office?

19         A.      I believe so.

20         Q.      And Mr. Serrano is in the quality

21  control department at Bear Stearns?

22         A.      He was for a period of time.

23         Q.      Was he there at this time in 2007?

24         A.      Yes.

25         Q.      Okay.  Do you recall receiving any

1                         SEARS

2     additional reports similar to the report

3     attached here?

4          A.    Yes, I did receive further ones.  I

5     cannot tell you how many.

6          Q.    Was this the first report?

7          A.    I believe this was the first report

8     from Fernando.

9          Q.    Did you receive quality control

10    reports similar to this -- prior to receiving

11    Exhibit 207?

12         A.    I may have.  I cannot say

13    specifically, but Fernando was new at this

14    point, had not been with EMC very long, and

15    this was his first at sharing information.

16              (Exhibit 208 marked.)

17         Q.    I marked as the next Exhibit 208 a

18    document bearing Bates number DEXDEP00019594.

19    This is an e-mail and attachment, and the

20    e-mail string in about one, two -- the third

21    one down is from Fernando Serrano to

22    Mr. Mongelluzzo and Jose Carrion and Pattie

23    Sears, and it's dated February 22nd, 2007.  Do

24    you recall receiving this e-mail?

25         A.    Yes.