# EXHIBIT 117

*FCIC INTERVIEW OF*
*JOHN MONGELLUZZO*

---

*AUDIO TRANSCRIPTION*
*September 29, 2010*

---

Ellen Grauer
COURT REPORTING
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434 FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 98008.txt*

*Min-U-Script® with Word Index*

EXHIBIT
Mongelluzzo
2
PENGAD 800-631-6989

CONFIDENTIAL DEXDEP00034928

1

-------------------------------------x

FCIC INTERVIEW OF

JOHN MONGELLUZZO

Interview Date: September 29, 2010

-------------------------------------x

AUDIO TRANSCRIPTION by Rita Persichetty, a Notary Public of the State of New York.

ELLEN GRAUER COURT REPORTING CO. LLC
126 East 56th Street, Fifth Floor
New York, New York 10022
212-750-6434
REF: 98008

AUDIO TRANSCRIPTION

PROCEEDINGS

MR. CUNICELLI: This is Victor Cunicelli of the Financial Crisis Inquiry Commission. Today's date is September 29, 2010. The time is approximately 10:30 a.m. eastern standard.

I am accompanied by Tom Borgers, Tom Krebs, Bob Hinkley of the commission, and Miss Carey and Mr. Mongelluzzo on the line.

We are at the offices of the FCIC for the interview of Mr. Mongelluzzo. The interview will be recorded with the consent of Mr. Mongelluzzo.

Mr. Mongelluzzo, could I get your verbal ascent for the record?

MR. MONGELLUZZO: Yes, that's fine.

MR. CUNICELLI: Thank you.

Will everyone please state your full name and affiliation for the record, and please spell your last name for the transcriptionist. We'll start on FCIC's side.

Cunicelli is C U N I C E L L I.

AUDIO TRANSCRIPTION

MR. BORGERS: Tom Borgers, B as in boy, O R G E R S.

MR. KREBS: Tom Krebs, FCIC. K R E B S.

MR. HINKLEY: Bob Hinkley, FCIC. H I N K L E Y.

MS. CAREY: Jessica Carey, Paul Weiss, C A R E Y.

MR. HAIMS: Joel Haims, H A I M S, counsel for Mr. Mongelluzzo from Morrison & Foerster.

UNIDENTIFIED SPEAKER: (Inaudible) Lerner and JP Morgan internal counsel.

MR. PATTERSON: Paul Patterson, Paul Weiss, P A T E I (sic) (inaudible).

MR. MONGELLUZZO: And John Mongelluzzo, M O N G E L L U Z Z O.

MR. CUNICELLI: Okay.

Mr. Mongelluzzo, in the way of background, the FCIC was established by statute public law 111-21 and signed into law by the president. It is bipartisan and consists of ten commissioners. It is charged with examining the causes of the financial

AUDIO TRANSCRIPTION

crisis and collapse or near collapse of major domestic financial institutions.

The commission is charged with composing reported findings to the President and Congress by December 15, 2010. The commission may compel attendance and testimony of witnesses and production of records. I can provide a copy of the statute by which the commission was formed if you so desire.

Please be advised that the FCIC is an agency of the United States, and FCIC staff are federal employees under the egest of 18, United States code Section 1001 concerning false statements.

With that, sir, just in the way of housekeeping, please make sure that all your responses are verbal and audible so that we obtain a quality transcript, and I'll turn it over to Mr. Borgers.

MR. BORGERS: Thank you.

Mr. Mongelluzzo, could you just start with a brief professional background, your resume starting with your college

AUDIO TRANSCRIPTION

education?

MR. MONGELLUZZO: What do you mean my college education, so starting with my college education, I attended Passaic County Community College, achieved an associate's degree there, and then attended NYU and received a bachelor's degree there.

MR. BORGERS: Okay. And if you then go through your professional career, employment background with dates?

MR. MONGELLUZZO: I'm not going to be able to provide specific dates.

MR. KREBS: Just do the best you can do, Mr. Mongelluzzo.

MR. BORGERS: Year is fine.

MR. MONGELLUZZO: I'm not sure I can do the year. So my first employment would have been Midlantic National Bank, approximate year would have been 1984 or '85. From there, I worked at National Community Bank, that would have been probably 1987, '88. From there, I worked for Chase

AUDIO TRANSCRIPTION

Manhattan. That would have taken us to 1990 or '91. From there, I worked for the State of New Jersey. After working for the State of New Jersey, that probably took us to '93/'94. From there, I went to work for PHH Mortgage. That would have taken us to maybe '96ish. From there, I went to work for GE Capital. I was with GE Capital until '98/'99, went to work for PMI Mortgage Insurance for about a year and a half and then returned to GE Capital.

And then from GE Capital, I went to work for Bear Stearns in 2004. Was employed with Bear Stearns/JPMorgan until 2008, and I've been employed with GMAC since 2009.

MR. BORGERS: Thank you. Can you just focus on the GE Capital to Bear Stearns for now?

MR. MONGELLUZZO: Sure. What specifically would you like?

MR. BORGERS: What your roles were, what your positions, your title, your

AUDIO TRANSCRIPTION

function?

MR. MONGELLUZZO: So at GE Capital, the initial period of time I was there, I was working on residential underwriting. I'm not sure what title I would have held at that point in time. So predominantly all underwriting of residential mortgages. When I went to PMI insurance, also in a similar role, underwriting of residential mortgages. When I went back to GE Capital, it was in a role more related to the purchases of bulk packages of mortgages, so reviewing those for quality assurance purposes in terms of purchasing both mortgage packages. At Bear Stearns, I was responsible for due diligence for the purchases of mortgage packages, and at GMAC, I am predominantly responsible for rep and warrant repurchases.

MR. BORGERS: What was that, I didn't get the -- at GMAC?

MR. MONGELLUZZO: For -- predominantly responsible for rep and

AUDIO TRANSCRIPTION

warrant repurchases.

MR. BORGERS: Can you -- on the Bear Stearns part on the due diligence, can you just give us some detailed background about what was entailed with your due diligence?

MR. MONGELLUZZO: Could you be more specific?

MR. KREBS: Let's try it this way: When Bear Stearns would purchase pools of mortgages, what documents would Bear Stearns take delivery of?

MR. MONGELLUZZO: When you say which documents would they take delivery of, it's strictly in regards to the due diligence?

MR. KREBS: Well, in connection with the purchase of pools of mortgages for which due diligence had been performed; for example, you would receive the original note with a complete chain of endorsements, correct?

MR. MONGELLUZZO: That is correct.

MR. KREBS: You would receive the

AUDIO TRANSCRIPTION

original recorded mortgage or certificate -- or certified copy of that mortgage with evidence of recording; is that right?

MR. MONGELLUZZO: Typically that would be correct, yes.

MR. KREBS: All right. Then you would get originals or certified copies with evidence recording of all intervening assignments, correct?

MR. MONGELLUZZO: That is typically correct.

MR. KREBS: How often would you get intervening assignments?

MR. MONGELLUZZO: I have no idea. I couldn't tell you.

MR. KREBS: All right. You would also receive original recertified copies of powers of attorney, if applicable, with evidences of the recordings of those; is that correct?

MR. MONGELLUZZO: That's correct.

MR. KREBS: You would also receive the original or a certified copy of the

AUDIO TRANSCRIPTION

modifications and assumptions with respect to that mortgage; is that right?

MR. MONGELLUZZO: Yes.

MR. KREBS: You would also receive the original or certified copy of title insurance policy or an attorney's opinion of title, accompanied by a title abstract; is that correct?

MR. MONGELLUZZO: Could you say that again?

MR. KREBS: You would receive an original or certified copy of title insurance policy or an attorney's opinion of title accompanied by the title abstract?

MR. MONGELLUZZO: I think generally speaking that would be correct.

MR. KREBS: Very good. You would also receive the original of any guarantee executed in connection with the mortgage note, correct?

MR. MONGELLUZZO: Generally that's correct.

MR. KREBS: And you would also

AUDIO TRANSCRIPTION

receive the security agreement, title mortgage or equivalent document executed in connection with a mortgage, correct?

MR. MONGELLUZZO: Generally that's correct.

MR. KREBS: All right. Now, what is MERS?

MR. MONGELLUZZO: MERS is a registration system for tracking ownership of mortgages.

MR. KREBS: Now, generally there was a statement, and I'm quoting from documents, if the mortgage is not recorded in the name of MERS, you would receive an original assignment in recordable form from the seller in blank or as designated by the purchaser; is that correct?

MR. MONGELLUZZO: Generally speaking, that would be correct.

MR. KREBS: All right. Tell me the functions that MERS performed in connection with securitization of mortgages, please?

MR. MONGELLUZZO: I didn't have

AUDIO TRANSCRIPTION

anything to do with that function, so I couldn't speak to that.

MR. KREBS: All right. Well, let me ask you this: You received these documents or someone under your control received these documents, what would you do with them?

MR. MONGELLUZZO: We wouldn't receive the documents. We would hire a document custodian to receive all of that documentation. They would maintain the custody of those documents.

MR. KREBS: Very good. Typically that probably would have been -- who was the document custodian for the mortgages received and pool purchases while you were employed at Bear Stearns?

MR. MONGELLUZZO: I believe there were multiple custodians used.

MR. KREBS: What happened to those mortgages once they were purchased by Bear Stearns?

MR. MONGELLUZZO: Which mortgages specifically are you asking?

AUDIO TRANSCRIPTION

MR. KREBS: Let's focus on the pool of purchases of mortgages to the exclusion of individual mortgages, although I understand pools (audio cuts out).

MR. MONGELLUZZO: I couldn't tell you.

MR. KREBS: All right. You would also receive original and certified copies of powers of attorney, if applicable, with evidences of the recordings of those; is that correct?

MR. MONGELLUZZO: That's correct.

MR. KREBS: You would also receive the original or a certified copy of the modifications and assumptions with respect to that mortgage; is that right?

MR. MONGELLUZZO: Yes.

MR. KREBS: You would also receive the original or certified copy of title insurance policy or an attorney's opinion of title accompanied by a title abstract; is that correct?

MR. MONGELLUZZO: Would you say that again?

AUDIO TRANSCRIPTION

MR. KREBS: You would receive an original or a certified copy of title insurance policy to the exclusion of individual mortgages, although I understand pools might or might not have been moved over into securitizations, but what I'm trying to get at is your understanding of what happened to the mortgages that you -- on which you performed due diligence while engaged at Bear Stearns?

MR. MONGELLUZZO: Let me ask -- let me see if I understand the question.

MR. KREBS: Sure, it's important that you understand the question. And go right ahead, please, sir.

MR. MONGELLUZZO: So your question is for the pools of loans that we do due diligence, what was the final disposition of those loans?

MR. KREBS: If you know, yes.

MR. MONGELLUZZO: They would have been varied, I don't think there was a one standard answer for that, so some of them

AUDIO TRANSCRIPTION

certainly could have been securitized, some of them could have been sold, and I'm sure that there were probably other exit strategies that I may or may not have been aware of.

MR. KREBS: Some of them might have been held as investments?

MR. MONGELLUZZO: That's quite possible.

MR. KREBS: Well, let's focus, if we can, on the securitizations. Do you know what happened to the mortgages that were earmarked or destined to be securitized, what would happen with all this paper?

MR. MONGELLUZZO: With which paper?

MR. KREBS: The paper that I just described, the documents received in connection with the purchase of pools, the delivery of the documents.

MR. MONGELLUZZO: So you're talking about the collateral package that would have been held at the custodian?

MR. KREBS: Correct.

AUDIO TRANSCRIPTION

MR. MONGELLUZZO: My understanding is, in a security, there's a custodian named for the trustee, and the trustee continues to direct that custodian to hold onto that documentation, so it all -- all of the documentation remains at the custodian.

MR. KREBS: Was the -- were those documents or were title to those mortgages transferred to another entity after they were received at the custodian?

MR. MONGELLUZZO: I don't know. I would assume that depending upon what the disposition of the particular loan was, would direct where the custodial package was then held.

MR. KREBS: All right. Let's go back, if we can, to MERS. What -- again, what is MERS?

MR. MONGELLUZZO: To the best of my understanding, MERS is a repository that tracks ownership of mortgages.

MR. KREBS: What was it -- what was MERS' relationship, if you know, with the

AUDIO TRANSCRIPTION

depository or the custodian?

MR. MONGELLUZZO: I don't know.

MR. KREBS: Okay. You understood, did you not, that the mortgages to be acquired on the pools for which you performed due diligence at Bear Stearns were oftentimes earmarked for securitizations, correct?

MR. MONGELLUZZO: You ask that question again, please.

MR. KREBS: You understood that the mortgages in the pools that you were acquiring oftentimes were earmarked for securitizations?

MR. MONGELLUZZO: Yes, I understood that we would securitize some of the loans that we purchased.

MR. KREBS: How were you noticed or notified that a particular pool was ultimately destined to be securitized?

MR. MONGELLUZZO: I wasn't. So there's a point of time where we were performing due diligence, I didn't necessarily know what the exit strategy

AUDIO TRANSCRIPTION

for the asset was.

MR. KREBS: Okay. I understand. That's fair.

Let me ask you this, then: Let's focus a little bit on the due diligence. What materials would you receive prior to making a bid on a pool of loans?

MR. MONGELLUZZO: I was not involved in the process of making bids on pools of loans, that's a trading function.

MR. KREBS: So the traders made that determination, insofar as you know?

MR. MONGELLUZZO: Insofar as I know, correct.

MR. KREBS: All right. Who would have been responsible for notifying you that there was a pool of loans for which due diligence had to be performed on behalf of Bear Stearns?

MR. MONGELLUZZO: The trade desk would notify us that there was a pool of loans that they had agreed to purchase.

MR. KREBS: What, if anything, would they provide you in connection with the

AUDIO TRANSCRIPTION

due diligence to be performed on that pool of loans?

MR. MONGELLUZZO: Generally speaking, they would provide us with a data tape of the pool of loans. They would provide us with any bid stipulations that were done and generally contacts for the counterparty.

MR. KREBS: What is a bid stip?

MR. MONGELLUZZO: Bid stipulations are something that the trade desk would put together outlining the details of the trade.

MR. KREBS: I mean when you say outlining the details of the trade, were they issues relating to the loan portfolio or are they only talking about price and issues of that nature?

MR. MONGELLUZZO: I'm not sure I understand your question.

MR. KREBS: I understand that you said -- you've told us what your belief of bid stips were. What I'm trying to get at is, did the bid stips contemplate the

AUDIO TRANSCRIPTION

quality of the loans that you would be reviewing?

MR. MONGELLUZZO: I'm not sure how to answer the question for you.

MR. KREBS: All right.

MR. MONGELLUZZO: So, you know, I'm -- I'm not sure -- I'm not sure what you're asking, did the bid stips indicate what the quality of the loans were.

MR. KREBS: I mean -- go ahead and tell us everything that you can recall that a bid stip contained.

MR. MONGELLUZZO: Bid stips would typically contain what the price was, who the counterparty was, what type of product it was, if there were particular restrictions on things that couldn't be in the loan pool, for one particular example, you know, that they couldn't be loans with a FICO score below X, so it would outline those sort of details.

MR. KREBS: And when you received that information, what did you do with it?

MR. MONGELLUZZO: It became part of

Page 21

AUDIO TRANSCRIPTION

our file and it was what we used to kick off the due diligence.

MR. BORGERS: This is Tom Borgers. Question, at this time, would the trader tell you the sample size?

MR. MONGELLUZZO: No.

MR. BORGERS: When would the trader tell you the size of the sample?

MR. MONGELLUZZO: The trader didn't necessarily tell us the size of the sample. It wasn't a directive from the trade desk necessarily in terms of what the sample size was.

MR. BORGERS: Who directed you on the sample size?

MR. MONGELLUZZO: I think it was more of a standing practice in terms of what we did for sample sizes, so it wasn't necessarily individually directed for each individual pool.

MR. BORGERS: So for subprime loans, what was your sample size, what was the range of sample size?

MR. MONGELLUZZO: Well, it would

Page 22

AUDIO TRANSCRIPTION

depend upon the time frame that you're speaking of, but generally speaking, for subprime pools, we did 100 percent due diligence, we looked at all of the loans.

MR. BORGERS: So in 2004, 100 percent?

MR. MONGELLUZZO: Generally speaking, there were some exceptions to that, but the vast majority we would have done 100 percent for.

MR. BORGERS: And who were the exceptions for?

MR. MONGELLUZZO: I can't tell you which year the exceptions were made, but there were several, and I would say several being something less than ten, to my knowledge, where we did single seller deals.

We were purchasing a large pool of loans and were going to securitize those loans strictly from that seller. They wouldn't be in an aggregated securitization, and so those particular transactions we did less than 100 percent

Page 23

AUDIO TRANSCRIPTION

due diligence.

MR. BORGERS: And were they large originators?

MR. MONGELLUZZO: Yes.

MR. BORGERS: And could you give us some examples of those originators? Were they -- was it Countrywide?

MR. MONGELLUZZO: Yeah, we didn't purchase -- to my knowledge, we didn't purchase much subprime from Countrywide. The two names that come to mind are Ameriquest and Fremont.

MR. BORGERS: And what size sample would you do for Ameriquest?

MR. MONGELLUZZO: Well, for those particular transactions, because we had purchased pools of loans from those firms where we did do 100 percent diligence, but for those particular transactions where we were doing a single seller transaction, I believe that we did 25 percent.

MR. BORGERS: So for Ameriquest, 25 percent in -- around 2004, and for Fremont?

Page 24

AUDIO TRANSCRIPTION

MR. MONGELLUZZO: Well, again, I said I wasn't certain of the year.

MR. BORGERS: Right.

MR. MONGELLUZZO: And to -- just for certain particular deals, not for all transactions with those two sellers.

MR. BORGERS: Right. So -- but Fremont was also about 25 percent or what percentage?

MR. MONGELLUZZO: I believe it was also 25 percent.

MR. BORGERS: Any other originators that come to mind about the exception to the 100 percent?

MR. MONGELLUZZO: No, not that come to mind.

MR. BORGERS: How about American Home Mortgage?

MR. MONGELLUZZO: Not that I'm aware of.

MR. BORGERS: New Century?

