# EXHIBIT 120

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEXIA SA/NV; DEXIA HOLDINGS, INC.; FSA ASSET MANAGEMENT LLC; DEXIA CRÉDIT LOCAL SA,<br><br>               Plaintiffs,<br><br>v.<br><br>BEAR, STEARNS & CO. INC., THE BEAR STEARNS COMPANIES, INC., BEAR STEARNS ASSET BACKED SECURITIES I LLC, EMC MORTGAGE LLC (f/k/a EMC MORTGAGE CORPORATION), STRUCTURED ASSET MORTGAGE INVESTMENTS II INC., J.P. MORGAN ACCEPTANCE CORPORATION I, J.P. MORGAN MORTGAGE ACQUISITION CORPORATION., J.P. MORGAN SECURITIES LLC (f/k/a JPMORGAN SECURITIES INC.), WAMU ASSET ACCEPTANCE CORP., WAMU CAPITAL CORP., WAMU MORTGAGE SECURITIES, JPMORGAN CHASE & CO., and JPMORGAN CHASE BANK, N.A.,<br><br>               Defendants. | 12-cv-4761 (JSR) |

## AFFIDAVIT OF JUDY A. WALTER

I, Judy A. Walter, hereby state and affirm under penalty of perjury that the following is true and correct:

    1.    I have personal knowledge of the facts set forth in this Affidavit. Between October 2005 and June 2007, I worked at EMC Mortgage Corporation ("EMC"), which was an affiliate of Bear, Stearns & Co. Inc.

    2.    The July 27, 2011 affidavit I swore to in the matter *Ambac Assurance Corporation v. EMC Mortgage LLC*, identified as DEXDEP00019029-DEXDEP00019038,

accurately reflects my recollection of the matters sworn to therein. If asked the same questions, the substance of my responses would remain the same.

3. The testimony I gave during my March 26, 2012 deposition in the matter *Ambac Assurance Corporation v. EMC Mortgage LLC* accurately reflects my recollection of the matters testified to therein. If asked the same questions, the substance of my responses would remain the same.

4. The transcript of my March 25, 2012 deposition in the matter *Ambac Assurance Corporation v. EMC Mortgage LLC* and identified as DEXDEP00018969-DEXDEP00019028, accurately reflects my sworn testimony.

5. I did not make changes to the deposition transcript following my March 25, 2012 deposition in the matter *Ambac Assurance Corporation v. EMC Mortgage LLC*.

6. During my March 25, 2012 deposition examination in the matter *Ambac Assurance Corporation v. EMC Mortgage LLC*, I was able to provide my best testimony and did not suffer from any condition that would prevent me from providing my best testimony.

Sworn to before me this
22 day of January, 2013

Judy A. Walter

Sworn and subscribed to me
on January 22, 2013
by Judy A Walker
Charles Thurman
Notary Public
Dallas County, State of Texas

CHARLES RAYMOND THURMAN
Notary Public, State of Texas
My Commission Expires
August 02, 2016

## AFFIDAVIT OF JUDY WALTER

Judy Walter, being duly sworn, deposes and says:

1. My name is Judy Walter. I have personal knowledge of the facts in this affidavit and am competent to testify to them if called upon to do so.

**Background**

2.

3. I have worked in the residential mortgage industry since 1982. From 1982 to 2005, I worked as a loan processor, closer, underwriter, director of compliance, risk manager, portfolio retention manager, operations manager, and quality control manager for a number of mortgage companies. These mortgage companies include Merrill Lynch Mortgage Corporation, First American Mortgage Corporation, First Gibraltar Mortgage Corporation, Lomas Mortgage, USA, Inc., Mortgage Recruiting Consultants, Greenwich Capital Financial, Inc., Sunbelt National Mortgage Corporation, Franklin Mortgage Capital Corporation, Mutual Equity Mortgage Company, Sebring Capital Partners, and Wells Fargo Mortgage.

4. As a loan processor and underwriter, I finalized loan applications, obtained the necessary documents, and underwrote loan files to determine whether the loans complied with the applicable underwriting guidelines. As a closer, I prepared the necessary documents for closings and ensured that the loans closed in a timely and proper manner. As an operations manager, my responsibilities included, among other things, managing the mortgage companies' correspondent lending channels, monitoring and approving loan brokers and appraisers, and training employees. As a quality control manager, I trained and managed quality control underwriters and supervisors.

