# EXHIBIT 122

Page 1

1

2    - - - - - - - - - - - - - - - - - - - - - - -x

3            UNITED STATES OF AMERICA

4        FINANCIAL CRISIS INQUIRY COMMISSION

5

6

7            Official Transcript

8

9         Interview of Mary Haggerty

10            August 17, 2010

11

12

13

14

15   APPEARING ON BEHALF OF THE FCIC:

16       VICTOR CUNICELLI

17       THOMAS KREBS

18       THOMAS BORGERS (TELEPHONICALLY)

19       MINA SIMHAI (TELEPHONICALLY)

20   - - - - - - - - - - - - - - - - - - - - - -x

21

22

23

24

25

PLAINTIFF'S
EXHIBIT NO. 140
FOR IDENTIFICATION
DATE 12/19/12  RPTR: MJ

Page 2

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2           MR. CUNICELLI:  This is Victor

3   Cunicelli of the Financial Crisis Inquiry

4   Commission.  Today's date is August 17,

5   2010.  The time is approximately 11 a.m.

6           I'm accompanied by Tom Krebs of the

7   FCIC and Tom Borgers telephonically, and

8   Mary Haggerty of J.P.Morgan and several

9   Paul Weiss attorneys.

10          We are at the offices of Paul Weiss,

11  New York, for the interview of Ms.

12  Haggerty.  This interview will be

13  recorded with the consent of Ms.

14  Haggerty.

15          Could I please get your verbal

16  assent for the record?

17          MS. HAGGERTY:  Yes, I agree.

18          MR. CUNICELLI:  Okay, great.

19          Will everyone please state your full

20  name and affiliation for the record?  And

21  please spell your last name for the

22  transcriptionist.  I'll start.

23          Cunicelli is C-U-N-I-C-E-L-L-I.

24          MR. KREBS:  Tom Krebs, K-R-E-B-S,

25  FCIC.

Page 3

1  FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        MS. HAGGERTY:  Mary Haggerty,

3  H-A-G-G-E-R-T-Y, J.P.Morgan Securities,

4  Inc.

5        MS. CAREY:  Jessica Carey,

6  C-A-R-E-Y, Paul Weiss.

7        MS. JENS:  Linda Jens, J-E-N-S,

8  JPMorgan Chase.

9        MR. GOLDSTEIN:  Eric Goldstein,

10  G-O-L-D-S-T-E-I-N, Paul Weiss.

11        MR. PATERSON:  Paul Paterson,

12  P-A-T-E-R-S-O-N, Paul Weiss.

13        MR. CUNICELLI:  Okay.

14        In the way of background, Ms.

15  Haggerty, the FCIC was established by

16  statute, Public Law 111-21, and signed

17  into law by the President.  It is

18  bipartisan and consists of ten

19  commissioners.  It is charged with

20  examining the causes of the financial

21  crisis and collapse or near collapse of

22  major domestic financial institutions.

23        The commission is charged with

24  composing a report of findings to the

25  President and Congress by December 15,

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         2010.

3              The commission may compel attendance

4         and testimony of witnesses and production

5         of records.

6              I can provide a copy of the statute

7         by which the commission was formed if you

8         so desire.

9              Be advised the FCIC is an agency of

10        the United States and FCIC staff are

11        federal employees under the aegis of 18

12        Unites States Code Section 1001

13        concerning false statements.

14             If -- at all times, if you mention a

15        proper name, a last name, if you could

16        spell it the first time you mention it.

17        If not, we'll try and -- try and remind

18        you throughout.  And just make sure that

19        all your responses are verbal, audible --

20             MS. HAGGERTY:  Okay.

21             MR. CUNICELLI:  -- and you should be

22        good to go.

23             MS. HAGGERTY:  Okay.

24             MR. KREBS:  Mary, thank you for

25        coming in this morning.  I really

Page 5

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       appreciate it.

3           Could you give us a little of your

4   background, please?

5           MS. HAGGERTY:  Sure.  I graduated

6   from college in 1982.  I went to State

7   University of New York at Albany and got

8   a Bachelor's degree in accounting.  Went

9   to work for Arthur Young, which is one of

10  the Big Eight public accounting firms.

11  And in 1985, went to work at Bear

12  Stearns.

13          Initially, in their back office, I

14  did the operational side of their initial

15  mortgage conduit that they operated in

16  the '80s.  Left the firm in beginning of

17  1989 to move to Cleveland, Ohio, and

18  worked for a small firm there for three

19  years.  And in '92, came back to New York

20  and back to Bear Stearns, where I worked

21  in the mortgage-backed securities

22  department until the merger with

23  J.P.Morgan.

24          At the merger with J.P.Morgan, I

25  transferred to JPMSI, the structured

Page 6

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        products group, also working in the

3        mortgage department.  And then in March

4        of this year, transferred within

5        structured products to another division

6        that manages the firm's principal

7        investments in delinquent tax liens.

8            MR. KREBS:  Who was your immediate

9        supervisor at Bear Stearns while you were

10       with the mortgage-backed securities

11       department?

12           MS. HAGGERTY:  It changed from time

13       to time, but it was Tom Marano, who we

14       just spoke about, and Jeff Verschleiser.

15           MR. KREBS:  What was your job there,

16       at the mortgage-backed securities

17       department?  What were you doing for Tom?

18       Or --

19           MS. HAGGERTY:  I did a number of

20       different things during my tenure there.

21       So when I first started again, the second

22       time in 1992, I was in the home loan

23       securitization group, which was

24       responsible for securitizing one-to-four

25       family residential mortgage loans.  I

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       continued in that position and became co-

3       head of that group in 1996.

4           And then in 2001, my job

5       responsibilities shifted when Tom Marano

6       asked me to start up and manage a

7       mortgage conduit.

8           MR. KREBS:  What was that mortgage

9       conduit?

10          MS. HAGGERTY:  It was an operation

11      by which a subsidiary of the Bear Stearns

12      Companies, called EMC Mortgage, would buy

13      whole loans -- one-to-four family

14      residential mortgage loans -- from

15      sellers of, and originators of, these

16      loans and securitize them into mortgages.

17      And to mortgage-backed securities, sorry.

18          MR. KREBS:  And ultimately, were

19      those mortgages to be securitized?

20          MS. HAGGERTY:  Yes.

21          MR. KREBS:  How did you go about

22      acquiring mortgages for securitization

23      purposes?

24          MS. HAGGERTY:  Well, there's a lot

25      of steps to that.

Page 8

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2           The firm employed salespeople that

3       would maintain relationships with the

4       originators of the mortgages.  So one

5       step is to find out who is creating them

6       and talk to them about selling them to

7       you.

8           The other thing that you would do to

9       go about doing that is just create the

10      parameters under which you would buy the

11      loans.  And so the trading desk would

12      work on that, along with the mortgage

13      securitization group.

14          MR. KREBS:  Did you buy these

15      securities in pools or did you buy them

16      individually?

17          MS. HAGGERTY:  Earlier on, we bought

18      the loans in pools.  And then the -- in

19      2001 is when we started -- actually, it

20      was in 2002 when we bought the first

21      ones.  But we built the operation within

22      EMC to buy individual loans, one by one.

23          MR. KREBS:  Ultimately, what did you

24      do with those loans that were acquired by

25      EMC, that had been acquired one by one?

Page 9

1  FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        MS. HAGGERTY:  They also were

3  securitized.

4        MR. KREBS:  Who was in the charge of

5  the securitization and who did -- with

6  whom did you work at the securitization

7  desk?

8        MS. HAGGERTY:  The co-head with me

9  of the securitization group was Baron

10  Silverstein, S-I-L-V-E-R-S-T-E-I-N.

11        MR. KREBS:  Was it Baron?

12        MS. HAGGERTY:  Yeah.  Baron, like

13  Snoopy and the Red.  B-A-R-O-N.

14        MR. KREBS:  Which loan originators

15  did you utilize to acquire these loans?

16        MS. HAGGERTY:  There were more than

17  a hundred of them.  Between 1- and 200, I

18  think.  And they ranged in size from

19  small originators to large ones like

20  Countrywide and Wells Fargo.

21        MR. KREBS:  I imagine this was a

22  relatively smaller part of the mortgage

23  market when you're looking at one-to-

24  fours or -- is that what you said --

25  family.

Page 10

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2           MS. HAGGERTY:  One-to-four family

3   products secured the loans, yeah.

4           MR. KREBS:  I imagine it was a much

5   small -- was it a much smaller group than

6   was in the mortgage industry generally?

7           MS. HAGGERTY:  Well, I think the

8   largest part of the industry would sell

9   to Fannie and Freddie.  Yeah, so this was

10  what we would call non-agency.

11          MS. CAREY:  Did somebody just join

12  on the line?

13          MS. SIMHAI:  Yes.  Yes, this is Mina

14  Simhai with the Financial Crisis Inquiry

15  Commission.

16          MR. KREBS:  Can you describe for us

17  the methodology that you used to acquire

18  loans from those originators?  Would you

19  take bids?  How would you do it?

20          MS. HAGGERTY:  Okay.  There were two

21  basic business lines.  And I would

22  describe one as flow and the other as

23  bulk.

24          So we'll start with bulk.  Bulk is a

25  situation where the originator aggregates

Page 11

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       a certain number of mortgage loans for

3       sale.  And it could be anywhere from a

4       million dollars' worth of mortgage loans

5       to a billion dollars' worth of mortgage

6       loans.  Again, depending on the size of

7       the originator and their capacity to

8       aggregate these and hold them for sale.

9           And so what an originator that was

10      selling bulk would typically do is have

11      relationships with several investors.

12      And they would send, typically, an Excel

13      spreadsheet that listed the loans that

14      they were offering and then certain

15      attributes about each of the loans,

16      things like the original balance, the

17      property type, the interest rate, what

18      kind of a loan was it, meaning was it

19      fixed-rate or adjustable.  Those types of

20      things.  And --

21          MR. KREBS:  Is this what's called

22      the tape?

23          MS. HAGGERTY:  Yes --

24          MR. KREBS:  Okay.

25          MS. HAGGERTY:  -- except they're not

Page 12

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        tapes anymore; they're Excel

3        spreadsheets --

4            MR. KREBS:  (Indiscernible).

5            MS. HAGGERTY:  -- but yes, the tape.

6        And so they would send the tape out

7        and -- to several different investors.

8        And they would say we'd like bids on this

9        by a certain date.  And the investors --

10        potential investors would bid and the

11        originator would make a selection and

12        award the bid.

13            MR. KREBS:  In connection with the

14        bid --

15            MS. HAGGERTY:  Um-hum.

16            MR. KREBS:  -- was the -- was it

17        contemplated that a sample would be done

18        for due diligence purposes?

19            MS. HAGGERTY:  Yes.  And it was --

20        would either be a sample or every single

21        loan would be looked at.

22            MR. KREBS:  Did the bid

23        oftentimes -- or ever specify the size of

24        the sample to be taken in connection with

25        the submission of a bid?

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       MS. HAGGERTY:  What we typically did

3   at Bear was a commitment letter that

4   would go out within, say, twenty-four

5   hours of a trade.  And in that commitment

6   letter, we would typically specify due

7   diligence.  And I -- it's hard for me to

8   remember exactly, but it would make sense

9   to me that at least in some

10  circumstances, at the time of the bid, we

11  would say what -- how much diligence we

12  were going to do, meaning the percentage

13  of the pools that would be looked at.