MR. MONGELLUZZO: Again, not that I'm aware of. The two that I recall are the two that I named.

AUDIO TRANSCRIPTION

MR. BORGERS: Let me just mention a couple other. Quick Loan Funding?

MR. MONGELLUZZO: Not -- again, not that I'm aware of.

MR. BORGERS: People's Choice?

MR. MONGELLUZZO: Again, not that I'm aware of.

MR. BORGERS: Okay. I'm just trying to trigger your memory.

MR. KREBS: Okay, let's go on.

MR. BORGERS: So in 2004, it was 100 percent except for these two exceptions, 2005, it's still 100 percent?

MR. MONGELLUZZO: Well, again, I didn't say it was 2004 for those two in particular. I don't recall which year it was.

UNIDENTIFIED SPEAKER: Right. But, Mr. Mongelluzzo, just so we're clear, we're not trying to put words in your mouth. When you give dates, we understand that they're approximate, it's not adversarial.

MR. MONGELLUZZO: I'm not trying to

AUDIO TRANSCRIPTION

be adversarial, but you just said those deals in 2004, I just want to make it clear that I don't recall -- I recall those two particular companies that we did something less than 100 percent for a particular deal, but I don't recall which year that particular deal was, so I just want to make sure that I'm not --

UNIDENTIFIED SPEAKER: That's understood.

MR. KREBS: Was there a time, Mr. Mongelluzzo, that a change did occur in terms -- or in connection with the size of the samples conducted on subprime?

MR. MONGELLUZZO: No, our policy was always that we did 100 percent for subprime, again with a couple of exceptions that I noted.

MR. KREBS: All right. What about alt A, how many, what size?

MR. MONGELLUZZO: Are you talking about what would be the size of the diligence sample?

MR. KREBS: That is correct, yes,

AUDIO TRANSCRIPTION

sir.

MR. MONGELLUZZO: So that would vary fairly significantly, so it -- and several different things would trigger that difference, so I would say the range of sample sizes there would be anything from a minimum of 25 percent to a maximum of 100 percent.

MR. KREBS: Did you internally conduct the due diligence reviews or did you engage third-party vendors to do that for you?

MR. MONGELLUZZO: We engaged third-party vendors to do that for us.

MS. CAREY: We're still talking about bulk purchases, right?

MR. KREBS: Yes, we're talking about bulk, that's correct. Which third-party vendors?

MR. MONGELLUZZO: We used several over the years. The major three would be Clayton, NBMC, and then PricewaterhouseCoopers/Watterson Prime, they went through a name change.

AUDIO TRANSCRIPTION

So those were the major three. We had used some others, you know, sporadically and intermittently, but those would be the major three.

UNIDENTIFIED SPEAKER: Mr. Mongelluzzo walking you back to alt A, what would occasion a 25 percent sample, what variables?

MR. MONGELLUZZO: The variables for sample size in alt A were several, so who the counterparty was, what our track record was with them on previous reviews, so those would be the primary two drivers.

UNIDENTIFIED SPEAKER: By what your track record was, can you explain that?

MR. MONGELLUZZO: Sure. So whenever we took on a new seller, we would do 100 percent due diligence for a number of transactions to determine what we thought of the quality of the loans that they were selling us, and that number of transactions increased over time. Initially we would do a minimum of five transactions, and eventually agreed

Min-U-Script®

AUDIO TRANSCRIPTION

to 15 transactions. After going through whatever the minimum number of transactions were in a point and period in time, we would then look at what the results were from those due diligence results and determine if we were comfortable in reducing the sample size.

UNIDENTIFIED SPEAKER: And by the results, can you explain that?

MR. KREBS: What factors led you to reduce the sample size?

MR. MONGELLUZZO: If we were getting due diligence results where the pools were extremely clean and there weren't a lot of exceptions or issues or loans kicked out of the pool, that would tend to lead us to reducing the sample size.

You know, the other component besides strictly the results is who the counterparty was themselves and what we felt their expertise was in originating that product, so a larger originator would more likely have a smaller sample size than a smaller originator because their

AUDIO TRANSCRIPTION

controls and the credit policies would tend to be better.

MR. HINKLEY: Could you walk us through how Clayton would handle their due diligence with you, what types of reports, you know, and so on?

MR. MONGELLUZZO: Sure. So once we -- and you want to speak specifically just about Clayton?

MR. KREBS: No, just talk generally about your conduct, and we'll come down to individuals if we need to.

MR. MONGELLUZZO: Okay. Well, the question was, is reports from Clayton, so I want to make sure I'm clear.

MR. KREBS: Sure.

MR. MONGELLUZZO: You want to talk about generally first?

MR. KREBS: Yes, please.

MR. MONGELLUZZO: Okay. So generally speaking, from the due diligence firms, we would get two different types of reporting on a daily basis as they were conducting the due diligence and then a final set of

AUDIO TRANSCRIPTION

reports when the due diligence was completed.

The daily reports were in two different formats. One was an individual asset level report, so a report just about a particular month. Those were typically called IAS reports, individual asset summary reports. And then we would get an aggregated set of Excel spreadsheets that would roll up all the findings from the individual asset reports into a rolled-up format so that we could look at the data on a global basis.

MR. KREBS: Did you or members of your staff travel to the sites for the conduct of the due diligence or did you retain -- remain at your headquarters?

MR. MONGELLUZZO: We did both. Predominantly we remained at headquarters, but there were times where we would travel and be on sites.

MR. KREBS: With respect to the persons who represented the due diligence firm on site, they were called what, the

AUDIO TRANSCRIPTION

lead underwriter; is that correct?

MR. MONGELLUZZO: They were called the lead, not a lead underwriter, but the lead.

MR. KREBS: To your knowledge, did Bear Stearns manifest a desire to have a particular person as a lead in connection with the due diligence performed, say, by Clayton?

MR. MONGELLUZZO: Yes.

MR. KREBS: And that would be Mr. Barmore (phonetic), wouldn't it?

MR. MONGELLUZZO: Mr. Barmore was one of the leads who would work. There were several leads that worked on our transactions, not just one.

MR. KREBS: Yes, but was it not common for Bear Stearns, when you were employed there in the due diligence department, to evidence a desire to have a particular lead in connection with a due diligence performed on its behalf?

MR. MONGELLUZZO: We had a desire to have a particular pool of leads as well as

AUDIO TRANSCRIPTION

a particular pool of underwriters. One of the things that we did as a firm, we were the first firm, as far as I know, the only firm to actually test all of the diligence firms and their contract underwriters, and if they couldn't pass the underwriting test, they weren't permitted to work on our transactions so --

MR. KREBS: All right. Excuse me, I didn't mean to interrupt you. I apologize.

MR. MONGELLUZZO: That's okay.

MR. KREBS: Was this a written test?

MR. MONGELLUZZO: It was an online test that we published through our Bear Stearns portal, so it was a written test that they had to lobby online to take, and then if they didn't pass the test, they were not permitted to work on Bear Stearns transactions.

MR. KREBS: And presumably the prospective underwriters, QC personnel at leads of any of the due diligence firms that wanted to provide services to Bear

AUDIO TRANSCRIPTION

Stearns, their employees had to pass that?

MR. MONGELLUZZO: That is correct.

MR. KREBS: What subjects were considered in connection with that online test?

MR. MONGELLUZZO: General underwriting and credit knowledge, so things, you know, things of how -- what to review on an appraisal, how to calculate DTI, how to look at credit reports, how to calculate income, so all standard credit, you know, credit criteria in terms of how to underwrite a loan.

MR. KREBS: And presumably Mr. Barmore was one of those persons who passed that examination, correct?

MR. MONGELLUZZO: If he was working our transactions after we posted that test, then the answer would be yes.

MR. KREBS: At what point in time was that test created and passage of that test was required?

MR. MONGELLUZZO: To be honest with you, I can't recall the year.

AUDIO TRANSCRIPTION

MR. KREBS: Do you recall whether or not it was early in the process or late in the process, that I'm looking for an approximate?

MR. MONGELLUZZO: I'm not sure how you define early or late. If you ask me for my best guess, I would say that we instituted that test in 2006.

MR. KREBS: Okay, that's fair. Now, let me ask you a little bit about the size of your department. How large was the due diligence -- what was the name of your department there at Bear Stearns?

MR. MONGELLUZZO: Well, the department that I worked in was called mortgage finance.

MR. KREBS: Yes.

MR. MONGELLUZZO: So if you're asking how many employees were in mortgage finance --

MR. KREBS: Yes.

MR. MONGELLUZZO: -- it would have changed over time, and I'm not certain

AUDIO TRANSCRIPTION

what those numbers would have been.

MR. KREBS: What were your duties in connection with your employment at Bear Stearns?

MR. MONGELLUZZO: That would have changed from periods in time.

MR. KREBS: All right. Let's start 2006 through 2007.

MR. MONGELLUZZO: My struggle here is with the exact dates.

MR. KREBS: Okay. Let's back up.

MR. MONGELLUZZO: It might be easier if I walked you through from 2004 without giving you specific dates.

MR. KREBS: That would be fine. Thank you.

MR. MONGELLUZZO: So in 2004 when I first joined the firm, I was brought on to run due diligence on particular pools of loans. So, you know, I was basically in, you know, a midlevel managerial world in terms of running due diligence, along with Patty Sears (phonetic) who also ran those, you know, due diligences.

AUDIO TRANSCRIPTION

As our volumes increased, I eventually took on responsibility for running the due diligence process. I would say that probably occurred late 2005, early 2006 and, you know, we continued to build staff, you know, over that period of time all the way through, you know, the end of the firm.

MR. KREBS: At the end, at the close of business, how large was your due diligence department?

MR. MONGELLUZZO: Well, again, it wasn't a due diligence department, so to speak, it was a group of individuals within mortgage finance responsible for due diligence.

I'm not sure what the final headcount would have been. I would say it was five, maybe six, to the best of my knowledge. It could have been one person or two persons larger or smaller.

MR. KREBS: When you began to run the whole department, what was the size?

MR. MONGELLUZZO: Well, initially it

AUDIO TRANSCRIPTION

was just two of us and then, you know, it grew from there.

MR. KREBS: In 2006, did you have to hire more folks?

MR. MONGELLUZZO: In 2006, by that point, yes, we would have hired more individuals.

MR. KREBS: What type of person were you hiring in 2006 and what were they -- what were you hiring them for?

MR. MONGELLUZZO: We were hiring them to manage the due diligence process, to coordinate the due diligence with the vendors, and so we were looking for people with management skills as well as strong underwriting and credit backgrounds.

MR. KREBS: Is it fair to say, sir, that during this period of time when you had multiple people running due diligence, that you, in fact, had more than one due diligence review of loan pools going on at the same time?

MR. MONGELLUZZO: So let me make sure I understand the question. So are you

AUDIO TRANSCRIPTION

saying were there -- looking to purchase more than one pool at a time and therefore having diligence going on on multiple pools at one time?

MR. KREBS: Yes, sir, that's exactly what I'm saying.

MR. MONGELLUZZO: Then the answer would be yes.

MR. KREBS: How often did that happen?

MR. MONGELLUZZO: I would say that it basically happened all of the time.

MR. KREBS: So you were a pretty busy operation there?

MR. MONGELLUZZO: Yes, I would say that we were busy.

MR. KREBS: Was it during this period of time that you traveled less frequently to the sites and actually did it online or received the due diligence vendors' reports online?

MR. MONGELLUZZO: We always received the due diligence vendors' reports via, you know, E-mail. Now -- and I don't

AUDIO TRANSCRIPTION

think the timing changed where we did review.

As a matter of fact, my recollection would be when I first started at the firm, that we didn't do any traveling at all and actually did more traveling as time went on.

One of the things besides going out and doing reviews of actual pools of loans is we also instituted a process where we went out and audited the individual diligence firms to see what their processes were and what they were doing internally as well. So I think our travel and, you know, or review of the diligence firms and what they were doing increased over time, not decreased.

MR. KREBS: What did the audit or review of the typical due diligence firm entail?

MR. MONGELLUZZO: It would entail an on-site visit typically to wherever they had their underwriting center, so not necessarily where their corporate

AUDIO TRANSCRIPTION

headquarters were.

So, for example, both Clayton and Watterson Prime had corporate headquarters in locations other than where their underwriting centers are, so the audit didn't occur at the corporate level, it occurred in the underwriting center. And we were looking to -- we did a security review in terms of how did they handle data, we had an attorney, an internal member of counsel, went with us to see how they were looking at compliance, and we had one of the senior diligence managers go to talk to their underwriting staff and managers in terms of how they looked at loans, how they escalated credit issues and that sort, so generally three people who were going on site to do the review.

MR. KREBS: When you say that you had your internal, inside counsel review how they handled compliance, are you talking about compliance in the sense of loan compliance with state lending laws or are

AUDIO TRANSCRIPTION

you talking about generally compliance as we come to think of it in the securities business?

MR. MONGELLUZZO: No, compliance with state regulatory laws in terms of the origination of the file.

MR. KREBS: So your counsel would go down and determine whether or not they actually understood and had loaded in their computers the correct data for, say, the state of Nevada or the state of California?

MR. MONGELLUZZO: Our counsel would go and make sure that they were interpreting the laws correctly, that we required that all of the diligence firms had an outside audit by an outside law firm to make sure that the actual, you know, computer programming was spitting out the right results in terms of compliance.

MR. KREBS: Thank you.

UNIDENTIFIED SPEAKER: How often did you do these audits?

AUDIO TRANSCRIPTION

MR. MONGELLUZZO: We did them annually.

MR. BORGERS: This is Tom Borgers again. I have a question on the policies for the due diligence area. When did you have written policies, what year did it start or did it start right away in 2004?

MR. MONGELLUZZO: Can you define what you mean by policies?

MR. BORGERS: Well, the written policies for due diligence, did you have written policies for your area?

MR. MONGELLUZZO: We had various written procedures, so I'm not sure if there's a distinction between procedures and policies.

MR. BORGERS: We understood that you helped write those policies with other members of your group, including your boss?

MR. MONGELLUZZO: That would be correct.

MR. BORGERS: And when were those policies written? I didn't hear that.

AUDIO TRANSCRIPTION

I'm sorry. Kind of bleeped out for a second.

MR. MONGELLUZZO: Again, in my mind, it's procedures versus policies, and maybe it's just how I think of them, and I couldn't tell you the time frame for certain. I would say it was probably 2005, 2006.

MR. BORGERS: Yeah, I'm not talking about procedures so much, I'm talking about the actual policies.

MR. MONGELLUZZO: You need to define for me then --

MR. CUNICELLI: Let's say policy, what you're allowed to do, procedures, how you do it, step by step?

MR. MONGELLUZZO: So policies in terms of what you're allowed to do.

MR. CUNICELLI: You -- a minute ago, you told Mr. Borgers that you did write up policy.

MR. MONGELLUZZO: Well, I said procedures and he said policy.

MR. CUNICELLI: Okay. So you wrote

AUDIO TRANSCRIPTION

up procedures. What's, I guess, your working definition of procedures? Is that --

MR. MONGELLUZZO: My working definition of procedure would be very similar to yours, the step by step of what you do in terms of, you know, checklists in terms of this is how you contact the diligence firm, this is what we're required to get from reporting from the diligence firm, this is how to communicate with the diligence firm on an ongoing basis, so those sort of step-by-step procedures.

So again, I'm not certain what you're looking for in terms of policy.

MR. CUNICELLI: Okay, that's fine. You defined procedure for us, you wrote procedure, you didn't write policy?

MR. MONGELLUZZO: That would be my understanding.

MR. CUNICELLI: Okay. Were you and Miss Sears the primary liaison with third-party due diligence firms when they

AUDIO TRANSCRIPTION

were performing the due diligence?

MR. MONGELLUZZO: It would depend upon the time frame, so initially in 2004, 2005, since we were the only two people responsible for that function, the answer would be yes. As we added on other due diligence managers, those people would also have contact with due diligence firms.

MR. KREBS: How did you make the decision to determine which due diligence firm to use on a particular pool?

MR. MONGELLUZZO: I think that there was a number of factors that would go into which due diligence firm we would use. Some of it was capacity driven, some of it was based upon expertise, so I would think that those two things were the primary, you know, the primary drivers.

MR. HINKLEY: Were some firms better than others at various things, you said expertise, and if so, which ones and how?

MR. MONGELLUZZO: Could you ask the question again, please?

AUDIO TRANSCRIPTION

MR. HINKLEY: You indicated you picked firms on the basis of their expertise. Please provide some specifics as to which firms were -- had more expertise than others in various types of mortgages.

MR. MONGELLUZZO: Clayton and Watterson Prime primarily did all of our subprime loans. NBMC didn't have staff that handled those kind of transactions. It wasn't where their business model was around.

And then additionally, the capacity would come in to play because all of the diligence firms had a pool of underwriters that would be more expertise in subprime loans versus others, so they didn't have enough capacity of underwriters available to, you know, at that time had that expertise. We would pick one firm over another depending upon the pool of people that were available.

MR. HINKLEY: You indicated that annually you conducted an audit as to each

AUDIO TRANSCRIPTION

of these firms. Is that -- this is the first time we've heard this from an underwriter. Do you know if any other Wall Street firms conducted audits of the due diligence firms?

MR. MONGELLUZZO: I can't say specifically whether they have or they haven't. I can tell you that we were the first firm to do the underwriting tests. We were the first firm to go out and do an audit.

One of the things that I spearheaded was we created within SIFMA of due diligence managers, so it was a due diligence committee within SIFMA so that all of the Wall Street firms could get together and talk about standards.

Part of what drove that was when the other firms found out that we were testing underwriters and doing audits, that they wanted to know what else that they could do and to make sure that we all could follow similar procedures to get improved people working in the industry working on

AUDIO TRANSCRIPTION

our projects.

MR. HINKLEY: Did -- I mean, you said you conducted the audits annually. Did they turn up anything significant that led you to do this or was it just your following the book? I mean, I think it seems a little unusual unless you were finding something.