WALTER
EX. 1
03.25.2012 ★ SPM

ABK-EMC03479906

CONFIDENTIAL

DEXDEP00019029

### EMC Mortgage Corporation

5. Between October 2005 and June 2007, I worked at EMC Mortgage Corporation ("EMC"), an affiliate of Bear, Stearns & Co. Inc. ("Bear Stearns"). I interviewed for this position with Dawn Gill, who was a manager of flow underwriting for "Alt-A" loans. Loans acquired by EMC through the flow channel were funded by EMC and originated by EMC's network of third-party originators and loan brokers (the "Sellers"). During the duration of my employment, I reported to Ms. Gill. Ms. Gill reported to Jo-Karen Whitlock, who headed EMC's flow channel. I also worked extensively with Ms. Whitlock and participated in management-level meetings with her.

### The Prior Approval Group at EMC's Flow Channel

6. Between October 2005 and mid-2006, I was a supervisor for the prior approval group at EMC. Through its prior approval group, EMC gave a "prior approval form" to Sellers pursuant to which EMC committed to purchase loans that had not yet closed, so long as the loans complied with the applicable underwriting guidelines, including EMC's Seller Guides, upon closing. Before providing the prior approval form, EMC reviewed each loan to determine whether it complied with the applicable underwriting guidelines. For some Sellers, EMC required that the Seller satisfy certain conditions *before* EMC provided a final prior approval form. Such conditions included requiring the Seller to provide certain documents missing from the loan file or requiring the Seller to provide additional documents such as those verifying the borrower's rent, mortgage history, or bank deposit. For example, if an underwriter at EMC found that the assets listed on a borrower's loan application appeared unreasonable, the underwriter could condition the approval of the loan on the Seller's ability to provide documentation verifying the amount of funds available in the borrower's bank account. If the

CONFIDENTIAL                                                                                                    DEXDEP00019030

Sellers satisfied these conditions, EMC would then issue the final prior approval form and commit to purchase the loan upon closing. For other favored Sellers who supplied EMC with a high volume of loans, EMC issued final prior approval forms upon initial review of the loan file and allowed those Sellers to provide the missing or additional documents *after* the loan had already closed.

7. Upon receipt of the prior approval letter, the Seller often obtained the necessary funds for closing from its warehouse line of credit lender, such as EMC Residential Corporation ("EMC Res"). After closing the loan, the Seller submitted the final closed loan to the prior approval group, which would then review the loan file (for both groups of Sellers) to determine whether the loan complied with the applicable underwriting guidelines. If the loan complied with the underwriting guidelines, it was referred to the funding group, headed by Steve Kelly, to be purchased by EMC. If the loan did not comply with the underwriting guidelines or the Seller failed to satisfy the conditions, EMC's policy required that EMC decline the loan. This policy, however, was regularly ignored so that EMC could continue to purchase a high volume of loans.

8. The prior approval group was different from the closed loan group, headed by Charles Kelly, in that the closed loan group reviewed and purchased loans that had already been closed. Mr. Kelly reported to Ms. Gill. The subprime group, headed by Joe Carrion, also reviewed and purchased only closed loans, until I formed and headed a prior approval group for subprime loans in early 2006.

9. As a supervisor of the prior approval group, I managed Regina Davis, Jocelyn Henry, and Marcus Nunn. Ms. Davis and Ms. Henry were underwriters. Their responsibilities included reviewing loan files submitted by Sellers to assess whether the loans

complied with the applicable underwriting guidelines and requiring the Sellers to satisfy certain conditions before the Sellers closed the loans. Mr. Nunn, who was the "suspense coordinator," was responsible for, among other things, ensuring that the Sellers satisfied the conditions required by the prior approval group.

10. Although the prior approval group required certain Sellers to satisfy conditions before receiving a prior approval form, in practice these Sellers often contacted Ms. Whitlock directly, who gave the Sellers permission to close the loans before satisfying the conditions. When these Sellers subsequently submitted the closed loans to the prior approval group, Ms. Davis and Ms. Henry often noticed that the Sellers had failed to satisfy the conditions, and brought the issue to my attention. On numerous occasions, I informed Ms. Gill and Ms. Whitlock about the Sellers' failure to satisfy the conditions, rendering the loans non-compliant with the applicable underwriting guidelines. Ms. Gill and Ms. Whitlock rejected my entreaties and directed that the loans be purchased by EMC.