14      MR. KREBS:  Did the material

15  submitted by the originator also contain

16  reps and warranties or were those

17  negotiated later?

18      MS. HAGGERTY:  The reps and

19  warranties would be negotiated later,

20  typically, in the mortgage loan purchase

21  agreement.  And then oftentimes, a master

22  mortgage loan purchase agreement could be

23  entered into between EMC and a seller.

24  And then if you have subsequent trades,

25  they would be settled via a term sheet.

Page 14

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2            So you use those same reps and

3   warranties, same agreement, and then the

4   term sheet would just specify whatever

5   was different for that particular trade.

6        MR. KREBS:  Was EMC also involved in

7   the origination business or was it merely

8   a conduit for Bear Stearns securitization

9   process?

10        MS. HAGGERTY:  EMC was a purchaser

11   and seller of loans; EMC did not

12   originate itself.

13        MR. KREBS:  Did EMC have,

14   internally, its own underwriting

15   guidelines?

16        MS. HAGGERTY:  EMC did publish a set

17   of guidelines, yes.

18        MR. KREBS:  And those guidelines

19   were available to anybody who wanted to

20   submit a bid to EMC so they knew

21   beforehand what your standards are?

22        MS. HAGGERTY:  The guidelines were

23   available to anybody that wanted to have

24   them.  People could submit bids or we

25   would bid on product if the -- the seller

Page 15

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       was approved by EMC.

3           MR. KREBS:  Did those underwriting

4       guidelines change?

5           MS. HAGGERTY:  Yes.

6           MR. KREBS:  Did they change between

7       2005 and 2006?  But I'm not going to let

8       you guess; I'm just going ahead to look

9       right here.

10          Here, this will help.  We'll use

11      this as Exhibit Number 1.

12          MS. HAGGERTY:  Thank you.

13          MR. KREBS:  This appears to be a

14      subprime credit profile.  And you'll

15      notice it's revised at the top on 1 --

16      5/1 of '05.  And it says -- on the right-

17      hand side, it says "date of last change

18      to credit profile was 5/18 of '05".  I

19      think --

20          MS. HAGGERTY:  Um-hum.

21          MR. KREBS:  -- is that -- I'm not

22      sure I'm reading that correctly --

23      revised 5/1/05 -- or 5/18/05.  So that

24      indicates there was at least one that was

25      different than the one we're looking at

Page 16

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        now in existence before this date.  Is

3        that correct?

4             MS. HAGGERTY:  Well, this is a

5        document that looks like it was prepared

6        by Clayton.  Is that right?

7             MR. KREBS:  Um-hum.

8             MS. HAGGERTY:  Okay, I've not seen

9        this document, to my recollection.  So

10       let's take a look at it.

11            MR. KREBS:  Well -- yes, go -- the

12       right hand.  Look at it if you'd like.

13       But I'm going to ask you some questions

14       about it.

15            MS. HAGGERTY:  Okay.

16            MR. KREBS:  You'll see under the top

17       heading, says "client-specific rejects".

18            MS. HAGGERTY:  Okay.

19            MR. KREBS:  That means loans that

20       the client, meaning EMC Bear, would not

21       accept, is that correct?

22            MS. HAGGERTY:  It appears to be the

23       case, yeah.

24            MR. KREBS:  And it says "unless you

25       advise us to the contrary", we would

Page 17

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2   review -- "should we review loans to the

3   seller's guidelines".  Now, what seller

4   are they talking about at that point?

5        That would be the loan originator --

6   origination firm?

7        MS. HAGGERTY:  I would assume so.  I

8   mean, I'm guessing a little bit just

9   because I haven't seen this document

10  before, but --

11       MR. KREBS:  Okay.

12       MS. HAGGERTY:  -- but that would

13  make sense to me.  Seller would be

14  whoever's selling to Clayton's client,

15  who's EMC.

16       MR. KREBS:  Are you familiar with

17  Clayton's ranking of loans?

18       MS. HAGGERTY:  I'm familiar with a

19  result of 1, 2 or 3 --

20       MR. KREBS:  Okay.

21       MS. HAGGERTY:  -- for both credit

22  and compliance.

23       MR. KREBS:  Are you familiar with a

24  term called 2W?

25       MS. HAGGERTY:  No.

Page 18

1  FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010
2          MR. KREBS:  Well, you will be before
3      the day is out.
4          MS. HAGGERTY:  Okay.
5          UNIDENTIFIED FEMALE SPEAKER:  Sounds
6      ominous.
7          MR. KREBS:  Well, I mean it's no
8      secret.  And it's been published widely.
9      It's just that they were 1, 2 or 3.  1 is
10     accept; 2 is okay, maybe it's not
11     perfect, but it has compensating factors;
12     and 3 is reject.
13         But what happens is when you get to
14     the 3s, oftentimes the purchaser waives
15     any prior constraints and they -- they
16     rank them as 2W, that's all.
17         But what I'm trying to get at here
18     is, if you look at the first bullet point
19     under the heading at the top that says
20     "DTI" --
21         MS. HAGGERTY:  Um-hum.
22         MR. KREBS:  -- and that's debt to
23     income?
24         MS. HAGGERTY:  Yes --
25         MR. KREBS:  And if you look --

Page 19

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        MS. HAGGERTY:  -- typically, debt-

3   to-income ratio.

4        MR. KREBS:  -- and if you look over

5   here to the right, it says Clayton

6   default is "EV-3 greater than sixty", is

7   that right?

8        MS. HAGGERTY:  That's what it says,

9   yes.

10        MR. KREBS:  But Bear-EMC preferences

11   are EV-3 greater than fifty-five.

12        Now, I -- I believe that EV means

13   event value -- or event 3, meaning it's a

14   reject.  If it is over fifty-five on the

15   DTI, it's to be rejected.

16        MS. HAGGERTY:  I believe that's what

17   it means, too.

18        MR. KREBS:  All right.  Are you

19   familiar with those?  Are you familiar

20   with the underwriting standards that were

21   in play -- or in place then at Bear

22   Stearns, do you recall?  And EMC during

23   2005/2006.

24        MS. HAGGERTY:  I was at the time,

25   and so my recollection for what they may

Page 20

1  FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       have been, specifically, back then, as I

3       sit here today, I -- I don't have a great

4       recall.

5           MR. KREBS:  Go down the other, to

6       the credit score.  You see it's three

7       bullet points down?

8           MS. HAGGERTY:  Yes.

9           MR. KREBS:  And it says "EV-3 less

10      than 500".

11          MS. HAGGERTY:  Yes.

12          MR. KREBS:  But over here, it says

13      "depends on bid stips".  What are bid

14      stips?

15          MS. HAGGERTY:  When an originator

16      puts the pool out -- a bulk pool out for

17      bid --

18          MR. KREBS:  Uh-huh.

19          MS. HAGGERTY:  -- they may say -- or

20      they would -- I'm sorry, the credit score

21      would be one of those attributes that I

22      described.  So when EMC would bid that,

23      they bid the pool to the originator, they

24      may make a list of stipulations that goes

25      with that bid.

Page 21

1  FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       So one of them might be we won't

3  accept anything with a credit score less

4  than 520, or it may be we wouldn't accept

5  anything with a credit score less than

6  500 or 600 or whatever it might be.

7       So that's what this would mean to

8  me; that, on an individual trade basis,

9  the instruction to Clayton would be for

10  the minimum credit score, take a look at

11  the terms of that particular deal.

12      MR. KREBS:  That particular bid stip

13  that accompanied this particular due

14  diligence review?

15      MS. HAGGERTY:  Correct.

16      MR. KREBS:  What were other

17  variables that Bear Stearns would utilize

18  in connection with bid stips?  Do you

19  recall?  LTVs, CLTVs?

20      MS. HAGGERTY:  Anything that was a

21  loan-level attribute could be considered

22  a bid stip, insofar as the originator or

23  the seller is presenting that data --

24      MR. KREBS:  Um-hum.

25      MS. HAGGERTY:  -- and EMC is making

Page 22

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         its bid based on that data.

3              So if there was a, you know, an LTV

4         of ninety-five percent on that tape, EMC

5         is saying, by accepting the -- or making

6         a bid, that that's okay.

7              Sometimes, EMC or the trader may

8         have created a set of bid stips that went

9         in contradiction.  So they may have --

10        the bid stip may have said maximum of

11        ninety, even if there was a ninety-five

12        on the tape.  So yes, LTV would certainly

13        be one, maximum loan amount might be one.

14        Those are the -- the types of things that

15        come to mind (indiscernible) --

16             MR. KREBS:  Well, in fact, if you

17        look here, down about the sixth bullet

18        point, it says "LTVs or CLTVs over one

19        hundred percent".  The Clayton default

20        would be to accept it, but the response

21        here is it looks like Bear Stearns would

22        say reject it unless otherwise specified.

23             MS. HAGGERTY:  I'm, frankly,

24        surprised to see Clayton accept that.

25        That is unusual -- was unusual at the

Page 23

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       time in the industry.

3           MR. KREBS:  What about negative am

4   loans, which are two lines down from

5   there?

6           MS. HAGGERTY:  Neg am loans were a

7   specific product type that you typically

8   did not see in subprime.  So it -- it's a

9   subprime credit profile.  Again, I'm

10  surprise to see neg am along with

11  subprime.

12          MR. KREBS:  Going down to cash-out

13  purchases --

14          MS. HAGGERTY:  Um-hum.

15          MR. KREBS:  -- do you see that?  EV-

16  3 is a Clayton default, but the answer --

17  the -- Bear EMC preferences are to ask

18  Bear Stearns underwriting -- I guess

19  that's what that means, UW?

20          MS. HAGGERTY:  Yes, that's what I

21  would assume it means.

22          Cash-out purchase.  That's unusual.

23          MR. KREBS:  Yeah.

24          MS. HAGGERTY:  Cash-out refi is

25  usual.  Cash-out purchase, I'm not

Page 24

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010
2        familiar with.
3             MR. KREBS:  Would there be a series
4        of bid stips or -- were your bid stips
5        standard, at least with respect to
6        subprime credit debt, do you recall?
7             MS. HAGGERTY:  I don't recall, but I
8        would say that, certainly, things change
9        from time to time.
10            MR. KREBS:  Do you recall having
11       seen or actually eyeballed a series of
12       bid stips with respect to the credit --
13       subprime credit?
14            MS. HAGGERTY:  As I sit here today,
15       no.  I will tell you, back then, I'm sure
16       I did look at them, but as I sit here
17       today, I just don't recall.
18            MR. KREBS:  Well, if I understand
19       you that the invitation to bid is
20       received and it -- and is accompanied
21       with a tape and underwriting standards,
22       and your response to that would be we
23       will buy it under -- or we would like to
24       make a bid under these conditions, which
25       may or may not be acceptable to the

Page 25

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        originator.  And among those conditions

3        was the bid stips, is that right?

4             MS. HAGGERTY:  Yes.

5             MR. KREBS:  Were reps and warranties

6        from your side also part of that?

7             MS. HAGGERTY:  Yes.  The bids were

8        always subject to the negotiation of the

9        mortgage loan purchase agreement.

10            MR. KREBS:  When were the reps and

11       warranties negotiated?  Were they at the

12       front end or the back end, or at the

13       front end and amended at the back end,

14       depending on the due diligence review?