MR. MONGELLUZZO: No, I think that we took due diligence exceptionally seriously, and so we were constantly looking at ways in which to make sure that we could improve the process, so not only did we go out and do audits of due diligence vendors, we used other vendors to provide us with fraud tools, other vendors to provide us with valuation tools, and we went through annual testing of those tools to see which ones were the best in class in terms of the marketplace. So we spent a lot of time and effort continually trying to improve the process. So I wouldn't say that we thought that there was something wrong. I kind of

AUDIO TRANSCRIPTION

liken the example to, you know, you build the best car you can today, but that doesn't mean that you don't want to build a better car tomorrow. So we were always looking at ways in which we could improve the process.

MR. HINKLEY: You said you worked on the SIFMA due diligence committee. Are you familiar with the proposed due diligence standards that SIFMA was working on?

MR. MONGELLUZZO: Yes.

MR. HINKLEY: To what extent did Bear Stearns' due diligence standards differ from those that were ultimately -- that are in the last draft proposed by SIFMA?

MR. MONGELLUZZO: It would depend upon point in time, so I chaired that committee at SIFMA, and we brought into that committee, members of the rating agencies as well as members of the diligence firms. And so it was a collective of bringing thoughts and processes from a

AUDIO TRANSCRIPTION

number of different ways, again, to improve the process. So I would think that any firm would have had some gap between that final version and their process because all of the firms were bringing contributions to the table in terms of let's do this, let's do that, these are things that we can do to improve. So we were drawing from a much bigger knowledge base in terms of other things that we could do.

MR. HINKLEY: Those -- the SIFMA procedures rely quite a bit on samples, yet Bear Stearns was doing 100 percent samples; is that right?

MR. MONGELLUZZO: We were doing 100 percent for subprime, generally speaking, correct.

MR. HINKLEY: I'm interested in why you were doing 100 percent, yet it seems like the SIFMA standard was for a sample of much less?

MR. MONGELLUZZO: I'm sorry, can you ask the question again?

AUDIO TRANSCRIPTION

MR. HINKLEY: I'm interested in why Bear Stearns was doing 100 percent, but the SIFMA sampling technique which was being recommended as a standard procedure seemed to be for using samples as opposed to 100 percent reviews?

MR. MONGELLUZZO: I just think that we, again, took diligence, you know, at a much, you know, at a very serious level, and so there are -- I think there were many instances where we were the trendsetter of doing things above and beyond what other organizations did. Again, I point you back to the underwriting tests and to going out and auditing the vendors, the testing that we did of valuation vendors and fraud vendors, you know, so just because somebody else would use a lesser standard wouldn't mean that we would.

MR. HINKLEY: Yeah, but you were sitting as the chair of this due diligence committee, and you had a procedure or policy at Bear Stearns that did not rely

Page 53

AUDIO TRANSCRIPTION

on samples, yet the committee was putting out a standardized policy or procedure that did. I'm trying to figure out how you reconciled that?

MR. MONGELLUZZO: I think it's a fairly easy reconciliation. When you're working from a trade association standpoint, you're building a consensus, that doesn't mean that any of the members of the organization couldn't exceed that standard, you know, so that would be, you know, you know, in my mind, the minimal acceptable standard.

If we or any other firm chose to exceed that standard, that would be fine, as long as everybody at least met the minimum standard.

MS. CAREY: Tom, for the first time, we'd like to take a short break.

MR. KREBS: Sure, why don't we call you back in ten.

MS. CAREY: We'll just put you on mute. We'll take a quick break.

MR. CUNICELLI: Break at 11:25, going

Page 54

AUDIO TRANSCRIPTION

off the record.

(Recess taken.)

MR. CUNICELLI: Back on the record, 11:36.

MR. HINKLEY: Mr. Mongelluzzo, a question about the audit review that you did in 2006. I'd like to focus on one of your firms, and that's Clayton. Can you tell us what your findings were about Clayton?

MR. MONGELLUZZO: When you say the audit review that we went on site to do at the diligence firm, is that the audit review you're speaking of?

MR. HINKLEY: Yes.

MR. MONGELLUZZO: I couldn't tell you specifically what audit findings were, you know, on a particular review. I wouldn't remember details.

MR. KREBS: How were the audit reviews memorialized?

MR. MONGELLUZZO: I'm trying to -- I'm hesitating because I'm trying to recall. I believe that we put together,

Page 55

AUDIO TRANSCRIPTION

you know, a report on those, but I don't remember what the format of that was.

MR. HINKLEY: And overall, did you find Clayton to be among your best, your worst, how -- without getting into the specifics?

MR. MONGELLUZZO: I would say that we thought that they -- that all of the diligence firms were fairly similar, that they all had, you know, things that they could improve upon, but in general, thought that they, you know, that they did a good job.

MR. HINKLEY: Was there any overall problem with all of the firms that you would like to see them do better for Bear Stearns? What was your wish list for your due diligence firms that you didn't think they were doing properly?

MR. MONGELLUZZO: Could you ask the question, I think you asked two different questions, and so I need a little clarification. Could you ask the question again, please.

Page 56

AUDIO TRANSCRIPTION

MR. HINKLEY: Based upon your standards, what did you want to see more from your firms, was there a particular type of review that you wished they would enhance or improve overall with all the firms?

MR. MONGELLUZZO: Well, I think that changed from time to time. I think at any point in period of time, we thought that they were doing the best review that could be done, and then as we became aware of something that could be improved, we would improve that process.

So I think we were constantly looking for ways to improve the process, but I don't know that I would say that, you know, we thought that their process was inadequate or we had a wish list while, oh, can they do this. When we found something that could be improved, we made it a requirement that that item change or be improved upon, so as soon as we found things that we could improve upon, that's what we would require.

AUDIO TRANSCRIPTION

MR. CUNICELLI: Mr. Mongelluzzo, I think you said earlier that you had three basic third-party due diligence firms, and two of them, Clayton and Pricewaterhouse, were generally qualified to do subprime?

MR. MONGELLUZZO: That's correct.

MR. CUNICELLI: Okay. Would you have engaged Clayton in particular to do diligence subprime deals?

MR. MONGELLUZZO: Yes, we did engage Clayton to do diligence on subprime deals.

MR. CUNICELLI: And when you engaged Clayton to do subprime deals, you engaged them to do a 100 percent sample of due diligence or 100 percent of every loan in the deal?

MR. MONGELLUZZO: Generally speaking, other than the exceptions I noted earlier, yes.

MR. CUNICELLI: So, you know, largely, every time you engage Clayton on a subprime deal, they performed 100 percent due diligence on the underlying assets?

AUDIO TRANSCRIPTION

MR. MONGELLUZZO: That's correct.

MR. KREBS: What are exception reports?

MR. MONGELLUZZO: Are you specifically talking about due diligence exception reports?

MR. KREBS: Absolutely. I believe that is the reason why we've got you -- you're sitting here where you are today and we're sitting where we are, to talk about due diligence.

MR. MONGELLUZZO: I just wanted to be clear that I wasn't going to answer something that you weren't looking for.

MR. KREBS: I think you're absolutely correct. Any time you have a question for us that you don't understand, I think -- we encourage you to go ahead and try to have a full understanding before you answer.

MR. MONGELLUZZO: With the exception reports were -- when I described earlier that there were two different types of reports that we received from the

AUDIO TRANSCRIPTION

diligence firm, one being an individual asset level report and the rolled-up report. The rolled-up report would frequently or, you know, always contain a portion of that which was an exception report.

So typically the reporting for that was in an Excel format. They would -- the reports that we would receive would have multiple tabs on the Excel format, and one of those tabs would be the exception report. The exception report would list all of the loans that had some sort of exception on them.

MR. CUNICELLI: Mr. Mongelluzzo, with that in mind, I asked you a question earlier about were you and Miss Sears the primary contact, and I think you told me that early on, that would have been the case.

MR. MONGELLUZZO: Yes, that's correct.

MR. CUNICELLI: Okay. So -- and by the way, early on, is that 2004 or 2005,

AUDIO TRANSCRIPTION

in that time frame?

MR. MONGELLUZZO: To the best of my knowledge, I'm not sure when we started adding on additional people.

MR. CUNICELLI: Okay. Excellent. And just going with your early on and perhaps in that '04, '05 time frame, perhaps not, you would have received these reports daily, these two reports, the IAS and the aggregate Excel spreadsheet, daily from any third-party due diligence firm you engaged?

MR. MONGELLUZZO: That's correct.

MR. CUNICELLI: Okay. And walk me through the process. You're receiving this daily via electronic mail?

MR. MONGELLUZZO: That's correct.

MR. CUNICELLI: Okay. And you reviewed that daily or would you review that at the end of an engagement?

MR. MONGELLUZZO: No, it would be reviewed daily.

MR. CUNICELLI: Okay. So you review that daily, and would you review the

AUDIO TRANSCRIPTION

exception tab daily?

MR. MONGELLUZZO: Yes.

MR. CUNICELLI: Okay. And I take it that some of these things, there would be things missing in the files. I guess Clayton would call that a 2T, there was trailing documentation. Are you familiar with that?

MR. MONGELLUZZO: We didn't use the nomenclature of 2T or transaction.

MR. CUNICELLI: Okay. What about trailing -- what nomenclature would you use for missing or trailing documentation?

MR. MONGELLUZZO: A loan that was missing documentation would have been rated as a three, and then if --

MR. CUNICELLI: I apologize. Go ahead.

MR. MONGELLUZZO: No, that's okay. I was finished.

MR. CUNICELLI: Okay. So that would have been a three. Before you close out this wake or this engagement, you have to have a final status on all loans. Does

AUDIO TRANSCRIPTION

Bear Stearns accept all the threes or do you have some sort of negotiation as to, you know, which threes have been cleared or which -- or for which threes there could be a waiver?

MR. MONGELLUZZO: I think you're asking multiple questions.

MR. CUNICELLI: Yes, I am. If you can give me multiple answers, that would be amazing.

MR. MONGELLUZZO: Could we take them one at a time because I can't remember the first one by the time you got to the second one.

MR. CUNICELLI: Okay.

MR. MONGELLUZZO: If it was in parts it would be easier for me.

MR. CUNICELLI: Less moving parts, no problem.

You've got a list, and the list has, you know, out of a pool of 5,000 loans, you have 1,000 that are in the status of three, 20 percent, and three means it doesn't meet the underwriting standards,

AUDIO TRANSCRIPTION

correct?

MR. MONGELLUZZO: It means that there's some issue with the loan, correct.

MR. CUNICELLI: Okay. And is Bear Stearns just going to accept that 20 percent or do you engage in some process to see how many of those you can clear?

MR. MONGELLUZZO: There is a process to see if those loans can be cleared.

MR. CUNICELLI: Okay. And what is that process, why don't you run it down for me step by step since you're a procedure guy and you know step by step?

MR. MONGELLUZZO: So upon receiving the final report, that final report would be shared with the seller of the loan, and the seller of the loan would be granted an opportunity to correct whatever the deficiencies with that loan are.

So in the instance that you gave the example where a loan was missing some documentation, if they were able to produce that documentation and that

AUDIO TRANSCRIPTION

documentation satisfied whatever findings the due diligence vendor had found, then that loan would be eligible for purchase.

If that documentation they provided did not satisfy the criteria for the diligence firm in terms of being either all of the missing documents or if there was some deficiency on the document that they provided, then that loan would remain a three and would not be purchased.

MR. CUNICELLI: Okay. And using that example that I started, missing documentation that they now produced, and you mentioned the word "nomenclature" earlier.

If there was missing documentation and the seller subsequently produced the documentation, would you use the nomenclature "waiver" for that or no, would that not be a waiver or would that be a waiver?

MR. MONGELLUZZO: Well, I'm not sure how you are using the term "waiver." We as a firm did not use the word "waiver."

AUDIO TRANSCRIPTION

MR. CUNICELLI: Okay. What term would you use for a loan that was in status three because of missing documentation, and that documentation was subsequently provided by the seller?

MR. MONGELLUZZO: Well, that loan, it would depend upon rereview of the loan and that documentation, that loan would be recoded and no longer be a three because it would no longer have a deficiency.

MR. CUNICELLI: So that would be a recode from a three to a one?

MR. MONGELLUZZO: That would depend. So in different periods in time, it was different. At a juncture in time, we required that those loans that changed code actually got a separate status code of a four.

MR. CUNICELLI: Okay. And a four would indicate kind of a repair from a three to basically a one where it's acceptable, it meets underwriting standards?

MR. MONGELLUZZO: It would basically

AUDIO TRANSCRIPTION

mean that there was a change from the original finding of a three to something else.

MR. CUNICELLI: To something else, okay.

And you said that at one juncture in time, you used a four. At other junctures, could you walk those down for me?

MR. MONGELLUZZO: The original process would have been that the diligence firm would have taken that three once the loan was repaired, turn it either to a two or one depending on what the appropriate rating was.

As time went on, we wanted to be able to track those loans separately, and so we then required that they code them as a four. So somewhere later in the process, we changed that coding from a reverting to one of the previous numbers to it having a separate and distinct code.

MR. CUNICELLI: Okay. And any idea in what time frame you're talking that you

AUDIO TRANSCRIPTION

would have used the numeric four?

MR. MONGELLUZZO: To be honest with you, I'm not really certain.

MR. KREBS: Let me ask you this question: This is Tom Krebs.

Were your duties and responsibilities, did they extend to EMC purchases or only for Bear Stearns?

MR. MONGELLUZZO: I'm not sure how to answer your question. Are you talking the difference between full purchases and another channel of origination?

MR. KREBS: Well, we were talking generally about bulk purchases, but now that you've raised that issue, what was, if any, your relationship with EMC and your responsibilities?

MR. MONGELLUZZO: Well, I was always an employee of Bear Stearns, so my relation -- and EMC was, you know, obviously a company owned by Bear Stearns, so my relationship with EMC would have been different in various different points in time.

AUDIO TRANSCRIPTION

MR. HINKLEY: All right. Let's start at the top, okay. We understand that Bear Stearns and EMC bought mortgages from various parties during the period 2004 to 2007.

MR. MONGELLUZZO: Yup.

MR. HINKLEY: Explain to us how your position fit in to the purchase of mortgages generally by Bear Stearns and EMC and what your responsibilities were. Now, we know you're part of the mortgage finance department. What other parts of the mortgage finance department were there besides due diligence, how did you fit in and what were your overall responsibilities?

MR. MONGELLUZZO: Well, I don't know if I could speak to all of the areas of mortgage finance in terms of what --

MR. HINKLEY: Give us your best recollection as to how your group fit in to Bear Stearns mortgage purchase operation.

MR. MONGELLUZZO: So --

Page 69

AUDIO TRANSCRIPTION

MR. HINKLEY: You went to work every morning, you knew where you fit in, just lay it out for us so we can understand it.

MR. MONGELLUZZO: Sure. So --

MS. CAREY: Bob, I think I might be able to help because I think we're just getting tangled in basic company structure stuff. The -- all the bulk purchases, and John will correct me if I'm wrong, that were purchased by Bear Stearns at large were purchased through the bulk channel EMC. That's my understanding, in talking today about EMC as a purchaser of those mortgages. John was getting his paycheck from Bear Stearns.

MR. KREBS: But we have been talking about, throughout this morning's conversation, about bulk purchases through EMC; is that right, Jessica?

MS. CAREY: Hold on, John, you're far away on that one. Can you repeat that? I didn't hear you.

Page 70

AUDIO TRANSCRIPTION

MR. HINKLEY: Bear Stearns wants to buy a mortgage or a pool of mortgages or EMC wants to buy a mortgage or a pool of mortgages. Where do we fit in in the total scheme of those things? There's bulk mortgages and there's what other kind of mortgages and what was our position in the organizational structure and what did we have to do?

MR. MONGELLUZZO: So the due diligence group that we've been speaking about was responsible for doing the due diligence on bulk purchases of loans. So that's where we fit in in the organization, so any bulk package that was purchased by the firm, this group would do the due diligence of those bulk purchases.

MR. HINKLEY: And that includes EMC and Bear?

MR. MONGELLUZZO: That is correct.

MR. HINKLEY: And that doesn't cover the flow, and explain to me what the flow is again.

MR. MONGELLUZZO: The flow was a

Page 71

AUDIO TRANSCRIPTION

different channel in which EMC purchased mortgages, so they would purchase mortgages one at a time as opposed to in bulk packages.

So those loans would be sent one at a time to EMC to be reviewed as opposed to a bulk package that would aggregate hundreds of loans together.

MR. HINKLEY: Right. So if Bear Stearns or EMC were to buy a mortgage during the period 2004 to 2007, it would either be a bulk or one of these individually purchased flow mortgages?

MR. MONGELLUZZO: To the best of my knowledge, yes.

MR. HINKLEY: And your responsibility was for all bulk purchases at both EMC and Bear?

MR. MONGELLUZZO: During the diligence of those, correct.

MR. HINKLEY: Now, that's the next point. When Bear Stearns or EMC goes to buy mortgages, that's -- how does that process work and how does due diligence

Page 72

AUDIO TRANSCRIPTION

fit into that process?

MR. MONGELLUZZO: When they go -- well, I thought we had outlined that process earlier, that the trade desk would do all of the, you know, the bidding on a package of loans, if they were awarded the package of loans, they would notify the due diligence group that we were purchasing a package of loans and that those loans needed to be diligenced, and then we would arrange with a third-party vendor to perform that loan level's diligence.

MR. HINKLEY: And your group had how many people in it, five people you said at the end?

MR. MONGELLUZZO: Five or six, to the best of my recollection.

MR. KREBS: And the 100 percent due diligence of subprime loans related both to Bear and to EMC's pool purchases; is that correct?

MR. MONGELLUZZO: Can you say that again, please?

AUDIO TRANSCRIPTION

MR. KREBS: The 100 percent requirement or the 100 percent due diligence performed on subprime loans for both EMC and Bear, that 100 percent of those loans were reviewed?

MR. MONGELLUZZO: Generally speaking, with the exceptions that I noted before, that's correct. The subprime loans, we would have done 100 percent due diligence.

MR. KREBS: With respect -- let me go back, if I can, to the exception reports. Were there some deficiencies that were noted in the exception reports that were not material, and if so, how did you rank those or how were those ranked?

MR. MONGELLUZZO: I think it would depend upon how you're defining material.

MR. KREBS: Well, in point of fact, I'm going to ask you for how you define material. What is a material deficiency with respect to a loan?