11. Similarly, for those Sellers that received prior approval forms and were allowed to submit conditions after the loans had been closed, Ms. Davis and Ms. Henry frequently found that the Sellers submitted closed loans that were defective because they failed to satisfy the required conditions. On numerous occasions, I contacted these Sellers to inquire why they had failed to submit certain required verification documents, such as documents verifying the borrowers' assets. These Sellers often told me that the loans had already been purchased by EMC through the closed loan group, headed by Mr. Charles Kelly. The Sellers were supposed to send these loans back to the prior approval group, but they already closed the loans and sent the loan files to the closed loan group. I often took these matters to Ms. Gill and/or Ms. Whitlock directly, who told me that EMC had purchased the loans because the Sellers

ABK-EMC03479909

CONFIDENTIAL                                                                                                      DEXDEP00019032

4

had promised to provide the required documents for each loan in the future. These documents often never came. As a result, EMC often purchased loans that did not comply with the applicable underwriting guidelines. On one occasion, when I brought this issue to Ms. Gill's attention, she told me, "let it go Judy. You are being too nitpicky." On another occasion, when I brought to Ms. Whitlock a pile of loan files for closed loans where the Sellers had failed to satisfy conditions, she grabbed the loan files out of my hand and told me, "I'll take care of them." I later discovered that all of these loans were purchased by EMC even though they contained serious defects.

## Implementation of the Color-Coded Tiered Scheme at the Flow Channel

12. In late 2006, in order to accommodate a large increase in the volume of loans EMC was acquiring, the flow channel was divided into a color-coded tiered grading system. Under this system, EMC underwriters were placed into a color-coded team. Each team reviewed loans submitted by Sellers, who were also placed into particular tiers based upon, among other things, the volume of loans they provided to EMC and the quality of those loans. After implementation of the color-coded tiered grading system, each team of underwriters was responsible for evaluating any prior approvals for Sellers designated to that team.

13. Under the new system, one team of underwriters was dedicated to reviewing loans submitted by Sellers favored by EMC who had a history of providing EMC with a large volume of loans. Per Ms. Whitlock's directive, loans submitted by Sellers designated to this team received "streamlined review," which meant that the underwriters simply checked whether the loan files contained the required closing documentation. Specifically, underwriters in this group were asked by EMC's management to not undertake a review of the documents provided in the loan file to assess whether those documents corroborated statements made on the

borrowers' loan applications. Further, loans submitted by Sellers designated for this team were not reviewed to determine whether the income listed on stated income loan applications submitted by these Sellers was reasonable, as required by the applicable underwriting guidelines.

14. A second team of underwriters was designated to review loans submitted by Sellers who had the wherewithal to repurchase defective loans. As such, these Sellers also received a slightly more stringent variation of "streamlined review."

15. A third team of underwriters was designated to review loans submitted by relatively small Sellers with whom EMC had little prior history. Underwriters in this team were directed by EMC's management to conduct an "intermediate" review of the loan file.

16. Lastly, a fourth team of underwriters was designated to review loans submitted by Sellers with known problems. Loans submitted by these Sellers required a more thorough review for defects, and received significantly more "required conditions" or recommendations for "declination" by EMC's underwriters.

17. After the shift to the color-coded tiered system, I first worked as an underwriting supervisor for the fourth team of underwriters. I later stepped down from being a supervisor to being an underwriter because, as discussed below, I refused to follow certain directives from EMC's management.

18. As an underwriter, I reviewed loans to determine whether they complied with the applicable underwriting guidelines. If a loan did not meet EMC's underwriting guidelines, I would (a) approve it subject to "conditions," (b) "suspend" with conditions, or (c) recommend that the loan be "declined." If a loan was approved subject to conditions, it meant that the loan was missing certain documents. Upon receiving such documents from the Seller, the loan would be approved. If a loan was "suspended" with conditions, it meant that the loan

6

ABK-EMC03479911

CONFIDENTIAL

DEXDEP00019034

was missing certain critical documents without which the loan could not be properly underwritten. Upon receipt of such documents, the loan would be re-underwritten, and if it met the applicable underwriting guidelines, it would be approved. By recommending that a loan be "declined," underwriters recommended that EMC refuse to purchase the loan from the Seller because the loan did not meet the criteria set out in EMC's underwriting guidelines. EMC's policy required that in order for an underwriter to decline a loan, the underwriter must obtain the approval of an underwriting supervisor.

### Pressures by EMC's Management on Underwriters

19. Depending on the documentation and complexity of a loan, in order to adequately underwrite a loan file an underwriter could only review approximately five to six loan files in an eight-hour workday. Underwriters who review more than five to six loan files in an eight-hour workday often fail to notice non-compliance with underwriting guidelines in loans because their focus is generally on the quantity of loans they review, rather than the quality of the underwriting. As an absolute maximum, an underwriter should review no more than ten loans per day.