15            MS. HAGGERTY:  They were never

16       amended depending on the due diligence

17       review.  The reps were the reps.  And the

18       way I like to do the business is

19       negotiate them up front before you even

20       have a trade, because then everybody

21       knows how we're engaging, we know how the

22       trade is going to work.  And you don't

23       want to do a trade and then have things

24       that might cause you to not settle.

25            MR. KREBS:  Um-hum.

Page 26

1  FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2          MS. HAGGERTY:  So the more of the

3      standard documentation or the

4      documentation required to close you can

5      do up front, the better.

6          So typically, you know, I always

7      advocated that let's get all the reps and

8      warranties negotiated up front, but it

9      didn't always work that way.  Sometimes

10     we did a trade and then negotiated the

11     mortgage loan purchase agreement prior to

12     settlement.

13         MR. KREBS:  The trade, of course,

14     wasn't completed until such time as the

15     due diligence had been completed, is that

16     right?

17         MS. HAGGERTY:  Typically, yes.

18         MR. KREBS:  What were the factors

19     involved in the contingent purchase of

20     this pool?  Can you tell me?

21         MS. HAGGERTY:  The factors in the --

22         MR. KREBS:  Yeah, I mean what --

23     what was it that was contingent?  Was it

24     the reps and warranties had to be signed,

25     we had to make certain that certain

Page 27

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       percentage of loans were -- you didn't

3       have X percent reject -- rejected loans.

4       What were -- what were the

5       (indiscernible)?

6           MS. HAGGERTY:  Okay, sure.  Yes, the

7       mortgage loan purchase agreement had to

8       be negotiated and finalized and signed

9       off on.

10          With respect to the due diligence,

11      typically what we did at Bear Stearns is,

12      in subprime, and it -- and the due

13      diligence protocols varied by product.

14      So would you like to talk about subprime

15      specifically?

16          MR. KREBS:  Sure.  I mean let's do

17      subprime and then we'll come back to

18      others --

19          MS. HAGGERTY:  Okay.

20          MR. KREBS:  -- and find out how

21      different they were.

22          MS. HAGGERTY:  For subprime, we --

23      best of my recollection, we did a hundred

24      percent due diligence.  We looked at

25      every loan for credit -- what we called

Page 28

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         credit -- which would have been a desk

3         review of the loan file to see if it

4         conformed with the agreed-upon

5         underwriting guidelines.  There would be

6         a compliance review.  There would be a

7         data review, meaning that the -- the

8         loan-level information provided on the

9         tape -- or the Excel spreadsheet --

10        matched the documents in the loan file.

11             MR. KREBS:  Um-hum.

12             MS. HAGGERTY:  And then for

13        subprime, I believe we also did some sort

14        of review of the appraised value of the

15        property.  And I -- I don't recall, as

16        we're sitting here, if those were -- if

17        we did BPOs or AVMs or drive-bys.  I just

18        don't recall what we did.

19             MR. KREBS:  So you did credit -- you

20        did compliance as well --

21             MS. HAGGERTY:  Yes.

22             MR. KREBS:  -- made sure -- and then

23        you did valuation.

24             MS. HAGGERTY:  I believe we did, on

25        subprime.

Page 29

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2           MS. SIMHAI:  When you said that you

3   review to see if they matched to your

4   agreed underwriting guidelines, what --

5   what was the agreed underline --

6   underwriting guidelines?  Meaning, were

7   they the guidelines of the originator,

8   were they Bear Stearns' specific

9   guidelines?

10          MS. HAGGERTY:  They were both.  What

11  we did at EMC was we would review the

12  originator's guidelines and approve them.

13  We would either approve them as they were

14  or we would approve them and say except

15  for these three things, your guidelines

16  are acceptable.

17          And oftentimes, what that really was

18  tantamount to was comparing the

19  originator's guidelines to an EMC

20  guideline and highlighting the

21  difference.  So in some cases, we were

22  using the originator's guidelines, and

23  then in other cases, we used the

24  originator's as modified to match EMC's

25  guidelines.

Page 30

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2           MR. KREBS:  How were those

3   modifications transmitted to the due

4   diligence third party provider?

5           MS. HAGGERTY:  They should have been

6   provided by Pattie Sears or John

7   Mongelluzzo, as the due diligence

8   managers.  And Pattie Sears is S-E-A-R-S

9   and John Mongelluzzo is

10  M-O-N-G-E-L-L-U-Z-Z-O.

11          MR. KREBS:  Were Pattie and John

12  responsible for affecting liaison with a

13  lead person from Clayton?

14          MS. HAGGERTY:  Yes.

15          MR. KREBS:  Would they attend

16  offsite reviews with Clayton?

17          MS. HAGGERTY:  Typically not.

18          MR. KREBS:  How was it they would

19  communicate?  That is, the due diligence

20  results.  How would they be transmitted

21  back to Pattie and John?

22          MS. HAGGERTY:  I don't have direct

23  knowledge of that, but I believe that it

24  would be via e-mail.  And I also believe

25  they would have spoken on the phone

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         throughout the engagement.

3              MR. KREBS:  Were the responses to

4         the bids -- we've heard them described as

5         overlays or as tolerances.  Do you have

6         any knowledge of the use of those terms

7         with respect to the originator's

8         guidelines -- underwriting guidelines?

9              MS. HAGGERTY:  Overlays?

10             MR. KREBS:  Uh-huh.

11             MS. HAGGERTY:  I think overlays --

12        and again, I'm guessing, depending on who

13        used the term.  But as an industry term,

14        it would make sense to me that overlay

15        was what I just kind of described --

16             MR. KREBS:  Um-hum.

17             MS. HAGGERTY:  -- where you're

18        comparing the originator's guidelines

19        that they use to make the loans with,

20        say, your own guidelines and what's

21        different.

22             Just, as an example, let's say that

23        the originator would to a ninety-five LTV

24        to some loan amount, and you would only

25        want to take a ninety-five LTV to a lower

Page 32

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2          loan amount.  So you might say I accept

3          your guidelines, originator, except that

4          I'll only go to this loan amount for that

5          LTV.

6              MR. KREBS:  So is it -- is it your

7          impression that the materials provided as

8          an overlay -- we'll use that as a term of

9          ours -- were, perhaps, more stringent

10         than the guidelines from the originator?

11             MS. HAGGERTY:  I would say by

12         definition, they should be.  Because if

13         the originators were less -- if the

14         originator's guidelines were more

15         conservative, let's say, than the

16         investor's, there would be no reason to

17         do an overlay, because by definition,

18         that originator's guidelines would be

19         will within the investor's guideline.

20             MR. KREBS:  That's all that I have

21         on that document.

22             What I'm going to show you is going

23         to be marked as Exhibit Number 2 to your

24         testimony.  And that is Clayton -- you're

25         familiar with Clayton, obviously.

Page 33

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2          MS. HAGGERTY:  Yes.

3          MR. KREBS:  And did you use them as

4   a due diligence firm in connection with

5   preparing or reviewing loans in

6   connection with securitizations?

7          MS. HAGGERTY:  We used Clayton as a

8   due diligence firm in connection with

9   purchasing bulk packages of whole loans,

10  yes.

11         MR. KREBS:  All right.  This is a

12  document.  It's actually page 2 of the

13  document.  And there's Bear EMC, and if

14  you'll look at the middle line where it

15  says "final rejection rate" --

16         MS. HAGGERTY:  Um-hum.

17         MR. KREBS:  -- you see that?

18         MS. HAGGERTY:  Yeah.

19         MR. KREBS:  Do you see where the

20  total Bear EMC final rejection rate is?

21  You see that that is a nine percent?

22         MS. HAGGERTY:  I see nine percent,

23  yes.

24         MR. KREBS:  Do you know what waivers

25  are?

Page 34

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2           MS. HAGGERTY:  I know what waivers

3       are in the context of Fannie Mae.

4           MR. KREBS:  Okay.  Do you know

5       whether or not a waiver in this context

6       means that, notwithstanding that a loan

7       was ranked as 3, that on forty-two

8       percent of those loans ranked as 3, Bear

9       Stearns EMC waived them in an accepted

10      those loans?

11          MS. HAGGERTY:  I don't know what

12      waiver means on this document.

13          MR. KREBS:  Well, we have another

14      one that defines it --

15          MS. HAGGERTY:  Okay.

16          MR. KREBS:  -- all right?

17          MS. HAGGERTY:  Sure.

18          MR. KREBS:  Now, is it your -- I

19      understood that you -- you say that

20      Clayton did one hundred -- or you did one

21      hundred percent due diligence on the

22      loans, is that right?

23          MS. HAGGERTY:  I think what I said

24      is that, typically for subprime, it was

25      our practice to do a hundred percent

Page 35

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1
2       diligence, yes.
3            MR. KREBS:  Are you saying -- do you
4       believe, then, that for the first quarter
5       of 2006 through the second quarter of
6       2007, that Bear Stearns had under -- had
7       due diligence performed at only 72,379
8       loans?  That's on the line, right next to
9       the final reject.  Right?
10           MS. HAGGERTY:  I -- I don't know how
11      this document was created.  I don't know
12      what 2006-1 means, 2006-3 means.  I don't
13      know --
14           MR. KREBS:  Well I will represent to
15      you that 2006-1 is the first quarter of
16      2006 --
17           MS. HAGGERTY:  Oh, okay.
18           MR. KREBS:  -- and the second
19      quarter of 2006, and so on until you get
20      down to 2007-2, which would be the second
21      quarter of 2007.
22           MS. HAGGERTY:  Okay.
23           MR. KREBS:  And this purports to
24      be -- and we have the testimony behind
25      it -- to be an amalgamation of all the

Page 36

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         due diligence efforts done by Clayton.

3              MS. HAGGERTY:  Okay.

4              MR. KREBS:  Now, was Clayton the

5         exclusive due diligence firm employed by

6         Bear Stearns EMC?

7              MS. HAGGERTY:  No.

8              MR. KREBS:  Who else did you

9         utilize?

10             MS. HAGGERTY:  It was a company

11        called Watterson Prime that also, during

12        its tenure, was purchased by

13        PricewaterhouseCoopers --

14             MR. KREBS:  Um-hum.

15             MS. HAGGERTY:  -- so sometimes, they

16        called themselves Watterson Prime, and

17        sometimes, PwC.

18             MR. KREBS:  Did you ever use Bohan

19        Group?

20             MS. HAGGERTY:  Yes, but very early

21        on, and just for a couple of

22        transactions.

23             MR. KREBS:  Did you ever use 406

24        Partners?

25             MS. HAGGERTY:  I don't think so, no.

Page 37

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1

2          MR. KREBS:  Are you familiar with

3     them?

4          MS. HAGGERTY:  No.

5          MR. KREBS:  Okay.

6          MS. HAGGERTY:  I know them as a --

7     maybe a BPO provider, if I'm remembering

8     right.

9          MR. KREBS:  Did -- did you use any

10    other -- to your knowledge, sitting here

11    today, any other due -- third party due

12    diligence providers or vendors?

13         MS. HAGGERTY:  Yeah, I think that we

14    tried one or two transactions with a

15    company called MortgageRamp.

16         MR. KREBS:  MortgageRamp?

17         MS. HAGGERTY:  Yeah, R-A-M-P, and

18    that would have been on Alt-A.