MR. MONGELLUZZO: I think there could be multiple material deficiencies for loans, so I don't think I could, off the

AUDIO TRANSCRIPTION

top of my head, define them all.

MR. KREBS: Well, let me ask you this, let's suppose you have a DTI greater than 60, would it be material or not material if you had a loan with a DTI equal to 60?

MR. MONGELLUZZO: As a policy, we didn't purchase loans with DTI's at 60 percent.

MR. KREBS: What was your policy with respect to the purchase of loans on DTI?

MR. MONGELLUZZO: As best as I recall, the maximum DTI that we would ever purchase would be 55 percent.

MR. KREBS: Was there any instances where loans had a 56 DTI and were nevertheless purchased?

MR. MONGELLUZZO: Not that I am specifically aware of.

MR. KREBS: Were there some deficiencies in loans which were deemed to -- which were deemed to be acceptable because they had compensating factors?

MR. MONGELLUZZO: Yes.

AUDIO TRANSCRIPTION

MR. KREBS: What -- how did you rank those loans?

MR. MONGELLUZZO: I'm not certain what you mean by how do we rank those loans.

MR. KREBS: Well, you told us earlier that loans with deficiencies were ranked threes, correct?

MR. MONGELLUZZO: I don't think I said that, but yes, that would be accurate.

MR. KREBS: If loans ranked as threes had compensating factors, would their designation as threes be altered?

MR. MONGELLUZZO: I think we need to take a step back. So typically, if you look at the scale of one, two and three, a one would be a loan that perfectly fit the underwriting guideline.

MR. KREBS: Good. All right. I understand that.

MR. MONGELLUZZO: A two typically is a loan that has some minor exception to it and has acceptable compensating factors,

AUDIO TRANSCRIPTION

so when you talk about compensating factors, most of those are what would be your twos.

And then your threes are loans that have issues that need to be remediated. If we purchased a loan that had been previously made a three because we felt that there was a significant compensating factors, but it was beyond the judgment call of the due diligence firm, those we would then code as a four.

MR. HINKLEY: Yeah, let me ask you about the compensating factors. Were you delegating the compensating factors to the due diligence firm or were you reviewing each exception and making that determination?

MR. MONGELLUZZO: We -- the combination of both, so they were delegated to make that initial call themselves; however, all of the loans that would be rated a two would be reviewed by whoever the diligence manager was handling that transaction to make sure that the

Page 77

AUDIO TRANSCRIPTION

compensating factors that the diligence firm noted were sufficient to compensate for whatever the factor was.

MR. HINKLEY: What if they were rated or ranked a three, were they allowed to develop compensating factors that -- Clayton, for example?

MR. MONGELLUZZO: Well, Clayton, if they felt that there were compensating factors but they were not comfortable making that judgment call of calling it a two, could call it a three, and if they called it a three and we thought that the compensating factors were sufficient enough, we would have them change that rating to a four so that we could distinguish between when they said that there were significant compensating factors and when we thought there were significant compensating factors.

MR. KREBS: Is a four ranking for a loan a loan that was rejected or one that was accepted?

MR. MONGELLUZZO: Say that again.

Page 78

AUDIO TRANSCRIPTION

MR. KREBS: Was a ranking of four for a loan a signal that the loan had been rejected or had been accepted?

MR. MONGELLUZZO: It would be a signal that the loan was accepted.

MR. KREBS: Thank you.

Do you have any notion as to how many loans Clayton reviewed for Bear Stearns and EMC, loan pools that is, how many loans were contained in the loan pools that they reviewed from the first quarter of 2006 through the second quarter of 2007?

MR. MONGELLUZZO: I would have no idea offhand.

MR. KREBS: If I told you that Clayton says that they had 72,379 loans that were so reviewed, would you agree or disagree with that or would you have an opinion?

MR. MONGELLUZZO: I wouldn't agree or disagree because I don't have any facts to know whether that number is accurate or not accurate.

Page 79

AUDIO TRANSCRIPTION

MR. KREBS: Did you have any meetings in the year 2007 with the management of Clayton concerning the exception reports and summary exception reports regarding loans reviewed for the year 2006 and the first two quarters of 2007?

MR. MONGELLUZZO: Could you ask the question again, please?

MR. KREBS: Did you meet with -- did you meet with Clayton officials in 2007?

MR. MONGELLUZZO: I don't recall, but quite possible, I spoke with them on a daily basis.

MR. KREBS: Did you have a meeting with them at your offices?

MR. MONGELLUZZO: Again, quite possible, we met on a fairly frequent basis.

MR. KREBS: Do you know who Vicki Beal (phonetic) is?

MR. MONGELLUZZO: I certainly do.

MR. KREBS: Do you know who Miss O'Neill is, Miss Kerry O'Neill (phonetic) is?

Page 80

AUDIO TRANSCRIPTION

MR. MONGELLUZZO: I do.

MR. KREBS: Did you meet with both of them during 2007 for the purpose of reviewing reports generated by Clayton for the year 2006 and the first two quarters of 2007?

MR. MONGELLUZZO: Again, I don't recall, but it's certainly a possibility.

MR. HINKLEY: When did you -- you started using the four as the waiver type of loan or loan that was originally rejected as a three but now -- then made a four, what year did you start using that code to describe your waiver?

MR. MONGELLUZZO: As I said earlier, I don't recall when we instituted that process change.

MR. HINKLEY: But would the due diligence firms always know the -- that you waived a particular loan?

MR. MONGELLUZZO: If we changed -- if you're asking if we changed the coding, would the diligence firm be aware of that, the answer is yes.

AUDIO TRANSCRIPTION

MR. KREBS: When the due diligence firm agreed with Bear Stearns or EMC to undertake a review of a loan pool, what standards were applied in connection with that pool reviewed?

MR. MONGELLUZZO: I'm not sure what you mean by what standards.

MR. KREBS: How did the due diligence firm know what standard to apply in order to make a determination that a loan was a one or a two or a three or a four? I'm sorry, you made the determination about fours. How did they know that?

MR. MONGELLUZZO: So the diligence firms all had a scope of review of what documents they were supposed to review in a file, and they would also get a set of underwriting guidelines for the pool as well as whatever business or overlays that there were, so they would use the conjunction of those items to perform the due diligence review.

MR. HINKLEY: So the underwriting guidelines, were they the originator's

AUDIO TRANSCRIPTION

underwriting guidelines?

MR. MONGELLUZZO: They could be one of two things, so EMC had a published set of underwriting guidelines to which we would purchase loans that were underwritten to those guidelines or if a seller chose to -- wanted to sell some -- their underwriting guidelines, those underwriting guidelines would have to be submitted and approved, and they may be approved in total or in part, which is where you would get the overlay from. So we might approve somebody's guidelines and then make exceptions and say we wouldn't buy loans with these certain characteristics in your underwriting guidelines.

MR. KREBS: So you would superimpose your own overlays over top of those underwriting guidelines; is that correct?

MR. MONGELLUZZO: That is a possibility, not necessarily, but it would be a possibility.

MR. HINKLEY: Question about, you

AUDIO TRANSCRIPTION

were at EMC, Bear Stearns from 2004 to 2007. Did you see any deterioration in the market in that period, and when, when did you see a problem?

MR. MONGELLUZZO: How are you defining deterioration?

MR. HINKLEY: Deterioration in underwriting standards.

MR. MONGELLUZZO: Deterioration in underwriting standards. I don't think -- I think that there were, over periods of time, changes in underwriting guidelines. I wouldn't characterize that as a deterioration of underwriting standards. Standards are -- excuse me.

MR. HINKLEY: So you're saying loans were underwritten to the same high standard that they always were throughout the period?

MR. MONGELLUZZO: I'm not sure I understand your question.

MR. HINKLEY: You saw no decrease in the quality of the underwriting from the period 2004 to 2007?

AUDIO TRANSCRIPTION

MR. MONGELLUZZO: I'm not sure how to answer the question. I'm not sure if you are specifically talking about guidelines or what underwriters did as procedural facts, so I'm not sure how to answer your question.

MR. HINKLEY: Because, Mr. Mongelluzzo, did you note an increase in acceptable LTV during that period?

MR. MONGELLUZZO: Did I note an --

MR. HINKLEY: An increase --

MR. MONGELLUZZO: I mean, that be a change in guidelines or products that are available, so yes.

MR. HINKLEY: Okay.

MR. MONGELLUZZO: Consistently over time, there's always changes to guidelines and product types.

MR. HINKLEY: Right. And the change that I was talking about was an increase in LTV, you did note that during that time?

MR. MONGELLUZZO: I believe in some products and in some guidelines, they were

AUDIO TRANSCRIPTION

increases in LTV.

MR. HINKLEY: And what would those products have been, sir?

MR. MONGELLUZZO: That specifically, you know, as a general matter, I could say that, yes, I was aware. Specifically it would be based upon the product and the guidelines, and that specific recollection I don't have.

MR. HINKLEY: And during that time, did you notice a decrease in the average FICO score in subprime?

MR. MONGELLUZZO: Again, I think it's the same answer with LTV. I think certain products, certain guidelines, there would have been, you know, would have been changes.

MR. HINKLEY: So -- right, those changes, would they have gone down, and I guess, you know, I was asking about subprime?

MR. MONGELLUZZO: Well, I think in -- for some guidelines and for some products, they may have gone down, and in others,

AUDIO TRANSCRIPTION

they may have gone up. I don't think it's a one-size-fits-all universal answer.

MR. HINKLEY: You couldn't say in aggregate that you observed FICOs decreasing during that time period?

MR. MONGELLUZZO: I don't think, you know, that I looked at aggregated data of what FICO scores were or, you know, what LTV's were.

MR. HINKLEY: Okay. But you were looking at aggregated data in the pools in the Excel spreadsheet, correct?

MR. MONGELLUZZO: Yeah, but I wasn't looking at things like weighted average FICO or weighted LTV of the pools, so I couldn't tell you whether, you know, over time, that those weighted averages went up or down.

MR. HINKLEY: Okay. Wouldn't that have been present on the tape?

MR. MONGELLUZZO: Not -- my function wasn't to be looking at those characteristics in terms of trends of weighted averages going up or down, that

AUDIO TRANSCRIPTION

would have been some sort of analytical function somewhere else in the firm.

MR. HINKLEY: Okay. We've now answered the questions about guidelines. In your experience, was there a uniform -- was the underwriting quality, that is the extent to which the loans that you were reviewing met guidelines, was that going up, down or did you see no appreciable difference over time? In other words, how many more -- were you getting more threes or was it basically staying level throughout?

MR. MONGELLUZZO: I think that answer would vary by each individual loan pool, individual time frames, you know, so I don't think that there's a one-size-fits-all answer for that.

MR. HINKLEY: So you didn't see any trends over the period you were there from 2004, 2007 in terms of quality of underwriting, it was ad hoc, sometimes the underwriting was good, sometimes it was bad, but there was no real trend?

AUDIO TRANSCRIPTION

MR. MONGELLUZZO: I'm not sure how to answer that question for you.

MR. HINKLEY: And -- well, what don't you understand? You were in charge of checking the underwriting of mortgages that Bear Stearns was buying, and over time, you didn't notice whether the underwriting was getting better or worse?

MR. MONGELLUZZO: I think you are defining underwriting as better or worse differently than what our function was. Our function was to make sure that the loans fell within and met the guidelines, and if they didn't fall within and meet the guidelines, that there were acceptable compensating factors for them. I think you're asking a question saying whether or not those underwriting guidelines were better or worse.

MR. HINKLEY: No, I'm not asking that question at all. I think I've made that quite clear. I actually -- we went through the underlying guidelines and how they may have varied and, in fact, gotten

Page 89

AUDIO TRANSCRIPTION

more liberal.

My question is: Were the people who were writing the loans, were they meeting the reduced guidelines or not, was the standard of underwriting going up, down or not -- staying the same?

MR. MONGELLUZZO: I would say, generally speaking, that it was staying the same.

MR. HINKLEY: Thank you.

UNIDENTIFIED SPEAKER: All right. I just want to drill down a little bit, for your underwriters, what were the ideal number of -- average number of loans for each reviewer to do on a daily basis, what were you looking for, was it five, ten, twelve loans, you tell me?

MR. MONGELLUZZO: Are you talking about the contract underwriters from the diligence firms?

UNIDENTIFIED SPEAKER: Yes.

MR. MONGELLUZZO: They didn't -- we didn't specify how many files they had to look at in a day in any shape, manner or

Page 90

AUDIO TRANSCRIPTION

form.

UNIDENTIFIED SPEAKER: Now, do you ever pay the underwriters, the due diligence firms a bonus for doing a quick turnaround?

MR. MONGELLUZZO: No, we paid strictly on a per file basis.

UNIDENTIFIED SPEAKER: What was that per file basis?

MR. MONGELLUZZO: It would have varied from time to time, from firm to firm.

UNIDENTIFIED SPEAKER: Well, for Clayton, tell me what was the per file basis.

MR. MONGELLUZZO: I don't remember the details of what the contract was, you know, and again, it would have changed from time to time.

UNIDENTIFIED SPEAKER: Was there a contract for each and every deal?

MR. MONGELLUZZO: No, there was a process in which contracts with the diligence firms were signed through global

Page 91

AUDIO TRANSCRIPTION

procurement, and so those contracts would have spelled out what the SLA's were in terms of turnaround time, in terms of reporting criteria and what the contract price per file review would be, but I don't remember the details of what those numbers would be.

UNIDENTIFIED SPEAKER: What percentage of your business did Clayton do?

MR. MONGELLUZZO: I don't recall.

UNIDENTIFIED SPEAKER: Was it majority, was it -- give me your best guess.

MR. MONGELLUZZO: My best guess would be overall that they were probably about 40 percent. I would say that Watterson Prime was another 40 percent. And the MDMC was about 20 percent. Those numbers could flux a little bit in any direction, but, you know, we didn't want to be in a situation where any one diligence vendor had the vast majority of, you know, of our business.

Pag

AUDIO TRANSCRIPTION

UNIDENTIFIED SPEAKER: So would Clayton be more on subprime or alt A?

MR. MONGELLUZZO: I think they did a balance of both.

UNIDENTIFIED SPEAKER: So about 50 percent of that 40 percent that you just mentioned?

MR. MONGELLUZZO: I think that would vary from time to time. I think you could have certain periods of time where they were heavier in one and lighter in the other, just depending upon where else we were sourcing the business and what the volumes were.

UNIDENTIFIED SPEAKER: One of the things -- you know, we just have a few more questions. When you had the exception reports, how many exceptions did you have to approve each day between -- let's say in the early years between you and Miss Sears?

MR. MONGELLUZZO: Like how many exceptions were in a particular pool of loans?

AUDIO TRANSCRIPTION

UNIDENTIFIED SPEAKER: Well, on a daily basis, you know, roughly, you know, did you get 20 exceptions or were there 100 exceptions on a daily basis?

MR. MONGELLUZZO: That number could vary dramatically and widely on a daily basis. I don't think it was anywhere near a consistent enough number that I could even hazard a guess.

UNIDENTIFIED SPEAKER: But was it over a hundred on certain days, so were you reviewing 100 loan files?

MR. MONGELLUZZO: Well, again, we didn't review loan files, we reviewed reporting of findings in files.

UNIDENTIFIED SPEAKER: I mean, to change a three to a four, you had to -- they -- the due diligence firms was relying upon your, you know, approval, and wouldn't you have to go into the loan file to see the compensating factors?

MR. MONGELLUZZO: No, you would look at the reporting from the diligence firm, not look in the loan file. So we never

AUDIO TRANSCRIPTION

physically looked in a loan file, unless we were on site somewhere, then we would look physically in a loan file, but if you're talking about just looking at the electronic reporting, the electronic reporting would spell out for us what the exception was and what the compensating factors was, that was data and information that the diligence firm was responsible for providing to us.

UNIDENTIFIED SPEAKER: Okay. So you didn't come up with additional compensating factors, you were relying upon Clayton or PPC and the rest?

MR. MONGELLUZZO: That is correct.

UNIDENTIFIED SPEAKER: So essentially Clayton would say that there were not sufficient compensating factors and you would overrule them?

MR. MONGELLUZZO: They would say that they weren't sure, you know, and there were certain circumstances where we would say to them that we wouldn't want them to make that decision, we would want to make

AUDIO TRANSCRIPTION

that decision.

So they were given a limited range of what exceptions and what compensating factors they could accept, and even though they may think that something was acceptable, we wanted to be the final party to look at that and review that because ultimately we would be the ones purchasing the loan.

UNIDENTIFIED SPEAKER: And you didn't do this yourself, at the end, you had people doing it that worked under you, correct, you were directing them?

MR. MONGELLUZZO: I had people that I was directing, but I always handled some number of transactions, that I was looking at them myself directly.

UNIDENTIFIED SPEAKER: Who were the people that worked for you, what were their names, in the end?

MR. MONGELLUZZO: I'm not sure I could give you all. I could give you some. So Patty Sears (phonetic), Joe Carion (phonetic), Maria Hargus

AUDIO TRANSCRIPTION

(phonetic), Faith Hoden (phonetic), Jackie Donahue (phonetic). Those are the ones I remember. There may have been others intermittently, you know, in and out, but I think that would have been the group at, you know, at the end, so to speak.

MR. CUNICELLI: All right. I've got 12:21. We'll go off record. Thank you.

(Whereupon the recording ended)

C E R T I F I C A T E

E OF NEW YORK )
:ss
TY OF RICHMOND )

I, RITA M. PERSICHETTY, a Notary Public within for the State of New York, do hereby certify the within is a true and accurate transcript he audio recording taken on September 29, 2010.

I further certify that I am not related to any he parties to this action by blood or marriage; that I am in no way interested in the outcome his matter.

IN WITNESS WHEREOF, I have hereunto set my this 2nd day of September, 2011.