20. Underwriters at EMC were regularly directed by management to underwrite up to twenty-five loan files per day. This directive also came from Bear Stearns. It was communicated by EMC's managers, including Ms. Whitlock and Ms. Gill, to EMC underwriters via email and at various weekly team meetings.

21. The pressure to review this high volume of loans typically came around the middle of the month. EMC managers, including Ms. Whitlock and Ms. Gill, were less concerned with the volume of loans that underwriters reviewed during the first fifteen days of the month. If the volume of funded loans was not on track to meet the monthly target, there was a

7

ABK-EMC03479912

CONFIDENTIAL

DEXDEP00019035

big push to quickly review loans in the latter half of the month. For example, I often heard EMC managers instruct underwriters, "quit conditioning and get these loans into funding." Managers also instructed underwriters to overlook missing documents so that they could review loans more quickly. Managers often went through a stack of loan files that were suspended for missing documents and stated, "do we really need this? No. Send it to funding." They often made such statements for loan files with missing documents.

22. Given the pressure to review a high number of loan files in a workday, it was impossible for me and other underwriters to ensure that loans submitted by Sellers complied with EMC's underwriting guidelines. Underwriters received pressure from EMC's management on a regular basis to underwrite a high number of loans per day. It was clear that EMC's management knew that in order to evaluate such a high number of loans per day, underwriters would sacrifice the quality of the underwriting.

23. Several underwriters notified EMC's management that the high quantity of loans they were being asked to review came at the expense of poor quality underwriting. For instance, in or around mid-2006, Ms. Davis drafted an "anonymous" petition complaining that underwriters were being asked to review an unacceptable number of loan files per day. I agreed with the content of Ms. Davis's petition. Even after EMC's management and human resources department became aware of the petition, the pressure to underwrite a high volume of loans in a workday continued. As a result of Ms. Davis's petition, I was asked by Ms. Gill and Ms. Whitlock on several occasions to "write up" (i.e., demerit) Ms. Davis. I refused.

24. As an underwriting supervisor, at management-level meetings, I was directed by Ms. Whitlock, Ms. Gill, and Mr. Steve Kelly to pressure underwriters to churn a high

8

ABK-EMC03479913

CONFIDENTIAL

DEXDEP00019036

volume of loans regardless of the quality of underwriting. I refused to cave to their demands, and, as a result, stepped down from my supervisory position to an underwriting position.

**Quality Control Assignment and Reasonableness of Stated Income**

25. In or around 2007, investors began complaining that many of the loans they purchased were performing poorly. In response to one investor's complaint, Mr. Steve Kelly asked me to conduct a quality control review for many of the affected loans. During the course of this review, I determined that nearly every loan was defective and uncovered a series of fraudulent documents in the loan file. In particular, one broker repeatedly submitted the same fabricated bank statement for a number of loans. Although these loans were for many different borrowers, the information on the bank statement in each of the loan files was almost exactly the same, except for the borrower's name.

26. Around the same time in 2007, EMC hired Kevin O'Connor as a quality control manager in the flow channel to address the high number of defective loans. Mr. O'Connor introduced a number of tools that underwriters could use to verify borrower information in loan files, such as Lexis/Nexis and CoreLogic. For a few months, underwriters actually used those tools when reviewing loans. EMC's management realized, however, that this slowed the pace of review and that EMC was purchasing fewer loans. As a result, Ms. Whitlock instructed underwriters that they should verify loan file information using these tools only when they suspected fraud. We were not allowed to use external sources to verify information in the loan file under any other circumstances.

27. Throughout my time at EMC, for stated income loans, underwriters were directed not to question the reasonableness of income stated on the borrower's loan application. If and when underwriters questioned the reasonableness of the stated income, we were directed

9                                                                                      ABK-EMC03479914

CONFIDENTIAL                                                           DEXDEP00019037

by EMC's management, "it's a stated income documentation loan, let it go. It's not a full doc loan." Underwriters were often directed to ignore fraud because if the borrower stopped making his or her monthly mortgage payments, EMC's quality control department was going to demand the Seller to repurchase the loan. After Mr. O'Connor introduced the new tools, underwriter were directed to only question the stated income of a loan when we could prove that the borrower or the Seller had committed fraud. However, we did not have the time to investigate fraud because we were being asked to review approximately twenty-five loan files per day.

Judy Walter

Sworn to before me this

27 day of July, 2011

Notary Public



SHAHBAZ KHAN
Notary Public, State of Texas
My Commission Expires
April 14, 2015

CONFIDENTIAL                                                                                   DEXDEP00019038