19         And then when we talk -- when we're

20    talking about due diligence and the firms

21    that we've just named --

22         MR. KREBS:  Um-hum.

23         MS. HAGGERTY:  -- we're talking

24    about the file review.  The valuation

25    work is a separate group of vendors.

Page 38

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2           MR. KREBS:  I understand.  So if,

3       for example, you had a question about the

4       valuation or the appraisal on a home, you

5       would go to one of these firms to ask

6       them to either do a -- an automated

7       review, based on their database, or you'd

8       have them send somebody to drive by -- or

9       maybe both -- to determine the value of

10      the home.  Is that right?

11          MS. HAGGERTY:  On subprime

12      transactions, we sometimes did that, yes.

13      That was not typically done on Alt-A or

14      jumbo product.

15          MR. KREBS:  Approximately how many

16      transactions did -- if you can recall; I

17      know this may be a tough question.  How

18      many transactions did Bear Stearns engage

19      in in 2006 and through the second quarter

20      of 2007?

21          MS. HAGGERTY:  I don't recall.

22          MR. KREBS:  Did Bear Stearns have

23      its own captive origination firms?

24          MS. HAGGERTY:  Yes.

25          MR. KREBS:  Who was that?

Page 39

1  FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       MS. HAGGERTY:  It was a company

3  called Bear Stearns Residential Mortgage

4  Corp.

5       MR. KREBS:  Bear Res?

6       MS. HAGGERTY:  That's right.

7       MR. KREBS:  Yeah.

8       MS. HAGGERTY:  Bear Res.

9       MR. KREBS:  Were -- was Bear Res

10  also a provider of mortgage loans that

11  were subsequently securitized?

12       MS. HAGGERTY:  Yes.

13       MR. KREBS:  Was due diligence

14  performed by third party due diligence

15  providers on the mortgages generated by

16  Bear Res?

17       MS. HAGGERTY:  We hired staff from

18  the Clayton group to be on site at Bear

19  Res in the beginning of its operations --

20  I don't recall exactly how long they

21  stayed -- so that we could -- we could do

22  that due diligence as the loans were

23  being made, rather than wait to have a

24  whole pool.

25       So that continued for some time.

Page 40

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1    And I don't remember how long that

2    continued.

3         MR. KREBS:  Do I understand to mean

4    that you employed employees of Clayton to

5    come over and assist you -- or to conduct

6    the due diligence work for Bear Res as

7    the loans were originated?

8         MS. HAGGERTY:  Yes, in the beginning

9    of the operation.

10        MR. KREBS:  What happened -- I mean

11   was there a time when that changed?

12        MS. HAGGERTY:  Yeah, there was.  And

13   I don't recall exactly when, but there

14   was a time where the results of those --

15   that Clayton review was positive and we

16   felt that we didn't need to continue

17   that.

18        MR. KREBS:  So you had brought your

19   staff up to speed to what Clayton knew

20   and they could do it on their own?

21        MS. HAGGERTY:  The -- the team that

22   was assembled at Bear Res were very

23   seasoned mortgage originators, but yes,

24   with the -- with the startup of any, you


Page 41

1     FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         know, new origination company, you want

3         to make sure everything is running

4         smoothly.  And so that's why we did that,

5         yes.

6              MR. KREBS:  Were -- after the

7         Clayton folks departed, was due diligence

8         continued on Bear Res' mortgage loan

9         origination work?

10             MS. HAGGERTY:  No.

11             MR. KREBS:  It was not?

12             MS. HAGGERTY:  Correct.

13             MR. KREBS:  And -- and the --

14        presumably, the belief was that the

15        people who were there originating loans

16        had grown up under the developmental --

17        had been overviewed by Clayton and knew

18        what the standards were?

19             MS. HAGGERTY:  That's right.

20             MR. KREBS:  From 2003 to 2007, did

21        you ever notice a decline in the

22        underwriting standards in this industry,

23        the mortgage origination business?

24             MS. HAGGERTY:  2003 to 2007.  I

25        noticed in subprime, for example, that,

Page 42

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        over time, the maximum loan-to-value

3        ratio that was accepted increased.  That

4        comes to mind specifically.

5            And also, over time, I think in the

6        Alt-A programs, the same thing; that

7        the -- the maximum combined loan-to-value

8        ratios increased to a hundred percent,

9        over time.

10           MR. KREBS:  Did you see any

11       deterioration in the FICO score?

12           MS. HAGGERTY:  The FICO scores, I

13       would say no.  The banding for the FICO

14       scores, in terms of guidelines, my

15       recollection, it stayed pretty static.

16           Alt-A tended to be a minimum of 620

17       at the bottom, with the average around

18       680-ish.  And subprime, I think, varied,

19       depending on the originator.  I think,

20       over time, it became typical to -- to

21       institute a minimum of 500 or 520,

22       whereas, maybe prior to that, it was

23       lower.  And that had something to do, I

24       think, with the increase in the LTV.

25           MR. KREBS:  Any other areas where

Page 43

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       you saw or you observed deterioration on

3       a -- throughout an industry-wide basis?

4           MS. HAGGERTY:  The other thing that

5       developed was the continuation of the

6       reduced documentation products.  So

7       earlier on in Alt-A, you had full doc and

8       stated income --

9           MR. KREBS:  Um-hum.

10          MS. HAGGERTY:  -- and then what was

11      added over time was the no ratio product

12      and the no doc product, and the no

13      income, no asset verification product.

14          MR. KREBS:  Any others?

15          MS. HAGGERTY:  For -- in terms of

16      products themselves, a product that came

17      into the market during that time period

18      was for the neg am firms.

19          MR. KREBS:  Well, what about the

20      3/27 and the 2/28 loans?  Did you see a

21      lot of those?  When did they come into

22      play?

23          MS. HAGGERTY:  3/27s and 2/28s were

24      traditionally the adjustable-rate

25      component of subprime.  So those had

Page 44

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1  always been part of the programs for

2  subprime.

3        MR. KREBS:  On the DTI, did you use

4  the teaser?  Why did you use the ultimate

5  increase -- potential increased rate?

6        MS. HAGGERTY:  To the best of my

7  recollection, the guidelines used the

8  fully indexed rate to underwrite, to

9  qualify.

10        MR. KREBS:  What number would they

11  use?  Would they make an estimate of the

12  number?

13        MS. HAGGERTY:  An estimate of

14  income?

15        MR. KREBS:  No -- you -- you're

16  right.  You're right.  I withdraw that

17  question; I was chasing the wrong trail.

18        MR. CUNICELLI:  If I could just get

19  one second.

20        MR. KREBS:  Go.

21        MR. CUNICELLI:  The -- the 2/28s and

22  the 3/27s, they were always in -- in the

23  ARMs, but did you see an increase in

24  their use during that time, as a

Page 45

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        percentage of your portfolio?

3            MS. HAGGERTY:  I don't really

4        recall.

5            MR. CUNICELLI:  Okay.  Thanks.

6            MR. KREBS:  Did you -- did you see

7        an increase in the use of the Alt-As?

8            MS. HAGGERTY:  The volumes that we

9        bought at Bear Stearns increased from

10       2003 to 2006, yes.  Just in general,

11       across the board.

12           MR. KREBS:  When you were approached

13       by an originator wanting to sell a pool,

14       what would you do to confirm or to verify

15       that his underwriting standards were as

16       he represented them?  The due diligence

17       process, and that was it?

18           MS. HAGGERTY:  Yes.

19           MR. KREBS:  How often would you deal

20       with an originator with whom you had done

21       business before?

22           MS. HAGGERTY:  So for -- an

23       originator that sells bulk would bring

24       packages maybe every two weeks or once a

25       month, just depending on their -- on the

Page 46

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         size of their origination book and their

3         warehouse capacity.  So I -- I think it

4         really varied.

5              We certainly didn't buy every pool

6         every time.  I think at one point, during

7         the period, I just recall that we were at

8         like a twenty percent win rate, overall,

9         on the bulks that were presented.

10             MR. KREBS:  I'm not sure I

11        understand that.  Twenty percent?

12             MS. HAGGERTY:  So if -- if a hundred

13        pools --

14             MR. KREBS:  Um-hum.

15             MS. HAGGERTY:  -- were presented to

16        us over a time a period --

17             MR. KREBS:  Yes.

18             MS. HAGGERTY:  -- we won twenty of

19        them.

20             MR. KREBS:  Okay.  You -- you --

21        you --

22             MS. HAGGERTY:  And other people won

23        the other eighty.

24             MR. KREBS:  Who were your principal

25        sellers of pools?

Page 47

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2           MS. HAGGERTY:  And again, would you

3    like to focus specifically on subprime --

4           MR. KREBS:  Yeah, subprime.

5           MS. HAGGERTY:  -- or just across the

6    board.  I'm sorry --

7           MR. KREBS:  Let's just deal with

8    subprime now.

9           MS. HAGGERTY:  Okay, I'm sorry.  I

10   keep --

11          MR. KREBS:  That's all right.

12          MS. HAGGERTY:  -- talking in

13   general.

14          Subprime.

15          MR. KREBS:  And then we'll come

16   back.

17          MS. HAGGERTY:  We bought a product

18   from Encore, People's Choice,

19   MortgageIT --

20          MR. KREBS:  I'm sorry.  That was

21   what?

22          MS. HAGGERTY:  MortgageIT,

23   Ameriquest, from time to time, New

24   Century.  Those are some of the names

25   that come to mind.

Page 48

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2          MR. KREBS:  Wells Fargo Home

3   Mortgage?

4          MS. HAGGERTY:  Wells Fargo was a big

5   customer of the firm on the jumbo and

6   Alt-A side, and so we would have bid

7   their product if they presented subprime

8   to us, yes.  I don't recall how much we

9   bought of subprime from them.

10         MR. KREBS:  Quick Loan Funding?

11         MS. HAGGERTY:  Yes.

12         MR. KREBS:  Impac --

13         MS. HAGGERTY:  Yes.

14         MR. KREBS:  -- Impac Funding?

15         MS. HAGGERTY:  Yes.

16         MR. BORGERS:  Fremont Investment &

17   Loan?

18         MS. HAGGERTY:  Yes, we bought from

19   Fremont.

20         MR. KREBS:  Comm Unity Linden

21   Associates (ph.)?

22         MS. HAGGERTY:  Comm Unity rings a

23   bell, yes.  Whether that was specifically

24   subprime or not --

25         MR. KREBS:  (Indiscernible) number

Page 49

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         3.

3              MS. HAGGERTY:  -- not sure.

4              MR. KREBS:  What I'm showing to you

5    is a document again, trending reports

6    generated by Clayton.  Have you seen

7    these documents before?  Trending

8    reports.

9              MS. HAGGERTY:  I don't recall this

10   document, no.

11             MR. KREBS:  Was there a point in

12   time where the Clayton folks came to and

13   met with Bear Stearns to discuss the

14   trending reports, that you're aware of?

15             MS. HAGGERTY:  I don't know.

16             MR. KREBS:  If they had come to Bear

17   Stearns to discuss the impact or the

18   findings of this trending report, who

19   would they likely have met?

20             MS. HAGGERTY:  I believe it'd be

21   likely they would've met with John

22   Mongelluzzo.

23             MR. KREBS:  And John was responsible

24   for the due diligence side?

25             MS. HAGGERTY:  Yes.

Page 50

1  FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        MR. KREBS:  And he was -- where was

3  John in the organizational chart with

4  respect to your position?