______________________

M. PERSICHETTY

**0**

**04 (1)** 60:8
**05 (1)** 60:8

**1**

**1,000 (1)** 62:23
**10:30 (1)** 2:7
**100 (27)** 22:4,7,11,25;23:19;24:15;25:13,14;26:6,17;27:9;28:19;51:15,18,21;52:3,7;57:15,16,24;72:20;73:2,3,5,10;93:5,13
**1001 (1)** 4:16
**11:25 (1)** 53:25
**11:36 (1)** 54:5
**111-21 (1)** 3:22
**12:21 (1)** 96:9
**15 (2)** 4:6;29:2
**18 (1)** 4:15
**1984 (1)** 5:21
**1987 (1)** 5:24
**1990 (1)** 6:3

**2**

**20 (4)** 62:24;63:7;91:20;93:4
**2004 (16)** 6:15;22:6;23:24;25:12,16;26:3;36:14,18;43:8;46:4;59:25;68:5;71:12;83:2,25;87:22
**2005 (5)** 25:14;37:6;44:9;46:5;59:25
**2006 (11)** 35:9;36:9;37:6;38:4,6,10;44:9;54:8;78:13;79:6;80:6
**2007 (12)** 36:9;68:6;71:12;78:14;79:3,7,11;80:4,7;83:3,25;87:22
**2008 (1)** 6:17
**2009 (1)** 6:18
**2010 (2)** 2:6;4:7
**25 (6)** 23:22,24;24:10,12;27:8;28:8
**29 (1)** 2:5
**2T (2)** 61:7,11

**4**

**40 (3)** 91:18,19;92:7

**5**

**5,000 (1)** 62:22
**50 (1)** 92:7
**55 (1)** 74:15
**56 (1)** 74:17

**6**

**60 (3)** 74:5,7,10

**7**

**72,379 (1)** 78:18

**8**

**85 (1)** 5:22
**88 (1)** 5:24

**9**

**91 (1)** 6:3
**93/'94 (1)** 6:6
**96ish (1)** 6:8
**98/'99 (1)** 6:10

**A**

**able (4)** 5:14;63:24;66:17;69:8
**above (1)** 52:13
**Absolutely (2)** 58:8,16
**abstract (3)** 10:8,16;13:22
**accept (3)** 62:2;63:6;95:5
**acceptable (7)** 53:14;65:23;74:23;75:25;84:10;88:17;95:7
**accepted (3)** 77:24;78:4,6
**accompanied (4)** 2:8;10:8,15;13:22
**accurate (3)** 75:12;78:24,25
**achieved (1)** 5:6
**acquired (1)** 17:6
**acquiring (1)** 17:14
**actual (3)** 40:10;42:19;44:12
**actually (6)** 33:5;39:20;40:7;42:10;65:18;88:23
**ad (1)** 87:23
**added (1)** 46:7
**adding (1)** 60:5
**additional (2)** 60:5;94:13
**additionally (1)** 47:14
**adversarial (2)** 25:24;26:2
**advised (1)** 4:12
**affiliation (1)** 2:21
**again (29)** 10:11;13:25;16:19;17:11;24:2,23;25:4,7,15;26:18;37:13;43:5;44:4;45:16;46:25;51:2,25;52:9,15;55:25;70:24;72:25;77:25;79:9,17;80:8;85:14;90:19;93:14
**agencies (1)** 50:22
**agency (1)** 4:13
**aggregate (3)** 60:11;71:8;86:5
**aggregated (4)** 22:23;31:10;86:8,12
**ago (1)** 44:20
**agree (2)** 78:19,22
**agreed (3)** 18:23;28:25;81:3
**agreement (1)** 11:2
**ahead (4)** 14:17;20:11;58:19;61:19
**allowed (3)** 44:16,19;77:6
**along (1)** 36:23
**alt (4)** 26:21;28:7,11;92:3
**altered (1)** 75:15
**although (2)** 13:4;14:5
**always (9)** 26:17;39:23;50:6;59:5;67:19;80:20;83:19;84:18;95:16
**amazing (1)** 62:11
**American (1)** 24:18
**Ameriquest (3)** 23:13,15,23
**among (1)** 55:5
**analytical (1)** 87:2
**annual (1)** 49:19
**annually (3)** 43:3;47:25;49:4
**answered (1)** 87:5
**apologize (2)** 33:12;61:18
**applicable (2)** 9:20;13:10
**applied (1)** 81:5
**apply (1)** 81:10
**appraisal (1)** 34:10
**appreciable (1)** 87:10
**appropriate (1)** 66:15
**approval (1)** 93:20
**approve (2)** 82:14;92:20
**approved (2)** 82:11,12
**approximate (3)** 5:21;25:23;35:5
**approximately (1)** 2:6
**area (2)** 43:6,13
**areas (1)** 68:19
**around (2)** 23:24;47:13
**arrange (1)** 72:12
**ascent (1)** 2:17
**asset (5)** 18:2;31:6,8,12;59:3
**assets (1)** 57:25
**assignment (1)** 11:16
**assignments (2)** 9:11,15
**associate's (1)** 5:7
**association (1)** 53:8
**assume (1)** 16:14
**assumptions (2)** 10:2;13:16
**assurance (1)** 7:15
**attendance (1)** 4:8
**attended (2)** 5:5,8
**attorney (3)** 9:20;13:10;41:11
**attorney's (3)** 10:7,14;13:21
**audible (1)** 4:19
**AUDIO (96)** 2:1;3:1;4:1;5:1;6:1;7:1;8:1;9:1;10:1;11:1;12:1;13:1,5;14:1;15:1;16:1;17:1;18:1;19:1;20:1;21:1;22:1;23:1;24:1;25:1;26:1;27:1;28:1;29:1;30:1;31:1;32:1;33:1;34:1;35:1;36:1;37:1;38:1;39:1;40:1;41:1;42:1;43:1;44:1;45:1;46:1;47:1;48:1;49:1;50:1;51:1;52:1;53:1;54:1;55:1;56:1;57:1;58:1;59:1;60:1;61:1;62:1;63:1;64:1;65:1;66:1;67:1;68:1;69:1;70:1;71:1;72:1;73:1;74:1;75:1;76:1;77:1;78:1;79:1;80:1;81:1;82:1;83:1;84:1;85:1;86:1;87:1;88:1;89:1;90:1;91:1;92:1;93:1;94:1;95:1;96:1
**audit (10)** 40:19;41:6;42:18;47:25;48:12;54:7,13,14,

18,21
**audited (1)** 40:12
**auditing (1)** 52:17
**audits (5)** 42:25;48:5,21;49:4,15
**available (3)** 47:19,23;84:15
**average (3)** 85:12;86:15;89:15
**averages (2)** 86:18,25
**awarded (1)** 72:7
**aware (9)** 15:6;24:20,24;25:5,8; 56:12;74:20;80:24;85:7
**away (2)** 43:8;69:24

## B

**bachelor's (1)** 5:8
**back (9)** 7:11;16:19;28:7; 36:12;52:15;53:22;54:4; 73:12;75:17
**background (4)** 3:20;4:24;5:12;8:5
**backgrounds (1)** 38:17
**bad (1)** 87:25
**balance (1)** 92:5
**Bank (2)** 5:20,23
**Barmore (3)** 32:13,14;34:16
**base (1)** 51:11
**based (3)** 46:18;56:2;85:8
**basic (2)** 57:4;69:9
**basically (5)** 36:21;39:13;65:22,25; 87:13
**basis (13)** 30:24;31:14;45:14; 47:3;79:14,19;89:16; 90:8,10,16;93:3,5,8
**Beal (1)** 79:21
**Bear (45)** 6:15,16,20;7:17;8:3, 11,12;12:18,22;14:12; 17:7;18:20;32:7,19; 33:16,20,25;35:14;36:4; 50:14;51:15;52:3,25; 55:17;62:2;63:5;67:9, 20,22;68:3,10,23;69:13, 18;70:2,20;71:10,19,23; 72:22;73:5;78:9;81:3; 83:2;88:7
**became (2)** 20:25;56:12
**began (1)** 37:23
**behalf (2)** 18:20;32:23
**belief (1)** 19:23
**below (1)** 20:21
**besides (3)** 29:19;40:9;68:15
**best (15)** 5:15;16:21;35:8; 37:20;49:21;50:3;55:5; 56:11;60:3;68:21;71:15; 72:19;74:13;91:14,16
**better (7)** 30:3;46:21;50:5; 55:17;88:9,11,20
**beyond (2)** 52:14;76:10
**bid (9)** 18:8;19:7,10,11,24,25; 20:9,13,14
**bidding (1)** 72:6
**bids (1)** 18:10
**bigger (1)** 51:11
**bipartisan (1)** 3:23
**bit (5)** 18:6;35:11;51:14; 89:13;91:21
**blank (1)** 11:17
**bleeped (1)** 44:2
**Bob (3)** 2:9;3:6;69:7
**bonus (1)** 90:5
**book (1)** 49:7
**Borgers (38)** 2:8;3:2,2,2;4:21,22; 5:10,17;6:19,24;7:22; 8:3;21:4,4,8,15,22;22:6, 12;23:3,6,14,23;24:4,8, 13,18,22;25:2,6,9,12; 43:4,4,11,18,24;44:10, 21
**boss (1)** 43:21
**both (9)** 7:16;31:19;41:3; 71:18;72:21;73:5;76:20; 80:3;92:5
**bought (1)** 68:4
**boy (1)** 3:3
**break (3)** 53:20,24,25
**brief (1)** 4:24
**bringing (2)** 50:25;51:7
**brought (2)** 36:19;50:20
**build (3)** 37:7;50:2,4
**building (1)** 53:9
**bulk (15)** 7:13;27:17,19;67:15; 69:11,14,21;70:7,14,16, 18;71:5,8,13,18
**business (7)** 37:11;42:4;47:12; 81:20;91:10,25;92:14
**busy (2)** 39:14,17
**buy (5)** 70:3,4;71:11,24;82:16
**buying (1)** 88:7

## C

**calculate (2)** 34:10,12
**California (1)** 42:13
**call (6)** 53:21;61:7;76:11,21; 77:12,13
**called (5)** 31:8,25;32:3;35:17; 77:14
**calling (1)** 77:12
**can (25)** 4:9;5:15,18;6:19;8:3, 4;15:12;16:19;20:12; 28:16;29:10;43:9;48:9; 50:3;51:9,24;54:10; 56:20;62:10;63:8,11; 69:4,24;72:24;73:12
**capacity (3)** 46:17;47:14,19
**Capital (7)** 6:9,10,13,14,20;7:3,12
**car (2)** 50:3,5
**career (1)** 5:11
**Carey (8)** 2:10;3:8,8;27:16; 53:19,23;69:7,23
**Carion (1)** 95:25
**case (1)** 59:21
**causes (1)** 3:25
**center (2)** 40:24;41:8
**centers (1)** 41:6
**Century (1)** 24:22
**certain (13)** 24:3,6;35:25;44:8; 45:16;67:4;75:4;82:17; 85:15,16;92:11;93:12; 94:23
**certainly (3)** 15:2;79:22;80:9
**certificate (1)** 9:3
**certified (9)** 9:3,9,25;10:6,13;13:9, 15,20;14:3
**chain (1)** 8:22
**chair (1)** 52:23
**chaired (1)** 50:19
**change (9)** 26:13;27:25;56:22; 66:2;77:16;80:18;84:14, 20;93:18
**changed (9)** 35:25;36:7;40:2;56:9; 65:17;66:21;80:22,23; 90:19
**changes (4)** 83:13;84:18;85:18,20
**channel (3)** 67:13;69:14;71:2
**characteristics (2)** 82:17;86:24
**characterize (1)** 83:14
**charge (1)** 88:5
**charged (2)** 3:24;4:4
**Chase (1)** 5:25
**checking (1)** 88:6
**checklists (1)** 45:8
**Choice (1)** 25:6
**chose (2)** 53:15;82:8
**circumstances (1)** 94:23
**clarification (1)** 55:24
**class (1)** 49:21
**Clayton (28)** 27:23;30:5,10,15; 32:10;41:3;47:8;54:9, 11;55:5;57:5,9,12,14,22; 61:7;77:8,9;78:9,18; 79:4,11;80:5;90:15; 91:10;92:3;94:15,18
**clean (1)** 29:15
**clear (6)** 25:20;26:4;30:16; 58:14;63:9;88:23
**cleared (2)** 62:4;63:11
**close (2)** 37:10;61:23
**code (7)** 4:15;65:18,18;66:19, 23;76:12;80:15
**coding (2)** 66:21;80:23
**collapse (2)** 4:2,2
**collateral (1)** 15:23
**collective (1)** 50:24
**college (4)** 4:25;5:4,5,6
**combination (1)** 76:20
**comfortable (2)** 29:8;77:11
**Commission (5)** 2:5,9;4:4,7,11
**commissioners (1)** 3:24
**committee (6)** 48:16;50:9,20,21; 52:24;53:2
**common (1)** 32:19
**communicate (1)** 45:12
**Community (2)** 5:6,23
**companies (1)** 26:5
**company (2)** 67:22;69:9
**compel (1)** 4:7
**compensate (1)** 77:3
**compensating (19)** 74:24;75:14,25;76:2, 9,14,15;77:2,7,10,15, 21;88:17;93:22;94:8, 19;95:4
**complete (1)**

8:22
**completed (1)** 31:3
**compliance (7)** 41:14;23,24,25;42:2,5,22
**component (1)** 29:19
**composing (1)** 4:5
**computer (1)** 42:20
**computers (1)** 42:11
**concerning (2)** 4:16;79:4
**conduct (3)** 27:11;30:12;31:17
**conducted (4)** 26:15;47:25;48:5;49:4
**conducting (1)** 30:24
**Congress (1)** 4:6
**conjunction (1)** 81:22
**connection (12)** 8:18;10:21;11:4,23;15:20;18:25;26:14;32:8,22;34:5;36:4;81:5
**consensus (1)** 53:9
**consent (1)** 2:15
**considered (1)** 34:5
**consistent (1)** 93:9
**Consistently (1)** 84:17
**consists (1)** 3:23
**constantly (2)** 49:12;56:15
**contact (3)** 45:9;46:9;59:19
**contacts (1)** 19:8
**contain (2)** 20:15;59:5
**contained (2)** 20:13;78:11
**contemplate (1)** 19:25
**continually (1)** 49:23
**continued (1)** 37:7
**continues (1)** 16:5
**contract (5)** 33:6;89:20;90:18,22;91:5
**contracts (2)** 90:24;91:2
**contributions (1)** 51:7
**control (1)** 12:6
**controls (1)** 30:2
**conversation (1)** 69:21
**coordinate (1)** 38:14
**copies (3)** 9:9,19;13:9
**copy (8)** 4:10;9:3,25;10:6,13;13:15,20;14:3
**corporate (3)** 40:25;41:4,7
**correctly (1)** 42:16
**counsel (6)** 3:11,14;41:12,22;42:8,14
**counterparty (4)** 19:9;20:16;28:12;29:21
**Countrywide (2)** 23:8,11
**County (1)** 5:6
**couple (2)** 25:3;26:18
**cover (1)** 70:22
**created (2)** 34:22;48:14
**credit (7)** 30:2;34:8,11,12,13;38:17;41:18
**Crisis (2)** 2:4;4:2
**criteria (3)** 34:13;64:6;91:5
**CUNICELLI (38)** 2:3,4,19,25;3:19;44:15,20,25;45:18,23;53:25;54:4;57:2,8,13,21;59:16,24;60:6,15,19,24;61:4,12,18,22;62:9,16,19;63:5,12;64:12;65:2,12,20;66:5,24;96:8
**custodial (1)** 16:16
**custodian (8)** 12:11,16;15:24;16:3,5,8,12;17:2
**custodians (1)** 12:20
**custody (1)** 12:13
**cuts (1)** 13:5

**D**

**daily (14)** 30:24;31:4;60:10,11,17,20,23,25;61:2;79:14;89:16;93:3,5,7
**data (7)** 19:5;31:13;41:11;42:11;86:8,12;94:9
**date (1)** 2:5
**dates (5)** 5:12,14;25:22;36:11,15
**day (2)** 89:25;92:20
**days (1)** 93:12
**deal (5)** 26:7,8;57:17,23;90:22
**deals (6)** 22:19;24:6;26:3;57:10,12,14
**December (1)** 4:6
**decision (3)** 46:12;94:25;95:2
**decrease (2)** 83:23;85:12
**decreased (1)** 40:18
**decreasing (1)** 86:6
**deemed (2)** 74:22,23
**deficiencies (5)** 63:21;73:13,24;74:22;75:8
**deficiency (3)** 64:9;65:11;73:21
**define (5)** 35:7;43:9;44:13;73:20;74:2
**defined (1)** 45:19
**defining (3)** 73:18;83:7;88:11
**definition (2)** 45:3,6
**degree (2)** 5:7,9
**delegated (1)** 76:21
**delegating (1)** 76:15
**delivery (3)** 8:13,15;15:21
**department (9)** 32:21;35:12,14,17;37:12,14,24;68:13,14
**depend (6)** 22:2;46:3;50:18;65:8,14;73:18
**depending (4)** 16:14;47:22;66:15;92:13
**depository (1)** 17:2
**describe (1)** 80:15
**described (2)** 15:19;58:23
**designated (1)** 11:17
**designation (1)** 75:15
**desire (4)** 4:11;32:7,21,24
**desk (4)** 18:21;19:12;21:13;72:5
**destined (2)** 15:14;17:21
**detailed (1)** 8:5
**details (6)** 19:13,16;20:22;54:20;90:18;91:7
**deterioration (5)** 83:3,7,8,10,15
**determination (4)** 18:13;76:18;81:11,13
**determine (4)** 28:20;29:7;42:9;46:12
**develop (1)** 77:7
**differ (1)** 50:15
**difference (3)** 27:6;67:12;87:11
**different (11)** 27:5;30:23;31:5;51:2;55:22;58:24;65:15,16;67:24,24;71:2
**differently (1)** 88:12
**diligence (117)** 7:18;8:4,7,17,20;14:11,20;17:7,24;18:6,19;19:2;21:3;22:5;23:2,19;26:24;27:11;28:19;29:6,14;30:6,22,25;31:2,17,24;32:9,20,23;33:5,24;35:13;36:20,23;37:4,12,14,17;38:13,14,20,22;39:4,21,24;40:13,16,20;41:15;42:17;43:6,12;45:10,12,13,25;46:2,8,9,12,16;47:16;48:6,15,16;49:11,16;50:9,11,15,23;52:9,23;54:14;55:10,19;57:4,10,12,16,24;58:6,12;59:2;60:12;64:3,7;66:12;68:15;70:12,14,18;71:21,25;72:9,14,21;73:4,10;76:11,16,24;77:2;80:20,24;81:2,9,15,23;89:21;90:5,25;91:23;93:19,24;94:10
**diligenced (1)** 72:11
**diligences (1)** 36:25
**direct (2)** 16:5,16
**directed (2)** 21:15,20
**directing (2)** 95:14,16
**direction (1)** 91:21
**directive (1)** 21:12
**directly (1)** 95:18
**disagree (2)** 78:20,23
**disposition (2)** 14:20;16:15
**distinct (1)** 66:23
**distinction (1)** 43:16
**distinguish (1)** 77:18
**document (4)** 11:3;12:10,16;64:9
**documentation (16)** 12:12;16:6,7;61:8,14,16;63:24,25;64:2,5,14,17,19;65:5,5,9
**documents (12)** 8:12,15;11:14;12:6,7,10,13;15:19,21;16:10;64:8;81:17
**domestic (1)** 4:3
**Donahue (1)** 96:3
**done (4)** 19:7;22:10;56:12;73:10
**down (11)** 30:12;42:9;63:13;66:9;85:20,25;86:19,25;87:10;89:6,13
**draft (1)** 50:17
**dramatically (1)** 93:7
**drawing (1)** 51:10
**drill (1)** 89:13
**driven (1)** 46:17
**drivers (2)** 28:14;46:20