5        MS. HAGGERTY:  John worked in the

6  mortgage finance department, of which I

7  was co-head.  So he reported up to me.

8        MR. KREBS:  Were you ever made aware

9  of a meeting between Clayton and any

10  person in your operation to discuss the

11  trending reports of Clayton Brokerage?

12        MS. HAGGERTY:  I don't recall.

13        MR. KREBS:  All right.  Let me ask

14  you to look at the second page of this

15  document.

16        MS. CAREY:  Tom --

17        MR. KREBS:  Yeah.

18        MS. CAREY:  We were talking before

19  about, in the context of subprime --

20        MR. KREBS:  Yes.

21        MS. CAREY:  -- it's unclear here

22  whether this has anything to do with

23  (indiscernible) --

24        MR. KREBS:  I think this is subprime

25  as well, but I cannot represent that to

Page 51

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2   you.  I -- I do not know whether this is

3   exclusively subprime.  I do believe that

4   it -- it is based on all of the due

5   diligence done by Clayton and it is a

6   document that would have been triggered

7   by the generation of this document.

8   My -- that's my understanding.

9       You see the waivers here?  It says

10  that "Bear Stearns overall waiver rate

11  seven percent compared to Clayton

12  industry average of eleven percent for

13  all summary reviews performed by all

14  clients for the same period"?

15      MS. HAGGERTY:  Um-hum.  Yes.

16      MR. KREBS:  Did you see this, where

17  the highest waiver rate among the top

18  five sellers was found on Encore reviews,

19  while the lowest was found on Fieldstone.

20  Have you ever dealt with Fieldstone, to

21  your knowledge?

22      MS. HAGGERTY:  Fieldstone was a

23  seller to EMC, I believe.  I know that

24  EMC bid their product.

25      MR. KREBS:  Says that the most

Page 52

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       commonly waived exceptions for Encore

3       were "MA borrower interest outside safe

4       harbor, not client approved".  Do you

5       know what that means?

6           MS. HAGGERTY:  I don't.  It's

7       ringing a bell.  MA, I believe, stands

8       for Mass --

9           MR. KREBS:  You're -- you're a lot

10      more likely to know what it means than I

11      am, I'll tell you, at this point.

12          MS. HAGGERTY:  MA, I believe, stands

13      for Massachusetts.

14          MR. KREBS:  Uh-huh.

15          MS. HAGGERTY:  And the bell that

16      it's ringing is somewhere along the

17      line -- states came up with their own

18      individual high-cost lending rules in

19      addition to the national HOEPA

20      requirements.  So I recall that there was

21      something in Massachusetts.

22          And "interest outside safe harbor,

23      not client approved" must refer to that.

24      And my recollection is it wasn't clear

25      what the risk of nonenforcement was, if

Page 53

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1 you will.  So that could be what that

2 was.

3         I'm very shaky on the details, but

4 I'm just offering you what I think it

5 could be.

6         MR. KREBS:  With respect to a loan

7 that was, say, questionable -- wasn't

8 exactly in the parameters of a reject and

9 it wasn't exactly an acceptable loan --

10 what were the factors that you might have

11 considered -- or Bear Stearns at that

12 time considered in connection with

13 approving or rejecting those loans?

14         MS. HAGGERTY:  Okay.  One -- to that

15 point --

16         MR. KREBS:  Sure.

17         MS. HAGGERTY:  -- what we just

18 looked at with Massachusetts --

19         MR. KREBS:  Uh-huh.

20         MS. HAGGERTY:  -- is a compliance

21 point.

22         MR. KREBS:  Right.

23         MS. HAGGERTY:  The compliance points

24 tended to be pretty cut and dry --

Page 54

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2          MR. KREBS:  You can't -- you can't

3   waive those.

4          MS. HAGGERTY:  It is or it isn't --

5          MR. KREBS:  Yeah.

6          MS. HAGGERTY:  Right.  So the

7   compensating factor analysis, that you

8   talked about --

9          MR. KREBS:  Um-hum.

10         MS. HAGGERTY:  -- before, with the

11  2, would be on the credit side.  And so

12  if Clayton coded something as a 2, they

13  thought there was a compensating factor.

14  That could be something like the maximum

15  loan-to-value ratio for the program is

16  seventy-five percent; the originator made

17  the loan at eighty percent; but the

18  compensating factor is that the homeowner

19  has 100,000 dollars in the bank.

20         MR. KREBS:  Um-hum.

21         MS. HAGGERTY:  So that's the type of

22  thing that would be evaluated.

23         MR. KREBS:  Who is it that would

24  have made the decision to accept or

25  reject that loan, based on those

Page 55

1  FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2      circumstances you just described?

3          MS. HAGGERTY:  Well, Clayton came up

4      with the 2s --

5          MR. KREBS:  Um-hum.

6          MS. HAGGERTY:  -- so they made the

7      decision that there was enough of a

8      compensating factor in the file to call

9      it a two.

10          MR. KREBS:  Based on what they had

11      been given and what they understood the

12      underwriting guidelines were?

13          MS. HAGGERTY:  Correct.  Correct.

14          MR. KREBS:  All right.  What happens

15      when the 3s come up, the waivers?

16          MS. HAGGERTY:  Well, again, waiver

17      is -- is something -- I'm not familiar

18      with that term in -- in how we did things

19      at Bear.

20          What would typically happen with 3s

21      is that the due diligence firm should

22      present them to the seller, because

23      sometimes 3s occur just because

24      documentation is missing.

25          The other thing that we would always

Page 56

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        want to make sure is that Clayton -- the

3        Clayton reviewer wasn't missing something

4        in the file.  So it was typical to give

5        the seller the opportunity to look at the

6        3s and see if they could provide

7        additional information or point out a

8        compensating factor, let's say, to -- to

9        show the Clayton lead that this is not a

10       3; it's a 2 or it's a 1.

11            MR. KREBS:  Well, in point of fact,

12       Clayton did have a 2T, which was a -- to

13       give somebody the opportunity to bring in

14       documents that were missing from the

15       file.  That -- so that wouldn't have

16       counted as in the 2Ws that they were

17       pushing out.

18            If you look at the bottom here,

19       "exception-level waivers".  It says by

20       far, the most common waiver exception

21       laws, "loan characteristics do not match

22       any available program.  With 681 waivers,

23       representing eleven percent of all waived

24       exceptions".

25            Do you know what "that loan

Page 57

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       characteristics do not match any

3       available program" might have been?

4           MS. HAGGERTY:  I don't.  But what I

5       would say is, what it could be is -- what

6       would come to mind would be an example

7       like I just gave, the loan-to-value

8       ratio --

9           MR. KREBS:  Um-hum.

10          MS. HAGGERTY:  -- is outside of the

11      parameters and it became an acceptable

12      risk --

13          MR. KREBS:  Well if you look at the

14      next one --

15          MS. HAGGERTY:  -- to whomever was

16      evaluating it.

17          MR. KREBS:  -- the -- the next one

18      is actually the one that I'm concerned

19      about.  The most common waived exception

20      in 2007 reviews was "stated income not

21      reasonable".

22          How is it that you came -- those

23      waivers were affected?  What compensating

24      factors were there that would make income

25      that appeared not reasonable to become

Page 58

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         reasonable?  Or other compensating

3         factors.

4              And you may not know the answer to

5         that; this is not a cross-examination.  I

6         really don't know the answer to it; I'm

7         just trying to get the data.

8              MS. HAGGERTY:  Yeah, understood.

9         And -- and I think that in the case of

10        "stated income not reasonable" and, in

11        fact, I think the case of all the

12        exceptions, it's very much facts and

13        circumstances of the individual files.

14             So, for example --

15             MR. KREBS:  Yes.

16             MS. HAGGERTY:  -- it could be a

17        couple of things.

18             One thing could be that -- let's

19        say, for example, the stated income

20        resulted in a debt-to-income ratio of

21        twenty-five percent and Clayton says that

22        stated income is not reasonable.  But an

23        income that was reasonable resulted in a

24        debt-to-income ratio of forty percent,

25        which was still within the acceptable

Page 59

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        debt-to-income guidelines.  That could be

3        a reason that you would waive the Clayton

4        finding.  Again, just an example --

5            MR. KREBS:  Sure.

6            MS. HAGGERTY:  -- as a possibility.

7        Not saying that's what happened --

8            MR. KREBS:  And again --

9            MS. HAGGERTY:  -- possibility.

10            MR. KREBS:  -- the two people who

11        would have been making those decisions

12        are John and Pattie?

13            MS. HAGGERTY:  Pattie, correct.

14            MR. KREBS:  Yeah.

15            MS. HAGGERTY:  That's correct.

16            I think the other possibility that

17        something might get waived is a

18        difference of opinion between the Clayton

19        reviewer as to the reasonableness of

20        stated income, and John or Pattie.

21        That's another possibility.

22            MR. KREBS:  And -- and those

23        concerns would have been transmitted to

24        John or -- or Pattie on a daily basis

25        from the Clayton due diligence site?

Page 60

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         MS. HAGGERTY:  You know, I think it

3    varied.  I think, very frankly, Pattie

4    was more of a daily keep-up-with-it and

5    John kind of looked at stuff at the end.

6    But I think it -- I think it varied from

7    transaction to transaction.

8         MR. KREBS:  Was this essentially the

9    same process, albeit with different

10   underwriting standards that were employed

11   in other loan origination or acquisition

12   of loans by Bear Stearns for the example

13   of family -- one-to-four families?

14        MS. HAGGERTY:  For bulk purchases?

15        MR. KREBS:  Yeah.

16        MS. HAGGERTY:  Yes, this was

17   typically the way it went, I note, as a

18   very general matter.

19        MR. KREBS:  But you feel quite

20   certain that Bear, with respect to

21   subprime, did a due diligence review on a

22   hundred percent of its loans?

23        MS. HAGGERTY:  When we were the

24   purchaser?

25        MR. KREBS:  Yes.

Page 61

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       MS. HAGGERTY:  When EMC was the

3   purchaser, yes.  There may have been a

4   situation where we did less.  And that,

5   again, would have been transaction-

6   specific, but my recollection is that we

7   typically did a hundred percent on the

8   loans we purchased from third parties.

9       MR. KREBS:  That's a -- that's a

10  mystery to me.  All right.

11      MR. BORGERS:  I did have a question

12  about the due diligence on the -- who

13  developed the policy for the due

14  diligence area?

15      MS. HAGGERTY:  The policy for the

16  due diligence area was developed by John

17  and Pattie and Baron and myself, along

18  with in-house counsel at the time.

19      MR. BORGERS:  Okay.

20      MR. KREBS:  I'm just showing you

21  what we'll probably mark as Exhibit 4.

22  If you read the first paragraph here, it

23  says, "critical lead" -- and that

24  presumably means the lead person at

25  Clayton -- "to call Bear due diligence

Page 62

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       manager on first morning of job.  Leave

3       message, leave callback number and/or

4       cell number.  If you're not aware which

5       contact you should call, contact Greg

6       Quinlan" (ph.) -- or somebody -- "this is

7       mandatory".

8           So it looks like, with respect to

9       the due diligence performed by Clayton,

10      that they were under instructions at the

11      commencement of the due diligence process

12      to be in touch with people at Bear.

13          MS. HAGGERTY:  Makes sense, yes.

14          MR. KREBS:  You'll see the first

15      bullet point says "please send in the

16      data every night so that we may run the

17      daily reports early the next morning".