**drove (1)** 48:19
**DTI (6)** 34:11;74:4,6,12,14,17
**DTI's (1)** 74:9
**due (86)** 7:18;8:4,6,16,20; 14:11,19;17:7,24;18:6, 19;19:2;21:3;22:4;23:2; 27:11;28:19;29:6,14; 30:5,22,25;31:2,17,24; 32:9,20,22;33:24;35:13; 36:20,23,25;37:4,11,14, 17;38:13,14,20,21; 39:21,24;40:20;43:6,12; 45:25;46:2,7,9,12,16; 48:6,14,15;49:11,15; 50:9,10,15;52:23;55:19; 57:4,15,24;58:6,12; 60:12;64:3;68:15;70:11, 13,18;71:25;72:9,20; 73:3,10;76:11,16;80:19; 81:2,9,23;90:4;93:19
**during (10)** 38:19;39:18;68:5; 71:12,20;80:4;84:10,22; 85:11;86:6
**duties (2)** 36:3;67:7

E

**earlier (8)** 57:3,19;58:23;59:18; 64:16;72:5;75:7;80:16
**early (7)** 35:3,7;37:6;59:20,25; 60:7;92:21
**earmarked (3)** 15:14;17:8,14
**easier (2)** 36:13;62:18
**eastern (1)** 2:7
**easy (1)** 53:7
**education (3)** 5:2,4,5
**effort (1)** 49:22
**egest (1)** 4:15
**either (3)** 64:7;66:14;71:13
**electronic (3)** 60:17;94:6,6
**eligible (1)** 64:4
**else (6)** 48:22;52:20;66:4,5; 87:3;92:13
**E-mail (1)** 39:25
**EMC (21)** 67:8,17,21,23;68:4,11; 69:15,16,22;70:4,19; 71:2,7,11,18,23;73:5; 78:10;81:3;82:4;83:2
**EMC's (1)** 72:22
**employed (4)** 6:16,17;12:18;32:20
**employee (1)** 67:20
**employees (3)** 4:14;34:2;35:21
**employment (3)** 5:12,19;36:4
**encourage (1)** 58:19
**end (7)** 37:9,10;60:21;72:17; 95:12,21;96:7
**ended (1)** 96:10
**endorsements (1)** 8:23
**engage (4)** 27:12;57:11,22;63:7
**engaged (6)** 14:11;27:14;57:9,13, 14;60:13
**engagement (2)** 60:21;61:24
**enhance (1)** 56:6
**enough (3)** 47:19;77:16;93:9
**entail (2)** 40:21,22
**entailed (1)** 8:6
**entity (1)** 16:11
**equal (1)** 74:7
**equivalent (1)** 11:3
**escalated (1)** 41:18
**essentially (1)** 94:17
**established (1)** 3:21
**even (2)** 93:10;95:5
**eventually (2)** 28:25;37:3
**everybody (1)** 53:17
**everyone (1)** 2:20
**evidence (3)** 9:4,10;32:21
**evidences (2)** 9:21;13:11
**exact (1)** 36:11
**exactly (1)** 39:6
**examination (1)** 34:17
**examining (1)** 3:25
**example (7)** 8:21;20:19;41:3;50:2; 63:23;64:13;77:8
**examples (1)** 23:7
**exceed (2)** 53:11,16
**Excel (5)** 31:10;59:9,11;60:11; 86:13
**Excellent (1)** 60:6
**except (1)** 25:13
**exception (17)** 24:14;58:3,7,22;59:6, 12,13,15;61:2;73:12,14; 75:24;76:17;79:4,5; 92:19;94:8
**exceptionally (1)** 49:11
**exceptions (14)** 22:9,13,15;25:14; 26:19;29:16;57:19;73:8; 82:15;92:19,24;93:4,5; 95:4
**exclusion (2)** 13:3;14:4
**Excuse (2)** 33:10;83:16
**executed (2)** 10:21;11:3
**exit (2)** 15:4;17:25
**experience (1)** 87:6
**expertise (7)** 29:22;46:18,23;47:4, 6,17,21
**explain (4)** 28:16;29:10;68:8; 70:23
**extend (1)** 67:8
**extent (2)** 50:14;87:8
**extremely (1)** 29:15

F

**fact (4)** 38:21;40:4;73:19; 88:25
**factor (1)** 77:4
**factors (21)** 29:11;46:15;74:24; 75:14,25;76:3,10,14,15; 77:2,7,11,15,20,21; 88:17;93:22;94:9,14,19; 95:5
**facts (2)** 78:23;84:6
**fair (3)** 18:4;35:10;38:18
**fairly (4)** 27:4;53:7;55:10;79:18
**Faith (1)** 96:2
**fall (1)** 88:15
**false (1)** 4:16
**familiar (2)** 50:10;61:8
**far (2)** 33:4;69:23
**FCIC (6)** 2:12;3:4,6,21;4:12,13
**FCIC's (1)** 2:23
**federal (1)** 4:14
**fell (1)** 88:14
**felt (3)** 29:22;76:8;77:10
**few (1)** 92:17
**FICO (4)** 20:21;85:13;86:9,16
**FICOs (1)** 86:5
**figure (1)** 53:4
**file (11)** 21:2;42:7;81:18;90:8, 10,15;91:6;93:21,25; 94:2,4
**files (5)** 61:6;89:24;93:13,15, 16
**final (8)** 14:20;30:25;37:18; 51:5;61:25;63:17,17; 95:7
**finance (6)** 35:18,22;37:16;68:13, 14,20
**Financial (3)** 2:4;3:25;4:3
**find (1)** 55:5
**finding (2)** 49:9;66:3
**findings (6)** 4:5;31:11;54:10,18; 64:2;93:16
**fine (5)** 2:18;5:17;36:16; 45:18;53:16
**finished (1)** 61:21
**firm (37)** 31:25;33:3,4,5;36:19; 37:9;40:5,20;42:19; 45:10,12,13;46:13,16; 47:21;48:10,11;51:4; 53:15;54:14;59:2;60:12; 64:7,25;66:13;70:17; 76:11,16;77:3;80:24; 81:3,10;87:3;90:12,13; 93:24;94:10
**firms (33)** 23:18;30:22;33:6,24; 40:13,17;42:17;45:25; 46:10,21;47:3,5,16;48:2, 5,6,17,20;50:23;51:6; 54:9;55:10,16,19;56:4,7; 57:4;80:20;81:16;89:21; 90:5,25;93:19
**first (13)** 5:19;30:19;33:4; 36:19;40:5;48:3,10,11; 53:19;62:14;78:12;79:7; 80:6
**fit (8)** 68:9,16,22;69:3;70: 15;72:2;75:19
**five (5)** 28:25;37:19;72:16,18; 89:17
**flow (4)** 70:23,23,25;71:14
**flux (1)** 91:21
**focus (5)** 6:20;13:2;15:11;18:6; 54:8
**Foerster (1)** 3:12
**folks (1)** 38:5
**follow (1)** 48:24
**following (1)** 49:7
**form (2)** 11:16;90:2
**format (4)** 31:13;55:3;59:9,11
**formats (1)** 31:5
**formed (1)** 4:11
**found (4)** 48:20;56:20,23;64:_
**four (13)** 65:19,20;66:8,20;

67:2;76:12;77:17,22; 78:2;80:11,14;81:12; 93:18
**fours (1)** 81:14
**frame (6)** 22:2;44:7;46:4;60:2,8; 66:25
**frames (1)** 87:17
**fraud (2)** 49:17;52:18
**Fremont (3)** 23:13,25;24:9
**frequent (1)** 79:18
**frequently (2)** 39:19;59:5
**full (3)** 2:20;58:20;67:12
**function (8)** 7:2;12:2;18:11;46:6; 86:22;87:3;88:12,13
**functions (1)** 11:22
**Funding (1)** 25:3

**G**

**gap (1)** 51:4
**gave (1)** 63:22
**GE (7)** 6:9,10,12,14,20;7:3,12
**General (3)** 34:7;55:12;85:6
**generally (21)** 10:17,23;11:5,12,19; 19:4,8;22:3,8;30:11,19, 21;41:19;42:2;51:18; 57:6,18;67:15;68:10; 73:7;89:9
**generated (1)** 80:5
**given (1)** 95:3
**giving (1)** 36:15
**global (2)** 31:14;90:25
**GMAC (3)** 6:17;7:19,23
**goes (1)** 71:23
**good (5)** 10:19;12:14;55:14; 75:21;87:24
**granted (1)** 63:19
**greater (1)** 74:4
**grew (1)** 38:3
**group (8)** 37:15;43:20;68:22; 70:12,17;72:9,15;96:6
**guarantee (1)** 10:21
**guess (7)** 35:8;45:2;61:6;85:21; 91:15,16;93:10
**guideline (1)** 75:20
**guidelines (25)** 81:19,25;82:2,5,7,9, 10,15,18,21;83:13;84:4, 14,18,25;85:9,16,24; 87:5,9;88:15,16,20,24; 89:5
**guy (1)** 63:15

**H**

**Haims (2)** 3:10,10
**half (1)** 6:12
**handle (2)** 30:5;41:11
**handled (3)** 41:23;47:11;95:16
**handling (1)** 76:24
**happen (2)** 15:15;39:11
**happened (4)** 12:21;14:9;15:13; 39:13
**Hargus (1)** 95:25
**hazard (1)** 93:10
**head (1)** 74:2
**headcount (1)** 37:18
**headquarters (4)** 31:18,20;41:2,4
**hear (2)** 43:25;69:25
**heard (1)** 48:3
**heavier (1)** 92:12
**held (4)** 7:6;15:8,24;16:17
**help (1)** 69:8
**helped (1)** 43:19
**hesitating (1)** 54:24
**high (1)** 83:18
**Hinkley (54)** 2:9;3:6,6;30:4;46:21; 47:2,24;49:3;50:8,14; 51:13,20;52:2,22;54:6, 16;55:4,15;56:2;68:2,8, 21;69:2;70:2,19,22; 71:10,17,22;72:15; 76:13;77:5;80:10,19; 81:24;82:25;83:8,17,23; 84:8,12,16,20;85:3,11, 19;86:4,11,20;87:4,20; 88:4,21;89:11
**hire (2)** 12:10;38:5
**hired (1)** 38:7
**hiring (3)** 38:10,11,12
**hoc (1)** 87:23
**Hoden (1)** 96:2
**hold (2)** 16:5;69:23
**Home (1)** 24:18
**honest (2)** 34:24;67:3
**housekeeping (1)** 4:18
**hundred (1)** 93:12
**hundreds (1)** 71:8

**I**

**IAS (2)** 31:8;60:10
**idea (3)** 9:16;66:24;78:16
**ideal (1)** 89:14
**important (1)** 14:15
**improve (10)** 49:14,23;50:7;51:3, 10;55:12;56:6,14,16,24
**improved (4)** 48:24;56:13,21,23
**inadequate (1)** 56:19
**Inaudible (2)** 3:13,16
**includes (1)** 70:19
**including (1)** 43:20
**income (1)** 34:12
**increase (3)** 84:9,12,21
**increased (3)** 28:23;37:2;40:17
**increases (1)** 85:2
**indicate (2)** 20:9;65:21
**indicated (2)** 47:2,24
**individual (10)** 13:4;14:5;21:21;31:5, 8,12;40:12;59:2;87:16, 17
**individually (2)** 21:20;71:14
**individuals (3)** 30:13;37:15;38:8
**industry (1)** 48:25
**information (2)** 20:24;94:9
**initial (2)** 7:4;76:21
**Initially (3)** 28:24;37:25;46:4
**Inquiry (1)** 2:4
**inside (1)** 41:22
**insofar (2)** 18:13,14
**instance (1)** 63:22
**instances (2)** 52:12;74:16
**instituted (3)** 35:9;40:11;80:17
**institutions (1)** 4:3
**Insurance (6)** 6:11;7:9;10:7,14; 13:21;14:4
**interested (2)** 51:20;52:2
**intermittently (2)** 28:4;96:5
**internal (3)** 3:14;41:12,22
**internally (2)** 27:10;40:15
**interpreting (1)** 42:16
**interrupt (1)** 33:11
**intervening (2)** 9:10,15
**interview (2)** 2:13,14
**into (8)** 3:22;14:7;31:12; 46:15;50:20;55:6;72:2; 93:21
**investments (1)** 15:8
**involved (1)** 18:9
**issue (2)** 63:4;67:16
**issues (5)** 19:17,19;29:16;41:18; 76:6
**item (1)** 56:22
**items (1)** 81:22

**J**

**Jackie (1)** 96:2
**Jersey (2)** 6:4,5
**Jessica (2)** 3:8;69:22
**job (1)** 55:14
**Joe (1)** 95:24
**Joel (1)** 3:10
**John (4)** 3:17;69:12,17,23
**joined (1)** 36:19
**JP (1)** 3:14
**judgment (2)** 76:10;77:12
**juncture (2)** 65:16;66:7
**junctures (1)** 66:9

**K**

**Kerry (1)** 79:24
**kick (1)** 21:2
**kicked (1)** 29:16
**Kind (5)** 44:2;47:11;49:25; 65:21;70:7
**knew (1)** 69:3
**knowledge (8)** 22:18;23:10;32:6; 34:8;37:20;51:11;60:4; 71:16
**Krebs (125)** 2:9;3:4,4;5:15;8:10, 18,25;9:8,14,18,24;10:5, 12,19,25;11:7,12,21; 12:4,14,21;13:2,8,14,19; 14:2,15,22;15:7,11,18, 25;16:9,18,24;17:4,12,

19;18:3,12,16,24;19:10, 15,22;20:6,11,23;25:11; 26:12,20,25;27:10,18; 29:11;30:11,17,20; 31:15,23;32:6,12,18; 33:10,14,22;34:4,15,21; 35:2,10,19,23;36:3,8,12, 16;37:10,23;38:4,9,18; 39:6,10,14,18;40:19; 41:21;42:8,23;46:11; 53:21;54:21;58:3,8,16; 67:5,6,14;69:19;72:20; 73:2,11,19;74:3,11,16, 21;75:2,7,13,21;77:22; 78:2,7,17;79:2,10,15,20, 23;80:3;81:2,9;82:19

**L**

**large (5)** 22:20;23:3;35:13; 37:11;69:13
**largely (1)** 57:22
**larger (2)** 29:23;37:22
**last (2)** 2:22;50:17
**late (3)** 35:3,7;37:5
**later (1)** 66:20
**law (3)** 3:22,22;42:18
**laws (3)** 41:25;42:6,16
**lay (1)** 69:4
**lead (7)** 29:17;32:2,4,4,5,8,22
**leads (4)** 32:15,16,25;33:24
**least (1)** 53:17
**led (2)** 29:11;49:5
**lending (1)** 41:25
**Lerner (1)** 3:14
**less (6)** 22:17,25;26:6;39:19; 51:23;62:19
**lesser (1)** 52:20
**level (5)** 31:6;41:7;52:10;59:3; 87:13
**level's (1)** 72:13
**liaison (1)** 45:24
**liberal (1)** 89:2
**lighter (1)** 92:12
**likely (1)** 29:24
**liken (1)** 50:2
**limited (1)** 95:3
**line (1)** 2:11
**list (5)** 55:18;56:19;59:13; 62:21,21
**little (6)** 18:6;35:11;49:8; 55:23;89:13;91:21
**loaded (1)** 42:10
**loan (47)** 16:15;19:17;20:19; 25:3;34:14;38:22;41:24; 57:16;61:15;63:4,18,19, 21,23;64:4,10;65:3,7,8, 9;66:14;72:13;73:22; 74:6;75:19,24;76:7; 77:23,23;78:3,3,6,10,11; 80:12,12,21;81:4,11; 87:16;93:13,15,21,25; 94:2,4;95:10
**loans (65)** 14:19,21;17:17;18:8, 11,18,23;19:3,6;20:2,10, 20;21:22;22:5,21,22; 23:18;28:21;29:16; 36:21;40:10;41:17; 47:10,18;59:14;61:25; 62:22;63:11;65:17; 66:18;70:14;71:6,9; 72:7,8,10,11,21;73:4,6,9, 25;74:9,12,17,22;75:3,6, 8,13;76:5,22;78:9,11,18; 79:6;82:6,16;83:17; 87:8;88:14;89:4,15,18; 92:25
**lobby (1)** 33:18
**locations (1)** 41:5
**long (1)** 53:17
**longer (2)** 65:10,11
**look (9)** 29:5;31:13;34:11; 75:18;89:25;93:23,25; 94:4;95:8
**looked (4)** 22:5;41:17;86:8;94:2
**looking (16)** 35:4;38:15;39:2;41:9; 13;45:17;49:13;50:6; 56:15;58:15;86:12,15, 23;89:17;94:5;95:17
**lot (2)** 29:15;49:22
**LTV (5)** 84:10,22;85:2,15; 86:16
**LTV's (1)** 86:10