18      What is a daily report?  Do you know?

19          MS. HAGGERTY:  That would have been

20      internal to Clayton, I believe.

21          MR. KREBS:  You don't know whether

22      those daily reports were provided to

23      Bear?

24          MS. HAGGERTY:  I don't.  You know, a

25      certain element of what has to occur here

Page 63

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1    is just managing the nuts and bolts of

2    getting through the work --

3         MR. KREBS:  Um-hum.

4         MS. HAGGERTY:  -- and keeping the

5    transaction -- or the work done on

6    schedule.  So that may have been what

7    that was about.

8         MR. KREBS:  If you look at the third

9    bullet point here, it indicates that the

10   bid stips override all guidelines and

11   must be followed closely.  And that --

12   you've spoken about what bid stips were

13   earlier, right?

14        MS. HAGGERTY:  Um-hum.  Yes.

15        MR. KREBS:  We'll come back to that

16   document in a little bit.

17        I think we're on what, Exhibit 6?

18        MS. CAREY:  5, I think.

19        MR. KREBS:  5?

20        MR. CUNICELLI:  5.

21        MR. KREBS:  You -- this is not a

22   document created by Bear.  It's a

23   document created by Clayton, but it shows

24   that in 2005, with respect to revenue,

Page 64

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        Bear was pretty high up on the list.  As

3        a matter of fact, it was second, only

4        behind Morgan Stanley.

5             But in 2006 and 2007, in terms of

6        the revenue generated -- that is,

7        presumably the revenue provided to

8        Clayton -- it fell behind just a little

9        bit, so that, if you look at loan volumes

10       on the line below it, well, Bear is --

11       was doing, in 2005, 132,000; in 2006,

12       61,000; and in 2007, 24,000.  Does that

13       seem to be about right to you?

14            MS. HAGGERTY:  As I sit here right

15       now, I don't know.  It certainly seems

16       plausible.

17            Then again, these would be the loan

18       volumes that Clayton reviewed?

19            MR. KREBS:  Yes.

20            MS. HAGGERTY:  Yeah.

21            MR. KREBS:  Clayton reviewed.  That

22       is correct.

23            MS. HAGGERTY:  Um-hum.  Yeah.

24            MR. KREBS:  I mean these are all

25       built off of the Clayton data.

Page 65

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         MS. HAGGERTY:  So not necessarily

3    the volume of loans that Bear Stearns or

4    EMC bought or securitized; these would be

5    the ones that Clayton reviewed --

6         MR. KREBS:  These are --

7         MS. HAGGERTY:  -- across all product

8    types?

9         MR. KREBS:  Yes --

10        MS. HAGGERTY:  Um-hum.

11        MR. KREBS:  -- that -- that is

12   correct.  Now --

13        MS. HAGGERTY:  Okay.

14        MR. KREBS:  -- did -- were there

15   loans reviewed by Clayton, to your

16   knowledge, that were not subsequently

17   securitized and -- or purchased by Bear?

18        MS. HAGGERTY:  If Clayton reviewed

19   loans in a bulk purchase and Bear

20   rejected them and didn't buy them, yes.

21        MR. KREBS:  Didn't buy the whole

22   pool -- or the --

23        MS. HAGGERTY:  Or didn't --

24        MR. KREBS:  -- or loans within the

25   pool?

Page 66

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        MS. HAGGERTY:   -- or didn't buy the

3   rejects within the pool.

4        There may have been instances where

5   Bear didn't buy the pool at all.  And

6   there would also be instances where

7   Clayton may have been used to do an

8   underwriter's due diligence sample, where

9   we didn't buy the loans, but they

10  reviewed loans that were in deals that

11  Bear was just the underwriter for.

12       MR. KREBS:  I understand.

13       MS. HAGGERTY:  So that could be part

14  of these -- should be part of these

15  numbers, too.

16       MR. KREBS:  In -- in those

17  instances, how many of the loans -- what

18  percentage of the loans would have been

19  subjected to due diligence?

20       MS. HAGGERTY:  I think it varied by

21  the product type of the -- the third

22  party issuer.  But a typical rule of

23  thumb would have been ten percent --

24       MR. KREBS:  Ten percent?

25       MS. HAGGERTY:  -- of the pool.

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        Typical.

3            MR. KREBS:  And -- but with respect

4        to those loans that Bear purchased,

5        brought in its own inventory and

6        subsequently packaged and securitized

7        under its own -- or a variety of names,

8        they did a hundred percent of the due

9        diligence on those, do you think?

10           MS. HAGGERTY:  For subprime.

11           MR. KREBS:  Okay.

12       We'll take a little break.

13           MS. HAGGERTY:  Sure.

14           MR. KREBS:  And then we'll pick up

15       here in a couple of minutes, if that's

16       all right.

17           Thank you.

18           (Break)

19           MR. CUNICELLI:  All right.  I've got

20       12:13, we're back on record.

21           MR. KREBS:  Do you have any notion

22       as to what time that Bear Stearns ceased

23       its operations in connection with

24       performing due diligence for Bear Res?

25           And I'll tell you why I'm asking the

Page 68

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010
2         question.  I'm trying to determine
3         whether or not the 72,000 loans are
4         involved in the figures we have here from
5         Clayton.  Would it have been before the
6         first quarter of 2006, before Bear Res
7         was up and operational and was put in --
8         doing its own internal due diligence?
9              MS. HAGGERTY:  I think that's
10        possible, yes, because they started
11        making loans in April or May of '05 --
12             MR. KREBS:  Okay.
13             MS. HAGGERTY:  -- so that sounds
14        about right.  Again, without certainty,
15        but it sounds reasonable.
16             MR. KREBS:  What other
17        methodologies -- the purchase of -- of
18        bulk loans, the Bear Res generating
19        loans --
20             MS. HAGGERTY:  Um-hum.
21             MR. KREBS:  -- what other
22        methodologies, if any, did Bear Stearns
23        employ for the acquisition of loans,
24        mortgage loans, for its securitization
25        desk?

Page 69

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         MS. HAGGERTY:  Bear Stearns had --

3    or EMC had a channel that we called the

4    flow conduit.  And that was an operation

5    that was located in Lewisville, Texas

6    within the EMC Servicing operation.  And

7    that operation reported up to the head of

8    EMC Servicing.

9         MR. KREBS:  Well, describe to me the

10   flow conduit.

11        MS. HAGGERTY:  Flow conduit was a

12   situation where an originator would be

13   approved to sell loans to the flow

14   conduit.  And once approved to sell, that

15   originator would get a daily pricing

16   sheet.

17        Every day, for a certain period of

18   time -- call it 9 to 4, or something like

19   that -- the originator could then sell

20   loans to EMC by calling up the commitment

21   desk and registering the loans at a price

22   for delivery in thirty days or forty-five

23   days or sixty days out.  On --

24        MR. KREBS:  Let -- let me stop for

25   a -- Tom, are you still here?

Page 70

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2            MR. BORGERS:  Yes.

3            MR. KREBS:  All right, sorry.  I

4    apologize.

5            MS. HAGGERTY:  So unlike bulk --

6    with bulk, the originator offered their

7    package of loans out to a number of

8    investors and Bear Stearns or EMC could

9    choose to bid them or not bid them.

10           MR. KREBS:  Yes.

11           MS. HAGGERTY:  But for flow, as long

12   as that originator was approved and in

13   good standing, they could sell, trade,

14   all day long, based on the prices that

15   were outlined on the rate sheet --

16           MR. KREBS:  What were --

17           MS. HAGGERTY:  -- the pricing sheet.

18           MR. KREBS:  In addition to the

19   pricing sheet, were these people who

20   could sell loans to the conduit, the flow

21   conduit, were they also provided with

22   minimum standards or due diligence or

23   underwriting standards?

24           MS. HAGGERTY:  Yes.  Each flow

25   seller entered into a mortgage loan

Page 71

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       purchase agreement.  That mortgage loan

3       purchase agreement, over time, changed to

4       reference a seller guide.  The seller

5       guide contained information about how to

6       register; how to deliver loans; in

7       general, what the process for reviewing

8       loans would be at EMC's operation; in

9       general, how the settlement process would

10      work; and it included underwriting

11      guidelines.

12          The sellers also had the option to

13      submit their own underwriting guidelines

14      for approval.  And this is what I

15      described earlier, where staff at the EMC

16      flow conduit would review that seller's

17      own guidelines against EMC's --

18          MR. KREBS:  Um-hum.

19          MS. HAGGERTY:  -- and approve the

20      seller's guidelines, with certain

21      restrictions.

22          MR. KREBS:  But the due diligence

23      was performed at the flow conduit level?

24          MS. HAGGERTY:  Yes, it was performed

25      by employees of EMC.  That's correct.

Page 72

1  FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2      MR. KREBS:  Were those loans -- or

3  any other loans, whether acquired through

4  the flow conduit or through the bulk loan

5  purchases -- were they ever re-

6  underwritten?  Was there another

7  procedure that they had to go through or

8  was this the -- the procedure, the -- the

9  due diligence side of the procedure?

10      MS. HAGGERTY:  The due diligence

11  review was the procedure that we went

12  through in order to buy the loans, yes.

13      In addition to that, there was a

14  quality control review that was done on a

15  sample of the loans.  And that was done

16  after the loans were purchased by EMC.

17      MR. KREBS:  Again, that was an in-

18  house review?

19      MS. HAGGERTY:  Yes, although an

20  outsourcer was used to perform some of

21  it.  And the name of that company was

22  Advitech, A-D-V-I-T-E-K -- C-H, I

23  believe.

24      MR. KREBS:  So we have loans

25  purchased in bulk, loans generated by

Page 73

1  FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2      Bear Res and the flow conduit.  Were

3      there any other methodologies employed at

4      Bear Stearns for the acquisition of

5      mortgages that were ultimately to be

6      securitized?

7          MS. HAGGERTY:  In 2007 -- February

8      of 2007, Bear Res completed its

9      acquisition of certain of the assets of

10     Encore Credit.

11         MR. KREBS:  Not really good timing,

12     was it?  I'm sorry, that -- everybody in

13     the room knows that now, I'm sure.

14     But -- and that was February of 2007?

15         MS. HAGGERTY:  Correct.

16         MR. KREBS:  Were those loans -- did

17     they appear in -- how -- how were the

18     loans generated by Encore Credit

19     evaluated for purposes of meeting the

20     guidelines?  Were they subjected to due

21     diligence as well?

22         MS. HAGGERTY:  Prior to the

23     settlement of the asset purchase, they

24     were subjected to due diligence, yes.

25     And after that, I don't recall exactly

Page 74

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        what we did.

3            MR. KREBS:  Going back to the flow

4        conduit and the acknowledgment and the

5        underwriting guidelines contained in the

6        seller guide.  Were there also warranties

7        and representations regarding having

8        complied with the underwriting guidelines

9        by those persons who were providing loans

10       pursuant to the flow conduit?

11           MS. HAGGERTY:  The mortgage loan

12       purchase agreement had many, many reps

13       and warranties.  And, to the best of my

14       recollection, there was one that said the

15       loans are underwritten in accordance with

16       the agreed-upon guidelines.

17           MR. KREBS:  Was due diligence

18       undertaken to determine whether to put

19       back those loans or some of those loans?