**M**

**mail (1)** 60:17
**maintain (1)** 12:12
**major (4)** 4:3;27:22;28:2,5
**majority (3)** 22:10;91:14,24
**making (4)** 18:8,10;76:17;77:12
**manage (1)** 38:13
**management (2)** 38:16;79:3
**manager (1)** 76:24
**managerial (1)** 36:22
**managers (4)** 41:15,16;46:8;48:15
**Manhattan (1)** 6:2
**manifest (1)** 32:7
**manner (1)** 89:25
**many (11)** 26:21;35:21;52:12; 63:8;72:16;78:8,10; 87:12;89:24;92:19,23
**Maria (1)** 95:25
**market (1)** 83:4
**marketplace (1)** 49:21
**material (7)** 73:15,18,21,21,24; 74:5,6
**materials (1)** 18:7
**matter (2)** 40:4;85:6
**maximum (2)** 27:8;74:14
**may (9)** 4:7;15:5,5;82:11; 85:25;86:2;88:25;95:6; 96:4
**maybe (3)** 6:8;37:20;44:5
**MDMC (1)** 91:20
**mean (15)** 5:3;19:15;20:11; 33:11;43:10;49:3,7; 50:4;52:21;53:10;66:2; 75:5;81:8;84:13;93:17
**means (2)** 62:24;63:3
**meet (5)** 62:25;79:10,11;80:3; 88:16
**meeting (2)** 79:15;89:4
**meetings (1)** 79:2
**meets (1)** 65:23
**member (1)** 41:12
**members (5)** 31:15;43:20;50:21,22; 53:10
**memorialized (1)** 54:22
**memory (1)** 25:10
**mention (1)** 25:2
**mentioned (2)** 64:15;92:8
**MERS (7)** 11:8,9,15,22;16:19,20, 22
**MERS' (1)** 16:25
**met (4)** 53:17;79:18;87:9; 88:14
**Midlantic (1)** 5:20
**midlevel (1)** 36:22
**might (6)** 14:6,6;15:7;36:13; 69:7;82:14
**mind (6)** 23:12;24:14,17;44:4; 53:13;59:17
**minimal (1)** 53:13
**minimum (4)** 27:8;28:24;29:3;53:18
**minor (1)** 75:24
**minute (1)** 44:20
**Miss (6)** 2:10;45:24;59:18; 79:24,24;92:22
**missing (8)** 61:6,14,16;63:23; 64:8,13,17;65:4
**model (1)** 47:12
**modifications (2)** 10:2;13:16
**Mongelluzzo (266)** 2:10,13,15,16,18;3:11, 17,18,20;4:23;5:3,13,16, 18;6:22;7:3,24;8:8,14, 24;9:6,12,16,23;10:4,10, 17,23;11:5,9,19,25;12:9, 19,24;13:6,13,18,24; 14:13,18,23;15:9,17,22; 16:2,13,21;17:3,10,16, 22;18:9,14,21;19:4,11, 20;20:4,7,14,25;21:7,10, 17,25;22:8,14;23:5,9,16; 24:2,5,11,16,20,23;25:4, 7,15,20,25;26:13,16,22; 27:3,14,21;28:6,10,17; 29:13;30:8,14,18,21; 31:19;32:3,11,14,24; 33:13,15;34:3,7,18,24; 35:6,16,20,24;36:6,10, 13,18;37:13,25;38:6,12, 24;39:8,12,16,23;40:22; 42:5,14;43:2,9,14,22; 44:4,13,18,23;45:5,21; 46:3,14,24;47:8;48:7; 49:10;50:13,18;51:17, 24;52:8;53:6;54:6,12,17, 23;55:8,21;56:8;57:2,7, 11,18;58:2,5,13,22; 59:16,22;60:3,14,18, 61:3,10,15,20;62:7, 17;63:3,10,16;64:23; 65:7,14,25;66:11;67:3, 10,19;68:7,18,25;69:5; 70:11,21,25;71:15,20; 72:3,18,24;73:7,17,23; 74:8,13,19,25;75:4,10, 16,23;76:19;77:9,25; 78:5,15,22;79:8,12,17, 22;80:2,8,16,22;81:7,15; 82:3,22;83:6,10,21;84:2, 9,11,13,17,24;85:5,14, 23;86:7,14,22;87:15; 88:2,10;89:8,19,23;90:7, 11,17,23;91:12,16;92:4, 9,23;93:6,14,23;94:16, 21;95:15,22
**month (1)** 31:7
**more (17)** 7:12;8:8;21:17;29:24; 38:5,7,21;39:3;40:7; 47:5,17;56:3;87:12,12; 89:2;92:3,18
**Morgan (1)** 3:14
**morning (1)** 69:3
**morning's (1)** 69:20
**Morrison (1)**

3:11
Mortgage (23)
6:7,11;7:16,19;9:2,4;10:3,22;11:3,4,14;13:17;24:19;35:18,21;37:16;68:13,14,20,23;70:3,4;71:11
mortgages (32)
7:8,11,14;8:12,19;11:11,24;12:17,22,24;13:3,4;14:5,10;15:14;16:10,23;17:5,13;47:7;68:4,10;69:17;70:3,5,7,8;71:3,4,14,24;88:6
most (1)
76:3
mouth (1)
25:22
moved (1)
14:7
moving (1)
62:19
much (5)
23:11;44:11;51:10,23;52:10
multiple (7)
12:20;38:20;39:4;59:11;62:8,10;73:24
mute (1)
53:24
myself (1)
95:18

N

name (5)
2:21,22;11:15;27:25;35:14
named (2)
16:4;24:25
names (2)
23:12;95:21
National (2)
5:20,22
nature (1)
19:19
NBMC (2)
27:23;47:10
near (2)
4:2;93:8
necessarily (6)
17:25;21:11,13,20;40:25;82:23
need (5)
30:13;44:13;55:23;75:16;76:6
needed (1)
72:11
negotiation (1)
62:3
Nevada (1)
42:12
nevertheless (1)
74:18
New (4)
6:4,5;24:22;28:18
next (1)
71:22
nomenclature (4)
61:11,13;64:15,20
note (5)
8:22;10:22;84:9,11,22
noted (5)
26:19;57:19;73:8,14;77:3
notice (2)
85:12;88:8
noticed (1)
17:19
notified (1)
17:20
notify (2)
18:22;72:8
notifying (1)
18:17
notion (1)
78:8
number (11)
28:19,22;29:3;46:15;51:2;78:24;89:15,15;93:6,9;95:17
numbers (4)
36:2;66:22;91:8,20
numeric (1)
67:2
NYU (1)
5:8

O

observed (1)
86:5
obtain (1)
4:20
obviously (1)
67:22
occasion (1)
28:8
occur (2)
26:13;41:7
occurred (2)
37:5;41:8
off (4)
21:3;54:2;73:25;96:9
offhand (1)
78:16
offices (2)
2:12;79:16
officials (1)
79:11
often (3)
9:14;39:10;42:24
oftentimes (2)
17:8,14
once (3)
12:22;30:8;66:13
one (38)
14:24;20:19;31:5;32:14,17;33:2;34:16;37:21;38:21;39:3,5;40:9;41:14;47:21;48:13;54:8;59:2,11;62:13,14,15;65:13,22;66:7,15,22;69:24;71:4,6,13;75:18,19;77:23;81:12;82:3;91:23;92:12,16
O'Neill (2)
79:24,24
ones (4)
46:23;49:20;95:9;96:3
one-size-fits-all (2)
86:3;87:19
ongoing (1)
45:13
online (5)
33:15,18;34:5;39:20,22
only (5)
19:18;33:4;46:5;49:14;67:9
on-site (1)
40:23
onto (1)
16:6
operation (2)
39:15;68:24
opinion (4)
10:7,14;13:21;78:21
opportunity (1)
63:20
opposed (3)
52:6;71:4,7
order (1)
81:10
organization (2)
53:11;70:16
organizational (1)
70:9
organizations (1)
52:14
original (14)
8:22;9:2,19,25;10:6,13,20;11:16;13:9,15,20;14:3;66:3,11
originally (1)
80:12
originals (1)
9:9
originating (1)
29:22
origination (2)
42:7;67:13
originator (2)
29:23,25
originators (3)
23:4,7;24:13
originator's (1)
81:25
others (6)
28:3;46:22;47:6,18;85:25;96:4
out (18)
13:5;29:16;40:9,12;42:21;44:2;48:11,20;49:15;52:16;53:3,4;61:23;62:22;69:4;91:3;94:7;96:5
outline (1)
20:21
outlined (1)
72:4
outlining (2)
19:13,16
outside (2)
42:18,18
over (16)
4:21;14:7;27:22;28:23;35:25;37:7;40:18;47:21;82:20;83:12;84:17;86:17;87:11,21;88:7;93:12
overall (5)
55:4,15;56:6;68:16;91:17
overlay (1)
82:13
overlays (2)
81:20;82:20
overrule (1)
94:20
own (1)
82:20
owned (1)
67:22
ownership (2)
11:10;16:23

P

package (7)
15:23;16:16;70:16;71:8;72:7,8,10
packages (4)
7:13,16,19;71:5
paid (1)
90:7
paper (3)
15:16,17,18
part (5)
8:4;20:25;48:19;68:12;82:12
particular (24)
16:15;17:20;20:17,19;22:24;23:17,20;24:6;25:17;26:5,7,8;31:7;32:8,22,25;33:2;36:20;46:13;54:19;56:4;57:9;80:21;92:24
parties (1)
68:5
parts (3)
62:17,19;68:14
party (1)
95:8
pass (3)
33:7,19;34:2
passage (1)
34:22
Passaic (1)
5:5
passed (1)
34:17
Patterson (2)
3:15,15
Patty (2)
36:24;95:24
Paul (3)
3:8,15,15
pay (1)
90:4
paycheck (1)
69:17
people (14)
38:15,20;41:19;46:5,8;47:22;48:25;60:5;72:16,16;89:3;95:13,15,20
People's (1)
25:6
per (4)
90:8,10,15;91:6
percent (40)
22:4,7,11,25;23:19,22,24;24:10,12,15;25:13,14;26:6,17;27:8,9;28:8,19;51:15,18,21;52:3,7;57:15,16,24;62:24;63:7;72:20;73:2,3,5,10;74:10,15;91:18,19,20;92:7,7
percentage (2)
24:10;91:10
perfectly (1)
75:19
perform (2)
72:13;81:22
performed (10)
8:20;11:22;14:11;17:7;18:19;19:2;32:9,23;57:23;73:4
performing (2)
17:24;46:2
perhaps (2)
60:8,9
period (14)
7:4;29:4;37:8;38:19;39:18;56:10;68:5;71:12;83:4,20,25;84:10;86:6;87:21
periods (4)
36:7;65:15;83:12;92:11
permitted (2)
33:8,20
person (3)
32:8;37:21;38:9

**personnel (1)** 33:23
**persons (3)** 31:24;34:16;37:22
**PHH (1)** 6:7
**phonetic (9)** 32:13;36:24;79:21,25; 95:24,25;96:2,2,3
**physically (2)** 94:2,4
**pick (1)** 47:21
**picked (1)** 47:3
**play (1)** 47:15
**please (13)** 2:20,22;4:12,18; 11:24;14:17;17:11; 30:20;46:25;47:4;55:25; 72:25;79:9
**PMI (2)** 6:11;7:9
**point (10)** 7:7;17:23;29:4;34:21; 38:7;50:19;52:15;56:10; 71:23;73:19
**points (1)** 67:24
**policies (12)** 30:2;43:5,7,10,12,13, 17,19,25;44:5,12,18
**policy (14)** 10:7,14;13:21;14:4; 26:16;44:15,22,24; 45:17,20;52:25;53:3; 74:8,11
**pool (27)** 12:17;13:2;17:20; 18:8,18,22;19:2,6;20:19; 21:21;22:20;29:17; 32:25;33:2;39:3;46:13; 47:16,22;62:22;70:3,4; 72:22;81:4,6,19;87:16; 92:24
**pools (20)** 8:11,19;13:5;14:6,19; 15:20;17:6,13;18:10; 22:4;23:18;29:14;36:20; 38:22;39:5;40:10;78:10, 11;86:12,16
**portal (1)** 33:17
**portfolio (1)** 19:17
**portion (1)** 59:6
**position (2)** 68:9;70:8
**positions (1)** 6:25
**possibility (3)** 80:9;82:23,24
**possible (3)** 15:10;79:13,18
**posted (1)** 34:19
**powers (2)** 9:20;13:10
**PPC (1)** 94:15
**practice (1)** 21:18
**predominantly (4)** 7:7,20,25;31:20
**present (1)** 86:21
**president (2)** 3:23;4:6
**presumably (2)** 33:22;34:15
**pretty (1)** 39:14
**previous (2)** 28:13;66:22
**previously (1)** 76:8
**price (3)** 19:18;20:15;91:6
**Pricewaterhouse (1)** 57:5
**PricewaterhouseCoopers/Watterson (1)** 27:24
**primarily (1)** 47:9
**primary (5)** 28:14;45:24;46:19,20; 59:19
**Prime (4)** 27:24;41:4;47:9;91:19
**prior (1)** 18:7
**probably (7)** 5:24;6:5;12:15;15:4; 37:5;44:8;91:17
**problem (3)** 55:16;62:20;83:5
**procedural (1)** 84:5
**procedure (7)** 45:6,19,20;52:5,24; 53:3;63:15
**procedures (11)** 43:15,16;44:5,11,16, 24;45:2,3,15;48:24; 51:14
**process (25)** 18:10;35:3,4;37:4; 38:13;40:11;49:14,23; 50:7;51:3,6;56:14,16,18; 60:16;63:8,10,13;66:12, 20;71:25;72:2,5;80:18; 90:24
**processes (2)** 40:14;50:25
**procurement (1)** 91:2
**produce (1)** 63:25
**produced (2)** 64:14,18
**product (4)** 20:16;29:23;84:19; 85:8
**production (1)** 4:9
**products (5)** 84:14,25;85:4,16,24
**professional (2)** 4:24;5:11
**programming (1)** 42:20
**projects (1)** 49:2
**properly (1)** 55:20
**proposed (2)** 50:10,17
**prospective (1)** 33:23
**provide (9)** 4:9;5:14;18:25;19:5,6; 33:25;47:4;49:17,18
**provided (3)** 64:5,10;65:6
**providing (1)** 94:11
**public (1)** 3:21
**published (2)** 33:16;82:4
**purchase (15)** 8:11,19;15:20;18:23; 23:10,11;39:2;64:4; 68:9,23;71:3;74:9,12,15; 82:6
**purchased (11)** 12:22;17:18;23:18; 64:11;69:13,14;70:17; 71:2,14;74:18;76:7
**purchaser (2)** 11:18;69:16
**purchases (14)** 7:13,18;12:17;13:3; 27:17;67:9,12,15;69:11, 21;70:14,18;71:18; 72:22
**purchasing (4)** 7:16;22:20;72:10; 95:10
**purpose (1)** 80:4
**purposes (1)** 7:15
**put (4)** 19:13;25:21;53:23; 54:25
**putting (1)** 53:2

### Q

**QC (1)** 33:23
**qualified (1)** 57:6
**quality (8)** 4:20;7:15;20:2,10; 28:21;83:24;87:7,22
**quarter (2)** 78:12,13
**quarters (2)** 79:7;80:6
**Quick (3)** 25:3;53:24;90:5
**quite (5)** 15:9;51:14;79:13,17; 88:23
**quoting (1)** 11:13

### R

**raised (1)** 67:16
**ran (1)** 36:24
**range (3)** 21:24;27:6;95:3
**rank (3)** 73:15;75:2,5
**ranked (4)** 73:16;75:8,13;77:6
**ranking (2)** 77:22;78:2
**rated (3)** 61:17;76:23;77:5
**rating (3)** 50:21;66:16;77:17
**real (1)** 87:25
**really (1)** 67:4
**reason (1)** 58:9
**recall (14)** 20:12;24:24;25:17; 26:4,4,7;34:25;35:2; 54:25;74:14;79:12;80:9, 17;91:12
**receive (17)** 8:21,25;9:19,24;10:5, 12,20;11:2,15;12:9,11; 13:9,14,19;14:2;18:7; 59:10
**received (11)** 5:8;12:5,7,17;15:19; 16:12;20:23;39:21,23; 58:25;60:9
**receiving (2)** 60:16;63:16
**recertified (1)** 9:19
**Recess (1)** 54:3
**recode (1)** 65:13
**recoded (1)** 65:10
**recollection (4)** 40:4;68:22;72:19;85:9
**recommended (1)** 52:5
**reconciled (1)** 53:5
**reconciliation (1)** 53:7
**record (7)** 2:17,21;28:13,16; 54:2,4;96:9
**recordable (1)** 11:16
**recorded (3)** 2:14;9:2;11:14
**recording (3)** 9:4,10;96:10
**recordings (2)** 9:21;13:11
**records (1)** 4:9
**reduce (1)** 29:12
**reduced (1)** 89:5
**reducing (2)** 29:8,18
**regarding (1)** 79:5
**regards (1)** 8:16
**registration (1)** 11:10
**regulatory (1)** 42:6
**rejected (3)** 77:23;78:4;80:13
**related (2)** 7:13;72:21
**relating (1)** 19:17
**relation (1)** 67:21
**relationship (3)** 16:25;67:17,23
**rely (2)** 51:14;52:25
**relying (2)** 93:20;94:14
**remain (2)** 31:18;64:10
**remained (1)** 31:20
**remains (1)** 16:7