20           MS. HAGGERTY:  The quality control

21       review that I spoke about --

22           MR. KREBS:  Um-hum.

23           MS. HAGGERTY:  -- that occurs post-

24       closing -- if the quality control review

25       showed a breach of the representation and

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1  warranty --

2      MR. KREBS:  Um-hum.

3      MS. HAGGERTY:  -- and that breach

4  had a material and adverse effect on the

5  loan, then the loan was to be put back to

6  the originator.  That was the standard in

7  the mortgage loan purchase agreement; the

8  breach had to have a material and adverse

9  effect on the loan.

10     MR. KREBS:  Was -- was that term

11 also employed in connection with the bulk

12 purchases?  "Material and

13 adverse" --

14     MS. HAGGERTY:  Yes.

15     MR. KREBS:  -- "effect".

16     MS. HAGGERTY:  Um-hum.

17     MR. KREBS:  Did Bear Stearns utilize

18 any warehouse lending for the acquisition

19 of mortgage loans?

20     MS. HAGGERTY:  Bear Stearns had two

21 warehouse facilities.  One was operated

22 under a company called Bear Stearns

23 Mortgage Capital Corporation and the

24 other was operated under a company called

Page 76

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       EMC Residential Mortgage Corporation.

3           The Bear Stearns Mortgage Capital

4   Corporation lines were to larger

5   originators, and they were what was

6   commonly referred to as aggregation

7   lines.

8           So, for example, a line may have

9   been extended to People's Choice such

10  that People's Choice could use that line

11  to make loans until they had enough

12  critical mass to do a securitization.

13  That was the general idea for that

14  warehouse business.

15          The one at EMC Residential was about

16  twenty or twenty-five customers.  And

17  those, with an aggregate, at the largest,

18  of about 5- or 600 million in

19  outstandings --

20          MR. KREBS:  Um-hum.

21          MS. HAGGERTY:  -- and the purpose of

22  that line was to make warehouse funds

23  available to smaller sellers who were

24  then going to sell whole loans to end

25  investors.

Page 77

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2            So two different business lines

3    within the firm.

4            MR. KREBS:  Under either line, were

5    they -- were the recipients of the

6    warehouse loaning facility obligated to

7    sell their -- or to offer their loans to

8    Bear Stearns or were they free to offer

9    them to anybody on the street?

10           MS. HAGGERTY:  They were free to

11   offer them to anybody on the street.

12           MR. KREBS:  To the extent that they

13   were offered to Bear Stearns, were they

14   also subjected to due diligence as we've

15   discussed with respect to bulk purchases?

16           MS. HAGGERTY:  Yes.  Or to the flow

17   conduit --

18           MR. KREBS:  Yes.

19           MS. HAGGERTY:  -- due diligence,

20   depending on which channel they selected.

21           MR. KREBS:  Explain that to me.  How

22   were they given an option as to which

23   channel they could select?

24           I'm -- I'm -- you've just taken a

25   right turn and I didn't follow you --

Page 78

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2              MS. HAGGERTY:  Okay.

3              MR. KREBS:  -- tell me.

4              MS. HAGGERTY:  This would relate to

5         the EMC Residential warehouse line --

6              MR. KREBS:  Uh-huh.

7              MS. HAGGERTY:  So if I am a seller

8         that has a warehouse line with EMC

9         Residential, I may be allowed to sell

10        bulk and I may also be signed up to sell

11        flow.  And the decision for an originator

12        to sell bulk or flow is really based on

13        their own risk appetite to take interest

14        rate risk.

15             MR. KREBS:  Um-hum.

16             MS. HAGGERTY:  So for flow, if I

17        make a -- a commitment to you, as a

18        homeowner, to sell you -- to do a loan

19        for you at five percent, the safest thing

20        for me to do that same exact day is to

21        sell your loan forward to somebody else.

22        So then I'm matched and I don't have any

23        risk.  And that's called a best efforts

24        commitment.

25             MR. KREBS:  Um-hum.

Page 79

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         MS. HAGGERTY:  If you don't close

3    with me, I don't have to deliver it out.

4    So for an originator, the safest thing to

5    do is to sell flow.

6         As the market heated up during that

7    time period, some originators chose to

8    bulk up and take some of that interest

9    rate risk to get more proceeds.

10        MR. BORGERS:  I -- I have a question

11   about Encore Credit.  Was that a -- which

12   side of the fence did they receive a

13   warehouse line, or could they receive it

14   under both the Bear Stearns and EMC?

15        MS. HAGGERTY:  Encore's warehouse

16   line was Bear Stearns Mortgage Capital

17   Corporation.

18        MR. BORGERS:  And do you know how

19   large of a facility that was?

20        MS. HAGGERTY:  I don't recall, no.

21        MR. KREBS:  During your tenure at

22   Bear Stearns, were there -- did there

23   come a point in time when you elected not

24   to deal with a particular loan

25   originator?

Page 80

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1
2          MS. HAGGERTY:  Yes.

3          MR. KREBS:  Who was that?

4          MS. HAGGERTY:  There were a number

5     of them.  People's Choice would have been

6     one.

7          MR. KREBS:  People's Choice?

8          MS. HAGGERTY:  Yes.

9          There was a group within the EMC

10    operation that was responsible for

11    monitoring sellers and they would make

12    the recommendations to stop doing

13    business.  So there were -- there were

14    quite a few.

15          What would happen first is we may

16    say -- or look at the performance and

17    say -- and this I recall in 2006 -- your

18    performance for a hundred percent LTV

19    product is not good; you can't sell us a

20    hundred percent LTV product anymore.

21    That happened with a company called

22    Entrust Mortgage.

23          MR. KREBS:  Entrust?

24          MS. HAGGERTY:  E-N-T-R-U-S-T, yeah.

25          And then in early 2007, there were

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         quite a few originators who were -- the

3         business relationship was terminated

4         because their capital levels fell below

5         the requirement.

6              MR. KREBS:  Why would you have

7         capital levels with the loan originators?

8         To ensure that they had the ability to

9         buy them back when you went back to them?

10             MS. HAGGERTY:  The capital levels

11        weren't that high; they were typically a

12        million dollars' tangible net worth.  But

13        that was part of the reason, yes.  I

14        think that it was a delegated

15        underwriting program.  So that was a

16        typical industry standard of capital

17        levels for delegated underwriting.

18             MR. KREBS:  What were some of the

19        other requirements of that program in

20        addition to the capital requirements?

21             MS. HAGGERTY:  As part of the

22        approval process, when a new seller

23        presented themselves, there was an

24        application that was filled out --

25             MR. KREBS:  Um-hum.

Page 82

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2              MS. HAGGERTY:   -- which gave the

3         level of experience of the principals and

4         the chief officers.  One of the other

5         requirements was that the originator be a

6         HUD-approved mortgagee.  Typically, the

7         originators would have experience with

8         mortgage insurance, although not always,

9         because certainly, in subprime, there was

10        no mortgage insurance.  The originators

11        had to have a warehouse line, they had to

12        be mortgage bankers.  And I believe that

13        we typically looked for, you know, some

14        sort of track record, either in the

15        current company or with the principals in

16        prior companies.

17             In addition, references would be

18        called, which would be, typically, other

19        investors, the warehouse banks --

20             MR. KREBS:  By "other investors",

21        you mean other investment banks?

22             MS. HAGGERTY:  Yes.

23             MR. KREBS:  People who had done

24        business with them purchasing their

25        product?

Page 83

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1

2      MS. HAGGERTY:  Correct.

3      MR. KREBS:  All right.  I'm sorry, I

4  didn't mean to interrupt you.

5      MS. HAGGERTY:  That's okay.

6      MR. KREBS:  Well, I did mean to

7  interrupt you.  But --

8      MS. HAGGERTY:  And mortgage

9  insurance companies.

10      MR. KREBS:  Okay.

11      MS. HAGGERTY:  Quality control

12  policies would be submitted and reviewed,

13  the underwriting guidelines would be

14  submitted and reviewed, and, typically,

15  that approval group would hold a

16  conference call with the operational

17  people to just discuss how loans are

18  originated, closed and funded, and then

19  just talk about logistical items with

20  respect to delivery of the files and then

21  the transfer of servicing from the

22  originator to EMC in connection with the

23  purchase.

24      MR. KREBS:  When -- when Clayton

25  departed Bear Res, we think sometime in,

Page 84

```
 1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010
 2        maybe, 2005, probably before the first
 3        quarter of 2006, how many personnel did
 4        you have devoted to underwriting in that
 5        operation?  Do you know?
 6            MS. HAGGERTY:  At Bear Res --
 7            MR. KREBS:  Yeah.
 8            MS. HAGGERTY:  I don't recall.
 9            MR. KREBS:  Yeah.  What about at
10        your flow lines?  How many folks did you
11        have there dedicated to underwriting and
12        due diligence?
13            MS. HAGGERTY:  I don't remember
14        exactly, but order of magnitude for that
15        whole operation, which would include flow
16        underwriters, maybe like eight people on
17        the commitment desk and then people that
18        would do funding reviews.  Order of
19        magnitude, around 120 people.
20            MR. KREBS:  How many of the --
21            MS. HAGGERTY:  And, again -- I'm
22        sorry, that's for all the products --
23            MR. KREBS:  For all --
24            MS. HAGGERTY:  -- not just subprime.
25            MR. KREBS:  I understand.
```

Page 85

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        MS. HAGGERTY:  For all the products.

3        MR. KREBS:  Tell us the types of

4   products, other than subprime, that you

5   engaged in the purchase of mortgages.

6        MS. HAGGERTY:  In the flow conduit,

7   there was very little subprime that came

8   through the flow conduit.  So it was

9   chiefly the Alt-A product.  Adjustable

10  rate and fixed rate Alt-A products.

11       MR. KREBS:  I'm going to ask you a

12  question that has been dogging me since I

13  started this project.  What's the

14  difference -- how do you know the

15  difference between -- when does Alt-A

16  become subprime?

17       MS. HAGGERTY:  I think that in your

18  travels, you'll probably get a lot of

19  different nuances.  And --

20       MR. KREBS:  Oh, believe me, I have.

21       MS. HAGGERTY:  -- answers.  So I'll

22  tell you what it meant to me and what it

23  meant to us at Bear.

24       A couple of things.  Some of the big

25  picture ones were, first of all, subprime

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       would be loan-to-value ratios over eighty

3       percent with no mortgage insurance.

4       That's a very large differentiator.  If

5       it was an Alt-A loan and the loan-to-

6       value ratio was over eighty percent, you

7       required mortgage insurance in most

8       cases.

9           The second thing that differentiated

10      subprime was the originator.  And by

11      that, I mean that when the originator

12      went to the marketplace to originate the

13      loans, they marketed a subprime program.

14      So if the originator was a retail

15      originator that employed loan officers to

16      talk to homeowners or they were a

17      wholesaler that employed account

18      executives to go call on brokers, they

19      were marketing a subprime product.