**remediated (1)** 76:6
**remember (6)** 54:20;55:3;62:13; 90:17;91:7;96:4
**rep (2)** 7:20,25
**repair (1)** 65:21
**repaired (1)** 66:14
**repeat (1)** 69:24
**report (11)** 31:6,6;55:2;59:3,4,4,7, 13,13;63:17,17
**reported (1)** 4:5
**reporting (8)** 30:23;45:11;59:8; 91:5;93:16,24;94:6,7
**reports (23)** 30:6,15;31:2,4,8,9,12; 34:11;39:22,24;58:4,7, 23,25;59:10;60:10,10; 73:12,14;79:4,5;80:5; 92:19
**repository (1)** 16:22
**represented (1)** 31:24
**repurchases (2)** 7:21;8:2
**require (1)** 56:25
**required (5)** 34:23;42:17;45:11; 65:17;66:19
**requirement (2)** 56:22;73:3
**rereview (1)** 65:8
**residential (3)** 7:5,8,11
**respect (6)** 10:2;13:16;31:23; 73:11,22;74:12
**responses (1)** 4:19
**responsibilities (4)** 67:8,18;68:11,17
**responsibility (2)** 37:3;71:17
**responsible (8)** 7:17,20,25;18:17; 37:16;46:6;70:13;94:10
**rest (1)** 94:15
**restrictions (1)** 20:18
**results (6)** 29:6,7,10,14,20;42:21
**resume (1)** 4:25
**retain (1)** 31:18
**returned (1)** 6:12
**reverting (1)** 66:21
**review (24)** 34:10;38:22;40:3,16, 20;41:10,20,22;54:7,13, 15,19;56:5,11;60:20,24, 25;81:4,16,17,23;91:6; 93:15;95:8
**reviewed (11)** 60:20,23;71:7;73:6; 76:23;78:9,12,19;79:6; 81:6;93:15
**reviewer (1)** 89:16
**reviewing (6)** 7:14;20:3;76:16;80:5; 87:9;93:13
**reviews (5)** 27:11;28:13;40:10; 52:7;54:22
**right (31)** 9:5,8,18;10:3;11:7,21; 12:4;13:8,17;14:16; 16:18;18:16;20:6;24:4, 8;25:19;26:20;27:17; 33:10;36:8;42:21;43:8; 51:16;68:2;69:22;71:10; 75:21;84:20;85:19; 89:12;96:8
**role (2)** 7:10,12
**roles (1)** 6:24
**roll (1)** 31:11
**rolled-up (3)** 31:12;59:3,4
**roughly (1)** 93:3
**run (3)** 36:20;37:23;63:13
**running (3)** 36:23;37:4;38:20

S

**same (5)** 38:23;83:18;85:15; 89:7,10
**sample (19)** 21:6,9,12,14,16,19,23, 24;23:14;26:24;27:7; 28:8,11;29:8,12,18,24; 51:22;57:15
**samples (5)** 26:15;51:14,16;52:6; 53:2
**sampling (1)** 52:4
**satisfied (1)** 64:2
**satisfy (1)** 64:6
**saw (1)** 83:23
**saying (4)** 39:2,7;83:17;88:18
**scale (1)** 75:18
**scheme (1)** 70:6
**scope (1)** 81:16
**score (2)** 20:21;85:13
**scores (1)** 86:9
**Sears (5)** 36:24;45:24;59:18; 92:22;95:24
**second (3)** 44:3;62:15;78:13
**Section (1)** 4:15
**securities (1)** 42:3
**securitization (2)** 11:23;22:24
**securitizations (4)** 14:7;15:12;17:9,15
**securitize (2)** 17:17;22:21
**securitized (3)** 15:2,15;17:21
**security (3)** 11:2;16:3;41:10
**seemed (1)** 52:6
**seems (2)** 49:8;51:21
**sell (1)** 82:8
**seller (10)** 11:17;22:18,22;23:21; 28:18;63:18,19;64:18; 65:6;82:8
**sellers (1)** 24:7
**selling (1)** 28:22
**senior (1)** 41:14
**sense (1)** 41:24
**sent (1)** 71:6
**separate (2)** 65:18;66:23
**separately (1)** 66:18
**September (1)** 2:5
**serious (1)** 52:10
**seriously (1)** 49:12
**services (1)** 33:25
**set (4)** 30:25;31:10;81:18; 82:4
**several (6)** 22:16,17;27:4,21; 28:11;32:16
**shape (1)** 89:25
**shared (1)** 63:18
**short (1)** 53:20
**sic (1)** 3:16
**side (1)** 2:24
**SIFMA (9)** 48:14,16;50:9,11,17, 20;51:13,22;52:4
**signal (2)** 78:3,6
**signed (2)** 3:22;90:25
**significant (4)** 49:5;76:9;77:19,21
**significantly (1)** 27:4
**similar (4)** 7:10;45:7;48:24;55:10
**single (2)** 22:18;23:21
**site (4)** 31:25;41:20;54:13; 94:3
**sites (3)** 31:16,22;39:20
**sitting (3)** 52:23;58:10,11
**situation (1)** 91:23
**six (2)** 37:20;72:18
**size (18)** 21:6,9,11,14,16,23,24; 23:14;26:14,21,23; 28:11;29:8,12,18,24; 35:12;37:24
**sizes (2)** 21:19;27:7
**skills (1)** 38:16
**SLA's (1)** 91:3
**smaller (3)** 29:24,25;37:22
**sold (1)** 15:3
**somebody (1)** 52:20
**somebody's (1)** 82:14
**someone (1)** 12:6
**sometimes (2)** 87:23,24
**somewhere (3)** 66:20;87:3;94:3
**soon (1)** 56:23
**sorry (3)** 44:2;51:24;81:13
**sort (6)** 20:22;41:18;45:14; 59:14;62:3;87:2
**sourcing (1)** 92:14
**speak (5)** 12:3;30:9;37:15; 68:19;96:7
**SPEAKER (25)** 3:13;25:19;26:10; 28:6,15;29:9;42:24; 89:12,22;90:3,9,14,21; 91:9,13;92:2,6,16;93:2, 11,17;94:12,17;95:11,19
**speaking (13)** 10:18;11:19;19:4; 22:3,3,8;30:22;51:19; 54:15;57:18;70:12;73:7; 89:9
**spearheaded (1)** 48:13
**specific (4)** 5:14;8:9;36:15;85:9
**specifically (10)** 6:23;12:25;30:9;48:8; 54:18;58:6;74:20;84:4; 85:5,7
**specifics (2)** 47:4;55:7
**specify (1)** 89:24
**spell (2)** 2:22;94:7
**spelled (1)** 91:3
**spent (1)** 49:22
**spitting (1)** 42:20
**spoke (1)** 79:13
**sporadically (1)** 28:4
**spreadsheet (2)** 60:11;86:13
**spreadsheets (1)** 31:10
**staff (5)**

4:14;31:16;37:7; 41:16;47:10
**standard (13)** 2:7;14:25;34:12; 51:22;52:5,20;53:12,14, 16,18;81:10;83:19;89:6
**standardized (1)** 53:3
**standards (12)** 48:18;50:11,15;56:3; 62:25;65:24;81:5,8; 83:9,11,15,16
**standing (1)** 21:18
**standpoint (1)** 53:9
**start (7)** 2:23;4:23;36:8;43:8,8; 68:2;80:14
**started (4)** 40:5;60:4;64:13;80:11
**starting (2)** 4:25;5:4
**state (7)** 2:20;6:4,5;41:25;42:6, 12,12
**statement (1)** 11:13
**statements (1)** 4:16
**States (2)** 4:13,15
**status (4)** 61:25;62:23;65:4,18
**statute (2)** 3:21;4:10
**staying (3)** 87:13;89:7,9
**Stearns (39)** 6:15,21;7:17;8:4,11, 13;12:18,23;14:12;17:7; 18:20;32:7,19;33:17,20; 34:2;35:15;36:5;51:15; 52:3,25;55:18;62:2; 63:6;67:9,20,22;68:4,10, 23;69:13,18;70:2;71:11, 23;78:9;81:3;83:2;88:7
**Stearns' (1)** 50:15
**Stearns/JPMorgan (1)** 6:16
**step (9)** 44:17,17;45:7,7; 63:14,14,15,15;75:17
**step-by-step (1)** 45:14
**still (2)** 25:14;27:16
**stip (2)** 19:10;20:13
**stips (4)** 19:24,25;20:9,14
**stipulations (2)** 19:7,11
**strategies (1)** 15:5
**strategy (1)** 17:25
**Street (2)** 48:5,17
**strictly (4)** 8:16;22:22;29:20;90:8
**strong (1)** 38:16
**structure (2)** 69:9;70:9
**struggle (1)** 36:10
**stuff (1)** 69:10
**subjects (1)** 34:4
**submitted (1)** 82:11
**subprime (19)** 21:22;22:4;23:11; 26:15,18;47:10,17; 51:18;57:6,10,12,14,23; 72:21;73:4,9;85:13,22; 92:3
**subsequently (2)** 64:18;65:6
**sufficient (3)** 77:3,15;94:19
**summary (2)** 31:9;79:5
**superimpose (1)** 82:19
**suppose (1)** 74:4
**supposed (1)** 81:17
**sure (38)** 4:18;5:18;6:22;7:6; 14:15;15:4;19:20;20:4, 8,8;26:9;28:17;30:8,16, 17;35:6;37:18;38:24; 42:15,19;43:15;48:23; 49:13;53:21;60:4;64:23; 67:10;69:5;76:25;81:7; 83:21;84:2,3,6;88:2,13; 94:22;95:22
**system (1)** 11:10

T

**tab (1)** 61:2
**table (1)** 51:7
**tabs (2)** 59:11,12
**talk (6)** 30:11,18;41:15;48:18; 58:11;76:2
**talking (19)** 15:22;19:18;26:22; 27:16,18;41:23;42:2; 44:10,11;58:6;66:25; 67:11,14;69:15,19;84:4, 21;89:19;94:5
**tangled (1)** 69:9
**tape (2)** 19:5;86:21
**technique (1)** 52:4
**ten (4)** 3:24;22:17;53:22; 89:17
**tend (2)** 29:17;30:3
**term (2)** 64:24;65:2
**terms (23)** 7:15;21:13,18;26:14; 34:13;36:23;41:10,16; 42:6,21;44:19;45:8,9,17; 49:21;51:8,11;64:7; 68:20;86:24;87:22;91:4, 4
**test (11)** 33:5,8,14,16,17,19; 34:6,20,22,22;35:9
**testimony (1)** 4:8
**testing (3)** 48:20;49:19;52:17
**tests (2)** 48:10;52:16
**therefore (1)** 39:3
**third-party (7)** 27:12,15,20;45:25; 57:4;60:12;72:12
**though (1)** 95:5
**thought (9)** 28:20;49:24;55:9,13; 56:10,18;72:4;77:14,20
**thoughts (1)** 50:25
**three (24)** 27:22;28:2,5;41:19; 57:3;61:17,23;62:24,24; 64:11;65:4,10,13,22; 66:3,13;75:18;76:8; 77:6,13,14;80:13;81:12; 93:18
**threes (8)** 62:2,4,5;75:9,13,15; 76:5;87:12
**throughout (3)** 69:20;83:19;87:14
**times (1)** 31:21
**timing (1)** 40:2
**title (14)** 6:25;7:6;10:6,8,8,13, 15,15;11:2;13:20,22,22; 14:3;16:10
**today (3)** 50:3;58:10;69:16
**Today's (1)** 2:5
**together (4)** 19:13;48:18;54:25; 71:9
**told (5)** 19:23;44:21;59:19; 75:7;78:17
**Tom (8)** 2:8,8;3:2,4;21:4;43:4; 53:19;67:6
**tomorrow (1)** 50:5
**took (5)** 6:6;28:18;37:3;49:11; 52:9
**tools (3)** 49:17,19,20
**top (3)** 68:3;74:2;82:20
**total (2)** 70:6;82:12
**track (3)** 28:12,16;66:18
**tracking (1)** 11:10
**tracks (1)** 16:23
**trade (7)** 18:21;19:12,14,16; 21:13;53:8;72:5
**trader (3)** 21:5,8,10
**traders (1)** 18:12
**trading (1)** 18:11
**trailing (3)** 61:8,13,14
**transaction (3)** 23:21;61:11;76:25
**transactions (15)** 22:25;23:17,20;24:7; 28:20,23,25;29:2,4; 32:17;33:9,21;34:19; 47:11;95:17
**transcript (1)** 4:20
**TRANSCRIPTION (95)** 2:1;3:1;4:1;5:1;6:1; 7:1;8:1;9:1;10:1;11:1; 12:1;13:1;14:1;15:1; 16:1;17:1;18:1;19:1; 20:1;21:1;22:1;23:1; 24:1;25:1;26:1;27:1; 28:1;29:1;30:1;31:1; 32:1;33:1;34:1;35:1; 36:1;37:1;38:1;39:1; 40:1;41:1;42:1;43:1; 44:1;45:1;46:1;47:1; 48:1;49:1;50:1;51:1; 52:1;53:1;54:1;55:1; 56:1;57:1;58:1;59:1; 60:1;61:1;62:1;63:1; 64:1;65:1;66:1;67:1; 68:1;69:1;70:1;71:1; 72:1;73:1;74:1;75:1; 76:1;77:1;78:1;79:1; 80:1;81:1;82:1;83:1; 84:1;85:1;86:1;87:1; 88:1;89:1;90:1;91:1; 92:1;93:1;94:1;95:1; 96:1
**transcriptionist (1)** 2:23
**transferred (1)** 16:11
**travel (3)** 31:16,21;40:15
**traveled (1)** 39:19
**traveling (2)** 40:6,7
**trend (1)** 87:25
**trends (2)** 86:24;87:21
**trendsetter (1)** 52:13
**trigger (2)** 25:10;27:5
**trustee (2)** 16:4,4
**try (2)** 8:10;58:19
**trying (9)** 14:8;19:24;25:9,21, 25;49:23;53:4;54:23,24
**turn (3)** 4:21;49:5;66:14
**turnaround (2)** 90:6;91:4
**twelve (1)** 89:18
**two (27)** 23:12;24:7,24,25; 25:13,16;26:5;28:14; 30:23;31:4;37:21;38:2; 46:5,19;55:22;57:5; 58:24;60:10;66:14; 75:18,23;76:23;77:13; 79:7;80:6;81:12;82:4
**twos (1)** 76:4
**type (4)** 20:16;38:9;56:5;80:11
**types (5)** 30:6,23;47:6;58:24; 84:19
**typical (1)**

40:20
Typically (9)
9:6,12;12:15;20:15;31:7;40:23;59:8;75:17,23

U

ultimately (3)
17:21;50:16;95:9
under (3)
4:14;12:6;95:13
underlying (2)
57:25;88:24
understood (6)
17:4,12,16;26:11;42:10;43:18
undertake (1)
81:4
underwrite (1)
34:14
underwriter (3)
32:2,4;48:4
underwriters (10)
33:2,6,23;47:16,19;48:21;84:5;89:14,20;90:4
underwriting (36)
7:5,8,10;33:7;34:8;38:17;40:24;41:6,8,16;48:10;52:16;62:25;65:23;75:20;81:19,24;82:2,5,9,10,18,21;83:9,11,13,15,24;87:7,23,24;88:6,9,11,19;89:6
underwritten (2)
82:7;83:18
UNIDENTIFIED (25)
3:13;25:19;26:10;28:6,15;29:9;42:24;89:12,22;90:3,9,14,21;91:9,13;92:2,6,16;93:2,11,17;94:12,17;95:11,19
uniform (1)
87:6
United (2)
4:13,15
universal (1)
86:3
unless (2)
49:8;94:2
unusual (1)
49:8
up (11)
31:11;36:12;44:21;45:2;49:5;86:2,18,25;87:10;89:6;94:13
upon (17)
16:14;22:2;46:4,18;47:22;50:19;55:12;56:2,23,24;63:16;65:8;73:18;85:8;92:13;93:20;94:15
use (9)
46:13,16;52:20;61:10,14;64:19,25;65:3;81:21
used (7)
12:20;21:2;27:21;28:3;49:16;66:8;67:2
using (5)
52:6;64:12,24;80:11,14

V

valuation (2)
49:18;52:18
variables (2)
28:9,10
varied (3)
14:24;88:25;90:12
various (5)
43:14;46:22;47:6;67:24;68:5
vary (4)
27:3;87:16;92:10;93:7
vast (2)
22:10;91:24
vendor (3)
64:3;72:13;91:23
vendors (10)
27:12,15,20;38:15;49:16,16,18;52:17,18,19
vendors' (2)
39:21,24
verbal (2)
2:17;4:19
version (1)
51:5
versus (2)
44:5;47:18
via (2)
39:24;60:17
Vicki (1)
79:20
Victor (1)
2:3
visit (1)
40:23
volumes (2)
37:2;92:15

W

waived (1)
80:21
waiver (8)
62:6;64:20,21,22,24,25;80:11,15
wake (1)
61:24
walk (3)
30:4;60:15;66:9
walked (1)
36:14
walking (1)
28:7
Wall (2)
48:5,17
wants (2)
70:2,4
warrant (2)
7:21;8:2
Watterson (3)
41:4;47:9;91:18
way (5)
3:20;4:17;8:10;37:8;59:25
ways (4)
49:13;50:6;51:2;56:16
weighted (4)
86:15,16,18,25
Weiss (2)
3:9,16
weren't (4)
29:15;33:8;58:15;94:22
What's (1)
45:2
whenever (1)
28:17
Whereupon (1)
96:10
wherever (1)
40:23
whole (1)
37:24
widely (1)
93:7
wish (2)
55:18;56:19
wished (1)
56:5
within (5)
37:16;48:14,16;88:14,15
without (2)
36:14;55:6
witnesses (1)
4:8
word (2)
64:15,25
words (2)
25:21;87:11
work (9)
6:7,9,10,15;32:15;33:8,20;69:2;71:25
worked (8)
5:22,25;6:3;32:16;35:17;50:8;95:13,20
working (9)
6:4;7:5;34:18;45:3,5;48:25,25;50:11;53:8
world (1)
36:22
worse (3)
88:9,11,20
worst (1)
55:6
write (3)
43:19;44:21;45:20
writing (1)
89:4
written (7)
33:14,17;43:7,11,13,15,25
wrong (2)
49:25;69:12
wrote (2)
44:25;45:19

Y

Year (14)
5:17,19,21;6:11;22:15;24:3;25:17;26:8;34:25;43:7;79:3,6;80:6,14
years (2)
27:22;92:21
Yup (1)
68:7