20          Another major differentiator between

21      subprime and Alt-A was just how the rate

22      sheet is constructed.  Alt-A rate sheet

23      starts with a base interest rate with a

24      price associated with it.  And then you

25      have a lot of different attributes that

Page 87

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010
2       impact that base rate, like is it a
3       second home or an investment property or
4       a primary residence.  Each of those, at
5       the primary being the base rate, but if
6       it's a second or investor, you might
7       change the price, which, in turn, affects
8       the interest rate.  So Alt-A was
9       categorized -- characterized by a lot of
10      these -- risk-based pricing is what we
11      called all these different attributes.
12          Typically, and this did change over
13      time, but the combined loan-to-value
14      ratio -- you didn't see first and seconds
15      in subprime as prevalently as you saw in
16      Alt-A; it was unusual to see a first and
17      second piggyback in subprime.  Subprime
18      was very much that, on the adjustable
19      rate side, that 2/28 and 3/27 product,
20      you didn't see that in Alt-A.  For Alt-A
21      the -- the ARMs would be a 3.6 LIBOR, a
22      5.6 LIBOR, 7 and 10.
23          Typically, the loan amounts, just on
24      average, tended to be smaller with
25      subprime.  But, again, the big

Page 88

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1
2    differentiator for me would be the
3    originator was offering a subprime
4    product.
5         MR. KREBS:  And what he called it,
6    you called it?
7         MS. HAGGERTY:  Well, it had these
8    other attributes.
9         MR. KREBS:  Sure.
10        MS. HAGGERTY:  And -- and, you know,
11   it was very much a way of -- of how the
12   loans were -- were priced and marketed.
13   Again, you know, this notion of the --
14   all the price adjustments on Alt-A, which
15   it didn't have that same kind of
16   granularity in subprime.
17        MR. KREBS:  So you acquire a company
18   in February of 2007.  How long had it
19   been operating prior to the acquisition?
20        MS. HAGGERTY:  I'm not a hundred
21   percent sure, but I believe it was
22   several years.  I want to say '04-ish.
23   Could have been before that, could have
24   been after that.
25        MR. KREBS:  So you've got a pipeline

Page 89

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2       of mortgages ready for -- to be

3       securitized and then, all of a sudden,

4       the market disappears.  What happens to

5       those mortgages that could not be

6       securitized?

7           MS. HAGGERTY:  Mortgages that can't

8       be securitized remain with the owner of

9       them.

10          MR. KREBS:  Do you have a notion as

11      to how many of those were on Bear

12      Stearns' books, say, September of '07?

13          MS. HAGGERTY:  I don't, as I sit

14      here today.

15          MR. KREBS:  Was there a point in

16      time where you saw the market turn, where

17      you knew there was no longer a market in

18      the securitization for RMBS, mortgage-

19      backed securities?

20          MS. HAGGERTY:  I think that the --

21      the team at Bear Stearns, yes, saw that.

22      I mean the team at Bear Stearns was

23      talking to the investor base daily and --

24      and certainly saw that.

25          MR. KREBS:  When was that?

Page 90

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2         MS. HAGGERTY:  Some time throughout

3    2007.  I -- I can't tell you with --

4         MR. KREBS:  Before --

5         MS. HAGGERTY:  -- specificity.

6         MR. KREBS:  -- BSAM crashed on 7/31

7    of '07?

8         MS. HAGGERTY:  There was a lot of

9    activity in the market -- or -- I don't

10   know if volatility's the right word, but

11   there was a lot happening in March,

12   April, May in general in the Alt-A

13   markets.  So as I sit here today, exactly

14   what happened -- what happened when, I

15   can't tell you.

16        MR. KREBS:  Do you have a -- a

17   knowledge of how much or how often Bear

18   Stearns was going to the market with RMBS

19   or mortgage-backed securities during that

20   time frame?  Had it resulted in a trickle

21   of offerings or was it a number of them

22   attempted to get ready to -- to move?

23   What -- what happened during that period

24   of time when it was all this volatility

25   in the market with respect to the

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2  securitizations?

3      MS. HAGGERTY:  I don't want to

4  answer because I don't remember exactly.

5  I'm sorry.

6      MR. KREBS:  Is it fair to say that

7  there came a point in time in 2007 when

8  you realized this deal is over?

9      MS. HAGGERTY:  Well, it was

10  certainly the volume started to come down

11  and there was less demand.  Yes, that

12  occurred during that springtime into the

13  summer, yes.

14      MR. KREBS:  With respect to that

15  springtime and summer, what did you do --

16  you and -- and -- with the loans that had

17  been -- or then being originated at Bear

18  Res and your new acquired company and

19  your flow channels, what were you doing

20  with those?

21      MS. HAGGERTY:  One thing that we

22  were doing during that time period is

23  reducing the number that we bought.  And

24  during that time period, we were also

25  reducing the types of loans that we

Page 92

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1    bought.   Meaning, I believe, sometime
2    during those time periods, we stopped
3    buying the no income verification loans
4    and the no ratio loans.   At some point
5    during that time period, we stopped
6    buying the negative amortization loans.
7    Again, I can't tell you exactly what
8    products when, but there was a lot of
9    activity with respect to reducing the --
10   the variety of the offering.
11        MR. KREBS:   You just used a term
12   that I -- I'm not familiar with.   Maybe
13   my colleagues are.   No ratio loans, what
14   does that mean?
15        MS. HAGGERTY:   No ratio is a -- a
16   documentation type description, like full
17   doc or stated income or -- or no
18   documentation.   And they -- you would
19   typically, in a no ratio, verified asset,
20   verify liquid assets, but you would not
21   only not verify income, you would not
22   require the borrower to state the income.
23   And because they're not stating the
24   income, you can't calculate a debt-to-

Page 93

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1
2    income ratio.  So hence the name.
3        MR. KREBS:  When did those loans
4    come into being?
5        MS. HAGGERTY:  I -- I don't remember
6    exactly when.  Somewhere --
7        MR. KREBS:  Presumably sometime
8    before.
9        MS. HAGGERTY:  -- in that period --
10   that time period, the '03 to '07 time
11   period.  Somewhere along that line.
12       MR. KREBS:  Was it -- did there come
13   a point in time at Bear Stearns where,
14   following the volatility in the market,
15   following the fact that we want to cut
16   back on our purchases, that we began to
17   intensify our efforts to put loans back
18   to originators?
19       MS. HAGGERTY:  There was a group at
20   EMC whose job it was to put loans back to
21   originators.  Loans went back to
22   originators for two reasons.
23       The first reason was in the mortgage
24   loan purchase agreement between EMC and
25   the sellers, it was -- typically, the

Page 94

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2        sellers made a covenant that if one of

3        the first, second or third payments due

4        to EMC after the loan was sold to EMC

5        became delinquent, EMC had the right to

6        put that loan back to the originator.

7        Sometimes they did and sometimes they

8        didn't.

9             A reason that they wouldn't would

10       typically be if the delinquency was

11       caused by some sort of servicing transfer

12       confusion on the part of the borrower

13       that then righted itself.  So the

14       borrower sent the payment to the old

15       mortgage company, they should have sent

16       it to EMC, the old mortgage company

17       forwards it to EMC, gets there late, it

18       shows as a delinquency; those types of

19       things, EMC would typically not put back

20       to the originator.

21            MR. KREBS:  Um-hum.

22            MS. HAGGERTY:  But if it was, you

23       know, a true default, EMC would seek to

24       do that.

25            The second reason that EMC would put

1   FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2      a loan back to an originator is if they

3      had done a quality control review and

4      found a breach of a rep and warranty that

5      materially and adversely impacted the

6      loan.  And that would be a basis for

7      putting the loan back.

8        MR. KREBS:  What were the common

9      breaches of reps and warranties that were

10     experienced during this period of time?

11        MS. HAGGERTY:  Let's see.

12       I think what -- what one would

13     typically see would be things like the

14     appraised value of the property was

15     misstated.  It could be that the borrower

16     represented that they were going to be

17     the primary residence and it was, in

18     fact, an investor property, it was

19     discovered.

20       Another thing that occurred over

21     time was that the borrowers would not

22     disclose all their debts.  So what we

23     would see, from time to time, was a

24     borrower might buy five properties on the

25     same day --

1    FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2          MR. KREBS:  Yeah.

3          MS. HAGGERTY:  -- get them financed

4    by five different lenders and not tell

5    each other that they had all this

6    indebtedness.

7          So those would be the type of things

8    that you could discover later.

9          MR. KREBS:  Presumably, you're not

10   buying all five of those loans.

11         MS. HAGGERTY:  Correct.  You're not.

12         MR. KREBS:  You're -- you're buying

13   just the one and then you discover the

14   existence of the other four?

15         MS. HAGGERTY:  Yeah.

16         MR. KREBS:  Who was doing the due

17   diligence in connection with these put-

18   backs at that time?

19         MS. HAGGERTY:  The quality control

20   group at EMC.  And, as I said earlier,

21   some of those reviews were done by

22   employees of EMC and some of the reviews

23   were outsourced to Advitech.  And there

24   may have been other outsource companies,

25   but Advitech was the major one.

Page 97

1  FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2      MR. KREBS:  When it came to offering

3  RMBS mortgage-backed securities, would

4  all of these methods that you have

5  described of acquiring loans, would they

6  funnel those loans into the package of

7  loans that were to be securitized?

8      MS. HAGGERTY:  Typically, yes.

9      MR. KREBS:  So we could -- you

10  couldn't count on just one methodology

11  unless that was -- well, how -- how --

12  how could you -- how can you distinguish,

13  based on any records that we have -- have

14  shown you, whether or not Bear was just a

15  underwriter, a pure underwriter, and not

16  a seller as well as an underwriter?  I

17  don't suppose that there is a method that

18  we could go back in and determine which

19  one of the underwritings done -- I mean

20  the due diligence done by Clayton and

21  other due diligence firms was done in

22  connection with the underwriting for

23  another seller.

24      MS. HAGGERTY:  Well, presumable,

25  Clayton should have that data, because

Page 98

FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

1    when they were engaged, they should

2    presumably know that.  You know, whether

3    or not they kept it at that level or not,

4    I don't know.

5         You know, the other thing that we

6    don't know from the Clayton reports is

7    the product mix.  I mean some of these

8    could be jumbo-A products that we bought

9    from Wells Fargo or Countrywide.  And --

10   and we did quite a bit of that in the

11   adjustable rate markets.

12        MR. KREBS:  It may very well be that

13   we have the ability to go back and find

14   that.  I will get in touch with you in

15   the event that I do.

16        How are these mortgages packaged and

17   securitized?  How are they sold to

18   investors?

19        MS. HAGGERTY:  Bear Stearns and EMC

20   had a number of different shelf names

21   that they use to create the securities.

22   And it was -- the shelves were pretty

23   much arranged by general product type.

24   So there might be one shelf that was used

Page 99

1  FCIC INTERVIEW OF MARY HAGGERTY - 08/17/2010

2      to securitize subprime.  There would be a

3      shelf or a number of shelf designations

4      used to securitize an offer: adjustable

5      rate jumbo, fixed rate jumbo, adjustable

6      rate Alt-A, fixed rate Alt-A, second

7      liens, home equity lines of credit,

8      scratch and dent product.  So there were

9      a number of different shelf designations

10      that were really a way of kind of

11      segregating the different product types

12      to be pooled and securitized.

13          MR. KREBS:  Were any of them -- is

14      it your understanding they were also

15      unregistered offerings, as opposed to

16      144A offerings?

17          MS. HAGGERTY:  There may have been

18      144A from time to time, but I believe,

19      primarily, they were SEC shelf

20      registrations.

21          MR. KREBS:  Now, you -- did you have

22      anything to do with meeting with and

23      consulting with the rating agencies in

24      connection with these offerings?

25          MS. HAGGERTY:  Earlier in my career,